# BP EXHIBIT  3

<pre>
 1                IN THE UNITED STATES BANKRUPTCY COURT

 2               FOR THE SOUTHERN DISTRICT OF TEXAS

 3                        HOUSTON DIVISION

 4  IN RE:                    §     CASE NO. 20-33948-11
                              §     JOINTLY ADMINISTERED
 5                            §     HOUSTON, TEXAS
    FIELDWOOD ENERGY LLC,     §     MONDAY,
 6                            §     JUNE 21, 2021
            DEBTOR.           §     8:00 A.M. TO 8:22 P.M.
 7

 8            CONFIRMATION HEARING DAY ONE (VIA ZOOM)

 9         BEFORE THE HONORABLE MARVIN ISGUR
              UNITED STATES BANKRUPTCY JUDGE
10

11

12      APPEARANCES:                    SEE NEXT PAGE

13

14      (Recorded via CourtSpeak; No log notes)

15

16

17

18

19

20                TRANSCRIPTION SERVICE BY:

21         JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                 935 Eldridge Road, #144
22               Sugar Land, TX 77478
                    281-277-5325
23             www.judicialtranscribers.com

24
    Proceedings recorded by electronic sound recording;
25      transcript produced by transcription service.
</pre>

```
1                        APPEARANCES (VIA ZOOM):

2

3   FOR THE DEBTOR:                WEIL GOTSHAL & MANGES, LLP
                                   Alfredo Perez, Esq.
4                                  Clifford Carlson, Esq.
                                   Erin Choi, Esq.
5                                  Paul Genender, Esq.
                                   700 Louisiana, Ste. 1700
6                                  Houston, TX  77002
                                   713-546-5040
7

8   FOR AD HOC GROUP OF
    SECURED LENDERS:               DAVIS POLK & WARDWELL, LLP
9                                  Damian S. Schaible, Esq.
                                   450 Lexington Avenue
10                                 New York, NY  10017
                                   212-450-4580
11

12  FOR HUNT OIL COMPANY:          BAKER BOTTS, LLP
                                   Kevin Chiu, Esq.
13                                 2001 Ross Avenue
                                   Dallas, TX 75201
14                                 214-953-6612

15  FOR OFFICIAL COMMITTEE OF
    UNSECURED CREDITORS:           STROOCK & STROOCK & LAVAN, LLP
16                                 Kenneth Pasquale, Esq.
                                   180 Maiden Lane
17                                 New York, NY  10038-4982
                                   212-806-5400
18

19  FOR U.S. DEPARTMENT
    OF THE INTERIOR:               U.S DEPARTMENT OF JUSTICE
20                                 Zachary Balasko, Esq.
                                   Matt Barr, Esq.
21                                 PO Box 875
                                   Washington, DC 20044
22                                 202-514-7162

23

24

25
```

```
 1                  APPEARANCES (CONT'D - VIA ZOOM):

 2
     FOR ASPEN AMERICAN INSURANCE
 3   COMPANY, BERKLEY INSURANCE
     COMPANY, EVEREST REINSURANCE
 4   COMPANY, AND SIRIUS AMERICA
     INSURANCE COMPANY:              CHIESA SHAHINIAN GIANTOMASI
 5                                   Scott Zuber, Esq.
                                     Darren Grzyb, Esq.
 6                                   One Boland Dr
                                     West Orange, NJ 07052
 7                                   973-530-2046

 8                                   HUSCH BLACKWELL
                                     Randall A. Rios, Esq.
 9                                   Timothy A. Million, Esq.
                                     600 Travis Street, Ste. 2350
10                                   Houston, TX  77002
                                     713-647-6800
11
12   FOR BP EXPLORATION AND
     PRODUCTION INC.:                GREENBERG TRAURIG, LLP
13                                   Shari Heyen, Esq.
                                     Karl Burrer, Esq.
14                                   Craig Duewall, Esq.
                                     John Hutton, Esq.
15                                   1000 Louisiana St., Ste. 100
                                     Houston, TX 77002
16                                   713-374-3612

17
18   FOR ENERGY TRANSFER:           KATTEN MUCHIN ROSENMAN, LLP
                                     Yelena E. Archiyan, Esq.
19                                   2121 N. Pearl St.
                                     Dallas, TX  75201
20                                   214-765-3600

21
22   FOR LEXON INSURANCE COMPANY:   HARRIS BEACH, PLLC
                                     Lee Woodard, Esq.
23                                   333 West Washington St.
                                     Syracuse, NY  13202
24                                   315-632-4125

25
```

```
 1                    APPEARANCES (CONT'D - VIA ZOOM):

 2

 3   FOR PHILADELPHIA INSURANCE
     COMPANY:                        MANIER & HEROD
 4                                   Robert W. Miller, Esq.
                                     1201 Demonbreun St., Ste. 900
 5                                   Nashville, TN  37203
                                     615-244-0030
 6

 7   FOR XTO OFFSHORE, HHE ENERGY
     COMPANY AND XLT, LLC:           FORSHEY PROSTOCK, LLP
 8                                   Suzanne K. Rosen, Esq.
                                     777 Main Street, Ste. 1550
 9                                   Fort Worth, TX  76102
                                     817-877-8855
10

11   FOR ECOPETROL AMERICA:          SQUIRE PATTON BOGGS (US) LLP
                                     Kelly Singer, Esq.
12                                   1 E. Washington St., Ste. 2700
                                     Phoenix, AZ  85004
13                                   602-528-4099

14

15   FOR RIDGEWOOD KATMAI &
     ILX PROSPECT:                   SIDLEY AUSTIN, LLP
16                                   Michael Fishel, Esq.
                                     1000 Louisiana St., Ste. 5900
17                                   Houston, TX  77002
                                     713-495-4645
18

19   FOR ZURICH AMERICAN INSURANCE
     COMPANY AND SEITEL DATA
20   LIMITED:                        CLARK HILL, PLC
                                     Duane J. Brescia, Esq.
21                                   720 Brazos St., Ste. 700
                                     Austin, TX  78701
22                                   512-499-3647

23

24

25
```

```
 1                  APPEARANCES (CONT'D - VIA ZOOM):

 2

 3   FOR RLI INSURANCE COMPANY:     KREBS FARLEY & DRY, PLLC
                                    Elliot Scharfenberg, Esq.
 4                                  400 Poydras St., Ste. 2500
                                    New Orleans, LA  70130
 5                                  504-299-3583

 6

 7   FOR MARATHON OIL COMPANY:      BONDS ELLIS EPPICH SCHAFER
                                    JONES, LLP
 8                                  Clay M. Taylor, Esq.
                                    420 Throckmorton St.
 9                                  Suite 1000
                                    Fort Worth, TX  76202
10

11   FOR COX ENTITIES:             LOCKE LORD, LLP
                                    Michael Kind, Esq.
12                                  111 South Wacker Drive
                                    Suite 4100
13                                  Chicago, IL  60606
                                    312-201-2392
14

15
     FOR LLOG EXPLORATION AND
16   LLOG ENERGY:                   GEIGER LABORDE & LAPEROUSE,
                                    LLC
17                                  John E.W. Baay, II, Esq.
                                    701 Poydras Street
18                                  Suite 4800
                                    New Orleans, LA
19                                  504-654-1302

20

21   FOR HOUSTON ENERGY DEEPWATER
     VENTURES I, LLC AND RED
22   WILLOW OFFSHORE, LLC:          LAW OFFICES OF BARNET B.
                                    SKELTON, JR.
23                                  Barnet B. Skelton, Jr., Esq.
                                    815 Walker St., Ste. 1502
24                                  Houston, TX  77002

25
```

```
 1                    APPEARANCES (CONT'D - VIA ZOOM):

 2

 3   FOR NORTH AMERICA SPECIALTY
     INSURANCE COMPANY:              LAW OFFICES OF T. SCOTT LEO PC
 4                                   T. Scott Leo, Esq.
                                     100 N. LaSalle St., Ste. 514
 5                                   Chicago, IL  60602
                                     312-857-0910
 6

 7   FOR HESS CORPORATION:           REED SMITH, LLP
                                     Omar J. Alaniz, Esq.
 8                                   2850 N. Harwood Street
                                     Suite 1500
 9                                   Dallas, TX  75201
                                     469-680-4200
10
     FOR TRAVELERS CASUALTY,
11   LIBERTY MUTUAL INSURANCE
     CO., HANOVER INSURANCE CO.,
12   AND XL SPECIALTY;              LANGLEY, LLP
                                    Keith A. Langley, Esq.
13                                  PO Box 94075
                                    Southlake, TX  76092
14                                  214-722-7162

15   FOR FREEPORT MCMORAN,
     MCMORAN OIL AND GAS, LLC,
16   CONOCO PHILLIPS COMPANY,
     AND MERIT ENERGY:             LOCKE LORD, LLP
17                                 Omer F. Kuebel, III, Esq.
                                   601 Poydras Street, Ste. 2660
18                                 New Orleans, LA  70130
                                   504-558-5155
19

20   FOR GENESIS ENERGY, LP:       ZABEL FREEMAN LAW FIRM
                                   Thomas A. Zabel, Esq.
21                                 1135 Heights Blvd.
                                   Houston, TX  77008
22                                 713-802-9117

23                                 HOWLEY LAW FIRM, PLLC
                                   Tom A. Howley, Esq.
24                                 711 Louisiana St.
                                   Houston, TX  77002
25
```

1                    APPEARANCES (CONT'D - VIA ZOOM):

2

3   FOR CGG SERVICES (US), INC.:   FROST BROWN TODD
                                   Mark Platt, Esq.
4                                  2101 Cedar Springs Road
                                   Suite 900
5                                  Dallas, TX  75201
                                   214-580-5852
6

7
    FOR VALERO MARKETING AND
8   SUPPLY COMPANY:               DYKEMA GOSSETT
                                  Deborah Williamson, Esq.
9                                 112 E. Pecan Street
                                  St. 1800
10                                San Antonio, TX  78205
                                  210-554-5500
11

12  FOR JX NIPPON OIL
    EXPLORATION, LTD:             CARVER DARDEN
13                                Leann Moses, Esq.
                                  1100 Poydras Street
14                                New Orleans, LA  70163
                                  504-585-3830
15

16  FOR BRIAN CLOYD, ANDREW
    LUIS, AND PATRICK BURNETT:    CAIN & SKARNULIS, PLLC
17                                Taylor Romero, Esq.
                                  400 W. 15th St., Ste. 900
18                                Austin, TX  78701
                                  512-477-5000
19

20

21

22

23

24  (Please also see Electronic Appearances.)

25

```
 1                              INDEX

 2   OPENING STATEMENTS:
       By Mr. Perez              13
 3     By Mr. Schaible           23
       By Mr. Chiu               27
 4     By Mr. Pasquale           29
       By Mr. Balasko            30
 5     By Mr. Zuber              33
       By Ms. Heyen              44
 6     By Mr. Burrer             53
       By Mr. Eisenberg          58
 7     By Ms. Archiyan           65
       By Mr. Woodard            66
 8     By Mr. Grzyb              73
       By Mr. Miller             74
 9     By Ms. Rosen              75
       By Mr. Singer             76
10     By Mr. Fishel             78
       By Mr. Brescia            79
11     By Mr. Scharfenberg       82
       By Mr. Taylor             84
12     By Mr. Kind               85
       By Mr. Baay               87
13     By Mr. Skelton            88
       By Mr. Leo                88
14     By Mr. Alaniz             96
       By Mr. Langley            97
15     By Mr. Kuebel             98
       By Mr. Zabel             103
16     By Mr. Platt             105
       By Ms. Williamson        106
17     By Ms. Moses             106
       By Ms. Romero            107
18
```

| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| MICHAEL DANE | | | | |
| By Mr. Perez | 117 | . | . | . |
| By Mr. Woodward | . | 208 | . | . |
| By Mr. Duewall | . | 218 | . | . |
| By Mr. Alaniz | . | 273 | . | . |
| By Mr. Kuebel | . | 288 | . | . |
| By Mr. Eisenberg | . | 297 | . | . |
| By Mr. Baay | . | 307 | . | . |
| By Ms. Hayden | . | 325 | . | . |

1                          INDEX (CONT'D)

2

3    EXHIBITS:                          Received

4    Exhibit 1155                          116
     Exhibit 108, ECF 1646-3               138
5
     BP Exhibit 5 to 23                    229
6    BP Exhibit 25 to 35                   229

7    LLOG Exhibit 1603-1 and 1603-2        309
     LLOG Exhibit 1603-4 and 1603-6        309
8    LLOG Exhibit 1603-8 and 1603-21       310
     LLOG Exhibit 1603-25 and 1603-41      311
9
     XH Exhibit 1665-15 and 1665-16        325
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      HOUSTON, TEXAS; MONDAY, JUNE 21, 2021; 8:00 A.M.

2          THE COURT:  All right.  Good morning, we're here

3  for the Confirmation Hearing, and a couple of other matters,

4  in the Fieldwood Energy case.  It's 20-33948, appearances

5  have been made electronically.  If you haven't yet made your

6  electronic appearance, at some point this morning, please go

7  to my home page, you'll find a link in order to make you're

8  electronic appearance.

9          I know that we have various matters concerning

10  exhibits and other issues today.  But we're going to start

11  with opening statements.  Let me get whoever is going to

12  make the opening statement for the lead proponent, which I

13  assume is the Debtor, to go ahead and press five-star on

14  your phone.  We'll then allow anyone else that wishes to

15  make an opening statement, in favor of confirmation, to make

16  their opening statement and then we'll take those that

17  oppose.

18          From 713-546-5271.

19          MR. PEREZ:  Good morning, Your Honor.  Alfredo

20  Perez on behalf of the Debtors.  Can you hear me?

21          THE COURT:  I can, Mr. Perez, good morning.

22          MR. PEREZ:  Good morning.  Would you mind giving

23  Mr. Carlson the ability to put the slides on the screen?

24          THE COURT:  Of course.

25          All right.  Mr. Carlson, you're enabled.

1          Mr. Carlson, if you will unclick "use presenter

2   view," we'll see the full screen I think.  It's up in the

3   top middle.  There's a little check box right below the --

4   it's in the gray area, under monitors.  Down.  Down to the

5   left.  Left.  Down.  Nope.  Way up.  In the gray area, not

6   the red area.  Now over.  Go over to the left in the gray

7   area, you see where it says, "Use presenter view."  You're

8   in the white area, I'm talking the gray area.  Up in the

9   menu section gray, left, down a little bit.  There you ought

10  to see it right there.

11         There's a checkbox "use presenter view."  About

12  one inch below where your pointer is.  Yep.  Okay.  Now

13  press five-star -- F5 and it will go.

14      (Pause in the proceedings.)

15         MR. PEREZ:  Well, Your Honor, I think we've maxed

16  out Mr. Carlson's technology capabilities once again, so if

17  we could --

18         THE COURT:  Sure.

19         MR. PEREZ:  -- if we could just go-forward --

20         THE COURT:  Sure.  Let's go.

21         MR. PEREZ:  -- that might do it.

22         THE COURT:  Let's go.

23         MR. PEREZ:  All right.  Apologize.

24         So Your Honor, thank you for seeing us.  I think

25  we're here in a good -- we're in a good place.  And I'd like

1  to start by saying that we didn't waste the time over the

2  weekend that we had to start, and I think we've made

3  significant progress with respect to some of the remaining

4  outstanding issues.  We haven't resolved them all, but I do

5  believe that, as a result of the work that's been done over

6  the last three days, hopefully we will significantly narrow

7  the issues in dispute during this Confirmation Hearing and

8  move forward.

9        We are still in the process of documenting many of

10  the agreements that have been reached over the weekend and

11  so obviously we're going to need to work through that.

12  Hopefully, that will happen during the course of the

13  morning, but I think everybody has been working diligently

14  over the weekend and late last night, through the night, to

15  be able to -- to get to a place where we have a

16  significantly -- and I mean, significantly more agreement

17  than we had, had we started on Friday.

18        So, Your Honor, I believe Mr. Carlson is getting a

19  helper here to help him do this.

20        THE COURT:  The good news is we have until

21  4:00 o'clock and then only probably a fairly short

22  interruption.  So we'll get this done.  We'll get this done.

23  Let's just take our time, we'll get it right.

24        MR. PEREZ:  All right.  I'll tell you what, could

25  we make -- well, let's just go-forward.

1        Okay.  So turn to the next page, please.

2             OPENING STATEMENT ON BEHALF OF DEBTORS

3        MR. PEREZ:  All right.  So Your Honor, our Plan

4   really is a combination of transactions that has three main

5   objectives.  One, is to the safe and orderly decommissioning

6   of all of Fieldwood's assets and at no cost to the taxpayer.

7   Number two, to preserve the deepwater business with over a

8   thousand jobs, you know, employing probably a group of

9   people that have done more P&A in the Gulf of Mexico than

10  anyone else, and as a result -- and keeping and maximizing

11  the value for our stakeholders.

12       Your Honor, the Plan has significant support.  It

13  has support from the, you know, our first lien, first out

14  lenders, our first lien term loan lenders with whom we did

15  the RSA and have substantial consent rights over a lot of

16  the Plan documents.  Third, it has support of the second

17  lien term loan, which is, YOU KNOW, about half a billion

18  dollars' worth.  And the three funded debt element at the

19  top of the structure total of approximately in excess of a

20  billion dollars -- A billion eight, I'm sorry.

21       Can we go back a page?

22       We also have the support of the Creditors

23  Committee and significant support from trade creditors who

24  have supported the business while it's been in bankruptcy

25  and will continue to support the business on a go-forward

1   basis.

2          Additionally, Your Honor, we have the support and

3   have entered into transactions with multiple predecessors

4   including Apache, Chevron, Eni and Hunt and let me digress

5   here for a minute.

6          On Friday, one of the sureties, referred to as

7   "NAS," I think North American Specialty, filed a lawsuit in

8   federal court basically alleging that as a result of Chevron

9   and Eni entering into these transactions that we -- that

10  they are in violation of their bonds and therefore, their

11  bonds should be discharged if you will.  We are filing later

12  this morning a declaratory judgment action, we think this is

13  both a stay violation and it creates -- it creates

14  significant issues that are -- basically they filed an

15  objection making all these arguments and then they filed a

16  lawsuit in federal court.  So we'll address that in due

17  course, during the course of the day.

18          It also -- it also has the support of US Specialty

19  Lines, one of Mr. Eisenberg's clients who is providing

20  additional surety bonding availability to Credit Bid NewCo.

21  Furthermore, Your Honor, and I'm sure you'll hear from the

22  Government themselves, they are not objecting to the Plan.

23  We're still -- you know, they still want to make sure that

24  the Confirmation Order embodies all of the requests that

25  they've made, but they will not be objecting to the Plan.

1        And then, Your Honor, what has taken us the most

2   time during the weekend is we've had very, very productive

3   discussions with the four Apache sureties that support the

4   approximately $498 million in LCs and letters of -- in LCs

5   and bonds.  And we think that we have an agreement with them

6   in principle that we're in the process of documenting that

7   agreement would -- once it's kind of -- it's finalized would

8   remove the objections that were filed by Everest,

9   Philadelphia, HCCI, and Zurich to the Plan and in particular

10  to the -- you know, to Fieldwood One and many of the items

11  associated with Fieldwood One.  And hopefully we'll get that

12  documented and that will significantly streamline the

13  presentation of the testimony during the case.

14        So if you'll turn to the next page?

15        Your Honor, and I apologize it is kind of small if

16  you can't see it.  But in essence what this does is it shows

17  kind of what the structure is, what the various transactions

18  are, and, you know, we take our shelf assets with Fieldwood

19  de Mexico and the deepwater assets.  The deepwater assets

20  are primarily going to Credit Bid Purchaser in connection

21  with a sale transaction as is Fieldwood de Mexico.  There

22  are certain specified shelf assets that are also going to

23  Credit Bid Purchaser.  And then the balance of the shelf

24  assets are going into Fieldwood One, which is the Apache

25  legacy assets.  And then Fieldwood Three, which is going to

1   independently plug and abandon certain assets for which

2   there is no financially responsible predecessor.  In

3   addition to that, it's also doing work that was requested by

4   the Government with respect to certain other assets.

5          You have Fieldwood Four, which is the legacy

6   Chevron assets, and then you have the remaining abandoned

7   assets.  And with respect to the remaining abandoned assets,

8   Your Honor, we have deals in place with Eni and Hunt.  And

9   so that leaves really three primary predecessors: BP, XTO

10  which is Exxon, and Hess -- and I'll say something about

11  them later.

12         Your Honor, if you turn to the next page, this is

13  the slide that we have been working on.  So we think we've

14  solved for 91 percent.  There's about 9 percent left.  The

15  bulk --

16         If you go to the next page.

17         -- Your Honor, approximately 4 of that 90 -- of

18  that 9 percent, approximately 4 is BP, approximately 2 is

19  Hess, 1 is XTO, and the other ones are actually smaller ones

20  all around.

21         XTO, Your Honor, we work with extensively.  They

22  are in kind of a unique position in that they likely have

23  more bonding coverage than they have exposure under their --

24  under their potential decommissioning skills.  They are --

25  so, Your Honor, they are -- we've worked with them to make

1  sure that all their rights are preserved in the Plan and
2  that their ability rides through.
3          And, Your Honor, the one thing I would mention
4  that, of the remaining predecessors, these are all certainly
5  financially responsible individuals and -- they are
6  financially responsible individuals and they are all under
7  the CFR jointly and separately liable for the commissioning
8  -- for the commission obligations that accrue during their
9  ownership, Your Honor.
10         As it relates to the proposals that we've made to
11 the Government, they're primarily embodied in Section 5.13
12 of the Plan, Exhibit A to the Plan, as well as paragraphs
13 99, 100, 101, 102, 103 in the Confirmation Order.
14         With respect to that remaining 9 percent, Your
15 Honor, we proposed to enter into a Transition Services
16 Agreement, you know, for up to a period of 9 months where we
17 will, in essence, safeguard the assets and conduct the
18 day-to-day operational and monitoring services, maintain
19 certain standards, respond in the event that there is a
20 response needed, and do this for a period of 9 months at our
21 cost.  You know, without any cost to the Government and
22 while they issue orders for the predecessors to begin
23 decommissioning.
24         In addition, Your Honor, a little earlier in the
25 year, we had actually entered into what we refer to as the

1   "Agreed Activities" with the -- with BSEE, pursuant to which

2   we would in essence conduct certain work that was needed in

3   order to go ahead and create egress and fix certain

4   safety-related instances of non-compliance.  And that work

5   is well underway and we're going forward.

6            Your Honor, if you turn to the next page, you look

7   at Fieldwood One.  The purpose of Fieldwood One is to plug

8   and abandon and then decommission the legacy Apache

9   property.  That's what it's -- that's what it's LLC

10   agreement says, and that entity will be wound down after it

11   conducts all of the -- you know, all of the -- production

12   ceases and all of the plug and abandonment and

13   decommissioning of the legacy assets are done.  This is an

14   entity that its sole purpose is to maximize its cash flow so

15   that it can effectively and safely decommission the Apache

16   assets on a go-forward basis.  And Your Honor, as the Court

17   knows, that's about 60-plus percent of all of our ARO.

18            If you go to the next page, Your Honor, the --

19   Fieldwood One will have one employee.  That employee is John

20   Graham.  He retired from Apache last year, you know, well

21   before this opportunity came up.  He has 43 years'

22   experience in the oil and gas industry, he was head of HS&E,

23   and he's managed a workforce and led certain parts of the

24   business that have had significant production and

25   significant employees.

1           In addition, Your Honor, he is a -- he is a

2     reservoir engineer.  Mr. Graham will serve kind of as an

3     independent fiduciary to carry out the objectives of

4     Fieldwood One.

5           Initially, Your Honor, the Credit Bid Purchaser

6     will enter into a Transition Services Agreement, pursuant to

7     which the work will be performed, and Mr. Graham will have

8     the ability to bid out the Contract Services Agreement in

9     order to make sure that the cash flow for this entity is

10    maximized.

11          Your Honor, Apache does have certain consent

12    rights under the LLC agreement and in essence the consent

13    rights relate to the -- you know, ensuring that the

14    objectives of Fieldwood One are, in fact, carried out.  I

15    think that it's in essence what you would call negative

16    control, to make sure that Fieldwood One doesn't do

17    something that isn't within its scope.

18          You go to the next page, Your Honor.

19          We believe the evidence will show that none of the

20    surety's rights are impaired as a result of this --

21          THE COURT:  Mr. Perez, let me --

22          MR. PEREZ:  -- and hopefully, Your Honor --

23          THE COURT:  Let me ask you.  I thought you had

24    indicated earlier that the Apache sureties were now on

25    board.

1          MR. PEREZ:  Right.

2          THE COURT:  Are we going to end up crossing the

3   bridge of the slide we're on, or are you telling me we now

4   have sort of a consensus that this slide is accurate?

5          MR. PEREZ:  Yeah.  I think, Your Honor, we have a

6   consensus that this slide will probably be --

7          THE COURT:  Uncontested basically?

8          MR. PEREZ:  -- it will become moot.  It will

9   become moot later in the day.

10          THE COURT:  Okay.

11          MR. PEREZ:  I'm confident, Your Honor.

12          THE COURT:  Yeah.  I still want to see it, I just

13   I was asking that, because I want to be sure I understood

14   what you told me earlier.

15          MR. PEREZ:  Yeah.  Right.  Right.  And so I'll go

16   -- let's go ahead and -- I will go through this, Your Honor.

17          And then the -- this next line shows what the

18   decommissioning collateral is, and again, hopefully this

19   will become a moot point.

20          So let's go to the next slide.

21          So focusing on Fieldwood Three, Your Honor.  The

22   purpose of Fieldwood Three is to decommission the assets.

23   The Plan Administrator, Mr. Dunn, will be empowered to

24   conduct -- you know, to basically oversee this work and it

25   will retain Credit Bid Purchaser to decommission the work.

1  Fieldwood Three will be capitalized with $12 million,

2  $5 million in cash up front, in addition to the amounts

3  associated with the Credit Bid Purchaser -- I'm sorry, in

4  amounts -- in addition to the $8 million that is going to be

5  advanced for the Plan Administrator, as well as all of the

6  various reserves.  But each one of those categories of

7  assets will be basically held in trust for purposes of what

8  the -- what the purpose indicated.  So the 12 million will

9  be for decommissioning, obviously the 8 million Plan

10  Administrator will be for those fees, and then the various

11  reserves that will be funded will be for purposes of what

12  they were intended -- either a claims reserve or

13  administrative expense reserve and those various items.

14         Substantially, all of the Fieldwood Three assets

15  have been shut in, so there's virtually no production there.

16  And, Your Honor, the Fieldwood Three will conduct the work

17  as a designated operator with respect to both Eni and Hunt,

18  which are abandoned assets, but they will conduct the work

19  and Mr. Dane will testify about that.

20         Then going to Fieldwood Four, Your Honor, that is

21  after Apache, the Chevron assets are the next largest piece

22  of the puzzle, Your Honor.  And so Fieldwood Four would

23  carry out and decommission those assets, pursuant to a

24  turnkey removal agreement between Credit Bid Purchaser and

25  Fieldwood Four.  And again that will serve to decommission,

1  in essence, our next largest piece.

2          So, Your Honor, in essence, when we're talking

3  about what the evidence will show, we think that the

4  evidence will show that we have created a Plan that achieves

5  what it's intended to achieve.  The principal objectors are

6  the non-settling predecessors, as well as some of the

7  sureties relating to some of the assets.  Some of the assets

8  hopefully will have, you know, significant consensus with

9  respect to the Apache sureties, which are, in fact, by far

10  the largest number in amount of the surety that's been

11  issued.

12          And Your Honor, I think that the Plan maximizes

13  value and more importantly it satisfies all of the

14  *Midlantic* Standards in order to get approval.  And Your

15  Honor, we believe that the evidence will show that the Plan

16  should be confirmed.

17          Thank you, Your Honor.

18          THE COURT:  Mr. Perez, thank you.

19          Mr. Perez, would you have someone either email or

20  deliver a copy of your PowerPoint to Ms. Do?

21          MR. PEREZ:  Yes, ma'am.  Yes, sir.

22          THE COURT:  Thank you.

23          All right.  Are there any other proponents, as of

24  today, of confirmation who would like to make an opening

25  statement?  If so, please press five-star.

1          I do have some folks.  Let me just take you one at

2     a time.

3          Mr. Schaible, good morning.

4          MR. SCHAIBLE:  Good morning, Your Honor.  Thank

5     you for hearing me.  Damian Schaible of Davis Polk here on

6     behalf of, as Your Honor knows, first lien term lenders and

7     the DIP lenders.

8          Your Honor, I'm going to be -- I'm going to be

9     brief today, as you know I'm fairly good at being, and

10    really just --

11         THE COURT:  Mr. Schaible, your audio is not good.

12         MR. SCHAIBLE:  Okay.  Hold one second, Your Honor.

13         Your Honor, is that better?

14         THE COURT:  A little bit.

15         MR. SCHAIBLE:  Okay.  I'm sorry, Your Honor.

16         THE COURT:  That is better.  That is better.

17         MR. SCHAIBLE:  That is better?  Okay.

18         THE COURT:  Yes, sir.  Thank you.

19         MR. SCHAIBLE:  Thank you, Your Honor.  Sorry about

20    that.  So again for the Record Damian Schaible on behalf of

21    the first lien term lenders and DIP lenders.

22              OPENING STATEMENT ON BEHALF OF FIRST LIEN

23                   TERM LENDERS AND DIP LENDERS

24         MR. SCHAIBLE:  Your Honor, we echo all of the

25    Debtors' points and as you know we've been a supporter of

1  the Plan since the time that the case filed.  And so I would

2  just like to raise a few brief comments by way of -- by way

3  of background from the lenders' perspective.

4           So, Your Honor, you know, if you step back to

5  where we were at the filing, there was a deal with Apache,

6  there wasn't even a fully based Plan with our clients and

7  what was going to be a marketing process was going to be

8  undertaken to find out if anyone was going to be able to

9  come in and decommission these assets in a way that would

10  not require stepping back to the predecessors and the

11  sureties.

12           And that marketing process ran its course and

13  unfortunately was unsuccessful.  Our clients agreed as part

14  of a Plan that was negotiated and was finalized during the

15  case, as Your Honor will remember, to not only put in

16  $100 million DIP, put in necessary at the outset of the

17  case, but to commit to $200 million of additional money that

18  would be needed both for the ongoing business Credit Bid

19  NewCo, but also for -- before agreed decommissioning and to

20  support the settlements that were undertaken.

21           Your Honor will remember a rather vociferous

22  Disclosure Statement hearing with a lot of objectors and a

23  lot of issues.  And Your Honor said something that I thought

24  made a lot of sense is that, you know -- I'm paraphrasing of

25  course -- but that you wanted us to go get deals done.  That

1  you were not going to let this case be held up for the final

2  deal.

3        In other words, parties were going to need to dig

4  in and get deals done and then at the end there was a chance

5  that people would give us a high vote.  Your Honor, I told

6  you, if I remember at the DIP hearing, that you took very

7  seriously getting to deals wherever possible.  I told you

8  again at the Disclosure Statement hearing and, Your Honor,

9  today we've been working with the Debtors since the initial

10  filing of the case to try to get deals wherever we could.

11        And so as Your Honor knows, we received the

12  support of the second lien lenders.  That was a hard-fought

13  negotiation.  We received the support of the Creditors

14  Committee, another very hard-fought negotiation.

15  Settlements with -- as Mr. Perez mentioned, the largest part

16  of predecessors accounting for more than 91 percent of the

17  interest liability and now we're working on the settlement

18  with some of the larger sureties.

19        In addition, Your Honor, we've been spending a

20  great deal of time with the Government and (indiscernible)

21  today.  I'm amazed and really impressed and appreciate the

22  amount of time that they have been willing to put in with

23  us.  We've spent hours and hours and hours on Zoom calls.

24  They tend to like Zoom calls, which is bad for anyone who

25  has been out for a run and hasn't been able to shower -- but

1  we've had lots and lots and lots of Zoom calls to try to --

2  to try to get to resolution.  And I think that the deal for

3  -- or I guess you can't call it a deal -- but the proposal

4  from the Debtors and from Credit Bid NewCo that provide the

5  support that's going to be required in the near term ahead

6  of being able to deal with the remaining sureties and

7  predecessors, which we understand subject to documentation

8  the Government would intend not to object to.  We came to a

9  really elegant solution that gets -- if not on board,

10  non-objecting the last big party that we were really focused

11  on.

12          Your Honor, we remain open for business and would

13  love to reach resolution from the sureties and predecessors,

14  but it is time, I believe, to do as Your Honor suggested at

15  the Disclosure Statement hearing, which is to move to

16  Confirmation, seek to confirm this Plan.  This Plan saves

17  jobs, this Plan provides for safe decommissioning, this Plan

18  has the support of all the major creditor constituencies,

19  and frankly, Your Honor, there are just no alternatives.

20          If the Plan were -- cannot be confirmed, with the

21  marketing process having already been undertaken and failed,

22  we're left with really a 363 sale of collateral, and

23  effectively a liquidation that we would have to start

24  negotiating with the Government, which would be worse for

25  everyone in this virtual room.

1              And so, Your Honor, we would respectfully request

2    that after hearing all the evidence you consider entering

3    the Confirmation Order.

4              Thank you, Your Honor.

5              THE COURT:  Mr. Schaible, thank you.

6              From 469-387-8891.

7              MR. CHIU:  Thank you.  Good morning, Your Honor.

8    Kevin Chiu, Baker Botts on behalf of Hunt Oil Company and

9    subsidiaries.

10             Can you hear me clearly?

11             THE COURT:  I can, Mr. Chiu, good morning.

12             MR. CHIU:  Good morning.

13         OPENING STATEMENT ON BEHALF OF HUNT OIL COMPANY

14             MR. CHIU:  Your Honor, as you may be aware, Hunt

15   Oil Company and subsidiaries has entered into a term sheet

16   with the Debtors which is filed at Docket No. 1392.  And we

17   believe that the term sheet represents a deal that is the

18   result of a good faith and arm's length negotiations between

19   parties, and provides an agreement principle that treats the

20   certain oil and gas assets for which Hunt or its affiliates

21   previously held in interest properly.

22             As agreed upon under the term sheet, Hunt is here

23   to support confirmation of the Plan.  And as Mr. Schaible

24   noted just now, that it's argued that there are no other

25   alternatives to properly treat and deal with these

1   environmental obligations that such -- the decommissioning

2   of these assets are not an issue that will come down years

3   down the road, but should happen in the near future.  And as

4   such, this arrangement represents the only viable means of

5   safely and efficiently decommissioning these properties.

6           We are here today to also clarify some of the

7   points of the term sheet and so the Debtors' statement for

8   the confirmation brief filed at Docket 1563.  Two key

9   points, Your Honor, just for your attention.  First, in

10  regards to the turnkey agreement that was mentioned there,

11  that would be part of the implementation of the

12  decommissioning.  The term sheet is currently still being

13  finalized between the parties and the process currently

14  awaits final comments from the Debtors' and their

15  professionals in hopes that this will be finalized in short

16  order and filed with the Court.

17          Additionally, the Debtors' oil and gas lease

18  Schedules for Fieldwood Three and those properties will need

19  to be updated accordingly to capture the terms of the deal.

20  They're presently filed at Docket Nos. 1562 and 1587.  These

21  Schedules don't fully capture the allocation of certain Hunt

22  properties under the term sheet, but we understand the

23  complex cases and certainly the heavy lift that the Debtors'

24  face, but there are such documents already caused a motion

25  and we hope that the Debtors will update these documents

1  properly and file them with the Court.

2          As we fully stand here today and support

3  confirmation, we believe that this deal represents the best

4  alternative solution for Hunt and these various properties.

5          Thank you.

6          THE COURT:  Mr. Chiu, thank you.

7          Mr. Pasquale.

8          MR. PASQUALE:  Good morning, Your Honor.  Ken

9  Pasquale from Stroock & Stroock & Lavan for the Creditors

10 Committee.

11         Can you hear me okay, Your Honor?

12         THE COURT:  I can, good morning.

13             OPENING STATEMENT ON BEHALF OF THE

14             OFFICIAL COMMITTEE OF UNSECURED CREDITORS

15         MR. PASQUALE:  Good morning.  Your Honor, I'm

16 going to reserve most of my comments for closing.  I did

17 just want to officially say what you've already heard and

18 know, that is the Committee does support the Plan.

19         We are in the process, as everyone is at this

20 point, of evaluating the settlement that you've heard about

21 with the sureties to Apache and with that small caveat which

22 will get back to the Court and the parties on.  I did just

23 want to say for now that we support the Plan and we'll save

24 the rest of our comments for later.

25         Thank you, Your Honor.

1          THE COURT:  Thank you, Mr. Pasquale.

2          Mr. Balasko.

3          MR. BALASKO:  Thank you, Your Honor.  Zach Balasko

4     for the Department of the Interior.

5                    OPENING STATEMENTS ON BEHALF OF THE

6                    US DEPARTMENT OF THE INTERIOR

7          MR. BALASKO:  As the Court knows this has been a

8     unique and challenging case, largely due to the sheer

9     magnitude, you know.  BSEE's estimates for the Debtors'

10    decommissioning obligations in total is around $7 billion.

11    So this has been a very important case for the Department

12    and one that we are working very hard with the Debtors, with

13    the lenders, and with the predecessor to reach as many

14    potential deals on decommissioning as possible.

15          When the Plan was filed was filed in January, the

16    Apache deal was in place in the deal and Fieldwood Three

17    were in place representing about 80 percent of the Debtors'

18    total decommissioning liability.  And partly, at that time,

19    as to the remaining 20 percent of the property that was

20    proposed to be abandoned, there was no funding in place or a

21    Plan in place to address the transition period between the

22    effective date of the Plan and when Interior could order the

23    jointly and severally liable predecessors, to appoint new

24    operators on these properties and perform decommissioning.

25    We've made it clear to the Debtors at that time and we've

1  made it clear to Your Honor at the Disclosure Statement that

2  we weren't there yet in terms of Government supporting the

3  Plan.

4         And since that time, the Debtors and their

5  professionals, the lenders and their professionals, and all

6  of the predecessors have gone to great lengths and many,

7  many, many hours on Zoom calls, as Mr. Schaible said, to

8  attempt to reach the maximum number of potential

9  arrangements.  We're up to 91 percent, as Mr. Perez detailed

10  to the Court.  And of the remaining 9 percent, again, most

11  of those are properties for which BP, Hess, and XTO are the

12  principle predecessors.

13         Interior is confident that BP, Hess, and XTO in

14  order to do so, will step up to the plate and perform the

15  decommissioning on their property.  But unfortunately they

16  were not able to get to consensual agreements with the

17  Debtor and we understand that that's not always possible.

18         Perhaps more importantly in the imminent term, the

19  Debtors have agreed to continue to maintain and monitor

20  these properties for nine months, following the effective

21  date, to allow Interior the time that will be necessary to

22  order collateral parties to take over the operatorship of

23  these properties and perform the decommissioning.  This

24  eliminates the risk that we're going to have, you know,

25  unmaintained and unmonitored properties in the Gulf as of

1   the effective date and the Debtors are going to continue to

2   fulfill their obligations while responding to do that for

3   the nine-month period the Interior believes will be enough

4   time to get other parties on board on these properties.

5           You know, it's been a long way to get to this

6   point and the Plan is not perfect from Interior's

7   perspective.  You know, we would have liked to have seen a

8   100 percent solution, but, you know, that's not always

9   possible.  And we've reached a point that the Government is

10  comfortable that the Plan data is satisfied and that this is

11  the best solution that's possible in this case to protect

12  health, safety and the environment and for that reason the

13  Government is not objecting to the Plan.

14          THE COURT:  Mr. Balasko, thank you.

15          Mr. Zuber.

16      (Pause in the proceedings.)

17          THE COURT:  Mr. Zuber.  Mr. Zuber, I can see you,

18  but can't hear you.

19          MR. ZUBER:  Thank you, Your Honor.  I'm sorry.

20  Good morning, Your Honor.

21          THE COURT:  Good morning.  I can hear you know.

22          MR. ZUBER:  Okay.  Thank you.  I'm with a law firm

23  in New Jersey of Chiesa Shahinian and Giantomasi and along

24  with the Husch Blackwell firm, Randy Rios and Tim Million,

25  we represent four pre-petition surety bond providers, which

1  include Aspen American Insurance Company, Berkley Insurance

2  Company, Sirius America Insurance Company, and Everest

3  Reinsurance Company.

4     OPENING STATEMENT ON BEHALF OF ASPEN AMERICAN INSURANCE

5        COMPANY, BERKLEY INSURANCE COMPANY, SIRIUS AMERICA

6        INSURANCE COMPANY, AND EVEREST REINSURANCE COMPANY

7           MR. ZUBER:  As stated at the outset, there has

8  been an agreement in principle reached with respect to

9  Everest's objections as they relate to the Fieldwood One

10 structure.  And my colleague, Darren Grzyb, will address any

11 issues related to that.  But at this point Everest does not

12 intend to go forward with its objections with respect to any

13 aspect of the Plan, but our other three sureties do continue

14 to -- will not object to the Fieldwood One structure, but do

15 continue to preserve arguments with respect to other

16 matters.

17           Your Honor, we filed a Plan Objection at Docket

18 No. 1461.  We filed yesterday a supplemental objection at

19 Docket No. 1664.  Many creditors and parties in the group

20 have also filed confirmation objections, some of which,

21 particularly those filed by other sureties and

22 predecessors-in-interest, our clients have joined to the

23 extent not inconsistent with our client's position.

24           I'm not going to go into too much detail regarding

25 our legal arguments, Your Honor, that we made in our filing,

1  but with the Court's indulgence, I would like to present a

2  couple of overriding bigger picture concerns that we have.

3          So first, you know, it's our view that any party

4  -- whether the Debtor, a divisive merger entity, a

5  predecessor, or anyone else exploiting assets for their

6  benefit should be obligated to pay decommissioning costs and

7  acquire with an applicable law.  And if they fail to do so,

8  we sureties may be called upon to pay.  And if we are called

9  upon to pay, we are entitled to step into the shoes of the

10 Government to be repaid.  We're talking about properties

11 which the Debtors or their designees continue to exploit for

12 their benefit.  If they're going to do so, Your Honor, they

13 need to accept the burdens associated with the benefits they

14 intend to derive.

15         If this were a liquidation, which at least in part

16 seems like it may be, and a third party were to acquire

17 assets in this case, they would need to comply with

18 applicable law.  If they're going to deride benefits they

19 need to take the burdens.

20         Respectfully, Your Honor, bankruptcy is not a

21 license to violate or be exempt from the law, which imposes

22 decommissioning obligations upon those who choose to avail

23 themselves of the privilege of exploiting natural resources.

24         The Debtors can choose to abandon wells and the

25 globe will sort out which third parties have to pay and who

1   has obligations as between them.  Respectfully, Your Honor,

2   we submit it's not the Bankruptcy Court's role in that

3   process to sort out disputes amongst parties with the

4   respective liabilities and rights against each other.  And

5   there's nothing in the Bankruptcy Code or in the law which

6   authorizes a Bankruptcy Court to declare a forfeiture of

7   rights by some third parties against others, including

8   subrogation rights.  And I would note, as set forth in our

9   papers, the U.S. Supreme Court case of *Pearlman vs Reliance*

10  *Insurance Company* at 371 US 132 (1962).

11             THE COURT:  Mr. Zuber --

12             MR. ZUBER:  Nothing in the Code or the law --

13             THE COURT:  Mr. Zuber, I think that -- and I just

14  want to be sure I'm understanding the argument.

15             Are you not receiving an unsecured claim if you

16  have to fund money, and if you are, why isn't that identical

17  to the amount you would receive in subrogation rights?  At

18  least my holding has been you get monetary subrogation, you

19  don't get regulatory subrogation.  And I wanted to

20  understand -- the argument to me in your objection wasn't

21  entirely clear about making a distinction between monetary

22  and regulatory, and I want to get a good understanding

23  before we proceed with the hearing.

24             MR. ZUBER:  Your Honor, we don't claim that we get

25  regulatory subrogation rights, we don't secede to the

1   Governments regulatory powers, but we belief that we

2   preserve all of our subrogation rights with respect to third

3   parties obligees stepping into the Debtors' shoes and

4   others.  We don't understand why rights are proposed to be

5   taken away from the sureties.  You know, the risk these

6   sureties took when they issued bonds was not that they would

7   be deprived of the ability to litigate damages from

8   enforcement of subrogation rights, so that the Court would

9   approve a Plan that provides for forfeiture.  That was not

10  bargained --

11          THE COURT:  Which rights are being taken away, ise

12  I guess then -- if you're not looking for a regulatory right

13  and you are getting an unsecured claim, what right is being

14  taken away?  I just want to get a little better definition

15  of that.

16          MR. ZUBER:  The right to, down the road, to defend

17  claims with respect to the Credit Bid Purchaser, Your Honor.

18  You know, we believe that that --

19          THE COURT:  I did not know that your right to

20  defend claims against the policy were being taken away.  And

21  that's -- I want to get to the definition because I need to

22  understand the argument.  And if you're not seeking

23  regulatory subrogation and if you are getting an unsecured

24  claim, I do want to know what rights are being taken away

25  with some specificity, because your argument has some force

1   with it, but the force is going to be in the details I'm

2   afraid.

3        MR. ZUBER:  Your Honor, any and all rights, other

4   than what our claims are against the Debtor should be

5   preserved.  Rights against obligees, rights against the

6   Government, rights against the Credited Bid Purchaser.  The

7   law is pretty clear in the Fifth Circuit, Your Honor, that

8   the -- you know, we were able to opt out of third party

9   releases under this Plan, and we submit, as we briefed, that

10  we should be able to opt out of exculpations and injunction

11  provision.  We don't want anything in this Plan to impair

12  our rights as to any party, other than the Debtors, as set

13  forth in the Plan.

14        I'm not talking about a pre-petition unsecured

15  claim.  I'm talking about down the road, you know, five

16  years from now when a claim is made on one of our bonds, we

17  should not be prohibited by an injunction under the Plan

18  from defending that claim and saying that we should have to

19  pay on that claim when we think that a bond obligee may have

20  impaired our rights.  There should be no impairment of

21  surety rights as to anyone other than the Debtors.  There

22  should be no exculpations and injunctions that protect the

23  Credit Bid Purchaser down the road.

24       (Pause in the proceedings.)

25        MR. ZUBER:  For example, Your Honor, Credit Bid

1  Purchaser is going to acquire some leases, it would then be

2  its responsibility to do decommissioning obligations.  If

3  the Credit Bid Purchaser down the road does not do it, it

4  will default to other entities.  BOEM could then order

5  others to do that.  They could order Fieldwood One, but for

6  the bankruptcy, and they could order our obligee -- for

7  example, Noble.  We need to be able to stand in the shoes of

8  principle and the obligee to assert any rights we may have

9  against the credit purchaser down the road, such as --

10         THE COURT:  So wait -- I just want to be sure I

11  understand.  This is not a present right to sue a purchaser.

12  This is, if we do a sale under 363, we can't do it free and

13  clear.  It has to be subject to your future rights that

14  wouldn't come into being until the sale was consummated,

15  right?

16         MR. ZUBER:  Correct, Your Honor.

17         THE COURT:  Well, that argument will not carry the

18  day.  So tell me another argument.

19         MR. ZUBER:  Well, Your Honor, I submit that there

20  are -- there should be --

21         THE COURT:  363 -- unless I'm missing it, 363

22  allows the Court to order the sale of property free and

23  clear of liens, claims, and encumbrances, and you're talking

24  about a claim that goes with the sale, not a claim you

25  presently have.  I thought you were telling me that we might

1  be impairing a claim you presently have, not that we can tie

2  up a property and never have it sold and never have it

3  cleaned up in a way that doesn't make your life -- your

4  client's life any worse.  And I'm trying to figure out how

5  does the sale make your client's life any worse than if we

6  didn't have the sale, and so far I'm not hearing it.

7           MR. ZUBER:  It doesn't today, but it may down the

8  road.

9           THE COURT:  Well, how down the road would it make

10  your life worse than it is today?

11           MR. ZUBER:  But for the bankruptcy, we would have

12  claims of defenses.  If an obligee impairs our rights we can

13  claim that we shouldn't have to pay a claim on the bond.

14           THE COURT:  Right.  And which obligee is impairing

15  your rights?

16           MR. ZUBER:  The obligees on the bonds such -- our

17  current obligees.  No they're not impairing our rights, we

18  need to be able to step into the shoes of our obligee to

19  defend claims against the Credit Bid Purchaser.

20           THE COURT:  Defend claims against the Credit Bid

21  Purchaser?  I don't under -- the Credit Bid Purchaser isn't

22  going to make you do anything, right?  You're talking about

23  prosecuting claims against the Credit Bid Purchaser, not

24  defending them, or else I'm misunderstanding the Plan.  I

25  did not believe the Credit Bid Purchaser has rights against

1   you under the Plan.

2           MR. ZUBER:  The Plan seeks to take away our

3   subrogation rights.  There is no jurisdiction of this Court

4   to take away our subrogation rights.  We should retain

5   those, whatever they are.

6           THE COURT:  Yeah, but I'm asking you to tell me

7   what subrogation rights these are.  It's not a subrogation

8   right against a future purchase.  I'm not taking that away,

9   because it doesn't exist right now.

10          Is there a present subrogation right that's being

11  taken away against an obligee?

12          MR. ZUBER:  No, Your Honor.

13          THE COURT:  Because I didn't think there was.

14          MR. ZUBER:  Future subrogation rights.  There have

15  been no claims on the bond.  If at some point in the future

16  there's a claim on the bond and we have to pay on that bond,

17  we have, as a matter of law, the right to step into the

18  shoes of the principle and the obligee for all purposes.

19  And we shouldn't lose any of those rights simply because a

20  chapter -- where the Debtor can't meet its obligations.

21  These are disputes that will arise -- or may arise, may not

22  arise, but may arise in the future between non-Debtor

23  parties.  And there's nothing in the Plan should impair our

24  ability to exercise our subrogation rights five years from

25  now when a claim is made on a bond and we have to pay that

1  claim and then we would try to exercise our subrogation

2  rights, and then someone would say you can't exercise those

3  rights because they've been enjoined under the Plan.

4         THE COURT:  And that's what I'm trying --

5         MR. ZUBER:  Inappropriate.

6         THE COURT:  -- what I'm trying to define is -- I

7  do understand your argument that you might have rights in a

8  future lawsuit against somebody that isn't yet an owner, a

9  future purchaser, and I'm telling you I believe the

10  Bankruptcy Code allows those rights to be cut off.

11         What I'm looking for is, if you have a right, for

12  example, to subrogate against a current obligee, if that's

13  being taken away, I really do want to know that.  And I

14  didn't think it was being taken away.  Tell me how it is.

15         MR. ZUBER:  That's not being taken away, Your

16  Honor.

17         THE COURT:  Well then, what is being taken away

18  besides your right to sue a future purchaser?

19         MR. ZUBER:  They're attempting, under the Plan,

20  Your Honor, to take our future subrogation rights --

21         THE COURT:  Against --

22         MR. ZUBER:  -- not rights -- the right --

23         THE COURT:  Against -- but is that only against a

24  future purchaser?  I'm trying to tell you -- get you to tell

25  me is there any right you have that's being taken away,

1 other than the rights against a future purchaser?

2        MR. ZUBER:  It would be against Credit Bid

3 Purchaser, Your Honor, and also being able to stand in

4 BOEM's shoes as the obligee in some of the bonds.

5        THE COURT:  Okay.

6        MR. ZUBER:  So, Your Honor, you know, we

7 respectfully submit that the exculpation should not go

8 beyond the normal exculpations of Creditors Committees and

9 Creditors Committee members acting in that capacity and

10 Debtors' management.  There shouldn't be any third-party

11 exculpations of impairment of rights by third parties

12 against other third parties.

13        So we have proposed some reservation of rights

14 language in our supplemental objection, Your Honor, at

15 paragraph 21 of our supplemental objection.  I'm not going

16 to read it for the Record, but it would go a long way if we

17 could make clear that this Plan is not impairing future

18 rights as between non-Debtor entities.

19        THE COURT:  Well let me -- just so you know where

20 at least I think the Plan is going -- and I'm going to need

21 you, as we proceed with today, to show me that I'm wrong.  I

22 think the Plan does impair your ability to take affirmative

23 action against someone that is not today an owner of the

24 property, i.e. a future purchaser.  Otherwise, I am not

25 aware of rights that are being taken away and I need those

1  explained to me as we go through documents and witnesses

2  today.

3        Because if all that we're looking at is, the

4  363(k) rights are being preserved, because you're not

5  telling me you have a claim against the future purchaser,

6  you're telling me you have a claim against the future

7  purchaser arising by their purchase of the assets, and

8  Section 363 allows the assets to be sold free and clear of

9  those claims.  That's an issue with Congress, not with me.

10        If there is another issue out there, I need it

11  defined as we go through today.  I got it, I think it's an

12  important question.  I just don't understand it in the

13  context of the case other than against the future creditors.

14        MR. ZUBER:  Okay.  We'll develop that as we go,

15  Your Honor, and we'll give you some more specific examples.

16        THE COURT:  Mr. Zuber, thank you, sir.

17        All right.

18        MR. ZUBER:  Thank you.

19        THE COURT:  Does anyone else wish to make a

20  statement now in opposition to Confirmation of the Plan?

21        All right.  I do have some folks.  And let me get

22  their lines activated.

23        Ms. Heyen, good morning.

24        MS. HEYEN:  Good morning, Your Honor.  Shari Heyen

25  at Greenberg Traurig on behalf of BP Exploration and

1  Production.

2  Can you hear me okay, Your Honor?

3  THE COURT:  I can.  Good morning.

4  MS. HEYEN:  Thank you.

5  OPENING STATEMENTS ON BEHALF OF BP EXPLORATION

6  AND PRODUCTION, INC.

7  MR. HEYEN:  I'm also joined by my colleagues,

8  Mr. Craig Duewall, Mr. Karl Burrer, and Mr. John Hutton also

9  of Greenberg Traurig.  And Your Honor I'm sure you've read

10 and heard form a number of objectors and we're opposing this

11 Fifth Amended Proposed Plan.

12  I'm not here to restate or relitigate those, argue

13 those objections, but instead, Your Honor, BP rises this

14 morning to propose a commercially reasonable solution to the

15 11th hour legally dense and complex documents and

16 information filed by the Debtors and others.

17  And Your Honor we understand this morning from the

18 opening statements that the Debtors and others are still

19 documenting agreements, that not all the definitive

20 documents have yet been reduced to writing, and those

21 documents are not yet made public.

22  Your Honor, there's no question that Fieldwood

23 seeks Court approval of an unprecedented and historic scope

24 of abandonment of wells, platforms, and pipelines in the

25 Gulf of Mexico.  This means that, if the Plan is confirmed,

1  that BP, along with other similarly situated predecessors

2  and co-interest owners will be left to tackle certain P&A

3  obligations in the Gulf of Mexico.  Your Honor, for BP

4  alone, our estimated P&A obligations exceed $300 million.

5         And Judge, by our objection and our proposed

6  language that we filed this morning, we're seeking to

7  preserve important bargained-for rights in our commercial

8  contracts and agreements with Fieldwood, with third parties,

9  with our sureties, and with those parties who are receiving

10  an assignment of our contracts.

11         This morning, in an effort to solve some of these

12  commercial issues with the Plan, BP filed proposed language,

13  it's at Docket No. 1673, and it's proposed language we would

14  like included in this Confirmation Order, which we have not

15  yet seen.  And if Your Honor accepts that language, it would

16  resolve all but one of BP's confirmation objections.

17         BP's proposed language, Your Honor, essentially

18  does four things.  Number one, it memorializes and confirms

19  that BP has opted out of the third-party releases.  Number

20  two, it preserves any subrogation claims by ensuring that

21  the Debtors' new language that was recently added in

22  Section 5.13(a) of the Fifth Amended Plan is applicable to

23  three of our bonds.  Number three, it ensures that BP's

24  contractual right, including its right of arbitration, is

25  not impaired by the Plan Injunction.  And then number four,

1  it preserves BP's rights regarding -- by ensuring that the

2  Plan does not simply eliminate or set off rights by virtue

3  of the NewCo sale.

4          Again, Your Honor, if accepted by the Court we

5  believe that this language will significantly narrow the

6  scope and length of this complicated and dense hearing.  BP

7  is prepared, however, Your Honor, to present evidence and

8  arguments on each one of these issues, but we believe that

9  the proposed language and its resolution are commercially

10 reasonable, are commercially fair, and would obviate the

11 need for extensive proceedings on issues that are really

12 capable of a commercial resolution.

13         Your Honor, our language is supported by

14 well established United States Supreme Court law, by Fifth

15 Circuit law, and by Bankruptcy Court decisions.  And I'll

16 just briefly go through each of the four points that I

17 previously raised, Your Honor.

18         First, with respect to the proposed third-party

19 releases:  BP does not believe that it is a, quote,

20 "Releasing Party," close quote, under the Plan, but in an

21 abundance of caution we filed an opt-out notice at Docket

22 No. 1437, and we also included our opt-out objection in our

23 filed objection.

24         Accordingly, Your Honor, this Confirmation Order,

25 we submit, should recognize that BP is not bound by the

1  third-party releases proposed in the Plan.  BP's proposed

2  language clarifies and confirms that nothing in the Plan,

3  the Confirmation Order, or these cases will impair or modify

4  BP's rights with respect to any non-Debtor parties,

5  including any other predecessors or other co-liable or

6  jointly and severally liable parties.

7           Nothing in the Plan or Confirmation Order should

8  be deemed to be construed as a release or a discharge of any

9  liability or obligation of any third party with respect to

10 any decommissioning liabilities associated with the Debtors'

11 assets.  And frankly, the claims and causes of action held

12 by BP against any all third parties should be reserved and

13 preserved.

14          And Your Honor, our proposed language is not

15 controversial, it preserves private rights and remedies

16 among non-Debtor parties.

17          Second, Your Honor, the proposed language by BP

18 preserves BP's subrogation claims.  And we think, you know,

19 perhaps Your Honor, most astonishingly about five days ago,

20 the Debtors filed a Fifth Amended Plan that contains

21 language in Section 5.13(a) that purports to waive every

22 person's relevant, you know, subrogation rights.  We think

23 that 5.13(a), the language that was included at the 11th

24 hour, purports to act as an absolute bar to any person's

25 subrogation rights in violation of well-established Fifth

1  Circuit law.

2        BP's proposed solution is that the Confirmation

3  Order preserve subrogation claims by ensuring that the

4  Debtors' new language in Section 5.13(a) is not applicable

5  to three of BP's bonds.  That BP's bonds are unaltered and

6  the rights of BP and other beneficiaries and obligees,

7  pursuant to the BP bonds, are unaffected by the Plan, the

8  Confirmation Order, or any of the proposed transactions.

9        THE COURT:  What would BP's language do with

10 respect to a purchaser of the assets?

11       MS. HEYEN:  So Your Honor, obviously we've

12 assembled our legal team here today to address these issues.

13 You know, we're happy to answer any questions that the Court

14 may have.  Obviously, given the density and the sheer volume

15 of the documents, including some that have been filed and

16 will be filed with the Court, we've divided and allocated a

17 lot of these issues among various Greenberg Traurig team

18 members.  And so if I may, Your Honor, Mr. Karl Burrer will

19 take that issue up with the Judge.

20       THE COURT:  All right.  We can come back to it.

21 If you want to finish your statement and then we'll go to

22 Mr. Burrer.

23       But my question to you is very similar to the one

24 that Mr. Zuber, it's one thing to tell me that you want to

25 be sure that your existing subrogation rights against an

1  existing party are maintained.  It's another to say that we

2  can't order the sale of an asset free and clear of liens,

3  claims, and encumbrances, which the statute says we can do.

4  And that's what I want to learn in terms of the proposed

5  language that you have and see whether it's broad or narrow

6  in that sense.

7        MS. HEYEN:  Very good, Your Honor, we will -- I'll

8  have Mr. Burrer address that at the conclusion of my opening

9  statements.

10        Third, Your Honor, BP's proposed language

11  preserves contractual and bargained for rights, which must

12  be preserved.  And here I'm going to turn to Section 10.6 of

13  the Plan, which seeks to enjoin claims, rights, and remedies

14  with respect to rejected contracts, with respect to future

15  contractual relationships, and also with respect to

16  contribution subrogation rights.

17        So BP has proposed language that preserves

18  pre-petition claims, rights, and defenses by ensuring that

19  the Plan Injunction is limited to pre-petition claims

20  against the Debtors.

21        And let me explain what I mean here, Judge.

22        A number of our contracts are being rejected and

23  whatever claims rights and defenses we now have as a result

24  of that rejection, we just want to make sure that those are

25  preserved for later adjudication.

1          Next, the Debtors are assuming and assigning

2   approximately 168 of our contracts to new parties.  The

3   Confirmation Order should clarify that the Plan Injunction

4   is not so expansive as to enjoin ongoing future

5   relationships with our new contract counterparties.

6          And in addition, Your Honor, BP has proposed

7   language that clarifies that the Plan Injunction should not

8   limit BP's right to arbitration.  There is currently a

9   dispute between BP and Fieldwood over the LSPS Operating

10  Agreement.  BP properly invoked the arbitration provision

11  under that contract.  However, Fieldwood refuses to

12  acknowledge that the arbitration provision exists.

13         So consequently, BP was forced to file a motion to

14  lift the automatic stay to compel arbitration.  That Motion

15  is pending and will be heard by the Court on July 9th.  Our

16  Motion is filed at Docket No. 1414.  BP's proposed language

17  simply clarifies, Your Honor, that none of BP's claims or

18  arbitration rights will be eliminated -- will be limited or

19  eliminated by the Plan Injunction.  The Court can decide the

20  merits of the arbitration issue at the hearing on the Motion

21  to Compel Arbitration, which again, Your Honor, is set to be

22  heard in two weeks on July 9th.

23         THE COURT:  Let me just ask you this.  And I had

24  not focused at all on the arbitration issue, I'll just tell

25  you, Ms. Heyen.  So this question is a practical one.

1           If we get down to that hearing and determine that

2      under Fifth Circuit law, we're not going to go to

3      arbitration, we're going to retain it here, could then the

4      Confirmation Order have an effect or are you saying even

5      then it would not have an effect?

6           Does that question make sense?

7           MS. HEYEN:  Yeah, I'm trying to think through it,

8      Your Honor.  I think, you know, what we're asking is that

9      whatever we -- whatever Your Honor decides on July 9th is

10     what we'd like to do.  We understand that that issue has

11     been tabled until July 9th.  We just want to make sure that

12     whatever rights we're arguing and remedies we're arguing for

13     under those Agreements that they are preserved and reserved

14     for later adjudication.

15          THE COURT:  Okay.  Got it.  Thank you.

16          MS. HEYEN:  Yeah, they're teed up before

17     Your Honor to be heard.

18          And finally with respect to 10.6 of the Plan

19     Injunction, there are certain properties that are being

20     abandoned, as Your Honor is well aware, and BP simply

21     requests the Confirmation Order clarify that BP's rights of

22     contribution, for example, against other predecessors and

23     co-interest owners, are preserved and are not enjoined and

24     that also BP's subrogation rights are likewise not enjoined.

25          Fourth, with respect to setoff, the Debtors should

1   not be permitted to sell assets free and clear of BP's

2   secured setoff rights.  BP has filed a separate motion for

3   stay relief seeking authority to implement its setoff

4   rights.  That's filed at Docket No. 1666 and that's set for

5   a hearing on July the 16th.

6           And we understand from Debtors' counsel that all

7   rejection claims will be heard separately and at a later

8   date and accordingly we're simply asking that the Court

9   include a provision in the Confirmation Order that

10  preserves, reserves and protects BP's contractual statutory

11  right of setoff.

12          Again, Your Honor, that is teed up for hearing on

13  July the 16th.  However, if Your Honor would like to hear

14  evidence with respect to setoff rights, we are prepared to

15  present those evidentiary issues and facts to the Judge --

16  to Your Honor today.  We're prepared to go forward with

17  them.  We're here at Your Honor's pleasure with respect to

18  the setoff rights.  They have been teed up for a hearing on

19  July the 16th.

20          So, Your Honor, with the adoption by the Court of

21  that language and certainly we understand that Your Honor

22  may have questions about it, we've got colleagues in the

23  room who can drill down on some of these issues and how

24  those languages is a commercially responsible and reasonable

25  resolution of our objection.  And so with the adoption of

1  that language, that will BP with only one evidentiary issue

2  today and that is the adequate assurance of future

3  performance by NewCo and specifically, Your Honor, we

4  question whether NewCo can satisfy its burden of adequate

5  assurance of future performance.

6          So for example, Your Honor, that's a $75 million

7  in new bonding commitments cover the approximate 10 million

8  of future P&A obligations under the MC519 and we need some

9  time to explore that with Mr. Dane today.

10          We're not privy to the bonding commitment.  We

11  have not seen it.  We do not know if it's a binding

12  commitment, whether it's a non-binding commitment, but -- so

13  we'd like some time with Mr. Dane on that issue today.

14          Your Honor, we're all present and assembled in our

15  virtual courtroom and are happy to answer any questions.

16  And if, Your Honor, I may yield the virtual podium to

17  Mr. Burrer who will address your specific subrogation

18  questions.

19          THE COURT:  Thank you.

20          MS. HEYEN:  Thank you.

21          MR. BURRER:  Good morning, Your Honor.

22          THE COURT:  Good morning, Mr. Burrer.

23          MR. BURRER:  Karl Burrer for BP.

24          OPENING STATEMENT ON BEHALF OF BP

25          MR. BURRER:  Your Honor, I think stepped back on

1  the subrogation issues makes sense and going to the Court's

2  *Tri-Union* Opinion, subrogation is just a creditor stepping

3  into the shoes of another party when that party pays the

4  debt.  So if you're selling free and clear of the rights

5  that they're subrogated to, here that would require the

6  Court to sell free and clear of the performance obligations

7  with the Federal Government, and that's not what this Plan

8  provides.

9        The second to last sentence of Section 5.13(a)

10 provides nothing in this Plan, including the Section 5.13 or

11 the Confirmation Order shall be construed as borrowing,

12 waiving or limiting the United States' rights to assert a

13 claim or cause of action against the Debtors, the post-

14 effective date Debtors or any co-lessee or predecessors-in-

15 interest with respect to the abandoned properties for any

16 decommissioning obligations on the abandoned properties.

17        That's the right you would have to sell free and

18 clear of, not the subrogation right.  Subrogation is just

19 you step into the shoes of the party that you step into, and

20 that's the Federal Government.  5.13 does not sell free and

21 clear of the Federal Government's performance obligations.

22        In the Debtors' brief, they try to distinguish

23 between regulatory obligations and the Government's

24 unsecured claims and that's a misnomer.  The Government

25 doesn't just retain the right to tell Fieldwood Three or

1  Fieldwood One or NewCo to go and do work.  If the work's not

2  done and the Federal Government does this, the Federal

3  Government has a claim against those entities, a damages

4  claim, and it results from the performance obligations.

5  It's not discharged.  And a subrogated party that comes in

6  and performs the work, such as a surety, such as BP, such as

7  any predecessor, steps into those shoes as they are when

8  they do the work.

9       THE COURT:  So let me just get this straight,

10  Mr. Burrer.  You're telling me that I have the authority

11  under 363(k) to say that if a purchaser purchases the

12  property, no one could assert any duty on their part to

13  clean it up, at which point your client would have no

14  rights, because I'm giving some rights to the Government

15  that your rights should get enhanced even those I have the

16  absolute statutory right to take them fully away.

17       Is that your argument?

18       MR. BURRER:  Your Honor, I believe the argument is

19  that the Government's rights are nondischargeable, so if the

20  Government --

21       THE COURT:  Well, that's not -- no, just -- I have

22  the right -- you know, I maybe shouldn't do it because of

23  some nondischargeable issue, but the Government can waive

24  those.

25       If I can order a 363 sale free and clear of liens,

1  claims and encumbrances and did do so, your client would

2  have no right against the future purchaser, right?

3          MR. BURRER:  Your Honor, I would need to brief

4  that more, but I think here the Plan is not doing that and I

5  think --

6          THE COURT:  Yeah, I want you to answer my

7  question, Mr. Burrer.

8          MR. BURRER:  Oh, okay.

9          THE COURT:  I have the authority under Section 363

10 to order the sale of property free and clear of liens,

11 claims and encumbrances that go with the property.

12          MR. BURRER:  Your Honor, I think if this Court

13 were to enter an order selling this property free and clear

14 of any and all liens, claims and encumbrances in compliance

15 with 363, including providing adequate protection,

16 indubitable equivalent or other, you know, relief necessary

17 to sell property free and clear, I think the Court certainly

18 could sell the property free and clear as we sit here right

19 now.  I don't think that --

20          THE COURT:  And your client -- and your client

21 right now has zero rights against that future purchaser,

22 right?  So it wouldn't get any adequate protection.

23          MR. BURRER:  Correct.  Any rights that we have

24 right now are contingent rights and I would align them with

25 interests and I would align the Government's rights with

1  interest and I would say, if you're going to sell free and

2  clear of a performance obligation, that the performance

3  obligation is a currently existing performance obligation in

4  favor of the Federal Government that would be entitled to

5  adequate protection, would be entitled to consent or not

6  consent.  And I did not hear the Federal Government, which

7  is why given the sureties' defenses, say they are agreeing

8  to this claim.  They're not consenting.  They're not

9  consenting under 363(f).  There are a lot --

10        THE COURT:  No, I'm talking about my power, not

11  theirs.  Different branch of Government.

12        MR. BURRER:  Understood.  I believe if the Court

13  was able to satisfy 363(f), the Court could sell the

14  property free and clear.

15        THE COURT:  Okay.  Look, I'll let you file your

16  supplemental brief if you want to, but I don't understand

17  how your client gets to complain if I have the authority to

18  do something and I do it and then I give somebody else a

19  right that you wouldn't have otherwise had.  So I'll let you

20  file your brief, but I think it's a problematic issue.

21        The whole idea of 363 is to allow a new purchaser

22  to come and start fresh.  We can limit starting fresh

23  because of a deal, if you will, but we can limit it and we

24  can say to the Government, "You have this right and no one

25  else does," because if your client doesn't have a present

1   right, it's a different story than us taking away a present

2   right to your client.  I think it's a tough brief, but go

3   ahead and write it.

4            MR. BURRER:  And, Your Honor --

5            THE COURT:  I think, Mr. Burrer, you probably

6   wrote the *Tri-Union* Opinion when you were my law clerk so

7   you ought to know what --

8            MR. BURRER:  Yeah.

9            THE COURT:  -- you're doing on this, so go ahead,

10  take your shot.  I think you'll not get there.

11           MR. BURRER:  And, Your Honor, I'm not so sure that

12  all of the Plan transactions have been proposed under 363.

13           THE COURT:  It doesn't --

14           MR. BURRER:  And I think the Plan --

15           THE COURT:  We're dealing with -- it doesn't

16  matter how they define it.  It matters how I define it.

17           MR. BURRER:  Understood, Your Honor.

18           THE COURT:  All right.  Thank you.

19           Mr. Eisenberg.

20           MR. EISENBERG:  Thank you, Your Honor.

21                OPENING STATEMENTS ON BEHALF OF

22                US SPECIALTY INSURANCE COMPANY

23           MR. EISENBERG:  Philip Eisenberg.  I represent a

24  number of clients.  As accurately reflected by Mr. Perez,

25  one of my clients, US Specialty Insurance Company, has

1  withdrawn its objections and we have entered into an ongoing

2  arrangement contingent upon the effective date and certain

3  things happening for an additional bonding facility for

4  NewCo.  And so that is -- that has been noticed on the

5  Docket and Mr. Perez has accurately described that.

6        With regard to Houston HCCI International, I will

7  simply point out that we are finalizing our documentation,

8  Your Honor.  I will significantly streamline any proceedings

9  before Your Honor.  Once our discussions here on opening are

10  done, I think it may be appropriate to take a brief recess,

11  Your Honor, to allow the final ink to dry on those things

12  because I think it will make for a more comfortable day for

13  everybody.

14        And I'm sure that Mr. Brescia and Mr. Miller will

15  have more to say about that.  They are the ones who are set

16  up to do opening on those arguments, Your Honor, and I think

17  they would if it was Your Honor's pleasure --

18        THE COURT:  Let me ask, Mr. Eisenberg.

19        Does it make some sense to postpone those opening

20  arguments to wait to see if the deal gets done and if it

21  doesn't, let them come back and make their opening

22  statements at that point?

23        MR. EISENBERG:  Absolutely, Your Honor.  And I was

24  just going to do cleanup on that, so I appreciate that

25  courtesy as well, Your Honor, and I think that Mr. Miller is

1  smiling and so I appreciate that.

2         For my other clients, which are W&T Offshore and

3  Merit Energy, I was -- of course, the *Tri-Union* Opinion I

4  was -- Mr. Burrer wrote it, okay, so.

5         THE COURT:  It's been about 15 years, but my guess

6  is he did all the drafting on that and I probably cleaned up

7  a verb or two, but that's probably about it.

8         MR. EISENBERG:  Right, right.  So for W&T, the --

9         THE COURT:  He was like 26 years old and now it's

10  going to get thrown back at him, I believe.

11         MR. EISENBERG:  He still looks 26 years old.  That

12  is a compliment so -- maybe not so much.  So you know, we

13  have been working very diligently with the Debtors.  We have

14  language that we thought was finally approved.  We're

15  waiting on the Confirmation Order to come for W&T and Merit

16  and for two of our other clients as well, McMoRan and

17  Conoco, that Mr. Kuebel and Mr. Knapp have been dealing

18  with.  And so that language is pretty much the basis for

19  what BP put in there for one of its legs of its four points,

20  and so we also think that we need to have that come to

21  ground here.  Those are very important issues.

22         I wasn't sure about the argument, Your Honor, with

23  regard to -- and I think Your Honor is thinking about it the

24  same way I am and that is:  If an entity buys a property

25  from the Federal Government and signs on, and says, "I am

1  now liable for whatever obligations go with that lease that

2  I just got assigned," then on a going forward basis, if the

3  Government were to call on another party in the future to do

4  decommissioning on that property, then that company that did

5  the decommissioning would have whatever rights it would be

6  subrogated to not because of an arrangement before this

7  bankruptcy, before the effective date, before the 363 sale,

8  but it would be subrogation rights for having performed on

9  the demand from the Government because the NewCo agreed on a

10  going forward basis to comply with the obligations under the

11  lease and be obligated to the Government.  So it's not the

12  old obligations that they're subrogated to, but the new ones

13  that they're signing onto, Your Honor.  And we don't know

14  whether or not and when that would happen, but it certainly

15  has --

16          THE COURT:  Here's the problem, Mr. Eisenberg,

17  which is:  If NewCo, let's say, puts in some new platforms

18  out there after they acquire, I agree.  As to those new

19  platforms, that's new operations and whoever has subrogation

20  rights will have subrogation rights as to the new platforms.

21          As to the old platforms, those are rights that we

22  could cut off and because we could cut them off, we can also

23  cut them off less than totally.  And if you're telling me

24  that you want subrogation rights against the new platform, I

25  got it, but if you're telling me you want subrogation rights

1  against the historic work, that would get in the way

2  obviously of meeting the Government's goal that is preserved

3  in *Midlantic* and that is actually contrary to the language

4  of 363 and contrary to abandonment language, but the Supreme

5  Court can do that, I can't.  And so once the Government

6  isn't going to insist on its *Midlantic* rights, I can use

7  abandonment and I can use 363.

8          MR. EISENBERG:  Two observations on that.  One, on

9  any new platforms or wells that are drilled, the Government

10  has no rights against the predecessors going back.

11          Second, on the new stuff --

12          THE COURT:  No, I understand that.

13          MR. EISENBERG:  Okay.

14          THE COURT:  But to the extent that the

15  predecessors want to assert some rights there, I'm not

16  cutting those off.  It's historic ones.  It's the ones that

17  go with the property where I can order the property sold

18  free and clear.  They can't --

19          MR. EISENBERG:  But the -- right, they could be

20  sold free and clear, but they still own them and they own

21  them subject to the regulations on a going forward basis.

22  And as part of that bundle of rights that they're getting,

23  they have the obligation as the current operator and current

24  record title owner to decommission.  And to the extent that

25  they did not perform in the future, right, and --

1          THE COURT:  I understand your argument.  It's

2   wrong, but I understand it.

3          MR. EISENBERG:  Okay, Your Honor.  I don't

4   necessarily agree with you on that and I --

5          THE COURT:  I know.  I know you don't.

6          MR. EISENBERG:  And so -- and I don't know how you

7   can cut something off that hasn't arisen because it can't

8   arise until after the effective date.

9          THE COURT:  Because it goes with the property.  It

10  doesn't exists in the ether.  It's a right that goes with

11  the sale of the property and Congress decided to write a

12  provision that allows Debtors to abandon the property, that

13  allows Debtors to sell property free and clear.  In either

14  of those instances, these rights wouldn't exist.

15         MR. EISENBERG:  Well, then if the Government did

16  that, they'd be cutting people's subrogation rights off and

17  they'd have a hard time coming against them, but we'll see

18  how that works out years from now.

19         THE COURT:  I got it.

20         MR. EISENBERG:  Okay.  So anyway, going back to

21  agreed language, Your Honor, the -- you know, we're just

22  waiting to get the ink to dry on that, as well, and so I

23  just wanted to let Your Honor know that, as well, which is

24  why we're kind of standing down here and just trying to get

25  this to be as consensual as possible and to shove off

1    whatever we don't have to decide today.

2              THE COURT:  I appreciate that.

3              MR. EISENBERG:  Okay.  Thank you, Your Honor.

4    I'll pass the podium.

5              THE COURT:  Thank you.

6              MR. EISENBERG:  Uh-huh.

7              THE COURT:  All right.  Mr. Langley?

8              MR. LANGLEY:  (No audible response).

9              THE COURT:  Mr. Langley, I don't hear you.  Let

10   me --

11             MR. LANGLEY:  Oh, I'm sorry, Your Honor.

12             THE COURT:  There we go.

13             MR. LANGLEY:  Do you hear me now?

14             THE COURT:  Yes, sir.  It's better when you unmute

15   it.

16             MR. LANGLEY:  Oh, thank you.

17             I'd like to defer to Mr. Grzyb, if I can.

18             THE COURT:  Of course.

19        (Pause in the proceedings.)

20             THE COURT:  Do you know what phone number

21   Mr. Grzyb is dialing in from today?  It looks like it might

22   be a different number than what I have him down on.  I have

23   a whole bunch of people that want to speak, so why don't we

24   do this: We'll get to him.  Whoever has pressed five star is

25   just -- his name isn't associated with whatever number he's

 1  dialing in from today.  So I'm just going to go to the next

 2  one on the list and then -- but Mr. Grzyb will eventually

 3  speak, if that's okay.  I've got a lot of people on the

 4  line.

 5          MR. LANGLEY:  Thank you.

 6          THE COURT:  Thank you.

 7          MR. LANGLEY:  I'd like to go later.  Thank you,

 8  Your Honor.

 9          THE COURT:  All right.  From 214-765-3657, who do

10  we have?

11          MS. ARCHIYAN:  Your Honor, good morning.

12          Yelena Archiyan, on behalf of Sea Robin and

13  certain other affiliates of Energy Transfer.

14       OPENING STATEMENT ON BEHALF OF ENERGY TRANSFER

15          MS. ARCHIYAN:  Your Honor, I will be very, very

16  brief.  Energy Transfer filed a cure objection on June 4th

17  and a reservation of rights on June 16th.  The issue at this

18  time, Your Honor, is that the parties are in the midst of

19  reconciling Energy Transfer's contracts and cure amounts as

20  well as negotiating a series of trade agreements.

21          Energy Transfer is sitting on some cash

22  collateral, but it would like the status of preserved

23  funding those negotiations and the renegotiation process and

24  have requested some protective language in the Confirmation

25  Order with respect to that cash collateral, including the

1 right to use that setoff against any claims for rejection

2 damages should it be determined that the Debtors are

3 rejecting any of Energy Transfer's contracts.

4   We reached out to Debtors' counsel last week and I

5 understand that they are working on it.  We haven't seen a

6 proposed Confirmation Order yet and it's possible that this

7 language be in there or will be in there, but we didn't want

8 to waive any rights by not speaking up today.

9   That's all, Your Honor.  Thank you.

10   THE COURT:  Ms. Archiyan, thank you.

11   From 315-632-4125?

12   MR. WOODARD:  Good morning, Your Honor.  This is

13 Lee Woodard on behalf of Lexon Insurance Company.

14   THE COURT:  Mr. Woodard, good morning.

15  OPENING STATEMENT ON BEHALF OF LEXON INSURANCE COMPANY

16   MR. WOODARD:  Good morning.  I thought I would

17 throw myself into the same barrel with the other -- my

18 surety folk, as well, and just had very -- hopefully very

19 briefly a couple of items.

20   One is, obviously this language that was just put

21 forth by the Debtor in the Fifth Plan at 5.13(a) is a bit of

22 a lightning rod over the subrogation rights of sureties.

23   And while you were talking to Mr. Zuber, there

24 was -- one question that you kept asking was:  What current

25 rates would be impacted by this insertion of this in the

1 | Plan?

2 |         THE COURT:  Right.

3 |         MR. WOODARD:  The answer is:  Lexon, about

4 | 99 percent of our $90 million worth of bonds are all with

5 | just the Government as the obligee.  And so what this

6 | Section 5.13(a) of the new -- of the latest version of the

7 | Plan does is it removes our rights, any Governmental rights

8 | including but not limited to any rights provided for under

9 | the Plan.  So those are our existing rights.

10 |         Now if the -- all we're seeking in the language

11 | that Aspen put forth in that -- in their supplemental

12 | objection at Document 1664 is that whatever our rights that

13 | exist, roll forward.

14 |         I can't disagree with the Court's view on a 363

15 | sale.  The Court has the power to be able to do a number of

16 | things.  The part that gets lost I think in that whole

17 | scenario, I think 363 can cut it off.  However, NewCo is

18 | going to need funds to be able to go-forward to do anything

19 | it wants to do and either they're going to replace our bonds

20 | or they're going to have to cut a deal with the existing

21 | sureties to be able to do -- change name rider or something

22 | along those lines that would allow them to continue forward

23 | or theoretically, I suppose, the Government can waive them.

24 |         But if there's a sale and it does not encompass

25 | our bonds, they can't be assumed, transferred or assigned,

1  they're cut off.  So there wouldn't be any subsequent issues

2  that we'd have with NewCo because our bonds would be cut

3  off.  It'd be a defense against the claims by the Government

4  to us.

5       But at the end of the day, our -- all we're really

6  seeking is to have our rights, whatever they exist today

7  pre-petition, should ride through the Plan to the extent

8  they're allowed.  If there's a 363 cutoff, then we're cut

9  off on that.  That raises new defenses for us, but

10  doesn't --

11       THE COURT:  Is anyone arguing that you don't get

12  monetary subrogation to the Government's rights?  Maybe they

13  are.

14       MR. WOODARD:  Well, I think we do get monetary

15  only.  I don't think we have the ability to claim

16  regulatory.

17       THE COURT:  Okay.  And that bond and your

18  reimbursement agreement on it come from Fieldwood; is that

19  right?

20       MR. WOODARD:  Fieldwood is the principal, that's

21  correct.

22       THE COURT:   So you would have --

23       MR. WOODARD:  And the Government is the obligee,

24  though.

25       THE COURT:  Right.  So if it's called upon, you

1  would have an unsecured claim against Fieldwood and you're

2  saying you want one against the purchaser as well.

3          MR. WOODARD:  I'm saying, Judge, that if -- I

4  don't see how the purchaser gets our bonds, right, so unless

5  they have some agreement with Lexon.

6          THE COURT:  Right.

7          MR. WOODARD:  When the purchaser buys and it's

8  approved by the 363 sale, it doesn't get our bonds.

9          THE COURT:  Correct.

10          MR. WOODARD:  That is -- our bonds are there --

11          THE COURT:  No, your bonds remain payable only to

12  the United States, right?

13          MR. WOODARD:  Absolutely correct.

14          THE COURT:  So the United States goes to Fieldwood

15  and says --

16          MR. WOODARD:  And if they've now consented in

17  that --

18          THE COURT:  But the United States goes to

19  Fieldwood and says, "Can up," Fieldwood doesn't, you may

20  have to fund the bond or maybe not, but your defense isn't

21  that there was a sale, right?

22          MR. WOODARD:  Correct.  Well, ultimately the

23  defense as to the Government?  Maybe because it's a sale

24  because it was the sale that cut off our liability as to

25  NewCo.  We wouldn't have any privy with NewCo, but we may

1  have a defense now.  If the Government has consented to let

2  them proceed without bonding, without whatever else, we may

3  have another defense as to the Government.  But it has

4  nothing to do with the 363 sale or NewCo.

5          THE COURT:  I got it.  And that's probably one

6  reason why Mr. Balasko isn't consenting, right?

7          MR. WOODARD:  Right.

8          THE COURT:  So they're going to sell.  It violates

9  your bond.  The Government's going to call in the bond and

10 you may have some defense to it, but otherwise, you would

11 get an unsecured claim for the amounts you fund if you don't

12 have a defense.

13         MR. WOODARD:  All correct.

14         THE COURT:  Okay.  Yeah.

15         MR. WOODARD:  But largely the sureties are going

16 to (indiscernible) though through most of the objections

17 that we filed anyway are that they can't -- this Plan can't

18 just transfer our bond, can't assume or assign, they can't

19 do any of those things and --

20         THE COURT:  So I didn't think it was and I

21 probably -- maybe I misunderstood that, so I'm going to --

22 when we're done, I need the Debtor to clarify whether your

23 bonds are being transferred to the purchaser because I did

24 not believe that they were.  I just didn't think that they

25 were being dealt with and so they're selling property to the

1  purchaser.  The Government isn't consenting to that.  You

2  may or may not have liability, but if you do, it isn't

3  vis-à-vis the purchaser.  It's vis-à-vis, Fieldwood and the

4  Government.

5          MR. WOODARD:  Correct.  And, Judge --

6          THE COURT:  I apologize --

7          MR. WOODARD:  -- you've hit the nail on the head

8  as far as our objections go.  We've been trying to figure

9  out what this Plan actually does --

10          THE COURT:  Well, let me go back --

11          MR. WOODARD:  -- to the variety of bonds.

12          THE COURT:  I'm going to interrupt everybody else

13  making a presentation and ask Mr. Perez if I've got that

14  right.

15          MR. WOODWARD:  Okay.

16          THE COURT:  There is no assumption or transfer of

17  the bonds to the -- any NewCo, right?  It's the bonds are

18  there and they just exist, but you're not transferring them

19  over, right, Mr. Perez, or do I have that wrong?

20          MR. PEREZ:  No, you have that correct, Your Honor.

21  There's no transfer of the bonds.  The bonds exist, they

22  continue to exist.  They're in favor of various parties and

23  they will -- they're out there on a go-forward basis.

24          THE COURT:  Okay.  Look I'm going to hear from

25  everybody else but, Mr. Perez, I do think whatever portion

1    of your team is working on things with respect to an awful

2    lot of what we've heard today, we need clarity in the

3    Confirmation Order I think as to termination of rights that

4    could be exercised today versus termination of rights

5    against entities that don't currently own the properties

6    because I think that my authority is vastly different in

7    those two circumstances.  Mr. Woodard is bringing it to a

8    head, but so did the others.  And I want to know for sure at

9    the end of the day what this language is doing.

10            And if you're asking me -- if BP, for example, has

11   a current contribution right against one of its other

12   predecessors-in-interest, if you're asking me to cut that

13   off, I need to know that because I don't think you can do

14   that.  If you're asking me to cut off the rights against a

15   future purchaser, I think I've been pretty clear that I

16   think under *Midlantic* and abandonment and 363, I can.

17            I think Mr. Woodard is largely in agreement with

18   that.  I know the others aren't.  That just may make him

19   smarter, I don't know, or joining my camp, whichever one,

20   Mr. Woodard, you want to do.

21            MR. WOODARD:  That's only because you don't know

22   me well enough, Judge, but thank you.

23       (Laughter.)

24            THE COURT:  All right.

25            MR. WOODARD:  Thank you, Judge.

1          THE COURT:  I do need that worked through,

2     Mr. Perez, because I don't want there to be confusion at the

3     end of the day about it.

4          MR. PEREZ:  Yes, Your Honor.  I believe that

5     Ms. Liou and Mr. Carlson are the ones that are primarily

6     focused on that and hopefully will have more success than

7     showing slides.

8          THE COURT:  Thank you.

9          MR. WOODARD:  Thank you, Your Honor.

10         THE COURT:  Mr. Grzyb, I do have you here.  Thank

11    you.

12         MR. GRZYB:  Good morning, Your Honor.

13          OPENING STATEMENT ON BEHALF OF SURETIES

14         MR. GRZYB:  Darren Grzyb, along with Scott Zuber

15    and Mr. Rios and Mr. Million of the Husch Blackwell firm

16    representing four sureties identified by Mr. Zuber

17    previously.

18         I have been sort of spearheading along with my

19    colleagues on the Apache bonds deal that has been in the

20    process of being negotiated and I was -- and that was my

21    opening as it relates to the common law bond associated with

22    the Apache structure and Fieldwood One structure and the

23    deal that's being discussed with the Debtors currently.

24         And I would sort of echo what Mr. Eisenberg said

25    that -- well, I do have an opening and I can -- we have had

1  some discourse during this proceeding about the issues

2  particular to those four bonds and letters of credit.  I

3  would ask that they be -- my opening be abated pending

4  further documentation of the deal that is almost there,

5  Your Honor.

6          THE COURT:  That's granted.

7          MR. GRZYB:  Thank you.

8          THE COURT:  Thank you.

9          Mr. Miller?

10         MR. MILLER:  (No audible response).

11         THE COURT:  Mr. Miller, I'm not hearing you.

12         MR. MILLER:  Good morning, Your Honor.

13         THE COURT:  Good morning, Mr. Miller.

14         MR. MILLER:  Robert Miller for Philadelphia

15  Indemnity Insurance Company.

16         THE COURT:  Good morning.

17         OPENING STATEMENT ON BEHALF OF PHILADELPHIA

18                 INDEMNITY INSURANCE COMPANY

19         MR. MILLER:  I'll keep it brief.  I will echo

20  Mr. Grzyb and Mr. Eisenberg's comments.  I have some

21  beautiful slide decks that is ready and hopefully able to be

22  shown, but with that being said, I think it would be

23  appropriate and also saving use of resources and time to

24  abate it until we can hopefully paper this agreement that is

25  almost there.

1           THE COURT:  Mr. Miller, thank you.

2           That motion is granted as well.

3           814-456-2294.

4           MS. ROSEN:  Good morning, Your Honor.  Suki Rosen

5    on behalf of Forshey and Prostok for XTO Offshore, HHE

6    Energy Company and XH, LLC.

7           Can you hear me, Your Honor?

8           THE COURT:  I can, Ms. Rosen, and good morning to

9    you.

10          MS. ROSEN:  Thank you.  Your Honor, due to a

11   previously-scheduled appointment, I'm going to have to miss

12   part of the hearing this afternoon and Mr. Forshey of our

13   firm is going to step in at that time, if that's okay.

14          THE COURT:  Of course.

15          OPENING STATEMENT ON BEHALF OF XTO OFFSHORE,

16              HHE ENERGY COMPANY AND XH, LLC

17          MS. ROSEN:  Okay.  And then I just wanted to let

18   the Court know, as Mr. Perez stated, that we have been

19   working with the Debtors for the inclusion of some language

20   in the proposed Confirmation Order that would resolve our

21   objections related to mostly the Debtors' proposed cure

22   amounts and providing that the terms of the XTO contracts

23   remain unchanged and also our objection related to the

24   third-party releases.

25          In addition, we've asked the Debtors to include

1   language in the proposed Confirmation Order that says that

2   we're not precluded from making demand on the Debtors if

3   necessary as a condition precedent under our bonds and I

4   believe that they have agreed to do that.

5           We are not able to resolve the remainder of our

6   objections and XTO just in -- and generally does not agree.

7   We did not consent to the Plan.  However, I think our

8   objections are going to be duplicative of what other parties

9   will raise, and therefore, we don't intend to present any

10  additional argument on that and we'll just reserve anything

11  else for closing argument.

12          THE COURT:  Ms. Rosen, thank you.

13          Mr. Singer?

14          MR. SINGER:  (No audible response).

15          THE COURT:  Mr. Singer?  There we go.  Good

16  morning.

17          MR. SINGER:  Good morning, Your Honor.

18          Can you hear me?

19          THE COURT:  I can.  Good morning.

20          MR. SINGER:  Good.  Good morning, Your Honor.

21  Thank you.  Kelly Singer on behalf of Ecopetrol America.

22       OPENING STATEMENT ON BEHALF OF ECOPETROL AMERICA

23          MR. SINGER:  Your Honor, an update and then also a

24  reminder.  I'll start with the reminder.  At the pretrial

25  conference, Your Honor, you asked me to remind you to --

1  remind you about giving my witness an hour's notice before

2  she needed to appear at today's hearing so I just wanted to

3  remind you about that.

4          The update, Your Honor, is that we did have --

5          THE COURT:  That's a reminder for Mr. Perez, how's

6  that?  So he needs to -- he'll give you that hour update

7  because I'm not going to know when it happens, but you'll

8  get the hour.

9          MR. SINGER:  Among the three of us, we should

10  figure it out.  I appreciate that.

11          Your Honor, the update is we did have a productive

12  exchange of language to put into an order that I think would

13  resolve our objections.  We were confirming some things and

14  then we got some last-minute changes late last night I

15  believe by lenders' counsel, which kind of drastically

16  changed the language, in our opinion at least, so we don't

17  have consensual language yet.  I think we're still working

18  on it.  I'm not sure where that puts us today.

19          We've obviously filed an objection.  There's been

20  no substantive response to our objection.  I think the

21  parties were hoping on just working this out through

22  language, but that has not happened as of last night.

23          So that's the update, Your Honor.

24          THE COURT:  Mr. Singer, thank you.

25          From 713-294-0379?

1          MR. FISHEL:  Good morning, Your Honor.

2          Michael Fishel from Sidley Austin, on behalf of

3    Ridgewood Katmai and ILX Prospect.

4          THE COURT:  Mr. Fishel, good morning.

5       OPENING STATEMENT ON BEHALF OF RIDGEWOOD KATMAI

6                     & ILX PROSPECT

7          MR. FISHEL:  And I just -- I stand here to pretty

8    much echo Mr. Singer's comments.  We're kind of in the same

9    boat.  We had what I thought was a resolution on the

10   Confirmation Order language on Friday and late last night we

11   received language that was severely scaled back what we had

12   agreed to and understandably so.  You know, it was subject

13   to everyone's approval, but this was a little bit of a

14   surprise.

15         So we're kind of in the same boat of where we

16   stand right now.  We're hoping that for the rest of the day

17   we can in the background get the final agreed language.  But

18   like Mr. Singer's comment, we haven't received a substantive

19   response to our objection and as of right now, we -- at the

20   appropriate time we'll need to prosecute it.

21         THE COURT:  Thank you, Mr. Fishel.

22         MR. FISHEL:  Thank you.

23         THE COURT:  Mr. Brescia?

24         MR. BRESCIA:  Your Honor, this is Duane Brescia.

25         Did you call on me?

1          THE COURT:  I did, Mr. Brescia.  Good morning.

2          MR. BRESCIA:  Okay.  Thank you.  I apologize,

3    Your Honor.  Sometimes you wait long enough in these

4    hearings and you don't know if your five star was received

5    or not, so you start pressing it several times to be heard

6    so I appreciate Your Honor --

7          THE COURT:  Let me just warn you that if you press

8    it an even number of times, there is no five star.  You have

9    to press it only an odd number of times so I would --

10   usually if someone --

11         MR. BRESCIA:  Yeah, I know.

12         THE COURT:  -- sat on it anymore, anybody else

13   that wants to speak, but anyway that's what's going on.

14         MR. BRESCIA:  I was trying to look back at my --

15   yeah, I was trying to look back at my history to count those

16   myself.

17         OPENING STATEMENT ON BEHALF OF ZURICH AMERICAN

18              INSURANCE COMPANY AND SEITEL DATA LIMITED

19         MR. BRESCIA:  So, Your Honor, Duane Brescia, on

20   behalf of Zurich American Insurance Company.  And I actually

21   have another client, Seitel Data Limited, and I'll get to

22   Seitel in a minute.

23         But I did just want to speak along with the other

24   surety counsels along with what Mr. Perez said so -- and I

25   did raise my star five as an objecting party because I think

1   the Agenda that was filed still lists us as an objecting

2   party so we're kind of in that situation where we have an

3   agreement in principle.  We are working on papering a term

4   sheet.  That term sheet is not complete, but we are very,

5   very close and part of that term sheet requires us not to

6   oppose the Plan.  So in the spirit of trying to continue

7   that settlement, I did not want to present my opening

8   argument at this point as well, so I also ask the Court's

9   permission to be able to present that either at the opening

10  of our evidence or at a later time when appropriate.

11          And barring that, Your Honor, you know, I think

12  part of the term sheet, which isn't disputed, requires

13  definitive documents to be entered into later prior to the

14  effective date.

15          I think the parties understood that, you know,

16  once we enter into a term sheet and the Plan gets confirmed,

17  if there's a dispute on something that wasn't contemplated

18  or there is a disagreement that we could come back to Your

19  Honor to resolve those disputes if we cannot do it

20  ourselves.

21          And so one of those two options would be

22  satisfactory to Zurich to get to the end result, either

23  continue our opening for later, perhaps allowing a small

24  break to see how far the parties can get.  And barring that

25  with Mr. Perez's consent, that any open items or issues that

1  can't be resolved today will be resolved in front of Your

2  Honor later on.

3          THE COURT:  I'll let you do whichever those works

4  out at your option is what we'll do so you preserve all your

5  rights.  Thank you.

6          MR. BRESCIA:  Your Honor, with respect to Seitel

7  Data Limited, they are a contract party that was originally

8  on the assumed list and then put on the rejection list.

9  Seitel is a seismic data licensing company and were usually

10 involved in many of these trying to resolve those at the

11 last minute.

12          This Debtor has agreed to reject the Licensing

13 Agreement from Seitel, so that puts us in a -- not needing

14 to assume it anymore, but because of the verification of

15 destruction of data issues, we did ask for some language

16 that merely states that the parties can agree to reject,

17 terminate as necessary, and that there will be a

18 verification of destruction signed.  I think the parties

19 have agreed on language, but they were pending confirmation

20 from the other, I guess, consenting parties and I did not

21 get a response on that.

22          Having said that, too, I think there is an

23 agreement in principle between Seitel and the Credit Bid

24 Purchaser to start a new license agreement going forward.  I

25 can't comment on the details of that yet, but I would just

1    request that either the rejecting language that we propose

2    just be assented to or that I can raise these issues later

3    on in the hearing if we cannot get to appropriate language

4    approved by all necessary parties.

5              THE COURT:  Mr. Brescia, you can raise it later.

6    Thank you.

7              All right.  Mr. Scharfenberg?

8              MR. SCHARFENBERG:  Good morning, Your Honor.

9              Can you hear me okay?

10             THE COURT:  Good morning.  I can,

11   Mr. Scharfenberg.

12             MR. SCHARFENBERG:  Perfect.  Thank you.

13       OPENING STATEMENT ON BEHALF OF RLI INSURANCE COMPANY

14             MR. SCHARFENBERG:  Elliot Scharfenberg, on behalf

15   of RLI Insurance Company.  I rise here today to address an

16   RLI specific issue relating to approximately $8.25 million

17   of escrow funds held by an escrow agent pursuant to the 1999

18   Escrow Agreement that relate to plugging and abandonment

19   obligations on a bond that RLI issued in favor of BP.

20             What we're looking for is some language in the

21   Confirmation Order to expressly provide that any rights we

22   have under those escrow funds, which are not property of the

23   Estate, not be impaired in any way by the Plan.

24   Specifically we're concerned with Section 10.6 of the Plan,

25   which deals with the Plan Injunction.  It might be arguably

1   broad enough to accept our language or somehow modify or

2   impair any rights that we otherwise have and that shouldn't

3   be impaired under 524.

4          We have reached -- we have both briefed this in

5   our objection and we have reached out to the Debtors.  My

6   understanding is that the Debtors are going to send us some

7   Confirmation Order language that they might propose.  We

8   have not received anything yet and we have not seen the

9   issues substantively briefed by the Debtors.

10          We are prepared to put on evidence showing that

11  this property is not property of the Estate, if need be, but

12  I suppose in the absence of getting some type of consensual

13  language, we would like somewhere between 15 and 20 minutes

14  to put on evidence of the opposing sections of this case.

15          THE COURT:  Of course, you'll have the chance to

16  do that.  Thank you.

17          Mr. Taylor, let me get your line active.

18          Mr. Taylor, go ahead please.

19          MR. TAYLOR:  Good morning, Your Honor.

20          Can you hear me?

21          THE COURT:  I can.  Good morning.

22          MR. TAYLOR:  Your Honor, I represent Marathon Oil

23  Company, who is a predecessor-in-interest.  We have filed an

24  objection.  It's found at Docket 1554.

25          THE COURT:  Right.

OPENING ON BEHALF OF MARATHON OIL COMPANY

1              OPENING ON BEHALF OF MARATHON OIL COMPANY

2          MR. TAYLOR:  Marathon does not maintain any

3 presence in the Gulf of Mexico currently and by that I mean

4 no longer holds any record titles in the Gulf of Mexico and

5 is no longer an operator, but it did hold assets previously

6 arising from leases dating all the way back to the '60s and

7 '70s across the spectrum of the structure proposed by this

8 Plan and that is they have assets going into Fieldwood One

9 and to NewCo and also presumably into Fieldwood Four.

10         We've reached a deal in principle with Chevron to

11 include that -- some assets where we held in that title in

12 conjunction with Chevron and is now going to be included in

13 Fieldwood Four.  It was previously going to be an abandoned

14 bucket.  And that's good news for all the parties here

15 today.

16         However, we do still have other assets that are

17 going into the abandoned bucket.  Those include assets where

18 we held title with Hess, also with Shell where Fieldwood is

19 not the operator but rather LLOG is.  Then there's some

20 other miscellaneous assets.  Therefore, we still do have a

21 live objection and still do join in Hess' objection as to

22 those assets.

23         I did want to note for the Court that Marathon has

24 opted out of the third-party releases.  We've objected to

25 that issue, but I presume Your Honor's going to hear a lot

1  about that, but since we have affirmatively opted out and so

2  noted in our objection also, that therefore, we're not going

3  to be making any evidentiary presentation regarding that.

4          And with that, Your Honor, we have nothing

5  further.

6          THE COURT:  Mr. Taylor, thank you.

7          From 847-363-6644, let me get your line active.

8  Hold on.  Go ahead, please.  Who do we have on that line?

9          MR. KIND:  Good morning, Your Honor.  My name is

10  Michael Kind representing the Cox entities.

11          THE COURT:  Mr. Kind, good morning.

12          OPENING STATEMENT ON BEHALF OF THE COX ENTITIES

13          MR. KIND:  Good morning, Your Honor.  Thank you

14  for the opportunity to speak.  I want to add our chorus to

15  some of the other creditors who have spoken.  We filed a

16  limited objection at Docket 1454 raising some issues

17  concerning setoff rights.

18          We've also exchanged language with members of the

19  Debtors' team.  We're hoping to reach resolution on language

20  but, Your Honor, we wanted to reserve our rights to present

21  a more substantive opening later if we don't reach an

22  agreement and I'm just flagging that for Your Honor.  But in

23  the interest of time, we want to just raise our hand, but

24  not go too deep into that argument.

25          But we're hopeful that the Debtors can work with

1 us on a reciprocal setoff provision in the Plan instead of

2 sort of way it's framed now.

3          Thank you, Your Honor.

4          THE COURT:  Mr. Kind, like others, if you don't

5 work that out with the Debtors, you're welcome to make your

6 opening later.  I do want to remind you -- I don't think

7 I've already done it because I don't have a list printed in

8 the last two hours.  As of the time I printed my list, you

9 hadn't made an electronic appearance yet, so if you'd please

10 be sure and do that.  You just go to my home page and do it.

11 You may have already done it, so if you have, don't worry

12 about it.

13          MR. KIND:  Thank you, Your Honor.

14          THE COURT:  Thank you.

15          MR. KIND:  Thank you, Your Honor.

16          THE COURT:  From 832-255-6000, let me get that

17 line active.  Go ahead please.

18     (No audible response.)

19          THE COURT:  Who do we have from 832-255-6000?

20     (No audible response.)

21          THE COURT:  You may have your own line muted.  I

22 have you unmuted from here, if that's you.

23     (No audible response.)

24          THE COURT:  Well, we're going to move ahead.  I

25 don't know who that was.  Let's see, Mr. Baay, I can see

1   your lips moving, but I can't hear you.  Was that you?

2            MR. BAAY:  Well, that's not my phone number,

3   Your Honor, but my line just became unmuted.

4            Can you hear me?

5            THE COURT:  Yes, sir.  I don't know -- it's

6   showing up that way.  I don't know what that's about, but

7   why don't you go ahead, Mr. Baay?

8                    OPENING STATEMENT ON BEHALF OF

9              LLOG EXPLORATION OFFSHORE AND LLOG ENERGY

10           MR. BAAY:  Okay.  Your Honor, like others that

11  you've heard from this morning, again for the Record, I'm

12  John Baay from Gieger Laborde & Laperouse, on behalf of LLOG

13  Exploration Offshore and LLOG Energy.  And I believe we

14  reached an agreement with Debtors' counsel yesterday evening

15  to sort of push our issue off.  You got a preview of that

16  issue when you heard the motion for adequate protection back

17  in January.

18           It's a very discrete issue about the nature of our

19  claim and whether or not it's secured.  And I believe we

20  have an agreement to have a separate hearing on that and

21  push that issue off.  I've not seen language for the

22  Confirmation Order yet, but I understand that that's coming.

23  So again like others, we'll reserve our opening and any

24  evidence assuming that can't be reached.  Thank you.

25           THE COURT:  Mr. Baay, thank you.

1              And of course that's granted.

2              Mr. Skelton, let me get your line turned on.

3              Go ahead, Mr. Skelton.

4      OPENING STATEMENT ON BEHALF OF HOUSTON ENERGY DEEPWATER

5              VENTURES I, LLC AND RED WILLOW OFFSHORE, LLC

6              MR. SKELTON:  Yes, Your Honor.  This is Barnet B.

7  Skelton, Jr.  I'm appearing here today for Houston Energy

8  Deepwater Ventures I, LLC and Red Willow Offshore, LLC.

9  Both of these entities are co-working interest owners with

10 the Debtors on the MC519 lease.  We filed cure objections at

11 Docket 1433 and 1472.

12             I am pleased to say that I've been working with

13 Weil on this and some language for the Confirmation Order

14 has been exchanged.  We've also agreed that the cure hearing

15 itself would be adjourned to a date reasonably soon after

16 the Confirmation Hearing.

17             That's all we have right now, but we're working on

18 this behind the scenes trying to resolve it.

19             THE COURT:  I appreciate the announcement.  Thank

20 you, Mr. Skelton.

21             MR. SKELTON:  Thank you.

22             THE COURT:  From 312-857-0910, let me get that

23 line active.  Go ahead please.

24         OPENING STATEMENT ON BEHALF OF NORTH AMERICA

25                  SPECIALTY INSURANCE COMPANY

1          MR. LEO:  Good morning, Your Honor.  Scott Leo, on

2   behalf of North America Specialty Insurance Company.

3          THE COURT:  Good morning.

4          MR. LEO:  I am one of the surety representatives.

5   We have (glitch in the audio) bonds.  One (glitch in the

6   audio) the other obligees.  I'd like to follow up maybe on

7   some of the things that Mr. Woodard had said earlier and

8   also some of the things that Mr. Zuber has said earlier.  I

9   would like the Court to know that Mr. Zuber's suggested

10  language in Document 1664 about the reservation of rights

11  for the surety is something we agree to that North America

12  Specialty would sign on to.

13         I would also point out to the Court in Document

14  1640, I filed a clarification on the objections -- the

15  response to objections that the Debtor made in the matrix

16  and really they were questions about suretyship that I

17  believe the Court kind of alluded to when you suggested to

18  Mr. Perez that perhaps these issues ought to be addressed.

19         One of the things in terms of the current

20  obligations of the Debtor to the surety that dawn on me is

21  its default versus payment of a loss and in many instances a

22  surety's rights arise upon default.  Now the Debtor had said

23  it's possible for BOEM to issue decommissioning orders as of

24  the effective date, which tells me there must be a current

25  default.  And the Debtors filed a suit to enforce their own

1  bonds on which their principle (glitch in the audio) and

2  that is the procedure, Your Honor, I had never seen before.

3  It's effectively the principal suing oneself because the

4  principal is a party to the bond.

5          So some of the questions I pondered over, you

6  know, and this is -- I've practiced surety law a long time

7  and this is a very unique situation and I would love to hear

8  the answers myself.  How the Debtor use surety credit post-

9  confirmation?  If security credit is applied post-

10 confirmation, why does the surety lose its rights to

11 recourse?

12         And I mentioned in my brief that, okay, throw out

13 the indemnity agreement, but if you're using surety credit

14 for an existing platform on which a subsequent owner bought,

15 the bond is called upon, why doesn't the surety have the

16 rights of reimbursement, exoneration, (indiscernible), which

17 is enforcing your exoneration right by requiring collateral

18 or even for that matter, restitution?

19         If there are no post-confirmation defaults, why

20 would BOEM -- or no pre-confirmation defaults, why would

21 they have the capacity to take issue of those demands on the

22 effective date?

23         And if the underlying leases are assumed, you

24 know, which in one case my bond is several bond.  It assigns

25 specific penal sums to sets of leases, why wouldn't then the

1  surety's rights of recourse go with it if they are assuming

2  something?

3          Now they clarified in a way that's confusing to me

4  that there's no transfer, there's no assignment, there's no

5  what you would call "assumption" of surety credit yet the

6  bond somehow mystically transferred over to the post-

7  confirmation world.  And I think you've seen all the

8  sureties briefing on this, but you know.

9          THE COURT:  Yeah, I'm not understanding and this

10 is sort of the same question.  I don't think they're

11 transferring into the post-confirmation world.  They are a

12 thing in existence today and they don't go out of existence

13 if we confirm.

14         MR. LEO:  Well, that's -- my understanding of what

15 Mr. Perez has said, I just don't understand how that works

16 without the sureties preserving their right of recourse

17 against whoever uses the surety credit at the time it's

18 called upon and that's one --

19         THE COURT:  When you say, "Whoever uses," I don't

20 understand the surety credit concept either.  The sureties

21 aren't providing credit.  The sureties might be called upon

22 to pay a penal sum under their bond, but that's not a

23 provision of credit.  That will then result in either a

24 reimbursement obligation or a common law right of

25 reimbursement or both from the maker of the -- from

1 Fieldwood, but that's not an extension of credit.  That is a

2 debt obligation that arises by operation either contract or

3 of law against Fieldwood, right?

4          MR. LEO:  It is an extension of credit,

5 Your Honor.  That's our position and --

6          THE COURT:  How is it an extension of credit?  I'm

7 not understanding that.  You're not being required by this

8 Plan to extend any credit.

9          MR. LEO:  The bond requires the surety to perform

10 upon the default of another.  It is --

11          THE COURT:  That's not an extension of credit.

12 That's a performance under your bond.

13          MR. LEO:  Yeah, but a surety --

14          THE COURT:  If you coincidentally then have a

15 reimbursement obligation, which you will, I think, against

16 Fieldwood, that's still not an extension of credit.  We

17 are -- if there's anything in the Plan that requires you to

18 extend credit, I need to see that because it was not my

19 intention to do that if we confirm.

20          MR. LEO:  Well, suretyship in itself is an

21 extension of credit.  Bonds are written as financial

22 obligations because --

23          THE COURT:  No, you extended credit when you wrote

24 the bond.  I got that.

25          MR. LEO:  Yeah.

1           THE COURT:  The payment on the bond is not an

2    extension of credit.  The payment on the bond is performance

3    under the bond.  It may result -- and almost always does

4    result -- in either a common law or contractual

5    reimbursement obligation.

6           MR. LEO:  But covering a post-confirmation use of

7    the surety credit post-confirmation default would be the use

8    of surety credit by whoever --

9           THE COURT:  There is -- I think as a matter of law

10   that description is flawed.

11          MR. LEO:  Well, that's probably the --

12          THE COURT:  You are simply not extending credit.

13   You already extended the bond.  Performance under the bond

14   is your performance to the Government, not your performance

15   to the party that requested that you issue the bond.  You're

16   certainly not extending credit to the Government and they're

17   the ones that are going to be demanding payment, right?  Or

18   to the -- if there's a predecessor that has a demand against

19   your bond and the predecessor isn't asking you to extend

20   them credit.  It's telling you, "Pay me your appeal sum

21   requirement," or part of it.

22          MR. LEO:  But in doing so in this extent on post-

23   petition or post-confirmation, there is an existing source

24   of credit that covers a default by the principal and gives

25   rise to a right of recourse.  That's the very reason why a

1 bond -- and I note that at one point the Debtor referred to

2 the independence principle and I was hoping they referred to

3 a city in Missouri and not a surety bond because there is no

4 independence principle when it comes to a bond.

5        The independence principle applies to standby

6 letters of credit and is the principle that you can't --

7 it's an independent obligation between the issuing bank and

8 the beneficiary.  That is not a suretyship relationship.

9 Suretyship relationship includes the right to recourse

10 reimbursement, exoneration, (indiscernible) that the surety

11 would have --

12        THE COURT:  Are you telling me that your

13 obligation -- and I don't know who your bonds are payable

14 to, but let me assume for a minute they're payable to

15 Mr. Velasco.  Are you telling me that if Mr. Velasco demands

16 payment, that you could assert a defense against payment if

17 Mr. Velasco did nothing wrong?  Because that's what's meant

18 by the independence in this concept of a surety bond is that

19 you have an independent duty to the beneficiary of the bond

20 to pay.  Now the beneficiary itself might breach their right

21 to demand payment, but that can't come about from, for

22 example, Fieldwood's breach.  That would have to come about

23 from Mr. Velasco's breach or his client.

24        MR. LEO:  Yeah, there are basically four

25 suretyship defenses and modifications, impairments, release

1  and extension of time.

2          THE COURT:  Right.

3          MR. LEO:  It's a general ruling.  I agree with

4  you, Your Honor, this would involve really kind of an

5  arrangement between the obligee and the principal that

6  prejudices the surety's rights.  There's an exception where

7  if there is a modification of the underlying obligation, the

8  obligee can be completely innocent and yet they're

9  discharged at that point.

10          THE COURT:  But that deals with your independent

11  obligations written into the suretyship to Mr. Velasco and

12  it is independent.  It may rely on what somebody else does,

13  but your obligation to him is one that he can call in on

14  independent of any action by the requesting party.

15          MR. LEO:  Yeah, they're not necessarily written

16  into the bond itself, Your Honor, but the suretyship

17  defenses give -- provide by virtue of suretyship standard.

18  So there -- whether they're written in the bond or not, they

19  are common law rights which exists by virtue of suretyship

20  standard.

21          And I'm just pointing out to the Court that these

22  are some of the questions we have had.  I would conclude

23  that, yes, we did file a lawsuit on Friday.  I don't believe

24  it violates the automatic stay.  I waited until the Debtor

25  very clearly in response to our objections said it doesn't

1  impair any of our defenses against the obligees -- that the

2  Plan does not impair any of our defenses against the

3  obligees.

4          And with respect to the bonds themselves --

5          THE COURT:  So that you know, I was unaware until

6  Mr. Perez said something that you had filed a lawsuit.  I

7  read the lawsuit.  I have no idea if you violated the stay.

8  Hope you didn't.

9          MR. LEO:  I hope I didn't either, Your Honor, but

10 I would also point out that that does not mean we are

11 unwilling to talk.  In fact, we've been talking with Eni

12 Petroleum to try and resolve things and I hope it's kind of

13 a precursor to some more productive discussions so that

14 maybe we can resolve everything.

15         THE COURT:  All right.  Thank you.

16         MR. LEO:  That's all I have.

17         THE COURT:  We have Mr. Alaniz.  Let me get his

18 line active.  Hold on.

19         Mr. Alaniz, good morning.  Go ahead, Mr. Alaniz.

20     OPENING STATEMENT ON BEHALF OF HESS CORPORATION

21         MR. ALANIZ:  Yes.  Good morning, Your Honor.  Omer

22 Alaniz of Reed Smith, on behalf of Hess Corporation.

23         Your Honor, I was planning to forego an opening

24 argument.  We do intend to cross Mr. Dane and to make a

25 closing argument, but I did want to latch onto an exchange

1  you had a little while ago with Mr. Perez.  I was concerned

2  when I heard counsel for BP mention the proposed language in

3  the Confirmation Order saying something like nothing would

4  prejudice BP from seeking contribution against other

5  predecessors.

6         My concern including that language specifically

7  mentioning BP was found by negative implication that Hess

8  would not be able to seek such contribution.  I don't know

9  that Mr. Taylor would do that, but he's a smart lawyer so I

10  wouldn't put it past him.

11         We haven't seen the proposed Confirmation Order.

12  I wouldn't think that the Confirmation Order would dictate

13  who has financial responsibility as a result of the Debtors'

14  abandonment, but I agree with Your Honor that a provision in

15  the Confirmation Order clarifying those issues is important.

16         THE COURT:  Mr. Alaniz, thank you.

17         Mr. Langley?

18         MR. LANGLEY:  Your Honor, thank you very much.

19         Can you hear me now?

20         THE COURT:  I can, Mr. Langley.  And then we're

21  going to go to Mr. Kuebel when you're finished.

22         MR. LANGLEY:  Thank you.

23      OPENING STATEMENT ON BEHALF OF TRAVELERS CASUALTY,

24             LIBERTY MUTUAL INSURANCE CO.,

25      HANOVER INSURANCE COMPANY, AND XL SPECIALTY

1          MR. LANGLEY:  All right.  I don't want to repeat

2    things.  All I have to say is that there are issues with the

3    abandonment of responsibilities in the Gulf and I think you

4    have heard all the surety issues about the treatment of the

5    bonds and the future in the Gulf.  And we do believe that

6    there are *Midlantic* issues that the creditors have here.

7    And that's all I have, Your Honor.

8          THE COURT:  Mr. Langley, thank you.

9          Mr. Kuebel, I'm coming to you.  With an awful lot

10   of people on the phone, that's making the software respond a

11   little bit slowly, but I will get to you.  Give me one

12   moment.

13         Mr. Kuebel, good morning.  Oops, that didn't work.

14   Hold on.

15         MR. KUEBEL:  Good morning, Your Honor.

16         THE COURT:  Oh, it did work.  Okay.  Go ahead

17   please.

18         MR. KUEBEL:  Good morning, Your Honor.

19         Can you hear me well?

20         THE COURT:  I can.  Good morning.

21      OPENING STATEMENT ON BEHALF OF MCMORAN OIL AND GAS

22               AND CONOCOPHILLIPS COMPANY

23         MR. KUEBEL:  Thank you, Your Honor.

24         Omer S. Kuebel, III specifically rising on behalf

25   of our clients, McMoRan Oil and Gas and their affiliates and

1    the ConocoPhillips Company and its affiliates.  Your Honor,

2    first let me say that throughout the last few months, there

3    has been a tremendous amount of progress in evolving this

4    Plan to something that I think is much more responsible for

5    the transition of these decommissioning activities and the

6    Debtors' assets and including those that are to be abandoned

7    and a lot of credit goes to the Debtor and the Debtors'

8    team, the Department of Justice, and all the predecessors

9    who participated for many, many hours in trying to move this

10   Plan in a proper direction.

11          Your Honor, on behalf of our clients, we had filed

12   limited objections.  At this point going into confirmation,

13   we have one open issue that deals with the breadth of the

14   leases and exculpation clauses.  We have proposed language

15   to the Debtors to resolve that objection.  I think we're

16   close if not in agreement with language.  We do have an

17   issue for McMoRan Oil and Gas with fuel that I think is

18   going to be set to another day.

19          With respect to the breadth of the releases and

20   particularly the exculpation clauses in Section 10.8 of the

21   Plan, I just wanted to make sure that Your Honor is clear

22   from our perspective, it is not exclusively or perhaps not

23   at all a subrogation issue with respect to which rights are

24   being subrogated to.  It's really a contract issue.  These

25   assets at their core, Your Honor, as you might know, are

1   creatures of contract and those contracts include mineral

2   leases, they include operating agreements, they include

3   production handling agreements, transportation agreements,

4   and the like.

5          And what we are concerned about with respect to

6   the scope and the breadth of the exculpation and release

7   clauses is that those various contracts that creates a

8   fabric of these assets are not distorted in a way that third

9   parties are released from those contracts.  We understand

10  even with respect to abandoned property, the Debtors' going

11  to reject this interest in those contracts.

12         And I would focus the Court on a particular

13  defined term in the exculpation clauses "additional

14  predecessor breaches" and that term is incredibly broad.  We

15  can get into it if we need to.  But the point is, Your

16  Honor, from our perspective, both with respect to assumed

17  agreements and even rejected agreements, we want to make

18  sure that the non-Debtor rights are preserved.

19         And this is important, Your Honor, because

20  historically when the Government comes calling on the

21  predecessors who are working interest owners, they still use

22  these contracts and agreements and particularly the

23  operating agreements to decide amongst themselves, "How are

24  we going to fix this or how are we going to address this?"

25         And so it's important from our perspective as we

1    deal with reservation of rights language to make sure that

2    those third-party rights are not impaired, they're not

3    impaired for assuming agreements or even rejected agreements

4    because it's really through those contract rights that the

5    other parties, the predecessors, the working interest owners

6    are going to have to define how exactly they react to these

7    orders from the Government.

8           So I just wanted to make that point clear that

9    it's -- from our perspective, the breadth of the exculpation

10   is beyond just a subrogation issue, but it's also about

11   trying to maintain the integrity of the contracts

12   particularly the operating agreement as between the parties

13   to those agreements that in the future may include or reject

14   the Debtor, but there are still parties that have to figure

15   out how to get contribution, how to get the P&A done.

16          And typically in my experience, those parties are

17   going to go back to the DLA and we want to make sure that

18   the Plan doesn't inadvertently shift around those third-

19   party liabilities under those various agreements and the

20   obligations under those agreements.

21          THE COURT:  Look I think it's a fair comment,

22   Mr. Kuebel.  I did not believe the Plan did.  I may be wrong

23   about that if it does, and we certainly -- I'll ask

24   Mr. Perez as he's working on the language that's going to

25   clarify existing rights that could be exercised if a call

1    were today versus something in the future that you add to it

2    contractual rights as well, Mr. Perez, just so we know

3    clearly what we're doing.

4              MR. PEREZ:  All right.

5              THE COURT:  But I didn't think you were impairing

6    the rights that Mr. Kuebel is talking about invading, but

7    this is a complicated deal and we ought to be sure that I'm

8    understanding it correctly as is he.

9              MR. PEREZ:  Yeah.  And, Your Honor, in the context

10   of rejecting -- the Debtor rejecting an operating agreement

11   in an abandoned property, we're reaching.  That's what that

12   is, but that agreement still exists just as among the other

13   parties, so I don't think the Plan is purporting to do that

14   at all.

15             THE COURT:  Yeah.  I think he's worried about some

16   particular language in that exculpation agreement that might

17   do that and I'll just let you all work through that.  But I

18   didn't think it was doing it.  I don't even know that

19   Mr. Kuebel thinks it's doing it.  He wants to be sure it's

20   not doing it and there's a slight difference there.

21             MR. PEREZ:  Understood.

22             MR. KUEBEL:  And, Your Honor, even if that wasn't

23   the intention, the breadth, for example, of that definition

24   of "additional predecessor agreements" is just such that

25   it's a red flashing light.

1        THE COURT:  Yeah, let's get some clarity on it to

2  where we all can agree what it says.  And you know, it may

3  be we all agree it says something somebody doesn't like, but

4  I don't want there to be ambiguity about what it says.

5        MR. PEREZ:  Yes.  Thank you, Your Honor.

6        THE COURT:  Thank you.

7        Mr. Zabel?

8        MR. ZABEL:  (No audible response).

9        THE COURT:  Mr. Zabel for Genesis.

10      OPENING STATEMENT ON BEHALF OF GENESIS ENERGY, LP

11        MR. ZABEL:  Yes.  Good morning, Your Honor.  Thank

12  you.  Tom Zabel, Zabel Freeman, co-counsel with Tom Howley

13  at the Howley Law Firm for Genesis Energy, LP and its

14  affiliates.

15        Your Honor, Genesis and its affiliates own and

16  operate oil and gas pipeline facilities offshore that

17  transport oil and gas from Fieldwood's platforms.  Fieldwood

18  has been working diligently with Genesis to resolve the

19  objection.  We have an objection on Document 1503.

20        I noticed in the notice of Agenda that was filed

21  early this morning in footnote 3, they have communicated

22  that there has been an agreed adjournment of our objection

23  and about 22 other objections until a later date.  And if

24  Your Honor is agreeable to that, which we are by the way, we

25  would reserve any opening or any argument until the

1  adjourned matters are taken up with the hopes that we

2  resolve all of our objection issues with Fieldwood before

3  that date.

4  THE COURT:  So both for you and for others that

5  have mentioned -- but your objection issue, you're asking if

6  I'm agreeable to that.  Yes.  If the parties have reached an

7  agreement that on a particular matter, the cure objection

8  can be deferred without getting in the way of the

9  Confirmation Hearing, it's going to be just fine with me.

10  But there may be some of the cure objections that need to be

11  resolved in order to determine confirmation and for those

12  we'll need to proceed because we have to -- we may have to

13  determine some to determine if the Plan is confirmable.

14  But if you have a cure objection where it isn't

15  going to affect whether the Plan can be confirmed or not,

16  just fine with me.  It'll be postponed, all of them that are

17  listed in footnote 3 of the Agenda.

18  Thank you, Mr. Zabel.

19  MR. ZABEL:  Thank you, Your Honor.

20  THE COURT:  From 214-580-5852, who do have?

21  MR. PLATT:  Good morning, Your Honor.

22  Mark Platt.  Can you hear me?

23  THE COURT:  I can, Mr. Platt.  Good morning.  And,

24  Mr. Platt, before you speak, you're the last person that I

25  show wants to speak in opening statements so I'm going to

1  let you take all the time you want.  But if somebody else

2  believes that they had their hand raised, please one time

3  only press five star because you're it in terms of clearing

4  out my backlog.

5      OPENING STATEMENT ON BEHALF OF CGG SERVICES (US), INC.

6          MR. PLATT:  Well, I appreciate the invitation,

7  Your Honor, but I will be brief.  I represent CGG Services

8  (US), Inc., which like Mr. Brescia -- one of Mr. Brescia's

9  clients, is a seismic data licensor.  Our licenses we

10 believe are being assumed and assigned to the Credit Bid

11 Purchaser and we have an agreement in principle but are

12 working on papering that agreement, so it is my

13 understanding that we are among the group that is being

14 pushed off to a future hearing of assumption disputes and we

15 are agreeable to that and just simply wanted to preserve our

16 objections until that date.

17          THE COURT:  Mr. Platt, thank you.

18          MR. PLATT:  We were just hoping we would get a

19 date certain for that, Your Honor.

20          THE COURT:  Well, let's see if we confirm.  And if

21 we confirm, once we do, why don't you all then tell me we

22 need some dates and we'll get you dates.  If we don't

23 confirm, it's a different story.

24          So I've got two more people that I see.

25          Ms. Williamson first followed by Ms. Moses.

1          Go ahead, Ms. Williamson.

2          OPENING STATEMENT ON BEHALF OF VALERO MARKETING

3                     AND SUPPLY COMPANY

4          MS. WILLIAMSON:  Yes, Your Honor.  I apologize.

5    Again Ms. Williamson, representing -- Deborah Williamson

6    representing Valero Marketing and Supply Company.  And we

7    are listed on the Agenda at item No. 32.  Mr. Green and I

8    did reach some language that we thought would resolve the

9    Valero objection, which was filed at 1334, but I understand

10   that we got some additional language from, I believe, the

11   consenting lenders, which was not on its face acceptable to

12   us.  We proposed some additional language back and hopefully

13   today we'll be able to announce an agreement on that.

14         THE COURT:  Thank you.  Again, like others, if you

15   don't, you can make your opening at that point.

16         Ms. Moses?

17         MS. WILLIAMSON:  Thank you, Your Honor.

18         MS. MOSES:  (No audible response).

19         THE COURT:  Ms. Moses, I can't hear you.  You may

20   have your own phone muted.

21         MS. MOSES:  I'm sorry, Your Honor.

22         Is that better?

23         THE COURT:  It is, but you're probably going to

24   have to look that way I'm afraid so -- but go ahead.

25         OPENING STATEMENT ON BEHALF OF JX NIPPON

OIL EXPLORATION LIMITED

1          MS. MOSES:  Yes, I'll try.  Thank you, Your Honor.

2     We have made this on behalf of JX Nippon Oil Exploration

3     Limited.  We just want to reserve our rights.  We have

4     resolved our objections with the Debtor, but there is a

5     footnote in the Agenda that indicates that even if that

6     language has been agreed to, that it's subject to ongoing

7     review and signoff by the consenting creditors under the

8     Restructuring Support Agreement.  So just wanted to reserve

9     our rights for objection in the event that any of the

10    language needs to change that we would present it to the

11    Court.

12         THE COURT:  Of course, Ms. Moses.  If it doesn't

13    work out, you can make your opening at that point and your

14    rights are going to be preserved.

15         Thank you.

16         MS. MOSES:  Thank you, Your Honor.

17         THE COURT:  I do have one more person that wishes

18    to speak.  From 512-217-5738.

19         OPENING STATEMENT ON BEHALF OF BRIAN CLOYD,

20              ANDREW LUIS, AND PATRICK BURNETT

21         MS. ROMERO:  Yes, Your Honor.  This is

22    Taylor Romero on behalf of post-petition maritime tort

23    claimants, Brian Cloyd, Andrew Luis, and Patrick Burnett.

24    Similar to the folks that just went previously, we're listed

1    on the Agenda at Nos. 28 and 29.  We reached, we believe, an

2    agreement that also is subject to final review and approval,

3    and we just wanted to preserve our rights to make objections

4    to the extent that approval is not reached.

5            THE COURT:  Ms. Romero, that is granted.  Thank

6    you.

7            MS. ROMERO:  Thank you.

8            THE COURT:  All right.  I show that -- if there's

9    anyone else that wishes to speak in opening statements,

10   please press five star one time on your phone.

11      (No audible response.)

12           THE COURT:  Okay.  For what it's worth, Mr. Perez,

13   you managed to produce more opening statements than I've

14   ever had in my 17 years on the Bench.  So what we're going

15   to do is take a break until 10:35.  We're going to return at

16   10:35.

17           That may be a request by you at that point after

18   you've conferred with parties to continue for a much longer

19   period of time than that, but probably everybody needs a

20   break and so we'll come back at 10:35.  If we then want to

21   take a couple-hour break or whatever you need, I'll listen

22   to your announcement at that point and then from anyone

23   else, but hopefully we'll be able to move ahead.

24           What I'm going to do for those of you that -- I've

25   activated all those lines.  I'm now going to re-mute all the

1    lines so you'll need to request to speak again.  Otherwise,

2    we'll get too much background noise during the day so

3    everyone's about to get re-muted.

4              Mr. Perez, if you'll press five star when you come

5    back, I'll need to find you.

6              See you all at 10:35.  Thank you.

7         (Recess taken from 10:18 a.m. to 10:35 a.m.)

8                           AFTER RECESS

9              THE COURT:  All right.  We're going to go back on

10   the Record on the Fieldwood case.

11             Mr. Perez, do you have any request as to how we

12   proceed?

13             MR. PEREZ:  Yes, Your Honor.  If we could have a

14   one-hour extension.  I think it's important to try to

15   finalize the APA Surety Term Sheet.  I think everything else

16   will probably fall in much quicker after that.

17             So if we could come back at quarter of 12:00, if

18   that's possible?

19             THE COURT:  All right.  Does anyone object?  If

20   so, press five star one time.

21        (No audible response.)

22             THE COURT:  Okay.  We'll return at 11:45.

23             I'm going to leave all the lines active, so you

24   may disconnect and reconnect or you can just stay connected,

25   whatever you prefer.

1           Thank you.

2           MR. PEREZ:  Thank you, Your Honor.

3       (Recess taken from 10:36 a.m. to 11:45 a.m.)

4                        AFTER RECESS

5           THE COURT:  All right.  We're going to go back on

6   the Record in the Fieldwood Energy case.

7           Let me ask Mr. Perez or someone else from his firm

8   to tell me what our current status is.

9       (Pause in the proceedings.)

10          THE COURT:  I apologize.  I'm having a little

11  trouble with my phone controller again.  Let me get back

12  into it.

13      (Pause in the proceedings.)

14          THE COURT:  Mr. Barr, I'm not seeing Mr. Perez

15  here.  I'm going to go ahead and activate your line and

16  maybe you can give me an update on where we are -- oh,

17  there's Mr. Perez now.

18          MR. BARR:  Your Honor, if you can hear me, it's

19  Mr. Barr from Weil.  I was just letting you know Mr. Perez

20  is having some technical difficulties, but I do see him now.

21          THE COURT:  All right.  And I've got his phone

22  here, as well.

23          MR. BARR:  Thank you, sir.

24          THE COURT:  Thank you.

25          Mr. Perez?

1          MR. PEREZ:  Yes, Your Honor.

2          Yes, Your Honor.  Can you hear me?

3          THE COURT:  I can.  Thank you.

4          MR. PEREZ:  All right.  Your Honor, first let me

5   apologize for being late.  I'm generally not late, but I

6   apologize.

7          Your Honor, I think we used the -- probably more

8   than allotted time and I do believe that as it relates to

9   the surety term sheet, we now have -- as among the lawyers,

10  a substantially negotiated term sheet, subject to obviously

11  final client sign-off.

12         And we had a -- basically we were on the phone the

13  entire time.  So that part of the -- that part of the

14  hearing, I think is going to be resolved and so that leaves

15  us the other parts, but obviously I would welcome, you know,

16  the other surety counterparties to speak to that, but I

17  think we're substantially resolved right now on a fully

18  negotiated term sheet.

19         THE COURT:  So let's assume that's correct.  What

20  do you want to then proceed to do?  Are you now wanting time

21  to work things out with predecessors or others?  Or do you

22  want to proceed into the evidence.

23         MR. PEREZ:  Your Honor, I think we can proceed

24  into the evidence.  Obviously it depends on your Court's

25  pleasure.  I know you have a 4:00 o'clock stop.  We could --

112

1  we could take an early lunch and come back and go straight

2  through, or we could start with Mr. Dane (phonetic) and then

3  take a lunch break and then come back.

4          I think whatever is the Court's pleasure, but I

5  think Mr. Dane is probably going to be -- my Direct will

6  probably be about an hour with him.  So if we could take an

7  early lunch and come back, that would definitely help clear

8  some of the other underbrush.  But I think -- and I would

9  very much like to be able to finish Mr. Dane today.  I know

10 he's got commitments -- business commitments later in the

11 week.

12         THE COURT:  All right.  We're adjourned until

13 1:20.  I will resume at 1:20.  You will need to reconnect

14 your phone lines.  I'm going to restart the whole phone

15 system.

16         We'll see you all then.  Thank you.

17         MR. PEREZ:  And I apologize --

18         THE COURT:  No.

19         MR. PEREZ:  -- I apologize, Your Honor, for being

20 so -- asking for another continuance at this point.  It

21 wasn't our intent, but --

22         THE COURT:  Nah.  As we said at the last hearing,

23 it's a moving problem and it ought to be.  And so you don't

24 need to apologize for things that are supposed to move are

25 moving.

1          We'll talk to everybody at 1:20.  You'll need to

2    reconnect on your phone lines.

3          Thank you.

4          MR. PEREZ:  Thank you.  Bye.

5       (Recess taken from 11:51 a.m. to 1:19 p.m.)

6                        AFTER RECESS

7          THE COURT:  All right.  We're going to go back on

8    the Record in the Fieldwood case.

9          Ms. Rosen, you had pressed five star on your line?

10         MS. ROSEN:  Yes.  Thank you, Your Honor.  Can you

11   hear me?

12         THE COURT:  I can.

13         MS. ROSEN:  Okay.  Thank you.

14         Cynthia Rosen, Your Honor, on behalf of the XTO

15   entities.

16         I just very briefly, Your Honor, wanted to let the

17   Court know that we've been going back and forth with the

18   Debtors for, you know, about a week on some proposed

19   language for the Confirmation Order that we think will

20   resolve a number of our objections.  And we, if we could,

21   like to try to get some resolution on that with the Debtors

22   before we get into the evidence.  We think it will affect

23   our -- even somewhat our evidentiary presentation.

24         I know the Debtors have spent the last couple of

25   hours with the sureties trying to get to a resolution on

1   some of their objections and I think that's great.  And I

2   think that we would just like the same courtesy and would

3   ask for maybe an hour to visit with the Debtors' counsel and

4   try to get some resolution on our proposed objections before

5   we move forward with the evidence.

6           I think there may be other predecessors who may

7   feel the same way.

8           THE COURT:  I'm not going to delay the evidentiary

9   hearing, given the witness's availability that was described

10  by Mr. Perez.  But I will direct Mr. Perez to have someone

11  from his office begin contacting people during the hearing.

12  They've got enough people.  They can have somebody contact

13  you.  And if you'll delegate someone for him, just send him

14  an email who you want him to call.

15          Thank you.

16          MS. ROSEN:  Thank you.

17          THE COURT:  Mr. Scharfenberg?

18          MR. SCHARFENBERG:  Oh, yeah.  Yes, Your Honor.  I

19  was just going to speak up because the confirmation language

20  that XTO is requesting might materially impact different

21  bond defenses and we would just want to be a part of that

22  discussion.  But I think I can take that up with

23  Ms. Rosen --

24          THE COURT:  Okay.  Thank you.

25          MR. SCHARFENBERG:  -- offline here.

1          THE COURT:  Okay.  Thank you.

2          Mr. Perez?

3          MR. PEREZ:  Good afternoon, Your Honor.  Alfredo

4  Perez.  I think we're prepared to move forward with

5  Mr. Dane's testimony.

6          I did have one housekeeping question.  One of our

7  witnesses, Mr. Brown, who is the -- who prepared the

8  liquidation analysis, we -- the parties agreed that his

9  Declaration could be admitted into evidence and he is in

10 another trial, as well, so we wanted to -- to the extent

11 anybody is going to cross-examine him, we'd like to know

12 that so that we can arrange -- you know, work around his

13 other trial, as well.

14         To the extent nobody is going to cross-examine the

15 liquidation analysis, then obviously that would come in.

16         But if we could -- somebody could tell us that --

17         THE COURT:  Are you offering --

18         MR. PEREZ:  -- it would be very helpful.

19         THE COURT:  Are you offering Mr. Brown's

20 Declaration into evidence?

21         MR. PEREZ:  Yes, Your Honor, we are and it's

22 without objection that it's coming in.  The issue is --

23         THE COURT:  Well, I've got a lot of people here.

24         Does anyone object to the admission of Mr. Brown's

25 Declaration?

1          What's its ECF number?

2          MR. PEREZ:  1555, Your Honor.

3          THE COURT:  Anyone object to 1555 being admitted

4    as substantive evidence at today's hearing?

5          Ms. Heyen?

6          MS. HEYEN:  (No audible response.)

7          THE COURT:  Ms. Heyen?

8          MR. DUVAL:  This is Mr. Duval, Your Honor.  No

9    objection to that issue.  We had raised our hand only to say

10   that we were supporting Ms. Suki and that someone from our

11   office will be reaching out to opposing counsel, as well.

12         We're ready to go-forward with the evidence.

13         THE COURT:  Thank you, sir.

14         All right.  There is no objection.  No. 1555 is

15   admitted.

16      (Exhibit 1555 received in evidence.)

17         THE COURT:  Is there any cross-examination of

18   Mr. Brown?

19      (No audible response.)

20         THE COURT:  All right.  Mr. Brown is excused from

21   the witness stand.

22         Who is your next witness?

23         MR. PEREZ:  Thank you.

24         Your Honor, Mike Dane.

25         THE COURT:  All right.  Mr. Dane, if you would

1  please press five star one time on your phone?

2         Mr. Dane, good afternoon.  Would you raise your

3  hand for me, please?

4     (Witness sworn.)

5         MR. DANE:  Yes.  I do.

6         THE COURT:  Okay.  Thank you.

7         All right.  Who is going to examine Mr. Dane?

8         MR. PEREZ:  Your Honor, I am.

9         THE COURT:  All right.  Go ahead, please.

10          DIRECT EXAMINATION OF MICHAEL DANE

11 BY MR. PEREZ:

12 Q    Would you please state your name?

13 A    Michael Dane.

14 Q    And how are you currently employed?

15 A    I'm the Senior Vice President and Chief Financial

16 Officer of Fieldwood.

17 Q    And when did you become the Chief Financial Officer?

18 A    March 2016.

19 Q    And do you hold any other executive positions at

20 Fieldwood?

21 A    I'm a member of the company's Executive Leadership

22 Team.

23 Q    And would you tell the Court what the Executive

24 Leadership Team is?

25 A    The Executive Leadership Team is comprised of myself,

MICHAEL DANE - DIRECT BY MR. PEREZ                    118

1   our General Counsel, Tommy Lamb, and our Senior Vice

2   President of Production, Gary Mitchell.  And this group is

3   in charge of the duties and responsibilities of the office

4   of the Chief Executive Officer.

5   Q    And when was the Executive Leadership Team created?

6   A    I believe it was in July of 2020.

7   Q    All right.  Now, Mr. Dane, have you been involved in

8   these bankruptcy cases?

9   A    Yes, I have.

10  Q    And what is the nature of your involvement?

11  A    I've been involved --

12       THE COURT:  Let me ask you -- let me ask you to

13  pause -- let me get you to pause one second, Mr. Dane.

14       Mr. Eisenberg, do you have an objection?

15       MR. EISENBERG:  No, Your Honor, I don't have an

16  objection.  I just wanted to have my line ready just in case

17  something came out on the direct testimony that I felt

18  compelled to object to on behalf of one of my oil and gas

19  clients.

20       THE COURT:  Thank you.

21       For everyone else listening, I have done away with

22  sustaining an objection to asked and answered.  If you have

23  an objection and I don't get to you, I'm going to let you

24  come back and make the objection.  We'll strike an answer

25  and then let the answer be given.

 1          Mr. Eisenberg, I'll leave your line open, but for

 2   others, I'll recognize you as promptly as I can.  You'll be

 3   able to object retroactively even if an answer has come out.

 4          Go ahead, please --

 5          MR. EISENBERG:  Appreciate that, Your Honor.

 6   Thank you.

 7          THE COURT:  Thank you.  Go ahead, Mr. Dane.

 8          THE WITNESS:  I'm sorry, Mr. Perez, could you

 9   repeat the question?

10   BY MR. PEREZ:

11   Q   Yes.  Have you been involved in these bankruptcy cases?

12   A   Yes.  I have.  I've been involved prior to the company

13   filing for Chapter 11, some of the early discussions leading

14   up to the bankruptcy, and then I've been involved in most of

15   the major negotiations during the bankruptcy process.

16   Q   All right.  And so could you describe in a little bit

17   more detail what parts of the bankruptcy case you have been

18   involved in?

19   A   The various conversations with the major stakeholders,

20   which I would characterize as a group of clearly the

21   Government, the creditors, surety bond providers, vendors

22   and predecessors.

23   Q   All right.  So what are your responsibilities as the

24   CFO of the company?

25   A   I've got a number of departs that report to me.  That

1  includes finance and planning, accounting, treasury, tax,

2  IT, procurement, and then my role in the Executive

3  Leadership Team has brought oversite of the general

4  operations of the business.

5  Q    All right.  And does Fieldwood on a yearly basis

6  prepare a business plan?

7  A    Yes.  Fieldwood does.

8  Q    And what is your involvement in the development of the

9  business plan?

10  A    We have a finance and planning group that is

11  responsible for putting together and organizing our

12  forecasts and our business plans.  They work with a broad

13  group of subject matter experts at the company.  It's a

14  process.  They ultimately assemble our projections and our

15  forecasts working with the various subject matter experts

16  and I review and approve those plans.

17  Q    All right.  And who is the person at the company

18  ultimately responsible for the Debtors' financial reporting?

19  A    The management is responsible for the company's

20  financial reporting.  We have an accounting group, which is

21  led by our Chief Accounting Officer, Bill Swindle

22  (phonetic).  They prepare our financials.  Mr. Swindle signs

23  off on those financials, alongside the Executive Leadership

24  Team after they are audited by our third-party auditors,

25  Ernst & Young, and ultimately they're approved by our Board

1  of Directors on an annual basis.

2  Q    And what is your involvement in the preparation of the

3  financial reporting?

4  A    There's various elements of the financial reporting

5  that I directly review.  I review the overall financial

6  statements, along with our Chief Accounting Officer to

7  understand the assumptions and the inputs and that I approve

8  -- or I approve the financial statements as CFO and as a

9  member of our Executive Leadership Team prior to their

10 submission for our audit.

11 Q    All right.  Mr. Dane, do you know why we're here today?

12 A    I do.  I understand we're here for Fieldwood's

13 Confirmation Hearing.

14 Q    And are you familiar with the Debtors' Plan?

15 A    Yes.  I am.

16 Q    Did you review the Plan?

17 A    I did.

18 Q    And were you involved in the negotiations of the

19 various transactions that are reflected in the Plan?

20 A    Yes.  I was.

21 Q    All right.  And then do you know why Fieldwood has

22 filed for bankruptcy?

23 A    Yes.

24 Q    Can you tell the Court why?

25 A    In early 2020, around the March time period, there was

1  some very significant strains that the business was facing.

2  At the time, particularly due to the significant commodity

3  price collapse and other challenges that were presented by

4  the global pandemic.  The company engaged at that time in a

5  number of conversations with its lender group and progressed

6  those conversations.  Ultimately it was understood that the

7  company wasn't able to meet all of its obligations.  And the

8  company pursued a Chapter 11 restructuring as a result.

9  Q    All right.  And what obligation are you talking about

10 that the company wasn't able to satisfy?

11 A    The company has a number of obligations.  The two major

12 categories are financial debt obligations and then also

13 plugging and abandonment obligations with respect to its

14 assets.

15 Q    All right.  Now with respect to the funded debt

16 obligations, can you tell the Court what the company's

17 capital structure is?

18 A    Currently and prior to filing of our restructuring, the

19 company's capital structure consisted of $1.8 million in

20 total funded debt.  There was three million tranches of

21 debt.  There was a first lien, first out facility, which has

22 a $139 million balance.  There's a first lien term loan,

23 which has a $1.4 billion balance.  And then there's a second

24 lien term loan that has a $518 million balance.

25        And all of those three tranches comprise our

1  $1.8 billion capital structure today.

2  Q    All right.  And then could you describe the plugging

3  and abandonment liabilities?

4  A    The company has significant plugging and abandonment

5  liabilities associated with its wells, platforms, and

6  pipelines in the Gulf of Mexico.  These are -- the company

7  has over 400 platforms, over 1,000 wells.  It's a

8  significant asset base, one of the largest asset bases in

9  the Gulf of Mexico.  So the obligation associated with the

10  physical infrastructure at the end of its useful life is

11  associated with plugging and abandonment and decommissioning

12  those assets.

13  Q    Okay.  As part of the company's financial reporting,

14  does it report its estimated plugging and abandonment

15  liabilities?

16  A    It does.

17  Q    And are you involved in that process?

18  A    Yes.  I am.

19  Q    And how does the company go about estimating its

20  plugging and abandonment liabilities?

21  A    The company has a decommissioning team as a part of --

22  as one of our departments.  It's led by -- we have a Vice

23  President of Decommissions, Brandon DeWolfe (phonetic).  He

24  oversees a group of folks both in the office and offshore.

25  It's a very sizable group of about 80 employees.  In the

1   office we have about a dozen professionals that focus on

2   exclusively estimating and performing plugging and

3   abandonment work.

4        Under the oversight of Mr. DeWolfe, that team is

5   responsible for preparing these estimates.  They're based on

6   assumptions that are updated on an annual basis.  I review

7   those assumptions and the outputs with Mr. DeWolfe and then

8   they're ultimately incorporated into our annual financial

9   statements.

10  Q    All right.  And are those estimates reviewed by anyone?

11  A    Yes.  They're also in addition to management.  They are

12  also reviewed and the assumptions are tested as part of our

13  annual audit process, which has historically been done and

14  is currently done by Ernst & Young.

15  Q    All right.  Now do you remember what the most current

16  number for the plugging and abandonment liabilities that

17  Fieldwood has on its balance sheet?  Do you remember -- do

18  you recall that number?

19  A    I believe I'd have to look at the balance sheet.  I

20  believe that the discounted error on the balance sheet is

21  just over a billion dollars.  I think it's between a billion

22  and a billion two, and I believe that corresponds to a

23  undiscounted value of around a billion eight in principle

24  and interest.

25  Q    Okay.  And let me just make sure of that.  Is that in

1   eight eights or is that just net to the company's interest?

2   A    That's net to the company's interest.

3   Q    All right.  Now are you familiar with BSEE?

4   A    Yes.  I am.

5   Q    All right.  And does BSEE provide estimates of plugging

6   and abandonment liability?

7   A    They do.

8   Q    And do they do it the same way that Fieldwood does, or

9   do they do it differently, or do you know?

10  A    I don't exactly know how BSEE drives their estimates.

11  I know that -- I'm pretty certain that it's not the same way

12  that Fieldwood drives its estimates, but I am generally

13  familiar with BSEE estimates.

14  Q    Could you tell the Court how Fieldwood derives its

15  estimates?

16  A    So for purposes of our audited financials and the

17  numbers that are included on our financial statements, these

18  estimates are generated pursuant to models that Fieldwood

19  maintains, which estimates costs associated with the

20  different type of asset, whether it's the well, platform, or

21  pipeline, depending on the type of well, platform, or

22  pipeline.  These models are updated with current assumptions

23  each year based on the cost of goods and services and

24  equipment, as well as Fieldwood's recent experience with

25  decommissioning assets of a like nature, and that forms the

1  basis of the model which is tested by Uniline (phonetic)

2  incorporated in our financial statements.

3      Also, we have business plans which look at these

4  estimates on a much more granular project level basis and

5  these business plans are high-quality estimates that we

6  believe the work can be executed on in a more precise

7  fashion.

8  Q    And does Fieldwood have experience in decommissioning

9  assets in the Gulf?

10  A    Yes.  Fieldwood has very extensive experience doing

11  decommissioning in the Gulf of Mexico.

12  Q    Can you roughly tell the Court either in terms of

13  number of assets or in dollar amount what Fieldwood's

14  experience has been?

15  A    Since 2013 Fieldwood has done over a billion and a half

16  dollars of plugging and abandonment work and that's

17  associated with over 400 platforms, over 400 pipelines and

18  over 1200 wells.  And to my knowledge, that's the most of

19  any operator in the Gulf of Mexico and potentially in many

20  of those years and periods, probably greater than industry

21  combined.

22  Q    Now have you reviewed BSEE estimates with respect to

23  some of the Fieldwood assets?

24  A    I've seen certain BSEE estimates associated with the

25  Fieldwood assets, yes.

1  Q    And are these -- and are these estimates the same or

2  different than Fieldwood's estimates?

3  A    Generally speaking, I would say that they're different.

4  Overall, they're certainly different.  In some cases they

5  may be similar, but it really runs the whole gamut.  I would

6  say on the whole of things, it is probably meaningfully

7  different.

8  Q    And is it meaningfully lower or meaningfully higher?

9  A    BSEE produces a range of estimates.  They've updated

10 their methodology.  They used to just provide a single

11 number, but more recently they now provide a distribution.

12 There's P-50 numbers, there's P-90 numbers.  I think it

13 really depends on the specific number that's being reviewed

14 and the specific asset.

15 Q    So how would the BSEE P-50 number compare to the

16 Fieldwood plugging and abandonment estimate?

17 A    We haven't -- I haven't reviewed recently if a P-50

18 number for all of BSEE's estimates relative to the entirety

19 of Fieldwood.  I would imagine it would be somewhat higher

20 because in general some of these numbers have been higher.

21 So the BSEE estimates are not a number that Fieldwood relies

22 on for any reason because we have a team that performs this

23 on a just more granular basis and there's a familiarity with

24 our specific assets that are (indiscernible).  So from

25 Fieldwood's perspective, there's not much utility to the

1  BSEE estimates due to our expertise in this area.

2  Q    And what would be your answer with respect to the BSEE

3  P-90 estimate?

4  A    So BSEE P-90 estimates that I have reviewed are

5  meaningfully higher than most cases that I've seen, which

6  would make sense because a P-90 estimate is an extremely

7  high level of confidence.

8  Q    All right.  So let's go back to March of 2020.  Can you

9  tell the Court what was going on in the oil and gas industry

10  -- not that the Court isn't aware, but just for the Record,

11  please.

12  A    Around the March timeframe, there was an onset of the

13  COVID-19 global pandemic and one of the ways in which our

14  industry was impacted by that was certainly with respect to

15  commodity prices.  Commodity prices have gone from the

16  mid-50's to at one point as low as negative $37, so the

17  primary revenue source of our product was really

18  significantly impacted.

19      In addition to that, just managing the business in

20  terms of the disruption to the business caused by COVID and

21  the ability to deal with a large workforce offshore, there

22  was a significant amount of disruption that the business

23  suffered.

24      And then further to that, this took place at a time

25  where there was a lot of uncertainty in the market and a lot

1  of uncertainty with oil and gas prices and it was a time at

2  which Fieldwood needed to engage in discussions with its

3  lenders.  And so capital availability was significantly

4  strained in the oil and gas space overall

5  Q    And so what did the company do in response to all of

6  these challenges?

7  A    So initially in March of 2020, it became clear that the

8  company needed to have some initial conversations with its

9  lender group.  The first impetus for those conversations was

10 the company was concerned that as a part of its annual audit

11 process, it may not be able to get an unqualified audit

12 opinion or an audit that did not have a going concern

13 qualification.  The going concern qualified audited opinion

14 was a potential default under its credit agreements.

15      And so Fieldwood originally approached its lenders in

16 late March seeking a waiver of that going concern

17 qualification.  Those conversations progressed and then

18 ultimately developed into a conversation around forbearance

19 around an upcoming interest payment which was due at the end

20 of April.  And the company ultimately ended up entering into

21 a forbearance agreement with its lenders, and one of the

22 conditions of that forbearance agreement was that the

23 company provide a comprehensive Plan of restructuring to its

24 lenders.

25 Q    All right.  And so what happened?  Were you able to

MICHAEL DANE - DIRECT BY MR. PEREZ                    130

1   obtain the forbearance?

2   A    Yes.  The company did obtain the forbearance.

3   Q    And what about the -- did you make the interest

4   payment?

5   A    No.  The interest payment that was owed at the end of

6   April was not made and the lenders agreed to forbear their

7   rights with respect to that interest payment.

8   Q    And did you begin preparing a restructuring proposal?

9   A    Yes.  We did.

10  Q    And so what happened after you started doing that?

11  What was the next step?

12  A    There was a recognition by the management team at that

13  point that based on feedback with respect to the lenders,

14  the lenders had provided very clear guidance on what they

15  were willing to support or not in order to contribute new

16  capital into the company, which was going to be a key part

17  of any restructuring the company needed to reorganize with

18  new capital in order to recapitalize the company and object

19  to liquidity.

20       The lenders were very clear about the fact that they

21  were not willing to capitalize the company with significant

22  new money unless it addressed its legacy P&A obligations and

23  weren't willing to continue funding those obligations in the

24  context of the whole company.

25       So kind of given that feedback and those parameters,

1   the company recognized that it was very important to try and

2   get some alignment with Fieldwood's largest

3   predecessor-in-interest, which was Apache.  Apache

4   represents about two-thirds of the company's overall shelf

5   plugging and abandonment liabilities, a little over

6   60 percent in total of the company's total liabilities.  And

7   so following the direction of the lenders and the fact that

8   we have to deliver a comprehensive term sheet that was

9   something that we thought we could execute on, the company

10  engaged in conversations with Apache to see if there was a

11  potential mutually consensual solution that the parties

12  might be able to reach and that was around the May

13  timeframe.

14  Q    All right.  Now you mentioned new capital.  Why did the

15  company need new capital?

16  A    In line with the need to forbear upon interest in the

17  April time frame, the company had a $35 million interest

18  payment that was due.  The company had limited sources of

19  liquidity.  The company was concerned that those sources of

20  liquidity would be further constrained.  If it had a default

21  under its credit agreements, prices had sunk pretty

22  dramatically, so there's a number of steps the company took

23  to try and support its liquidity.

24       There was some changes to the company's hedge programs

25  and terminations, cost reductions, that were pursued, but it

1  ultimately just given the magnitude of the need of capital

2  and also the severity of the price environment, the company

3  recognized its liquidity runway and that period was going to

4  be uncomfortably short.

5            And any meaningful recapitalization of the

6  business was going to require an injection of new capital.

7  Q    Now let me just fast forward for a minute.  Does the

8  current Plan provide for any new capital?

9  A    Yes.  It does.

10  Q    And could you tell the Court what that is?

11  A    So the Plan contemplates that there's going to be

12  $225 million of new money contributed.  That's in the form

13  of a second lien term loan facility for up to $185 million.

14  And then two equity rights offerings of $20 million each for

15  a total of $40 million provided by the first lien term loan

16  lenders and the second lien term loan lenders.

17  Q    All right.  Now let's go back to Apache.  You indicated

18  that Apache was your single largest predecessor.  What did

19  you do in order to try to implement the proposal that you

20  had made to the banks?

21  A    So this was pretty even.  Making a proposal to the

22  banks, this was more in the formulation stage of

23  understanding what a potential proposal could look like

24  before something was required to be delivered to the lenders

25  under the forbearance agreement.

MICHAEL DANE - DIRECT BY MR. PEREZ                    133

1      And then early May, the company reached out to Apache

2   and their advisors -- Parkland & Welling (phonetic) was

3   their advisors at the time who had worked with the company

4   previously -- worked with Apache previously.  And Fieldwood

5   expressed the desire to meet and get a situation update on

6   the company's staff discussion with the lenders, the

7   requirements under the forbearance agreement, and explore

8   consensual alternatives.

9      Apache was very immediately responsive and they were

10  prepared to engage with Fieldwood.  Fieldwood had something

11  that they wanted to discuss and so we prepared a

12  presentation that provided a situation update and provided

13  several potential alternatives to explore in terms of mutual

14  consensual solutions with respect to the assets that

15  Fieldwood had acquired from Apache back in 2013.

16     And those conversations went on for a couple of months.

17  Q    All right.  And so let's talk a little bit about the

18  transaction in 2013.  Can you describe the transaction back

19  in 2013?

20  A    In 2013 Fieldwood had purchased the Gulf of Mexico

21  Shelf Business Unit from Apache.  This was an acquisition

22  that the company's private equity sponsor at the time had

23  identified.  That was a nearly four-billion-dollar

24  acquisition.  It was a very, very significant asset base.

25  It was the largest asset base in the Gulf of Mexico Shelf.

1      And the company had purchased the entire asset base,

2   which was producing -- this was a $110 oil price

3   environment, so it was a very significant time -- it was a

4   very different time than the current market today.  That

5   asset base was very large, very, very profitable.  It had

6   approximately 90,000 barrels of oil a day and over a billion

7   dollars of EBITDA, and that's how the company came to own

8   the Apache assets.

9   Q    All right.  Are you familiar with the BSEE regulations

10  regarding legacy properties?

11  A    I'm familiar with the regulations around liabilities,

12  if that's what you're referring to.

13  Q    Yes.  I am.  So could you tell the Court what your

14  understanding is with respect those regulations?

15  A    My understanding is the regulations provide that all

16  lease owners, lease holders are jointly and severally

17  responsible for decommissioning obligations.  This

18  responsibility extends to any period, even if the lease

19  holders assign their leases at a subsequent point.  And

20  that's been kind of a foundation of Gulf of Mexico

21  regulatory framework for quite some time and certainly since

22  all of the Fieldwood assets and Fieldwood's predecessors

23  have entered into transactions in the Gulf of Mexico.

24  Q    All right.  And so at the time that Fieldwood purchased

25  those assets, had Apache acrued any asset retirement

1  liabilities?

2  A    Yes.  Effectively all of the asset retirement

3  obligations that Fieldwood has today that came through the

4  Apache acquisition were assets for which Apache is jointly

5  and severally liable for.

6  Q    All right.  Did Apache take any steps in order to

7  protect themselves against that liability?

8  A    Yes.  So Apache was very thoughtful and focused on its

9  potential liability at the time of the 2013 acquisition.

10  One of the foundational documents as a part of that

11  acquisition was the Decommissioning Agreement and the

12  security that was required to be provided pursuant to the

13  Decommissioning Agreement, which governs certain aspects of

14  Fieldwood's obligations related to decommissioning that it

15  acquired from Apache.

16      This was something that was a substantial area of focus

17  during the original negotiations of that deal between the

18  parties.

19  Q    All right.  Now, could you tell the Court what security

20  backs the Decommissioning Agreement?

21  A    Apache negotiated for some very substantial security in

22  2013 in the event that there was ever a default, since they

23  were required to satisfy the obligations for which they are

24  jointly and severally liable for.  And so that security

25  today comprises a cash escrow account, which is called

MICHAEL DANE - DIRECT BY MR. PEREZ                    136

1  "Trust A."  It has $238 million of cash.  That cash balance

2  was built up over time by a net profits interest that was

3  granted over all of the Apache-related properties.  It's

4  called the "Trust A."

5       Net Profits Interest, or "NPI," and that is a Net

6  Profits Interest that on a monthly basis requires the

7  crediting of the Trust A account for any net profits that

8  are generated and so over time that's built up to the

9  $238 million of cash and will continue in the future to the

10 extent that it continues to generate positive net profits.

11      In addition to the Trust A cash escrow account, NPI

12 construct, there's also $497 million of bonds and letters of

13 credit that are outstanding, as well.  So in total there's

14 $736 million of security that Apache holds related to the

15 original 2013 transaction with Fieldwood.

16 Q    All right.  So Mr. Dane, in connection with reaching

17 out to Apache, did you come to any understanding with them

18 with respect to the Apache legacy assets?

19 A    Yes.  There was a number of meetings and conversations,

20 both with Apache and with their advisors and through a very

21 constructive process, despite the challenges that were

22 obviously presented for Apache at the time.  The parties

23 were able to get an understanding of the mutual objectives

24 and this culminated in a term sheet that was negotiated,

25 which formed the basis of the Fieldwood One entities and

MICHAEL DANE - DIRECT BY MR. PEREZ                    137

1  formed the basis of Apache's support under the Restructuring

2  Support Agreement that was ultimately filed at the time of

3  Fieldwood's Chapter 11 filing.

4  Q    All right.  Let me ask you to turn to Debtors'

5  Exhibit 28 and I believe that is found at Docket 1562-1 and

6  I think 1562-2 because they're so long.

7          MR. PEREZ:  And Your Honor, I gave Mr. Dane a book

8  with his exhibits, so he has that in front of him.

9          THE COURT:  Thank you.

10          THE WITNESS:  All right.

11  BY MR. PEREZ:

12  Q    Could you identify Exhibit No. 28, Mr. Dane?

13  A    Exhibit 28 is the Apache definitive documentations --

14  documents.

15  Q    Okay.

16          MR. PEREZ:  And Your Honor, I am told that --

17  Ms. Choi corrected me.  It's Document 1616-7 and 1616-8.

18          THE COURT:  Thank you.

19  BY MR. PEREZ:

20  Q    All right.  And what was your involvement in the

21  negotiation of those documents, Mr. Dane?

22  A    I was involved along with some other senior executives

23  of Fieldwood in negotiating various parts of the definitive

24  documentation associated with this transaction.

25  Q    Okay.

MICHAEL DANE - DIRECT BY MR. PEREZ                    138

1          THE COURT:  So let me just ask you to hold for one
2   second.
3          You said 1615-7?
4          MR. PEREZ:  1616-7 and 1616-8.
5          THE COURT:  I've got it.  Thank you.
6          MR. PEREZ:  And Your Honor, I believe that those
7   documents are stipulated into evidence.  I don't believe
8   that there's any objection to them.
9          THE COURT:  So the Debtors filed at ECF No. 1672 a
10  list of exhibits that they believe to be, as I understand
11  it, stipulated as to admissibility.  Maybe we should take up
12  now whether anyone disputes whether all of the documents
13  that are listed on pages 5 through 12 of 1672, are they all
14  being offered?
15         Mr. Perez, are you offering them all?
16         MR. PEREZ:  Yes.  They are, Your Honor.  Yes.
17  They are, Your Honor.
18         THE COURT:  Does anyone object to the admission of
19  any of the documents on those -- on that lengthy Exhibit
20  List?
21      (No audible response.)
22         THE COURT:  All right.  All of exhibits that are
23  listed on pages 5 to 12 of 1672 are all admitted.
24      (ECF 1672, exhibits listed on pages 5 through 12
25  received in evidence.)

1          THE COURT:  Thank you.

2          MR. PEREZ:  Thank you, Your Honor.

3   BY MR. PEREZ:

4   Q    All right.  So Mr. Dane, I know this is probably

5   several hundred pages, but what was the purpose of entering

6   into this transaction in connection with the Plan?

7   A    This was viewed as one of the cornerstone transactions

8   of our Plan because it addressed a significant amount of the

9   total liabilities.  As I mentioned, the Apache assets

10  represent two-thirds, 75 percent of the company's shelf

11  liabilities and well over 60 percent of the company's total

12  liabilities.  So the purpose of this transaction per the

13  term sheet was ultimately to be able to consensually resolve

14  a significant amount of the Debtors liabilities and this

15  documentation was following the terms outlined in the term

16  sheet.

17  Q    Okay.  And what were the goals that you were trying to

18  achieve in doing this transaction?

19  A    There was a number of important goals.  Both Fieldwood

20  and Apache had certain objectives with respect to handling

21  these liabilities.  The real goal is to create a framework

22  that was able to comprehensively address all of the

23  obligations associated with the properties that Apache had

24  joint and several liability for.

25          The goal was to look at this holistically, identify all

1  the sources that could be contributed to addressing the

2  significant liabilities and so the parties were able to find

3  common ground on a structure that became the Fieldwood One

4  entity.  The objectives were to take all the assets that

5  Apache had joint and several liability for, put them in a

6  separate entity, which was this Fieldwood One entity, and be

7  able to maximize the cash flow of this entity in order to

8  provide for operations and decommissioning of these assets.

9       The mandate of this entity is to handle its

10 decommissioning obligations and wind itself down.  And any

11 other objectives that was clear focus of the parties, given

12 Apache's willingness to engage only on certain terms was to

13 make sure that the structure didn't jeopardize their ability

14 to protect the security that they had bargained for in 2013.

15      Those were the main objectives in the Fieldwood One.

16 Q    And I meant to ask you:  Fieldwood previously filed for

17 bankruptcy; is that correct?

18 A    Yes.  Fieldwood had a restructuring in 2001.

19 Q    And what happened to the Decommissioning Agreement in

20 connection with that restructuring?

21 A    That restructuring was a pre-packaged restructuring

22 where it was basically a balance sheet reduction.  That

23 reduction exercise and all of their obligations of the

24 company were assumed so every other contract in the company

25 and obligation other than the debt that was being

1   restructured was assumed by Fieldwood and as part of the

2   restructuring company, including the Decommissioning

3   Agreement.

4   Q    All right.

5   A    With certain modifications that the parties had

6   mutually agreed at the time.

7   Q    Okay.  So let's talk a little bit about how Fieldwood

8   One is going to operate in the future.  Are you aware of how

9   Fieldwood One is going to operate in the future?

10  A    Yes.

11  Q    And could you tell the Court how that's going to work?

12  A    Generally speaking the goal of this entity is to

13  utilize any available cash flow that it has in order to

14  conduct decommissioning and provide just the ordinary

15  expenses of operations.  This entity is going to be managed

16  by a sole manager.  That individual was selected as John

17  Graham through a selection process amongst the parties.

18       It's going to be capitalized originally by Fieldwood

19  pursuant to the agreement that we have with Apache as

20  outlined in these definitive documentation.  Fieldwood is

21  going to contribute the difference between $50 million and

22  the amount of P&A that it had spent money on between the

23  filing date and the effective date.  We estimate that that's

24  going to be a contribution at exit of between $15-20

25  million.  Apache is going to provide a standby facility for

1  $400 million.  That standby facility is available under

2  certain conditions for plugging and abandonment obligations,

3  and the Credit Bid Purchase is going to serve as the

4  original contract operator pursuant to a Transition Services

5  Agreement that the parties negotiated so the employees that

6  are going to be a Credit Bid Purchaser who had familiarity

7  with these assets are going to provide all these services

8  associated with operating these assets and administering the

9  assets because the only employee in the vicinity is going to

10 be the sole manager.

11      This entity is going to be entirely focused on doing as

12 much decommissioning as possible and providing funds for

13 decommissioning and providing a framework for

14 comprehensively addressing the decommissioning utilizing,

15 you know, all available sources that are available for that

16 purpose.

17 Q   Can you tell the Court about the process to select the

18 sole manager?

19 A   Yes.  So originally the Fieldwood One term sheet

20 contemplated a process where Fieldwood and Apache had the

21 right to nominate parties and then there has to be a mutual

22 agreement, otherwise it would be determined by, I believe,

23 an outside party or the judge.

24      Fieldwood had proposed three candidates.  Apache had

25 offered as their proposal, John Graham.  Fieldwood had

1    reviewed John Graham's résumé.  Fieldwood conducted several

2    interviews of John Graham and after assessing all the

3    candidates and getting a better understanding of John

4    Graham's qualifications and having discussed in the

5    interviews his insights into these properties to determine

6    that Fieldwood is comfortable supporting John Graham as the

7    sole manager and so the parties agreed that Mr. Graham was

8    going to be selected as the sole manager.

9    Q    All right.  And could you tell the Court what in

10   Mr. Graham's background made you think that he was an

11   appropriate person to be the sole manager?

12   A    Yeah.  I think it was not only his background, but also

13   his individual characteristics that I think that everyone

14   felt like qualified him.  Yeah, Mr. Graham has an extensive

15   experience in the oil and gas states.  He has over 40 years

16   of experience.  A significant portion of that was spent

17   working at Apache Corp over the last 25 years.  He retired

18   in April, but at Apache, he had experience that we thought

19   was very meaningful and unique for this role.  He has

20   experience with these particular assets in the Gulf of

21   Mexico, just a significant asset base, and we thought that

22   experience with respect to these specific assets that are

23   going to be a part of Fieldwood One was very valuable in

24   terms of an understanding of the actual assets.  He was a

25   reservoir engineer manager years ago over the Gulf of

1    Mexico.

2        Also, Mr. Graham has run several significant business

3    units for Apache, some very complicated and large businesses

4    with significant assets in terms of, you know, volume and

5    production and also employees.

6        He ran Apache's North Sea business most recently.  He

7    was responsible for managing a part of their Canadian

8    operations, their Argentinian business, I believe at one

9    point their Canadian business, and then probably most

10   importantly to me, Mr. Graham mentored a number of folks on

11   our team.

12        Mr. Graham had an extensive background in HSE at

13   Apache.  He had helped to form and lead of a group of their

14   HSE department at Apache for a number of years.  I believe

15   it's in the post-McCondo era.  And his understanding and

16   focus on HSE-related areas was something that was very

17   important to the company.

18        Aside from that, I think would a number of our team

19   felt that they took away from the interviews and was

20   appreciative of his name being put forward in the selection

21   process was that he came across as a person that had a high

22   level of integrity and was -- you know, he expressed his

23   commitment to working for all parties to get the best

24   possible answer to meet the mandate of this entity, and we

25   believe that he was a good candidate to do that.

1  Q    Do you believe that he will be under the control of

2  Apache in connection with his role as the sole manager?

3  A    No.  I don't believe that.

4  Q    And why do you say that?

5  A    Well, one, based on his -- based on our conversations

6  with Mr. Graham, particularly at the interview phase,

7  Mr. Graham was clearly interviewing with Fieldwood for this

8  role and he was very upfront about the fact that he

9  understands his role is to be a fiduciary to this entity, to

10  operate within the mandate and the constraints of what his

11  duty and responsibilities are to this entity.

12      So I think, you know, his integrity and character gives

13  me some comfort there.  I also don't believe that Apache has

14  control of Fieldwood One.  They have reasonable consent

15  rights that provide them oversight of the entities to ensure

16  that, in my opinion, to ensure that it's operating within

17  its mandate.  And so I think Mr. Graham is going to operate

18  as an independent sole manager.  He has been working as a

19  consultant for Fieldwood for the last several months because

20  we determined it would be helpful for him to get up-to-speed

21  on the asset base, given the significance of this position

22  and the post-effective company.  And he's been working very

23  constructively with our employees to get his arms around

24  this very complicated situation.

25  Q    And Mr. Dane, does the sole manager have the ability to

1  change who the contract operator is?

2  A    Yes.  Not only does -- he does have that ability, and

3  that's part of his responsibility is to ensure that the most

4  effective, sufficient cost effective services are being

5  provided to the entities.  He's going to be incentivized in

6  a manner that ensures that, as well.

7        And so it is his responsibility, just like it's his

8  responsibility to ensure that all costs are appropriate for

9  that entity.  He has the ability to replace the sole service

10  provider.  That is something that requires Apache's consent,

11  but that's within his responsibilities and he has been

12  upfront about the fact, both with us and Apache, that he's

13  going to be evaluating who the appropriate service provider

14  is on a long-term basis after the initial period that

15  Fieldwood is going to be providing these services so we have

16  a Plan that's confirmed.

17  Q    All right.  In connection with the Disclosure

18  Statement, did Fieldwood prepare projections of the

19  Fieldwood One entity?

20  A    Yes.  It did.

21  Q    All right.  Can I ask you to turn to Exhibit No. 17?

22            MR. PEREZ:  And I believe, Your Honor, that is

23  16 -- yes, 1620, Your Honor.

24  BY MR. PEREZ:

25  Q    Okay.  Mr. Dane, were you involved in the preparation

1  of these financial projections?

2  A     Yes.  I was.

3  Q     And when were these projections prepared?

4  A     These projections, so that the Disclosure Statement was

5  ultimately filed -- or that these projections were filed in

6  April.  The Disclosure Statement projections were updated

7  throughout this process because the process timeline got

8  extended for various reasons.  Originally it was expected

9  that we would have these filings done in the fourth quarter

10  of 2020, but ultimately the solicitation and the Final

11  Disclosure Statement was provided much later than that at

12  the beginning of the second quarter.

13        So they were updated and these projections that were

14  included in this final draft were prepared around the

15  March/April time frame over the course of several months

16  leading up to that, as well.

17  Q     All right.  And could you tell the Court how these

18  projections were prepared?

19  A     So in line with how I was describing our finance and

20  planning group and their responsibilities earlier, our

21  finance and planning group is responsible for preparing our

22  plans and projections.  They work with a wide range of

23  subject matter experts at the company.  This includes

24  reservoir engineers, geologists and geophysicists, our asset

25  team managers, production engineers, landmen, our marketing

1  department, et cetera.

2      All of these folks -- certainly our production

3  operations and operation groups, all of these folks provide

4  the relevant input.  This is a bottoms-up forecasting effort

5  like most of our planning and forecasting.  And so this

6  bottoms up effort takes -- bottoms up analysis takes the

7  inputs from the various subject matter experts and they're

8  consolidated by our finance and planning group.  It's an

9  iterative process where our financing and planning group

10  assembles this information and tests assumptions, make sure

11  that it works within the context, the bottom context of what

12  the objective is, and then ultimately management reviews

13  these projections and as a part of my oversight of that

14  finance and planning group, I was involved in that process,

15  reviewed their work, and ultimately approved the projections

16  that we've been using.

17  Q   All right.  Let me ask you to turn to the very last

18  page.  Could you tell the Court what that is?

19  A   These are the projections associated with the Fieldwood

20  entity, the Fieldwood One entity that we prepared.

21  Q   All right.  I'm not going to go through each line.  I

22  think that substantial part of the testimony as a result of

23  the settlement, I'm not going to go through it.  I just want

24  to highlight a couple of lines.

25      Do you see kind of toward the middle of the page there

1  is a change in networking capital, 36.  Do you see that?

2  A    Yes.  I do.

3  Q    Could you explain to the Court what that is?

4  A    So that number represents the estimated change in

5  networking capital that this entity is going to experience

6  as a result of these transactions.  It's obviously a

7  meaningful, positive number, and the reason -- but the basis

8  for this number is there is a pre- and post-effective date

9  construct that's assumed as a part of all these

10 transactions.  Fieldwood One entity is going to start with a

11 very clean working capital balance because under our Plan

12 it's contemplated that the Credit Bid Purchaser is going to

13 assume effectively all of the working capital associated

14 with Fieldwood.

15      And so at the time of the effective date, the Fieldwood

16 One entity is not really going to have any payables.  It is

17 only going to be responsible for post-effective date

18 payables and when we look at our estimates for the cash

19 impact of these transactions and the fact that the Credit

20 Bid Purchaser is going to be assuming all the payables at

21 the time of exit that are pre-effective date, and when we

22 look at and make our estimates for the fact that revenue is

23 received on a much more current basis then payables are paid

24 when you start with a clean balance sheet, it results in a

25 meaningful positive working capital balance.

1        So for instance, if a transaction was to be effective

2   at August 1st as an example, then Fieldwood One's first

3   revenue payment for the month of August would be received in

4   the month of September.  Fieldwood One's payables would

5   likely not be paid for many, many months after that because

6   if for a payable for the service month of August probably

7   wouldn't be received until September and due until October.

8        So there's a working capital benefit that this entity

9   receives.  It's the opposite of the working capital impacts

10  to the NewCo, which is expected to be about a $50-plus

11  million negative working capital result as a result of these

12  transactions.

13  Q    All right.  And also, could you tell the Court what the

14  R&M expenses are that's kind of toward the top of the page?

15  A    R&M stands for "Repair and Maintenance."  And these are

16  basically non-recurring major projects spends associated

17  with remediating and maintaining the facilities to include

18  everything from general maintenance of the facilities, for

19  corrosion, because these facilities require ongoing upkeep.

20  It could include repairs related to hurricanes or other

21  storms, so it's a broad category of repair and maintenance

22  that's required on this asset base.

23  Q    All right.  And then finally, --

24          THE COURT:  Mr. Dane, if you would look at -- I

25  need to be sure I understand how this page works.  Tell me

1  where the change in networking capital line item comes from,

2  if you don't mind?  We can take May to December.

3        THE WITNESS:  Sure.

4        THE COURT:  Where does that 36 million come from?

5        THE WITNESS:  So that is -- Your Honor, we look at

6  the various cash-related items that will implement Fieldwood

7  One's networking capital balance as a result of these

8  transactions and so it's a function of the timing of revenue

9  and the timing of expenses.  So when we look at on a cash

10  basis when revenue is actually received versus the expenses

11  when they're actually paid because indemnity is going to be

12  starting with a clean working capital balance, and it's not

13  going to be responsible for any pre-effective date

14  obligations associated with the payables.  This is basically

15  the benefit that this entity gets because it effectively

16  receives the revenue more currently then it will pay the

17  payables and that will result in a meaningful initial

18  working capital benefit because you're getting two or three

19  months of revenue before you're having to pay expenses at

20  the beginning.

21        THE COURT:  So in effect, that 36 million is

22  largely a bill of accounts payable?

23        THE WITNESS:  Yes.  It's the benefit of getting

24  revenue without having to pay expenses for an extended

25  period of time and it's the opposite for the NewCo, where

1  NewCo is going to forgo the future revenue, but it's going

2  to maintain responsibility for pre-effective date payables,

3  which have to be paid over time.

4           THE COURT:  All right.  Go ahead.

5           Thank you.

6  BY MR. PEREZ:

7  Q    Okay.  So Mr. Dane, last thing I'm going to ask you

8  about this is:  Could you explain to the Court what the

9  standby credit facility is?

10  A    The standby credit facility is something that was a

11  component of the Fieldwood One/Apache Fieldwood transaction

12  whereby Apache has agreed to provide a $400 million standby

13  facility.  This standby facility is available for plugging

14  and abandonment upon certain conditions -- major provisions

15  associated with these funds is that other sources of

16  security that are in favor of Apache are required to be

17  exhausted prior to this facility being able to be drawn,

18  other than in certain other circumstances that the lender

19  may consent to for utilizing these funds.

20  Q    All right.  And so when we're looking at does Fieldwood

21  have an estimate of what they believe the asset retirement

22  obligations for Fieldwood One is?

23  A    Yes.  Fieldwood has done a number of different analysis

24  on the Fieldwood One obligations and generally the estimates

25  are between 950 million in total to around 1.2 billion, has

1  been the numbers that we do in our various estimates, and in

2  these projections -- I'm sorry, in the forecast period that

3  goes from May '21 to the end of 2025, there were around

4  410 million, I believe, dollars of projects that were

5  identified under these assumptions that are associated with

6  activity that could be performed in this period.

7  Q     Okay.  And to address those obligations, what sources

8  of revenue exists to address those obligations?

9  A     So it's sources obviously beyond revenue, but the

10  various sources -- I mentioned that this Fieldwood One

11  entity, the objective was to create a framework in order to

12  address all of the decommissioning obligations.  And you

13  know, we looked at the resources in a holistic manner.

14      And those resources comprised certainly as a part of

15  this transaction, I mentioned that Fieldwood is going to be

16  contributing cash at exist to this Fieldwood One entity.

17  That's going to be, in our estimate, $15-20 million.  That's

18  going to provide the initial capitalization of Fieldwood

19  One.  This entity is going to -- under these projections and

20  these assumptions it's going to generate cash flow of that's

21  going to enable approximately $170 million of P&A to be

22  accomplished while maintaining an adequate minimum cash

23  balance in this entity.  So the cash flow from the entity

24  itself is a resource.

25          The amount that is -- the security arrangements

1  that Apache has in place, pursuant to the Decommissioning

2  Agreement, which comprise the Trust A balance of

3  $238 million, which will grow over time.  If as under these

4  assumptions the Net Profits Interest continues to generate

5  in that process and these projections, there is a forecast

6  that that Net Profits Interest will generate over

7  $40 million of additional Net Profits Interest that will be

8  deposited into Trust A over this period and that obviously

9  extends into the future, as well.

10        There is the $497 million of bonds and LCs that are an

11  available resource pursuant to the terms of those

12  agreements.  There is the $400 million standby facility that

13  Apache has made available.  And then certainly behind all of

14  those sources, which in and of themselves add up to a

15  meaningful number and a number that we believe is in excess

16  of the total liabilities of Fieldwood One net related

17  properties, certainly behind all those numbers is Apache,

18  who has joint and several liability and it's very well

19  capitalized, nearly $20 billion enterprise value company.

20  Q    All right.  Mr. Dane, I'm going to switch gears a

21  little bit and talk about the sale transaction to Credit Bid

22  NewCo.

23        Could you give the Court an overview of that

24  transaction?

25  A    So early in this process, one of the components of the

1  original Plan was a dual track marketing effort of certain

2  of the company's deepwater assets or a potential

3  recapitalization of certain of the company's assets, and

4  this was going to be at the lender's decision ultimately.

5  The company engaged in a third-party -- you know, multiple

6  third-party marketing efforts.  Those marketing efforts were

7  being developed in a way that was acceptable to the parties,

8  and the lenders decided to pursue the reorganization and

9  recapitalization of certain assets that the company owns.

10      The company performed an evaluation with its lenders

11  and advisors and other stakeholders as to the assets that

12  were going to be recapitalized and that were going to form

13  the basis of the new money that the lenders were going to be

14  willing to support as a part of that transaction.

15      And so the Credit Bid Purchase transaction contemplates

16  the sale of certain assets through our Plan to the Credit

17  Bid Purchaser to effectively substantially of the company's

18  deepwater business and 13 shelf properties to the Credit Bid

19  Purchaser.

20  Q    All right.  And what consideration is the Credit Bid

21  Purchaser paying for those assets?

22  A    So the Plan states that there's an aggregate

23  consideration of approximately $1.03 billion related to the

24  Credit Bid Purchaser transaction.  That consideration is in

25  the form of first cash.  There is up to $125 million of

MICHAEL DANE - DIRECT BY MR. PEREZ                    156

1   cash.  There is the allowed first lien term loan claims,

2   their credit bid.  There's the Gulf warrants, the second

3   lien term loan warrants.  There is the allowed first

4   lien/first out claims.  There is the assumption of

5   meaningful liabilities, which is effectively the working

6   capital and that's the working capital that Your Honor asked

7   about.  It's the assumption of those working capitals that

8   are pre-effective date working capital of effectively all of

9   the companies' liabilities associated with that

10  post-effective date payables.

11      And that's broadly the categories of the consideration.

12  Q   All right.  And what do you think the amount of the

13  current liabilities that the Credit Bid Purchaser will be

14  assuming?  What is the amount of that?

15  A   I believe it's approximately $350 million of asset

16  retirement obligations.  But in addition to -- that's asset

17  retirement obligations by our estimates associated with

18  those deepwater properties and 13 shelf properties, but in

19  addition to that, there's other categories of obligations.

20      I'm not sure if your question was just asset retirement

21  obligations.  There's also the Fieldwood Three related

22  properties the company is going to continue to support

23  certain properties in Fieldwood Three.  As of right now,

24  those Fieldwood Three properties are nine platforms and ten

25  wells for which it's providing $5 million at exit and credit

1  support of up to $8 million for.

2      There's obligations under the various predecessor

3  consensual arrangements that the company is going to support

4  to handle P&A.  There's the working capital obligations it's

5  assuming.  There's obviously the new data obligations that

6  are going to be created in the pro forma capital structure.

7      So those are the obligations that the Credit Bid

8  Purchaser is going to be assuming.

9  Q    And specifically as it relates to the working capital

10 items that it will be assuming, what do you believe that

11 number will be?

12 A    I estimate that's $50-60 million.

13 Q    Thank you.

14     Let me ask you to turn to Exhibit No. 26, which is

15 1616-5.

16     Can you identify that document, sir?

17 A    This document is the Credit Bid Purchase Agreement.

18 Q    Okay.  And were you involved in the negotiation of that

19 document?

20         THE COURT:  I'm sorry.  Which ECF number is this

21 again?  I've turned to the wrong one is what this means.

22         MR. PEREZ:  1616-5, I think, Your Honor.

23         THE COURT:  No.  I went to 1615-5.  I just

24 misheard you.  Let me get the right one open.

25         I've got it now.  Thank you.

1        THE WITNESS:  Yes, Mr. Perez.  I was involved in

2   certain elements of the negotiation around this agreement.

3   BY MR. PEREZ:

4   Q    All right.  Now who will be managing the team at the

5   new Credit Bid Purchaser?

6   A    So our Plan and the conversations that we've had with

7   our stakeholders contemplate that the management team of

8   Fieldwood today will continue to be the management team of

9   the Credit Bid Purchaser.

10  Q    And how much debt will the Credit Bid Purchaser have

11  upon funded debt once the transaction is concluded?

12  A    The Credit Bid Purchaser will have up to $304 million

13  of debt.  That's comprised of $119 million first lien term

14  loan and that is -- there is a second lien term loan of up

15  to $185 million.  The final amount of that second lien term

16  loan will be determined by the final sources and uses of the

17  transaction, so it would be up to $304 million of funded

18  debt.

19  Q    And how does that compare to Fieldwood's current

20  capital structure?

21  A    It's substantially less.  Fieldwood has $1.8 billion of

22  funded debt, as I was mentioning, so it's over 80 percent

23  reduction in the company's debt.

24  Q    Are you familiar with the capital structures of other

25  operators in the Gulf?

1   A    I am.

2   Q    And how was the new Credit Bid Purchaser compared to

3   those?

4   A    I believe that the Credit Bid Purchaser is going to

5   have a leading balance sheet amongst its peer group.  Peers

6   in the Gulf of Mexico have -- our closest peers in the Gulf

7   of Mexico has capital structures that have a leverage

8   profile --

9           THE COURT:  Let me -- Mr. Dane, I'm going to

10  interrupt you for a minute.

11          Let's go ahead and take the objection from

12  Mr. Duewall.

13          MR. DUEWALL:  Objection, hearsay, Your Honor; it's

14  outside the scope of the --

15          THE COURT:  Sustained.

16          MR. DUEWALL:  -- witness's knowledge.

17          THE COURT:  Sustained.

18  BY MR. PEREZ:

19  Q    Mr. Dane, can you turn to Exhibit 17 again?  In

20  particular, page 9.

21  A    Yes.  I have that available.

22  Q    All right.  Can you tell the Court what this is?

23  A    These are the projections associated with NewCo.

24  Q    All right.  And --

25  A    I'm sorry, Credit Bid Purchaser.

1  Q    Okay.  And did you -- what was your involvement in

2  preparing these projections?

3  A    Similar to what I described earlier about our overall

4  general planning and projection process and the Fieldwood

5  One planning and projection process, it was the same process

6  where finance and planning group assembled a bottoms up

7  analysis collectively with all the subject matter experts.

8       I assembled it.  I reviewed -- I was involved in that

9  effort and I reviewed and approved these projections

10  Q    Do you feel that the Credit Bid Purchaser will be able

11  perform on these projections?

12  A    I believe that these are very reasonable projections

13  that are a very fair set of projections and very much in

14  line with all the reasonable assumptions that are forecasted

15  here.  I think that the company right now is very well

16  positioned to accomplish these objectives that are outlined

17  in the projections.  The company has been working very

18  actively throughout this very long process to try and

19  position itself to be able to be successful and accomplish a

20  business plan that's in line with these projections.

21       I do feel very comfortable with these projections given

22  where we are today and how the assets are performing.

23  Q    All right.

24            THE COURT:  So I just want to make one comment for

25  the appellate record and that is that what we're looking at,

1  as I understand it, is 1615-20 ECF page 8, not ECF page 9,

2  but it is Document page --

3            MR. PEREZ:  9.

4            THE COURT:  -- well, there's a 9 at the bottom,

5  but it also says, "Page 8 of 9" at the bottom.  That's where

6  the confusion is coming in.

7            These are called "NewCo Projections," is what

8  we're looking at and I think the page references might not

9  have been accurate that we were making.

10           But I want to be sure you're looking at the page

11 that's labeled "NewCo Projections," right, Mr. Dane?

12           THE WITNESS:  Yes, Your Honor.

13           THE COURT:  Okay.  Thank you.

14 BY MR. PEREZ:

15 Q    All right.  Let me ask you a question.  On the P&A

16 line, which is in the middle of the page, do you see that

17 line?

18 A    I do.

19 Q    Okay.  And it shows, you know, relatively modest

20 amounts of single-digits.  Why is that -- why are those

21 amounts the amounts needed for the asset retirement

22 liability on these assets?

23 A    They are certainly modest compared to Fieldwood's

24 overall obligations today, but with respect to the assets

25 that this work is attributable to is a significant amount of

MICHAEL DANE - DIRECT BY MR. PEREZ                    162

1  the work associated with Fieldwood's shelf asset retirement

2  obligations that this entity is going to be assuming.

3       The nature of the assets that are going into the NewCo

4  that are being acquired pursuant to the Credit Bid Purchase

5  are that they are generally assets that have a significant

6  reserve life and the asset retirement obligations are

7  generally not going to be realized until much further down

8  the road once those assets deplete and the P&A is ripe for

9  being conducted.

10      The P&A that's forecast in these periods --

11           THE COURT:  Let me -- Mr. Dane, I'm going to

12  interrupt you again.

13           Mr. Duewall, go ahead, please.

14           MR. DUEWALL:  So Your Honor, he's not there now.

15  Previously he was drifting into an area that I think had

16  been limineed out by the Court's previous Order regarding

17  what he couldn't testify to with regard to feasibility, but

18  he has since backed away from that.  That was the nature of

19  my -- what was going to be my objection.

20           THE COURT:  So as I've indicated, I'm not going to

21  do waivers based on an answer already given.

22           Do you think any of his answers already given

23  crossed the line?  I'm not sure they did.  I gotcha that you

24  were worried about them getting close, but if you want to

25  make that objection, you're still free to do so.

1              MR. DUEWALL:  No, Your Honor.  He's -- no, Your

2    Honor.

3              THE COURT:  Okay, thanks.

4              Mr. Duewall, I'm leaving your line active so you

5    will not need to press five star to speak.  Just speak up if

6    you wish.

7              MR. DUEWALL:  Thank you, Your Honor.

8              THE COURT:  If you remember where you were,

9    Mr. Dane, you can finish that answer.  If not, we'll have

10   Mr. Perez repeat it.  This is just the awkwardness of the

11   COVID hearing.

12             THE WITNESS:  That's no problem.  Thank you, Your

13   Honor.

14             So the -- now I forget.  The projections over this

15   five-year period are effectively associated with -- even

16   though there's a long reserve line associated with most of

17   Fieldwood's -- most of the assets that are going to comprise

18   the NewCo entities.  The rejections that are shown for P&A

19   work over the five years were estimates that were assuming

20   that the company has a very pro-active idle iron campaign

21   with respect to the Shelf assets that it's retaining, the

22   reason that they're relatively small is there's not a

23   significant amount of P&A work that needs to be done.

24   There's not a substantial amount of idle iron.

25             There's also other factors that can feature --

1  that can be a function of how significant the annual

2  spending is.  Like, for instance, a number of the Credit Bid

3  Purchaser's assets are going to be assets that have a lower

4  working interest.

5           One of the significant fields is Grand Isle 43

6  that has a significant amount of the idle iron that's going

7  to be accomplished over this period.  The Credit Bid

8  Purchaser only has a 25 percent interest in that field, so

9  the gross number of projects continue in full, but the net

10 dollar spend would not be that significant.

11          But generally speaking the reason the amounts here

12 are low is because of the fact that the nature of the assets

13 that are going to be owned by the Credit Bid Purchaser do

14 not have meaningful near term P&A.

15 BY MR. PEREZ:

16 Q    Okay.  And what is the current asset retirement

17 obligation on the Debtors' books and records with respect to

18 these assets?  The total amount.  I think you may have

19 mentioned it before, but I just want to have a clear

20 estimate.

21 A    Approximately -- I'm sorry.  Approximately $350

22 million, I believe.

23 Q    All right.  Thank you.

24      Now one last question about Credit Bid NewCo, do you

25 believe that Credit Bid NewCo will have sufficient funding

1  capability to carry out its business plan?

2  A    I do.

3  Q    And why do you say that?

4  A    We're aware of the bond that we know are required to

5  provide as a part of these transactions that we've been made

6  aware of.  We have been engaged in a number of conversations

7  with surety parties.  We have a commitment from one of the

8  surety providers that was a recent consensual solution that

9  was able to be worked out between the Debtor and this party,

10 USSIC, in order to provide for a $75 million facility --

11 committed facility for two years, which is a very meaningful

12 amount and it more than satisfies, at least initially, what

13 we know we need to provide and we're engaged in other

14 conversations that may result in incremental capacity, as

15 well, to the extent it's necessary.

16 Q    Thank you.

17       Now let me turn to other transactions.  Has Fieldwood

18 entered into other consensual transactions addressing the

19 ARO obligations with other predecessors?

20 A    It has.

21 Q    Okay.  Let me ask you to turn to Exhibit No. 18, which

22 is 1615-21.

23       And ask if you could identify that.

24 A    This is the Fieldwood/Chevron term sheet.

25 Q    All right.  And could you tell the Court in general

MICHAEL DANE - DIRECT BY MR. PEREZ                166

1   terms what the term sheet provides for?

2   A    Well, Fieldwood was obviously interested in continuing

3   to find as many consensual solutions as it could with major

4   predecessors or all predecessors and Chevron represented in

5   our view the second largest predecessor after Apache.

6   Fieldwood engaged in very constructive conversations with

7   Chevron around the 3Q 1420 period of time of 2020 and was

8   able to ultimately come to a term sheet, which has

9   subsequently then incorporated into the definitive

10  documentation that was recently filed, related to assets in

11  which Chevron is a predecessor.

12       The main contours of the agreement between the Debtors

13  and Chevron comprised a Fieldwood Four entity, which is

14  going to be made up of certain properties that Chevron is

15  the primary predecessor-in-interest of, related to Fieldwood

16  Shelf asset base.  It's a meaningful position.  It's I

17  believe over 25 platforms, over 100 wells.

18       The Fieldwood Four construct contemplates that those

19  assets are going to be put into Fieldwood Four.  The Credit

20  Bid Purchaser is going to conduct the contract operations of

21  that entity, pursuant to a contract operating agreement.

22       The Credit Bid Purchaser is going to enter into a

23  turnkey P&A Agreement with Chevron, where the Credit Bid

24  Purchaser is going to perform the P&A on the Fieldwood Four

25  asset pursuant to that turnkey agreement that has that has a

1    specified price that's been negotiated for every individual

2    pipeline, platform, and well associated with the Fieldwood

3    Four properties.

4         There's going to be an amount of money and to the

5    extent that Credit Bid Purchaser can do the work on each

6    individual property for less than that money, it would be

7    able to realize a profit.  To the extent that it spends more

8    than that stated turnkey number, then it's going to be

9    susceptible for any overages, subject to qualified

10   conditions that the parties negotiated which allowed the

11   parties to renegotiate the turnkey numbers or agree on an

12   alternative structure for payment, such as costs -- you

13   know, being done on a cost basis or cost-plus basis or some

14   other way.

15        The qualified conditions account for if there are

16   changes in the nature of the assets due to storms or if

17   there's well-related conditions like sustained casing

18   pressure issues or other changes in the regulatory

19   environment.  It's a comprehensive qualified condition

20   turnkey arrangement.

21        Also as part of the Fieldwood Four structure, Fieldwood

22   agreed -- Chevron agreed to maintain the direct

23   decommissioning of one of the company's largest liabilities,

24   which was the *Neptune Spar* and the *Swordfish Field*.  That's

25   a very significant deepwater facility.  It's one of the only

1  properties that's not going to be a part of the deepwater

2  asset base that's associated with the Credit Bid Purchase

3  arrangement and Chevron is going to conduct that

4  decommissioning directly over the near term.

5       In between when Chevron conducts that decommissioning,

6  Fieldwood is -- or excuse me, Credit Bid Purchaser is going

7  to provide the contract operating services to continue

8  operating and maintaining that facility subject to

9  reimbursement of costs.

10      Chevron is also going to be responsible for all the

11  operating expenses associated with the Fieldwood Four

12  entity.  And Fieldwood is going to contribute $5 million at

13  exit to the Fieldwood Four structure.  That money is going

14  to be utilized in order to stake out the properties over the

15  remainder of this year.

16      Fieldwood is also -- subsequent to the original term

17  sheet, Fieldwood agreed that properties that were originally

18  going to be the responsibility of Credit Bid Purchaser and

19  were going to be the responsibility of Credit Bid Purchaser

20  and were going to reside in Fieldwood Three, the parties

21  agreed to take those properties, along with $15 million that

22  the Credit Bid Purchaser was going to earmark for those

23  property's P&A and contribute that into Fieldwood Four.  It

24  made more sense to adapt the construct because those

25  properties also had Chevron as a major predecessor-in-

1  interest, so Fieldwood is contributing $15 million more into

2  Fieldwood Four and those properties and it's going to

3  decommission those properties at cost.

4      Chevron is going to receive two years after the

5  effective date, the $25 million bond from the Credit Bid

6  Purchaser.  And that was something that was agreed to

7  between the parties as Chevron had a desire for more

8  security and they recognize that the properties underlying

9  the NewCo asset base were largely properties for which they

10  had joint and several liabilities for.

11      So that's the general contours of the Chevron

12  agreement.

13  Q    So --

14  A    I'm sorry.  One other point:  These properties are

15  going to be decommissioning in Fieldwood Four over the next

16  three to five years probably.

17  Q    And do you believe that the Credit Bid Purchaser will

18  be able to perform the work under this agreement?

19  A    Yes.  I'm confident.  The Credit Bid Purchaser has

20  already made advanced plans to commence this work as soon as

21  we have a confirmed Plan.  There's a number of wells,

22  pipelines, and platforms, that are in the queue to get

23  underway and complete as soon as possible and there's a

24  long-term plan to conduct the rest of this work.

25      So we've engaged in advanced planning efforts to

1   conduct this as expeditiously as possible, which was the

2   main motivation of the parties.

3   Q    And so did you also enter into a term sheet with Eni?

4   A    Yes.  That was another consensual arrangement.

5   Q    All right.  Would you please turn to Exhibit No. 40 and

6   that is 1616-21?

7   A    Okay.  I have that here.

8   Q    All right.  And would you tell the Court what the terms

9   of this term sheet -- its general terms?

10  A    So the major terms of the Eni agreement contemplates

11  that the Credit Bid Purchaser is going to enter into a

12  turnkey arrangement with Eni related to certain properties

13  which Eni is the primary predecessor-in-interest, properties

14  that Fieldwood had acquired from Eni.

15      The turnkey arrangement is a little bit different from

16  the Chevron arrangement, just based on what the parties

17  negotiated in their different objectives with respect to

18  these specific assets and Eni's objectives in this

19  transaction.

20      But it is a turnkey arrangement.  There is a total of

21  $57 million turnkey value associated with all of these

22  properties.  The properties comprise around a dozen

23  platforms, 35 or so wells.

24      Similar to the Chevron transaction, to the extent the

25  Credit Bid Purchaser can conduct the work for less than the

1   turnkey amount, which I mentioned is $57 million, it'd be

2   able to realize a profit.  If it would cost more than that,

3   it would be an exposure of the Credit Bid Purchaser.

4       There are certain more limited qualified conditions in

5   this arrangements, more limited to regulatory standards in

6   the future or windstorm events that would change the nature

7   of the assets.  You know, under those conditions there is an

8   agreed upon adjusted upward amount that could be added to

9   the $57 million turnkey amount.

10       That $57 million turnkey amount is net to Eni's

11   interest in these properties.  And so this work is going to

12   be conducted over the next -- it should be completed within

13   the next two to three years.  It's going to get started as

14   early as the effective date.  There is a plan to do material

15   work on these assets this year, assuming that we have an

16   effective date that provides the ability to do this work

17   during the summer P&A season.

18       The final kind of, I think, meaningful points of this

19   arrangement are that Fieldwood agreed to contribute

20   $3 million at exit as a contribution towards the P&A of

21   these assets and agreed to a $1-1/2 million legal fee

22   reimbursement for Eni as a result of reaching this

23   consensual solution.

24   Q   And is that money coming from Credit Bid Purchaser's

25   funding of the Plan?

1  A    Yes.  All of the contributions associated with these

2  consensual arrangements and then obviously a number of other

3  expenses associated with the Plan are being funded through

4  the new money that is going to be contributed by the lenders

5  under the Plan, the $225 million in new money.

6  Q    Thank you.

7       Now --

8  A    Not all of it, a substantial portion of it.

9  Q    All right.  Did you also reach a consensual agreement

10 with Hunt?

11 A    Yes.  We did.

12 Q    All right.  And can you turn to Exhibit No. 41?

13 A    Okay.  I have that here.

14 Q    And that's ECF No. 1616-22.  Can you tell the Court

15 generally about the Hunt agreement?

16 A    So the Hunt agreement is another consensual solution.

17 There is an element of a turnkey arrangement contemplated

18 under the Hunt agreement, as well, there Hunt is going to

19 pay the Fieldwood or the Credit Bid Purchaser -- depending

20 on the timing because this is activity that's imminently

21 underway.  A $5.4 million amount associated with three

22 platforms and one Grand Island 63.  This activity is in

23 process right now in the early stages.  The actual projects

24 could be completed within the next month to two months,

25 depending on whether an equipment availability and these

MICHAEL DANE - DIRECT BY MR. PEREZ                    173

1  platforms will be removed.

2      Fieldwood is going to contribute $375,000 towards the

3  decommissioning.  And there are other properties that

4  Fieldwood has agreed to maintain, financial responsibility

5  for decommissioning as a part of its Fieldwood Three

6  agreement and that was also agreed as part of the Hunt term

7  sheet.  There's several properties for which Hunt is the

8  primary predecessor that Fieldwood will conduct the P&A out

9  over the next couple of years as well.

10      So those are the major components of the Hunt

11  transaction.

12  Q    And is there any importance of doing the P&A in short

13  order?

14  A    With respect to -- in general obviously, to the extent

15  we have the capability to do the P&A, we want to get it done

16  as soon as possible because there's a limited window to be

17  able to do your platform removal work.  And that work is

18  typically done during the summer months.  The reason it's

19  done during the summer months is because you're using

20  equipment that is more effective to work in seascapes that

21  are calmer.  You're utilizing dairy barges and other heavy

22  lift vessels that can't operate in heavy sea storm months.

23  There's better weather for that.

24      It would not be cost effective or safe to operate that

25  equipment in winter months.  So we generally do platform

1    removal work during the summer months.

2         In order to be able to do the platform removal work,

3    you need to complete the well work on a platform and so to

4    the extent there's ever delays that delay the well work, it

5    delays potential platform removal work which can only happen

6    during the summer.

7         With respect to these particular properties under the

8    Hunt agreement, the Island 63 platforms, those three

9    platforms had permit exploration considerations that we

10   needed to be mindful of.  They had permits that were

11   expiring at the beginning of July and if we had not

12   completed the work prior to that time, then it was going to

13   require Fieldwood to re-apply for permits and re-applying

14   for those permits is a lengthy process that could take up to

15   six months or longer for platform removal permits, which

16   would have compromised our ability to get this work done in

17   this summer months season.

18        So Hunt and the Debtor worked very constructively, kind

19   of recognizing the benefit of trying to remove these

20   facilities sooner rather than later, which is beneficial

21   because it removes risk, it removes costs, it accomplishes

22   the objectives of the Government.

23   Q    Thank you.

24        Let's turn now to Fieldwood Three.  Can you describe

25   what Fieldwood Three is going to do?

1  A     So originally Fieldwood Three contemplated properties

2  that were not a part of the Fieldwood One transaction or the

3  consensual solutions or the abandoned properties.  These

4  were a set of properties that Fieldwood had identified that

5  the Credit Bid Purchaser was going to not assume, but

6  maintain responsibility for the decommissioning of -- there

7  were properties that decommissioning was imminent.  They

8  weren't -- they were either expired leases or about to be

9  expired, and it was obligations that the stakeholders felt

10  that in addition to all of the other arrangements, they

11  could put aside capital to support.

12       They were also -- it was also earmarked to be a

13  resource to be available to the extent there was leases or,

14  you know, wells, pipelines, platforms, that were -- that had

15  problematic predecessors in the chain of title.  So

16  originally there was $27 million worth of properties that

17  Fieldwood thought it identified that method's parameters or

18  it could just handle the decommissioning in an expedited

19  way.

20       The $27 million was intended to be funded by originally

21  -- under the original Plan, $5-15 million of cash

22  contributed by exit to the Fieldwood Three entity in credit

23  support from the NewCo entity for the remaining amount.  As

24  the Plan evolved, and as I mentioned, the number of these

25  properties, the parties agreed to contribute to the

1  Fieldwood Four structure, which is beneficial for all the

2  parties.  The remaining amount of the properties in the

3  Fieldwood Three pool shrunk.  And so as a result right now,

4  the remaining Fieldwood Three properties comprise ten wells,

5  I believe, and nine platforms.  Those properties we are

6  earmarking $5 million at exit to be contributed to the

7  Fieldwood Three entity, and then credit support for between

8  $7-to-8 million of credit support that the Fieldwood wanted

9  -- excuse me, that the Credit Bid Purchaser will maintain to

10  conduct the P&A.

11      The P&A on those assets is well underway.  Over the

12  last two months, we have engaged on trying to proactively

13  address this P&A as we've gotten more comfort in our process

14  and visibility as to the other moving parts of the other

15  entities.  We made the decision that we thought was prudent

16  and comfortable to move forward with trying to do this P&A,

17  to extinguish it sooner rather than later.

18      And also so that we could feel comfortable that the

19  $12 million plus the $8 million of credit support, that

20  $13 million was going to be adequate to do all this P&A.

21  Our current estimate for the liability post-effective date

22  for these remaining properties is $7 million.

23      So we feel very comfortable that the work is going to

24  be able to get done, particularly given that it's already

25  underway.  There's also $12 million bond that are behind

1   this, the third parties.

2   Q    Mr. Dane, there was some activity in the Gulf last

3   week.  Did that have any impact on Fieldwood's operations?

4   A    It did.  It was -- unfortunately this is the start of

5   hurricane season and there was a weak tropical event where

6   it crossed through the Central Gulf of Mexico.  Fieldwood

7   took a very cautious approach with this storm and in

8   hindsight maybe over cautious.  It ended up not being much

9   of a storm.  It was only reaching 30-to-40 knot winds, which

10  is not that severe, but Fieldwood evacuated effectively all

11  of its personnel from the Gulf.  We evacuated 800 folks

12  offshore, which is a very -- a very entailed evacuation

13  protocol.  We've evacuated everything other than our

14  western-most area.

15       This effectively took down a very significant portion

16  of Fieldwood's production and that decision was made just

17  because the company felt it was the prudent thing to do.

18  The company felt that we have extremely low risk tolerance

19  at this stage, and despite the fact that I think industry in

20  general did not really mobilize to evacuate to the extent

21  Fieldwood did.  Fieldwood thought that that was appropriate

22  under our circumstance, but this obviously is going to have

23  an impact on our cash and our revenue for the month of June.

24       But I think this event will be hopefully short-lived

25  because we're in the process of remanning as we speak and we

1  don't expect there to be damage from the storm.

2  Q    Thank you.

3  A    It does impact -- I'm sorry.  One other thing I wanted

4  to say.  It does impact our ability to get underway with

5  certain projects like P&A projects.

6  Q    So Mr. Dane, has the Debtors been in conversations with

7  the Government regarding the Plan?

8  Q    Yes.  The Debtor has engaged in conversations with the

9  Government well ahead of the company's ultimate filing in

10 August.  I think we engaged the Government -- various

11 regulatory entities and various departments in the

12 Government several months ahead of ultimately filing.  You

13 know, once it became clear that there was a restructuring

14 that was going to be a part of the Plan in court, the

15 Debtors engaged with various regulatory entities and stayed

16 engaged, in pretty close contact.

17 Q    And has Fieldwood agreed to do certain things pursuant

18 to the Plan to address the Government's concerns?

19 A    Yes.  Fieldwood has agreed to do a number of things

20 based on the Government's concerns and conversations that

21 Fieldwood has had with the Government.

22 Q    Okay.  Let me ask you:  Are you familiar with the term,

23 "Agreed Activities"?

24 A    Yes.

25 Q    And what are the Agreed Activities?

1  A    Unfortunately I think we use this term to define a

2  couple of different things.  But the major component of

3  Agreed Activities was initially back in the first quarter of

4  this year, Fieldwood had discussed with the Government

5  certain remediation and maintenance activities that it was

6  committing to undertake related to the abandoned properties

7  and the Agreed Activities was a schedule that Fieldwood had

8  provided to the Government that listed all of the abandoned

9  property's platforms and the projects associated with the

10  Agreed Activities that Fieldwood was going to endeavor to

11  commit to performing on those platforms.

12      The work scope effectively was re-establishing egress

13  and resolving certain safety-related instances of

14  non-compliance.  A number of Fieldwood's platforms had

15  sustained very substantial damage over the course of the

16  2020 hurricane season.  There was an unprecedented number of

17  storms.  You know, Fieldwood has almost 500 platforms today

18  and there was damage on 97 percent of the company's

19  platforms.

20      So, you know, we wish we could have just snapped our

21  fingers, put aside a pot of money, and resolved all the

22  related damage, but unfortunately, given the volume of

23  platforms and the need to ensure that we're handling all of

24  these operations safely and given just limitations on the

25  amount of repair and maintenance crews and the ability to

MICHAEL DANE - DIRECT BY MR. PEREZ                    180

1  properly manage repair and maintenance crews and the number

2  of equipment availability in the Gulf of Mexico for

3  equipment like list those that are required.

4      Fieldwood is at capacity with respect to doing repair

5  and maintenance and basically has been since the end of the

6  last hurricane season doing work on all 500 of its

7  platforms.

8      So the Agreed Activities list was a schedule of

9  activities associated with abandoned properties comprising

10 $6 million of activities to re-establish egress and clear

11 certain safety-related (indiscernible), most all of which

12 was related to hurricane-related damage.

13     And just for the Court's clarification, egress is the

14 ability to access a platform.  There has to be, I believe,

15 two methods of being able to evacuate a platform.  It's

16 usually ensuring that boat landings and, you know, ladders

17 and stairways and other means of -- the heliports provide

18 accessibility to a platform.

19 Q    And let me ask you to turn to Exhibit No. 99, which is

20 625-23 -- 1625-23.

21 A    Yes.  I have that.

22 Q    And can you tell the Court what this is?

23 A    This is the schedule of Agreed Activities that the

24 company provided and discussed with the Government.  Back

25 in, I believe it was, the first quarter of 2020, it also

MICHAEL DANE - DIRECT BY MR. PEREZ                    181

1   provided the schedule to the various stakeholders and then

2   we have the predecessors that had properties that were

3   included in the abandoned properties.

4   Q    All right.

5   A    It described property and the amount that was allocated

6   to each property and the high level description of the

7   activity that's going to take place.

8   Q    All right.  Are there any other proposals that

9   Fieldwood has made to the Government in connection with the

10  Plan?

11  A    Yes.  One clarification in the Agreed Activities

12  exhibit you just asked, that was the original Agreed

13  Activities -- original abandoned property list.  Obviously

14  through a number of these consensual agreements, that list

15  of platforms has shrunk meaningfully.  So for instance all

16  of the Chevron/Noble, any Hunt platforms that were on that

17  last are now resolved pursuant to the consensual

18  arrangements.

19       To answer your questions, Mr. Perez, is another major

20  proposal that the company discussed with the Government and

21  is incorporated in its Plan is the "Transition Services

22  Arrangement."  The Transition Services Agreement

23  contemplates that for a period of up to nine months,

24  post-effective date, that Credit Bid Purchaser is going to

25  -- or Fieldwood is going to maintain operations, maintenance

1  and safe-keeping of the remaining abandoned properties.  It

2  is the earlier of nine months or when a predecessor will

3  assume operational control of those facilities and the

4  activities that the -- that Fieldwood is required to conduct

5  pursuant to that Transition Services Agreement are detailed

6  under our proposal in our Plan.

7       I mentioned that that's another area where there's a

8  defined term, "Agreed Activities," but it's defined, "Agreed

9  Activities pursuant to the Transition Services arrangement"

10 in that case.

11 Q    All right.  And is that implemented -- will that be

12 implemented through the Plan?

13 A    It will be, or its contemplated.

14 Q    Okay.  All right.  And are there any other proposals

15 that Fieldwood has made to the Government in connection with

16 the Plan?

17 A    The Government had expressed to Fieldwood that there

18 were certain assets for which it would like to see Fieldwood

19 maintain responsibility for the decommissioning and

20 expediently address the decommissioning.  This was namely

21 four specific wells and four pipelines that are right-of-

22 ways.

23      Fieldwood agreed to do that activity and in fact has

24 already been underway with that activity, even though those

25 conversations develops relatively recently.  We are on

1  location working on three of those four wells.

2      Currently we've already abandoned at least one of the

3  right-of-way pipelines and I think we may have been in more

4  than that and all of that activity, I believe, is

5  contemplated to be completed in the next couple of months.

6      Fieldwood is also talking to the Government about a

7  civil penalty settlement addressing all civil penalties that

8  the company has outstanding and a schedule related to

9  resolving other incidents of non-compliance that remain

10 outstanding.

11 Q   And do you believe that Fieldwood would have sufficient

12 resources in order to carry out all of these proposals to

13 the Government and to the various other deals that you've

14 described?

15 A   I do.  We obviously have spent a significant amount of

16 time analyzing not only the ability to all the various costs

17 and expenses associated with this Plan and the new money

18 need and the cost and expenses to exit and the ongoing

19 obligations with a value of each of these consensual

20 arrangements and our ability to satisfy them, the risk to

21 Credit Bid Purchaser and the stakeholder's willingness to

22 assume those risks and then also accept the profit

23 opportunities, I'm confident that we're going to be able to

24 meet those needs.

25 Q   Mr. Dane, do you believe that the Plan as drafted

1   accomplishes the intended purposes that it was intended to

2   achieve?

3   A    Yes.  I do.

4   Q    And why do you say that, sir?

5   A    The objectives of Fieldwood and our stakeholders --

6            THE COURT:  Mr. Dane, let me interrupt you for a

7   moment.

8            Mr. Eisenberg?

9            MR. EISENBERG:  Yes, Your Honor.  That question is

10  objectionable as just totally vague.  And lacking foundation

11  at this point.

12           THE COURT:  I'm going to sustain the way that was

13  asked.  You've asked all the detailed questions, Mr. Perez,

14  and asking the big general one, I'm not sure what that does

15  for us.

16           MR. PEREZ:  All right.  Let me then ask some of

17  the more detailed questions.

18  BY MR. PEREZ:

19  Q    Mr. Dane, is one of the goals of the Plan to

20  decommissioning the assets that comprise the former

21  Fieldwood One?

22  A    Yeah.

23  Q    The former Fieldwood, I'm sorry.  The former Fieldwood.

24  A    Yeah, said a bit differently, I think one of the

25  principle goals of the restructuring was to comprehensively

MICHAEL DANE - DIRECT BY MR. PEREZ                    185

1   address all of the company's P&A liabilities and to do so in

2   a manner that protected the US taxpayer.  That was amongst

3   other important goals, that was one of the principle goals.

4   Q    And you believe the Plan accomplishes that goal?

5   A    I do.  We have consensually resolved approximately

6   90 percent of all of Fieldwood's liabilities and I believe

7   we've resolved the other amounts, as well.  Unfortunately

8   they just weren't able to be resolved consensually, but

9   there is a Plan that provides for the abandonment of all of

10  the outsets that comprise Fieldwood pursuant to the Plan

11  that we've put forth.

12  Q    Now does the Plan provide releases and exculpations?

13  A    It does.

14  Q    All right.  And does it provide for Debtor releases?

15  A    It does.

16  Q    And how did the Debtors determine that the releases

17  were appropriate?

18  A    There was a number of factors that the Debtors

19  evaluated to make that determination.  There was an

20  investigation that took place where company's counsel

21  evaluated any potential claims that they be colorable or

22  relevant.  That analysis was conducted through a lengthy

23  interview process and investigatory process.  It was

24  presented to our lead independent board member.  He agreed

25  with the conclusion that there weren't any valuable claims

1   or concerns and he made that recommendation to the board.

2   That was an important part of that consideration and then

3   obviously just the consideration of the contribution that a

4   number of the parties -- had a number of the parties'

5   contribution to achieving an overall successful Plan.

6   Q    And what were the parties' contributions?

7   A    The parties' contributions were, you know, broadly

8   bringing the business to the state where we have the ability

9   to address all of these obligations successfully, to achieve

10  all the goals of the Plan.  You know, the goals of the Plan

11  being in my mind not only what we discussed, but in terms

12  comprehensively addressing all of the company's P&A, but

13  also finding new capital of hundreds of millions of dollars

14  during this really challenging time in order to recapitalize

15  the NewCo business in order to save the jobs of thousands of

16  people in order to create a business with new capital that

17  was capable of satisfying all these various predecessor

18  arrangements.

19       The predecessor arrangements are utility the Credit Bid

20  Purchaser's employees in order to do that so the Credit Bid

21  Purchaser and the new capital is kind of an instrumental

22  part.  In order to recognize the contributions of the

23  parties that reached the consensual arrangements in order to

24  get us to this point, so those were some of the

25  considerations.

1   Q    Thank you.

2        Are there third-party releases also in the Plan?

3   A    Yes.

4   Q    All right.  And is it your understanding that these

5   releases are consensual releases?

6   A    It is.

7   Q    And are you aware that certain parties have opted out

8   of those releases?

9   A    Yes.  I am.

10  Q    All right.  Next, Mr. Dane, are you aware that the

11  unsecured creditors are classified in two classes, Class 6A

12  and Class 6B?

13  A    Yes.  That's what I understand.

14  Q    All right.  And what is the purpose for having a

15  Class 6A?

16  A    The Class 6A creditors represent trade creditors that

17  is a separate group and if those trade creditors sign a

18  trade agreement that will ensure that Fieldwood will be able

19  to continue receiving services and good from these vendors,

20  then in exchange for a 14-cent payout, they participate in

21  that class and the significance of it is these vendors are

22  critical for our ongoing operations.  This business is not

23  capable of functioning with our vendors, but importantly,

24  the future certainties that the vendors that participate in

25  this class, provides the company to know that it's going to

1  be able to rely on this vendor group to service the outset

2  is a critical thing that the company feels that it needed to

3  get comfortable with to ensure it continued to operate.

4  Q     Now during the course of the bankruptcy, has the

5  company entered into any trade agreements with vendors?

6  A     Yes.  Pursuant to the vendor motion that was issued on

7  the First Day Hearing, the company has entered into 100-and

8  -- I believe over 165 trade agreements with vendors and it

9  has -- that's associated with, I believe, $145 million of

10  pre-petition claims which represents, according to our

11  analysis, approximately 70 percent of the total pre-petition

12  claims that were outstanding.

13  Q     All right.  You mean pre-petition trade claims,

14  correct?

15  A     Correct, sorry.  It's pre-petition trade claims.

16  Q     All right.  And so let me ask you this question:  Why

17  is it important for the ongoing business a Credit Bid

18  Purchaser to have the support of the trade vendors?

19  A     The certainty that these agreements provide the vendors

20  that agreed to enter into the trade agreements, gives the

21  business the certainty that we know we can rely on these

22  vendors to support the business.  The Gulf of Mexico vendor

23  community is not, I would say, broadly commoditized.  There

24  are, in some cases sole service providers, in other cases

25  limited options.

1    And so that's certainty that we can rely on for these

2    vendors is very meaningful.

3    Also, you know, as a part of these trade agreements,

4    they are agreeing to release any claims and liens.  That's

5    something that allows the company and its advisors and staff

6    to focus on other matters, as opposed to addressing those

7    concerns.

8    Q    All right.  And then do you consider that the trade

9    vendors that sign trade agreements in Class 6A are critical

10   to the look forward business?

11   A    I think that the certainty that these trade agreements

12   provide is critical to the go-forward business and these

13   vendors signing these trade agreements giving the business

14   that certainty that they are going to be there to service

15   the company is something that's critical for successful

16   operation.

17   Q    Thank you.

18   Mr. Dane, let me ask you to turn to Exhibit No. 108.

19        MR. PEREZ:  And Your Honor, this is a

20   demonstrative.  It is not admitted into evidence.

21        THE COURT:  So --

22        MR. PEREZ:  It is, I'm sorry, 108 is 1646-3.

23        THE COURT:  1644-3 maybe?  1643 doesn't have a

24   dash three is the problem.

25        MR. PEREZ:  No.  I'm sorry.  1546-3.

1          THE COURT:  1646 -- okay.  I have that open.

2          MR. PEREZ:  Okay.

3     BY MR. PEREZ:

4     Q    Mr. Dane, do you have that?

5     A    I do.

6     Q    All right.  And I'm going -- and can you just briefly

7     tell the Court what this is?

8     A    This is a Schedule that reflects the estimated exit

9     cost associated with the Plan as prepared by the company and

10    its advisors.

11    Q    Okay.  All right.  And I'm going to focus you on the

12    right-hand column and ask you to go down through what these

13    various payments are.

14         So what is the Fieldwood One exit payment?

15    A    The Fieldwood One exit payment, as I described earlier,

16    is the payment that Fieldwood agreed to as a part of this

17    overall Apache agreement which established that Fieldwood

18    was required to pay the difference between $50 million and

19    however much money it actually paid related to P&A costs

20    between filing date and the effective date, plus some other

21    minor adjustments.

22         And that cost estimate of $10-to-20 million reflects

23    the arrangement that Fieldwood expressed to have to

24    contribute at exit pursuant to that agreement.

25    Q    And what is the Fieldwood Three exit payment?

MICHAEL DANE - DIRECT BY MR. PEREZ                    191

1  A    The Fieldwood Three exit payment is the money that

2  Fieldwood is leaving behind associated with the nine

3  platforms and ten wells for which it also is maintaining

4  future credit support.  At Fieldwood Three that Fieldwood

5  Three money will be used to reimburse the Credit Bid

6  Purchaser for any costs associated with completing that

7  work.

8  Q    What is the Fieldwood Four exit payment?

9  A    The Fieldwood Four exit payment is pursuant to the

10 consensual agreement reached between Chevron and Fieldwood

11 whereby Fieldwood agreed to contribute $5 million at exit

12 and that is going to be used in order to pay for safety

13 costs associated with the 25 platforms -- or 20-or-so

14 platforms associated with the Chevron/Fieldwood Four

15 transaction.

16 Q    All right.  And then what about the next $5 million of

17 Fieldwood Four's exit payment?

18 A    Oh, I'm sorry.  I read the wrong -- the lines the wrong

19 way.

20 Q    Okay.

21 A    What I just described was the $5 million payment.  The

22 $14-1/2 million payment is associated with properties that

23 Fieldwood is going to -- properties that are going to be a

24 part of the Fieldwood Four divisive merger entity, which

25 previously were associated with Fieldwood Three and by

1   virtue of agreeing to place them in Fieldwood Four, that

2   $14-1/2 million was the allocated amount of P&A that

3   Fieldwood had otherwise earmarked for those properties and

4   it's the amount that's going to be contributed at exit for

5   Fieldwood Four to address those specific properties.

6   Q    All right.  And then what about the Eni exit payment?

7   A    Eni exit payment is a combination of capital that's

8   being contributed towards the decommissioning and legal fee

9   reimbursement that was contemplated under our agreement with

10  Eni.

11  Q    And so what is the paydown of the FLFO facility?

12  A    The negotiations around Fieldwood's future capital

13  structure, the current first lien/first out facility is

14  $139 million and it was a condition as a part of those

15  negotiations that there was a required paydown of

16  $20 million, plus some accrued interest expense that's

17  associated with that facility -- that exit.

18  Q    And what about the DIP repayment?

19  A    So the company had $10 million it was required to draw

20  at the approval of the DIP.  $90 million remains undrawn,

21  was never drawn and $10 million plus accrued interest is

22  contemplated as being repaid at exit.

23  Q    What are the sale reserve costs?

24  A    Sale reserve costs are certain costs that under the

25  Plan agreement, the Fieldwood is leaving behind to satisfy

1  certain deductibles associated with interest-related

2  deductibles associated with personal injury policies and

3  other excluded assets that are going with the Credit Bid

4  Purchaser.

5  Q    What about the implementation fees?

6  A    Implementation and filing fees are associated with

7  implementing certain of these transactions and being able to

8  conduct the required filings associated with the

9  transaction.

10 Q    And what about the premiums?

11 A    Premiums are bond premiums pursuant to the deal that

12 Fieldwood has in principle with USSIC for $75 million of new

13 bonding capacities.  These are premiums associated with

14 bonds that the parties agreed that the Credit Bid Purchaser

15 would assume under modified indemnity agreements.  And these

16 are the annual premium that is due on the effective date

17 associated with those bonds being assumed, pursuant to the

18 modified indemnity agreement.

19 Q    All right.  Let me drop you down to Plan Administrator

20 Expense Reserve.  Do you see that?

21 A    I do.  At the very --

22 Q    And what is that?

23 A    That's the amount that was negotiated between the

24 company and the UCC and determined to be remaining for the

25 Plan Administrator to be able to conduct all the Plan

1  Administrator activities post-effective date.

2  Q    All right.  So on the column on the left-hand side,

3  those are the various claim reserves; is that correct?

4  A    That's right.

5  Q    Okay.  If we assume the high number for the claim

6  reserves, what is the total cash that you would need at

7  exist, either to pay or to reserve?

8  A    Total exit costs are $168-1/2 million under these

9  assumptions on the end.

10  Q    Okay.  Would you turn to the next slide, sir?

11  A    Mr. Perez, I don't believe those were included in my --

12  Q    It's on the back side -- it's on the back side of that

13  one.

14  A    Oh.  Thank you.  I found it.

15  Q    All right.  Did the company prepare a 13-week cash flow

16  budget?

17  A    It does.  It prepares that every two weeks.

18  Q    Okay.  And to answer my question, every two weeks.  And

19  is that -- but it's presented to the lenders every two

20  weeks?

21  A    It is.

22  Q    All right.  And what the company project to be its cash

23  amount for the next two months?

24  A    Over the course, the company obviously has variability

25  in its weekly ending cash balances as timing of when it

1  receives its revenue, which is predominately one week of the

2  two days of the month, the 20th and 25th, and the timing of

3  which it needs to make its disbursements, which is every

4  week of the month.

5      So the company's cash balance over this period is

6  projected to be between approximately 50 million to as high

7  as $120 million.

8  Q    All right.  And so what would -- what is the four-week

9  average from -- you know, during July?

10 A    A four-week average during July is $72 million.

11 Q    All right.  So if you use that amount as the balance

12 sheet cash, based on the numbers on the preceding page, does

13 the Debtor have enough cash at exit to actually exit

14 bankruptcy?

15 A    Yes.  If we use that amount and we assume a full draw

16 on the $185 million available to the facility and the

17 company allocates $120 million to the Credit Bid Purchaser

18 opening cash balance, which it's required to do under its

19 agreements, which at the discretion of the lenders is

20 actually able to be reduced to 100.

21     And we assume the high amount of expenses of almost

22 $169 million, then assuming all of those assumptions, there

23 is excess cash that's available to fund all of the various

24 needs.

25 Q    Do you believe that you're going to be at the high end

1  of the expenses?

2  A    It's not my expectation that we're going to be at the

3  high end of the expense.

4  Q    And then currently what are the -- what is the buffer

5  assuming that you have the full $120 million on the balance

6  sheet?

7  A    That buffer is $5 million.

8  Q    And if you only had to put --

9        THE COURT:  I'm sorry.  I just didn't hear the

10  answer, Mr. Dane.  The buffer is about what?

11        THE WITNESS:  Sorry, Your Honor.  The buffer is

12  $5 million.

13        THE COURT:  MS. TOGNETTI:

14  BY MR. PEREZ:

15  Q    Okay.  And if you only had to put 100 million on the

16  balance sheet of Credit Bid Purchaser, what would the buffer

17  be?

18  A    The buffer would be $25 million.

19  Q    All right.  Now on a go-forward basis, is the Credit

20  Bid Purchaser generating positive cash?

21  A    Yes.  The Credit Bid Purchaser is expected to generate

22  meaningful positive cash.  Initially as I mentioned, it's

23  going to be -- the cash flow is going to be burdened by

24  significant expenses that is pertaining -- as far as these

25  transactions affect the working capital, but even in the

1   first period under our projections that were included in the

2   exhibit, the projections exhibit, there's positive cash

3   flows.

4   Q    All right.  Could you actually turn to page 8 of 9 in

5   Exhibit 16-15 of -- 1615-20?

6   A    I'm sorry, Mr. Perez.  What is that exhibit number?

7   Q    17 -- Exhibit 17, page 8 of 9.

8   A    Found it.  Thank you.

9   Q    Okay.  And what does that show to be the ending cash

10  balance at the end of the projection period in 2025?

11  A    It shows $876 million of ending cash.

12  Q    And what would the total debt be at that time?

13  A    Total debt in these projections is shown as

14  $194 million.

15  Q    All right.

16          MR. PEREZ:  Your Honor, I have no further

17  questions of this witness.

18          THE COURT:  Thank you.

19          Are there any proponents of the Plan that have any

20  questions for Mr. Dane?  If so, please press five star.

21      (No audible response.)

22          THE COURT:  All right.  I'm showing no other

23  proponents have any questions, so we'll move to opponents of

24  Confirmation.

25          I'm not sure how long do you want to -- whether

1  you want to take a break now or what you want to do.  I've

2  got a 4:00 o'clock hearing.  I don't know how long that's

3  going to last.

4         Mr. Dane, are you available to return at 5:00 if

5  we take a break now?

6         THE WITNESS:  Yes, Your Honor.  I can return at

7  any time.

8         THE COURT:  And how late can you stay tonight?

9         THE WITNESS:  I can stay as long as the Court has

10 the patience for me.

11         THE COURT:  Okay.  Why don't we do this?  Just so

12 that maybe the opponents can organize who's going to go

13 first and what all -- how it's going to be divided up, let's

14 adjourn.  I'll call my 4:00 o'clock hearing on time at 4:00.

15 I don't know how long it's going to last.  I will not recall

16 Fieldwood prior to 5:00 so that you all can plan to have an

17 hour and a half break.

18         At 5:00 I would just ask you to start tuning in

19 and watching what's happening to the *Country Fresh* hearing.

20 I suspect it will end around then, but if not, we may not

21 really get to you until, you know, 5:15 or 5:30.

22         Does anyone have any problem where that won't work

23 for your particular schedules?

24         I do have someone that has pressed five star.

25         Mr. Alaniz?

1          MR. DUEWALL:  Your Honor?

2          THE COURT:  Was that Mr. Duewall?

3          MR. DUEWALL:  Yes, Your Honor.  I had a quick

4  housekeeping matter before we broke --

5          THE COURT:  Yeah, go ahead and then we'll --

6          MR. DUEWALL:  -- for a break.

7          THE COURT:  -- then we'll hear from Mr. Alaniz

8  next, so what do you have Mr. Duewall?

9          MR. DUEWALL:  Thank you, Your Honor.  In Debtors'

10 exhibits were authorized, I wanted to make sure the Record

11 was clear, and we're talking about Document 1672 in the

12 Court's Record, specifically on page 5 of that document.

13 The Debtors have done a nice job of color coordinating their

14 Exhibit List to reflect the documents where the Court is

15 taking judicial notice, the documents where the parties had

16 agreed were admissible, and the documents where we agreed

17 there would be admissible for a new purpose.  They're a

18 demonstrative aid.  I just wanted to make sure that the

19 Court's previous ruling admitting their exhibits was

20 reflective of what was intended in that document (glitch in

21 the audio) --

22          THE COURT:  I should have made that clear and yes,

23 I'm admitting 1672 -- all of the documents from 1672 as

24 indicated on 1672 and not differently than what's indicated

25 there.

1             Thank you.

2             Anything else, Mr. Duewall, or should we move to

3    Mr. Alaniz?

4             MR. DUEWALL:  No, Your Honor.

5             THE COURT:  Thank you.

6             Mr. Alaniz?

7             MR. ALANIZ:  Yes, Your Honor.  Omar Alaniz on

8    behalf of Hess Corporation.

9             Your Honor, I actually just wanted to get into the

10   queue as a cross-examiner of Mr. Dane, and also the break is

11   good for us because we -- Mr. Bred and I were expecting

12   consensual resolution during the last break and I couldn't

13   get to my client in time.

14            We do have an outstanding email to him during the

15   examination.  This is a good time for us to go back and see

16   if we can resolve before the next examination.

17            THE COURT:  All right.  That's fine, or if you

18   just want to give Mr. Dane a hard time, that's fine, too.

19   We'll see where we go.

20        (Laughter.)

21            THE COURT:  Mr. Singer?

22            MR. SINGER:  Hello, Your Honor, Kelly Singer on

23   behalf of Ecopetrol.

24            Your Honor, we've been waiting patiently and I

25   don't know if my witness is going to be available after

1  5:00 o'clock today.  I'm going to follow up with them, but I

2  just wanted to -- I just didn't want that to prejudice us in

3  case we intended to finish everything today.

4          We still have our issue and our objection.  We're

5  hopeful that we can get it resolved, but we're not there

6  yet.  So I wanted to throw that out there, Your Honor, just

7  so that --

8          THE COURT:  It will not -- if we get to the end of

9  the day and your issue is not resolved, we will schedule

10  your witness not today.

11          MR. SINGER:  Thank you, Judge.

12          THE COURT:  Anyone else?

13      (No audible response.)

14          THE COURT:  Okay.  Wait, I do have one more

15  person.

16          Mr. Baay?

17          MR. BAAY:  (No audible response.)

18          THE COURT:  Mr. Baay?

19          MR. BAAY:  Yes, Your Honor, we are in --

20          THE COURT:  Go ahead, please.

21          MR. BAAY:  Can you hear me now?

22          THE COURT:  I can.  Thank you.

23          MR. BAAY:  We are in close with witnesses that may

24  or may not be available tomorrow and we also have, I think,

25  some language that we're working on with Debtors, so I guess

1  we are -- want the same consideration, I guess, if we need

2  to go forward, we'll be able to set a time that is available

3  for us and our witnesses?

4            THE COURT:  You said he's not available tomorrow?

5            MR. BAAY:  I'm sorry, later today.

6            THE COURT:  Okay.

7            MR. BAAY:  I'm not sure about tomorrow.  We're

8  just --

9            THE COURT:  What we'll do is we're going to try

10  and finish Mr. Dane today and maybe make some more progress,

11  but I'm not going to count on finishing everything today and

12  so we'll find some time at the end of the day to come back

13  with your other witnesses.

14            MR. BAAY:  Thank you, Your Honor.

15            THE COURT:  Mr. Genender?

16            MR. GENENDER:  (No audible response.)

17            THE COURT:  Mr. Genender?

18            MR. GENENDER:  Your Honor, I think you answered

19  the point I wanted to make, which is our next witnesses are

20  not available this evening.  So I'm assuming if Mr. Dane is

21  the last witness then for the day, then it's not an issue.

22  I just wanted to alert the Court of that.

23            THE COURT:  That's fine with me.  I didn't know

24  that, but that's fine with me.  And we're going to find time

25  to finish this hearing, but there's no point in us being

1    here until midnight when we've also got 18 balls up in the

2    air where other things are going to get resolved and we're

3    not going to sign the Order today for sure, so we'll find a

4    way to get it finished.

5            MR. GENENDER:  Thank you, Judge.

6            THE COURT:  Mr. Fishel?

7            MR. FISHEL:  Thank you, Your Honor.  Mr. Fishel on

8    behalf of Ridgewood.

9            Same issue as Mr. Singer.  Witness won't be

10   available after 6:00 o'clock, but if we're not signing the

11   Order today, that shouldn't be a problem.  Hopefully it's

12   all resolved before them.

13           THE COURT:  Well, I mean, from the announcement

14   Mr. Genender has made, it's clear the Debtors aren't going

15   to rest, so I don't think anyone needs to worry at all about

16   your witnesses being available, other than when we're going

17   to finish the Debtors' case-in-chief, and then we'll line up

18   with enough notice that your witnesses can participate.

19           Anybody else?

20           MR. FISHEL:  Thank you, Your Honor.

21           THE COURT:  Okay.  We will adjourn your hearing

22   till 5:00.  We're going to adjourn court till 4:00.  I don't

23   promise I'm going to restart at 5:00.  What I promise is I

24   won't restart before 5:00 on your hearing.  And then we'll

25   see where we go.

1          Thank you.

2          I'm going to go ahead and mute everyone that is on

3  the line right now so that you're not making noise during my

4  other hearings and then you'll need to repress five star

5  when we come back.

6       (Recess taken from 3:36 p.m. to 4:59 p.m.)

7                         AFTER RECESS

8          THE COURT:  All right.  We're going to go back on

9  the Record in Fieldwood.  Mr. Dane, I've reactivated your

10  line and you remain under oath from the earlier session.

11          I assume that the opposing parties have worked out

12  who will begin the cross-examination of Mr. Dane.  Whoever

13  wants to begin that, if you would please press five star one

14  time -- one time on your line.

15       (Pause in the proceedings.)

16          THE COURT:  I'm not sure who wants to take the lead

17  on cross-examining Mr. Dane.  If you would press five star

18  one time, please.

19       (Pause in the proceedings.)

20          THE COURT:  Mr. Dane, are you able to hear me all

21  right?

22          THE WITNESS:  I am, Your Honor.

23          THE COURT:  All right.  There we go, I've got

24  somebody here.  All right.

25          MR. DUEWALL:  Your Honor?

1          THE COURT:  Yes, go ahead.

2          MR. DUEWALL:  Your Honor, Craig Duewall with

3   Greenberg Traurig on behalf of BP.  During the break we have

4   reached out to the sureties.  It is my understanding that

5   they as a group were going to go first.  I don't know if I'm

6   wrong in that regard, but that's why we were pausing there

7   and waiting for them to begin.

8          THE COURT:  Thank you.

9          Let me -- I've got somebody else that's pressed five

10   star, now let me see who -- well, that was Mr. Perez.  Let

11   me see, do I have anybody on behalf of the sureties that has

12   any questions that you wish to ask Mr. Dane?  If so, please

13   press five star one time on your phone.

14      (Pause in the proceedings.)

15          THE COURT:  So I suspect somebody is having a

16   problem.  If you're representing the sureties and you want to

17   cross-examine, and I'm not seeing any five star, can you turn

18   on your camera and just wave at me and I'll find you.

19      (Pause in the proceedings.)

20          THE COURT:  Mr. Million, I'm going to impose on you

21   because I hear -- yours is the first line I found for a

22   surety, do you know who's going to take the lead for the

23   sureties, Mr. Million?

24          MR. MILLION:  (No audible response.)

25          THE COURT:  Mr. Million?

1           MR. MILLION:  (No audible response.)

2           THE COURT:  Mr. Perez?

3           MR. MILLION:  I apologize, Your Honor.  I am not

4    sure.  I will be happy to find out as quickly as possible

5    though.

6           THE COURT:  Okay.  Thank you.

7           Mr. Perez?

8           MR. PEREZ:  Your Honor --

9           THE COURT:  Go ahead.

10          MR. PEREZ:  -- yeah, Your Honor, I didn't

11   understand that the sureties were going to cross-examine

12   Mr. Dane at this time, but I may be mistaken about that.

13   But I thought that it was BP and Hess that were going to do

14   the cross-examination.

15          THE COURT:  That's fine.  I'm just -- I'm not going

16   to stop anyone from cross-examining him.  I mean if you

17   think it breaches an agreement, I'll let you reach -- you

18   know, make that objection then.  But I know that they --

19          MR. PEREZ:  Oh, I --

20          THE COURT:  -- it wasn't like you had a deal with

21   100 percent of the sureties I don't think so.

22           Okay.  Let's wait just a second.  We're only at you

23   know, three after 5:00, so.

24          There we go, I've got somebody now.

25          Mr. Woodard, were you taking the lead on the

1   cross-examination?

2          MR. WOODARD:  (No audible response.)

3          THE COURT:  Mr. Woodard, I think you may have your

4   own line muted.

5          MR. WOODARD:  I did.  I have to be smarter than

6   the phone unfortunately, but --

7          THE COURT:  That's right.

8          MR. WOODARD:   -- I hadn't planned on taking the

9   lead, but rather than have everybody sit around and twiddle

10  their thumbs, we might as well -- I can take the first shot

11  and then hopefully some of my brethren will show up along

12  the way.

13         THE COURT:  Yeah, but look, COVID's tough enough, I

14  mean if we're having some problems, somebody getting hooked

15  up, I'm going to just wait a minute for them to get here.  If

16  you're expecting them, let's give people a minute --

17         MR. WOODARD:  Oh, I mean, I haven't heard from

18  them, any of them, so I don't know.

19         THE COURT:  Okay.

20         MR. WOODARD:  And so --

21         THE COURT:  Well, do you have some questions that

22  you want to ask anyway?

23         MR. WOODARD:  Yeah, I do actually.

24         THE COURT:  Okay.

25         MR. WOODARD:  That's not part of the Apache group

1    so I can do that.

2              THE COURT:  Go ahead.

3              MR. WOODARD:  Okay.  Thank you, Your Honor.

4              CROSS-EXAMINATION OF MICHAEL DANE

5    BY MR. WOODARD:

6    Q     This is Lee Woodard, Harris Beach, PLLC, on behalf of

7    Lexon Insurance Company, Mr. Dane.

8          Good afternoon where you are, it's good evening where I

9    am.  But you've had a long day of testimony already, so I'm

10   going to try to be as brief as I can.  But you're familiar

11   with the bonding requirements.  Right?  You testified to

12   that earlier.  That Fieldwood has been subject to leading up

13   to the bankruptcy.  Right?

14   A     Yes, sir.

15   Q     Did you ever sign any indemnity agreements with any of

16   the -- with any of the sureties on behalf of Fieldwood?

17   A     I believe I did, but I don't recall.  We had a number

18   of folks that had signed indemnity agreements here.

19   Q     But you're familiar with those as well?

20   A     Yes, I am.

21   Q     Have you ever seen any bonds issued without an

22   indemnity agreement?

23   A     No, I've never seen a bond issued without an indemnity

24   agreement.

25   Q     And you would agree with me, would you not, that

1  Fieldwood would not have been able to operate pre-bankruptcy

2  without all of the bonding that it had in place.  Right?

3  A     I think, well it's a hypothetical.  It's hard for me to

4  know if we weren't able to produce all of the bonds that we

5  needed, if there wouldn't have been other ways to satisfy

6  them or if we wouldn't have been able to negotiate something

7  different with the Government or with the other parties,

8  private parties that those bonds are in favor of.

9  Q     Okay.  And if there are certainly other ways to

10 satisfy the financial accommodation, other than by bond.

11 But as you sit here, you didn't have any of those, you just

12 had the bond.  Right?

13             MR. PEREZ:  I'm going to object, Your Honor, to the

14 form of the question.  I don't know what he meant by

15 "financial accommodation" in connection with that.  I think

16 it's vague.

17             THE COURT:  Sustained.

18 BY MR. WOODARD:

19 Q     The -- it doesn't matter.  These are all leading up to

20 another thing.

21      What I need to find out, Mr. Dane, is all my questions

22 are going to be directed to is exactly what happens to the

23 bonds under the Plan.  All right?  So that's where we're going

24 to be going.

25          Let's start -- I mean, let's try to go by bucket if we

1  can.  So we're going to have the Credit Bid NewCo.  It's going

2  to need bonds to operate going forward, wouldn't you agree?

3  A    Yes.

4  Q    And is, in fact, arranged, we heard earlier in the

5  testimony that there is $75 million of new bonding being

6  arranged for this; is that right?

7  A    That's right.  As you mentioned earlier there are other

8  ways to satisfy financial security requirements.

9  Q    Yet your testimony was that they have agreed to --

10 with one of the companies, to get $75 million worth of new

11 bonds.  Right?  That was your testimony.

12 A    Fieldwood had a commitment from USSIC to provide

13 $75 million upon capacity to purchase the agreement.

14 Q    Okay.  And we haven't seen the terms so that's why I'm a

15 little confused as to between who.  What about the existing

16 bonds on the leases that are going to NewCo as part of the

17 purchase, what happens to those?

18 A    Well, I defer to our counsel on the treatment of the

19 contracts themselves.  But as I understand it, the indemnity

20 agreements are pre-petition claims that are going to be

21 treated under the Plan.  The bonds are not something in

22 favor of Fieldwood, and even Fieldwood is not the obligee or

23 beneficiary of the bonds.  The bonds were issued and our

24 security outstanding in the favor of the obligee, and

25 Fieldwood doesn't have the ability to implement that.

MICHAEL DANE - CROSS BY MR. WOODARD                    211

1  Fieldwood's Plan addresses the pre-petition indemnity

2  agreements, and so asking mutual agreement with the bonding

3  provider, or the surety, Fieldwood's Plan does not

4  contemplate any allocation, assignment or other transfer of

5  any bonds.

6  Q    So that the -- is it your testimony that the existing

7  bonds, while they will still be in existence because they

8  don't get cancelled, they'll just remain there, but not be at

9  the disposal of the Credit Bid Purchaser?

10  A    I don't think any bond is ever at the disposal of the

11  obligor.

12  Q    Well -- well, that wouldn't be the obligor.  Right?

13  That would be the principal.  But the -- if the principal is

14  going to be credit -- is still going to be Fieldwood.

15  Right?

16  A    The principal on the bond is going to be whoever the

17  principal that was originally on the bond when it was issued

18  is going to be.  And like I said, the Plan doesn't

19  contemplate any non-consensual transfer, allocation,

20  assignment of any bonds.  So the bonds would remain in the

21  hands of the beneficiary, or the obligee as they were, you

22  know, as they were when they were issued.  It's not security

23  of Fieldwood.

24  Q    And Fieldwood is not going to be in control of the

25  property -- or of the lease that that bond would be

1  purported to be the financial accommodation for, is it?

2          MR. PEREZ:  The same objection, Your Honor.  I

3  don't know what he means by "financial accommodation."

4          THE COURT:  Overruled.

5          THE WITNESS:  Those properties are falling into

6  various different categories that I described in my earlier

7  testimony.  There's a Fieldwood One entity, there's a

8  Fieldwood Four entity, there's the Credit Bid Purchaser

9  entity, there's going to be a couple of free properties,

10 there's going to be abandoned properties.  And so I'm not sure

11 what you mean by in the control of.  Certain -- each of

12 those entities is going to have properties on them.

13 BY MR. WOODARD:

14 Q    Mr. Dane, I said we were talking about the Credit Bid

15 Purchasers.  We're at bucket number one.  We haven't moved on

16 to any of the other buckets yet.

17        And in bucket number one we have the Credit Bid

18 Purchaser is, according to its purchase contract, right, is

19 going to buy the assignment of a number of leases.  My

20 question to you was, is Fieldwood the principal on those

21 bonds that cover those leases?  They're not going to have

22 anything remaining to do with those leases, are they?

23 A    The Credit Bid Purchaser is going to be the owner of

24 the leases that is required under the Plan, which is the

25 Credit Bid Purchaser is not the same entity as Fieldwood.

MICHAEL DANE - CROSS BY MR. WOODARD                213

1  Q      Thank you.

2      And is it also not true that the Credit Bid Purchaser

3  is not seeking to substitute itself on those bonds?

4  A    They're -- Fieldwood has had a number of conversations

5  with the surety providers, but asking mutual consent, or

6  some mutually acceptable arrangement, there's nothing, as I

7  said several times, there's nothing under the Plan that

8  contemplates non-consensual assignment, allocation, transfer

9  of any bonds.

10  Q    Right.  I've heard that, yeah, I've heard that statement

11  numbers of times.  But so at the end of the day the point is

12  that the bonds that cover -- or that relate to the leases

13  that will now be owned, operated by the Credit Bid

14  Purchaser, there will be a transfer of the principal.

15          MR. PEREZ:  Object to the form of the questions,

16  calls for a legal conclusion and it misstates his testimony.

17          THE COURT:  I'm going to sustain as to calling for

18  a legal conclusion.  I don't think it's a valid objection that

19  it misstates his testimony.  It didn't attempt to state his

20  testimony.  But it does call for a legal conclusion.

21          MR. WOODARD:  I understand, Your Honor.  Thank

22  you.

23  BY MR. WOODARD:

24  Q    Let's see, let's move on then to Fieldwood One that we

25  were talking about before.  Is Fieldwood One planning on

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

1  acquiring new bonds to operate its stated purpose?

2  A      Fieldwood One is going to -- needs to procure whatever

3  financial assurance the Government requires of it in order

4  to be able to operate, so it does intend to, yes, bonding or

5  otherwise.

6  Q      Well, what does Fieldwood One believe happens to the

7  existing bonds that are issued to the leases that will be

8  held then in the name of the divisibly emerged entity,

9  Fieldwood One?

10 A      I did mention that, I don't believe the bonds are held

11 by the principal, but the bond is held by the obligee.

12 Q      Okay.  Let me ask it a different way.  Fieldwood One

13 you indicated needs -- will need bonding to do what it needs

14 to do if the Government requires it.  Correct?

15 A      Fieldwood will have to satisfy any financial assurance

16 regulations that the Government imposes on an entity.

17 Q      And if the Government imposes a requirement of

18 financial assurance, does Fieldwood One believe it can

19 utilize the existing bonds to the leases it then holds?

20 A      I don't think -- when you say "use," I'm not sure I'm

21 completely aligned with what you're saying there.  You -- the

22 bonds are going to exist independent of Fieldwood's

23 decision -- the bonds will just exist because they've been

24 issued.  The bonds will be outstanding.  If the bond -- if

25 the -- maybe to answer your question a little more directly,

1   I think if BOEM requires certain financial assurance, I do

2   not think that Fieldwood One can non-consensually require

3   the existing bonds that are outstanding to be transferred to

4   a new principal, other than by mutual consent.

5   Q     Okay.  Thank you.

6         And is that the position that is held in the Plan?

7   A     The position that's held in the Plan is that there's no

8   non-consensual assignment allocation or other transfer of

9   any bonds.

10  Q     Is that also true for Fieldwood Three?

11  A     That's true for every entity.

12  Q     Okay.  Now there are a number of leases that the Plan

13  purports to split in different percentages.  Correct?

14        MR. PEREZ:  Object to the question.  I think that

15  misstates the Plan.

16        THE COURT:  Overruled.  This is cross-examination.

17  The witness can answer.

18        THE WITNESS:  There are -- the way that the -- the

19  way that certain leases are being allocated through the

20  divisive mergers to the different entities is based upon the

21  working interest in each lease and where it was acquired.

22  So for instance, if there was a lease where a working

23  interest was acquired 75 percent by Fieldwood One and

24  represents a legacy Apache obligation, 75 percent of the

25  working interest in that lease pursuant to the divisive

1  merger is being transferred to Fieldwood One, and that the

2  other 25 percent interest, as an example, is something that

3  the Credit Bid Purchaser is acquiring, then that other

4  25 percent interest would be allocated through the divisive

5  merger, in that example, through the Credit Bid Purchase

6  arrangement purchased by the Credit Bid Purchaser.

7          So in the example I just gave you there's a field,

8  Grand Isle 43, that is exactly like that.  In other cases an

9  interest may be allocated through the divisive merger to

10 Fieldwood One or Fieldwood Four and then another interest

11 that came from another party that was unrelated to the chain

12 of title predecessor for which the entity is being allocated

13 pursuant to the divisive merger, it may be abandoned.  It

14 depends on who the relevant predecessor is to what entity it

15 is being allocated to.

16 BY MR. WOODARD:

17 Q     But maybe your prior question may have answered the

18 same way.  I just wanted to spread it over for this as well.

19 But the -- if the Debtor is not seeking to force non-

20 consensual retention of the bonding, it doesn't matter if the

21 leases are split because you're not trying to split the

22 lease -- I'm sorry, sir, you're not trying to split the bond?

23 A     Yes, I think you're conflating allocating a working

24 interest on a lease with the fact that the property that

25 that lease -- that that bond is related to is not -- it's not

1  related.  They're two different things.

2  Q    But if two different things --

3  A    It's not an allocation -- I'm sorry, in other words it's

4  not an allocation of the bond because the leasehold interest

5  in getting split and allocated pursuant to divisive merger.

6  The bond stays in the hands of the obligee and the obligee

7  continues to possess the bond.

8  Q    Okay.  I understand.  But the bond is not

9  extinguished.  Whether or not there are other defenses that

10  come into existence because of the dissolution or no longer

11  holding the lease is a different story.  I'm not asking you

12  to opine on that, that would be legal conclusion that you

13  don't need to do.

14        MR. WOODARD:  All right.  Your Honor, I will -- I

15  think that's all the questions I have.  I've got my questions

16  answered.  Thank you.

17        THE COURT:  Mr. Woodard, thank you.

18        MR. WOODARD:  Thank you, Mr. Dane.

19        THE COURT:  So I know that we have -- Greenberg

20  has questions.  Does anyone else have any questions before

21  we go to them for Mr. Dane?  If so, please press five star

22  one time on your phone.  He wanted to wait till the end.

23      (Pause in the proceedings.)

24        THE COURT:  All right.  We do have someone.

25  Mr. Alaniz, go ahead, please.

1              MR. ALANIZ:  Your Honor, Omer Alaniz from the Hess

2    Corporation.  I just want to make sure again that I'm in the

3    queue, and I'm happy to let BP proceed and I can follow BP's

4    examination.

5              THE COURT:  All right.  Mr. Kuebel.

6              MR. KUEBEL:  (No audible response.)

7              THE COURT:  Mr. Kuebel?

8              MR. KUEBEL:  (No audible response.)

9              MR. DUEWALL:  Good evening, Your Honor.  Can you

10   hear me?

11             THE COURT:  I can.  Good evening to you.

12             MR. DUEWALL:  Thank you very much, Your Honor.

13                  CROSS-EXAMINATION OF MICHAEL DANE

14   BY MR. DUEWALL:

15   Q    Mr. Dane, taking a few steps back and looking at the

16   Plan as a whole, do you agree we're essentially engaged --

17   Fieldwood's essentially engaged in a liquidation of its

18   assets?

19             MR. PEREZ:  Objection to the form of the question.

20   Calls for a legal conclusion, but --

21             THE COURT:  Hold on.  The question broke up for

22   me.  Let me just get you to re-ask the question if you

23   would, please.

24             MR. DUEWALL:  Thank you, Your Honor.

25                  Taking a few steps back and looking at the Plan as

1   a whole, I asked Mr. Dane if he would agree with me that

2   Fieldwood is essentially engaged, or attempting a

3   liquidation of its assets.

4           MR. PEREZ:  And I objected that it calls for a

5   legal conclusion.

6           THE COURT:  I'm going to overrule it.  We're not

7   asking about Chapter 7 liquidation, Chapter 11 liquidation.

8   We're just asking a common language, so I'm going to allow him

9   to answer it.  Go ahead.

10          THE WITNESS:  Yeah, I think -- I believe that is,

11  you know, a strong mischaracterization of the Plan.  I think

12  it ignores many features of the Plan that would be entirely

13  different than a liquidation.  Frankly I think, you know, in

14  a liquidation every party, every stakeholder in this process

15  for the most part, maybe not everyone, but most all of them,

16  are worse off in a liquidation.  A liquidation would not

17  bring in new capital into the business.

18          There's $225 million of new money that's being

19  contributed.  That new money is being utilized in order to

20  fund a variety of different things under this Plan.  That

21  starts with being able to capitalize a NewCo business to

22  employ thousands of employees and contractors.  The NewCo

23  business is assuming its own significant obligations.

24          That new money is also being utilized to fund the

25  various expenses under the Plan, to fund these consensual

1   arrangements, the NewCo entities is a material component of

2   being able to satisfy all the consensual arrangements as to

3   whether the NewCo entity that was capable of raising new

4   capital, it wouldn't be able to conduct the decommissioning

5   on all these various assets.

6          There wouldn't be a proposal with respect to the

7   Government that safely addressed all the abandoned

8   properties, and was able to, in an organized and orderly

9   fashion, hand over the very reduced set of abandoned

10  properties that at this point is somewhere around 28-29

11  platforms.  So I think it is -- I think that there's very few

12  things that this Plan accomplishes that are not exactly

13  better than a liquidation.

14  BY MR. DUEWALL:

15  Q     Mr. Dane, Fieldwood's transferring assets that

16  Fieldwood One by the divisive merger; is that correct?

17  A     Yes.

18  Q     And Fieldwood's transferring assets to Fieldwood Three

19  by divisive merger; is that correct?

20         MR. PEREZ:  Your Honor, let me just make an

21  objection, I mean, I'm objecting to the word "transfer"

22  because I think that is calling for a legal conclusion as to

23  what a divisive merger does.  So I'm objecting to the extent

24  it calls for a legal conclusion as to what a divisive merger

25  does.

 1          THE COURT:  Are you asking for it in a legal

 2 sense, or are you asking for it in a non-legal determination

 3 of whether this is a transfer, Mr. Duewall?

 4          MR. DUEWALL:  Non-legal, Your Honor.  I was just

 5 asking if that -- this was going from Fieldwood to Fieldwood

 6 One by divisive merger.  I can say it that way if that's

 7 better.

 8          THE COURT:  Either way I'm going to overrule the

 9 objection.  I don't think you're asking for the legal

10 conclusion.

11          Mr. Dane.

12          THE WITNESS:  Yes, so I don't know if the correct

13 terminology is being allocated through the divisive merger

14 or being transferred, but the interests are going to land in

15 the various entities through the divisive merger.

16 BY MR. DUEWALL:

17 Q     Correct.  And so the divisive merger applies to

18 Fieldwood One, Fieldwood Three and Fieldwood Four; is that

19 correct?

20 A     Yes.

21 Q     And the Credit Bid Purchase that's assets going from

22 Fieldwood to NewCo.  Correct?  The Credit Bid Purchases only

23 apply to NewCo.

24 A     Correct.

25 Q     All right.  I'd like to transition to just asking some

MICHAEL DANE - CROSS BY MR. DUEWALL                    222

1  questions to you regarding some of the objections that BP

2  has asserted with regard to set off.

3         So, Mr. Dane, do you have personal knowledge that on

4  May -- on or about May 17, 2019 Fieldwood Energy, LLC and BP

5  Exploration and Production, Inc. entered into the Purchase

6  and Sale Agreement in respect to the Mississippi Canyon

7  Block 519?

8  A     Yes.

9  Q     Okay.  And I may return -- I may refer to that as

10 MSC -- or "MC519 PSA."  Is that all right?

11 A     Yes, sir, I understand.

12 Q     Okay.  Thank you.

13        And under the terms of the MC519 PSA Fieldwood agreed,

14 among other things, to pay BP $30 million; is that correct?

15        MR. PEREZ:  Your Honor, I'm going to object to

16 the -- I'm going to object to the question for a couple of

17 reasons.  Number one, the document speaks for itself.

18 Number two, we have a dispute as to these issues that

19 obviously will come before the Court.  They've filed a motion

20 to be able to effectuate a set off, and in essence they're

21 taking discovery right now with respect to that.

22        I think this is inappropriate.  Number one, I'm not

23 sure it's really relevant for purposes of the Confirmation

24 Hearing.  But it's highly inappropriate for him to be

25 questioning a witness, not showing him the document and

1  relating to a dispute that's going to be heard at another

2  time as Ms. Heyen had indicated.

3          THE COURT:  Well, let me ask you, Mr. Perez, do

4  you agree that the set off rights will be unaffected by

5  confirmation of the Plan?

6          MR. PEREZ:  No, Your Honor, we're not -- I don't

7  know that I can take that position.  I mean we -- they've

8  taken that position but I don't know that they have set off

9  rights.  To the extent that they have valid set off rights

10 currently, they may be affected by the Plan.  So I'm not

11 prepared to make that statement.

12         THE COURT:  I'm overruling the objection on it's

13 inappropriate to be asking the questions, because if the

14 Plan might affect the set off rights, he absolutely has the

15 right to ask questions about it.  I'm sustaining the

16 objection that you're asking about a document not in

17 evidence.

18         MR. DUEWALL:  Your Honor, I'll re-ask the question.

19 BY MR. DUEWALL:

20 Q    Mr. Dane, under the terms of the MC519 PSA Fieldwood

21 agreed, among other things, to pay BP $30 million; is that

22 correct?

23 A    Fieldwood agreed as a part of that agreement to a

24 contingent payment.  A contingent payment was related to

25 certain payment conditions, so I would -- it's under those

1  contingent payment terms there was a payment that is

2  described in the PSA.  But I don't -- I think it's -- I think

3  you're saying they agreed, or it's agreed pursuant to the

4  contingent terms that need to arise in order for that

5  payment to be payable and due.

6  Q     And as the CFO, do you recall if you booked that

7  payment as due and owing when the contract was executed?

8  A     I don't recall the financial counter-treatment of that

9  payment.

10 Q     Do you recall when the payment comes due under the

11 terms and conditions of the parties' agreement?  Is it your

12 testimony it's due to be paid 180 days after production from

13 the Genovesa well?

14 A     To my recollection --

15       MR. PEREZ:  Let me make a -- Your Honor, I guess

16 I'm -- is that a question or is that a comment?  I mean

17 Mr. Duewall is in essence testifying.  I don't know where he

18 said, Is it your testimony that, I don't know where that

19 comes from.  I don't believe he was -- there's been any

20 deposition testimony taken on this.  So I'm not quite sure

21 where that -- I guess the objection is it's an inappropriate

22 question.

23       THE COURT:  I'll just get you to --

24       MR. DUEWALL:  I can rephrase, Your Honor.

25       THE COURT:  Yeah, thank you, Mr. Duewall.

1    BY MR. DUEWALL:

2    Q     Do you have an opinion as to when the $30 million

3    comes due and payable under the MC519 PSA?

4                MR. PEREZ:  Yes, Your Honor, I'm going to object to

5    the question.  It actually calls for an interpretation of

6    the document, which I don't believe -- I'm not sure is in

7    evidence.  But, you know, again, it's just calling for a

8    legal conclusion, an interpretation of the document.

9                THE COURT:  Sustained.

10               MR. DUEWALL:  All right.  Your Honor, I'll try to

11   short circuit the document issues.  We'll pull up documents

12   -- or I think it's been filed under seal but I'd refer the

13   Court to our Exhibit 1607-27.

14               THE COURT:  All right.  Hold on.

15        (Pause in the proceedings.)

16               MR. DUEWALL:  And, Mr. Dane, are you able to have

17   that document pulled up for you?

18               THE COURT:  I have Exhibit --

19               THE WITNESS:  I need to --

20               THE COURT:   -- 27 in front of me.

21               MR. DUEWALL:  Your Honor, we will -- it'll take us

22   a minute to email that document to Mr. Dane.

23               THE COURT:  All right.

24               MR. DUEWALL:  I believe Ms. Choi can do it.

25               MR. PEREZ:  And while we're waiting for that, Your

1    Honor, if I could have the Court make Ms. Hymel, H-Y-M-E-L,

2    of our office a presenter.  There will be some documents

3    here in a moment and I'll have her share her screen with --

4              THE COURT:  Sure.

5              MR. PEREZ:   -- for.

6         (Pause in the proceedings.)

7              THE COURT:  Can I get you to turn on your camera,

8    please, Ms. Hymel, and then we'll make you the presenter, and

9    then you can turn your camera back off.  It's just that I've

10   got about 150 initials that I have to sort through.

11             MR. PEREZ:  She's working on that right now, Your

12   Honor.

13             THE COURT:  Thank you.

14        (Pause in the proceedings.)

15             THE COURT:  If she can't do that, she doesn't have a

16   camera, I need to know her initials.

17        (Pause in the proceedings.)

18             THE COURT:  Here we go.  Ms. Hymel, let me get you

19   now the presenter.  Thank you.

20             All right.  Ms. Hymel is now the presenter.  And

21   let's wait for Mr. Dane to get Exhibit 27 in front of him.

22        (Pause in the proceedings.)

23             MR. DUEWALL:  And I think we have an agreement,

24   Your Honor, with Debtors regarding the admissibility of the

25   BP exhibits.  So if it's appropriate to do it now, I would --

1  Exhibit Numbers 1, 2, 3 and 4 from our list are all

2  demonstrative and they're only offered for demonstrative

3  purposes.  And I believe the remainder of the exhibits on

4  our list they did not find objectionable except for No. 24,

5  which is the methodology paper regarding decommissioning and

6  we would not move to admit that exhibit at this time.

7          THE COURT:  So you're moving for --

8          MR. DUEWALL:  We would move --

9          THE COURT:   -- 5 through -- let's be sure -- it's 5

10  though 35 with the exception of 24?

11         MR. DUEWALL:  Yes, Your Honor.

12         THE COURT:  Any objections?

13         MR. PEREZ:  Your Honor, Ms. Choi probably needs to

14  weigh in.

15         THE COURT:  All right.  Ms. Choi, let me get your

16  line active.

17         Mr. Million, I see that you have raised your hand

18  and I want you to be aware that you're free to speak at any

19  point.

20         Mr. Genender, I've activated your line.  And I'm

21  looking --

22         MR. GENENDER:  Ms. Choi's with me.  Ms. Choi's with

23  me, Your Honor, same line.

24         THE COURT:  Okay.

25         MR. GENENDER:  First of all, just a housekeeping

1  matter.  The document on the screen is a document that's

2  highly confidential so it shouldn't be shown.  I wanted to

3  point that out.  And Ms. Choi can speak to the other

4  documents.

5           MS. CHOI:  Your Honor, Erin Choi, Weil Gotshal, on

6  behalf of the Debtors.  I agree with Exhibits 5 through 35,

7  except for 24 --

8           THE COURT:  Okay.  BP --

9           MS. CHOI:  -- line.

10           THE COURT:  -- BP 5 through 23 and BP 25 through

11  35 are admitted.

12      (BP Exhibit Nos. 5 through 23 and 25 through 35

13  received in evidence.)

14           MR. PEREZ:  Yeah, we can't show that one.

15           MR. GENENDER:  Your Honor, Paul Genender for

16  Debtors.  I just want to make sure 27 is going to come down.

17  Thank you.

18           MR. PEREZ:  Thank you.

19           MR. GENENDER:  Here it is.

20           THE COURT:  All right.  Let's just -- Mr. Dane, do

21  you have 27 now in front of you?

22           THE WITNESS:  I haven't received it yet, Your

23  Honor.

24           THE COURT:  It's --

25           THE WITNESS:  Ms. Choi, have you sent it?

MICHAEL DANE - CROSS BY MR. DUEWALL                    229

1          MS. CHOI:  Yes, I sent it.  It's just a large file,

2    so it's coming.

3        (Pause in the proceedings.)

4          THE WITNESS:  I still haven't received the

5    document.

6          Ms. Choi, do you want to put it in Dropbox for me?

7    I can access it there, or I have a copy of the document.  It

8    should be the same.  Oh, I got it.

9          MS. CHOI:  Mr. Dane --

10         THE COURT:  Wait a minute.

11         MS. CHOI:  -- it's going to be the

12   (indiscernible).

13         THE COURT:  I think he said he just --

14         THE WITNESS:  I got it.

15         THE COURT:  -- got it.  Right?  Did you get it,

16   Mr. Dane?

17         THE WITNESS:  Thank you.  Yes, I'm pulling it up

18   right now.

19         THE COURT:  Thank you.

20       (Pause in the proceedings.)

21         THE WITNESS:  Unfortunately the (indiscernible)

22   has significant security restrictions, so now I'm just

23   waiting for the password.

24       (Pause in the proceedings.)

25         MR. DUEWALL:  And, Your Honor, when he's received

1  that document we're going to be talking about Section 3.1(b)

2  which is on Page 17.

3           THE COURT:  Thank you.

4           THE WITNESS:  The document's downloading right now.

5  Just a minute.

6           THE COURT:  Okay.

7      (Pause in the proceedings.)

8           THE WITNESS:  Okay.  Mr. Duewall, can you tell me

9  the section again?

10          MR. DUEWALL:  Yes, Page 17, Section 3.1(b).

11      (Pause in the proceedings.)

12          THE WITNESS:  Okay.  I have the deal.  Thank you.

13  BY MR. DUEWALL:

14  Q    Okay.  Now that you've been given an opportunity to

15  look at Exhibit 1607-27, specifically page 17,

16  Section 3.1(b), does that refresh your recollection as to

17  when the $30 million became due and payable as it related to

18  the MC519 agreement?

19  A    Yes.

20  Q    Okay.  And generally speaking, is it your

21  understanding that that payment, that $30 million, became

22  due and payable 180 days after the completion of the

23  Genovesa well?

24  A    I think there's some more specifics that are important

25  to consider there.

1  Q     Can you tell me, excuse me, your understanding of when

2  the $30 million became due and payable, or owed?

3         MR. PEREZ:  Your Honor, again, it calls for a

4  legal conclusion, interpreting the document, so that's the

5  objection.

6         THE COURT:  Sustained.

7  BY MR. DUEWALL:

8  Q     Mr. Dane, do you believe the $30 million became due

9  and payable on March 27th of this year?

10 A     No, I don't.

11 Q     But for the fact that Fieldwood has rejected that

12 contract, do you think the $30 million would be due and

13 payable?

14 A     No.

15        MR. PEREZ:  Object to the form -- Your Honor,

16 object to the form of the question.  Fieldwood hasn't

17 rejected any contract yet.  It's going to be done in

18 connection with Confirmation.  So that's a false promise.

19 BY MR. DUEWALL:

20 Q     Well, let's just walk off through 3.1(b) then,

21 Mr. Dane.  Do you see where it says, "A one-time payment of

22 $30 million which becomes payable and owing to seller on

23 successful completion of the Genovesa well?"

24        Did I read that correctly?

25 A     You read the first part of that correctly.

1  Q     Right.  And it continues to say, "Or any other well

2  within the Genovesa formation and shall be due and paid --

3  and shall be due and paid to seller within the first 180

4  days of production (whether consecutive or not) of

5  hydrocarbons from any such well, which is defined as the

6  contingent payment."

7       Did I read that correctly?

8  A     That's what the document says in that section.

9  Q     Thank you.  And it says, "That payment shall be made

10 by buyer to seller by wire transfer of immediately available

11 funds to the account designated pursuant to Section 9.8."

12      Did I read that correctly?

13 A     I'm not checking verbatim, but that's what it looks like

14 it says.

15 Q     Okay.  And continues to say, "Provided, however, that

16 buyer delivers to seller within notice -- written notice

17 within 6 months.  Within such 6-month period a buyer's

18 election to offset the contingent payment against the

19 outstanding amount of the cash consideration (as defined in

20 the cash consideration exchange agreement) then due by

21 seller to buyer under Section 3.1 of the exchange agreement,

22 then" --

23           THE COURT:  Mr. Genender?

24           MR. DUEWALL:  Was there an objection?  I'm sorry.

25           MR. GENENDER:  Your Honor, I apologize.  Paul

MICHAEL DANE - CROSS BY MR. DUEWALL                    233

1   Genender for the Debtors, I apologize for interrupting, but

2   Mr. Duewall is basically reading from a highly confidential

3   document on the Record.  And we had an understanding that

4   questions could be asked about the documents and not

5   publishing them.  We're in effect unnecessarily revealing the

6   contents of them.  In the way he's asking questions, he's

7   basically publishing the contents of the document.

8            THE COURT:  Overruled.

9            This part of the document as to how you measure

10  and things of this nature, I mean it may be confidential

11  that it was 30 million, but everybody's decided to put that

12  out in the public record.  I don't think this part's

13  confidential and I wouldn't seal it if I had to, so -- if I

14  was asked to.

15           So I'm going to allow the questions to be asked

16  that way.  Particularly in light of the objections that are

17  being raised, which is when he asks for the end result, he's

18  being told it's a legal conclusion.  He now needs to go

19  through to see whether the facts meet what this says.  And I

20  don't know how else he can do it.

21           So I'm going to overrule it.  You can ask the

22  questions, Mr. Duewall.  Go ahead.

23           MR. GENENDER:  Thank you.

24           MR. DUEWALL:  Thank you, Your Honor.  I'm going to

25  try to short circuit again.  If I get another objection, I'll

1  start reading again.

2  BY MR. DUEWALL:

3  Q     But, Mr. Dane, generally speaking did the $30 million

4  become due and payable 180 days after the Genovesa well was

5  completed?

6  A     No, not in my opinion.

7  Q     Okay.  When in your opinion did it become due and

8  payable?

9  A     Well, it has not become due and payable in my opinion.

10  Q     Can you tell me why in your opinion that's the case?

11  A     Yes.  For several reasons.  First of all, the payment

12  in this section, it becomes due and payable upon the

13  production -- upon 180 days of production, whether

14  consecutive or not, which is what you stated.  The well came

15  online on March 27th, 180 days from March 27th, assuming

16  that there was no interruption at all in production, would

17  be I believe September 23rd of this year.

18        There have been -- well has not produced so it

19  would be at some point later than that that it would become

20  due and payable.  There's not a certainty that this well will

21  produce for 180 days.  There's a number of things that could

22  happen in the future that causes this well to not have

23  produced for 180 days.

24        As of today this well has not satisfied the

25  conditions that would have resulted, in my opinion, a

1    $30 million payment being owed.  If the well successfully

2    produced for 180 days, whether consecutive or not, if it

3    took 5 years for that 180 days, or 10 years, or in the

4    extreme if it never produced for 180 days, it wouldn't be

5    owed in my opinion.  But I think that that's one reason I

6    don't believe this payment is due and payable.

7            The other reason is that there's essential ongoing

8    litigation under this same document, there are writs and

9    warranties that are described, and that's the focus of the

10   company's Rule 2004 request that it's seeking more information

11   in order to understand if there's been other breaches.  So

12   the disputed amount on my mind, to the extent that it ever

13   did become due and payable, it would be at a later date.

14   Q    And is this a contract -- and do you know if this is

15   the contract, the MC519 PSA, that Fieldwood has designated

16   for rejection under the Plan?

17   A    Yes, it has been designated as -- to be rejected.

18   Q    Thank you.  Do you have a copy -- or actually were you

19   sent all of BP's exhibits now, or do -- I'd like you to turn

20   to 1607-28.

21   A    I don't.  This is the only exhibit I have, but I have

22   access to the portal, so if someone from counsel could

23   upload it, I can easily get it.

24        (Pause in the proceedings.)

25            THE WITNESS:  I'm sorry, Mr. Duewall, what exhibit

1  did you say that was?

2           MR. DUEWALL:  We're now moving to 28, it's -- on the

3  Court's record it's 1607-28 filed under seal.

4       (Pause in the proceedings.)

5           THE WITNESS:  Yeah, I'm pulling it up that

6  document. I have that document.

7  BY MR. DUEWALL:

8  Q    Okay.  Can you generally identify what Exhibit 28 is?

9  A    This is the cash consideration exchange agreement

10  between BP and Fieldwood with respect to Mississippi Canyon

11  562, the developed property.

12  Q    Thank you.  And I understand this has been filed under

13  seal so I'll try to do a better job with regard to this one

14  than I did the last one.  But is it generally your

15  understanding that this agreement calls for amounts to be

16  paid from BP to Fieldwood; is that correct?

17  A    That's correct.

18  Q    Okay.  And do you have a position as to whether or not

19  amounts are still due and owing under this agreement from BP

20  to Fieldwood?

21  A    Yes, there's approximately 12- to $13 million of

22  amounts that are still owing from  BP to Fieldwood this

23  year.

24  Q    And is it your understanding that this contract has

25  not been rejected under the Plan?

1  A      Correct, there's no (indiscernible).

2  Q      And do you recall when you were CFO did Fieldwood book

3  amounts due and owing under this contract as a receivable

4  when it was executed by the parties?

5  A      Yes, I do know that that is on our balance sheet.

6  Q      And to the best of your knowledge do you think it was

7  booked as a receivable when it was executed?

8  A      I believe it -- I believe that it was booked as a

9  receivable when the transaction closed.

10  Q     And that would have been in October of 2018, do you

11  recall that?

12  A     I don't recall if it closed in October, but it was -- I

13  would have to check it on the agreement.

14  Q     I'm going to try to do that for you.  Could you turn to

15  Page 1 of the agreement?

16  A     Yes, I did.

17  Q     Okay.  And just so the Court's Record is clear, the

18  date of the agreement is October 25, 2018 there in the first

19  paragraph.  Do you see that?

20  A     I see that the signing date was October 25, 2018.

21  Q     Okay.  And have BP and Fieldwood had a general course

22  of dealing with the parties with net amounts due and owing

23  in the normal course of business?

24  A     The parties have netted against each other, which has

25  been the subject of separate disputes to which there's quite

1  a bit of history.  And the main -- the main observation I

2  have about the difference of opinion on the netting was that

3  BP was very vociferous that the payments shouldn't be netted.

4  However, Fieldwood was netting payments because it wasn't

5  receiving money that it was owed from BP.  So I wouldn't say

6  it was -- it happens, I wouldn't say it was -- I'm aware of

7  many letters in which BP protested of the netting of

8  payments of unpaid amounts to those.

9  Q    Okay.  So it's happened in the past; is that correct?

10 The netting?

11 A    Yes.

12 Q    Okay.  Now next I'd like to turn to the list of assumed

13 contracts.  Before we go to that, Mr. Dane, as it relates to

14 the MC519 do you think that we are within 180 days -- as we

15 sit here today, do you think we're within 180 days of

16 production?

17 A    I know we are not within 180 days of production.

18 Q    Okay.

19        THE COURT:  Wait, wait.  When you say within 180

20 days of production, do you mean are we less than 180 days

21 from the date of first production, or did you mean something

22 else by that question, Mr. Duewall?

23        MR. DUEWALL:  No, that was it, Your Honor.  That

24 was it.

25        THE COURT:  So you're saying -- I want to be sure

1  Mr. Dane, because it means I misunderstood something you

2  said before, we are not less than 180 days from the date of

3  first production?

4            THE WITNESS:  I'm sorry, Your Honor.  We are

5  certainly less than 180 days from first production.  The

6  well began to produce on March 27 or 28.

7            THE COURT:  Okay.  Thank you.

8            MR. DUEWALL:  Thank you, Mr. Dane.

9            We're going to turn next, Your Honor, to Exhibit

10 1616-3.

11           THE COURT:  Is that sealed or unsealed?

12           MR. DUEWALL:  I don't believe it's sealed.

13           THE COURT:  All right.

14      (Pause in the proceedings.)

15           MR. PEREZ:  Mr. Duewall, what exhibit number is

16 that in your exhibits?

17           THE COURT:  It's one of your exhibits, Mr. Perez.

18           MR. PEREZ:  Oh, okay.  I'm sorry.

19      (Pause in the proceedings.)

20           THE COURT:  And I think she has up on the screen.

21 Right?

22           MR. DUEWALL:  She does.  We're going to try to --

23 we're going to go to Page 9, Line 225.

24           THE COURT:  Mr. Dane, if you hover over the right

25 side of your screen there will be a Zoom feature to make

 1  this bigger.

 2          THE WITNESS:  Thank you, Your Honor.

 3      (Pause in the proceedings.)

 4  BY MR. DUEWALL:

 5  Q    So, Mr. Dane, the reason I brought up Exhibit 1616-3,

 6  the list of assumed contracts that are being assumed by

 7  NewCo, and I wanted to pull up for you the entity, 519 loop

 8  agreement contract.  Do you see that there on your screen?

 9  A    I do.

10  Q    Okay.  I was going to try to avoid having to pull the

11  contract up, but we'll do that if we need to, but just so

12  that the Record is clear, NewCo's assuming the entity 519

13  loop agreement that's referenced there on Line 225 of

14  Exhibit 1616-3 as the -- as a Joint Operating Agreement.  Do

15  you see that in front of you?

16  A    Yes, I do.

17  Q    Okay.  And so you agree this was an assumed contract.

18  Correct?

19  A    If it's listed on the schedule as a new contract, then

20  I believe it is and I believe it is something that we would

21  intend to assume.

22  Q    Okay.  Thank you.  To the best of your knowledge does

23  this contract contain a dispute resolution provision between

24  the parties?

25  A    I believe it does.

1  Q      Okay.  And to the best of your knowledge does that

2  both include a -- when I say dispute resolution provision I'm

3  speaking in terms of an agreement to arbitrate disputes

4  under that contact?

5  A      I understand --

6              MR. PEREZ:  Your Honor --

7              THE WITNESS:   -- the provision.

8  MR. DUEWALL:

9  Q      Okay.  Thank you.

10  Next, Mr. Dane, I'd like to turn to Debtor's Exhibit 105

11  that's found I believe at 1646-2.  Specifically in that

12  document Page 105.

13        (Pause in the proceedings.)

14  BY MR. DUEWALL:

15  Q      Do you see that -- we brought that up on our screen,

16  Mr. Dane.  Can you see that on your screen?

17  A      Yes, sir, I could.

18              MR. DUEWALL:  Do you want to make it bigger?

19  Thank you.

20  BY MR. DUEWALL:

21  Q      I understand from your -- I understand that you've been

22  working with the Government to try to -- well, strike that.

23  Exhibit B on this exhibit, Mr. Dane, is titled, Excluded

24  Events.  Do you see that at the top?

25  A      I do.

1  Q     Okay.  And it says, Fieldwood 3 will not be

2  responsible for the non-performance or delay in performance

3  of the transition services, or for not taking any action, or

4  meet any condition to the extent called in whole or in part

5  by any of the following, and then it lists certain events

6  there on that document.  Do you see that?

7  A     I do.

8  Q     Okay.  On the first one it says, Adverse weather or

9  sea conditions, loop current, acts of God, including but not

10 limited to hurricanes.  Do you see where I read that?

11 A     Yes.

12 Q     So my question, Mr. Dane, is simply if there's a

13 hurricane during this hurricane season and it impacts assets

14 that are abandoned under this Plan, who has the obligation

15 to go out there and take care of that?

16 A     So under the Plan and the proposals that are included

17 as a part of the Plan, the exhibit -- this exhibit has a

18 transition services description of all the services that

19 Fieldwood will continue to support the abandoned properties

20 upon the effective date.  It describes the way that

21 Fieldwood will need to respond to any issue should they

22 develop.

23        But the Plan contemplates that these are abandoned

24 properties, they're going to be abandoned at exit, that's what

25 the Plan contemplates.  And I would think that, you know,

1    responsible co-predecessors would assist with the

2    transition.  That's what -- it's intended to be a transition

3    service.

4           So to the extent that there's an issue that needs

5    to be remediated that has an imminent impact to the

6    environment or safety, under the -- if it's still within the

7    9-month period that's contemplated under the transition

8    services, Fieldwood would respond to that incident, which

9    it's Fieldwood's position, and I would expect, although I

10   obviously don't speak for the Government, but I believe that

11   I heard the Government say that they expected that

12   responsible predecessors would efficiently transition these

13   assets pursuant to their joint and several liability.

14           MR. DUEWALL:  Objection, non-responsive, Your

15   Honor, to the extent it tries to rephrase any statements

16   that were made by the Government representatives.

17           THE COURT:  Sustained.

18   BY MR. DUEWALL:

19   Q    So just that I'm clear, Mr. Dane, before I move on,

20   Fieldwood 3 under this excluded events exhibit is expressly

21   excluding any type of liability for hurricanes or any other

22   act of God during hurricane season?

23   A    The properties are intended to be abandoned pursuant

24   to the Plan.  Fieldwood is going to be operating a

25   transition services arrangement proposal, and it will

MICHAEL DANE - CROSS BY MR. DUEWALL                          244

1  respond to any events that pose an imminent risk to the

2  environment or safety.  But the properties are abandoned.

3         So these excluded events were reviewed with the

4  Government, that was a part of the discussion with the

5  Government under what conditions would they be comfortable

6  that Fieldwood could provide transition services,

7  recognizing that the properties are abandoned.  I think that

8  the Exhibit A and B are pretty self-explanatory.

9  Q    When you say respond what does respond mean, what do

10 you understand that to mean?

11 A    I understand it to mean that if there is an event that

12 would cause a risk, event risk to the environment, health,

13 safety, that Fieldwood would take the actions necessary to

14 make sure that those issues were mitigated or resolved.

15 Q    Okay.  Earlier in your testimony, and it's not my

16 intent to quote you verbatim, you were testifying about the

17 amount of P&A that Fieldwood had done since 2013.  Do you

18 remember that?

19 A    Yes, I do.

20 Q    And it's my recollection that you provide -- that you

21 stated generally, and correct me again if I'm wrong, but that

22 amount was generally $1.5 billion?

23 A    Yes, in excess of 1-1/2 billion.

24 Q    How much has -- how much has Fieldwood spent or

25 incurred doing P&A work in this year, 2021?

1    A      I'd have to consult our records to get the exact

2    number.

3    Q      And what I'm trying to determine, Mr. Dane, just to be

4    up front with you, is I'm trying to determine over what

5    course of time that that 1.5 spent.  Was it primarily in

6    2013 and '14, many years ago, or is that amount that has been

7    spent primarily in the last 2 or 3 years?

8    A      I believe in 2013 for a sub-period, because the

9    transaction with Apache closed in 2013, there was a couple

10   of hundred million dollars spent over less than a 6-month

11   period.  I believe in 2014 there was over $400 million

12   spent, within the next year it was 2- to $300 million.  It

13   was 100 to -- 150- to $200 million a year in the subsequent

14   years.  Last year we spent $70 million.

15   Q      Okay.  Now on day one when NewCo -- if this Plan is

16   approved, on day one NewCo by your own estimates I believe

17   is going to have approximately $350 million of day one P&A

18   liability; is that correct?

19   A      That's correct.

20   Q      And is that -- does that represent a nominal net value

21   to NewCo?

22   A      That represents the net working interest owner

23   expected to pay RO costs based on our estimates, net to the

24   NewCo's working interest ownership in each of the leases.

25   Q      Okay.  Is there any reason why when you're preparing

1  those cost estimates you don't use a P50 valuation?

2  A    I don't know that we don't use a P50 valuation.  I think

3  we use a -- P50 means the most likely case.  P50, that's not

4  the methodology that we adopted, the same as BSEE.  We don't

5  have a P50, a P90.  We have an estimate that's based on

6  certain assumptions.  I think it probably does approximate a

7  P50 case, which is the most likely case.

8  Q    Let me make sure I understand your testimony.  Is it

9  your testimony that the 350 million that you estimated at

10  day one NewCo P&A net liability is reflective of a P50

11  estimate?

12  A    No, our -- my testimony is that Fieldwood would have

13  its own methodology for establishing its P&A estimates.

14  There's a number of assumptions which I reviewed earlier that

15  are the basis for generating those estimates.  And those

16  estimates and assumptions are refreshed on an annual basis

17  and updated for what we expect the cost to be for -- to

18  conduct the abandonment.  We don't have a distribution where

19  we have P50 number and a P90 number.  We just have an

20  estimate that we believe is a reasonable estimate.

21  Q    Did you have a chance to read your expert's rebuttal

22  report in this case, Mr. Hanson's rebuttal report?

23  A    I did.

24  Q    And we're going to pull up Exhibit 1620-1.  And

25  specifically Page 105.

 1          (Pause in the proceedings.)

 2          MR. PEREZ:  So, Your Honor, is this exhibit coming

 3   into evidence?

 4          MR. DUEWALL:  No, Your Honor, we're using it as a

 5   demonstrative as Plaintiffs -- or as Debtors have stipulated

 6   in their designation of their own exhibits.

 7          THE COURT:  I don't understand what that means

 8   actually, but I don't think I have an objection, so I'll wait

 9   and see if I get one.

10          (No audible response.)

11          THE COURT:  Go ahead.

12   BY MR. DUEWALL:

13   Q    Mr. Dane, we're going to highlight or make --

14          THE COURT:  Yeah, I don't think I have a question

15   pending, I don't think I have an objection pending.  You all

16   just move ahead and I'll see if I get a question -- if I get

17   an objection.

18          MR. DUEWALL:  Thank you, Your Honor.

19   BY MR. DUEWALL:

20   Q    Do you see what we've highlighted there, Mr. Dane, and

21   I'm -- there it goes, my screen's a little bit far away.  It

22   says -- your own expert says there, at least states on that

23   exhibit, Debtor's exhibit, it is P50 cost estimates that

24   actually reflects -- I'm sorry, I've not stated that

25   correctly.  I'm going to start over.

MICHAEL DANE - CROSS BY MR. DUEWALL                    248

1          It states it is P50 cost estimates that actually

2     reflect the "most probable outcome".  Do you see where it

3     says that in your expert's report?

4          MR. PEREZ:  I'm sorry, Your Honor, I don't see it.

5          THE WITNESS:  Exactly.  I see where it states

6     that, I think --

7          THE COURT:  Hold on just -- wait just a minute.

8          Mr. Perez, you have your Zoom too high, lower your

9     Zoom and you'll see --

10         MR. PEREZ:  Ah, okay.  Got it.  Got it.  Okay.

11         THE COURT:  Or move the document.

12         MR. PEREZ:  All right.  Okay.

13         THE COURT:  Okay.  Then did you have an objection

14    to the question?

15         MR. PEREZ:  No, Your Honor.

16         THE COURT:  All right.  Go ahead, please.

17         MR. DUEWALL:  Thank you, Your Honor.

18    BY MR. DUEWALL:

19    Q    My question, Mr. Dane, is if it's your expert's opinion

20    that P50 reflects the most probable outcome, is there any

21    reason why NewCo in their own financial projects are using a

22    nominal value for P&A estimates?

23         MR. PEREZ:  Your Honor, I'm going to object to the

24    question.  I mean there's really no foundation as to what

25    this P50 is.  I mean Mr. Dane testified that they used a P50

MICHAEL DANE - CROSS BY MR. DUEWALL                  249

1   base on their estimates.  I'm going to object to the

2   question.

3        THE COURT:  Can I just get you to repeat the

4   question, Mr. Duewall.  You can repeat it just the same way

5   it was, I just want to hear the question in light of the

6   objection.

7        MR. DUEWALL:  Sure, Your Honor.  It might be

8   easier to read it back, but I'll try it.  My question is, if

9   Mr. Dane had a reason why they didn't use P50 in the NewCo

10  financial projections when the expert report reflects that

11  P50 cost estimates are actually the most probable outcome,

12  that's my question.

13       MR. PEREZ:  And, Your Honor, a further objection

14  as to -- I mean taking -- this is kind of being taken out of

15  context as to, you know, "most probable outcome".  And

16  Mr. Hanson's going to testify.

17       THE COURT:  If that's the objection, I'm going to

18  overrule it.  Go ahead, Mr. Dane.

19       THE WITNESS:  I think when I read this sentence, I

20  think it is defining what P50 says.  I don't think it's

21  stating that the BSEE P50 estimate is the most probable

22  outcome.  I think when I read this sentence I interpret it

23  as P50 is by definition the most probable outcome.  It

24  defines what P50 means.

25       Our expert is not a P&A expert.  Fieldwood One

MICHAEL DANE - CROSS BY MR. DUEWALL                    250

1  believe is a P&A expert and we develop our own estimates.

2  And so if your question is why would we not use -- we are

3  using what we believe to be the most reliable estimate.

4  That's my response.

5  BY MR. DUEWALL:

6  Q     If your expert's not a P&A expert, do you know where he

7  got this information to put in his report?

8  A     I believe he's stating a definition in this report.  It

9  is P50 cost estimates that actually reflect the most

10 probable outcome, and when I read that bullet I think it's a

11 relevant statement, it means relative to a P90 case.  P90

12 represents a 90th percentile probability, it's a much, much

13 more than probable case.  P50 is most probable.

14       I don't think that this statement says that the

15 BSEE P50 estimates are the most probable outcome with

16 respect to the actual costs that will be associated with the

17 NewCo entity, and as such they should be the basis for the

18 NewCo projections.  That's not how I interpret this.

19       I think that's consistent with our expert who,

20 doing the same report, stated that Fieldwood has a

21 decommissioning group through its experts and their

22 estimates have more utility for purposes of developing

23 projections than BSEE estimates which are done a broad basis

24 for all assets in the entire Gulf of Mexico and not specific

25 to the actual assets of Fieldwood.

1  Q     If P50 is applied to your financial -- have you ever

2  applied P50 to your financial projections in this case?

3  A     Well, we have analyzed them mainly in the context of

4  just understanding what the BSEE numbers show and in the

5  context of evaluating your expert's report.  But we don't

6  believe that they are -- we believe that, like I already

7  stated, that the Fieldwood estimates that are done specific

8  to the Fieldwood assets being performed by the internal

9  expert at Fieldwood on decommissioning are what's relevant

10  for purposes of us understanding.

11  Q     Have you ever applied the P50 estimates to your

12  revenue projections or your cost projections that you've done

13  in this case?

14  A     Our projections go back 5 years.  As I stated earlier,

15  there is a very limited amount of P&A that takes place in

16  those years.  So there's very little measure with respect to

17  our overall P&A, with respect to our projections.  But our

18  projections largely do not include P&A given that it's not

19  necessary within the time frame of the projections that we

20  included.  So, I'm sorry, to answer your question, it's not --

21  it wasn't applied because it largely falls outside the

22  forecast period.  And, no, we haven't done that in any event.

23  Q     Using your nominal net P&A estimate of 350, how much

24  of that is represented what I would call legacy properties,

25  properties where there's been another operator somewhere in

1  the chain of title?

2  A     There's only -- Fieldwood, that's the basis that's going

3  to comprise the -- that's the basis that's going to comprise

4  the Credit Bid Purchaser has very few wells that don't have

5  any other parties in the chain of title.  The only -- I don't

6  know that I can think of a well that Fieldwood has drilled

7  that does not have another party in the chain of title

8  somewhere.

9  Q     So for example for the Katmai 1, is that a well that

10 Fieldwood drilled itself?

11 A     No, it's not.

12 Q     Okay.  And the Orlov, is that a well that Fieldwood

13 drilled itself?

14 A     Yes, it did.

15 Q     Okay.  So what I'm trying to determine, and maybe --

16 A     No, I'm sorry, Fieldwood drilled the well and did not

17 drill by itself.  Fieldwood had two co-working interest

18 owners in the properties.

19 Q     But you testified earlier that the 350 P&A was a net

20 to Fieldwood number.  Correct?

21 A     It is, yes.

22 Q     Okay.  So what I'm trying to determine is if I was to

23 make three buckets of potential NewCo assets, and if I

24 called the first bucket legacy properties similar to the

25 properties you're abandoning in this case, that would be

1  bucket Number 1; Bucket Number 2 would be wells that

2  Fieldwood has drilled; and then Bucket Number 3 would be

3  wells that you plan to drill in the future.  Are you

4  following me?

5  A    Somewhat.  Your second category, I'm sorry, is wells

6  that Fieldwood would have drilled, but there's no other

7  party, or it's just wells that Fieldwood would have drilled?

8  Q    Wells that Fieldwood would have drilled as the

9  operator.

10  A    Okay.  I understand.

11  Q    What I'm trying to determine is that on day one of --

12  if this Plan is confirmed by the Court, on day one it's my

13  understanding that there's 350 -- based upon your testimony

14  there's $350 million of net P&A liability on day one to

15  NewCo.  Correct?

16  A    That's -- yes, that's Fieldwood's estimate.

17  Q    Okay.  And so what I'm trying to determine is how much

18  of that, if Fieldwood as to declare bankruptcy again, they

19  can try to abandon, as it is in this case, and how much of

20  that liability it cannot abandon.  Does that -- are you

21  following me?

22           MR. PEREZ:  Yeah, object, Your Honor, it wouldn't

23  be -- I think he's talking about credit bit purchaser, he's

24  not talking about Fieldwood.  So I object to the form of the

25  question.

1          THE COURT:  Sustained.

2          MR. DUEWALL:  I was talking about NewCo, Your

3    Honor.  And if I mis-spoke, I'll rephrase.

4          THE COURT:  Go ahead.

5    BY MR. DUEWALL:

6    Q     Mr. Dane, I'll try again.  On -- if the Plan is

7    confirmed, on day one of NewCo's existence what percent of

8    the $350 million of net P&A liability is represented by

9    properties that were originally drilled by another operator?

10   A     Fieldwood drilled four wells that I can think of in

11   that asset base that it operated.

12   Q     Are there any wells on day one of -- if the Plan's

13   confirmed by the Court, on day one are there any wells that

14   NewCo is going to operate that were drilled by another

15   operator in the chain of title?

16   A     Yes, every other well other than those four that come

17   to my mind.

18   Q     Okay.  And can you identify those four for me, please?

19   A     The four that I were thinking about -- that I was

20   thinking about that Fieldwood drilled as the operator was

21   Genovesa, the Tri 2 well, the Tri 3 well, and Orlov.

22   Q     So just to rephrase, the Orlov well, the two Troica

23   wells and the Genovesa well represent wells that Fieldwood

24   drilled itself.  Correct?

25   A     Fieldwood operated the drilling of those wells.  It

1  did not drill those wells by itself in all cases.

2  Q    Fieldwood was the operator when the Orlov, the two

3  Troica wells, the Genovesa well were drilled.  Did I say

4  that properly?

5  A    Yes.

6  Q    Okay.  And how much of the $350 million of P&A

7  liability do those four wells represent?

8  A    I would have to consult our records to give you an

9  exact number.

10 Q    Do you have a ballpark or percentage?

11 A    10 percent.  That's an estimate.

12 Q    And does that mean that the remaining 90 percent are

13 in the bucket of to-be-drilled, or is the remaining 90

14 percent in properties that are -- were drilled by another

15 operator?

16 A    Well, a to-be-drilled well doesn't have a liability

17 associated with it --

18 Q    Okay.

19 A     -- so everything else would fall into the other

20 category.

21 Q    So I'll put a zero in the to-be-drilled bucket.  And in

22 the -- so 90 percent of the $350 million of P&A liability on

23 day one of NewCo is liability for properties that were

24 originally drilled or developed by another operator; is that

25 correct?

1  A     Roughly speaking that -- based on my assumption on

2  those other four wells and not being able to identify off

3  the top of my head any other wells that Fieldwood operated

4  itself, with respect to that subset of assets I think that

5  that's probably fair.

6  Q     Okay.  And it's my understanding that Fieldwood has $75

7  million of bonding lined up; is that correct?  Or NewCo, I'm

8  sorry, has -- strike that -- has $75 million of bonding

9  lined up; is that correct?

10 A     Yes, we have a committed -- we entered into a term

11 sheet for -- that provides for a committed $75 million

12 amount for the next couple of years.

13 Q     How much of NewCo's value is made up of the new

14 drilling program versus existing wells on day one?

15 A     That's not a number I can give you off the top of my

16 head.  There's substantial value in each and it depends

17 obviously upon how much future activity happens, it depends

18 on prices, it depends on a number of factors.  Both

19 categories have very significant value.

20 Q     Based upon the financial projections that have been

21 done in this case, are the new wells essential to Fieldwood's

22 payments to bills in the ordinary course of business?

23              MR. PEREZ:  Objection, Your Honor, they --

24              THE COURT:  By Fieldwood do you mean NewCo, or do

25 you mean somebody else?

1      MR. DUEWALL:  NewCo, Your Honor.  I'm going to

2  write that at the top of my page now, NewCo.  I'm sorry.

3      THE COURT:  I'll just get you to re-ask the

4  question and then I think it'll be a lot less vague so.

5      MR. DUEWALL:  Thank you, Your Honor.

6  BY MR. DUEWALL:

7  Q    Are the new wells that are proposed by NewCo essential

8  for NewCo to meet its financial projections that have been

9  made in this case?

10  A    The new wells are an assumption that is included in

11  the financial projections.  In other words, the business

12  Plan contemplates -- the projection contemplates additional

13  wells.

14  Q    Have you done any -- have you done any business

15  planning or modeling that does not account for any of the

16  new wells?

17  A    Yes.

18  Q    What happens to NewCo's cash flow at the end of Year 5

19  if none of the new wells are brought online?

20  A    Early on in our evaluation.  There hasn't been a

21  scenario that I've reviewed recently, but early on in our

22  evaluation we performed a case where there was -- I don't

23  know if it was no, I think it was little to no -- maybe one

24  well, or zero wells.  And the high commodity prices which is

25  probably lower today, and I believe that was one of our best

1  sets of projections compared to the others.

2  Q     Do you have an opinion as to whether or not there's

3  negative cash flow at the end of Year 5 of your model,

4  NewCo's model, if the new wells do not come online?

5  A     I have seen the BP expert report that shows positive

6  cash flow for four years, and then a $20 million negative

7  cash flow in the fifth period.  And I believe that if the

8  company was to operate the business such that it understood

9  it was not going to be drilling any more wells, that that's

10 not an appropriate set of projections.

11           The company would re-evaluate a number of other

12 assumptions that are embedded within that business plan, and

13 given the fact that fifth period is only $20 million

14 negative and every other period is substantially positive,

15 which if I recall off memory, had built a cumulative cash

16 balance of $550 million.  I think that there would be ways

17 to be accretive to that forecast which to begin with is

18 actually not that bad.

19 Q     But that's not the forecast that you put forward as

20 your financial projections.  Your financial projections

21 assume that all of the new wells will come online; is that

22 correct?

23 A     The projections assume a business plan that drills one

24 to two wells a year, has a disciplined amount of capital

25 spending that generates such cash flow every year and it

1    does assume that the wells are drilled and producing.

2    Q     And can you identify for us the wells that are

3    presumed to come online in the financial projections that

4    you've shared with us?  Is it -- and I'll just try to do it as

5    quickly as I can.  Are those wells the Katmai 2, the Katmai

6    3, the Katmai 4, the Big Bend, the Gunflint and the CPN, are

7    those the wells that we're talking about?

8    A     For the projections that were included in the

9    Disclosure Statement, in addition to some other work-over

10   activity and simulations, those are the wells that were

11   included as adding additional volumes.

12   Q     And as we sit here today have any of the wells that

13   were identified been permitted?

14   A     They have not, but I think that that's a misleading

15   question because permitting multi-year programs in the Gulf

16   of Mexico for deepwater does not happen in advance in that

17   manner.  You need to identify a specific rig, you need to

18   include that rig on your permit, that rig's BOP

19   qualifications, and other equipment on the rig need to

20   specifically be aligned with the particular project once it's

21   been fully engineered.  So it's not a common practice for

22   most independent operators to permit a multi-well program

23   when you don't have a rig under contract.  It's a waste of

24   time.

25   Q     What is the first well that you're proposing to drill

1  in NewCo?

2  A     I believe -- the projections that you're referring to

3  I've seen that there's a -- that there Is a work-over and a

4  simulation in the Gunflint deal.  Those aren't drilling

5  activities, but those are activities that require a rig in

6  the capital activities.  Those activities were scheduled for

7  late this year.  In 2022 the only project that was scheduled

8  was the Katmai Number 2 well.  I believe in 2023 there was a

9  Gunflint in-field well and a Big Bend well followed by a

10 Katmai well, then CPN, followed by another Katmai well in

11 '25.

12 Q     So let's just talk about the first two that you

13 identified then.  The Gunflint later this year, will that

14 require any type of permitting or pre-permitting for

15 environmental issues?

16 A     Every operation in the Gulf of Mexico generally

17 requires some level of permitting.

18 Q     And based upon your financial projections in this case

19 what are you assuming to be the approximate month that you

20 can show production from the Gunflint activity that you just

21 described?

22 A     I believe in the -- I'm sorry, can you repeat the

23 question for me?

24 Q     Sure.

25 A     Are you asking me about the projections or are you

MICHAEL DANE - CROSS BY MR. DUEWALL                    261

1    asking about given where we stand today when we think we'd be

2    able to produce?

3    Q     No, I'm talking about the projections you'd made.  What

4    do they presume in terms of when the Gunflint will come

5    online and who production?

6    A     I don't specifically remember, but I believe it's

7    somewhere between 4Q of this year and 1Q of next year.

8    Q     Do you believe that's on time or do you believe it's

9    behind schedule?

10   A     Yeah, I believe relatively on time.

11   Q     And when you begin your permitting for Gunflint, what's

12   your expectation for how long that'll take?

13   A     That's a work-over operation, it's a replacement of a

14   subsea safety valve that failed.  It's not a drilling

15   operation.  I think that permitting should not be a complex

16   permitting exercise, but all permitting takes time.

17   Q     Do you have any estimation in terms of your operations

18   as to how long that will take given the new regulatory

19   environment that we're in now?

20   A     I believe that if we had a Plan confirmed and we were

21   able to locate and tender for a rig that met the

22   requirements for that project and the campaign that they

23   follow, which we're in the process of evaluating, that that

24   project could be conducted as early as November-December,

25   maybe more likely December-January, which is relatively in

1  line with those projections.  And that we would be able to

2  obtain the permitting and other equipment that's required to

3  conduct that activity, that initial activity in that time

4  frame, which is what our team has been focused on.

5  Q    And I think you testified -- or didn't -- strike that.

6  Tell me when you think the -- your projections call for the

7  Katmai 2 to be drilled when?

8  A    As early as 2022 I believe.

9  Q    And that was when you expected it to be drilled.

10  Correct?

11  A    Yes.

12  Q    And as we sit here today could you tell us when you

13  expect that well to be drilled?

14  A    Are you the owner?  They're going to assess their

15  appetite for these types of capital projects, they

16  understand these projections in the business plan, they

17  understand the prospectivity of that particular project,

18  which is a meaningful -- a meaningful well.  They have

19  reviewed these same projections, they understand the

20  business plan that we're looking to implement.

21       That's a part of the reason why they are putting

22  several hundred million dollars in new capital into this

23  business, understanding that opportunity and those risks.

24  If that well ultimately gets drilled in that time frame, it's

25  going to be subject to board approvals, it's going to be

1  subject to business conditions at the time, the risk

2  appetite of the stakeholders that are in strategic

3  opportunities.

4      But right now as we sit here today, we are planning to

5  be able to be in a position to drill that well within that

6  time frame.

7  Q    And that time frame would be early 2022?

8  A    We would like to be in a position to be able to drill

9  that well in the first half of 2022, you know, all those

10 other considerations that I mentioned, you know, pending.

11 Q    Is it your testimony that the drilling program that's

12 put forth in the financial projection is still subject to

13 approval by the individuals who would be making the

14 decisions for NewCo?

15 A    Of course.

16 Q    But it's also correct, isn't it, that unless you drill

17 those wells and achieve production from those wells that

18 we've identified here within that 5-year period, you are cash

19 flow negative by Year 5?

20 A    No, that's -- I answered that question and I stated

21 that if Fieldwood was -- if the Credit Bid Purchaser was to

22 pursue a business plan and never drill another well, that

23 would be an entirely different business plan than what the

24 projections contemplate.  Under the -- under what I reviewed

25 in BP's expert report, under the scenario that doesn't account

1  for that being the strategy that I think the Credit Bid

2  Purchaser would pursue, and not incorporating all the

3  corresponding adjustments, every other variable that would

4  be required to be reviewed in that scenario, it still looks

5  like a very profitable business to me.

6        And I believe that that modest negative free cash flow

7  in that one year would likely not be the result because the

8  company would ensure that it wasn't producing negative cash

9  flow, it would likely have less expenses and other, you

10  know, other factors that would support a business plan that

11  doesn't drill more wells.

12  Q    As we sit here today are there still questions

13  regarding what the business plan of NewCo is going to be?

14  A    Any business requires its stakeholders, whether it's

15  its board of directors, its owners to approve its Plan, I

16  believe every business has a board that reviews at least an

17  annual business plan and approves those business plans.  I

18  would expect that NewCo is going to have a board that's going

19  to want to review all of its capital investment

20  opportunities and have the board approve the business plan.

21  So I think that that's just consistent with how businesses

22  are generally run.  I don't know of a business that doesn't

23  have some level of oversight with respect to how it spends

24  its capital.

25  Q    The bonding that you've obtained for NewCo is that

1  bonding that includes adequate assurance for the loop system

2  that we were talking about earlier this evening?

3         MR. PEREZ:  Object to the form of the question,

4  calls for a legal conclusion.

5         THE COURT:  Sustained as asked.  You can re-word

6  it.

7  BY MR. DUEWALL:

8  Q    Mr. Dane, did you obtain bonding that includes the

9  loop system that we've previously discussed this evening?

10  A    I'm not aware of a need to obtain bonding for the loop

11  system that we discussed.

12  Q    Do you know how much of the 75 million in new bonds

13  for NewCo are allocated to the MC519?

14  A    New bonds to NewCo are allocated to any asset.

15  Q    Mr. Dane, --

16  A    Excuse me, I'm sorry, other than -- we know that we

17  have a bond that needs to be procured for Apache, which was

18  a part of our transaction with Apache, the similar 308

19  facility is going to be included in Credit Bid Purchase

20  assets, and a bond is going to be given to Apache for

21  $13.2 million.

22  Q    I understood you to say earlier that yourself,

23  Mr. Lemay and Mr. Mitchell will be part of the management

24  team going forward; is that correct?

25  A    I stated that it's contemplated that the employees and

1  management team of Fieldwood are going to have continuity

2  through the -- through the Credit Bid Purchaser.

3  Q     Is it contemplated that you'll be the CEO of NewCo?

4  A     The lenders have had that discussion with me, and

5  that's what is currently contemplated.

6  Q     And is it contemplated that Mr. Lemay will be the

7  general counsel of NewCo?

8  A     It's contemplated that Mr. Lamb is going to be the

9  president/general counsel of NewCo.

10 Q      Mr. Lamb, I'm sorry.  And Mr. Mitchell, will he, with

11 NewCo, remain in his position as vice president of

12 production?

13 A     We would hope that Mr. Mitchell would remain in that

14 position or a comparable position.  Mr. Mitchell is

15 determining it.  He's had a long distinguished career and at

16 some point he has the desire to retire, but to the extent

17 that Mr. Mitchell would indulge us for a longer period of

18 time, we would be really grateful to have Mr. Mitchell

19 continue.

20 Q     And were all three of you also part of the management

21 team in 2018 when the company declared bankruptcy?

22 A     No.

23 Q     Were you the CFO in 2018?

24 A     I was.

25 Q     Was Mr. Lamb the general counsel?

MICHAEL DANE - CROSS BY MR. DUEWALL                    267

1   A      I believe it was Mr. Black at that time, or around

2   that time.

3   Q      But Mr. Lamb was with Fieldwood in 2018 during that

4   time?

5   A      Yes, he was.

6   Q      And was Mr. Mitchell also part of the executive team

7   in 2018 when the first bankruptcy was filed?

8   A      No, he was not.

9   Q      Was he the vice president of production or in some

10  other capacity?

11  A      I don't believe he -- I believe he joined after 2018.

12  Q      And then all three of you were with the company when

13  the second bankruptcy was filed clearly.  Correct?

14  A      Yes.

15  Q      Okay.  As part of the first bankruptcy being filed, do

16  you recall making financial projections during that

17  bankruptcy as well?

18  A      I do.

19  Q      And were you the CFO when that was done?

20  A      I was.

21  Q      And did you do that in a similar fashion as the

22  financial projections you made for this bankruptcy when it

23  was filed too?

24  A      In a sense that, yeah, there was a number of folks

25  that were involved at the time.  It was a collaborative

1  effort to develop those projections.  It was probably a

2  little bit -- there was other elements that the -- the

3  management was meaningfully different at that time, there

4  was a number of folks that were part of the company that are

5  no longer a part of the company, and vice-versa.  So the

6  people involved are slightly different.  Generally the

7  process is putting together estimates.  Yeah, we've

8  maintained kind of an approach where a number of departments

9  are involved, not necessarily the same people.  Certainly

10 the asset base is very different.

11 Q    What was your role I doing the financial statements in

12 2018?  Did you engage in the same process as you did when

13 you did for this bankruptcy filing?

14 A    No, I think I just answered your question.  I wouldn't

15 describe it as exactly the same process.  There was some

16 level of different people, there was certainly a different

17 level of assets.  It was similar in the sense that there was

18 a number of departments involved to help produce estimates.

19 I was a part of that process.

20 Q    Were you responsible for the accuracy of the financial

21 projections that were done when the 2018 bankruptcy was

22 filed?

23 A    I'm not sure what you mean by "responsible for."  Do

24 you mind clarifying that for me?

25 Q    Sure.  I was trying to determine who the person was

1  who was responsible for putting it together.

2  A    As I mentioned, there was an effort that involves a

3  number of people who also had a financial advisor at the

4  time.

5  Q    Were you responsible for putting together the

6  financial projections for this bankruptcy filing?

7  A    I was involved in the effort to put together these

8  financial projections, I oversaw part of that effort, I

9  approved these projections.

10 Q    And have you had an opportunity to go back and look at

11 whether or not the projections that you did as the CFO in

12 2018 were accurate as it related to revenue or EBITDA?

13 A    I've reviewed the projections that the team generated

14 as a part of that financial statement, and I have looked at

15 them relative to actual results over time.

16 Q    So just to be clear, when you did your financial

17 projections for the bankruptcy, it was filed in 2018.  You

18 made projections for performance throughout the remainder of

19 2018 and then also in 2019 and subsequent years.

20      Do you remember that?

21 A    I do.

22 Q    Okay.  And looking back when you compare those

23 projections to your audited financial reports, are you aware

24 that in 2018 you missed revenue by 9 percent?

25 A    I'm familiar with the numbers that were cited in the

1  expert report, I don't agree that they're correct.  But I

2  believe it was a 9 percent -- I'd have to see the exact

3  numbers, I apologize, the variances were less than the

4  numbers that were cited in the expert report that you were

5  citing to me.

6  Q     And so your response to that -- so you've read that

7  report; is that correct?

8  A     I have.

9  Q     And you familiarized yourself with it?

10        THE COURT:  I didn't hear you.

11        THE WITNESS:  I'm sorry?

12  BY MR. DUEWALL:

13  Q     Did you familiarize yourself with it, did you take the

14  time, spent some time with it?

15  A     I have.

16  Q     And then you know that in 2018 that report suggests

17  that you missed your revenue projection by 9 percent.

18        Do you remember it saying that?

19  A     Yeah, there was some times, I don't know if that

20  variance was exactly correct.  I know that when I looked at

21  their expert's report, the production and the EBITDA

22  variances were more exaggerated than actual.  And most

23  importantly it was missing some important lines like cash

24  flow that told a very different story than several top line

25  numbers.

1  Q      And same question with regard to 2019, that report,

2  are you familiar with the fact that that report suggests

3  that you missed your revenue projection by 16 percent in

4  2019 with regard to the projections that you were making

5  when you declared bankruptcy in 2018?

6  A      Yeah, their response, I reviewed their report, I don't

7  specifically remember, if people want to show me I can more

8  specifically tell you which numbers I thought were

9  incorrect.  But same observation was that the variances that

10  we understood for production of EBITDA were not as

11  significant as the variances we have in the expert report.

12  But there was a negative -- there was a negative variance in

13  2019 with respect to production and EBITDA.

14  Q      And in 2018 do you have any response for the

15  missing -- the projected EBITDA by 21 percent?

16  A      Yes.  I don't know that that's correct.  The EBITDA

17  number you had for 2018 was not correct in your expert

18  report.  I don't think someone tabulated the EBITDA

19  correctly.  But I thought the more relevant number for 2018

20  was frankly the period that reflected the best of the

21  projections.

22      The Disclosure Statement projections for 2018, I

23  believe, had around $390 million of free cash flow, and the

24  business generated, I think, around $370 million of free

25  cash flow having spent half as much capital in that year.

1  But I thought -- my observation was -- to answer your

2  question, my observation was 2018 was a successful year and

3  very much in line with the overall business plan objectives

4  for that loan year.

5  Q    And was 2019 a successful year when EBITDA was missed

6  by 47 percent of the --

7  A    No -- I'm sorry, I cut you off.

8         No, 2018 was not at a greater variance than the

9  Disclosure Statement projections.  I wouldn't consider 2019 a

10 particularly successful year, although I do think that there

11 is -- there was several variables, for instance, the lack of

12 capital spending the previous year, that they weren't apples-

13 to-apples comparisons.  There was substantially less capital

14 spending in 2018 and that's where the lower production

15 results in 2019 and lower EBITDA.

16        A number of those things were intended to -- the

17 2020 period prior to all the strains the business

18 experienced in the first quarter, a number of the executive

19 variances were expected to be corrected in that period.

20 Obviously ultimately the business environment changed

21 significantly.  2019 was impacted by other external factors,

22 as well.

23 Q    Have you gone back and synthesized the projections you

24 did in this case with kind of the analysis we just did with

25 regard to revenue misses to determine performance, if that

1  has any impact on your projected performance?

2  A    We haven't done a specific analysis to synthesize it,

3  but, you know, we've discussed and we understand some of the

4  major drivers of the variances.

5         MR. DUEWALL:  Those are all my questions, Your

6  Honor.  Thank you.

7         THE COURT:  Mr. Duewall, thank you.

8         All right.  Mr. Alaniz.

9         MR. ALANIZ:  Your Honor, can you hear me?

10        THE COURT:  Yes.

11                CROSS-EXAMINATION OF MICHAEL DANE

12  BY MR. ALANIZ:

13  Q    Mr. Dane, you and I have met before.  Correct?

14  A    Yes, sir.

15  Q    Over the past -- over the past couple of months we've

16  had roughly, you know, five or so conversations?

17  A    Yes, sounds about right.

18  Q    Mr. Dane, based on your testimony earlier it sounds

19  like you're familiar with the Bureau of Safety and

20  Environmental Enforcement, or BSEE.

21  A    Yes, I am.

22  Q    Do you recall using the term "INC" in your testimony

23  with Mr. Perez?

24  A    I do, yes.

25  Q    Can you describe for the Court the meaning of an INC?

1  A      INC is an acronym of an Incident of Non-Compliance.

2  An Incident of Non-Compliance is a -- it is something that

3  is issued generally pursuant to offshore inspections.  We

4  have facilities that are inspected on -- local facilities

5  probably on a daily basis.  There's active inspections that

6  are ongoing at all times in the Gulf of Mexico.  And to the

7  extent that the regular course inspections result in the

8  inspector determining that there's something that they

9  determine to not be in compliance, then they can issue you

10  an Incident of Non-Compliance, and that's a standard part of

11  operations in the regulatory environment in the Gulf of

12  Mexico.

13  Q      Thank you, Mr. Dane.

14         Can I turn your attention to Debtor's Exhibit 99, which

15  is also, I believe, 1625-23.  If I've got that right.

16         Do you have that in front of you, Mr. Dane?

17  A      I do not.  Can you remind me which one it is again,

18  please?

19  Q      It's Debtor's Exhibit 99, it's also Exhibit -- Docket

20  No. 1625-23.

21             THE COURT:  So 1625-23 is under seal.

22             MR. PEREZ:  Your Honor, it's in his book as

23  Exhibit 99.

24             THE COURT:  It's in whose book?

25             MR. PEREZ:  The book that I used with him.  I

1  think that's it.

2         THE COURT:  All right.

3         THE WITNESS:  Yes, sir, I have it here.

4  BY MR. ALANIZ:

5  Q    Okay.  Mr. Dane, do you recall testifying from this

6  document in Mr. Perez's examination of you?

7  A    Yes, I do.

8  Q    Are you able to refer to the properties, or identify

9  the properties in which Hess was the predecessor on this

10 chart?

11 A    Yes.  That is the West Delta properties at the bottom,

12 West Delta 79A, B, C, F.  E I believe was mistakenly

13 included in this chart, we believe that facility is removed.

14 And then West Delta A, B, D, 86A and B.

15 Q    Thank you, Mr. Dane.

16       So when I refer -- when I say, "West Delta

17 properties," you understand that I mean the properties in

18 which Hess was a predecessor.

19 A    Yes, I do.

20 Q    According to this chart, are there any un-resolved

21 INCs on the West Delta properties?

22 A    On this chart there are a couple of INCs that are

23 labeled as items that are going to be performed pursuant to

24 the Agreed Activities.  I see them listed on West Delta 79A,

25 and I see one listed on West Delta 79C, and I see one listed

MICHAEL DANE - CROSS BY MR. ALANIZ                    276

1  on West Delta 86A.

2  Q    Okay.  So the work that is mentioned in the comments

3  deal has not yet been performed?

4  A    This list, which is what we refer to as the "Agreed

5  Activity Schedule," was provided to the regulatory agencies

6  and discussed, and I believe it was around the first quarter

7  time frame of this year.  I think it was around maybe March

8  or so.  And this was -- the comments referred to the

9  activities that are contemplated to be completed under the

10 Agreed Activity Schedule.  The costs are what is associated

11 with the activities that are described upon it, most of

12 which relate to re-establishing egress that was compared to

13 somewhat due to hurricanes and then resolved in certain

14 safety-related activities.

15 Q    Okay.  Thank you.

16      Do you know if the INCs that you identified a moment

17 ago will be resolved once the Debtors perform these

18 activities?

19 A    I do, one of -- I know that -- my understanding is

20 that there are only two INCs that are currently remaining

21 outstanding on the properties, and one of them has been

22 satisfied, the work has been completed, that is in the

23 process of approving it.  I believe that is the West

24 Delta 79C facility.  100 percent of the work has been

25 completed on that facility and is pending at BSEE according

MICHAEL DANE - CROSS BY MR. ALANIZ                    277

1    to the update that I had heard from our team.

2             And the activity associated with the other

3    facility, West Delta 86A, it's 50 percent complete, there is

4    pending the remaining operations on that activity, it would

5    have been complete but there was another issue that came up

6    which requires addressing that issue before additional hard

7    work can be performed on that facility.  And so pending that

8    repair, which we anticipate doing in the coming couple of

9    months, the rest of that activity will be completed in very

10   short order since it's only around ten days of activity.  It's

11   50 percent complete.

12   Q    Okay.

13   A    And it has been re-established on all the rest of

14   these properties where there's a comment about re-

15   establishing egress.  That has all been completed.

16   Q    Okay.  So the Debtors are committed to resolving the

17   INC on that West Delta 86A?

18   A    Yes, sir.  And as a part of Agreed Activities and

19   that's something that we've already conducted half the work on

20   and intend to complete.

21   Q    Thank you.

22        Mr. Dane, in Mr. Perez's examination of you, you

23   mentioned the term sheet with Eni Petroleum US, LLC.

24   Correct?

25   A    Yes, I did.

MICHAEL DANE - CROSS BY MR. ALANIZ                    278

1  Q      Eni's term sheet contained an initial phase out

2  concept.  Correct?

3  A      It does, yes.

4  Q      Can you describe what that means?

5  A      So part of the -- part of the negotiation with -- the

6  Eni transaction happened subsequent to the Chevron

7  transaction.  And as I'm sure everyone is familiar with, you

8  know, whenever there's a publicly filed arrangement, folks

9  like to look at the previous deals and identify things that

10 they prefer that are publicly part of other deals.

11      And so by, you know, by observation of the previous

12 deal in respect to Chevron, in the Chevron transaction

13 Fieldwood agreed to contribute $5 million and Chevron's

14 preference was for that contribution to be utilized in order

15 to take out the properties.  The Credit Bid Purchaser is

16 going to be performing that work pursuant to a contract

17 operation agreement.  That was in -- within the context of a

18 broader commercial solution where there's a term sheet

19 arrangement and, you know, all the other mechanisms.

20      So Eni had observed that provision, and what they had

21 requested in the Eni term sheet was that the contribution

22 was not directly identified I don't believe in the Eni term

23 sheet with the data.  However, as a part of the broad

24 turnkey arrangement, they had asked that the properties be

25 staked out prior to year end, which is an activity that

MICHAEL DANE - CROSS BY MR. ALANIZ                    279

1  Fieldwood would conduct in any event under the turnkey --
2  under a turnkey deal where it is responsible for P&A.  The
3  stake-out operation is a precursor to P&A activity.
4  Q     Well, now I'm going to ask you if you could give the
5  Court maybe a contract the agreed activity versus the
6  stakeout.
7  A     Sure.  The Agreed Activity Schedule contemplates re-
8  establishing egress, which typically is associated with most
9  of the egress re-establishment associated with these
10 properties.  And as I mentioned, this was the original
11 Agreed Activities list.  This has a number of properties on
12 it that are now being handled pursuant to consensual
13 solutions.  So for instance the list gets cuts down I think
14 by about half when you remove the Chevron, Noble, Eni, Hunt
15 properties from this list.
16      The egress re-establishment with respect to the rest
17 of these properties is physically associated with preparing
18 Gulf landings, repairing heliports, repairing some
19 stairwells, you know, ladders to be able to access the
20 platform to be able to -- to be able to observe any
21 compliance related maintenance items that you need to
22 establish that you need to be able to conduct.  So the
23 Agreed Activities here contemplates generally re-
24 establishing egress, and there was certain safety related
25 INCs that were identified that would be completed as well.

1       Staking out a facility is a much more expensive work

2  scope.  Staking out, generally in my mind when I understand

3  the term -- what I understand the term staking out a

4  facility to mean is that you are preparing the facility to

5  be able to be completely decommissioned, and particularly

6  with respect to the platform abandonment, a critical element

7  of that decommissioning work is rendering the platform

8  completely hydrocarbon free, completely flushing and filling

9  and draining all of the lines and vessels, all of the piping

10 equipment.

11      It is a series of steps that is a much more extensive

12 campaign that's necessary in order to ultimately conduct the

13 plugging and abandonment, but not required to maintain the

14 site in a way that it could anything for ordinary safety.

15 Q    Thank you.

16      I think you may have answered my next question, but I'm

17 going to ask it anyway, it's just more direct.  There's a

18 reference in the Eni term sheet, which we can look at if you

19 need to refresh your recollection, but there's a reference to

20 leaving the properties hydrocarbon free, and I wanted you to

21 explain what that means to leave a property hydrocarbon

22 free.

23 A    I believe, in my opinion, leaving a property fully

24 hydrocarbon free suggests that that is the equivalent of a

25 true safe operation where you are flushing, filling,

1  draining the vessels, you're drilling them at the low points,

2  you are doing a number of other activities in order to

3  prepare the facility for platform abandonment work, such

4  that you can abandon the actual platform without needing to

5  take any further steps prior to removing the physical

6  structure.

7  Q     And this activity is not part of the agreed activity

8  that the Debtors have agreed to perform on the West Delta

9  properties.  Correct?

10 A     No, that is not, it's specifically not.  The company

11 had a number of conversations and discussions with the

12 Government internally as to what the appropriate status of

13 these facilities was at the time of abandonment, and the

14 company committed to maintain the facilities in a state that

15 did not -- that it does not represent any imminent harm to

16 safety or the environment, and the list of activities that

17 the company believes accomplishes that is addressed through

18 both this list of Agreed Activities and also the transition

19 services list that outlines what type of safety thing and

20 regular maintenance activities would be expected.

21 Q     Okay.  And thank you.  I appreciate the explanation.

22 I think my simple question, though, is with respect to the

23 West Delta properties, those will not be left hydrocarbon

24 free.

25 A     No, they are not contemplated to be left hydrocarbon

1  free.  They -- the West Delta properties at the request of

2  Hess have been shut in and are in a state in which they are

3  not operating and there's -- the facilities are being

4  remediated pursuant to the schedule that we just discussed

5  with the fact that I was just advising you of.  But, no,

6  they're not intended to be left fully hydrocarbon free at the

7  time of abandonment.

8  Q    Okay.  Thank you.

9       So moving on, Mr. Dane, I only have a couple more

10  questions.  With respect to Chevron, are the Debtors also

11  performing a stake out for Chevron?

12  A    Pursuant to the agreement that's contemplated for that,

13  that we have definitive documentation that is executed,

14  there is a provision that the -- that we will be staking out

15  all the properties by no later than year end the properties

16  that are not intending to produce any longer.  Plus, there

17  are properties in Fieldwood for an entity that has

18  meaningful future production, those are not going to be

19  staked out.  The properties that are going to be scheduled

20  for future abandon will be staked out.  And that is --

21  that's -- you're correct, that is a part of that transaction.

22  Q    Is the stake out activities similar to what the

23  Debtors are doing for Eni?

24  A    Yes, it is.

25  Q    As you sit here today, Mr. Dane, are the Debtors

1  willing to perform those stake out activities on the West

2  Delta properties at the Debtor's expense?

3  A     So the way I've been described, the stake out

4  activities that we discussed is a much more significant

5  scope of work than what's contemplated under the Plan that

6  would have been discussed with Government as the appropriate

7  status of these facilities.  That's a significant incremental

8  commitment.

9         And as you know, Fieldwood's position as we have

10  discussed, you know, very recently is that we would

11  certainly contemplate -- we've updated -- our objective has

12  been defined as many consensual solutions and possible

13  process of every counterparty.  We understand that at this

14  point it's something that Hess is focused on.  But for

15  meaningful incremental commitments of capital beyond what

16  the parties -- the company believes is a safe status of the

17  facility and the Government understands the proposal to be,

18  so we would be willing to do that in the context of a

19  broader arrangement to the extent that there would be one

20  just to make that incremental commitment is not something

21  that is contemplated by the Plan.

22  Q    So what I'm hearing you say is that Hess would have to

23  agree to some longer term arrangement with Fieldwood in

24  order for the Debtors to review the property as hydrocarbon

25  free.

1  A     I don't think that -- yeah, I think that that's

2  generally correct.  I think when we discussed the Chevron

3  transactions, the Eni transactions, the reason that there

4  was a contribution associated with those transactions is

5  because it was in the context of a broader framework.

6       The broader framework established all the different

7  ways that those properties are going to be P&A, it

8  established that those parties were going to provide funding

9  for the ultimate P&A, it established the timing of how those

10 facilities were going to be P&A, and each of the parties'

11 response -- respective obligations to each other.

12      What I understand Hess to be asking is just for an

13 incremental commitment without any obligation to each other.

14 What I understand Hess to be asking is just for an

15 incremental commitment without any obligation -- to settle

16 on what a more comprehensive solution for the entire field

17 would be.  And so I think that that's not something that

18 contemplated under this Plan because we don't think it's

19 necessary for purposes of leaving the facilities in a safe

20 state.  But it certainly is something that the company would

21 be willing to contemplate.

22      The other thing that has been discussed with your

23 client specifically is the company now has a very

24 significant number of projects that it needs to conduct.

25 Safe activity is a very delicate activity.  You're removing

1  hydrocarbons from a facility.  It needs to be done in a very

2  careful manner with very qualified individuals.

3          Due to the fact that Fieldwood has now an agreement

4  with Chevron, now an agreement with Eni, it's going to be

5  assisting with the Fieldwood One properties, there's a very

6  significant amount of activity that Fieldwood is going to be

7  conducting, and the credit bit purchaser, et cetera is going

8  to be conducting on stake out.  There's an allocation of

9  recourse consideration that we're very thoughtful about in

10  order to utilize those crews.

11          We are basically at full capacity in terms of viewing

12  the stake out work that we can handle for the foreseeable

13  future.  It may be possible to squeeze in a double project

14  here or there, but it's not possible to vastly increase the

15  scale of stake out activities the company is doing, which is

16  why the company encouraged predecessors to engage earlier

17  than within the last couple of weeks.

18  Q    Well, and going back to my earlier question, we have

19  been -- we have been communicating for at least a couple of

20  months.  Correct, Mr. Dane?

21  A    I don't think that there was any substantive

22  conversations until very recently with respect to Hess.

23  Q    Okay.

24  A    But there have been over the course of the last month,

25  I would agree with that.  Over the course of the last month

1  essentially, if I was to just go by memory, there's been a

2  willingness to discuss context that may result in consensual

3  solutions.

4  Q     Thank you for your time, Mr. Dane.

5           MR. ALANIZ:  Pass the witness, Your Honor.

6           THE COURT:  Thank you, Mr. Alaniz.

7           THE WITNESS:  Thank you very much.

8           THE COURT:  Does anyone else have any questions

9  for Mr. Dane this evening?

10          MR. KUEBEL:  Your Honor?

11          THE COURT:  Yes.  Who was that?

12          MR. KUEBEL:  This is Rick Kuebel.

13          THE COURT:  All right.  Go ahead, Mr. Kuebel.

14          MR. KUEBEL:  Your Honor, before I get started just

15 by way of a process check.  I think that's some questions for

16 the witness.  Maybe the infamous 20 questions or so, most of

17 which deal with the release and exculpation issues that I

18 had raised with the Court earlier.  I know there are a few

19 other predecessors that will be interest owners that have

20 indicated they may have similar questions.

21          We were supposed to have a 7:00 p.m. call with the

22 Debtors, and specifically Mr. Carlson, to try to knock out

23 language.  We've been going back and forth with language that

24 could be inserted in the Confirmation Order that would

25 resolve this part of our objection.  And so by way of

1   process check, I thought I'd kind of poll the Debtor and the

2   Court and ask whether -- since it's after 7:00 already

3   tonight, if the preference is for us to try to use time to

4   resolve language that will obviate the need for myself and

5   potentially others to question Mr. Dane about these issues

6   or whether the preference is to just proceed ahead?

7           THE COURT:  I'm thinking it's getting pretty late,

8   and if you're on the verge of thinking you're going to

9   minimize that, it may make some sense.

10          Does anybody -- Mr. Baay, I know that you wanted

11  to address that.  I'll activate your line and we'll hear from

12  others.  It may make some sense to come back tomorrow.

13          Does anybody believe we should just continue on

14  tonight?

15          MR. PEREZ:  Your Honor, I hate to be the party

16  pooper, but to the extent that we're only talking about two

17  additional individuals I don't think at this point I'm going

18  to have any Redirect.  I would rather try to get Mr. Dane

19  off the witness stand.

20          THE COURT:  All right.  Let's take a 10-minute

21  break, we'll come back at 7:20 and we'll pick it up then.

22  Thank you.

23          MR. PEREZ:  Thank you.

24      (Recess taken from 7:11 p.m. to 7:20 p.m.)

25                      AFTER RECESS

1           THE COURT:  All right.  Let's go back on the

2    Record and we'll resume the Fieldwood hearing.

3           Mr. Kuebel.

4        (No verbal response)

5           THE COURT:  I can't hear you.  I don't know, you

6    may have your own line muted because I didn't touch

7    anything.  There we go, hold on.

8           All right.  Mr. Kuebel, go ahead, please.

9           MR. KUEBEL:  Your Honor, can you hear me?

10          THE COURT:  I can.  Yes, sir.

11          MR. KUEBEL:  Can you hear me now, Your Honor?

12          THE COURT:  I can.  Thank you.

13          MR. KUEBEL:  Okay.  Thank you.  Thank you, Your

14   Honor.  Just making sure that we have Mr. Dane.  There he

15   is, great.  Thank you, Your Honor.

16               CROSS-EXAMINATION OF MICHAEL DANE

17   BY MR. KUEBEL:

18   Q    Good evening, Mr. Dane.  My name is Omer Kuebel, III.

19   As you may know, I go by "Rick."  I'm representing a number

20   of predecessors and working interest owners in this

21   bankruptcy, including McMoRan Oil and Gas, Freeport McMoRan,

22   and ConocoPhillips.  You may recall that -- I don't know

23   that we've personally met, but I believe we've been on a

24   number of phone calls or Zoom calls during the course of

25   this case.

MICHAEL DANE - CROSS BY MR. KUEBEL                289

1   A    I do.

2   Q    Do you recall?

3   A    I do.  Nice to see you.  Thank you.

4   Q    Great.

5        Are you aware that the Debtor is a member of operating

6   agreements or Joint Operating Agreements with McMoRan?

7   A    I am aware there's various agreements within the

8   company.

9   Q    Well, specifically, are you aware that there are

10  operating agreements that govern the operations of OCS

11  leases?

12  A    Yes.

13  Q    I take it the Debtor is a party to a number of such

14  operating agreements; is that correct?

15  A    Yes, they have quite a few.

16  Q    Is it fair to say that those operating agreements work

17  in tandem with other types of agreements, like production

18  handling agreements or marketing agreements or

19  transportation agreements?

20        MR. PEREZ:  Object to the form of the question,

21  Your Honor.  Vague.

22        THE COURT:  Sustained.

23  BY MR. KUEBEL:

24  Q    Mr. Dane, are you aware that the Debtor is also a party

25  to production handling agreements or farm-out agreements

1  with McMoRan?

2  A    I'm not -- I'm not specifically aware of production

3  handling agreements that are outstanding with McMoRan, but

4  it wouldn't surprise me if there were.

5  Q    Okay.  Well, have you personally been involved in the

6  decision on deciding which operating agreements to assume or

7  reject?

8  A    I've been a part of a team that evaluates that, but I

9  haven't reviewed every agreement to determine if we should

10  assume or reject it.  I -- we -- we have a large group of

11  people that did that evaluation, and I certainly provided

12  input on a number of contracts, but definitely by no means

13  all of them.

14  Q    There are a very large number of such agreements, are

15  there not?

16  A    Yes, there are.

17  Q    Mr. Dane, for purposes of my next handful of questions,

18  I'm going to refer to the Debtors' Plan.  And when I mean

19  the term "Plan," I'm specifically referring to the Fifth

20  Amended Plan that the Debtors filed, I believe it's at

21  Docket No. 1629.  It has also been referred to, I think

22  today, as Exhibit 105.

23       Do you have a copy of that Plan, the Fifth Amended

24  Plan, with you?

25  A    I believe I do.  Sorry.  Can you give me the -- the

MICHAEL DANE - CROSS BY MR. KUEBEL                    291

1  docket number again?

2  Q    I believe it was referred to as "Exhibit 105" in your

3  book by Mr. Perez.  It was Docket No. 1629 as filed.  And I

4  believe it may have another docket number with the Debtors'

5  Witness List, maybe 1646.

6  A    I'm looking at 1641, which I believe was the Fifth

7  Amended Plan.

8  Q    All right.  Thank you.

9  A    Is that (glitch in the audio).

10 Q    Mr. Dane, during your direct examination by Mr. Perez,

11 Mr. Perez asked you questions regarding the release -- asked

12 you questions about the release and exculpation provisions

13 of the Plan.

14      Do you recall those questions?

15 A    I do.

16 Q    I take it that you have reviewed Section 10.7 of the

17 Plan that contains the Plan releases?

18 A    I have at various times, yes.

19 Q    Does the Plan contain third-party releases or

20 non-Debtor releases?

21 A    I believe it does.

22 Q    And are those third-party releases consensual?

23 A    Yes.

24 Q    And did creditors such as McMoRan have an opportunity

25 to opt out of the releases in Section 10.7 of the Plan?

1  A     Yes, I believe they did.

2  Q     And in fact, are you aware of whether McMoRan opted

3  out?

4  A     I do not know, but I imagine they did, given that they

5  objected.

6  Q     Are you familiar with the exculpation provisions of the

7  Plan in Section 10.8?

8  A     Yes, I am.  I've -- I've reviewed them at various

9  times.

10  Q    Does the exculpation provision in Section 10.8 of the

11  Plan exculpate or release third parties?

12         MR. PEREZ:  I object to the form of the question,

13  Your Honor.  I think it calls for a legal conclusion.  I

14  believe the document speaks for itself.

15         THE COURT:  The question, as worded, calls for a

16  legal conclusion, Mr. Kuebel.  I'm not trying to keep you

17  out of this area, if you want to reword it.  But I think, as

18  worded, you've asked --

19         MR. KUEBEL:  Well, let me --

20         THE COURT:  -- him what it legally is, so.

21         MR. KUEBEL:  I will be happy to reword it, Your

22  Honor.  I'll withdraw the question and ask another one.

23         THE COURT:  Thank you.

24  BY MR. KUEBEL:

25  Q    Mr. Dane, do you know the identity of the parties that

1  are exculpated by Section 10.8 of the Plan?

2  A    I believe that's included in -- in the Plan.  And I --

3  you know, I would want to refer to the document in order to

4  provide you with a list of the parties because I know that

5  there's a number of them.

6  Q    And do you recall whether a number of those parties are

7  non-Debtor parties?

8  A    Yes.

9  Q    And I don't want you to engage in a guessing game.  I

10 -- by my number, the definition of "exculpated parties" as

11 defined in the Plan, I've got it on page 15.

12 A    I think I'm looking at a -- I'm looking at a redline of

13 the document.  Are you -- can you give me a specific section

14 or definition?

15         THE COURT:  So he's looking actually at page 10 of

16 the Plan; it's ECF page 15.  And the definition is

17 "exculpated parties."

18         THE WITNESS:  Thank you, Your Honor.

19         Okay.  I have that, Mr. Kuebel.

20 BY MR. KUEBEL:

21 Q    Is it your view that every one of these exculpated

22 parties made a substantial contribution to the Plan process?

23 A    My understanding of -- of the basis for the parties

24 that the Plan contemplates being defined as "exculpated

25 parties" is consistent with what you're saying, which is

1  that these parties contributed in a meaningful way to the

2  Plan process.

3  Q    Mr. Dane, has Fieldwood One been formed yet?

4  A    No, it has not.

5  Q    Has Fieldwood Four been formed yet?

6  A    No, it has not.

7  Q    Has Fieldwood Three been formed yet?

8  A    No, it has not.  Well, Fieldwood Three is technically

9  Fieldwood Energy, Inc, so it exists, but it is not going to

10  exist in the same way after the effect of the divisive

11  mergers, where properties that were allocated out of it.

12  Q    Are these Plan exculpation provisions set forth in

13  Section 10.8 consensual?

14         MR. PEREZ:  Object to the form of the question.

15  Calls for a legal conclusion.

16         THE COURT:  Overruled.

17         THE WITNESS:  I would defer to our counsel on

18  that.  I know that -- I know that there are -- when I look

19  at this list of exculpated parties, I know that many of the

20  releases related to these parties were consensual.  But I

21  don't know -- I don't know if -- if that is -- if it's by

22  definition under the Plan that it was consensual or not.  I

23  would defer to our counsel.

24  BY MR. KUEBEL:

25  Q    Well, do you know whether there was an opt-out for

MICHAEL DANE - CROSS BY MR. KUEBEL                    295

1   working interest owners and predecessors to these

2   exculpation provisions?

3   A    I'm not aware.

4   Q    Mr. Dane, while we're looking at the definition

5   section, could I ask you to maybe scroll a page or so

6   forward and look at the Plan definition of "Additional

7   Predecessor Agreement Documents?"

8        (Pause in proceedings)

9   A    Okay.  I have that.

10  Q    Do you understand or do you know whether these

11  Additional Predecessor Agreement Documents are addressed or

12  fall within the scope of the Plan exculpation provisions?

13  A    I would defer to our counsel on that.  I'm not -- I

14  don't -- I would need to see where that definition traces

15  back to, to give you an answer.

16  Q    Did you have any understanding of what documents are

17  covered by this definition of "Additional Predecessor

18  Agreement Documents?"

19  A    I -- I believe that it's consistent with the definition

20  that's directly above it, which is any consensual agreement

21  that the Debtors may enter into prior to the confirmation

22  date with any entity or entities in the chain of title for

23  working interest owner or other related party for any of the

24  properties.

25  Q    And that definition --

MICHAEL DANE - CROSS BY MR. KUEBEL                          296

1  A      And --

2  Q      I'm sorry.  Go ahead.  I don't want -- I'm sorry, I

3  didn't mean to interrupt you.

4  A      Oh, I'm sorry.  My understanding is it's just the

5  documents associated with additional predecessor agreement.

6         (Pause in proceedings)

7  Q      Mr. Dane, do you know whether it's the Debtors' intent

8  to include predecessor contracts such as operating

9  agreements or PSAs or PHAs inside of the ambit of this

10 definition?

11 A      I would have to consult with our counsel, but I believe

12 that those are independent contracts.  There -- there was a

13 separate determination of all of the contracts that the

14 company currently has, as to whether it's going to be

15 assumed or rejected.  That's also the case with respect to

16 consensual agreements that we have reached with

17 predecessors.  In many of those cases, those are contracts

18 to which there may some applicability to the properties that

19 are a part of the consensual solutions are still being

20 rejected.  In some cases, there are contracts that are being

21 assumed and allocated.

22        So I think it -- I think it is -- that there's not a

23 single answer to that.  I think it's a contract-by-contract

24 evaluation with respect to the agreement that the -- well,

25 whatever the terms of the consensual agreements that were

1  contemplated.  I've seen it both ways.

2  Q    Okay.  Thank you, Mr. Dane.  I do not have any further

3  questions for you at this time.

4             THE COURT:  Mr. Kuebel, thank you.

5             THE WITNESS:  Thank you very much.

6             THE COURT:  Does any other party have any

7  questions for Mr. Dane this evening?  If so, please press

8  five-star one time on your phone.

9        (Pause in proceedings)

10            THE COURT:  Mr. Eisenberg.

11            MR. EISENBERG:  Your Honor, Philip Eisenberg on

12 behalf of W&T Offshore and Merritt Energy.

13            THE COURT:  Go ahead, please, Mr. Eisenberg.

14            MR. EISENBERG:  May I proceed?  Thank you.

15                CROSS-EXAMINATION OF MICHAEL DANE

16 BY MR. EISENBERG:

17 Q    Mr. Dane, I'll try to be brief, as well.

18      Do you understand that the exculpation provision covers

19 performance under agreements even after the effective date

20 of the Plan?

21            MR. PEREZ:  Your Honor, there's no foundation for

22 Mr. Dane to answer this question, you know, the

23 interpretation of a legal document.

24            THE COURT:  Overruled.

25            THE WITNESS:  Mr. Eisenberg, I would -- I would

1  defer to our counsel to answer that question.

2  BY MR. EISENBERG:

3  Q    Yeah, but I wanted to know your understanding.  If you

4  have no understanding, that's fine.

5  A    I don't want to speculate.  I would -- I would defer to

6  counsel and want to review the document.

7  Q    Well, you just had the document in front of you.  Can

8  we pull it back up, so we can look at it, or will that not

9  help you at all?

10 A    I -- I think, to answer that question, I would want to

11 consult with our counsel.  I wouldn't feel comfortable

12 providing you an answer just based on my own knowledge --

13           THE COURT:  Yeah, I'm going to --

14 A    -- right now.

15           THE COURT:  I'm going to go back and now sustain

16 the objection.  You asked him what his understanding was,

17 and now you're asking him to read the document to form the

18 understanding.  Those are -- the second question does ask

19 for the legal conclusion; the initial one did not.

20           MR. EISENBERG:  Thank you, Your Honor.

21           He said that I would need to read it, and so I

22 just offered --

23           THE COURT:  I --

24           MR. EISENBERG:  -- for him to have an

25 understanding.

1           THE COURT:  This isn't your fault.  I'm just

2    saying it still leads to the same conclusion.

3         (Laughter)

4           MR. EISENBERG:  I gotcha.

5    BY MR. EISENBERG:

6    Q    Mr. Dane, you know who W&T Offshore is, right?

7    A    Yes, I do.

8    Q    They're a counterparty to many Joint Operating

9    Agreements with the Fieldwood entities.

10   A    Yes, that's right.

11   Q    And those agreements contain various provisions.

12   Pretty standard to have lien provisions in there, correct?

13   A    I -- that's a very broad question.  But there's

14   concepts and general ways that incorporate concepts around

15   liens, so if there is lien language in general.

16   Q    All right.  And so -- and you're aware that there are

17   multiple agreements with W&T, some of which are on your

18   executory contract lists and some of which are not, correct?

19   A    I would -- I would have to see the lists in order to be

20   able to answer that question, but it would not surprise me

21   that there are -- if you're asking are there contracts that

22   are being assumed and -- and both rejected with respect to

23   W&T, I would say the answer is probably "yes."

24   Q    Okay.  And the operating agreements that Fieldwood has,

25   in many occasions, Fieldwood was not the original party to

1  those operating agreements, correct?

2  A    That's correct.

3  Q    Right.  In fact, like many of them they bought from

4  Apache, so Apache was a party and Apache might have bought

5  it from somebody else.  And so there might have been parties

6  down the chain that were parties to that operating agreement

7  before Fieldwood, correct?

8  A    Yes, that's not uncommon.

9  Q    And the same thing with W&T, right?  They may not have

10 been the original parties, as well.

11 A    I haven't reviewed those specific documents, but as I

12 said, that that's not an uncommon thing to see.

13 Q    And do you know, also, that Fieldwood currently owns

14 properties on which W&T is a predecessor?

15 A    I do, that's correct.

16 Q    And there are several of those properties, correct?

17 A    I believe so, yes.

18 Q    In fact, as part of your discussions with many of the

19 operators or producers, you've sent packets to them, right,

20 and formulated lists of those properties as part of your

21 review?

22 A    That's right.  When we -- when we had a -- our Plan --

23 when we filed our Plan in January -- even prior to January,

24 we contacted a number of parties in the months in the -- in

25 the late third quarter, early fourth quarter, and then those

1  conversations continued through the early part of this year.

2  So, yes, there was various presentations, packages, and

3  other information exchanged with respect to how predecessors

4  were going to be impacted by various properties under the

5  different categories of our Plan.

6  Q    All right.  And Merritt was a predecessor on several of

7  the properties that are currently owned by Fieldwood, as

8  well, correct?

9  A    I -- I don't know the answer to that question.

10 Q    You don't know, one way or the other?

11 A    I -- I am not -- I'm not aware, not having reviewed our

12 Schedules, of Merritt being a direct predecessor or not.  I

13 couldn't -- I couldn't tell you one way or -- I know Merritt

14 has, you know, had a meaningful presence in the Gulf of

15 Mexico.  I know that we have a very substantial asset base.

16 So it wouldn't surprise me, but I just -- I can't

17 definitively tell you that answer, having not reviewed the

18 schedule.

19      We've got -- I know that Merritt is probably a

20 significant predecessor or predecessor that -- that I

21 understand has an operating interest that Fieldwood is

22 abandoning.  So, in the context of understanding every

23 single predecessor, I don't have that answer without looking

24 at the detailed Schedules.

25 Q    All right.  Okay.  So let's talk about the Schedules.

1   And when you say "Schedules," you understand that each of

2   the Debtor entities filed Schedules as part of the matters

3   that it had to provide to the Court, Schedules of Financial

4   Affairs, Schedules of assets and things of that nature,

5   correct, sir?

6   A    I understand that there's been many filings of many

7   Schedules throughout this process.

8   Q    Were you the person who certified those of verified

9   them?

10  A    Yes.  Would you mind asking me about a specific

11  document?

12        MR. EISENBERG:  Well, I don't have a specific one,

13  Your Honor.

14  BY MR. EISENBERG:

15  Q    Do you recall verifying any of the Statements of

16  Financial Affairs or other Schedules of assets that

17  Fieldwood filed in this case?

18  A    Again, that's a very broad question.  I know we have

19  Monthly Operating Reports, which I sign, sometimes our Chief

20  Accounting Officer signs.  I know that, when we have filed

21  major documents, like our various versions of our Plan and

22  our Disclosure Statement and the supplements that have

23  various Schedules attached to the supplements of contracts,

24  I've reviewed those.

25        I don't know -- I'm -- your particular language around

1  certification, the only -- the only thing that I recall I

2  specifically certified or signed are my declarations, my --

3  the Monthly Operating Reports.  There may be other

4  documents, but those are the ones that I recall specifically

5  signing prior to filing, other that reviewing everything

6  with our counsel.

7  Q    All right.  I know it's late, but I'm just trying to

8  wrap this up for you.

9       (Pause in proceedings)

10 Q    All right.  So you know what an opt-out is with regard

11 to the releases, right?  It was a form that said opt out,

12 right, of the releases, right?

13 A    Yeah.  That -- that's what I understand.

14 Q    Okay.  Was a similar form -- or did that form include

15 the exculpation provisions in 10.8, to the best of your

16 knowledge?

17 A    I would have the same question earlier, that I would

18 have to consult counsel to -- to answer that question.  I --

19 I don't know the answer offhand.

20      (Pause in proceedings)

21 Q    Is it your understanding that the exculpation

22 provisions of a contract impair or affect the rights of

23 parties to pursue claims against non-Debtor third parties?

24      MR. PEREZ:  Object to the question, Your Honor.

25 Calls for a legal conclusion.

1          THE COURT:  Sustained.

2     BY MR. EISENBERG:

3     Q    Do you personally know why the exculpations were

4     written the way they were?

5     A    The exculpations were an important point to the various

6     parties that are identified as exculpated parties.  This was

7     something that -- exculpations and releases were generally

8     heavily negotiated provisions of various agreements,

9     particularly with respect to the parties that were integral

10    to our restructuring.  So I think they were negotiated as

11    part of the various transactions that we did in order to

12    establish an overall Plan.

13    Q    But do you know personally know why they say what they

14    say?

15    A    Well, I understand why someone would want to be

16    released or exculpated.

17    Q    But do you understand why the specific words in the

18    particular exculpation provisions in 10.8 are in 10.8?

19    A    I'm having a hard time with that question.  It feels a

20    little vague to me.  I mean, I -- I know that I -- the

21    process by which we negotiate the documents it is we hire

22    counsel, who has broad experience with respect to

23    restructuring processes, generating Plans and Disclosure

24    Statements, negotiating with parties through a restructuring

25    transaction.  They start with language that would be, in

1    their minds, acceptable for purposes of a Plan, based on, I

2    assume, their experience.  And I know that these provisions

3    are specifically negotiated with the parties that need to be

4    released or exculpated, and there's adjustment to the

5    language to accomplish the parties' objectives.  But based

6    on that process, that's how I understand these documents,

7    like most negotiated documents get crafted.

8    Q    And do you have any personal knowledge of whether

9    adjustments were made to the language in that process?

10   A    I would refer to the various redlines that we've

11   posted.  I don't recall offhand the iterations of these

12   particular sections, other than the additions of additional

13   parties as appropriate, once we reached -- once we reached

14   further consensual solutions and it was appropriate.

15   Q    Okay.  Well, let's talk about those additional parties.

16   Chevron just got added to the exculpation provision?

17   A    I believe they are an exculpated party.

18   Q    And Chevron, the predecessor is co-liable on the

19   properties that are going into Fieldwood Four, correct?

20   A    As -- as I testified earlier, the basis for the

21   properties that comprise Fieldwood Four are certain

22   properties which Chevron has joint and several liabilities

23   for.

24   Q    And that's the same for Apache and Fieldwood One?

25   A    The basis for the Fieldwood One entity was properties

1  for which Apache had joint and several liability.

2  Q    And that's another way of saying they are already

3  liable for the P&A, correct?

4  A    They have joint and several liability under the

5  regulations, so with respect to decommissioning for assets

6  in which they're in the chain of -- they were in a chain of

7  title.

8         MR. EISENBERG:  All right.  I have no further

9  questions, Your Honor.

10        THE COURT:  Thank you.

11        Mr. Baay.

12     (No verbal response)

13        THE COURT:  Mr. Baay?

14        MR. EISENBERG:  I thought you said goodbye to me,

15  Judge.  I think --

16     (Laughter)

17        MR. EISENBERG:  Which you may have, which, at this

18  time of night, that's --

19        THE COURT:  Mr. Baay, do you have any questions?

20  I think you need to unmute your own line, Mr. Baay.

21     (No verbal response)

22        THE COURT:  Well, let's see.  Okay.  So you dialed

23  back in.  Let me get you hooked up here.  I apologize.

24  Mr. Baay.

25        MR. BAAY:  Thank you, Your Honor.

1              THE COURT:  Yeah, let's try it now.  Go ahead,

2  please.

3              MR. BAAY:  Can you hear me, Your Honor?

4              THE COURT:  I can.  Thank you.

5              MR. BAAY:  Okay.  Your Honor.  I don't know.

6  Somehow I got dropped and dialed back in.  Thank you, Your

7  Honor.

8              And again, this is John Baay for LLOG Exploration

9  Offshore and LLOG Energy.

10                  CROSS-EXAMINATION OF MICHAEL DANE

11  BY MR. BAAY:

12  Q    Good evening, Mr. Dane.  How are you?

13  A    I'm well.  Thank you very much.  Good evening.

14  Q    Mr. Dane, I apologize.

15  A    Okay.

16  Q    Do you recall testifying in January regarding LLOG and

17  -- you know what I'm talking about if I say "LLOG,"

18  obviously, right?

19  A    Yes, I do.

20  Q    Okay.  LLOG's motion for adequate protection and motion

21  to lift stay, you provided some testimony, correct?

22  A    Yes, I did.

23  Q    And that's Central time?

24  A    I'm sorry.  Would you mind repeating the question,

25  please?

1  Q    I'm just asking if you have reviewed that testimony,

2  that transcript since you gave it back in January?

3  A    No, I did not.

4         MR. BAAY:  Okay.  Your Honor, LLOG filed its

5  Exhibit List at 1603, and we're not going to use very many

6  of these exhibits.  Can I -- but I wanted to go ahead, just

7  a housekeeping matter, and offer the exhibits that we have

8  an agreement with Debtors' counsel, so that we get those

9  into evidence.  And I may use a couple of them this evening,

10 if that's okay.

11        THE COURT:  Which ones are there an agreement on?

12        MR. BAAY:  The ones agreement are our L-1 and L-2

13 to 1 and 2.

14        THE COURT:  So you're offering 1603-1 and 1603-2?

15        MR. BAAY:  Yes, Your Honor.

16        THE COURT:  Any objection to the admission of

17 1603-1 and 1603-2?

18        Hold on.  Ms. Hayden, I actually think you're

19 calling to ask your own questions, but I need to know if you

20 have any objections to those, since you raised your hand, as

21 well.

22     (No verbal response)

23         THE COURT:  Does any party object to 1603-1 or 2?

24        MR. PEREZ:  Do you have any objection?

25        MS. CHOI:  Yes.

MICHAEL DANE - CROSS BY MR. BAAY                    309

1          MR. PEREZ:  Your Honor, Ms. Choi is --

2          MS. CHOI:  No objection.

3      (Participants speak simultaneously)

4          MR. PEREZ:  We have no objection, Your Honor.

5          MR. BAAY:  The next set is L-4 through L --

6      (Participants speak simultaneously)

7          THE COURT:  Hold on, hold on.  Wait, wait, wait.

8  I've got somebody else that wants to speak.  Let me find

9  them.

10         Mr. Genender, your line is active already.  You

11 don't need to press five-star.  Go ahead.

12         UNIDENTIFIED:  No objection, Your Honor.

13         THE COURT:  Thank you.  All right.  There are no

14 objections, 1603-1 and 2 are admitted.

15     (LLOG Exhibits 1603-1 and 1603-2 received in evidence.)

16         THE COURT:  Go ahead, please, Mr. Baay.

17         MR. BAAY:  The next set is L-4 through L-6, which

18 is at 1603-4 through 1603-6.

19         THE COURT:  Any objection to 1603-4, 5, and 6?

20     (No verbal response)

21         THE COURT:  All right.  They are admitted.

22     (LLOG Exhibits 1603-4 through 1603-6 received in

23 evidence.)

24         MR. BAAY:  So Exhibits L-8 through L-20 is at

25 1603-8 through 1603-21.

1          THE COURT:  Any objection to 1603-8 through 21?

2          THE COURT:  We do have --

3          MS. CHOI:  No objection.

4          THE COURT:  We do have an objection.  Hold on, let

5   me see who we have.

6          Ms. Hayden, your line is active.  Go ahead, you

7   don't need to press five-star again.  Do you have an

8   objection?

9       (No verbal response)

10          THE COURT:  Ms. Hayden?

11       (No verbal response)

12          THE COURT:  Ms. Hayden, you may have your own line

13   muted.

14          MS. HAYDEN:  I apologize.  I was not meaning to

15   object to this, Your Honor.  I apologize.

16          THE COURT:  Oh, no problem.

17          MS. HAYDEN:  I was really meaning --

18          THE COURT:  I'm going to leave your line active,

19   so that you can ask questions when Mr. Baay is done.

20          MS. HAYDEN:  Okay.  Thank you.

21          THE COURT:  Thank you.

22          All right.  1603-8 through 21 are admitted.

23       (LLOG Exhibits 1603-8 and 1603-21 received in

24   evidence.)

25          MR. BAAY:  And the last set, Your Honor, is L-24

1   through L-40, which are found at Docket 1603-25 through

2   1603-41.

3          THE COURT:  Any objection to 25 through 41?

4       (No verbal response)

5          THE COURT:  1603-25 through 41 are admitted.

6       (LLOG Exhibits 1603-25 through 1603-41 received in

7   evidence.)

8          MR. BAAY:  Thank you, Your Honor.

9   BY MR. BAAY:

10  Q    Mr. Dane, are you familiar with Fieldwood overriding

11  royalty interest in Green Canyon 201 in the northeast corner

12  of 17,000 feet?

13  A    Yes, I'm -- yes, I am.

14  Q    Okay.  That is an overriding royalty interest that was

15  acquired from Shell in 2015, correct?

16  A    I believe so.

17  Q    And based on the Amended Disclosure Statement, that

18  interest is being sold to the Credit Bid Purchaser, correct?

19  A    Correct.

20  Q    And it's being sold free and clear of any liens,

21  correct?

22  A    That's my understanding.

23  Q    And it's Fieldwood's position that I believe you

24  learned during your testimony in January that Fieldwood was

25  taking the position that LLOG does not have a security

MICHAEL DANE - CROSS BY MR. BAAY                    312

1  interest or a mortgage on that royalty -- overriding royalty

2  interest, correct?

3  A    Yes.

4  Q    And you were aware, back in January and currently, that

5  LLOG took that position that claims in overriding royalty

6  interests -- claimed that this overriding royalty interest

7  secures Fieldwood's obligations under the Offshore Operating

8  Agreement that covered Green Canyon 201 and Green

9  Canyon 157, correct?

10 A    I -- I understand that LLOG has that interpretation.

11 Q    We're working on a deal to deal with these issues post-

12 confirmation, so I will -- I'm hoping that that goes

13 through, but wanted to get these questions in and just be

14 sure to make a record in case something happens.

15      The Credit Bid Purchasers don't have any kind of

16 security interest or lien on this overriding royalty

17 interest, correct?

18 A    I'm sorry.  Do you mind specifying?  Are you asking

19 about the current lenders under the current Fieldwood credit

20 agreements, or are you asking about the future Credit Bid

21 Purchasers with respect to the lien position that they'll

22 have under their new facility?

23 Q    That's a very good point.  The -- I'm talking about the

24 current lenders who are making a bid for that certain group

25 of assets that are described in the Disclosure Statement, to

1   include this overriding royalty interest.

2   A     I -- I don't know.

3   Q     (Indiscernible).

4   A     I would have to consult our --

5   Q     (Indiscernible).

6   A     I would have to consult our --

7   Q     Do you know if there are certain assets that are being

8   purchased by the lenders that are going to NewCo that

9   they're just purchasing as part of the assets, not because

10  they have any kind of a security interest in them?

11  A     I -- I would have to review the Schedules to check

12  which -- which properties specifically have liens, versus

13  what interest -- what assets are being transferred that may

14  not have liens.  It's just there's a number of properties

15  and I don't know off the top of my head.

16  Q     All right.  Do you know how much is being paid for this

17  overriding royalty interest?

18  A     No.

19  Q     If -- assuming that it is not part of the secured

20  assets, but it is an unencumbered asset that is going to

21  NewCo, do you know how much, if any, of the $105 million in

22  cash has been allocated to this override?

23  A     No.

24  Q     Do you know how much Fieldwood is currently receiving

25  each month as a result of this override?

1  A    I -- I reviewed the Schedules at the time of the last

2  hearing, but I don't -- I don't recall what the amount is

3  for that.

4  Q    Okay.  Is this a valuable asset for the Debtors?

5  A    I think it has value, which is why it is something

6  that's contemplated being owned by NewCo.  But you know,

7  frankly, any override has value because it's not burdened by

8  -- by cost.  Most of -- I believe most of the Debtors'

9  overrides that are not a portion of the Fieldwood One entity

10 are being acquired by the Credit Bid Purchaser, and this is

11 one of those overrides.

12 Q    Okay.  How does Fieldwood value assets like this

13 override?

14 A    Field -- in the same way Fieldwood would value any oil

15 and gas interest.  It would look at its estimation of future

16 reserves.  It would conduct an analysis consistent with how

17 we value our reserves, whether we -- we look at the Klein

18 curve analysis or volumetric analysis.  We have our

19 corporate reserves team value reserves; in some cases,

20 they're audited.  So we would look at the properties that

21 this override is attached to, understand the performance,

22 the -- the expected recoveries, any future potential upside.

23 Q    Okay.  Are you familiar then with the terms proved,

24 proven, probable, and proved, probable, and possible?

25 You're familiar with those valuation concepts?

1    A      Yes, I am.

2    Q      Okay.  Do you know how -- whether this override is

3    valued by Fieldwood as a proved or one P or two P proved,

4    plus probable, or three P proved, plus probable, plus

5    possible?

6    A      Generally speaking, for most assets that Fieldwood

7    owns, it values -- it -- "value" may not be the right word.

8    But if performs -- it performs reserve estimation that would

9    allow it to understand proved reserves, probable reserves,

10   and possible reserves.

11          In some cases, for assets that we don't have as much

12   knowledge of or data to support, assets that may just be an

13   override or may be a non-operated working interest owner,

14   there's not always a separate proved, probable, possible

15   evaluation done.  And I'm not aware specifically of this

16   asset, if we have multiple reserve estimations done at

17   different reserve category levels or not.

18   Q      Okay.  Are you aware that Fieldwood used the two P, or

19   proved plus probable values from its reserve report for

20   valuations associated with the Plan in this case, in

21   general?

22   A      Yes.  I -- I'm sorry, let me qualify that.  I

23   understand that our expert's report considered in its net

24   asset valuation probable reserves.

25   Q      Okay.  Which would include proved reserves.

1   A     Right, it --

2   Q     Proved plus --

3   A     Well, it is a -- probable reserve category is its own

4   category.

5   Q     Right.

6         Under the Plan, assuming this asset gets sold to the

7   Credit Bid Purchasers, are the Debtors holding any cash

8   proceeds from the sale to satisfy LLOG's claims, should it

9   be determined that those claims are, in fact, secured by

10  this override?

11  A     I'm sorry.  Can you -- can you repeat that for me?  Are

12  the Debtors holding any?

13  Q     All right.  So the Debtors are receiving some cash as

14  part of the sale.  We went through the -- all the

15  considerations that's been received by the Debtors as part

16  of the Credit Bid Purchase, correct?  Do you remember that

17  testimony?

18  A     Yes.

19  Q     So part of that was $105 million in cash?

20  A     The -- the cash that's being provided is being used to

21  pay various Plan expenses.  It has a variety -- we reviewed

22  the sources and uses statement.  There is not currently

23  anything contemplated to set aside funds related to this

24  particular dispute.  And I don't think that -- I understand

25  that was the basis of the adequate protection motion that

1  LLOG filed, but I -- I thought -- I -- as I understand it, I

2  think that that issue is not resolved.

3  Q    Correct, okay.

4       Do you know how much LLOG is claiming as unpaid joint

5  interest billings under the Offshore Operating Agreement?

6  A    I know that LLOG is claiming that it's owed roughly

7  $900,000, which is an amount that's significantly in

8  dispute.  And that has been in dispute.

9  Q    Okay.

10 A    Fieldwood was aware of this balance for a long time,

11 and it was trying to negotiate with LLOG for a long period

12 of time to pay this balance, you know, before it entered

13 into Chapter 11, and it would have been paid.  I think we

14 reviewed with the Court during the last hearing the specific

15 discrepancies.  And there's a very simple schedule that

16 outlines those discrepancies.  And we've never been provided

17 with a reasonable answer as to why the balance is two times

18 higher.

19      But notwithstanding all that, given that we could never

20 understand and reconcile the Schedule with LLOG and so much

21 time elapsed, the company ended up filing for bankruptcy.

22 And at that point, it determined that those properties

23 probably ought to just be abandoned in any event, so it

24 largely became irrelevant in our -- in our opinion.  But we

25 dispute the -- the balance.

MICHAEL DANE - CROSS BY MR. BAAY                         318

1  Q    Okay.  And it have those adjustments that Fieldwood
2  believed are appropriate in this case, have those changed
3  since your testimony in January or are they roughly the same
4  as they were?
5  A    I'm not aware of any changes.  I -- I think I
6  understand -- this hasn't been an issue that I've been
7  particularly focused on since the hearing, but I think I
8  understand that Fieldwood believes the -- the Fieldwood
9  undisputed balance, I think, was around a half a million
10 dollars.  But again, it was associated with a -- an interest
11 that the company was contemplating abandoning or rejecting.
12 Q    Okay.  The last thing I want to ask you about are the
13 P&A liabilities associated with Green Canyon 201 and 157.
14 Are you familiar with those amounts?
15 A    Are you asking -- this -- sorry, just to clarify.  Are
16 you asking about the properties in which Fieldwood non-
17 consented and it has a 15 percent working interest in the
18 157 and 201 leases?
19 Q    Absolutely.
20 A    I have a -- I have a vague understanding, I think, of
21 what I recall some of those values potentially being.
22 Q    Okay.  And is that based on a BOEM estimate or a BSEE
23 estimate or some combination?
24 A    This isn't an overly material asset.  So I know that
25 I've seen the values at one point in time.  I think that I

1  recall that Fieldwood's 15 percent interest in these two

2  wells was something on the order of magnitude of

3  $2-3 million.  But I -- I, frankly, don't recall.  This is a

4  -- again, this is a small, non-operated working interest.

5  Q    Okay.  So I mean, as we sit here today, you don't know

6  what Fieldwood's liability is or, even as Fieldwood

7  calculates it, whether it's 15 percent of the total P&A in

8  Green Canyon 201 and 157; you can't provide us with that

9  number, correct?

10 A    Fieldwood has thousands of wells.

11 Q    No, no.

12 A    This is a -- this is a well which we non-consented and

13 are rejecting.  I would -- I -- there -- the estimate

14 exists, we have an estimate.  I don't recall it off the top

15 of my head.  I believe that it's somewhere in the

16 neighborhood of $3 million.

17     I know I've seen astronomical values that have been

18 published in -- in your objections, which would equate to

19 two wells having an abandonment value of a hundred-plus

20 million dollars on a gross basis, which I don't think LLOG

21 truly believes.

22     I think that, if I understand correctly what I think

23 the liability is here is it's a 15 percent interest in two

24 deepwater sub-sea wells.  And if that's correct, then an

25 approximate $3 million abandonment liability seems

1  reasonable, if I have all my assumptions correct.

2  Q    Okay.  Did Fieldwood cure those liabilities on its

3  balance sheet?

4  A    With -- the company -- prior to having rejected those

5  interests, the company would carry all liabilities.  I

6  haven't specifically looked at this particular liability.

7  But I assume, if it's a liability of the company, then it

8  would be -- it should be incorporated.

9  Q    Okay.  And the company doesn't consider in those

10 obligations and those liabilities, doesn't consider them to

11 be contingent liabilities, do they?

12 A    I would need to check the accounting treatment.  I

13 think that P&A liabilities are an obligation of the company.

14 Obviously, the effect of this restructuring is going to

15 change the nature of those liabilities if -- if we have a

16 Plan that gets confirmed.

17 Q    Sure, I understand.  But those -- but pre-petition, I'm

18 talking about.  The liability arises for that P&A when

19 Fieldwood enters into an operating agreement like it did for

20 Green Canyon 201 and 157, correct?

21 A    I don't believe --

22 Q    Was it --

23 A    -- this was a contingent liability.  I would have to --

24 I would have to consult with our Chief Accounting Officer.

25 I believe that -- that Fieldwood previously had a working

1  interest in this -- I understand that Fieldwood previously

2  had a working interest in these wells, that Fieldwood non-

3  consented its interest in these wells.  And that non-

4  consent, in and of itself, I don't believe would have

5  eliminated a plugging and abandonment liability.

6      But I do know that these wells were sidetracked and

7  that it's a complicated -- it's a more complicated issue

8  because additional and subsequent plugging and abandonment

9  liability was created.  So this unique situation, I think,

10 is one that I would need to explore further to be able to

11 answer that question.

12      MR. BAAY:  Okay.  That's all the questions I have.

13 Thank you very much.

14      THE COURT:  Mr. Baay, thank you.

15      Ms. Hayden.

16      MR. PEREZ:  Your Honor, before we leave that, I

17 think that, with respect to two of the exhibits, they were

18 only admitted as -- for a limited purpose.  I think 1630-40

19 and 1630-41.  I don't know if that's correct or not.

20      THE COURT:  Mr. Baay, were they offered for all

21 purposes or for a limited purpose?

22      MR. BAAY:  I believe they were offered for all

23 purposes, but I'll -- I will -- let me just look and see

24 which ones those are.

25      I'm sorry.  Tell me the numbers again, Mr. Perez.

322

1              THE COURT:  1603-40 and 1603-41.

2        (Pause in proceedings)

3              MR. BAAY:  Those are business records that were

4    offered for all purposes.  I don't know what limited purpose

5    it would be.

6              THE COURT:  What do you believe the limit --

7              MS. CHOI:  Your Honor?

8              THE COURT:  -- should be?

9              Ms. Choi?

10             MS. CHOI:  Your Honor, this is Erin Choi on behalf

11   of the Debtors.

12             We think these letters should not be admitted for

13   the truth, but only for the fact that they were sent.

14        (Pause in proceedings)

15             MR. BAAY:  Your Honor, and I think they're

16   business records, they're two letters.  I think they'll --

17             THE COURT:  Yeah, I'm looking at them.

18             MR. BAAY:  For this objection, they're a business

19   record.

20             MS. CHOI:  They haven't been proven up.

21             MR. BAAY:  I know that.  But I thought that's why

22   we had an -- I thought that's what our agreement was other

23   day, is that we didn't have to prove these up.

24             THE COURT:  So 41.  The only -- I think the only

25   statements of fact in there are they consider it closed,

323

1   right?  I mean, is there really a problem with 41?  I'm just

2   trying to understand what we got.

3           MS. CHOI:  Your Honor, 41, it's probably fine.

4   It's 40 that we're concerned mostly about here.

5       (Pause in proceedings)

6           THE COURT:  Tell me why it's not a business

7   record, even though you all were stipulating.  Are you

8   alleging it's not a business record and you want them to

9   prove that up?  I mean, I may go there, but is that the

10  issue?

11          MS. CHOI:  Your Honor, in our agreement, we agreed

12  to admit this for a limited purpose, so.

13          THE COURT:  Is there some writing on that or was

14  this all done orally?

15          MS. CHOI:  Let me check, Your Honor.

16          THE COURT:  Okay.

17      (Pause in proceedings)

18          MS. CHOI:  Your Honor, it appears that we -- this

19  was discussed orally.

20          THE COURT:  Okay.  I'm going to leave it admitted.

21  I'm going to ask Mr. Baay to file a business records

22  affidavit, and then we'll determine if we're admitting it

23  for all purposes or for limited purposes.  I'll listen to

24  the argument on that when we get to the close.

25          MS. CHOI:  Okay.

1            THE COURT:  Ms. Rosen, did you have a comment
2    about that issue?

3            MS. ROSEN:  I'm sorry, Your Honor.  Are you
4    speaking to me?

5            THE COURT:  Yes, you pressed five-star.

6            MS. ROSEN:  Oh.  Yeah, I did, Your Honor.  Thank
7    you.

8            I just had -- actually, it wasn't about that
9    issue.  I just -- I had an agreement with the Debtors on the
10   admission of two exhibits.  I wanted to offer them now, and
11   I think that would dispense with my need to present -- ask
12   Mr. Dane any questions.

13           THE COURT:  Okay.

14           MS. ROSEN:  And those exhibits are -- yes, Your
15   Honor.  It's Exhibits Nos. 11 and 12, and they are at Docket
16   Nos. 1665-16 and 1665-17.

17           THE COURT:  Do we have a stipulation on 1665-16 --
18   wait, I've only got -- I don't have a 1665-17.

19           MS. ROSEN:  Sorry.  Let me look.  I'm sorry, Your
20   Honor.  It's the two Declarations.  And maybe -- it looks to
21   me like it's Part 16 and 17 of exhibit -- of Docket 1665.

22           THE COURT:  1665 doesn't have a 17.

23           MS. ROSEN:  Okay.  Then it would be 15 and 16,
24   Your Honor.

25           THE COURT:  Let's see.  Exhibit 15 is the Karen

1  Jones Declaration, and Exhibit 16 --

2           MS. ROSEN:  That's --

3           THE COURT:  -- is the Michael Jori Declaration.

4           Are there objections to the substantive admission

5  of the two Declarations?

6           MS. CHOI:  No objection, Your Honor.

7           THE COURT:  All right.  We're admitting 1665-15

8  and 16.  Thank you.

9      (XH Exhibits 1665-15 and 1665-16 received in evidence.)

10          THE COURT:  Ms. Hayden, go ahead, please.

11          MS. ROSEN:  Thank you, Your Honor.

12          THE COURT:  Thank you.

13          MS. HAYDEN:  Your Honor, I just have like two

14 questions for the witness.  And I apologize for doing this

15 so late.  I think I --

16          THE COURT:  I don't think you -- I don't think you

17 can get blamed for that.  We can find other people to blame

18 on that.

19     (Laughter)

20          MS. HAYDEN:  And I will.  I'll blame everybody,

21 but I think I have just two questions.

22                CROSS-EXAMINATION OF MICHAEL DANE

23 BY MS. HAYDEN:

24 Q    One, I think I understand exculpated party, and please

25 correct me if I'm wrong because I've read, you know, the

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

1  brief, I've listened to Mr. Eisenberg and I've listened to

2  Mr. Kuebel examine you, and I also listened to your counsel

3  examine you.

4      This exculpated party are those parties who

5  participated in the Plan process and helped you like reach

6  the agreements that have resulted in this Plan.

7      I know that's not great legalese.

8  A   The exculpated parties are the parties that are defined

9  in the exculpated parties' definition.

10 Q   Okay.  Now then let me ask you this.  Well, then, under

11 the terms of 10.8, it released those parties of claims.  And

12 those claims arise out of a whole series of about 20 or 30

13 claims that all seem to relate to the conception of the

14 Plan.  And I'm just maybe jumping to conclusions, correct me

15 if I'm wrong.

16     But why did you include Additional Predecessor

17 Agreement Documents in that list of 20 some-odd items that

18 claims arise out of?

19 A   I would have to defer to our counsel about that

20 particular provision.  But it seems like that is something

21 that is a part of the Plan process.

22 Q   Okay.  So, other than what they would tell me, you

23 really don't know.  Would that be fair?

24 A   The answer I -- I just provided is the answer that I

25 would give you.

1   Q    Okay.  Thank you.

2        MS. HAYDEN:  And Your Honor, that's it for my

3   questions.  Thank you for your patience.

4        THE COURT:  Ms. Hayden, thank you.

5        Is there any Redirect?

6        MR. PEREZ:  No, Your Honor.

7        THE COURT:  All right.  We're adjourned until 1:45

8   tomorrow.  We'll have some interruptions, I'm afraid, in the

9   afternoon.  I don't think they'll be lengthy.

10       I, again, need to have an understanding with

11  respect to pre-petition obligations and post-petition events

12  on what the Plan is purporting to do with releases,

13  injunctions, exculpations, all of that stuff.  I thought

14  that I was told that, if someone had an obligation that

15  existed pre-petition, for example, to contribute to a P&A

16  obligation, that that was not being eliminated by the Plan,

17  but now I'm concerned that the additional predecessor

18  documents would do just that.

19       I want unambiguous statements in the Confirmation

20  Order, as I mentioned yesterday, so that -- I think it was

21  yesterday, whenever we talked about.  I mean, I guess it was

22  Thursday.  I need to understand it.  And I don't yet

23  understand it and I don't -- and you know, Mr. Dane

24  correctly says that's largely a legal issue that I've left

25  up to my lawyers.  I don't have a problem with that, but I

1   need a definition, so I know what I'm being asked to do.

2           If I am being asked to say that, if I have two

3   predecessors-in-interest, one who participates and one who

4   doesn't, and I'm cutting off the other predecessor's rights

5   of contribution against the one that's participating, I need

6   to understand why I can do that under the law.  That's a lot

7   different than saying events in the future.

8           But if you think I can do that, I want plain

9   language that that's what you're asking me to do and I want

10  to know the basis on which I can do it.  So, again, I need

11  to have those definitions clearly known.  And I know that I

12  haven't looked at what you've done.  You may have already

13  made all those clarifications.  I'm just reiterating that,

14  you know, that's a pretty significant issue for me that I

15  need to worry about.

16          I'll see you all at 1:45 tomorrow.  Thank you.

17      (The parties thank the Court.)

18          THE COURT:  Goodnight.

19       (Proceedings concluded at 8:22 p.m.)

20

21

22

23

24

25                      *  *  *  *  *

1          I certify that the foregoing is a correct

2    transcript to the best of my ability due to the condition of

3    the electronic sound recording of the ZOOM/telephonic

4    proceedings in the above-entitled matter.

5    /S/ MARY D. HENRY

6    CERTIFIED BY THE AMERICAN ASSOCIATION OF

7    ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337

8    JUDICIAL TRANSCRIBERS OF TEXAS, LLC

9    JTT TRANSCRIPT #64127

10   DATE FILED:  JUNE 26, 2021

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25