# BP EXHIBIT  5

1              IN THE UNITED STATES BANKRUPTCY COURT

2            FOR THE SOUTHERN DISTRICT OF TEXAS

3                     HOUSTON DIVISION

4   IN RE:                      §      CASE NO. 20-33948-11
                                §      JOINTLY ADMINISTERED
5   FIELDWOOD ENERGY, LLC,      §      HOUSTON, TEXAS
    ET AL,                      §      WEDNESDAY,
6                               §      JUNE 23, 2021
              DEBTORS.          §      9:57 A.M. TO 4:53 P.M.
7

8            CONFIRMATION HEARING DAY THREE --
                 CLOSING ARGUMENTS (VIA ZOOM)
9
            BEFORE THE HONORABLE MARVIN ISGUR
10            UNITED STATES BANKRUPTCY JUDGE

11

12     APPEARANCES:                   SEE NEXT PAGE

13     COURTROOM DEPUTY:              TYLER LAWS

14      (Recorded via CourtSpeak; No log notes)

15

16

17

18

19

20             TRANSCRIPTION SERVICE BY:

21        JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                935 Eldridge Road, #144
22              Sugar Land, TX 77478
                    281-277-5325
23            www.judicialtranscribers.com

24

     Proceedings recorded by electronic sound recording;
25      transcript produced by transcription service.

```
1                          APPEARANCES (VIA ZOOM):

2

3   FOR THE DEBTOR:                WEIL GOTSHAL & MANGES, LLP
                                   Alfredo Perez, Esq.
4                                  Clifford Carlson, Esq.
                                   Jessica Liou, Esq.
5                                  700 Louisiana, Ste. 1700
                                   Houston, TX  77002
6                                  713-546-5040

7   FOR AD HOC GROUP OF
    SECURED LENDERS:               DAVIS POLK & WARDWELL, LLP
8                                  Damian S. Schaible, Esq.
                                   450 Lexington Avenue
9                                  New York, NY  10017
                                   212-450-4580
10
    FOR HUNT OIL COMPANY:          BAKER BOTTS, LLP
11                                 Kevin Chiu, Esq.
                                   2001 Ross Avenue
12                                 Dallas, TX 75201
                                   214-953-6612
13
    FOR OFFICIAL COMMITTEE OF
14  UNSECURED CREDITORS:           STROOCK & STROOCK & LAVAN, LLP
                                   Kenneth Pasquale, Esq.
15                                 180 Maiden Lane
                                   New York, NY  10038-4982
16                                 212-806-5400

17  FOR U.S. DEPARTMENT
    OF THE INTERIOR:               U.S DEPARTMENT OF JUSTICE
18                                 Zachary Balasko, Esq.
                                   PO Box 875
19                                 Washington, DC 20044
                                   202-514-7162
20
    FOR ASPEN AMERICAN INSURANCE
21  COMPANY, BERKLEY INSURANCE
    COMPANY, EVEREST REINSURANCE
22  COMPANY, AND SIRIUS AMERICA
    INSURANCE COMPANY:             CHIESA SHAHINIAN GIANTOMASI
23                                 Scott Zuber, Esq.
                                   Darren Grzyb, Esq.
24                                 One Boland Dr
                                   West Orange, NJ 07052
25                                 973-530-2046
```

```
 1                    APPEARANCES (CONT'D - VIA ZOOM):

 2

 3   FOR BP EXPLORATION AND
     PRODUCTION INC.:              GREENBERG TRAURIG, LLP
 4                                 Shari Heyen, Esq.
                                   John Hutton, Esq.
 5                                 1000 Louisiana St., Ste. 100
                                   Houston, TX 77002
 6                                 713-374-3612

 7

 8   FOR ENERGY TRANSFER:          KATTEN MUCHIN ROSENMAN, LLP
                                   Yelena E. Archiyan, Esq.
 9                                 2121 N. Pearl St.
                                   Dallas, TX 75201
10                                 214-765-3600

11

12   FOR PHILADELPHIA INSURANCE
     COMPANY:                      MANIER & HEROD
13                                 Robert W. Miller, Esq.
                                   1201 Demonbreun St., Ste. 900
14                                 Nashville, TN 37203
                                   615-244-0030

15

16   FOR XTO OFFSHORE, HHE ENERGY
     COMPANY AND XLT, LLC:         FORSHEY PROSTOCK, LLP
17                                 Suzanne K. Rosen, Esq.
                                   777 Main Street, Ste. 1550
18                                 Fort Worth, TX 76102
                                   817-877-8855

19

20   FOR ZURICH AMERICAN INSURANCE
     COMPANY AND SEITEL DATA
21   LIMITED:                      CLARK HILL, PLC
                                   Duane J. Brescia, Esq.
22                                 720 Brazos St., Ste. 700
                                   Austin, TX 78701
23                                 512-499-3647

24

25
```

```
 1                    APPEARANCES (CONT'D - VIA ZOOM):

 2

 3   FOR COX ENTITIES:              LOCKE LORD, LLP
                                    Michael Kind, Esq.
 4                                  111 South Wacker Drive
                                    Suite 4100
 5                                  Chicago, IL  60606
                                    312-201-2392
 6

 7
     FOR HESS CORPORATION:          REED SMITH, LLP
 8                                  Omar J. Alaniz, Esq.
                                    2850 N. Harwood Street
 9                                  Suite 1500
                                    Dallas, TX  75201
10                                  469-680-4200

11   FOR TRAVELERS CASUALTY,
     LIBERTY MUTUAL INSURANCE
12   CO., HANOVER INSURANCE CO.,
     AND XL SPECIALTY;             LANGLEY, LLP
13                                  Keith A. Langley, Esq.
                                    PO Box 94075
14                                  Southlake, TX  76092
                                    214-722-7162
15
     FOR FREEPORT MCMORAN,
16   MCMORAN OIL AND GAS, LLC,
     CONOCO PHILLIPS COMPANY,
17   AND MERIT ENERGY:             LOCKE LORD, LLP
                                    Omer F. Kuebel, III, Esq.
18                                  601 Poydras Street, Ste. 2660
                                    New Orleans, LA  70130
19                                  504-558-5155

20
     FOR APACHE CORPORATION:        HUNTON ANDREWS KURTH, LLP
21                                  Robin Russell, Esq.
                                    600 Travis St., Ste. 4200
22                                  Houston, TX  77002
                                    713-220-4200
23

24

25
```

5

```
1                    APPEARANCES (CONT'D - VIA ZOOM):

2

3  FOR ENI PETROLEUM US LLC AND
   ENI US OPERATING CO., INC.:    BRACEWELL, LLP
4                                 Mark E. Dendinger, Esq.
                                  185 Asylum Street
5                                 City Place I, 34th Fl.
                                  Hartford, CN  06103
6                                 860-256-8541

7
   FOR HCCI INTERNATIONAL, LTD.: LOCKE LORD, LLP
8                                 Philip Eisenberg, Esq.
                                  600 Travis, Ste. 2800
9                                 Houston, TX  77002
                                  713-226-1304
10

11 FOR ATLANTIC MARITIME
   SERVICES:                      KIRKLAND & ELLIS, LLP
12                                Jeffrey J. Zeiger, P.C.
                                  300 North LaSalle
13                                Chicago, IL  60654
                                  312-862-3237
14

15

16

17

18 (Please also see Electronic Appearances.)

19

20

21

22

23

24

25
```

1                                   INDEX

2   CLOSING ARGUMENTS:
    By Mr. Perez                    11
3   By Ms. Liou                     30
    By Mr. Schaible                 57
4   By Mr. Balasko                  69
    By Mr. Pasquale                 74
5   By Ms. Russell                  76
    By Mr. Grzyb                    82
6   By Mr. Brescia                  84
    By Mr. Eisenberg                85
7   By Mr. Miller                   87
    By Mr. Chiu                     88
8   By Ms. Heyen                    91
    By Mr. Carlson                  92
9   By Mr. Alaniz                   96
    By Mr. Zuber                    110
10  By Mr. Langley                  113
    By Mr. Kooy                     125

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        HOUSTON, TEXAS; WEDNESDAY, JUNE 23, 2021; 9:57 A.M.

2            THE COURT:  Now we're going to go to closing

3    arguments in the Fieldwood case.  It's my understanding from

4    my case manager is there may be a request to continue this

5    morning's hearing.  I don't really -- I didn't understand it

6    in terms of why that was being requested.  Perfectly happy

7    to listen to that, but I wanted to do it on the Record at

8    9:45.  So let me ask Mr. Genender to tell me what's going

9    on.  Go ahead, please.

10            MR. GENENDER:  Your Honor, Paul Genender.  I'm

11   actually -- was going to give you a courtesy reminder or

12   notice on the *Speedcast* matter with Mr. Dockerman's

13   permission, a hearing we have tomorrow at 4:00.  You had

14   asked us to submit stipulated facts by 9:00 o'clock this

15   morning.  Mr. Dockerman and I were working late last night

16   on them.  He's in a hearing in Delaware.  We're finalizing

17   them, but I wanted -- he -- with his permission, I wanted to

18   let you know that we will get them to you shortly.  But

19   obviously hasn't happened by 9:00 o'clock this morning.

20            THE COURT:  Thank you.  I appreciate that notice.

21            Mr. Perez.

22            MR. GENENDER:  Very welcome.

23            MR. PEREZ:  Your Honor, Alfredo Perez.  Your

24   Honor, I apologize.  This is a little bit my fault.  I

25   missed an email where one of the parties indicated that they

1   were unavailable from 10:00 to 11:00.  And that's when I

2   realized that last night, we -- that's when Mr. Carlson sent

3   the email.  But one of the key parties was unavailable at

4   that -- at this time.  And, you know, I apologize, it was my

5   fault for missing that email.

6           THE COURT:  So this is somebody that needs to be

7   here to hear your closing so they can respond to it; is that

8   the issue?

9           MR. PEREZ:  No.  It's Mr. Schaible.  He will, you

10  know, kind of be the second person up.

11          THE COURT:  Got it.  We're going to work from

12  11:00 to 12:00.  We're going to return at 3:15 and we'll

13  stay until we're finished with closing arguments.  Sorry

14  about if there's any confusion on my part, but Mr. Schaible

15  is a key player in the case.  I'm going to let him be

16  here --

17          MR. PEREZ:  Yeah.

18          THE COURT:  -- throughout.  So we'll adjourn --

19          MR. PEREZ:  Again, Your Honor, this is my fault.

20  I just missed an email.  So I apologize to the Court and to

21  all the parties.

22          THE COURT:  Yeah.  It's fine with me.  But we'll

23  adjourn until 11:00 o'clock this morning and we'll start

24  sharply at 11:00.  Thank you.

25          (Recess taken from 10:00 a.m. to 10:59 a.m.)

9

1                   AFTER RECESS

2          THE COURT:  All right.  We're going to return to

3  the Fieldwood Confirmation Hearing.  As I had indicated

4  yesterday, we're going to start with closing arguments by

5  the Debtor and then we'll move to closing arguments by any

6  other proponent.  We will then move to closing arguments by

7  any opponent.  And then we're going to allow a rebuttal by

8  the Debtor only.

9          So whoever is going to take the lead for the

10  Debtor, if you'll press five star one time on your phone,

11  also let me know who you want to have the presenter role.

12          Mr. Perez, good morning.

13          MR. PEREZ:  Good morning, Your Honor, Alfredo

14  Perez on behalf of the Debtors.  Your Honor, if you could

15  give the presenter role to Ms. Choi?

16          THE COURT:  All right.  Ms. Choi has the screen.

17          MR. PEREZ:  Thank you, Your Honor.

18          THE COURT:  Hold on one second, please.  I was

19  handed a note that I'm supposed to turn on my cam.

20          MR. PEREZ:  That -- it's okay by me, Your Honor.

21          THE COURT:  All right.  Let's move ahead.

22          MR. PEREZ:  Thank you, Your Honor.  Again, Your

23  Honor, Alfredo Perez on behalf of the Debtors.

24              CLOSING ARGUMENTS ON BEHALF OF DEBTORS

25              BY MR. PEREZ:  We want to first thank you for

1  accommodating the short pause this morning.  And again I

2  apologize to everyone for having missed that.

3          Your Honor, I think we're here, you know, after a

4  very, very seems like very long and unfortunately somewhat

5  contentious case that I think has come to a point where I

6  think that the evidence and the actions taken by the Debtors

7  and the other parties that are really key, key to this kind

8  of mosaic put together to address some very significant

9  business and other related issues that I would think that

10 the evidence overwhelmingly establishes that the Plan should

11 be confirmed.  If you turn to the next slide, please?

12          Your Honor, I described this as a mosaic because I

13 think the evidence is uncontroverted that each of these

14 participants really contributed to the Plan.  And without

15 any of these participants, it's like the stool would have

16 lost one of its legs and we wouldn't have been able to be in

17 the position where we are today.

18          As the evidence indicated, you know, back in March

19 of last year, Fieldwood started experiencing problems.  And

20 obviously the Court is well aware of what was going on in

21 the energy business at that time.  And it reached out to its

22 first lien term loan lenders represented by Davis, Polk and

23 began, you know, the process.  And it was key -- and as

24 Mr. Dane testified, it was key for this business to survive

25 to get additional capital.  It needed that capital.

1       It wouldn't have been able to survive, it wouldn't

2   have been able to accomplish what it's seeking to accomplish

3   pursuant to the Plan without that additional capital.  And I

4   think the lenders were very clear that in Order to do that,

5   we needed to address all of the various legacy issues that

6   were addressed.

7       So, Your Honor, in terms of we wouldn't be here

8   but for the sale, but for the significant cash that the

9   lenders are contributing, but for the first lien first out

10  lenders agreeing to roll over their debt, but for the second

11  lien lenders agreeing to compromise, and most importantly

12  but for, you know, the very significant contribution that

13  the first lien term lenders are making in providing up to

14  $105 million of cash so that we can exit, by agreeing to

15  assume all the working capital obligations, by doing all of

16  the things that they're doing in order to make this work.

17  So but for those participants, we wouldn't be here, this

18  Plan would not be confirmable.

19      Second, Your Honor, again, we wouldn't be here but

20  for the Apache, you know, agreeing to assume

21  responsibilities and as of last night -- and, Your Honor, we

22  filed at Docket Number 1700 the term sheet with the Apache

23  sureties.  That single transaction addresses almost, you

24  know, two-thirds of all of our decommissioning obligations.

25  And that was a key centerpiece to the Plan.  And, again, but

1    for having done this, we wouldn't have been able -- we would

2    not have been able to be here where we are today.

3          USCCI, Your Honor, they provided -- they're the

4    only surety that's provided bonding on a go forward basis.

5    We have a term sheet.  Credit bid purchaser needs that in

6    order to operate to be able to go forward.  Again, but for

7    that we wouldn't have been able to be here.

8          You know, the Unsecured Creditors Committee

9    obviously were key.  We signed 165 trade credit agreements

10   compromising over $145 million of claims.  And in addition,

11   but for the support of our vendors, again we wouldn't be

12   here.  If all of our vendors -- if we didn't have the vendor

13   support that we had during the case and the vendor support

14   that we're going to have -- that Credit Bid Purchaser is

15   going to have after the case, this wouldn't have been

16   feasible credit -- a Credit Bid Purchaser wouldn't have been

17   able to raise the money that they did.

18         Your Honor, next I want to talk about the

19   predecessors that we have consensual agreements with.  And,

20   Your Honor, if you will recall, at one of the hearings it

21   was very clear that, you know, that we came in with

22   approximately 80 percent or a little bit under 80 percent of

23   our liabilities, of our asset retirement liabilities

24   resolved.  And it was very clear from what the Government

25   was saying and some comments from the Court that, you know,

1   we needed to make the Government comfortable, number one,

2   and we needed to try to resolve as many of these consensual

3   obligations as possible.  So, Your Honor, we think that

4   again but for the consensual arrangements that we have with

5   Chevron, Eni, and Hunt which resolve, which get us into that

6   90, 91 percent, that we wouldn't be here with a Plan that

7   the Government doesn't object to.

8           And, Your Honor, and they've kind of paid the

9   price already for having done that.  They've already paid

10  the price by being sued by one of the insurers that -- on a

11  non-confirmed Plan.  They're already saying that they've

12  been discharged on their bonds.  So, you know, but for this

13  arrangement, we wouldn't be able to do -- we wouldn't be

14  able to confirm a Plan.  And they've already paid the price,

15  Your Honor.  You know, this is an integral part of our Plan,

16  it is integral to the success of the Plan, it is integral to

17  the Government's non-objection to our Plan.  And but for

18  having these consensual agreements, we wouldn't be able to

19  confirm this Plan.

20          And then finally, Your Honor, with respect to the

21  Government, obviously as testified by Mr. Dane, we've had

22  extensive, productive discussions with the Government and,

23  you know, there have been, and as the Court recalls, you

24  know, at the disclosure statement hearing, they totally

25  reserved their rights.  And I think as a result of the steps

1    that we have taken since that time, that the Government is

2    in a position where they're not objecting to the Plan.  And

3    in particular, Your Honor, the key aspects of what the

4    agreements that the proposal that we have made that have

5    satisfied the Government, that we meet our *Midlantic*

6    standards, are embodied in Section 5.13 of the Plan.  And

7    that is at Document 1697, and pages 216 of 218, as well as

8    paragraphs 141 to 144 of the proposed Confirmation Order.

9    Again, but for the Government's, you know, non-objection to

10   the Plan and having worked with us extensively to make sure

11   that they were satisfied that we didn't violate the

12   *Midlantic* standards, again we wouldn't be here.  We would be

13   facing a different Plan confirmation.

14           So, Your Honor, I'm going to come back to each one

15   of these.  But, again, the key, key view in my mind is that

16   any one of these -- if we knocked out any one of these, Your

17   Honor, we wouldn't be able to -- for this Plan to be

18   successful, we wouldn't be able to confirm this Plan.  I

19   think that they're all integrally tied together.  And if you

20   knock one out, I think you knock out the whole thing.  So,

21   Your Honor, let me go next to the next slide, please.

22           And, again, just to -- and this is the slide that

23   we've probably shown at every hearing, that nine percent is

24   primarily composed of three individual predecessors.  And

25   I'll get to that next time.  But in essence, we have

1    resolved all but nine percent of our liability.  If you go

2    to the next slide.

3           And, Your Honor, I had this in the -- in our

4    opening, and this kind of -- and I'll go through each one of

5    these transactions, but I think the evidence, you know,

6    overwhelmingly establishes that we will be able to address

7    the asset retirement obligations, that we will be able to

8    accomplish the goals of the Plan.

9           And, Your Honor, basically what we have left, if

10   you go to the very far right at the bottom in the abandoned

11   properties, we have the remaining predecessors, and those

12   are principally, you know, three large, multinational energy

13   companies with a combined -- with a market cap of 93

14   billion, 28 billion, and 272 billion combined that are the

15   ones that are objecting to the Plan for having to respond to

16   joint and several liability that they had before Fieldwood

17   was ever Fieldwood, Your Honor.  This is not a situation

18   where this liability is something that is new to them.

19   They've had this liability.  They are jointly and severally

20   liable.  That's what happens when you operate in the Gulf.

21   And those are in essence the three main predecessor

22   objectors to the Plan.  Next slide, please.

23           Your Honor, I'm going to only focus on the areas

24   that I thought were contested in terms of the Evidentiary

25   Record.  I think many of the other items are probably more

1  legal argument.  And I neglected to say, Your Honor, that

2  I'm going to address the evidence, Ms. Liou is going to

3  address the legal issues, and Mr. Carlson will address any

4  questions with respect to the Order.  And I think on a

5  couple of things Ms. Choi will address them.  But I'm going

6  to focus -- I'm focusing on the evidence.

