**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIELDWOOD ENERGY LLC,** *et al.,* | § | **Case No. 20-33948 (MI)** |
| | § | |
| **Post-Effective Date Debtors.** | § | **(Jointly Administered)** |

**BP EXPLORATION & PRODUCTION INC.'S OBJECTION
TO EMERGENCY MOTION OF QUARTERNORTH
ENERGY LLC TO ENFORCE CONFIRMATION ORDER AND PLAN**
[Relates to Docket No. 2199]

BP Exploration & Production Inc. ("BP") hereby objects (the "Objection") to the *Emergency Motion of QuarterNorth Energy LLC to Enforce Confirmation Order and Plan* [Docket No. 2199] (the "Emergency Motion") filed by QuarterNorth Energy LLC ("QuarterNorth") on a purported emergency basis. In support of its Objection, BP respectfully states as follows:

**PRELIMINARY STATEMENT**

1. QuarterNorth's "Emergency" Motion is nothing more than an attempt to obtain a $6.9 million windfall and drag BP through the mud in hopes of securing "sound bites" from this Court to utilize against BP in two pending arbitration proceedings.[1] Indeed, the first two-thirds of the Emergency Motion is replete with false and unsubstantiated accusations, along with incendiary rhetoric (some of which is ironically characterized as "factual background") regarding BP's alleged "bad faith" conduct and "bullying," all of which BP disputes and none of which has any

---

[1] After this Court granted BP's motion seeking relief from the automatic stay to commence arbitration, (ECF No. 1414, granted at ECF No. 2003), BP commenced arbitration proceedings (AAA Case No. 01-21-0016-8750) against QuarterNorth on September 2, 2021 regarding the dispute addressed in that motion and the Court's order, i.e., the validity of QuarterNorth's notice purporting to remove BP as operator of the LSPS. On October 1, 2021, QuarterNorth purported to commence a second arbitration (AAA Case No. 01-21-0017-1925) against BP based on largely the same factual allegations rehashed in the "factual background" section of its instant motion, seeking damages for alleged breach of contract in connection therewith.

bearing on the declaratory judgment and injunctive relief QuarterNorth actually seeks regarding BP's setoff rights.  At bottom, QuarterNorth is attempting, through the Emergency Motion, to vitiate BP's setoff rights, contrary to the language in the Confirmation Order that expressly reserved and preserved such setoff rights.[2]

    2.    The Emergency Motion should be denied because BP's secured setoff rights:

- were *expressly* preserved by the Confirmation Order;

- were expressly assumed under the original Credit Bid PSA that was approved under the Confirmation Order (the "Court Approved PSA") through QuarterNorth's assumption of all liabilities arising out of or relating to affirmative defenses, which includes defensive setoff and recoupment rights;

- were acknowledged by counsel to QuarterNorth, in post-effective date communications, to not be impacted by the Debtors' unilateral modifications of the Court Approved PSA; and

- cannot be unilaterally stripped under section 363(f) and section 363(e) as a result of QuarterNorth's purchase of the Debtors' assets.

    3.    QuarterNorth's disingenuous interpretation of the parties' heavily-negotiated, agreed-upon language in the Confirmation Order defies logic and strains the bounds of basic common sense.  If QuarterNorth's position was accepted then paragraph 133 of the Confirmation Order would not only run contrary to the parties' actual agreement, it would effectively mean that the parties agreed to preserve BP's setoff rights knowing that they would not exist in a matter of days, or weeks.  This simply is not accurate.  Instead, the record before this Court at the confirmation hearing and the parties' conduct, as set forth herein, demonstrate that the Confirmation Order reserved and preserved BP's setoff rights notwithstanding the sale to QuarterNorth, in resolution of BP's section 363(f) and section 363(e) objection to the proposed free and clear sale.

---

[2] In an effort to perpetuate a false narrative, QuarterNorth references BP's "bad faith," "bad acts" and "bullying" more than twenty-five times in the nineteen-page Emergency Motion.

*ACTIVE 61420773v1*

4.      BP validly preserved and subsequently exercised its setoff rights.  Upon the occurrence of day 180 of production from the Genovesa well (the indisputable outside date by which the MC519 Payment would be due and owing) BP promptly sent QuarterNorth a notice that it (a) was exercising its setoff rights, and (b) would be filing an amended proof of claim in a reduced amount that reflects BP's claim following the exercise of such rights.

5.      Finally, the Emergency Motion appears to seek injunctive relief and a declaratory judgment finding that BP breached the Confirmation Order and the Plan.  Insofar as QuarterNorth is in fact seeking a declaratory judgment or injunctive relief, then the Emergency Motion is procedurally improper and must be denied.  Any such relief must instead be sought through the adversary proceeding process on a non-emergency basis.

6.      For these reasons, as well as the inability of QuarterNorth to demonstrate the existence of any legitimate emergency, the Court should deny the Emergency Motion.

## **RELEVANT BACKGROUND**

### **A.  The Isabella PSA**

7.      On October 25, 2018, BP and Fieldwood entered into that certain Cash Consideration Exchange Agreement in respect of Mississippi Canyon Block 562 (the "Isabella PSA").  BP agreed to pay Fieldwood $66 million (the "Isabella Cash Consideration"), all of which was due and payable at the time the Isabella PSA was signed in 2018, and recorded on the books of BP as a liability in 2018 when the Isabella PSA was signed, to be paid pursuant to the terms of the Isabella PSA.  The payment schedule set forth in Section 3.1 of the Isabella PSA, provides for (a) monthly payments based on production and (b) to the extent that the total payments during each year are less than a certain specified amount, an annual payment at the end of such year to achieve the specified amount for that year.  *See* Isabella PSA § 3.1.

