IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **FIELDWOOD ENERGY III LLC**, *et. al*, | § | Case No. 20-33948 (MI) |
| | § | |
| Post-Effective Date Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | Re. ECF No. 1387, 1388, 2487 |
| ------------------------------------------------- | § | |

**QUARTERNORTH ENERGY LLC'S STATEMENT IN SUPPORT OF
BANKRUPTCY RULE 2004 REQUESTS FOR PRODUCTION OF DOCUMENTS
FROM BP EXPLORATION & PRODUCTION, INC. AND SHELL OFFSHORE INC.**

QuarterNorth Energy LLC ("**QuarterNorth**") files this *Statement in Support of Bankruptcy Rule 2004 Requests for Production of Documents from BP Exploration & Production, Inc. and Shell Offshore Inc.* (*see* ECF Nos. 1387, 1388, collectively the "**Rule 2004 Requests**"), and in support, states the matters set forth below and in the charts attached as Exhibits A and B.

---

[1] The Post-Effective Date Debtors, along with the last four digits of each Post-Effective Date Debtor's federal tax identification number, as applicable, are: Fieldwood Energy III LLC (6778); Fieldwood Energy Offshore LLC (4494); Fieldwood Energy Inc. (4991); GOM Shelf LLC (8107); and FW GOM Pipeline, Inc. (8440). Fieldwood Energy III LLC, Fieldwood Energy Offshore LLC, and Fieldwood Energy Inc. are managed and operated by the Plan Administrator, whose primary mailing address is 16255 Ventura Blvd., Suite 440, Encino, CA, 91436, C/O of Province LLC. GOM Shelf LLC and FW GOM Pipeline, Inc. (collectively, the "**Post-Effective Date FWE I Subsidiaries**") are managed and operated by Jon Graham, as sole manager of each Post-Effective Date FWE I Subsidiary. The Debtors in the other nine pending chapter 11 cases (which continue to be jointly administered with the cases of the Post-Effective Date Debtors), each of which have either been dissolved or merged into other entities as of the Effective Date, consist of the following: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422).

**STATEMENT**

1. During the June 7, 2022 hearing (the "**Hearing**"), the Court asked QuarterNorth to provide charts explaining how the Rule 2004 Requests relate to potential causes of action against BP and Shell related to the *Purchase and Sale Agreement* (May 17, 2019) (the "**PSA**").[2] June 7, 2022 Record'g of Hr'g (ECF No. 2504) ("**Hr'g**"). As set forth below and in Exhibits A and B (the "**Charts**"), the Rule 2004 Requests directly support QuarterNorth's investigation of potential claims against BP concerning the PSA and against Shell for its role in harming QuarterNorth.[3] While QuarterNorth maintains that all of its Requests are proper, QuarterNorth will withdraw certain Requests at this time, as explained below.[4]

2. Rule 2004 examinations are "aimed at discovering evidence upon which future causes of action may be based." *In re Bounds*, 443 B.R. 729, 732 (Bankr. W.D. Tex. 2010) (citation omitted). While "the scope of a Rule 2004 examination is exceptionally broad," "unfettered," and "virtually unlimited," encompassing ***any matter*** which "may affect administration of the debtor's estate," the scope of what QuarterNorth seeks here is appropriately limited and tailored only to potential claims against BP and Shell that are not included in the arbitration proceedings or, in the case of Shell, are outside the jurisdiction of the arbitrations. *In re Correra*, 589 B.R. 76, 108–09 (Bankr. N.D. Tex. 2018); *see In re NE 40 Partners, Ltd. P'ship*, 440 B.R. 124, 129 (Bankr. S.D. Tex. 2010) (noting that the rule effectively permits "licensed fishing expeditions").

---

[2] Capitalized terms not otherwise defined herein have the meanings set forth in the Rule 2004 Requests.

[3] As further explained below, the Rule 2004 Requests to Shell also seek to investigate claims against Shell for tortious interference with the PHA and Loop Agreement, which are contracts that contain arbitration clauses but to which Shell is not a party.

