**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIELDWOOD ENERGY III LLC,** *et al.*, | § | **Case No. 20-33948 (MI)** |
| | § | |
| **Post-Effective Date Debtors.**[1] | § | **(Jointly Administered)** |

**BRIEF OF BP EXPLORATION & PRODUCTION, INC. IN SUPPORT OF ITS
EMERGENCY MOTION TO ALTER OR AMEND MAY 24 ORDER PURSUANT TO
BANKRUPTCY RULE 9023 AND IN RESPONSE TO QUARTERNORTH ENERGY
LLC'S STATEMENT IN SUPPORT OF BANKRUPTCY RULE 2004 REQUESTS FOR
PRODUCTION OF DOCUMENTS FROM BP EXPLORATION & PRODUCTION, INC.**

**[RELATES TO DOCKET NOS. 2475 AND 2505]**

BP Exploration & Production Inc. ("BP") submits this brief in support of its *Emergency*

*Motion to Alter or Amend May 24 Order Pursuant to Bankruptcy Rule 9023* [Docket No. 2487]

(the "Emergency Motion")[2] and in response to *QuarterNorth Energy LLC's Statement in Support*

*of Bankruptcy Rule 2004 Requests for Production of Documents from BP Exploration &*

*Production, Inc.* [Docket No. 2510] ("QuarterNorth's Statement") and seeks entry of an order,

substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), altering or

amending the *Amended Order* [Docket No. 2505] entered on June 7, 2022 (the "July 7 Order"),

---

[1]    The Post-Effective Date Debtors, along with the last four digits of each Post-Effective Date Debtor's federal tax
identification number, as applicable, are: Fieldwood Energy III LLC (6778); Fieldwood Energy Offshore LLC
(4494), Fieldwood Energy Inc. (4991), GOM Shelf LLC (8107), and FW GOM Pipeline, Inc. (8440). Fieldwood
Energy III LLC, Fieldwood Energy Offshore LLC, and Fieldwood Energy Inc. are managed and operated by the
Plan Administrator, whose primary mailing address is 16255 Ventura Blvd., Suite 440, Encino, CA, 91436, C/O
of Province LLC. GOM Shelf LLC and FW GOM Pipeline, Inc. (collectively, the "Post-Effective Date FWE I
Subsidiaries") are managed and operated by Jon Graham, as sole manager of each Post-Effective Date FWE I
Subsidiary. The Debtors in the other nine pending chapter 11 cases (which continue to be jointly administered
with the cases of the Post-Effective Date Debtors), each of which have either been dissolved or merged into other
entities as of the Effective Date, consist of the following: Dynamic Offshore Resources NS, LLC (0158);
Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); Bandon
Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston
Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422).

[2]    Capitalized terms used but not otherwise defined herein shall have the same meanings as ascribed to them in the
Emergency Motion.

which superseded and replaced the *Order* [Docket No. 2475] entered on May 24, 2022 (the "May 24 Order"), and in support would respectfully show the Court as follows:

## INTRODUCTION

1.      QuarterNorth has now admitted to the Court that eight of its Rule 2004 Requests are without merit and for its nine remaining requests has finally settled on a single claim against BP related to the PSA that it is seeking to investigate by serving these Rule 2004 Requests: fraudulent inducement.[3]   But QuarterNorth has made no attempt to identify even one misrepresentation on which it relied such that it was induced to enter into the PSA.

2.      QuarterNorth has also made no attempt to address its predecessor's broad disclaimers of reliance in the PSA, and an earlier attempt to do so based on BP's alleged misrepresentations in the PSA itself grossly misstates the meaning of those representations.  As a result, QuarterNorth has failed to show that it has a real, actionable claim against BP to investigate and to which its requested discovery relates.

3.      The 2004 Requests are therefore wholly improper and will only serve to annoy and harass BP and impose great costs on BP in service of a claim that is barred as a matter of law.  The Court also lacks jurisdiction (or should decline to exercise its jurisdiction) at this late date post-confirmation.  Accordingly, the Court should refuse to allow QuarterNorth to serve the 2004 Requests on BP.

---

[3]     BP respectfully requests a ruling on or before June 21, 2022 so that, in the event the Court decides to allow QNE to serve BP with some (or all) of the remaining 2004 requests for production it is seeking, the Court's order will accurately reflect that discovery is not required regarding all of the 2004 requests that were originally served by QuarterNorth.  June 21, 2022 is also the deadline to seek relief from the Court's June 7 Order that amended the Court's May 24 Order.

