## Exhibit A

**Leases**

**OCS-G 01027**

Form 4-1255
(May 1954)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

RECEIVED
MAY 4 1962
Bureau of
Land Management
New Orleans, La.

Cash Bonus $110,000.
Rental Rate $3.
Minimum royalty rate $3.
Royalty rate 1/6

Office   NEW ORLEANS

Serial   OCS-G 1027

# OIL AND GAS LEASE OF SUBMERGED LANDS UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

This indenture of lease entered into and effective as of _____ JUN 1 1962 _____, by and between the United States of America, hereinafter called the lessor, by the Director, Bureau of Land Management, and

PAN AMERICAN PETROLEUM CORPORATION
P. O. Box 3092
Houston 1, Texas

hereinafter called the lessee, under, pursuant, and subject to the terms and provisions of the Outer Continental Shelf Lands Act of August 7, 1953 (67 Stat. 462; 43 U. S. C., sec. 1331, *et seq.*), hereinafter referred to as the act, and to all lawful and reasonable regulations of the Secretary of the Interior (hereinafter referred to as the Secretary) when not inconsistent with any express and specific provisions herein, which are made a part hereof:

WITNESSETH:

SECTION 1. *Rights of lessee.*—That the lessor, in consideration of a cash bonus and of the rents and royalties to be paid, and the conditions and covenants to be observed as herein set forth, does hereby grant and lease to the lessee the exclusive right and privilege to drill for, mine, extract, remove and dispose of all oil and gas deposits except helium gas in or under the following-described area of the outer Continental Shelf (as that term is defined in the act):

    Block 246 Ship Shoal Area, South Addition, as shown on official leasing map
    La. No. 5A, Outer Continental Shelf Leasing Map, Louisiana Offshore Operations.

containing ___5,000___ acres, more or less (hereinafter referred to as the leased area), together with:

(*a*) the non-exclusive right to conduct within the leased area geological and geophysical explorations which are not unduly harmful to aquatic life;

(*b*) the right to drill water wells within the leased area and use free of cost, and to dispose of, water produced from such wells; and

(*c*) the right to construct or erect and to maintain within the leased area all artificial islands, platforms, fixed or floating structures, sea walls, docks, dredged channels and spaces, buildings, plants, telegraph or telephone lines and cables, pipelines, reservoirs, tanks, pumping stations, and other works and structures necessary or convenient to the full enjoyment of the rights granted by this lease,

for a period of 5 years and as long thereafter as oil or gas may be produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Secretary, are conducted thereon; subject to any unitization or pooling agreement heretofore or hereafter approved by the Secretary which affects the leased area or any part thereof, the provisions of such agreements to govern the leased area or part thereof subject thereto where inconsistent with the terms of this lease.

SEC. 2. *Obligations of lessee.*—In consideration of the foregoing, the lessee agrees:

(*a*) *Bonds.*—To maintain at all times the bond required prior to the issuance of this lease and to furnish such additional security as may be required by the lessor if, after operations or production have begun, the lessor deems such additional security as necessary.

(*b*) *Cooperative or unit plan.*—Within 30 days after demand, to subscribe to and to operate under such reasonable cooperative or unit plan for the development and operation of the area, field, or pool, or part thereof, embracing lands included herein as the Secretary may determine to be practicable and necessary or advisable in the interest of conservation, which plan shall adequately protect the rights of all parties in interest, including the United States.

(*c*) *Wells.*—(1) To drill and produce such wells as are necessary to protect the lessor from loss by reason of production on other properties or, in lieu thereof, with the consent of the oil and gas supervisor, to pay a sum determined by the supervisor as adequate to compensate the lessor for failure to drill and produce any such well. In the event that this lease is not being maintained in force by other production of oil or gas in paying quantities or by other approved drilling or reworking operations, such payments shall be considered as the equivalent of production in paying quantities for all purposes of this lease.

(2) After due notice in writing, to drill and produce such other wells as the Secretary may reasonably require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with good operating practice.

(3) At the election of the lessee, to drill and produce other wells in conformity with any system of well spacing or production allotments affecting the area, field, or pool in which the leased area or any part thereof is situated, which is authorized or sanctioned by applicable law or by the Secretary.

(*d*) *Rentals and royalties.*—(1) To pay rentals and royalties as follows:

*Rentals.*—To pay the lessor on or before the first day of each lease year commencing prior to a discovery of oil or gas on the leased area, a rental of ___$3.___ per acre or fraction thereof.

*Minimum royalty.*—To pay the lessor in lieu of rental at the expiration of each lease year commencing after discovery a minimum royalty of ___$3.___ per acre or fraction thereof or, if there is production, the difference between the actual royalty paid during the year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

*Royalty on production.*—To pay the lessor a royalty of ___16-2/3___ percent in amount or value of production saved, removed, or sold from the leased area. Gas of all kinds (except helium, and gas used for purposes of production from and operations upon the leased area or unavoidably lost) is subject to royalty.

(2) It is expressly agreed that the Secretary may establish reasonable minimum values for purposes of computing royalty on products obtained from this lease, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, or area, to the price received by the lessee, to posted prices, and to other relevant matters. Each such determination shall be made only after due notice to the lessee and a reasonable opportunity has been afforded the lessee to be heard.

(3) When paid in value, such royalties on production shall be due and payable monthly on the last day of the calendar month next following the calendar month in which the production is obtained. When paid in production, such royalties shall be delivered at pipeline connections or in tanks provided by the lessee. Such deliveries shall be made at reasonable times and intervals and, at the lessee's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The lessee shall not be required to provide storage for royalty taken in kind in excess of tankage required when royalty is paid in value. When payments are made in production the lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the lessee has no control.

(4) Rentals or minimum royalties may be reduced and royalties on the entire leasehold or any deposit, tract, or portion thereof segregated for royalty purposes may be reduced if the Secretary finds that, for the purpose of increasing the ultimate recovery of oil or gas and in the interest of conservation of natural resources, it is necessary, in his judgment, to do so in order to promote development, or because the lease cannot be successfully operated under the terms fixed herein.

(*e*) *Payments.*—Unless otherwise provided by regulation or directed by the Secretary, to make rental, royalty, or other payments to the lessor, or to the order of the Treasurer of the United States, and to tender such payments to the oil and gas supervisor, Geological Survey.

(*f*) *Contracts for disposal of products.*—To file with the oil and gas supervisor, Geological Survey, not later than 30 days after the effective date thereof, copies of all contracts for the disposal of lease products; provided that the supervisor may relieve the lessee of this requirement, in which event the contracts shall be made available

16—70375-1

for inspection by the supervisor upon his request. Nothing in any such contract or ~~in any approval thereof by the supervisor shall be~~ construed or accepted as modifying any of the provisions of this lease, including, but not limited to, provisions relating to gas waste, taking royalty in kind, and the method of computing royalties due as based on a minimum valuation and in accordance with the regulations applicable to this lease.

(g) *Statements, plats, and reports.*—At such times and in such form as the lessor may prescribe, to furnish detailed statements and reports showing the amounts and quality of all products saved, removed, and sold from the leased area, the proceeds therefrom, and the amount used for production purposes or unavoidably lost; with regard to the leased area.

(h) *Inspection.*—To keep open at all reasonable times for the inspection of any duly authorized representative of the lessor, the leased area and all wells, improvements, machinery and fixtures thereon and all books, accounts and records relative to operations and surveys or investigations on or with regard to the leased area or under the lease.

(i) *Diligence.*—To exercise reasonable diligence in drilling and producing the wells herein provided for; to carry on all operations in accordance with approved methods and practices including those provided in the operating and conservation regulations for the outer Continental Shelf; to remove all structures when no longer required for operations under the lease to sufficient depth beneath the surface of the waters to prevent them from being a hazard to navigation; to carry out at expense of the lessee all lawful and reasonable orders of the lessor relative to the matters in this paragraph, and that on failure of the lessee so to do the lessor shall have the right to enter on the property and to accomplish the purpose of such orders at the lessee's cost: *Provided*, That the lessee shall not be held responsible for delays or casualties occasioned by causes beyond the lessee's control.

(j) *Freedom of purchase.*—To accord all workmen and employees directly engaged in any of the operations under this lease complete freedom of purchase.

(k) *Nondiscrimination.*—Not to discriminate against any employee, or applicant for employment, because of race, creed, color or national origin, and to require an identical provision to be included in all sub-contracts relating to operations under this lease.

(l) *Assignment of lease.*—To file for approval with the Bureau of Land Management, within 90 days from the date of final execution, any instrument of transfer of this lease, or any interest therein, including assignments of record title, operating agreements, and subleases. Carried working interests, overriding royalty interests, or payments out of production, may be created or transferred without requirement for filing or approval. Instruments required to be filed shall take effect upon approval as of the first day of the lease month following the date of filing unless at the request of the parties an earlier date is specified in such approval.

SEC. 3. *Reservations to lessor.*—The lessor reserves:

(a) *Geological and geophysical exploration; rights-of-way.*—The right to authorize the conduct of geological and geophysical exploration in the leased area which does not interfere with or endanger ·actual operations under this lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands containing the deposits described in the act, and to the treatment and shipment of products thereof by or under authority of the United States, its lessees or permittees, and for other public purposes, subject to the provisions of section 5 (c) of the act where they are applicable and to all lawful and·reasonable regulations and conditions prescribed by the Secretary thereunder.

(b) *Leases of sulfur and other mineral.*—The right to grant sulfur leases and leases of any mineral other than oil, gas, and sulfur within the leased area or any part thereof, subject to the provisions of section 8(c), 8(d), and 8(e) of the act and all lawful and reasonable regulations prescribed by the Secretary thereunder: *Provided*, That no such sulfur lease or lease of other mineral shall authorize or permit the·lessee thereunder unreasonably to interfere with or endanger operations under this lease.

(c) *Purchase of production.*—In time of war, or when the President of the United States shall so prescribe, the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in section 12(b) of the act.

(d) *Taking of royalties.*—All rights, pursuant to clause (3) of section 8(b) of the act, to take royalties in the amount or value of production.

(e) *Fissionable materials.*—All uranium, thorium, and all other materials determined pursuant to paragraph (1) of subsection (b) of section 5 of the Atomic Energy Act of 1946, as amended, to be peculiarly essential to the production of fissionable materials, contained, in whatever concentration, in deposits in the subsoil or seabed of the leased area or any part thereof, as provided in section 12(e) of the act.

(f) *Helium.*—Pursuant to section 12(f) of the act, the ownership and the right to extract helium from all gas produced under this lease, subject to such rules and regulations as·shall be prescribed by the Secretary.

(g) *Suspension of operations during war or national emergency.*—Upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or President of the United States after August 7, 1953, the authority of the Secretary to suspend any or all operations under this lease, as provided in section 12(c) of the act: *Provided*, That just compensation shall be paid by the lessor to the lessee.

(h) *Restriction of exploration and operations.*—The right, as provided in section 12(d) of the act, to restrict from exploration and

operations the leased area or any part thereof which may be designated by and through the Secretary of Defense, with the approval of the President, as, or as part of, an area of the outer Continental Shelf needed for national defense; and so long as such designation remains in effect no exploration or operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense; and if operations or production under this lease within any such restricted area shall be suspended, any payments of rentals, minimum royalty, and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the lessor shall be liable to the lessee for such compensation as is required to be paid under the Constitution of the United States.

SEC. 4. *Directional drilling.*—This lease may be maintained in force by directional wells drilled under the leased area from surface locations on adjacent or adjoining lands not covered by this lease. In such circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the adjacent or adjoining land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on adjacent or adjoining land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations (as the case may be) on the leased area for all purposes of this lease. Nothing contained in this paragraph is intended or shall be construed as granting to the lessee any leasehold interests, licenses, easements, or other rights in or with respect to any such adjacent or adjoining land in addition to any such leasehold interests, licenses, easements, or other rights which the lessee may have lawfully acquired under the act or from the lessor or others.

SEC. 5. *Surrender and termination of lease.*—The lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the Bureau of Land Management, a written relinquishment, in triplicate, which shall be effective as of the date of filing, subject to the continued obligation of the lessee and his surety to make payment of all accrued rentals and royalties and to abandon all wells on the area to be relinquished to the satisfaction of the oil and gas supervisor.

SEC. 6. *Removal of property on termination of lease.*—Upon the expiration of this lease, or the earlier termination thereof as herein provided, the lessee shall within a period of 1 year thereafter remove from the premises all structures, machinery, equipment, tools, and materials other than improvements needed for producing wells or for drilling or producing on other leases and other property permitted by the lessor to be maintained on the area.

SEC. 7. *Remedies in case of default.*—(a) Whenever the lessee fails to comply with any of the provisions of the act or this lease or the applicable regulations in force and effect on the date of issuance of this lease, the lease shall be subject to cancellation as follows:

(1) *Cancellation of non-producing lease.*—If, at the time of such default, no well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be canceled by the Secretary (subject to the right of judicial review as provided in section 8(j) of the act) if such default continues for the period of 30 days after mailing of notice by registered letter to the lessee at the lessee's record point office address.

(2) *Cancellation of producing lease.*—If, at the time of such default, a well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this·lease may be canceled by·an appropriate·proceeding in any United States district court having jurisdiction under the provisions of section·4(b) of the act if such default continues for the period of 30 days after mailing of notice by registered letter to the lessee at the lessee's record post office address.

(b) *Other remedies.*—If any such default continues for the period of 30 days after mailing of notice by registered letter to the lessee at the lessee's record post office address, the lessor may then exercise any legal or equitable remedy which the lessor may have; however, the remedy of cancellation of this lease may be exercised only under the conditions and subject to the limitations set out above in paragraph (a) of this section, or pursuant to section 8(i) of the act.

(c) *Effect of waiver of default.*—A waiver of any particular default shall not prevent the cancellation of this lease or the exercise of any other remedy the lessor may have by reason of any other cause or for the same cause occurring at any other time.

SEC. 8. *Heirs and successors in interest.*—Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

SEC. 9. *Unlawful interest.*—No member of, or Delegate to, Congress, or Resident Commissioner, after his election or appointment, or either before or after he has qualified, and during his continuance in office, and no other, agent, or employee of the Department of the Interior, except as provided in 43 CFR 7.4(a)(1), shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom; and the provisions of section 3741 of the Revised Statutes, as amended (41 U.S.C., sec. 22), and sections 431, 432 and 433 of Title 18 of the United States Code, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease so far as the same may be applicable.

*IN WITNESS WHEREOF:*

WITNESSES TO SIGNATURE OF LESSEE

THE UNITED STATES OF AMERICA

By *(signature)*

Manager, Bureau of Land Management
New Orleans Office

MAY 7 1962
_____
(Title) (Date)

*(signature)* ~2

Pan American Petroleum Corporation

*(signature)*
(Name and address)

P. O. BOX 3092
HOUSTON, TEXAS

*(signature)* O. N. Gammill
Attorney-In-Fact
(Lessee)

*(signature)*
(Name and address)

*If this lease is executed by a corporation, it must bear the corporate seal*

U. S. GOVERNMENT PRINTING OFFICE    16—70376-1

**OCS-G 1028**

**12 (7) UNITED STATES**
**DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**

Cash Bonus ____ $657,778.
Rental Rate _____ $3.
Minimum royalty rate __ $3.
Royalty rate ____ 1/6

Office _____ NEW ORLEANS

Serial _____ OCS-G 1028

# OIL AND GAS LEASE OF SUBMERGED LANDS UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

This indenture of lease entered into and effective as of _____ JUN 1 1962 _____, by and between the United States of America, hereinafter called the lessor, by the Director, Bureau of Land Management, and

### FOREST OIL CORPORATION
### 300 Oil and Gas Building
### Houston, Texas

hereinafter called the lessee, under, pursuant, and subject to the terms and provisions of the Outer Continental Shelf Lands Act of August 7, 1953 (67 Stat. 462; 43 U. S. C., sec. 1331, et seq.), hereinafter referred to as the act, and to all lawful and reasonable regulations of the Secretary of the Interior (hereinafter referred to as the Secretary) when not inconsistent with any express and specific provisions herein, which are made a part hereof:

WITNESSETH:

SECTION 1. *Rights of lessee.*—That the lessor, in consideration of a cash bonus and the rents and royalties to be paid, and the conditions and covenants to be observed as herein set forth, does hereby grant and lease to the lessee the exclusive right and privilege to drill for, mine, extract, remove and dispose of all oil and gas deposits except helium gas in or under the following-described area of the outer Continental Shelf (as that term is defined in the act):

Block 247 Ship Shoal Area, South Addition, as shown on official leasing map La. No. 5A, Outer Continental Shelf Leasing Map, Louisiana Offshore Operations.

containing __5,000_____ acres, more or less (hereinafter referred to as the leased area), together with:

(a) the non-exclusive right to conduct within the leased area geological and geophysical explorations which are not unduly harmful to aquatic life;

(b) the right to drill water wells within the leased area and use free of cost, and to dispose of, water produced from such wells; and

(c) the right to construct or erect and to maintain within the leased area all artificial islands, platforms, fixed or floating structures, sea walls, docks, dredged channels and spaces, buildings, plants, telegraph or telephone lines and cables, pipelines, reservoirs, tanks, pumping stations, and other works and structures necessary or convenient to the full enjoyment of the rights granted by this lease,

for a period of 5 years and as long thereafter as oil or gas may be produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Secretary, are conducted thereon; subject to any unitization or pooling agreement heretofore or hereafter approved by the Secretary which affects the leased area or any part thereof, the provisions of such agreements to govern the leased area or part thereof subject thereto where inconsistent with this lease.

SEC. 2. *Obligations of lessee.*—In consideration of the foregoing, the lessee agrees:

(a) *Bonds.*—To maintain at all times the bond required prior to the issuance of this lease and to furnish such additional security as may be required by the lessor if, after operations or production have begun, the lessor deems such additional security to be necessary.

(b) *Cooperative or unit plan.*—Within 30 days after demand, to subscribe to and to operate under such reasonable cooperative or unit plan for the development and operation of the area, field, or pool, or part thereof, embracing lands included herein as the Secretary may determine to be practicable and necessary or advisable in the interest of conservation which plan shall adequately protect the rights of all parties in interest, including the United States.

(c) *Wells.*—(1) To drill and produce such wells as are necessary to protect the lessor from loss by reason of production on other properties or, in lieu thereof, with the consent of the oil and gas supervisor, to pay a sum determined by the supervisor as adequate to compensate the lessor for failure to drill and produce any such well. In the event that this lease is not being maintained in force by other production of oil or gas in paying quantities or by other approved drilling or reworking operations, such payments shall be considered as the equivalent of production in paying quantities for all purposes of this lease.

(2) After due notice in writing, to drill and produce such other wells as the Secretary may reasonably require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with good operating practice.

(3) At the election of the lessee, to drill and produce other wells in conformity with any system of well spacing or production allotments affecting the area, field, or pool in which the leased area or any part thereof is situated, which is authorized or sanctioned by applicable law or by the Secretary.

(d) *Rentals and royalties.*—(1) To pay rentals and royalties as follows:

*Rentals.*—To pay the lessor on or before the first day of each lease year commencing prior to a discovery of oil or gas on the leased area, a rental of ____ $3. _____ per acre or fraction thereof.

*Minimum royalty.*—To pay the lessee in lieu of rental at the expiration of each lease year commencing after discovery a minimum royalty of ____ $3. _____ per acre or fraction thereof or, if there is production, the difference between the actual royalty paid during the year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

*Royalty on production.*—To pay the lessor a royalty of __16-2/3__ percent in amount or value of production saved, removed, or sold from the leased area. Gas of all kinds (except helium, and gas used for purposes of production from and operations upon the leased area or unavoidably lost) is subject to royalty.

(2) It is expressly agreed that the Secretary may establish reasonable minimum values for purposes of computing royalty on products obtained from this lease, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, or area, to the price received by the lessee, to posted prices, and to other relevant matters. Each such determination shall be made only after due notice to the lessee and a reasonable opportunity has been afforded the lessee to be heard.

(3) When paid in value, such royalties on production shall be due and payable monthly on the last day of the calendar month next following the calendar month in which the production is obtained. When paid in production, such royalties shall be delivered at pipeline connections or in tanks provided by the lessee. Such deliveries shall be made at reasonable times and intervals and, at the lessee's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The lessee shall not be required to provide storage for royalty taken in kind in excess of tankage required when royalty is paid in value. When payments are made in production the lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the lessee has no control.

(4) Rentals or minimum royalties may be reduced and royalties on the entire leasehold or any deposit, tract, or portion thereof segregated for royalty purposes may be reduced if the Secretary finds that, for the purpose of increasing the ultimate recovery of oil or gas and in the interest of conservation of natural resources, it is necessary, in his judgment, to do so in order to promote development, or because the lease cannot be successfully operated under the terms fixed herein.

(e) *Payments.*—Unless otherwise provided by regulation or directed by the Secretary, to make rental, royalty, or other payments to the lessor, to the order of the Treasurer of the United States, and to tender such payments to the oil and gas supervisor, Geological Survey.

(f) *Contracts for disposal of products.*—To file with the oil and gas supervisor, Geological Survey, not later than 30 days after the effective date thereof, copies of all contracts for the disposal of lease products; provided that the supervisor may relieve the lessee of this requirement, in which event the contracts shall be made available

16—70375-1

for inspection by the supervisor upon his request. Nothing in any such contract or in any approval thereof by the supervisor shall be construed or accepted as modifying any of the provisions of this lease, including, but not limited to, provisions relating to gas waste, taking royalty in kind, and the method of computing royalties based as based on a minimum valuation and in accordance with the regulations applicable to this lease.

(g) *Statements, plats, and reports.*—At such times and in such form as the lessor may prescribe, to furnish detailed statements and reports showing the amounts and quality of all products saved, removed, and sold from the leased area, the proceeds therefrom, and the amount used for production purposes or unavoidably lost; also a plat showing development work and improvements on or with regard to the leased area.

(h) *Inspection.*—To keep open at all reasonable times for the inspection of any duly authorized representative of the lessor, the leased area and all wells, improvements, machinery and fixtures thereon and all books, accounts and records relative to operations and surveys or investigations on or with regard to the leased area or under the lease.

(i) *Diligence.*—To exercise reasonable diligence in drilling and producing the wells herein provided for; to carry on all operations in accordance with approved methods and practices including those provided in the operating and conservation regulations for the outer Continental Shelf; to remove all structures when no longer required for operations under the lease to sufficient depth beneath the surface of the waters to prevent them from being a hazard to navigation; to carry out at expense of the lessee all lawful and reasonable orders of the lessor relative to the matters in this paragraph, and that on failure of the lessee so to do the lessor shall have the right to enter on the property and to accomplish the purpose of such orders at the lessee's cost: *Provided,* That the lessee shall not be held responsible for delays or casualties occasioned by causes beyond the lessee's control.

(j) *Freedom of purchase.*—To accord all workmen and employees directly engaged in any of the operations under this lease complete freedom of purchase.

(k) *Nondiscrimination.*—Not to discriminate against any employee, or applicant for employment, because of race, creed, color or national origin, and to require an identical provision to be included in all sub-contracts relating to operations under this lease.

(l) *Assignment of lease.*—To file for approval with the Bureau of Land Management, within 90 days from the date of final execution, any instrument of transfer of this lease, or any interest therein, including assignments of record title, operating agreements, and subleases. Carried working interests, overriding royalty interests, or payments out of production, may be created or transferred without requirement for filing or approval. Instruments required to be filed shall take effect upon approval as of the first day of the lease month following the date of filing unless at the request of the parties an earlier date is specified in such approval.

SEC. 3. *Reservations to lessor.*—The lessor reserves:

(a) *Geological and geophysical exploration; rights-of-way.*—The right to authorize the conduct of geological and geophysical exploration in the leased area which does not interfere with or endanger actual operations under this lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands containing the deposits described in the act, and to the treatment and shipment of products thereof by or under authority of the United States, its lessees or permittees, and for other public purposes, subject to the provisions of section 5 (c) of the act where they are applicable and to all lawful and reasonable regulations and conditions prescribed by the Secretary thereunder.

(b) *Leases of sulfur and other mineral.*—The right to grant sulfur leases and leases of any mineral other than oil, gas, and sulfur within the leased area or any part thereof, subject to the provisions of section 8(c), 8(d), and 8(e) of the act and all lawful and reasonable regulations prescribed by the Secretary thereunder: *Provided,* That no such sulfur lease or lease of other mineral shall authorize or permit the lessee thereunder unreasonably to interfere with or endanger operations under this lease.

(c) *Purchase of production.*—In time of war, or when the President of the United States shall so prescribe, the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in section 12(b) of the act.

(d) *Taking of royalties.*—All rights, pursuant to clause (3) of section 8(b) of the act, to take royalties in the amount or value of production.

(e) *Fissionable materials.*—All uranium, thorium, and all other materials determined pursuant to paragraph (1) of subsection (b) of section 5 of the Atomic Energy Act of 1946, as amended, to be peculiarly essential to the production of fissionable materials, contained, in whatever concentration, in deposits in the subsoil or seabed of the leased area or any part thereof, as provided in section 12(e) of the act.

(f) *Helium.*—Pursuant to section 12(f) of the act, the ownership and the right to extract helium from all gas produced under this lease, subject to such rules and regulations as shall be prescribed by the Secretary.

(g) *Suspension of operations during war or national emergency.*—Upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or President of the United States after August 7, 1953, the authority of the Secretary to suspend any or all operations under this lease, as provided in section 12(c) of the act: *Provided,* That just compensation shall be paid by the lessor to the lessee.

(h) *Restriction of exploration and operations.*—The right, as provided in section 12(d) of the act, to restrict from exploration and

operations the leased area or any part thereof which may be designated by and through the Secretary of Defense, with the approval of the President, as, or as part of, an area of the outer Continental Shelf needed for national defense; and so long as such designation remains in effect no exploration or operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense; and if operations or production under this lease within any such restricted area shall be suspended, any payments of rentals, minimum royalty, and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the lessor shall be liable to the lessee for such compensation as is required to be paid under the Constitution of the United States.

SEC. 4. *Directional drilling.*—This lease may be maintained in force by directional wells drilled under the leased area from surface locations on adjacent or adjoining lands not covered by this lease. In such circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the adjacent or adjoining land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on adjacent or adjoining land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations (as the case may be) on the leased area for all purposes of this lease. Nothing contained in this paragraph is intended or shall be construed as granting to the lessee any leasehold interests, licenses, easements, or other rights in or with respect to any such adjacent or adjoining land in addition to any such leasehold interests, licenses, easements, or other rights which the lessee may have lawfully acquired under the act or from the lessor or others.

SEC. 5. *Surrender and termination of lease.*—The lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the Bureau of Land Management, a written relinquishment, in triplicate, which shall be effective as of the date of filing, subject to the continued obligation of the lessee and his surety to make payment of all accrued rentals and royalties and to abandon all wells on the area to be relinquished to the satisfaction of the oil and gas supervisor.

SEC. 6. *Removal of property on termination of lease.*—Upon the expiration of this lease, or the earlier termination thereof as herein provided, the lessee shall within a period of 1 year thereafter remove from the premises all structures, machinery, equipment, tools, and materials other than improvements needed for producing wells or for drilling or producing on other leases and other property permitted by the lessor to be maintained on the area.

SEC. 7. *Remedies in case of default.*—(a) Whenever the lessee fails to comply with any of the provisions of the act or this lease or the applicable regulations in force and effect on the date of issuance of this lease, the lease shall be subject to cancellation as follows:

(1) *Cancellation of non-producing lease.*—If, at the time of such default, no well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be canceled by the Secretary (subject to the right of judicial review as provided in section 8(j) of the act) if such default continues for the period of 30 days after mailing of notice by registered letter to the lessee at the lessee's record post office address.

(2) *Cancellation of producing lease.*—If, at the time of such default, any well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be canceled by an appropriate proceeding in any United States district court having jurisdiction under the provisions of section 4(b) of the act if such default continues for the period of 30 days after mailing of notice by registered letter to the lessee at the lessee's record post office address.

(b) *Other remedies.*—If any such default continues for the period of 30 days after mailing of notice by registered letter to the lessee at the lessee's record post office address, the lessor may then exercise any legal or equitable remedy which the lessor may have; however, the remedy of cancellation of this lease may be exercised only under the conditions and subject to the limitations set out above in paragraph (a) of this section, or pursuant to section 8(i) of the act.

(c) *Effect of waiver of default.*—A waiver of any particular default shall not prevent the cancellation of this lease or the exercise of any other remedy the lessor may have by reason of any other cause or for the same cause occurring at any other time.

SEC. 8. *Heirs and successors in interest.*—Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

SEC. 9. *Unlawful interest.*—No member of, or Delegate to, Congress, or Resident Commissioner, after his election or appointment, or either before or after he has qualified, and during his continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR 7.4(a)(1), shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom; and the provisions of section 3741 of the Revised Statutes, as amended (41 U.S.C., sec. 22), and sections 431, 432 and 433 of Title 18 of the United States Code, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease so far as the same may be applicable.

*IN WITNESS WHEREOF:*

WITNESSES TO SIGNATURE OF LESSEE

<div style="display:flex">

*[signature]*
H. J. WARNER
300 OIL & GAS BLDG.
HOUSTON 2, TEXAS
(Name and address)

*[signature]*
B. W. PURDUM
300 OIL & GAS BLDG.
HOUSTON 2, TEXAS
(Name and address)

</div>

THE UNITED STATES OF AMERICA

By *[signature]*

Manager, Bureau of Land Management
New Orleans Office                    MAY 8 1962
(Title)                                    (Date)

FOREST OIL CORPORATION

*[signature]*
DAVID F. DORN, VICE PRESIDENT (Lessee)

*If this ... is executed by a corporation, it must bear the corporate seal*

U. S. GOVERNMENT PRINTING OFFICE   16—70376-1

**OCS-G 1029**

Form 1155
(May 1954)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

RECEIVED
MAY 4 1962
Bureau of Land Management
New Orleans, La.

Cash Bonus ___$2,227,778.___
Rental Rate ___$3.___
Minimum royalty rate ___$3.___
Royalty rate ___1/6___

Office _____ NEW ORLEANS

Serial _____ OCS-G-1029

# OIL AND GAS LEASE OF SUBMERGED LANDS UNDER THE
# OUTER CONTINENTAL SHELF LANDS ACT

This indenture of lease entered into and effective as of ___JUN 1 1962___, by and between the United States of America, hereinafter called the lessor, by the Director, Bureau of Land Management, and

FOREST OIL CORPORATION
300 Oil and Gas Building
Houston, Texas

hereinafter called the lessee, under, pursuant, and subject to the terms and provisions of the Outer Continental Shelf Lands Act of August 7, 1953 (67 Stat. 462; 43 U. S. C., sec. 1331, *et seq.*), hereinafter referred to as the act, and to all lawful and reasonable regulations of the Secretary of the Interior (hereinafter referred to as the Secretary) when not inconsistent with any express and specific provisions herein, which are made a part hereof:

WITNESSETH:

SECTION 1. *Rights of lessee.*—That the lessor, in consideration of a cash bonus and of the rents and royalties to be paid, and the conditions and covenants to be observed as herein set forth, does hereby grant and lease to the lessee the exclusive right and privilege to drill for, mine, extract, remove and dispose of all oil and gas deposits except helium gas in or under the following-described area of the outer Continental Shelf (as that term is defined in the act):

AREA

Block 248, Ship Shoal, South Addition, as shown on official leasing map La. No. 5A, Outer Continental Shelf Leasing Map, Louisiana Offshore Operations.

containing ___5,000___ acres, more or less (hereinafter referred to as the leased area), together with:

(*a*) the non-exclusive right to conduct within the leased area geological and geophysical explorations which are not unduly harmful to aquatic life;

(*b*) the right to drill water wells within the leased area and use free of cost, and to dispose of, water produced from such wells; and

(*c*) the right to construct or erect and to maintain within the leased area all artificial islands, platforms, fixed or floating structures, sea walls, docks, dredged channels and spaces, buildings, plants, telegraph or telephone lines and cables, pipelines, reservoirs, tanks, pumping stations, and other works and structures necessary or convenient to the full enjoyment of the rights granted by this lease,

for a period of 5 years and as long thereafter as oil or gas may be produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Secretary, are conducted thereon; subject to any unitization or pooling agreement heretofore or hereafter approved by the Secretary which affects the leased area or any part thereof, the provisions of such agreements to govern the leased area or part thereof subject thereto where inconsistent with the terms of this lease.

SEC. 2. *Obligations of lessee.*—In consideration of the foregoing, the lessee agrees:

(*a*) *Bonds.*—To maintain at all times the bond required prior to the issuance of this lease and to furnish such additional security as may be required by the lessor if, after operations or production have begun, the lessor deems such additional security to be necessary.

(*b*) *Cooperative or unit plan.*—Within 30 days after demand, to subscribe to and to operate under such reasonable cooperative or unit plan for the development and operation of the area, field, or pool, or part thereof, embracing lands included herein as the Secretary may determine to be practicable and necessary or advisable in the interest of conservation, which plan shall adequately protect the rights of all parties in interest, including the United States.

(*c*) *Wells.*—(1) To drill and produce such wells as are necessary to protect the lessor from loss by reason of production on other properties or, in lieu thereof, with the consent of the oil and gas supervisor, to pay a sum determined by the supervisor as adequate to compensate the lessor for failure to drill and produce any such well. In the event that this lease is not being maintained in force by other production of oil or gas in paying quantities or by other approved drilling or reworking operations, such payments shall be considered as the equivalent of production in paying quantities for all purposes of this lease.

(2) After due notice in writing, to drill and produce such other wells as the Secretary may reasonably require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with good operating practice.

(3) At the election of the lessee, to drill and produce other wells in conformity with any system of well spacing or production allotments affecting the area, field, or pool in which the leased area or any part thereof is situated, which is authorized or sanctioned by applicable law or by the Secretary.

(*d*) *Rentals and royalties.*—(1) To pay rentals and royalties as follows:

*Rentals.*—To pay the lessor on or before the first day of each lease year commencing prior to a discovery of oil or gas on the leased area, a rental of ___$3.___ per acre or fraction thereof.

*Minimum royalty.*—To pay the lessor in lieu of rental at the expiration of each lease year commencing after discovery a minimum royalty of ___$3.___ per acre or fraction thereof or, if there is production, the difference between the actual royalty paid during the year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

*Royalty on production.*—To pay the lessor a royalty of ___16-2/3___ percent in amount or value of production saved, removed, or sold from the leased area. Gas of all kinds (except helium, and gas used for purposes of production from and operations upon the leased area or unavoidably lost) is subject to royalty.

(2) It is expressly agreed that the Secretary may establish reasonable minimum values for purposes of computing royalty on products obtained from this lease, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, or area, to the price received by the lessee, to posted prices, and to other relevant matters. Each such determination shall be made only after due notice to the lessee and a reasonable opportunity has been afforded the lessee to be heard.

(3) When paid in value, such royalties on production shall be due and payable monthly on the last day of the calendar month next following the calendar month in which the production is obtained. When paid in production, such royalties shall be delivered at pipeline connections or in tanks provided by the lessee. Such deliveries shall be made at reasonable times and intervals and, at the lessee's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The lessee shall not be required to provide storage for royalty taken in kind in excess of tankage required when royalty is paid in value. When payments are made in production the lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the lessee has no control.

(4) Rentals or minimum royalties may be reduced and royalties on the entire leasehold or any deposit, tract, or portion thereof segregated for royalty purposes may be reduced if the Secretary finds that, for the purpose of increasing the ultimate recovery of oil or gas and in the interest of conservation of natural resources, it is necessary, in his judgment, to do so in order to promote development, or because the lease cannot be successfully operated under the terms fixed herein.

(*e*) *Payments.*—Unless otherwise provided by regulation or directed by the Secretary, to make rental, royalty, or other payments to the lessor, to the order of the Treasurer of the United States, and to tender such payments to the oil and gas supervisor, Geological Survey.

(*f*) *Contracts for disposal of products.*—To file with the oil and gas supervisor, Geological Survey, not later than 30 days after the effective date thereof, copies of all contracts for the disposal of lease products; provided that the supervisor may relieve the lessee of this requirement, in which event the contracts shall be made available

16—70375-1

for inspection by the supervisor upon his request. Nothing in any such contract or in any approval thereof by the supervisor shall be construed or accepted as modifying any of the provisions of this lease, including, but not limited to, provisions relating to gas waste, taking royalty in kind, and the method of computing royalties due as based on a minimum valuation and in accordance with the regulations applicable to this lease.

(g) *Statements, plats, and reports.*—At such times and in such form as the lessor may prescribe, to furnish detailed statements and reports showing the amounts and quality of all products saved, removed, and sold from the leased area, the proceeds therefrom, and the amount used for production purposes or unavoidably lost; also a plat showing development work and improvements on or with regard to the leased area.

(h) *Inspection.*—To keep open at all reasonable times for the inspection of any duly authorized representative of the lessor, the leased area and all wells, improvements, machinery and fixtures thereon and all books, accounts and records relative to operations and surveys or investigations on or with regard to the leased area or under the lease.

(i) *Diligence.*—To exercise reasonable diligence in drilling and producing the wells herein provided for; to carry on all operations in accordance with approved methods and practices including those provided in the operating and conservation regulations for the outer Continental Shelf; to remove all structures when no longer required for operations under the lease to sufficient depth beneath the surface of the waters to prevent them from being a hazard to navigation; to carry out at expense of the lessee all lawful and reasonable orders of the lessor relative to the matters in this paragraph, and that on failure of the lessee so to do the lessor shall have the right to enter on the property and to accomplish the purpose of such orders at the lessee's cost: *Provided,* That the lessee shall not be held responsible for delays or casualties occasioned by causes beyond the lessee's control.

(j) *Freedom of purchase.*—To accord all workmen and employees directly engaged in any of the operations under this lease complete freedom of purchase.

(k) *Nondiscrimination.*—Not to discriminate against any employee, or applicant for employment, because of race, creed, color or national origin, and to require an identical provision to be included in all sub-contracts relating to operations under this lease.

(l) *Assignment of lease.*—To file for approval with the Bureau of Land Management, within 90 days from the date of final execution, any instrument of transfer of this lease, or any interest therein, including assignments of record title, operating agreements, and subleases. Carried working interests, overriding royalty interests, or payments out of production, may be created or transferred without requirement for filing or approval. Instruments required to be filed shall take effect upon approval as of the first day of the lease month following the date of filing unless at the request of the parties an earlier date is specified in such approval.

SEC. 3. *Reservations to lessor.*—The lessor reserves:

(a) *Geological and geophysical exploration; rights-of-way.*—The right to authorize the conduct of geological and geophysical exploration in the leased area which does not interfere with or endanger actual operations under this lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands containing the deposits described in the act, and to the treatment and shipment of products thereof by or under authority of the United States, its lessees or permittees, and for other public purposes, subject to the provisions of section 5 (c) of the act where they are applicable and to all lawful and reasonable regulations and conditions prescribed by the Secretary thereunder.

(b) *Leases of sulfur and other mineral.*—The right to grant sulfur leases and leases of any mineral other than oil, gas, and sulfur within the leased area or any part thereof, subject to the provisions of section 8(c), 8(d), and 8(e) of the act and all lawful and reasonable regulations prescribed by the Secretary thereunder: *Provided,* That no such sulfur lease or lease of other mineral shall authorize or permit the lessee thereunder unreasonably to interfere with or endanger operations under this lease.

(c) *Purchase of production.*—In time of war, or when the President of the United States shall so prescribe, the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in section 12(b) of the act.

(d) *Taking of royalties.*—All rights, pursuant to clause (3) of section 8(b) of the act, to take royalties in the amount or value of production.

(e) *Fissionable materials.*—All uranium, thorium, and all other materials determined pursuant to paragraph (1) of subsection (b) of section 5 of the Atomic Energy Act of 1946, as amended, to be peculiarly essential to the production of fissionable materials, contained, in whatever concentration, in deposits in the subsoil or seabed of the leased area or any part thereof, as provided in section 12(e) of the act.

(f) *Helium.*—Pursuant to section 12(f) of the act, the ownership and the right to extract helium from all gas produced under this lease, subject to such rules and regulations as shall be prescribed by the Secretary.

(g) *Suspension of operations during war or national emergency.*—Upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or President of the United States after August 7, 1953, the authority of the Secretary to suspend any or all operations under this lease, as provided in section 12(c) of the act: *Provided,* That just compensation shall be paid by the lessor to the lessee.

(h) *Restriction of exploration and operations.*—The right, as provided in section 12(d) of the act, to restrict from exploration and

IN WITNESS WHEREOF:

operations the leased area or any part thereof which may be designated by and through the Secretary of Defense, with the approval of the President, as, or as part of, an area of the outer Continental Shelf needed for national defense; and so long as such designation remains in effect no exploration or operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense; and if operations or production under this lease within any such restricted area shall be suspended, any payments of rentals, minimum royalty, and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the lessor shall be liable to the lessee for such compensation as is required to be paid under the Constitution of the United States.

SEC. 4. *Directional drilling.*—This lease may be maintained in force by directional wells drilled under the leased area from surface locations on adjacent or adjoining lands not covered by this lease. In such circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the adjacent or adjoining land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on adjacent or adjoining land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations (as the case may be) on the leased area for all purposes of this lease. Nothing contained in this paragraph is intended or shall be construed as granting to the lessee any leasehold interests, licenses, easements, or other rights in or with respect to any such adjacent or adjoining land in addition to any such leasehold interests, licenses, easements, or other rights which the lessee may have lawfully acquired under the act or from the lessor or others.

SEC. 5. *Surrender and termination of lease.*—The lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the Bureau of Land Management, a written relinquishment, in triplicate, which shall be effective as of the date of filing, subject to the continued obligation of the lessee and his surety to make payment of all accrued rentals and royalties and to abandon all wells on the area to be relinquished to the satisfaction of the oil and gas supervisor.

SEC. 6. *Removal of property on termination of lease.*—Upon the expiration of this lease, or the earlier termination thereof as herein provided, the lessee shall within a period of 1 year thereafter remove from the premises all structures, machinery, equipment, tools, and materials other than improvements needed for producing wells or for drilling or producing on other leases and other property permitted by the lessor to be maintained on the area.

SEC. 7. *Remedies in case of default.*—(a) Whenever the lessee fails to comply with any of the provisions of the act or this lease or the applicable regulations in force and effect on the date of issuance of this lease, the lease shall be subject to cancellation as follows:

(1) *Cancellation of non-producing lease.*—If, at the time of such default, no well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be canceled by the Secretary (subject to the right of judicial review as provided in section 8(j) of the act) if such default continues for the period of 30 days after mailing of notice by registered letter to the lessee at the lessee's record post office address.

(2) *Cancellation of producing lease.*—If, at the time of such default, any well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be canceled by an appropriate proceeding in any United States district court having jurisdiction under the provisions of section 4(b) of the act if such default continues for the period of 30 days after mailing of notice by registered letter to the lessee at the lessee's record post office address.

(b) *Other remedies.*—If any such default continues for the period of 30 days after mailing of notice by registered letter to the lessee at the lessee's record post office address, the lessor may then exercise any legal or equitable remedy which the lessor may have; however, the remedy of cancellation of this lease may be exercised only under the conditions and subject to the limitations set out above in paragraph (a) of this section, or pursuant to section 8(i) of the act.

(c) *Effect of waiver of default.*—A waiver of any particular default shall not prevent the cancellation of this lease or the exercise of any other remedy for the lessor may have by reason of any other cause or for the same cause occurring at any other time.

SEC. 8. *Heirs and successors in interest.*—Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

SEC. 9. *Unlawful interest.*—No member of, or Delegate to, Congress, or Resident Commissioner, after his election or appointment, or either before or after he has qualified, and during his continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR 7.4(a)(1), shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom; and the provisions of section 3741 of the Revised Statutes, as amended (41 U.S.C., sec. 22), and sections 431, 432 and 433 of Title 18 of the United States Code, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease so far as the same may be applicable.

THE UNITED STATES OF AMERICA

By _James L. _____

MAY 8 1962

Manager, Bureau of Land Management
New Orleans Office

(Date)

WITNESSES TO SIGNATURE OF LESSEE

FOREST OIL CORPORATION

_____ (Lessee)

DAVID F. DORN, VICE PRESIDENT

H. J. WARNER
300 OIL & GAS BLDG.
HOUSTON 2, TEXAS
(Name and address)

B. W. PURDUM
300 OIL & GAS BLDG.
HOUSTON 2, TEXAS
(Name and address)

If this lease is executed by a corporation, it must bear the corporate seal

U. S. GOVERNMENT PRINTING OFFICE   16—70378—1

**OCS-G 1030**

Form 1
May 1...

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Cash Bonus  $3,107,778.
Rental Rate  $3.
Minimum royalty rate  $3.
Royalty rate  1/6

Office  NEW ORLEANS

Serial  OCS-G-1030

# OIL AND GAS LEASE OF SUBMERGED LANDS UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

This indenture of lease entered into and effective as of _____ JUN 1 1962 _____, by and between the United States of America, hereinafter called the lessor, by the Director, Bureau of Land Management, and

FOREST OIL CORPORATION
300 Oil and Gas Building
Houston, Texas

hereinafter called the lessee, under, pursuant, and subject to the terms and provisions of the Outer Continental Shelf Lands Act of August 7, 1953 (67 Stat. 462; 43 U. S. C., sec. 1331, *et seq.*), hereinafter referred to as the act, and to all lawful and reasonable regulations of the Secretary of the Interior (hereinafter referred to as the Secretary) when not inconsistent with any express and specific provisions herein, which are made a part hereof:

WITNESSETH:

SECTION 1. *Rights of lessee.*—That the lessor, in consideration of a cash bonus and of the rents and royalties to be paid, and the conditions and covenants to be observed as herein set forth, does hereby grant and lease to the lessee the exclusive right and privilege to drill for, mine, extract, remove and dispose of all oil and gas deposits except helium gas in or under the following-described area of the outer Continental Shelf (as that term is defined in the act):

> Block 249, Ship Shoal Area, South Addition, as shown on official leasing map La. No. 5A, Outer Continental Shelf Leasing Map, Louisiana Offshore Operations.

containing ____5,000____ acres, more or less (hereinafter referred to as the leased area), together with:

(*a*) the non-exclusive right to conduct within the leased area geological and geophysical explorations which are not unduly harmful to aquatic life;

(*b*) the right to drill water wells within the leased area and use free of cost, and to dispose of, water produced from such wells; and

(*c*) the right to construct or erect and to maintain within the leased area all artificial islands, platforms, fixed or floating structures, sea walls, docks, dredged channels and spaces, buildings, plants, telegraph or telephone lines and cables, pipelines, reservoirs, tanks, pumping stations, and other works and structures necessary or convenient to the full enjoyment of the rights granted by this lease,

for a period of 5 years and as long thereafter as oil or gas may be produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Secretary, are conducted thereon; subject to any unitization or pooling agreement heretofore or hereafter approved by the Secretary which affects the leased area or any part thereof, the provisions of such agreements to govern the leased area or part thereof subject thereto where inconsistent with the terms of this lease.

SEC. 2. *Obligations of lessee.*—In consideration of the foregoing, the lessee agrees:

(*a*) *Bonds.*—To maintain at all times the bond required prior to the issuance of this lease and to furnish such additional security as may be required by the lessor if, after operations or production have begun, the lessor deems such additional security to be necessary.

(*b*) *Cooperative or unit plan.*—Within 30 days after demand, to subscribe to and to operate under such reasonable cooperative or unit plan for the development and operation of the area, field, or pool, or part thereof, embracing lands included herein as the Secretary may determine to be practicable and necessary or advisable in the interest of conservation which plan shall adequately protect the rights of all parties in interest, including the United States.

(*c*) *Wells.*—(1) To drill and produce such wells as are necessary to protect the lessor from loss by reason of production on other properties or, in lieu thereof, with the consent of the oil and gas supervisor, to pay a sum determined by the supervisor as adequate to compensate the lessor for failure to drill and produce any such well. In the event that this lease is not being maintained in force by other production of oil or gas in paying quantities or by other approved drilling or reworking operations, such payments shall be considered as the equivalent of production in paying quantities for all purposes of this lease.

(2) After due notice in writing, to drill and produce such wells as the Secretary may reasonably require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with good operating practice.

(3) At the election of the lessee, to drill and produce other wells in conformity with any system of well spacing or production allotments affecting the area, field, or pool in which the leased area or any part thereof is situated, which is authorized or sanctioned by applicable law or by the Secretary.

(*d*) *Rentals and royalties.*—(1) To pay rentals and royalties as follows:

*Rentals.*—To pay the lessor on or before the first day of each lease year commencing prior to a discovery of oil or gas on the leased area, a rental of ____$3.____ per acre or fraction thereof.

*Minimum royalty.*—To pay the lessor in lieu of rental at the expiration of each lease year commencing after discovery a minimum royalty of ____$3.____ per acre or fraction thereof or, if there is production, the difference between the actual royalty paid during the year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

*Royalty on production.*—To pay the lessor a royalty of ____16-2/3____ percent in amount or value of production saved, removed, or sold from the leased area. Gas of all kinds (except helium, and gas used for purposes of production from and operations upon the leased area or unavoidably lost) is subject to royalty.

(2) It is expressly agreed that the Secretary may establish reasonable minimum values for purposes of computing royalty on products obtained from this lease, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, or area, to the price received by the lessee, to posted prices, and to other relevant matters. Each such determination shall be made only after due notice to the lessee and a reasonable opportunity has been afforded the lessee to be heard.

(3) When paid in value, such royalties on production shall be due and payable monthly on the last day of the calendar month next following the calendar month in which the production is obtained. When paid in production, such royalties shall be delivered at pipeline connections or in tanks provided by the lessee. Such deliveries shall be made at reasonable times and intervals and, at the lessee's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The lessee shall not be required to provide storage for royalty taken in kind in excess of tankage required when royalty is paid in value. When payments are made in production the lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the lessee has no control.

(4) Rentals or minimum royalties may be reduced and royalties on the entire leasehold or any deposit, tract, or portion thereof segregated for royalty purposes may be reduced if the Secretary finds that, for the purpose of increasing the ultimate recovery of oil or gas and in the interest of conservation of natural resources, it is necessary, in his judgment, to do so in order to promote development, or because the lease cannot be successfully operated under the terms fixed herein.

(*e*) *Payments.*—Unless otherwise provided by regulation or directed by the Secretary, to make rental, royalty, or other payments to the lessor, to the order of the Treasurer of the United States, and to tender such payments to the oil and gas supervisor, Geological Survey.

(*f*) *Contracts for disposal of products.*—To file with the oil and gas supervisor, Geological Survey, not later than 30 days after the effective date thereof, copies of all contracts for the disposal of lease products; provided that the supervisor may relieve the lessee of this requirement, in which event the contracts shall be made available

16—70876-1

for inspection by the supervisor upon his request. Nothing in any such contract or in any approval thereof by the supervisor shall be construed or accepted as modifying any of the provisions of this lease, including, but not limited to, provisions relating to gas waste, taking royalty in kind, and the method of computing royalties due as based on a minimum valuation and in accordance with the regulations applicable to this lease.

(g) *Statements, plats, and reports.*—At such times and in such form as the lessor may prescribe, to furnish detailed statements and reports showing the amounts and quality of all products saved, removed, and sold from the leased area, the proceeds therefrom, and the amount used for production purposes or unavoidably lost; also a plat showing development work and improvements on or with regard to the leased area.

(h) *Inspection.*—To keep open at all reasonable times for the inspection of any duly authorized representative of the lessor, the leased area and all wells, improvements, machinery and fixtures thereon and all books, accounts and records relative to operations and surveys or investigations on or with regard to the leased area or under the lease.

(i) *Diligence.*—To exercise reasonable diligence in drilling and producing the wells herein provided for; to carry on all operations in accordance with approved methods and practices including those provided in the operating and conservation regulations for the outer Continental Shelf; to remove all structures when no longer required for operations under the lease to sufficient depth beneath the surface of the waters to prevent them from being a hazard to navigation; to carry out at expense of the lessee all lawful and reasonable orders of the lessor relative to the matters in this paragraph, and that on failure of the lessee so to do the lessor shall have the right to enter on the property and to accomplish the purpose of such orders at the lessee's cost: *Provided,* That the lessee shall not be held responsible for delays or casualties occasioned by causes beyond the lessee's control.

(j) *Freedom of purchase.*—To accord all workmen and employees directly engaged in any of the operations under this lease complete freedom of purchase.

(k) *Nondiscrimination.*—Not to discriminate against any employee, or applicant for employment, because of race, creed, color or national origin, and to require an identical provision to be included in all sub-contracts relating to operations under this lease.

(l) *Assignment of lease.*—To file for approval with the Bureau of Land Management, within 90 days from the date of final execution, any instrument of transfer of this lease, or any interest herein, including assignments of record title, operating agreements, and subleases. Carried working interests, overriding royalty interests, or payments out of production, may be created or transferred without requirement for filing or approval. Instruments required to be filed shall take effect upon approval as of the first day of the lease month following the date of filing unless at the request of the parties an earlier date is specified in such approval.

SEC. 3. *Reservations to lessor.*—The lessor reserves:

(a) *Geological and geophysical exploration; rights-of-way.*—The right to authorize the conduct of geological and geophysical exploration in the leased area which does not interfere with or endanger actual operations under this lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands containing the deposits described in the act, and to the treatment and shipment of products thereof by or under authority of the United States, its lessees or permittees, and for other public purposes, subject to the provisions of section 5 (c) of the act where they are applicable and to all lawful and reasonable regulations and conditions prescribed by the Secretary thereunder.

(b) *Leases of sulfur and other mineral.*—The right to grant sulfur leases and leases of any mineral other than oil, gas, and sulfur within the leased area or any part thereof, subject to the provisions of section 8(c), 8(d), and 8(e) of the act and all lawful and reasonable regulations prescribed by the Secretary thereunder: *Provided,* That no such sulfur lease or lease of other mineral shall authorize or permit the lessee thereunder unreasonably to interfere with or endanger operations under this lease.

(c) *Purchase of production.*—In time of war, or when the President of the United States shall so prescribe, the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in section 12(b) of the act.

(d) *Taking of royalties.*—All rights, pursuant to clause (3) of section 8(b) of the act, to take royalties in the amount or value of production.

(e) *Fissionable materials.*—All uranium, thorium, and all other materials determined pursuant to paragraph (1) of subsection (b) of section 5 of the Atomic Energy Act of 1946, as amended, to be peculiarly essential to the production of fissionable materials, contained, in whatever concentration, in deposits in the subsoil or seabed of the leased area or any part thereof, as provided in section 12(e) of the act.

(f) *Helium.*—Pursuant to section 12(f) of the act, the ownership and the right to extract helium from all gas produced under this lease, subject to such rules and regulations as shall be prescribed by the Secretary.

(g) *Suspension of operations during war or national emergency.*—Upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or President of the United States after August 7, 1953, the authority of the Secretary to suspend any or all operations under this lease, as provided in section 12(c) of the act: *Provided,* That just compensation shall be paid by the lessee to the lessee.

(h) *Restriction of exploration and operations.*—The right, as provided in section 12(d) of the act, to restrict from exploration and

operations the leased area or any part thereof which may be designated by and through the Secretary of Defense, with the approval of the President, as, or as part of, an area of the outer Continental Shelf needed for national defense; and so long as such designation remains in effect no exploration or operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense; and if operations or production under this lease within any such restricted area shall be suspended, any payments of rentals, minimum royalty, and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the lessor shall be liable to the lessee for such compensation as is required to be paid under the provisions of the United States.

SEC. 4. *Directional drilling.*—This lease may be maintained in force by directional wells drilled under the leased area from surface locations on adjacent or adjoining lands not covered by this lease. In such circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the adjacent or adjoining land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on adjacent or adjoining land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations (as the case may be) on the leased area for all purposes of this lease. Nothing contained in this paragraph is intended or shall be construed as granting to the lessee any leasehold interests, licenses, easements, or other rights in or with respect to any such adjacent or adjoining land in addition to any such leasehold interests, licenses, easements, or other rights which the lessee may have lawfully acquired under the act or from the lessor or others.

SEC. 5. *Surrender and termination of lease.*—The lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the Bureau of Land Management, a written relinquishment, in triplicate, which shall be effective as of the date of filing, subject to the continued obligation of the lessee and his surety to make payment of all accrued rentals and royalties and to abandon all wells on the area to be relinquished to the satisfaction of the oil and gas supervisor.

SEC. 6: *Removal of property on termination of lease.*—Upon the expiration of this lease, or the earlier termination thereof as herein provided, the lessee shall within a period of 1 year thereafter remove from the premises all structures, machinery, equipment, tools, and materials other than improvements needed for producing wells or for drilling or producing on other leases and other property permitted by the lessor to be maintained on the area.

SEC. 7. *Remedies in case of default.*—(a) Whenever the lessee fails to comply with any of the provisions of the act or this lease or the applicable regulations in force and effect on the date of issuance of this lease, the lease shall be subject to cancellation as follows:

(1) *Cancellation of non-producing lease.*—If, at the time of such default, no well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be canceled by the Secretary (subject to the right of judicial review as provided in section 8(j) of the act) if such default continues for the period of 30 days after mailing of notice by registered letter to the lessee at the lessee's record post office address.

(2) *Cancellation of producing lease.*—If, at the time of such default, any well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be canceled by an appropriate proceeding in any United States district court having jurisdiction under the provisions of section 4(b) of the act if such default continues for the period of 30 days after mailing of notice by registered letter to the lessee at the lessee's record post office address.

(b) *Other remedies.*—If any such default continues for the period of 30 days after mailing of notice by registered letter to the lessee at the lessee's record post office address, the lessor may then exercise any legal or equitable remedy which the lessor may have; however, the remedy of cancellation of this lease may be exercised only under the conditions and subject to the limitations set out above in paragraph (a) of this section, or pursuant to section 8(i) of the act.

(c) *Effect of waiver of default.*—A waiver of any particular default shall not prevent the cancellation of this lease or the exercise of any other remedy the lessor may have by reason of any other cause or for the same cause occurring at any other time.

SEC. 8. *Heirs and successors in interest.*—Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

SEC. 9. *Unlawful interest.*—No member of, or Delegate to, Congress, or Resident Commissioner, after his election or appointment, or either before or after he has qualified, and during his continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR 7.4(a)(1), shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom; and the provisions of section 3741 of the Revised Statutes, as amended (41 U.S.C., sec. 22), and sections 431, 432 and 433 of Title 18 of the United States Code, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease so far as the same may be applicable.

*IN WITNESS WHEREOF:*

WITNESSES TO SIGNATURE OF LESSEE:

THE UNITED STATES OF AMERICA

By [signature]

Manager, Bureau of Land Management
New Orleans Office                    MAY 8 1962

    (Title)                              (Date)

H. J. WARNER
300 OIL & GAS BLDG.
HOUSTON 2, TEXAS

[signature]
(Name and Address)

FOREST OIL CORPORATION

B. W. PURDUM
300 OIL & GAS BLDG.
HOUSTON 2, TEXAS

[signature]
(Name and address)

[signature]
DAVID F. DORN, VICE PRESIDENT (Lessee)

*If this lease is executed by a corporation, it must bear the corporate seal*

U. S. GOVERNMENT PRINTING OFFICE   16—70375-1

**OCS-G 1031**

Form 4-1255
(May 1954)

**UNITED STATES**
**DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**

RECEIVED
MAY 7 1962
Bureau of
Land Management
New Orleans, La.

| | |
|---|---|
| Cash Bonus | $2,808,000. |
| Rental Rate | $3. |
| Minimum royalty rate | $3. |
| Royalty rate | 1/6 |

Office _____ NEW ORLEANS

Serial _____ OCS-G 1031

# OIL AND GAS LEASE OF SUBMERGED LANDS UNDER THE
# OUTER CONTINENTAL SHELF LANDS ACT

JUN 1 1962

This indenture of lease entered into and effective as of _____, by and between the United States of America, hereinafter called the lessor, by the Director, Bureau of Land Management, and

| | |
|---|---|
| THE OHIO OIL COMPANY  (50%)<br>P. O. Box 3128<br>Houston 1, Texas | THE PURE OIL COMPANY  (50%)<br>P. O. Box 239<br>Houston 1, Texas |

hereinafter called the lessee, under, pursuant, and subject to the terms and provisions of the Outer Continental Shelf Lands Act of August 7, 1953 (67 Stat. 462; 43 U. S. C., sec. 1331, *et seq.*), hereinafter referred to as the act, and to all lawful and reasonable regulations of the Secretary of the Interior (hereinafter referred to as the Secretary) when not inconsistent with any express and specific provisions herein, which are made a part hereof:

WITNESSETH:

SECTION 1. *Rights of lessee.*—That the lessor, in consideration of a cash bonus and of the rents and royalties to be paid, and the conditions and covenants to be observed as herein set forth, does hereby grant and lease to the lessee the exclusive right and privilege to drill for, mine, extract, remove and dispose of all oil and gas deposits except helium gas in or under the following-described area of the outer Continental Shelf (as that term is defined in the act):

Block 253 Ship Shoal Area, South Addition, as shown on official leasing map
La. No. 5A, Outer Continental Shelf Leasing Map, Louisiana Offshore Operations.

containing _____5,000_____ acres, more or less (hereinafter referred to as the leased area), together with:

(a) the non-exclusive right to conduct within the leased area geological and geophysical explorations which are not unduly harmful to aquatic life;

(b) the right to drill water wells within the leased area and use free of cost, and to dispose of, water produced from such wells; and

(c) the right to construct or erect and to maintain within the leased area all artificial islands, platforms, fixed or floating structures, sea walls, docks, dredged channels and spaces, buildings, plants, telegraph or telephone lines and cables, pipelines, reservoirs, tanks, pumping stations, and other works and structures necessary or convenient to the full enjoyment of the rights granted by this lease,

for a period of 5 years and as long thereafter as oil or gas may be produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Secretary, are conducted thereon; subject to any unitization or pooling agreement heretofore or hereafter approved by the Secretary which affects the leased area or any part thereof, the provisions of such agreements to govern the leased area or part thereof subject thereto where inconsistent with the terms of this lease.

SEC. 2. *Obligations of lessee.*—In consideration of the foregoing, the lessee agrees:

(a) *Bonds.*—To maintain at all times the bond required prior to the issuance of this lease and to furnish such additional security as may be required by the lessor if, after operations or production have begun, the lessor deems such additional security to be necessary.

(b) *Cooperative or unit plan.*—Within 30 days after demand, to subscribe to and to operate under such reasonable cooperative or unit plan for the development and operation of the area, field, or pool, or part thereof, embracing lands included herein as the Secretary may determine to be practicable and necessary or advisable in the interest of conservation which plan shall adequately protect the rights of all parties in interest, including the United States.

(c) *Wells.*—(1) To drill and produce such wells as are necessary to protect the lessor from loss by reason of production on other properties or, in lieu thereof, with the consent of the said lessor, supervisor, to pay a sum determined by the supervisor as adequate to compensate the lessor for failure to drill and produce any such well. In the event that this lease is not being maintained in force by other production of oil or gas in paying quantities or by other approved drilling or reworking operations, such payments shall be considered as the equivalent of production in paying quantities for all purposes of this lease.

(2) After due notice in writing, to drill and produce such other wells as the Secretary may reasonably require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with good operating practice.

(3) At the election of the lessee, to drill and produce other wells in conformity with any system of well spacing or production allotments affecting the area, field, or pool in which the leased area or any part thereof is situated, which is authorized or sanctioned by applicable law or by the Secretary.

(d) *Rentals and royalties.*—(1) To pay rentals and royalties as follows:

*Rentals.*—To pay the lessor on or before the first day of each lease year commencing prior to a discovery of oil or gas on the leased area, a rental of _____$3._____ per acre or fraction thereof.

*Minimum royalty.*—To pay the lessor in lieu of rental at the expiration of each lease year commencing after discovery a minimum royalty of _____$3._____ per acre or fraction thereof or, if there is production, the difference between the actual royalty paid during the year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

*Royalty on production.*—To pay the lessor a royalty of _____16-2/3_____ percent in amount or value of production saved, removed, or sold from the leased area. Gas of all kinds (except helium, and gas used for purposes of production from and operations upon the leased area or unavoidably lost) is subject to royalty.

(2) It is expressly agreed that the Secretary may establish reasonable minimum values for purposes of computing royalty on products obtained from this lease, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, or area, to the price received by the lessee, to posted prices, and to other relevant matters. Each such determination shall be made only after due notice to the lessee and a reasonable opportunity has been afforded the lessee to be heard.

(3) When paid in value, such royalties on production shall be due and payable monthly on the last day of the calendar month next following the calendar month in which the production is obtained. When paid in production, such royalties shall be delivered at pipeline connections or in tanks provided by the lessee. Such deliveries shall be made at reasonable times and intervals and, at the lessee's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the lessee, or (ii) at a more convenient point closer to shore or on shore, in which event the lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The lessee shall not be required to provide storage for royalty taken in kind in excess of tankage required when royalty is paid in value. When payments are made in production the lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the lessee has no control.

(4) Rentals or minimum royalties may be reduced and royalties on the entire leasehold or any deposit, tract, or portion thereof segregated for royalty purposes may be reduced if the Secretary finds that, for the purpose of increasing the ultimate recovery of oil or gas and in the interest of conservation of natural resources, it is necessary, in his judgment, to do so in order to promote development, or because the lease cannot be successfully operated under the terms fixed herein.

(e) *Payments.*—Unless otherwise provided by regulation or directed by the Secretary, to make rental, royalty, or other payments to the lessor, to the order of the Treasurer of the United States, and to tender such payments to the oil and gas supervisor, Geological Survey.

(f) *Contracts for disposal of products.*—To file with the oil and gas supervisor, Geological Survey, not later than 30 days after the effective date thereof, copies of all contracts for the disposal of lease products; provided that the supervisor may relieve the lessee of this requirement, in which event the contracts shall be made available

16—70375-1

for inspection by the supervisor upon his request. Nothing in any such contract or in any approval thereof by the supervisor shall be construed or accepted as modifying any of the provisions of this lease, including, but not limited to, provisions relating to gas waste, taking royalty in kind, and the method of computing royalties due as based on a minimum valuation and in accordance with the regulations applicable to this lease.

(g) *Statements, plats, and reports.*—At such times and in such form as the lessor may prescribe, to furnish detailed statements and reports showing the amounts and quality of all products saved, removed, and sold from the leased area, the proceeds therefrom, and the amount used for production purposes or unavoidably lost; also a plat showing development work and improvements on or with regard to the leased area.

(h) *Inspection.*—To keep open at all reasonable times for the inspection of any duly authorized representative of the lessor, the leased area and all wells, improvements, machinery and fixtures thereon and all books, accounts and records relative to operations and surveys or investigations on or with regard to the leased area or under the lease.

(i) *Diligence.*—To exercise reasonable diligence in drilling and producing the wells herein provided for; to carry on all operations in accordance with approved methods and practices including those provided in the operating and conservation regulations for the outer Continental Shelf; to remove all structures when no longer required for operations under the lease to sufficient depth beneath the surface of the waters to prevent them from being a hazard to navigation; to carry out at expense of the lessee all lawful and reasonable orders of the lessor relative to the matters in this paragraph, and that on failure of the lessee so to do the lessor shall have the right to enter on the property and to accomplish the purpose of such orders at the lessee's cost: *Provided,* That the lessee shall not be held responsible for delays or casualties occasioned by causes beyond the lessee's control.

(j) *Freedom of purchase.*—To accord all workmen and employees directly engaged in any of the operations under this lease complete freedom of purchase.

(k) *Nondiscrimination.*—Not to discriminate against any employee, or applicant for employment, because of race, creed, color or national origin, and to require an identical provision to be included in all sub-contracts relating to operations under this lease.

(l) *Assignment of lease.*—To file for approval with the Bureau of Land Management, within 90 days from the date of final execution, any instrument of transfer of this lease, or any interest therein, including assignments of record title, operating agreements, and subleases. Carried working interests, overriding royalty interests, or payments out of production, may be created or transferred without requirement for filing or approval. Instruments required to be filed shall take effect upon approval as of the first day of the lease month following the date of filing unless at the request of the parties an earlier date is specified in such approval.

SEC. 3. *Reservations to lessor.*—The lessor reserves:

(a) *Geological and geophysical exploration; rights-of-way.*—The right to authorize the conduct of geological and geophysical exploration in the leased area which does not interfere with or endanger actual operations under this lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands constituting the deposits described in the act, and to the treatment and shipment of products thereof by or under authority of the United States, its lessees or permittees, and for other public purposes, subject to the provisions of section 5 (c) of the act where they are applicable and to all lawful and reasonable regulations and conditions prescribed by the Secretary thereunder.

(b) *Leases of sulfur and other mineral.*—The right to grant sulfur leases and leases of any mineral other than oil, gas, and sulfur within the leased area or any part thereof, subject to the provisions of section 8(c), 8(d), and 8(e) of the act and all lawful and reasonable regulations prescribed by the Secretary thereunder: *Provided,* That no such sulfur lease or lease of other mineral shall authorize or permit the lessee thereunder unreasonably to interfere with or endanger operations under this lease.

(c) *Purchase of production.*—In time of war, or when the President of the United States shall so prescribe, the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in section 12(b) of the act.

(d) *Taking of royalties.*—All rights, pursuant to clause (3) of section 8(b) of the act, to take royalties in the amount or value of production.

(e) *Fissionable materials.*—All uranium, thorium, and all other materials determined pursuant to paragraph (1) of subsection (b) of section 5 of the Atomic Energy Act of 1946, as amended, to be peculiarly essential to the production of fissionable materials, contained, in whatever concentration, in deposits in the subsoil or seabed of the leased area or any part thereof, as provided in section 12(e) of the act.

(f) *Helium.*—Pursuant to section 12(f) of the act, the ownership and the right to extract helium from all gas produced under this lease, subject to such rules and regulations as shall be prescribed by the Secretary.

(g) *Suspension of operations during war or national emergency.*—Upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or President of the United States after August 7, 1953, the authority of the Secretary to suspend any or all operations under this lease, as provided in section 12(c) of the act: *Provided,* That just compensation shall be paid by the lessor to the lessee.

(h) *Restriction of exploration and operations.*—The right, as provided in section 12(d) of the act, to restrict from exploration and

operations the leased area or any part thereof which may be designated by and through the Secretary of Defense, with the approval of the President, as, or as part of, an area of the outer Continental Shelf needed for national defense; and so long as such designation remains in effect no exploration or operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense; and if operations or production under this lease within any such restricted area shall be suspended, any payments of rentals, minimum royalty, and royalty prescribed by this lease likewise shall be suspended during such period and the term of this lease shall be extended by adding thereto any such suspension period, and the lessor shall be liable to the lessee for such compensation as is required to be paid under the Constitution of the United States.

SEC. 4. *Directional drilling.*—This lease may be maintained in force by directional wells drilled under the leased area from surface locations on adjacent or adjoining lands not covered by this lease. In such circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the adjacent or adjoining land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on adjacent or adjoining land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations (as the case may be) on the leased area for all purposes of this lease. Nothing contained in this paragraph is intended or shall be construed as granting to the lessee any leasehold interests, licenses, easements, or other rights in or with respect to any such adjacent or adjoining land in addition to any such leasehold interests, licenses, easements, or other rights which the lessee may have lawfully acquired under the act or from the lessor or others.

SEC. 5. *Surrender and termination of lease.*—The lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the Bureau of Land Management, a written relinquishment, in triplicate, which shall be effective as of the date of filing, subject to the continued obligation of the lessee and his surety to make payment of all accrued rentals and royalties and to abandon all wells on the area to be relinquished to the satisfaction of the oil and gas supervisor.

SEC. 6. *Removal of property on termination of lease.*—Upon the expiration of this lease, or the earlier termination thereof as herein provided, the lessee shall within a period of 1 year thereafter remove from the premises all structures, machinery, equipment, tools, and materials other than improvements needed for producing wells or for drilling or producing on other leases and other property permitted by the lessor to be maintained on the area.

SEC. 7. *Remedies in case of default.*—(a) Whenever the lessee fails to comply with any of the provisions of the act or this lease or the applicable regulations in force and effect on the date of issuance of this lease, the lease shall be subject to cancellation as follows:

(1) *Cancellation of non-producing lease.*—If, at the time of such default, no well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be canceled by the Secretary (subject to the right of judicial review as provided in section 8(j) of the act) if such default continues for the period of 30 days after mailing of notice by registered letter to the lessee at the lessee's record post office address.

(2) *Cancellation of producing lease.*—If, at the time of such default, any well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be canceled by an appropriate proceeding in any United States district court having jurisdiction under the provisions of section 4(b) of the act if such default continues for the period of 30 days after mailing of notice by registered letter to the lessee at the lessee's record post office address.

(b) *Other remedies.*—If any such default continues for the period of 30 days after mailing of notice by registered letter to the lessee at the lessee's record post office address, the lessor may then exercise any legal or equitable remedy which the lessor may have; however, the remedy of cancellation of this lease may be exercised only under the conditions and subject to the limitations set out above in paragraph (a) of this section, or pursuant to section 8(i) of the act.

(c) *Effect of waiver of default.*—A waiver of any particular default shall not prevent the cancellation of this lease or the exercise of any other remedy the lessor may have by reason of any other cause or for the same cause occurring at any other time.

SEC. 8. *Heirs and successors in interest.*—Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

SEC. 9. *Unlawful interest.*—No member of, or Delegate to, Congress, or Resident Commissioner, after his election or appointment, or either before or after he has qualified, and during his continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR 7.4(a)(1), shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom; and the provisions of section 3741 of the Revised Statutes, as amended (41 U.S.C., sec. 22), and sections 431, 432 and 433 of Title 18 of the United States Code, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease so far as the same may be applicable.

IN WITNESS WHEREOF:

WITNESSES TO SIGNATURE OF LESSEE

221 E. Lincoln, Findlay, O.

1500, Eastview, Findlay, O.

2704 Hampton Parkway, Evanston, Ill.

5701 N. Virginia Avenue, Chgo, ILL.

*If this     is executed by a corporation, it must bear the corporate seal.*

THE UNITED STATES OF AMERICA

By _____

Manager, Bureau of Land Management
New Orleans Office          MAY 7 1962
                                      (Date)

THE OHIO OIL COMPANY
By: _____ Vice Pres. 4/12/62
By: _____ Secretary, 4/12/62

THE PURE OIL COMPANY
By: _____
                    Harris Van Zandt, Vice Pres.

A. C. Hutcheson, Secy. 4-25-62

**OCS-G 1037**

Form 1-1255
(May 1954)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Cash Bonus  **$457,778.**
Rental Rate  **$3.**
Minimum royalty rate  **$3.**
Royalty rate  **1/6**

Office  NEW ORLEANS

Serial  OCS-G-1037

# OIL AND GAS LEASE OF SUBMERGED LANDS UNDER THE
# OUTER CONTINENTAL SHELF LANDS ACT

This indenture of lease entered into and effective as of _____ JUN 1 1962 _____, by and between the United States of America, hereinafter called the lessor, by the Director, Bureau of Land Management, and

FOREST OIL CORPORATION
300 Oil and Gas Building
Houston, Texas

hereinafter called the lessee, under, pursuant, and subject to the terms and provisions of the Outer Continental Shelf Lands Act of August 7, 1953 (67 Stat. 462; 43 U. S. C., sec. 1331, *et seq.*), hereinafter referred to as the act, and to all lawful and reasonable regulations of the Secretary of the Interior (hereinafter referred to as the Secretary) when not inconsistent with any express and specific provisions herein, which are made a part hereof:

WITNESSETH:

SECTION 1. *Rights of lessee.*—That the lessor, in consideration of a cash bonus and of the rents and royalties to be paid, and the conditions and covenants to be observed as herein set forth, does hereby grant and lease to the lessee the exclusive right and privilege to drill for, mine, extract, remove and dispose of all oil and gas deposits except helium gas in or under the following-described area of the outer Continental Shelf (as that term is defined in the act):

Block 270, Ship Shoal Area, South Addition, as shown on official leasing
map La. No. 5A, Outer Continental Shelf Leasing Map, Louisiana Offshore
Operations.

containing  5,000  acres, more or less (hereinafter referred to as the leased area), together with:
   (a) the non-exclusive right to conduct within the leased area geological and geophysical explorations which are not unduly harmful to aquatic life;
   (b) the right to drill water wells within the leased area and use free of cost, and to dispose of, water produced from such wells; and
   (c) the right to construct or erect and to maintain within the leased area all artificial islands, platforms, fixed or floating structures, sea walls, docks, dredged channels and spaces, buildings, plants, telegraph or telephone lines and cables, pipelines, reservoirs, tanks, pumping stations, and other works and structures necessary or convenient to the full enjoyment of the rights granted by this lease,
for a period of 5 years and as long thereafter as oil or gas may be produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Secretary, are conducted thereon; subject to any unitization or pooling agreement heretofore or hereafter approved by the Secretary which affects the leased area or any part thereof, the provisions of such agreements to govern the leased area or part thereof subject thereto where inconsistent with the terms of this lease.

SEC. 2. *Obligations of lessee.*—In consideration of the foregoing, the lessee agrees:

(a) *Bonds.*—To maintain at all times the bond required prior to the issuance of this lease and to furnish such additional security as may be required by the lessor if, after operations or production have begun, the lessor deems such additional security to be necessary.

(b) *Cooperative or unit plan.*—Within 30 days after demand, to subscribe to and to operate under such reasonable cooperative or unit plan for the development and operation of the area, field, or pool, or part thereof, embracing lands included herein as the Secretary may determine to be practicable and necessary or advisable in the interest of conservation which plan shall adequately protect the rights of all parties in interest, including the United States.

(c) *Wells.*—(1) To drill and produce such wells as are necessary to protect the lessor from loss by reason of production on other properties or, in lieu thereof, with the consent of the oil and gas supervisor, to pay a sum determined by the supervisor as adequate to compensate the lessor for failure to drill and produce any such well. In the event that this lease is not being maintained in force by other production of oil or gas in paying quantities or by other approved drilling or reworking operations, such payments shall be considered as the equivalent of production in paying quantities for all purposes of this lease.

(2) After due notice in writing, to drill and produce such other wells as the Secretary may reasonably require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with good operating practice.

(3) At the election of the lessee, to drill and produce other wells in conformity with any system of well spacing or production allotments affecting the area, field, or pool in which the leased area or any part thereof is situated, which is authorized or sanctioned by applicable law or by the Secretary.

(d) *Rentals and royalties.*—(1) To pay rentals and royalties as follows:

*Rentals.*—To pay the lessor on or before the first day of each lease year commencing prior to a discovery of oil or gas on the leased area, a rental of  $3.  per acre or fraction thereof.

*Minimum royalty.*—To pay the lessor in lieu of rental at the expiration of each lease year commencing after discovery a minimum royalty of  $3.  per acre or fraction thereof, or, if there is production, the difference between the actual royalty paid during the year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

*Royalty on production.*—To pay the lessor a royalty of  16-2/3  percent in amount or value of production saved, removed, or sold from the leased area. Gas of all kinds (except helium, and gas used for purposes of production from and operations upon the leased area or unavoidably lost) is subject to royalty.

(2) It is expressly agreed that the Secretary may establish reasonable minimum values for purposes of computing royalty on products obtained from this lease, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, or area, to the price received by the lessee, to posted prices, and to other relevant matters. Each such determination shall be made only after due notice to the lessee and a reasonable opportunity has been afforded the lessee to be heard.

(3) When paid in value, such royalties on production shall be due and payable monthly on the last day of the calendar month next following the calendar month in which the production is obtained. When paid in production, such royalties shall be delivered at pipeline connections or in tanks provided by the lessee. Such deliveries shall be made at reasonable times and intervals and, at the lessee's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The lessee shall not be required to provide storage for royalty taken in kind in excess of tankage required when royalty is paid in value. When payments are made in production the lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the lessee has no control.

(4) Rentals or minimum royalties may be reduced and royalties on the entire leasehold or any deposit, tract, or portion thereof segregated for royalty purposes may be reduced if the Secretary finds that, for the purpose of increasing the ultimate recovery of oil or gas and in the interest of conservation of natural resources, it is necessary, in his judgment, to do so in order to promote development, or because the lease cannot be successfully operated under the terms fixed herein.

(e) *Payments.*—Unless otherwise provided by regulation or directed by the Secretary, to make rental, royalty, or other payments to the lessor, to the order of the Treasurer of the United States, and to tender such payments to the oil and gas supervisor, Geological Survey.

(f) *Contracts for disposal of products.*—To file with the oil and gas supervisor, Geological Survey, not later than 30 days after the effective date thereof, copies of all contracts for the disposal of lease products; provided that the supervisor may relieve the lessee of this requirement, in which event the contracts shall be made available

16-70375-1

for inspection by the supervisor upon his request. Nothing in any such contract or in any approval thereof by the supervisor shall be construed or accepted as modifying any of the provisions of this lease, including, but not limited to, provisions relating to gas waste, taking royalty in kind, and the method of computing royalties due as based on a minimum valuation and in accordance with the regulations applicable to this lease.

(g) *Statements, plats, and reports.*—At such times and in such form as the lessor may prescribe, to furnish detailed statements and reports showing the amounts and quality of all products saved, removed, and sold from the leased area, the proceeds therefrom, and the amount used for production purposes or unavoidably lost; also a plat showing development work and improvements on or with regard to the leased area.

(h) *Inspection.*—To keep open at all reasonable times for the inspection of any duly authorized representative of the lessor, the leased area and all wells, improvements, machinery and fixtures thereon and all books, accounts and records relative to operations and surveys or investigations on or with regard to the leased area or under the lease.

(i) *Diligence.*—To exercise reasonable diligence in drilling and producing the wells herein provided for; to carry on all operations in accordance with approved methods and practices including those provided in the operating and conservation regulations for the outer Continental Shelf; to remove all structures when no longer required for operations under the lease to sufficient depth beneath the surface of the waters to prevent them from being a hazard to navigation; to carry out at expense of the lessee all lawful and reasonable orders of the lessor relative to the matters in this paragraph, and that on failure of the lessee so to do the lessor shall have the right to enter on the property and to accomplish the purpose of such orders at the lessee's cost: *Provided*, That the lessee shall not be held responsible for delays or casualties occasioned by causes beyond the lessee's control.

(j) *Freedom of purchase.*—To accord all workmen and employees directly engaged in any of the operations under this lease complete freedom of purchase.

(k) *Nondiscrimination.*—Not to discriminate against any employee, or applicant for employment, because of race, creed, color or national origin, and to require an identical provision to be included in all sub-contracts relating to operations under this lease.

(l) *Assignment of lease.*—To file for approval with the Bureau of Land Management, within 90 days from the date of final execution, any instrument of transfer of this lease, or any interest therein, including assignments of record title, operating agreements, and subleases. Carried working interests, overriding royalty interests, or payments out of production, may be created or transferred without requirement for filing or approval. Instruments required to be filed shall take effect upon approval as of the first day of the lease month following the date of filing unless at the request of the parties an earlier date is specified in such approval.

SEC. 3. *Reservations to lessor.*—The lessor reserves:

(a) *Geological and geophysical exploration; rights-of-way.*—The right to authorize the conduct of geological and geophysical exploration in the leased area which does not interfere with or endanger actual operations under this lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands containing the deposits described in the act, and to the treatment and shipment of products thereof by or under authority of the United States, its lessees or permittees, and for other public purposes, subject to the provisions of section 5 (e) of the act where they are applicable and to all lawful and reasonable regulations and conditions prescribed by the Secretary thereunder.

(b) *Leases of sulfur and other mineral.*—The right to grant sulfur leases and leases of any mineral other than oil, gas, and sulfur within the leased area or any part thereof, subject to the provisions of section 8 (c), 8 (d), and 8 (e) of the act and all lawful and reasonable regulations prescribed by the Secretary thereunder: *Provided*, That no such sulfur lease or lease of other mineral shall authorize or permit the lessee thereunder unreasonably to interfere with or endanger operations under this lease.

(c) *Purchase of production.*—In time of war, or when the President of the United States shall so prescribe, the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in section 12(b) of the act.

(d) *Taking of royalties.*—All rights, pursuant to clause (3) of section 8(b) of the act, to take royalties in the amount or value of production.

(e) *Fissionable materials.*—All uranium, thorium, and all other materials determined pursuant to paragraph (1) of subsection (b) of section 5 of the Atomic Energy Act of 1946, as amended, to be peculiarly essential to the production of fissionable materials, contained, in whatever concentration, in deposits in the subsoil or seabed of the leased area or any part thereof, as provided in section 12(e) of the act.

(f) *Helium.*—Pursuant to section 12(f) of the act, the ownership and the right to extract helium from all gas produced under this lease, subject to such rules and regulations as shall be prescribed by the Secretary.

(g) *Suspension of operations during war or national emergency.*—Upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or President of the United States after August 7, 1953, the authority of the Secretary to suspend any or all operations under this lease, as provided in section 12(c) of the act: *Provided*, That just compensation shall be paid by the lessor to the lessee.

(h) *Restriction of exploration and operations.*—The right, as provided in section 12(d) of the act, to restrict from exploration and

operations the leased area or any part thereof which may be designated by and through the Secretary of Defense, with the approval of the President, as, or as part of, an area of the outer Continental Shelf needed for national defense; and so long as such designation remains in effect no exploration or operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense; and if operations or production under this lease within any such restricted area shall be suspended, any payments of rentals, minimum royalty, and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the lessor shall be liable to the lessee for such compensation as is required to be paid under the Constitution of the United States.

SEC. 4. *Directional drilling.*—This lease may be maintained in force by directional wells drilled under the leased area from surface locations on adjacent or adjoining lands not covered by this lease. In such circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the adjacent or adjoining land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on adjacent or adjoining land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations (as the case may be) on the leased area for all purposes of this lease. Nothing contained in this paragraph is intended or shall be construed as granting to the lessee any leasehold interests, licenses, easements, or other rights in or with respect to any such adjacent or adjoining land in addition to any such leasehold interests, licenses, easements, or other rights which the lessee may have lawfully acquired under the act or from the lessor or others.

SEC. 5. *Surrender and termination of lease.*—The lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the Bureau of Land Management, a written relinquishment, in triplicate, which shall be effective as of the date of filing, subject to the continued obligation of the lessee and his surety to make payment of all accrued rentals and royalties and to abandon all wells on the area to be relinquished to the satisfaction of the oil and gas supervisor.

SEC. 6. *Removal of property on termination of lease.*—Upon the expiration of this lease, or the earlier termination thereof as herein provided, the lessee shall within a period of 1 year thereafter remove from the premises all structures, machinery, equipment, tools, and materials other than improvements needed for producing wells or for drilling or producing on other leases and other property permitted by the lessor to be maintained on the area.

SEC. 7. *Remedies in case of default.*—(a) Whenever the lessee fails to comply with any of the provisions of the act or this lease or the applicable regulations in force and effect on the date of issuance of this lease, the lease shall be subject to cancellation as follows:

(1) *Cancellation of non-producing lease.*—If, at the time of such default, no well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be canceled by the Secretary (subject to the right of judicial review as provided in section 8(j) of the act) if such default continues for the period of 30 days after mailing of notice by registered letter to the lessee at the lessee's record post office address.

(2) *Cancellation of producing lease.*—If, at the time of such default, any well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be canceled by an appropriate proceeding in any United States district court having jurisdiction under the provisions of section 4(b) of the act if such default continues for the period of 30 days after mailing of notice by registered letter to the lessee at the lessee's record post office address.

(b) *Other remedies.*—If any such default continues for the period of 30 days after mailing of notice by registered letter to the lessee at the lessee's record post office address, the lessor may then exercise any legal or equitable remedy which the lessor may have; however, the remedy of cancellation of this lease may be exercised only under the conditions and subject to the limitations set out above in paragraph (a) of this section, or pursuant to section 8(i) of the act.

(c) *Effect of waiver of default.*—A waiver of any particular default shall not prevent the cancellation of this lease or the exercise of any other remedy by the lessor for any reason of any other cause or for the same cause occurring at any other time.

SEC. 8. *Heirs and successors in interest.*—Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

SEC. 9. *Unlawful interest.*—No member of, or Delegate to, Congress, or Resident Commissioner, after his election or appointment, or either before or after he has qualified, and during his continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR 7.4(a)(1), shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom; and the provisions of section 3741 of the Revised Statutes, as amended (41 U.S.C., sec. 22), and sections 431, 432 and 433 of Title 18 of the United States Code, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease so far as the same may be applicable.

*IN WITNESS WHEREOF:*

WITNESSES TO SIGNATURE OF LESSEE

THE UNITED STATES OF AMERICA

By _____
Manager, Bureau of Land Management,
   New Orleans Office
                    MAY 8 1962
        (Title)                    (Date)

FOREST OIL CORPORATION

_____
H. J. WARNER
300 OIL & GAS BLDG.
HOUSTON 2, TEXAS
(Name and address)

_____
B. W. PURDUM
300 OIL & GAS BLDG.
HOUSTON 2, TEXAS
(Name and address)

_____
DAVID F. DORN, VICE PRESIDENT (Lessee)

If this lease is executed by a corporation, it must bear the corporate seal
U. S. GOVERNMENT PRINTING OFFICE    16—70375-1

**OCS-G 1038**

Form 4-1255
(May 1954)

**UNITED STATES**
**DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**

Cash Bonus $657,778.
Rental Rate $3.
Minimum royalty rate $3.
Royalty rate 1/6

Office ....... **NEW ORLEANS**

Serial ....... **OCS-G-1038**

# OIL AND GAS LEASE OF SUBMERGED LANDS UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

This indenture of lease entered into and effective as of ................ **JUN 1 1962** ................, by and between the United States of America, hereinafter called the lessor, by the Director, Bureau of Land Management, and

**FOREST OIL CORPORATION**
**300 Oil and Gas Building**
**Houston, Texas**

hereinafter called the lessee, under, pursuant, and subject to the terms and provisions of the Outer Continental Shelf Lands Act of August 7, 1953 (67 Stat. 462; 43 U. S. C., sec. 1331, et seq.), hereinafter referred to as the act, and to all lawful and reasonable regulations of the Secretary of the Interior (hereinafter referred to as the Secretary) when not inconsistent with any express and specific provisions herein, which are made a part hereof:

WITNESSETH:

SECTION 1. *Rights of lessee.*—That the lessor, in consideration of a cash bonus and of the rents and royalties to be paid, and the conditions and covenants to be observed as herein set forth, does hereby grant and lease to the lessee the exclusive right and privilege to drill for, mine, extract, remove and dispose of all oil and gas deposits except helium gas in or under the following-described area of the outer Continental Shelf (as that term is defined in the act):

> **Block 271, Ship Shoal Area, South Addition, as shown on official leasing map La. No. 5A, Outer Continental Shelf Leasing Map, Louisiana Offshore Operations.**

containing __5,000__ acres, more or less (hereinafter referred to as the leased area), together with:

(a) the non-exclusive right to conduct within the leased area geological and geophysical explorations which are not unduly harmful to aquatic life;

(b) the right to drill water wells within the leased area and use free of cost, and to dispose of, water produced from such wells; and

(c) the right to construct or erect and to maintain within the leased area all artificial islands, platforms, fixed or floating structures, sea walls, docks, dredged channels and spaces, buildings, plants, telegraph or telephone lines and cables, pipelines, reservoirs, tanks, pumping stations, and other works and structures necessary or convenient to the full enjoyment of the rights granted by this lease,

for a period of 5 years and as long thereafter as oil or gas may be produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Secretary, are conducted thereon; subject to any unitization or pooling agreement heretofore or hereafter approved by the Secretary which affects the leased area or any part thereof, the provisions of such agreements to govern the leased area or part thereof subject thereto where inconsistent with the terms of this lease.

SEC. 2. *Obligations of lessee.*—In consideration of the foregoing, the lessee agrees:

(a) *Bonds.*—To maintain at all times the bond required prior to the issuance of this lease and to furnish such additional security as may be required by the lessor if, after operations on production have begun, the lessor deems such additional security to be necessary.

(b) *Cooperative or unit plan.*—Within 30 days after demand, to subscribe to and to operate under such reasonable cooperative or unit plan for the development and operation of the area, field, or pool, or part thereof, embracing lands included herein as the Secretary may determine to be practicable and necessary or advisable in the interest of conservation which plan shall adequately protect the rights of all parties in interest, including the United States.

(c) *Wells.*—(1) To drill and produce such wells as are necessary to protect the lessor from loss by reason of production on other properties or, in lieu thereof, with the consent of the oil and gas supervisor, to pay a sum determined by the supervisor as adequate to compensate the lessor for failure to drill and produce any such well. In the event that this lease is not being maintained in force by other production of oil or gas in paying quantities or by other approved drilling or reworking operations, such payments shall be considered as the equivalent of production in paying quantities for all purposes of this lease.

(2) After due notice in writing, to drill and produce such other wells as the Secretary may reasonably require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with good operating practice.

(3) At the election of the lessee, to drill and produce other wells in conformity with any system of well spacing or production allotments affecting the area, field, or pool in which the leased area or any part thereof is situated, which is authorized or sanctioned by applicable law or by the Secretary.

(d) *Rentals and royalties.*—(1) To pay rentals and royalties as follows:

*Rentals.*—To pay the lessor on or before the first day of each lease year commencing prior to a discovery of oil or gas on the leased area, a rental of __$3__ per acre or fraction thereof.

*Minimum royalty.*—To pay the lessor in lieu of rental at the expiration of each lease year commencing after discovery a minimum royalty of __$3__ per acre or fraction thereof or, if there is production, the difference between the actual royalty paid during the year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

*Royalty on production.*—To pay the lessor a royalty of __16-2/3__ percent in amount or value of production saved, removed, or sold from the leased area. Gas of all kinds (except helium, and gas used for purposes of production from and operations upon the leased area or unavoidably lost) is subject to royalty.

(2) It is expressly agreed that the Secretary may establish reasonable minimum values for purposes of computing royalty on products obtained from this lease, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, or area, to the price received by the lessee, to posted prices, and to other relevant matters. Each such determination shall be made only after due notice to the lessee and a reasonable opportunity has been afforded the lessee to be heard.

(3) When paid in value, such royalties on production shall be due and payable monthly on the last day of the calendar month next following the calendar month in which the production is obtained. When paid in production, such royalties shall be delivered at pipeline connections or in tanks provided by the lessee. Such deliveries shall be made at reasonable times and intervals and, at the lessee's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The lessee shall not be required to provide storage for royalty taken in kind in excess of tankage required when royalty is paid in value. When payments are made in production the lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the lessee has no control.

(4) Rentals or minimum royalties may be reduced and royalties on the entire leasehold or any deposit, tract, or portion thereof segregated for royalty purposes may be reduced if the Secretary finds that, for the purpose of increasing the ultimate recovery of oil or gas and in the interest of conservation of natural resources, it is necessary, in his judgment, to do so in order to promote development, or because the lease cannot be successfully operated under the terms fixed herein.

(e) *Payments.*—Unless otherwise provided by regulation or directed by the Secretary, to make rental, royalty, or other payments to the lessor, to the order of the Treasurer of the United States, and to tender such payments to the oil and gas supervisor, Geological Survey.

(f) *Contracts for disposal of products.*—To file with the oil and gas supervisor, Geological Survey, not later than 30 days after the effective date thereof, copies of all contracts for the disposal of lease products; provided that the supervisor may relieve the lessee of this requirement, in which event the contracts shall be made available

16—70375-1

for inspection by the supervisor upon his request. Nothing in any such contract or in any approval thereof by the supervisor shall be construed or accepted as modifying any of the provisions of this lease, including, but not limited to, provisions relating to gas waste, taking royalty in kind, and the method of computing royalties due as based on a minimum valuation and in accordance with the regulations applicable to this lease.

(g) *Statements, plats, and reports.*—At such times and in such form as the lessor may prescribe, to furnish detailed statements and reports showing the amounts and quality of all products saved, removed, and sold from the leased area, the proceeds therefrom, and the amount used for production purposes or unavoidably lost; also a plat showing development work and improvements on or with regard to the leased area.

(h) *Inspection.*—To keep open at all reasonable times for the inspection of any duly authorized representative of the lessor, the leased area and all wells, improvements, machinery and fixtures thereon and all books, accounts and records relative to operations and surveys or investigations on or with regard to the leased area or under the lease.

(i) *Diligence.*—To exercise reasonable diligence in drilling and producing the wells herein provided for; to carry on all operations in accordance with approved methods and practices including those provided in the operating and conservation regulations for the outer Continental Shelf; to remove all structures when no longer required for operations under the lease to sufficient depth beneath the surface of the waters to prevent them from being a hazard to navigation; to carry out at expense of the lessee all lawful and reasonable orders of the lessor relative to the matters in this paragraph, and that on failure of the lessee so to do the lessor shall have the right to enter on the property and to accomplish the purpose of such orders at the lessee's cost: *Provided,* That the lessee shall not be held responsible for delays or casualties occasioned by causes beyond the lessee's control.

(j) *Freedom of purchase.*—To accord all workmen and employees directly engaged in any of the operations under this lease complete freedom of purchase.

(k) *Nondiscrimination.*—Not to discriminate against any employee, or applicant for employment, because of race, creed, color or national origin, and to require an identical provision to be included in all sub-contracts relating to operations under this lease.

(l) *Assignment of lease.*—To file for approval with the Bureau of Land Management, within 90 days from the date of final execution, any instrument of transfer of this lease, or any interest therein, including assignments of record title, operating agreements, and subleases. Carried working interests, overriding royalty interests, or payments out of production, may be created or transferred without requirement for filing or approval. Instruments required to be filed shall take effect upon approval as of the first day of the lease month following the date of filing unless at the request of the parties an earlier date is specified in such approval.

SEC. 3. *Reservations to lessor.*—The lessor reserves:

(a) *Geological and geophysical exploration; rights-of-way.*—The right to authorize the conduct of geological and geophysical exploration in the leased area which does not interfere with or endanger actual operations under this lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands containing the deposits described in the act, and to the treatment and shipment of products thereof by or under authority of the United States, its lessees or permittees, and for other public purposes, subject to the provisions of section 5 (c) of the act where they are applicable and to all lawful and reasonable regulations and conditions prescribed by the Secretary thereunder.

(b) *Leases of sulfur and other mineral.*—The right to grant sulfur leases and leases of any mineral other than oil, gas, and sulfur within the leased area or any part thereof, subject to the provisions of section 8 (c), 8(d), and 8 (e) of the act and all lawful and reasonable regulations prescribed by the Secretary thereunder: *Provided,* That no such sulfur lease or lease of other mineral shall authorize or permit the lessee thereunder unreasonably to interfere with or endanger operations under this lease.

(c) *Purchase of production.*—In time of war, or when the President of the United States shall so prescribe, the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in section 12 (b) of the act.

(d) *Taking of royalties.*—All rights, pursuant to clause (3) of section 8(b) of the act, to take royalties in the amount or value of production.

(e) *Fissionable materials.*—All uranium, thorium, and all other materials determined pursuant to paragraph (1) of subsection (b) of section 5 of the Atomic Energy Act of 1946, as amended, to be peculiarly essential to the production of fissionable materials, contained, in whatever concentration, in deposits in the subsoil or seabed of the leased area or any part thereof, as provided in section 12(e) of the act.

(f) *Helium.*—Pursuant to section 12 (f) of the act, the ownership and the right to extract helium from all gas produced under this lease, subject to such rules and regulations as shall be prescribed by the Secretary.

(g) *Suspension of operations during war or national emergency.*—Upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or President of the United States after August 7, 1953, the authority of the Secretary to suspend any or all operations under this lease, as provided in section 12 (c) of the act: *Provided,* That just compensation shall be paid by the lessor to the lessee.

(h) *Restriction of exploration and operations.*—The right, as provided in section 12(d) of the act, to restrict from exploration and

operations the leased area or any part thereof which may be designated by and through the Secretary of Defense, with the approval of the President, as, or as part of, an area of the outer Continental Shelf needed for national defense; and so long as such designation remains in effect no exploration or operations may be conducted on the surface of the leased area or the part thereof included within the designation except: with the concurrence of the Secretary of Defense; and if operations or production under this lease within any such restricted area shall be suspended, any payments of rentals, minimum royalty, and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the lessor shall be liable to the lessee for such compensation as is required to be paid under the Constitution of the United States.

SEC. 4. *Directional drilling.*—This lease may be maintained in force by directional wells drilled under the leased area from surface locations on adjacent or adjoining lands not covered by this lease. In such circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the adjacent or adjoining land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on adjacent or adjoining land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations (as the case may be) on the leased area for all purposes of this lease. Nothing contained in this paragraph is intended or shall be construed as granting to the lessee any leasehold interests, licenses, easements, or other rights in or with respect to any such adjacent or adjoining land in addition to any such leasehold interests, licenses, easements, or other rights which the lessee may have lawfully acquired under the act or from the lessor or others.

SEC. 5. *Surrender and termination of lease.*—The lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the Bureau of Land Management, a written relinquishment, in triplicate, which shall be effective as of the date of filing, subject to the continued obligation of the lessee and his surety to make payment of all accrued rentals and royalties and to abandon all wells on the area to be relinquished to the satisfaction of the oil and gas supervisor.

SEC. 6. *Removal of property on termination of lease.*—Upon the expiration of this lease, or the earlier termination thereof as herein provided, the lessee shall within a period of 1 year thereafter remove from the premises all structures, machinery, equipment, tools, and materials other than improvements needed for producing wells or for drilling or producing on other leases and other property permitted by the lessor to be maintained on the area.

SEC. 7. *Remedies in case of default.*—(a) Whenever the lessee fails to comply with any of the provisions of the act or this lease or the applicable regulations in force and effect on the date of issuance of this lease, the lease shall be subject to cancellation as follows:

(1) *Cancellation of non-producing lease.*—If, at the time of such default, no well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be canceled by the Secretary (subject to the right of judicial review as provided in section 8 (j) of the act) if such default continues for the period of 30 days after mailing of notice by registered letter to the lessee at the lessee's record post office address.

(2) *Cancellation of producing lease.*—If, at the time of such default, a well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be canceled by an appropriate proceeding in any United States district court having jurisdiction under the provisions of section 4(b), of the act if such default continues for the period of 30 days after mailing of notice by registered letter to the lessee at the lessee's record post office address.

(b) *Other remedies.*—If any such default continues for the period of 30 days after mailing of notice by registered letter to the lessee at the lessee's record post office address, the lessor may then exercise any legal or equitable remedy which the lessor may have; however, the remedy of cancellation of this lease may be exercised only under the conditions and subject to the limitations set out above in paragraph (a) of this section, or pursuant to section 8(j) of the act.

(c) *Effect of waiver of default.*—A waiver of any particular default shall not prevent the cancellation of this lease or the exercise of any other remedy under the lease or may have by reason of any other cause or for the same cause occurring at any other time.

SEC. 8. *Heirs and successors in interest.*—Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

SEC. 9. *Unlawful interest.*—No member of, or Delegate to, Congress, or Resident Commissioner, after his election or appointment, or either before or after he has qualified, and during his continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR 7.4(a) (1), shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom; and the provisions of section 3741 of the Revised Statutes, as amended (41 U.S.C., sec. 22), and sections 431, 432 and 433 of Title 18 of the United States Code, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease so far as the same may be applicable.

IN WITNESS WHEREOF:

WITNESSES TO SIGNATURE OF LESSEE

THE UNITED STATES OF AMERICA

By _(signature)_

_(Name and address)_     H. J. WARNER
       300 OIL & GAS BLDG.
       HOUSTON 2, TEXAS

Manager, Bureau of Land Management, New Orleans Office     MAY 8 1962
       (Title)            (Date)

_(Name and address)_     G. W. PURDUM
       300 OIL & GAS BLDG.
       HOUSTON 2, TEXAS

FOREST OIL CORPORATION

_(signature)_

DAVID F. DORN, VICE PRESIDENT (Lessee)

*If this lease is executed by a corporation, it must bear the corporate seal*

**OCS-G 1172**

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Cash Bonus $305,558.00
Rental Rate $3.
Minimum royalty rate $3.
Royalty rate 1/6

Office NEW ORLEANS

Serial OCS-G 1172

# OIL AND GAS LEASE OF SUBMERGED LANDS UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

This indenture of lease entered into and effective as of JUN 1 1962 _____, by and between the United States of America, hereinafter called the lessor, by the Director, Bureau of Land Management, and

FOREST OIL CORPORATION
300 Oil and Gas Building
Houston, Texas

hereinafter called the lessee, under, pursuant, and subject to the terms and provisions of the Outer Continental Shelf Lands Act of August 7, 1953 (67 Stat. 462; 43 U. S. C., sec. 1331, et seq.), hereinafter referred to as the act, and to all lawful and reasonable regulations of the Secretary of the Interior (hereinafter referred to as the Secretary) when not inconsistent with any express and specific provisions herein, which are made a part hereof:

WITNESSETH:

SECTION 1. *Rights of lessee.*—That the lessor, in consideration of a cash bonus and of the rents and royalties to be paid, and the conditions and covenants to be observed as herein set forth, does hereby grant and lease to the lessee the exclusive right and privilege to drill for, mine, extract, remove and dispose of all oil and gas deposits except helium gas in or under the following-described area of the outer Continental Shelf (as that term is defined in the act):

Block 313 Vermilion Area, South Addition, as shown on official leasing map
La. No. 3B, Outer Continental Shelf Leasing Map, Louisiana Offshore Operations.

containing ___5,000___ acres, more or less (hereinafter referred to as the leased area), together with:

(a) the non-exclusive right to conduct within the leased area geological and geophysical explorations which are not unduly harmful to aquatic life;

(b) the right to drill water wells within the leased area and use free of cost, and to dispose of, water produced from such wells; and

(c) the right to construct or erect and to maintain within the leased area all artificial islands, platforms, fixed or floating structures, sea walls, docks, dredged channels and spaces, buildings, plants, telegraph or telephone lines and cables, pipelines, reservoirs, tanks, pumping stations, and other works and structures necessary or convenient to the full enjoyment of the rights granted by this lease,

for a period of 5 years and as long thereafter as oil or gas may be produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Secretary, are conducted thereon; subject to any unitization or pooling agreement heretofore or hereafter approved by the Secretary which affects the leased area or any part thereof, the provisions of such agreements to govern the leased area or any part thereof subject thereto where inconsistent with the provisions of this lease.

SEC. 2. *Obligations of lessee.*—In consideration of the foregoing, the lessee agrees:

(a) *Bonds.*—To maintain at all times the bond required prior to the issuance of this lease and to furnish such additional security as may be required by the lessor if, after operations or production have begun, the lessor deems such additional security to be necessary.

(b) *Cooperative or unit plan.*—Within 30 days after demand, to subscribe to and to operate under such reasonable cooperative or unit plan for the development and operation of the area, field, or pool, or part thereof, embracing lands included herein as the Secretary may determine to be practicable and necessary or advisable in the interest of conservation which plan shall adequately protect the rights of all parties in interest, including the United States.

(c) *Wells.*—(1) To drill and produce such wells as are necessary to protect the lessor from loss by reason of production on other properties or, in lieu thereof, with the consent of the oil and gas supervisor, to pay a sum determined by the supervisor as adequate to compensate the lessor for failure to drill and produce any such well. In the event that this lease is not being maintained in force by other production of oil or gas in paying quantities or by other approved drilling or reworking operations, such payments shall be considered as the equivalent of production in paying quantities for all purposes of this lease.

(2) After due notice in writing, to drill and produce such other wells as the Secretary may reasonably require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with good operating practice.

(3) At the election of the lessee, to drill and produce other wells in conformity with any system of well spacing or production allotments affecting the area, field, or pool in which the leased area or any part thereof is situated, which is authorized or sanctioned by applicable law or by the Secretary.

(d) *Rentals and royalties.*—(1) To pay rentals and royalties as follows:

*Rentals.*—To pay the lessor on or before the first day of each lease year commencing prior to a discovery of oil or gas on the leased area, a rental of ___$3.___ per acre or fraction thereof.

*Minimum royalty.*—To pay the lessor in lieu of rental at the expiration of each lease year commencing after discovery a minimum royalty of ___$3.___ per acre or fraction thereof or, if there is production, the difference between the actual royalty paid during the year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

*Royalty on production.*—To pay the lessor a royalty of 16-2/3 percent in amount or value of production saved, removed, or sold from the leased area. Gas of all kinds (except helium, and gas used for purposes of production from and operations upon the leased area or unavoidably lost) is subject to royalty.

(2) It is expressly agreed that the Secretary may establish reasonable minimum values for purposes of computing royalty on products obtained from this lease, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, or area, to the price received by the lessee, to posted prices, and to other relevant matters. Each such determination shall be made only after due notice to the lessee and a reasonable opportunity has been afforded the lessee to be heard.

(3) When paid in value, such royalties on production shall be due and payable monthly on the last day of the calendar month next following the calendar month in which the production is obtained. When paid in production, such royalties shall be delivered at pipeline connections or in tanks provided by the lessee. Such deliveries shall be made at reasonable times and intervals and, at the lessee's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The lessee shall not be required to provide storage for royalty taken in kind in excess of tankage required when royalty is paid in value. When payments are made in production the lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the lessee has no control.

(4) Rentals or minimum royalties may be reduced and royalties on the entire leasehold or any deposit, tract, or portion thereof segregated for royalty purposes may be reduced if the Secretary finds that, for the purpose of encouraging the ultimate recovery of oil or gas and in the interest of conservation of natural resources, it is necessary, in his judgment, to do so in order to promote development, or because the lease cannot be successfully operated under the terms fixed herein.

(e) *Payments.*—Unless otherwise provided by regulation or directed by the Secretary, to make rental, royalty, or other payments to the lessor, to the order of the Treasurer of the United States, and to tender such payments to the oil and gas supervisor, Geological Survey.

(f) *Contracts for disposal of products.*—To file with the oil and gas supervisor, Geological Survey, not later than 30 days after the effective date thereof, copies of all contracts for the disposal of lease products; provided that the supervisor may relieve the lessee of this requirement, in which event the contracts shall be made available

16—70375—1

for inspection by the supervisor upon his request. Nothing in any such contract or in any approval thereof by the supervisor shall be construed or accepted as modifying any of the provisions of this lease, including, but not limited to, provisions relating to gas waste, taking royalty in kind, and the method of computing royalties as based on a minimum valuation and in accordance with the regulations applicable to this lease.

(g) *Statements, plats, and reports.*—At such times and in such form as the lessor may prescribe, to furnish detailed statements and reports showing the amounts and quality of all products saved, removed, and sold from the leased area, the proceeds therefrom, and the amount used for production purposes or unavoidably lost; also a plat showing development work and improvements on or with regard to the leased area.

(h) *Inspection.*—To keep open at all reasonable times for the inspection of any duly authorized representative of the lessor, the leased area and all wells, improvements, machinery and fixtures thereon and all books, accounts and records relative to operations and surveys or investigations on or with regard to the leased area or under the lease.

(i) *Diligence.*—To exercise reasonable diligence in drilling and producing the wells herein provided for; to carry on all operations in accordance with approved methods and practices including those provided in the operating and conservation regulations for the outer Continental Shelf; to remove all structures when no longer required for operations under the lease to sufficient depth beneath the surface of the waters to prevent them from being a hazard to navigation; to carry out at expense of the lessee all lawful and reasonable orders of the lessor relative to the matters in this paragraph, and that on failure of the lessee so to do the lessor shall have the right to enter on the property and to accomplish the purpose of such orders at the lessee's cost: *Provided,* That the lessee shall not be held responsible for delays or casualties occasioned by causes beyond the lessee's control.

(j) *Freedom of purchase.*—To accord all workmen and employees directly engaged in any of the operations under this lease complete freedom of purchase.

(k) *Nondiscrimination.*—Not to discriminate against any employee, or applicant for employment, because of race, creed, color or national origin, and to require an identical provision to be included in all sub-contracts relating to operations under this lease.

(l) *Assignment of lease.*—To file for approval with the Bureau of Land Management, within 90 days from the date of final execution, any instrument of transfer of this lease, or any interest therein, including assignments of record title, operating agreements, and subleases. Carried working interests, overriding royalty interests, or payments out of production, may be created or transferred without requirement for filing or approval. Instruments required to be filed shall take effect upon approval as of the first day of the lease month following the date of filing unless at the request of the parties an earlier date is specified in such approval.

SEC. 3. *Reservations to lessor.*—The lessor reserves:

(a) *Geological and geophysical exploration; rights-of-way.*—The right to authorize the conduct of geological and geophysical exploration in the leased area which does not interfere with or endanger actual operations under this lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands containing the deposits described in the act, and to the treatment and shipment of products thereof by or under authority of the United States, its lessees or permittees, and for other public purposes, subject to the provisions of section 5 (c) of the act where they are applicable and to the Secretary thereunder.

(b) *Leases of sulfur and other mineral.*—The right to grant sulfur leases and leases of any mineral other than oil, gas, and sulfur within the leased area or any part thereof, subject to the provisions of section 8(c), 8(d), and 8(e) of the act and all lawful and reasonable regulations prescribed by the Secretary thereunder: *Provided,* That no such sulfur lease or lease of other mineral shall authorize or permit the lessee thereunder unreasonably to interfere with or endanger operations under this lease.

(c) *Purchase of production.*—In time of war, or when the President of the United States shall so prescribe, the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in section 12(b) of the act.

(d) *Taking of royalties.*—All rights, pursuant to clause (3) of section 8(b) of the act, to take royalties in the amount or value of production.

(e) *Fissionable materials.*—All uranium, thorium, and all other materials determined pursuant to paragraph (1) of subsection (b) of section 5 of the Atomic Energy Act of 1946, as amended, to be peculiarly essential to the production of fissionable materials, contained, in whatever concentration, in deposits in the subsoil or seabed of the leased area or any part thereof, as provided in section 12(e) of the act.

(f) *Helium.*—Pursuant to section 12(f) of the act, the ownership and the right to extract helium from all gas produced under this lease, subject to such rules and regulations as shall be prescribed by the Secretary.

(g) *Suspension of operations during war or national emergency.*—Upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or President of the United States after August 7, 1953, the authority of the Secretary to suspend any or all operations under this lease, as provided in section 12(c) of the act: *Provided,* That just compensation shall be paid by the lessor to the lessee.

(h) *Restriction of exploration and operations.*—The right, as provided in section 12(d) of the act, to restrict from exploration and

operations the leased area or any part thereof which may be designated by and through the Secretary of Defense, with the approval of the President, as, or as part of, an area of the outer Continental Shelf needed for national defense; and so long as such designation remains in effect no exploration or operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense; and if operations or production under this lease within any such restricted area shall be suspended, any payments of rentals, minimum royalty, and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the lessor shall be liable to the lessee for such compensation as is required to be paid under the Constitution of the United States.

SEC. 4. *Directional drilling.*—This lease may be maintained in force by directional wells drilled under the leased area from surface locations on adjacent or adjoining lands not covered by this lease. In such circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the adjacent or adjoining land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on adjacent or adjoining land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations (as the case may be) on the leased area for all purposes of this lease. Nothing contained in this paragraph is intended or shall be construed as granting to the lessee any leasehold interests, licenses, easements, or other rights in or with respect to any such adjacent or adjoining land in addition to any such leasehold interests, licenses, easements, or other rights which the lessee may have lawfully acquired under the act or from the lessor or others.

SEC. 5. *Surrender and termination of lease.*—The lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the Bureau of Land Management, a written relinquishment, in triplicate, which shall be effective as of the date of filing, subject to the continued obligation of the lessee and his surety to make payment of all accrued rentals and royalties and to abandon all wells on the area to be relinquished to the satisfaction of the oil and gas supervisor.

SEC. 6. *Removal of property on termination of lease.*—Upon the expiration of this lease, or the earlier termination thereof as herein provided, the lessee shall within a period of 1 year thereafter remove from the premises all structures, machinery, equipment, tools, and materials other than improvements needed for producing wells or for drilling or producing on other leases and other property permitted by the lessor to be maintained on the area.

SEC. 7. *Remedies in case of default.*—(a) Whenever the lessee fails to comply with any of the provisions of the act or this lease or the applicable regulations in force and effect on the date of issuance of this lease, the lease shall be subject to cancellation as follows:

(1) *Cancellation of non-producing lease.*—If, at the time of such default, no well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be canceled by the Secretary (subject to the right of judicial review as provided in section 8(j) of the act) if such default continues for the period of 30 days after mailing of notice by registered letter to the lessee at the lessee's record post office address.

(2) *Cancellation of producing lease.*—If, at the time of such default, any well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be canceled by an appropriate proceeding in any United States district court having jurisdiction under the provisions of section 4(b) of the act if such default continues for the period of 30 days after mailing of notice by registered letter to the lessee at the lessee's record post office address.

(b) *Other remedies.*—If any such default continues for the period of 30 days after mailing of notice by registered letter to the lessee at the lessee's record post office address, the lessor may then exercise any legal or equitable remedy which the lessor may have; however, the remedy of cancellation of this lease may be exercised only under the conditions and subject to the limitations set out above in paragraph (a) of this section, or pursuant to section 8(i) of the act.

(c) *Effect of waiver of default.*—A waiver of any particular default shall not prevent the cancellation of this lease or the exercise of any other remedy the lessor may have by reason of any other cause or for the same cause occurring at any other time.

SEC. 8. *Heirs and successors in interest.*—Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

SEC. 9. *Unlawful interest.*—No member of, or Delegate to, Congress, or Resident Commissioner, after his election or appointment, or either before or after he has qualified, and during his continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR 7.4(a)(1), shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom; and the provisions of section 3741 of the Revised Statutes, as amended (41 U.S.C., sec. 22), and sections 431, 432 and 433 of Title 18 of the United States Code, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease so far as the same may be applicable.

*IN WITNESS WHEREOF:*

WITNESSES TO SIGNATURE OF LESSEE

THE UNITED STATES OF AMERICA

By _____

Manager, Bureau of Land Management
New Orleans Office

MAY 8 1962

(Title)                          (Date)

H. J. WARNER
300 OIL & GAS BLDG.
(Name and address)

G. W. PURDUM
800 OIL & GAS BLDG.
HOUSTON 2, TEXAS
(Name and address)

FOREST OIL CORPORATION
(Lessee)

DAVID F. DORN, VICE PRESIDENT

*If this ▶ is executed by a corporation, it must bear the corporate seal*

U. S. GOVERNMENT PRINTING OFFICE   16—70375-1

**OCS-G 1216**

Form 4-1255
(Mr. 1954)

**UNITED STATES**
**DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**

Cash Bonus ............ **$143,587.**
Rental Rate ............ **$3.**
Minimum royalty rate ... **$3.**
Royalty rate ............ **1/6**

RECEIVED
MAY 4 1962
Bureau of
Land Management
New Orleans

Office ....... **NEW ORLEANS**

Serial ....... **OCS-G 1216**

# OIL AND GAS LEASE OF SUBMERGED LANDS UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

This indenture of lease entered into and effective as of ............ **JUN 1 1962** ............, by and between the United States of America, hereinafter called the lessor, by the Director, Bureau of Land Management, and

**FOREST OIL CORPORATION**
**300 Oil and Gas Building**
**Houston, Texas**

hereinafter called the lessee, under, pursuant, and subject to the terms and provisions of the Outer Continental Shelf Lands Act of August 7, 1953 (67 Stat. 462; 43 U. S. C., sec. 1331, *et seq.*), hereinafter referred to as the act, and to all lawful and reasonable regulations of the Secretary of the Interior (hereinafter referred to as the Secretary) when not inconsistent with any express and specific provisions herein, which are made a part hereof:

WITNESSETH:
SECTION 1. *Rights of lessee.*—That the lessor, in consideration of a cash bonus and of the rents and royalties to be paid, and the conditions and covenants to be observed as herein set forth, does hereby grant and lease to the lessee the exclusive right and privilege to drill for, mine, extract, remove and dispose of all oil and gas deposits except helium gas in or under the following-described area of the outer Continental Shelf (as that term is defined in the act):

Block 142 South Marsh Island, South Addition, as shown on official leasing map La. No. 3C, Outer Continental Shelf Leasing Map, Louisiana Offshore Operations.

containing ...... **2,760.91** ...... acres, more or less (hereinafter referred to as the leased area), together with:
(a) the non-exclusive right to conduct within the leased area geological and geophysical explorations which are not unduly harmful to aquatic life;
(b) the right to drill water wells within the leased area and use free of cost, and to dispose of, water produced from such wells; and
(c) the right to construct or erect and to maintain within the leased area all artificial islands, platforms, fixed or floating structures, sea walls, docks, dredged channels and spaces, buildings, plants, telegraph or telephone lines and cables, pipelines, reservoirs, tanks, pumping stations, and other works and structures necessary or convenient to the full enjoyment of the rights granted by this lease,
for a period of 5 years and as long thereafter as oil or gas may be produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Secretary, are conducted thereon; subject to any unitization or pooling agreement heretofore or hereafter approved by the Secretary which affects the leased area or any part thereof, the provisions of such agreements to govern the leased area or part thereof subject thereto where inconsistent with the terms of this lease.

SEC. 2. *Obligations of lessee.*—In consideration of the foregoing, the lessee agrees:
(a) *Bonds.*—To maintain at all times the bond required prior to the issuance of this lease and to furnish such additional security as may be required by the lessor if, after operations or production have begun, the lessor deems such additional security to be necessary.
(b) *Cooperative or unit plan.*—Within 30 days after demand, to subscribe to and to operate under such reasonable cooperative or unit plan for the development and operation of the area, field, or pool, or part thereof, embracing lands included herein as the Secretary may determine to be practicable and necessary or advisable in the interest of conservation which plan shall adequately protect the rights of all parties in interest, including the United States.
(c) *Wells.*—(1) To drill and produce such wells as are necessary to protect the lessor from loss by reason of production on other properties or, in lieu thereof, with the consent of the oil and gas supervisor, to pay a sum determined by the supervisor as adequate to compensate the lessor for failure to drill and produce any such well. In the event that this lease is not being maintained in force by other production of oil or gas in paying quantities or by other approved drilling or reworking operations, such payments shall be considered as the equivalent of production in paying quantities for all purposes of this lease.
(2) After due notice in writing, to drill and produce such other wells as the Secretary may reasonably require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with good operating practice.
(3) At the election of the lessee, to drill and produce other wells in conformity with any system of well spacing or production allotments affecting the area, field, or pool in which the leased area or any part thereof is situated, which is authorized or sanctioned by applicable law or by the Secretary.
(d) *Rentals and royalties.*—(1) To pay rentals and royalties as follows:
*Rentals.*—To pay the lessor on or before the first day of each lease year commencing prior to a discovery of oil or gas on the leased area, a rental of ...... **$3.** ...... per acre or fraction thereof.
*Minimum royalty.*—To pay the lessor in lieu of rental at the expiration of each lease year commencing after discovery a minimum royalty of ...... **$3.** ...... per acre or fraction thereof or, if there is production, the difference between the actual royalty paid during the year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

*Royalty on production.*—To pay the lessor a royalty of ... **16-2/3** percent in amount or value of production saved, removed, or sold from the leased area. Gas of all kinds (except helium, and gas used for purposes of production from and operations upon the leased area or unavoidably lost) is subject to royalty.
(2) It is expressly agreed that the Secretary may establish reasonable minimum values for purposes of computing royalty on products obtained from this lease, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, or area, to the price received by the lessee, to posted prices, and to other relevant matters. Each such determination shall be made only after due notice to the lessee and a reasonable opportunity has been afforded the lessee to be heard.
(3) When paid in value, such royalties on production shall be due and payable monthly on the last day of the calendar month next following the calendar month in which the production is obtained. When paid in production, such royalties shall be delivered at pipeline connections or in tanks provided by the lessee. Such deliveries shall be made at reasonable times and intervals and, at the lessee's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The lessee shall not be required to provide storage for royalty taken in kind in excess of tankage required when royalty is paid in value. When payments are made in production the lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the lessee has no control.
(4) Rentals or minimum royalties may be reduced and royalties on the entire leasehold or any deposit, tract, or portion thereof segregated for royalty purposes may be reduced if the Secretary finds that, for the purpose of increasing the ultimate recovery of oil or gas and in the interest of conservation of natural resources, it is necessary, in his judgment, to do so in order to promote development, or because the lease cannot be successfully operated under the terms fixed herein.
(e) *Payments.*—Unless otherwise provided by regulation or directed by the Secretary, to make rental, royalty, or other payments to the lessor, to the order of the Treasurer of the United States, and to tender such payments to the oil and gas supervisor, Geological Survey.
(f) *Contracts for disposal of products.*—To file with the oil and gas supervisor, Geological Survey, not later than 30 days after the effective date thereof, copies of all contracts for the disposal of lease products; provided that the supervisor may relieve the lessee of this requirement, in which event the contracts shall be made available

16—70375-1

for inspection by the supervisor upon his request. Nothing in any such contract or in any approval thereof by the supervisor shall be construed or accepted as modifying any of the provisions of this lease, including, but not limited to, provisions relating to gas waste, taking royalty in kind, and the method of computing royalties due as based on a minimum valuation and in accordance with the regulations applicable to this lease.

(g) *Statements, plats, and reports.*—At such times and in such form as the lessor may prescribe, to furnish detailed statements and reports showing the amounts and quality of all products saved, removed, and sold from the leased area, the proceeds therefrom, and the amount used for production purposes or unavoidably lost; also a plat showing development work and improvements on or with regard to the leased area.

(h) *Inspection.*—To keep open at all reasonable times for the inspection of any duly authorized representative of the lessor, the leased area and all wells, improvements, machinery and fixtures thereon and all books, accounts and records relative to operations and surveys or investigations on or with regard to the leased area or under the lease.

(i) *Diligence.*—To exercise reasonable diligence in drilling and producing the wells herein provided for; to carry on all operations in accordance with approved methods and practices including those provided in the operating and conservation regulations for the outer Continental Shelf; to remove all structures when no longer required for operations under the lease to sufficient depth beneath the surface of the waters to prevent them from being a hazard to navigation; to carry out at expense of the lessee all lawful and reasonable orders of the lessor relative to the matters in this paragraph, and that on failure of the lessee so to do the lessor shall have the right to enter on the property and to accomplish the purpose of such orders at the lessee's cost: *Provided,* That the lessee shall not be held responsible for delays or casualties occasioned by causes beyond the lessee's control.

(j) *Freedom of purchase.*—To accord all workmen and employees directly engaged in any of the operations under this lease complete freedom of purchase.

(k) *Nondiscrimination.*—Not to discriminate against any employee, or applicant for employment, because of race, creed, color or national origin, and to require an identical provision to be included in all sub-contracts relating to operations under this lease.

(l) *Assignment of lease.*—To file for approval with the Bureau of Land Management, within 90 days from the date of final execution, any instrument of transfer of this lease, or any interest therein, including assignments of record title, operating agreements, and subleases. Carried working interests, overriding royalty interests, or payments out of production, may be created or transferred without requirement for filing or approval. Instruments required to be filed shall take effect upon approval as of the first day of the lease month following the date of filing unless at the request of the parties an earlier date is specified in such approval.

SEC. 3. *Reservations to lessor.*—The lessor reserves:

(a) *Geological and geophysical exploration; rights-of-way.*—The right to authorize the conduct of geological and geophysical exploration in the leased area which does not interfere with or endanger actual operations under this lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands containing the deposits described in the act, and to the treatment and shipment of products thereof by or under authority of the United States, its lessees or permittees, and for other public purposes, subject to the provisions of section 5 (c) of the act where they are applicable and by the Secretary thereunder.

(b) *Leases of sulfur and other mineral.*—The right to grant sulfur leases and leases of any mineral other than oil, gas, and sulfur within the leased area or any part thereof, subject to the provisions of section 8 (c), 8 (d), and 8 (e) of the act and all lawful and reasonable regulations prescribed by the Secretary thereunder: *Provided,* That no such sulfur lease or lease of other mineral shall authorize or permit the lessee thereunder unreasonably to interfere with or endanger operations under this lease.

(c) *Purchase of production.*—In time of war, or when the President of the United States shall so prescribe, the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in section 12 (b) of the act.

(d) *Taking of royalties.*—All rights, pursuant to clause (3) of section 8 (b) of the act, to take royalties in the amount or value of production.

(e) *Fissionable materials.*—All uranium, thorium, and all other materials determined pursuant to paragraph (1) of subsection (b) of section 5 of the Atomic Energy Act of 1946, as amended, to be peculiarly essential to the production of fissionable materials, contained, in whatever concentration, in deposits in the subsoil or seabed of the leased area or any part thereof, as provided in section 12 (e) of the act.

(f) *Helium.*—Pursuant to section 12 (f) of the act, the ownership and the right to extract helium from all gas produced under this lease, subject to such rules and regulations as shall be prescribed by the Secretary.

(g) *Suspension of operations during war or national emergency.*—Upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or President of the United States after August 7, 1953, the authority of the Secretary to suspend any or all operations under this lease, as provided in section 12 (c) of the act: *Provided,* That just compensation shall be paid by the lessor to the lessee.

(h) *Restriction of exploration and operations.*—The right, as provided in section 12 (d) of the act, to restrict from exploration and

*IN WITNESS WHEREOF:*

operations the leased area or any part thereof which may be designated by and through the Secretary of Defense, with the approval of the President, as, or as part of, an area of the outer Continental Shelf needed for national defense; and so long as such designation remains in effect no exploration or operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense; and if operations or production under this lease within any such restricted area shall be suspended, any payments of rentals, minimum royalty, and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the lessor shall be liable to the lessee for such compensation as is required to be paid under the Constitution of the United States.

SEC. 4. *Directional drilling.*—This lease may be maintained in force by directional wells drilled under the leased area from surface locations on adjacent or adjoining lands not covered by this lease. In such circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the adjacent or adjoining land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on adjacent or adjoining land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations (as the case may be) on the leased area for all purposes of this lease. Nothing contained in this paragraph is intended or shall be construed as granting to the lessee any leasehold interests, licenses, easements, or other rights in or with respect to any such adjacent or adjoining land in addition to any such leasehold interests, licenses, easements, or other rights which the lessee may have lawfully acquired under the act or from the lessor or others.

SEC. 5. *Surrender and termination of lease.*—The lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the Bureau of Land Management, a written relinquishment, in triplicate, which shall be effective as of the date of filing, subject to the continued obligation of the lessee and his surety to make payment of all accrued rentals and royalties and to abandon all wells on the area to be relinquished to the satisfaction of the oil and gas supervisor.

SEC. 6. *Removal of property on termination of lease.*—Upon the expiration of this lease, or the earlier termination thereof as herein provided, the lessee shall within a period of 1 year thereafter remove from the premises all structures, machinery, equipment, tools, and materials other than improvements needed for producing wells or for drilling or producing on other leases and other property permitted by the lessor to be maintained on the area.

SEC. 7. *Remedies in case of default.*—(a) Whenever the lessee fails to comply with any of the provisions of the act or this lease or the applicable regulations in force and effect on the date of issuance of this lease, the lease shall be subject to cancellation as follows:

(1) *Cancellation of non-producing lease.*—If, at the time of such default, no well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be canceled by the Secretary (subject to the right of judicial review as provided in section 8 (j) of the act) if such default continues for the period of 30 days after mailing of notice by registered letter to the lessee at the lessee's record post office address.

(2) *Cancellation of producing lease.*—If, at the time of such default, any well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be canceled by an appropriate proceeding in any United States district court having jurisdiction under the provisions of section 4 (b) of the act if such default continues for the period of 30 days after mailing of notice by registered letter to the lessee at the lessee's record post office address.

(b) *Other remedies.*—If any such default continues for the period of 30 days after mailing of notice by registered letter to the lessee at the lessee's record post office address, the lessor may then exercise any legal or equitable remedy which the lessor may have; however, the remedy of cancellation of this lease may be exercised only under the conditions and subject to the limitations set out above in paragraph (a) of this section, or pursuant to section 8 (i) of the act.

(c) *Effect of waiver of default.*—A waiver of any particular default shall not prevent the cancellation of this lease or the exercise of any other remedy the lessor may have by reason of any other cause or for the same cause occurring at any other time.

SEC. 8. *Heirs and successors in interest.*—Each obligation hereunder shall extend to and bind the binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

SEC. 9. *Unlawful interest.*—No member of, or Delegate to, Congress, or Resident Commissioner, after his election or appointment, or either before or after he has qualified, and during his continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR 7.4 (a) (1), shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom; and the provisions of section 3741 of the Revised Statutes, as amended (41 U.S.C., sec. 22), and sections 431, 432 and 433 of Title 18 of the United States Code, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease so far as the same may be applicable.

THE UNITED STATES OF AMERICA

By _____

Manager, Bureau of Land Management
    New Orleans Office                    MAY 8 1962
    (Title)                              (Date)

FOREST OIL CORPORATION

_____
DAVID F. DORN, VICE PRESIDENT (Lessee)

WITNESSES TO SIGNATURE OF LESSEE

_____
(Name and Address)          H. J. WARNER
                            300 OIL & GAS BLDG.
                            HOUSTON 2, TEXAS

_____
(Name and address)          B. W. PURDUM
                            300 OIL & GAS BLDG.
                            HOUSTON 2, TEXAS

If this ● is executed by a corporation, it must bear the corporate seal

U. S. GOVERNMENT PRINTING OFFICE   16—70375-1

**OCS-G 1520**

Form 3380—1
(February 1966)
(formerly 4—1255)

| | |
|---|---|
| Office | New Orleans, La. |
| Serial Number | OCS-G 1520 |
| Cash Bonus | $2,565,000.00 |
| Rental Rate | $3.00 per acre |
| Minimum Royalty Rate $3.00 per acre | Royalty Rate 1/6th |

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

OIL AND GAS LEASE OF SUBMERGED LANDS
UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

This indenture of lease entered into and effective as of **JUL 1 1967** , by and between the United States of America, hereinafter called the Lessor, by the Director, Bureau of Land Management, and

| | |
|---|---|
| Hamilton Brothers Oil Company | 13.40% |
| Hunt Oil Company | 14.90% |
| Kewanee Oil Company | 14.90% |
| J. Ray McDermott & Co., Inc. | 4.50% |
| Metals Service Company | 26.00% |
| Offshore Operators, Inc. | 11.40% |
| Placid Oil Company | 14.90% |

hereinafter called the Lessee, under, pursuant, and subject to the terms and provisions of the Outer Continental Shelf Lands Act of August 7, 1953 (67 Stat. 462; 43 U.S.C., Sec. 1331, *et seq.*), hereinafter referred to as the Act, and to all lawful and reasonable regulations of the Secretary of the Interior (hereinafter referred to as the Secretary) when not inconsistent with any express and specific provisions herein, which are made a part hereof:

WITNESSETH:

Sec. 1. Rights of Lessee. That the Lessor, in consideration of a cash bonus and of the rents and royalties to be paid, and the conditions and covenants to be observed as herein set forth, does hereby grant and lease to the Lessee the exclusive right and privilege to drill for, mine, extract, remove and dispose of all oil and gas deposits except helium gas in or under the following-described area of the Outer Continental Shelf (as that term is defined in the Act):

All Block 204, Ship Shoal Area, Official Leasing Map, Louisiana Map No. 5.

containing 5,000 acres, more or less (hereinafter referred to as the leased area), together with:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations which are not unduly harmful to aquatic life;

(b) the right to drill water wells within the leased area and use free of cost, and to dispose of, water produced from such wells; and

(c) the right to construct or erect and to maintain within the leased area all artificial islands, platforms, fixed or floating structures, sea walls, docks, dredged channels and spaces, buildings, plants, telegraph or telephone lines and cables, pipelines, reservoirs, tanks, pumping stations, and other works and structures necessary or convenient to the full enjoyment of the rights granted by this lease, for a period of 5 years and as long thereafter as oil or gas may be produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Secretary, are conducted thereon; subject to any unitization or pooling agreement heretofore or hereafter approved by the Secretary which affects the leased area or any part thereof, the provisions of such agreements to govern the leased area or part thereof subject thereto where inconsistent with the terms of this lease.

Sec. 2. Obligations of Lessee. In consideration of the foregoing, the Lessee agrees:

(a) *Rentals and royalties.* (1) To pay rentals and royalties as follows:

*Rentals.* To pay the Lessor on or before the first day of each lease year commencing prior to a discovery of oil or gas on the leased area, a rental of $3.00 per acre or fraction thereof.

*Minimum royalty.* To pay the Lessor in lieu of rental at the expiration of each lease year commencing after discovery a minimum royalty of $3.00 per acre or fraction thereof or, if there is production, the difference between the actual royalty paid during the year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

*Royalty on production.* To pay the Lessor a royalty of 16-2/3 percent in amount or value of production saved, removed, or sold from leased area. Gas of all kinds (except helium and gas used for purposes of production from and operations upon the leased area or unavoidably lost) is subject to royalty.

(2) It is expressly agreed that the Secretary may establish reasonable minimum values for purposes of computing royalty on products obtained from this lease, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, or area, to the price received by the Lessee, to posted prices, and to other relevant matters. Each such determination shall be made only after due

notice to the Lessee and a reasonable opportunity has been afforded the Lessee to be heard.

(3)  When paid in value, such royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained. When paid in production, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessee's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The Lessee shall not be required to provide storage for royalty taken in kind in excess of tankage required when royalty is paid in value. When payments are made in production the Lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the Lessee has no control.

(4) Rentals or minimum royalties may be reduced and royalties on the entire leasehold or any deposit, tract, or portion thereof segregated for royalty purposes may be reduced if the Secretary finds that, for the purpose of increasing the ultimate recovery of oil or gas and in the interest of conservation of natural resources, it is necessary, in his judgment, to do so in order to promote development, or because the lease cannot be successfully operated under the terms fixed herein.

(b) Bonds. To maintain at all times the bond required prior to the issuance of this lease and to furnish such additional security as may be required by the Lessor if, after operations or production have begun, the Lessor deems such additional security to be necessary.

(c) Cooperative or unit plan. Within 30 days after demand, to subscribe to and to operate under such reasonable cooperative or unit plan for the development and operation of the area, field, or pool, or part thereof, embracing lands included herein as the Secretary may determine to be practicable and necessary or advisable in the interest of conservation which plan shall adequately protect the rights of all parties in interest, including the United States.

(d) Wells. (1) To drill and produce such wells as are necessary to protect the Lessor from loss by reason of production on other properties or, in lieu thereof, with the consent of the oil and gas supervisor, to pay a sum determined by the supervisor as adequate to compensate the Lessor for failure to drill and produce any such well.  In the event that this lease is not being maintained in force by other production of oil or gas in paying quantities or by other approved drilling or reworking operations, such payments shall be considered as the equivalent of production in paying quantities for all purposes of this lease.

(2) After due notice in writing, to drill and produce such other wells as the Secretary may reasonably require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with good operating practice.

(3) At the election of the Lessee, to drill and produce other wells in conformity with any system of well spacing or production allotments affecting the area, field, or pool in which the leased area or any part thereof is situated, which is authorized or sanctioned by applicable law or by the Secretary.

(e) Payments. To make all payments to the Lessor by check, bank draft or money order payable as indicated herein unless otherwise provided by regulations or by direction of the Secretary. Rental, royalties, and other payments shall be made payable to the United States Geological Survey and tendered to the Oil and Gas Supervisor, except that filing charges, bonuses, and first year's rental shall be made payable to the Bureau of Land Management and remitted to the Manager of the appropriate field office of that Bureau.

(f) Contracts for disposal of products. To file with the Oil and Gas Supervisor, Geological Survey, not later than 30 days after the effective date thereof, copies of all contracts for the disposal of lease products; provided that the Supervisor may relieve the Lessee of this requirement, in which event the contracts shall be made available for inspection by the Supervisor upon his request.  Nothing in any such contract or in any approval thereof by the Supervisor shall be construed or accepted as modifying any of the provisions of this lease, including, but not limited to, provisions relating to gas waste, taking royalty in kind, and the method of computing royalties due as based on a minimum valuation and in accordance with the regulations applicable to this lease.

(g) Statements, plats, and reports. At such times and in such form as the Lessor may prescribe, to furnish detailed statements and reports showing the amounts and quality of all products saved, removed, and sold from the leased area, the proceeds therefrom, and the amount used for production purposes or unavoidably lost; also a plat showing development work and improvements on or with regard to the leased area.

(h) Inspection. To keep open at all reasonable times for the inspection of any duly authorized representative of the Lessor, the leased area and all wells, improvements, machinery and fixtures thereon and all books, accounts, and records relative to operations and surveys or investigations on or with regard to the leased area or under the lease.

(i) Diligence. To exercise reasonable diligence in drilling and producing the wells herein provided for; to carry on all operations in accordance with approved methods and practices including those provided in the operating and conservation regulations for the Outer Continental Shelf; to remove all structures when no longer required for operations under the lease to sufficient depth beneath the surface of the waters to prevent them from being a hazard to navigation; to carry out at expense of the Lessee all lawful and reasonable orders of the Lessor relative to the matters in this paragraph, and that on failure of the Lessee so to do the Lessor shall have the right to enter on the property and to accomplish the purpose of such orders at the Lessee's cost:  Provided, That the Lessee shall not be held responsible for delays or casualties occasioned by causes beyond the Lessee's control.

(j) Freedom of purchase. To accord all workmen and employees directly engaged in any of the operations under this lease complete freedom of purchase.

(k) Equal Opportunity clause. During the performance of this contract the lessee agrees as follows:

(1) The lessee will not discriminate against any employee or applicant for employment because of race, creed, color, or national origin.  The lessee will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, creed, color, or national origin.  Such action shall include, but not be limited to the following:  employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship.  The lessee agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

(2) The lessee will, in all solicitations or advertisements for employees placed by or on behalf of the lessee, state that all qualified applicants will receive consideration for employment without regard to race, creed, color, or national origin.

**OCS-G 1529**

Form 3380—1
(February 1966)
(formerly 4—1255)

| | |
|---|---|
| Office | New Orleans, La. |
| Serial Number | OCS-G 1529 |
| Cash Bonus | $ 1,062,500.00 |
| Rental Rate | $3.00 per acre |

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

OIL AND GAS LEASE OF SUBMERGED LANDS
UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

| Minimum Royalty Rate | Royalty Rate |
|---|---|
| $3.00 per acre | 1/6th |

This indenture of lease entered into and effective as of **JUL 1 1967**, by and between the United States of America, hereinafter called the Lessor, by the Director, Bureau of Land Management, and

| | |
|---|---|
| **Union Oil Company of California** | **50%** |
| **Marathon Oil Company** | **50%** |

hereinafter called the Lessee, under, pursuant, and subject to the terms and provisions of the Outer Continental Shelf Lands Act of August 7, 1953 (67 Stat. 462; 43 U.S.C., Sec. 1331, *et seq.*), hereinafter referred to as the Act, and to all lawful and reasonable regulations of the Secretary of the Interior (hereinafter referred to as the Secretary) when not inconsistent with any express and specific provisions herein, which are made a part hereof:

WITNESSETH:

Sec. 1. Rights of Lessee. That the Lessor, in consideration of a cash bonus and of the rents and royalties to be paid, and the conditions and covenants to be observed as herein set forth, does hereby grant and lease to the Lessee the exclusive right and privilege to drill for, mine, extract, remove and dispose of all oil and gas deposits except helium gas in or under the following-described area of the Outer Continental Shelf (as that term is defined in the Act):

All Block 252 Ship Shoal Area, South Addition, Official Leasing Map, Louisiana Map No. 5A

containing 5,000 acres, more or less (hereinafter referred to as the leased area), together with:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations which are not unduly harmful to aquatic life;

(b) the right to drill water wells within the leased area and use free of cost, and to dispose of, water produced from such wells; and

(c) the right to construct or erect and to maintain within the leased area all artificial islands, platforms, fixed or floating structures, sea walls, docks, dredged channels and spaces, buildings, plants, telegraph or telephone lines and cables, pipelines, reservoirs, tanks, pumping stations, and other works and structures necessary or convenient to the full enjoyment of the rights granted by this lease, for a period of 5 years and as long thereafter as oil or gas may be produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Secretary, are conducted thereon; subject to any unitization or pooling agreement heretofore or hereafter approved by the Secretary which affects the leased area or any part thereof, the provisions of such agreements to govern the leased area or part thereof subject thereto where inconsistent with the terms of this lease.

Sec. 2. Obligations of Lessee. In consideration of the foregoing, the Lessee agrees:

(a) Rentals and royalties. (1) To pay rentals and royalties as follows:

Rentals. To pay the Lessor on or before the first day of each lease year commencing prior to a discovery of oil or gas on the leased area, a rental of $3.00 per acre or fraction thereof.

Minimum royalty. To pay the Lessor in lieu of rental at the expiration of each lease year commencing after discovery a minimum royalty of $3.00 per acre or fraction thereof or, if there is production, the difference between the actual royalty paid during the year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

Royalty on production. To pay the Lessor a royalty of 16-2/3 percent in amount or value of production saved, removed, or sold from leased area. Gas of all kinds (except helium and gas used for purposes of production from and operations upon the leased area or unavoidably lost) is subject to royalty.

(2) It is expressly agreed that the Secretary may establish reasonable minimum values for purposes of computing royalty on products obtained from this lease, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, or area, to the price received by the Lessee, to posted prices, and to other relevant matters. Each such determination shall be made only after due

notice to the Lessee and a reasonable opportunity has been afforded the Lessee to be heard.

(3) When paid in value, such royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained. When paid in production, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessee's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The Lessee shall not be required to provide storage for royalty taken in kind in excess of tankage required when royalty is paid in value. When payments are made in production the Lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the Lessee has no control.

(4) Rentals or minimum royalties may be reduced and royalties on the entire leasehold or any deposit, tract, or portion thereof segregated for royalty purposes may be reduced if the Secretary finds that, for the purpose of increasing the ultimate recovery of oil or gas and in the interest of conservation of natural resources, it is necessary, in his judgment, to do so in order to promote development, or because the lease cannot be successfully operated under the terms fixed herein.

(b) Bonds. To maintain at all times the bond required prior to the issuance of this lease and to furnish such additional security as may be required by the Lessor if, after operations or production have begun, the Lessor deems such additional security to be necessary.

(c) Cooperative or unit plan. Within 30 days after demand, to subscribe to and to operate under such reasonable cooperative or unit plan for the development and operation of the area, field, or pool, or part thereof, embracing lands included herein as the Secretary may determine to be practicable and necessary or advisable in the interest of conservation which plan shall adequately protect the rights of all parties in interest, including the United States.

(d) Wells. (1) To drill and produce such wells as are necessary to protect the Lessor from loss by reason of production on other properties or, in lieu thereof, with the consent of the oil and gas supervisor, to pay a sum determined by the supervisor as adequate to compensate the Lessor for failure to drill and produce any such well. In the event that this lease is not being maintained in force by other production of oil or gas in paying quantities or by other approved drilling or reworking operations, such payments shall be considered as the equivalent of production in paying quantities for all purposes of this lease.

(2) After due notice in writing, to drill and produce such other wells as the Secretary may reasonably require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with good operating practice.

(3) At the election of the Lessee, to drill and produce other wells in conformity with any system of well spacing or production allotments affecting the area, field, or pool in which the leased area or any part thereof is situated, which is authorized or sanctioned by applicable law or by the Secretary.

(e) Payments. To make all payments to the Lessor by check, bank draft or money order payable as indicated herein unless otherwise provided by regulations or by direction of the Secretary. Rental, royalties, and other payments shall be made payable to the United States Geological Survey and tendered to the Oil and Gas Supervisor, except that filing charges, bonuses, and first year's rental shall be made payable to the Bureau of Land Management and remitted to the Manager of the appropriate field office of that Bureau.

(f) Contracts for disposal of products. To file with the Oil and Gas Supervisor, Geological Survey, not later than 30 days after the effective date thereof, copies of all contracts for the disposal of lease products; provided that the Supervisor may relieve the Lessee of this requirement, in which event the contracts shall be made available for inspection by the Supervisor upon his request. Nothing in any such contract or in any approval thereof by the Supervisor shall be construed or accepted as modifying any of the provisions of this lease, including, but not limited to, provisions relating to gas waste, taking royalty in kind, and the method of computing royalties due as based on a minimum valuation and in accordance with the regulations applicable to this lease.

(g) Statements, plats, and reports. At such times and in such form as the Lessor may prescribe, to furnish detailed statements and reports showing the amounts and quality of all products saved, removed, and sold from the leased area, the proceeds therefrom, and the amount used for production purposes or unavoidably lost; also a plat showing development work and improvements on or with regard to the leased area.

(h) Inspection. To keep open at all reasonable times for the inspection of any duly authorized representative of the Lessor, the leased area and all wells, improvements, machinery and fixtures thereon and all books, accounts, and records relative to operations and surveys or investigations on or with regard to the leased area or under the lease.

(i) Diligence. To exercise reasonable diligence in drilling and producing the wells herein provided for; to carry on all operations in accordance with approved methods and practices including those provided in the operating and conservation regulations for the Outer Continental Shelf; to remove all structures when no longer required for operations under the lease to sufficient depth beneath the surface of the waters to prevent them from being a hazard to navigation; to carry out at expense of the Lessee all lawful and reasonable orders of the Lessor relative to the matters in this paragraph, and that on failure of the Lessee so to do the Lessor shall have the right to enter on the property and to accomplish the purpose of such orders at the Lessee's cost: Provided, That the Lessee shall not be held responsible for delays or casualties occasioned by causes beyond the Lessee's control.

(j) Freedom of purchase. To accord all workmen and employees directly engaged in any of the operations under this lease complete freedom of purchase.

(k) Equal Opportunity clause. During the performance of this contract the lessee agrees as follows:
(1) The lessee will not discriminate against any employee or applicant for employment because of race, creed, color, or national origin. The lessee will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, creed, color, or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The lessee agrees to post in conspicuous places available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.
(2) The lessee will, in all solicitations or advertisements for employees placed by or on behalf of the lessee, state that all qualified applicants will receive consideration for employment without regard to race, creed, color, or national origin.

(3) The lessee will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the lessee's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) The lessee will comply with all provisions of Executive Order No. 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) The lessee will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6) In the event of the lessee's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated or suspended in whole or in part and the lessee may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, and such other sanctions may be imposed and remedies involved as provided in Executive Order No. 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7) The lessee will include the provisions of Paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The lessee will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for noncompliance: *Provided, however,* That in the event the lessee becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a reults of such direction by the contracting agency, the lessee may request the United States to enter into such litigation to protect the interests of the United States.

*(l) Assignment of lease.* To file for approval with the Bureau of Land Management, within 90 days from the date of final execution, any instrument of transfer of this lease, or any interest therein, including assignments of record title, operating agreements, and subleases. Carried working interests, overriding royalty interests, or payments out of production, may be created or transferred without requirement for filing or approval. Instruments required to be filed shall take effect upon approval as of the first day of the lease month following the date of filing unless at the request of the parties an earlier date is specified in such approval.

Sec. 3. Reservations to Lessor. The Lessor reserves:

*(a) Geological and geophysical exploration; rights-of-way.* The right to authorize the conduct of geological and geophysical exploration in the leased area which does not interfere with or endanger actual operations under this lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands containing the deposits described in the Act, and to the treatment and shipment of products thereof by

or under authority of the United States, its Lessees or Permittees, and for other public purposes, subject to the provisions of Section 5(c) of the Act where they are applicable and to all lawful and reasonable regulations and conditions prescribed by the Secretary thereunder.

*(b) Leases of sulfur and other mineral.* The right to grant sulfur leases and leases of any mineral other than oil, gas, and sulfur within the leased area or any part thereof, subject to the provisions of Section 8(c), 8(d), and 8(e) of the Act and all lawful and reasonable regulations prescribed by the Secretary thereunder; *Provided,* That no such sulfur lease or lease of other mineral shall authorize or permit the Lessee thereunder unreasonably to interfere with or endanger operations under this lease.

*(c) Purchase of production.* In time of war, or when the President of the United States shall so prescribe, the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in Section 12(b) of the Act.

*(d) Taking of royalties.* All rights, pursuant to clause (3) of Section 8(b) of the Act, to take royalties in the amount or value of production.

*(e) Fissionable materials.* All uranium, thorium, and all other materials determined pursuant to paragraph (1) of subsection (b) of Section 5 of the Atomic Energy Act of 1946, as amended, to be peculiarly essential to the production of fissionable materials, contained, in whatever concentration, in deposits in the subsoil or seabed of the leased area or any part thereof, as provided in Section 12(e) of the Act.

*(f) Helium.* Pursuant to Section 12(f) of the Act, the ownership and the right to extract helium from all gas produced under this lease, subject to such rules and regulations as shall be prescribed by the Secretary.

*(g) Suspension of operations during war or national emergency.* Upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or President of the United States after August 7, 1953, the authority of the Secretary to suspend any or all operations under this lease, as provided in Section 12(c) of the Act: *Provided,* That just compensation shall be paid by the Lessor to the Lessee.

*(h) Restriction of exploration and operations.* The right, as provided in Section 12(d) of the Act, to restrict from exploration and operations the leased area or any part thereof which may be designated by and through the Secretary of Defense, with the approval of the President, as, or as part of, an area of the Outer Continental Shelf needed for national defense; and so long as such designation remains in effect no exploration or operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense; and if operations or production under this lease within any such restricted area shall be suspended, any payments of rentals, minimum royalty, and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

Sec. 4. Directional drilling. This lease may be maintained in force by directional wells drilled under the leased area from surface locations on adjacent or adjoining lands not covered by this lease. In such circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the adjacent or adjoining land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on adjacent or adjoining land or drilling or reworking of any such directional well

shall be considered production or drilling or reworking operations (as the case may be) on the leased area for all purposes of this lease. Nothing contained in this paragraph is intended or shall be construed as granting to the Lessee any leasehold interests, licenses, easements, or other rights in or with respect to any such adjacent or adjoining land in addition to any such leasehold interests, licenses, easements, or other rights which the Lessee may have lawfully acquired under the Act or from the Lessor or others.

Sec. 5. Surrender and termination of lease. The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the Bureau of Land Management, a written relinquishment, in *triplicate*, which shall be effective as of the date of filing, subject to the continued obligation of the Lessee and his surety to make payment of all accrued rentals and royalties and to abandon all wells on the area to be relinquished to the satisfaction of the Oil and Gas Supervisor.

Sec. 6. Removal of property on termination of lease. Upon the expiration of this lease, or the earlier termination thereof as herein provided, the Lessee shall within a period of 1 year thereafter remove from the premises all structures, machinery, equipment, tools, and materials other than improvements needed for producing wells or for drilling or producing on other leases and other property permitted by the Lessor to be maintained on the area.

Sec. 7. Remedies in case of default. *(a)* Whenever the Lessee fails to comply with any of the provisions of the Act or this lease or the applicable regulations in force and effect on the date of issuance of this lease, the lease shall be subject to cancellation as follows:
(1) *Cancellation of nonproducing lease.* If, at the time of such default, no well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be cancelled by the Secretary (subject to the right of judicial review as provided in Section 8*(j)* of the Act) if such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address.

(2) *Cancellation of producing lease.* If, at the time of such default, any well is producing, or is capable of producing, oil or gas in paying quantities from the leased area, whether such well be drilled from a surface location within the leased area or be directionally drilled from a surface location on adjacent or adjoining lands, this lease may be cancelled by an appropriate proceeding in any United States district court having jurisdiction under the provisions of Section 4*(b)* of the Act if such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address.

*(b) Other remedies.* If any such default continues for the period of 30 days after mailing of notice by registered letter to the Lessee at the Lessee's record post office address, the Lessor may then exercise any legal or equitable remedy which the Lessor may have; however, the remedy of cancellation of this lease may be exercised only under the conditions and subject to the limitations set out above in paragraph *(a)* of this Section, or pursuant to Section 8*(i)* of the Act.

*(c) Effect of waiver of default.* A waiver of any particular default shall not prevent the cancellation of this lease or the exercise of any other remedy the Lessor may have by reason of any other cause or for the same cause occurring at any other time.

Sec. 8. Heirs and successors in interest. Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns of the respective parties hereto.

Sec. 9. Unlawful interest. No Member of, or Delegate to, Congress, or Resident Commissioner, after his election or appointment, or either before or after he has qualified, and during his continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR 7.4(a) (1), shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom; and the provisions of Section 3741 of the Revised Statutes (41 U.S.C. Sec. 22), as amended, and Sections 431, 432, and 433 of Title 18 of the United States Code, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease so far as the same may be applicable.

UNION OIL COMPANY OF CALIFORNIA

By: _(signature)_

(Signature of Lessee) W. F. BOLDING
Attorney in Fact

_____
(Signature of Lessee)

MARATHON OIL COMPANY

_(signature)_

(Signature of Lessee) Vice President
Production Exploration

_____
(Signature of Lessee)

THE UNITED STATES OF AMERICA

By _(signature)_
(Authorized Officer)

Manager, Bureau of Land Management
New Orleans Office

_____
(Title)

JUN 29 1967

_____
(Date)

*If this lease is executed by a corporation, it must bear the corporate seal*

GPO 855-238

**OCS-G 2721**

'73

RECEIVED
JUN 10 1974
. L. D.

Form 3300-1
(February 1971)
(formerly 3380-1)

**UNITED STATES**
**DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**

OIL AND GAS LEASE OF SUBMERGED LANDS
UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

| | |
|---|---|
| Office | New Orleans, Louisiana |
| Serial Number | OCS-G-2721 |
| Cash Bonus | $15,813,000.00 |
| Rental Rate | $3.00 per acre |
| Minimum Royalty Rate | $3.00 per acre |
| Royalty Rate | 1/6th |

This lease is made and effective as of **JUL 1 1974** (hereinafter called the Effective Date)
by and between the United States of America (hereinafter called the Lessor), by the **Manager**
Gulf of Mexico Outer Continental Shelf Office , Bureau of Land Management, its authorized officer, and

| | |
|---|---|
| Mobil Oil Corporation | 33-10/30% |
| Union Oil Company of California | 11- 3/30% |
| Amoco Production Company | 22- 7/30% |
| Texas Gas Exploration Corporation | 11- 3/30% |
| The Northwestern Mutual Life Insurance Company | 22- 7/30% |

(hereinafter called the Lessee). In consideration of the cash payment heretofore made by the Lessee to the Lessor and in consideration of the promises, terms, conditions and covenants contained herein, the parties hereto agree as follows:

**Sec. 1. Statutes and Regulations.** This lease is made pursuant to the Outer Continental Shelf Lands Act of August 7, 1953 (67 Stat. 462; 43 U.S.C. Secs. 1331, *et seq.*) (hereinafter called the Act). This lease is subject to all the provisions of the Act and to all the terms, conditions and requirements of the valid regulations promulgated by the Secretary of the Interior (hereinafter called the Secretary) thereunder in existence upon the effective date of this lease, all of which are incorporated herein and, by reference, made a part hereof. This lease shall also be subject to regulations hereafter issued by the Secretary pursuant to his authority under section 5(a)(1) of the Act to prescribe and amend at any time such rules and regulations as he may determine to be necessary and proper in order to provide for the prevention of waste and for the conservation of the natural resources of the Outer Continental Shelf, and for the protection of correlative rights therein, which regulations shall be deemed incorporated herein and, by reference, made a part hereof when promulgated.

**Sec. 2. Rights of Lessee.** The Lessor hereby grants and leases to the Lessee the exclusive right and privilege to drill for, mine, extract, remove and dispose of oil and gas deposits, except helium gas, in or under the following-described area of the Outer Continental Shelf of the United States:

All of Block A-595 High Island Area – South Addition – OCS Official Leasing Map,
Texas Map No. 7B

RECEIVED
Bureau of
Land Management
New Orleans, La.

containing approximately **5760** acres (hereinafter referred to as the leased area), together with:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations in accordance with applicable regulations;

(b) the nonexclusive right to drill water wells within the leased area and to use water produced therefrom for operations pursuant to the Act free of cost, provided that such drilling is conducted in accordance with procedures approved by the Regional Oil and Gas Supervisor of the Geological Survey (hereinafter called the "Supervisor"); and

(c) the right to construct or erect and to maintain within the leased area all artificial islands, platforms, fixed or floating structures, sea walls, docks, dredged channels and spaces, buildings, plants, telegraph or telephone lines and cables, pipelines, reservoirs, tanks, pumping stations, and other works and structures necessary to the full enjoyment of the rights granted by this lease, subject to compliance with applicable laws and regulations.

**Sec. 3. Obligations of Lessee.** The Lessee agrees:

(a) *Rentals and royalties.* (1) To pay rentals and royalties as follows:

*Rentals.* With respect to each lease year commencing prior to a discovery of oil or gas on the leased area, to pay the Lessor on or before the first day of each such year, a rental of **$3.00** per acre or fraction thereof.

*Minimum royalty.* To pay the Lessor at the expiration of each lease year commencing after discovery a minimum royalty of **$3.00** per acre or fraction thereof, or, if there is production, the difference between the actual royalty required to be paid with respect to such lease year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

*Royalty on production.* To pay the Lessor a royalty of **16-2/3** percent in amount or value of production saved, removed, or sold from the leased area. Gas of all kinds (except helium and gas used for purposes of production from and operations on the leased area or unavoidably lost) is subject to royalty.

(2) It is expressly agreed that the Secretary may establish minimum values for purposes of computing

SEE ATTACHED STIPULATION(S)

royalty on products obtained from this lease, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, or area, to the price received by the Lessee, to posted prices, and to other relevant matters. Each such determination shall be made only after due notice to the Lessee and a reasonable opportunity has been afforded the Lessee to be heard.

(3) When paid in value, royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained. When paid in production, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessor's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The Lessee shall not be required to provide storage for royalty taken in kind in excess of tankage required when royalty is paid in value. When payments are made in production the Lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the Lessee has no control.

(b) *Bonds.* To maintain at all times the bond required prior to the issuance of this lease and to furnish such additional security as may be required by the Lessor if, after operations or production have begun, the Lessor deems such additional security to be necessary.

(c) *Wells.* (1) To diligently drill and produce such wells as are necessary to protect the Lessor from loss by reason of production on other properties or, in lieu thereof, with the consent of the Supervisor, to pay a sum determined by the Supervisor as adequate to compensate the Lessor for failure to drill and produce any such well. In the event that this lease is not being maintained in force by other production of oil or gas in paying quantities or by other approved drilling or reworking operations, such payments shall be considered as the equivalent of production in paying quantities for all purposes of this lease.

(2) After due notice in writing, to diligently drill and produce such other wells as the Secretary may reasonably require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with good operating practice.

(3) At the election of the Lessee, to drill and produce other wells in conformity with any system of well spacing or production allotments affecting the area, field, or pool in which the leased area or any part thereof is situated, which is authorized or sanctioned by applicable law or by the Secretary.

(d) *Payments.* To make all payments to the Lessor by check, bank draft or money order payable as indicated herein unless otherwise provided by regulations or by direction of the Secretary. Rental, royalties, and other payments shall be made payable to the United States Geological Survey and tendered to the Supervisor, *except* that filing charges, bonuses, and first year's rental shall be made payable to the Bureau of Land Management and remitted to the Manager of the appropriate field office of that Bureau.

(e) *Inspection.* To keep open at all reasonable times for the inspection of any duly authorized representative of the Lessor, the leased area and all wells, improvements, machinery and fixtures thereon and all books, accounts, and records relative to operations and surveys or investigations on or with regard to the leased area or under the lease.

(f) *Conduct of operations.* To conduct all operations under this lease in accordance with applicable law and regulations.

(g) *Indemnification.* To indemnify and save the Lessor harmless against and from any and all claims of any nature whatever, including without limitation claims for loss or damage to property or injury to persons, caused by, or resulting from, any operation on the leased area conducted by or on behalf of the Lessee; provided that the Lessee shall not be held responsible to the Lessor under this subsection for any loss, damage, or injury caused by, or resulting from: (1) any negligent action of the Lessor other than the exercise or performance of (or the failure to exercise or perform) a discretionary function or duty on the part of a Federal agency or an employee of such an agency, whether or not the discretion involved is abused; or (2) the Lessee's compliance with an order or directive of the Lessor against which an appeal by the Lessee under 30 CFR 250.81 is filed before the cause of action for such a claim arises and is pursued diligently thereafter.

(h) *Equal Opportunity Clause.* The Lessee agrees that, during the performance of this lease:

(1) The Lessee will not discriminate against any employee or applicant for employment because of race, color, religion, sex or national origin. The Lessee will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Lessee agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the Lessor setting forth the provisions of this Equal Opportunity clause.

(2) The Lessee will, in all solicitations or advertisements for employees placed by or on behalf of the Lessee, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin.

(3) The Lessee will send to each labor union or representative of workers with which Lessee has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the Lessor, advising the labor union or workers' representative of the Lessee's commitments under this Equal Opportunity clause, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) The Lessee will comply with all provisions of Executive Order No. 11246 of September 24, 1965, as amended, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) The Lessee will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, as amended, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the Secretary of the Interior and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6) In the event of the Lessee's noncompliance with the Equal Opportunity clause of this lease or with any of said rules, regulations, or orders, this lease may be canceled, terminated or suspended in whole or in part and the Lessee may be declared ineligible for further Federal government contracts or leases in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, as amended, and such other sanctions may be imposed and remedies invoked as provided in Executive Order No. 11246 of September 24, 1965, as amended, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7) The Lessee will include the provisions of Paragraphs (1) through (7) of this subsection 3(h) in

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale #34
Outer Continental Shelf
TEXAS

Serial No. __OCS-G-2721__

(1)  The lessee agrees that, prior to any drilling activity or the construction
or placement of any structure for exploration or development on the lease,
including, but not limited to, well drilling and pipeline and platform
placement, hereinafter referred to as "operation", he will conduct geo-
physical surveys sufficient to determine the possible existence of any sites,
structures, or objects of historical or archaeological significance that may
be affected by such operation.  Such sites, structures, or objects are
hereafter in this stipulation included in the term "cultural resource".
If these geophysical surveys indicate anomalies that suggest the possible
existence of a cultural resource, the lessee will either:  (1) have a
qualified marine archaeologist confirm or refute the existence of a cultural
resource using such other equipment and survey techniques as may be necessary;
or  (2) relocate the site of such operation so as not to disturb the area in
which an anomaly has been identified; or  (3) show how such operation will
not disturb the area in which an anomaly has been identified.

All data obtained in the course of the geophysical and any archaeological
surveys shall be submitted to the Supervisor with any application for
drilling or other activity.  If the Supervisor determines there are indi-
cations that a possible cultural resource may be affected by the proposed
operation he shall direct the lessee to utilize the services of a marine
archaeologist to survey the area unless an archaeological survey has been
completed.

Upon completion of any archaeological survey, a report shall be forwarded by
the Supervisor to the Manager, Gulf of Mexico OCS Office, Bureau of Land
Management for review and recommendations.  Should the archaeological survey
report indicate that a cultural resource may be affected by the operation
and the lessee chooses not to relocate, the lessee shall take no action that
may result in the disturbance of the cultural resource until the Supervisor
has given directions as to its disposition.

The lessee agrees that, if any cultural resource should be accidentally
discovered after the completion of the archaeological survey, he will report
immediately such findings to the Supervisor, and make every reasonable effort
to preserve and protect the cultural resource from damage until the Supervisor
has given directions as to its disposition.

(2)  Structures for drilling or production, including pipelines, shall be kept to
the minimum necessary for proper exploration, development, and production and,
to the greatest extent consistent therewith, shall be placed so as not to
interfere with other significant uses of the Outer Continental Shelf, including
commercial fishing.  To this end, no structure, for drilling or production,
including pipelines, may be placed on the Outer Continental Shelf until the
Supervisor has found that the structure is necessary for the proper exploration,
development, and production of the leased area and that no reasonable alter-
native placement would cause less interference with other significant uses of
the Outer Continental Shelf, including commercial fishing.  The lessee's
exploratory and development plans, filed under 30 CFR 250.34, shall identify
the anticipated placement and grouping of necessary structures, including
pipelines, showing how such placement and grouping will have the minimum
practicable effect on other significant uses of the Outer Continental Shelf,
including commercial fishing.

(3)  The lessor specifically reserves the right to require any pipelines between a
structure on the OCS and an onshore facility to be placed in certain designated
areas or corridors through the submerged lands of the OCS.

RECEIVED
Bureau of
Land Management
New Orleans, La.

every contract, subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to section 204 of Executive Order No. 11246 of September 24, 1965, as amended, so that such provisions will be binding upon each contractor, subcontractor or vendor. The Lessee will take such action with respect to any contract, subcontract or purchase order as the Secretary may direct as a means of enforcing such provisions including sanctions for noncompliance; *provided, however,* that in the event the Lessee becomes involved in, or is threatened with, litigation with a contractor, subcontractor or vendor as a result of such direction by the Secretary, the Lessee may request the Lessor to enter into such litigation to protect the interests of the Lessor.

(i) *Certification of nonsegregated facilities.* By entering into this lease, the Lessee certifies that Lessee does not and will not maintain or provide for Lessee's employees any segregated facilities at any of Lessee's establishments, and that Lessee does not and will not permit Lessee's employees to perform their services at any location, under Lessee's control, where segregated facilities are maintained. The Lessee agrees that a breach of this certification is a violation of the Equal Opportunity clause in this lease. As used in this certification, the term "segregated facilities" means, but is not limited to, any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom, or otherwise. Lessee further agrees that (except where Lessee has obtained identical certifications from proposed contractors and subcontractors for specific time periods) Lessee will obtain identical certifications from proposed contractors and subcontractors prior to the award of contracts or subcontracts exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity clause; that Lessee will retain such certifications in Lessee's files; and that Lessee will forward the following notice to such proposed contractors and subcontractors (except where the proposed contractor or subcontractor has submitted identical certifications for specific time periods): Notice to prospective contractors and subcontractors of requirement for certification of nonsegregated facilities. A Certification of Nonsegregated Facilities, as required by the May 9, 1967, order (32 F.R. 7439, May 19, 1967) on Elimination of Segregated Facilities, by the Secretary of Labor, must be submitted prior to the award of a contract or subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity clause. The certification may be submitted either for each contract and subcontract or for all contracts and subcontracts during a period (i.e., quarterly, semiannually, or annually).

(j) *Assignment of lease.* To file for approval with the appropriate office of the Bureau of Land Management any instrument of transfer of this lease, or any interest therein, required to be filed under applicable regulations, within the time and in the manner prescribed by the applicable regulations.

**Sec. 4. Term.** This lease shall continue for a period of 5 years from the effective date of this lease and so long thereafter as oil or gas may be produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Secretary, are conducted thereon.

**Sec. 5. Cooperative or Unit Plan.** Lessee agrees that, within 30 days after demand by Lessor, Lessee will subscribe to and operate under such cooperative or unit plan for the development and operation of the area, field,

or pool, or part thereof, embracing lands subject to this lease as the Secretary may determine to be practicable and necessary or advisable in the interest of conservation. Where any provision of a cooperative or unit plan of development which has been approved by the Secretary, and which by its terms affects the leased area or any part thereof, is inconsistent with a provision of this lease, the provision of such cooperative or unit plan shall govern.

**Sec. 6. Reservations to Lessor.** All rights in the leased area not expressly granted to the Lessee by the Act, the regulations, or this lease are hereby reserved to the Lessor. Without limiting the generality of the foregoing, such reserved rights include:

(a) *Geological and geophysical exploration; rights-of-way.* The right to authorize the conduct of geological and geophysical exploration in the leased area which does not interfere with or endanger actual operations under this lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands or to the treatment and shipment of products thereof by or under authority of the United States, its Lessees or Permittees.

(b) *Leases of sulfur and other minerals.* The right to grant leases of any mineral other than oil and gas within the leased area or any part thereof. No lease of other mineral shall authorize or permit the Lessee thereunder unreasonably to interfere with or endanger operations under this lease.

(c) *Purchase of production.* In time of war, or when the President of the United States shall so prescribe, the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in Section 12(b) of the Act.

(d) *Taking of royalties.* The right to determine whether royalty will be taken in the amount or the value of production.

(e) *Helium.* Pursuant to Section 12(f) of the Act, the ownership of and the right to extract helium from all gas produced under this lease.

(f) *Suspension of operations during war or national emergency.* Upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or President of the United States after August 7, 1953, the authority of the Secretary to suspend any or all operations under this lease, as provided in Section 12(c) of the Act: *Provided,* That just compensation shall be paid by the Lessor to the Lessee.

(g) *Restriction of exploration and operations.* The right, as provided in Section 12(d) of the Act, to restrict from exploration and operations the leased area or any part thereof which may be designated by and through the Secretary of Defense, with the approval of the President, as, or as part of, an area of the Outer Continental Shelf needed for national defense; and so long as such designation remains in effect no exploration or operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense; and if operations or production under this lease within any such restricted area shall be suspended, any payments of rentals and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

**Sec. 7. Directional Drilling.** A directional well drilled under the leased area from a surface location on nearby land not covered by this lease shall be deemed to have the same effect for all purposes of this lease as a well drilled from a surface location on the leased area. In such circumstances, drilling shall be considered to have

been commenced on the leased area when drilling is commenced on the nearby land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on nearby land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations (as the case may be) on the leased area for all purposes of this lease. Nothing contained in this paragraph is intended or shall be construed as granting to the Lessee any leasehold interests, licenses, easements, or other rights in or with respect to any such nearby land in addition to any such leasehold interests, licenses, easements, or other rights which the Lessee may have lawfully acquired under the Act or from the Lessor or others.

Sec. 8. Surrender of Lease. The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the appropriate office of the Bureau of Land Management a written relinquishment, in *triplicate*, which shall be effective as of the date of filing. No surrender of this lease or of any portion of the leased area shall relieve the Lessee or his surety of the obligation to make payment of all accrued rentals and royalties or to abandon all wells on the area to be surrendered in a manner satisfactory to the Supervisor.

Sec. 9. Removal of property on termination of lease. Upon the termination of this lease in whole or in part, or the surrender of the lease in whole or in part, as herein provided, the Lessee shall within a period of 1 year thereafter remove from the premises no longer subject to the lease all structures, machinery, equipment, tools, and materials in accordance with applicable regulations and orders of the Supervisor; *provided, however*, that the Lessee may continue to maintain any such property on the leased area for whatever longer period it may be needed, as determined by the Supervisor, for producing wells or for drilling or producing on other leases.

Sec. 10. Remedies in case of default. (a) Whenever the Lessee fails to comply with any of the provisions of the Act, or of this lease, or of the regulations issued under the Act and in force and effect on the effective date of this lease, the lease shall be subject to cancellation in accordance with the provisions of Section 5(b) of the Act; *provided, however*, that the 30-day notice provision applicable to non-producing leases under Section 5(b)(1) of the Act shall also apply as a prerequisite to the institution of any legal action by the Lessor to cancel this lease while it is in a producing status. Nothing in this subsection shall be construed to apply to, or require any notice with respect to, any legal action instituted by the Lessor other than an action to cancel the lease pursuant to Section 5(b) of the Act.

(b) Whenever the Lessee fails to comply with any of the provisions of the Act, or of this lease, or of any regulations promulgated by the Secretary under the Act, the Lessor may exercise any legal or equitable remedy or remedies which the Lessor may have, including appropriate action under the penalty provisions of Section 5(a)(2) of the Act; *however*, the remedy of cancellation of the lease may be exercised only under the provisions of Section 5(b) and Section 8(i) of the Act.

(c) A waiver of any particular violation of the provisions of the Act, or of this lease, or of any regulations promulgated by the Secretary under the Act, shall not prevent the cancellation of this lease or the exercise of any other remedy or remedies under paragraphs (a) and (b) of this section by reason of any other such violation or for the same violation occurring at any other time.

Sec. 11. Heirs and successors in interest. Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns, of the respective parties hereto.

Sec. 12. Unlawful interest. No member of, or Delegate to, Congress, or Resident Commissioner, after his election or appointment, or either before or after he has qualified, and during his continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR 7.4(a)(1), shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom; and the provisions of Section 3741 of the Revised Statutes (41 U.S.C. Sec. 22), as amended, and Sections 431, 432, and 433 of Title 18 of the United States Code, relating to contracts made or entered into, or accepted by, or on behalf of the United States, form a part of this lease so far as the same may be applicable.

TEXAS GAS EXPLORATION CORPORATION

By _____    ATTEST: _____
        Vice President              (Assistant Secretary)

MOBIL OIL CORPORATION

By _____
        (Signature of Lessee)
        Attorney-in-Fact

AMOCO PRODUCTION COMPANY

By _____
        (Signature of Lessee)
        Attorney-in-Fact

THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY

By _____
        (Signature of Lessee)
        Attorney-in-Fact

UNION OIL COMPANY OF CALIFORNIA

By _____
   W. F. BOLDING    (Signature of Lessee)
        Attorney-in-Fact

THE UNITED STATES OF AMERICA

By _____
        (Authorized Officer)

Acting   Manager, Bureau of Land Management
         Gulf of Mexico
         Outer Continental Shelf Office

_____
        (Title)

JUN 28 1974
        (Date)

*If this lease is executed by a corporation it must bear the corporate seal*

GPO 833 - 869

**OCS-G 2722**

Form 3300–1
(February 1971)
(formerly 3380–1)

**UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT**

OIL AND GAS LEASE OF SUBMERGED LANDS
UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

| | |
|---|---|
| Office | New Orleans, Louisiana |
| Serial Number | OCS-G-2722 |
| Cash Bonus | $18,909,000.00 |
| Rental Rate | $3.00 per acre |

| Minimum Royalty Rate | Royalty Rate |
|---|---|
| $3.00 per acre | 1/6th |

RECEIVED
JUN 1
W. L. D.

This lease is made and effective as of   **JUL 1**  **1974**   (hereinafter called the Effective Date)
by and between the United States of America (hereinafter called the Lessor), by the   **Manager**
**Gulf of Mexico Outer Continental Shelf Office**   , Bureau of Land Management, its authorized officer, and

| | |
|---|---|
| Mobil Oil Corporation | 33–10/30% |
| Union Oil Company of California | 11– 3/30% |
| Amoco Production Company | 22– 7/30% |
| Texas Gas Exploration Corporation | 11– 3/30% |
| The Northwestern Mutual Life Insurance Company | 22– 7/30% |

(hereinafter called the Lessee). In consideration of the cash payment heretofore made by the Lessee to the Lessor and in consideration of the promises, terms, conditions and covenants contained herein, the parties hereto agree as follows: Sec. 1. **Statutes and Regulations.** This lease is made pursuant to the Outer Continental Shelf Lands Act of August 7, 1953 (67 Stat. 462; 43 U.S.C. Secs. 1331, *et seq.*) (hereinafter called the Act). This lease is subject to all the provisions of the Act and to all the terms, conditions and requirements of the valid regulations promulgated by the Secretary of the Interior (hereinafter called the Secretary) thereunder in existence upon the effective date of this lease, all of which are incorporated herein and, by reference, made a part hereof. This lease shall also be subject to regulations hereafter issued by the Secretary pursuant to his authority under section 5(a)(1) of the Act to prescribe and amend at any time such rules and regulations as he may determine to be necessary and proper in order to provide for the prevention of waste and for the conservation of the natural resources of the Outer Continental Shelf, and for the protection of correlative rights therein, which regulations shall be deemed incorporated herein and, by reference, made a part hereof when promulgated.

Sec. 2. **Rights of Lessee.** The Lessor hereby grants and leases to the Lessee the exclusive right and privilege to drill for, mine, extract, remove and dispose of oil and gas deposits, except helium gas, in or under the following-described area of the Outer Continental Shelf of the United States:

All of Block A-596 High Island Area – South Addition, OCS Official Leasing Map,
Texas Map No. 7B

containing approximately   **5760**   acres (hereinafter referred to as the leased area) together with:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations in accordance with applicable regulations;

(b) the nonexclusive right to drill water wells within the leased area and to use water produced therefrom for operations pursuant to the Act free of cost, provided that such drilling is conducted in accordance with procedures approved by the Regional Oil and Gas Supervisor of the Geological Survey (hereinafter called the "Supervisor"); and

(c) the right to construct or erect and to maintain within the leased area all artificial islands, platforms, fixed or floating structures, sea walls, docks, dredged channels and spaces, buildings, plants, telegraph or telephone lines and cables, pipelines, reservoirs, tanks, pumping stations, and other works and structures necessary to the full enjoyment of the rights granted by this lease, subject to compliance with applicable laws and regulations.

Sec. 3. **Obligations of Lessee.** The Lessee agrees:
(a) *Rentals and royalties.* (1) To pay rentals and

royalties as follows:

*Rentals.* With respect to each lease year commencing prior to a discovery of oil or gas on the leased area, to pay the Lessor on or before the first day of each such year, a rental of   **$3.00**   per acre or fraction thereof.

*Minimum royalty.* To pay the Lessor at the expiration of each lease year commencing after discovery a minimum royalty of   **$3.00**   per acre or fraction thereof or, if there is production, the difference between the actual royalty required to be paid with respect to such lease year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

*Royalty on production.* To pay the Lessor a royalty of  16-2/3 percent in amount or value of production saved, removed, or sold from the leased area. Gas of all kinds (except helium and gas used for purposes of production from and operations upon the leased area or unavoidably lost) is subject to royalty.

(2) It is expressly agreed that the Secretary may establish minimum values for purposes of computing

SEE ATTACHED STIPULATION(S)

royalty on products obtained from this lease, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, or area, to the price received by the Lessee, to posted prices, or to other relevant matters. Each such determination shall be made only after due notice to the Lessee and a reasonable opportunity has been afforded the Lessee to be heard.

(3) When paid in value, royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained. When paid in production, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessor's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The Lessee shall not be required to provide storage for royalty taken in kind in excess of tankage required when royalty is paid in value. When payments are made in production the Lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the Lessee has no control.

(b) *Bonds.* To maintain at all times the bond required prior to the issuance of this lease and to furnish such additional security as may be required by the Lessor if, after operations or production have begun, the Lessor deems such additional security to be necessary.

(c) *Wells.* (1) To diligently drill and produce such wells as are necessary to protect the Lessor from loss by reason of production on other properties or, in lieu thereof, with the consent of the Supervisor, to pay a sum determined by the Supervisor as adequate to compensate the Lessor for failure to drill and produce any such well. In the event that this lease is not being maintained in force by other production of oil or gas in paying quantities or by other approved drilling or reworking operations, such payments shall be considered as the equivalent of production in paying quantities for all purposes of this lease.

(2) After due notice in writing, to diligently drill and produce such other wells as the Secretary may reasonably require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with good operating practice.

(3) At the election of the Lessee, to drill and produce other wells in conformity with any system of well spacing or production allotments affecting the area, field, or pool in which the leased area or any part thereof is situated, which is authorized or sanctioned by applicable law or by the Secretary.

(d) *Payments.* To make all payments to the Lessor by check, bank draft or money order payable as indicated herein unless otherwise provided by regulations or by direction of the Secretary. Rental, royalties, and other payments shall be made payable to the United States Geological Survey and tendered to the Supervisor, *except* that filing charges, bonuses, and first year's rental shall be made payable to the Bureau of Land Management and remitted to the Manager of the appropriate field office of that Bureau.

(e) *Inspection.* To keep open at all reasonable times for the inspection of any duly authorized representative of the Lessor, the leased area and all wells, improvements, machinery and fixtures thereon and all books, accounts, and records relative to operations and surveys or investigations on or with regard to the leased area or under the lease.

(f) *Conduct of operations.* To conduct all operations under this lease in accordance with applicable law and regulations.

(g) *Indemnification.* To indemnify and save the Lessor harmless against and from any and all claims of any nature whatever, including without limitation claims for loss or damage to property or injury to persons, caused by, or resulting from, any operation on the leased area conducted by or on behalf of the Lessee; provided that the Lessee shall not be held responsible to the Lessor under this subsection for any loss, damage, or injury caused by, or resulting from: (1) any negligent action of the Lessor other than the exercise or performance of (or the failure to exercise or perform) a discretionary function or duty on the part of a Federal agency or an employee of such an agency, whether or not the discretion involved is abused; or (2) the Lessee's compliance with an order or directive of the Lessor against which an appeal by the Lessee under 30 CFR 250.81 is filed before the cause of action for such a claim arises and is pursued diligently thereafter.

(h) *Equal Opportunity Clause.* The Lessee agrees that, during the performance of this lease:

(1) The Lessee will not discriminate against any employee or applicant for employment because of race, color, religion, sex or national origin. The Lessee will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Lessee agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the Lessor setting forth the provisions of this Equal Opportunity clause.

(2) The Lessee will, in all solicitations or advertisements for employees placed by or on behalf of the Lessee, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin.

(3) The Lessee will send to each labor union or representative of workers with which Lessee has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the Lessor, advising the labor union or workers' representative of the Lessee's commitments under this Equal Opportunity clause, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) The Lessee will comply with all provisions of Executive Order No. 11246 of September 24, 1965, as amended, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) The Lessee will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, as amended, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the Secretary of the Interior and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6) In the event of the Lessee's noncompliance with the Equal Opportunity clause of this lease or with any of said rules, regulations, or orders, this lease may be canceled, terminated or suspended in whole or in part and the Lessee may be declared ineligible for further Federal government contracts or leases in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, as amended, and such other sanctions may be imposed and remedies invoked as provided in Executive Order No. 11246 of September 24, 1965, as amended, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7) The Lessee will include the provisions of Paragraphs (1) through (7) of this subsection 3(h) in

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale #34
Outer Continental Shelf
TEXAS

Serial No. OCS-G-2722

(1) The lessee agrees that, prior to any drilling activity or the construction or placement of any structure for exploration or development on the lease, including, but not limited to, well drilling and pipeline and platform placement, hereinafter referred to as "operation," he will conduct geophysical surveys sufficient to determine the possible existence of any sites, structures, or objects of historical or archaeological significance that may be affected by such operation. Such sites, structures, or objects are hereafter in this stipulation included in the term "cultural resource". If these geophysical surveys indicate anomalies that suggest the possible existence of a cultural resource, the lessee will either: (1) have a qualified marine archaeologist confirm or refute the existence of a cultural resource using such other equipment and survey techniques as may be necessary; or (2) relocate the site of such operation so as not to disturb the area in which an anomaly has been identified; or (3) show how such operation will not disturb the area in which an anomaly has been identified.

All data obtained in the course of the geophysical and any archaeological surveys shall be submitted to the Supervisor with any application for drilling or other activity. If the Supervisor determines there are indications that a possible cultural resource may be affected by the proposed operation he shall direct the lessee to utilize the services of a marine archaeologist to survey the area unless an archaeological survey has been completed.

Upon completion of any archaeological survey, a report shall be forwarded by the Supervisor to the Manager, Gulf of Mexico OCS Office, Bureau of Land Management for review and recommendations. Should the archaeological survey report indicate that a cultural resource may be affected by the operation and the lessee chooses not to relocate, the lessee shall take no action that may result in the disturbance of the cultural resource until the Supervisor has given directions as to its disposition.

The lessee agrees that, if any cultural resource should be accidentally discovered after the completion of the archaeological survey, he will report immediately such findings to the Supervisor, and make every reasonable effort to preserve and protect the cultural resource from damage until the Supervisor has given directions as to its disposition.

(2) Structures for drilling or production, including pipelines, shall be kept to the minimum necessary for proper exploration, development, and production and, to the greatest extent consistent therewith, shall be placed so as not to interfere with other significant uses of the Outer Continental Shelf, including commercial fishing. To this end, no structure, for drilling or production, including pipelines, may be placed on the Outer Continental Shelf until the Supervisor has found that the structure is necessary for the proper exploration, development, and production of the leased area and that no reasonable alternative placement would cause less interference with other significant uses of the Outer Continental Shelf, including commercial fishing. The lessee's exploratory and development plans, filed under 30 CFR 250.34, shall identify the anticipated placement and grouping of necessary structures, including pipelines, showing how such placement and grouping will have the minimum practicable effect on other significant uses of the Outer Continental Shelf, including commercial fishing.

(3) The lessor specifically reserves the right to require any pipelines between a structure on the OCS and an onshore facility to be placed in certain designated areas or corridors through the submerged lands of the OCS.

every contract, subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to section 204 of Executive Order No. 11246 of September 24, 1965, as amended, so that such provisions will be binding upon each contractor, subcontractor or vendor. The Lessee will take such action with respect to any contract, subcontract or purchase order as the Secretary may direct as a means of enforcing such provisions including sanctions for noncompliance; *provided, however,* that in the event the Lessee becomes involved in, or is threatened with, litigation with a contractor, subcontractor or vendor as a result of such direction by the Secretary, the Lessee may request the Lessor to enter into such litigation to protect the interests of the Lessor.

(i) *Certification of nonsegregated facilities.* By entering into this lease, the Lessee certifies that Lessee does not and will not maintain or provide for Lessee's employees any segregated facilities at any of Lessee's establishments, and that Lessee does not and will not permit Lessee's employees to perform their services at any location, under Lessee's control, where segregated facilities are maintained. The Lessee agrees that a breach of this certification is a violation of the Equal Opportunity clause in this lease. As used in this certification, the term "segregated facilities" means, but is not limited to, any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom, or otherwise. Lessee further agrees that (except where Lessee has obtained identical certifications from proposed contractors and subcontractors for specific time periods) Lessee will obtain identical certifications from proposed contractors and subcontractors prior to the award of contracts or subcontracts exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity clause; that Lessee will retain such certifications in Lessee's files; and that Lessee will forward the following notice to such proposed contractors and subcontractors (except where the proposed contractor or subcontractor has submitted identical certifications for specific time periods): Notice to prospective contractors and subcontractors of requirement for certification of nonsegregated facilities. A Certification of Nonsegregated Facilities, as required by the May 9, 1967, order (32 F.R. 7439, May 19, 1967) on Elimination of Segregated Facilities, by the Secretary of Labor, must be submitted prior to the award of a contract or subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity clause. The certification may be submitted either for each contract and subcontract or for all contracts and subcontracts during a period (i.e., quarterly, semiannually, or annually).

(j) *Assignment of lease.* To file for approval with the appropriate office of the Bureau of Land Management any instrument of transfer of this lease, or any interest therein, required to be filed under applicable regulations, within the time and in the manner prescribed by the applicable regulations.

Sec. 4. Term. This lease shall continue for a period of 5 years from the effective date of this lease and so long thereafter as oil or gas may be produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Secretary, are conducted thereon.

Sec. 5. Cooperative or Unit Plan. Lessee agrees that, within 30 days after demand by Lessor, Lessee will subscribe to and operate under such cooperative or unit plan for the development and operation of the area, field, or pool, or part thereof, embracing lands subject to this lease as the Secretary may determine to be practicable and necessary or advisable in the interest of conservation. Where any provision of a cooperative or unit plan of development which has been approved by the Secretary, and which by its terms affects the leased area or any part thereof, is inconsistent with a provision of this lease, the provision of such cooperative or unit plan shall govern.

Sec. 6. Reservations to Lessor. All rights in the leased area not expressly granted to the Lessee by the Act, the regulations, or this lease are hereby reserved to the Lessor. Without limiting the generality of the foregoing, such reserved rights include:

(a) *Geological and geophysical exploration; rights-of-way.* The right to authorize the conduct of geological and geophysical exploration in the leased area which does not interfere with or endanger actual operations under this lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands or to the treatment and shipment of products thereof by or under authority of the United States, its Lessees or Permittees.

(b) *Leases of sulfur and other minerals.* The right to grant leases of any mineral other than oil and gas within the leased area or any part thereof. No lease of other mineral shall authorize or permit the Lessee thereunder unreasonably to interfere with or endanger operations under this lease.

(c) *Purchase of production.* In time of war, or when the President of the United States shall so prescribe, the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in Section 12(b) of the Act.

(d) *Taking of royalties.* The right to determine whether royalty will be taken in the amount or the value of production.

(e) *Helium.* Pursuant to Section 12(f) of the Act, the ownership of and the right to extract helium from all gas produced under this lease.

(f) *Suspension of operations during war or national emergency.* Upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or President of the United States after August 7, 1953, the authority of the Secretary to suspend any or all operations under this lease, as provided in Section 12(c) of the Act: *Provided,* That just compensation shall be paid by the Lessor to the Lessee.

(g) *Restriction of exploration and operations.* The right, as provided in Section 12(d) of the Act, to restrict from exploration and operations the leased area or any part thereof which may be designated by and through the Secretary of Defense, with the approval of the President, as, or as part of, an area of the Outer Continental Shelf needed for national defense; and so long as such designation remains in effect no exploration or operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense; and if operations or production under this lease within any such restricted area shall be suspended, any payments of rentals and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

Sec. 7. Directional Drilling. A directional well drilled under the leased area from a surface location on nearby land not covered by this lease shall be deemed to have the same effect for all purposes of this lease as a well drilled from a surface location on the leased area. In such circumstances, drilling shall be considered to have

been commenced on the leased area when drilling is commenced on the nearby land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on nearby land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations (as the case may be) on the leased area for all purposes of this lease. Nothing contained in this paragraph is intended or shall be construed as granting to the Lessee any leasehold interests, licenses, easements, or other rights in or with respect to any such nearby land in addition to any such leasehold interests, licenses, easements, or other rights which the Lessee may have lawfully acquired under the Act or from the Lessor or others.

Sec. 8. Surrender of Lease. The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the appropriate office of the Bureau of Land Management a written relinquishment, in *triplicate*, which shall be effective as of the date of filing. No surrender of this lease or of any portion of the leased area shall relieve the Lessee or his surety of the obligation to make payment of all accrued rentals and royalties or to abandon all wells on the area to be surrendered in a manner satisfactory to the Supervisor.

Sec. 9. Removal of property on termination of lease. Upon the termination of this lease in whole or in part, or the surrender of the lease in whole or in part, as herein provided, the Lessee shall within a period of 1 year thereafter remove from the premises no longer subject to the lease all structures, machinery, equipment, tools, and materials in accordance with applicable regulations and orders of the Supervisor; *provided, however*, that the Lessee may continue to maintain any such property on the leased area for whatever longer period it may be needed, as determined by the Supervisor, for producing wells or for drilling or producing on other leases.

Sec. 10. Remedies in case of default. (a) Whenever the Lessee fails to comply with any of the provisions of the Act, or of this lease, or of the regulations issued under the Act and in force and effect on the effective date of this lease, the lease shall be subject to cancellation in accordance with the provisions of Section 5(b) of the Act; *provided, however*, that the 30-day notice provision applicable to non-producing leases under Section 5(b)(1) of the Act shall also apply as a prerequisite to the institution of any legal action by the Lessor to cancel this lease while it is in a producing status. Nothing in this subsection shall be construed to apply to, or require any notice with respect to, any legal action instituted by the Lessor other than an action to cancel the lease pursuant to Section 5(b) of the Act.

(b) Whenever the Lessee fails to comply with any of the provisions of the Act, or of this lease, or of any regulations promulgated by the Secretary under the Act, the Lessor may exercise any legal or equitable remedy or remedies which the Lessor may have, including appropriate action under the penalty provisions of Section 5(a)(2) of the Act; *however*, the remedy of cancellation of the lease may be exercised only under the provisions of Section 5(b) and Section 8(i) of the Act.

(c) A waiver of any particular violation of the provisions of the Act, or of this lease, or of any regulations promulgated by the Secretary under the Act, shall not prevent the cancellation of this lease or the exercise of any other remedy or remedies under paragraphs (a) and (b) of this section by reason of any other such violation or for the same violation occurring at any other time.

Sec. 11. Heirs and successors in interest. Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns, of the respective parties hereto.

Sec. 12. Unlawful interest. No member of, or Delegate to, Congress, or Resident Commissioner, after his election or appointment, or either before or after he has qualified, and during his continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR 7.4(a)(1), shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom; and the provisions of Section 3741 of the Revised Statutes (41 U.S.C. Sec. 22), as amended, and Sections 431, 432, and 433 of Title 18 of the United States Code, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease so far as the same may be applicable.

TEXAS GAS EXPLORATION CORPORATION

ATTEST:

By _____    _____    THE UNITED STATES OF AMERICA
   Vice President              Assistant Secretary

MOBIL OIL CORPORATION

By _____                    By _____
   (Signature of Lessee)                          (Authorized Officer)
   Attorney-in-Fact
                                              Acting    Manager, Bureau of Land Management
AMOCO PRODUCTION COMPANY                                Gulf of Mexico
                                                       Outer Continental Shelf Office
By _____
   (Signature of Lessee)                       _____
   Attorney-in-Fact                                   (Title)

THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY

By _____                     JUN 28 1974
   (Signature of Lessee)
   Attorney-in-Fact                            _____
                                                      (Date)
UNION OIL COMPANY OF CALIFORNIA

By _____
   W. F. BOLDING    (Signature of Lessee)
                    Attorney-in-Fact

*If this lease is executed by a corporation it must bear the corporate seal*

GPO 833-869

**OCS-G 2754**

Form 3300—1
(February 1971)
(formerly 3380—1)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

OIL AND GAS LEASE OF SUBMERGED LANDS
UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

| | |
|---|---|
| Office | New Orleans, Louisiana |
| Serial Number | OCS-G 2754 |
| Cash Bonus | $45,887,000.00 |
| Rental Rate | $3.00 per acre |
| Minimum Royalty Rate | $3.00 per acre |
| Royalty Rate | 1/6th |

This lease is made and effective as of **JUL 1 1974** (hereinafter called the Effective Date) by and between the United States of America (hereinafter called the Lessor), by the **Manager Gulf of Mexico Outer Continental Shelf Office** , Bureau of Land Management, its authorized officer, and

Texaco Inc.                                                          87.5%

Columbia Gas Development Corporation          12.5%

(hereinafter called the Lessee). In consideration of the cash payment heretofore made by the Lessee to the Lessor and in consideration of the promises, terms, conditions and covenants contained herein, the parties hereto agree as follows:

**Sec. 1. Statutes and Regulations.** This lease is made pursuant to the Outer Continental Shelf Lands Act of August 7, 1953 (67 Stat. 462; 43 U.S.C. Secs. 1331, *et seq.*) (hereinafter called the Act). This lease is subject to all the provisions of the Act and to all the terms, conditions and requirements of the valid regulations promulgated by the Secretary of the Interior (hereinafter called the Secretary) thereunder in existence upon the effective date of this lease, all of which are incorporated herein and, by reference, made a part hereof. This lease shall also be subject to regulations hereafter issued by the Secretary pursuant to his authority under section 5(a)(1) of the Act to prescribe and amend at any time such rules and regulations as he may determine to be necessary and proper in order to provide for the prevention of waste and for the conservation of the natural resources of the Outer Continental Shelf, and for the protection of correlative rights therein, which regulations shall be deemed incorporated herein and, by reference, made a part hereof when promulgated.

**Sec. 2. Rights of Lessee.** The Lessor hereby grants and leases to the Lessee the exclusive right and privilege to drill for, mine, extract, remove and dispose of oil and gas deposits, except helium gas, in or under the following-described area of the Outer Continental Shelf of the United States:

All of Block A-376 High Island Area – East Addition – South Extension – OCS Official
Leasing Map, Texas Map No. 7C

containing approximately     5760          acres (hereinafter referred to as the leased area), together with

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations in accordance with applicable regulations;

(b) the nonexclusive right to drill water wells within the leased area and to use water produced therefrom for operations pursuant to the Act free of cost, provided that such drilling is conducted in accordance with procedures approved by the Regional Oil and Gas Supervisor of the Geological Survey (hereinafter called the "Supervisor"); and

(c) the right to construct or erect and to maintain within the leased area all artificial islands, platforms, fixed or floating structures, sea walls, docks, dredged channels and spaces, buildings, plants, telegraph or telephone lines and cables, pipelines, reservoirs, tanks, pumping stations, and other works and structures necessary to the full enjoyment of the rights granted by this lease, subject to compliance with applicable laws and regulations.

**Sec. 3. Obligations of Lessee.** The Lessee agrees:
(a) *Rentals and royalties.* (1) To pay rentals and

royalties as follows:

*Rentals.* With respect to each lease year commencing prior to a discovery of oil or gas on the leased area, to pay the Lessor on or before the first day of each such year, a rental of     $3.00     per acre or fraction thereof.

*Minimum royalty.* To pay the Lessor at the expiration of each lease year commencing after discovery a minimum royalty of     $3.00     per acre or fraction thereof or, if there is production, the difference between the actual royalty required to be paid with respect to such lease year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

*Royalty on production.* To pay the Lessor a royalty of  16-2/3 percent in amount or value of production saved, removed, or sold from the leased area. Gas of all kinds (except helium and gas used for purposes of production from and operations upon the leased area or unavoidably lost) is subject to royalty.

(2) It is expressly agreed that the Secretary may establish minimum values for purposes of computing

SEE ATTACHED STIPULATION(S)

royalty on products obtained from this lease, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, or area, to the price received by the Lessee, to posted prices, and to other relevant matters. Each such determination shall be made only after due notice to the Lessee and a reasonable opportunity has been afforded the Lessee to be heard.

(3) When paid in value, royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained. When paid in production, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessor's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The Lessee shall not be required to provide storage for royalty taken in kind in excess of tankage required when royalty is paid in value. When payments are made in production the Lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the Lessee has no control.

(b) *Bonds.* To maintain at all times the bond required prior to the issuance of this lease and to furnish such additional security as may be required by the Lessor if, after operations or production have begun, the Lessor deems such additional security to be necessary.

(c) *Wells.* (1) To diligently drill and produce such wells as are necessary to protect the Lessor from loss by reason of production on other properties or, in lieu thereof, with the consent of the Supervisor, to pay a sum determined by the Supervisor as adequate to compensate the Lessor for failure to drill and produce any such well. In the event that this lease is not being maintained in force by other production of oil or gas in paying quantities or by other approved drilling or reworking operations, such payments shall be considered as the equivalent of production in paying quantities for all purposes of this lease.

(2) After due notice in writing, to diligently drill and produce such other wells as the Secretary may reasonably require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with good operating practice.

(3) At the election of the Lessee, to drill and produce other wells in conformity with any system of well spacing or production allotments·affecting the area, field, or pool in which the leased area or any part thereof is situated, which is authorized or sanctioned by applicable law or by the Secretary.

(d) *Payments.* To make all payments to the Lessor by check, bank draft or money order payable as indicated herein unless otherwise provided· by regulations or by direction of the Secretary. Rental, royalties, and other payments shall be made payable to the United States Geological Survey and tendered to the Supervisor, *except* that filing charges, bonuses, and first year's rental shall be made payable to the Bureau of Land Management and remitted to the Manager of the appropriate field office of that Bureau.

(e) *Inspection.* To keep open at all reasonable times for the inspection of any duly authorized representative of the Lessor, the leased area and all wells, improvements, machinery and fixtures thereon and all books, accounts, and records relative to operations and surveys or investigations on or with regard to the leased area or under the lease.

(f) *Conduct of operations.* To conduct all operations under this lease in accordance with applicable law and regulations.

(g) *Indemnification.* To indemnify and save the Lessor harmless against and from any and all claims of any nature whatever, including without limitation claims for loss or damage to property or injury to persons, caused by, or resulting from, any operation on the leased area conducted by or on behalf of the Lessee; provided that the Lessee shall not be held responsible to the Lessor under this subsection for any loss, damage, or injury caused by, or resulting from: (1) any negligent action of the Lessor other than the exercise or performance of (or the failure to exercise or perform) a discretionary function or duty on the part of a Federal agency or an employee of such an agency, whether or not the discretion involved is abused; or (2) the Lessee's compliance with an order or directive of the Lessor against which an appeal by the Lessee under 30 CFR 250.81 is filed before the cause of action for such a claim arises and is pursued diligently thereafter.

(h) *Equal Opportunity Clause.* The Lessee agrees that, during the performance of this lease:

(1) The Lessee will not discriminate against any employee or applicant for employment because of race, color, religion, sex or national origin. The Lessee will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Lessee agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the Lessor setting forth the provisions of this Equal Opportunity clause.

(2) The Lessee will, in all solicitations or advertisements for employees placed by or on behalf of the Lessee, state that all qualified applicants will receive consideration for employment without regard to . race, color, religion, sex or national origin.

(3) The Lessee will send to each labor union or representative of workers with which Lessee has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the Lessor, advising the labor union or workers' representative of the Lessee's commitments under this Equal Opportunity clause, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) The Lessee will comply with all provisions of Executive Order No. 11246 of September 24, 1965, as amended, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) The Lessee will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, as amended, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts· by the Secretary of the Interior and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6) In the event of the Lessee's noncompliance with the Equal Opportunity clause of this lease or with any of said rules, regulations, or orders, this lease may be canceled, terminated or suspended in whole or in part and the Lessee may be declared ineligible for further Federal government contracts or leases in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, as amended, and such other sanctions may be imposed and remedies invoked as provided in Executive Order No. 11246 of September 24, 1965, as amended, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7) The Lessee will include the provisions of Paragraphs (1) through (7) of this subsection 3(h) in

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Stipulations for Oil and Gas Lease Sale #34
Outer Continental Shelf
TEXAS

Serial No. __OCS-G 2754__

(1) The lessee agrees that, prior to any drilling activity or the construction
or placement of any structure for exploration or development on the lease,
including, but not limited to, well drilling and pipeline and platform
placement, hereinafter referred to as "operation", he will conduct geo-
physical surveys sufficient to determine the possible existence of any sites,
structures, or objects of historical or archaeological significance that may
be affected by such operation. Such sites, structures, or objects are
hereafter in this stipulation included in the term "cultural resource".
If these geophysical surveys indicate anomalies that suggest the possible
existence of a cultural resource, the lessee will either: (1) have a
qualified marine archaeologist confirm or refute the existence of a cultural
resource using such other equipment and survey techniques as may be necessary;
or (2) relocate the site of such operation so as not to disturb the area in
which an anomaly has been identified; or (3) show how such operation will
not disturb the area in which an anomaly has been identified.

All data obtained in the course of the geophysical and any archaeological
surveys shall be submitted to the Supervisor with any application for
drilling or other activity. If the Supervisor determines there are indi-
cations that a possible cultural resource may be affected by the proposed
operation he shall direct the lessee to utilize the services of a marine
archaeologist to survey the area unless an archaeological survey has been
completed.

Upon completion of any archaeological survey, a report shall be forwarded by
the Supervisor to the Manager, Gulf of Mexico OCS Office, Bureau of Land
Management for review and recommendations. Should the archaeological survey
report indicate that a cultural resource may be affected by the operation
and the lessee chooses not to relocate, the lessee shall take no action that
may result in the disturbance of the cultural resource until the Supervisor
has given directions as to its disposition.

The lessee agrees that, if any cultural resource should be accidentally
discovered after the completion of the archaeological survey, he will report
immediately such findings to the Supervisor, and make every reasonable effort
to preserve and protect the cultural resource from damage until the Supervisor
has given directions as to its disposition.

(2) Structures for drilling or production, including pipelines, shall be kept to
the minimum necessary for proper exploration, development, and production and,
to the greatest extent consistent therewith, shall be placed so as not to
interfere with other significant uses of the Outer Continental Shelf, including
commercial fishing. To this end, no structure, for drilling or production,
including pipelines, may be placed on the Outer Continental Shelf until the
Supervisor has found that the structure is necessary for the proper exploration,
development, and production of the leased area and that no reasonable alter-
native placement would cause less interference with other significant uses of
the Outer Continental Shelf, including commercial fishing. The lessee's
exploratory and development plans, filed under 30 CFR 250.34, shall identify
the anticipated placement and grouping of necessary structures, including
pipelines, showing how such placement and grouping will have the minimum
practicable effect on other significant uses of the Outer Continental Shelf,
including commercial fishing.

(3) The lessor specifically reserves the right to require any pipelines between a
structure on the OCS and an onshore facility to be placed in certain designated
areas or corridors through the submerged lands of the OCS.

every contract, subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to section 204 of Executive Order No. 11246 of September 24, 1965, as amended, so that such provisions will be binding upon each contractor, subcontractor or vendor. The Lessee will take such action with respect to any contract, subcontract or purchase order as the Secretary may direct as a means of enforcing such provisions including sanctions for noncompliance; *provided, however,* that in the event the Lessee becomes involved in, or is threatened with, litigation with a contractor, subcontractor or vendor as a result of such direction by the Secretary, the Lessee may request the Lessor to enter into such litigation to protect the interests of the Lessor.

(i) *Certification of nonsegregated facilities.* By entering into this lease, the Lessee certifies that Lessee does not and will not maintain or provide for Lessee's employees any segregated facilities at any of Lessee's establishments, and that Lessee does not and will not permit Lessee's employees to perform their services at any location, under Lessee's control, where segregated facilities are maintained. The Lessee agrees that a breach of this certification is a violation of the Equal Opportunity clause in this lease. As used in this certification, the term "segregated facilities" means, but is not limited to, any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom, or otherwise. Lessee further agrees that (except where Lessee has obtained identical certifications from proposed contractors and subcontractors for specific time periods) Lessee will obtain identical certifications from proposed contractors and subcontractors prior to the award of contracts or subcontracts exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity clause; that Lessee will retain such certifications in Lessee's files; and that Lessee will forward the following notice to such proposed contractors and subcontractors (except where the proposed contractor or subcontractor has submitted identical certifications for specific time periods): Notice to prospective contractors and subcontractors of requirement for certification of nonsegregated facilities. A Certification of Nonsegregated Facilities, as required by the May 9, 1967, order (32 F.R. 7439, May 19, 1967) on Elimination of Segregated Facilities, by the Secretary of Labor, must be submitted prior to the award of a contract or subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity clause. The certification may be submitted either for each contract and subcontract or for all contracts and subcontracts during a period (i.e., quarterly, semiannually, or annually).

(j) *Assignment of lease.* To file for approval with the appropriate office of the Bureau of Land Management any instrument of transfer of this lease, or any interest therein, required to be filed under applicable regulations, within the time and in the manner prescribed by the applicable regulations.

Sec. 4.  Term.  This lease shall continue for a period of 5 years from the effective date of this lease and so long thereafter as oil or gas may be produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Secretary, are conducted thereon.

Sec. 5.  Cooperative or Unit Plan.  Lessee agrees that, within 30 days after demand by Lessor, Lessee will subscribe to and operate under such cooperative or unit plan for the development and operation of the area, field, or pool, or part thereof, embracing lands subject to this lease as the Secretary may determine to be practicable and necessary or advisable in the interest of conservation.  Where any provision of a cooperative or unit plan of development which has been approved by the Secretary, and which by its terms affects the leased area or any part thereof, is inconsistent with a provision of this lease, the provision of such cooperative or unit plan shall govern.

Sec. 6.  Reservations to Lessor.  All rights in the leased area not expressly granted to the Lessee by the Act, the regulations, or this lease are hereby reserved to the Lessor. Without limiting the generality of the foregoing, such reserved rights include:

(a) *Geological and geophysical exploration; rights-of-way.* The right to authorize the conduct of geological and geophysical exploration in the leased area which does not interfere with or endanger actual operations under this lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands or to the treatment and shipment of products thereof by or under authority of the United States, its Lessees or Permittees.

(b) *Leases of sulfur and other minerals.* The right to grant leases of any mineral other than oil and gas within the leased area or any part thereof. No lease of other mineral shall authorize or permit the Lessee thereunder unreasonably to interfere with or endanger operations under this lease.

(c) *Purchase of production.* In time of war, or when the President of the United States shall so prescribe, the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in Section 12(b) of the Act.

(d) *Taking of royalties.* The right to determine whether royalty will be taken in the amount or the value of production.

(e) *Helium.* Pursuant to Section 12(f) of the Act, the ownership and the right to extract helium from all gas produced under this lease.

(f) *Suspension of operations during war or national emergency.* Upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or President of the United States after August 7, 1953, the authority of the Secretary to suspend any or all operations under this lease, as provided in Section 12(c) of the Act: *Provided,* That just compensation shall be paid by the Lessor to the Lessee.

(g) *Restriction of exploration and operations.* The right, as provided in Section 12(d) of the Act, to restrict from exploration and operations the leased area or any part thereof which may be designated by and through the Secretary of Defense, with the approval of the President, as, or as part of, an area of the Outer Continental Shelf needed for national defense; and so long as such designation remains in effect no exploration or operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense; and if operations or production under this lease within any such restricted area shall be suspended, any payments of rentals and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

Sec. 7.  Directional Drilling.  A directional well drilled under the leased area from a surface location on nearby land not covered by this lease shall be deemed to have the same effect for all purposes of this lease as a well drilled from a surface location on the leased area.  In such circumstances, drilling shall be considered to have

been commenced on the leased area when drilling is commenced on the nearby land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on nearby land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations (as the case may be) on the leased area for all purposes of this lease. Nothing contained in this paragraph is intended or shall be construed as granting to the Lessee any leasehold interests, licenses, easements, or other rights in or with respect to any such nearby land in addition to any such leasehold interests, licenses, easements, or other rights which the Lessee may have lawfully acquired under the Act or from the Lessor or others.

**Sec. 8. Surrender of Lease.** The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the appropriate office of the Bureau of Land Management a written relinquishment, in *triplicate*, which shall be effective as of the date of filing. No surrender of this lease or of any portion of the leased area shall relieve the Lessee or his surety of the obligation to make payment of all accrued rentals and royalties or to abandon all wells on the area to be surrendered in a manner satisfactory to the Supervisor.

**Sec. 9. Removal of property on termination of lease.** Upon the termination of this lease in whole or in part, or the surrender of the lease in whole or in part, as herein provided, the Lessee shall within a period of 1 year thereafter remove from the premises no longer subject to the lease all structures, machinery, equipment, tools, and materials in accordance with applicable regulations and orders of the Supervisor; *provided, however*, that the Lessee may continue to maintain any such property on the leased area for whatever longer period it may be needed, as determined by the Supervisor, for producing wells or for drilling or producing on other leases.

**Sec. 10. Remedies in case of default.** (a) Whenever the Lessee fails to comply with any of the provisions of the Act, or of this lease, or of the regulations issued under the Act and in force and effect on the effective date of this lease, the lease shall be subject to cancellation in accordance with the provisions of Section 5(b) of the Act; *provided, however*, that the 30-day notice provision applicable to non-producing leases under Section 5(b)(1) of the Act shall also apply as a prerequisite to the institution of any legal action by the Lessor to cancel this lease while it is in a producing status. Nothing in this subsection shall be construed to apply to, or require any notice with respect to, any legal action instituted by the Lessor other than an action to cancel the lease pursuant to Section 5(b) of the Act.

(b) Whenever the Lessee fails to comply with any of the provisions of the Act, or of this lease, or of any regulations promulgated by the Secretary under the Act, the Lessor may exercise any legal or equitable remedy or remedies which the Lessor may have, including appropriate action under the penalty provisions of Section 5(a)(2) of the Act; *however*, the remedy of cancellation of the lease may be exercised only under the provisions of Section 5(b) and Section 8(i) of the Act.

(c) A waiver of any particular violation of the provisions of the Act, or of this lease, or of any regulations promulgated by the Secretary under the Act, shall not prevent the cancellation of this lease or the exercise of any other remedy or remedies under paragraphs (a) and (b) of this section by reason of any other such violation or for the same violation occurring at any other time.

**Sec. 11. Heirs and successors in interest.** Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns, of the respective parties hereto.

**Sec. 12. Unlawful interest.** No member of, or Delegate to, Congress, or Resident Commissioner, after his election or appointment, or either before or after he has qualified, and during his continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR 7.4(a)(1), shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom; and the provisions of Section 3741 of the Revised Statutes (41 U.S.C. Sec. 22), as amended, and Sections 431, 432, and 433 of Title 18 of the United States Code, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease so far as the same may be applicable.

THE UNITED STATES OF AMERICA

COLUMBIA GAS DEVELOPMENT CORPORATION

BY: _____
(Signature of Lessee)
R. G. DARROW
Vice President

By _____
(Authorized Officer)

Acting Manager, Bureau of Land Management
Gulf of Mexico
Outer Continental Shelf Office

_____
(Signature of Lessee)

_____
(Title)

TEXACO INC.

BY: _____
(Signature of Lessee)
H. R. ALEXANDER
Attorney-in-Fact

JUN 2 8 1974
_____
(Date)

_____
(Signature of Lessee)

*If this lease is executed by a corporation it must bear the corporate seal*

GPO 833 - 869

**OCS-G 2757**

Y28

Form 3300-1
(February 1971)
(formerly 3380-1)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

OIL AND GAS LEASE OF SUBMERGED LANDS
UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

RECEIVED

Office
JUN 1 ... New Orleans, Louisiana
Serial Number
W. L. D. ... OCS-G-2757
Cash Bonus

| | |
|---|---|
| Cash Bonus | $3,222,000.00 |
| Rental Rate | $3.00 per acre |

| Minimum Royalty Rate | Royalty Rate |
|---|---|
| $3.00 per acre | 1/6th |

This lease is made and effective as of **JUL 1 1974** (hereinafter called the Effective Date) by and between the United States of America (hereinafter called the Lessor), by the **Manager** Gulf of Mexico Outer Continental Shelf Office , Bureau of Land Management, its authorized officer, and

| | |
|---|---|
| Mobil Oil Corporation | 29.924% |
| Union Oil Company of California | 14.510% |
| Amoco Production Company | 22.233% |
| Texas Gas Exploration Corporation | 11.100% |
| The Northwestern Mutual Life Insurance Company | 22.233% |

(hereinafter called the Lessee). In consideration of the cash payment heretofore made by the Lessee to the Lessor and in consideration of the promises, terms, conditions and covenants contained herein, the parties hereto agree as follows:

Sec. 1. **Statutes and Regulations.** This lease is made pursuant to the Outer Continental Shelf Lands Act of August 7, 1953 (67 Stat. 462; 43 U.S.C. Secs. 1331, *et seq.*) (hereinafter called the Act). This lease is subject to all the provisions of the Act and to all the terms, conditions and requirements of the valid regulations promulgated by the Secretary of the Interior (hereinafter called the Secretary) thereunder in existence upon the effective date of this lease, all of which are incorporated herein and, by reference, made a part hereof. This lease shall also be subject to regulations hereafter issued by the Secretary pursuant to his authority under section 5(a)(1) of the Act to prescribe and amend at any time such rules and regulations as he may determine to be necessary and proper in order to provide for the prevention of waste and for the conservation of the natural resources of the Outer Continental Shelf, and for the protection of correlative rights therein, which regulations shall be deemed incorporated herein and, by reference, made a part hereof when promulgated.

Sec. 2. **Rights of Lessee.** The Lessor hereby grants and leases to the Lessee the exclusive right and privilege to drill for, mine, extract, remove and dispose of oil and gas deposits, except helium gas, in or under the following-described area of the Outer Continental Shelf of the United States:

**All of Block A-382 High Island Area – East Addition – South Extension, OCS Official Leasing Map, Texas Map No. 7C**

RECEIVED
... Bureau of
Land Management
New Orleans, La.

containing approximately **5760** acres (hereinafter referred to as the leased area), together with:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations in accordance with applicable regulations;

(b) the nonexclusive right to drill water wells within the leased area and to use water produced therefrom for operations pursuant to the Act free of cost, provided that such drilling is conducted in accordance with procedures approved by the Regional Oil and Gas Supervisor of the Geological Survey (hereinafter called the "Supervisor"); and

(c) the right to construct or erect and to maintain within the leased area all artificial islands, platforms, fixed or floating structures, sea walls, docks, dredged channels and spaces, buildings, plants, telegraph or telephone lines and cables, pipelines, reservoirs, tanks, pumping stations, and other works and structures necessary to the full enjoyment of the rights granted by this lease, subject to compliance with applicable laws and regulations.

Sec. 3. **Obligations of Lessee.** The Lessee agrees:
(a) *Rentals and royalties.* (1) To pay rentals and royalties as follows:

*Rentals.* With respect to each lease year commencing prior to a discovery of oil or gas on the leased area, to pay the Lessor on or before the first day of each such year, a rental of **$3.00** per acre or fraction thereof.

*Minimum royalty.* To pay the Lessor at the expiration of each lease year commencing after discovery a minimum royalty of **$3.00** per acre or fraction thereof or, if there is production, the difference between the actual royalty required to be paid with respect to such lease year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

*Royalty on production.* To pay the Lessor a royalty of **16-2/3** percent in amount or value of production saved, removed, or sold from the leased area. Gas of all kinds (except helium and gas used for purposes of production from and operations upon the leased area or unavoidably lost) is subject to royalty.

(2) It is expressly agreed that the Secretary may establish minimum values for purposes of computing

SEE ATTACHED STIPULATION(S)

royalty on products obtained from this lease, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field, or area, to the price received by the Lessee, to posted prices, and to other relevant matters. Each such determination shall be made only after due notice to the Lessee and a reasonable opportunity has been afforded the Lessee to be heard.

(3) When paid in value, royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained. When paid in production, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessor's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The Lessee shall not be required to provide storage for royalty taken in kind in excess of tankage required when royalty is paid in value. When payments are made in production the Lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the Lessee has no control.

(b) *Bonds.* To maintain at all times the bond required prior to the issuance of this lease and to furnish such additional security as may be required by the Lessor if, after operations or production have begun, the Lessor deems such additional security to be necessary.

(c) *Wells.* (1) To diligently drill and produce such wells as are necessary to protect the Lessor from loss by reason of production on other properties or, in lieu thereof, with the consent of the Supervisor, to pay a sum determined by the Supervisor as adequate to compensate the Lessor for failure to drill and produce any such well. In the event that this lease is not being maintained in force by other production of oil or gas in paying quantities or by other approved drilling or reworking operations, such payments shall be considered as the equivalent of production in paying quantities for all purposes of this lease.

(2) After due notice in writing, to diligently drill and produce such other wells as the Secretary may reasonably require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with good operating practice.

(3) At the election of the Lessee, to drill and produce other wells in conformity with any system of well spacing or production allotments affecting the area, field, or pool in which the leased area or any part thereof is situated, which is authorized or sanctioned by applicable law or by the Secretary.

(d) *Payments.* To make all payments to the Lessor by check, bank draft or money order payable as indicated herein unless otherwise provided by regulations or by direction of the Secretary. Rental, royalties, and other payments shall be made payable to the United States Geological Survey and tendered to the Supervisor, *except* that filing charges, bonuses, and first year's rental shall be made payable to the Bureau of Land Management and remitted to the Manager of the appropriate field office of that Bureau.

(e) *Inspection.* To keep open at all reasonable times for the inspection of any duly authorized representative of the Lessor, the leased area and all wells, improvements, machinery and fixtures thereon and all books, accounts, and records relative to operations and surveys or investigations on or with regard to the leased area or under the lease.

(f) *Conduct of operations.* To conduct all operations under this lease in accordance with applicable law and regulations.

(g) *Indemnification.* To indemnify and save the Lessor harmless against and from any and all claims of any nature whatever, including without limitation claims for loss or damage to property or injury to persons, caused by, or resulting from, any operation on the leased area conducted by or on behalf of the Lessee; provided that the Lessee shall not be held responsible to the Lessor under this subsection for any loss, damage, or injury caused by, or resulting from: (1) any negligent action of the Lessor other than the exercise or performance of (or the failure to exercise or perform) a discretionary function or duty on the part of a Federal agency or an employee of such an agency, whether or not the discretion involved is abused; or (2) the Lessee's compliance with an order or directive of the Lessor against which an appeal by the Lessee under 30 CFR 250.81 is filed before the cause of action for such a claim arises and is pursued diligently thereafter.

(h) *Equal Opportunity Clause.* The Lessee agrees that, during the performance of this lease:

(1) The Lessee will not discriminate against any employee or applicant for employment because of race, color, religion, sex or national origin. The Lessee will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Lessee agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the Lessor setting forth the provisions of this Equal Opportunity clause.

(2) The Lessee will, in all solicitations or advertisements for employees placed by or on behalf of the Lessee, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin.

(3) The Lessee will send to each labor union or representative of workers with which Lessee has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the Lessor, advising the labor union or workers' representative of the Lessee's commitments under this Equal Opportunity clause, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) The Lessee will comply with all provisions of Executive Order No. 11246 of September 24, 1965, as amended, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) The Lessee will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, as amended, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the Secretary of the Interior and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6) In the event of the Lessee's noncompliance with the Equal Opportunity clause of this lease or with any of said rules, regulations, or orders, this lease may be canceled, terminated or suspended in whole or in part and the Lessee may be declared ineligible for further Federal government contracts or leases in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, as amended, and such other sanctions may be imposed and remedies invoked as provided in Executive Order No. 11246 of September 24, 1965, as amended, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7) The Lessee will include the provisions of Paragraphs (1) through (7) of this subsection 3(h) in

every contract, subcontract or purchase order, unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to section 204 of Executive Order No. 11246 of September 24, 1965, as amended, so that such provisions will be binding upon each contractor, subcontractor or vendor. The Lessee will take such action with respect to any contract, subcontract or purchase order as the Secretary may direct as a means of enforcing such provisions including sanctions for noncompliance; *provided, however,* that in the event the Lessee becomes involved in, or is threatened with, litigation with a contractor, subcontractor or vendor as a result of such direction by the Secretary, the Lessee may request the Lessor to enter into such litigation to protect the interests of the Lessor.

(i) *Certification of nonsegregated facilities.* By entering into this lease, the Lessee certifies that Lessee does not and will not maintain or provide for Lessee's employees any segregated facilities at any of Lessee's establishments, and that Lessee does not and will not permit Lessee's employees to perform their services at any location, under Lessee's control, where segregated facilities are maintained. The Lessee agrees that a breach of this certification is a violation of the Equal Opportunity clause in this lease. As used in this certification, the term "segregated facilities" means, but is not limited to, any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom, or otherwise. Lessee further agrees that (except where Lessee has obtained identical certifications from proposed contractors and subcontractors for specific time periods) Lessee will obtain identical certifications from proposed contractors and subcontractors prior to the award of contracts or subcontracts exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity clause; that Lessee will retain such certifications in Lessee's files; and that Lessee will forward the following notice to such proposed contractors and subcontractors (except where the proposed contractor or subcontractor has submitted identical certifications for specific time periods): Notice to prospective contractors and subcontractors of requirement for certification of nonsegregated facilities. A Certification of Nonsegregated Facilities, as required by the May 9, 1967, order (32 F.R. 7439, May 19, 1967) on Elimination of Segregated Facilities, by the Secretary of Labor, must be submitted prior to the award of a contract or subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity clause. The certification may be submitted either for each contract and subcontract or for all contracts and subcontracts during a period (i.e., quarterly, semiannually, or annually).

(j) *Assignment of lease.* To file for approval with the appropriate office of the Bureau of Land Management any instrument of transfer of this lease, or any interest therein, required to be filed under applicable regulations, within the time and in the manner prescribed by the applicable regulations.

Sec. 4. **Term.** This lease shall continue for a period of 5 years from the effective date of this lease and so long thereafter as oil or gas may be produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Secretary, are conducted thereon.

Sec. 5. **Cooperative or Unit Plan.** Lessee agrees that, within 30 days after demand by Lessor, Lessee will subscribe to and operate under such cooperative or unit plan for the development and operation of the area, field,

or pool, or part thereof, embracing lands subject to this lease as the Secretary may determine to be practicable and necessary or advisable in the interest of conservation. Where any provision of a cooperative or unit plan of development which has been approved by the Secretary, and which by its terms affects the leased area or any part thereof, is inconsistent with a provision of this lease, the provision of such cooperative or unit plan shall govern.

Sec. 6. **Reservations to Lessor.** All rights in the leased area not expressly granted to the Lessee by the Act, the regulations, or this lease are hereby reserved to the Lessor. Without limiting the generality of the foregoing, such reserved rights include:

(a) *Geological and geophysical exploration; rights-of-way.* The right to authorize the conduct of geological and geophysical exploration in the leased area which does not interfere with or endanger actual operations under this lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands or to the treatment and shipment of products thereof by or under authority of the United States, its Lessees or Permittees.

(b) *Leases of sulfur and other minerals.* The right to grant leases of any mineral other than oil and gas within the leased area or any part thereof. No lease of other mineral shall authorize or permit the Lessee thereunder unreasonably to interfere with or endanger operations under this lease.

(c) *Purchase of production.* In time of war, or when the President of the United States shall so prescribe, the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in Section 12(b) of the Act.

(d) *Taking of royalties.* The right to determine whether royalty will be taken in the amount or the value of production.

(e) *Helium.* Pursuant to Section 12(f) of the Act, the ownership of and the right to extract helium from all gas produced under this lease.

(f) *Suspension of operations during war or national emergency.* Upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or President of the United States after August 7, 1953, the authority of the Secretary to suspend any or all operations under this lease, as provided in Section 12(c) of the Act: *Provided,* That just compensation shall be paid by the Lessor to the Lessee.

(g) *Restriction of exploration and operations.* The right, as provided in Section 12(d) of the Act, to restrict from exploration and operations the leased area or any part thereof which may be designated by and through the Secretary of Defense, with the approval of the President, as, or as part of, an area of the Outer Continental Shelf needed for national defense; and so long as such designation remains in effect no exploration or operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense; and if operations or production under this lease within any such restricted area shall be suspended, any payments of rentals and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

Sec. 7. **Directional Drilling.** A directional well drilled under the leased area from a surface location on nearby land not covered by this lease shall be deemed to have the same effect for all purposes of this lease as a well drilled from a surface location on the leased area. In such circumstances, drilling shall be considered to have

been commenced on the leased area when drilling is commenced on the nearby land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on nearby land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations (as the case may be) on the leased area for all purposes of this lease. Nothing contained in this paragraph is intended or shall be construed as granting to the Lessee any leasehold interests, licenses, easements, or other rights in or with respect to any such nearby land in addition to any such leasehold interests, licenses, easements, or other rights which the Lessee may have lawfully acquired under the Act or from the Lessor or others.

Sec. 8. Surrender of Lease. The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the appropriate office of the Bureau of Land Management a written relinquishment, in *triplicate*, which shall be effective as of the date of filing. No surrender of this lease or of any portion of the leased area shall relieve the Lessee or his surety of the obligation to make payment of all accrued rentals and royalties or to abandon all wells on the area to be surrendered in a manner satisfactory to the Supervisor.

Sec. 9. Removal of property on termination of lease. Upon the termination of this lease in whole or in part, or the surrender of the lease in whole or in part, as herein provided, the Lessee shall within a period of 1 year thereafter remove from the premises no longer subject to the lease all structures, machinery, equipment, tools, and materials in accordance with applicable regulations and orders of the Supervisor; *provided, however*, that the Lessee may continue to maintain any such property on the leased area for whatever longer period it may be needed, as determined by the Supervisor, for producing wells or for drilling or producing on other leases.

Sec. 10. Remedies in case of default. (a) Whenever the Lessee fails to comply with any of the provisions of the Act, or of this lease, or of the regulations issued under the Act and in force and effect on the effective date of this lease, the lease shall be subject to cancellation in accordance with the provisions of Section 5(b) of the Act; *provided, however*, that the 30-day notice provision applicable to non-producing leases under Section 5(b)(1) of the Act shall also apply as a prerequisite to the institution of any legal action by the Lessor to cancel this lease while it is in a producing status. Nothing in this subsection shall be construed to apply to, or require any notice with respect to, any legal action instituted by the Lessor other than an action to cancel the lease pursuant to Section 5(b) of the Act.

(b) Whenever the Lessee fails to comply with any of the provisions of the Act, or of this lease, or of any regulations promulgated by the Secretary under the Act, the Lessor may exercise any legal or equitable remedy or remedies which the Lessor may have, including appropriate action under the penalty provisions of Section 5(a)(2) of the Act; *however*, the remedy of cancellation of the lease may be exercised only under the provisions of Section 5(b) and Section 8(i) of the Act.

(c) A waiver of any particular violation of the provisions of the Act, or of this lease, or of any regulations promulgated by the Secretary under the Act, shall not prevent the cancellation of this lease or the exercise of any other remedy or remedies under paragraphs (a) and (b) of this section by reason of any other such violation or for the same violation occurring at any other time.

Sec. 11. Heirs and successors in interest. Each obligation hereunder shall extend to and be binding upon, and every benefit hereof shall inure to, the heirs, executors, administrators, successors, or assigns, of the respective parties hereto.

Sec. 12. Unlawful interest. No member of, or Delegate to, Congress, or Resident Commissioner, after his election or appointment, or either before or after he has qualified, and during his continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR 7.4(a)(1), shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom; and the provisions of Section 3741 of the Revised Statutes (41 U.S.C. Sec. 22), as amended, and Sections 431, 432, and 433 of Title 18 of the United States Code, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease so far as the same may be applicable.

MOBIL OIL CORPORATION

By _____
Attorney-in-Fact

AMOCO PRODUCTION COMPANY

By _____
(Signature of Lessee)
Attorney-in-Fact

TEXAS GAS EXPLORATION CORPORATION

By _____
(Signature of Lessee)
Vice President

Attest:

_____
Assistant
Secretary

THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY

By _____
(Signature of Lessee)
Attorney-in-Fact

UNION OIL COMPANY OF CALIFORNIA

By _____
W. F. BOLDING   (Signature of Lessee)
Attorney-in-Fact

*If this lease is executed by a corporation it must bear the corporate seal.*

THE UNITED STATES OF AMERICA

By _____
(Authorized Officer)

Acting   Manager, Bureau of Land Management
Gulf of Mexico
Outer Continental Shelf Office

_____
(Title)

JUN 28 1974

_____
(Date)

**OCS-G06069**

Form MMS-2005
(August 1982)
(formerly Form 3300-1)

| Office | Serial number |
|---|---|
| Metairie, LA | OCS-G 6069 |
| Cash bonus | Rental rate per acre, hectare or fraction thereof |
| $2,813,000.00 | $3.00 per acre |
| Minimum royalty rate per acre, hectare or fraction thereof  $3.00 per acre | Royalty rate |
|  | 16 2/3 percent |
| Work commitment | Profit share rate |

## UNITED STATES
## DEPARTMENT OF THE INTERIOR
## MINERALS MANAGEMENT SERVICE

## OIL AND GAS LEASE OF SUBMERGED LANDS
## UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

*This form does not constitute an information collection as defined by 44 U.S.C. 3502 and therefore does not require approval by the Office of Management and Budget.*

This lease is effective as of **OCT 1  1983** (hereinafter called the "Effective Date") and shall continue for an initial period of **five** years (hereinafter called the "Initial Period") by and between the United States of America (hereinafter called the "Lessor"), by the **Regional Manager, Gulf of Mexico OCS Region,** Minerals Management Service, its authorized officer, and

**Samedan Oil Corporation**                    **100%**

(hereinafter called the "Lessee"). In consideration of any cash payment heretofore made by the Lessee to the Lessor and in consideration of the promises, terms, conditions, and covenants contained herein, including the Stipulation(s) numbered                    **1** attached hereto, the Lessee and Lessor agree as follows:

**Sec. 1. Statutes and Regulations.** This lease is issued pursuant to the Outer Continental Shelf Lands Act of August 7, 1953, 67 Stat. 462; 43 U.S.C. 1331 et seq., as amended (92 Stat. 629), (hereinafter called the "Act"). The lease is issued subject to the Act; all regulations issued pursuant to the statute and in existence upon the Effective Date of this lease; all regulations issued pursuant to the statute in the future which provide for the prevention of waste and the conservation of the natural resources of the Outer Continental Shelf, and the protection of correlative rights therein; and all other applicable statutes and regulations.

**Sec. 2. Rights of Lessee.** The Lessor hereby grants and leases to the Lessee the exclusive right and privilege to drill for, develop, and produce oil and gas resources, except helium gas, in the submerged lands of the Outer Continental Shelf containing approximately **5760** acres or                    hectares (hereinafter referred to as the "leased area"), described as follows:

## All of Block 491, Brazos Area, OCS Leasing Map, Texas Map No. 5.

These rights include:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations in accordance with applicable regulations;

(b) the nonexclusive right to drill water wells within the leased area, unless the water is part of geopressured-geothermal and associated resources, and to use the water produced therefrom for operations pursuant to the Act free of cost, on the condition that the drilling is conducted in accordance with procedures approved by the Director of the Minerals Management Service or the Director's delegate (hereinafter called the "Director"); and

(c) the right to construct or erect and to maintain within the leased area artificial islands, installations, and other devices permanently or temporarily attached to the seabed and other works and structures necessary to the full enjoyment of the lease, subject to compliance with applicable laws and regulations.

**Sec. 3. Term.** This lease shall continue from the Effective Date of the lease for the Initial Period and so long thereafter as oil or gas is produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Lessor, are conducted thereon.

**Sec. 4. Rentals.** The Lessee shall pay the Lessor, on or before the first day of each lease year which commences prior to a discovery in paying quantities of oil or gas on the leased area, a rental as shown on the face hereof.

**Sec. 5. Minimum Royalty.** The Lessee shall pay the Lessor at the expiration of each lease year which commences after a discovery of oil and gas in paying quantities, a minimum royalty as shown on the face hereof or, if there is production, the difference between the actual royalty required to be paid with respect to such lease year and the prescribed minimum royalty, if the actual royalty paid is less than the minimum royalty.

**Sec. 6. Royalty on Production.** (a) The Lessee shall pay a fixed royalty as shown on the face hereof in amount or value of production saved, removed, or sold from the leased area. Gas of all kinds (except helium) is subject to royalty. The Lessor shall determine whether production royalty shall be paid in amount or value.

(b) The value of production for purposes of computing royalty on production from this lease shall never be less than the fair market value of the production. The value of production shall be the estimated reasonable value of the production as determined by the Lessor, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field or area, to the price received by the Lessee, to posted prices, to regulated prices, and to other relevant matters. Except when the Lessor, in its discretion, determines not to consider special pricing relief from otherwise applicable Federal regulatory requirements, the value of production for the purposes of computing royalty shall not be deemed to be less than the gross proceeds accruing to the Lessee from the sale thereof. In the absence of good reason to the contrary, value computed on the basis of the highest price paid or offered at the time of production in a fair and

open market for the major portion of like-quality products produced and sold from the field or area where the leased area is situated, will be considered to be a reasonable value.

(c) When paid in value, royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained, unless the Lessor designates a later time. When paid in amount, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessor's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point. The Lessee shall not be required to provide storage for royalty paid in amount in excess of tankage required when royalty is paid in value. When royalties are paid in amount, the Lessee shall not be held liable for the loss or destruction of royalty oil or other liquid products in storage from causes over which the Lessee has no control.

**Sec. 7. Payments.** The Lessee shall make all payments to the Lessor by check, bank draft, or money order unless otherwise provided by regulations or by direction of the Lessor. Rentals, royalties, and any other payments required by this lease shall be made payable to the Minerals Management Service and tendered to the Director.

**Sec. 8. Bonds.** The Lessee shall maintain at all times the bond(s) required by regulation prior to the issuance of the lease and shall furnish such additional security as may be required by the Lessor if, after operations have begun, the Lessor deems such additional security to be necessary.

**Sec. 9. Plans.** The Lessee shall conduct all operations on the leased area in accordance with approved exploration plans, and approved development and production plans as are required by regulations. The Lessee may depart from an approved plan only as provided by applicable regulations.

**Sec. 10. Performance.** The Lessee shall comply with all regulations and orders relating to exploration, development, and production. After due notice in writing, the Lessee shall drill such wells and produce at such rates as the Lessor may require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles.

**Sec. 11. Directional Drilling.** A directional well drilled under the leased area from a surface location on nearby land not covered by this lease shall be deemed to have the same effect for all purposes of the lease as a well drilled from a surface location on the leased area. In those circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the nearby land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on nearby land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations on the leased area for all purposes of the lease. Nothing contained in this Section shall be construed as granting to the Lessee any interest, license, easement, or other right in any nearby land.

**UNITED STATES**
**DEPARTMENT OF THE INTERIOR**
**MINERALS MANAGEMENT SERVICE**

Outer Continental Shelf, Western Gulf of Mexico
Oil and Gas Lease Offering (August 1983)

STIPULATION NO. 1 - CULTURAL RESOURCE        OCS-G **6069**

(a)     "Cultural resource" means any site, structure, or object of historic or prehistoric archaeo-
logical significance. "Operations" means any drilling, mining, or construction or placement
of any structure for exploration, development, or production of the lease.

(b)     If the Regional Manager (RM) believes a cultural resource may exist in the lease area, the
RM will notify the lessee in writing. The lessee shall then comply with subparagraphs
(1) through (3).

   (1)     Prior to commencing any operations, the lessee shall prepare a report, as
   specified by the RM, to determine the potential existence of any cultural
   resource that may be affected by operations. The report, prepared by an
   archaeologist and geophysicist, shall be based on an assessment of data from
   remote-sensing surveys and other pertinent cultural and environmental infor-
   mation. The lessee shall submit this report to the RM for review.

   (2)     If the evidence suggests that a cultural resource may be present, the lessee
   shall either:

      (i)     Locate the site of any operation so as not to adversely affect the
      area where the cultural resource may be; or

      (ii)     Establish to the satisfaction of the RM that a cultural resource
      does not exist or will not be adversely affected by operations.
      This shall be done by further archaeological investigation, con-
      ducted by an archaeologist and a geophysicist, using survey
      equipment and techniques deemed necessary by the RM. A
      report on the investigation shall be submitted to the RM for
      review.

   (3)     If the RM determines that a cultural resource is likely to be present on the
   lease and may be adversely affected by operations, he will notify the lessee
   immediately. The lessee shall take no action that may adversely affect the
   cultural resource until the RM has told the lessee how to protect it.

(c)     If the lessee discovers any cultural resource while conducting operations on the lease area,
the lessee shall report the discovery immediately to the RM. The lessee shall make every
reasonable effort to preserve the cultural resource until the RM has told the lessee how to
protect it.

**Sec. 12.** <u>Safety Requirements</u>. The Lessee shall (a) maintain all places of employment within the leased area in compliance with occupational safety and health standards and, in addition, free from recognized hazards to employees of the Lessee or of any contractor or subcontractor operating within the leased area;

(b) maintain all operations within the leased area in compliance with regulations intended to protect persons, property, and the environment on the Outer Continental Shelf; and

(c) allow prompt access, at the site of any operation subject to safety regulations, to any authorized Federal inspector and shall provide any documents and records which are pertinent to occupational or public health, safety, or environmental protection as may be requested.

**Sec. 13.** <u>Suspension and Cancellation</u>. (a) The Lessor may suspend or cancel this lease pursuant to Section 5 of the Act and compensation shall be paid when provided by the Act.

(b) The Lessor may, upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by Congress or the President of the United States, suspend operations under the lease, as provided in Section 12(c) of the Act, and just compensation shall be paid to the Lessee for such suspension.

**Sec. 14.** <u>Indemnification</u>. The Lessee shall indemnify the Lessor for, and hold it harmless from, any claim, including claims for loss or damage to property or injury to persons caused by or resulting from any operation on the leased area conducted by or on behalf of the Lessee. However, the Lessee shall not be held responsible to the Lessor under this section for any loss, damage, or injury caused by or resulting from:

(a) negligence of the Lessor other than the commission or omission of a discretionary function or duty on the part of a Federal agency whether or not the discretion involved is abused; or

(b) the Lessee's compliance with an order or directive of the Lessor against which an administrative appeal by the Lessee is filed before the cause of action for the claim arises and is pursued diligently thereafter.

**Sec. 15.** <u>Disposition of Production</u>. (a) As provided in Section 27(a)(2) of the Act, the Lessor shall have the right to purchase not more than 16-2/3 percent by volume of the oil and gas produced pursuant to the lease at the regulated price, or if no regulated price applies, at the fair market value at the wellhead of the oil and gas saved, removed, or sold, except that any oil or gas obtained by the Lessor as royalty or net profit share shall be credited against the amount that may be purchased under this subsection.

(b) As provided in Section 27(d) of the Act, the Lessee shall take any Federal oil or gas for which no acceptable bids are received, as determined by the Lessor, and which is not transferred to a Federal agency pursuant to Section 27(a)(3) of the Act, and shall pay to the Lessor a cash amount equal to the regulated price, or if no regulated price applies, the fair market value of the oil or gas so obtained.

(c) As provided in Section 8(b)(7) of the Act, the Lessee shall offer 20 percent of the crude oil, condensate, and natural gas liquids produced on the lease, at the market value and point of delivery as provided by regulations applicable to Federal royalty oil, to small or independent refiners as defined in the Emergency Petroleum Allocation Act of 1973.

(d) In time of war, or when the President of the United States shall so prescribe; the Lessor shall have the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in Section 12(b) of the Act.

**Sec. 16.** <u>Unitization, Pooling, and Drilling Agreements</u>. Within such time as the Lessor may prescribe, the Lessee shall subscribe to and operate under a unit, pooling, or drilling agreement embracing all or part of the lands subject to this lease as the Lessor may determine to be appropriate or necessary. Where any provision of a unit, pooling, or drilling agreement, approved by the Lessor, is inconsistent with a provision of this lease, the provision of the agreement shall govern.

**Sec. 17.** <u>Equal Opportunity Clause</u>. During the performance of this lease, the Lessee shall fully comply with paragraphs (1) through (7) of Section 202 of Executive Order 11246, as amended (reprinted in 41 CFR 60-1.4(a)), and the implementing regulations, which are for the purpose of preventing employment discrimination against persons on the basis of race, color, religion, sex, or national origin. Paragraphs (1) through (7) of Section 202 of Executive Order 11246, as amended, are incorporated in this lease by reference.

**Sec. 18.** <u>Certification of Nonsegregated Facilities</u>. By entering into this lease, the Lessee certifies, as specified in 41 CFR 60-1.8, that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained. As used in this certification, the term "segregated facilities" means, but is not limited to, any waiting rooms, work areas, restrooms and washrooms, restaurants and other eating areas, timeclocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom, or otherwise. The Lessee further agrees that it will obtain identical certifications from proposed contractors and subcontractors prior to award of contracts or subcontracts unless they are exempt under 41 CFR 60-1.5.

**Sec. 19.** <u>Reservations to Lessor</u>. All rights in the leased area not expressly granted to the Lessee by the Act, the regulations, or this lease are hereby reserved to the Lessor. Without limiting the generality of the foregoing, reserved rights include:

(a) the right to authorize geological and geophysical exploration in the leased area which does not unreasonably interfere with or endanger actual operations under the lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands or to the treatment and shipment of products thereof by or under authority of the Lessor;

(b) the right to grant leases for any minerals other than oil and gas within the leased area, except that operations under such leases shall not unreasonably interfere with or endanger operations under this lease;

(c) the right, as provided in Section 12(d) of the Act, to restrict operations in the leased area or any part thereof which may be designated by the Secretary of Defense, with approval of the President, as being within an area needed for national defense, and so long as such designation remains in effect no operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense. If operations or production under this lease within any designated area are suspended pursuant to this paragraph, any payments of rentals and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, and the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

**Sec. 20.** <u>Transfer of Lease</u>. The Lessee shall file for approval with the appropriate field office of the Minerals Management Service any instrument of assignment or other transfer of this lease, or any interest therein, in accordance with applicable regulations.

(Continued on reverse)

**Sec. 21. Surrender of Lease.** The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the appropriate field office of the Minerals Management Service a written relinquishment, in triplicate, which shall be effective as of the date of filing. No surrender of this lease or of any portion of the leased area shall relieve the Lessee or its surety of the obligation to pay all accrued rentals, royalties, and other financial obligations or to abandon all wells on the area to be surrendered in a manner satisfactory to the Director.

**Sec. 22. Removal of Property on Termination of Lease.** Within a period of one year after termination of this lease in whole or in part, the Lessee shall remove all devices, works, and structures from the premises no longer subject to the lease in accordance with applicable regulations and orders of the Director. However, the Lessee may, with the approval of the Director, continue to maintain devices, works, and structures on the leased area for drilling or producing on other leases.

**Sec. 23. Remedies in Case of Default.** (a) Whenever the Lessee fails to comply with any of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease, the lease shall be subject to cancellation in accordance with the provisions of Section 5(c) and (d) of the Act and the Lessor may exercise any other remedies which the Lessor may have, including the penalty provisions of Section 24 of the Act. Furthermore, pursuant to Section 8(o) of the Act, the Lessor may cancel the lease if it is obtained by fraud or misrepresentation.

(b) Nonenforcement by the Lessor of a remedy for any particular violation of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease shall not prevent the cancellation of this lease or the exercise of any other remedies under paragraph (a) of this section for any other violation or for the same violation occurring at any other time.

**Sec. 24. Unlawful Interest.** No member of, or Delegate to, Congress, or Resident Commissioner, after election or appointment, or either before or after they have qualified, and during their continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR Part 7, shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom. The provisions of Section 3741 of the Revised Statutes, as amended, 41 U.S.C. 22, and the Act of June 25, 1948, 62 Stat. 702, as amended, 18 U.S.C. 431 – 433, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease insofar as they may be applicable.

---

SAMEDAN OIL CORPORATION
(Lessee)

(Signature of Authorized Officer)

Thomas C. Jobe
(Name of Signatory)

Senior Vice President
(Title)

September 1, 1983
(Date)

ATTEST:

Robert Kelley, Assistant Secretary

350 Glenborough, Suite 240
Houston, Texas   77067
(Address of Lessee)

THE UNITED STATES OF AMERICA, Lessor

(Signature of Authorized Officer)

J. Rogers Pearcy
(Name of Signatory)

Acting  Regional Manager
Gulf of Mexico OCS Region
Minerals Management Service
(Title)

SEP 1 2 1983
(Date)

*If this lease is executed by a corporation, it must bear the corporate seal.*

**OCS-G 8658**

Form MMS-2005 (March 1986)
(Supersedes MMS-2005 August 1982)

| | |
|---|---|
| Office | Serial number |
| New Orleans, LA | **OCS-G 8658** |
| Cash bonus | Rental rate per acre, hectare or fraction thereof |
| **$800,000.00** | **$3.00 per acre** |
| Minimum royalty rate per acre, hectare or fraction thereof | Royalty rate |
| | **16 2/3 percent** |
| | Profit share rate |
| **$3.00 per acre** | |

UNITED STATES
DEPARTMENT OF THE INTERIOR
MINERALS MANAGEMENT SERVICE

**OIL AND GAS LEASE OF SUBMERGED LANDS
UNDER THE OUTER CONTINENTAL SHELF LANDS ACT**

*This form does not constitute an information collection as defined by 44 U.S.C. 3502 and therefore does not require approval by the Office of Management and Budget.*

This lease is effective as of            **AUG 1   1987**            (hereinafter called the "Effective Date") and shall continue for an initial period of      **five**         years (hereinafter called the "Initial Period") by and between the United States of America (hereinafter called the "Lessor"), by the   Regional Director, Gulf of Mexico OCS Region
Minerals Management Service, its authorized officer, and

**Mark Producing, Inc.**                          **60%**

**EP Operating Company**                          **40%**

(hereinafter called the "Lessee"). In consideration of any cash payment heretofore made by the Lessee to the Lessor and in consideration of the promises, terms, conditions, and covenants contained herein, including the Stipulation(s) numbered      **1**
attached hereto, the Lessee and Lessor agree as follows:

**Sec. 1. Statutes and Regulations.** This lease is issued pursuant to the Outer Continental Shelf Lands Act of August 7, 1953, 67 Stat. 462; 43 U.S.C. 1331 et seq., as amended (92 Stat. 629), (hereinafter called the "Act"). The lease is issued subject to the Act; all regulations issued pursuant to the Act and in existence upon the Effective Date of this lease; all regulations issued pursuant to the statute in the future which provide for the prevention of waste and conservation of the natural resources of the Outer Continental Shelf and the protection of correlative rights therein; and all other applicable statutes and regulations.

**Sec. 2. Rights of Lessee.** The Lessor hereby grants and leases to the Lessee the exclusive right and privilege to drill for, develop, and produce oil and gas resources, except helium gas, in the submerged lands of the Outer Continental Shelf containing approximately
**5000.00**          acres or                        hectares (hereinafter referred to as the "leased area"), described as follows:

**All of Block 331, East Cameron Area, South Addition, OCS Leasing Map, Louisiana Map No. 2A.**

RECEIVED

JUL 13 1987

Minerals Management Service
Leasing & Environment

These rights include:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations in accordance with applicable regulations;

(b) the nonexclusive right to drill water wells within the leased area, unless the water is part of geopressured-geothermal and associated resources, and to use the water produced therefrom for operations pursuant to the Act free of cost, on the condition that the drilling is conducted in accordance with procedures approved by the Director of the Minerals Management Service or the Director's delegate (hereinafter called the "Director"); and

(c) the right to construct or erect and to maintain within the leased area artificial islands, installations, and other devices permanently or temporarily attached to the seabed and other works and structures necessary to the full enjoyment of the lease, subject to compliance with applicable laws and regulations.

**Sec. 3. Term.** This lease shall continue from the Effective Date of the lease for the Initial Period and so long thereafter as oil or gas is produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Lessor, are conducted thereon, or as otherwise provided by regulation.

**Sec. 4. Rentals.** The Lessee shall pay the Lessor, on or before the first day of each lease year which commences prior to a discovery in paying quantities of oil or gas on the leased area, a rental as shown on the face hereof.

**Sec. 5. Minimum Royalty.** The Lessee shall pay the Lessor, at the expiration of each lease year which commences after a discovery of oil and gas in paying quantities, a minimum royalty as shown on the face hereof or, if there is production, the difference between the actual royalty required to be paid with respect to such lease year and the prescribed minimum royalty if the actual royalty paid is less than the minimum royalty.

**Sec. 6. Royalty on Production.**

(a) The Lessee shall pay a fixed royalty as shown on the face hereof in amount or value of production saved, removed, or sold from the leased area. Gas (except helium) and oil of all kinds are subject to royalty. Any Lessee is liable for royalty payments on oil or gas lost or wasted from a lease site when such loss or waste is due to negligence on the part of the operator of the lease, or due to the failure to comply with any rule or regulation, order, or citation issued under the Federal Oil and Gas Royalty Management Act of 1982 or the Act. The Lessor shall determine whether production royalty shall be paid in amount or value.

(b) The value of production for purposes of computing royalty on production from this lease shall never be less than the fair market value of the production. The value of production shall be the estimated reasonable value of the production as determined by the Lessor, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field or area, to the price received by the Lessee, to posted prices, to regulated prices, and to other relevant matters. Except when the Lessor, in its discretion, determines not to consider special pricing relief from otherwise applicable Federal regulatory requirements, the value of production for the purposes of computing royalty shall not be deemed to be less than the gross proceeds accruing to the Lessee from the sale thereof. In the absence of good reason to the contrary, value

computed on the basis of the highest price paid or offered at the time of production in a fair and open market for the major portion of like-quality products produced and sold from the field or area where the leased area is situated will be considered to be a reasonable value.

(c) When paid in value, royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained, unless the Lessor designates a later time. When paid in amount, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessor's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point.

**Sec. 7. Payments.** The Lessee shall make all payments (rentals, royalties and any other payments required by this lease) to the Lessor by electronic transfer of funds, check, draft on a solvent bank, or money order unless otherwise provided by regulations or by direction of the Lessor. Rentals, royalties, and any other payments required by this lease shall be made payable to the Minerals Management Service and tendered to the Director. Determinations made by the Lessor as to the amount of payment due shall be presumed to be correct and paid as due.

**Sec. 8. Bonds.** The Lessee shall maintain at all times the bond(s) required by regulation prior to the issuance of the lease and shall furnish such additional security as may be required by the Lessor if, after operations have begun, the Lessor deems such additional security to be necessary.

**Sec. 9. Plans.** The Lessee shall conduct all operations on the leased area in accordance with approved exploration plans and approved development and production plans as are required by regulations. The Lessee may depart from an approved plan only as provided by applicable regulations.

**Sec. 10. Performance.** The Lessee shall comply with all regulations and Orders. After due notice in writing, the Lessee shall drill such wells and produce at such rates as the Lessor may require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles.

**Sec. 11. Directional Drilling.** A directional well drilled under the leased area from a surface location on nearby land not covered by this lease shall be deemed to have the same effect for all purposes of the lease as a well drilled from a surface location on the leased area. In those circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the nearby land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on nearby land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations on the leased area for all purposes of the lease. Nothing contained in this Section shall be construed as granting to the Lessee any interest, license, easement, or other right in any nearby land.

UNITED STATES
DEPARTMENT OF THE INTERIOR
MINERALS MANAGEMENT SERVICE

Outer Continental Shelf, Central Gulf of Mexico
Oil and Gas Lease Sale 110

OCS-G 8658

## Stipulation No. 1-- Protection of Archaeological Resources

(a)  "Archaeological resource" means any prehistoric or historic district,
site, building, structure, or object (including shipwrecks); such term
includes artifacts, records, and remains which are related to such a district,
site, building, structure, or object (Section 301(5), National Historic
Preservation Act, as amended, 16 U.S.C. 470w(5).)  "Operations" means any
drilling, mining, or construction or placement of any structure for
exploration, development, or production of the lease.

(b)  If the Regional Director (RD) believes an archaeological resource may
exist in the lease area, the RD will notify the lessee in writing.  The lessee
shall then comply with subparagraphs (1) through (3).

 (1)  Prior to commencing any operations, the lessee shall prepare a
 report, as specified by the RD, to determine the potential existence of
 any archaeological resource that may be affected by operations.  The
 report, prepared by an archaeologist and geophysicist, shall be based on
 an assessment of data from remote sensing surveys and of other pertinent
 archaeological and environmental information.  The lessee shall submit
 this report to the RD for review.

 (2)  If the evidence suggests that an archaeological resource may be
 present, the lessee shall either:

  (i)  Locate the site of any operation so as not to adversely affect
  the area where the archaeological resource may be; or

  (ii) Establish to the satisfaction of the RD that an archaeological
  resource does not exist or will not be adversely affected by
  operations.  This shall be done by further archaeological
  investigation, conducted by an archaeologist and a geophysicist,
  using survey equipment and techniques deemed necessary by the RD.
  A report on the investigation shall be submitted to the RD for
  review.

 (3)  If the RD determines that an archaeological resource is likely to be
 present in the lease area and may be adversely affected by operations, he
 will notify the lessee immediately.  The lessee shall take no action that
 may adversely affect the archaeological resource until the RD has told
 the lessee how to protect it.

(c)  If the lessee discovers any archaeological resource while conducting
operations on the lease area, the lessee shall report the discovery
immediately to the RD.  The lessee shall make every reasonable effort to
preserve the archaeological resource until the RD has told the lessee how to
protect it.

EP Operating Company,
a Limited Partnership
By Enserch Exploration, Inc.,
Managing General Partner

_____          _____
(Lessee)                                      (Lessee)

_____          _____
(Signature of Authorized Officer)             (Signature of Authorized Officer)

Gary J. Junco
_____          _____
(Name of Signatory)                           (Name of Signatory)

Senior Vice President
_____          _____
(Title)                                       (Title)

July 7, 1987
_____          _____
(Date)                                        (Date)

P. O. Box 2649
Dallas, Texas   75221
_____          _____
(Address of Lessee)                           (Address of Lessee)

_____          _____
(Lessee)                                      (Lessee)

_____          _____
(Signature of Authorized Officer)             (Signature of Authorized Officer)

_____          _____
(Name of Signatory)                           (Name of Signatory)

_____          _____
(Title)                                       (Title)

_____          _____
(Date)                                        (Date)

_____          _____
(Address of Lessee)                           (Address of Lessee)

*If this lease is executed by a corporation, it must bear the corporate seal.*

---
(Lessee)

---
(Signature of Authorized Officer)

---
(Name of Signatory)

---
(Title)

---
(Date)

---
(Address of Lessee)

---
(Lessee)

---
(Signature of Authorized Officer)

---
(Name of Signatory)

---
(Title)

---
(Date)

---
(Lessee)

---
(Signature of Authorized Officer)

---
(Name of Signatory)

---
(Title)

---
(Date)

---
(Address of Lessee)

---
(Lessee)

---
(Signature of Authorized Officer)

---
(Name of Signatory)

---
(Title)

---
(Date)

---
(Address of Lessee)

*If this lease is executed by a corporation, it must bear the corporate seal.*

**Sec. 12. Safety Requirements.** The Lessee shall:

(a) maintain all places of employment within the leased area in compliance with occupational safety and health standards and, in addition, free from recognized hazards to employees of the Lessee or of any contractor or subcontractor operating within the lease area;

(b) maintain all operations within the leased area in compliance with regulations or orders intended to protect persons, property, and the environment on the Outer Continental Shelf; and

(c) allow prompt access, at the site of any operation subject to safety regulations, to any authorized Federal inspector and shall provide any documents and records which are pertinent to occupational or public health, safety, or environmental protection as may be requested.

**Sec. 13. Suspension and Cancellation.**

(a) The Lessor may suspend or cancel this lease pursuant to section 5 of the Act, and compensation shall be paid when provided by the Act.

(b) The Lessor may, upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by Congress or the President of the United States, suspend operations under the lease, as provided in section 12(c) of the Act, and just compensation shall be paid to the Lessee for such suspension.

**Sec. 14. Indemnification.** The Lessee shall indemnify the Lessor for, and hold it harmless from, any claim, including claims for loss or damage to property or injury to persons caused by or resulting from any operation on the leased area conducted by or on behalf of the Lessee. However, the Lessee shall not be held responsible to the Lessor under this section for any loss, damage, or injury caused by or resulting from:

(a) negligence of the Lessor other than the commission or omission of a discretionary function or duty on the part of a Federal Agency whether or not the discretion involved is abused; or

(b) the Lessee's compliance with an order or directive of the Lessor against which an administrative appeal by the Lessee is filed before the cause of action for the claim arises and is pursued diligently thereafter.

**Sec. 15. Disposition of Production.**

(a) As provided in section 27(a)(2) of the Act, the Lessor shall have the right to purchase not more than 16 2/3 percent by volume of the oil and gas produced pursuant to the lease at the regulated price or, if no regulated price applies, at the fair market value at the wellhead of the oil and gas saved, removed, or sold, except that any oil or gas obtained by the Lessor as royalty or net profit share shall be credited against the amount that may be purchased under this subsection.

(b) Pursuant to section 27(b) and (c) of the Act, the Lessor may offer and sell certain oil and gas obtained or purchased pursuant to a lease. As provided in section 27(d) of the Act, the Lessee shall take any Federal oil or gas for which no acceptable bids are received, as determined by the Lessor, and which is not transferred to a Federal Agency pursuant to section 27(a)(3) of the Act, and shall pay to the Lessor a cash amount equal to the regulated price or, if no regulated price applies, the fair market value of the oil or gas so obtained.

(c) As provided in section 8(b)(7) of the Act, the Lessee shall offer 20 percent of the crude oil, condensate, and natural gas liquids produced on the lease, at the market value and point of delivery as provided by regulations applicable to Federal royalty oil, to small or independent refiners as defined in the Emergency Petroleum Allocation Act of 1973.

(d) In time of war or when the president of the United States shall so prescribe, the Lessor shall have the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in section 12(b) of the Act.

**Sec. 16. Unitization, Pooling, and Drilling Agreements.** Within such time as the Lessor may prescribe, the Lessee shall subscribe to and operate under a unit, pooling, or drilling agreement embracing all or part of the lands subject to this lease as the Lessor may determine to be appropriate or necessary. Where any provision of a unit, pooling, or drilling agreement, approved by the Lessor, is inconsistent with a provision of this lease, the provision of the agreement shall govern.

**Sec. 17. Equal Opportunity Clause.** During the performance of this lease, the Lessee shall fully comply with paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended (reprinted in 41 CFR 60-1.4(a)), and the implementing regulations which are for the purpose of preventing employment discrimination against persons on the basis of race, color, religion, sex, or national origin. Paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended, are incorporated in this lease by reference.

**Sec. 18. Certification of Nonsegregated Facilities.** By entering into this lease, the Lessee certifies, as specified in 41 CFR 60-1.8, that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained. As used in this certification, the term "segregated facilities" means, but is not limited to, any waiting rooms, work areas, restrooms and washrooms, restaurants and other eating areas, timeclocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom, or otherwise. The Lessee further agrees that it will obtain identical certifications from proposed contractors and subcontractors prior to award of contracts or subcontracts unless they are exempt under 41 CFR 60-1.5.

**Sec. 19. Reservations to Lessor.** All rights in the leased area not expressly granted to the Lessee by the Act, the regulations, or this lease are hereby reserved to the Lessor. Without limiting the generality of the foregoing, reserved rights included:

. (a) the right to authorize geological and geophysical exploration in the lease area which does not unreasonably interfere with or endanger actual operations under the lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands or to the treatment and shipment of products thereof by or under authority of the Lessor;

(b) the right to grant leases for any minerals other than oil and gas within the leased area, except that operations under such leases shall not unreasonably interfere with or endanger operations under this lease;

(c) the right, as provided in section 12(d) of the Act, to restrict operations in the leased area or any part thereof which may be designated by the Secretary of Defense, with approval of the President, as being within an area needed for national defense, and so long as such designation remains in effect, no operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense. If operations or production under this lease within any designated area are suspended pursuant to this paragraph, any payments of rentals and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

**Sec. 20. Transfer of Lease.** The Lessee shall file for approval with the appropriate field office of the Minerals Management Service any instrument of assignment or other transfer of this lease, or any interest therein, in accordance with applicable regulations.

**Sec. 21. Surrender of Lease.** The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the appropriate field office of the Minerals Management Service a written relinquishment, in triplicate, which shall be effective as of the date of filing. No surrender of this lease or of any portion of the leased area shall relieve the Lessee or its surety of the obligation to pay all accrued rentals, royalties, and other financial obligations or to abandon all wells on the area to be surrendered in a manner satisfactory to the Director.

(Continued on reverse)

**Sec. 22. Removal of Property on Termination of Lease.** Within a period of 1 year after termination of this lease in whole or in part, the Lessee shall remove all devices, works, and structures from the premises no longer subject to the lease in accordance with applicable regulations and Orders of the Director. However, the Lessee may, with the approval of the Director, continue to maintain devices, works, and structures on the leased area for drilling or producing on other leases.

**Sec. 23. Remedies in Case of Default.**

(a) Whenever the Lessee fails to comply with any of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease, the lease shall be subject to cancellation in accordance with the provisions of section 5(c) and (d) of the Act and the Lessor may exercise any other remedies which the Lessor may have, including the penalty provisions of section 24 of the Act. Furthermore, pursuant to section 8(o) of the Act, the Lessor may cancel the lease if it is obtained by fraud or misrepresentation.

(b) Nonenforcement by the Lessor of a remedy for any particular violation of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease shall not prevent the cancellation of this lease or the exercise of any other remedies under paragraph (a) of this section for any other violation or for the same violation occurring at any other time.

**Sec. 24. Unlawful Interest.** No member of, or Delegate to, Congress, or Resident Commissioner, after election or appointment, or either before or after they have qualified and during their continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR Part 20, shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom. The provisions of Section 3741 of the Revised Statutes, as amended, 41 U.S.C. 22, and the Act of June 25, 1948, 62 Stat. 702, as amended, 18 U.S.C. 431-433, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease insofar as they may be applicable.

MARK PRODUCING, INC.
_____
(Lessee)

_____
(Signature of Authorized Officer)

Duane R. Bartels
_____
(Name of Signatory)

Attorney in Fact
_____
(Title)

July 1, 1987
_____
(Date)

THE UNITED STATES OF AMERICA, Lessor

_____
(Signature of Authorized Officer)

J. Rogers Pearcy
_____
(Name of Signatory)

Regional Director
Gulf of Mexico OCS Region
Minerals Management Service
_____
(Title)

JUL 1 5 1987
_____
(Date)

675 Bering Drive
Houston, TX 77057
_____
(Address of Lessee)

*If this lease is executed by a corporation, it must bear the corporate seal.*

Page 4

**OCS-G 9478**

Form MMS-2005 (March 1986)
(Supersedes MMS-2005 August 1982)

| | |
|---|---|
| Office | Serial number |
| New Orleans, LA | **OCS-G 9478** |
| Cash bonus | Rental rate per acre, hectare or fraction thereof |
| **$540,000.00** | **$ 3.00 per acre** |
| Minimum royalty rate per acre, hectare or fraction thereof | Royalty rate |
| | **16 2/3 percent** |
| | Profit share rate |
| **$ 3.00 per acre** | |

UNITED STATES
DEPARTMENT OF THE INTERIOR
MINERALS MANAGEMENT SERVICE

**OIL AND GAS LEASE OF SUBMERGED LANDS
UNDER THE OUTER CONTINENTAL SHELF LANDS ACT**

*This form does not constitute an information collection as defined by 44 U.S.C. 3502 and therefore does not require approval by the Office of Management and Budget.*

This lease is effective as of **MAY 1 1988** (hereinafter called the "Effective Date") and shall continue for an initial period of **five** years (hereinafter called the "Initial Period") by and between the United States of America (hereinafter called the "Lessor"), by the **Regional Director, Gulf of Mexico OCS Region** Minerals Management Service, its authorized officer, and

**CNG Producing Company**      **50.0%**

**Union Texas Petroleum Corporation**      **50.0%**

(hereinafter called the "Lessee"). In consideration of any cash payment heretofore made by the Lessee to the Lessor and in consideration of the promises, terms, conditions, and covenants contained herein, including the Stipulation(s) numbered **1** attached hereto, the Lessee and Lessor agree as follows:

**Sec. 1. Statutes and Regulations.** This lease is issued pursuant to the Outer Continental Shelf Lands Act of August 7, 1953, 67 Stat. 462; 43 U.S.C. 1331 et seq., as amended (92 Stat. 629), (hereinafter called the "Act"). The lease is issued subject to the Act; all regulations issued pursuant to the Act and in existence upon the Effective Date of this lease; all regulations issued pursuant to the statute in the future which provide for the prevention of waste and conservation of the natural resources of the Outer Continental Shelf and the protection of correlative rights therein; and all other applicable statutes and regulations.

**Sec. 2. Rights of Lessee.** The Lessor hereby grants and leases to the Lessee the exclusive right and privilege to drill for, develop, and produce oil and gas resources, except helium gas, in the submerged lands of the Outer Continental Shelf containing approximately **5000.00** acres or hectares (hereinafter referred to as the "leased area"), described as follows:

**All of Block 332, East Cameron Area, South Addition, OCS Leasing Map, Louisiana Map No. 2A.**

RECEIVED

APR 29 1988

Minerals Management Service
Leasing & Environment

These rights include:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations in accordance with applicable regulations;

(b) the nonexclusive right to drill water wells within the leased area, unless the water is part of geopressured-geothermal and associated resources, and to use the water produced therefrom for operations pursuant to the Act free of cost, on the condition that the drilling is conducted in accordance with procedures approved by the Director of the Minerals Management Service or the Director's delegate (hereinafter called the "Director"); and

(c) the right to construct or erect and to maintain within the leased area artificial islands, installations, and other devices permanently or temporarily attached to the seabed and other works and structures necessary to the full enjoyment of the lease, subject to compliance with applicable laws and regulations.

**Sec. 3. Term.** This lease shall continue from the Effective Date of the lease for the Initial Period and so long thereafter as oil or gas is produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Lessor, are conducted thereon, or as otherwise provided by regulation.

**Sec. 4. Rentals.** The Lessee shall pay the Lessor, on or before the first day of each lease year which commences prior to a discovery in paying quantities of oil or gas on the leased area, a rental as shown on the face hereof.

**Sec. 5. Minimum Royalty.** The Lessee shall pay the Lessor, at the expiration of each lease year which commences after a discovery of oil and gas in paying quantities, a minimum royalty as shown on the face hereof or, if there is production, the difference between the actual royalty required to be paid with respect to such lease year and the prescribed minimum royalty if the actual royalty paid is less than the minimum royalty.

**Sec. 6. Royalty on Production.**

(a) The Lessee shall pay a fixed royalty as shown on the face hereof in amount or value of production saved, removed, or sold from the leased area. Gas (except helium) and oil of all kinds are subject to royalty. Any Lessee is liable for royalty payments on oil or gas lost or wasted from a lease site when such loss or waste is due to negligence on the part of the operator of the lease, or due to the failure to comply with any rule or regulation, order, or citation issued under the Federal Oil and Gas Royalty Management Act of 1982 or the Act. The Lessor shall determine whether production royalty shall be paid in amount or value.

(b) The value of production for purposes of computing royalty on production from this lease shall never be less than the fair market value of the production. The value of production shall be the estimated reasonable value of the production as determined by the Lessor, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field or area, to the price received by the Lessee, to posted prices, to regulated prices, and to other relevant matters. Except when the Lessor, in its discretion, determines not to consider special pricing relief from otherwise applicable Federal regulatory requirements, the value of production for the purposes of computing royalty shall not be deemed to be less than the gross proceeds accruing to the Lessee from the sale thereof. In the absence of good reason to the contrary, value

computed on the basis of the highest price paid or offered at the time of production in a fair and open market for the major portion of like-quality products produced and sold from the field or area where the leased area is situated will be considered to be a reasonable value.

(c) When paid in value, royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained, unless the Lessor designates a later time. When paid in amount, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessor's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point.

**Sec. 7. Payments.** The Lessee shall make all payments (rentals, royalties and any other payments required by this lease) to the Lessor by electronic transfer of funds, check, draft on a solvent bank, or money order unless otherwise provided by regulations or by direction of the Lessor. Rentals, royalties, and any other payments required by this lease shall be made payable to the Minerals Management Service and tendered to the Director. Determinations made by the Lessor as to the amount of payment due shall be presumed to be correct and paid as due.

**Sec. 8. Bonds.** The Lessee shall maintain at all times the bond(s) required by regulation prior to the issuance of the lease and shall furnish such additional security as may be required by the Lessor if, after operations have begun, the Lessor deems such additional security to be necessary.

**Sec. 9. Plans.** The Lessee shall conduct all operations on the leased area in accordance with approved exploration plans and approved development and production plans as are required by regulations. The Lessee may depart from an approved plan only as provided by applicable regulations.

**Sec. 10. Performance.** The Lessee shall comply with all regulations and Orders. After due notice in writing, the Lessee shall drill such wells and produce at such rates as the Lessor may require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles.

**Sec. 11. Directional Drilling.** A directional well drilled under the leased area from a surface location on nearby land not covered by this lease shall be deemed to have the same effect for all purposes of the lease as a well drilled from a surface location on the leased area. In those circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the nearby land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on nearby land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations on the leased area for all purposes of the lease. Nothing contained in this Section shall be construed as granting to the Lessee any interest, license, easement, or other right in any nearby land.

Page 2

UNITED STATES
DEPARTMENT OF THE INTERIOR
MINERALS MANAGEMENT SERVICE

Outer Continental Shelf, Central Gulf of Mexico
Oil and Gas Lease Sale 113

OCS-G 9478

Stipulation No. 1-- Protection of Archaeological Resources

(a) "Archaeological resource" means any prehistoric or historic district, site, building, structure, or object (including shipwrecks); such term includes artifacts, records, and remains which are related to such a district, site, building, structure, or object (Section 301(5), National Historic Preservation Act, as amended, 16 U.S.C. 470w(5).) "Operations" means any drilling, mining, or construction or placement of any structure for exploration, development, or production of the lease.

(b) If the Regional Director (RD) believes an archaeological resource may exist in the lease area, the RD will notify the lessee in writing. The lessee shall then comply with subparagraphs (1) through (3).

(1) Prior to commencing any operations, the lessee shall prepare a report, as specified by the RD, to determine the potential existence of any archaeological resource that may be affected by operations. The report, prepared by an archaeologist and geophysicist, shall be based on an assessment of data from remote sensing surveys and of other pertinent archaeological and environmental information. The lessee shall submit this report to the RD for review.

(2) If the evidence suggests that an archaeological resource may be present, the lessee shall either:

(i) Locate the site of any operation so as not to adversely affect the area where the archaeological resource may be; or

(ii) Establish to the satisfaction of the RD that an archaeological resource does not exist or will not be adversely affected by operations. This shall be done by further archaeological investigation, conducted by an archaeologist and a geophysicist, using survey equipment and techniques deemed necessary by the RD. A report on the investigation shall be submitted to the RD for review.

(3) If the RD determines that an archaeological resource is likely to be present in the lease area and may be adversely affected by operations, he will notify the lessee immediately. The lessee shall take no action that may adversely affect the archaeological resource until the RD has told the lessee how to protect it.

(c) If the lessee discovers any archaeological resource while conducting operations on the lease area, the lessee shall report the discovery immediately to the RD. The lessee shall make every reasonable effort to preserve the archaeological resource until the RD has told the lessee how to protect it.

_____
(Lessee)

_____
(Signature of Authorized Officer)

_____
(Name of Signatory)

_____
(Title)

_____
(Date)

_____
(Address of Lessee)

UNION TEXAS PETROLEUM CORPORATION
                                    (Lessee)

_____
(Signature of Authorized Officer)

J. S. Empie
_____
(Name of Signatory)

Vice President
_____
(Title)

April 21, 1988
_____
(Date)

P. O. Box 2120
1330 Post Oak Blvd.
Houston, Texas 77252-2120
_____
(Address of Lessee)

_____
(Lessee)

_____
(Signature of Authorized Officer)

_____
(Name of Signatory)

_____
(Title)

_____
(Date)

_____
(Address of Lessee)

_____
(Lessee)

_____
(Signature of Authorized Officer)

_____
(Name of Signatory)

_____
(Title)

_____
(Date)

_____
(Address of Lessee)

*If this lease is executed by a corporation, it must be bear the corporarte seal*

Page 5

_____          _____
(Lessee)                                   (Lessee)


_____          _____
(Signature of Authorized Officer)          (Signature of Authorized Officer)


_____          _____
(Name of Signatory)                        (Name of Signatory)


_____          _____
(Title)                                    (Title)


_____          _____
(Date)                                     (Date)


_____          _____
(Address of Lessee)                        (Address of Lessee)


_____          _____
(Lessee)                                   (Lessee)


_____          _____
(Signature of Authorized Officer)          (Signature of Authorized Officer)


_____          _____
(Name of Signatory)                        (Name of Signatory)


_____          _____
(Title)                                    (Title)


_____          _____
(Date)                                     (Date)


_____          _____
(Address of Lessee)                        (Address of Lessee)

*If this lease is executed by a corporation, it must bear the corporate seal.*



Page 6

**Sec. 12. Safety Requirements.** The Lessee shall:

(a) maintain all places of employment within the leased area in compliance with occupational safety and health standards and, in addition, free from recognized hazards to employees of the Lessee or of any contractor or subcontractor operating within the lease area;

(b) maintain all operations within the leased area in compliance with regulations or orders intended to protect persons, property, and the environment on the Outer Continental Shelf; and

(c) allow prompt access, at the site of any operation subject to safety regulations, to any authorized Federal inspector and shall provide any documents and records which are pertinent to occupational or public health, safety, or environmental protection as may be requested.

**Sec. 13. Suspension and Cancellation.**

(a) The Lessor may suspend or cancel this lease pursuant to section 5 of the Act, and compensation shall be paid when provided by the Act.

(b) The Lessor may, upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by Congress or the President of the United States, suspend operations under the lease, as provided in section 12(c) of the Act, and just compensation shall be paid to the Lessee for such suspension.

**Sec. 14. Indemnification.** The Lessee shall indemnify the Lessor for, and hold it harmless from, any claim, including claims for loss or damage to property or injury to persons caused by or resulting from any operation on the leased area conducted by or on behalf of the Lessee. However, the Lessee shall not be held responsible to the Lessor under this section for any loss, damage, or injury caused by or resulting from:

(a) negligence of the Lessor other than the commission or omission of a discretionary function or duty on the part of a Federal Agency whether or not the discretion involved is abused; or

(b) the Lessee's compliance with an order or directive of the Lessor against which an administrative appeal by the Lessee is filed before the cause of action for the claim arises and is pursued diligently thereafter.

**Sec. 15. Disposition of Production.**

(a) As provided in section 27(a)(2) of the Act, the Lessor shall have the right to purchase not more than 16 2/3 percent by volume of the oil and gas produced pursuant to the lease at the regulated price or, if no regulated price applies, at the fair market value at the wellhead of the oil and gas saved, removed, or sold, except that any oil or gas obtained by the Lessor as royalty or net profit share shall be credited against the amount that may be purchased under this subsection.

(b) Pursuant to section 27(b) and (c) of the Act, the Lessor may offer and sell certain oil and gas obtained or purchased pursuant to a lease. As provided in section 27(d) of the Act, the Lessee shall take any Federal oil or gas for which no acceptable bids are received, as determined by the Lessor, and which is not transferred to a Federal Agency pursuant to section 27(a)(3) of the Act, and shall pay to the Lessor a cash amount equal to the regulated price or, if no regulated price applies, the fair market value of the oil or gas so obtained.

(c) As provided in section 8(b)(7) of the Act, the Lessee shall offer 20 percent of the crude oil, condensate, and natural gas liquids produced on the lease, at the market value and point of delivery as provided by regulations applicable to Federal royalty oil, to small or independent refiners as defined in the Emergency Petroleum Allocation Act of 1973.

(d) In time of war or when the president of the United States shall so prescribe, the Lessor shall have the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in section 12(b) of the Act.

**Sec. 16. Unitization, Pooling, and Drilling Agreements.** Within such time as the Lessor may prescribe, the Lessee shall subscribe to and operate under a unit, pooling, or drilling agreement embracing all or part of the lands subject to this lease as the Lessor may determine to be appropriate or necessary. Where any provision of a unit, pooling, or drilling agreement, approved by the Lessor, is inconsistent with a provision of this lease, the provision of the agreement shall govern.

**Sec. 17. Equal Opportunity Clause.** During the performance of this lease, the Lessee shall fully comply with paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended (reprinted in 41 CFR 60-1.4(a)), and the implementing regulations which are for the purpose of preventing employment discrimination against persons on the basis of race, color, religion, sex, or national origin. Paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended, are incorporated in this lease by reference.

**Sec. 18. Certification of Nonsegregated Facilities.** By entering into this lease, the Lessee certifies, as specified in 41 CFR 60-1.8, that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained. As used in this certification, the term "segregated facilities" means, but is not limited to, any waiting rooms, work areas, restrooms and washrooms, restaurants and other eating areas, timeclocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom, or otherwise. The Lessee further agrees that it will obtain identical certifications from proposed contractors and subcontractors prior to award of contracts or subcontracts unless they are exempt under 41 CFR 60-1.5.

**Sec. 19. Reservations to Lessor.** All rights in the leased area not expressly granted to the Lessee by the Act, the regulations, or this lease are hereby reserved to the Lessor. Without limiting the generality of the foregoing, reserved rights included:

(a) the right to authorize geological and geophysical exploration in the lease area which does not unreasonably interfere with or endanger actual operations under the lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands or to the treatment and shipment of products thereof by or under authority of the Lessor;

(b) the right to grant leases for any minerals other than oil and gas within the leased area, except that operations under such leases shall not unreasonably interfere with or endanger operations under this lease;

(c) the right, as provided in section 12(d) of the Act, to restrict operations in the leased area or any part thereof which may be designated by the Secretary of Defense, with approval of the President, as being within an area needed for national defense, so long as such designation remains in effect, no operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense. If operations or production under this lease within any designated area are suspended pursuant to this paragraph, any payments of rentals and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

**Sec. 20. Transfer of Lease.** The Lessee shall file for approval with the appropriate field office of the Minerals Management Service any instrument of assignment or other transfer of this lease, or any interest therein, in accordance with applicable regulations.

**Sec. 21. Surrender of Lease.** The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the appropriate field office of the Minerals Management Service a written relinquishment, in triplicate, which shall be effective as of the date of filing. No surrender of this lease or of any portion of the leased area shall relieve the Lessee or its surety of the obligation to pay all accrued rentals, royalties, and other financial obligations or to abandon all wells on the area to be surrendered in a manner satisfactory to the Director.

(Continued on reverse)

**Sec. 22. Removal of Property on Termination of Lease.** Within a period of 1 year after termination of this lease in whole or in part, the Lessee shall remove all devices, works, and structures from the premises no longer subject to the lease in accordance with applicable regulations and Orders of the Director. However, the Lessee may, with the approval of the Director, continue to maintain devices, works, and structures on the leased area for drilling or producing on other leases.

**Sec. 23. Remedies in Case of Default.**

(a) Whenever the Lessee fails to comply with any of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease, the lease shall be subject to cancellation in accordance with the provisions of section 5(c) and (d) of the Act and the Lessor may exercise any other remedies which the Lessor may have, including the penalty provisions of section 24 of the Act. Furthermore, pursuant to section 8(o) of the Act, the Lessor may cancel the lease if it is obtained by fraud or misrepresentation.

(b) Nonenforcement by the Lessor of a remedy for any particular violation of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease shall not prevent the cancellation of this lease or the exercise of any other remedies under paragraph (a) of this section for any other violation or for the same violation occurring at any other time.

**Sec. 24. Unlawful Interest.** No member of, or Delegate to, Congress, or Resident Commissioner, after election or appointment, or either before or after they have qualified and during their continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR Part 20, shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom. The provisions of Section 3741 of the Revised Statutes, as amended, 41 U.S.C. 22, and the Act of June 25, 1948, 62 Stat. 702, as amended, 18 U.S.C. 431-433, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease insofar as they may be applicable.

CNG Producing Company
_____
(Lessee)

_____
(Signature of Authorized Officer)

P. L. Plusquellec
_____
(Name of Signatory)

Vice President-Expl. & Devel.
_____
(Title)

April 18, 1988
_____
(Date)

THE UNITED STATES OF AMERICA, Lessor

_____
(Signature of Authorized Officer)

J. Rogers Pearcy
_____
(Name of Signatory)

Regional Director
Gulf of Mexico OCS Region
Minerals Management Service
_____
(Title)

APR 2 9 1988
_____
(Date)

Canal Place One, Suite 3100, New Orleans, LA. 70130-9990
_____
(Address of Lessee)

*If this lease is executed by a corporation, it must bear the corporate seal.*

**OCS-G 10594**

Form MMS-2005 (March 1986)
(Supersedes MMS-2005 August 1982)

| | Office **New Orleans, LA** | Serial number **OCS-G 10594** |
|---|---|---|

### UNITED STATES
### DEPARTMENT OF THE INTERIOR
### MINERALS MANAGEMENT SERVICE

### OIL AND GAS LEASE OF
### SUBMERGED LANDS UNDER THE
### OUTER CONTINENTAL SHELF LANDS ACT

*This form does not constitute an information collection as defined by 44 U.S.C. 3502 and therefore does not require approval by the Office of Management and Budget.*

| Cash bonus **$91,250.00** | Rental rate per acre, hectare or fraction thereof **$3.00 per acre** |
|---|---|
| Minimum royalty rate per acre, hectare or fraction thereof **$3.00 per acre** | Royalty rate **16 2/3 percent** |
| | Profit share rate |

This lease is effective as of　　　　　JUN 1  1989　　　　(hereinafter called the "Effective Date") and shall continue for an initial period of **five**　years (hereinafter called the "Initial Period") by and between the United States of America (hereinafter called the "Lessor"), by the **Regional Director, Gulf of Mexico OCS Region,** Minerals Management Service, its authorized officer, and

**Columbia Gas Development Corporation**　　　　　　　　　　**100%**

(hereinafter called the "Lessee").  In consideration of any cash payment heretofore made by the Lessee to the Lessor and in consideration of the promises, terms, conditions, and covenants contained herein, including the Stipulation(s) numbered **1**　　　　　　　　　attached hereto, the Lessee and Lessor agree as follows:

**Sec. 1. Statutes and Regulations.**  This lease is issued pursuant to the Outer Continental Shelf Lands Act of August 7, 1953, 67 Stat. 462; 43 U.S.C. 1331 et seq., as amended (92 Stat. 629), (hereinafter called the "Act").  The lease is issued subject to the Act; all regulations issued pursuant to the Act and in existence upon the Effective Date of this lease; all regulations issued pursuant to the statute in the future which provide for the prevention of waste and conservation of the natural resources of the Outer Continental Shelf and the protection of correlative rights therein; and all other applicable statutes and regulations.

**Sec. 2. Rights of Lessee.**  The Lessor hereby grants and leases to the Lessee the exclusive right and privilege to drill for, develop, and produce oil and gas resources, except helium gas, in the submerged lands of the Outer Continental Shelf containing approximately **2500.00**　　　　　acres　　　　　hectares (hereinafter referred to as the "leased area"), described as follows:

S½ of Block 507, West Cameron Area, South Addition, OCS Leasing Map, Louisiana Map No. 1B.

RECEIVED

MAY 1   1989

Minerals Management Service
Leasing & Environment

These rights include:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations in accordance with applicable regulations;

(b) the nonexclusive right to drill water wells within the leased area, unless the water is part of geopressured-geothermal and associated resources, and to use the water produced therefrom for operations pursuant to the Act free of cost, on the condition that the drilling is conducted in accordance with procedures approved by the Director of the Minerals Management Service or the Director's delegate (hereinafter called the "Director"); and

(c) the right to construct or erect and to maintain within the leased area artificial islands, installations, and other devices permanently or temporarily attached to the seabed and other works and structures necessary to the full enjoyment of the lease, subject to compliance with applicable laws and regulations.

**Sec. 3. Term.** This lease shall continue from the Effective Date of the lease for the Initial Period and so long thereafter as oil or gas is produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Lessor, are conducted thereon, or as otherwise provided by regulation.

**Sec. 4. Rentals.** The Lessee shall pay the Lessor, on or before the first day of each lease year which commences prior to a discovery in paying quantities of oil or gas on the leased area, a rental as shown on the face hereof.

**Sec. 5. Minimum Royalty.** The Lessee shall pay the Lessor, at the expiration of each lease year which commences after a discovery of oil and gas in paying quantities, a minimum royalty as shown on the face hereof or, if there is production, the difference between the actual royalty required to be paid with respect to such lease year and the prescribed minimum royalty if the actual royalty paid is less than the minimum royalty.

**Sec. 6. Royalty on Production.**

(a) The Lessee shall pay a fixed royalty as shown on the face hereof in amount or value of production saved, removed, or sold from the leased area. Gas (except helium) and oil of all kinds are subject to royalty. Any Lessee is liable for royalty payments on oil or gas lost or wasted from a lease site when such loss or waste is due to negligence on the part of the operator of the lease, or due to the failure to comply with any rule or regulation, order, or citation issued under the Federal Oil and Gas Royalty Management Act of 1982 or the Act. The Lessor shall determine whether production royalty shall be paid in amount or value.

(b) The value of production for purposes of computing royalty on production from this lease shall never be less than the fair market value of the production. The value of production shall be the estimated reasonable value of the production as determined by the Lessor, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field or area, to the price received by the Lessee, to posted prices, to regulated prices, and to other relevant matters. Except when the Lessor, in its discretion, determines not to consider special pricing relief from otherwise applicable Federal regulatory requirements, the value of production for the purposes of computing royalty shall not be deemed to be less than the gross proceeds accruing to the Lessee from the sale thereof. In the absence of good reason to the contrary, value

computed on the basis of the highest price paid or offered at the time of production in a fair and open market for the major portion of like-quality products produced and sold from the field or area where the leased area is situated will be considered to be a reasonable value.

(c) When paid in value, royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained, unless the Lessor designates a later time. When paid in amount, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessor's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point.

**Sec. 7. Payments.** The Lessee shall make all payments (rentals, royalties and any other payments required by this lease) to the Lessor by electronic transfer of funds, check, draft on a solvent bank, or money order unless otherwise provided by regulations or by direction of the Lessor. Rentals, royalties, and any other payments required by this lease shall be made payable to the Minerals Management Service and tendered to the Director. Determinations made by the Lessor as to the amount of payment due shall be presumed to be correct and paid as due.

**Sec. 8. Bonds.** The Lessee shall maintain at all times the bond(s) required by regulation prior to the issuance of the lease and shall furnish such additional security as may be required by the Lessor if, after operations have begun, the Lessor deems such additional security to be necessary.

**Sec. 9. Plans.** The Lessee shall conduct all operations on the leased area in accordance with approved exploration plans and approved development and production plans as are required by regulations. The Lessee may depart from an approved plan only as provided by applicable regulations.

**Sec. 10. Performance.** The Lessee shall comply with all regulations and Orders. After due notice in writing, the Lessee shall drill such wells and produce at such rates as the Lessor may require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles.

**Sec. 11. Directional Drilling.** A directional well drilled under the leased area from a surface location on nearby land not covered by this lease shall be deemed to have the same effect for all purposes of the lease as a well drilled from a surface location on the leased area. In those circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the nearby land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on nearby land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations on the leased area for all purposes of the lease. Nothing contained in this Section shall be construed as granting to the Lessee any interest, license, easement, or other right in any nearby land.

UNITED STATES
DEPARTMENT OF THE INTERIOR
MINERALS MANAGEMENT SERVICE

Outer Continental Shelf
Central Gulf of Mexico
Oil and Gas Lease Sale 118

OCS-G 10594

Stipulation No. 1--Protection of Archaeological Resources.


        (a)  "Archaeological resource" means any prehistoric or
historic district, site, building, structure, or object (including
shipwrecks); such term includes artifacts, records, and remains
which are related to such a district, site, building, structure or
object (16 U.S.C. 470w(5), National  Historic Preservation Act, as
amended).  "Operations" means any drilling, mining, or construction
or placement of any structure for exploration, development, or
production of the lease.

        (b)  If the Regional Director (RD) believes an archaeo-
logical resource may exist in the lease area, the RD will notify the
lessee in writing.  The lessee shall then comply with subparagraphs
(1) through (3).

        (1)  Prior to commencing any operations, the lessee
shall prepare a report, as specified by the RD, to determine the
potential existence of any archaeological resource that may be
affected by operations.  The report, prepared by an archaeologist
and a geophysicist, shall be based on an assessment of data from
remote-sensing surveys and of other pertinent archaeological and
environmental information.  The lessee shall submit this report to
the RD for review.

        (2)  If the evidence suggests that an archaeological
resource may be present, the lessee shall either:

              (i)  Locate the site of any operation so as not to
adversely affect the area where the archaeological resource may be;
or

              (ii) Establish to the satisfaction of the RD that
an archaeological resource does not exist or will not be adversely
affected by operations.  This shall be done by further archaeo-
logical investigation, conducted by an archaeologist and a geophy-
sicist, using survey equipment and techniques deemed necessary by
the RD.  A report on the investigation shall be submitted to the RD
for review.

(3)   If the RD determines that an archaeological resource is likely to be present in the lease area and may be adversely affected by operations, the RD will notify the lessee immediately.  The lessee shall take no action that may adversely affect the archaeological resource until the RD has told the lessee how to protect it.

(c)   If the lessee discovers any archaeological resource while conducting operations on the lease area, the lessee shall report the discovery immediately to the RD.  The lessee shall make every reasonable effort to preserve the archaeological resource until the RD has told the lessee how to protect it.

**Sec. 12. Safety Requirements.** The Lessee shall:

(a) maintain all places of employment within the leased area in compliance with occupational safety and health standards and, in addition, free from recognized hazards to employees of the Lessee or of any contractor or subcontractor operating within the lease area;

(b) maintain all operations within the leased area in compliance with regulations or orders intended to protect persons, property, and the environment on the Outer Continental Shelf; and

(c) allow prompt access, at the site of any operation subject to safety regulations, to any authorized Federal inspector and shall provide any documents and records which are pertinent to occupational or public health, safety, or environmental protection as may be requested.

**Sec. 13. Suspension and Cancellation.**

(a) The Lessor may suspend or cancel this lease pursuant to section 5 of the Act, and compensation shall be paid when provided by the Act.

(b) The Lessor may, upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by Congress or the President of the United States, suspend operations under the lease, as provided in section 12(c) of the Act, and just compensation shall be paid to the Lessee for such suspension.

**Sec. 14. Indemnification.** The Lessee shall indemnify the Lessor for, and hold it harmless from, any claim, including claims for loss or damage to property or injury to persons caused by or resulting from any operation on the leased area conducted by or on behalf of the Lessee. However, the Lessee shall not be held responsible to the Lessor under this section for any loss, damage, or injury caused by or resulting from:

(a) negligence of the Lessor other than the commission or omission of a discretionary function or duty on the part of a Federal Agency whether or not the discretion involved is abused; or

(b) the Lessee's compliance with an order or directive of the Lessor against which an administrative appeal by the Lessee is filed before the cause of action for the claim arises and is pursued diligently thereafter.

**Sec. 15. Disposition of Production.**

(a) As provided in section 27(a)(2) of the Act, the Lessor shall have the right to purchase not more than 16 2/3 percent by volume of the oil and gas produced pursuant to the lease at the regulated price or, if no regulated price applies, at the fair market value at the wellhead of the oil and gas saved, removed, or sold, except that any oil or gas obtained by the Lessor as royalty or net profit share shall be credited against the amount that may be purchased under this subsection.

(b) Pursuant to section 27(b) and (c) of the Act, the Lessor may offer and sell certain oil and gas obtained or purchased pursuant to a lease. As provided in section 27(d) of the Act, the Lessee shall take any Federal oil or gas for which no acceptable bids are received, as determined by the Lessor, and which is not transferred to a Federal Agency pursuant to section 27(a)(3) of the Act, and shall pay to the Lessor a cash amount equal to the regulated price or, if no regulated price applies, the fair market value of the oil or gas so obtained.

(c) As provided in section 8(b)(7) of the Act, the Lessee shall offer 20 percent of the crude oil, condensate, and natural gas liquids produced on the lease, at the market value and point of delivery as provided by regulations applicable to Federal royalty oil, to small or independent refiners as defined in the Emergency Petroleum Allocation Act of 1973.

(d) In time of war or when the president of the United States shall so prescribe, the Lessor shall have the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in section 12(b) of the Act.

**Sec. 16. Unitization, Pooling, and Drilling Agreements.** Within such time as the Lessor may prescribe, the Lessee shall subscribe to and operate under a unit, pooling, or drilling agreement embracing all or part of the lands subject to this lease as the Lessor may determine to be appropriate or necessary. Where any provision of a unit, pooling, or drilling agreement, approved by the Lessor, is inconsistent with a provision of this lease, the provision of the agreement shall govern.

**Sec. 17. Equal Opportunity Clause.** During the performance of this lease, the Lessee shall fully comply with paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended (reprinted in 41 CFR 60-1.4(a)), and the implementing regulations which are for the purpose of preventing employment discrimination against persons on the basis of race, color, religion, sex, or national origin. Paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended, are incorporated in this lease by reference.

**Sec. 18. Certification of Nonsegregated Facilities.** By entering into this lease, the Lessee certifies, as specified in 41 CFR 60-1.8, that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained. As used in this certification, the term "segregated facilities" means, but is not limited to, any waiting rooms, work areas, restrooms and washrooms, restaurants and other eating areas, timeclocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom, or otherwise. The Lessee further agrees that it will obtain identical certifications from proposed contractors and subcontractors prior to award of contracts or subcontracts unless they are exempt under 41 CFR 60-1.5.

**Sec. 19. Reservations to Lessor.** All rights in the leased area not expressly granted to the Lessee by the Act, the regulations, or this lease are hereby reserved to the Lessor. Without limiting the generality of the foregoing, reserved rights included:

(a) the right to authorize geological and geophysical exploration in the lease area which does not unreasonably interfere with or endanger actual operations under the lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands or to the treatment and shipment of products thereof by or under authority of the Lessor;

(b) the right to grant leases for any minerals other than oil and gas within the leased area, except that operations under such leases shall not unreasonably interfere with or endanger operations under this lease;

(c) the right, as provided in section 12(d) of the Act, to restrict operations in the leased area or any part thereof which may be designated by the Secretary of Defense, with approval of the President, as being within an area needed for national defense, and so long as such designation remains in effect, no operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense. If operations or production under this lease within any designated area are suspended pursuant to this paragraph, any payments of rentals and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

**Sec. 20. Transfer of Lease.** The Lessee shall file for approval with the appropriate field office of the Minerals Management Service any instrument of assignment or other transfer of this lease, or any interest therein, in accordance with applicable regulations.

**Sec. 21. Surrender of Lease.** The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the appropriate field office of the Minerals Management Service a written relinquishment, in triplicate, which shall be effective as of the date of filing. No surrender of this lease or of any portion of the leased area shall relieve the Lessee or its surety of the obligation to pay all accrued rentals, royalties, and other financial obligations or to abandon all wells on the area to be surrendered in a manner satisfactory to the Director.

(Continued on reverse)

Page 3

**Sec. 22. Removal of Property on Termination of Lease.** Within a period of 1 year after termination of this lease in whole or in part, the Lessee shall remove all devices, works, and structures from the premises no longer subject to the lease in accordance with applicable regulations and Orders of the Director. However, the Lessee may, with the approval of the Director, continue to maintain devices, works, and structures on the leased area for drilling or producing on other leases.

**Sec. 23. Remedies in Case of Default.**

(a) Whenever the Lessee fails to comply with any of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease, the lease shall be subject to cancellation in accordance with the provisions of section 5(c) and (d) of the Act and the Lessor may exercise any other remedies which the Lessor may have, including the penalty provisions of section 24 of the Act. Furthermore, pursuant to section 8(o) of the Act, the Lessor may cancel the lease if it is obtained by fraud or misrepresentation.

(b) Nonenforcement by the Lessor of a remedy for any particular violation of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease shall not prevent the cancellation of this lease or the exercise of any other remedies under paragraph (a) of this section for any other violation or for the same violation occurring at any other time.

**Sec. 24. Unlawful Interest.** No member of, or Delegate to, Congress, or Resident Commissioner, after election or appointment, or either before or after they have qualified and during their continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR Part 20, shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom. The provisions of Section 3741 of the Revised Statutes, as amended, 41 U.S.C. 22, and the Act of June 25, 1948, 62 Stat. 702, as amended, 18 U.S.C. 431-433, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease insofar as they may be applicable.

COLUMBIA GAS DEVELOPMENT CORPORATION

THE UNITED STATES OF AMERICA, Lessor

_____
(Lessee)

_____
(Signature of Authorized Officer)

_____
(Signature of Authorized Officer)

Leslie M. Moor, Jr.
_____
(Name of Signatory)

J. Rogers Pearcy
_____
(Name of Signatory)

Vice President
_____
(Title)

Regional Director
Gulf of Mexico OCS Region
Minerals Management Service
_____
(Title)

April 25, 1989
_____
(Date)

MAY 1    1989
_____
(Date)

P. O. Box 1350
Houston, Texas  77251-1350
_____
(Address of Lessee)

*If this lease is executed by a corporation, it must bear the corporate seal.*

**OCS-G 10780**

Form MMS-2005 (March 1986)
(Supersedes MMS-2005 August 1982)

| | |
|---|---|
| Office **New Orleans, LA** | Serial number **OCS-G 10780** |

## UNITED STATES
### DEPARTMENT OF THE INTERIOR
### MINERALS MANAGEMENT SERVICE

| Cash bonus | Rental rate per acre, hectare or fraction thereof |
|---|---|
| **$251,700.00** | **$3.00 per acre** |

### OIL AND GAS LEASE OF
### SUBMERGED LANDS UNDER THE
### OUTER CONTINENTAL SHELF LANDS ACT

| Minimum royalty rate per acre, hectare or fraction thereof | Royalty rate |
|---|---|
| **$3.00 per acre** | **16 2/3 percent** |

*This form does not constitute an information collection as defined by 44 U.S.C. 3502 and therefore does not require approval by the Office of Management and Budget.*

Profit share rate

This lease is effective as of     JUL 1 1989     (hereinafter called the "Effective Date") and shall continue for an initial period of **five** years (hereinafter called the "Initial Period") by and between the United States of America (hereinafter called the "Lessor"), by the **Regional Director, Gulf of Mexico OCS Region,** Minerals Management Service, *its authorized officer, and*

**Union Exploration Partners, Ltd.**                **100%**

(hereinafter called the "Lessee"). In consideration of any cash payment heretofore made by the Lessee to the Lessor and in consideration of the promises, terms, conditions, and covenants contained herein, including the Stipulation(s) numbered **1**         attached hereto, the Lessee and Lessor agree as follows:

**Sec. 1. Statutes and Regulations.** This lease is issued pursuant to the Outer Continental Shelf Lands Act of August 7, 1953, 67 Stat. 462; 43 U.S.C. 1331 et seq., as amended (92 Stat. 629), (hereinafter called the "Act"). The lease is issued subject to the Act; all regulations issued pursuant to the Act and in existence upon the Effective Date of this lease; all regulations issued pursuant to the statute in the future which provide for the prevention of waste and conservation of the natural resources of the Outer Continental Shelf and the protection of correlative rights therein; and all other applicable statutes and regulations.

**Sec. 2. Rights of Lessee.** The Lessor hereby grants and leases to the Lessee the exclusive right and privilege to drill for, develop, and produce oil and gas resources, except helium gas, in the submerged lands of the Outer Continental Shelf containing approximately **5000.00** acres          hectares (hereinafter referred to as the "leased area"), described as follows:

**All of Block 243, Ship Shoal Area, South Addition, OCS Leasing Map, Louisiana Map No. 5A.**

R E C E I V E D

JUN 12 1989

Minerals Management Service
Leasing & Environment

These rights include:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations in accordance with applicable regulations;

(b) the nonexclusive right to drill water wells within the leased area, unless the water is part of geopressured-geothermal and associated resources, and to use the water produced therefrom for operations pursuant to the Act free of cost, on the condition that the drilling is conducted in accordance with procedures approved by the Director of the Minerals Management Service or the Director's delegate (hereinafter called the "Director"); and

(c) the right to construct or erect and to maintain within the leased area artificial islands, installations, and other devices permanently or temporarily attached to the seabed and other works and structures necessary to the full enjoyment of the lease, subject to compliance with applicable laws and regulations.

**Sec. 3. Term.** This lease shall continue from the Effective Date of the lease for the Initial Period and so long thereafter as oil or gas is produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Lessor, are conducted thereon, or as otherwise provided by regulation.

**Sec. 4. Rentals.** The Lessee shall pay the Lessor, on or before the first day of each lease year which commences prior to a discovery in paying quantities of oil or gas on the leased area, a rental as shown on the face hereof.

**Sec. 5. Minimum Royalty.** The Lessee shall pay the Lessor, at the expiration of each lease year which commences after a discovery of oil and gas in paying quantities, a minimum royalty as shown on the face hereof or, if there is production, the difference between the actual royalty required to be paid with respect to such lease year and the prescribed minimum royalty if the actual royalty paid is less than the minimum royalty.

**Sec. 6. Royalty on Production.**

(a) The Lessee shall pay a fixed royalty as shown on the face hereof in amount or value of production saved, removed, or sold from the leased area. Gas (except helium) and oil of all kinds are subject to royalty. Any Lessee is liable for royalty payments on oil or gas lost or wasted from a lease site when such loss or waste is due to negligence on the part of the operator of the lease, or due to the failure to comply with any rule or regulation, order, or citation issued under the Federal Oil and Gas Royalty Management Act of 1982 or the Act. The Lessor shall determine whether production royalty shall be paid in amount or value.

(b) The value of production for purposes of computing royalty on production from this lease shall never be less than the fair market value of the production. The value of production shall be the estimated reasonable value of the production as determined by the Lessor, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field or area, to the price received by the Lessee, to posted prices, to regulated prices, and to other relevant matters. Except when the Lessor, in its discretion, determines not to consider special pricing relief from otherwise applicable Federal regulatory requirements, the value of production for the purposes of computing royalty shall not be deemed to be less than the gross proceeds accruing to the Lessee from the sale thereof. In the absence of good reason to the contrary, value

computed on the basis of the highest price paid or offered at the time of production in a fair and open market for the major portion of like-quality products produced and sold from the field or area where the leased area is situated will be considered to be a reasonable value.

(c) When paid in value, royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained, unless the Lessor designates a later time. When paid in amount, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessor's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point.

**Sec. 7. Payments.** The Lessee shall make all payments (rentals, royalties and any other payments required by this lease) to the Lessor by electronic transfer of funds, check, draft on a solvent bank, or money order unless otherwise provided by regulations or by direction of the Lessor. Rentals, royalties, and any other payments required by this lease shall be made payable to the Minerals Management Service and tendered to the Director. Determinations made by the Lessor as to the amount of payment due shall be presumed to be correct and paid as due.

**Sec. 8. Bonds.** The Lessee shall maintain at all times the bond(s) required by regulation prior to the issuance of the lease and shall furnish such additional security as may be required by the Lessor if, after operations have begun, the Lessor deems such additional security to be necessary.

**Sec. 9. Plans.** The Lessee shall conduct all operations on the leased area in accordance with approved exploration plans and approved development and production plans as are required by regulations. The Lessee may depart from an approved plan only as provided by applicable regulations.

**Sec. 10. Performance.** The Lessee shall comply with all regulations and Orders. After due notice in writing, the Lessee shall drill such wells and produce at such rates as the Lessor may require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles.

**Sec. 11. Directional Drilling.** A directional well drilled under the leased area from a surface location on nearby land not covered by this lease shall be deemed to have the same effect for all purposes of the lease as a well drilled from a surface location on the leased area. In those circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the nearby land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on nearby land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations on the leased area for all purposes of the lease. Nothing contained in this Section shall be construed as granting to the Lessee any interest, license, easement, or other right in any nearby land.

Page 2

UNITED STATES
DEPARTMENT OF THE INTERIOR
MINERALS MANAGEMENT SERVICE

Outer Continental Shelf
Central Gulf of Mexico
Oil and Gas Lease Sale 118

OCS-G 10780

## Stipulation No. 1--Protection of Archaeological Resources.

(a)  "Archaeological resource" means any prehistoric or historic district, site, building, structure, or object (including shipwrecks); such term includes artifacts, records, and remains which are related to such a district, site, building, structure or object (16 U.S.C. 470w(5), National  Historic Preservation Act, as amended).  "Operations" means any drilling, mining, or construction or placement of any structure for exploration, development, or production of the lease.

(b)  If the Regional Director (RD) believes an archaeological resource may exist in the lease area, the RD will notify the lessee in writing.  The lessee shall then comply with subparagraphs (1) through (3).

(1)  Prior to commencing any operations, the lessee shall prepare a report, as specified by the RD, to determine the potential existence of any archaeological resource that may be affected by operations.  The report, prepared by an archaeologist and a geophysicist, shall be based on an assessment of data from remote-sensing surveys and of other pertinent archaeological and environmental information.  The lessee shall submit this report to the RD for review.

(2)  If the evidence suggests that an archaeological resource may be present, the lessee shall either:

(i)  Locate the site of any operation so as not to adversely affect the area where the archaeological resource may be; or

(ii) Establish to the satisfaction of the RD that an archaeological resource does not exist or will not be adversely affected by operations.  This shall be done by further archaeological investigation, conducted by an archaeologist and a geophysicist, using survey equipment and techniques deemed necessary by the RD.  A report on the investigation shall be submitted to the RD for review.

(3)  If the RD determines that an archaeological resource is likely to be present in the lease area and may be adversely affected by operations, the RD will notify the lessee immediately.  The lessee shall take no action that may adversely affect the archaeological resource until the RD has told the lessee how to protect it.

(c)  If the lessee discovers any archaeological resource while conducting operations on the lease area, the lessee shall report the discovery immediately to the RD.  The lessee shall make every reasonable effort to preserve the archaeological resource until the RD has told the lessee how to protect it.

**Sec. 12. Safety Requirements.** The Lessee shall:

(a) maintain all places of employment within the leased area in compliance with occupational safety and health standards and, in addition, free from recognized hazards to employees of the Lessee or of any contractor or subcontractor operating within the lease area;

(b) maintain all operations within the leased area in compliance with regulations or orders intended to protect persons, property, and the environment on the Outer Continental Shelf; and

(c) allow prompt access, at the site of any operation subject to safety regulations, to any authorized Federal inspector and shall provide any documents and records which are pertinent to occupational or public health, safety, or environmental protection as may be requested.

**Sec. 13. Suspension and Cancellation.**

(a) The Lessor may suspend or cancel this lease pursuant to section 5 of the Act, and compensation shall be paid when provided by the Act.

(b) The Lessor may, upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by Congress or the President of the United States, suspend operations under the lease, as provided in section 12(c) of the Act, and just compensation shall be paid to the Lessee for such suspension.

**Sec. 14. Indemnification.** The Lessee shall indemnify the Lessor for, and hold it harmless from, any claim, including claims for loss or damage to property or injury to persons caused by or resulting from any operation on the leased area conducted by or on behalf of the Lessee. However, the Lessee shall not be held responsible to the Lessor under this section for any loss, damage, or injury caused by or resulting from:

(a) negligence of the Lessor other than the commission or omission of a discretionary function or duty on the part of a Federal Agency whether or not the discretion involved is abused; or

(b) the Lessee's compliance with an order or directive of the Lessor against which an administrative appeal by the Lessee is filed before the cause of action for the claim arises and is pursued diligently thereafter.

**Sec. 15. Disposition of Production.**

(a) As provided in section 27(a)(2) of the Act, the Lessor shall have the right to purchase not more than 16 2/3 percent by volume of the oil and gas produced pursuant to the lease at the regulated price or, if no regulated price applies, at the fair market value at the wellhead of the oil and gas saved, removed, or sold, except that any oil or gas obtained by the Lessor as royalty or net profit share shall be credited against the amount that may be purchased under this subsection.

(b) Pursuant to section 27(b) and (c) of the Act, the Lessor may offer and sell certain oil and gas obtained or purchased pursuant to a lease. As provided in section 27(d) of the Act, the Lessee shall take any Federal oil or gas for which no acceptable bids are received, as determined by the Lessor, and which is not transferred to a Federal Agency pursuant to section 27(a)(3) of the Act, and shall pay to the Lessor a cash amount equal to the regulated price or, if no regulated price applies, the fair market value of the oil or gas so obtained.

(c) As provided in section 8(b)(7) of the Act, the Lessee shall offer 20 percent of the crude oil, condensate, and natural gas liquids produced on the lease, at the market value and point of delivery as provided by regulations applicable to Federal royalty oil, to small or independent refiners as defined in the Emergency Petroleum Allocation Act of 1973.

(d) In time of war or when the president of the United States shall so prescribe, the Lessor shall have the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in section 12(b) of the Act.

**Sec. 16. Unitization, Pooling, and Drilling Agreements.** Within such time as the Lessor may prescribe, the Lessee shall subscribe to and operate under a unit, pooling, or drilling agreement embracing all or part of the lands subject to this lease as the Lessor may determine to be appropriate or necessary. Where any provision of a unit, pooling, or drilling agreement, approved by the Lessor, is inconsistent with a provision of this lease, the provision of the agreement shall govern.

**Sec. 17. Equal Opportunity Clause.** During the performance of this lease, the Lessee shall fully comply with paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended (reprinted in 41 CFR 60-1.4(a)), and the implementing regulations which are for the purpose of preventing employment discrimination against persons on the basis of race, color, religion, sex, or national origin. Paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended, are incorporated in this lease by reference.

**Sec. 18. Certification of Nonsegregated Facilities.** By entering into this lease, the Lessee certifies, as specified in 41 CFR 60-1.8, that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained. As used in this certification, the term "segregated facilities" means, but is not limited to, any waiting rooms, work areas, restrooms and washrooms, restaurants and other eating areas, timeclocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom, or otherwise. The Lessee further agrees that it will obtain identical certifications from proposed contractors and subcontractors prior to award of contracts or subcontracts unless they are exempt under 41 CFR 60-1.5.

**Sec. 19. Reservations to Lessor.** All rights in the leased area not expressly granted to the Lessee by the Act, the regulations, or this lease are hereby reserved to the Lessor. Without limiting the generality of the foregoing, reserved rights included:

(a) the right to authorize geological and geophysical exploration in the lease area which does not unreasonably interfere with or endanger actual operations under the lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands or to the treatment and shipment of products thereof by or under authority of the Lessor;

(b) the right to grant leases for any minerals other than oil and gas within the leased area, except that operations under such leases shall not unreasonably interfere with or endanger operations under this lease;

(c) the right, as provided in section 12(d) of the Act, to restrict operations in the leased area or any part thereof which may be designated by the Secretary of Defense, with approval of the President, as being within an area needed for national defense, and so long as such designation remains in effect, no operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense. If operations or production under this lease within any designated area are suspended pursuant to this paragraph, any payments of rentals and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

**Sec. 20. Transfer of Lease.** The Lessee shall file for approval with the appropriate field office of the Minerals Management Service any instrument of assignment or other transfer of this lease, or any interest therein, in accordance with applicable regulations.

**Sec. 21. Surrender of Lease.** The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the appropriate field office of the Minerals Management Service a written relinquishment, in triplicate, which shall be effective as of the date of filing. No surrender of this lease or of any portion of the leased area shall relieve the Lessee or its surety of the obligation to pay all accrued rentals, royalties, and other financial obligations or to abandon all wells on the area to be surrendered in a manner satisfactory to the Director.

(Continued on reverse)

Page 3

**Sec. 22. Removal of Property on Termination of Lease.** Within a period of 1 year after termination of this lease in whole or in part, the Lessee shall remove all devices, works, and structures from the premises no longer subject to the lease in accordance with applicable regulations and Orders of the Director. However, the Lessee may, with the approval of the Director, continue to maintain devices, works, and structures on the leased area for drilling or producing on other leases.

**Sec. 23. Remedies in Case of Default.**

(a) Whenever the Lessee fails to comply with any of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease, the lease shall be subject to cancellation in accordance with the provisions of section 5(c) and (d) of the Act and the Lessor may exercise any other remedies which the Lessor may have, including the penalty provisions of section 24 of the Act. Furthermore, pursuant to section 8(o) of the Act, the Lessor may cancel the lease if it is obtained by fraud or misrepresentation.

(b) Nonenforcement by the Lessor of a remedy for any particular violation of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease shall not prevent the cancellation of this lease or the exercise of any other remedies under paragraph (a) of this section for any other violation or for the same violation occurring at any other time.

**Sec. 24. Unlawful Interest.** No member of, or Delegate to, Congress, or Resident Commissioner, after election or appointment, or either before or after they have qualified and during their continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR Part 20, shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom. The provisions of Section 3741 of the Revised Statutes, as amended, 41 U.S.C. 22, and the Act of June 25, 1948, 62 Stat. 702, as amended, 18 U.S.C. 431-433, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease insofar as they may be applicable.

Union Exploration Partners, Ltd.
By: Union Oil Company of California, Managing General Partner
(Lessee)

(Signature of Authorized Officer)

M. W. Renaud
(Name of Signatory)

Attorney-in-Fact
(Title)

June 8, 1989
(Date)

THE UNITED STATES OF AMERICA, Lessor

(Signature of Authorized Officer)

J. Rogers Pearcy
(Name of Signatory)

Regional Director
Gulf of Mexico OCS Region
Minerals Management Service
(Title)

JUN 2 2 1989
(Date)

900 Executive Plaza West
4635 Southwest Freeway
Houston, Texas   77027
(Address of Lessee)

*If this lease is executed by a corporation, it must bear the corporate seal.*

**OCS-G19760**

| | | |
|---|---|---|
| Form MMS-2005 (March 1986)<br>(Supersedes MMS-2005 August 1982) | Office<br>**New Orleans, LA** | Serial number<br>**OCS-G 19760** |

Form MMS-2005 (March 1986)
(Supersedes MMS-2005 August 1982)

Office
**New Orleans, LA**

Serial number
**OCS-G 19760**

UNITED STATES
DEPARTMENT OF THE INTERIOR
MINERALS MANAGEMENT SERVICE

Cash bonus

**$3,863,231.00**

Rental rate per acre,
hectare or fraction
thereof
**$5.00 per acre**

**OIL AND GAS LEASE OF
SUBMERGED LANDS UNDER THE
OUTER CONTINENTAL SHELF LANDS ACT**

Minimum royalty rate
per acre, hectare
or fraction thereof
**$5.00 per acre**

Royalty rate

**16 2/3 percent**

*This form does not constitute an information collection as
defined by 44 U.S.C. 3502 and therefore does not require
approval by the Office of Management and Budget.*

Profit share rate

---

This lease is effective as of **AUG 1 1998** (hereinafter called the "Effective Date") and shall continue for an initial period of **five** years (hereinafter called the "Initial Period") by and between the United States of America (hereinafter called the "Lessor"), by the **Regional Director, Gulf of Mexico OCS Region,** Minerals Management Service, its authorized officer, and

**Shell Offshore Inc.**                                                    **100%**

(hereinafter called the "Lessee"). In consideration of any cash payment heretofore made by the Lessee to the Lessor and in consideration of the promises, terms, conditions, and covenants contained herein, including the Stipulation(s) numbered **3** attached hereto, the Lessee and Lessor agree as follows:

**Sec. 1. Statutes and Regulations.** This lease is issued pursuant to the Outer Continental Shelf Lands Act of August 7, 1953, 67 Stat. 462; 43 U.S.C. 1331 et seq., as amended (92 Stat. 629), (hereinafter called the "Act"). The lease is issued subject to the Act; all regulations issued pursuant to the Act and in existence upon the Effective Date of this lease; all regulations issued pursuant to the statute in the future which provide for the prevention of waste and conservation of the natural resources of the Outer Continental Shelf and the protection of correlative rights therein; and all other applicable statutes and regulations.

**Sec. 2. Rights of Lessee.** The Lessor hereby grants and leases to the Lessee the exclusive right and privilege to drill for, develop, and produce oil and gas resources, except helium gas, in the submerged lands of the Outer Continental Shelf containing approximately **5,000.00** acres hectares (hereinafter referred to as the "leased area"), described as follows:

**All of Block 196, Vermilion Area, OCS Leasing Map, Louisiana Map No. 3.**

These rights include:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations in accordance with applicable regulations;

(b) the nonexclusive right to drill water wells within the leased area, unless the water is part of geopressured-geothermal and associated resources, and to use the water produced therefrom for operations pursuant to the Act free of cost, on the condition that the drilling is conducted in accordance with procedures approved by the Director of the Minerals Management Service or the Director's delegate (hereinafter called the "Director"); and

(c) the right to construct or erect and to maintain within the leased area artificial islands, installations, and other devices permanently or temporarily attached to the seabed and other works and structures necessary to the full enjoyment of the lease, subject to compliance with applicable laws and regulations.

**Sec. 3. Term.** This lease shall continue from the Effective Date of the lease for the Initial Period and so long thereafter as oil or gas is produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Lessor, are conducted thereon, or as otherwise provided by regulation.

**Sec. 4. Rentals.** The Lessee shall pay the Lessor, on or before the first day of each lease year which commences prior to a discovery in paying quantities of oil or gas on the leased area, a rental as shown on the face hereof.

**Sec. 5. Minimum Royalty.** The Lessee shall pay the Lessor, at the expiration of each lease year which commences after a discovery of oil and gas in paying quantities, a minimum royalty as shown on the face hereof or, if there is production, the difference between the actual royalty required to be paid with respect to such lease year and the prescribed minimum royalty if the actual royalty paid is less than the minimum royalty.

**Sec. 6. Royalty on Production.**

(a) The Lessee shall pay a fixed royalty as shown on the face hereof in amount or value of production saved, removed, or sold from the leased area. Gas (except helium) and oil of all kinds are subject to royalty. Any Lessee is liable for royalty payments on oil or gas lost or wasted from a lease site when such loss or waste is due to negligence on the part of the operator of the lease, or due to the failure to comply with any rule or regulation, order, or citation issued under the Federal Oil and Gas Royalty Management Act of 1982 or the Act. The Lessor shall determine whether production royalty shall be paid in amount or value.

(b) The value of production for purposes of computing royalty on production from this lease shall never be less than the fair market value of the production. The value of production shall be the estimated reasonable value of the production as determined by the Lessor, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field or area, to the price received by the Lessee, to posted prices, to regulated prices, and to other relevant matters. Except when the Lessor, in its discretion, determines not to consider special pricing relief from otherwise applicable Federal regulatory requirements, the value of production for the purposes of computing royalty shall not be deemed to be less than the gross proceeds accruing to the Lessee from the sale thereof. In the absence of good reason to the contrary, value

computed on the basis of the highest price paid or offered at the time of production in a fair and open market for the major portion of like-quality products produced and sold from the field or area where the leased area is situated will be considered to be a reasonable value.

(c) When paid in value, royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained, unless the Lessor designates a later time. When paid in amount, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessor's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point.

**Sec. 7. Payments.** The Lessee shall make all payments (rentals, royalties and any other payments required by this lease) to the Lessor by electronic transfer of funds, check, draft on a solvent bank, or money order unless otherwise provided by regulations or by direction of the Lessor. Rentals, royalties, and any other payments required by this lease shall be made payable to the Minerals Management Service and tendered to the Director. Determinations made by the Lessor as to the amount of payment due shall be presumed to be correct and paid as due.

**Sec. 8. Bonds.** The Lessee shall maintain at all times the bond(s) required by regulation prior to the issuance of the lease and shall furnish such additional security as may be required by the Lessor if, after operations have begun, the Lessor deems such additional security to be necessary.

**Sec. 9. Plans.** The Lessee shall conduct all operations on the leased area in accordance with approved exploration plans and approved development and production plans as are required by regulations. The Lessee may depart from an approved plan only as provided by applicable regulations.

**Sec. 10. Performance.** The Lessee shall comply with all regulations and Orders. After due notice in writing, the Lessee shall drill such wells and produce at such rates as the Lessor may require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles.

**Sec. 11. Directional Drilling.** A directional well drilled under the leased area from a surface location on nearby land not covered by this lease shall be deemed to have the same effect for all purposes of the lease as a well drilled from a surface location on the leased area. In those circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the nearby land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on nearby land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations on the leased area for all purposes of the lease. Nothing contained in this Section shall be construed as granting to the Lessee any interest, license, easement, or other right in any nearby land.

Page 2

Stipulation No. 3--Military Areas.  (W-59)

(a)  Hold and Save Harmless

Whether compensation for such damage or injury might be due under a theory of strict or absolute liability or otherwise, the lessee assumes all risks of damage or injury to persons or property, which occur in, on, or above the Outer Continental Shelf (OCS), to any persons or to any property of any person or persons who are agents, employees, or invitees of the lessee, its agents, independent contractors, or subcontractors doing business with the lessee in connection with any activities being performed by the lessee in, on, or above the OCS, if such injury or damage to such person or property occurs by reason of the activities of any agency of the United States Government, its contractors or subcontractors, or any of its officers, agents or employees, being conducted as a part of, or in connection with, the programs and activities of the command headquarters listed in the following table.

Notwithstanding any limitation of the lessee's liability in Section 14 of the lease, the lessee assumes this risk whether such injury or damage is caused in whole or in part by any act or omission, regardless of negligence or fault, of the United States, its contractors or subcontractors, or any of its officers, agents, or employees.  The lessee further agrees to indemnify and save harmless the United States against all claims for loss, damage, or injury sustained by the lessee, or to indemnify and save harmless the United States against all claims for loss, damage, or injury sustained by the agents, employees, or invitees of the lessee, its agents, or any independent contractors or subcontractors doing business with the lessee in connection with the programs and activities of the aforementioned military installation, whether the same be caused in whole or in part by the negligence or fault of the United States, its contractors, or subcontractors, or any of its officers, agents, or employees and whether such claims might be sustained under a theory of strict or absolute liability or otherwise.

(b)  Electromagnetic Emissions

The lessee agrees to control its own electromagnetic emissions and those of its agents, employees, invitees, independent contractors or subcontractors emanating from individual designated defense warning areas in accordance with requirements specified by the commander of the command headquarters listed in the following table to the degree necessary to prevent damage to, or unacceptable interference with, Department of Defense flight, testing, or operational activities, conducted within individual designated warning areas.  Necessary monitoring control, and coordination with the lessee, its agents, employees, invitees, independent contractors or subcontractors, will be effected by the commander of the appropriate onshore military installation conducting operations in the particular warning area; provided, however, that control of such electromagnetic emissions shall in no instance prohibit all manner of electromagnetic communication during any period of time between a lessee, its agents, employees, invitees, independent contractors or subcontractors and onshore facilities.

(c) Operational

The lessee, when operating or causing to be operated on its behalf, boat, ship, or aircraft traffic into the individual designated warning areas shall enter into an agreement with the commander of the individual command headquarters listed in the following list, upon utilizing an individual designated warning area prior to commencing such traffic.  Such an agreement will provide for positive control of boats, ships, and aircraft operating into the warning areas at all times.

W-59:  Naval Air Station - JRB
               400 Russel Avenue
               Box 27
               New Orleans, Louisiana 70143-0027
               Telephone: (504) 391-8696/8687



**Sec. 12. Safety Requirements.** The Lessee shall:

(a) maintain all places of employment within the leased area in compliance with occupational safety and health standards and, in addition, free from recognized hazards to employees of the Lessee or of any contractor or subcontractor operating within the lease area;

(b) maintain all operations within the leased area in compliance with regulations or orders intended to protect persons, property, and the environment on the Outer Continental Shelf; and

(c) allow prompt access, at the site of any operation subject to safety regulations, to any authorized Federal inspector and shall provide any documents and records which are pertinent to occupational or public health, safety, or environmental protection as may be requested.

**Sec. 13. Suspension and Cancellation.**

(a) The Lessor may suspend or cancel this lease pursuant to section 5 of the Act, and compensation shall be paid when provided by the Act.

(b) The Lessor may, upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by Congress or the President of the United States, suspend operations under the lease, as provided in section 12(c) of the Act, and just compensation shall be paid to the Lessee for such suspension.

**Sec. 14. Indemnification.** The Lessee shall indemnify the Lessor for, and hold it harmless from, any claim, including claims for loss or damage to property or injury to persons caused by or resulting from any operation on the leased area conducted by or on behalf of the Lessee. However, the Lessee shall not be held responsible to the Lessor under this section for any loss, damage, or injury caused by or resulting from:

(a) negligence of the Lessor other than the commission or omission of a discretionary function or duty on the part of a Federal Agency whether or not the discretion involved is abused; or

(b) the Lessee's compliance with an order or directive of the Lessor against which an administrative appeal by the Lessee is filed before the cause of action for the claim arises and is pursued diligently thereafter.

**Sec. 15. Disposition of Production.**

(a) As provided in section 27(a)(2) of the Act, the Lessor shall have the right to purchase not more than 16 2/3 percent by volume of the oil and gas produced pursuant to the lease at the regulated price or, if no regulated-price applies, at the fair market value at the wellhead of the oil and gas saved, removed, or sold, except that any oil or gas obtained by the Lessor as royalty or net profit share shall be credited against the amount that may be purchased under this subsection.

(b) Pursuant to section 27(b) and (c) of the Act, the Lessor may offer and sell certain oil and gas obtained or purchased pursuant to a lease. As provided in section 27(d) of the Act, the Lessee shall take any Federal oil or gas for which no acceptable bids are received, as determined by the Lessor, and which is not transferred to a Federal Agency pursuant to section 27(a)(3) of the Act, and shall pay to the Lessor a cash amount equal to the regulated price or, if no regulated price applies, the fair market value of the oil or gas so obtained.

(c) As provided in section 8(b)(7) of the Act, the Lessee shall offer 20 percent of the crude oil, condensate, and natural gas liquids produced on the lease, at the market value and point of delivery as provided by regulations applicable to Federal royalty oil, to small or independent refiners as defined in the Emergency Petroleum Allocation Act of 1973.

(d) In time of war or when the president of the United States shall so prescribe, the Lessor shall have the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in section 12(b) of the Act.

**Sec. 16. Unitization, Pooling, and Drilling Agreements.** Within such time as the Lessor may prescribe, the Lessee shall subscribe to and operate under a unit, pooling, or drilling agreement embracing all or part of the lands subject to this lease as the Lessor may determine to be appropriate or necessary. Where any provision of a unit, pooling, or drilling agreement, approved by the Lessor, is inconsistent with a provision of this lease, the provision of the agreement shall govern.

**Sec. 17. Equal Opportunity Clause.** During the performance of this lease, the Lessee shall fully comply with paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended (reprinted in 41 CFR 60-1.4(a)), and the implementing regulations which are for the purpose of preventing employment discrimination against persons on the basis of race, color, religion, sex, or national origin. Paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended, are incorporated in this lease by reference.

**Sec. 18. Certification of Nonsegregated Facilities.** By entering into this lease, the Lessee certifies, as specified in 41 CFR 60-1.8, that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained. As used in this certification, the term "segregated facilities" means, but is not limited to, any waiting rooms, work areas, restrooms and washrooms, restaurants and other eating areas, timeclocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom, or otherwise. The Lessee further agrees that it will obtain identical certifications from proposed contractors and subcontractors prior to award of contracts or subcontracts unless they are exempt under 41 CFR 60-1.5.

**Sec. 19. Reservations to Lessor.** All rights in the leased area not expressly granted to the Lessee by the Act, the regulations, or this lease are hereby reserved to the Lessor. Without limiting the generality of the foregoing, reserved rights included:

(a) the right to authorize geological and geophysical exploration in the lease area which does not unreasonably interfere with or endanger actual operations under the lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands or to the treatment and shipment of products thereof by or under authority of the Lessor;

(b) the right to grant leases for any minerals other than oil and gas within the leased area, except that operations under such leases shall not unreasonably interfere with or endanger operations under this lease;

(c) the right, as provided in section 12(d) of the Act, to restrict operations in the leased area or any part thereof which may be designated by the Secretary of Defense, with approval of the President, as being within an area needed for national defense and, so long as such designation remains in effect, no operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense. If operations or production under this lease within any designated area are suspended pursuant to this paragraph, any payments of rentals and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

**Sec. 20. Transfer of Lease.** The Lessee shall file for approval with the appropriate field office of the Minerals Management Service any instrument of assignment or other transfer of this lease, or any interest therein, in accordance with applicable regulations.

**Sec. 21. Surrender of Lease.** The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the appropriate field office of the Minerals Management Service a written relinquishment, in triplicate, which shall be effective as of the date of filing. No surrender of this lease or of any portion of the leased area shall relieve the Lessee or its surety of the obligation to pay all accrued rentals, royalties, and other financial obligations or to abandon all wells on the area to be surrendered in a manner satisfactory to the Director.

(Continued on reverse)

Page 3

**Sec. 22. Removal of Property on Termination of Lease.** Within a period of 1 year after termination of this lease in whole or in part, the Lessee shall remove all devices, works, and structures from the premises no longer subject to the lease in accordance with applicable regulations and Orders of the Director. However, the Lessee may, with the approval of the Director, continue to maintain devices, works, and structures on the leased area for drilling or producing on other leases.

**Sec. 23. Remedies in Case of Default.**

(a) Whenever the Lessee fails to comply with any of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease, the lease shall be subject to cancellation in accordance with the provisions of section 5(c) and (d) of the Act and the Lessor may exercise any other remedies which the Lessor may have, including the penalty provisions of section 24 of the Act. Furthermore, pursuant to section 8(o) of the Act, the Lessor may cancel the lease if it is obtained by fraud or misrepresentation.

(b) Nonenforcement by the Lessor of a remedy for any particular violation of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease shall not prevent the cancellation of this lease or the exercise of any other remedies under paragraph (a) of this section for any other violation or for the same violation occurring at any other time.

**Sec. 24. Unlawful Interest.** No member of, or Delegate to, Congress, or Resident Commissioner, after election or appointment, or either before or after they have qualified and during their continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR Part 20, shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom. The provisions of Section 3741 of the Revised Statutes, as amended, 41 U.S.C. 22, and the Act of June 25, 1948, 62 Stat. 702, as amended, 18 U.S.C. 431-433, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease insofar as they may be applicable.

SHELL OFFSHORE INC.

(Lessee)

THE UNITED STATES OF AMERICA, Lessor

(Signature of Authorized Officer)

(Signature of Authorized Officer)

K.R. SISSELL

(Name of Signatory)

Chris C. Oynes

(Name of Signatory)

ATTORNEY IN FACT

(Title)

Regional Director
Gulf of Mexico OCS Region
Minerals Management Service

(Title)

JUN 23 1998

(Date)

JUL 2 1998

(Date)

P. O. BOX 61933
NEW ORLEANS, LA 70161

(Address of Lessee)

*If this lease is executed by a corporation, it must bear the corporate seal.*

**OCS-G 21106**

Form MMS-2005 (March 1986)
(Supersedes MMS-2005 August 1982)

| | |
|---|---|
| Office **New Orleans, LA** | Serial number **OCS-G 21106** |

**UNITED STATES
DEPARTMENT OF THE INTERIOR
MINERALS MANAGEMENT SERVICE**

| | |
|---|---|
| *Cash bonus* **$362,886.00** | Rental rate per acre, hectare or fraction thereof **$5.00 per acre** |

**OIL AND GAS LEASE OF
SUBMERGED LANDS UNDER THE
OUTER CONTINENTAL SHELF LANDS ACT**

| | |
|---|---|
| Minimum royalty rate per acre, hectare or fraction thereof **$5.00 per acre** | Royalty rate **16 2/3 percent** |
| | Profit share rate |

*This form does not constitute an information collection as
defined by 44 U.S.C. 3502 and therefore does not require
approval by the Office of Management and Budget.*

This lease is effective as of          JUL  1 1989          (hereinafter called the "Effective Date") and shall continue for an initial period of          **five**          years (hereinafter called the "Initial Period") by and between the United States of America (hereinafter called the "Lessor"), by the **Regional Director, Gulf of Mexico OCS Region,** Minerals Management Service, its authorized officer, and

**Chieftain International (U.S.) Inc.**                                        **100%**

(hereinafter called the "Lessee").  In consideration of any cash payment heretofore made by the Lessee to the Lessor and in consideration of the promises, terms, conditions, and covenants contained herein, including the Stipulation(s) numbered          **3**          attached hereto, the Lessee and Lessor agree as follows:

**Sec. 1.  Statutes and Regulations.**  This lease is issued pursuant to the Outer Continental Shelf Lands Act of August 7, 1953, 67 Stat. 462; 43 U.S.C. 1331 et seq., as amended (92 Stat. 629), (hereinafter called the "Act").  The lease is issued subject to the Act; all regulations issued pursuant to the Act and in existence upon the Effective Date of this lease; all regulations issued pursuant to the statute in the future which provide for the prevention of waste and conservation of the natural resources of the Outer Continental Shelf and the protection of correlative rights therein; and all other applicable statutes and regulations.

**Sec. 2.  Rights of Lessee.**  The Lessor hereby grants and leases to the Lessee the exclusive right and privilege to drill for, develop, and produce oil and gas resources, except helium gas, in the submerged lands of the Outer Continental Shelf containing approximately          **5,000.00**          acres          hectares (hereinafter referred to as the "leased area"), described as follows:

**All of Block 139, South Marsh Island Area, South Addition, OCS Leasing Map, Louisiana Map No. 3C.**

These rights include:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations in accordance with applicable regulations;

(b) the nonexclusive right to drill water wells within the leased area, unless the water is part of geopressured-geothermal and associated resources, and to use the water produced therefrom for operations pursuant to the Act free of cost, on the condition that the drilling is conducted in accordance with procedures approved by the Director of the Minerals Management Service or the Director's delegate (hereinafter called the "Director"); and

(c) the right to construct or erect and to maintain within the leased area artificial islands, installations, and other devices permanently or temporarily attached to the seabed and other works and structures necessary to the full enjoyment of the lease, subject to compliance with applicable laws and regulations.

**Sec. 3. Term.** This lease shall continue from the Effective Date of the lease for the Initial Period and so long thereafter as oil or gas is produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Lessor, are conducted thereon, or as otherwise provided by regulation.

**Sec. 4. Rentals.** The Lessee shall pay the Lessor, on or before the first day of each lease year which commences prior to a discovery in paying quantities of oil or gas on the leased area, a rental as shown on the face hereof.

**Sec. 5. Minimum Royalty.** The Lessee shall pay the Lessor, at the expiration of each lease year which commences after a discovery of oil and gas in paying quantities, a minimum royalty as shown on the face hereof or, if there is production, the difference between the actual royalty required to be paid with respect to such lease year and the prescribed minimum royalty if the actual royalty paid is less than the minimum royalty.

**Sec. 6. Royalty on Production.**

(a) The Lessee shall pay a fixed royalty as shown on the face hereof in amount or value of production saved, removed, or sold from the leased area. Gas (except helium) and oil of all kinds are subject to royalty. Any Lessee is liable for royalty payments on oil or gas lost or wasted from a lease site when such loss or waste is due to negligence on the part of the operator of the lease, or due to the failure to comply with any rule or regulation, order, or citation issued under the Federal Oil and Gas Royalty Management Act of 1982 or the Act. The Lessor shall determine whether production royalty shall be paid in amount or value.

(b) The value of production for purposes of computing royalty on production from this lease shall never be less than the fair market value of the production. The value of production shall be the estimated reasonable value of the production as determined by the Lessor, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field or area, to the price received by the Lessee, to posted prices, to regulated prices, and to other relevant matters. Except when the Lessor, in its discretion, determines not to consider special pricing relief from otherwise applicable Federal regulatory requirements, the value of production for the purposes of computing royalty shall not be deemed to be less than the gross proceeds accruing to the Lessee from the sale thereof. In the absence of good reason to the contrary, value

computed on the basis of the highest price paid or offered at the time of production in a fair and open market for the major portion of like-quality products produced and sold from the field or area where the leased area is situated will be considered to be a reasonable value.

(c) When paid in value, royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained, unless the Lessor designates a later time. When paid in amount, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessor's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point.

**Sec. 7. Payments.** The Lessee shall make all payments (rentals, royalties and any other payments required by this lease) to the Lessor by electronic transfer of funds, check, draft on a solvent bank, or money order unless otherwise provided by regulations or by direction of the Lessor. Rentals, royalties, and any other payments required by this lease shall be made payable to the Minerals Management Service and tendered to the Director. Determinations made by the Lessor as to the amount of payment due shall be presumed to be correct and paid as due.

**Sec. 8. Bonds.** The Lessee shall maintain at all times the bond(s) required by regulation prior to the issuance of the lease and shall furnish such additional security as may be required by the Lessor if, after operations have begun, the Lessor deems such additional security to be necessary.

**Sec. 9. Plans.** The Lessee shall conduct all operations on the leased area in accordance with approved exploration plans and approved development and production plans as are required by regulations. The Lessee may depart from an approved plan only as provided by applicable regulations.

**Sec. 10. Performance.** The Lessee shall comply with all regulations and Orders. After due notice in writing, the Lessee shall drill such wells and produce at such rates as the Lessor may require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles.

**Sec. 11. Directional Drilling.** A directional well drilled under the leased area from a surface location on nearby land not covered by this lease shall be deemed to have the same effect for all purposes of the lease as a well drilled from a surface location on the leased area. In those circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the nearby land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on nearby land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations on the leased area for all purposes of the lease. Nothing contained in this Section shall be construed as granting to the Lessee any interest, license, easement, or other right in any nearby land.

Page 2

<u>Stipulation No. 3--Military Areas</u>.

    (a)  <u>Hold and Save Harmless</u>

    Whether compensation for such damage or injury might be due under a theory of strict or absolute liability or otherwise, the lessee assumes all risks of damage or injury to persons or property, which occur in, on, or above the Outer Continental Shelf (OCS), to any persons or to any property of any person or persons who are agents, employees, or invitees of the lessee, its agents, independent contractors, or subcontractors doing business with the lessee in connection with any activities being performed by the lessee in, on, or above the OCS, if such injury or damage to such person or property occurs by reason of the activities of any agency of the United States Government, its contractors or subcontractors, or any of its officers, agents or employees, being conducted as a part of, or in connection with, the programs and activities of the command headquarters listed in the following table.

    Notwithstanding any limitation of the lessee's liability in Section 14 of the lease, the lessee assumes this risk whether such injury or damage is caused in whole or in part by any act or omission, regardless of negligence or fault, of the United States, its contractors or subcontractors, or any of its officers, agents, or employees.  The lessee further agrees to indemnify and save harmless the United States against all claims for loss, damage, or injury sustained by the lessee, or to indemnify and save harmless the United States against all claims for loss, damage, or injury sustained by the agents, employees, or invitees of the lessee, its agents, or any independent contractors or subcontractors doing business with the lessee in connection with the programs and activities of the aforementioned military installation, whether the same be caused in whole or in part by the negligence or fault of the United States, its contractors, or subcontractors, or any of its officers, agents, or employees and whether such claims might be sustained under a theory of strict or absolute liability or otherwise.

    (b)  <u>Electromagnetic Emissions</u>

    The lessee agrees to control its own electromagnetic emissions and those of its agents, employees, invitees, independent contractors or subcontractors emanating from

individual designated defense warning areas in accordance with
requirements specified by the commander of the command
headquarters listed in the following table to the degree
necessary to prevent damage to, or unacceptable interference
with, Department of Defense flight, testing, or operational
activities, conducted within individual designated warning areas.
Necessary monitoring control, and coordination with the lessee,
its agents, employees, invitees, independent contractors or
subcontractors, will be effected by the commander of the
appropriate onshore military installation conducting operations
in the particular warning area; provided, however, that control
of such electromagnetic emissions shall in no instance prohibit
all manner of electromagnetic communication during any period of
time between a lessee, its agents, employees, invitees,
independent contractors or subcontractors and onshore facilities.

 (c) <u>Operational</u>

  The lessee, when operating or causing to be operated on its
behalf, boat, ship, or aircraft traffic into the individual
designated warning areas shall enter into an agreement with the
commander of the individual command headquarters listed in the
following list, upon utilizing an individual designated warning
area prior to commencing such traffic.  Such an agreement will
provide for positive control of boats, ships, and aircraft
operating into the warning areas at all times.

W-59:  Naval Air Station - JRB
    400 Russel Avenue
    Box 27
    New Orleans, Louisiana 70143-0027
    Telephone: (504) 391-8696/8687

W-92:  Naval Air Station
    Air Operations Department
    Air Traffic Division/Code 52
    New Orleans, Louisiana 70146-5000
    Telephone: (504) 393-3100/3101

W-147:  147th Fighter Wing
    Operations Officer
    14657 Sneider Street
    Houston, Texas 77034-5586
    Telephone (281) 929-2716/2683

W-155A and B (For Agreement):
        Chief, Naval Air Training
        Naval Air Station, Office No. 206
        Corpus Christi, Texas 78419-5100
        Telephone: (512) 939-3862/2621

W-155A and B (For Operational Control):
        Fleet Area Control & Surveillance Facility (FACSFAC)
            Operations
        Naval Air Station
        Pensacola, Florida 32508
        Telephone: (904) 452-2735/4671

W-453:    Air National Guard - CRTC
        4715 Hews Avenue Building 1
        Gulfport, Mississippi 39507-4324
        Telephone: (601) 867-2432/2433

Eglin Water Test Areas 1 and 3:
        Air Armament Center
        Programs Division
        101 West "D" Avenue, Suite 128
        Eglin AFB, Florida 32542-5495
        Telephone: (904) 882-3899/4188

**Sec. 12. Safety Requirements.** The Lessee shall:

(a) maintain all places of employment within the leased area in compliance with occupational safety and health standards and, in addition, free from recognized hazards to employees of the Lessee or of any contractor or subcontractor operating within the lease area;

(b) maintain all operations within the leased area in compliance with regulations or orders intended to protect persons, property, and the environment on the Outer Continental Shelf; and

(c) allow prompt access, at the site of any operation subject to safety regulations, to any authorized Federal inspector and shall provide any documents and records which are pertinent to occupational or public health, safety, or environmental protection as may be requested.

**Sec. 13. Suspension and Cancellation.**

(a) The Lessor may suspend or cancel this lease pursuant to section 5 of the Act, and compensation shall be paid when provided by the Act.

(b) The Lessor may, upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by Congress or the President of the United States, suspend operations under the lease, as provided in section 12(c) of the Act, and just compensation shall be paid to the Lessee for such suspension.

**Sec. 14. Indemnification.** The Lessee shall indemnify the Lessor for, and hold it harmless from, any claim, including claims for loss or damage to property or injury to persons caused by or resulting from any operation on the leased area conducted by or on behalf of the Lessee. However, the Lessee shall not be held responsible to the Lessor under this section for any loss, damage, or injury caused by or resulting from:

(a) negligence of the Lessor other than the commission or omission of a discretionary function or duty on the part of a Federal Agency whether or not the discretion involved is abused; or

(b) the Lessee's compliance with an order or directive of the Lessor against which an administrative appeal by the Lessee is filed before the cause of action for the claim arises and is pursued diligently thereafter.

**Sec. 15. Disposition of Production.**

(a) As provided in section 27(a)(2) of the Act, the Lessor shall have the right to purchase not more than 16 2/3 percent by volume of the oil and gas produced pursuant to the lease at the regulated price or, if no regulated price applies, at the fair market value at the wellhead of the oil and gas saved, removed, or sold, except that any oil or gas obtained by the Lessor as royalty or net profit share shall be credited against the amount that may be purchased under this subsection.

(b) Pursuant to section 27(b) and (c) of the Act, the Lessor may offer and sell certain oil and gas obtained or purchased pursuant to a lease. As provided in section 27(d) of the Act, the Lessee shall take any Federal oil or gas for which no acceptable bids are received, as determined by the Lessor, and which is not transferred to a Federal Agency pursuant to section 27(a)(3) of the Act, and shall pay to the Lessor a cash amount equal to the regulated price or, if no regulated price applies, the fair market value of the oil or gas so obtained.

(c) As provided in section 8(b)(7) of the Act, the Lessee shall offer 20 percent of the crude oil, condensate, and natural gas liquids produced on the lease, at the market value and point of delivery as provided by regulations applicable to Federal royalty oil, to small or independent refiners as defined in the Emergency Petroleum Allocation Act of 1973.

(d) In time of war or when the president of the United States shall so prescribe, the Lessor shall have the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in section 12(b) of the Act.

**Sec. 16. Unitization, Pooling, and Drilling Agreements.** Within such time as the Lessor may prescribe, the Lessee shall subscribe to and operate under a unit, pooling, or drilling agreement embracing all or part of the lands subject to this lease as the Lessor may determine to be appropriate or necessary. Where any provision of a unit, pooling, or drilling agreement, approved by the Lessor, is inconsistent with a provision of this lease, the provision of the agreement shall govern.

**Sec. 17. Equal Opportunity Clause.** During the performance of this lease, the Lessee shall fully comply with paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended (reprinted in 41 CFR 60-1.4(a)), and the implementing regulations which are for the purpose of preventing employment discrimination against persons on the basis of race, color, religion, sex, or national origin. Paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended, are incorporated in this lease by reference.

**Sec. 18. Certification of Nonsegregated Facilities.** By entering into this lease, the Lessee certifies, as specified in 41 CFR 60-1.8, that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained. As used in this certification, the term "segregated facilities" means, but is not limited to, any waiting rooms, work areas, restrooms and washrooms, restaurants and other eating areas, timeclocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom, or otherwise. The Lessee further agrees that it will obtain identical certifications from proposed contractors and subcontractors prior to award of contracts or subcontracts unless they are exempt under 41 CFR 60-1.5.

**Sec. 19. Reservations to Lessor.** All rights in the leased area not expressly granted to the Lessee by the Act, the regulations, or this lease are hereby reserved to the Lessor. Without limiting the generality of the foregoing, reserved rights included:

(a) the right to authorize geological and geophysical exploration in the lease area which does not unreasonably interfere with or endanger actual operations under the lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands or to the treatment and shipment of products thereof by or under authority of the Lessor;

(b) the right to grant leases for any minerals other than oil and gas within the leased area, except that operations under such leases shall not unreasonably interfere with or endanger operations under this lease;

(c) the right, as provided in section 12(d) of the Act, to restrict operations in the leased area or any part thereof which may be designated by the Secretary of Defense, with approval of the President, as being within an area needed for national defense and, so long as such designation remains in effect, no operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense. If operations or production under this lease within any designated area are suspended pursuant to this paragraph, any payments of rentals and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

**Sec. 20. Transfer of Lease.** The Lessee shall file for approval with the appropriate field office of the Minerals Management Service any instrument of assignment or other transfer of this lease, or any interest therein, in accordance with applicable regulations.

**Sec. 21. Surrender of Lease.** The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the appropriate field office of the Minerals Management Service a written relinquishment, in triplicate, which shall be effective as of the date of filing. No surrender of this lease or of any portion of the leased area shall relieve the Lessee or its surety of the obligation to pay all accrued rentals, royalties, and other financial obligations or to abandon all wells on the area to be surrendered in a manner satisfactory to the Director.

(Continued on reverse)

Page 3

**Sec. 22. Removal of Property on Termination of Lease.** Within a period of 1 year after termination of this lease in whole or in part, the Lessee shall remove all devices, works, and structures from the premises no longer subject to the lease in accordance with applicable regulations and Orders of the Director. However, the Lessee may, with the approval of the Director, continue to maintain devices, works, and structures on the leased area for drilling or producing on other leases.

**Sec. 23. Remedies in Case of Default.**

(a) Whenever the Lessee fails to comply with any of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease, the lease shall be subject to cancellation in accordance with the provisions of section 5(c) and (d) of the Act and the Lessor may exercise any other remedies which the Lessor may have, including the penalty provisions of section 24 of the Act. Furthermore, pursuant to section 8(o) of the Act, the Lessor may cancel the lease if it is obtained by fraud or misrepresentation.

(b) Nonenforcement by the Lessor of a remedy for any particular violation of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease or the exercise of any other remedies under paragraph (a) of this section for any other violation or for the same violation occurring at any other time.

**Sec. 24. Unlawful Interest.** No member of, or Delegate to, Congress, or Resident Commissioner, after election or appointment, or either before or after they have qualified and during their continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR Part 20, shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom. The provisions of Section 3741 of the Revised Statutes, as amended, 41 U.S.C. 22, and the Act of June 25, 1948, 62 Stat. 702, as amended, 18 U.S.C. 431-433, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease insofar as they may be applicable.

CHIEFTAIN INTERNATIONAL (U.S.) INC.
_____
(Lessee)

_____
(Signature of Authorized Officer)

E. L. HAHN
(Name of Signatory)

SENIOR VICE PRESIDENT,
FINANCE AND TREASURER
(Title)

May 26/99
(Date)

1201 TD Tower
10088-102 Avenue
Edmonton, Alberta T5J 2Z1
Canada

_____
(Address of Lessee)

THE UNITED STATES OF AMERICA, Lessor

_____
(Signature of Authorized Officer)

**Chris C. Oynes**
(Name of Signatory)

**Regional Director
Gulf of Mexico OCS Region
Minerals Management Service**
(Title)

JUN 3 1999
(Date)

*If this lease is executed by a corporation, it must bear the corporate seal.*

**OCS-G 22679**

Form MMS-2005 (March 1986)
(Supersedes MMS-2005 August 1982)

| Office | Serial number |
|---|---|
| **New Orleans, LA** | **OCS-G 22679** |

| Cash bonus | Rental rate per acre, hectare or fraction thereof |
|---|---|
| **$851,550.00** | **$5.00 per acre** |

# UNITED STATES
## DEPARTMENT OF THE INTERIOR
## MINERALS MANAGEMENT SERVICE

## OIL AND GAS LEASE OF
## SUBMERGED LANDS UNDER THE
## OUTER CONTINENTAL SHELF LANDS ACT

*This form does not constitute an information collection as defined by 44 U.S.C. 3502 and therefore does not require approval by the Office of Management and Budget.*

| Minimum royalty rate per acre, hectare or fraction thereof | Royalty rate[1] |
|---|---|
| | **16 2/3 percent** |
| **$5.00 per acre** | Profit share rate |

This lease is effective as of **JUN 0 1 2001** (hereinafter called the "Effective Date") and shall continue for an initial period of **five[2]** years (hereinafter called the "Initial Period") by and between the United States of America (hereinafter called the "Lessor"), by the **Regional Director, Gulf of Mexico OCS Region**, Minerals Management Service, its authorized officer, and

**Devon Energy Production Company, L.P.**                    **100%**



(hereinafter called the "Lessee"). In consideration of any cash payment heretofore made by the Lessee to the Lessor and in consideration of the promises, terms, conditions, and covenants contained herein, including the Stipulation(s) numbered **3** attached hereto, the Lessee and Lessor agree as follows:

**Sec. 1. Statutes and Regulations.** This lease is issued pursuant to the Outer Continental Shelf Lands Act of August 7, 1953, 67 Stat. 462; 43 U.S.C. 1331 et seq., as amended (92 Stat. 629), (hereinafter called the "Act"). The lease is issued subject to the Act; all regulations issued pursuant to the Act and in existence upon the Effective Date of this lease; all regulations issued pursuant to the statute in the future which provide for the prevention of waste and conservation of the natural resources of the Outer Continental Shelf and the protection of correlative rights therein; and all other applicable statutes and regulations.

**Sec. 2. Rights of Lessee.** The Lessor hereby grants and leases to the Lessee the exclusive right and privilege to drill for, develop, and produce oil and gas resources, except helium gas, in the submerged lands of the Outer Continental Shelf containing approximately **5,000.02** acres or hectares (hereinafter referred to as the "leased area"), described as follows:

**All of Block 312, Eugene Island Area, South Addition, OCS Leasing Map, Louisiana Map No. 4A.**

[1]This lease may be eligible for a royalty suspension volume on the first 20 billion cubic feet of its new deep gas production pursuant to the final rule published in the Federal Register on February 23, 2001, at 66 FR 11511, and the Final Notice of Sale 178, Part 1. If eligible, Section 6 of this lease instrument will be amended by addendum, pages 2a and 2b, attached hereto and made a part hereof.

[2]This lease may be eligible for a lease term extension consistent with 30 CFR 250.180(e), provided the lease has a potential subsalt hydrocarbon objective, pursuant to NTL No. 2000-G22, effective December 22, 2000.

These rights include:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations in accordance with applicable regulations;

(b) the nonexclusive right to drill water wells within the leased area, unless the water is part of geopressured-geothermal and associated resources, and to use the water produced therefrom for operations pursuant to the Act free of cost, on the condition that the drilling is conducted in accordance with procedures approved by the Director of the Minerals Management Service or the Director's delegate (hereinafter called the "Director"); and

(c) the right to construct or erect and to maintain within the leased area artificial islands, installations, and other devices permanently or temporarily attached to the seabed and other works and structures necessary to the full enjoyment of the lease, subject to compliance with applicable laws and regulations.

**Sec. 3. Term.** This lease shall continue from the Effective Date of the lease for the Initial Period and so long thereafter as oil or gas is produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Lessor, are conducted thereon, or as otherwise provided by regulation.

**Sec. 4. Rentals.** The Lessee shall pay the Lessor, on or before the first day of each lease year which commences prior to a discovery in paying quantities of oil or gas on the leased area, a rental as shown on the face hereof.

**Sec. 5. Minimum Royalty.** The Lessee shall pay the Lessor, at the expiration of each lease year which commences after a discovery of oil and gas in paying quantities, a minimum royalty as shown on the face hereof or, if there is production, the difference between the actual royalty required to be paid with respect to such lease year and the prescribed minimum royalty if the actual royalty paid is less than the minimum royalty.

**Sec. 6. Royalty on Production.**

(a) The Lessee shall pay a fixed royalty as shown on the face hereof in amount or value of production saved, removed, or sold from the leased area. Gas (except helium) and oil of all kinds are subject to royalty. Any Lessee is liable for royalty payments on oil or gas lost or wasted from a lease site when such loss or waste is due to negligence on the part of the operator of the lease, or due to the failure to comply with any rule or regulation, order, or citation issued under the Federal Oil and Gas Royalty Management Act of 1982 or the Act. The Lessor shall determine whether production royalty shall be paid in amount or value.

(b) The value of production for purposes of computing royalty on production from this lease shall never be less than the fair market value of the production. The value of production shall be the estimated reasonable value of the production as determined by the Lessor, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field or area, to the price received by the Lessee, to posted prices, to regulated prices, and to other relevant matters. Except when the Lessor, in its discretion, determines not to consider special pricing relief from otherwise applicable Federal regulatory requirements, the value of production for the purposes of computing royalty shall not be deemed to be less than the gross proceeds accruing to the Lessee from the sale thereof. In the absence of good reason to the contrary, value

computed on the basis of the highest price paid or offered at the time of production in a fair and open market for the major portion of like-quality products produced and sold from the field or area where the leased area is situated will be considered to be a reasonable value.

(c) When paid in value, royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained, unless the Lessor designates a later time. When paid in amount, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessor's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point.

**Sec. 7. Payments.** The Lessee shall make all payments (rentals, royalties and any other payments required by this lease) to the Lessor by electronic transfer of funds, check, draft on a solvent bank, or money order unless otherwise provided by regulations or by direction of the Lessor. Rentals, royalties, and any other payments required by this lease shall be made payable to the Minerals Management Service and tendered to the Director. Determinations made by the Lessor as to the amount of payment due shall be presumed to be correct and paid as due.

**Sec. 8. Bonds.** The Lessee shall maintain at all times the bond(s) required by regulation prior to the issuance of the lease and shall furnish such additional security as may be required by the Lessor if, after operations have begun, the Lessor deems such additional security to be necessary.

**Sec. 9. Plans.** The Lessee shall conduct all operations on the leased area in accordance with approved exploration plans and approved development and production plans as are required by regulations. The Lessee may depart from an approved plan only as provided by applicable regulations.

**Sec. 10. Performance.** The Lessee shall comply with all regulations and Orders. After due notice in writing, the Lessee shall drill such wells and produce at such rates as the Lessor may require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles.

**Sec. 11. Directional Drilling.** A directional well drilled under the leased area from a surface location on nearby land not covered by this lease shall be deemed to have the same effect for all purposes of the lease as a well drilled from a surface location on the leased area. In those circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the nearby land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on nearby land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations on the leased area for all purposes of the lease. Nothing contained in this Section shall be construed as granting to the Lessee any interest, license, easement, or other right in any nearby land.

Page 2

## *SALE 178, PART 1, LEASE ADDENDUM*

*To the following extent, Sections 4, 5, and 6 of this lease instrument are amended by addendum pursuant to the Final Notice of Sale in accordance with revised rental/minimum royalty requirements and suspension of royalty on production.*

### Sec. 4.  Rentals.

Notwithstanding the language in Sec. 4 of the lease instrument, annual rental shall be paid until the start of royalty-bearing production, to be paid at the beginning of the lease year until a discovery in paying quantities of oil or gas is made, then at the end of the lease year until the start of royalty-bearing production.

### Sec. 5.  Minimum Royalty.

Notwithstanding the language in Sec. 5 of the lease instrument, minimum royalty shall be paid after the start of royalty-bearing production, to be paid at the end of the lease year.

### Sec. 6.  Royalty on Production.

Notwithstanding the language in Sec. 6 of the lease instrument, and in accordance with the final rule published in the *Federal Register* on February 23, 2001, at 66 *FR* 11511, the following royalty suspension provisions for shallow water deep gas production apply to this lease:

1. The lease will receive a royalty suspension on the first 20 billion cubic feet of its deep gas production if a new deep gas reservoir (15,000 feet or greater subsea) is drilled and commences production within the first 5 years of the life of the lease (does not include lease extensions due to the granting of a suspension).  Deep gas is defined as any gas production from a completion with the top of perforated interval 15,000 feet or greater subsea (true vertical depth below the datum at mean sea level).  The lessee must notify the Regional Supervisor, Office for Production and Development, Gulf of Mexico OCS Region, in writing upon the commencement of such deep gas production.

2. Liquid hydrocarbons (oil and condensate) which exist in liquid form at standard conditions after passing through separating facilities will be subject to royalty payments.

3. The lease will receive the royalty suspension even if the field to which it is assigned by MMS is producing.

4. Any volumes of deep gas production that are not normally royalty-bearing under the lease terms or regulations (e.g. fuel gas) do not count against royalty suspension volumes.

5. The royalty suspension will continue through the end of the month in which cumulative production from the lease reaches the applicable royalty suspension volume or the lease period ends.

6. The lessee must pay the rental fee at the end of each calendar year during the period of royalty suspension.   A rental fee is not due if the royalty payment for other lease production exceeds the rental amount.

7. The lessee must pay royalty on natural gas production that would otherwise receive royalty suspension under the following conditions:

   a) In any calendar year during which the arithmetic average of the closing prices for the nearby delivery month on the NYMEX for natural gas exceeds $3.50 per million British thermal units (threshold gas price).

   b) This threshold price for natural gas represents an annual average for 2000 and must be adjusted for subsequent calendar years by the percentage by which the implicit price deflator for the gross domestic product has changed.   For instance, suppose the computation for the deflator for 2001, which is made in the Spring of 2002, indicates that inflation was 3% in 2001.   Then the threshold price in calendar year 2001 would become $3.605 per million British thermal units for natural gas.   Royalty on all natural gas production in calendar year 2001 would be due if the 2001 average NYMEX natural gas price in 7a above exceeded $3.605 per million British thermal units.

   c) MMS will provide notice when price thresholds are exceeded.   Also, information on price thresholds will be available via the MMS Internet website.

   d) Production under this paragraph counts toward the royalty suspension volume.

   e) The lessee must pay the royalty due under this paragraph plus late payment interest by March 31 of the following calendar year.

8. There are  no circumstances under which the lease will receive a royalty suspension both for deep gas production and for deepwater production.

Stipulation No. 3--Military Areas.

(a) Hold and Save Harmless

Whether compensation for such damage or injury might be due under a theory of strict or absolute liability or otherwise, the lessee assumes all risks of damage or injury to persons or property, which occur in, on, or above the Outer Continental Shelf (OCS), to any persons or to any property of any person or persons who are agents, employees, or invitees of the lessee, its agents, independent contractors, or subcontractors doing business with the lessee in connection with any activities being performed by the lessee in, on, or above the OCS, if such injury or damage to such person or property occurs by reason of the activities of any agency of the United States Government, its contractors or subcontractors, or any of its officers, agents or employees, being conducted as a part of, or in connection with, the programs and activities of the command headquarters listed in the following table.

Notwithstanding any limitation of the lessee's liability in Section 14 of the lease, the lessee assumes this risk whether such injury or damage is caused in whole or in part by any act or omission, regardless of negligence or fault, of the United States, its contractors or subcontractors, or any of its officers, agents, or employees.  The lessee further agrees to indemnify and save harmless the United States against all claims for loss, damage, or injury sustained by the lessee, or to indemnify and save harmless the United States against all claims for loss, damage, or injury sustained by the agents, employees, or invitees of the lessee, its agents, or any independent contractors or subcontractors doing business with the lessee in connection with the programs and activities of the aforementioned military installation, whether the same be caused in whole or in part by the negligence or fault of the United States, its contractors, or subcontractors, or any of its officers, agents, or employees and whether such claims might be sustained under a theory of strict or absolute liability or otherwise.

(b) Electromagnetic Emissions

The lessee agrees to control its own electromagnetic emissions and those of its agents, employees, invitees, independent contractors or subcontractors emanating from individual designated defense warning areas in accordance with requirements specified by the commander of the command headquarters listed in the following table to the degree necessary to prevent damage to, or unacceptable interference with, Department of Defense flight, testing, or operational activities, conducted within individual designated warning areas.  Necessary monitoring control, and coordination with the lessee, its agents, employees, invitees, independent contractors or subcontractors, will be effected by the commander of the appropriate onshore military installation conducting operations in the particular warning area; provided, however, that control of such electromagnetic emissions shall in no instance prohibit all manner of electromagnetic communication during any period of time between a lessee, its agents, employees, invitees, independent contractors or subcontractors and onshore facilities.

(c)  <u>Operational</u>

The lessee, when operating or causing to be operated on its behalf, boat, ship, or aircraft traffic into the individual designated warning areas shall enter into an agreement with the commander of the individual command headquarters listed in the following list, upon utilizing an individual designated warning area prior to commencing such traffic.  Such an agreement will provide for positive control of boats, ships, and aircraft operating into the warning areas at all times.

W-59: Naval Air Station - JRB
      400 Russel Avenue
      Box 27
      New Orleans, Louisiana 70143-0027
      Telephone: (504) 391-8696/8687

**Sec. 12. Safety Requirements.** The Lessee shall:

(a) maintain all places of employment within the leased area in compliance with occupational safety and health standards and, in addition, free from recognized hazards to employees of the Lessee or of any contractor or subcontractor operating within the lease area;

(b) maintain all operations within the leased area in compliance with regulations or orders intended to protect persons, property, and the environment on the Outer Continental Shelf; and

(c) allow prompt access, at the site of any operation subject to safety regulations, to any authorized Federal inspector and shall provide any documents and records which are pertinent to occupational or public health, safety, or environmental protection as may be requested.

**Sec. 13. Suspension and Cancellation.**

(a) The Lessor may suspend or cancel this lease pursuant to section 5 of the Act, and compensation shall be paid when provided by the Act.

(b) The Lessor may, upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by Congress or the President of the United States, suspend operations under the lease, as provided in section 12(c) of the Act, and just compensation shall be paid to the Lessee for such suspension.

**Sec. 14. Indemnification.** The Lessee shall indemnify the Lessor for, and hold it harmless from, any claim, including claims for loss or damage to property or injury to persons caused by or resulting from any operation on the leased area conducted by or on behalf of the Lessee. However, the Lessee shall not be held responsible to the Lessor under this section for any loss, damage, or injury caused by or resulting from:

(a) negligence of the Lessor other than the commission or omission of a discretionary function or duty on the part of a Federal Agency whether or not the discretion involved is abused; or

(b) the Lessee's compliance with an order or directive of the Lessor against which an administrative appeal by the Lessee is filed before the cause of action for the claim arises and is pursued diligently thereafter.

**Sec. 15. Disposition of Production.**

(a) As provided in section 27(a)(2) of the Act, the Lessor shall have the right to purchase not more than 16 2/3 percent by volume of the oil and gas produced pursuant to the lease at the regulated price or, if no regulated price applies, at the fair market value at the wellhead of the oil and gas saved, removed, or sold, except that any oil or gas obtained by the Lessor as royalty or net profit share shall be credited against the amount that may be purchased under this subsection.

(b) Pursuant to section 27(b) and (c) of the Act, the Lessor may offer and sell certain oil and gas obtained or purchased pursuant to a lease. As provided in section 27(d) of the Act, the Lessee shall take any Federal oil or gas for which no acceptable bids are received, as determined by the Lessor, and which is not transferred to a Federal Agency pursuant to section 27(a)(3) of the Act, and shall pay to the Lessor a cash amount equal to the regulated price or, if no regulated price applies, the fair market value of the oil or gas so obtained.

(c) As provided in section 8(b)(7) of the Act, the Lessee shall offer 20 percent of the crude oil, condensate, and natural gas liquids produced on the lease, at the market value and point of delivery as provided by regulations applicable to Federal royalty oil, to small or independent refiners as defined in the Emergency Petroleum Allocation Act of 1973.

(d) In time of war or when the president of the United States shall so prescribe, the Lessor shall have the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in section 12(b) of the Act.

**Sec. 16. Unitization, Pooling, and Drilling Agreements.** Within such time as the Lessor may prescribe, the Lessee shall subscribe to and operate under a unit, pooling, or drilling agreement embracing all or part of the lands subject to this lease as the Lessor may determine to be appropriate or necessary. Where any provision of a unit, pooling, or drilling agreement, approved by the Lessor, is inconsistent with a provision of this lease, the provision of the agreement shall govern.

**Sec. 17. Equal Opportunity Clause.** During the performance of this lease, the Lessee shall fully comply with paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended (reprinted in 41 CFR 60-1.4(a)), and the implementing regulations which are for the purpose of preventing employment discrimination against persons on the basis of race, color, religion, sex, or national origin. Paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended, are incorporated in this lease by reference.

**Sec. 18. Certification of Nonsegregated Facilities.** By entering into this lease, the Lessee certifies, as specified in 41 CFR 60-1.8, that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained. As used in this certification, the term "segregated facilities" means, but is not limited to, any waiting rooms, work areas, restrooms and washrooms, restaurants and other eating areas, timeclocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom, or otherwise. The Lessee further agrees that it will obtain identical certifications from proposed contractors and subcontractors prior to award of contracts or subcontracts unless they are exempt under 41 CFR 60-1.5.

**Sec. 19. Reservations to Lessor.** All rights in the leased area not expressly granted to the Lessee by the Act, the regulations, or this lease are hereby reserved to the Lessor. Without limiting the generality of the foregoing, reserved rights included:

(a) the right to authorize geological and geophysical exploration in the lease area which does not unreasonably interfere with or endanger actual operations under the lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands or to the treatment and shipment of products thereof by or under authority of the Lessor;

(b) the right to grant leases for any minerals other than oil and gas within the leased area, except that operations under such leases shall not unreasonably interfere with or endanger operations under this lease;

(c) the right, as provided in section 12(d) of the Act, to restrict operations in the leased area or any part thereof which may be designated by the Secretary of Defense, with approval of the President, as being within an area needed for national defense and, so long as such designation remains in effect, no operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense. If operations or production under this lease within any designated area are suspended pursuant to this paragraph, any payments of rentals and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

**Sec. 20. Transfer of Lease.** The Lessee shall file for approval with the appropriate field office of the Minerals Management Service any instrument of assignment or other transfer of this lease, or any interest therein, in accordance with applicable regulations.

**Sec. 21. Surrender of Lease.** The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the appropriate field office of the Minerals Management Service a written relinquishment, in triplicate, which shall be effective as of the date of filing. No surrender of this lease or of any portion of the leased area shall relieve the Lessee or its surety of the obligation to pay all accrued rentals, royalties, and other financial obligations or to abandon all wells on the area to be surrendered in a manner satisfactory to the Director.

(Continued on reverse)

Page 3

**Sec. 22. Removal of Property on Termination of Lease.** Within a period of 1 year after termination of this lease in whole or in part, the Lessee shall remove all devices, works, and structures from the premises no longer subject to the lease in accordance with applicable regulations and Orders of the Director. However, the Lessee may, with the approval of the Director, continue to maintain devices, works, and structures on the leased area for drilling or producing on other leases.

**Sec. 23. Remedies in Case of Default.**

(a) Whenever the Lessee fails to comply with any of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease, the lease shall be subject to cancellation in accordance with the provisions of section 5(c) and (d) of the Act and the Lessor may exercise any other remedies which the Lessor may have, including the penalty provisions of section 24 of the Act. Furthermore, pursuant to section 8(o) of the Act, the Lessor may cancel the lease if it is obtained by fraud or misrepresentation.

(b) Nonenforcement by the Lessor of a remedy for any particular violation of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease or the exercise of any other remedies under paragraph (a) of this section for any other violation or for the same violation occurring at any other time.

**Sec. 24. Unlawful Interest.** No member of, or Delegate to, Congress, or Resident Commissioner, after election or appointment, or either before or after they have qualified and during their continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR Part 20, shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom. The provisions of Section 3741 of the Revised Statutes, as amended, 41 U.S.C. 22, and the Act of June 25, 1948, 62 Stat. 702, as amended, 18 U.S.C. 431-433, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease insofar as they may be applicable.

Devon Energy Production Company, L.P.
By: Devon Energy Management Company, L.L.C.
General Partner (Lessee)

---
(Signature of Authorized Officer)

Mark K. Gress
---
(Name of Signatory)

Agent & Attorney-in-fact
---
(Title)

May 8, 2001
---
(Date)

THE UNITED STATES OF AMERICA, Lessor

*Chris C. Oynes*
---
(Signature of Authorized Officer)

**Chris C. Oynes**
---
(Name of Signatory)

Regional Director
Gulf of Mexico OCS Region
Minerals Management Service
---
(Title)

MAY 1 6 2001
---
(Date)

P.O. Box 4616, Houston, TX  77210-4616
---
(Address of Lessee)

*If this lease is executed by a corporation, it must bear the corporate seal.*

**OCS-G 23735**

Form MMS-2005 (March 1986)
(Supersedes MMS-2005 August 1982)

| | |
|---|---|
| Office **New Orleans, LA** | Serial number **OCS-G 23735** |
| Cash bonus **$7,355,500.00** | Rental rate per acre, hectare or fraction thereof **$5.00 per acre** |
| Minimum royalty rate per acre, hectare or fraction thereof **$5.00 per acre** | Royalty rate **16 2/3 percent** |
| | Profit share rate |

## UNITED STATES
## DEPARTMENT OF THE INTERIOR
## MINERALS MANAGEMENT SERVICE

### OIL AND GAS LEASE OF
### SUBMERGED LANDS UNDER THE
### OUTER CONTINENTAL SHELF LANDS ACT

*This form does not constitute an information collection as defined by 44 U.S.C. 3502 and therefore does not require approval by the Office of Management and Budget.*

This lease is effective as of **1 JUL 2002** (hereinafter called the "Effective Date") and shall continue for an initial period of **five** years (hereinafter called the "Initial Period") by and between the United States of America (hereinafter called the "Lessor"), by the **Regional Director, Gulf of Mexico OCS Region**, Minerals Management Service, its authorized officer, and

**Dominion Exploration & Production, Inc.**        **75.0%**

**Spinnaker Exploration Company, L.L.C.**        **25.0%**

RECEIVED
JUN 03 2002
ADJUDICATION UNIT
MS 5421

(hereinafter called the "Lessee").  In consideration  of any cash payment heretofore made by the Lessee  to  the  Lessor and in consideration of the promises, terms, conditions, and covenants  contained herein,  including  the  Stipulation(s) numbered **6** attached hereto, the Lessee and Lessor agree as follows:

**Sec. 1.  Statutes and Regulations.**  This lease is issued pursuant to the Outer Continental Shelf Lands Act  of August 7, 1953, 67 Stat. 462; 43 U.S.C. 1331 et seq., as amended (92 Stat. 629),  (hereinafter called the "Act").  The lease  is issued subject to the Act; all regulations issued pursuant to the Act and in existence upon  the Effective Date of this lease; all regulations  issued pursuant  to  the  statute  in  the  future  which provide  for the prevention of waste and conservation of  the natural resources  of the  Outer  Continental  Shelf and the protection of correlative rights therein; and all other applicable statutes and  regulations.

**Sec. 2.  Rights of Lessee.**  The Lessor  hereby grants and leases to the Lessee the exclusive right and privilege to drill for, develop, and produce oil and gas resources,  except helium gas,  in  the submerged lands of the Outer Continental Shelf containing approximately **5,000.00** acres or hectares (hereinafter referred to as the "leased area"), described as follows:

### All of Block 72, West Cameron Area, OCS Leasing Map, Louisiana Map No. 1.

This lease may be eligible for a royalty suspension volume on the first 20 billion cubic feet of its new deep gas production pursuant to regulations at 30 CFR 260 and the Final Notice of Sale 182. If eligible, Section 6 of this lease instrument will be amended by addendum, pages 2a and 2b, attached hereto and made a part hereof.

This lease may be eligible for a lease term extension consistent with 30 CFR 250.180(e), provided the lease has a potential subsalt hydrocarbon objective, pursuant to NTL No. 2000-G22, effective December 22, 2000.

These rights include:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations in accordance with applicable regulations;

(b) the nonexclusive right to drill water wells within the leased area, unless the water is part of geopressured-geothermal and associated resources, and to use the water produced therefrom for operations pursuant to the Act free of cost, on the condition that the drilling is conducted in accordance with procedures approved by the Director of the Minerals Management Service or the Director's delegate (hereinafter called the "Director"); and

(c) the right to construct or erect and to maintain within the leased area artificial islands, installations, and other devices permanently or temporarily attached to the seabed and other works and structures necessary to the full enjoyment of the lease, subject to compliance with applicable laws and regulations.

**Sec. 3. Term.** This lease shall continue from the Effective Date of the lease for the Initial Period and so long thereafter as oil or gas is produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Lessor, are conducted thereon, or as otherwise provided by regulation.

**Sec. 4. Rentals.** The Lessee shall pay the Lessor, on or before the first day of each lease year which commences prior to a discovery in paying quantities of oil or gas on the leased area, a rental as shown on the face hereof.

**Sec. 5. Minimum Royalty.** The Lessee shall pay the Lessor, at the expiration of each lease year which commences after a discovery of oil and gas in paying quantities, a minimum royalty as shown on the face hereof or, if there is production, the difference between the actual royalty required to be paid with respect to such lease year and the prescribed minimum royalty if the actual royalty paid is less than the minimum royalty.

**Sec. 6. Royalty on Production.**

(a) The Lessee shall pay a fixed royalty as shown on the face hereof in amount or value of production saved, removed, or sold from the leased area. Gas (except helium) and oil of all kinds are subject to royalty. Any Lessee is liable for royalty payments on oil or gas lost or wasted from a lease site when such loss or waste is due to negligence on the part of the operator of the lease, or due to the failure to comply with any rule or regulation, order, or citation issued under the Federal Oil and Gas Royalty Management Act of 1982 or the Act. The Lessor shall determine whether production royalty shall be paid in amount or value.

(b) The value of production for purposes of computing royalty on production from this lease shall never be less than the fair market value of the production. The value of production shall be the estimated reasonable value of the production as determined by the Lessor, due consideration being given to the highest price paid for production of like quality in the same field or area, to the price received by the Lessee, to posted prices, to regulated prices, and to other relevant matters. Except when the Lessor, in its discretion, determines not to consider special pricing relief from otherwise applicable Federal regulatory requirements, the value of production for the purposes of computing royalty shall not be deemed to be less than the gross proceeds accruing to the Lessee from the sale thereof. In the absence of good reason to the contrary, value

computed on the basis of the highest price paid or offered at the time of production in a fair and open market for the major portion of like-quality products produced and sold from the field or area where the leased area is situated will be considered to be a reasonable value.

(c) When paid in value, royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained, unless the Lessor designates a later time. When paid in amount, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessor's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point.

**Sec. 7. Payments.** The Lessee shall make all payments (rentals, royalties and any other payments required by this lease) to the Lessor by electronic transfer of funds, check, draft on a solvent bank, or money order unless otherwise provided by regulations or by direction of the Lessor. Rentals, royalties, and any other payments required by this lease shall be made payable to the Minerals Management Service and tendered to the Director. Determinations made by the Lessor as to the amount of payment due shall be presumed to be correct and paid as due.

**Sec. 8. Bonds.** The Lessee shall maintain at all times the bond(s) required by regulation prior to the issuance of the lease and shall furnish such additional security as may be required by the Lessor if, after operations have begun, the Lessor deems such additional security to be necessary.

**Sec. 9. Plans.** The Lessee shall conduct all operations on the leased area in accordance with approved exploration plans and approved development and production plans as are required by regulations. The Lessee may depart from an approved plan only as provided by applicable regulations.

**Sec. 10. Performance.** The Lessee shall comply with all regulations and Orders. After due notice in writing, the Lessee shall drill such wells and produce at such rates as the Lessor may require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles.

**Sec. 11. Directional Drilling.** A directional well drilled under the leased area from a surface location on nearby land not covered by this lease shall be deemed to have the same effect for all purposes of the lease as a well drilled from a surface location on the leased area. In those circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the nearby land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on nearby land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations on the leased area for all purposes of the lease. Nothing contained in this Section shall be construed as granting to the Lessee any interest, license, easement, or other right in any nearby land.

Page 2

### SALE 182 LEASE ADDENDUM

*To the following extent, Sections 4, 5, and 6 of this lease instrument are amended by addendum pursuant to the Final Notice of Sale 182 in accordance with revised rental/minimum royalty requirements and suspension of royalty on production.*

**Sec. 4. <u>Rentals.</u>**

Notwithstanding the language in Sec. 4 of the lease instrument, annual rental shall be paid until the start of royalty-bearing production, to be paid at the beginning of the lease year until a discovery in paying quantities of oil or gas is made, then at the end of the lease year until the start of royalty-bearing production.

**Sec. 5. <u>Minimum Royalty.</u>**

Notwithstanding the language in Sec. 5 of the lease instrument, minimum royalty shall be paid after the start of royalty-bearing production, to be paid at the end of the lease year.

**Sec. 6. <u>Royalty on Production.</u>**

Notwithstanding the language in Sec. 6 of the lease instrument, and in accordance with regulations at 30 CFR 260, the following royalty suspension provisions for shallow water deep gas production apply to this lease:

1. This lease will receive a royalty suspension on the first 20 billion cubic feet of its deep gas production if the lessee drills a new deep gas reservoir (15,000 feet or greater subsea) and commences production within the first 5 years of the life of the lease (does not include lease extensions due to the granting of a suspension). Deep gas is defined as any gas production from a completion with the top of perforated interval 15,000 feet or greater subsea (true vertical depth below the datum at mean sea level). The lessee must notify the Regional Supervisor, Office of Production and Development, Gulf of Mexico OCS Region, in writing upon the commencement of such deep gas production.

2. Liquid hydrocarbons (oil and condensate) which exist in liquid form at standard conditions after passing through separating facilities will be subject to royalty payments.

3. This lease will not receive the royalty suspension for a well drilled into a deep gas reservoir that has produced on any current lease. In addition, the lease will not receive the royalty suspension if any deep gas reservoir on that lease has produced.

4. Any volumes of deep gas production that are not normally royalty-bearing under the lease terms or regulations (e.g. fuel gas) do not count against royalty suspension volumes.

5. Production includes deep gas volumes allocated to a lease under an approved unit agreement.

6. The royalty suspension will continue through the end of the month in which cumulative production from deep gas reservoirs on the lease reaches the applicable royalty suspension volume or the lease period ends, whichever comes first.

Page 2a

7. The lessee must pay the rental fee at the end of each lease year during the period of royalty suspension. A rental fee is not due if the royalty payment during the lease year (for other lease production and under A.6. and A.8.) exceeds the rental amount.

8. The lessee must pay royalty on natural gas production that would otherwise receive royalty suspension, and such production will count towards the royalty suspension volume, in any calendar year during which the arithmetic average of the closing prices for the nearby delivery month on the NYMEX for natural gas exceeds the adjusted gas price threshold.

   a) The base level price threshold for natural gas is set at $5.00 per million British thermal units (MMBTU) in 2000. The adjusted gas price threshold in any subsequent calendar year is computed by changing the base price by the percentage by which the implicit price deflator for the gross domestic product has changed.

   b) As an example, suppose the computation for the deflator indicates that inflation was 3% in 2001 and 4% in 2002. Then the adjusted price threshold per MMBTU would become $5.15 in 2001 and $5.36 in 2002 for natural gas. Royalty on all natural gas production in calendar year 2002 would be due if the 2002 average NYMEX natural gas price exceeded $5.36 per MMBTU.

   c) MMS will provide notice when this adjusted price threshold is exceeded. Also, information on price thresholds is available at the MMS website (www.mms.gov/econ).

   d) The lessee must pay the royalty due under this paragraph plus late payment interest by March 31 of the following calendar year.

9. There are no circumstances under which a single lease could receive a royalty suspension both for deep gas production and for deepwater production.

Page 2b

Stipulation No. 6 - Marine Protected Species

To reduce the potential taking of marine protected species (sea turtles, marine mammals, Gulf sturgeon, and other listed marine species):

(a)   MMS will condition all permits issued to lessees and their operators to require them to collect and remove flotsam resulting from activities related to exploration, development, and production of this lease.

(b)   MMS will condition all permits issued to lessees and their operators to require them to post signs in prominent places on all vessels and platforms used as a result of activities related to exploration, development, and production of this lease detailing the reasons (legal and ecological) why release of debris must be eliminated.

(c)   MMS will develop, in conjunction with NMFS, an observer training program. This program will include methods by which observers can report sightings of sea turtles and large whales and any possible takes of sea turtles or cetaceans resulting from vessel operations.

Lessees and operators will be instructed how to implement these mitigation measures in Notices To Lessees to be issued in 2002.

**DOMINION EXPLORATION & PRODUCTION, INC.**

_____
(Lessee)

_____
(Signature of Authorized Officer)

MICHAEL A. ACKAL, JR.

_____
(Name of Signatory)

Agent and Attorney-in-Fact

_____
(Title)

MAY 3 1 2002

_____
(Date)

DOMINION EXPLORATION &
PRODUCTION, INC.
1450 POYDRAS STREET
NEW ORLEANS, LA 70112-6000

_____
(Address of Lessee)

_____
(Lessee)

_____
(Signature of Authorized Officer)

_____
(Name of Signatory)

_____
(Title)

_____
(Date)

_____
(Address of Lessee)

_____
(Lessee)

_____
(Signature of Authorized Officer)

_____
(Name of Signatory)

_____
(Title)

_____
(Date)

_____
(Address of Lessee)

_____
(Lessee)

_____
(Signature of Authorized Officer)

_____
(Name of Signatory)

_____
(Title)

_____
(Date)

_____
(Address of Lessee)

*If this lease is executed by a corporation, it must bear the corporate seal.*

_____
(Lessee)

_____
(Signature of Authorized Officer)

_____
(Name of Signatory)

_____
(Title)

_____
(Date)

_____
(Address of Lessee)

_____
(Lessee)

_____
(Signature of Authorized Officer)

_____
(Name of Signatory)

_____
(Title)

_____
(Date)

_____
(Address of Lessee)

_____
(Lessee)

_____
(Signature of Authorized Officer)

_____
(Name of Signatory)

_____
(Title)

_____
(Date)

_____
(Address of Lessee)

_____
(Lessee)

_____
(Signature of Authorized Officer)

_____
(Name of Signatory)

_____
(Title)

_____
(Date)

_____
(Address of Lessee)

*If this lease is executed by a corporation, it must bear the corporate seal.*

**Sec. 12. Safety Requirements.** The Lessee shall:

(a) maintain all places of employment within the leased area in compliance with occupational safety and health standards and, in addition, free from recognized hazards to employees of the Lessee or of any contractor or subcontractor operating within the lease area;

(b) maintain all operations within the leased area in compliance with regulations or orders intended to protect persons, property, and the environment on the Outer Continental Shelf; and

(c) allow prompt access, at the site of any operation subject to safety regulations, to any authorized Federal inspector and shall provide any documents and records which are pertinent to occupational or public health, safety, or environmental protection as may be requested.

**Sec. 13. Suspension and Cancellation.**

(a) The Lessor may suspend or cancel this lease pursuant to section 5 of the Act, and compensation shall be paid when provided by the Act.

(b) The Lessor may, upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by Congress or the President of the United States, suspend operations under the lease, as provided in section 12(c) of the Act, and just compensation shall be paid to the Lessee for such suspension.

**Sec. 14. Indemnification.** The Lessee shall indemnify the Lessor for, and hold it harmless from, any claim, including claims for loss or damage to property or injury to persons caused by or resulting from any operation on the leased area conducted by or on behalf of the Lessee. However, the Lessee shall not be held responsible to the Lessor under this section for any loss, damage, or injury caused by or resulting from:

(a) negligence of the Lessor other than the commission or omission of a discretionary function or duty on the part of a Federal Agency whether or not the discretion involved is abused; or

(b) the Lessee's compliance with an order or directive of the Lessor against which an administrative appeal by the Lessee is filed before the cause of action for the claim arises and is pursued diligently thereafter.

**Sec. 15. Disposition of Production.**

(a) As provided in section 27(a)(2) of the Act, the Lessor shall have the right to purchase not more than 16 2/3 percent by volume of the oil and gas produced pursuant to the lease at the regulated price or, if no regulated price applies, at the fair market value at the wellhead of the oil and gas saved, removed, or sold, except that any oil or gas obtained by the Lessor as royalty or net profit share shall be credited against the amount that may be purchased under this subsection.

(b) Pursuant to section 27(b) and (c) of the Act, the Lessor may offer and sell certain oil and gas obtained or purchased pursuant to a lease. As provided in section 27(d) of the Act, the Lessee shall take any Federal oil or gas for which no acceptable bids are received, as determined by the Lessor, and which is not transferred to a Federal Agency pursuant to section 27(a)(3) of the Act, and shall pay to the Lessor a cash amount equal to the regulated price or, if no regulated price applies, the fair market value of the oil or gas so obtained.

(c) As provided in section 8(b)(7) of the Act, the Lessee shall offer 20 percent of the crude oil, condensate, and natural gas liquids produced on the lease, at the market value and point of delivery as provided by regulations applicable to Federal royalty oil, to small or independent refiners as defined in the Emergency Petroleum Allocation Act of 1973.

(d) In time of war or when the president of the United States shall so prescribe, the Lessor shall have the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in section 12(b) of the Act.

**Sec. 16. Unitization, Pooling, and Drilling Agreements.** Within such time as the Lessor may prescribe, the Lessee shall subscribe to and operate under a unit, pooling, or drilling agreement embracing all or part of the lands subject to this lease as the Lessor may determine to be appropriate or necessary. Where any provision of a unit, pooling, or drilling agreement, approved by the Lessor, is inconsistent with a provision of this lease, the provision of the agreement shall govern.

**Sec. 17. Equal Opportunity Clause.** During the performance of this lease, the Lessee shall fully comply with paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended (reprinted in 41 CFR 60-1.4(a)), and the implementing regulations which are for the purpose of preventing employment discrimination against persons on the basis of race, color, religion, sex, or national origin. Paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended, are incorporated in this lease by reference.

**Sec. 18. Certification of Nonsegregated Facilities.** By entering into this lease, the Lessee certifies, as specified in 41 CFR 60-1.8, that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained. As used in this certification, the term "segregated facilities" means, but is not limited to, any waiting rooms, work areas, restrooms and washrooms, restaurants and other eating areas, timeclocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom, or otherwise. The Lessee further agrees that it will obtain identical certifications from proposed contractors and subcontractors prior to award of contracts or subcontracts unless they are exempt under 41 CFR 60-1.5.

**Sec. 19. Reservations to Lessor.** All rights in the leased area not expressly granted to the Lessee by the Act, the regulations, or this lease are hereby reserved to the Lessor. Without limiting the generality of the foregoing, reserved rights included:

(a) the right to authorize geological and geophysical exploration in the lease area which does not unreasonably interfere with or endanger actual operations under the lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands or to the treatment and shipment of products thereof by or under authority of the Lessor;

(b) the right to grant leases for any minerals other than oil and gas within the leased area, except that operations under such leases shall not unreasonably interfere with or endanger operations under this lease;

(c) the right, as provided in section 12(d) of the Act, to restrict operations in the leased area or any part thereof which may be designated by the Secretary of Defense, with approval of the President, as being within an area needed for national defense and, so long as such designation remains in effect, no operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense. If operations or production under this lease within any designated area are suspended pursuant to this paragraph, any payments of rentals and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

**Sec. 20. Transfer of Lease.** The Lessee shall file for approval with the appropriate field office of the Minerals Management Service any instrument of assignment or other transfer of this lease, or any interest therein, in accordance with applicable regulations.

**Sec. 21. Surrender of Lease.** The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the appropriate field office of the Minerals Management Service a written relinquishment, in triplicate, which shall be effective as of the date of filing. No surrender of this lease or of any portion of the leased area shall relieve the Lessee or its surety of the obligation to pay all accrued rentals, royalties, and other financial obligations or to abandon all wells on the area to be surrendered in a manner satisfactory to the Director.

(Continued on reverse)

Page 3

**Sec. 22. Removal of Property on Termination of Lease.** Within a period of 1 year after termination of this lease in whole or in part, the Lessee shall remove all devices, works, and structures from the premises no longer subject to the lease in accordance with applicable regulations and Orders of the Director. However, the Lessee may, with the approval of the Director, continue to maintain devices, works, and structures on the leased area for drilling or producing on other leases.

**Sec. 23. Remedies in Case of Default.**

(a) Whenever the Lessee fails to comply with any of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease, the lease shall be subject to cancellation in accordance with the provisions of section 5(c) and (d) of the Act and the Lessor may exercise any other remedies which the Lessor may have, including the penalty provisions of section 24 of the Act. Furthermore, pursuant to section 8(o) of the Act, the Lessor may cancel the lease if it is obtained by fraud or misrepresentation.

(b) Nonenforcement by the Lessor of a remedy for any particular violation of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease shall not prevent the cancellation of this lease or the exercise of any other remedies under paragraph (a) of this section for any other violation or for the same violation occurring at any other time.

**Sec. 24. Unlawful Interest.** No member of, or Delegate to, Congress, or Resident Commissioner, after election or appointment, or either before or after they have qualified and during their continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR Part 20, shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom. The provisions of Section 3741 of the Revised Statutes, as amended, 41 U.S.C. 22, and the Act of June 25, 1948, 62 Stat. 702, as amended, 18 U.S.C. 431-433, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease insofar as they may be applicable.

Spinnaker Exploration Company, L.L.C.
_____
(Lessee)

_____
(Signature of Authorized Officer)

Kelly M. Barnes
_____
(Name of Signatory)

Vice President-Land
_____
(Title)

May 30, 2002
_____
(Date)

THE UNITED STATES OF AMERICA, Lessor

_____
(Signature of Authorized Officer)

Charles J. Schoennagel
_____
(Name of Signatory)

Regional Director
Gulf of Mexico OCS Region
Minerals Management Service
_____
(Title)

1 4 JUL 2002
_____
(Date)

1200 Smith Street, Suite 800
Houston, Texas  77002
_____
(Address of Lessee)

*If this lease is executed by a corporation, it must bear the corporate seal.*

**OCS-G 23829**

**Form MMS-2005 (March 1986)**
**(Supersedes MMS-2005 August 1982)**

| Office **New Orleans, LA** | Serial number **OCS-G 23829** |
|---|---|
| Cash bonus **$228,660.00** | Rental rate per acre, hectare or fraction thereof **$5.00 per acre** |
| Minimum royalty rate per acre, hectare or fraction thereof **$5.00 per acre** | Royalty rate **16 2/3 percent** Profit share rate |

## UNITED STATES
## DEPARTMENT OF THE INTERIOR
## MINERALS MANAGEMENT SERVICE

### OIL AND GAS LEASE OF SUBMERGED LANDS UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

*This form does not constitute an information collection as defined by 44 U.S.C. 3502 and therefore does not require approval by the Office of Management and Budget.*

This lease is effective as of **1 JUN 2002** (hereinafter called the "Effective Date") and shall continue for an initial period of **five** years (hereinafter called the "Initial Period") by and between the United States of America (hereinafter called the "Lessor"), by the **Regional Director, Gulf of Mexico OCS Region**, Minerals Management Service, its authorized officer, and

**LLOG Exploration Offshore, Inc.**                    **100%**

RECEIVED 2002 MAY -8 A 4 01 MINERALS MGMT SERVICE GULF OF MEXICO OCS RGN

(hereinafter called the "Lessee"). In consideration of any cash payment heretofore made by the Lessee to the Lessor and in consideration of the promises, terms, conditions, and covenants contained herein, including the Stipulation(s) numbered **3 and 6** attached hereto, the Lessee and Lessor agree as follows:

**Sec. 1. Statutes and Regulations.** This lease is issued pursuant to the Outer Continental Shelf Lands Act of August 7, 1953, 67 Stat. 462; 43 U.S.C. 1331 et seq., as amended (92 Stat. 629), (hereinafter called the "Act"). The lease is issued subject to the Act; all regulations issued pursuant to the Act and in existence upon the Effective Date of this lease; all regulations issued pursuant to the statute in the future which provide for the prevention of waste and conservation of the natural resources of the Outer Continental Shelf and the protection of correlative rights therein; and all other applicable statutes and regulations.

**Sec. 2. Rights of Lessee.** The Lessor hereby grants and leases to the Lessee the exclusive right and privilege to drill for, develop, and produce oil and gas resources, except helium gas, in the submerged lands of the Outer Continental Shelf containing approximately **4,381.4** acres or hectares (hereinafter referred to as the "leased area"), described as follows:

### All of Block 272, Vermilion Area, South Addition, OCS Leasing Map, Louisiana Map No. 3B.

This lease may be eligible for a royalty suspension volume on the first 20 billion cubic feet of its new deep gas production pursuant to regulations at 30 CFR 260 and the Final Notice of Sale 182. If eligible, Section 6 of this lease instrument will be amended by addendum, pages 2a and 2b, attached hereto and made a part hereof.

This lease may be eligible for a lease term extension consistent with 30 CFR 250.180(e), provided the lease has a potential subsalt hydrocarbon objective, pursuant to NTL No. 2000-G22, effective December 22, 2000.

These rights include:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations in accordance with applicable regulations;

(b) the nonexclusive right to drill water wells within the leased area, unless the water is part of geopressured-geothermal and associated resources, and to use the water produced therefrom for operations pursuant to the Act free of cost, on the condition that the drilling is conducted in accordance with procedures approved by the Director of the Minerals Management Service or the Director's delegate (hereinafter called the "Director"); and

(c) the right to construct or erect and to maintain within the leased area artificial islands, installations, and other devices permanently or temporarily attached to the seabed and other works and structures necessary to the full enjoyment of the lease, subject to compliance with applicable laws and regulations.

**Sec. 3. Term.** This lease shall continue from the Effective Date of the lease for the Initial Period and so long thereafter as oil or gas is produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Lessor, are conducted thereon, or as otherwise provided by regulation.

**Sec. 4. Rentals.** The Lessee shall pay the Lessor, on or before the first day of each lease year which commences prior to a discovery in paying quantities of oil or gas on the leased area, a rental as shown on the face hereof.

**Sec. 5. Minimum Royalty.** The Lessee shall pay the Lessor, at the expiration of each lease year which commences after a discovery of oil and gas in paying quantities, a minimum royalty as shown on the face hereof or, if there is production, the difference between the actual royalty required to be paid with respect to such lease year and the prescribed minimum royalty if the actual royalty paid is less than the minimum royalty.

**Sec. 6. Royalty on Production.**

(a) The Lessee shall pay a fixed royalty as shown on the face hereof in amount or value of production saved, removed, or sold from the leased area. Gas (except helium) and oil of all kinds are subject to royalty. Any Lessee is liable for royalty payments on oil or gas lost or wasted from a lease site when such loss or waste is due to negligence on the part of the operator of the lease, or due to the failure to comply with any rule or regulation, order, or citation issued under the Federal Oil and Gas Royalty Management Act of 1982 or the Act. The Lessor shall determine whether production royalty shall be paid in amount or value.

(b) The value of production for purposes of computing royalty on production from this lease shall never be less than the fair market value of the production. The value of production shall be the estimated reasonable value of the production as determined by the Lessor, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field or area, to the price received by the Lessee, to posted prices, to regulated prices, and to other relevant matters. Except when the Lessor, in its discretion, determines not to consider special pricing relief from otherwise applicable Federal regulatory requirements, the value of production for the purposes of computing royalty shall not be deemed to be less than the gross proceeds accruing to the Lessee from the sale thereof. In the absence of good reason to the contrary, value

computed on the basis of the highest price paid or offered at the time of production in a fair and open market for the major portion of like-quality products produced and sold from the field or area where the leased area is situated will be considered to be a reasonable value.

(c) When paid in value, royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained, unless the Lessor designates a later time. When paid in amount, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessor's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point.

**Sec. 7. Payments.** The Lessee shall make all payments (rentals, royalties and any other payments required by this lease) to the Lessor by electronic transfer of funds, check, draft on a solvent bank, or money order unless otherwise provided by regulations or by direction of the Lessor. Rentals, royalties, and any other payments required by this lease shall be made payable to the Minerals Management Service and tendered to the Director. Determinations made by the Lessor as to the amount of payment due shall be presumed to be correct and paid as due.

**Sec. 8. Bonds.** The Lessee shall maintain at all times the bond(s) required by regulation prior to the issuance of the lease and shall furnish such additional security as may be required by the Lessor if, after operations have begun, the Lessor deems such additional security to be necessary.

**Sec. 9. Plans.** The Lessee shall conduct all operations on the leased area in accordance with approved exploration plans and approved development and production plans as are required by regulations. The Lessee may depart from an approved plan only as provided by applicable regulations.

**Sec. 10. Performance.** The Lessee shall comply with all regulations and Orders. After due notice in writing, the Lessee shall drill such wells and produce at such rates as the Lessor may require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles.

**Sec. 11. Directional Drilling.** A directional well drilled under the leased area from a surface location on nearby land not covered by this lease shall be deemed to have the same effect for all purposes of the lease as a well drilled from a surface location on the leased area. In those circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the nearby land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on nearby land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations on the leased area for all purposes of the lease. Nothing contained in this Section shall be construed as granting to the Lessee any interest, license, easement, or other right in any nearby land.

Page 2

*SALE 182 LEASE ADDENDUM*

*To the following extent, Sections 4, 5, and 6 of this lease instrument are amended by addendum pursuant to the Final Notice of Sale 182 in accordance with revised rental/minimum royalty requirements and suspension of royalty on production.*

**Sec. 4.  Rentals.**

Notwithstanding the language in Sec. 4 of the lease instrument, annual rental shall be paid until the start of royalty-bearing production, to be paid at the beginning of the lease year until a discovery in paying quantities of oil or gas is made, then at the end of the lease year until the start of royalty-bearing production.

**Sec. 5.  Minimum Royalty.**

Notwithstanding the language in Sec. 5 of the lease instrument, minimum royalty shall be paid after the start of royalty-bearing production, to be paid at the end of the lease year.

**Sec. 6.  Royalty on Production.**

Notwithstanding the language in Sec. 6 of the lease instrument, and in accordance with regulations at 30 CFR 260, the following royalty suspension provisions for shallow water deep gas production apply to this lease:

1. This lease will receive a royalty suspension on the first 20 billion cubic feet of its deep gas production if the lessee drills a new deep gas reservoir (15,000 feet or greater subsea) and commences production within the first 5 years of the life of the lease (does not include lease extensions due to the granting of a suspension).  Deep gas is defined as any gas production from a completion with the top of perforated interval 15,000 feet or greater subsea (true vertical depth below the datum at mean sea level).  The lessee must notify the Regional Supervisor, Office of Production and Development, Gulf of Mexico OCS Region, in writing upon the commencement of such deep gas production.

2. Liquid hydrocarbons (oil and condensate) which exist in liquid form at standard conditions after passing through separating facilities will be subject to royalty payments.

3. This lease will not receive the royalty suspension for a well drilled into a deep gas reservoir that has produced on any current lease.  In addition, the lease will not receive the royalty suspension if any deep gas reservoir on that lease has produced.

4. Any volumes of deep gas production that are not normally royalty-bearing under the lease terms or regulations (e.g. fuel gas) do not count against royalty suspension volumes.

5. Production includes deep gas volumes allocated to a lease under an approved unit agreement.

6. The royalty suspension will continue through the end of the month in which cumulative production from deep gas reservoirs on the lease reaches the applicable royalty suspension volume or the lease period ends, whichever comes first.

Page 2a

7. The lessee must pay the rental fee at the end of each lease year during the period of royalty suspension. A rental fee is not due if the royalty payment during the lease year (for other lease production and under A.6. and A.8.) exceeds the rental amount.

8. The lessee must pay royalty on natural gas production that would otherwise receive royalty suspension, and such production will count towards the royalty suspension volume, in any calendar year during which the arithmetic average of the closing prices for the nearby delivery month on the NYMEX for natural gas exceeds the adjusted gas price threshold.

   a) The base level price threshold for natural gas is set at $5.00 per million British thermal units (MMBTU) in 2000. The adjusted gas price threshold in any subsequent calendar year is computed by changing the base price by the percentage by which the implicit price deflator for the gross domestic product has changed.

   b) As an example, suppose the computation for the deflator indicates that inflation was 3% in 2001 and 4% in 2002. Then the adjusted price threshold per MMBTU would become $5.15 in 2001 and $5.36 in 2002 for natural gas. Royalty on all natural gas production in calendar year 2002 would be due if the 2002 average NYMEX natural gas price exceeded $5.36 per MMBTU.

   c) MMS will provide notice when this adjusted price threshold is exceeded. Also, information on price thresholds is available at the MMS website (www.mms.gov/econ).

   d) The lessee must pay the royalty due under this paragraph plus late payment interest by March 31 of the following calendar year.

9. There are no circumstances under which a single lease could receive a royalty suspension both for deep gas production and for deepwater production.

Page 2b

Stipulation No. 3 - Military Areas

A.  Hold and Save Harmless

Whether compensation for such damage or injury might be due
under a theory of strict or absolute liability or
otherwise, the lessee assumes all risks of damage or injury
to persons or property, which occur in, on, or above the
Outer Continental Shelf (OCS), to any persons or to any
property of any person or persons who are agents,
employees, or invitees of the lessee, its agents,
independent contractors, or subcontractors doing business
with the lessee in connection with any activities being
performed by the lessee in, on, or above the OCS, if such
injury or damage to such person or property occurs by
reason of the activities of any agency of the United States
Government, its contractors or subcontractors, or any of
its officers, agents or employees, being conducted as a
part of, or in connection with, the programs and activities
of the command headquarters listed in the following table.

Notwithstanding any limitation of the lessee's liability in
section 14 of the lease, the lessee assumes this risk
whether such injury or damage is caused in whole or in part
by any act or omission, regardless of negligence or fault,
of the United States, its contractors or subcontractors, or
any of its officers, agents, or employees.  The lessee
further agrees to indemnify and save harmless the United
States against all claims for loss, damage, or injury
sustained by the lessee, or to indemnify and save harmless
the United States against all claims for loss, damage, or
injury sustained by the agents, employees, or invitees of
the lessee, its agents, or any independent contractors or
subcontractors doing business with the lessee in connection
with the programs and activities of the aforementioned
military installation, whether the same be caused in whole
or in part by the negligence or fault of the United States,
its contractors, or subcontractors, or any of its officers,
agents, or employees and whether such claims might be
sustained under a theory of strict or absolute liability or
otherwise.

B.  Electromagnetic Emissions

The lessee agrees to control its own electromagnetic
emissions and those of its agents, employees, invitees,
independent contractors or subcontractors emanating from

individual designated defense warning areas in accordance
with requirements specified by the commander of the command
headquarters listed in the following table to the degree
necessary to prevent damage to, or unacceptable
interference with, Department of Defense flight, testing,
or operational activities, conducted within individual
designated warning areas.  Necessary monitoring control,
and coordination with the lessee, its agents, employees,
invitees, independent contractors or subcontractors, will
be effected by the commander of the appropriate onshore
military installation conducting operations in the
particular warning area; provided, however, that control of
such electromagnetic emissions shall in no instance
prohibit all manner of electromagnetic communication during
any period of time between a lessee, its agents, employees,
invitees, independent contractors or subcontractors and
onshore facilities.

C.  Operational

The lessee, when operating or causing to be operated on its
behalf, boat, ship, or aircraft traffic into the individual
designated warning areas shall enter into an agreement with
the commander of the individual command headquarters listed
in the following list, upon utilizing an individual
designated warning area prior to commencing such traffic.
Such an agreement will provide for positive control of
boats, ships, and aircraft operating into the warning areas
at all times.

    W-59:       Naval Air Station - JRB
                400 Russel Avenue
                Box 27
                New Orleans, Louisiana 70143-0027
                Telephone: (504) 391-8696/8687

Stipulation No. 6 - Marine Protected Species

To reduce the potential taking of marine protected species (sea turtles, marine mammals, Gulf sturgeon, and other listed marine species):

(a)  MMS will condition all permits issued to lessees and their operators to require them to collect and remove flotsam resulting from activities related to exploration, development, and production of this lease.

(b)  MMS will condition all permits issued to lessees and their operators to require them to post signs in prominent places on all vessels and platforms used as a result of activities related to exploration, development, and production of this lease detailing the reasons (legal and ecological) why release of debris must be eliminated.

(c)  MMS will develop, in conjunction with NMFS, an observer training program. This program will include methods by which observers can report sightings of sea turtles and large whales and any possible takes of sea turtles or cetaceans resulting from vessel operations.

Lessees and operators will be instructed how to implement these mitigation measures in Notices To Lessees to be issued in 2002.

**Sec. 12. Safety Requirements.** The Lessee shall:

(a) maintain all places of employment within the leased area in compliance with occupational safety and health standards and, in addition, free from recognized hazards to employees of the Lessee or of any contractor or subcontractor operating within the lease area;

(b) maintain all operations within the leased area in compliance with regulations or orders intended to protect persons, property, and the environment on the Outer Continental Shelf; and

(c) allow prompt access, at the site of any operation subject to safety regulations, to any authorized Federal inspector and shall provide any documents and records which are pertinent to occupational or public health, safety, or environmental protection as may be requested.

**Sec. 13. Suspension and Cancellation.**

(a) The Lessor may suspend or cancel this lease pursuant to section 5 of the Act, and compensation shall be paid when provided by the Act.

(b) The Lessor may, upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by Congress or the President of the United States, suspend operations under the lease, as provided in section 12(c) of the Act, and just compensation shall be paid to the Lessee for such suspension.

**Sec. 14. Indemnification.** The Lessee shall indemnify the Lessor for, and hold it harmless from, any claim, including claims for loss or damage to property or injury to persons caused by or resulting from any operation on the leased area conducted by or on behalf of the Lessee. However, the Lessee shall not be held responsible to the Lessor under this section for any loss, damage, or injury caused by or resulting from:

(a) negligence of the Lessor other than the commission or omission of a discretionary function or duty on the part of a Federal Agency whether or not the discretion involved is abused; or

(b) the Lessee's compliance with an order or directive of the Lessor against which an administrative appeal by the Lessee is filed before the cause of action for the claim arises and is pursued diligently thereafter.

**Sec. 15. Disposition of Production.**

(a) As provided in section 27(a)(2) of the Act, the Lessor shall have the right to purchase not more than 16 2/3 percent by volume of the oil and gas produced pursuant to the lease at the regulated price or, if no regulated price applies, at the fair market value at the wellhead of the oil and gas saved, removed, or sold, except that any oil or gas obtained by the Lessor as royalty or net profit share shall be credited against the amount that may be purchased under this subsection.

(b) Pursuant to section 27(b) and (c) of the Act, the Lessor may offer and sell certain oil and gas obtained or purchased pursuant to a lease. As provided in section 27(d) of the Act, the Lessee shall take any Federal oil or gas for which no acceptable bids are received, as determined by the Lessor, and which is not transferred to a Federal Agency pursuant to section 27(a)(3) of the Act, and shall pay to the Lessor a cash amount equal to the regulated price or, if no regulated price applies, the fair market value of the oil or gas so obtained.

(c) As provided in section 8(b)(7) of the Act, the Lessee shall offer 20 percent of the crude oil, condensate, and natural gas liquids produced on the lease, at the market value and point of delivery as provided by regulations applicable to Federal royalty oil, to small or independent refiners as defined in the Emergency Petroleum Allocation Act of 1973.

(d) In time of war or when the president of the United States shall so prescribe, the Lessor shall have the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in section 12(b) of the Act.

**Sec. 16. Unitization, Pooling, and Drilling Agreements.** Within such time as the Lessor may prescribe, the Lessee shall subscribe to and operate under a unit, pooling, or drilling agreement embracing all or part of the lands subject to this lease as the Lessor may determine to be appropriate or necessary. Where any provision of a unit, pooling, or drilling agreement, approved by the Lessor, is inconsistent with a provision of this lease, the provision of the agreement shall govern.

**Sec. 17. Equal Opportunity Clause.** During the performance of this lease, the Lessee shall fully comply with paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended (reprinted in 41 CFR 60-1.4(a)), and the implementing regulations which are for the purpose of preventing employment discrimination against persons on the basis of race, color, religion, sex, or national origin. Paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended, are incorporated in this lease by reference.

**Sec. 18. Certification of Nonsegregated Facilities.** By entering into this lease, the Lessee certifies, as specified in 41 CFR 60-1.8, that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained. As used in this certification, the term "segregated facilities" means, but is not limited to, any waiting rooms, work areas, restrooms and washrooms, restaurants and other eating areas, timeclocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom, or otherwise. The Lessee further agrees that it will obtain identical certifications from proposed contractors and subcontractors prior to award of contracts or subcontracts unless they are exempt under 41 CFR 60-1.5.

**Sec. 19. Reservations to Lessor.** All rights in the leased area not expressly granted to the Lessee by the Act, the regulations, or this lease are hereby reserved to the Lessor. Without limiting the generality of the foregoing, reserved rights included:

(a) the right to authorize geological and geophysical exploration in the lease area which does not unreasonably interfere with or endanger actual operations under the lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands or to the treatment and shipment of products thereof by or under authority of the Lessor;

(b) the right to grant leases for any minerals other than oil and gas within the leased area, except that operations under such leases shall not unreasonably interfere with or endanger operations under this lease;

(c) the right, as provided in section 12(d) of the Act, to restrict operations in the leased area or any part thereof which may be designated by the Secretary of Defense, with approval of the President, as being within an area needed for national defense and, so long as such designation remains in effect, no operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense. If operations or production under this lease within any designated area are suspended pursuant to this paragraph, any payments of rentals and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

**Sec. 20. Transfer of Lease.** The Lessee shall file for approval with the appropriate field office of the Minerals Management Service any instrument of assignment or other transfer of this lease, or any interest therein, in accordance with applicable regulations.

**Sec. 21. Surrender of Lease.** The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the appropriate field office of the Minerals Management Service a written relinquishment, in triplicate, which shall be effective as of the date of filing. No surrender of this lease or of any portion of the leased area shall relieve the Lessee or its surety of the obligation to pay all accrued rentals, royalties, and other financial obligations or to abandon all wells on the area to be surrendered in a manner satisfactory to the Director.

(Continued on reverse)

Page 3

**Sec. 22. Removal of Property on Termination of Lease.** Within a period of 1 year after termination of this lease in whole or in part, the Lessee shall remove all devices, works, and structures from the premises no longer subject to the lease in accordance with applicable regulations and Orders of the Director. However, the Lessee may, with the approval of the Director, continue to maintain devices, works, and structures on the leased area for drilling or producing on other leases.

**Sec. 23. Remedies in Case of Default.**

(a) Whenever the Lessee fails to comply with any of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease, the lease shall be subject to cancellation in accordance with the provisions of section 5(c) and (d) of the Act and the Lessor may exercise any other remedies which the Lessor may have, including the penalty provisions of section 24 of the Act. Furthermore, pursuant to section 8(o) of the Act, the Lessor may cancel the lease if it is obtained by fraud or misrepresentation.

(b) Nonenforcement by the Lessor of a remedy for any particular violation of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease shall not prevent the cancellation of this lease or the exercise of any other remedies under paragraph (a) of this section for any other violation or for the same violation occurring at any other time.

**Sec. 24. Unlawful Interest.** No member of, or Delegate to, Congress, or Resident Commissioner, after election or appointment, or either before or after they have qualified and during their continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR Part 20, shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom. The provisions of Section 3741 of the Revised Statutes, as amended, 41 U.S.C. 22, and the Act of June 25, 1948, 62 Stat. 702, as amended, 18 U.S.C. 431-433, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease insofar as they may be applicable.

LLOG Exploration Offshore, Inc.
_____
(Lessee)

_____
(Signature of Authorized Officer)

Harold N. Garic
_____
(Name of Signatory)

Treasurer
_____
(Title)

May 6, 2002
_____
(Date)


THE UNITED STATES OF AMERICA, Lessor

_____
(Signature of Authorized Officer)

Charles J. Schoennagel
_____
(Name of Signatory)

Regional Director
Gulf of Mexico OCS Region
Minerals Management Service
_____
(Title)

16 MAY 2002
_____
(Date)


433 Metairie Road, Suite 600
Metairie, Louisiana 70005
_____
(Address of Lessee)

*If this lease is executed by a corporation, it must bear the corporate seal.*

**OCS-G 24870**

Form MMS-2005 (March 1986)
(Supersedes MMS-2005 August 1982)

| | |
|---|---|
| Office **New Orleans, LA** | Serial number **OCS-G 24870** |
| Cash bonus **$405,900.00** | Rental rate per acre, hectare or fraction thereof **$5.00 per acre** |
| Minimum royalty rate per acre, hectare or fraction thereof **$5.00 per acre** | Royalty rate **16 2/3 percent** |
| | Profit share rate |

UNITED STATES
DEPARTMENT OF THE INTERIOR
MINERALS MANAGEMENT SERVICE

## OIL AND GAS LEASE OF SUBMERGED LANDS UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

*This form does not constitute an information collection as defined by 44 U.S.C. 3502 and therefore does not require approval by the Office of Management and Budget.*

This lease is effective as of **1 MAY 2003** (hereinafter called the "Effective Date") and shall continue for an initial period of **five** years (hereinafter called the "Initial Period") by and between the United States of America (hereinafter called the "Lessor"), by the **Regional Director, Gulf of Mexico OCS Region**, Minerals Management Service, its authorized officer, and

**LLOG Exploration Offshore, Inc.**                                    **100%**

RECEIVED
MINERALS MAGNT. SERVICE
APR 0 4 2003
GULF OF MEXICO OCS RGN.
ADJUDICATION UNIT

(hereinafter called the "Lessee").   In consideration of any cash payment heretofore made by the Lessee to the Lessor and in consideration of the promises, terms, conditions, and covenants contained herein, including the Stipulation(s) numbered **3 and 6** attached hereto, the Lessee and Lessor agree as follows:

**Sec. 1.  Statutes and Regulations.**  This lease is issued pursuant to the Outer Continental Shelf Lands Act of August 7, 1953, 67 Stat. 462; 43 U.S.C. 1331 et seq., as amended (92 Stat. 629),  (hereinafter called the "Act").  The lease is issued subject to the Act; all regulations issued pursuant to the Act and in existence upon the Effective Date of this lease; all regulations issued pursuant to the statute in the future which provide for the prevention of waste and conservation of the natural resources of the Outer Continental Shelf and the protection of correlative rights therein; and all other applicable statutes and regulations.

**Sec. 2.  Rights of Lessee.**  The Lessor hereby grants and leases to the Lessee the exclusive right and privilege to drill for, develop, and produce oil and gas resources,  except helium gas,  in the submerged lands of the Outer Continental Shelf containing approximately **3,076.74** acres or             hectares (hereinafter referred to as the "leased area"), described as follows:

### All of Block 87, South Marsh Island Area, South Addition, OCS Leasing Map, Louisiana Map No. 3C.

This lease may be eligible for a royalty suspension volume on the first 20 billion cubic feet of its new deep gas production pursuant to regulations at 30 CFR 260 and the Final Notice of Sale 185. If eligible, Section 6 of this lease instrument will be amended by addendum, pages 2a and 2b, attached hereto and made a part hereof.

This lease may be eligible for a lease term extension consistent with 30 CFR 250.180(e), provided the lease has a potential subsalt hydrocarbon objective, pursuant to NTL No. 2000-G22, effective December 22, 2000.

These rights include:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations in accordance with applicable regulations;

(b) the nonexclusive right to drill water wells within the leased area, unless the water is part of geopressured-geothermal and associated resources, and to use the water produced therefrom for operations pursuant to the Act free of cost, on the condition that the drilling is conducted in accordance with procedures approved by the Director of the Minerals Management Service or the Director's delegate (hereinafter called the "Director"); and

(c) the right to construct or erect and to maintain within the leased area artificial islands, installations, and other devices permanently or temporarily attached to the seabed and other works and structures necessary to the full enjoyment of the lease, subject to compliance with applicable laws and regulations.

**Sec. 3. Term.** This lease shall continue from the Effective Date of the lease for the Initial Period and so long thereafter as oil or gas is produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Lessor, are conducted thereon, or as otherwise provided by regulation.

**Sec. 4. Rentals.** The Lessee shall pay the Lessor, on or before the first day of each lease year which commences prior to a discovery in paying quantities of oil or gas on the leased area, a rental as shown on the face hereof.

**Sec. 5. Minimum Royalty.** The Lessee shall pay the Lessor, at the expiration of each lease year which commences after a discovery of oil and gas in paying quantities, a minimum royalty as shown on the face hereof or, if there is production, the difference between the actual royalty required to be paid with respect to such lease year and the prescribed minimum royalty if the actual royalty paid is less than the minimum royalty.

**Sec. 6. Royalty on Production.**

(a) The Lessee shall pay a fixed royalty as shown on the face hereof in amount or value of production saved, removed, or sold from the leased area. Gas (except helium) and oil of all kinds are subject to royalty. Any Lessee is liable for royalty payments on oil or gas lost or wasted from a lease site when such loss or waste is due to negligence on the part of the operator of the lease, or due to the failure to comply with any rule or regulation, order, or citation issued under the Federal Oil and Gas Royalty Management Act of 1982 or the Act. The Lessor shall determine whether production royalty shall be paid in amount or value.

(b) The value of production for purposes of computing royalty on production from this lease shall never be less than the fair market value of the production. The value of production shall be the estimated reasonable value of the production as determined by the Lessor, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field or area, to the price received by the Lessee, to posted prices, to regulated prices, and to other relevant matters. Except when the Lessor, in its discretion, determines not to consider special pricing relief from otherwise applicable Federal regulatory requirements, the value of production for the purposes of computing royalty shall not be deemed to be less than the gross proceeds accruing to the Lessee from the sale thereof. In the absence of good reason to the contrary, value

computed on the basis of the highest price paid or offered at the time of production in a fair and open market for the major portion of like-quality products produced and sold from the field or area where the leased area is situated will be considered to be a reasonable value.

(c) When paid in value, royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained, unless the Lessor designates a later time. When paid in amount, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessor's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement for the reasonable cost of transporting the royalty substance to such delivery point.

**Sec. 7. Payments.** The Lessee shall make all payments (rentals, royalties and any other payments required by this lease) to the Lessor by electronic transfer of funds, check, draft on a solvent bank, or money order unless otherwise provided by regulations or by direction of the Lessor. Rentals, royalties, and any other payments required by this lease shall be made payable to the Minerals Management Service and tendered to the Director. Determinations made by the Lessor as to the amount of payment due shall be presumed to be correct and paid as due.

**Sec. 8. Bonds.** The Lessee shall maintain at all times the bond(s) required by regulation prior to the issuance of the lease and shall furnish such additional security as may be required by the Lessor if, after operations have begun, the Lessor deems such additional security to be necessary.

**Sec. 9. Plans.** The Lessee shall conduct all operations on the leased area in accordance with approved exploration plans and approved development and production plans as are required by regulations. The Lessee may depart from an approved plan only as provided by applicable regulations.

**Sec. 10. Performance.** The Lessee shall comply with all regulations and Orders. After due notice in writing, the Lessee shall drill such wells and produce at such rates as the Lessor may require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles.

**Sec. 11. Directional Drilling.** A directional well drilled under the leased area from a surface location on nearby land not covered by this lease shall be deemed to have the same effect for all purposes of the lease as a well drilled from a surface location on the leased area. In those circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the nearby land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on nearby land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations on the leased area for all purposes of the lease. Nothing contained in this Section shall be construed as granting to the Lessee any interest, license, easement, or other right in any nearby land.

Page 2

*SALE 185 LEASE ADDENDUM*

*To the following extent, Sections 4, 5, and 6 of this lease instrument are amended by addendum pursuant to the Final Notice of Sale 185 in accordance with revised rental/minimum royalty requirements and suspension of royalty on production.*

## Sec. 4.  Rentals.

Notwithstanding the language in Sec. 4 of the lease instrument, annual rental shall be paid until the start of royalty-bearing production, to be paid at the beginning of the lease year until a discovery in paying quantities of oil or gas is made, then at the end of the lease year until the start of royalty-bearing production.

## Sec. 5.  Minimum Royalty.

Notwithstanding the language in Sec. 5 of the lease instrument, minimum royalty shall be paid after the start of royalty-bearing production, to be paid at the end of the lease year.

## Sec. 6.  Royalty on Production.

Notwithstanding the language in Sec. 6 of the lease instrument, and in accordance with regulations at 30 CFR 260, the following royalty suspension provisions for shallow water deep gas production apply to this lease:

1. This lease will receive a royalty suspension on the first 20 billion cubic feet of its deep gas production if the lease is in less than 200 meters of water and if the lessee drills a new deep gas reservoir or reservoirs (15,000 feet or greater subsea) and commences production within 5 years from lease issuance, i.e., not extended by lease suspension.  Deep gas is defined as any gas production from a completion with the top of perforated interval 15,000 feet or greater subsea (true vertical depth below the datum at mean sea level). The lessee must notify the Regional Supervisor, Office of Production and Development, Gulf of Mexico OCS Region, in writing upon the commencement of such deep gas production.  Only one royalty suspension volume is available per lease.

2. Liquid hydrocarbons (oil and condensate) which exist in liquid form at standard conditions after passing through separating facilities will be subject to royalty payments.

3. This lease will not receive the royalty suspension for a well drilled into a deep gas reservoir that has produced on any current lease.

4. Any volumes of deep gas production that are not normally royalty-bearing under the lease terms or regulations (e.g. fuel gas) do not count against royalty suspension volumes.

5. Production includes deep gas volumes allocated to a lease under an approved unit agreement.

Page 2a

6.  The royalty suspension will continue through the end of the month in which cumulative production from deep gas reservoir(s) on the lease reaches the applicable royalty suspension volume or the lease period ends.  Lease period means the time from lease issuance until relinquishment, expiration, or termination.

7.  The lessee must pay the rental fee at the end of each lease year during the period of royalty suspension.  A rental fee is not due if the royalty payment during the lease year (for other lease production and under numbered paragraphs 6 and 8 herein) exceeds the rental amount.

8.  The lessee must pay royalty on natural gas production that would otherwise receive royalty suspension, and such production will count towards the royalty suspension volume, in any calendar year during which the arithmetic average of the closing prices for the nearby delivery month on the NYMEX for natural gas exceeds the adjusted gas price threshold.

    a)  The base level price threshold for natural gas is set at $5.00 per million British thermal units (MMBTU) in 2000.  The adjusted gas price threshold in any subsequent calendar year is computed by changing the base price by the percentage by which the implicit price deflator for the gross domestic product has changed.

    b)  As an example, suppose the computation for the deflator indicates that inflation was 3% in 2001 and 4% in 2002.  Then the adjusted price threshold per MMBTU would become $5.15 in 2001 and $5.36 in 2002 for natural gas. Royalty on all natural gas production in calendar year 2002 would be due if the 2002 average NYMEX natural gas price exceeded $5.36 per MMBTU.

    c)  MMS will provide notice when this adjusted price threshold is exceeded.  Also, information on price thresholds is available at the MMS website (www.mms.gov/econ).

    d)  The lessee must pay the royalty due under this paragraph plus late payment interest by March 31 of the following calendar year.

9.  There are no circumstances under which a single lease could receive a royalty suspension both for deep gas production and for deepwater production.

**Stipulation No. 3 - Military Areas**

A. Hold and Save Harmless

Whether compensation for such damage or injury might be due under a theory of strict or absolute liability or otherwise, the lessee assumes all risks of damage or injury to persons or property, which occur in, on, or above the Outer Continental Shelf (OCS), to any persons or to any property of any person or persons who are agents, employees, or invitees of the lessee, its agents, independent contractors, or subcontractors doing business with the lessee in connection with any activities being performed by the lessee in, on, or above the OCS, if such injury or damage to such person or property occurs by reason of the activities of any agency of the United States Government, its contractors or subcontractors, or any of its officers, agents or employees, being conducted as a part of, or in connection with, the programs and activities of the command headquarters listed in the following table.

Notwithstanding any limitation of the lessee's liability in section 14 of the lease, the lessee assumes this risk whether such injury or damage is caused in whole or in part by any act or omission, regardless of negligence or fault, of the United States, its contractors or subcontractors, or any of its officers, agents, or employees. The lessee further agrees to indemnify and save harmless the United States against all claims for loss, damage, or injury sustained by the lessee, or to indemnify and save harmless the United States against all claims for loss, damage, or injury sustained by the agents, employees, or invitees of the lessee, its agents, or any independent contractors or subcontractors doing business with the lessee in connection with the programs and activities of the aforementioned military installation, whether the same be caused in whole or in part by the negligence or fault of the United States, its contractors, or subcontractors, or any of its officers, agents, or employees and whether such claims might be sustained under a theory of strict or absolute liability or otherwise.

B. Electromagnetic Emissions

The lessee agrees to control its own electromagnetic emissions and those of its agents, employees, invitees, independent contractors or subcontractors emanating from individual designated defense warning areas in accordance with requirements specified by the commander of the command headquarters listed in the following table to the degree necessary to prevent damage to, or unacceptable interference with, Department of Defense flight, testing, or operational activities, conducted within individual designated warning areas. Necessary monitoring control, and coordination with the lessee, its agents, employees, invitees, independent contractors or subcontractors, will be effected by the commander of the appropriate onshore military installation conducting operations in the particular warning area; provided, however, that control of such electromagnetic emissions shall in no instance prohibit all manner of electromagnetic communication during any period of time between a lessee, its agents, employees, invitees, independent contractors or subcontractors and onshore facilities.

C. Operational

        The lessee, when operating or causing to be operated on its behalf, boat, ship, or aircraft traffic into the individual designated warning areas shall enter into an agreement with the commander of the individual command headquarters listed in the following list, upon utilizing an individual designated warning area prior to commencing such traffic.  Such an agreement will provide for positive control of boats, ships, and aircraft operating into the warning areas at all times.

W-59                  Naval Air Station - JRB
                             400 Russel Avenue
                             Box 27
                             New Orleans, Louisiana 70143-0027
                             Telephone: (504) 391-8696/8687

**Stipulation No. 6 - Protected Species**

To reduce the potential taking of Federally protected species (e.g., sea turtles, marine mammals, Gulf sturgeon, and other listed species):

(a)   MMS will condition all permits issued to lessees and their operators to require them to collect and remove flotsam resulting from activities related to exploration, development, and production of this lease.

(b)   MMS will condition all permits issued to lessees and their operators to require them to post signs in prominent places on all vessels and platforms used as a result of activities related to exploration, development, and production of this lease detailing the reasons (legal and ecological) why release of debris must be eliminated.

(c)   MMS will develop, in conjunction with National Oceanic and Atmospheric Administration Fisheries, an observer training program to minimize the risk of vessel strikes to protected species.

(d)   MMS will require that all seismic surveys employ mandatory mitigation measures to include the use of a 500 meter impact zone based on the appropriate water depth, visual observers, and ramp-up procedures. Seismic operations must immediately cease when a sperm whale is detected within the 500 meter impact zone. Ramp-up procedures and seismic surveys may be initiated only during daylight.

(e)   MMS will require lessees and operators to instruct offshore personnel to immediately report all sightings and locations of injured or dead endangered and threatened species (e.g. sea turtles and whales) to the MMS. If oil and gas industry activity is responsible for the injured or dead animals (e.g. because of a vessel strike), the MMS shall require the responsible parties to assist the respective salvage and stranding network as appropriate.

(f)   MMS will require oil spill contingency planning to identify important habitats, including designated critical habitat, used by listed species (e.g. sea turtle nesting beaches, piping plover critical habitat), and require the strategic placement of spill cleanup equipment to be used only by personnel trained in less-intrusive cleanup techniques on beach and bay shores.

Lessees and operators will be instructed how to implement these mitigation measures in Notices To Lessees.

**Sec. 12. Safety Requirements.** The Lessee shall:

(a) maintain all places of employment within the leased area in compliance with occupational safety and health standards and, in addition, free from recognized hazards to employees of the Lessee or of any contractor or subcontractor operating within the lease area;

(b) maintain all operations within the leased area in compliance with regulations or orders intended to protect persons, property, and the environment on the Outer Continental Shelf; and

(c) allow prompt access, at the site of any operation subject to safety regulations, to any authorized Federal inspector and shall provide any documents and records which are pertinent to occupational or public health, safety, or environmental protection as may be requested.

**Sec. 13. Suspension and Cancellation.**

(a) The Lessor may suspend or cancel this lease pursuant to section 5 of the Act, and compensation shall be paid when provided by the Act.

(b) The Lessor may, upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by Congress or the President of the United States, suspend operations under the lease, as provided in section 12(c) of the Act, and just compensation shall be paid to the Lessee for such suspension.

**Sec. 14. Indemnification.** The Lessee shall indemnify the Lessor for, and hold it harmless from, any claim, including claims for loss or damage to property or injury to persons caused by or resulting from any operation on the leased area conducted by or on behalf of the Lessee. However, the Lessee shall not be held responsible to the Lessor under this section for any loss, damage, or injury caused by or resulting from:

(a) negligence of the Lessor other than the commission or omission of a discretionary function or duty on the part of a Federal Agency whether or not the discretion involved is abused; or

(b) the Lessee's compliance with an order or directive of the Lessor against which an administrative appeal by the Lessee is filed before the cause of action for the claim arises and is pursued diligently thereafter.

**Sec. 15. Disposition of Production.**

(a) As provided in section 27(a)(2) of the Act, the Lessor shall have the right to purchase not more than 16 2/3 percent by volume of the oil and gas produced pursuant to the lease at the regulated price or, if no regulated price applies, at the fair market value at the wellhead of the oil and gas saved, removed, or sold, except that any oil or gas obtained by the Lessor as royalty or net profit share shall be credited against the amount that may be purchased under this subsection.

(b) Pursuant to section 27(b) and (c) of the Act, the Lessor may offer and sell certain oil and gas obtained or purchased pursuant to a lease. As provided in section 27(d) of the Act, the Lessee shall take any Federal oil or gas for which no acceptable bids are received, as determined by the Lessor, and which is not transferred to a Federal Agency pursuant to section 27(a)(3) of the Act, and shall pay to the Lessor a cash amount equal to the regulated price or, if no regulated price applies, the fair market value of the oil or gas so obtained.

(c) As provided in section 8(b)(7) of the Act, the Lessee shall offer 20 percent of the crude oil, condensate, and natural gas liquids produced on the lease, at the market value and point of delivery as provided by regulations applicable to Federal royalty oil, to small or independent refiners as defined in the Emergency Petroleum Allocation Act of 1973.

(d) In time of war or when the president of the United States shall so prescribe, the Lessor shall have the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in section 12(b) of the Act.

**Sec. 16. Unitization, Pooling, and Drilling Agreements.** Within such time as the Lessor may prescribe, the Lessee shall subscribe to and operate under a unit, pooling, or drilling agreement embracing all or part of the lands subject to this lease as the Lessor may determine to be appropriate or necessary. Where any provision of a unit, pooling, or drilling agreement, approved by the Lessor, is inconsistent with a provision of this lease, the provision of the agreement shall govern.

**Sec. 17. Equal Opportunity Clause.** During the performance of this lease, the Lessee shall fully comply with paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended (reprinted in 41 CFR 60-1.4(a)), and the implementing regulations which are for the purpose of preventing employment discrimination against persons on the basis of race, color, religion, sex, or national origin. Paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended, are incorporated in this lease by reference.

**Sec. 18. Certification of Nonsegregated Facilities.** By entering into this lease, the Lessee certifies, as specified in 41 CFR 60-1.8, that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained. As used in this certification, the term "segregated facilities" means, but is not limited to, any waiting rooms, work areas, restrooms and washrooms, restaurants and other eating areas, timeclocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom, or otherwise. The Lessee further agrees that it will obtain identical certifications from proposed contractors and subcontractors prior to award of contracts or subcontracts unless they are exempt under 41 CFR 60-1.5.

**Sec. 19. Reservations to Lessor.** All rights in the leased area not expressly granted to the Lessee by the Act, the regulations, or this lease are hereby reserved to the Lessor. Without limiting the generality of the foregoing, reserved rights included:

(a) the right to authorize geological and geophysical exploration in the lease area which does not unreasonably interfere with or endanger actual operations under the lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands or to the treatment and shipment of products thereof by or under authority of the Lessor;

(b) the right to grant leases for any minerals other than oil and gas within the leased area, except that operations under such leases shall not unreasonably interfere with or endanger operations under this lease;

(c) the right, as provided in section 12(d) of the Act, to restrict operations in the leased area or any part thereof which may be designated by the Secretary of Defense, with approval of the President, as being within an area needed for national defense and, so long as such designation remains in effect, no operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense. If operations or production under this lease within any designated area are suspended pursuant to this paragraph, any payments of rentals and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

**Sec. 20. Transfer of Lease.** The Lessee shall file for approval with the appropriate field office of the Minerals Management Service any instrument of assignment or other transfer of this lease, or any interest therein, in accordance with applicable regulations.

**Sec. 21. Surrender of Lease.** The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the appropriate field office of the Minerals Management Service a written relinquishment, in triplicate, which shall be effective as of the date of filing. No surrender of this lease or of any portion of the leased area shall relieve the Lessee or its surety of the obligation to pay all accrued rentals, royalties, and other financial obligations or to abandon all wells on the area to be surrendered in a manner satisfactory to the Director.

(Continued on reverse)

**Sec. 22. Removal of Property on Termination of Lease.** Within a period of 1 year after termination of this lease in whole or in part, the Lessee shall remove all devices, works, and structures from the premises no longer subject to the lease in accordance with applicable regulations and Orders of the Director. However, the Lessee may, with the approval of the Director, continue to maintain devices, works, and structures on the leased area for drilling or producing on other leases.

**Sec. 23. Remedies in Case of Default.**

(a) Whenever the Lessee fails to comply with any of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease, the lease shall be subject to cancellation in accordance with the provisions of section 5(c) and (d) of the Act and the Lessor may exercise any other remedies which the Lessor may have, including the penalty provisions of section 24 of the Act. Furthermore, pursuant to section 8(o) of the Act, the Lessor may cancel the lease if it is obtained by fraud or misrepresentation.

(b) Nonenforcement by the Lessor of a remedy for any particular violation of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease shall not prevent the cancellation of this lease or the exercise of any other remedies under paragraph (a) of this section for any other violation or for the same violation occurring at any other time.

**Sec. 24. Unlawful Interest.** No member of, or Delegate to, Congress, or Resident Commissioner, after election or appointment, or either before or after they have qualified and during their continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR Part 20, shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom. The provisions of Section 3741 of the Revised Statutes, as amended, 41 U.S.C. 22, and the Act of June 25, 1948, 62 Stat. 702, as amended, 18 U.S.C. 431-433, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease insofar as they may be applicable.

LLOG Exploration Offshore, Inc.
_____
(Lessee)

_____
(Signature of Authorized Officer)

Kemberlia K. Ducote
_____
(Name of Signatory)

Secretary and Treasurer
_____
(Title)

April 2, 2003
_____
(Date)

THE UNITED STATES OF AMERICA, Lessor

_____
(Signature of Authorized Officer)

**Chris C. Oynes**
_____
(Name of Signatory)

Regional Director
Gulf of Mexico OCS Region
Minerals Management Service
_____
(Title)

15 APR 2003
_____
(Date)

433 Metairie Road, Suite 600
Metairie, Louisiana 70005
_____
(Address of Lessee)

*If this lease is executed by a corporation, it must bear the corporate seal.*

**OCS-G 24872**

Form MMS-2005 (March 1986)
(Supersedes MMS-2005 August 1982)

| | |
|---|---|
| Office **New Orleans, LA** | Serial number **OCS-G 24872** |

| Cash bonus **$455,900.00** | Rental rate per acre, hectare or fraction thereof **$5.00 per acre** |
|---|---|

UNITED STATES
DEPARTMENT OF THE INTERIOR
MINERALS MANAGEMENT SERVICE

## OIL AND GAS LEASE OF SUBMERGED LANDS UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

*This form does not constitute an information collection as defined by 44 U.S.C. 3502 and therefore does not require approval by the Office of Management and Budget.*

| Minimum royalty rate per acre, hectare or fraction thereof **$5.00 per acre** | Royalty rate **16 2/3 percent** Profit share rate |
|---|---|

This lease is effective as of **1 MAY 2003** (hereinafter called the "Effective Date") and shall continue for an initial period of **five** years (hereinafter called the "Initial Period") by and between the United States of America (hereinafter called the "Lessor"), by the **Regional Director, Gulf of Mexico OCS Region**, Minerals Management Service, its authorized officer, and

**LLOG Exploration Offshore, Inc.**                                    **100%**

RECEIVED
MINERALS MAGNT. SERVICE
APR 0 4 2003
GULF OF MEXICO OCS RGN.
ADJUDICATION UNIT

(hereinafter called the "Lessee").   In consideration of any cash payment heretofore made by the Lessee to the Lessor and in consideration of the promises, terms, conditions, and covenants contained herein, including the Stipulation(s) numbered **3 and 6** attached hereto, the Lessee and Lessor agree as follows:

**Sec. 1.  Statutes and Regulations.**  This lease is issued pursuant to the Outer Continental Shelf Lands Act of August 7, 1953, 67 Stat. 462; 43 U.S.C. 1331 et seq., as amended (92 Stat. 629), (hereinafter called the "Act").  The lease is issued subject to the Act; all regulations issued pursuant to the Act and in existence upon the Effective Date of this lease; all regulations issued pursuant to the statute in the future which provide for the prevention of waste and conservation of the natural resources of the Outer Continental Shelf and the protection of correlative rights therein; and all other applicable statutes and regulations.

**Sec. 2.  Rights of Lessee.**  The Lessor hereby grants and leases to the Lessee the exclusive right and privilege to drill for, develop, and produce oil and gas resources, except helium gas, in the submerged lands of the Outer Continental Shelf containing approximately **3,112.83** acres or              hectares (hereinafter referred to as the "leased area"), described as follows:

## All of Block 102, South Marsh Island Area, South Addition, OCS Leasing Map, Louisiana Map No. 3C.

This lease may be eligible for a royalty suspension volume on the first 20 billion cubic feet of its new deep gas production pursuant to regulations at 30 CFR 260 and the Final Notice of Sale 185. If eligible, Section 6 of this lease instrument will be amended by addendum, pages 2a and 2b, attached hereto and made a part hereof.

This lease may be eligible for a lease term extension consistent with 30 CFR 250.180(e), provided the lease has a potential subsalt hydrocarbon objective, pursuant to NTL No. 2000-G22, effective December 22, 2000.

These rights include:

(a) the nonexclusive right to conduct within the leased area geological and geophysical explorations in accordance with applicable regulations;

(b) the nonexclusive right to drill water wells within the leased area, unless the water is part of geopressured-geothermal and associated resources, and to use the water produced therefrom for operations pursuant to the Act free of cost, on the condition that the drilling is conducted in accordance with procedures approved by the Director of the Minerals Management Service or the Director's delegate (hereinafter called the "Director"); and

(c) the right to construct or erect and to maintain within the leased area artificial islands, installations, and other devices permanently or temporarily attached to the seabed and other works and structures necessary to the full enjoyment of the lease, subject to compliance with applicable laws and regulations.

**Sec. 3. Term.** This lease shall continue from the Effective Date of the lease for the Initial Period and so long thereafter as oil or gas is produced from the leased area in paying quantities, or drilling or well reworking operations, as approved by the Lessor, are conducted thereon, or as otherwise provided by regulation.

**Sec. 4. Rentals.** The Lessee shall pay the Lessor, on or before the first day of each lease year which commences prior to a discovery in paying quantities of oil or gas on the leased area, a rental as shown on the face hereof.

**Sec. 5. Minimum Royalty.** The Lessee shall pay the Lessor, at the expiration of each lease year which commences after a discovery of oil and gas in paying quantities, a minimum royalty as shown on the face hereof or, if there is production, the difference between the actual royalty required to be paid with respect to such lease year and the prescribed minimum royalty if the actual royalty paid is less than the minimum royalty.

**Sec. 6. Royalty on Production.**

(a) The Lessee shall pay a fixed royalty as shown on the face hereof in amount or value of production saved, removed, or sold from the leased area. Gas (except helium) and oil of all kinds are subject to royalty. Any Lessee is liable for royalty payments on oil or gas lost or wasted from a lease site when such loss or waste is due to negligence on the part of the operator of the lease, or due to the failure to comply with any rule or regulation, order, or citation issued under the Federal Oil and Gas Royalty Management Act of 1982 or the Act. The Lessor shall determine whether production royalty shall be paid in amount or value.

(b) The value of production for purposes of computing royalty on production from this lease shall never be less than the fair market value of the production. The value of production shall be the estimated reasonable value of the production as determined by the Lessor, due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field or area, to the price received by the Lessee, to posted prices, to regulated prices, and to other relevant matters. Except when the Lessor, in its discretion, determines not to consider special pricing relief from otherwise applicable Federal regulatory requirements, the value of production for the purposes of computing royalty shall not be deemed to be less than the gross proceeds accruing to the Lessee from the sale thereof. In the absence of good reason to the contrary, value

computed on the basis of the highest price paid or offered at the time of production in a fair and open market for the major portion of like-quality products produced and sold from the field or area where the leased area is situated will be considered to be a reasonable value.

(c) When paid in value, royalties on production shall be due and payable monthly on the last day of the month next following the month in which the production is obtained, unless the Lessor designates a later time. When paid in amount, such royalties shall be delivered at pipeline connections or in tanks provided by the Lessee. Such deliveries shall be made at reasonable times and intervals and, at the Lessor's option, shall be effected either (i) on or immediately adjacent to the leased area, without cost to the Lessor, or (ii) at a more convenient point closer to shore or on shore, in which event the Lessee shall be entitled to reimbursement of the reasonable cost of transporting the royalty substance to such delivery point.

**Sec. 7. Payments.** The Lessee shall make all payments (rentals, royalties and any other payments required by this lease) to the Lessor by electronic transfer of funds, check, draft on a solvent bank, or money order unless otherwise provided by regulations or by direction of the Lessor. Rentals, royalties, and any other payments required by this lease shall be made payable to the Minerals Management Service and tendered to the Director. Determinations made by the Lessor as to the amount of payment due shall be presumed to be correct and paid as due.

**Sec. 8. Bonds.** The Lessee shall maintain at all times the bond(s) required by regulation prior to the issuance of the lease and shall furnish such additional security as may be required by the Lessor if, after operations have begun, the Lessor deems such additional security to be necessary.

**Sec. 9. Plans.** The Lessee shall conduct all operations on the leased area in accordance with approved exploration plans and approved development and production plans as are required by regulations. The Lessee may depart from an approved plan only as provided by applicable regulations.

**Sec. 10. Performance.** The Lessee shall comply with all regulations and Orders. After due notice in writing, the Lessee shall drill such wells and produce at such rates as the Lessor may require in order that the leased area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles.

**Sec. 11. Directional Drilling.** A directional well drilled under the leased area from a surface location on nearby land not covered by this lease shall be deemed to have the same effect for all purposes of the lease as a well drilled from a surface location on the leased area. In those circumstances, drilling shall be considered to have been commenced on the leased area when drilling is commenced on the nearby land for the purpose of directionally drilling under the leased area, and production of oil or gas from the leased area through any directional well surfaced on nearby land or drilling or reworking of any such directional well shall be considered production or drilling or reworking operations on the leased area for all purposes of the lease. Nothing contained in this Section shall be construed as granting to the Lessee any interest, license, easement, or other right in any nearby land.

Page 2

*SALE 185 LEASE ADDENDUM*

*To the following extent, Sections 4, 5, and 6 of this lease instrument are amended by addendum pursuant to the Final Notice of Sale 185 in accordance with revised rental/minimum royalty requirements and suspension of royalty on production.*

## Sec. 4. Rentals.

Notwithstanding the language in Sec. 4 of the lease instrument, annual rental shall be paid until the start of royalty-bearing production, to be paid at the beginning of the lease year until a discovery in paying quantities of oil or gas is made, then at the end of the lease year until the start of royalty-bearing production.

## Sec. 5. Minimum Royalty.

Notwithstanding the language in Sec. 5 of the lease instrument, minimum royalty shall be paid after the start of royalty-bearing production, to be paid at the end of the lease year.

## Sec. 6. Royalty on Production.

Notwithstanding the language in Sec. 6 of the lease instrument, and in accordance with regulations at 30 CFR 260, the following royalty suspension provisions for shallow water deep gas production apply to this lease:

1. This lease will receive a royalty suspension on the first 20 billion cubic feet of its deep gas production if the lease is in less than 200 meters of water and if the lessee drills a new deep gas reservoir or reservoirs (15,000 feet or greater subsea) and commences production within 5 years from lease issuance, i.e., not extended by lease suspension. Deep gas is defined as any gas production from a completion with the top of perforated interval 15,000 feet or greater subsea (true vertical depth below the datum at mean sea level). The lessee must notify the Regional Supervisor, Office of Production and Development, Gulf of Mexico OCS Region, in writing upon the commencement of such deep gas production. Only one royalty suspension volume is available per lease.

2. Liquid hydrocarbons (oil and condensate) which exist in liquid form at standard conditions after passing through separating facilities will be subject to royalty payments.

3. This lease will not receive the royalty suspension for a well drilled into a deep gas reservoir that has produced on any current lease.

4. Any volumes of deep gas production that are not normally royalty-bearing under the lease terms or regulations (e.g. fuel gas) do not count against royalty suspension volumes.

5. Production includes deep gas volumes allocated to a lease under an approved unit agreement.

Page 2a

6. The royalty suspension will continue through the end of the month in which cumulative production from deep gas reservoir(s) on the lease reaches the applicable royalty suspension volume or the lease period ends. Lease period means the time from lease issuance until relinquishment, expiration, or termination.

7. The lessee must pay the rental fee at the end of each lease year during the period of royalty suspension. A rental fee is not due if the royalty payment during the lease year (for other lease production and under numbered paragraphs 6 and 8 herein) exceeds the rental amount.

8. The lessee must pay royalty on natural gas production that would otherwise receive royalty suspension, and such production will count towards the royalty suspension volume, in any calendar year during which the arithmetic average of the closing prices for the nearby delivery month on the NYMEX for natural gas exceeds the adjusted gas price threshold.

   a) The base level price threshold for natural gas is set at $5.00 per million British thermal units (MMBTU) in 2000. The adjusted gas price threshold in any subsequent calendar year is computed by changing the base price by the percentage by which the implicit price deflator for the gross domestic product has changed.

   b) As an example, suppose the computation for the deflator indicates that inflation was 3% in 2001 and 4% in 2002. Then the adjusted price threshold per MMBTU would become $5.15 in 2001 and $5.36 in 2002 for natural gas. Royalty on all natural gas production in calendar year 2002 would be due if the 2002 average NYMEX natural gas price exceeded $5.36 per MMBTU.

   c) MMS will provide notice when this adjusted price threshold is exceeded. Also, information on price thresholds is available at the MMS website (www.mms.gov/econ).

   d) The lessee must pay the royalty due under this paragraph plus late payment interest by March 31 of the following calendar year.

9. There are no circumstances under which a single lease could receive a royalty suspension both for deep gas production and for deepwater production.

**Stipulation No. 3 - Military Areas**

    A.  Hold and Save Harmless

        Whether compensation for such damage or injury might be due under a theory of strict or absolute liability or otherwise, the lessee assumes all risks of damage or injury to persons or property, which occur in, on, or above the Outer Continental Shelf (OCS), to any persons or to any property of any person or persons who are agents, employees, or invitees of the lessee, its agents, independent contractors, or subcontractors doing business with the lessee in connection with any activities being performed by the lessee in, on, or above the OCS, if such injury or damage to such person or property occurs by reason of the activities of any agency of the United States Government, its contractors or subcontractors, or any of its officers, agents or employees, being conducted as a part of, or in connection with, the programs and activities of the command headquarters listed in the following table.

        Notwithstanding any limitation of the lessee's liability in section 14 of the lease, the lessee assumes this risk whether such injury or damage is caused in whole or in part by any act or omission, regardless of negligence or fault, of the United States, its contractors or subcontractors, or any of its officers, agents, or employees.  The lessee further agrees to indemnify and save harmless the United States against all claims for loss, damage, or injury sustained by the lessee, or to indemnify and save harmless the United States against all claims for loss, damage, or injury sustained by the agents, employees, or invitees of the lessee, its agents, or any independent contractors or subcontractors doing business with the lessee in connection with the programs and activities of the aforementioned military installation, whether the same be caused in whole or in part by the negligence or fault of the United States, its contractors, or subcontractors, or any of its officers, agents, or employees and whether such claims might be sustained under a theory of strict or absolute liability or otherwise.

    B.  Electromagnetic Emissions

        The lessee agrees to control its own electromagnetic emissions and those of its agents, employees, invitees, independent contractors or subcontractors emanating from individual designated defense warning areas in accordance with requirements specified by the commander of the command headquarters listed in the following table to the degree necessary to prevent damage to, or unacceptable interference with, Department of Defense flight, testing, or operational activities, conducted within individual designated warning areas.  Necessary monitoring control, and coordination with the lessee, its agents, employees, invitees, independent contractors or subcontractors, will be effected by the commander of the appropriate onshore military installation conducting operations in the particular warning area; provided, however, that control of such electromagnetic emissions shall in no instance prohibit all manner of electromagnetic communication during any period of time between a lessee, its agents, employees, invitees, independent contractors or subcontractors and onshore facilities.

## C. Operational

       The lessee, when operating or causing to be operated on its behalf, boat, ship, or aircraft traffic into the individual designated warning areas shall enter into an agreement with the commander of the individual command headquarters listed in the following list, upon utilizing an individual designated warning area prior to commencing such traffic.  Such an agreement will provide for positive control of boats, ships, and aircraft operating into the warning areas at all times.

W-59                Naval Air Station - JRB
                             400 Russel Avenue
                             Box 27
                             New Orleans, Louisiana 70143-0027
                             Telephone: (504) 391-8696/8687

**Stipulation No. 6 - Protected Species**

To reduce the potential taking of Federally protected species (e.g., sea turtles, marine mammals, Gulf sturgeon, and other listed species):

(a)   MMS will condition all permits issued to lessees and their operators to require them to collect and remove flotsam resulting from activities related to exploration, development, and production of this lease.

(b)   MMS will condition all permits issued to lessees and their operators to require them to post signs in prominent places on all vessels and platforms used as a result of activities related to exploration, development, and production of this lease detailing the reasons (legal and ecological) why release of debris must be eliminated.

(c)   MMS will develop, in conjunction with National Oceanic and Atmospheric Administration Fisheries, an observer training program to minimize the risk of vessel strikes to protected species.

(d)   MMS will require that all seismic surveys employ mandatory mitigation measures to include the use of a 500 meter impact zone based on the appropriate water depth, visual observers, and ramp-up procedures.  Seismic operations must immediately cease when a sperm whale is detected within the 500 meter impact zone.  Ramp-up procedures and seismic surveys may be initiated only during daylight.

(e)   MMS will require lessees and operators to instruct offshore personnel to immediately report all sightings and locations of injured or dead endangered and threatened species (e.g. sea turtles and whales) to the MMS.  If oil and gas industry activity is responsible for the injured or dead animals (e.g. because of a vessel strike), the MMS shall require the responsible parties to assist the respective salvage and stranding network as appropriate.

(f)   MMS will require oil spill contingency planning to identify important habitats, including designated critical habitat, used by listed species (e.g. sea turtle nesting beaches, piping plover critical habitat), and require the strategic placement of spill cleanup equipment to be used only by personnel trained in less-intrusive cleanup techniques on beach and bay shores.

Lessees and operators will be instructed how to implement these mitigation measures in Notices To Lessees.

**Sec. 12. Safety Requirements.** The Lessee shall:

(a) maintain all places of employment within the leased area in compliance with occupational safety and health standards and, in addition, free from recognized hazards to employees of the Lessee or of any contractor or subcontractor operating within the lease area;

(b) maintain all operations within the leased area in compliance with regulations or orders intended to protect persons, property, and the environment on the Outer Continental Shelf; and

(c) allow prompt access, at the site of any operation subject to safety regulations, to any authorized Federal inspector and shall provide any documents and records which are pertinent to occupational or public health, safety, or environmental protection as may be requested.

**Sec. 13. Suspension and Cancellation.**

(a) The Lessor may suspend or cancel this lease pursuant to section 5 of the Act, and compensation shall be paid when provided by the Act.

(b) The Lessor may, upon recommendation of the Secretary of Defense, during a state of war or national emergency declared by Congress or the President of the United States, suspend operations under the lease, as provided in section 12(c) of the Act, and just compensation shall be paid to the Lessee for such suspension.

**Sec. 14. Indemnification.** The Lessee shall indemnify the Lessor for, and hold it harmless from, any claim, including claims for loss or damage to property or injury to persons caused by or resulting from any operation on the leased area conducted by or on behalf of the Lessee. However, the Lessee shall not be held responsible to the Lessor under this section for any loss, damage, or injury caused by or resulting from:

(a) negligence of the Lessor other than the commission or omission of a discretionary function or duty on the part of a Federal Agency whether or not the discretion involved is abused; or

(b) the Lessee's compliance with an order or directive of the Lessor against which an administrative appeal by the Lessee is filed before the cause of action for the claim arises and is pursued diligently thereafter.

**Sec. 15. Disposition of Production.**

(a) As provided in section 27(a)(2) of the Act, the Lessor shall have the right to purchase not more than 16 2/3 percent by volume of the oil and gas produced pursuant to the lease at the regulated price or, if no regulated price applies, at the fair market value at the wellhead of the oil and gas saved, removed, or sold, except that any oil or gas obtained by the Lessor as royalty or net profit share shall be credited against the amount that may be purchased under this subsection.

(b) Pursuant to section 27(b) and (c) of the Act, the Lessor may offer and sell certain oil and gas obtained or purchased pursuant to a lease. As provided in section 27(d) of the Act, the Lessee shall take any Federal oil or gas for which no acceptable bids are received, as determined by the Lessor, and which is not transferred to a Federal Agency pursuant to section 27(a)(3) of the Act, and shall pay to the Lessor a cash amount equal to the regulated price or, if no regulated price applies, the fair market value of the oil or gas so obtained.

(c) As provided in section 8(b)(7) of the Act, the Lessee shall offer 20 percent of the crude oil, condensate, and natural gas liquids produced on the lease, at the market value and point of delivery as provided by regulations applicable to Federal royalty oil, to small or independent refiners as defined in the Emergency Petroleum Allocation Act of 1973.

(d) In time of war or when the president of the United States shall so prescribe, the Lessor shall have the right of first refusal to purchase at the market price all or any portion of the oil or gas produced from the leased area, as provided in section 12(b) of the Act.

**Sec. 16. Unitization, Pooling, and Drilling Agreements.** Within such time as the Lessor may prescribe, the Lessee shall subscribe to and operate under a unit, pooling, or drilling agreement embracing all or part of the lands subject to this lease as the Lessor may determine to be appropriate or necessary. Where any provision of a unit, pooling, or drilling agreement, approved by the Lessor, is inconsistent with a provision of this lease, the provision of the agreement shall govern.

**Sec. 17. Equal Opportunity Clause.** During the performance of this lease, the Lessee shall fully comply with paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended (reprinted in 41 CFR 60-1.4(a)), and the implementing regulations which are for the purpose of preventing employment discrimination against persons on the basis of race, color, religion, sex, or national origin. Paragraphs (1) through (7) of section 202 of Executive Order 11246, as amended, are incorporated in this lease by reference.

**Sec. 18. Certification of Nonsegregated Facilities.** By entering into this lease, the Lessee certifies, as specified in 41 CFR 60-1.8, that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained. As used in this certification, the term "segregated facilities" means, but is not limited to, any waiting rooms, work areas, restrooms and washrooms, restaurants and other eating areas, timeclocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom, or otherwise. The Lessee further agrees that it will obtain identical certifications from proposed contractors and subcontractors prior to award of contracts or subcontracts unless they are exempt under 41 CFR 60-1.5.

**Sec. 19. Reservations to Lessor.** All rights in the leased area not expressly granted to the Lessee by the Act, the regulations, or this lease are hereby reserved to the Lessor. Without limiting the generality of the foregoing, reserved rights included:

(a) the right to authorize geological and geophysical exploration in the lease area which does not unreasonably interfere with or endanger actual operations under the lease, and the right to grant such easements or rights-of-way upon, through, or in the leased area as may be necessary or appropriate to the working of other lands or to the treatment and shipment of products thereof by or under authority of the Lessor;

(b) the right to grant leases for any minerals other than oil and gas within the leased area, except that operations under such leases shall not unreasonably interfere with or endanger operations under this lease;

(c) the right, as provided in section 12(d) of the Act, to restrict operations in the leased area or any part thereof which may be designated by the Secretary of Defense, with approval of the President, as being within an area needed for national defense and, so long as such designation remains in effect, no operations may be conducted on the surface of the leased area or the part thereof included within the designation except with the concurrence of the Secretary of Defense. If operations or production under this lease within any designated area are suspended pursuant to this paragraph, any payments of rentals and royalty prescribed by this lease likewise shall be suspended during such period of suspension of operations and production, the term of this lease shall be extended by adding thereto any such suspension period, and the Lessor shall be liable to the Lessee for such compensation as is required to be paid under the Constitution of the United States.

**Sec. 20. Transfer of Lease.** The Lessee shall file for approval with the appropriate field office of the Minerals Management Service any instrument of assignment or other transfer of this lease, or any interest therein, in accordance with applicable regulations.

**Sec. 21. Surrender of Lease.** The Lessee may surrender this entire lease or any officially designated subdivision of the leased area by filing with the appropriate field office of the Minerals Management Service a written relinquishment, in triplicate, which shall be effective as of the date of filing. No surrender of this lease or of any portion of the leased area shall relieve the Lessee or its surety of the obligation to pay all accrued rentals, royalties, and other financial obligations or to abandon all wells on the area to be surrendered in a manner satisfactory to the Director.

(Continued on reverse)

Page 3

**Sec. 22. Removal of Property on Termination of Lease.** Within a period of 1 year after termination of this lease in whole or in part, the Lessee shall remove all devices, works, and structures from the premises no longer subject to the lease in accordance with applicable regulations and Orders of the Director. However, the Lessee may, with the approval of the Director, continue to maintain devices, works, and structures on the leased area for drilling or producing on other leases.

**Sec. 23. Remedies in Case of Default.**

(a) Whenever the Lessee fails to comply with any of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease, the lease shall be subject to cancellation in accordance with the provisions of section 5(c) and (d) of the Act and the Lessor may exercise any other remedies which the Lessor may have, including the penalty provisions of section 24 of the Act. Furthermore, pursuant to section 8(o) of the Act, the Lessor may cancel the lease if it is obtained by fraud or misrepresentation.

(b) Nonenforcement by the Lessor of a remedy for any particular violation of the provisions of the Act, the regulations issued pursuant to the Act, or the terms of this lease shall not prevent the cancellation of this lease or the exercise of any other remedies under paragraph (a) of this section for any other violation or for the same violation occurring at any other time.

**Sec. 24. Unlawful Interest.** No member of, or Delegate to, Congress, or Resident Commissioner, after election or appointment, or either before or after they have qualified and during their continuance in office, and no officer, agent, or employee of the Department of the Interior, except as provided in 43 CFR Part 20, shall be admitted to any share or part in this lease or derive any benefit that may arise therefrom. The provisions of Section 3741 of the Revised Statutes, as amended, 41 U.S.C. 22, and the Act of June 25, 1948, 62 Stat. 702, as amended, 18 U.S.C. 431-433, relating to contracts made or entered into, or accepted by or on behalf of the United States, form a part of this lease insofar as they may be applicable.

LLOG Exploration Offshore, Inc.
(Lessee)

_(Signature of Authorized Officer)_

Kemberlia K. Ducote
(Name of Signatory)

Secretary and Treasurer
(Title)

April 2, 2003
(Date)

THE UNITED STATES OF AMERICA, Lessor

_(Signature of Authorized Officer)_

**Chris C. Oynes**
(Name of Signatory)

Regional Director
Gulf of Mexico OCS Region
Minerals Management Service
(Title)

**15 APR 2003**
(Date)

433 Metairie Road, Suite 600
Metairie, Louisiana 70005
(Address of Lessee)

*If this lease is executed by a corporation, it must bear the corporate seal.*