# **<u>EXHIBIT 1</u>**

6/21/2023 3:23 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 76835831
By: Monica Jackson
Filed: 6/21/2023 3:23 PM

CAUSE NO. _____

| | | |
|---|---|---|
| ZURICH AMERICAN INSURANCE COMPANY, HCC INTERNATIONAL INSURANCE COMPANY PLC, PHILADELPHIA INDEMNITY INSURANCE COMPANY and EVEREST REINSURANCE COMPANY, | § § § § § § | IN THE DISTRICT COURT OF |
| | § | HARRIS COUNTY, TEXAS |
| *Plaintiffs,* | § § | |
| vs. | § § | _____ JUDICIAL DISTRICT |
| APACHE CORPORATION, *Defendant.* | § § § § | |

**PLAINTIFFS' VERIFIED ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY AND PERMANENT INJUNCTIONS**

TO THE HONORABLE COURT:

Plaintiff Zurich American Insurance Company ("**Zurich**"), Plaintiff HCC International Insurance Company PLC ("**HCCI**"), Plaintiff Philadelphia Indemnity Insurance Company ("**Philadelphia**"), and Plaintiff Everest Reinsurance Company ("**Everest**") (collectively "**Plaintiffs**" or "**Sureties**") file this *Original Petition and Application for Temporary Restraining Order and Temporary and Permanent Injunctions* against Defendant Apache Corporation ("**Apache**") seeking: (1) damages caused by Apache's tortious interference with Plaintiffs' contracts, (2) a declaratory judgment that Apache is not entitled to draw on Trust A or the surety bonds/letters of credit for "maintenance and monitoring" and that Apache must replenish the amounts improperly withdrawn, (3) a declaratory judgment that Apache has impaired the Sureties' collateral and that the Sureties are discharged from their obligations to the extent of the impairment, (4) a declaratory judgment that the Sureties are discharged from their obligations to Apache due to Apache's material alteration of the bonded risk, (5) a declaratory judgment that the Sureties are discharged from their obligations to Apache due to Apache's impairment of the Sureties' suretyship status, and (6) a declaratory judgment that the Sureties are discharged from their obligations to Apache due to Apache's post-Effective Date violation of the terms of the Parties' agreements.  Plaintiffs also seek a temporary restraining order, temporary injunction and permanent injunction against Apache to immediately

cease and refrain from executing or prosecuting any act to draw upon any letter of credit or file a claim on any bond described in this lawsuit. In support of this Petition, Plaintiffs respectfully show the Court as follows:

## I.    DISCOVERY CONTROL PLAN

1.      Plaintiffs intend discovery to be conducted under Discovery Control Plan Level 3. This case is not an expedited action.

## II.    PARTIES

2.      Plaintiff HCC International Insurance Company PLC is a public company organized in the United Kingdom with its principal place of business in London, United Kingdom.

3.      Plaintiff Philadelphia Indemnity Insurance Company is a Pennsylvania corporation with its principal place of business at One Bala Plaza East, Bala Cynwyd, PA 19004.

4.      Plaintiff Everest Reinsurance Company is a Delaware corporation with its principal place of business at Warren Corporate Center, 100 Everest Way, Warren, NJ 07059.

5.      Plaintiff Zurich American Insurance Company is New York corporation with a statutory home office at 4 World Trade Center, 150 Greenwich Street, New York, NY 10007, and its principal place of business located at 1299 Zurich Way, Schaumburg, IL 60196.

6.      Defendant Apache Corporation is a Delaware corporation with its principal place of business in Houston, Texas. Apache may be served with process by serving its registered agent, CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201, or wherever it may be found.

## III.    JURISDICTION AND VENUE

7.      This Court has jurisdiction over Apache because Apache is a resident of Texas, has a registered agent in Texas, has offices in Texas, and otherwise has minimum contacts with Texas. Further, Plaintiffs' causes of action in this lawsuit relate to Apache's contacts with Texas.

8.      This Court has jurisdiction over the subject matter of this dispute because the amount in controversy exceeds the jurisdictional requirements of this Court.

9.     Venue is proper in Harris County because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Harris County and/or because Apache has a principal office in Houston.

## IV.     RULE 47 STATEMENT OF RELIEF REQUESTED

10.     Pursuant to Texas Rule of Civil Procedure 47, Plaintiffs state that they seek relief under 47(c)(5), or monetary relief over $1,000,000, plus Plaintiffs' attorneys' fees and costs incurred in connection with this dispute.

## V.     FACTUAL BACKGROUND

11.     Fieldwood Energy, LLC ("**FWE**") was an oil and gas company based in Texas that operated oil and gas leases primarily in the Gulf of Mexico Outer Continental Shelf.

12.     Apache also owns and operates offshore leases for the exploration and production of oil and gas.

13.     Plaintiffs provide surety bonds to customers in various industries, including the oil and gas industry.

**A.     FWE purchases offshore oil and gas leases from Apache and agrees to provide Apache with security covering a situation in which FWE fails to perform its decommissioning obligations and the government orders Apache to perform the decommissioning.**

14.     In or around July 2013, Apache and certain of its affiliates (collectively, the "**Apache Sellers**"), on the one hand, and FWE and its affiliate, GOM Shelf LLC ("**GOM**") (collectively, with FWE, the "**Fieldwood Buyers**"), on the other hand, entered into a Purchase and Sale Agreement (the "**PSA**"), under which the Fieldwood Buyers purchased from the Apache Sellers certain oil and gas leases and related assets in the Gulf of Mexico (the "**Legacy Apache Assets**").

15.     In connection with the PSA, the Apache Sellers and the Fieldwood Buyers also entered into a Decommissioning Agreement, under which FWE is obligated to decommission the Legacy Apache Assets.

16.     To protect against the risk that the government would demand that the Apache Sellers, as prior owners of the leases, decommission the assets, the parties agreed that the Fieldwood Buyers would

perform a minimum annual amount of decommissioning work associated with the Legacy Apache Assets based on an agreed plan.

17.     In addition, the parties agreed to terms covering their respective liability in the event the government demands that *the Apache Sellers* perform the decommissioning work.



███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████

27.     Accordingly, in the Decommissioning Agreement, the Fieldwood Buyers obtained numerous protections against the Apache Sellers unilaterally accessing the security provided by the Fieldwood Buyers.

---

[1] The language concerning Trust B from the Decommissioning Agreement has since been removed under an amendment to the Decommissioning Agreement. There is no longer any Trust B.

**B.**   **FWE provides security to Apache through (i) various letters of credit secured by Zurich and HCCI, and (ii) surety bonds issued by Everest and Philadelphia**

28.      FWE secured its obligations owed to Apache under the Decommissioning Agreement with the issuance of certain letters of credit, surety bonds, and other agreements.

**i.**      **The DBNY / Apache Letter of Credit and the DBNY / HCCI Participation Agreement**

29.      On or around January 4, 2016, FWE entered into a Continuing Agreement for Standby Letter of Credit with Deutsche Bank AG New York Branch ("**DBNY**") for the issuance of a letter of credit (the "**DBNY / FWE LC Agreement**").

30.      The DBNY / FWE LC Agreement contains customary provisions concerning indemnification and security for DBNY in return for the issuance of a letter of credit.   Specifically, under the agreement, FWE, as Applicant, is required to indemnify and reimburse DBNY, as Issuer, for any payments made by the bank under any letter of credit issued pursuant to the DBNY / FWE LC Agreement. Further, under the agreement, FWE granted DBNY a security interest in certain collateral, including, but not limited to, any and all property received or receivable by DBNY, any and all deposits, any and all supporting obligations, proceeds, and products in all of the foregoing.