7          So, Your Honor, again, I think the evidence

8  overwhelmingly demonstrates that we've complied with 1129

9  and that the Plan should be confirmed.  I'm only going to

10  really focus on a couple of three prongs of 1129 which there

11  was actually evidence or, you know, there was something with

12  respect to whether we had met our evidentiary burden.

13          And I think the first one, Your Honor, is whether

14  we satisfied the adequate assurances provision of 365.  And,

15  again, I think there -- and I'll get to it when I get to

16  credit bid NewCo, but I think again the uncontroverted

17  testimony from Mr. Dane is that there will be sufficient

18  resources in order to satisfy, and that there's really no

19  question that as it relates to the contracts that will be

20  assumed, that those -- that that Credit Bid Purchaser will

21  be able to perform.

22          Second, Your Honor, I think that there was

23  allegations that the Plan was not proposed in good faith.  I

24  frankly think that, you know, the definition of good faith

25  is does the Plan address what it's intended to address.

1  Here, the Plan very clearly intended to address the ARO,

2  intended to create a sustainable entity, intended to

3  preserve the jobs.  And all of the things that it was

4  intended to do, I think the Plan addresses.  And I think

5  that meets the good faith standard.

6          Your Honor, there has also been questions about

7  1129(a)(11).  And, Your Honor, I'll address that in the

8  context of all of the various entities.  But, Your Honor,

9  again, I think that we provide a means to address all of the

10 various objectives of the Plan, and that to that extent I

11 think the Plan complies with 1129(a)(11).

12         Finally, Your Honor, there were seven other

13 secured creditors that were -- that objected, and so we

14 would have to cram them down.  And, again, I think the

15 uncontroverted testimony from Mr. Green was that we would be

16 able to do that based on the estimate of their claims and

17 the reserves that we had set up.  So again I think the

18 Evidentiary Record is that we would be able to meet the

19 cramdown.  So if you turn to the next page, please.

20         So with respect to an asset sale, Your Honor,

21 which is what we're doing with credit purchaser -- and let

22 me just digress here for a minute because -- and I believe

23 Ms. Liou is going to really address this.  But, you know,

24 the premise and the fundamental aspect of this Plan is that

25 Credit Bid Purchaser is willing to provide $105 million of

1    cash, is willing to assume all the working capital

2    liability, is willing to provide the credit support for the

3    various activities, is willing to do all of the things that

4    it's willing to do so that we can make, you know, Fieldwood

5    Three successful, so that Fieldwood Four can implement, if

6    in fact they get the assets free and clear of liens, claims,

7    and encumbrances.  And that's the fundamental premise.  And

8    that is an aspect of this that is kind of at the heart of

9    what I think, you know, disputed.  It's the -- it's what

10   does it mean to have an asset sale free and clear of liens

11   versus, you know, what are the other potential obligations

12   and what, in essence, is right and that's really the heart

13   of the issue here.

14          But clearly in terms of the intended purchase, can

15   Credit Bid Purchaser close this transaction?  And I think

16   the evidence is overwhelmingly yes.  You know, we looked at

17   the sources and uses with Mr. Dane yesterday.  There was at

18   the -- even at the high end and at an average cash, not at

19   the high cash, we were -- at the high end of expenses and at

20   an average cash, not the high cash, this -- we were

21   comfortably able to make all of the Plan payments that were

22   needed at exit, as well as the reserves.  So there's no

23   question but that they can accomplish this.  If you turn to

24   the next slide.

25          You know, we actually don't think that 1129(a)(11)

1  applies to the Credit Bid Purchaser on the other side.
2  Nevertheless, Your Honor, I think the uncontroverted
3  evidence is that even in the scenario, I mean, where they
4  don't drill, Mr. Dane testified that that was one of the
5  most attractive cash positions.  The Credit Bid Purchaser is
6  going to generate cash.  They're -- it -- they're going to,
7  you know, this company is going to, you know, be valued at
8  in excess of a billion dollars.  And it will be a standalone
9  independent oil and gas company.  So you turn to the next
10  page.
11         And, again, we don't think this is applicable.
12  But if you turn to the -- they're going to be well-
13  capitalized.  They're only going to have about 300 million
14  of funded debt.  They're going to have a -- they're going to
15  raise 40 million in equity, which is quite astounding.
16  They're going to have at least -- up to 120 million on the
17  balance sheet but at least a hundred million on the balance
18  sheet.
19         They're going to have significant cashflow and --
20  in the hundreds of millions.  That's what exhibit page eight
21  of nine shows as it related to them.  And as Mr. Dane
22  testified, if you stop the drilling, that they would also
23  have, you know, significant cashflow and that that was a
24  very attractive -- that was also very attractive, you know,
25  business Plan and depending on what the owners decided to

1    do.

2            In addition, Your Honor, it has the bonding

3    capability to go forward on an ongoing basis to the extent

4    that, you know, people were alleging that somehow that was a

5    bar.

6            But, Your Honor, in addition to the significant,

7    and I mean significant, support the Credit Bid Purchaser is

8    providing in order for us -- in order for Fieldwood to

9    emerge from bankruptcy, to confirm this Plan, including the

10   cash, the assumption of the working capital, the other

11   agreements with Fieldwood Three and Fieldwood Four, I think,

12   Your Honor, that this company on a standalone basis, even if

13   we had to meet that test, there's no question based on the

14   evidence that it complies.

15           Let me then turn to Fieldwood One.  And

16   fortunately, Your Honor, I'm not going to dwell on Fieldwood

17   One.  But the issue here, and I think we've largely resolved

18   that as a result of the agreement with Apache and with the

19   Apache sureties, but the purpose of Fieldwood One, as

20   testified to by Mr. Graham, is to decommission, maximize

21   cashflow, and then wind this company down.  It's going to be

22   done over a period of time.  And at least in a --

23   Mr. Graham, you know, has indicated that the way his

24   contract works, has to stay here for five years in order to

25   accomplish the goals of that contract.  And so we're really

1   talking about a situation where I think now largely

2   uncontested we think that Fieldwood One would be, you know,

3   accomplishes the goals that it's intended to accomplish.

4              Then let's turn to Fieldwood Four.  And Fieldwood

5   Four again is to wind down the legacy Chevron properties,

6   CUSA properties primarily, and many of the Noble properties.

7   And, again, they -- we're -- that is being done pursuant to

8   a fixed -- a turnkey contract with Credit Bid Purchaser that

9   Mr. Dane testified to.  And here we have a situation where

10  we have one of the most sophisticated energy companies that

11  has -- that currently has joint and several liability that

12  will be paying the amounts in a situation where there are

13  significant conditions that would adjust the turnkey price,

14  depending on factors beyond everyone's control.  So if you

15  turn to the next page.

16             The Credit Bid Purchaser will decommission the

17  legacy CUSA property pursuant to that turnkey agreement.

18  And the -- in essence, protects that exit.  Money will come

19  from Credit Bid Purchaser to fund the 15 -- the five million

20  in cash contribution.  And then in addition, there'll be

21  another 14 million that at one time had been scheduled to go

22  into Fieldwood Three that now is going into Fieldwood Four

23  to plug and abandon certain assets in which Chevron had been

24  a predecessor in interest.  So I think that the evidence

25  obviously in my mind overwhelmingly demonstrates that

1  Fieldwood Four with all those factors will be able to
2  accomplish what it's intended to accomplish.

3          Then additionally, Your Honor, if you turn the
4  page, we have the other existing consensual deals with Eni
5  and with Hunt, and these again we have turnkey agreements
6  pursuant to which most of the Hunt work is being done
7  currently simply, you know, because we had a current permit
8  to actually do the work.  And that will be done currently.

9          And then with respect to Eni, we have a agreement
10 where they will fund up to $57 million, and the work will be
11 done.  And in each one of those, the money coming from
12 Credit Bid Purchaser at exit will fund a contribution to the
13 -- those amounts.

14         Finally, Your Honor, we get to -- if you go to the
15 next page, we get to Fieldwood Three.  And Fieldwood Three
16 obviously is the balance of the bucket.  But as a result of
17 moving some of the assets from Fieldwood Three to Fieldwood
18 Four, the remaining -- and I think the testimony was that
19 the credit support was up to $12 million, including five
20 million in cash at exit and an additional amount, an
21 additional seven million amount, that would be provided from
22 Credit Bid Purchaser.  But I think Mr. Dane's testimony,
23 again uncontroverted, was that the post-effective date
24 liability was approximately $7 million, and that there were
25 $4 million of bonds to accomplish this.  So, again, you

1  know, these are assets that the -- that a -- that Fieldwood

2  and the lenders in connection with, you know, the proposals

3  made to the Government decided that they were going to offer

4  to plug and abandon these assets in Fieldwood Three.

5  And then finally, Your Honor, if you go to the

6  next slide, I'm going to turn to the abandoned properties

7  because this is obviously as we sit today where most of the

8  dissent exists.  So, number one, and I'm sure we'll hear

9  from Mr. Balasko, but the Government does not object to the

10  Plan.  The company has done significant work, made

11  significant concessions, and has done, you know, a lot of

12  discussion and made proposals to the Government in order to

13  be in a position where the Government does not object.

14  That's not where we found ourselves at the disclosure

15  statement hearing.  That's not in essence at the time when

16  the Court directed us to address the Government's concerns.

17  That's what we did and that's what we accomplished, Your

18  Honor.

19  So one of the key aspects of the proposals that

20  we've made to the Government which have resulted in their

21  not objecting, first, Your Honor, is the transition services

22  for the specified abandoned properties.  And, again, at

23  Docket Number 697 of the Plan, Sections 513 in Exhibit A,

24  which have the -- in fact what the agreed activities are --

25  and, Your Honor, this includes the safeguarding of the day-

1   to-day operational monitoring, maintaining egress of

2   pollution inspections, and to ensure, you know, proper

3   response.  And, yes, the exhibit and what was testified to

4   is that Fieldwood, you know, is abandoning these properties.

5   They are agreeing to undertake these transition services,

6   they are agreeing to respond to the -- to, you know, certain

7   events.  But because these are abandoned properties, to the

8   extent that the events are, in essence, in excess of what

9   the Government and Fieldwood agreed to, those are not

10  necessarily for our account and they're not at our cost.

11  But it's not a situation we meet the *Midlantic* standards

12  because there isn't going to be any slip between the lip and

13  the cup.  We are going to provide, to respond.  And the

14  responsible, you know, the party that the property's

15  abandoned to will obviously be responsible for that.

16          Your Honor, in addition to the transition services

17  which really, --

18          THE COURT:  Yeah, --

19          MR. PEREZ:  -- you know, the core of --

20          THE COURT:  -- Mr. Perez, I'm not sure that's the

21  *Midlantic* standard.  And I just think the *Midlantic* standard

22  is actually less than what you have described, not more than

23  what you've described.  But I want to be sure --

24          MR. PEREZ:  I --

25          THE COURT:  -- that parties are aware --

1         MR. PEREZ:  Oh, I --

2         THE COURT:  -- of what I think it is.  The --

3         MR. PEREZ:  Yes.

4         THE COURT:  A Debtor --

5         MR. PEREZ:  Yes.

6         THE COURT:  -- under the Bankruptcy Code can

7    abandon an environmentally troubled property and does not

8    under the Bankruptcy Code then have a duty to provide the

9    transition services or to respond at all or after is

10   abandoned to provide any support.

11        However, the Supreme Court has held that the

12   environmental concerns that both State and local Governments

13   can have may preclude the Debtor from engaging in the

14   abandonment.  But if the abandonment is not precluded by the

15   Government's concerns, then frankly I don't think that I am

16   charged with assuring that post-abandonment that the

17   response will be proper.  That's Mr. Balasko's problem.

18   Now, the fact that he has solved that with the deal with you

19   is fine with me.  But you're sort of saying that in order to

20   meet *Midlantic*, that the Court needs to be assured of what

21   the future environmental issues are.

22        I don't think that's what the Bankruptcy Code

23   says.  And I just want it clear the way that I'm going to be

24   applying the law, unless somebody can persuade me that I am

25   wrong about this.  But I don't think it's the standard that

1  you're setting up.  I don't think that the Government is

2  going to agree to allow the abandonment unless they have a

3  solution to these things.  That's their decision.  And I

4  don't think under *Midlantic* I look behind their decision.

5  So a little different than what you're describing.  And I

6  think it may matter in terms of where this deal goes.

7            MR. PEREZ:  Thank you, Your Honor.

8            And we actually -- I think we agree that the

9  *Midlantic* standard is, you know, imminent harm.  And but I

10  think what we're doing here is just to take this issue off

11  the table, you know, we've entered into a nine-month

12  Transition Services Agreement.  And, remember, primarily for

13  these three very substantial companies that have, you know,

14  predecessor liability we've entered into this transition

15  services to really take anything having to do with *Midlantic*

16  off the table.  It's not -- it -- I agree with you, Your

17  Honor, that it goes way beyond *Midlantic*.  To the extent

18  that --

19            THE COURT:  But I guess I'm telling --

20            MR. PEREZ:  -- in my view we --

21            THE COURT:  -- you and I'm telling others, I do

22  not intend to review the Transition Services Agreement or

23  the agreed activities to determine if I think it's feasible,

24  if I think it works, if I think it's adequate.  The Code

25  allows abandonment.  Abandonment can be precluded by

1  environmental regulators.  But if it isn't, the

2  environmental regulators may need to worry about that.  And

3  I don't -- the Court doesn't babysit them.  You know, it's

4  just a different story.  I mean, you could even be in a

5  potential situation, which I've been in in some other cases,

6  where the Government actually will take over the cleanup and

7  allow an abandonment in exchange for a huge amount of money

8  going to solve the problem that they wouldn't otherwise

9  have.

10           They just get to make a decision as to what's best

11  for them.  And it's like me looking behind somebody's vote

12  to say, well, you know, I think that was kind of a foolish

13  vote, they voted for the Plan, they could have held out for

14  a better deal.  You know, no.  And I'm not looking if

15  they're in support of the Plan.  I'm looking at whether

16  they're going to veto the Plan is what I'm looking at at the

17  Government.  If they choose not to veto the Plan on an

18  environmental bases, then that's their choice and I am not

19  going to be second-guessing the Government's decision.  So I

20  don't care -- the fact that you may want to try and persuade

21  me of that is not going to help your case.

22           You may want it on appeal in case I'm wrong about

23  that.  But I'm not looking at the issue that you're

24  describing.  And I'm for better or for worse --

25           MR. PEREZ:  Well, thank you -- okay, thank you,

1  Your Honor.  Then I think we should have -- this slide

2  should have stopped after the first bullet.  The Government

3  does not object to the Plan.  Okay.  I blame Mr. Carlson for

4  the balance so --

5           THE COURT:  Look, you're welcome to talk about it.

6  I just -- I don't want others --

7           MR. PEREZ:  No, no, no, I look --

8           THE COURT:  -- believing that the standard that

9  you're announcing is a standard that I think is one that I'm

10  going to adopt.  And I'm --

11          MR. PEREZ:  I'm not suggesting at all that this is

12  the standard you should adopt.  All I'm saying, Your Honor,

13  is that the Government doesn't object and here are the

14  things that we have done to address their concerns.  And

15  that's the extent of my --

16          THE COURT:  I thought you --

17          MR. PEREZ:  -- remarks, Your Honor.

18          THE COURT:  I thought you crossed the line from

19  saying not only are these the things we've done to address

20  their concerns but the things that you've done to address

21  their concerns will work.  And I'm not willing to cross the

22  bridge into whether they'll work.

23          MR. PEREZ:  Okay.  Understood, Your Honor.  So,

24  Your Honor, I think in terms of the evidentiary support for

25  meeting the requirements of 1129, Your Honor, I think that

1    I've gone through kind of the areas that were contested and

2    the areas that I believe that the evidence overwhelmingly

3    supports confirmation of the Plan large -- based largely on

4    what appears to be an uncontested Record.

5             So with that, Your Honor, let me turn it over to

6    Ms. Liou who will address the legal issues that have been

7    raised.  To the extent the Court has any evidentiary issues,

8    obviously I'll be happy to address them at an appropriate

9    time.  But I think that in terms of meeting the evidentiary

10   basis for meeting the 1129 standard on a substantially

11   uncontested Record, we have done.  And I've highlighted the

12   areas where there was some concern or some, you know,

13   allegation that we didn't meet the Evidentiary Record, Your

14   Honor.

15            THE COURT:  So if this is for Ms. Liou to do or

16   for Mr. Carlson to do, that's fine.  But who is going to

17   handle the question of third-party versus third-party

18   rights; is that by you, by Ms. Liou, by Mr. Carlson?

19            MR. PEREZ:  Ms. Liou.

20            THE COURT:  All right.  Ms. Liou, if you would

21   press five star one time on your phone, please?  There we

22   go.  Thank you.

23            From 862-228-0079, is that you, Ms. Liou?

24            MS. LIOU:  Yes, that is me.  Apologies, give us

25   one minute to work through some technical difficulties.

1          THE COURT:  Of course.

2          MS. LIOU:  Your Honor, I have to apologize.  The

3     vagaries of technology, we had a fancy setup here and I'm

4     now talking through an iPhone.

5          Good morning, Your Honor.  Jessica Liou from Weil

6     Gotshal & Manges on behalf of the Fieldwood Debtors.

7          Notwithstanding the Record that we set on the

8     first day of the hearing in terms of the number of opening

9     arguments presented and the number of objections filed for

10    our Plan, I think that after three days of hearings and many

11    good faith discussions that the Debtors have had with the

12    many parties in this case over the last several days, there

13    really are only two main contested legal issues in this

14    case.  I think Mr. Perez has done a pretty good job of

15    covering the first.  And frankly there isn't much that I

16    would add regarding the point about compliance with Section

17    1129(a)(11) of the Bankruptcy Code.

18         But I will comment on the fact that in connection

19    with the sources and uses, the sources that we are talking

20    about for the Debtors' restructuring are sources coming from

21    fully committed, Court-approved, binding commitments or

22    backstops associated with the $119 million of debt, proceeds

23    funded through the first lien exit facility, and up to $185

24    million in proceeds funded through the second lien exit

25    facility, and the $40 million of proceeds funded through the

1  equity rights offering that will be coming in the door and

2  coming over to the Debtors as consideration of a part of the

3  credit bid transaction to fund the Chapter 11 cases, pay

4  creditors, and capitalize Credit Bid Purchaser for future

5  success.

6          I'd like to cover the second issue which deals

7  with the appropriateness and the scope of the releases,

8  exculpations, and discharge under the Plan.  As apparent

9  from some of the opening statements and the objections

10 filed, there remain I think a few conceptual

11 misunderstandings about what the Plan does and is intended

12 to do, which I'd like to clear up today.  Although the Plan

13 seeks to achieve an extraordinary result in terms of the

14 sheer complexity and magnitude of the restructuring, its

15 release, exculpation, and discharge provisions are fairly

16 standard.

17         So what does the Plan actually provide for?  It

18 does provide for discharge of prepetition claims.  It does

19 not, as some have said or suggested, discharge post-petition

20 claims or post-effective date obligations unless there is a

21 specific agreement between relevant parties pursuant to a

22 settlement.  In section 2.1 of the Plan in particular,

23 there's provision for administrative expense claims.  And

24 any ordinary course administrative expense claim that's

25 incurred by the Debtor effectively gets satisfied in the

1  ordinary course post-effective date as well to the extent

2  that it is not an obligation that's otherwise picked up by

3  Credit Bid Purchaser.  To the extent that it is an

4  obligation that is assumed by Credit Bid Purchaser, as

5  Mr. Perez has indicated and as Mr. Dane has testified, it's

6  going to constitute the working capital that's assumed by

7  Credit Bid Purchaser and fully paid for pursuant to, you

8  know, the terms of the Credit Bid Purchase agreement and in

9  the ordinary course.