8.      As of the date BP exercised its setoff rights, BP had a remaining obligation under the Isabella PSA in the amount of approximately $6.9 million, which was due and payable, and obligated to be paid pursuant to the terms of the Isabella PSA.

**B. The MC519 PSA**

9.      On May 17, 2019, BP (as Seller) and Fieldwood (as Buyer) entered into that certain Purchase and Sale Agreement in respect of Mississippi Canyon Block 519 (the "MC519 PSA"). Under the terms of the MC519 PSA, Fieldwood agreed, among other things, to pay BP $30 million (the "MC519 Payment"), which became payable and owing to BP upon the successful completion of the Genovesa well and shall be due and paid within the first 180 days of production from the well. *See* MC519 PSA § 3.1(b).

10.      As the Debtors have expressly recognized and stated, "Genovesa was successfully brought online as planned on March 27, 2021." (Disclosure Statement, at p. 49.)  However, the Debtors have also argued that the obligation to make the MC519 Payment was contingent upon the Genovesa well first producing for 180 days.  As acknowledged by QuarterNorth in the Emergency Motion, this production milestone was reached on or about October 26, 2021.  Thus, under any interpretation of the MC519 PSA, the $30 million MC519 Payment became payable and owing to BP more than one month ago.

11.      In the ordinary course of business between BP and Fieldwood, the parties consistently netted out amounts owing from one party to amounts due to the other, often at the suggestion of Fieldwood, as demonstrated on the record at the confirmation hearing.[3]  Thus, there

---

[3] The Debtors' Senior Vice President and Chief Financial Officer (and currently QuarterNorth's Chief Executive Officer), Michael Dane, acknowledged in testimony at the confirmation hearing: "The parties have netted against each other, which has been the subject of separate disputes to which there's quite a bit of history." June 21, 2021 Hr'g. Tr., 237:24-238:1.  *See also* June 21, 2021 Hr'g. Tr., 238:9-11 ("Q  Okay, So it's happened in the past; is that correct? The netting? A. Yes.").  BP's witness, Adriana Bonjour also testified that the parties netted against each other in the ordinary course of business: "In the normal course of our business we have netted amounts out between each other." June 22, 2021 Hr'g. Tr.,74:7-11.

4

has been a course of dealing between the parties pursuant to which amounts owing from one party have been netted out against amounts due to the other party.

### C. The Confirmation Proceedings

12.     On June 2, 2021, BP filed *BP Exploration & Production Inc.'s Objection to Confirmation of the Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* [Docket No. 1468] (the "<u>Confirmation Objection</u>").   In the Confirmation Objection, BP argued, *inter alia*, that the Debtors could not sell assets free and clear of BP's secured setoff rights, that the Debtors had not identified or established a basis under section 363(f) of the Bankruptcy Code to sell free and clear of BP's secured setoff rights, that setoff rights under section 363 take precedence over section 1141, and that any sale free and clear of BP's secured setoff rights would require adequate protection of BP's interests.   Confirmation Objection at ¶¶ 44-51.

13.     During the June 25, 2021 confirmation hearing, an extensive discussion between Debtors' counsel, the Court, and counsel to another counterparty raising concerns regarding the preservation of its setoff rights, Debtors' counsel confirmed that secured setoff rights would not be impacted by the Plan.   June 25, 2021 Hr'g. Tr., 43:21-45:6.   Debtors' counsel subsequently tried to narrow the preservation of setoff rights with respect to only BP (to preserve only contractual setoff rights, and exclude setoff rights pursuant to applicable law), but the Court overruled the Debtors' objection, thus preserving *both* BP's contractual setoff rights, *and* BP's setoff rights pursuant to applicable law, *Id.,* 69:3-73:2.   Based upon this resolution of the setoff issue, the Court did not find or rule that the Debtors were permitted to sell free and clear of BP's secured setoff rights, and the Court did not make any adequate protection determination; indeed, those issues became moot by virtue of the Court's ruling on preservation of setoff rights.

*ACTIVE 61420773v1*

14.     On June 25, 2021, the Court entered the *Findings of Fact, Conclusions of Law, and Order (I) Confirming Eighth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors and (II) Granting Related Relief* [Docket No. 1751] (the "Confirmation Order") which confirmed the *Eighth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* (the "Plan").

15.     The Confirmation Order contained language resolving several of BP's objections outlined in the Confirmation Objection, including, *inter alia*, heavily-negotiated language intended to ensure that BP's setoff rights were fully reserved and preserved notwithstanding the Debtors' impending sale to QuarterNorth.  Specifically, the relevant portions of paragraph 133 provide as follows:

> BP. The terms of this paragraph shall apply to the BP Entities [including BP Exploration & Production Inc. and BP American Production Company, together with their successors and assigns] and the Executory Contracts identified on the Schedule of Assumed Contracts between any of the Debtors and any BP Entity (the "BP Executory Contracts"):
>
> ii.     To the extent that a BP Executory Contract is assumed, assumed and assigned or assumed and allocated, such assumption or assumption and assignment or assumption and allocation shall result in the full release and satisfaction of only those Claims based on a default existing as of the Effective Date with respect to such BP Executory Contract. For the avoidance of doubt, the Plan and this Order shall not alter any of the terms under the BP Executory Contracts including, without limitation, any arbitration rights or any valid netting (either based on setoff or recoupment).
>
> iii.    The assumption, assumption and assignment, or assumption and allocation of any BP Executory Contract shall not alter, impair or otherwise affect any of the parties' respective rights and obligations under the BP Executory Contracts, including, without limitation, any valid netting (either based on setoff or recoupment) under the BP Executory Contracts or pursuant to applicable law (unless it is inconsistent with the applicable BP Executory Contract); and any rights for arbitration.