[4] QuarterNorth reserves all rights to discover the information it previously sought in the now-withdrawn requests in any subsequent lawsuit against BP or Shell.

2

3. QuarterNorth's Rule 2004 Requests also satisfy the narrower standards for discovery under the Federal Rules of Civil Procedure ("**Federal Rules**") and Texas Rules of Civil Procedure ("**Texas Rules**"). Federal Rule 26 states, "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Texas Rule 192.3, which could govern claims related to the PSA,[5] provides:

> [A] party may obtain discovery regarding any matter that is not privileged and is relevant to the subject matter of the pending action, whether it relates to the claim or defense of the party seeking discovery or the claim or defense of any other party. It is not a ground for objection that the information sought will be inadmissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

4. Because QuarterNorth's Rule 2004 Requests are narrow, relevant, proportional, and reasonably calculated to lead to the discovery of admissible evidence of potential PSA-related claims against BP and Shell and potential claims against Shell, the Court should deny BP's Motion and Shell's Joinder and permit QuarterNorth to obtain the Rule 2004 discovery set forth herein.

5. To help narrow this dispute and resolve it quickly, QuarterNorth voluntarily will withdraw 8 of its 17 requests to BP—Request Nos. 2, 5, 7, 8, 9, 10, 11, 16—leaving only Request Nos. 1, 3, 4, 6, 12, 13, 14, 15, 17 to BP in dispute, and will withdraw 6 of its 13 requests to Shell—Request Nos. 2, 5, 7, 8, 10, 11—leaving only Request Nos. 1, 3, 4, 6, 9, 12, 13 to Shell in dispute.

I. **The Rule 2004 Requests to BP Seek to Investigate BP's Wrongful Acts and Omissions that Induced Fieldwood to Enter the PSA**

6. In the chart attached as Exhibit A, QuarterNorth has grouped its nine remaining Requests to BP topically into the following three categories, with a brief explanation of the Requests included therein.

---

[5] The PSA requires that Texas law govern any disputes and that such disputes be heard in Harris County, Texas. PSA § 11.9(a)–(b).

3

A. **Evidence of BP's Fraudulent Intent Pre- and Post-PSA[6] (Request Nos. 1, 3, 12, 13, 14, 17)**:  These Requests seek BP's documents about the PSA itself and Genovesa generally.  They also seek documents concerning BP's awareness of a leak on the Loop near where QuarterNorth was eventually to connect Genovesa and why BP failed to disclose this leak to QuarterNorth or to investigate it more fully before closing on the PSA.  They also seek BP's documents about BP's motivation in delivering a bill to QuarterNorth immediately after QuarterNorth had signed the PSA, which was later than usual and for a significantly higher cost because of QuarterNorth's increased percentage ownership in Genovesa.

B. **Evidence of BP's Motivation to Fraudulently Induce QuarterNorth to Enter the PSA: BP's Conflict of Interest (Request No. 6)**:  This Request seeks BP's documents about how it viewed the conflict of interest due to its ownership in Manuel and its contractual duty to the Genovesa owners.

C. **Evidence of BP's Fraudulent Intent: BP's "Prioritization" Excuse (Request Nos. 4, 15)**:  These Requests seek only documents *sufficient to show* discrete components of BP's apparent plan to delay Genovesa's production, which was part of BP's basis for inducing QuarterNorth into purchasing BP's interest in Genovesa via the PSA.  Both Requests could be answered in as little as two documents total: the contract (or perhaps contracts) making up the "Na Kika Obligations" and a spreadsheet showing with three columns: date, persons on board Na Kika, and then-current persons-on-board capacity at Na Kika.

II. **The Rule 2004 Requests to Shell Seek to Investigate Potential Claims Against Shell for Conspiracy and Tortious Interference**

7. Shell is independently liable for any wrongful acts it committed and QuarterNorth is entitled to discover evidence of such acts.  Shell is not a party to the PSA and cannot be joined as a party in either of the two arbitrations.  Shell has not yet asserted any colorable reason to avoid production of the requested information.