**ARGUMENT**

**A.     QuarterNorth identified just one possible claim against BP related to the PSA: fraudulent inducement.**

> **1.     QuarterNorth has never identified any misrepresentations upon which its predecessor was entitled to rely when entering into the PSA.**

4.     QuarterNorth's Statement identifies just one possible claim against BP related to the PSA that it is seeking to investigate: fraudulent inducement.[4]  To prevail on a claim for fraudulent inducement, a plaintiff must prove that: (1) the defendant made a material representation; (2) the defendant knew at the time that the representation was false or lacked knowledge of its truth; (3) the defendant intended that the plaintiff should rely or act on the misrepresentation; (4) the plaintiff relied on the misrepresentation; and (5) the plaintiff's reliance on the misrepresentation caused injury.  *Int'l Bus. Machines Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 228 (Tex. 2019).  In such a claim, the "misrepresentation" occurs when the defendant falsely promises to perform a future act while having no present intent to perform it, and the plaintiff's "reliance" on the false promise "induces" the plaintiff to agree to a contract the plaintiff would not have agreed to had the defendant not made the false promise.  *Id.*

5.     Here, QuarterNorth's Statement claims that the 2004 Requests are aimed at discovering evidence of BP's "fraudulent intent" both before and after execution of the PSA as well as BP's "motivation to fraudulently induce" QuarterNorth to enter into the PSA.  *See* QuarterNorth's Statement at pp. 3–4.  The chart attached as Exhibit A to QuarterNorth's Statement makes similar claims, attempting to justify the various requests by claiming that they seek evidence that is relevant to a claim of fraudulent inducement against BP.  Conspicuously absent, however,

---

[4]     *See generally* QuarterNorth's Chart Regarding Rule 2004 Requests to BP (attached as <u>Exhibit A</u> to QuarterNorth's Statement) and QuarterNorth's Statement at pp. 3–4.

is the identification of any allegedly false representations on which BP intended QuarterNorth to rely and on which QuarterNorth was entitled to rely such that it was "induced" to enter into the PSA.

6.      As a result, and as more fully set forth in the chart attached hereto as **Exhibit D**, QuarterNorth has not identified a legally viable claim which supports its proposed 2004 Requests. *See In re Countrywide Home Loans, Inc.*, 384 B.R. 373, 393 (Bankr. W.D. Pa. 2008) (concluding that when a creditor objects to a 2004 examination, the moving party must meet a threshold standard of "good cause" before it will be permitted to conduct examinations and require the production of documents); *In re Grabill Corp.*, 109 B.R. 329, 334 (Bankr. N.D. Ill. 1989) ("Good cause is the standard to be employed under Rule 2004.").  They are improper under Rule 2004, as discussed below in Part C.  And they will serve no purpose other than to annoy and harass BP; distract BP and its counsel from focusing on the pending arbitrations, where discovery is scheduled to begin in the coming weeks and months, respectively; and, as discussed in Part D below, cause BP to expend great resources in responding to far-reaching discovery requests purportedly in support of a claim that is barred as a matter of law.  For these reasons, the Court should refuse to allow QuarterNorth to serve the proposed 2004 Requests on BP.

**2.      The PSA's broad disclaimers of reliance bar QuarterNorth from bringing a fraudulent inducement claim against BP based on representations outside of those specifically excluded in the disclaimer.**

7.      The PSA contains several broad disclaimers of reliance that bar any cause of action QuarterNorth might have for fraudulent inducement against BP.  In PSA § 6.1, QuarterNorth's predecessor Fieldwood Energy LLC ("Fieldwood"), expressly agreed that, except for certain specifically identified representations in the PSA, it had not relied upon any representations from BP:

6.1     Disclaimers

>    (a)     Except as and to the extent expressly set forth in Article VII or for the special warranty in the assignment and bill of sale, with respect to the properties and the transactions contemplated hereby . . . (ii) Buyer [Fieldwood] has not relied upon . . . any representation, warranty, statement or information made or communicated (orally or in writing) to Buyer or any of its Affiliates . . . .

>    (b)     Except as and to the extent expressly set forth in Article VII or for the special warranty in the assignment and bill of sale, without limiting the generality of the foregoing, . . . Buyer acknowledges and agrees that it has not relied upon[] any representation or warranty, statutory, express or implied, as to [a litany of items related to the properties being sold], and that Buyer shall be deemed to be obtaining the properties in their present status, condition and state of repair, "as is" and "where is" with all faults and defects . . . .