31.      On or around January 14, 2016, to obtain additional security for DBNY in the event of a presentation of any DBNY-issued letter of credit, FWE and HCCI entered into a General Indemnity Agreement, under which the parties agreed to certain terms concerning the issuance of surety bonds by HCCI (the "**HCCI / FWE Indemnity Agreement**").

32.      The HCCI / FWE Indemnity Agreement contains customary provisions concerning indemnification of and security for HCCI.  Specifically, under the agreement, FWE, as Indemnitor, agreed to indemnify HCCI for any payments made by HCCI under the agreement.  Further, under the agreement, FWE agreed to deposit funds with HCCI as collateral for any loss suffered by HCCI under any financial assurance issued under the agreement.

33.     On or around April 27, 2016, DBNY and HCCI entered into a Participation Agreement, under which DBNY agreed to sell an undivided interest in any letter of credit issued by DBNY under the DBNY / FWE LC Agreement (the "**DBNY / HCCI Participation Agreement**").

34.     Pursuant to the DBNY / HCCI Participation Agreement, HCCI acquired a 100% participation interest in any letter of credit issued under the DBNY / FWE LC Agreement, and HCCI agreed that, if FWE fails to pay DBNY amounts owed under the DBNY / FWE LC Agreement, HCCI would reimburse DBNY one hundred percent (100%) of that amount.

35.     On or around May 23, 2016, pursuant to the DBNY / FWE LC Agreement, DBNY issued Standby Letter of Credit No. 839BGC1600430 to Apache, as Beneficiary, on behalf of FWE, as Applicant, in the amount of fifty million dollars ($50,000,000) (the "**DBNY / Apache LC**").

**ii.     The Everest / Apache Bond and the HCCI / Everest Bond**

36.     In addition to the DBNY / Apache LC, FWE obtained other security for Apache covering costs that are reimbursable to Apache under the terms and conditions of the Decommissioning Agreement. This additional security includes, but is not limited to, a bond issued by Everest Reinsurance Company ("**Everest**").

37.     Prior to the issuance of the bond by Everest, Everest and FWE entered into an Agreement of Indemnity (the "**Everest / FWE Indemnity Agreement**"). The Everest / FWE Indemnity Agreement contains customary provisions concerning indemnification of and security for Everest in return for the issuance of a bond.

38.     Specifically, under the Everest / FWE Indemnity Agreement, FWE agreed to indemnify Everest for all losses incurred with respect to any bond issued by Everest. Further, to secure FWE's obligations to Everest, in the FWE / Everest Indemnity Agreement, FWE granted Everest a security interest in "all goods (including inventory, equipment and any accessories thereto), instruments (including promissory notes), documents, accounts, chattel paper, deposit accounts, letter-of-credit rights, securities and all other investment property supporting obligations, any Contract or contract rights or rights to payment of money, insurance claims and proceeds, and all general intangibles."

39.     On or about August 30, 2018, pursuant to the Everest / FWE Indemnity Agreement, Everest issued Bond No. ES00001441 in favor of Apache in the amount seventy-five million dollars ($75,000,000) (the "**Everest / Apache Bond**").

40.     The Everest / Apache Bond permits Apache, as obligee, to draw upon the bond to recover decommissioning costs to which Apache is entitled to reimbursement under the Decommissioning Agreement, provided that the request by Apache is proper under the terms of the bond and Decommissioning Agreement.   More specifically, among other things, Apache has to certify that: (a) Apache is authorized to make a draw request in accordance with the terms and in the amounts permitted under the Decommissioning Agreement, (b) the buyer has failed to reimburse Apache for the Reimbursable Amounts as defined in the Decommissioning Agreement, (c) the obligee has complied with sections 3.2(a)(i) and 3.2(a)(ii) of the Decommissioning Agreement, and (d) the Drawing Amount does not exceed the amount the obligee is entitled to draw under the Payment Bond and Decommissioning Agreement.

41.     On or around the same date, August 30, 2018, Everest and HCCI entered into a Surety Claim Sharing Agreement, under which the parties agreed that, in the event of any claim made on the Everest / Apache Bond, Everest and HCCI would share in the loss in the proportion to their share of liability under the bond has to the total bond amount (the "**Surety Claim Sharing Agreement**").   HCCI agreed to be responsible for fifty million dollars ($50,000,000) of the total bond amount (i.e., $75,000,000), leaving Everest responsible for twenty-five million dollars ($25,000,000) of the bond.

**iii.     The Philadelphia / Apache Bond**

42.     FWE executed a General Indemnity Agreement Commercial Surety dated September 26, 2018 (the "**Philadelphia Indemnity Agreement**") in favor of Philadelphia.

43.     In the Philadelphia Indemnity Agreement, FWE agreed, among other things, to indemnify and hold harmless Philadelphia from and against any liability and/or loss that Philadelphia may sustain or incur as a result of having issued surety bonds on behalf of FWE.

44.     As consideration for FWE's execution of the Philadelphia Indemnity Agreement, and in reliance on the terms and provisions therein, Philadelphia issued Payment Bond No. PB03251500040 (the

"**Philadelphia / Apache Bond**") in the amount of $73,000,000 naming FWE as principal, and Apache as obligee, in connection with the Decommissioning Agreement.

45.     Under the Philadelphia / Apache Bond, Apache may submit Drawing Requests (as defined under the Philadelphia / Apache Bond) to Philadelphia for proper Reimbursable Amounts (as defined in the Decommissioning Agreement) for Decommissioning not reimbursed by FWE and/or Trust A.

**iv.     The DBNY / Apache Letters of Credit and the Zurich Bonds**

46.     On November 9, 2015, FWE entered into a Continuing Agreement for Standby Letters of Credit with DBNY for the issuance of letters of credit (the "**DBNY / FWE Continuing Agreement**"). The DBNY/FWE Continuing Agreement contains customary provisions concerning indemnification for DBNY in return for the issuance of letters of credit.

47.     Pursuant to the DBNY / FWE Continuing Agreement, on November 12, 2015, DBNY issued four standby letters of credit in favor of Apache in the total sum of $300,000,000. Specifically, DBNY issued standby letters of credit numbers 839BGC1500968, 839BGC1500969, and 839BGC1500970 each in the amount of $67,557,356 and standby letter of credit number 839BGC1500971 in the amount of $97,327,931 (collectively, the "**Zurich-Bonded L/Cs**").

48.     As a condition for the issuance of the Zurich-Bonded L/Cs, DBNY required FWE to obtain surety bonds to collateralize DBNY's payment obligation. On November 9, 2015, Zurich issued four surety bonds in the total penal sum of three-hundred million dollars ($300,000,000) with DBNY as the obligee and FWE as the principal. Specifically, Zurich issued bond numbers LPM9181831, LPM9181832, LPM9181833 (each in the penal sum of $67,557,356), and LPM9181834 (in the penal sum of $97,327,931) related to the Zurich-Bonded L/Cs (collectively, the "**Zurich Bonds**"). According to their terms, DBNY may call upon the Zurich Bonds in the event there is a draw upon the Zurich-Bonded L/Cs.

49.     As a condition for the issuance of the Zurich Bonds, Zurich required FWE and several of its affiliates to enter into a General Agreement of Indemnity dated September 18, 2014 (the "**Zurich Indemnity Agreement**").