10         The Plan does provide for clear voluntary third-

11  party releases that have been broad notice.  What it does

12  not provide for are non-consensual releases of third

13  parties.  And I'll come back to that point in a little bit.

14         The third item, the Plan does provide for a

15  process under which the Debtors may assume, assume and

16  assign or assume and allocate executory contracts.  But it

17  does not, either through that process or any other

18  provision, provide for a blanket impairment, modification,

19  or alteration of the terms of any third-party agreement as

20  between non-Debtor parties.

21         And as the evidence demonstrated, in particular

22  the surety bonds, they will continue to exist and be

23  outstanding.  Any indemnification claim that arises against

24  the Debtor as discussed, so those agreements will be treated

25  in accordance with the terms of the Plan like any other

1   claim against the Debtors.  And in fact, Your Honor, the

2   Debtors have worked with multiple parties over the course of

3   the last several days to include reservations of rights

4   language in the proposed Confirmation Order that makes this

5   abundantly clear.

6           Next, on the exculpation.  As I will explain later

7   in further detail, the Plan does provide for appropriately

8   tailored exculpations for certain non-estate fiduciaries

9   based upon the substantial contributions made by those

10  parties integral to the success of this restructuring.  It

11  does not, again, provide for non-consensual releases to the

12  third-party.

13          THE COURT:  What are the exculpation, --

14          MS. LIOU:  (Glitch in the audio) --

15          THE COURT:  -- what does it mean -- and maybe

16  you're going to show me this and, if so, that's fine -- the

17  exculpation provisions that exculpate obligations under

18  prepetition agreements by third parties; how does that work?

19          MS. LIOU:  Which prepetition agreements by third

20  parties, Your Honor, are in particular?

21          THE COURT:  Well, you have the -- there's a

22  definition that then got carried forward into the

23  exculpation provision and it defines as some of what is

24  exculpated will be some prepetition agreements.  Is there

25  any exculpation with respect to any prepetition agreement?

1          MS. LIOU:  I believe Your Honor may be referring
2   to the confusion around the defined term for "additional
3   predecessor agreements."

4          THE COURT:  Yes.

5          MS. LIOU:  That term relates solely to agreements
6   struck by the Debtor during the course of the Chapter 11
7   cases with other predecessors prior to confirmation in
8   support of the Plan.  And so, for example, that defined term
9   solely relates to Apache, Hunt, Eni, and Chevron.  The
10  additional predecessor agreements are the agreements between
11  the Debtors and each of those respective parties.

12         THE COURT:  What about prepetition agreements with
13  those parties?

14         MS. LIOU:  There -- the exculpation does not cover
15  the scope of those prepetition agreements, Your Honor.

16         THE COURT:  And where do I get clarity on that?
17  Because when I read it, I thought it did.  I accept your
18  statement to me but there was going to be some language
19  added that made that clear.  Is that now clear in the
20  Confirmation Order?

21         MS. LIOU:  I believe it's clear, Your Honor, as
22  it's written; although we are happy to consider potential
23  language.  But let me explain why I believe it's clear.  We
24  had indicated in the Plan that as a part of the Plan
25  supplement, we would file the additional predecessor

1  agreements.  And we have done that.

2          THE COURT:  And you're telling me there are no

3  additional predecessor agreements that were in existence

4  prepetition.

5          MS. LIOU:  I'm sure that there were other

6  agreements between the parties prepetition but those are not

7  captured by the defined term and those were not agreements

8  that were filed as part of the Plan supplement.

9          THE COURT:  Sorry.  I meant as the defined term,

10  and my bad wording choice.  You're telling me at this point

11  additional predecessor agreements include no prepetition

12  agreements.

13          MS. LIOU:  Correct.

14          THE COURT:  Okay.

15          MS. LIOU:  Correct, at this point.  Your Honor,

16  that's absolutely correct.  If what you would like us to do

17  is add a word to the definition of "additional predecessor

18  agreements" to indicate that it constitutes solely post-

19  petition agreements that the Debtors have entered into, I

20  think that that would probably be acceptable for the

21  parties.  I'll have to make sure but that seems to me to be

22  a non-controversial change.

23          THE COURT:  And have you added any language -- and

24  I haven't looked at what you've done in your Confirmation

25  Order.  I want to be certain that the exculpations will be

1    applied only in a manner that is consistent with the Fifth

2    Circuit's *Pacific Lumber* opinion.  So the language may be

3    fine so long as -- because it says in accordance with

4    applicable law or language to that effect.  I want it to

5    specifically say that the exculpations are limited to

6    exculpations that are permitted under *Pacific Lumber*.  Is

7    there any problem with that?

8            MS. LIOU:  Not from the Debtors' perspective, Your

9    Honor.

10           THE COURT:  Okay.  Go ahead then.

11           MS. LIOU:  The last -- excuse me.  The last set of

12   topics that I'd like to cover are the treatment of the

13   sureties, Your Honor.  The Plan does provide the Debtors the

14   ability to allocate their own property interest as a

15   beneficiary under certain bonds to different entities.  But

16   very importantly, and this is a very, very important

17   distinction because I think there was a lot of confusion

18   that arose out of this, the Plan does not allocate,

19   transfer, or provide any surety bond to any entity under the

20   Plan under which the Debtor is a principal.  I think that

21   was also made very clear by Mr. Dane's testimony.

22           The Plan and the credit bid transactions do

23   provide that credit bid-acquired assets will be sold free

24   and clear of claims, liens, and interests.  But as Your

25   Honor noted yourself on the first day, that is permitted by

1    Section 363 of the Bankruptcy Code.

2           I'd like to now focus a little bit more on the

3    consensual third-party releases.

4           THE COURT:  Before we go there, the other sort of

5    big issue back on the prior page that we spent a lot of time

6    on are subrogation rights or duties that might exist with

7    respect to properties that are being sold.  Do you want to

8    tell me what your -- and you may remember the colloquy of

9    subrogation rights as to the Government since we could in

10   fact have allowed an abandonment or allowed a sale free and

11   clear.  And the issue that I raised was can we go ahead and

12   leave the Government in place, but since without the

13   Government in place there wouldn't have been subrogation

14   rights, still cut off subrogation rights?  What is the

15   Debtors' argument on that issue?

16          MS. LIOU:  So, Your Honor, we actually have

17   specific --

18          THE COURT:  You need a minute?  We'll take a

19   minute.

20          MS. LIOU:  (Coughing.)

21          THE COURT:  Why don't you take a minute?

22          MS. LIOU:  No, I'm sorry (glitch in the audio).

23   Everybody else that I've been working with knows that I have

24   this persistent cough.

25          Section 513 of the Plan actually has some language

1  that addresses this, Your Honor, which we heavily negotiated

2  with the RSA parties and this also with the Government.

3             THE COURT:  Five point --

4             MS. LIOU:  And it does provide that --

5             THE COURT:  So I need to look at 5.13 to answer

6  that.  Let me just open that.

7             MS. LIOU:  Okay.

8             THE COURT:  I want to understand exactly what

9  you're telling me you think I can do so that I'm going to

10  understand the arguments of others that say that I can't do

11  it.

12             MS. LIOU:  Sure.

13             THE COURT:  Let me open the Plan.  Okay.  I'm

14  looking at 5.13.

15             MS. LIOU:  Subparagraph "A," Your Honor.

16             THE COURT:  Okay.

17             MS. LIOU:  It's in this Plan.

18          (Pause in the proceeding.)

19             THE COURT:  So, again, this is clarity.  I want to

20  be sure I understand it.  So a surety -- I'm looking at the

21  very last clause.  So a surety furnishes a bond to the

22  United States and pays on that bond.  Are they subrogated to

23  the United States' financial recovery rights against anyone?

24             MS. LIOU:  I think the answer depends, Your Honor.

25  What the Plan does is it preserves whatever subrogation

1  rights they may have had at that time if those bonds are

2  drawn.  I don't think we're making a determination at this

3  point in time, and the Plan certainly doesn't prescribe one

4  way or another whether or not those surety parties would

5  lose their subrogation rights or gain extra rights.

6       What we wanted to do was put this back to a mutual

7  position and make very clear that the Plan is not interring

8  their ability to assert a subrogation right post the draw of

9  the bond that occurs post-effective date.

10      THE COURT:  So should that eventuality occur, the

11 surety may assert a financial subrogation right to the

12 Government, and any party or non-party may contest that

13 subrogation right.

14      MS. LIOU:  That's correct, Your Honor.

15      THE COURT:  Okay.  Thank you.

16      MS. LIOU:  Your Honor, I think we've covered

17 expenses, so I don't know that we need to dwell on it but I

18 did want to go to the third-party release provision slide.

19 As the evidence demonstrates and as the docket also

20 demonstrates, the third-party release provisions are fully

21 consensual and they were exclusively noticed.  This Court

22 had approved our process for noticing out the ballots, which

23 included the provisions of the releases in them, and

24 approved the notice of the confirmation -- also has

25 provisions, copies of the releases in them as well.  It was

1  very expensive.

2        THE COURT:  Yeah.  I'm --

3        MS. LIOU:  -- all of the (glitch in the audio) --

4        THE COURT:  -- actually not aware of anyone that

5  has objected to the third-party releases except for people

6  that opted out of them.  And people that opted out of them

7  of course aren't bound by them.  Am I missing something?

8        MS. LIOU:  Okay.

9        THE COURT:  Is there an objection by any party to

10  the third-party release that is the ones that -- has anybody

11  objected to third-party release that also then didn't opt

12  out of it?  Because I didn't think we did.

13        MS. LIOU:  Your Honor, I'm not aware of any party

14  who has not affirmatively opted out or made clear to the

15  Debtors by filing an opt-out notice on the docket that they

16  have opted out.

17        THE COURT:  Okay.  Thank you.

18        MS. LIOU:  I will take that as a not so subtle

19  hint to move on --

20        THE COURT:  Well, I'm just -- I'm not sure --

21        MS. LIOU:  -- to the next slide.

22        THE COURT:  -- why I care about something that no

23  one is objecting to when the Fifth Circuit has said you

24  could do a consensual third-party release and, I mean, which

25  they have.  There is always an issue as to whether opt-in,

1    opt-out is correct.  And I understand that issue.  People

2    can argue whether we meet the Fifth Circuit.  But if no

3    one's arguing against it, I'm not sure why I want to spend a

4    lot of time on it.  I want to be sure that people that want

5    to opt out have opted out.  And I don't think anyone's --

6              MS. LIOU:  Yeah.

7              THE COURT:  -- objecting who didn't also opt out

8    and which I'm not a -- I don't understand the issue if

9    that's where we are.  So --

10             MS. LIOU:  Your Honor, we addressed it simply

11   because it was raised as an objection.  But I completely

12   agree with your position which is folks had the opportunity

13   to opt out.  And to the extent that they did exercise that

14   right to opt out, then they are not forced to provide these

15   releases to third parties under the Plan.

16             THE COURT:  It's more that I think that right now

17   no one that is objecting didn't also opt out.  And that's

18   slightly different than what you're saying.  But someone

19   that opted out can't then come in and say you shouldn't have

20   given us the option to participate in a third-party release.

21   I mean, it didn't hurt them to get the option to

22   participate.  So -- and I don't think we have anyone like

23   that that's doing it so --

24             MS. LIOU:  Yes.  I think if we do, they should be

25   at the proper hearing, but I am not aware of any party who

1   has complained about these releases and has not already

2   opted out.

3          So, Your Honor, I think we can move on to the next

4   slide which deals with the exculpation provisions.  As I

5   mentioned before, in our view the exculpation provision sets

6   a standard of care, it's not really a release per se for the

7   conduct during the Chapter 11 cases, the acts arising out of

8   the restructuring itself.  The exculpation certainly covers

9   Debtors' estates and creditors' Committee and members of the

10  creditors' Committee.  But it also covers certain non-

11  fiduciaries who nevertheless were incredibly integral to the

12  Plan process.

13         As Mr. Perez has already explained, each of those

14  parties participated in one aspect or another in ensuring

15  the success of this restructuring, whether providing some

16  form of exit financing, negotiating relevant documents and

17  providing the voting support needed to get the Plan

18  confirmed, or negotiating with us like the predecessors, the

19  relevant predecessors, did on very complex arrangements

20  under which they would effectively work consensually with

21  the Debtors and the Credit Bid Purchaser to address much of

22  the decommissioning obligations that are present here, over

23  90 percent of the decommissioning obligations that are

24  present in this case.

25              THE COURT:  What happens --

1          MS. LIOU:  The parties acted --

2          THE COURT:  -- what happens if there is a future

3   dispute over the exculpation provision?  Is it coming back

4   here for a decision as to whether the dispute is within or

5   outside of the exculpation, or is that not addressed in the

6   Confirmation Order?

7          MS. LIOU:  Your Honor, I would expect that because

8   the exculpation provisions are a part of the Plan, they

9   would be addressed before this Court at the time, and if a

10  dispute were to arise regarding the scope of the

11  exculpation.

12         THE COURT:  So when you draft the language that

13  I've asked you to draft that deals with *Pacific Lumber*, I

14  want to be certain that there is a gatekeeping function so

15  that, for example, no one uses the exculpation when they

16  shouldn't be using it.  And if we were to determine that

17  some action is not exculpated, then I don't want somebody

18  trying to defend on something where they claim it's

19  exculpated -- or vice-versa.  You know, if somebody got

20  exculpated, they shouldn't be sued at all for the

21  exculpation.  So include a gate keeping function to be sure

22  that *Pacific Lumber* is fully and faithfully adhered to.

23         MS. LIOU:  We will do so, Your Honor.

24         THE COURT:  Thank you.

25         MS. LIOU:  I did also want to point out that there

1   is carved intentional fraud, unlawful conduct and that

2   generally the exculpation, in our views, are a pretty common

3   feature in complex cases like this.  And the purpose of it

4   is obvious, because there are many parties who can work with

5   the Debtor to arrive at consensual arrangements, which are

6   to the benefit of all the creditors in the case, and

7   maximize value for the Debtors' estate.  And by allowing

8   those parties to be exculpated protects -- the exculpation

9   you facilitate the consensual process, that I think

10  Chapter 11 is designed hold.

11          Your Honor, with that I think we can turn to the

12  next slide.  I don't necessarily belabor the point, because

13  I know Mr. Brescia did a really great job of laying out each

14  of these parties provided in their own unique way support

15  for the Plan and how that value was integral to the success

16  of the restructuring.  And how like a four-legged stool, if

17  you pull one leg out, the stool is not going to stand.

18          THE COURT:  I think we might call those

19  three-legged stools here in Texas, but that's okay.

20          MS. LIOU:  Given the number of parties here I

21  opted for a four-legged stool.

22          Your Honor, lastly, I just want to make a couple

23  of points before I close.  As we iterated throughout the

24  case, and I think as you've heard from Mike Dane in his

25  testimony, the Plan is designed to accomplish three very

1   important goals.

2          It was important from the beginning -- even before

3   the cases were filed that the Debtors be positioned to

4   withdraw all of their decommissioning obligations with as

5   little impact to the taxpayer as possible.  This was an

6   important goal, not only of the Debtors but also of the

7   Government, and the Debtors have heeded that concern that

8   the Government had.

9          In addition this restructure maximizes value for

10  creditors.  I think testimony -- uncontroverted testimony

11  was presented, but the alternatives really are potential for

12  (indiscernible) effectively.  Chapter 7 liquidation or a 363

13  sale without this financing provided to ensure that the

14  Debtors were able to provide the coverage of creditors under

15  their Plan.  I don't think it's a value maximizing

16  proposition for all of the parties in this case.

17         And last thing I think, most importantly from the

18  Debtors' perspective, it does preserve thousands of jobs and

19  it preserves the Debtors' deepwater business.  It is in line

20  with the rehabilitative purposes of Chapter 11 and they have

21  an opportunity for a fresh start.

22         And I know that it has been an incredibly long

23  odyssey for management, especially who have been extremely

24  dedicated to working nights, weekends and as you saw from

25  the dedications Mr. Dane testified all day on Monday.  They

1   are eager to emerge from Chapter 11.  They are eager to have

2   that fleshed out, the Chapter 11 offer, and look forward to

3   the future of successfully continuing their operations in

4   the Gulf of Mexico.

5            And with that, Your Honor, I think we would press

6   our case ask that you confirm the Chapter 11 Plan.

7            THE COURT:  Ms. Liou, thank you.

8            Mr. Carlson, will you be ready to address the

9   Confirmation Order issues at 3:00 o'clock?

10           I'm not seeing Mr. Carlson.  Hold on.  There we

11  go.

12           Mr. Carlson, will you be ready to address the

13  Confirmation Order issues at 3:00 o'clock?

14           MR. CARLSON:  Yes, Your Honor.  I will.  We are

15  continuing to work with several different parties on

16  provisions even as this hearing is ongoing and will be ready

17  to address any questions that the Court has and to kind of

18  give a status update on where we are with various parties

19  and negotiating language and finalizing it.

20           THE COURT:  All right.  If the parties that will

21  oppose even after whatever deals get made by Mr. Carlson,

22  can we organize how those opposing arguments will be -- have

23  you-all decided who's going first, second, third, things

24  like that?  It will take a minute just to get the afternoon

25  organized.

1          UNIDENTIFIED MALE:  No, Your Honor.  We haven't

2    yet finalized Order --

3          THE COURT:  Well, no, that's for others to see how

4    they've organized it.

5          Let's see, Mr. Schaible, I thought you were not

6    going to be opposing, but maybe you're going to surprise me.

7          MR. SCHAIBLE:  I'm not opposing, Your Honor.  I

8    would like to just ask for a few minutes at 3:00 o'clock if

9    that's okay, Your Honor.

10          THE COURT:  Of course.  Did you want to go before

11    or after Mr. Carlson?

12          MR. SCHAIBLE:  After Mr. Carlson is always a heavy

13    opportunity, I think I should go after Mr. Carlson.

14          THE COURT:  Okay.  That's fine.

15          Mr. Balasko.

16          MR. BALASKO:  Thank you, Your Honor.  Zach Balasko

17    for the Department of the Interior.

18          Like Mr. Schaible, I would like just a brief

19    opportunity before the opponents go, to go over the reasons

20    why the Government has decided not to object to this Plan.

21          THE COURT:  Of course, thank you, Mr. Balasko.

22          Mr. Pasquale.

23          MR. PASQUALE:  Well, Your Honor, Ken Pasquale

24    Stroock and Stroock and Lavan for the Official Committee of

25    Unsecure Creditors.

1          I, too, will just have a very short statement if I

2    may.

3          THE COURT:  Of course.  Thank you.

4          Mr. Zuber.

5          MR. ZUBER:  Good afternoon, Your Honor.  Yes.

6    Scott Zuber.  I will have a little bit of argument when

7    everybody else is through on the proponent's side and

8    opponent on behalf of several surety clients.

9          THE COURT:  All right.  And are you planning to go

10   first Mr. Zuber, or will you work that out with the other

11   opponents?  I don't care who goes first.  Maybe between now

12   and 3:00 --

13         MR. ZUBER:  I'm happy to --

14         THE COURT:  -- you can work out an Order of who's

15   going to go first, second, third, et cetera, I'm not going

16   to cut anyone off.

17         MR. ZUBER:  Sure.  I'm happy to go first, and I'm

18   not sure at this point how many other sureties are planning

19   to make arguments, but we can try to coordinate that during

20   the recess.  But I'm happy to go first if that works.

21         THE COURT:  Why don't we do this?  Let's take in

22   terms of opponents, we'll take all of the sureties, whoever

23   wants to make any statements, followed by predecessors-in-

24   interest.

25         So do we have any predecessors-in-interest that

1   intend to make arguments?