Confirmation Order, ¶ 133(ii)-(iii).

16.     In addition to the express reservation of rights provided under the Plan, BP's rights were also preserved under section 11.1 of the Court Approved PSA which provided:

> Subject to the terms of this Agreement, if the Closing occurs, Buyer shall be deemed to have assumed (and shall pay, perform and discharge) the following Liabilities of the Sellers, as of the Closing (collectively, the "***Assumed Liabilities***"): … all Liabilities ***arising out of or relating to any affirmative defenses of third parties with respect to any Claim***[4] or cause of action assigned to Buyer pursuant to Section 1.2(i), Section 1.2(w) and Section 1.2(rr) to the extent that if treated as Retained Liabilities such defenses would not constitute general unsecured claims of the Sellers.

Court Approved PSA, [Docket 1562-1], § 11.1(n) (emphasis added).

### D. The Setoff Motion for Relief from Stay

17.     Prior to the commencement of the extended confirmation proceedings, on June 20, 2021, BP filed the *Motion of BP Exploration & Production Inc. for Entry of an Order Pursuant to 11 U.S.C. § 362(d) Authorizing Relief from the Automatic Stay to Effectuate Setoff of Mutual Obligations* [Docket No. 1666] (the "Setoff Motion").

18.     On July 8, 2021, the Debtors filed the *Debtors' Opposition to BP Exploration & Production Inc.'s Motion for Entry of an Order Pursuant to 11 U.S.C. § 362(d) Authorizing Relief from the Automatic Stay to Effectuate Setoff of Mutual Obligations* [ECF No. 1843] (the "Debtors' Setoff Opposition").  Therein, the Debtors argued that their $30 million payment obligation under the Genovesa PSA would not be triggered until the well had successfully produced for 180 days, thus raising a ripeness issue, not a validity issue.  The Debtors did *not* argue or assert that the previously entered Confirmation Order somehow authorized the sale of assets free and clear of BP's secured setoff rights contrary to paragraph 133 of the Confirmation Order; rather, the Debtors

---

[4] The term "***Claims***" is defined in Annex I as "any and all claims, demands … actions (whether judicial, administrative or arbitrational), causes of action, suits, proceedings and controversies."  Here, there is no ambiguity that the right to recover from BP under the Isabella PSA is a "Claim" that was purchased by QuarterNorth.  In addition, BP's secured setoff right is an affirmative defense that would not constitute a general unsecured claim.

merely presented a timing issue: "Here, BP does not currently have the right to request payment from the Debtors, and instead must continue to wait and see if Genovesa completes 180 days of production." Debtors' Setoff Opposition, ¶ 19.

19.     Thereafter, on July 26, 2021, BP withdrew the Setoff Motion without prejudice, given (a) the substantial likelihood that the Genovesa well would soon reach 180 days of production (and thus become unquestionably ripe under any interpretation of the Genovesa PSA), (b) the express language of the Court Approved PSA preserving the setoff rights, and (c) the knowledge that it had negotiated the preservation language contained in paragraph 133 of the Confirmation Order, notwithstanding the looming sale to QuarterNorth.

### E.  The Post-Confirmation Amendment to the Court Approved PSA and the Effective Date

20.     On August 27, 2021, the Debtors filed a revised Credit Bid Purchase Agreement ("Revised Credit Bid PSA") with QuarterNorth [Docket Nos. 2013, Exh. F; 2014, Exh. C] that contained a purported modification to certain setoff language.  Specifically, buried in the Revised Credit Bid PSA – which was filed with no notice to parties that might be impacted by modifications as part of a 1,389-page Sixth Amended Plan Supplement and separately as a 393-page suite of redlined pages – was the strike-through of language indicating that QuarterNorth would assume liabilities related to defensive setoff or recoupment rights. *See* Redline Revised Credit Bid PSA, Docket No. 2014 (Exh. C, p. 120 of 393).[5]

21.     On August 27, 2021, the same day that the Debtors filed the extensively revised Sixth Amended Plan Supplement, the Debtors also filed the *Notice of (I) Entry of Order*

---

[5] Ironically, the Court Approved PSA did not contain the deleted language, but the strike-through of the setoff language caused BP to become concerned that the Debtors were attempting to change the terms of the parties' agreement, reflected on the record at the confirmation hearing, and set forth in paragraph 133 of the Confirmation Order.

*ACTIVE 61420773v1*

*Confirming Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors and (II) Occurrence of Effective Date* [Docket No. 2016].