8. The Rule 2004 Requests to Shell seek to discover Shell's independent liability for its conduct in connection with the PSA and Genovesa.  In early 2020, BP suggested that a "joint conversation between BP, Shell and [Fieldwood]" and a "commercial arrangement"

---

[6] "While a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made."  *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986).

4

might result in bringing Genovesa online. *Declaration of Erin M. Choi in Support of QuarterNorth Energy LLC's Statement in Support of Bankruptcy Rule 2004 Requests for Production of Documents from BP Exploration & Production, Inc. and Shell Offshore Inc.* (filed contemporaneously herewith) ("**Choi Decl.**"), Ex. 1; Choi Decl., Ex. 2 (BP: "Shell has indicated they may consider an agreement providing for an ORRI on [Genovesa]."). This documentary evidence, along with anticipated testimony from witnesses, suggest both a possible conspiracy and Shell's possible tortious interference with contracts.

9. Specifically, the Rule 2004 Requests to Shell seek answers to two basic questions: (1) did Shell conspire with BP for BP to fraudulently induce Fieldwood to enter the PSA; and (2) did Shell tortuously interfere with BP's performance of its obligations under the Loop Agreement and the PHA?[7]

10. As discussed in reference to the Rule 2004 Requests to BP above, and as further detailed in the chart attached as Exhibit B, the Rule 2004 Requests to Shell correspond to potential claims related to the PSA and/or Shell's tortious interference with other contracts to which it is not a party.

11. In the chart attached as Exhibit B, QuarterNorth has grouped its seven remaining Requests to Shell topically into the following categories, with a brief explanation of the Requests included therein.

    A.    **Evidence of Shell's Conspiracy with BP Pre- and Post-PSA (Request Nos. 1, 3, 12, 13):** These Requests seek Shell's documents about the PSA itself and Genovesa generally. They also seek documents concerning Shell's awareness of a leak on the Loop near where QuarterNorth was eventually to connect Genovesa and whether Shell had any role in BP waiting to investigate evidence of a leak until approximately 72 hours after

---

[7] Shell is not a party to any of these agreements. Only the PHA and Loop Agreement contain arbitration clauses.

closing on the PSA. They also seek to know when Shell learned of a temporary expansion of Na Kika's person-on-board capacity.

    **B.**    **Evidence of Shell's Motivation to Conspire with BP to Fraudulently Induce QuarterNorth to Enter the PSA: Shell's Conflict of Interest (Request Nos. 6, 9):** These Requests seek Shell's documents about how it viewed the conflict of interest between its economic interest in Manuel and its common law duty related to Fieldwood and QuarterNorth.

    **C.**    **Evidence of Shell's Conspiracy with BP: the "Prioritization" Excuse (Request No. 4)**: This Request seeks only documents *sufficient to show* the meaning of "Na Kika Obligations" (the term on which BP has relied in many of its delays).

12. The Rule 2004 Requests to Shell are reasonable and appropriately seek evidence to support potential claims against Shell—a party that is not in either of the arbitrations and that cannot be joined as a party in either of the arbitrations.

## **CONCLUSION**

13. For the foregoing reasons, the Court should deny BP's Motion and Shell's Joinder, and order BP and Shell to respond to the Rule 2004 Requests as narrowed herein.

Dated: June 10, 2022
      Houston, Texas

Respectfully submitted,

  /s/ *Paul R. Genender*
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:   Alfredo.Perez@weil.com
         Clifford.Carlson@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (admitted *pro hac vice*)
Jessica Liou (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   Matt.Barr@weil.com
         Jessica.Liou@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Paul R. Genender (00790758)
Erin M. Choi (24079436)
Kevin M. Simmons (24110364)
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-7700
Facsimile: (214) 746-7777
Email:   Paul.Genender@weil.com
         Erin.Choi@weil.com

*Attorneys for QuarterNorth Energy LLC*

## **Certificate of Service**

I hereby certify that on June 10, 2022, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                            */s/ Paul R. Genender*
                                            Paul R. Genender