Purchase and Sale Agreement [Docket No. 2488-8] ("PSA") § 6.1 (changed from all caps for readability).  Fieldwood made a similar—and even stronger—representation in PSA § 8.8:

>    8.8     Independent Evaluation.  Buyer is sophisticated in the evaluation, purchase, ownership and operation of spars, platforms, processing plants, treaters, wells, and offshore facilities similar to the Properties.  In making its decision to enter into this Agreement and to consummate the transactions contemplated herein, Buyer (i) has relied or will rely solely on the express representations of Seller contained in this Agreement, and its own independent investigation and evaluation of the Properties and the advice of its engineers, contractors, lawyers, accountants and other professional advisors and not on any comments, statements, reports, projections or other documents or materials provided by or for Seller or its Affiliates or agents . . . .

PSA § 8.8.

8.     Under Texas law, clauses like these that "clearly and unequivocally express[] the party's intent to disclaim reliance on the specific misrepresentations at issue can preclude a fraudulent inducement claim." *See Int'l Bus. Machines*, 573 S.W.3d at 229; *accord Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 180–81 (Tex. 1997); *see also Prudential Ins. Co. v.*

*Jefferson Assocs.*, 896 S.W.2d 156, 163 (Tex. 1995) (holding that agreement to buy property "as is," in which buyer included "voluntary, freely negotiated affirmation that he was depending on his own assessment of the building," precluded claim for damages when building was found to have asbestos) (cited with approval in *Schlumberger*, 896 S.W.2d at 179, as an example of when a disclaimer of reliance may conclusively negate the element of reliance, which is essential to a fraudulent inducement claim).  The same is true with respect to claims for fraudulent inducement based on non-disclosures.  *See Schlumberger*, 959 S.W.2d at 181–82 (holding that disclaimer-of-reliance provision barred fraudulent inducement claim based on non-disclosure because "non-disclosure allegations are simply the converse of affirmative misrepresentations."); *accord Stabilis Fund II LLC v. Compass Bank*, No. 3:18-CV-0283-B, 2018 WL 3768343, at *1 (N.D. Tex. Aug. 9, 2019).  In determining whether a disclaimer of reliance is binding, courts must also consider whether:

(1)     the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties specifically discussed the issue which has become the topic of the subsequent dispute;

(2)     the complaining party was represented by counsel;

(3)     the parties dealt with each other at arm's length;

(4)     the parties were knowledgeable in business matters; and

(5)     the release language was clear.

*Int'l Bus. Machines*, 573 S.W.3d at 229.

9.     In the present situation, all of these factors weigh heavily in favor of enforcement.  The terms of the contract were vigorously negotiated over a period of weeks.  *See* **Exhibit B**, Declaration of Jourdan Janik at ¶¶ 4–5.  Fieldwood and BP repeatedly acknowledged in the PSA that they had the opportunity to obtain legal counsel or would obtain legal counsel, *see, e.g.*, PSA §§ 1.2(l); 5.1; 8.8; 11.13; 11.14, the participation of Fieldwood's own general counsel, Thomas

Lamme,[5] was expressly memorialized in the PSA, *see* PSA Art. 1.1 (definition of "Knowledge"), PSA Art. 11.1; PSA Sched. 1.1-1; PSA Sched. 1.1-2 (list of "Knowledge Persons"), and Fieldwood and BP were actually represented by counsel. *See* **Exhibit B**, Declaration of Jourdan Janik at ¶ 5. The parties were dealing with each other at arm's length. *See id.*; PSA §§ 1.2(l); 8.8; 11.10. Fieldwood was a sophisticated oil and gas company that was knowledgeable about business matters.   *See* PSA §§ 1.2(l) ("the Parties to this Agreement are sophisticated . . . ."); 8.8 ("[Fieldwood] is sophisticated in the evaluation, purchase, ownership and operation of spars, platforms, processing plants, treaters, wells, and offshore facilities similar to the Properties."). Finally, the disclaimer language that permeates the PSA is broad and clear. *See, e.g.,* PSA §§ 6.1; 8.8; 11.18.