50. The Zurich Indemnity Agreement contains customary provisions concerning indemnification of and security for Zurich in return for the issuance of bonds. Specifically, under the Zurich Indemnity Agreement, FWE, as Indemnitor, agreed to indemnify Zurich for any payments made by Zurich under any bond issued under the agreement. Further, under the agreement, FWE agreed to deposit funds with Zurich as collateral for any loss suffered by Zurich under any bond issued under the agreement.

51. As a result of the foregoing collateral agreements, Apache has secured the following:

| Collateral Provider to Apache | Description | Amount | Additional Collateral/Info |
|---|---|---|---|
| Everest | Payment Surety Bond No. ES00001441 | $75,000,000.00 | none |
| Philadelphia | Payment Surety Bond No. PB03251500040 | $73,000,000.00 | none |
| DBNY | Standby Letter of Credit No. 839BGC1500968 | $67,557,356.00 | Zurich Bond No. LPM9181831 |
| DBNY | Standby Letter of Credit No. 839BGC1500969 | $67,557,356.00 | Zurich Bond No. LPM9181832 |
| DBNY | Standby Letter of Credit No. No. 839BGC1500970 | $67,557,356.00 | Zurich Bond No. LPM9181833 |
| DBNY | Standby Letter of Credit No. 839BGC1500971 | $97,327,931.00 | Zurich Bond No. LPM9181834 |
| DBNY | Standby Letter of Credit No. 839BGC1600430 | $50,000,000.00 | DBNY/HCCI Participation Agreement |
| | | $497,999,999.00 | |

**C.** **The Apache Sellers and the Fieldwood Buyers agree to transfer all Legacy Apache Assets to a newly formed entity, over which, following the Effective Date of FWE's Chapter 11 Plan of Reorganization, Apache has taken control.**

52. On or about August 3 and 4, 2020, the Fieldwood Buyers filed voluntary petitions under Chapter 11 of Title 11 of the United States Code with the United States Bankruptcy Court for the Southern District of Texas.

53. On or around January 1, 2021, the Fieldwood Buyers and their affiliates filed a Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors. The Joint Chapter 11 Plan was amended on several occasions (as amended, the "**FWE Chapter 11 Plan**").

54. As part of the FWE Chapter 11 Plan, the Legacy Apache Assets would be transferred to and subsequently owned by a newly-created entity known as "Fieldwood I" ("**FWE I**").

55.     Under the FWE Chapter 11 Plan, according to the Disclosure Statement, the Fieldwood Buyers represented to the Bankruptcy Court that, under the plan, once confirmed, "FWE I will, among other things, own, operate, plug and abandon, and decommission the Legacy Apache [Assets]."

56.     Under the FWE I LLC Agreement, in Section 2.05, the stated purpose of FWE I was:

The purposes of the Company are to engage in the acquisition, disposition, ownership, operation, plugging and abandonment, and decommissioning of the Legacy Apache Properties and to cause GOM Shelf to engage in the acquisition, disposition, ownership, operation, plugging and abandonment, and decommissioning of the GOM Shelf Properties, and to engage in any and all activities necessary or incidental to the foregoing purposes.

57.     The Fieldwood Buyers provided financial projections in connection with the FWE Chapter 11 Plan on April 15, 2021.  Those financial projections indicated that FWE I was forecasted to pay $172.2 million in plugging and abandonment costs by the end of fiscal year 2025 and that "additional" plugging and abandonment costs will be addressed by the Decommissioning Agreement and security provided under Trust A.

58.     Each Surety filed objections to the FWE Chapter 11 Plan.  Prior to and during the hearing to confirm the FWE Chapter 11 Plan, FWE, Apache and the Sureties entered into an agreement to resolve the objections, which culminated in several agreements being entered into between the parties prior to the Effective Date of the FWE Chapter 11 Plan.

59.     The Bankruptcy Court confirmed the FWE Chapter 11 Plan on June 25, 2021.

60.     Consistent with the FWE Chapter 11 Plan, upon the plan's Effective Date, all of the Legacy Apache Assets were transferred by reverse merger to FWE I, which subsequently merged into GOM Shelf.

61.     Also consistent with the FWE Chapter 11 Plan and settlement described above, the parties entered into or reached agreement concerning edits to the following agreements: (i) a S*ubrogation, Subordination and Payment Agreement*, (ii) an *Information Sharing Letter Agreement*, (iii) a *Letter Agreement* related to GOM Shelf merger with Fieldwood Energy I, and (iv) a *Limited Liability Company Agreement of Fieldwood Energy I, LLC*, along with numerous other related documents (collectively, the "**Apache Surety Settlement Documents**").

62.     Pursuant to Paragraph 84 of the Confirmation Order, the Decommissioning Agreement was assumed and assigned to GOM Shelf.

63.     In connection with FWE I/GOM Shelf, Apache was given consent rights related to any sale of assets, any incurrence of debt, and selection of a service provider, among other rights.  Apache, the Debtors and Jon Graham (the Sole Manager of GOM Shelf) each asserted in the bankruptcy, however, that notwithstanding Apache's consent rights, Apache would not seek to control GOM Shelf post-Effective Date and Jon Graham would be an independent manager.  This was testified to by both the Debtors and Jon Graham at the Confirmation Hearing.  And paragraph 94 of the Confirmation Order also reflected that Apache would not have control over FWE I.

**D.      Eleven days after the FWE Chapter 11 Plan becomes effective, FWE I / GOM Shelf "defaults" on its decommissioning obligations to Apache, and Apache performs certain decommissioning work that is not reimbursable under the Decommissioning Agreement.**

64.     The FWE Chapter 11 Plan became effective on August 27, 2021.  As of the Effective Date, the Legacy Apache Assets were vested in FWE I and subsequently merged into GOM Shelf.

65.     Despite representing to the Bankruptcy Court that, under the plan, Apache would not be in control of GOM Shelf, it became clear that after the Effective Date of the FWE Chapter 11 Plan, Apache was in fact in control of the operations of GOM Shelf.

66.     On or around September 8, 2021, only 11 days after the FWE Chapter 11 Plan became effective, GOM Shelf notified the Bureau of Ocean Energy Management ("**BOEM**") and the Bureau of Safety and Environmental Enforcement ("**BSEE**") that it would not perform its decommissioning work associated with 44 leases and certain pipelines from the Legacy Apache Assets, thereby repudiating its obligations under the Decommissioning Agreement and the FWE Chapter 11 Plan.

67.     On February 22, 2022, GOM Shelf sent an additional notice of its "default" to BOEM and BSEE indicating it would not perform decommissioning on an additional 18 leases, 23 pipeline segments, and 1 right of use and easement.

68.     Upon information and belief, GOM Shelf already has or intends to send additional notices of default to BOEM and BSEE related to the Legacy Apache Assets.

69.     Upon information and belief, Apache caused GOM Shelf to notice a default of its decommissioning obligations, notwithstanding its repeated assertions during the bankruptcy that it would not seek to "control" GOM Shelf post-Effective Date.

70.     Upon information and belief, the GOM Shelf default letters prompted BOEM and BSEE to issue decommissioning orders and incidents of noncompliance to Apache and other predecessors in interest requiring that the decommissioning be performed.  Apache knew or should have known that the default letters would have this effect.

71.     Upon information and belief, Apache's causing GOM Shelf to issue the default letters was for the purpose of manufacturing a claim under the surety bonds/letters of credit, which required government orders to decommission before Apache could draw on them.