2          Mr. Alaniz.

3          MR. ALANIZ:  Good afternoon, Your Honor.  Omar

4   Alaniz on behalf of the Hess Corporation.

5          Yes.  We do intend to make a short closing

6   argument.  And I did coordinate with BP and I believe BP

7   will be going first, but maybe they should just confirm.

8          THE COURT:  Okay.  Can I just get you-all to

9   coordinate on the predecessors so that we've got that

10  organized for this afternoon?

11         MR. ALANIZ:  Sure.  I don't know if the other

12  predecessors.  I believe that counsel for Exxon and Marathon

13  made some opening statements and I wasn't sure if they were

14  going to make closing arguments, but I'll send an email out

15  to some of those parties and coordinate.

16         THE COURT:  All right.  Thank you.

17         Mr. Kuebel.

18         MR. KUEBEL:  Yes.  Good afternoon, Your Honor.

19  Omer F. Kuebel, III, on behalf of McMoRan and its affiliates

20  and ConocoPhillips and its affiliates.

21         I certainly do intend to have closing arguments

22  directed almost exclusively to the scope of the exculpation

23  clause, Your Honor.  I'm happy to slot in after BP and Hess,

24  or if anyone else wants to go forward.

25         And I do think that the guidance that Your Honor

1  has given on these issues, were they implemented in the

2  Confirmation Order, into language that we've requested,

3  would actually solve a lot of our objections.  But for

4  whatever reason we have unfortunately not been able to

5  engage with the Debtor over the last few days over those

6  issues.  But as of this moment, we certainly Plan to go

7  forward and address the breadth of the exculpation clauses

8  in the Plan.

9          THE COURT:  So as you know, I've been known to put

10 an Order on the screen and put my own language in it,

11 Mr. Kuebel.  I intend to do what I said I'm going to do

12 there.  They don't have exclusive drafting rights on that

13 Confirmation Order.  And I'm saying that for everyone's

14 benefit, so that, you know, maybe between now and

15 3:00 o'clock, Mr. Carlson and you can have a conversation.

16         MR. KUEBEL:  We would certainly welcome that, Your

17 Honor.

18         THE COURT:  Thank you.

19         From 713-374-3674.

20         MR. HUTTON:  Your Honor, John Hutton on behalf of

21 BP.

22         Your Honor, I think we're prepared to move closing

23 arguments on all the issues raised.  I think the scope of

24 what they present is potentially impacted by the language

25 that was filed last night with the proposed Confirmation

1  Order, which includes some of our language that we've

2  proposed.  And I think, depending on some clarifications we

3  hope to get, to go a ways towards resolving it.

4         But I think it's subject to some ambiguity, but we

5  will seek to clarify.  And if it means what we think it

6  means and accomplishes what we think it's intended to

7  accomplish, it may go a long way towards resolving our

8  issues, but that's something we would like to have the

9  opportunity to flesh out with the Debtors and have not had

10 that opportunity as of yet.

11        THE COURT:  All right.  Thank you.

12        And finally, Ms. Rosen wanted to speak.

13        MS. ROSEN:  Thank you, Your Honor.  Suki Rosen on

14 behalf of XTO entities.  We're in somewhat of the same boat.

15 We've been working with the Debtors on language for the

16 Confirmation Order and we've gotten close, there's a couple

17 of remaining issues and we're going to try to have a

18 conference with the Debtors this afternoon to try to resolve

19 those remaining issues.

20        THE COURT:  Thank you.

21        I was wrong, you weren't last.

22        Mr. Eisenberg.

23        MR. EISENBERG:  Thank you, Your Honor.  I was

24 waiting for Ms. Guffy to chime in and she didn't, so I took

25 the opportunity.

1           Obviously, we coordinated with Mr. Kuebel and

2    Ms. Guffy, and Mr. Kuebel will go first for McMoRan a lot of

3    what he'll do obviously will also bear on our clients, W and

4    T, Merit, and ConocoPhillips.  Ms. Guffy will be speaking on

5    the exculpations, as well, and I also be speaking, Your

6    Honor.  But with regard to 513 -- and we did see the changes

7    they made last night -- we also will be speaking to the

8    language that the Debtors put into their proposed

9    Confirmation Order and will look forward to trying to work

10   that out between now and 3:00 o'clock if we can.

11          We've obviously proposed our own language, we will

12   have that available for the Court as well.  There is some

13   confusions that we have with regard to contracts that are

14   executory contracts that have been assumed and are somehow

15   being affected.

16          And so, but we do appreciate Your Honor's guidance

17   and we do have that split up amongst ourselves today as

18   well.

19          THE COURT:  All right.  Thank you.

20          Ms. Archiyan.

21          MS. ARCHIYAN:  Good afternoon, Your Honor.  Yelena

22   Archiyan on behalf of the Energy Transfer affiliates.

23          Unfortunately, we have unable to come to a

24   resolution with counsel for the Debtors with respect to an

25   agreed form of language to be included in the Confirmation

1   Order.  So I will also like to make a few statements at the

2   appropriate time.  Our issue is a little different from the

3   issues that the sureties and predecessors-in-interest, so

4   I'm happy to wait until the very end or whenever you think

5   is appropriate.

6             THE COURT:  That makes sense to me.  Thank you.

7             Mr. Chiu.

8             MR. CHIU:  Yes.  Thank you, Your Honor.  Kevin

9   Chiu, Baker Botts, on behalf of Hunt Oil Company and

10  subsidiaries.

11            Your Honor, we've been working as well with the

12  Debtors similarly to Mr. Carlson with regards to the

13  language in the Confirmation Order for the Hunt turnkey

14  agreements and the various provisions and terms under the

15  Hunt deal.  I think we are certainly close, and we will work

16  closely with Mr. Carlson and his team to confirm a couple

17  things and making sure that the right documents are being

18  filed in front of Your Honor and the Court.  But we

19  certainly do like to preserve our rights and if any items

20  need to be brought to your attention, we anticipate in doing

21  so this afternoon while Mr. Carlson is going through the

22  Confirmation Order.

23            THE COURT:  Thank you.

24            Ms. Russell.

25            MS. RUSSELL:  Good afternoon, Your Honor.  Robin

1  Russell, Hunton Andrews Kurth, on behalf of Apache

2  Corporation.

3          We may have a very brief statement in support of

4  the Plan and the recently filed Apache surety term sheet.

5  We also have a few minor issues that we're working out on

6  the Confirmation Order, and we will do that with the Debtor

7  during our recess.

8          THE COURT:  Thank you.

9          Mr. Dendinger.  Mr. Dendinger.

10         MR. DENDINGER:  Yes.  Thank you, Your Honor.  Good

11 afternoon, Mark Dendinger on behalf of Eni Petroleum US LLC

12 and Eni US Operating Co., Inc.

13         We've been working closely with the Debtors on

14 language to resolve the remaining concerns in the

15 Confirmation Order.  We would simply like to reserve our

16 rights with regard to making any closing arguments if we

17 cannot resolve those concerns, but we expect to be able to

18 resolve them prior to confirmation of the Plan.

19         THE COURT:  All right.  Thank you for that

20 announcement.

21         Mr. Zeiger.

22         MR. ZEIGER:  Good afternoon, Your Honor.  It's

23 Jeffrey Zeiger, Kirkland and Ellis, on behalf of Atlantic

24 Maritime Services.

25         We filed a very limited objection that frankly has

1   been addressed based on comments during the hearing as well

2   as changes to the Plan since we filed.  So I was going to

3   spend 30 seconds informing the Court of that, but since I

4   just did, I'm happy to handle it however you want.  Less

5   than a minute at most, Your Honor.

6               THE COURT:  Thank you, Mr. Zeiger.

7               All right.  Mr. Carlson, would you arrange to have

8   someone walk over here at 3:00 o'clock?  It may be you know,

9   five after 3:00, they may walk in whenever it is they walk

10  in with a flash drive with the Word version of the

11  Confirmation Order, so that we're not just fighting -- me

12  fighting to try to get it in an editable form.  I'll edit on

13  the word version, I'll put it up on the screen.

14              MR. CARLSON:  Yes, Your Honor.  We're happy to do

15  that.

16              THE COURT:  All right.  Thank you.

17              From 847-363-6644.

18              MR. KIND:  Yes, Your Honor.  This is Michael Kind

19  for the Cox entities.

20              THE COURT:  Yes, sir.

21              MR. KIND:  We wanted to also reserve the right to

22  make a short closing statement.

23              THE COURT:  Thank you.  At which point did you

24  want to have it?

25              MR. KIND:  We're hoping to resolve our issues as

1  well, Your Honor, so we could go at the end.  We're hoping

2  that others will cover some of our arguments, we might not

3  be able to -- we might not have to repeat a lot of what's

4  argued previously.

5          THE COURT:  All right.  I appreciate all the

6  announcements and all the work that's going into this.  We

7  will adjourn --

8          MR. PEREZ:  Your Honor?

9          THE COURT:  Yes.  Mr. Perez.

10         MR. PEREZ:  Your Honor, this is Alfredo Perez.  I

11 apologize, I have been side barring with Mr. Schaible and it

12 might make sense for the other supportive of the Plan to go

13 first before Mr. Carlson goes through the Order, just in the

14 interest of -- the Court hearing all the arguments first and

15 then we can go through the Order before the objectors come

16 on.

17         THE COURT:  That actually makes sense.

18         Then, Mr. Carlson, why don't you -- I have a

19 feeling, during that, you're still going to be working on

20 the Confirmation Order so forget my 3:05 time deadline.  Get

21 it to me at a point you think I need it, so that I'm working

22 with a live but editable version of the Confirmation Order,

23 okay.

24         MR. CARLSON:  Yep.  Will do.

25         THE COURT:  Okay.  Thank you.

1          Court's in adjournment until 1:30.  This hearing

2   is in adjournment until 3:00.

3        (Recess taken from 12:15 p.m. to 3:08 p.m.)

4                         AFTER RECESS

5          THE COURT:  We don't need new appearances.  I

6   think what we are now going to do is to go to the first

7   proponent that wishes to speak in favor of confirmation.  So

8   if that individual would please press five star one time on

9   their phone.

10          Mr. Schaible, good afternoon.

11          MR. SCHAIBLE:  Good afternoon, Your Honor.  Damian

12   Schaible with Davis Polk on behalf of the First Lien Term

13   Loan Lenders and the DIP lenders.

14          Can you hear me okay, Your Honor?

15          THE COURT:  Yes, sir.

16          MR. SCHAIBLE:  Okay.  Perfect.

17        CLOSING ARGUMENTS ON BEHALF OF THE FIRST LIEN

18              TERM LOAN LENDERS AND DIP LENDERS

19          MR. SCHAIBLE:  Your Honor, first I want to

20   apologize to the Court and the other parties for

21   inadvertently inconveniencing everyone this morning with the

22   schedule.  I was moderating an ABI panel on commercial real

23   estate, which as Your Honor knows I've been learning a

24   little bit, so I wasn't able to change that and I apologize.

25          THE COURT:  You don't owe me an apology.  It was I

1  believe Mr. Perez fell on the sword as his fault.

2          MR. SCHAIBLE:  Mr. Perez is kind.  There's a lot

3  of emails flying around so.  But again apologies for that.

4          Your Honor, I virtually rise and obviously to

5  support the arguments made by the Debtors.  I thought that

6  Mr. Perez and Ms. Liou --

7          THE COURT:  I need to interrupt you a minute,

8  Mr. Schaible, Mr. Chiu has apparently an objection.

9          Mr. Chiu.

10          MR. CHIU:  Oh.  Sorry about that, Your Honor.  No

11  objections, merely throwing my name in to make a statement

12  during the proponent's phase, but (glitch in the audio) I

13  have no objections to --

14          THE COURT:  Okay.  I'll go ahead -- if I can get

15  you to press it when the time comes.  Thank you.

16          Sorry to interrupt, Mr. Schaible, just wanted to

17  be sure if somebody had an objection to you, they could

18  voice it.

19          MR. SCHAIBLE:  Your Honor, lots of people have

20  objections to me, that's a little --

21          So, Your Honor, I rise virtually to support the --

22  obviously to support the Debtors' case.  I thought that

23  obviously Mr. Perez and Ms. Liou did a terrific job of

24  laying out the arguments, and I'm not going to bore Your

25  Honor with them.  I rise virtually merely to make a few

1  points and really by way of emphasis of a few points that

2  Mr. Perez and Ms. Liou raised and to ask Your Honor for some

3  guidance on one point.

4          So Your Honor, as Your Honor has heard at length

5  over the past many months that we've been before you, you've

6  heard a lot about the successes of the cases and the

7  significant contributions that our group has made.  But just

8  to remind -- and there's a reason for this -- as Your Honor,

9  knows our group first negotiated the RSA and the cornerstone

10  deal with Apache prepetition when we had no idea where the

11  case was going to go.  But that deal was important and

12  formed a cornerstone of what ended up becoming the Plan.  We

13  backstopped $100 million DIP and provided that to the

14  Debtors to permit the cases to proceed.

15          We supported the Debtors in difficult negotiations

16  with all the additional predecessors and stand here now with

17  the vast lion's share of Fieldwood's P&A obligations

18  consensually spoken for.  We worked hard with the Debtors

19  and the Government to get to the non-objection that we've

20  received from the Government, and we've been working with

21  the Debtors' sureties throughout.  We are, as was mentioned,

22  both backstopping the exit financing and putting in over

23  $100 million of new money, much of which will be used to not

24  only capitalize the new co-entity but also to ensure that

25  the decommissioning will be done.

1          I say all of this Your Honor to remind the context

2   -- and this is where we believe it's important to remember

3   that, in addition to having provided all the DIP, this is

4   not one of those cases where someone's standing here saying

5   hey Your Honor we have another idea, we have another

6   solution that we can offer the Court that is better or

7   different from the solution that's being offered by the

8   Plan.  Unfortunately, I think everyone agrees that this

9   really is the only solution that exists to avoid a

10  liquidation and additional hardships all around.

11         So the nature of the objections that Your Honor is

12  dealing with today are legal objections that obviously we

13  have different disagreements with and again I think that the

14  Weil team ably handled what we would have said on all those

15  points.  And then objections where people are seeking -- and

16  I think when Mr. Carlson takes over to talk through the

17  Order -- I think you're going to see that we've done further

18  work, during the period of time you gave us early afternoon,

19  Your Honor, we were able to reach additional agreements on

20  language.  But some agreements -- disagreements on language

21  may continue to exist.  And I think that those exist in a

22  couple of places that I wanted to touch base with Your Honor

23  about this afternoon.

24         The first -- and I'll deal with it quickly -- is

25  the exculpation.  I heard Your Honor's point when Ms. Liou

1  was handling the exculpation point.  I think you get the

2  fact that our group in addition to other groups have

3  provided what I would describe as extraordinary support and

4  have played a critical role in the Plan, and the exculpation

5  is appropriately limited both in time and in scope.  And so

6  we believe it quickly and quickly passes the *Pacific Lumber*

7  standard.

8          And Your Honor said, you know, add language to the

9  Plan to make clear that I get to decide whether a given

10 exculpation is to be covered or not.  I think that makes

11 perfect sense.  And the Debtors have proposed some language

12 that I think Your Honor will soon see.

13         The one thing I wanted to be clear about, because

14 I just want to avoid any ambiguity here, by referring to

15 *Pacific Lumber* standard, as Your Honor notes, people throw

16 around the *Pacific Lumber* standard often times as a way to

17 argue the only safe fiduciaries can be and receive an

18 exculpation.  I don't think that's right, and I don't think

19 that's what Your Honor has ruled in prior cases and I know

20 that Your Honor and the Southern District of Texas, more

21 generally, has permitted in call it extraordinary cases

22 third-party non-fiduciaries to get the benefit of

23 exculpation.

24         And so I would love for us to be able to, when you

25 get to the Order, consider language that would make clear

1   that while the *Pacific Lumber* standard will be the standard

2   for Your Honor to call balls and strikes, if you need to

3   with respect to exculpation, we don't have to relitigate

4   whether our holders would fit within that standard.  In

5   other words we very much would like Your Honor to rule today

6   that our group is entitled to the exculpation.  And the

7   question is just what is the scope of the exculpation under

8   controlling law?  And so that's the first point I wanted to

9   make, Your Honor.

10          THE COURT:  So when we get there, and I need to

11   hear argument about it, but here's been my concern about --

12   I have to rely on *Pacific Lumber* and I will apply *Pacific*

13   *Lumber*.  But *Pacific Lumber* isn't the only law that is used

14   when thinking about what fits within a *Pacific Lumber*.  And

15   in my view *Midlantic* plays a relatively major role in what

16   we ought to be doing here.

17          I want to go back and talk about *Midlantic* for

18   just a moment.  Where what the Supreme Court did was said

19   that the public policy behind our environmental laws was so

20   important that we're going to make it preeminent over

21   enforcement of specific language within the bankruptcy code.

22   And the evidence is now closed and so far the evidence is

23   that the parties who are participating in the cleanup

24   effort, which includes your client, have played a really

25   significant role in furthering the public policy of the

1    United States a *Midlantic*.  So when you think about who the
2    critical players are that would fall within *Pacific Lumber*,
3    I think that you have to think about that in the context of
4    *Midlantic*, which would in fact educate the Court that your
5    client does fall within *Pacific Lumber* read in the context
6    of *Midlantic*.
7            So as to -- I want to hear arguments about this,
8    but the concept to me that you can be sued for what you did
9    in the case -- your client could be sued for what they did
10   in the case.  I'm not talking about before the case and I'm
11   not talking about what they might do after the case, but the
12   concept they can be sued for what they did within the case
13   when it was in effect mandated by *Midlantic* if we were going
14   to ever clean these matters up.  With counsel heavily in
15   favor of being certain it applies to you.  I don't know that
16   I want to put particular language in there, as opposed to
17   the comment that I'm making now, because it's awfully
18   difficult to draw where the lines are.  I don't know what
19   your client did two years ago, and I don't know what your
20   client will do two years from now.
21           But I don't read *Pacific Lumber* as being some far
22   out of the market opinion where I need to worry about it
23   being cabined narrowly by what was occurring in *Pacific
24   Lumber*, which is vastly different than what is happening
25   here.  I mean just on a superficial level it was (glitch in

1  the audio) even not by me I don't -- it's not that I have an

2  opinion on this, this is an anti-environmental case, whereas

3  *Midlantic* says that we should counsel pro-environmental

4  cases.

5         So this isn't a hard call for me right now to know

6  that.  I want to hear argument about it.  I'm not sure that

7  I want to give the definition you want to give only because

8  the difficulty of anything that we say and then when

9  something becomes fact specific, you know, how we apply it

10 may be difficult, but I'm perfectly willing to listen to the

11 argument about it.  But it has been my view throughout, and

12 based on the evidence that I've heard which was undisputed,

13 is that without the efforts of your clients and others but

14 I'll take yours since you're the one I'm looking at, we

15 would not have a solution to a major environmental problem

16 in the Gulf of Mexico that *Midlantic* tells me to utilize the

17 Bankruptcy Code in a manner to solve the problem.

18        So with that, we'll worry about the particular

19 language when we get there, but I very appreciate and you're

20 not -- I hope you realize you're not making me think about

21 this for the first time, right.  I've been worried about

22 this throughout the case and how *Midlantic* plays into

23 *Pacific Lumber*, and I do think it clearly does from what I'm

24 seeing.

25        MR. SCHAIBLE:  Okay.  Okay, Your Honor.

1  Understood.  I think at the right time I would love the

2  opportunity to try to convince Your Honor that -- and by the

3  way I was saying my group, but what I really mean as you

4  know is the ad hoc group and credited purchaser, which

5  obviously both are what you are talking about.