22.     On September 10, 2021, in response to concerns raised by counsel to BP that the aforementioned modifications to the Court Approved PSA could be read as impacting BP's setoff rights that were otherwise preserved in the Confirmation Order and the Court Approved PSA, counsel to BP received email confirmation from counsel to QuarterNorth that "QuarterNorth Energy LLC and its affiliates confirm that none of the changes to the Credit Bid PSA filed with the Plan Supplement at Docket No. 2013, including the change to section 11.1(n), impairs any setoff and recoupment rights reserved by the BP Entities under the Confirmation Order (Docket No. 1751)." Carlson Email dated September 10, 2021, attached hereto as **Exhibit A**.

**F.  The BP Proof of Claim and the Setoff**

23.     On September 27, 2021, BP timely filed a proof of claim identified as Claim No. 144 on the Debtors' claims registry in the amount of $30 million arising from the Debtors' rejection of the MC519 PSA.  In connection therewith, BP asserted a secured claim for any prepetition monetary obligations to Fieldwood, including under the Isabella PSA and any other agreements between the parties.

24.     As the Debtors acknowledge, on or about October 26, 2021, the Genovesa well achieved 180 days of production.  Emergency Motion, ¶ 29.  This milestone eliminated any ripeness issue as to the $30 million due under the Genovesa PSA.

25.     On October 28, 2021, BP sent to QuarterNorth and Fieldwood a notice of setoff notifying both parties that the Isabella Payment in the amount of $6,970,816.40 had been setoff and netted against the MC519 Payment.

*ACTIVE 61420773v1*

26.     On October 29, 2021, BP filed an amended proof of claim in the amount of $23,029,183.60 reflecting the balance due and owing in respect of the MC519 Payment after providing for a commensurate reduction in the amount of the Isabella Payment following the setoff.

## OBJECTION

**A.     Contrary to QuarterNorth's Assertions, the Parties Bargained for, BP Received, and Fieldwood Counsel Acknowledged on the Record, a Carveout and Preservation in Respect of BP's Setoff Rights**

27.     Contrary to the QuarterNorth recitation of the confirmation proceedings, BP's secured setoff claims were expressly reserved and preserved, based upon the parties' extensive negotiations, as reflected by the confirmation hearing transcript, the negotiated language of the Confirmation Order, the terms of the Court Approved PSA presented for approval at confirmation, and subsequent written representations by QuarterNorth counsel to BP counsel.  The Emergency Motion attempts to rewrite history, misinterprets the Confirmation Order, and disregards the parties' agreements, the record of the confirmation hearing, and QuarterNorth's own counsel's prior, recent representations to BP.

28.     After cutting through the numerous pages of false and divisive rhetoric, the Emergency Motion relies on a single argument: because of the Debtors' "free and clear" asset sale to QuarterNorth, the key setoff element of mutuality is lacking and therefore, BP should not be permitted to setoff the Isabella Payment against the MC519 Payment.  However, the "free and clear" language the Debtors cite in paragraphs 18 and 20 of the Confirmation Order is subject to the preservation of BP's secured setoff rights in paragraph 133 of the Confirmation Order, which is otherwise devoid of any supporting findings that the Debtors could sell free and clear of BP's secured setoff rights under section 363(f) of the Bankruptcy Code or that the Debtors had provided adequate protection to BP under section 363(e) of the Bankruptcy Code.  The Court Approved

PSA presented at the confirmation hearing also preserved setoff rights, and that setoff right was subsequently affirmed by QuarterNorth's counsel after the effective date following the Debtors' unilateral amendments to the Court Approved PSA. Alas, such preservation and affirmation notwithstanding, QuarterNorth seeks to obtain a nearly $7 million windfall it would not otherwise be entitled to receive as a result of a properly preserved setoff by BP.

**(1) The Confirmation Order Is Clear and Unambiguous**

29.     BP filed the Confirmation Objection and the Setoff Motion in part to raise concerns that the Plan or the impending sale to QuarterNorth could be read to impact BP's otherwise valid setoff rights. Following numerous discussions with Debtors' counsel, the parties arrived at agreed-upon language that was ultimately included in paragraph 133 of the Confirmation Order. The inclusion of such language gave BP comfort that its setoff rights would not be impacted by confirmation of the Plan or the QuarterNorth sale.

30.     Paragraph 133 is not ambiguous. Per the parties' agreement, it clearly states that

> To the extent that a BP Executory Contract is assumed, assumed and assigned or assumed and allocated, such assumption or assumption and assignment or assumption and allocation shall result in the full release and satisfaction of only those Claims based on a default existing as of the Effective Date with respect to such BP Executory Contract. **For the avoidance of doubt, the Plan and this Order shall not alter any of the terms under the BP Executory Contracts including, without limitation, any arbitration rights or any valid netting (either based on setoff or recoupment)**.

> The assumption, assumption and assignment, or assumption and allocation of any BP Executory Contract **shall not alter, impair or otherwise affect any of the parties' respective rights and obligations under the BP Executory Contracts, including, without limitation, any valid netting (either based on setoff or recoupment)** under the BP Executory Contracts or pursuant to applicable law (unless it is inconsistent with the applicable BP Executory Contract); and any rights for arbitration.

Confirmation Order, ¶133(ii)-(iii) (emphasis added).