# EXHIBIT A

## CHART REGARDING RULE 2004 REQUESTS TO BP

A. **Evidence of BP's Fraudulent Intent Pre- and Post-PSA[1]**

| No. | Request | Relevance to PSA-Related Claims |
|---|---|---|
| 3 | All Documents and Communications concerning the PSA, including, but not limited to, BP's decision to enter into the PSA. | As BP's counsel conceded on the record at the June 7, 2022 hearing,[2] and as is apparent on its face, this Request asks for all documents concerning the PSA, including, but not limited to, BP's decision to enter into the PSA, which is plainly relevant to a potential claim of fraudulent inducement to enter into the PSA. |

---

[1] "While a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986).

[2] Hr'g.

| No. | Request | Relevance to PSA-Related Claims |
|---|---|---|
| 1 | All Documents and Communications concerning Genovesa, including, but not limited to:<br>• Internal Communications or Communications with Shell, [OneSubsea ("**OSS**")], Honeywell, or any third party;<br>• Analyses on the impact Genovesa would have on production at Manuel;<br>• Fieldwood's timeline for bringing Genovesa online at Na Kika; and<br>• BP's offer to accelerate bringing Genovesa on at Na Kika, if Fieldwood paid. | This Request is relevant to potential PSA-related claims because it seeks to investigate evidence of BP's intent to fraudulently induce Fieldwood to enter into the PSA. The purpose of the PSA was BP's sale of Genovesa to QuarterNorth. BP's emails and other documents concerning Genovesa before the PSA go toward establishing BP's intent in proposing and inducing QuarterNorth to sign the PSA. BP's emails and other documents concerning Genovesa after the PSA establish BP's implementation of that pre-PSA intent.<br><br>All of BP's internal communications concerning Genovesa prior to the PSA are relevant to a claim of fraudulent inducement. BP's internal communications about Genovesa after the PSA go toward proving BP was executing the plan it formed prior to executing the PSA.<br><br>Shell never owned an interest in Genovesa. Any communications with Shell about Genovesa that are not merely factual updates are reasonably likely to be furthering some wrongful act, whether conspiring between the parties toward fraudulent inducement, Shell committing tortious interference, or something similar. QuarterNorth requests such documents to prove Shell's non-arbitrable possible misconduct. QuarterNorth also requests such documents to show BP implementing a plan it seems to have formed pre-PSA as motivation for entering the PSA.<br><br>Before the PSA and continuing after, BP refused to authorize OSS from developing the software Na Kika needed to process Genovesa, even though QuarterNorth requested it and was contractually obligated to pay for the development (and did pay for it). BP committed to working |

2

| No. | Request | Relevance to PSA-Related Claims |
|---|---|---|
| | | collaboratively on the issue. *See* Choi Decl., Ex. 3. BP did not do so.<br><br>BP's interest in Manuel and how Genovesa affects Manuel is the principle motive behind any and all of BP's bad acts regarding Genovesa. Thus, if BP fraudulently induced QuarterNorth to enter into the PSA, as it appears, this analysis would be critical to QuarterNorth's case for establishing BP's motive.<br><br>BP's business people often said QuarterNorth's timeline for bringing Genovesa online was unrealistic, including before the PSA, while BP's technical people said otherwise. QuarterNorth requests the documents explaining the discrepancy. One scenario is that the technical side of BP was telling the truth, and the business side was not, which the Court itself found on February 2, 2021. *See* Feb. 2, 2021 Hr'g Tr. 214:9–11. QuarterNorth wants to establish whether BP had fraudulent intent.<br><br>As this Court found, BP attempted to extort QuarterNorth. *Id.* at 231:13–14. This was a part of the pattern of BP's conduct stemming from shortly before the parties signed the PSA and continuing thereafter. Such documents help establish BP's continuous pattern of wrongful behavior. |