10.     Accordingly, Fieldwood's disclaimers of reliance in the PSA are binding on QuarterNorth and therefore bar it from bringing a claim for fraudulent inducement against BP based on representations outside those specifically excluded in the disclaimers. *See Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181–82 (Tex. 1997) (holding that the trial court correctly rendered a judgment notwithstanding the verdict against the plaintiffs on their fraudulent inducement claim because their contractual disclaimers of reliance conclusively negated the element of reliance as a matter of law).  Moreover, as discussed in the next section, the purported representations in PSA § 7.2 on which QuarterNorth previously relied to justify the proposed 2004

---

[5]     *See* QuarterNorth Energy Leadership Team, https://quarternorthenergy.com/leadership/ (last accessed June 14, 2022) ("Thomas R. Lamme is Executive Vice President & General Counsel for QuarterNorth Energy. Prior to QuarterNorth, Mr. Lamme served as Senior Vice President, Deputy General Counsel, General Counsel, and Secretary for Fieldwood Energy since its inception in 2013. Mr. Lamme's roles prior to Fieldwood Energy include serving as Senior Vice President and General Counsel of Dynamic Offshore Resources, LLC until its sale in 2012. Prior to joining Dynamic, Mr. Lamme was a Senior Partner in the corporate and securities section of the law firm Thompson & Knight LLP, where he practiced law for over 15 years. He holds a B.A. degree from Dartmouth College and a Doctor of Jurisprudence degree from the University of Houston Law Center. Mr. Lamme is a member of the State Bar of Texas.").

Requests were never made (QuarterNorth grossly misstates the meaning of that section) and therefore could not have induced QuarterNorth to enter into the PSA.

11.     As a result, QuarterNorth does not have an actionable—or even colorable—claim for fraudulent inducement against BP and, for this reason too, there is no good cause for the proposed 2004 Requests; they are improper; and they will serve no purpose other than to annoy and harass BP, distract BP and its counsel from focusing on the pending arbitrations, and cause BP to expend great resources in responding to the requests.  Thus, the Court should exercise its discretion and refuse to allow QuarterNorth to serve the proposed 2004 Requests on BP.

**3.     The purported representations in PSA § 7.2 on which QuarterNorth previously relied to justify the proposed 2004 Requests were never made and therefore could not have induced QuarterNorth to enter into the PSA.**

12.     BP made no representation in the PSA, express or otherwise, "that it had the power and authority to comply with its obligations" under the PHA and the LSPS OA, or that the terms of the PHA and LSPS OA "constitute terms of the agreements between the parties" as QuarterNorth claimed when seeking reconsideration of the Court's deferred ruling.  *See* Reply in Support of Emergency Motion for Reconsideration of the Court's Deferral of Ruling on BP Exploration & Production, Inc.'s Motion to Quash Rule 2004 Discovery [Docket No. 2051] ("QuarterNorth's Reply in Support of Motion for Reconsideration") ¶ 12.   In so doing, QuarterNorth advised the Court that it was merely "paraphrasing" PSA § 7.2 but, in reality, it was grossly misstating the scope and reach of this section by inaccurately indicating that the entirety of both the PHA and the LSPS OA are included within the definition of "Operative Documents."

13.     In § 7.2, which is captioned "Authorization," BP as Seller represented that it had "all requisite corporate power and authority" to:

- execute and deliver this Agreement [the PSA] and the Operative Documents to which it is a party; and

- consummate the transactions contemplated by and to perform all of its obligations under this Agreement and the Operative Documents to which it is a party.

PSA § 7.2.  BP further represented that such authorization had been given and no further action was needed before it executed the PSA and the Operative Documents:

> The execution and delivery of this Agreement and each Operative Document to which Seller is a party and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized and approved by all requisite corporate action on the part of Seller, and no other proceeding on the part of Seller is necessary to authorize this Agreement or any of the Operative Documents to which Seller is a party.

PSA § 7.2.  Lastly, BP represented, in relevant part, that the PSA and the Operative Documents, once executed, would be valid and binding obligations subject to enforcement against BP:

> This Agreement constitutes, and the Operative Documents to which it is a party, when executed and delivered by the Seller and the other parties thereto, will constitute, the valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms . . . .

PSA § 7.2.

14.    The term "Operative Documents" is defined as "those documents listed or referred to in Sections 10.2 and/or 10.3 or otherwise executed at the Closing, in each case to the extent executed and delivered by a Party or one of its Affiliates."  PSA § 1.1 at p. 9.  Among the listed documents, executed copies of which were to be delivered by Seller to Buyer (PSA § 10.2) and by Buyer to Seller (PSA § 10.3) at Closing, are *amendments* to the LSPS OA[6] and the PHA[7] but *not* the LSPA OA and the PHA themselves.  PSA §§ 10.2(z), (bb); 10.3(bb), (dd).  Thus, the representations made by BP in § 7.2 in no way constitute representations about the PHA or the

---

[6]    The form of the amendment to the LSPS OA is attached to the PSA as Exhibit F.  *See* Docket No. 2488-8 at pp. 202–05.  For an executed copy of this amendment, see Docket No. 2488-1 at pp. 188–94.