72.     Upon GOM Shelf's voluntary default, Apache elected to perform certain work associated with the defaulted properties.

73.     Based on GOM Shelf's default and the decommissioning orders, Apache proceeded to submit extensive draw requests from Trust A.

74.     However, Apache did not limit its draw of funds from Trust A only to actual decommissioning expenses, including plugging and abandonment of wells.  Instead, Apache further used Trust A proceeds for costs of maintenance and monitoring of the leases.

75.     Apache has no right to use Trust A proceeds for maintenance and monitoring or other general operational expenses, unrelated to decommissioning.

76.     Upon information and belief, Apache has withdrawn approximately $40-60 million from Trust A for "maintenance and monitoring" costs which represents approximately 20% of Trust A.  In all likelihood, there are additional improper draws upon Trust A and Plaintiffs are in the process of reviewing recently provided voluminous documents provided by Apache regarding same.

77.     Despite the fact that the costs sought by Apache are not Reimbursable Amounts under Trust A, and with no real opposition by GOM Shelf (which Apache is controlling), Apache obtained

reimbursement for non-Reimbursable Amounts, thereby rapidly depleting the funds in Trust A and knowingly manufacturing premature access to the letters of credit and bonds issued by the Sureties.

78.     By controlling GOM Shelf, Apache has positioned itself on both sides of the security (i.e., applicant and beneficiary) and effectively removed all protections afforded to the Fieldwood Buyers with respect to the security.

79.     In the course of GOM Shelf's performance post-bankruptcy, the Sureties observed that very little of the oil and gas revenue generated by the Legacy Apache Assets was going towards a capital drilling program, even though reserve reports provided by GOM Shelf to the Sureties identify numerous potential capital drilling projects that are viable.

80.     On numerous occasions, the Sureties requested of GOM Shelf and Apache that GOM Shelf commence operations toward fulfilling identified capital projects.[2] If GOM Shelf did not have sufficient capital, the Sureties offered that they might be willing to invest in or loan GOM Shelf funds to start these projects under appropriate conditions.  Failing the ability to start such projects, the Sureties repeatedly advised GOM Shelf and Apache that GOM Shelf should pursue a robust sale process of any or all Legacy Apache Assets in order to maximize the value of the oil and gas assets identified by GOM Shelf in its reserve report.

81.     In response to such requests by the Sureties, GOM Shelf and Apache delayed responses, provided limited, but ultimately uncooperative information, and otherwise declined to meaningfully pursue a robust sale effort or capital drilling program that could have greatly increased revenue and cash available for decommissioning, as was contemplated to be pursued under the Apache Surety Settlement Documents.

82.     The Sureties have also been advised that Apache, under the *Limited Liability Company Agreement of Fieldwood Energy I, LLC*, has effectively chilled the potential for interested investment bankers or ultimate buyers to pursue an acquisition of the Legacy Apache Assets by placing unreasonable

---

[2] In the bankruptcy case, as part of the disclosures to creditors, the Debtors proposed that FWE I (now GOM Shelf) would expend $167,000,000 toward capital projects.  In reality, GOM Shelf spent only a small fraction of that amount post-bankruptcy.

and unattainable conditions upon any sale such that no potential buyer could even contemplate pursuing a purchase.

83.    Apache's conduct has caused, and will continue to cause, the Sureties damages, for which the Sureties now sue.

## VI.    CAUSES OF ACTION

### COUNT I: TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS

84.    Plaintiffs re-allege the factual allegations contained in the previous paragraphs and incorporate them as if fully set forth herein.

85.    Plaintiffs have valid contracts, including, but not limited to, the surety bonds and bonded contract.

86.    Post-Effective Date, GOM Shelf became the principal on the bonds; paid premiums to the Sureties on the bonds; and became responsible, as principal, for FWE's obligations under the Decommissioning Agreement.

87.    Post-Effective Date, Apache knowingly and intentionally interfered with the contracts, by, without limitation: (1) causing GOM Shelf to issue default letters to BOEM and BSEE prompting BOEM and BSEE to issue decommissioning orders and incidents of noncompliance to Apache requiring that the decommissioning be performed, (2) taking actions, including, but not limited to, the acts and/or omissions described herein, to make the Sureties' performance under the contracts more burdensome, difficult and expensive, (3) willfully manufacturing accelerated and greater potential losses to the Sureties, and (4) making improper draws on Trust A including, but not limited to, draws for "maintenance and monitoring" and general overhead expenses unrelated to decommissioning.

88.    Upon information and belief, Post-Effective Date Apache is accelerating the draws on Trust A and ultimately the surety bonds in an effort to exhaust those funds as quickly as possible and derive for itself the sole benefit of the producing GOM Shelf properties and behind-pipe value which remains after Trust A and the surety bonds have been exhausted.

89.     Upon information and belief, Post-Effective Date Apache has also caused GOM Shelf to refuse to engage in good faith sale negotiations of the assets because Apache's intent is to exhaust Trust A and the surety bonds and derive all of the benefits from the producing properties and behind-pipe value for itself, in contrast to a sale of the assets which would distribute that value evenly amongst the Sureties and Apache.

90.     Post-Effective Date, Apache has wrongfully forced GOM Shelf to focus on plugging and abandonment only, without any measurable capital investment or good faith sales efforts, notwithstanding repeated requests from the Sureties to act as a prudent operator and in accordance with the proposed plan.

91.     Apache's interference has proximately caused the Sureties injury, including, but not limited to, depleting Trust A at an unduly rapid rate; using Trust A for improper expenses; depriving the Sureties of the benefit of the revenue from the producing GOM Shelf properties and the benefits of the behind-pipe value; and manufacturing demands upon the letters of credit and the surety bonds.

### COUNT II:  DECLARATORY JUDGMENT THAT APACHE IS NOT ENTITLED TO DRAW ON TRUST A OR THE OTHER DECOMMISSIONING SECURITY FOR "MAINTENANCE AND MONITORING" EXPENSES

92.     Plaintiffs re-allege the factual allegations contained in the previous paragraphs and incorporate them as if fully set forth herein.

93.     Post-Effective Date, Apache has drawn tens of millions of dollars from Trust A for "maintenance and monitoring" expenses which are not proper withdrawals from the Trust.  Nor are they proper draws on the surety bonds or letters of credit.

94.     Upon information and belief, Apache has withdrawn $40-60 million from Trust A for "maintenance and monitoring" costs which represents approximately 20% of Trust A.

95.     The Decommissioning Agreement only entitles Apache to draw on Trust A and the surety bonds/letters of credit for costs for decommissioning.

96.     "Maintenance and monitoring" costs are not "decommissioning" costs and therefore Apache has wrongfully withdrawn funds from Trust A to which it is not entitled, thereby harming the Sureties.

97.     Therefore, an actual case and controversy exists for the Court to issue a declaratory judgment pursuant to Chapter 37 of the Texas Civil Practice & Remedies Code.  The Sureties request a declaratory judgment that Apache is not entitled to draw on Trust A or the surety bonds/letters of credit for "maintenance and monitoring" costs and that Apache must reimburse the prior amounts improperly withdrawn from Trust A.

**COUNT III:  DECLARATORY JUDGMENT THAT APACHE HAS IMPAIRED THE SURETIES' COLLATERAL AND THAT THE SURETIES ARE DISCHARGED FROM THEIR OBLIGATIONS TO THE EXTENT OF THE IMPAIRMENT**

98.     Plaintiffs re-allege the factual allegations contained in the previous paragraphs and incorporate them as if fully set forth herein.