6          THE COURT:  Right.

7          MR. SCHAIBLE:  And I do think that the exculpation

8  provision does not exculpate anyone for anything they did

9  before the case and does not exculpate anyone for anything

10  they would do after the case.  So I would ask Your Honor to

11  consider at the right time -- again my only request would be

12  that I don't have to relitigate two years from now whether

13  our clients were covered by the exculpation at all.  I think

14  that's something that Your Honor is ably able to determine

15  today.  The scope of that exculpation would remain an open

16  question, I understand that, but we can get to that when

17  you've heard the argument, Your Honor, and we can --

18          THE COURT:  And I think you've heard what I'm

19  saying about it.  I don't know that it's inconsistent with

20  what you're saying at all, but it may be difficult writing

21  it, but that's -- that is how I view under applicable law.

22          MR. SCHAIBLE:  Understood.  Understood and we can

23  discuss it when we get to the language, Your Honor.

24          The other point, and I think you're going to hear

25  about this again Your Honor, and again I almost said nothing

1  about it because Ms. Liou handled it so well during her

2  closing.  But during some of the conversations that we've

3  had over the past couple of hours it's sort remained an

4  issue.  And this is effectively the free and clear sell kind

5  of issue here.  And again, Your Honor, we're not looking for

6  third-party releases -- non-consensual third-party releases

7  of the ad hoc group or of credited purchaser or of anyone,

8  but we do need to know that with respect to the claims that

9  are being addressed in the case and with respect to assets

10  that are being purchased by credited purchaser and with

11  respect to credited purchaser as a purchaser of assets free

12  and clear that there aren't obligations or claims that are

13  somehow riding through.

14       And this is one of those topics, it's very easy to

15  talk about in theory.  I think it's so obvious in theory

16  it's almost a waste of Your Honor's time.  But when you

17  start to look at the breadth of some of the language, then

18  in particular some of the sureties are pushing for as carve

19  outs under their sureties policies, what I would -- what I

20  would ask Your Honor to consider as you're hearing the

21  arguments -- and we can talk further about -- is we

22  understand and want to be crystal clear that with respect to

23  any contract, surety bonds, any agreements that are being

24  achieved and assigned to credited purchaser, no one is

25  looking to impact anyone's rights under those agreements and

1  that's an absolutely imperative completely understood.  We

2  are not looking for a free pass with respect to any

3  agreements that we are purchasing on a go forward basis.

4         All of that said, we can't stand by carve outs --

5  and you'll see it when you see the language -- that might

6  suggest that somehow with respect to agreements that were

7  not assumed and assigned, third parties have the right to

8  come after a credited purchaser or come after the purchased

9  assets on account of those non-assumed and defined

10 agreements.

11        And so what we have proposed, and you'll see it in

12 the language, is that we need very broad carve outs that are

13 being sought by a number of the sureties that basically say

14 not withstanding anything that exists in the Plan,

15 effectively we maintain all of our rights under all of our

16 agreements with respect to any third parties.  We have

17 proposed that third parties, other than credited purchaser

18 and with respect to the purchased assets, except to the

19 extent that it's on account of assumed and assigned

20 agreements and subrogation.

21        And anything that comes along with those assumed

22 and assigned agreements we are 100 percent on the hook for

23 and we're not looking to impact anyone's rights with respect

24 to.  But with respect to prepetition agreements that the

25 Debtors had merely to the extent that we are purchasing

1   those assets those obligations should not ride along they

2   should be addressed in the Plan as we believe they would be

3   as unsecured claims.

4           THE COURT:  Let's look at the language.  We've had

5   an extensive discussion about that on the Record, if we

6   approve this Plan, your client is buying free and clear of

7   the kinds of claims you're describing, period.

8           MR. SCHAIBLE:  Correct.  Okay.  Thank you, Your

9   Honor.  And that's really -- and you'll see as it comes down

10  to it.  Other than that, Your Honor, I'm going to let you

11  get on to others.  But we do appreciate Your Honor's time

12  and the Court's time, and this is incredibly complex.  Those

13  of us who have spent, you know, the better part of

14  nine months on this day-in-day-out sort of lose sight of the

15  bigger picture sometimes.  But when you do look at the

16  bigger picture this is a Plan that really does show the best

17  of a lot of people on this Zoom call, those I agree with and

18  disagree with.  Thank you, Your Honor.

19          THE COURT:  Thank you.

20          Mr. Balasko, if you would go ahead and press

21  five star I would appreciate it.  I made comments about how

22  I thought *Midlantic* should be applied to further the

23  interest of the people of the United States.  And in fact if

24  we're going to utilize it properly, that it does influence

25  the application of the bankruptcy code to particular

1 situations.  It dawns on me that because I'm saying how I

2 believe you are acting in terms of implementing this, I

3 should confirm that I'm reading, if you will, the United

4 States correctly that you have determined that you're not

5 objecting, because this in fact furthers the kind of

6 principles of *Midlantic*.  Because if not then the decision

7 that I'm telling Mr. Schaible that I think is correct, could

8 be incorrect.  Because it depends on -- in fact I've read

9 the Department of Justice correctly.  So go ahead, please,

10 if you would, Mr. Balasko.

11         MR. BALASKO:  Thank you, Your Honor.  Zach Balasko

12 on behalf of the Department of the Interior.

13                 CLOSING ARGUMENTS ON BEHALF OF

14                   THE DEPARTMENT OF INTERIOR

15         MR. BALASKO:  I think Your Honor's understanding

16 of *Midlantic* is correct.  The Bankruptcy Code under

17 Section 554 gives Debtors -- or trustees and those in

18 possession a very broad right to abandon property if it's a

19 burden to the estate.  You know, in recognition of the

20 overwhelmingly important public policy considerations of

21 particularly environmental laws, the Supreme Court created a

22 -- judge made exception to that to the management standard

23 in *Midlantic*, where --

24         THE COURT:  Probably wouldn't happen with the

25 current Supreme Court, right?  But I think I need to rule on

1 the way they've already ruled and not the way they might

2 rule today, right?

3          MR. BALASKO:  Your Honor, as a proud graduate of

4 Washington and Lee school of law, I would have to note that

5 this is one of Justice Powell's my fellow WNL graduate, I

6 think.  But I agree with you, Your Honor.

7          But *Midlantic* exception -- if a regulator raises

8 an objection under *Midlantic* that an abandonment would

9 violate a law that's designed to protect public health and

10 safety, abandonment is not permitted.  The Supreme Court

11 found that Congress didn't intend to advocate a Debtors'

12 plausibility to comply with these environmental laws in

13 particular while we're in Bankruptcy Code.

14          As Your Honor noted earlier and noted in the

15 American Coastal opinion, *Midlantic* doesn't call on the

16 Bankruptcy Court to replace its judgment with the judgment

17 of the regulator or with Congress when enacting statutes and

18 enforcing regulations.  It's the prerogative of the

19 regulator to decide whether or not to assert *Midlantic*

20 claims, and it's analogous of whether or not a particular

21 Bankruptcy Plan proposed abandonment protects the Gulf, the

22 environment.

23          In this case, Interior has thought long and hard

24 about the decision and reviewed the Debtors' Plan, gone back

25 and forth with the Debtor for many, many months to determine

1  that this Plan is the best practical solution to protect

2  health, safety, and environment in this case.  We are

3  confident that the properties will continue to be maintained

4  and monitored as there would be no gap in which -- you know,

5  after the effective date there's a property that's out in

6  the Gulf unmonitored.  That's a very, very important

7  consideration, even before we get to decommissioning that

8  someone is watching these properties to make sure there

9  aren't vessel collisions or oil spills.

10        We're also confident that 91 percent of these

11  properties there are already agreements in place, or there

12  will be on the effective date that the decommissioning will

13  be performed.  And as to the remaining 9 percent, the

14  predecessors-in-interest on those properties have recognized

15  their obligation to perform the decommissioning as joint and

16  several with the Debtor, and when called upon to do so by

17  Interior, we're confident that they will perform the

18  decommissioning.

19        Your Honor, we haven't looked at the Confirmation

20  Order yet, but it's also important to note that under

21  paragraphs 142 to 146 of the current Confirmation Order, the

22  Debtors aren't being released of their obligations to comply

23  with the decommissioning obligations and other regulations,

24  and neither are the post effective date Debtors.  This is

25  also very important from Interior's perspective that there

1  is no release of liability happening here.

2          And finally as Your Honor noted earlier in the

3  discussion with Mr. Perez, this court is not charged with

4  determining whether or not the post-effective date Debtors

5  ultimately comply with the regulations or with the

6  transition services.  The Confirmation Order also makes it

7  explicitly clear that the applicable tribunal, whether they

8  be Interior's Administrative process or an article three

9  court, will be where the United States goes to make sure

10  that the Debtor is complying with the environmental

11  obligations.  Which I think is how Congress intended the

12  process to work, and that's not the type of thing that I

13  think this court wants to get involved in.

14          Your Honor this has been, as I said at the

15  beginning of my presentation yesterday, a long and

16  challenging case, but I think that this a solution that

17  protects the environment and protects health and safety, and

18  for that reason the Government's not objecting to the Plan.

19  They could not have gotten here without the many, many hours

20  of work from the Debtors, from the lenders, from the

21  predecessors, and all their counsel, and I would be remiss

22  if I didn't mention my co-counsel at Justice Serajul Ali, as

23  well as Casey Hines and of Interior Ryan lamb all of us have

24  put in many hours to get to this point.  And we are

25  approaching and confirmed we're not objecting to it and

1  happy to answer any questions the Court may have.

2           THE COURT:  So in the last part of your statement,

3  you were thinking people that if we wouldn't have gotten the

4  deal or you wouldn't have gotten the deal done without them.

5  With respect to Mr. Schaible's clients for example, I think

6  the evidence shows, not only that you wouldn't have gotten

7  the deal done with out them, but that they wouldn't have

8  done the deal without having appropriate exculpation for

9  doing the deal.  And that the deal is --

10          MR. BALASKO:  Absolutely, Your Honor.

11          THE COURT:  -- in furtherance of *Midlantic*.  Is

12  that your view as well?

13          MR. BALASKO:  That is my view, Your Honor.  Now it

14  is important to note that this transition services you know,

15  the reason that the Plan worked that was before Your Honor

16  in January didn't provide for those services, was that there

17  was no money with which to provide the services.  And you

18  know, that money has to come from somewhere and I believe

19  that money is in fact coming from Mr. Schaible's clients.

20  And I believe that this Debtor would not be able to comply

21  with *Midlantic* without the support of the lenders.

22          THE COURT:  Thank you, I just wanted to be sure I

23  wasn't out to far over my sleeves.  I'm going to go ahead

24  and mute your line, Mr. Balasko.

25          Mr. Pasquale, let me get your line active.  There

1  we go.  Mr. Pasquale, sorry.

2          MR. PASQUALE:  There we go.  Thank you, Your

3  Honor.  Can you hear me okay?

4          THE COURT:  I can.

5          MR. PASQUALE:  Thank you, Your Honor.  Ken

6  Pasquale at Strook and Strook and Lavan for the Official

7  Committee of Unsecured Creditors.

8              CLOSING ARGUMENTS ON BEHALF OF THE

9              OFFICIAL COMMITTEE OF UNSECURED CREDITORS

10         MR. PASQUALE:  Your Honor, I will be very brief.

11  The Committee filed a statement in support of confirmation

12  at Docket No. 1552 which outlines the Committee's actions

13  and diligence, as well as the Committee's Planned settlement

14  with the Debtors and lenders, which resulted in the

15  treatment provided in the Plan for general unsecured

16  creditors in classes 6(a) and 6(b).

17         Your Honor, this case presented some difficult

18  facts for unsecured creditors.  In addition to the P&A

19  issues, there was 1.8 billion in prepetition secured debt, a

20  proposed credit bid transaction, and a valuation that did

21  not seem to leave room to satisfy general unsecured claims.

22  In these circumstances, the Committee was able to achieve

23  what we believe is very favorable treatment for general

24  unsecured claims and important structural concessions.  Such

25  as the opportunity to select the Plan administrator, and the

1  release by the estate of any possible preference claims

2  against holders of general unsecured claims.

3          I won't burden the Record here, Your Honor, by

4  reciting each term of the Plan settlement.  The complete

5  terms are set forth in the disclosure statement, that's

6  Docket No. 1285 at page 16.  We do believe it's significant

7  however that many of the objections that were initially

8  filed against the Plan -- of the many objections, excuse me,

9  Your Honor, none of the objections took issue with the Plan

10 settlement and the treatment of general unsecured claims.

11         Your Honor, I mentioned at the start of the

12 hearing that the Committee was in the process of evaluating

13 the Apache-sureties settlement for which the term sheet was

14 filed by the Debtors last night.  Just for the Record, the

15 Committee supports that settlement and Your Honor we

16 respectfully request that the Plan be confirmed.  Thank you

17 very much.

18         THE COURT:  Thank you, Mr. Pasquale.

19         All right.  Who next wants to address from a

20 proponent's point of view advocacy of the Plan?

21         Ms. Russell.

22         MS. RUSSELL:  Good afternoon, Your Honor.

23         THE COURT:  Good afternoon.

24              CLOSING ARGUMENTS ON BEHALF OF

25                   APACHE CORPORATION

1          MS. RUSSELL:  I'll start by saying that I'm proud

2   that Lewis Powell was a partner at Hunton before he went on

3   the Bench.

4          After many months of litigation and negotiation,

5   the Apache sureties, the Debtors on behalf of Fieldwood One,

6   and Apache reached an agreement as to the terms for settling

7   the disputes among them, including the adversary proceeding

8   that was filed with this court.  The Apache surety term

9   sheet was filed early this morning, as just noted.  It

10  contemplates that between now and the effective date the

11  parties will further memorialize the settlement in a

12  subrogation, subordination, and payment agreement.  And the

13  parties have agreed that if we have any problems or disputes

14  arising from turning the term sheet into that agreement, we

15  will come back to you for resolution.

16         So I would like to briefly walk through the terms

17  of that agreement and address questions that I have.  There

18  are four sureties that are parties to this agreement.  Two

19  of them issued bonds directly to Apache, two of them stand

20  behind the Deutsche Bank letters of credit that were issued

21  to Apache, and that's bundled together with what we call

22  Trust A constitutes the decommissioning security which you

23  will see referenced in the Confirmation Order.

24         In order to implement this, the sureties are going

25  to enter into an inter-surety agreement and designate one

1 representative, the surety representative to on an ongoing

2 basis work with Fieldwood One and Apache.  There are several

3 important things that wrote out of this.

4        The first, Apache had a claim against the Debtors

5 for the short fall in the decommissioning funding for 2020,

6 and that was in the range of $50 million.  The sureties

7 asserted that, that had to be strictly cured and Fieldwood

8 One was going to have to borrow money in order to effectuate

9 that cure.  But as a result of the settlement, the sureties

10 have agreed that Fieldwood One and Apache can agree to an

11 alternative cure.  And the cure being the entire settlement

12 that was reached between the Debtors and Apache before this

13 case began.

14        As a result, Fieldwood One will not have to borrow

15 money to make the cure.  That money was going to go into

16 Trust A which was going to be sitting for awhile until it

17 had to be drawn on.  And so through that savings, Fieldwood

18 One will be able to make payments to the sureties which we

19 are calling the Fieldwood One premium claims.  Now these

20 claims are not at the same level as the premiums that were

21 due prepetition, but it is an amount that has been agreed to

22 by the sureties and they will allocate it amongst themselves

23 under their surety agreement.

24        The way it's set up 6.25 million will be paid in

25 semi-annual payments for a total of 6.25 a year that starts

1   60 days after the effective date.  And then, if there is

2   sufficient free cash flow above the 20 million mark that is

3   going to be set aside for working capital, then the sureties

4   will be entitled to additional 2.75 million on an annual

5   basis.  And this total of 9 million will not be subject to

6   the subordination that I'm going to reference momentarily.

7          So the sureties are also going to be allowed to

8   opt into the farm end that was negotiated between Fieldwood

9   One and NewCo.  So that agreement those farm end rights last

10  for two years, and at the end of the two year mark the

11  sureties can elect -- they're not obligated to -- but they

12  can elect to step into that agreement.  And if they do and

13  things work out well, they will recover their initial

14  capital investment.  Then 50 percent of the profits, above

15  their initial investment return, they can use those funds to

16  top up to their premium, if free cash flow wasn't otherwise

17  available to do that.  And then the other 50 will go into

18  Trust A.

19         So Fieldwood One will get the benefit of working

20  capital of 50, once the sureties get back their capital and

21  they get their pre- (indiscernible) topped up, the other

22  50 percent will got into Trust A, which will be used for

23  decommissioning as well.  So it's really a win, win

24  situation all around.  The Surety representative will have

25  information rights similar to Apache's and will be allowed

1  to distribute that information that's subject to appropriate

2  confidentiality with the other sureties.

3          And then we get to this agreement, this

4  subrogation and subordination and payment agreement.  And

5  that agreement is intended to grant to the sureties a

6  contractual right of subrogation, if and when all the bonds

7  and LCs have been drawn on, that has been agreed to by

8  Fieldwood One.  And they will step in with a claim for the

9  amount that has been drawn plus any premium fees up to $12

10  million that they have not previously been paid.  That

11  agreement will have very standard subordination provisions,

12  as well, so that it's clear that nothing will be paid out on

13  that subrogation claim to the sureties until Apache has been

14  fully repaid on the standby facility that it has offered,

15  there's no future commitment to lend, and all the

16  decommissioning has been completed on the Legacy Apache

17  property.

18          In connection with this the sureties have agreed

19  to support the Plan, provide the releases as outlined there

20  in, and this is what we view as a great resolution for

21  everyone.  The adversary proceeding will be dismissed,

22  Apache will get the comfort that it needs in connection with

23  the Plan.

24          I'll stop at that point and ask the Court if it

25  has questions.

1        THE COURT:  Not many and I don't think I should

2   ask many, I want to be sure of a couple of things.  Number

3   one, I know of no difference -- sitting here right now

4   without studying it -- between the words you used today and

5   the words that are written on the paper, but it would be my

6   understanding between you and the sureties that, if there is

7   any difference between what you said today and what is on

8   the paper that was filed, that the paper would control.

9        MS. RUSSELL:  Absolutely.

10       THE COURT:  And second, I want to understand, if

11  there is a dispute over how to document the final contract,

12  which I understand you're going to bring back to the

13  Bankruptcy Court, and if there are some holes in the

14  agreement that just have to be filled in, in order to be

15  able to make it final, are the parties agreeing that they

16  have a sufficiently documented deal that I am empowered to

17  fill in the blanks that need to be filled in if there's

18  something just completely missing but that's absolutely

19  necessary?  O does the deal fail if you have that situation?

20  I just want to -- I'm not -- I don't want to change what

21  you-all have agreed to do, but to me that is the hardest

22  question.  This is really complicated, there's probably some

23  holes, I think you'll work through them, but if you can't, I

24  want to know if I'm supposed to fill them in or not.

25  Whether that's what you are empowering me to do.

1        MS. RUSSELL:  Your Honor, from Apache's

2   perspective, we are empowering you to do that.  We feel like

3   this is a deal, where we can't see it but there's a lot of

4   blood on this term sheet, a lot of people have looked at it

5   for a long time, and so I'll defer to Mr. Perez and the

6   counsel for the sureties, but from Apache's perspective we

7   would rely upon the Court understanding the history of this

8   bankruptcy and the issues here to fill in those blanks.

9        THE COURT:  Mr. Grzyb, what is the sureties'

10  position on that?