*ACTIVE 61420773v1*

31.     BP made clear in its Confirmation Objection and on the very first day of the confirmation hearing that it wanted to ensure that "the Plan does not simply eliminate [our] set off rights by virtue of the NewCo sale" and that "with respect to setoff, the Debtors should not be permitted to sell assets free and clear of BP's secured setoff rights" and requested that "the Court include a provision in the Confirmation Order that preserves, reserves and protects BP's contractual [and] statutory right of setoff."  Confirmation Objection, ¶¶5, 44-51; June 21, 2021 Hr'g. Tr. 46:1-3; 51:25-52:2; 52:8-11.  BP also argued that the Debtors had failed to establish a basis under section 363(f) to sell free and clear of BP's secured setoff rights, that setoff rights under section 553 take precedence over the Debtor's ability to sell free and clear under section 1141, and that the Debtors had failed to provide or demonstrate any adequate protection to BP under section 363(e) of the Bankruptcy Code.

32.     In resolution of its Confirmation Objection, BP bargained for, and received, the agreed upon language in paragraph 133 of the Confirmation Order that fully preserved BP's valid setoff rights in all respects.  Indeed, there is otherwise no finding or ruling in the Confirmation Order that there was a basis under section 363(f) for the Debtors to sell assets free and clear of BP's secured setoff rights or that the Debtors had provided adequate protection to BP under section 363(e); these issues were rendered moot by the preservation of setoff rights set forth in paragraph 133 of the Confirmation Order.  BP would never have agreed to withdraw its Confirmation Objection if it thought all it was getting was an agreement that the Plan and Confirmation Order were doing something they could not otherwise do (*i.e.*, hitting pause on unilaterally eliminating BP's secured setoff rights).  Moreover, whether the effective date occurred on June 27, 2021 or August 27, 2021 the result would be the same: BP's setoff rights are preserved notwithstanding

the sale to QuarterNorth.  QuarterNorth's effort to eviscerate the parties' agreement should not be countenanced.

33.     QuarterNorth also deliberately misreads and attempts to rewrite paragraph 133 of the Confirmation Order to advocate a position that was expressly overruled by the Court at the time of the confirmation hearing.  In its Emergency Motion (paragraph 28), QuarterNorth incorrectly states "subparagraph ii. [of paragraph 133] merely says the Plan and Confirmation Order do not alter the terms of the Isabela PSA," arguing that "No term in the Isabela PSA provides for netting between the Isabela PSA and Genovesa PSA."  Contrary to QuarterNorth's assertions, paragraph 133 of the Confirmation Order expressly preserves "any valid netting (either based upon setoff or recoupment) under the BP Executory Contracts [which includes the Genovesa PSA] under the BP Executory Contracts *or pursuant to applicable law* (unless it is inconsistent with the applicable BP Executory Contract) . . . ."  Confirmation Order, ¶ 133 (emphasis added).  At the confirmation hearing, the Debtors argued that BP's preserved setoff rights should be limited to contractual setoff rights, and exclude setoff rights under applicable law.  The Court overruled the Debtors' position at the hearing, June 25, 2021 Hr'g. Tr., 69:3-73:2, and paragraph 133 of the Confirmation Order expressly includes BP's preservation of setoff rights, *both* pursuant to contract *and* pursuant to applicable law.  QuarterNorth's attempt to re-write paragraph 133 of the Confirmation Order, in contravention of the Court's ruling at the hearing, must fail.

34.     QuarterNorth then attempts to argue that the alleged "ripeness" issue with respect to BP's setoff claim somehow impacts the claim's validity, improperly conflating notions of ripeness and validity, and seeking to inject an improper temporal trap into the Confirmation Order preservation language.  The fact that BP's setoff claim may not have been "ripe" at the time of the confirmation hearing does not mean it was invalid, and there is absolutely nothing in the

preservation language contained in paragraph 133 of the Confirmation Order, the record at the confirmation hearing or otherwise to suggest that BP's setoff rights had to be ripe at the time of confirmation in order to be preserved pursuant to the parties' agreement, the Court's ruling or the language of the Confirmation Order.

### (2) The Record of the Confirmation Hearing is Clear and Unambiguous

35. In addition to this heavily negotiated language, BP was further given comfort that its setoff rights would be fully preserved based on a lengthy colloquy between Debtors' counsel, the Court, and counsel to another counterparty on the record at the confirmation hearing on June 25, 2021:

> MR. KIND: No, Your Honor, those points are well taken. I think that the concern is that when the Plan specifies a rejection, damages claims can be brought but that will be classified as an unsecured claim, I think there's a concern about, well, you know, in order to prepare that claim are we allowed -- you know, are they trying to cut off our right to take into effect the vetting that we assert, you know, we're entitled to per the contract before they were rejected. But, Your Honor –

> THE COURT: So, let me go back to Mr. Perez on this one. This has been sort of your bailiwick so far. What do we do on a provision in the Plan like what Mr. Kind is referencing where -- you know, I don't know if you can do that or not, you certainly -- it's a fair provision in a Plan, but if he's saying he's not sure that you can cut off his secured rights, if he has them, how do you think we ought to handle that?

> MR. PEREZ: Two things, Your Honor. Number one, I don't think the paragraph cuts off whatever right of whatever rights he has. And to the extent that he's allowed -- he's entitled to file a claim as a result of the rejection damages, and for instance *even if we say in the Plan that he's entitled to file a claim, you know, they're holding a deposit, I don't think the Plan would be able to vitiate that hold – the deposit*.

> And *to the extent that he has a valid claim for a set off, again, I don't think we -- I don't think that the Plan would cut that off on a pre basis*, Your Honor.