| No. | Request | Relevance to PSA-Related Claims |
|---|---|---|
| 12 | All Documents and Communications concerning the LSPS Leak from January 1, 2015 to the present, including, but not limited to, BP's observation of an anomaly at the site of the LSPS Leak in August 2015, any prior or subsequent observations of anomalies at the site of the LSPS Leak, including in December 2017, April 2018, and May 2019, and any efforts by BP to fix the LSPS Leak. | This Request is relevant to potential PSA-related claims because it seeks to investigate evidence of BP's intent to fraudulently induce Fieldwood to enter into the PSA. QuarterNorth requests the documents answering why BP did not disclose the evidence of the leak to QuarterNorth pre-PSA, why BP failed to investigate it more fully until after entering into the PSA, why it did not immediately report the damage once identified, why it did not remediate the leak despite needing to do so (as BP admitted[3]), and why BP accused QuarterNorth of causing the leak despite BP having evidence of the leak long before QuarterNorth attempted to tie Genovesa into the Loop.[4] |
| 13 | All Documents and communications concerning the Authorizations for Expenditure related to the 2019 TAR (NKO3Z400DJK, NKO392023 and NKO391985), including, but not limited to, BP's reasons for delaying sending them to Fieldwood until after closing on the PSA. | This Request is relevant to potential PSA-related claims because it seeks to investigate evidence of BP's intent to fraudulently induce Fieldwood to enter into the PSA. This Request explicitly concerns the Authorization for Expenditure ("**AFE**") that BP gave QuarterNorth in the PSA's signing room. BP ordinarily sent such requests earlier. QuarterNorth seeks to discover BP's justification for not providing these AFEs until minutes after signing the PSA. These AFEs are attached as Choi Declaration, Exhibit 5 and are each dated April 30, 2019, two weeks before the PSA. |

---

[3] *See* Feb. 2, 2021 Hr'g Tr. 201:3–4 (BP's witness testified, "Yes, if there are hydrates we would remediate.").

[4] Choi Decl., Ex. 4, at 5 (noting "Hydrate formation" on May 20, 2019).

4

| No. | Request | Relevance to PSA-Related Claims |
|---|---|---|
| 14 | Documents and communications sufficient to show when BP first developed plans to undertake the 2019 TAR, how those plans changed through completion of the 2019 TAR, and when BP finalized and signed the Authorizations for Expenditure referenced above. | This Request is relevant to potential PSA-related claims because it seeks to investigate evidence of BP's intent to fraudulently induce Fieldwood to enter into the PSA. For the same reasons QuarterNorth requests the documents requested in Request 13, QuarterNorth requests these documents. Request 13 seeks all documents concerning the three AFEs. Request 14 seeks only documents sufficient to show how the timeline for undertaking the 2019 TAR (which is the basis for the AFEs) changed over time. |
| 17 | All documents and communications concerning the deployment of a flotel at Na Kika in 2020, including, but not limited to, documents and communications concerning the Authorization for Expenditure, NKO392817, and BP's decision to refrain from sending such AFE to Fieldwood until June 2020. | This Request is relevant to potential PSA-related claims because it seeks to investigate evidence of BP's intent to fraudulently induce Fieldwood to enter into the PSA. BP delayed sending the AFEs discussed in Request 13. BP again delayed AFEs for apparently similar strategic reasons approximately six months later.[5] QuarterNorth's theory is that BP engaged in a plan developed before the PSA that BP executed over the next eighteen months and beyond. BP seems to have fraudulently induced QuarterNorth to enter the PSA as the critical part of this plan. A key part of establishing QuarterNorth's damages will be to establish a pattern of wrongful conduct. |

---

[5] The AFE is signed on January 28, 2020, and BP ordinarily would have sent such an AFE shortly after signing it. Choi Decl., Ex. 6. BP failed to do so until June 11, 2020. *Id*.