[7]    The form of the amendment to the PHA is attached to the PSA as Exhibit H.  *See* Docket No. 2488-8 at pp. 212–16.  For an executed copy of this amendment, see Docket No. 2488-7 at pp. 176–82.

LSPS OA as a whole, as QuarterNorth seems to suggest, only the contemplated (and later executed) amendments to these agreements.

15.     The scope of these amendments is very narrow.  As stated in the amendment to the PHA, the Parties merely "desire[d] to amend the definition of MC 519 UOA of the PHA to reflect newly contemplated joint operating agreements, and to reflect a change in certain handling charges."  And as stated in the amendment to the LSPS OA, the Parties merely "desire[d] to amend the definitions of MC 519 Unit Operating Agreement and MC 519 UOA of the LSPS Agreement to reflect a newly contemplated joint operating agreement."  By executing these amendments, the Parties thereto effected these changes to the original agreements—nothing more.  As a result, the purported representations in PSA § 7.2 on which QuarterNorth previously relied to justify the proposed 2004 Requests were never made and therefore could not have induced QuarterNorth to enter into the PSA.

**B.     Allowing the proposed 2004 Requests will prejudice BP and undermine the authority of the arbitrators.**

16.     As set forth in <u>Exhibit D</u> to the Emergency Motion, each of the remaining 2004 Requests overlaps significantly with the pending arbitrations, and the PSA nexus articulated by QuarterNorth for the majority of the requests is tenuous at best.  Although the arbitration agreements in the PSA and LSPS OA narrowly limit discovery, QuarterNorth is seeking to take discovery on BP's compliance with the PHA and LSPS OA over a four-and-half year period based on QuarterNorth's rank speculation that it may reveal information that supports a fraudulent inducement claim related to the PSA.  The Court should treat these requests like what they are—a blatant attempt to evade the discovery limitations of the arbitration agreements.  If it does not, BP will be prejudiced in the arbitrations because it will be forced to comply with the discovery

limitations in those proceedings while QuarterNorth enjoys a bonus round of discovery. This deprives BP of the benefits of the discovery limitations for which it negotiated.

17.     Moreover, allowing the proposed 2004 Requests will undermine the authority of the arbitrators to manage their arbitrations. At the June 7, 2022 hearing, the Court distinguished between the knowledge QuarterNorth would gain from documents produced in Rule 2004 discovery context and the admissibility of those documents in the arbitrations. Respectfully, in the present context, that is a distinction without a difference—especially in light of the Court's decision to allow QuarterNorth to show the documents to professionals, which includes experts, because it will give QuarterNorth a path by which these documents can become evidence for and even admissible at the final arbitration hearings. Under the Federal Rules of Evidence:

> Rule 703: Bases of an Expert's Testimony. An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, *they need not be admissible for the opinion to be admitted*. But if the facts would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect (emphasis added).

> Rule 705: Disclosing the Facts of Data Underlying an Expert's Opinion: Unless the court orders otherwise, an expert may state an opinion – and give the reasons for it – without first testifying to the underlying facts or data. But the expert may be required to disclose those facts or data on cross-examination.

Thus, in the event one or both of the arbitrators decides to limit discovery somehow, but QuarterNorth has already received in this forum what it is unable to get in one or both of the arbitrations, it will still be able to show those documents to its arbitration experts. QuarterNorth's experts will then be free to base their opinions on these otherwise inadmissible documents, in which case QuarterNorth will be free to argue that they should be admitted into evidence because their probative value outweighs any prejudicial effect. *See* FED. R. EVID. 703. Even if the

11

arbitrators were to deny such a request, the evidence might still become admissible on cross-examination, *see* FED. R. EVID. 705, thereby forcing BP to carefully balance its questioning so as not to open the door to admitting otherwise inadmissible evidence while still effectively challenging the expert's opinion.   Such a dance not only prejudices BP—and only BP, as QuarterNorth will not have to worry about the same possibility—but also undermines the authority of the arbitrators and the limits on discovery in the arbitration agreements to which the parties agreed.