99.     Post-Effective Date, Apache has drawn tens of millions of dollars from Trust A for "maintenance and monitoring" expenses which are not proper withdrawals from the Trust.  Nor are they proper draws on the surety bonds or letters of credit.

100.     Upon information and belief, Apache has withdrawn approximately $40-60 million from Trust A for "maintenance and monitoring" costs which represents approximately 20% of Trust A.

101.     The Decommissioning Agreement only entitles Apache to draw on Trust A and the surety bonds/letters of credit for costs for decommissioning.

102.     "Maintenance and monitoring" costs are not "decommissioning" costs and therefore Apache has wrongfully withdrawn funds from Trust A to which it is not entitled.

103.     Trust A serves as collateral security to both Apache and the Sureties and Apache's improper withdrawals from Trust A have therefore harmed the Sureties.

104.     Through its conduct and its control of GOM Shelf, Apache wrongfully focused the entirety of GOM Shelf operations toward decommissioning and has delayed or otherwise declined to meaningfully pursue a robust sale effort or capital drilling program that could have greatly increased revenue and cash available for decommissioning, as was contemplated to be pursued under the Apache Surety Settlement Documents.  As a result, Apache has impaired the Sureties' collateral.

105.     Therefore, an actual case and controversy exists for the Court to issue a declaratory judgment pursuant to Chapter 37 of the Texas Civil Practice & Remedies Code.  The Sureties request a declaratory judgment that Apache is not entitled to draw on Trust A or the surety bonds/letters of credit for "maintenance and monitoring" costs and that the Sureties are discharged from their obligations to the extent of "maintenance and monitoring" costs improperly withdrawn from Trust A.

<u>COUNT IV:  DECLARATORY JUDGMENT THAT THE SURETIES ARE DISCHARGED FROM THEIR OBLIGATIONS DUE TO APACHE'S MATERIAL ALTERATION OF THE BONDED RISK</u>

106.     Plaintiffs re-allege the factual allegations contained in the previous paragraphs and incorporate them as if fully set forth herein.

107.     Post-Effective Date, Apache knowingly and intentionally caused GOM Shelf to issue default letters to BOEM and BSEE prompting BOEM and BSEE to issue decommissioning orders and incidents of noncompliance to Apache requiring that the decommissioning be performed.

108.     This was in contravention of the terms of the Decommissioning Agreement which only requires Apache to perform decommissioning if the government, unilaterally, demands that Apache perform the decommissioning.

109.     Upon information and belief, Apache caused GOM Shelf to issue the default letters in order to manufacture a claim under the surety bonds and Trust A, thereby causing the Sureties' losses and depriving the Sureties of the benefit of the revenue from the producing GOM Shelf properties.

110.     Upon information and belief, Post-Effective Date Apache is accelerating the draws on Trust A and ultimately the surety bonds in an effort to exhaust those funds as quickly as possible and derive for itself the sole benefit of the producing GOM Shelf properties and behind-pipe value which remains after Trust A and the surety bonds have been exhausted.

111.     Upon information and belief, Post-Effective Date Apache has also caused GOM Shelf to refuse to engage in good faith sale negotiations of the assets because Apache wishes to exhaust the surety bonds and the derive all of the benefits from the producing properties and behind-pipe value for itself, in contrast to a sale of the assets which would distribute that value evenly amongst the Sureties and Apache.

112.     Post-Effective Date, Apache has wrongfully forced GOM Shelf to focus on plugging and abandonment only, without any measurable capital investment or good faith sales efforts, notwithstanding repeated requests from the Sureties to act as a prudent operator and in accordance with proposed plan.

113.     Apache causing GOM Shelf to issue default letters has materially altered the Sureties' bonded risk and caused the Sureties' performance under the bonds/letters of credit to become more burdensome, difficult and expensive, and has manufactured accelerated losses to the Sureties.

114.     Therefore, an actual case and controversy exists for the Court to issue a declaratory judgment pursuant to Chapter 37 of the Texas Civil Practice & Remedies Code.  The Sureties request a declaratory judgment that the Sureties are discharged from their obligations under the bonds / letters of credit due to Apache's material alteration of the bonded risk.

### COUNT V:  DECLARATORY JUDGMENT THAT THE SURETIES ARE DISCHARGED FROM THEIR OBLIGATIONS DUE TO APACHE'S IMPAIRMENT OF SURETYSHIP STATUS

115.     Plaintiffs re-allege the factual allegations contained in the previous paragraphs and incorporate them as if fully set forth herein.

116.     Post-Effective Date, Apache knowingly and intentionally caused GOM Shelf to issue default letters to BOEM and BSEE prompting BOEM and BSEE to issue decommissioning orders and incidents of noncompliance to Apache requiring that the decommissioning be performed.

117.     This was in contravention of the terms of the Decommissioning Agreement which only requires Apache to perform decommissioning if the government, unilaterally, demands that Apache perform decommissioning.

118.     Upon information and belief, Apache caused GOM Shelf to issue the default letters in order to manufacture a claim under the surety bonds and Trust A, manufacturing the Sureties' losses and deprive the Sureties of the benefit of the revenue from the producing GOM Shelf properties.

119.     Upon information and belief, Post-Effective Date Apache is accelerating the draws on Trust A and ultimately the surety bonds in an effort to exhaust those funds as quickly as possible and derive

for itself the sole benefit of the producing GOM Shelf properties and behind-pipe value which remains after Trust A and the surety bonds have been exhausted.

120.     Upon information and belief, Post-Effective Date Apache has also caused GOM Shelf to refuse to engage in good faith sale negotiations of the assets because Apache wishes to exhaust the surety bonds and the derive all of the benefits from the producing properties and behind-pipe value for itself, in contrast to a sale of the assets which would distribute that value evenly amongst the Sureties and Apache.

121.     Post-Effective Date, Apache has wrongfully forced GOM Shelf to focus on plugging and abandonment only, without any measurable capital investment or good faith sales efforts, notwithstanding repeated requests from the Sureties to act as a prudent operator and in accordance with proposed plan.

122.     Apache causing GOM Shelf to issue default letters has impaired the Sureties' suretyship status and caused the Sureties' performance under the bonds/letters of credit to become more burdensome, difficult and expensive, and has manufactured accelerated losses to the Sureties.

123.     Therefore, an actual case and controversy exists for the Court to issue a declaratory judgment pursuant to Chapter 37 of the Texas Civil Practice & Remedies Code.  The Sureties request a declaratory judgment that the Sureties are discharged from their obligations under the bonds / letters of credit due to Apache's impairment of the Sureties' suretyship status.

### COUNT VI:  DECLARATORY JUDGMENT THAT THE SURETIES ARE DISCHARGED FROM THEIR OBLIGATIONS DUE TO APACHE'S POST-EFFECTIVE DATE VIOLATION OF THE TERMS AND STATED PURPOSE OF THE PARTIES' AGREEMENTS

124.     Plaintiffs re-allege the factual allegations contained in the previous paragraphs and incorporate them as if fully set forth herein.

125.     The Parties to this lawsuit entered into the Apache Surety Settlement Documents governing the parties' relationship and the operations of GOM Shelf after the Effective Date of the FWE Chapter 11 Plan.

126.     Post-Effective Date, Apache willfully and intentionally caused GOM Shelf to issue default letters to BOEM and BSEE prompting BOEM and BSEE to issue decommissioning orders and incidents of noncompliance to Apache requiring that the decommissioning be performed.