11       MR. GRZYB:  Well, I think Ms. Russell has

12  accurately captured, I think, the proper response now.  I

13  would probably, to the extent he has raised his hand

14  virtually, defer to Mr. Brescia to go first because he's

15  been sort of leading the charge with respect to negotiating

16  this term sheet.  So if he has raised his hand, I would

17  defer to him.  If --

18       THE COURT:  You know with that --

19       MR. GRZYB:  -- Your Honor can see if he's --

20       THE COURT:  -- you know, with that, I'm always

21  going to call on you first, so you have this sort of built

22  in problem Mr. Grzyb, so.

23     (Laughter.)

24       MR. GRZYB:  Well, I will say that I think that job

25  sort of started to really accelerate the process of this

1 term sheet, so Marvin will forever be a legend in sureties.

2 Going forward.  But thank you, Your Honor.

3          THE COURT:  But as far as you're concerned though,

4 if there are holes in the deal, you want them filled in by

5 me as opposed to saying that the deal fails because there's

6 a hole?

7                    CLOSING ARGUMENTS ON BEHALF OF

8                    ASPEN AMERICAN INSURANCE COMPANY,

9     BERKLEY INSURANCE COMPANY, EVEREST REINSURANCE COMPANY,

10                 AND SIRIUS AMERICA INSURANCE COMPANY

11          MR. GRZYB:  We very much want to see this deal

12 concluded as part of this bankruptcy case.  My comment would

13 be sort of two-fold.  The deal the subordination agreement

14 with Apache and the Debtor, I think we want to have

15 confirmed and part of the Plan of Reorganization.  As part

16 of the Confirmation Order, I think that the term sheet also

17 makes clear that, after the effective date, should a dispute

18 arise there is a venue selection clause outside of the

19 Bankruptcy Court.  And hopefully that doesn't happen or it

20 doesn't happen for a number of years.

21          The second aspect that I don't think is absolutely

22 necessary and may take some time to figure out if he -- it

23 references an inter-surety agreement with no terms

24 whatsoever.  I don't think that hole or that gap needs to be

25 filled, that was to be the deal among the four sureties.

1   That hole does not require us to get sign off from the

2   Bankruptcy Court.

3           THE COURT:  Right.  But with respect to the

4   dispute that you might have with Apache -- and if we knew

5   what the hole was right now, we would all fill it in, right?

6   But let's assume something comes up as you-all do the formal

7   documentation, there's a hole you-all are going to work

8   through it, probably work it out, but if you don't, does the

9   agreement fail because there's a hole or do you want me to

10  fill it in?  I also need to tell you that you just said

11  something different than what the way that I read the term

12  sheet.  You said after the effective date matters would

13  return to state court.  This says after the case is closed,

14  those are two different things.  I don't care what your deal

15  is, I don't want there to be ambiguity.

16          MR. GRZYB:  Yeah.  And the actual different term

17  was after the case was closed, so I would defer to the term

18  sheet on that and I apologize for the --

19          THE COURT:  No problem.  And again I just -- my

20  whole -- the reason I'm asking these questions is I don't

21  want to get down the road once there's a dispute and then

22  figure out whether I've got authority to deal with it.  Let

23  go ahead and -- let me go ahead and --

24          MR. GRZYB:  To answer your question --

25          THE COURT:  -- Mr. Brescia's line, you wanted to

1  defer to him, it looks like you're thinking about, let's see

2  what he says and see where we go.

3       Mr. Brescia.  Your camera is off, Mr. Brescia, if

4  you care, but your line is now activated.

5       MR. BRESCIA:  Yeah.  Thank you, Your Honor.  This

6  is Duane Brescia for Zurich American Insurance Company.

7  I've been trying for the last 10 minutes to get my video

8  working and I'm not sure why it's not.  So I'll try to speak

9  and hope that, that satisfies the Court.

10                 CLOSING ARGUMENTS ON BEHALF OF

11              ZURICH AMERICAN INSURANCE COMPANY

12       MR. BRESCIA:  On behalf of all the sureties and

13  for my client Zurich, I do think that what Ms. Russell

14  stated was accurate is that we do have a deal.  There is, I

15  guess, the gap filler, Zurich is okay with the Court filling

16  those.  Although we think we've filled it in ourselves and

17  believe me we're going to give the next round of documents

18  the same attention to detail and professionalism that all

19  the parties have shown in this to try to get to that, so we

20  don't have to go to you.

21       Quite a bit of care over the weekend to make sure

22  at least the broad brushes would cover anything so there's

23  not any ambiguity as to what is intended how it's said.

24  Obviously, we have yet to deal with that.  So with those

25  issues I would agree with the Court's comment that they can

1   fill in the gaps.  With the exclusion of the

2   inter-surety we're just not there yet on those terms but the

3   role of the surety representative is in place.

4          The final thing to add, Your Honor, is simply just

5   more of a mechanical issue.  We're talking about this term

6   sheet, I just did not see -- and I've reached out to

7   counsel, I'm not saying that they've avoided me they just --

8   I know they're doing a lot of different things here -- we

9   just want to make sure that there's a spot in the Plan

10  Confirmation Order where the term sheet is officially

11  adopted, and I'm not sure I saw that.  So I just open that

12  request to the other counsel involved in the term sheet.

13         THE COURT:  Yeah.  I'll direct Mr. Carlson to the

14  extent that he hasn't already done so to be sure that's

15  there.

16         Mr. Eisenberg.

17         MR. EISENBERG:  Yes.  Thank you, Your Honor.

18  Philip Eisenberg on behalf of HCCI International Limited.

19                  CLOSING ARGUMENTS ON BEHALF OF

20                    HCCI INTERNATIONAL LIMITED

21         MR. EISENBERG:  We echo Mr. Brescia's sentiments,

22  and we also confirm that Your Honor would be the gap filler

23  here, I actually had a situation like this in front of Judge

24  Steen many years ago where he had to do that and the parties

25  presented their views and the Court came up with a process

1  for doing that and -- but we ought to be able to --

2             THE COURT:  Yeah.  Maybe I should just --

3             MR. EISENBERG:  -- afford it.

4             THE COURT:  -- just call Judge Steen and see if he

5  wants to do that.

6             MR. EISENBERG:  Yeah.  That would be fine by me.

7  And Your Honor, on the inter-surety agreement yeah that is

8  not something we would bring to the Court.

9             THE COURT:  No.  I agree.  With respect to

10  disputes with Apache for example or with the Debtor, if the

11  final agreements require hole filling and I know no one

12  wants them to be there, but we've all been there where we

13  didn't think of something, I'm supposed to fill in the gap.

14            MR. EISENBERG:  Right.  Exactly, Your Honor, when

15  we're doing -- if we have to do the subordination agreement

16  and if there's something that one thinks goes one way and

17  one goes the other way and we can't agree, we'll have to

18  bring that to the Court.

19            THE COURT:  Mr. Miller.

20            MR. MILLER:  Good afternoon, Your Honor.  Robert

21  Miller on behalf of Philadelphia Indemnity Insurance

22  Company.

23            Can you hear me okay?

24            THE COURT:  Good afternoon.  I can hear you fine.

25                    CLOSING ARGUMENTS ON BEHALF OF

1              PHILADELPHIA INDEMNITY INSURANCE COMPANY

2              MR. MILLER:  Excellent.  I will confirm our

3    agreements with statements made on the Record by Mr. Brescia

4    and Mr. Eisenberg and Mr. Grzyb that you are the appropriate

5    person to fill in the gaps there, and to see if they exist,

6    we certainly hope there will not be.  And as to the inter-

7    surety agreement we also agree that, that's outside the

8    scope of your gap filing purview.  So I would like to say

9    that all four sureties are on board with the statements that

10   Ms. Russell made with the obviously the caveat in regards to

11   the inter-surety agreement.

12             THE COURT:  Thank you.

13             All right.  Ms. Russell, I think what you said has

14   been adopted by everybody.  Is there anything else you want

15   to add or should we move to Mr. Chiu and see what he has to

16   say?

17             MS. RUSSELL:  If you'll indulge me just briefly.

18   We do need the surety representative designated to us at the

19   effective date so that we know who information needs to be

20   provided to.  And finally I would like to think the sureties

21   counsel and the Debtors' counsel for getting this done with

22   us and particular I would like to thank Mike Dane and Tommy

23   Lamb from Fieldwood and Anthony Langley (phonetic) and Brett

24   Cupid (phonetic) from Apache, who were very creative and

25   constructive in helping structure this agreement.

1          So thank you.

2          THE COURT:  Ms. Russell, I suspect that you were,

3    too, but thank you.

4          MS. RUSSELL:  Thank you, Your Honor.

5          THE COURT:  All right.  Mr. Chiu, if I can get you

6    to press five star.  Sorry to interrupt you before, I only

7    get a -- it's the same signal I get if somebody wants to

8    talk or somebody objects, so I try and keep that cleared out

9    so that I don't have any pending objections.

10          I didn't mean to cut you off otherwise, Mr. Chiu.

11          MR. CHIU:  No.  Not at all, Your Honor.  And

12    apologies again to Mr. Schaible for temporarily stealing his

13    thunder a little bit, so hopefully we can proceed as is.

14          But again, Kevin Chiu Baker Botts on behalf of

15    Hunt Oil Company and subsidiaries.

16        CLOSING ARGUMENTS ON BEHALF OF HUNT OIL COMPANY

17          MR. CHIU:  As Your Honor, is aware Hunt is one of

18    the predecessors of consensual agreements with the Debtors,

19    and as indicated before going into the break that Hunt does

20    have a deal with the Debtors and intends to honor that deal.

21    And we certainly stand, as far as that agreement, in support

22    of confirmation of the Plan.

23          We did reach out to the Debtors' counsel

24    Mr. Carlson and his team before going into -- you know,

25    going into the break with regards to certain mechanical

1  issues that we had with regards to the Confirmation Order
2  language, and also some other documents include the Plan
3  supplements and the turnkey agreements.  I don't know if
4  Your Honor wants to wait until Mr. Carlson is going to be
5  going through and addressing each of those provisions in the
6  Confirmation Order for us to raise our issue, or if we
7  should go ahead and raise them now so you can correct
8  Mr. Carlson accordingly.

9         THE COURT:  I'm a little inclined to wait to where
10 I've got the document, I've got it on the screen, and if we
11 direct a resolution, I can just type it in so everybody
12 knows what it is.  Is that okay with you, Mr. Chiu?

13        MR. CHIU:  Yes.  That works for the Confirmation
14 Order.

15        With regards to some of the other documents, we do
16 want to make sure that, when it comes to that point in time,
17 there's a Hunt turnkey agreement that was alluded to
18 throughout this hearing by, you know, Mr. Dane and Debtors'
19 counsel.  Hopefully once that gets resolved with regards to
20 the confirmation language, the Order language that is part
21 of that agreement will get filed promptly before entry of
22 the Confirmation Order.  And that the Plan supplement
23 documents that particularly the oil and gas lease schedules
24 for Fieldwood Three and the abandoned properties, will be
25 updated accordingly to encapsulate the terms of our

1  agreement with the Debtors.  But other than that, we

2  certainly thank the Debtors for their ongoing efforts to

3  move this deal forward and stand in support of confirmation.

4          THE COURT:  Mr. Chiu, thank you.

5          Mr. Carlson, when we get to you, I will need to

6  understand whether the Plan supplement is going to all be

7  updated before an Order would be entered.  So you can wait

8  and address that, but let's not forget the issue that

9  Mr. Chiu is addressing.

10         Thank you, Mr. Chiu.

11         MR. CHIU:  Thank you very much, Your Honor.

12         THE COURT:  All right.  Who else do we have that

13 wishes to make any statement in support of confirmation?

14     (No audible response.)

15         THE COURT:  All right.  Does it make some sense to

16 sort of abort the game Plan and now go to statements in

17 opposition of confirmation, and then take up the

18 Confirmation Order?  Because I think a lot of people have

19 told me their objections are close to getting resolved, and

20 it may make some sense to hear those and then be sure we can

21 fix it in the Confirmation Order.  So unless there's a

22 problem by the Debtor, I think I'm just going to come back

23 to Mr. Carlson while he continues to work on revisions as

24 people tell me their objections.

25         So let me ask the first party that wishes to speak

1 in opposition to confirmation to do so?

2          All right.  Yeah.  Let's hear from BP.  Go ahead,

3 please.

4          MS. HEYEN:  Thank you, Your Honor.  Shari Heyen

5 for BP.

6                CLOSING ARGUMENTS ON BEHALF OF BP

7          MS. HEYEN:  We were able, likewise, to speak

8 during the break with Mr. Carlson and we've made some

9 progress on our language as well.  And so I just rise to let

10 Your Honor know that if the language -- if we're close on

11 our language, I don't really know how much time we're going

12 to need for our closing.  So it might be helpful to find out

13 where Mr. Carlson is with respect to our language.  And we

14 can do that now.

15          THE COURT:  So what you're telling me is that

16 we're better off going to Mr. Carlson before I listen to the

17 objections, I'm perfectly happy to do that.

18          MS. HEYEN:  Yes, Your Honor.  From where we sit,

19 yes.  Because we're pretty close.

20          THE COURT:  I'll change course.  We'll go back to

21 that.

22          All right.  Mr. Carlson --

23          I'm going to leave you on, Ms. Heyen.

24          Let's get Mr. Carlson on.

25          MS. HEYEN:  Thank you.

1          THE COURT:  And then we'll come back and pick up

2    other objecting parties.

3          So I'm going to not recognize Mr. Alaniz and

4    Mr. Kuebel

5          I want to go to Mr. Carlson before we get to them.

6          And then we'll come back and you're going to have

7    a full chance to make your objections.

8          All right.  Mr. Carlson, where are we on the

9    Confirmation Order?  Let's start with the BP disputed

10   provisions or whatever we want to call them.

11         MR. CARLSON:  So Your Honor, yeah, we have made

12   quite a bit of progress and we're working through several

13   objections.  For BP I do think we're very close.  We have

14   narrowed it down to just two issues.  And not long before

15   this call, some revised language was sent around, and I

16   think we are -- I think from the Debtors' perspective the

17   revisions are acceptable, but we are waiting for sign off

18   from other consenting stakeholders.

19         THE COURT:  Do you have those in a form right now

20   on your screen that you can show me?

21         MR. CARLSON:  Yes.  Just give me one second.

22      (Pause in proceedings.)

23         MR. CARLSON:  Sorry, just one second, I'm trying

24   to find the email here.  It never came in.

25         I would ask Ms. Heyen, which associate sent across

1  that language, I'm just having trouble finding it right now.

2          MS. HEYEN:  It was Mr. Ryan Wagner of Greenberg

3  Traurig.

4          MR. CARLSON:  Ah.  Thank you.

5      (Pause in proceedings.)

6          MR. CARLSON:  So Your Honor, I think it's really

7  just two issues we're down to.  Number one, this reservation

8  of rights language regarding arbitration rights.  And then

9  number two, they're set off and so this is proposed -- BP's

10  proposed addition to 128(9).

11          THE COURT:  And is the Debtor okay with that

12  revision?

13          MR. CARLSON:  Yes, Your Honor.  We're fine with

14  this.  We think it's not doing anything other than to the

15  extent they have arbitration rights are valid in any rights.

16  That this Order would not upset those rights.

17          THE COURT:  So hold up then --

18          MR. CARLSON:  -- but I haven't --

19          THE COURT:  Mr. Kuebel and Mr. Alaniz, I'm about

20  to not recognize you-all on purpose.  So I'm going to make

21  you-all repress five star, when you need to, which may be

22  right now.

23          Is there any party that has any problem with the

24  language shown on the screen in proposed paragraph 128

25  sub (9)?  If so, please press five star.

1          Mr. Perez.  Mr. Perez, you pressed five star.

2          MR. PEREZ:  Yes, Your Honor.  Obviously, I don't

3  have any issue with it, but we do -- this is part of the

4  consent that the FLT lenders have pursuant to the RSA, so I

5  want to make sure that --

6          THE COURT:  Right.  I want to hear not consent or

7  consent.  We can't just -- I don't know else to get that

8  sub.  I'm about to talk about doing another thing than the

9  way we're going on it.  But on this one, if they've got a

10  problem, press five star and let me hear it.  If they're

11  okay with it, they're okay with it.

12          Okay.  Let's go to the next BP issue and then I

13  want to maybe change course a little bit.  What's the next

14  BP issue?

15          MR. CARLSON:  So I think that captures it.  Then

16  the rest of the changes that you see here on the screen, I

17  think we're fine with the changes in 10 as well.  The only

18  question I have here, I think, is as permitted under the

19  Plan language regarding set off has been a -- has been a

20  subject of dispute and discussion involving lender's counsel

21  as well, so I'm not prepared to say that we're signed off on

22  that language yet.

23          THE COURT:  What's going to take -- who needs to

24  sign off on that or reject it from your team?

25          MR. CARLSON:  We have a similar language issue

1    with XTO, and I think there's been back and forth emails on

2    that point where we had said -- and I don't want to get out

3    of focus -- but I think we had said something a little bit

4    differently.  I would ask the Davis Polk team, I think that

5    they may have proposed language here that may have resolved

6    this whole complaint.

7         THE COURT:  Let me go where I was going to go

8    then.  I really do want to end the Confirmation Hearing at

9    some point, and there may be people that have objections

10   where they don't anticipate that they are resolvable through

11   the Confirmation Order.  Someone has a substantive objection

12   that we're taking away one of their rights for example.

13   Other people believe it's going to get resolved in the

14   Confirmation Order.

15        Here's what I would like to propose, and I want to

16   see if this works without causing undue delay.  I know it's

17   expensive every time we adjourn.  Is let your people who

18   believe that they have objections that are not resolvable by

19   language in the Confirmation Order.  If we sustain an

20   objection or overrule an objection, that will then inform

21   where we need to go.  And then adjourn until 1:30 tomorrow

22   to let the balance of the language work or not work,

23   preserving for everyone, for example, Ms. Heyen, if the

24   netting language can't be worked out, she can make her full

25   objection without any waiver tomorrow, but that way she'll

1  know for sure whether it's made.  So I'm not going to cut

2  off anybody's rights to make their full objection tomorrow

3  if they don't make it today.

4          But I'm sure we have some people that think their

5  objection is not resolvable in the Confirmation Order and,

6  you know, that they need to be totally cut out of the

7  provisions of the Plan or the Plan shouldn't be confirmed or

8  something like that.  If there's somebody that thinks they

9  can't resolve it by working with the Order, let's hear from

10 you now.  And does anyone have any problem then coming back

11 at 1:30, and we will then -- we'll then know if there are

12 things that you-all can't voluntarily work out and we'll

13 take them up at 1:30.  Looks like nobody has a real problem

14 with that.

15         So let me now hear from anyone that has a

16 non-resolvable objection.

17         Mr. Alaniz, a non-resolvable objection by you.

18         MR. ALANIZ:  Yes, Your Honor.  Omar Alaniz on

19 behalf of Hess Corporation.

20    CLOSING ARGUMENTS ON BEHALF OF HESS CORPORATION

21         MR. ALANIZ:  Well, I want to be clear, I -- well,

22 we have an issue that I think is resolvable with language,

23 and I emailed Mr. Carlson, and I know he's got a lot going

24 on, but I've not heard back.  So I think we can work out some

25 language in the Confirmation Order.

1          I do, however, have a very short closing argument,

2    and so I will just take the Court's direction as to when you

3    want to hear that.

4          THE COURT:  Now.  Let's do it now.

5          MR. ALANIZ:  You want to hear it now?  Sure.

6          THE COURT:  Yeah, because I assume it's closing --

7          MR. ALANIZ:  Okay, Your Honor.

8          THE COURT:  -- argument where you're telling me

9    that I shouldn't confirm the Plan as it is and it's not going

10   to be worked out with confirmation language.  Right?

11         MR. ALANIZ:  Correct, and then I think we have

12   some that will be fruitful.