> THE COURT: So he's -- what he -- and I haven't looked at this provision, he's telling me the Plan itself says that damages from a -- from the rejection of a contract will be treated solely as an unsecured claim. So if they have damages for which

they have set off rights, and again, those may not be effective, I don't know, but what do we do so that that argument gets preserved?

MR. PEREZ: Well, Your Honor, I think we're having this colloquy on the Record, but normally when you file a -- when you get a claim it does give rise to an unsecured claim. To the extent somebody I guess is holding security, then that unsecured claim would have whatever security that person is holding. It's kind of how the Plan purports to strip any of that security.

THE COURT: Mr. Kind, it is 9:10 in the morning Central Time, **with Mr. Perez estopping his client**. Are you okay with that?

June 25, 2021 Hr'g. Tr., 43:21 – 45:6 (emphasis added).

36.     This exchange provided additional comfort, and affirmation, to BP that the Debtors and QuarterNorth would not later attempt to argue that any one provision or multiple provisions of the Plan, the Confirmation Order, or the sale to QuarterNorth would serve as a basis to eviscerate BP's otherwise valid setoff rights (as QuarterNorth is now attempting to argue).

### (3) QuarterNorth's Own Counsel Specifically Confirmed that BP's Setoff Rights Were Preserved Notwithstanding the Sale

37.     On August 27, 2021, more than two months following the Court's entry of the Confirmation Order, the Debtors filed the Sixth Amended Plan Supplement which contained *extensive* modifications to documents critical to implementing the Debtors' Plan, including language striking defensive setoff and recoupment rights from the assumed liabilities section of the Court Approved PSA.   In addition to the concern that such post-confirmation material modifications were made with *no notice* to parties in interest (in fact, the notice of occurrence of effective date was filed with the Court that same day) and could arguably require re-solicitation of the Plan or, at a minimum, sufficient notice and an opportunity to be heard for potentially impacted counterparties, BP also became concerned that QuarterNorth might attempt to utilize this particular modification to argue that it effectively eliminated BP's setoff rights, in contravention of paragraph

133 of the Confirmation Order and the record at the confirmation hearing.[6]   As a result, BP

contacted QuarterNorth's counsel requesting immediate clarification.  In response, QuarterNorth's

counsel confirmed that "QuarterNorth Energy LLC and its affiliates confirm that none of the

changes to the Credit Bid PSA filed with the Plan Supplement at Docket No. 2013, including the

change to section 11.1(n), impairs any setoff and recoupment rights reserved by the BP Entities

under the Confirmation Order (Docket No. 1751)."  Carlson Email dated September 10, 2021,

attached hereto as **Exhibit A**.  This confirmation from QuarterNorth's counsel provided BP with

necessary assurance that the parties' agreement, and the Court's Confirmation Order, would be

respected.

### (4) QuarterNorth Mischaracterizes the Circumstances Surrounding BP's Withdrawal of the Setoff Motion

38.     The Emergency Motion also mischaracterizes the circumstances surrounding BP's

withdrawal of its Setoff Motion.  Importantly though, BP's withdrawal of its Setoff Motion in July

2021 has no bearing on the propriety of its subsequent exercise of its valid setoff rights in October

2021.  Nevertheless, BP must correct the record.

39.     In the Emergency Motion, QuarterNorth posits that "[a]fter the Court continued the

hearing at BP's request and over Fieldwood's objection, BP eventually abandoned BP's Setoff

Motion altogether."   Emergency Motion, ¶ 21.   QuarterNorth then goes on to say that BP

"unilaterally withdrew BP's Setoff Motion 36 hours before the hearing to resolve it. . . ."  *Id.*, ¶

30.  This is inaccurate and highly misleading.  In reality, counsel to BP contacted Debtors' (now

QuarterNorth's) counsel in advance of BP's withdrawal of the Setoff Motion to determine whether

the Debtors opposed such withdrawal.  Debtors' counsel responded by email that "[t]he Debtors

---

[6] Two days earlier, on August 25, 2021, the Debtors also filed a modified Plan, *two months* after the Court entered
the Confirmation Order.  *See* Docket No. 2008.

16

do not oppose withdrawal of the motion." Carlson Email dated July 26, 2021, attached hereto as **Exhibit B**. Thus, BP was in communication with the Court and Debtors' counsel before formally withdrawing its Setoff Motion. The Court's own docket notes in respect of the withdrawal that "Debtors are unopposed to the withdrawal of the motion at Docket No. 1666." To suggest otherwise by referencing that BP "unilaterally withdrew" the Setoff Motion is simply disingenuous.

40.     QuarterNorth also improperly suggests that BP "abandoned" the Setoff Motion it filed. This is not correct. As the record makes clear, BP simply withdrew the Setoff Motion without prejudice, expressly indicating that BP "reserves and preserves its right to reassert the [setoff] Motion upon the Genovesa Well achieving 180 days of production." *Notice of Withdrawal Without Prejudice of Motion of BP Exploration & Production Inc. for Entry of an Order Pursuant to 11 U.S.C. § 362(d) Authorizing Relief from the Automatic Stay to Effectuate Setoff of Mutual Obligation* (ECF No. 1921).