B. **Evidence of BP's Motivation to Fraudulently Induce QuarterNorth to Enter the PSA: BP's Conflict of Interest**

| No. | Request | Relevance to PSA-Related Claims |
|---|---|---|
| 6 | All Documents and Communications concerning BP's efforts to bring Manuel online at Na Kika, including, but not limited to:<br><br>• BP's prioritization of Manuel ahead of Genovesa;<br>• BP's timeline for bringing Manuel online, including any changes to that timeline over time; and<br>• BP's refusal to combine the MCS Software Upgrade Work for Manuel with the MCS Software Upgrade Work for Genovesa. | This Request is relevant to potential PSA-related claims because it seeks evidence of BP's motive to fraudulently induce QuarterNorth into signing the PSA. The Documents and Communications before the PSA are likely to lead to admissible evidence of BP's motive. Documents and Communications after the PSA also go to establishing BP's motive and plan to act in its own economic self-interest to the detriment of the Genovesa owners.<br><br>In particular, the third sub-bullet refers explicitly to BP's refusal before signing the PSA to allow OSS to develop Genovesa's software for Na Kika simultaneously with software related to Manuel. |

6

C. **Evidence of BP's Fraudulent Intent: BP's "Prioritization" Excuse**

| No. | Request | Relevance to PSA-Related Claims |
|---|---|---|
| 4 | Documents sufficient to show the meaning of "Na Kika Obligations," as defined in PHA § 2.2.87, including, without limitation, "the Na Kika JOA, the Na Kika HUA, the Host M&A, the Satellite Field Start-up Agreement" (as those terms are defined in the PHA), and any other agreements or other Documents necessary to determine the meaning of "Na Kika Obligations." | This Request is relevant to potential PSA-related claims because it seeks to investigate evidence of BP's intent to fraudulently induce Fieldwood to enter into the PSA. Before signing the PSA and continuously afterwards, BP said it did not see how it could find room on Na Kika—a production platform with room for approximately 100 people, which can be expanded as needed by flotel—for a few days for a small software installation team at any time over more than a year. BP said it was because of the "Na Kika Obligations." Choi Decl., Ex. 3 (BP saying in April 2019 that QuarterNorth's timeline would not work "because of our obligations under existing agreements," referring to the Na Kika Obligations). QuarterNorth seeks to investigate what that phrase means. |
| 15 | Documents and communications sufficient to show the daily count of persons on board Na Kika and the flotel referenced in the previous request,[6] from June 1, 2019 through March 30, 2021. | This Request is relevant to potential PSA-related claims because it seeks to investigate evidence of BP's intent to fraudulently induce Fieldwood to enter into the PSA. Even pre-PSA, BP referenced space limitations as one reason it did not believe QuarterNorth would be able to bring Genovesa online in a timely manner. *See* Choi Decl., Ex. 3. This Request attempts to establish as a threshold matter when and for how long BP was actually operating at capacity at Na Kika. |

---

[6] The "previous request" refers to Request 17.

7

**EXHIBIT B**

**CHART REGARDING RULE 2004 REQUESTS TO SHELL**

A.  **Evidence of Shell's Conspiracy with BP Pre- and Post-PSA** [1]

| No. | Request | Relevance to PSA-Related Claims |
|---|---|---|
| 3 | All Documents and Communications concerning the PSA. | As BP's counsel conceded on the record at the June 7, 2022 hearing,[2] and as is apparent on its face, this Request asks for all documents concerning the PSA, including, but not limited to, Shell's communications with BP concerning the PSA. |
| 1 | All Documents and Communications concerning Genovesa, including but not limited to:<br>• Internal Communications or Communications with BP, OSS, Honeywell, or any third party;<br>• Analyses on the impact Genovesa would have on production at Manuel;<br>• Fieldwood's timeline for bringing Genovesa online at Na Kika;<br>• BP and Shell's offer to accelerate bringing Genovesa on at Na Kika, if Fieldwood paid. | This Request is relevant to potential PSA-related claims because it seeks to investigate evidence of Shell's participation in BP's potential fraudulent inducement, and is also relevant to potential claims of tortious interference in BP's and QuarterNorth's other contracts. Having never owned an interest in Genovesa, Shell should not have many Documents or Communications concerning that well; all such documents likely are relevant. |

---

[1] "While a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986).