**C.     The proposed 2004 Requests are improper as requests made under Rule 2004.**

18.     The proposed 2004 Requests are also improper as requests made under Rule 2004, because (a) they seek discovery on a putative claim that is barred as a matter of law (as discussed in <u>Part A</u> above), the basis for which have not been adequately explained by QuarterNorth, and (b) they exceed the scope of discovery allowed into the general business and internal affairs of a creditor under Rule 2004.[8]

19.     Although the scope of Rule 2004 is broad, it is not without limits.   Bankruptcy Rule 2004 cannot be used to seek discovery relating to claims that are already barred as a matter of law, for example, due to preclusion doctrines, or where the party seeking such discovery otherwise fails to make a basic showing that it may have real, actionable claims to investigate and to which its requested discovery relates.   *See In re Wilcher*, 56 B.R. 428, 435–40 (Bankr. N.D. Ill. 1985); *see also In re Mathews*, No. 18-mc-80-LPS, 2018 U.S. Dist. 178364, at *6 (D. Del. Oct. 17, 2018) (quashing 2004 requests because, among other things, the requesting party "ha[d] not sufficiently explained how the Rule 2004 investigation relates to the specific documents he seeks,

---

[8]     BP also maintains that the 2004 Requests are invalid and improper under Bankruptcy Rule 2004 itself due to, *inter alia*, the pending proceeding rule.   *See, e.g.*, Motion of BP Exploration & Production, Inc. to Quash Debtors' Bankruptcy Rule 2004 Discovery Requests [Docket No. 1415] (the "<u>Motion to Quash</u>") ¶¶ 32–37; BP's Reconsideration Resp. ¶¶ 9–12.

nor how the requested documents relate to any potential claim."); *In re CIS Corp.*, 123 B.R. 488, 491 (S.D.N.Y. 1991) (trustee could not seek 2004 discovery against accounting firm where the trustee had not made any determination or showing that he had any "adequate basis for filing a claim against" the firm); *In re Onatah Farms, LLC*, No. 21-10091, 2021 Bankr. LEXIS 1808, at *3–4 (Bankr. N.D. Ind. April 29, 2021) (declining to allow Bankruptcy Rule 2004 discovery where the party seeking such discovery had not adequately explained what potential claims it could have and how the discovery related to an investigation into the viability of such claims); *In re Strecker*, 251 B.R. 878, 883 (Bankr. D. Col. 2000) (declining to allow Rule 2004 investigation "without some alleged conduct, or other facts, which could lead to a cause of action" beyond vague allegations of single purported instance of bad conduct whose actionability was neither explained nor readily apparent); *In re Gross*, 121 B.R. 587, 593 (Bankr. S.D. 1990) (declining to allow post-confirmation 2004 discovery based only on "a vague suspicion" of potential fraud).  Thus, the party seeking discovery must present some reasonable basis for the court to conclude that there are real potential—and actionable—claims to be investigated, and that the scope of the requested discovery is related to such potential claims.  *See, e.g.*, *In re Kleynerman*, 617 B.R. 122, 128 (Bankr. E.D. Wis. 2020); *Onatah Farms*, 2021 Bankr. LEXIS 1808, at *3–4.

20.     Similarly, Rule 2004 "may not be used as a device to launch into a wholesale investigation of a non-debtor's private business affairs."  *Wilcher*, 56 B.R. at 343; *see also, e.g.*, *Bank of Am., N.A. v. Landis*, No. 11-cv-1338, 2011 U.S. Dist. LEXIS 140868, at *18–19 (D. Nev. Dec. 7, 2011); *In re Johns-Manville Corp.*, 42 B.R. 362, 364 (S.D.N.Y. 1984); *Mathews*, 2018 U.S. Dist. 178364, at *6–7; *In re Continental Forge Co.*, 73 B.R. 1005, 1007 (Bankr. W.D. Pa. 1987).  In *Continental Forge*, for example, the debtor sought to obtain extremely broad Rule 2004 discovery concerning the operations and production processes, among other things, of a creditor,

without having adequately demonstrated the relation of such discovery to any putative claims the debtor could potentially assert. *See* 73 B.R. at 1007. The debtor there did present some theories regarding potential claims it might have and to which the requested discovery might relate, but the link to the discovery was so tenuous and the claims so unlikely to even exist, never mind succeed, that the court was unwilling to permit broad discovery into the affairs of such creditor. *See id.* Finally, where the scope of the requests is so broad, including requests that relate to third party creditors and cover a wide subject matter and length of time, "there must be a higher showing of good cause" for the court to allow discovery under Rule 2004. *Kleynerman*, 617 B.R. at 128.