127.    This was in contravention of the terms of the Decommissioning Agreement which only require Apache to perform decommissioning if the government, unilaterally, demands that Apache perform decommissioning.

128.    Upon information and belief, Apache caused GOM Shelf to issue the default letters in order to manufacture a claim under the surety bonds and Trust A, manufactured accelerated losses to the Sureties' and deprived the Sureties of the benefit of the revenue from the producing GOM Shelf properties.

129.    Post-Effective Date, Apache also conducted itself and exercised sufficient dominion and control over GOM Shelf solely for the benefit of Apache and to the detriment of GOM Shelf and the Sureties, which is in contravention of the terms of the agreements and stated purpose of the agreements.

130.    Through its conduct and its control of GOM Shelf, Apache wrongfully focused the entirety of GOM Shelf operations toward decommissioning and has delayed or otherwise declined to meaningfully pursue a robust sale effort or capital drilling program that could have greatly increased revenue and cash available for decommissioning, as was contemplated to be pursued under the Apache Surety Settlement Documents.

131.    Apache's conduct constitutes a material breach of the Apache Surety Settlement Documents, excusing performance by the Sureties under the bonds.

132.    Therefore, an actual case and controversy exists for the Court to issue a declaratory judgment pursuant to Chapter 37 of the Texas Civil Practice & Remedies Code.  The Sureties request a declaratory judgment that the Sureties are discharged from their obligations under the bonds / letters of credit due to Apache's violation of the terms of the agreements.

## VII.    APPLICATION FOR TEMPORARY RESTRAINING ORDER

133.    Plaintiffs re-allege the factual allegations contained in the previous paragraphs and incorporate them as if fully set forth herein.

134.    Texas Civil Practice and Remedies Code section 65.011 authorizes injunctive relief in the following scenarios:

a. When the applicant is entitled to the relief demanded, and all or part of the relief requires the restraint of some act prejudicial to the applicant. Tex. Civ. Prac. & Rem. Code § 65.011(1);

b. A party performs or is about to perform or is procuring or allowing the performance of an act related to the subject matter of pending litigation, in violation of the rights of the applicant, and the act would tend to render the judgment in that litigation ineffectual.  Tex. Civ. Prac. & Rem. Code § 65.011(2)

c. When an applicant is entitled to a writ of injunction under the principles of equity and the laws of Texas relating to injunctions. Tex. Civ. Prac. & Rem. Code § 65.011(3).

135.    By reason of the foregoing, Plaintiffs request that this Court issue a Temporary Restraining Order ordering Defendant Apache to immediately cease and refrain from executing or prosecuting any act to draw upon any letter of credit or file a claim on any bond described in this lawsuit.  If Defendant is not immediately ordered and restrained from such actions, Plaintiffs will suffer immediate and irreparable injury, as their rights will be irreparably harmed.

136.    Pursuant to Texas Rule of Civil Procedure 684, Plaintiffs are willing and able to post a bond in this matter and request that the Court determine a fair and reasonable amount of security to be given by Plaintiffs for the protection of Defendant in the unlikely event that the Temporary Restraining Order is wrongfully issued and results in harm to Defendant.  However, since any injunction will be temporarily preventing a draw on a letter of credit backstopped by a bond or a direct claim on a bond, and the relief is sought by surety bond providers, the Court should set a nominal bond.

137.    As set forth below, Plaintiffs have asserted valid causes of action in Texas and have a probable right to relief.  Further, without a temporary restraining order, Defendant has indicated that it intends to draw on any letter of credit or file a claim on any bond in the very near future.  If any or all Plaintiffs are required to pay on a bond, or, if any letter of credit is paid by DBNY, one or several Plaintiffs may be forced to pay on their bonds, but there is no adequate remedy at law, also as set forth below.

138.    Pursuant to Texas Rules of Civil Procedure 680 and 682, this *Application for Temporary Restraining Order* (and the factual statements set forth herein) is supported and verified by Plaintiffs'

representatives, Thomas Finley (for Zurich), John Steven William Backhouse (for HCCI), Kimberly B Czap (for Philadelphia), and Anthony Romano (for Everest). See Declarations attached hereto as *Exhibits A - D*.

### VIII.   APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION

139.    Plaintiffs re-allege the factual allegations contained in the previous paragraphs and incorporate them as if fully set forth herein.

140.    A temporary injunction's purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex. 1993); *Electronic Data Sys. Corp. v. Powell*, 508 S.W.2d 137, 139 (Tex. Civ. App. Dallas 1974, no writ).   To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Walling*, 863 S.W.2d at 57; *Sun Oil Co. v. Whitaker*, 424 S.W.2d 216, 218 (Tex. 1968). An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard. *Canteen Corp. v. Republic of Tex. Props., Inc.*, 773 S.W.2d 398, 401 (Tex. App. Dallas 1989, no writ). Whether to grant or deny a temporary injunction is within the trial court's sound discretion. *Walling*, 863 S.W.2d at 58; *State v. Walker*, 679 S.W.2d 484, 485 (Tex. 1984).

141.    Plaintiffs are entitled to a temporary injunction enjoining Defendant from drawing upon and/or paying on any letters of credit and/or bonds described herein pending a decision on a permanent injunction and declaratory judgment.  As set forth above, Apache's conduct has tortiously interfered with Sureties' contracts, wrongfully impaired the Sureties' collateral, materially altered the bonded risk, impaired the Sureties' suretyship status and materially breached the Apache Surety Settlement Documents. With the respect to all claims, except for breach of contract, they are defenses to a bond claim or are otherwise unrecoverable against Apache if Apache is permitted to draw upon any letter of credit or be paid pursuant to a bond claim.  If Plaintiffs prevail on at least one of the asserted Counts, which is likely, Plaintiffs' cumulative liability to Apache could be eliminated altogether or greatly reduced.  As such, the

Plaintiffs would be in the position of having a "probable, imminent and irreparable injury" as set forth by Texas law on injunctions.

142.     The decision in *Gulf Liquids New River Project, LLC v. Gulsby Engineering, Inc.*, 356 S.W.3d 54 (Tx. App. – Houston [1st Dist.] 2011, no pet.) ("***Gulsby***") makes clear that if the Sureties are forced to pay now before their claims are adjudicated, their injury will be irreparable as there is not a recognized remedy available to recoup their payments.  In *Gulsby*, a general contractor and surety bond issuer brought an action against a bond obligee (in this case, a project owner) alleging numerous counts of wrongdoing against the owner, including breach of contract, tortious interference with a contract, fraud and fraudulent inducement.  The surety also sought, among other things, relief in the nature of the defense of "material alteration of the bonded risk," which acts as a complete discharge to liability on a surety bond. Ultimately, the Houston Court of Appeals held that a surety may not seek *damages* against the obligee for independent torts or to recoup the funds paid as a result of the material alteration which the court determined can only be asserted as a *defense* to a surety's liability.  *Id.* at 81, 83.

143.     The ruling in *Gulsby* compels an injunction in this case.  Like *Gulsby*, the obligee of the bond or a letter of credit backed by a bond (here, Apache), is accused of (i) an intentional tort, (ii) several surety defenses, including, but not limited to, material alteration of the bonded risk, which give rise to a complete or partial discharge of the surety's liability, and (iii) a material breach of contract and/or a good faith equitable defense that the contract was breached by the obligee's abuse of contractual rights. According to *Gulsby*, however, none of these claims can create a direct action for damages against the obligee.  Such actions are a defense to payment.  Thus, if any Plaintiff is forced to prematurely pay before liability on their claims can be adjudicated, the Plaintiffs will be without an adequate remedy at law and will sustain an irreparable injury, whether that payment is made directly to Apache or through DBNY. Accordingly, an injunction is appropriate enjoining both a direct draw on a bond or a draw to DBNY on a letter of credit.