13         THE COURT:  Right.

14         MR. ALANIZ:  Hopefully it'll be resolved.

15         THE COURT:  I got it.  I got it.  Go ahead.

16         MR. ALANIZ:  Okay.  So, Your Honor, I would like

17   to begin by being clear about what we are not arguing.  We

18   are -- well, we are disappointed that Fieldwood is not

19   complying with obligations under regulations and contractual

20   agreements to P&As.  We understand that Hess has obligations

21   under applicable regulations which include decommissioning.

22   Hess is not trying to escape its obligations.

23         And we very much appreciate the Government's

24   efforts to negotiate the agreed activities.  We appreciate

25   the Debtors agreement to perform the agreed activities which

1  does ameliorate some of our health and safety concerns.  The

2  health and safety concerns have been paramount to Hess

3  throughout the entire time that we've been in dialogue with

4  the Debtors.

5       In my examination of Mr. Dane, Your Honor heard

6  him discuss outstanding income to West Delta properties, and

7  as Your Honor reads the comments in the Debtor's Exhibit 99

8  that correspond to those things, you'll see some of those

9  health and safety concerns.  Mr. Dane testified that he was

10  committed to performing those activities to clear up those

11  things, and that representation was very important to Hess.

12       I then moved on in my examination to address the

13  fact that the Debtors intend to abandon the West Delta

14  properties and leave those properties with hydrocarbons.

15  And Mr. Dane testified that he knew that it's been a focus to

16  Hess, that in connection with the Debtors' abandonment that

17  the properties be left hydrocarbon free.

18       And, Your Honor, I went back and I looked into

19  Mr. Dane's testimony last night, which is at Docket K4, and

20  if Your Honor were to go back and listen at the second hour,

21  10:18, you'll hear him say these words, he says, Safe-out

22  activity is a very delicate activity.  You're removing

23  hydrocarbons from a facility.  It needs to be done in a very

24  careful manner with very qualified individuals.

25       And, Your Honor, we couldn't agree more.  It is a

1   delicate activity.  And Hess's focus, as corroborated by

2   Mr. Dane, has been this hydrocarbon issue precisely because

3   of the delicate nature of handling hydrocarbons.  And I

4   would also encourage Your Honor to listen to Mr. Dane's

5   testimony that begins about the two-hour mark where I asked

6   Mr. Dane a series of questions regarding the Debtors'

7   willingness to perform the safe-out work, specifically the

8   hydrocarbon free work for any in Chevron's but not for Hess.

9          And he had two responses.  His first response was

10  that the Debtors believe that to safe-out the properties at

11  their cost was in the context of a broader commercial term

12  fee arrangement and Hess and the Debtors simply could not

13  come to that agreement.  In other words, and these are not

14  his words, these are my words, the Debtors are saying that

15  if Newco can profit off a long term commercial arrangement

16  to perform P&A, then they will perform the safe-out at their

17  cost, and leaving those properties hydrocarbon free.

18         His second response was that they're basically

19  stretched too thin with other commitments and they can't

20  handle the additional RCL safe-out work.  And so those two

21  statements to me are a little bit contradictory.  So on the

22  one hand he's saying, Well, we would do it if you would give

23  us a proper opportunity, at least that's my interpretation.

24  But on the other hand we actually don't have the bandwidth to

25  do it.

1          And so given all this testimony, Your Honor, so

2    the Court's really -- ultimately what our legal arguments

3    that we set out in our brief, which is that the Debtors' not

4    treating similarly situated creditors in a similar way.  And

5    this isn't a classic disparate treatment issue where the

6    Debtors are agreeing to pay one creditor 75 cents and the

7    other one, this claim contemplates arrangements with some

8    predecessors to perform certain work.  Literally safe is in

9    that title.  Safe out work.  But they're essentially throwing

10   the keys to others with platforms that are filled with

11   leftover fuel hydrocarbons that Mr. Dane testified need to

12   be removed in a very careful manner with qualified

13   individuals.

14          So to be clear, this isn't a concern of one

15   creditor getting more money in their pockets than Hess.  It's

16   that the Debtors are agreeing to perform environmental safe

17   activity for some predecessors but not others.   And those

18   facts also support Hess's argument that as a legal matter the

19   Debtors' Plan cannot be confirmed because of *Midlantic,* which

20   says that the Debtor cannot abandon properties in

21   contravention of a regulation designed for health and

22   safety.

23          Now I heard Your Honor loud and clear this

24   morning, and I understand this Court's interpretation of

25   *Midlantic* and the fact that the Government isn't objecting to

1   the Plan under this, Your Honor -- it sounds like Your Honor

2   is going to hold that *Midlantic* does not preclude

3   confirmation.  We respectfully disagree but we understand

4   it's going to be an issue that we'll need to take up on

5   appeal.

6           But before I rest, Your Honor, the last thing I

7   want to leave the Court with --

8           THE COURT:  I want to go back to before you even

9   leave the argument.  You're right, I'm going to overrule your

10  *Midlantic* objection you made in the brief.  I don't think

11  that you have the -- you can't assert the Government's

12  *Midlantic* rights.  The Government needs to use its *Midlantic*

13  rights as it determines it needs to do to maximize the

14  health, safety of the environment.  I don't think that you

15  can assert them, you particularly can't assert them in a case

16  where the Government has, in fact, ostentatiously not

17  objected for lack of a better description of what they have

18  done.

19          With respect to the equal treatment, I don't

20  understand where that falls under 1129 when you're not

21  identically situated to someone else.  You have an analogous

22  situation to someone else.  Safe-out of your facility is

23  different from than the safe-out of their facility.  They're

24  just both safe-outs.

25          So where under 1129 does this objection fall?

1          MR. ALANIZ:  Yeah, Your Honor, the tie here was

2     1129(a)(1), the Plan does not comply with the applicable

3     provisions of this title, and then we tied that to

4     1123(a)(4) that says a Plan must provide the same treatment

5     for each claim of a particular class.

6          And you're right, Your Honor, this is sort of an

7     analogous argument in that, you know, really it's just a

8     matter of sort of the unequal treatment in the fact that

9     you're treating one creditor like Eni or Chevron in a way

10    that is very different than the way that they're treating us.

11         And that's the argument.  I understand (glitch in

12    the audio) --

13         THE COURT:  So, look, I think that your client is

14    an unsecured creditor and you should be getting the same

15    unsecured type claim that everyone else gets.  But if in

16    furtherance of *Midlantic*, in keeping with priorities that

17    the Government doesn't object to, their decision is to safe-

18    out one and not safe-out another.  I don't see how that fits

19    into equal class treatment, and you're saying it doesn't, it's

20    just kind of analogous to equal class treatment, and I think

21    that fails under a *Midlantic* -- specifically fails under a

22    *Midlantic* standard.  We need to maximize environmental

23    protections.

24         And I haven't heard, in addition to sort or on a

25    general good faith standard, that there has been a

1   comparable commercial reason to do yours as there has been

2   to do others.  And, you know, if you want to put up the kind

3   of money, or make the kind of concessions others are making,

4   I might cross into some good faith area, but I've heard no

5   evidence about that.

6           So as to that objection I'm going to overrule it

7   and let you move down to your final -- or however many more

8   you have.  I think you said you have one more.

9           MR. ALANIZ:  Well, no, Your Honor, it's really just

10  to make a point that I -- we hope is non-controversial, but,

11  you know, just the statement that the Plan should not set

12  off Hess and the other predecessors in the chain of title

13  with an increased risk that a man or woman that they are

14  forced to send out to one of these facilities to remove --

15  deal with hydrocarbons does not come home at night, like if

16  either of us commits to do with other predecessors which is

17  commit to remove hydrocarbons from the West Delta property,

18  and that's the only statement that we wanted to make, Your

19  Honor.  So that --

20          THE COURT:  So I am going to require that a

21  provision go in the confirm Order that to the extent that

22  Hess elects, and Hess is not required to elect, but to the

23  extent that Hess elects to take immediate or at some point

24  down the road later possession of the property, that it is

25  required to administer as a predecessor-in-interest.

1            The provision will require that the Debtor
2   promptly cooperate in transferring the assets to them that
3   require retirement work to be done, and to do so with all
4   due haste in compliance with applicable federal regulations.
5   So that if Hess believes for example that it is being
6   required to send an employee into a dangerous situation, I
7   want it as quickly as it can under federal law to be able to
8   take over the asset and the Debtor shouldn't be able to stand
9   in the way by delaying the abandonment.  The Debtor has to
10  cooperate with immediate abandonment consistent with federal
11  law if Hess so demands.
12           And I think that then resolves that by putting
13  control in Hess's hands to the maximum extent it can be.  Is
14  there any objection to that either by Hess or by the Debtor
15  to including such a provision?
16           MR. PEREZ:  Your Honor, --
17           MR. ALANIZ:  No problem here, Your Honor.
18           THE COURT:  Mr. Perez?
19           MR. PEREZ:  (No audible response.)
20           THE COURT:  I think I heard Mr. Alaniz say, No
21  problem here, and I didn't hear Mr. Perez.
22           MR. PEREZ:  Yes, Your Honor.  Am I on the line?
23           THE COURT:  You are.
24           MR. PEREZ:  Okay.  Your Honor, we don't have any
25  objection, but that is, in fact, what the transition

1   services are intended to do.  And we will obviously

2   cooperate and provide and, you know, provide what's required

3   under the transition services.  I certainly don't want

4   Mr. Alaniz to think that what the Court has ruled is that we

5   have to safe-out these properties before --

6            THE COURT:  No, I didn't say --

7            MR. ALANIZ:   -- before they are transitioned.

8            THE COURT:   -- no, no, no, I didn't say that at

9   all.  What I'm saying is if Hess believes that you're putting

10  some of its employees in danger, unless I'm misunderstanding

11  the whole purpose of the transition agreement, the minute

12  Hess is ready to take over, the transition service agreement

13  at that point terminates as to the Hess properties.  This is

14  the way I think that that works.

15           And what I'm saying is that once Hess is ready, I

16  don't want their employees endangered either, nor do you.

17  And at that point you can't delay them, there's not going to

18  be any further negotiations, consistent with federal

19  regulations in terms of how you would do the transition to

20  Hess, and --

21           MR. ALANIZ:  Right.

22           THE COURT:   -- I don't know what type of permits

23  they would need to have in order to take over, Mr. Alaniz,

24  but whatever you all need to do to be able to take it over,

25  they have to immediately engage in compliance with that.

1          And, Mr. Perez, I think that's consistent, not

2    inconsistent, with the Transition Services Agreement.  But I

3    don't remember anything in the Plan that is part of the

4    abandonment that requires you to engage in a transition to

5    the predecessor-in-interest on a hasty basis.  I'm saying as

6    hastily as you can so long as it's consistent with the

7    transition required by Mr. Velasco's friends.

8          MR. PEREZ:  Absolutely, Your Honor.  Obviously

9    we're spending, you know, a million-plus dollars a month to

10   make payments during the transition, so if everybody was

11   prepared to do the transition on the effective date, I'm sure

12   Mr. Dane would welcome that.

13         THE COURT:  I got that.  I just -- we've all been

14   in situations where someone can then say, Well, let's reopen

15   the negotiations about how this ought to happen.  And I'm

16   saying, No, when they're ready, they get it.

17         MR. PEREZ:  Okay.

18         THE COURT:  Okay.  Let's put that in the Order.

19         And then, Mr. Alaniz, tomorrow you'll be able to

20   worry about the language in the Confirmation Order not only

21   on that issue but on other issues.  And if they don't satisfy

22   any other issues, you can then make your further objection

23   if that works for you.

24         MR. ALANIZ:  Yes, Your Honor.  Thank you.

25         THE COURT:  All right.  Does anyone else have what

1   I will call an unresolvable objection with respect to

2   negotiating terms of the Confirmation Order?  We do have

3   someone.  Let me see who that is.  I don't know if that was

4   Mr. Perez raising his hand again when he was already

5   authorized to speak.

6           Okay.  So no one else has something that they

7   think isn't going to -- wait, Mr. Eisenberg, you do.

8   Mr. Eisenberg, go ahead, please.

9           MR. EISENBERG:  Thank you, Your Honor.  Are you

10  able to hear me?

11          THE COURT:  I can.

12          MR. EISENBERG:  Thank you, Your Honor.  Just I'm

13  not sure if my technology may work or not.

14          We had sent language to the Debtors and I don't

15  know if this is unresolvable, but we have -- we've been

16  talking to them about Paragraph 13A, particularly the

17  subrogating -- the language with regard to the claims for

18  subrogation and the recent occupation and things of that

19  nature.

20          And certainly we think we can -- I think there's

21  language that satisfies me, I don't know if the same language

22  satisfies them.  We're certainly willing to spend some time

23  talking about it with them and then preserving the argument

24  for tomorrow, Your Honor, so.

25          And I know also my colleague, Mr. Kuebel, is

1   taking his wife out for her birthday tonight, and so I don't

2   want to (indiscernible).

3           THE COURT:  Look, we've talked quite a bit about

4   what that language needs to look like today.  That may help

5   inform some overnight negotiations.  But all of your rights

6   to make objections are going to be preserved if you don't get

7   the language there.  That's language that I think ought to be

8   worked out that sort of said in about 18 different ways what

9   I think it needs -- what I'm going to order that it says.

10          It may very well be, and, Mr. Eisenberg, I would

11  regard this as totally fair, that you -- and the same goes

12  for you, Mr. Perez, I know I've said some things that both

13  sides don't particularly like in this area, so you can each

14  agree to language that you think is consistent with the way

15  that I have ruled, and preserve your right to object to the

16  ruling, you're not agreeing to the outcome, you're only

17  agreeing to language and what I've ruled.  That may make this

18  a little bit easier because I'm not looking to have you be

19  kowtowed into waiving some appellate right because you're

20  complying with an Order that I've already made.

21          MR. EISENBERG:  We understand that, Your Honor.

22  We appreciate that, and will continue to talk with the

23  Debtors and the other parties constructively to try to close

24  whatever gaps that exist.  Thank you.

25          THE COURT:  All right.  So I did receive from

1    Locke Lord an envelope with a flash drive, and I've received

2    from Weil an envelope with a flash drive.  I've opened the

3    envelopes and I've not looked at the flash drives.  I'm going

4    to assume that they are irrelevant now and just throw the

5    away and not make them part of the Record, because overnight

6    I assume that whatever you sent me will now change.

7         So if you would send me new flash drives tomorrow,

8    but for now I'm going to toss them.  Unless somebody thinks I

9    need them as part of the Record.  I do not think I do.  They

10   weren't shown, I haven't read them, they weren't filed.

11        (No audible response.)

12        THE COURT:  Okay.  They're gone.  Anyone else have

13   anything you want to talk -- oh, let's see, I do have

14   somebody else.  Mr. Kuebel.

15        MR. KUEBEL:  (No audible response.)

16        THE COURT:  You've got your own line muted.

17        MR. KUEBEL:  Oh, I certainly do.  I apologize,

18   Your Honor.  Can you hear me?

19        THE COURT:  I can.  Would you wish your wife well

20   tonight?

21        MR. KUEBEL:  Thank you.  It's a milestone birthday

22   for her this evening.  I appreciate that, Your Honor.

23        I actually think it's a very constructive idea to

24   come back at 1:30.  We do have language outstanding.  We did

25   send over to the Court language that we thought was

1  consistent with the Court's instruction, and if we have to

2  take it up tomorrow, we can take it up tomorrow.  Hopefully

3  it'll be resolved in between now and then.

4          THE COURT:  Thank you, sir.

5          Mr. Zuber.

6          MR. ZUBER:  Good afternoon, Your Honor.  Scott

7  Zuber --

8          THE COURT:  Good afternoon.

9          MR. ZUBER:   -- on behalf of Berkley and Sirius.

10          CLOSING ARGUMENTS ON BEHALF OF

11             BERKLEY AND SIRIUS

12          MR. ZUBER:  We also have had some discussions with

13  Debtors' counsel and other stakeholders involving some

14  language, in particular with respect to Paragraph 5.13A of

15  the Plan, and we also suggested some minor tweaks to

16  Paragraph 10K of the Plan Confirmation Order.  And I thought

17  we had made pretty progress, but we didn't really connect

18  with what we hear on the Zoom so I think that given the

19  opportunity to continue this hearing till tomorrow may be

20  helpful to get resolution there.

21          The other issue, I'm not sure if it's resolvable or

22  not, is we still have a standing objection with respect to

23  the exculpation provisions.  Perhaps we can work that out as

24  well.  Perhaps we'll have to do that tomorrow, unless Your

25  Honor required that be done now.  But I think reserving our

111

1    arguments for tomorrow makes sense and see what works out.

2           THE COURT:  No, look, I just want to trust

3    everybody's judgment on this.  If you think that there's a

4    decent chance you're going to work it out, and let -- you can

5    make your argument tomorrow.  And I'm not going to second

6    guess your judgment that you thought you'd work it out.  But,

7    you know, if you want to make an argument right now, I'll

8    listen to it right now, but it makes more sense if you think

9    you're going to work it out to just defer the argument

10   without prejudice till tomorrow.  So let me just trust your

11   judgment and not my own.

12          MR. ZUBER:  Yeah, as long as we reserve all

13   arguments for tomorrow I'd prefer to reserve and see what we

14   can get accomplished.

15          THE COURT:  You and all others do, so thank you.

16          I show --

17          MR. ZUBER:  Thank you, Your Honor.

18          THE COURT:   -- Mr. Peck has an issue.

19          MR. KADDEN:  Good afternoon, Your Honor.  This is

20   actually Benjamin Kadden --

21          THE COURT:  Mr. Kadden.

22          MR. KADDEN:   -- on behalf of Atlantic Maritime

23   Services.

24          I wanted to just confirm that -- the Court's intent

25   to take up our motion for relief from stay at the conclusion

1  of the Confirmation Hearing tomorrow, at the same time of

2  confirmation.  Just wanted to confirm that timing.

3          THE COURT:  I have not been thinking about that.

4  I know that I promised to take it up at the end of

5  confirmation.  Does it make the most sense to do it

6  tomorrow, or to do it now?  I think tomorrow, but if you

7  think it makes more sense now, let me know.  I know I made

8  you the promise, I just haven't worried about it.  But I'm

9  going to keep my promise.

10          MR. KADDEN:  At the conclusion of confirmation is

11  fine, Your Honor.

12          THE COURT:  Thank you, Mr. Kadden.

13          Mr. Langley.

14          MR. LANGLEY:  (No audible response.)

15          THE COURT:  Mr. Langley?

16          MR. LANGLEY:  (No audible response.)

17          THE COURT:  I think you may have your own line

18  muted, Mr. Langley.

19          MR. LANGLEY:  You are correct, Your Honor.  Do you

20  h hear me now?

21          THE COURT:  I can.  Thank you.

22          MR. LANGLEY:  We do have some legal objections to

23  the Plan pending.  Do you want to hear those now or

24  tomorrow?

25          THE COURT:  I want to hear them now, unless you

1  believe that they're resolvable by Confirmation Order

2  language.

3           MR. LANGLEY:  I do not.

4           THE COURT:  Then let's hear them now.  Go ahead.

5           MR. LANGLEY:  Thank you.  And we do have some

6  language issues pending, and so I'll leave those aside.  And,

7  Your Honor, Keith Langley on behalf of Travelers, Liberty

8  Mutual, Hanover and XL.

9           CLOSING ARGUMENTS ON BEHALF OF TRAVELERS,

10              LIBERTY MUTUAL, HANOVER AND XL

11          MR. LANGLEY:  We are four sureties that have

12  issued approximately 220 million in private bonds on behalf

13  of the Debtors.  And I have three issues to present to the

14  Court.

15          The first issue is jurisdictional.  I'm here to

16  change your mind on *Midlantic*, and so I'm going to talk about

17  that.  I then want to talk about oil and the Gulf and

18  suretyship.  And with Your Honor's permission I'll address

19  those issues.