**B. The Emergency Motion Does Not Identify an Actual Emergency and it is Procedurally Improper**

41.     QuarterNorth has failed to demonstrate the existence of any "emergency" that requires the Emergency Motion to be heard on shortened notice, immediately following the Thanksgiving holiday weekend. BP has already effectuated its setoff in respect of the MC519 Payment. If QuarterNorth thinks BP's exercise of its setoff rights is somehow in violation of the Plan or Confirmation Order it should have sought relief within the bounds of an appropriate notice period and through procedurally appropriate mechanisms.

42.     To that end, the Emergency Motion is procedurally improper in that it requests that the Court "find BP violated [the Confirmation Order and Plan] injunctions . . . [and] order BP to comply with the Confirmation Order and Plan and award QuarterNorth its reasonable and

necessary attorneys' fees" and for an order precluding BP from setting off future amounts again. Emergency Motion, ¶¶ 34-35. Insofar as QuarterNorth is in fact seeking a declaratory judgment or injunctive relief, then the Emergency Motion is procedurally improper and must be denied as it is in contravention of Fed. R. Bankr. P. 7001, which requires the filing of an adversary proceeding before any such declaratory judgment or injunctive relief may be obtained.

### C. Even if the Language in Paragraph 133 of the Confirmation Order Was Never Included, the Debtors Cannot Sell Assets Free and Clear of BP's Secured Setoff Rights

43.     Debtor Fieldwood Energy LLC ("Fieldwood") is indebted to BP in the amount of $30 million on account of unpaid acquisition costs pursuant to the MC519 PSA, which BP is entitled to setoff against the $6.9 million payment obligation that BP owes to QuarterNorth (as successor to Fieldwood) under the Isabella PSA. Under the terms of the MC519 PSA, Fieldwood agreed, among other things, to pay BP $30 million, which becomes payable and owing to BP upon the successful completion of the Genovesa well and shall be due and paid within the first 180 days of production from the well. (MC519 PSA § 3.1(b).) As acknowledged by the Debtors, "Genovesa was successfully brought online as planned on March 27, 2021." Disclosure Statement, at p. 49. As QuarterNorth now acknowledges, the absolute latest the $30 million MC519 Payment became due was on or about October 26, 2021 when the Genovesa well had produced for 180 days. As set forth herein and in BP's proof of claim no. 144 (as amended) BP asserted a rejection damages claim for at least the amount that Fieldwood owes to BP. At the same time, BP continued to make timely payments under the Cash Consideration Agreement, leaving a balance of $6,970,816.40 due and owing to Fieldwood at the time BP validly exercised its setoff rights, once all issues involving "ripeness" of the setoff right had been conclusively resolved.

44.     Section 553 of the Bankruptcy Code expressly preserves BP's setoff rights in these chapter 11 cases. 11 U.S.C. § 553 ("Except as otherwise provided in this section and in section

362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case[.]"). Additionally, because BP has a right of setoff, BP is a secured creditor to the extent of such setoff rights. 11 U.S.C. § 506(a) (providing that a claim "that is subject to setoff under section 553 "is a secured claim . . . to the extent of the amount subject to setoff"); *see also In re Corp. Res. Servs., Inc.*, 564 B.R. 196, 204 (Bankr. S.D.N.Y. 2017) (recognizing that "section 506(a) provides that the existence of a right of setoff under nonbankruptcy law establishes the existence of a secured claim for purposes of the section"); *Szymanski v. Wachovia Bank, N.A. (In re Szymanski)*, 413 B.R. 232, 242 (Bankr. E.D. Pa. 2009) (holding that "a setoff right gives rise to an allowed secured claim" and that such right must be adequately protected); *In re Rehab Project, Inc.*, 238 B.R. 363, 375 (Bankr. N.D. Ohio 1999) ("Congress bestowed upon creditors having a valid right of setoff, the status of an allowed secured claim, thus giving that creditor the highest priority under the Bankruptcy Code."). Indeed, the express provisions of the Plan acknowledge that a right of setoff constitutes a "Secured" claim.  Plan, Art. I, § 1.1, at p. 24 ("Secured means, when referring to a Claim[,] . . . secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.").

45.     Although the Plan does not expressly disallow or discharge setoff rights generally, the Plan provides for the sale of certain assets to QuarterNorth under sections 363 and 1141(c) of the Bankruptcy Code free and clear of liens, claims, charges, interests, or other encumbrances. Plan § 5.2(a).  The Debtors and QuarterNorth have failed to establish any basis for selling assets free and clear of BP's secured setoff rights under section 363 of the Bankruptcy Code. Additionally, setoff rights under section 553 take precedence over section 1141.  In response to

BP's concerns regarding any free and clear sale (resulting in a purported elimination of BP's secured setoff rights), BP and the Debtors agreed upon the heavily-negotiated language contained in paragraph 133 of the Confirmation Order, which expressly preserved BP's setoff rights notwithstanding the sale to QuarterNorth.

### (1) The Debtors Did Not Meet Their Burden Under Section 363(f)

46.      A debtor in possession may sell property of the estate under section 363 of the Bankruptcy Code free and clear of liens and other interests of an entity in such property only if one of five requirements is met. 11 U.S.C. § 363(f).  *In re Sherwin Alumina Co., L.L.C.*, 952 F.3d 229, 238 (5th Cir. 2020) ("Section 363(f) . . . limits a debtor's right to sell free and clear of others' interests in property."); *In re Ricco, Inc.*, No. 10-23, 2014 Bankr. LEXIS 1265 at *12 (Bankr. N.D. W. Va. Apr. 1, 2014) (recognizing that the sale proponent bears the burden of proving they have satisfied one of the provisions of section 363(f) of the Bankruptcy Code with respect to each lien or interest from which the sale is to be free and clear) (*citing In re Daufuskie Island Props., LLC*, 431 B.R. 626, 637 (Bankr. D.S.C. 2010)).