[2] Hr'g.

| No. | Request | Relevance to PSA-Related Claims |
|---|---|---|
| 12 | All Documents and Communications concerning the LSPS Leak. | This Request is relevant to potential PSA-related claims because it seeks to investigate evidence of Shell's participation in BP's potential fraudulent inducement, and is also relevant to potential claims of tortious interference in BP's and QuarterNorth's other contracts. Shell should not have many Documents or Communications concerning the LSPS Leak and all such documents likely are relevant. |
| 13 | Documents sufficient to show when Shell received initial notification of BP's deployment of a flotel at Na Kika in 2020 and Shell's initial receipt of such AFE from BP. | This Request is relevant to potential PSA-related claims because it seeks to investigate evidence of Shell's participation in BP's potential fraudulent inducement, and is also relevant to potential claims of tortious interference in BP's and QuarterNorth's other contracts. This Request imposes a minimal burden—asking for only two documents—documents that will go to establish BP's potential pattern of intentionally withholding AFEs from QuarterNorth for strategic reason, and Shell's role in that pattern. |

2

B.     **Evidence of Shell's Motivation to Conspire with BP to Fraudulently Induce QuarterNorth to Enter the PSA: Shell's Conflict of Interest**

| No. | Request | Relevance to PSA-Related Claims |
|---|---|---|
| 6 | All Documents and Communications concerning BP's efforts to bring Manuel online at Na Kika, including, but not limited to:<br>• BP's prioritization of Manuel ahead of Genovesa;<br>• BP's timeline for bringing Manuel online, including any changes to that timeline over time; and<br>• BP's refusal to combine the MCS Software Upgrade Work for Manuel with the MCS Software Upgrade Work for Genovesa. | This Request is relevant to potential PSA-related claims because it seeks evidence of Shell's motive to conspire with BP to fraudulently induce QuarterNorth into signing the PSA, and is also relevant to potential claims of tortious interference in BP's and QuarterNorth's other contracts. The Documents and Communications before the PSA are likely to lead to admissible evidence of BP's and Shell's motive. Documents and Communications after the PSA go to establish BP's and Shell's continuous concern for the relationship between Manuel and Genovesa.<br><br>In particular, the third sub-bullet refers explicitly to BP's refusal before signing the PSA to allow OSS to develop Genovesa's software for Na Kika simultaneously with Manuel. QuarterNorth does not expect Shell to have any relevant documents concerning this sub-bullet, except those that would be highly relevant to establishing Shell's misconduct. |
| 9 | Documents sufficient to show Shell's percent ownership interest, if any, in Manuel. | By this Request, QuarterNorth only seeks a document it can enter as admissible evidence of Shell's ownership interest in Manuel. After beginning production from Manuel on June 23, 2021, BP published a press release in which it represented it was a 50% owner, with Shell owning the remaining 50%. All QuarterNorth requests is a representation by counsel concerning Shell's ownership percentage, which BP says is 50%. |

3

C. **Evidence of Shell's Conspiracy with BP: the "Prioritization" Excuse**

| No. | Request | Relevance to PSA-Related Claims |
|---|---|---|
| 4 | Documents sufficient to show the meaning of "Na Kika Obligations," as defined in PHA § 2.2.87, including, without limitation, "the Na Kika JOA, the Na Kika HUA, the Host M&A, the Satellite Field Start up Agreement" (as those terms are defined in the PHA), and any other agreements or other Documents necessary to determine the meaning of "Na Kika Obligations." | Before signing the PSA and continuously afterwards, BP said it did not see how it could find room on Na Kika—a production platform with room for approximately 100 people, which can be expanded as needed by flotel—for a small software installation team for more than a year. BP said it was because of the "Na Kika Obligations," and that Shell refused to permit QuarterNorth to be shown the documents setting out the meaning of "Na Kika Obligations." This Request is relevant to potential PSA-related claims because it seeks to investigate the meaning of the phrase BP used to try to justify its delays of Genovesa, and is also relevant to potential claims of tortious interference in BP's and QuarterNorth's other contracts. QuarterNorth seeks to investigate what that phrase means. |