21.     All these limitations on discovery under Rule 2004 are applicable here. The purported fraudulent inducement claims on which QuarterNorth relies is nonexistent due to, *inter alia*, the unambiguous language in the PSA effecting a waiver of any such claims. QuarterNorth has still failed to adequately explain, on a fundamental level, (a) what the basis and nature of this purported claim might be, including, without limitation, QuarterNorth's failure to identify any allegedly false misrepresentations on which BP intended QuarterNorth to rely and on which it was entitled to rely such that it was "induced" to enter into the PSA and how any such claim for fraudulent inducement survives the broad, unambiguous disclaimers contained in the PSA (other than its gross misstatement of PSA § 7.2), and (b) how the 2004 Requests would relate to a pre-suit investigation of any such claims. *See, e.g.*, *Mathews*, 2018 U.S. Dist. 178364, at *6–7; *Onatah Farms*, 2021 Bankr. LEXIS 1808, at *3–4; *Wilcher*, 56 B.R. at 435–40. In addition, even if such claims do exist or are viable (which BP adamantly disputes), as explained in Part D below, the 2004 Requests are still far broader and more burdensome than is reasonably necessary to investigate any such hypothetical fraudulent inducement claim relating to the PSA. QuarterNorth cannot use Bankruptcy Rule 2004 to launch a broad, open-ended investigation into the internal

affairs and business of BP, especially one covering a lengthy period, without demonstrating a closer relationship to the potential claims to be investigated, in addition to the existence of such potential claims. *See, e.g.*, *Landis*, 2011 U.S. Dist. LEXIS 140868, at *18–19; *Kleynerman*, 617 B.R. at 128–30; *Continental Forge*, 73 B.R. at 1007. Accordingly, the Court should not allow QuarterNorth to proceed with discovery for a pre-suit investigation, especially such a broad investigation into the general business of BP, based only on putative claims that QuarterNorth has affirmatively waived and thus cannot pursue in any case.

**D.      The proposed discovery is overly broad and extremely burdensome.**

22.      Contrary to QuarterNorth's characterization, the proposed discovery is anything but "narrow, relevant, proportional, and reasonably calculated to lead to the discovery of admissible evidence of potential PSA-related claims against BP." [*See* Docket No. 2510 at ¶ 4].

23.      As an initial matter, the timeframe for eight of the remaining 2004 Requests is "January 1, 2018 to the present[.]" Debtors' Notice of Bankruptcy Rule 2004 Request for Production of Documents from BP Exploration & Production Inc. [Docket No. 1387] (the "2004 Requests") ¶ 21; Request Nos. 1, 3–4, 6, 13–15, 17. One request seeks information from "January 1, 2015 to the present[.]" *Id.* at Request No. 12. This is a breathtaking timeframe for 2004 Requests that purportedly would support a claim that BP fraudulently induced Fieldwood into entering the PSA on May 17, 2019. Although BP believes that any Rule 2004 discovery is inappropriate, if such discovery is permitted at all, it should be limited to a few months on either side of the PSA's May 17, 2019 execution date. It is inconceivable that, if BP fraudulently induced Fieldwood into entering into the PSA, the evidence relating to such fraudulent inducement would not be present in that specific period (even though evidence from any period will be unavailing to QuarterNorth as set forth in Part A above).

24.     Additionally, six of the 2004 Requests seek information in extraordinarily broad terms: "All Documents and Communications concerning" the identified topics—most of which are also extremely broad: "Genovesa[,]" "the PSA[,]" "BP's efforts to bring Manuel online[,]" "the LSPS Leak[,]" and "deployment of a flotel at Na Kika in 2020[.]"  2004 Requests, Request Nos. 1, 3, 6, 12, 13, 17.  Taken at face value, these will require BP personnel and outside counsel to expend hundreds, if not thousands, of hours collecting and reviewing documents, an effort that is all but guaranteed to cost six-figures, if not more, in lost productivity, vendor costs, and attorneys' fees.

25.     Counsel has done some *very* preliminary test searches in a subset of potential custodians and the volume of potentially responsive documents is staggering.  For example, a search for the word "Manuel" in a deduplicated body of documents from a limited number of custodians from on or after January 1, 2018, returned over 50,000 documents including families.  That is over 60 gigabytes of data and includes, among other things, thousands of spreadsheets.  *See* **Exhibit C**, *Declaration of Jared Weir* at ¶ 6.  This illustrates the magnitude of the potential undertaking if BP is required to respond to the 2004 Requests.