144.     Further, Apache has stated to the Sureties on numerous occasions that it intends to draw upon the letters of creditor and/or file a claim on the direct bonds in June or July 2023, so the injury is imminent.

145.     The Plaintiffs also have a probable right to recovery, as there is no dispute that, eleven days after entering into the Apache Surety Settlement Documents, which allowed GOM Shelf to operate in all respects,[3] Apache caused GOM Shelf to voluntarily default on a huge amount of decommissioning liability with the government (in excess of at least $480 million dollars after all notices were submitted).  This immediately put Trust A and the bonds at risk, even though Apache was not yet liable for decommissioning.  GOM Shelf was under no obligation to affirmatively issue the default notices.  To the contrary, GOM Shelf's predecessor, FWE, had been working cooperatively with the government and reaching agreements to extend decommissioning schedules that could reasonably be accomplished.  Apache and GOM Shelf could have done the same with its decommissioning liability.  On this fact alone, even without considering all of Apache's other improper conduct, this Court should rule in Plaintiffs' favor.  Under the circumstances – and taking into account the significant potential for irreparable injury – satisfaction of this element has been established.  Injunction applicants only need to show that they are likely to succeed on the merits.  *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 686 (Tex. 1990).  It is not necessary for the applicants to prove they will ultimately prevail.  *Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex. 1993).

146.     Under the circumstances of the case, the status quo should be maintained.  Given the sum of money at issue, approximately $500 million dollars, the injunctions as requested are appropriate to protect Plaintiffs' rights and sufficient to protect Defendant Apache's rights.

---

[3] Per the *Limited Liability Company Agreement of Fieldwood Energy I, LLC*, Section 2.05, the purpose of GOM Shelf is "engage in the acquisition, disposition, ownership, operation, plugging and abandonment, and decommissioning of the Legacy Apache Assets and to cause GOM Shelf to engage in the acquisition, disposition, ownership, operation, plugging and abandonment, and decommissioning of the GOM Shelf Properties, and to engage in any and all activities necessary or incidental to the foregoing purposes."

147.    Based upon the facts and legal arguments set forth herein, and after a trial on the merits, Plaintiffs request that the Court issue a permanent injunction enjoining Defendant Apache from drawing upon on any letters of credit and/or filing claims on the bonds described in this lawsuit.

### IX.    CONDITIONS PRECEDENT

148.    Any and all conditions precedent to Plaintiffs right to recover on the claims stated herein have been satisfied or have occurred or have been waived.

### X.    ATTORNEYS' FEES

149.    As a result of the actions complained of herein, Plaintiffs have had to engage qualified counsel to prosecute this action and have incurred, and will continue to incur, reasonable and necessary attorneys' fees.  Plaintiffs are therefore entitled to recover these fees pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code

### XI.    PRAYER FOR RELIEF

150.    Based on the foregoing, Plaintiffs respectfully request the following relief from the Court:

(a)    The declaratory relief requested herein;

(b)    Actual and/or consequential damages as requested herein;

(c)    A temporary restraining order as requested herein;

(d)    A temporary injunction and permanent injunction as requested herein;

(e)    Attorneys' fees;

(f)    Litigation costs; and

(g)    Such other and further relief to which Plaintiffs may show themselves to be justly entitled.

(remainder of page left blank)

Respectfully submitted,

**LOCKE LORD LLP**

By:/s/ Philip Eisenberg
    Philip Eisenberg (TX Bar No. 24033923)
    peisenberg@lockelord.com
    Christopher A. Verducci (TX Bar No. 24051470)
    cverducci@lockelord.com
    600 Travis Street
    Houston, Texas 77002
    (713) 226-1200 (Tel.) / (713) 223-3717 (Fax)

    **ATTORNEYS FOR PLAINTIFF HCC
    INTERNATIONAL INSURANCE COMPANY PLC**

**CLARK HILL, PLC**

By:/s/ James Kimbell
    James Kimball (TX Bar No. 11420000)
    jkimbell@clarkhill.com
    Christopher Ward (TX Bar No. 24008233)
    cward@clarkhill.com
    Duane J. Brescia (TX Bar No. 24025265)
    dbrescia@clarkhill.com
    Adam Diamond (TX Bar No. 24092344)
    adiamond@clarkhilll.com
    909 Fannin Street, Suite 2300
    Houston, Texas 77010
    (713) 951-5600 (Tel.) / (713) 951-5660 (Fax)

    **ATTORNEYS FOR PLAINTIFF ZURICH
    AMERICAN INSURANCE COMPANY**

**MANIER & HEROD**

By:/s/ Scott Williams
    Michael E. Collins (TX Bar No. 24029006)
    mcollins@manierherod.com
    Jeff Price (TN Bar No. 019550)
    jprice@manierherod.com
    Scott Williams (TN Bar No. 021757)
    swilliams@manierherod.com
    1201 Demonbreun St, Suite 900
    Nashville, Tennessee 37203
    (615) 244-0300 (Tel.) / (615) 242-4203 (Fax)
    *Pro Hac Vice Motions Pending*

    **ATTORNEYS FOR PLAINTIFF PHILADELPHIA
    INDEMNITY INSURANCE COMPANY**

**CHIESA, SHAHINIAN & GIANTOMASI, PC**

By: */s/ Darren Gryzb*
    Darren Gryzb (NJ Bar No. 016142005)
    dgryzb@csglaw.com
    Jase A. Brown (NJ Bar No. 225202018)
    jbrown@csglaw.com
    105 Eisenhower Parkway
    Roseland, New Jersey 07068
    (973) 325-1500 (Tel.) / (973) 530-2277 (Fax)
    *Pro Hac Vice Motions Pending*

    **ATTORNEYS FOR PLAINTIFF EVEREST
    REINSURANCE COMPANY**

Exhibit "A"

## DECLARATION OF THOMAS FINLEY

STATE OF OKLAHOMA          §

COUNTY OF OKLAHOMA     §

 My name is Thomas Finley. I am the Surety Claims Counsel for Zurich American Insurance Corporation ("**Zurich**"). I have personal knowledge of the general factual allegations as stated herein and the Zurich-specific allegations, and they are all true and correct. I have read *Plaintiffs' Verified Original Petition and Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction* (the "**Petition**") and, pursuant to Rules 680 and 682 of the Texas Rules of Civil Procedure, verify that all of the factual statements made in the Petition as stated in this Declaration are accurate and true and within my personal knowledge.

 I am over 21 years of age and am otherwise competent to execute this Declaration. My address is 1299 Zurich Way, Schaumburg, IL 60196 (Attn: Tom Finley, Surely Claims Dept/Do Not Scan/Fwd Original). I declare under penalty of perjury that the foregoing is true and correct.

 Executed in Oklahoma County, State of Oklahoma, on June ~~14~~, 2023.