20          THE COURT:  Thank you, Mr. Langley.  Go ahead.

21          MR. LANGLEY:  Your Honor, the first issue is the

22  impacts of the Debtors in seeking to abandon depleted assets

23  without addressing the environmental responsibilities

24  required of an oil and gas operator in the Gulf.  If a Plan

25  violates the law, which the abandonment of these properties

1    would, the Plan cannot be confirmed under 1129(a)(3).

2          The Debtors have not established that the Plan is

3    in the best interest of creditors versus a liquidation under

4    1129(a)(7).  And the treatment of surety bonds across the

5    board including a mistaken belief that a bond issued on

6    behalf of Fieldwood can remain in force and can be used by a

7    successor entity without assumption, cure or indemnity.

8          A surety bond -- we've heard about policy and a

9    surety bond is not insurance, and there can be no bond

10   without a principal.  Yet here the Plan envisions that the

11   bonds continue to exist without a principal, and this would

12   violate the law about suretyship and makes the Plan

13   unconfirmable under 1129(a)(3).  And the --

14         THE COURT:  Well, what happens --

15         MR. LANGLEY:   -- probably the Plan --

16         THE COURT:   -- what happens under applicable non-

17   bankruptcy law if a principal induces a surety to issue a

18   bond and a surety issues the bond, and the principal then

19   dissolves its existence.  So they just go to state law --

20         MR. LANGLEY:  Thank you --

21         THE COURT:   -- you know, let's take a Delaware

22   corporation and they go dissolve.  What happens to the bond?

23         MR. LANGLEY:  The bond is a tri-part by a three-

24   party agreement and it runs to the obligee on behalf of the

25   principal.  So we could talk about that a lot, but I think

1  where Your Honor is going is a jurisdictional issue, a

2  *Midlantic* issue and how that impacts suretyship and

3  bankruptcy --

4          THE COURT:  Well, no, I'm not.  I'm actually trying

5  to deal with -- you said as a matter of law that a bond does

6  not exist if there isn't a principal.  I think that's pretty

7  much a quotation of what you just said.  My question to you

8  is --

9          MR. LANGLEY:  Yes, sir?

10          THE COURT:   -- under applicable non-bankruptcy

11  law if the principal dissolves, what happens to the bond?

12

13          MR. LANGLEY:  The bond is still there, Your Honor.

14          THE COURT:  So how is your statement accurate?

15          MR. LANGLEY:  The fact -- because you -- to have a

16  new -- a bond in existence for a risk, you have to have a

17  principal.  And here there's no principal.  Newco would take

18  assets without being liable on the bond.

19          THE COURT:  But Fieldwood was the one that was

20  liable on the bond, and Fieldwood remains liable via an

21  unsecured claim.  Right?

22          MR. LANGLEY:  Yes, sir.

23          THE COURT:  So I don't understand -- I just

24  didn't -- I don't think that your statement of law is

25  consistent with what you're telling me because it means that

1  just as in applicable non-bankruptcy law, if there is a

2  dissolution, that your client's obligation under the bond

3  would not be altered.  Under bankruptcy law their obligation

4  under the bond isn't altered either.  It's not enhanced

5  either, but it's not altered merely by dissolution or merely

6  by confirmation of a Plan.

7          Unless there is an alteration, and maybe there is.

8  But I don't see what that alteration is from merely the

9  dissolution/confirmation.

10         MR. LANGLEY:  I think that's a good argument.  I

11 think there's 50 percent on the right hand that you're arguing

12 and 50 percent on the left hand, and without a principal you

13 don't have a bond.  And here I think the Plan does impair

14 those rights.

15         THE COURT:  No, I --

16         MR. LANGLEY:  And I think that --

17         THE COURT:   -- but I guess I'm -- you just said

18 this again, without a principal you don't have a bond.

19 Without a principal you don't start a bond, but you've issued

20 your bond.  How is it possible under your answer to my

21 question that without a principal you don't have a bond?

22 That can't be an accurate statement.

23         MR. LANGLEY:  Well, imagine two things.  In

24 Fieldwood One, Fieldwood, where they abandon an asset like

25 the Spar, the Spar is abandoned.  Now the bond is still in

1   effect and the issue is a jurisdictional issue going to

2   clean up of oil in the Gulf.  And then you have Newco, which

3   might take over an asset, and in that instance the

4   Government looks to Newco and the existing assets, which

5   include an argument about the bond.  We don't think it's an

6   asset of Fieldwood and we think that produces a problem,

7   Judge.

8          THE COURT:  You're making several arguments and I'm

9   trying to deal with them one at a time.  I want to deal with

10  your issue that says no principal, no bond.  And I don't

11  understand that that is the law.  And from what you've told

12  me, if there is a dissolution, there is no principal, but

13  there is still a bond.  And then we can move to your

14  jurisdictional argument, which is a completely different

15  argument.  And I'm happy to move there.  But I'm telling you,

16  I don't understand the no principal, no bond argument as

17  being consistent with non-bankruptcy law.

18         MR. LANGLEY:  Well, just thinking on that one no

19  principal, no bond issue, Judge, the problem is tomorrow

20  with Newco there's no principal but there is an asset which

21  is covered by the bond.  So you have an argument about does

22  the bond continue in full force and does that provide a

23  protection to the Government.  Now we argue the answer is

24  no.

25         THE COURT:  So what does that have to do with the

118

1  no principal, no bond issue?  I understand your argument

2  that the transfer of the asset might obviate the bond, but

3  that's not the argument you're making.  You're telling me no

4  principal, no bond.  Those are different issues.  Tell me

5  why this -- why no principal, no bond concept matters to me.

6          MR. LANGLEY:  Well, I think I am saying that,

7  Judge.  I might not be saying it very well, but I think the

8  problem becomes when Fieldwood exits stage left, and the

9  permission is given by this Court to exit stage left, you're

10  left with a surety and an issue of where do you get

11  indemnity rights, subrogation, and exoneration on that bond

12  other than -- no one is left --

13          THE COURT:  Well, no, there's an unsecured claim

14  against Fieldwood.  That's the credit risk your client took.

15          MR. LANGLEY:  There's an issue as to who owes what

16  relative to that oil in the Gulf.

17          THE COURT:  And what does the oil in the Gulf?

18  Okay.  So I am -- I will just tell you, I don't understand no

19  principal, no bond.  I'm overruling that as an objection

20  because the argument makes no sense to me.

21          So let's go to your next argument, which may be

22  that the transfer from what you're telling me causes a

23  problem separate from that.  So what happens under

24  applicable non-bankruptcy law if your principal transfers an

25  asset in violation of the bond?  What happens to your bond?

1          MR. LANGLEY:  You have a bond defense issue there,

2    Your Honor, and that is an increase in the risk on the bond

3    and a material --

4          THE COURT:  So I have an obligee that got your

5    bond, you guaranteed to pay you told me $220 million in

6    clean up costs, and your obligee does not make -- does not

7    do anything, they sit still, and the borrower transfers --

8    I'm sorry, the principal transfers the asset.  You're telling

9    me the obligee loses its bond under that situation under

10   non-bankruptcy law?

11         MR. LANGLEY:  You have an issue there, Judge,

12   about the amount that the bonding company owes in that

13   circumstance and who else owes in that circumstance.

14         THE COURT:  Well, let's start with whether the

15   obligee can collect its $220 million.  So the Debtor, the

16   principal, transfers its asset on its own, that's not

17   illegal, it simply violates your contract.  Does it -- do

18   you have an argument that your client's penal sum is not

19   still callable by the obligee?

20         MR. LANGLEY:  If the obligee is a party to that

21   issue you mentioned, yes.

22         THE COURT:  They're not.  The Government has not

23   authorized --

24         MR. LANGLEY:  In your hypo, they're not --

25         THE COURT:   -- that the Government has simply not

1  objected to it.

2           MR. LANGLEY:  If the Government -- the Government

3  gets to set under its regulatory powers the amount of

4  financial responsibility to operate that asset.  And so

5  setting that financial responsibility amount impacts the

6  liability on the bond.

7           THE COURT:  What does that have to do with whether

8  the principal transferred the asset in violation of the bond

9  but not in violation of the law?

10          MR. LANGLEY:  Well, we argue that a transfer is in

11 violation of the law, Your Honor.

12          THE COURT:  Okay.  What law does it violate?

13          MR. LANGLEY:  *Midlantic*.

14          THE COURT:  I am overruling an objection that the

15 transfer of --

16          MR. LANGLEY:  Got it.

17          THE COURT:   -- an asset that is environmentally

18 troubled violates *Midlantic* unless those who are responsible

19 in the Governmental regulatory position in both in *Midlantic*

20 rights, I do not believe as a matter of law that a bond

21 issuer may invoke *Midlantic* rights for a number of reasons.

22          First, the situation in *Midlantic* is not a bond

23 issue.  The situation in *Midlantic* in terms of being fact

24 specific were Governmental entities that were objecting.

25          *Midlantic* makes clear that it is inconsistent

121

1    with the language of the Bankruptcy Code and therefore its

2    exception to the Bankruptcy Code should be extremely

3    narrowly tailored.  I am extremely narrowly tailoring it and

4    holding that it applies to Governmental units.

5          Number two, the public policy reason behind

6    *Midlantic* was to encourage and make available clean up of

7    environmentally hazardous sites as -- if regulators

8    otherwise objected.  If, in fact, we allowed parties other

9    than the Government to exercise those rights, we're going to

10   end up with orphaned properties.

11         By way of example, in this case there simply are

12   not enough assets in Fieldwood's possession and control.  And

13   by the way, its asset do not include the penal sums on the

14   bonds, and never did.  They have no right to the penal sums

15   on the bonds.  It would mean that we were left with

16   environmental hazards if those were ratably put across all

17   environmental issues.

18         And so if we did that, we would have orphaned

19   properties that could not be cleaned up because they will be

20   properties without predecessors-in-interest available

21   potentially to clean them up.  And the Government needs to

22   exercise its discretion as to when and how to apply

23   *Midlantic* to maximize the environmental rights.

24         The Supreme Court has simply not ruled that a

25   private litigant can overrule the determination of the

1    Government with respect to how to handle environmental

2    matters and simultaneously ask a Bankruptcy Court not to

3    invoke the provisions of the Bankruptcy Code.  There's no

4    Supreme Court authority for that, not 5th Circuit authority

5    for that.  And I am not doing that.  I'm overruling the

6    objection.

7              Go ahead.

8              MR. LANGLEY:  Okay.  Thank you, Your Honor.  The

9    issue that -- I want to make sure if I stated clearly or

10   properly is that a transfer to a new principal does result

11   in discharge of the surety, and we have public policy issues

12   around that that sureties are key to operations in the Gulf

13   to --

14             THE COURT:  Wait, wait, wait, wait, you're telling

15   me --

16             MR. LANGLEY:   -- contain it --

17             THE COURT:   -- that this goes back to the example

18   where I thought you said it didn't.  I'm talking -- the

19   example we have here is the principal transfers a property

20   in violation of the bond, the obligee does not do that, that

21   you're telling me that under non-bankruptcy law the surety's

22   obligation to the obligee is discharged because the

23   principal did something that's inconsistent with the bond?

24             MR. LANGLEY:  I think that, Your Honor, the

25   obligee had a duty under the bond to act responsibly and had

1  to act in this bankruptcy case responsibly on that issue.

2  So, yes, I think there's a fact issue as to what the obligee

3  has done to permit a transfer of the principal.

4  　　　　THE COURT:  Great.  Tell me what evidence you have

5  to support that argument then, because if you're telling me

6  that there is evidence that the obligee has acted in a

7  manner in bad faith under the bonds, what was the evidence

8  that was introduced at the hearing to support that argument?

9  　　　　MR. LANGLEY:  Your Honor, I don't know that it's a

10  bad faith issue, I think it's a totality of the circumstances

11  of what is done as it relates to the bond in default.

12  　　　　THE COURT:  What's the evidence then?  Give me the

13  totality of the circumstances of it.  I don't know of any

14  evidence that you introduced, or that anyone else did, that

15  supports the argument.  But I'm willing to have you refresh

16  my recollection.  Tell me the evidence that under the

17  totality of the circumstances that something has occurred

18  here where I should determine that the bonds would not be

19  enforceable.

20  　　　　MR. LANGLEY:  I don't think you would determine

21  that, Your Honor.  I think that would be an issue of --

22  between the surety and the obligee, and it would be the

23  actions taken in this bankruptcy.

24  　　　　THE COURT:  What evidence is there that any

25  actions in this bankruptcy would precipitate that result?

1          MR. LANGLEY:  I'm not in a position to go into

2    that, Judge.

3          THE COURT:  Okay.  I'm going to overrule as a

4    matter of law that the actions that are being undertaken by

5    the Debtor and by all of the parties to the bankruptcy case

6    that are acting in cooperation with the Debtor have been

7    undertaken in the utmost good faith to maximize the

8    principles of *Midlantic*, and that no party who failed to

9    introduce any evidence in support of what I regard as a

10   specious argument, may subsequently raise the issue that

11   there was any wrongdoing that occurred in the bankruptcy

12   case.  The evidence is overwhelming that it's not.

13          And that is one of the reasons why, in furtherance

14   of *Midlantic* and in furtherance of 5th Circuit law, I'm

15   ordering exculpation for these actions.  We're never going to

16   get matters cleaned up if we allow parties to put up road

17   blocks and say, If you work on cleaning up the environment

18   publicly in good faith with the cooperation of all parties

19   concerned and with the Government not objecting, we can't let

20   private parties endanger the environment the way your client

21   is trying to do it.

22          I'm overruling the objection and I'm finding this is

23   not subsequently challengeable.   What's your next argument?

24          MR. LANGLEY:  Then I rest, Your Honor.

25          THE COURT:  All right.  Mr. Langley, I'm being very

125

1  blunt because I want you to have a good Appellate Record,

2  and I think I'm ruling correctly.

3          MR. LANGLEY:  I appreciate that.

4          THE COURT:  I have zero problem that you're making

5  the arguments, but without evidence, you know, I'm not sure

6  on what basis I would ever rule any other way when there was

7  a complete absence of evidence of anything other than utmost

8  good faith.

9          All right.  Let me move to the next person.  From

10 630-790-0261.

11         MR. KOOY:  Good morning, Your Honor -- or good

12 afternoon, Your Honor.  Ralph Kooy on behalf of one of the

13 other non-Apache sureties, North American Specialty Company.

14 I'm in a similar situation as Mr. Zuber.

15                 CLOSING ARGUMENTS ON BEHALF OF

16                 NORTH AMERICAN SPECIALTY COMPANY

17         MR. KOOY:  We've been exchanging language with

18 respect to the subrogation, and actually my partner's been

19 involved in those discussions.  And with respect to the

20 reservation of the surety's rights with respect to other

21 obligees.  In our specific cases E&I and Chevron and Union,

22 I believe we're going to resolve those, but I just wanted to

23 reserve the right to make our argument tomorrow.

24         THE COURT:  Of course.  Thank you for letting me

25 know, Mr. Kooy, and your rights are reserved.  And hopefully

126

1  the language will get worked out.

2          Mr. Perez?

3          MR. KOOY:  Thank you very much, Your Honor.

4          MR. PEREZ:  Did you call on me, Your Honor?

5          THE COURT:  Yes, sir.

6          MR. PEREZ:  Yes.  So, Your Honor, just for to

7  inform the Court, I think it was appropriate to go after

8  counsel.  We did file an adversary proceeding and a motion

9  to impose the automatic stay with respect to the lawsuit

10 that NAS filed over -- last Friday against Eni and Chevron

11 because of their actions in furtherance of the Plan.

12         So, Your Honor, we've requested an expedited

13 hearing.  Obviously to the extent that we can solve --

14 resolve this consensually, that's great.  If we can't, as you

15 know we'd request that the Court set it for a hearing perhaps

16 after the end of the Confirmation Hearing.

17         UNIDENTIFIED SPEAKER:  And, Your Honor, I

18 apologize, I haven't had an opportunity to review that yet,

19 having just came in.

20         THE COURT:  I'm not going to set it right now, and

21 I haven't read it.  And when -- I would really doubt that

22 there is going to be somebody else -- as I recall, you

23 removed the lawsuit into Federal Court anyway.  Isn't that

24 correct?  Or no?

25         UNIDENTIFIED SPEAKER:  Your Honor, the -- yes, the

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

1    lawsuit was filed on Friday in Federal Court.  It's not a

2    removed case, it's a new lawsuit.

3              THE COURT:  Sorry, in Federal Court here or in

4    Federal Court somewhere else?

5              UNIDENTIFIED SPEAKER:  No, in Federal Court

6    upstairs here.  I believe it was filed as an adversary in

7    the bankruptcy, wasn't it?

8              UNIDENTIFIED SPEAKER:  I don't believe so.

9              THE COURT:  So --

10             UNIDENTIFIED SPEAKER:  The United Stated

11   Bankruptcy Court -- it was filed as an adversary.  Let me --

12   I'll -- I have to strike that.  I apologize, that is not the

13   case.  No, it was just filed in the District Court.  You're

14   correct.

15             THE COURT:  So I mean in terms of setting

16   something for an emergency hearing, are you going to try and

17   get any relief from the District Court in the next seven

18   days?

19             UNIDENTIFIED SPEAKER:  I do not believe so, no.

20             THE COURT:  All right.  I'm going to Order that if

21   you do intend to change -- you're welcome to change your

22   mind, if you decide to change your mind, I'm going to require

23   you and Mr. Perez jointly to get with my case manager and to

24   schedule an emergency hearing before me prior to the date on

25   which you schedule anything with the District Court.  Fair

1   enough?

2              UNIDENTIFIED SPEAKER:  Okay.  Very good.

3              THE COURT:  Okay.  Thank you.

4              All right.  What do we have next?  Let me see, I've

5   got Ms. Rosen.

6              MS. ROSEN:  Thank you, Your Honor.  I just wanted

7   to speak up on behalf of XTO entities.  This is Suki Rosen

8   of Forshey Prostok.

9              I just wanted to make sure, I believe the Court

10  said earlier that all the parties could reserve their rights

11  if they're dealing with the Debtors on language for the

12  Confirmation Order.  And while we don't consent to the Plan,

13  we are possibly working out language with the Debtors.  I

14  just wanted to make sure we could reserve our rights as

15  well.

16             THE COURT:  You do and so does everyone else who

17  is within the range of my voice which is pretty broad right

18  now.

19             MS. ROSEN:  Thank you, Your Honor.

20             THE COURT:  Thank you.

21             All right.  Anyone else believe they have anything

22  we should address today, otherwise we'll go ahead and adjourn

23  till 1:30.

24             Mr. Carlson, if you want to use this opportunity

25  to schedule anything with people to talk to you about the

129

1  Order, or you want to just continue to move where you're

2  going.  I'm leaving it up to you as -- do you want to talk to

3  everybody while you have everybody here listening.  Or are

4  you just going to do it all by email?

5         MR. CARLSON:  I'm happy to reach out by email and

6  set up calls this evening.

7         THE COURT:  Okay.  I will see you all tomorrow at

8  1:30.  Thank you everyone.

9         We're in adjournment for the day.

10        MR. CARLSON:  Thank you.

11     (Hearing adjourned 4:53 p.m.)

12                    *  *  *  *  *

13      *I certify that the foregoing is a correct*

14  *transcript to the best of my ability due to the condition of*

15  *the electronic sound recording of the ZOOM/telephonic*

16  *proceedings in the above-entitled matter.*

17  */S/  MARY  D.  HENRY*

18  *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

19  *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

20  *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

21  *JTT TRANSCRIPT #64167*

22  *DATE FILED:  JUNE 29, 2021*

23

24

25