47.      At confirmation, the Debtors failed to meet their burden under section 363(f).  BP did not consent to the transfer of the Debtors' assets free and clear of its setoff rights, and the Debtors did not assert, much less demonstrate, how any other provisions of section 363(f) of the Bankruptcy Code were satisfied. Accordingly, the Debtors could not sell assets to the Credit Bid Purchaser free and clear of BP's secured setoff rights under section 363(f), and the Court made no such finding or ruling either at the confirmation hearing or in the Confirmation Order.  Ironically, QuarterNorth seemed to acknowledge that the parties' agreement reflected this very point in counsel's email to BP's counsel on September 10, 2021. Carlson Email dated September 10, 2021, attached hereto as **Exhibit A**.

20

**(2)  Setoff Rights Under Section 553 Take Precedence Over Section 1141**

48.     Section 1141(c) of the Bankruptcy Code provides that "the property dealt with by the plan is free and clear of all claims and interests of creditors . . . ." 11 U.S.C. § 1141(c). Recognizing an apparent conflict between setoff rights under section 553, which are not affected by any other provision of the Bankruptcy Code, and section 1141(c), courts hold that section 553 takes precedence over 1141 and find that setoff rights are otherwise preserved notwithstanding confirmation of a plan. *See, e.g., In re De Laurentiis Entm't Grp., Inc*., 963 F.2d 1269, 1276 (9th Cir. 1992) (concluding that section 553 controls "notwithstanding any other provision of the Bankruptcy Code" including section 1141 and recognizing that to hold otherwise would require setoff to be written into a plan of reorganization); *cf. Davidovich v. Welton (In re Davidovich)*, 901 F.2d 1533, 1538-39 (10th Cir. 1990) (recognizing that "the right to assert a setoff against a mutual, prepetition debt owed the bankrupt estate survives even the Bankruptcy Court's discharge of the bankrupt's debts").

49.     Thus, even though the Court approved the sale of the Debtors' assets to QuarterNorth under section 1141(c) free and clear of claims, the sale is not free and clear of BP's secured setoff rights.  And, the interplay of the sections 553 and 1141 notwithstanding, BP and the Debtors agreed to the preservation of those rights resulting in BP's withdrawal of its Confirmation Objection and the inclusion of paragraph 133 in the Confirmation Order.

50.     Even if the Debtors had satisfied their burden of demonstrating a basis under section 363(f) to sell free and clear of BP's secured setoff claim – which they did not – the Debtors would have been required to provide adequate protection to BP under section 363(e) and 361, such that BP could realize the "indubitable equivalent" of BP's secured setoff right.  These obligations were resolved by the parties' agreement and the incorporation of paragraph 133 into the Confirmation

21

Order.  Indeed, there was no finding or ruling by the Court either at the confirmation hearing or in the Confirmation Order that the Debtors had satisfied their burden of providing adequate protection to BP under section 363(e).  Notwithstanding the foregoing, by way of the relief requested in the Emergency Motion, QuarterNorth seeks to vitiate these important statutory protections to not only re-write paragraph 133 of the Confirmation Order, but to also deny BP any adequate protection whatsoever.

**F.  BP's Reservation of Rights**

52.    Nothing contained in this Objection shall be deemed an admission by BP of liability on any alleged claims against it, in connection with this proceeding or any pending or future proceedings (including, but not limited to any pending or future arbitration proceedings) and BP does not waive any rights against any party or person.  BP reserves all rights, including, without limitation: (a) the right to amend, modify, or supplement this Objection; (b) all rights against the Debtors, the entities created under the Plan, QuarterNorth, or other potentially liable or responsible parties; and (c) the right to seek reimbursement of BP's reasonable costs and attorneys' fees.

*ACTIVE 61420773v1*

**WHEREFORE**, BP respectfully requests that this Court deny, with prejudice, the Emergency Motion in its entirety.

Date:   November 29, 2021                    Respectfully submitted,

                                                  **GREENBERG TRAURIG, LLP**

                                     By: */s/ Karl D. Burrer*
                                              Shari L. Heyen
                                              Texas State Bar No. 09564750
                                              HeyenS@gtlaw.com
                                              Karl D. Burrer
Texas State Bar No. 24043584
BurrerK@gtlaw.com
1000 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 374-3500
Facsimile: (713) 374-3505

– and –

Craig A. Duewall
Texas State Bar Number 24025334
DuewallC@gtlaw.com
300 West 6th Street, Suite 2050
Austin, Texas 78701
Telephone: (512) 320-7200
Facsimile: (512) 320-7210

– and –

**GREENBERG TRAURIG, P.A.**

John B. Hutton (admitted *pro hac vice*)
HuttonJ@gtlaw.com
333 SE 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717

***Counsel for BP Exploration & Production Inc.***

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on November 29, 2021, I caused a copy of the foregoing to be served on all parties eligible to receive service through the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas by electronic mail.

By: */s/ Karl D. Burrer*
       Karl D. Burrer

*ACTIVE 61420773v1*