**E.     The Court lacks, or should decline to exercise, subject matter jurisdiction over the proposed 2004 Requests.**

26.     As and for the reasons set forth in the Emergency Motion, *see* Emergency Mot. ¶¶ 30–32; *see also* Response of BP Exploration & Production, Inc. to Emergency Motion for Reconsideration of Court's Ruling Quashing Rule 2004 Discovery [Docket No. 2035] ("BP's Reconsideration Response") ¶¶ 20–23, BP maintains that, under applicable Fifth Circuit precedent, this Court no longer has subject matter jurisdiction over the 2004 Requests, especially in light of QuarterNorth's initiation of the Second Arbitration, and that, even if such jurisdiction exists, the Court should abstain from exercising such jurisdiction in favor of the Arbitration

Proceedings.  Regardless of QuarterNorth's statements to the contrary, it remains well-established that 2004 discovery is not available post-confirmation with respect to claims that are no longer property of the estate and concern a dispute between non-debtor parties only.  *See, e.g.*, *In re Express One Int'l*, 217 B.R. 215, 216–17 (Bankr. E.D. Tex. 1998); *In re Cinderella Clothing Indus., Inc.*, 93 B.R. 373, 377–79 (Bankr. E.D. Pa. 1988).  Moreover, under both the Fifth Circuit's narrower version of the *Pacor* test for post-confirmation subject matter jurisdiction, *see, e.g.*, *Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390–91 (5th Cir. 2001), as well as the general *Pacor* test, the Court no longer has subject matter jurisdiction over the claims covered by the 2004 Requests as such claims do not pertain to the implementation or execution of the plan and the outcome of any disputes regarding such claims can have no conceivable effect on the post-confirmation estates.

27.     Contrary to QuarterNorth's assertions, the *Enron* case and its progeny do not support its arguments.  *See Newby v. Enron Corp. (In re Enron Corp. Sec.)*, 535 F.3d 325, 335–36 (5th Cir. 2008).  While the content of any potential fraudulent inducement claim under the PSA would be based on pre-confirmation events, any such claim was not actually "raised" or "pending" pre-confirmation and there was no "antagonism" between the parties as to such claims within the meaning of *Enron*.  *See id.* at 335–36; *see also, e.g.*, *QuarterNorth Energy LLC v. Atl. Mar. Servs.(In re Fieldwood Energy LLC)*, 2021 Bankr. LEXIS 2867, at *11–14 (Bankr. S.D. Tex. Oct. 15, 2021).  QuarterNorth asserts that the 2004 Requests sought to investigate potential claims, allegedly including the putative fraudulent inducement claim under the PSA; however, such pre-suit discovery alone, especially broad pre-suit discovery designed in large part to only identify a single potential claim, does not "raise" a claim or cause a claim to be "pending" within the meaning of *Enron*.  And while it is true in a general sense that there was "antagonism" between the parties

before confirmation, that term, as used in the *Enron*, refers to a live, active dispute or controversy between the parties regarding specific claims. *See, e.g.*, *UPD Global Res., Inc. v. Cont'l Cas. Co. (In re UPD Global Res., Inc.)*, No. H-15-2488, 2016 U.S. Dist. LEXIS 95115, at *30–31 (S.D. Tex. July 21, 2016); *Faulkner v. Lane Gorman Trubitt, LLC (In re Reagor-Dykes Motors, LP)*, No. 18-50214-RLJ-11, 2021 Bankr. LEXIS 2891, at *9–10 (Bankr. N.D. Tex. Oct. 13, 2021). Here, as is discussed more fully above and below, QuarterNorth has never satisfactorily explained the basis for a viable claim under the PSA and how such a claim survives the broad waiver language in the PSA. Under these circumstances, without a pre-confirmation proceeding against BP, or even a plausible explanation as to the nature and existence of the purported claim pre-confirmation, there is no basis for subject matter jurisdiction post-confirmation over a dispute between non-debtors that will have no effect or impact on the post-confirmation estates.

WHEREFORE, BP respectfully requests that the Court enter the Proposed Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested in BP's Emergency Motion as further discussed in this brief in support and such other and further relief the Court may deem proper.

Date: June 15, 2022                    Respectfully submitted,

                                       GREENBERG TRAURIG, LLP

                                       By: */s/ Karl D. Burrer*
                                       Shari L. Heyen (SBN 09564750)
                                       HeyenS@gtlaw.com
                                       Karl D. Burrer (SBN 24043584)
                                       BurrerK@gtlaw.com
                                       1000 Louisiana Street, Suite 1700
                                       Houston, Texas 77002
                                       Telephone: (713) 374-3500
                                       Facsimile: (713) 374-3505

                                       – and –

Craig A. Duewall (admitted *pro hac vice*)
Texas State Bar Number 24025334
DuewallC@gtlaw.com
300 West 6th Street, Suite 2050
Austin, Texas 78701
Telephone: (512) 320-7200
Facsimile: (512) 320-7210

***Counsel for BP Exploration & Production Inc.***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 15, 2022, I caused a copy of the foregoing to be served on all parties eligible to receive service through the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas by electronic mail.

By: */s/  Karl D. Burrer*
Karl D. Burrer