Signature: *Thomas Finley*
Print: *Thomas Finley*
D.O.B.: *August 22, 1956*

**PLAINTIFFS' VERIFIED ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION, AND PERMANENT INJUNCTION - Page 31 of 34**

271877007.v6-6/14/23

Exhibit "B"

## DECLARATION OF KIMBERLY B. CZAP

STATE OF PENNSYLVANIA §

COUNTY OF CHESTER       §

"My name is Kimberly B. Czap. I am a Vice President for Philadelphia Indemnity Insurance Company ("**Philadelphia**"). I have personal knowledge of the general factual allegations as stated herein and the Philadelphia-specific allegations, and they are all true and correct. I have read *Plaintiffs' Verified Original Petition and Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction* (the "**Petition**") and, pursuant to Rules 680 and 682 of the Texas Rules of Civil Procedure, verify that all of the factual statements made in the Petition as stated in this Declaration are accurate and true and within my personal knowledge."

I am over 21 years of age and am otherwise competent to execute this Declaration. My address is One Bala Plaza East, Bala Cynwyd, PA 19004. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Chester County, State of Pennsylvania, on June 16, 2023.

DOB 8-30-72

Kimberly B. Czap
Vice President
Philadelphia Indemnity Insurance Company

Exhibit "C"

## DECLARATION OF JOHN STEVEN WILLIAM BACKHOUSE

| | |
|---|---|
| CITY OF LONDON | § |
| COUNTRY OF UNITED KINGDOM | § |

My name is John Steven William Backhouse. I am an Underwriting Manager – Surety for HCC International Insurance Company PLC ("HCCI"). I have personal knowledge of the general factual allegations as stated herein and the HCCI-specific allegations, and they are all true and correct. I have read *Plaintiffs' Verified Original Petition and Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction* (the "**Petition**") and, pursuant to Rules 680 and 682 of the Texas Rules of Civil Procedure, verify that all of the factual statements made in the Petition as stated in this Declaration are accurate and true and within my personal knowledge.

I am over 21 years of age and am otherwise competent to execute this Declaration. My birth date is February 12, 1959. My business address is 10 St. Mary Axe, London EC3A 8AE, United Kingdom. I declare under penalty of perjury that the foregoing is true and correct.

Executed in London, United Kingdom on June 20, 2023.

John Steven William Backhouse
Underwriting Manager - Surety
HCC International Insurance Company PLC

PLAINTIFFS' VERIFIED ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION, AND PERMANENT INJUNCTION - Page 32 of 34

271877007.v6-6/14/23

**"Exhibit "D"**

## <u>DECLARATION OF ANTHONY ROMANO</u>

STATE OF NEW YORK          §

COUNTY OF NEW YORK          §

My name is Anthony Romano. I am a Senior Vice President for Everest Reinsurance Company ("**Everest**"). I have personal knowledge of the general factual allegations as stated herein and the Everest-specific allegations, and they are all true and correct. I have read Plaintiffs' *Verified Original Petition and Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction* (the "**Petition**") and, pursuant to Rules 680 and 682 of the Texas Rules of Civil Procedure, verify that all of the factual statements made in the Petition as stated in this Declaration are accurate and true and within my personal knowledge.

I am over 21 years of age and am otherwise competent to execute this Declaration. My address is 100 Everest Way, Warren, NJ 07059. I declare under penalty of perjury that the foregoing is true and correct.

Executed in New York County, State of New York, on June 20, 2023.

_____
Anthony Romano
Senior Vice President
Everest Reinsurance Company
Date of Birth 3-14-1966

6/21/2023 3:23:35 PM
Marilyn Burgess - District Clerk
Harris County
Envelope No: 76835831
By: JACKSON, MONICA J
Filed: 6/21/2023 3:23:35 PM

CAUSE NO. _____

| | | |
|---|---|---|
| ZURICH AMERICAN INSURANCE COMPANY, HCC INTERNATIONAL INSURANCE COMPANY PLC, PHILADELPHIA INDEMNITY INSURANCE COMPANY and EVEREST REINSURANCE COMPANY, | § § § § § § | IN THE DISTRICT COURT OF |
| | § | HARRIS COUNTY, TEXAS |
| *Plaintiffs,* | § § | |
| vs. | § § | _____ JUDICIAL DISTRICT |
| APACHE CORPORATION | § § § | |
| *Defendant*. | § § | |

## ORDER GRANTING TEMPORARY RESTRAINING ORDER

Plaintiffs Zurich American Insurance Company ("**Zurich**"), HCC International Insurance Company PLC ("**HCCI**"), Philadelphia Indemnity Insurance Company ("**Philadelphia**"), and Everest Reinsurance Company's ("**Everest**") (together, "**Plaintiffs**" or "**Sureties**") Application for Temporary Restraining Order came before the Court. Plaintiffs seek a temporary restraining order against Apache Corporation ("**Apache**") restraining Apache from drawing on certain letters of credit or filing a claim on certain bonds. The Court conducted a hearing on June _____, 2023, during which it received evidence, considered the pleadings, including the *Original Petition and Application for Temporary Restraining Order and Temporary and Permanent Injunctions* ("**Petition**"), and heard arguments of counsel. All parties were represented by counsel.

THE COURT FINDS THAT, based upon the evidence presented and the Petition, Sureties will suffer probable, imminent, and irreparable injury during the pendency of this litigation if Apache is not so restrained because funds could be drawn or claimed, as set forth in the Petition, without Sureties having an adequate remedy if the draw or claim is wrongful.  The Court further finds that Sureties are entitled to the relief demanded to avoid prejudice. The Court also finds that

Plaintiffs have no other adequate remedy at law and that there is a likelihood that the Sureties claims will succeed on the merits.  Additionally, the Court finds that Apache has stated an intent to make a draw on the letters of credit or file a claim on the bonds, which would render a subsequent judgment in favor of Sureties ineffectual. Therefore, the Court finds that Sureties are entitled to this temporary restraining order under principles of equity and the laws of the State of Texas. Preserving the funds at issue is the only and best manner to preserve the status quo.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that Apache, and its officers, affiliates, agents, servants, employees, contractors, attorneys, and including those persons and entities acting in concert or participation with Apache, shall be enjoined and restrained from (i) executing, filing, requesting, receiving,  prosecuting or otherwise making any draw on any letter of credit or (ii) executing, filing, requesting, receiving, prosecuting or otherwise making any claim on any surety bond as defined below:

| Collateral Provider to Apache | Description | Amount | Additional Collateral/Info |
|---|---|---|---|
| Everest | Payment Surety Bond No. ES00001441 | $75,000,000.00 | none |
| Philadelphia | Payment Surety Bond No. PB03251500040 | $73,000,000.00 | none |
| Deutsche Bank AG New York Branch | Standby Letter of Credit No. 839BGC1500968 | $67,557,356.00 | Zurich Bond No. LPM9181831 |
| Deutsche Bank AG New York Branch | Standby Letter of Credit No. 839BGC1500969 | $67,557,356.00 | Zurich Bond No. LPM9181832 |
| Deutsche Bank AG New York Branch | Standby Letter of Credit No. No. 839BGC1500970 | $67,557,356.00 | Zurich Bond No. LPM9181833 |
| Deutsche Bank AG New York Branch | Standby Letter of Credit No. 839BGC1500971 | $97,327,931.00 | Zurich Bond No. LPM9181834 |
| Deutsche Bank AG New York Branch | Standby Letter of Credit No. 839BGC1600430 | $50,000,000.00 | DBNY/HCCI Participation Agreement |

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Order is not effective until Plaintiffs post a bond in the amount of $_____.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Temporary Restraining Order will expire automatically after the passage of 14 days from the date hereof.

A temporary injunction hearing is set on _____.


Signed at _____ a.m./p.m. on _____.




                                                                _____

**JUDGE PRESIDING**