# EXHIBIT 22

7/6/2023 3:27 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 77268745
By: Patricia Gonzalez
Filed: 7/6/2023 3:27 PM

Cause No. 2023-38238

| | | |
|---|---|---|
| Zurich American Insurance Company, | § | In the District Court of |
| HCC International Insurance Company | § | |
| PLC, Philadelphia Indemnity Insurance | § | Harris County, Texas |
| Company, Everest Reinsurance Company, | § | |
|     Plaintiffs, | § | 281st Judicial District |
| v. | § | |
| Apache Corporation, | § | |
|     Defendant. | § | |

<u>Apache's Response to Plaintiffs' Request for Injunctive Relief</u>

This Court should deny the plaintiff insurance companies' ("Insurers") request for a TRO or other injunctive relief. Without meeting their burden to plead and prove their allegations, the Insurers seek an "extraordinary remedy"—an injunction—while simultaneously asserting a (meritless) injunction-defeating tortious interference claim for an exact amount of money damages. The Insurers do not provide this Court with controlling precedent that supports their request. They do not provide evidence (or even detailed factual allegations) supporting their wished-for relief.

In *Abbott v. Anti-Defamation League Austin, Southwest, & Texoma Regions*, 610 S.W.3d 911, 916–23 (Tex. 2020) (per curiam), the Texas Supreme Court reversed an injunction and explained that the "extraordinary remedy" of a temporary injunction requires that moving parties "must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable imminent, and irreparable injury in the interim." (citation omitted). "If any one of these required showings is lacking, the injunction should be denied (or reversed on appeal)." *Abbott v. Harris Cnty.*, No. 22-0124, 2023 WL 4278763, at *5 (Tex. June 30, 2023) (reversing and dissolving injunction). The Insurers have not met their burden of proof.

The Insurers' lawsuit arises from Apache's compliance with the U.S. government's requirement to decommission thousands of old, non-producing offshore oil and gas wells and facilities in the Gulf of Mexico. The Insurers are liable for $498 million of decommissioning surety bonds and letters of credit issued for the express purpose of partially reimbursing Apache for its anticipated billion-plus-dollar decommissioning costs. Written, signed contracts obligate the Insurers to pay when Apache submits a draw request. But the Insurers wrongfully and preemptively ask this Court to alter the status quo and eliminate Apache's contractual right to submit draw requests to obtain reimbursement for the millions of dollars Apache actually expends.

Part I of this response outlines the federal requirements mandating that Apache now conduct the billion-plus dollar decommissioning of the thousands of wells in the Gulf of Mexico that Apache previously owned before it sold those facilities to Fieldwood Energy LLC ("Fieldwood," now GOM Shelf LLC ("GOM Shelf")) in 2013. As part of that transaction, Apache received $498 million in decommissioning "Letters of Credit" and "Surety Bonds" as protection against Fieldwood's potential default—protection that the Insurers were paid to provide. Sure enough, Fieldwood went bankrupt, the decommissioning obligations reverted to Apache and, from 2022 to today, the federal government ordered Apache to decommission the wells and other facilities.

- The Insurers refer 32 times in their petition to the 2013 Apache/Fieldwood Decommissioning Agreement and admit in petition ¶ 16 that the Decommissioning Agreement was designed to "protect against the risk that the government would demand that the Apache Sellers, as prior owners of the leases, decommission the assets." The Insurers quote in ¶ 18 of the petition from § 2.7(b) of the Decommissioning Agreement, which provides for reimbursement to Apache for costs "reasonably and actually incurred as a result of, relating to or arising out of any performance by Sellers of Government Decommissioning." Apache will have the Decommissioning Agreement at the hearing.

- The Insurers admit in ¶ 25 that the Decommissioning Agreement required Fieldwood to obtain "letters of credit in favor of the Apache Sellers" and allege in ¶ 51 that "Apache has

secured" exactly "$497,999,999.00" in bonds and letters of credit from the Insurers and from Deutsche Bank AG New York ("DBNY"), which is not a party in this lawsuit.[1]

- The Insurers admit in ¶ 23 that "*the Apache Sellers are entitled* to seek reimbursement of such costs" and admit in ¶ 24 that "*the Apache Sellers are permitted* to draw on any letters of credit issued by the Fieldwood Buyers in favor of Apache or any direct bonds issued in favor of Apache." (All emphasis in this brief is added).

- The Insurers allege "Upon information and belief" that Apache withdrew "$40-60 million" in "maintenance and monitoring costs" (¶¶ 76, 94, 100), and wrongly allege that maintenance and monitoring costs "are not 'decommissioning' costs" (¶¶ 96, 102) and are "unrelated to decommissioning" (¶¶ 75, 87).

- The Insurers omit that the federal government expressly ordered Apache "to *immediately begin maintenance and monitoring* of the wells and facilities pending completition of decommissioning," *see, e.g.*, X-1 (BSEE SP89 Decommissioning Order), and that maintenance and monitoring are part of the "Government Decommissioning" for which the Decommissioning Agreement expressly authorizes reimbursement to Apache. All exhibits are attached to the Declaration of Apache Assistant General Counsel Stuart Brett Cupit.

Part II shows the Insurers have not met their burden to prove a probable right to relief. The Insurers do not allege, let alone demonstrate, facts that support their conclusory (and incorrect) "upon information and belief" assertions related to their "tortious interference" and declaratory judgment claims. The contracts speak for themselves and confirm Apache's entitlement to reimbursement for its decommissioning costs under the Letters of Credit and Surety Bonds. The *evidence* shows that GOM Shelf (and not Apache) made its own decision to default on its decommissioning obligations, and that Apache has properly undertaken government-ordered "maintenance and monitoring" expressly as part of the decommissioning process.

- The Insurers say in ¶ 145 that Apache should have tried to delay decommissioning to give GOM Shelf more time to decommission on its own. The Insurers omit that BSEE requires that decommissioning occur in "a timely manner" to prevent environmental harm and specifically ordered Apache to perform decommissioning within specific time frames here.

- The Insurers say in ¶¶ 79–82 that non-party GOM Shelf could have tried to increase drilling operations to try to generate revenue to delay decommissioning. The Insurers

---

[1] The Insurers at ¶ 51 show that DBNY provided $350 million (70%) of the $498 million in collateral. The Insurers do not say why DBNY decided *not* to join their lawsuit as a plaintiff.

did not identify any specific opportunities they think GOM Shelf could/should have attempted. They do not provide factual support for their hopeful speculation that some unspecified investment in new operations might have generated revenue (and enough multi-hundred-million-dollar revenue to theoretically make a difference).

- BSEE expressly ordered Apache to "immediately begin maintenance and monitoring" of the properties "pending completion of decommissioning." Apache did so and these costs are "decommissioning costs" under the Decommissioning Agreement. They are "operations, work and activities conducted to . . . perform, fulfill, [or] satisfy" "site clearance, site survey, remediation, disposal, and restoration operations" and were "incurred as a result of, relating to or arising out" of decommissioning "that is required in accordance with applicable Law[.]"

- Apache's costs for government-ordered decommissioning of the more than 300 GOM Shelf leases are projected to be $1.7 billion and will require a full draw on the letters of credit and surety bonds in the coming years even without maintenance and monitoring costs (which are properly included). *Please see* the attached Declaration of Apache's Gulf of Mexico General Manager Julie Traylor ("Traylor Decl.") ¶ 11.

- The Insurers' claims also are meritless because they agreed in writing that the "obligations of the Surety" are "*unconditional and irrevocable*," that Apache's drawing requests are "conclusive proof that the amount demanded is due and payable," and that each Insurer individually "*waives . . . each and every right* which it may have to contest" payment and waives "*any and all defenses or counterclaims*."

- The Insurers agreed in writing in August 2021 that they would not take "any action" that would hinder Apache's "exercise of remedies under" the Letters of Credit and Surety Bonds. The Insurers are here breaching that and other commitments.

Part III shows the Insurers have not met their burden to prove a probable imminent and irreparable injury. The Insurers' alleged "injury" is all about money. They quantified the exact amount of what they call their "significant *potential* for irreparable injury" as "approximately $500 million dollars" and more precisely as the amount of the Letters of Credit and Surety Bonds (¶¶ 51, 145-146). They quantified their lesser included "maintenance and monitoring" injury at "approximately $40-60 million" (¶¶ 76, 94, 100). The Insurers seek money damages in their Count I for "tortious interference."

- The Insurers do not identify any alleged non-monetary harm and do not even attempt to show that any monetary harm would be incalculable.

- In *Enterprise Int'l., Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 473 (5th Cir. 1985), the Fifth Circuit vacated an injunction barring a draw on a letter of credit because the injunction "failed to maintain the status quo" and "*interfered with the parties' contractual arrangement*, for it prevented C.E.P.E. from making the demand it might otherwise have made" and because—like the Insurers here—"movants would have *suffered only monetary loss, for which adequate remedies at law were available.*" *Id.* at 476.

- Apache is a large energy industry company that generates hundreds of millions of dollars in quarterly net cash from operating activities and has a market capitalization over $10 billion. The Insurers do not (and cannot) dispute that Apache can respond to a judgment of the magnitude at issue. (And it will be the Insurers, not Apache, that will be liable for compensatory and other damages, fees, and costs after Apache files its counterclaims.)

- The Insurers heavily (mis)rely on *Gulf Liquids New River Project, LLC v. Gulsby Engineering, Inc.*, 356 S.W.3d 54 (Tex. App.—Houston [1st Dist.] 2011, no pet.). *Gulf Liquids* is not an injunction case. *Gulf Liquids* undermines the Insurers' position as the court of appeals identified multiple ways for insurers/sureties to recover monetary damages when, unlike here, they have legitimate claims.

Part IV shows the Insurers improperly seek to disrupt, not preserve, the status quo. In *Pidgeon v. Turner*, 625 S.W.3d 583, 607 (Tex. App.—Houston [14th Dist.] 2021, pet. Denied), the court affirmed denial of an injunction because the moving party failed to show the injunction would preserve the status quo. Apache currently has the right to draw on the Letters of Credit and Surety Bonds that were established for Apache's benefit in this exact scenario: where Fieldwood (now GOM Shelf) defaults on its decommissioning obligations.

- The Insurers in ¶ 135 ask this Court to prevent Apache from "executing or prosecuting *any act* to draw upon any letter of credit or file a claim on any bond described in this lawsuit," even though it is undisputed that there are at least some expenses for which Apache can appropriately draw on the letters of credit and surety bonds.

- In their Surety Bond agreements, Insurers Everest and Philadelphia agreed in writing that Apache's draw requests are "conclusive" proof of Apache's right to reimbursement, agreed the Insurers obligations to pay Apache are "unconditional and irrevocable," agreed their payment obligations are "not subject to any condition or qualification," and agreed their obligations are irrespective of any "defenses or counterclaims." *See, e.g.*, X-2 (Everest Bond) at 4; X-3 (Philadelphia Bond) at 4.

- Under DBNY's Letters of Credit for which Insurers are financially responsible, Apache is entitled to reimbursement directly from DBNY upon presenting a drawing request

5

that will "be duly honored upon presentation" with payment made in two banking days. *See, e.g.*, X-4 (DBNY LOC) at 2.

- The Insurers agreed in writing in a Subrogation, Subordination, and Payment Agreement ("SSPA") that they would not "take any action that would, or could reasonably be expected to, hinder, in any manner, any exercise of remedies under the Senior Documents," including the Letters of Credit and Surety Bonds at issue. X-5 at §§ 1, 4. The Insurers breached their agreements and engaged in other wrongful conduct.

Apache is contractually entitled to draw on the Letters of Credit and Surety Bonds for decommissioning cost reimbursement. The Insurers improperly seek to alter the status quo, circumvent their payment obligations, and deprive Apache of its contractual right to reimbursement for carrying out the U.S. government's decommissioning orders. This Court should deny the Insurers' request for a TRO/temporary injunction.

## I.
## Facts

BSEE is the federal agency with authority over the extensive regulatory regime for offshore oil and gas operations, including the safe decommissioning of offshore facilities at the end of their useful oil and gas operations. *See, e.g.*, 43 U.S.C. § 1334, *et seq.*; 30 C.F.R. § 250, *et seq.*; X-6 (Decommissioning, BSEE). BSEE's "Idle Iron" program provides that "[f]rom the first signature on a lease, offshore operators know that they will have to clean up the area after they drill and produce hydrocarbons (oil and natural gas) and decommission the facilities and structures placed on the leased area, also called Plug and Abandonment (P&A)." *See* X-7 (Idle Iron, BSEE). Apache, Fieldwood, and the Insurers knew when they executed the Letters of Credit and Surety Bonds that the purpose was to pay for Apache's eventual decommissioning work if Fieldwood defaulted.

### A.   The U.S. Government Mandates Offshore Decommissioning

Decommissioning includes the P&A of undersea wells and the removal of platforms, pipelines, and other facilities. *See* 30 C.F.R. § 250.1703 (listing general decommissioning requirements). Every offshore property is unique in terms of the number and depth of wells, the

6

time in which the wells have been shut in, the volume of hydrocarbons and amount of pressure in the wells, and the types and condition of platform and pipeline facilities, among other considerations. Decommissioning activities are complex, expensive, highly engineered undertakings that require advanced planning for safe and efficient work. *See* Traylor Decl. ¶ 10.

The federal government does not bear the risk that offshore owners may default on their decommissioning obligations. "Lessees, owners of operating rights, *and their predecessors* are jointly and severally liable for meeting decommissioning obligations." 30 C.F.R. § 250.1701. Thus, energy companies like Apache (and Exxon, Chevron, and others) remain potentially liable for the decommissioning of any assets they have ever owned in the Gulf of Mexico, even if those assets have been re-sold numerous times.

Safe and timely operations are paramount to BSEE. *See, e.g.*, 30 C.F.R. § 250.1703. There is real potential for environmental disasters like hurricanes to damage idle infrastructure and cause catastrophic damage and otherwise increase the cost and difficulty to decommission. *See* X-8 at 1 (Dec. 2018 BSEE Notice to Lessees). Where, as here, the government orders a predecessor in the ownership chain to decommission legacy assets, an important early step is to "begin maintaining and monitoring" the facilities. 30 C.F.R. § 250.1708(a)(1). This includes testing valves and sensors, checking for hydrocarbons, and monitoring and performing maintenance to ensure safe access to the facilities for decommissioning work. *Id.*; Traylor Decl. ¶ 13. Decommissioning activities, including the required maintenance and monitoring, can cost millions of dollars per well or facility. For example, the cost to decommission individual wells can range from $500,000 to $10 million. Traylor Decl. ¶ 10. There are more than 2,000 GOM Shelf wells. *Id.* ¶ 11.

B.   Apache Sold Assets to Fieldwood and Received Surety-Backed Letters of Credit and Bonds to Cover Future Decommissioning Costs

In 2013, Apache sold its Gulf of Mexico offshore assets to Fieldwood, including oil and gas leases, wells, and onshore and offshore facilities. Fieldwood assumed the decommissioning obligations for those assets. *See* X-9 (PSA) § 1.1, 3.1(a).

Apache and Fieldwood entered into a 2013 "Decommissioning Agreement," which obligated Fieldwood to reimburse Apache for any costs "that have been reasonably and actually incurred as a result of, relating to or arising out of any performance by Sellers of Government Decommissioning"—*e.g.*, if Fieldwood failed and the government or another person required Apache to decommission the assets. Decommissioning Agreement § 2.7(b). Apache sought to protect itself by having Fieldwood create a cash trust ("Trust A") that ultimately accumulated $238 million to be set aside for decommissioning, and also by having Fieldwood issue "Letters of Credit" to Apache in the exact aggregate amount of $497,601,297.00. *Id.* §§ 3.2(a)(ii-iii), 4.1.[2]

C.   Fieldwood's Bankruptcies Reconfirmed the Enforceability of the Decommissioning Agreement, Letters of Credit, and Surety Bonds

Fieldwood filed for Chapter 11 bankruptcy in 2018 and again in 2020. In the 2018 bankruptcy, Fieldwood replaced $148.7 million of the Letters of Credit with Surety Bonds, and Apache and Fieldwood signed a Fifth Amendment to the Decommissioning Agreement to confirm that surety bonds "shall be deemed 'Letters of Credit.'" X-11 at pp. 3–6. Two bonds were issued directly to Apache by Insurers Everest and Philadelphia. *See* X-2 (Everest Bond); X-3 (Philadelphia Bond); *see also* Pet. ¶¶ 36–45.

Five of the original letters of credit with DBNY remain. *See, e.g.*, X-4 (DBNY LOC); Pet.

___

[2] The Insurers' petition in ¶ 51 is slightly off by listing the Philadelphia Bond as $73,000,000 and the total as $497,999,999.

¶¶ 29–35, 46–50. Four were collateralized by Zurich bonds and the fifth was backed by HCCI through a participation agreement. Pet. ¶¶ 33–34, 48–50; X-12 (Zurich Bonds). The Letters of Credit and Surety Bonds issued to Apache require immediate payment if Apache (as beneficiary or obligee) makes a draw or reimbursement request. X-4 (DBNY LOC) at 1–2; X-2 (Everest Bond) at 4; X-3 (Philadelphia Bond) at 4; X-12 (Zurich Bonds) at 2–3, 12–13, 22–23, 32–33.

Fieldwood filed its second bankruptcy in 2020. On June 25, 2021, the SDTX Bankruptcy Court confirmed a joint bankruptcy plan that allocated the legacy Apache Gulf of Mexico assets, including the Decommissioning Agreement, to a newly formed entity called Fieldwood Energy I LLC, which then merged into and is now called GOM Shelf. *See* X-13 (Confirmation Order) ¶¶ 81, 85; Declaration of GOM Shelf Manager Jon Graham ("Graham Decl.") ¶ 4. The Bankruptcy Confirmation Order preserved the Decommissioning Agreement and Apache's ability to draw on the Letters of Credit and Surety Bonds. *E.g.*, X-13 ¶¶ 84–85, 87.

To resolve certain disputes about the effect of the Fieldwood reorganization, GOM Shelf, Apache (as Senior Creditor of GOM Shelf), and the Insurers (as Junior Creditors of GOM Shelf) entered into the "Subrogation, Subordination and Payment Agreement" ("SSPA") on August 21, 2021. X-5. The parties agreed in the SSPA that GOM Shelf would pay the Insurers additional premium payments (approximately $6 million per year), despite the Insurers' status as junior creditors, and that the Insurers would then be subrogated to Apache's lien rights against GOM Shelf until after GOM Shelf's debts to Apache are paid in full. *Id.* §§ 2(b), 3; *see* Traylor Decl. ¶ 23. The Insurers expressly agreed to limitations on their rights to contest any "Senior Documents," which included the Letters of Credit and Surety Bonds. X-5 §§ 1, 4.

D.    Apache Is Entitled to Reimbursement for Government-Ordered Decommissioning

In 2021, GOM Shelf began issuing decommissioning default notices to BSEE and the Bureau of Ocean Management ("BOEM") confirming that GOM Shelf lacked the resources to decommission the properties. Traylor Decl. ¶¶ 5–9; Graham Decl. ¶¶ 6–11; X-19–21 (GOM Shelf Default Notices). BSEE also began issuing orders requiring Apache (as predecessor owner) to decommission wells and facilities, some of which were identified on GOM Shelf's default notices and some of which were not. Traylor Decl. ¶¶ 7, 9; *see, e.g.*, X-1 (SP89 BSEE Order). BSEE's orders specifically required Apache "to immediately begin maintenance and monitoring of the wells and facilities pending completition of decommissioning." X-1 (SP89 BSEE Order) at 2. Apache coordinated with BSEE to comply with its decommissioning obligations in a safe and timely manner. Traylor Decl. ¶¶ 8, 12–14, 17.

Apache anticipates it will incur over $500 million for decommissioning activities in 2023, including government-ordered maintenance and monitoring, for the properties it took over from GOM Shelf on BSEE's orders. Traylor Decl. ¶¶ 6, 9, 21–22. Apache has been reimbursed for most of these costs from Trust A. After Trust A is depleted this month, Apache will exercise its contractual right to draw on the Letters of Credit and Surety Bonds for reimbursement. Traylor Decl. ¶¶ 20–22; *see also* Graham Decl. ¶ 11. Apache expects its total decommissioning costs for the GOM Shelf assets at issue will be $1.7 billion. Traylor Decl. ¶ 11.

II.
The Insurers Have Not Demonstrated a Probable Right to Relief

In *Abbott*, 610 S.W.3d at 917, the Texas Supreme Court held that an applicant must demonstrate that the "claims will probably succeed on the merits" to establish a "probable right to relief." The Court reversed an injunction because the "plaintiffs' claims [were] likely to fail on

their merits." *Id.* at 917–23. The Insurers' meritless claims for tortious interference and declaratory relief will not succeed on the merits.

A.    Apache Does Not Control GOM Shelf

The Insurers say in ¶ 145 that "Apache caused GOM Shelf to voluntarily default on a huge amount of decommissioning liability" and that this "fact" means the "Court should rule in [the Insurers'] favor" and grant the injunction. The Insurers do not come to this Court with evidence or even detailed factual allegations. They offer only conclusory and "information and belief" assertions about Apache's supposed "control" over GOM Shelf. The Insurers incorrectly allege:

- "Despite representing to the Bankruptcy Court that, under the plan, Apache would not be in control of GOM Shelf, it became clear that after the Effective Date of the FWE Chapter 11 Plan, Apache was in fact in control of the operations of GOM Shelf." ¶ 65.

- "Upon information and belief, Apache caused GOM Shelf to notice a default of its decommissioning obligations, notwithstanding its repeated assertions during the bankruptcy that it would not seek to 'control' GOM Shelf post-Effective Date." ¶ 69.

- "Upon information and belief, Apache's causing GOM Shelf to issue the default letters was for the purpose of manufacturing a claim under the surety bonds/letters of credit, which required government orders to decommission before Apache could draw on them." ¶ 71.

The evidence disproves the Insurers' unsubstantiated allegations, and their allegations are not sufficient to carry their burden of pleading or proof for a TRO.

The Insurers wrongly allege that Apache controls GOM Shelf. Apache does not control GOM Shelf. Apache and GOM Shelf cooperate because Apache is a senior creditor and is jointly liable for decommissioning GOM Shelf's assets. Traylor Decl. ¶¶ 18–20; *see also* Graham Decl. ¶¶ 8, 10. At the time of the GOM Shelf merger, decommissioning was already overdue on a substantial number of properties that were allocated to GOM Shelf post-merger, and GOM Shelf had limited resources available to pay for or perform such work. Traylor Decl. ¶¶ 5–6; Graham Decl. ¶¶ 6–7, 9–10. The Insurers knew this. Graham, GOM Shelf's manager, testified during the

bankruptcy proceedings that GOM Shelf already faced hundreds of millions of dollars in decommissioning expenses and would likely need to resort to the Decommissioning Agreement's remedy provisions with Apache:

> Q. And if Fieldwood I was required to do all of its currently due plugging and abandonment obligations on July 1st, would there be sufficient funds to actually do that?

> A. The -- what Fieldwood I would utilize as -- as much of its current cash flow to satisfy those obligations, then it would rely upon the -- the resources available in the decommissioning security agreement signed between Apache and Fieldwood in 2013.

X-10 at 37:20–38:3; *see also id.* 38:4–11, 38:22 –24, 66:25–67:9, 68:3–8; Graham Decl. ¶¶ 6–7.

It was GOM Shelf's (not Apache's) decision to default on its decommissioning obligations. Traylor Decl. ¶ 20; Graham Decl. ¶¶ 8–10. Once GOM Shelf noticed its default to BSEE and BSEE issued orders to Apache, Graham Decl. ¶ 9; *see, e.g.*, X-19–21 (GOM Shelf Default Notices), Apache appropriately coordinated with BSEE to address decommissioning, Traylor Decl. ¶¶ 8, 12–14, 17. GOM Shelf has been in direct and repeated communication with the Insurers on issues related to GOM Shelf's operations, cash flow, and reimbursements to Apache on the decommissioning obligations. Graham Decl. ¶ 12.

The Insurers omit that BSEE required Apache to take over decommissioning of GOM Shelf properties even as to properties that GOM Shelf had not issued a default notice for. Traylor Decl. ¶ 9.

The Insurers fault Apache in ¶ 145 for not working with GOM Shelf and the government to "extend decommissioning schedules." The Insurers omit that BSEE itself explained in its December 2018 Notice to Lessees that decommissioning must occur in "a timely manner" because environmental and financial catastrophe can occur if an idle oil and gas facility is damaged or destroyed by events like a hurricane. X-8 at 1; *see also* Traylor Decl. ¶ 12.

The Insurers' few generic case cites in ¶ 145 do not help them and do not address the

matters at hand. In *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 685–86 (Tex. 1990), the Court considered claims for breach of condition of an injunction bond and malicious prospection for the issuance of a bond and held the claims failed because the injunctions were not dissolved, jury findings were not requested, and the record lacked evidence supporting malicious prosecution. In *Walling v. Metcalfe*, 863 S.W.2d 56, 57–58 (Tex. 1993), the Court reversed denial of an injunction because it disagreed that the movant had failed to establish a viable cause of action.

The Insurers incorrectly say in ¶¶ 79–82 that Apache prevented GOM Shelf from engaging in drilling operations that the Insurers claim could bring in additional revenue for decommissioning. The Insurers do not identify any such opportunities in the Petition, nor have they identified any such opportunities to Apache or GOM Shelf. Traylor Decl. ¶ 23; Graham Decl. ¶ 13. This is not for lack of information from GOM Shelf. Graham Decl. ¶ 12. As with their baseless assertions about control, the Insurers cannot meet their burden of establishing a probable right to relief with conclusory allegations lacking any factual support.

B.    Apache's Government-Ordered Maintenance and Monitoring Costs are Reimbursable

The Insurers allege in ¶ 75 that "Apache has no right to use Trust A proceeds for maintenance and monitoring or other general operational expenses, unrelated to decommissioning." The Insurers do not identify a single Apache "maintenance" or "monitoring" expense that is "unrelated to decommissioning." As explained in the previous section, the Insurers repeated failure to provide any factual support for their assertions requires denial of the application.

Apache's *maintenance and monitoring costs are directly related to decommissioning* and reimbursable from Trust A and by drawing on the Letters of Credit and Surety Bonds. The Decommissioning Agreement allows Apache to draw on the Letters of Credit or Surety Bonds for reimbursement of "any out-of-pocket costs or expenses that have been reasonably and actually

incurred as a result of, relating to or arising out of any performance by Sellers of Government Decommissioning," which is "[d]ecommissioning that is required in accordance with applicable Law or contract." § 2.7(a)–(b).

BSEE expressly ordered Apache to "begin maintenance and monitoring" pending completion of decommissioning:



X-1 (SP89 BSEE Decommissioning Order). This is one example of the many "maintenance and monitoring" decommissioning orders that BSEE sent to Apache.

In the real world—and to comply with BSEE's orders—Apache has had to incur "maintenance and monitoring" costs to address safety issues like restoring old, rusted platforms that Fieldwood had left in disrepair. This is necessary for safe access and decommissioning. Traylor Decl. ¶¶ 13–14, 16.

For example, Apache had to make repairs to the South Pass 89 platform to make it safe for workers to board the platform, monitor well pressure, and perform P&A and other decommissioning work. *Id.* ¶¶ 15–16. Regulations require suitable guards and rails for all deck areas and stairways on platforms. *See, e.g.*, 33 CFR § 143.110(a)–(c). These before-and-after pictures show some required safety repairs on SP89:



X-25–26; Traylor Decl. ¶¶ 15–16. These expenses are the "result of," "relat[e] to," and "aris[e]

out" of Government Decommissioning and are reimbursable under the Decommissioning

Agreement.

The Insurers incorrectly say at ¶ 74 that maintenance and monitoring costs are not

decommissioning expenses. The parties' Decommissioning Agreement defines

"Decommissioning" to include "operations, work, and activities conducted to pay, perform, fulfill,

satisfy, or otherwise discharge" the P&A Obligations. PSA § 1.1 defines "P&A Obligations" as

"the Liability and obligation to perform the following plugging, replugging, abandonment, removal, *site clearance, site survey, remediation, disposal, and restoration operations*, in each case to be conducted in compliance with applicable Laws and contracts, and in a good and workmanlike manner" including:

> (i) to properly plug and abandon and remove, dismantle, decommission and dispose of all wells, structures, platforms, facilities, flow lines, pipelines, any other Equipment located on the Assets or Pipeline Company Assets and all applicable Pending Abandoned Properties;
>
> . . .
>
> (iv) to clean up any Hazardous Substances related to the Assets, the Pipeline Company Assets or the Pending Abandoned Properties to the extent required by Law[.]

X-9 § 1.1. Apache's maintenance and monitoring expenses are operations, work or activities that are part of performing, fulfilling, and satisfying the P&A obligations in a good and workmanlike manner and are reimbursable expenses under the Decommissioning Agreement.

Decommissioning Agreement § 2.6 requires Apache to "perform, or cause to be performed, [any] Decommissioning as a Reasonably Prudent Operator," which is defined as:

> a Person (a) seeking in good faith to perform all of its obligations under all applicable Laws (including those issued by BOEM and BSEE) . . . (b) exercising that *degree of skill, diligence, prudence, and foresight which would reasonably and ordinarily be expected from a skilled an experienced operator* . . . and (c) conducting any relevant activities (including Decommissioning) in a *good and workmanlike manner*, with due diligence and dispatch, in accordance with *good oilfield practice* and in compliance with all *applicable Laws* (including those *issued by* BOEM and *BSEE*) . . . .

Decommissioning Agreement, Ex. A. This is consistent with 30 C.F.R. § 250.1703's requirement that decommissioning be conducted "in a manner that is safe." Apache had to incur maintenance and monitoring costs and BSEE's orders show they most certainly *are* related to decommissioning.

The "maintenance and monitoring" argument is a red herring. The Insurers know that Apache will need to draw on the full $498 million in bonds/letters of credit—and expend hundreds

of millions more of its own unsecured funds—whether or not the relatively small-dollar subset of maintenance and monitoring costs are included. Apache anticipates the total decommissioning costs for all of the GOM Shelf assets to be $1.7 billion. Traylor Decl. ¶ 11. This is far in excess of the amount that is (or has ever been) in Trust A and will far exceed even the Letters of Credit and Surety Bonds. Apache itself will be on the hook for significant decommissioning costs long after the trust, bonds, and letters of credit are exhausted. Traylor Decl. ¶¶ 10–11, 20–22. The Insurers omit this.

The Insurers admit in ¶ 76 that "maintenance and monitoring" represents "approximately 20% of Trust A," and thus admit that 80% of Apache's reimbursement has been for other decommissioning costs. The Insurers speculate in ¶ 76 they may discover "additional improper draws upon Trust A" but, of course, they do not allege facts to support their speculation. The Insurers omit that, in April 2023, Apache provided them with over 150,000 pages of documents with information about Apache's draws on Trust A. X-30–31.

C.   The "Tortious Interference" Claim Is Meritless and Defeats Injunctive Relief

The elements of a claim for tortious interference are (1) the existence of a contract subject to interference, (2) the occurrence of an act of interference that was willful and intentional, (3) the act was a proximate cause of the claimant's damage, and (4) actual damage or loss. *Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 856–57 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). The Insurers' tortious interference claim fails for at least four reasons.

First, even crediting the Insurers' legally unsound theory, they have not paid anything and have not incurred any of what they try to portray as damages or loss.

Second, *Gulf Liquids New River Project, LLC v. Gulsby Eng'g, Inc.*, 356 S.W.3d 54, 81 (Tex. App.—Houston [1st Dist.] 2011, no pet.), which the Insurers themselves cited in ¶¶ 142–43,

held that an insurer that has paid out on a surety bond does not have an independent tort cause of action against the obligee (here, Apache) to recover damages.

Third, Apache has a powerful (indeed, dispositive) defense to the Insurers' tortious interference allegations. ***Apache is (and will be) contractually and legally justified in asserting its rights to reimbursement***.

In *Sakowitz, Inc. v. Steck*, 669 S.W.2d 105 (Tex. 1984), the Texas Supreme Court held that the defendant was not liable for tortious interference in connection with asserting its legal rights. *Id.* at 107 (overruled on other grounds by *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686 (Tex. 1989)). "One is privileged to interfere with a contract of another if it is done in the bona fide exercise of his own rights or if he has an equal or superior right in the subject matter to that of the plaintiff." *Id.* Apache has express contractual rights under the Surety Bonds, Letters of Credit, and Decommissioning Agreement—far more than the requisite "colorable legal right," *id.*—to seek and obtain reimbursement under the Surety Bonds and Letters of Credit.

Fourth, as a matter of law, Apache cannot tortiously interfere with contracts to which it is a party. *See Cent. Sav. & Loan Ass'n v. Stemmons Nw. Bank, N.A.*, 848 S.W.2d 232, 241 (Tex. App.—Dallas 1992, no writ) (affirming summary judgment that party to letter of credit could not be liable for tortiously interfering with that letter of credit). Apache is a party to the Everest and Philadelphia Surety Bonds. Apache is the express "beneficiary" of the Zurich Surety Bonds, X-12, backing the DBNY Letters of Credit.

D.    The Insurers Waived Their Defenses to Payment

The Insurers' request for a TRO/injunction and their claims also fail because the Insurers repeatedly waived and limited their rights to dispute Apache's ability to draw on the Letters of Credit and Surety Bonds.

18

The Everest and Philadelphia Surety Bonds provide that the "obligations of the Surety" are "***unconditional and irrevocable***." X-2 (Everest Bond) at 4; X-3 (Philadelphia Bond) at 4. These Surety Bonds provide that Apache's drawing requests constitute "*conclusive proof* that the amount demanded is due and payable." *Id.* Each of Insurers Everest and Philadelphia expressly **"waives . . . *each and every right* which it may have *to contest* Obligee's . . payment" and "*any and all defenses or counterclaims*."** *Id.*

The Zurich bonds similarly provide that Apache's written statement for reimbursement "shall constitute *conclusive evidence* of the facts stated therein," the "Surety's *liabilities and obligations* under this Bond to the Obligee are *not subject to any condition or qualification*," and:

> This Bond constitutes the ==Surety's primary, absolute and independent obligation to make payment to the Obligee== in accordance with the terms hereof, under any and all circumstances, including, without limitation, due to the lack of validity, legality or enforceability of the Agreement, the Reimbursement Agreement or the Security and ==irrespective of all objections, exceptions, set-offs, counterclaims or defenses of any kind from the Surety, Fieldwood or other third parties.==

X-12 (Zurich Bonds) at 2–3, 12–13, 22–23, 32–33.

The SDTX Bankruptcy Confirmation Order confirmed that the Decommissioning Agreement and Apache's ability to draw on the Letters of Credit and Surety Bonds remained in effect:

- "[N]o third party, including, without limitation, the Apache Sureties, may raise any defense to payment under the Apache Surety Bonds or letters of credit, in each case constituting Decommissioning Security, based on the agreement reached between the Debtors and Apache as to the Apache Cure." X-13 ¶ 84.

- "For the avoidance of doubt, any and all claims the Apache PSA Parties may have against FWE I or GOM Shelf LLC related to the Decommissioning Agreement arising post-Effective Date and any security obtained, provided, or pledged in connection with the Decommissioning Agreement (the 'Decommissioning Security') will be preserved." ¶ 85.

- "All rights of the Apache PSA Parties with respect to bonds and letters of credit constituting security for decommissioning of the assets held by the GOM Shelf LLC or allocated to and vested in FWE I, including, without limitation, the Decommissioning

Security shall be preserved as against such bonding companies and letter of credit issuers in all respects." ¶ 87.

In the August 2021 SSPA, the Insurers ("Junior Creditors" under the SSPA) agreed that they would not take "any action" that would hinder Apache's "exercise of remedies under the Senior Documents," which includes the Letters of Credit and Surety Bonds:

> 4.      Limitation on Actions, Remedies by Junior Creditors.  Each Junior Creditor agrees that:
>
> (a)      Until all Senior Debt is Paid in Full and the Commitments are terminated it will not, without the prior written consent of the Senior Creditors (i) at any time commence, prosecute, or participate in any administrative, legal, or equitable action against any Obligor to collect or enforce any Junior Obligations, (ii) at any time commence, prosecute, or participate in commencing or prosecuting, any Proceeding unless Senior Creditors have commenced or prosecuted, or is participating in, such Proceeding, (iii) at any time take any action to enforce the Junior Obligations or exercise any remedies against or in respect of any property of any Obligor to collect the Junior Obligations, or (iv) take any action that would, or could reasonably be expected to, hinder, in any manner, any exercise of remedies under the Senior Documents, it being understood that the Junior Creditors' rights to collect the FWE I Premium Claims are not limited by this provision but are subject to the limitations of Section 2(g) hereof.

X-5 § 1, 4. The Insurers each "agree[d] and acknowledge[d] that the GOM Shelf Merger *will not alter its individual obligations* as an Apache Surety *nor create a defense to performance* of those obligations." X-15–18 (Merger Ltr. Agreements).

The Insurers have continued to admit *in writing* that their obligations to Apache remain in "force and effect." Even after the Insurers (and their lawyers) expressed concerns about rising decommissioning costs, including maintenance/monitoring, and Apache's need to draw on the Letters of Credit and Surety Bonds—even after all this—the Insurers have reconfirmed their obligations.

On July 6, 2022, the Insurers' lawyer sent a letter to GOM Shelf and raised these and other concerns. X-14. Just two weeks later, Everest renewed the Surety Bond in favor of Apache and confirmed that "*The bond remains in force and effect subject to its terms and conditions*":

20



X-24 (7/19/22 Everest Email to Apache).

Two weeks later, Philadelphia confirmed that its Bond was "still active" and it planned to "renew."

X-23.

The Insurers' allegations are false. Their claims are contrived and meritless. The contracts undermined their positions. They waived and limited their defenses. They have not met their burden to plead and prove a probable right to relief.

III.
The Insurers' Alleged Injuries Are Not Irreparable and Can Be Satisfied with Money Damages

The Insurers cannot obtain injunctive relief because they have an adequate remedy at law to pursue their (meritless) claims, and their claims can be satisfied with money damages.

The Insurers say in ¶¶ 141, 143–44, and 146 that they will be required to pay if Apache draws on the Everest and Philadelphia Surety Bonds or the Zurich- and HCCI-back-stopped DBNY Letters of Credit. Money damages can remedy any such alleged injury. The amount is easily calculable—it is the exact amount of the allegedly improper withdrawals. In *Pidgeon*, 625 S.W.3d at 606, the court held "injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard," and affirmed denial of a temporary injunction because the movant failed to make this showing.

In *Enterprise Int'l., Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d at 473, the Fifth Circuit vacated the district court's grant of a temporary injunction preventing a draw on a letter of credit. The injunction was improper because "*movants would have suffered only monetary loss, for which adequate remedies at law were available.*" *Id.* The court considered movant's argument—like Insurers' argument here—about the "*immediate* loss of a large sum of money" and rejected it because the "*very purpose*" of the letter of credit is to "*place the money in the beneficiary's hands while 'contractual disputes wend their way toward resolution,'*" and "monetary loss alone, therefore, does not constitute irreparable harm sufficient to justify the issuance of a preliminary injunction." *Id.* at 474. The Fifth Circuit also noted that the injunction was an "abuse of discretion" because it "failed to maintain the status quo" and "*interfered with the*

*parties' contractual arrangement*, for it prevented C.E.P.E. from making the demand it might otherwise have made." *Id.* at 476.

In *Northern Cypress Medical Center Operating Co. v. St. Laurent*, 296 S.W.3d 171, 174–78 (Tex. App.—Houston [14th Dist.] 2009, no pet.), the court reversed a temporary injunction barring the sale of partnership assets because plaintiffs failed to show irreparable injury. The court explained:

> The undisputed evidence in the record indicates that St. Laurent is at risk for loss of only his proportionate share in the partnership's net income and any future distributions. Both of these items represent an interest in *money*. Therefore, St. Laurent has not shown that breach-of-contract damages would be inadequate to compensate him for any such monetary losses.

*Id.* at 176 (emphasis in original). The court rejected plaintiff's attempt to shift the burden to the defendants to show that damages were calculable: "In a temporary-injunction hearing, the burden is on the applicant to prove that his damages cannot be calculated, not on the non-movant to *dis*prove that notion." *Id.* at 177 (emphasis in original).

The Insurers do not dispute that Apache can answer for monetary relief. In *Haq v. America's Favorite Chicken Co.*, 921 S.W.2d 728, 731 (Tex. App.—Corpus Christi–Edinburg 1996, writ dism'd w.o.j.), the court affirmed denial of a temporary injunction in part because appellee contended it could "make appellants whole for any amount of damages they might suffer" and "Appellants presented no evidence that [appellee] could not make appellants whole for such damages."

The only case the Insurers cite (in ¶¶ 142–43) ostensibly to support their specious assertion of irreparable injury is *Gulf Liquids*, 356 S.W.3d 54. That court there did not grant or approve injunctive relief of any kind. The case did not involve an injunction. To the extent it applies, *Gulf Liquids* undermines Insurers' position.

23

In *Gulf Liquids*, an insurance company paid a project owner pursuant to surety bonds issued for the project's general contractor. The insurance company sought to recover those payments from the project owner based on theories of fraud in the inducement, tortious interference, and material alteration of the underlying contract. *Id.* at 79–83. The court held the insurance company surety did not have a direct claim for damages against the obligee project owner to recover amounts paid on behalf of the principal general contractor. *Id.* at 80–81, 83. The court noted the insurers' theories were defenses to surety liability, not proper affirmative claims. *Id.*

The insurer/surety in *Gulf Liquids* paid what it owed. The Insurers here are trying to avoid payment, avoid their contractual obligations, and avoid how sureties and letters of credit work. If Apache makes an appropriate drawing request under the terms of the DBNY Letters of Credit, DBNY will pay Apache and there is no direct harm to the Insurers, who have a *separate* contract with DBNY where Apache is not a party. If Zurich and HCCI believe that they are not obligated to repay DBNY under the terms of their agreements then (at their own risk) they may decline to do so. If Apache presents drawing requests to Everest or Philadelphia under the Surety Bonds, then Everest or Philadelphia may (at their own risk) refuse to pay. The Insurers will be in breach of their various obligations, but they can make their own decisions about how to litigate and whether to try to assert, for example, the defenses they contractually waived.

*Gulf Liquids* did not involve or address whether allegedly improper payments under surety bonds are compensable by money damages. *Gulf Liquids* undermines the Insurers' claims because it held that a surety does not have a direct claim for damages against an obligee once the surety has already paid under the bond. But *Gulf Liquids* explains that a surety seeking to recover payments made under a surety bond may have at least four potential means of trying to obtain monetary recompense: (1) try to recover from the principal based on the right of reimbursement,

(2) try to recover from the principal based on the right of restitution, (3) try to assert the principal's contract, tort, or statutory claims against the obligee through equitable subrogation, and (4) try to get indemnification from the principal based on contractual rights. *Id.* at 81–82.

*Gulf Liquids* does not provide or support the Insurers' litigation abuse and assertion of invalid claims against Apache.

IV.

The Insurers' Proposed Injunction Would Disrupt (Not Preserve) the Status Quo

In *Pidgeon v. Turner*, 625 S.W.3d at 590, the Fourteenth Court of Appeals affirmed the district court's denial of a temporary injunction challenging a directive by Houston's mayor to recognize same-sex marriages for City employee benefits purposes, explaining that the status quo was "the City's continuing to offer equal benefits to all spouses of city employees," which would be "dramatically disrupted[ed]" by the temporary injunction barring these benefits. *Id.* at 590–93, 607. Without showing the "preservation of status quo element, which is a requirement for the injunctive relief sought," the court concluded no injunctive relief was warranted. *Id.* at 607.

The Insurers' requested injunction in ¶ 135 would dramatically disrupt the status quo by preventing Apache from "executing or prosecuting *any act* to draw upon any letter of credit or file a claim on any bond described in this lawsuit." While the Insurers improperly may quibble about whether some costs qualify as decommissioning under the Decommissioning Agreement—they do—there is no dispute that the vast majority of costs do qualify for reimbursement. The Insurers' requested injunction seeks to prejudge the merits, alter the status quo, and deprive Apache from exercising its contractual rights. That is exactly the sort of radical departure from the parties' current rights and obligations that injunctions must avoid.

25

The Insurers are trying to disrupt Apache's present legal/contractual right and ability to draw on the Letters of Credit and Surety Bonds. The Insurers thus omit from their petition that their requested injunction would be wholly improper under their own contractual agreements.

- The Everest and Philadelphia Surety Bonds state that the "obligations of the Surety" are "*unconditional and irrevocable*," an Apache drawing request is "*conclusive proof* that the amount demanded is due and payable," and the Surety "*waives . . . each and every right* which it may have *to contest* Obligee's . . payment" and "*any and all defenses or counterclaims*." X-2 (Everest Bond) at 4; X-3 (Philadelphia Bond) at 4.

- The Zurich bonds provide that Apache's written statement for reimbursement "shall constitute *conclusive evidence* of the facts stated therein" and the "Surety's *liabilities and obligations* under this Bond to the Obligee are *not subject to any condition or qualification.*" X-12 (Zurich Bonds) at 2–3, 12–13, 22–23, 32–33.

- The Zurich bonds also provide that "[t]his Bond constitutes the Surety's *primary, absolute and independent obligation to make payment* to the Obligee in accordance with the terms hereof, *under any and all circumstances*, including, without limitation, due to the lack of validity, legality or enforceability of the Agreement, the Reimbursement Agreement or the Security and *irrespective of all objections, exceptions, set-offs, counterclaims or defenses of any kind* from the Surety, Fieldwood or other third parties." *Id.*

In the SSPA, the Sureties agreed—in exchange for additional premiums and subrogation rights—to not "take any action that would, or could reasonably be expected to, hinder, in any manner, any exercise of remedies under the Senior Documents," which included the Letters of Credit and Surety Bonds. X-5 § 1, 4. The Insurers' injunction would abrogate Apache's current rights currently to draw on the Letters of Credit and Surety Bonds without hindrance and would allow the Insurers to circumvent their current binding obligations. The Fourteenth Court's decision in *Pidgeon* prohibits that.

The Insurers' requested injunction is contrary to the law governing letters of credit. The International Chamber of Commerce's International Standby Practices 98 governs the Deutsche Bank letters of credit and provides that an issuer's obligations do not depend on either "the issuer's right or ability to obtain reimbursement from the applicant" or "the beneficiary's right to obtain payment from the applicant"—rather, they are triggered solely by "the presentation of documents

and an examination of required documents on their face." *See* International Chamber of Commerce, Pub. No. 590, International Standby Practices ("ISP98"), 1.06 ("Nature of Standbys").

In *GATX Leasing Corp. v. DBM Drilling Corp.*, 657 S.W.2d 178, 181 (Tex. App.—San Antonio 1983, no writ), the court dissolved a temporary injunction and explained that "[t]he essential purpose of a letter of credit is to insure payment to the beneficiary." The court noted that "it is a cardinal principle of letter of credit law that the obligation of the issuer bank to pay the beneficiary upon presentment of confirming documents[] is independent of the underlying contractual relationship between the customer and the beneficiary." *Id.* "When conforming documents are presented, payment *must be made*." *Id.*

In the letter-of-credit case *Eakin v. Continental Illinois National Bank & Trust Co. of Chicago*, 875 F.2d 114 (7th Cir. 1989), the Seventh Circuit effectively agreed with the Texas Court of Appeals in *GATX Leasing* and the Fifth Circuit in *Enterprise International.* As the Seventh Circuit succinctly put it, the rule with letters-of-credit is that banks/sureties must *"pay now, argue later." Id.* at 116.

This Court should not countenance the Insurers' counter-contractual, legally unsupported, and factually erroneous attempt to invert the rules as they try to get their hoped-for "argue now, pay later" injunction. This Court should reject the Insurers' attempt to avoid controlling contract language, avoid the effect of their contractual obligations and waivers, depart from settled law, dramatically alter the status quo, and ignore that money damages and an adequate remedy at law are available if the Insurers somehow prevail on their (meritless) claims.

<u>Conclusion</u>

The Court should deny the Insurers' request for a TRO or other injunctive relief.

27

Dated: July 6, 2023

Respectfully submitted,

By: /s/ *Geoffrey L. Harrison*

    Geoffrey L. Harrison
    TX State Bar No. 00785947
    Abigail C. Noebels
    TX State Bar No. 24083578
    Susman Godfrey L.L.P.
    1000 Louisiana Street, Suite 5100
    Houston, Texas 77002-5096
    Telephone: (713) 651-9366
    Facsimile: (713) 654-6666
    gharrison@susmangodfrey.com
    anoebels@susmangodfrey.com

    Nick Spear (*pro hac vice* forthcoming)
    CA State Bar No. 304281
    Susman Godfrey L.L.P.
    1900 Avenue of the Stars, Suite 1400
    Los Angeles, California 90067
    Telephone: (310) 789-3100
    Facsimile: (310) 789-3150
    nspear@susmangodfrey.com

    Winston Luo (*pro hac vice* forthcoming)
    WA State Bar No. 60828
    Susman Godfrey L.L.P.
    401 Union Street, Suite 3000
    Seattle, Washington 98101
    Telephone: (206) 516-3880
    Facsimile: (206) 516-3883
    wluo@susmangodfrey.com

*Counsel for Defendant Apache Corporation*

<u>Certificate of Service</u>

On July 6, 2023, a true and correct copy of this document was served on counsel of record in accordance with the TRCP via electronic filing.

/s/ *Geoffrey L. Harrison*
Geoffrey L. Harrison

28

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Naela Olguin on behalf of Geoffrey Harrison
Bar No. 00785947
nolguin@susmangodfrey.com
Envelope ID: 77268745
Filing Code Description: Answer/ Response / Waiver
Filing Description: Apache's Response to Plaintiffs' Request for Injunctive Relief
Status as of 7/6/2023 3:52 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Becky Delancy | | bdelancy@clarkhill.com | 7/6/2023 3:27:14 PM | SENT |
| Christopher Verducci | 24051470 | cverducci@lockelord.com | 7/6/2023 3:27:14 PM | SENT |
| Philip Guy Eisenberg | 24033923 | peisenberg@lockelord.com | 7/6/2023 3:27:14 PM | SENT |
| Adam Diamond | | ADiamond@clarkhill.com | 7/6/2023 3:27:14 PM | SENT |
| Christopher RichardWard | | cward@clarkhill.com | 7/6/2023 3:27:14 PM | SENT |
| Jase ABrown | | jbrown@csglaw.com | 7/6/2023 3:27:14 PM | SENT |
| Geoffrey L.Harrison | | gharrison@susmangodfrey.com | 7/6/2023 3:27:14 PM | SENT |
| Nicholas Spear | | nspear@susmangodfrey.com | 7/6/2023 3:27:14 PM | SENT |
| Charlotte Oxley | | coxley@susmangodfrey.com | 7/6/2023 3:27:14 PM | SENT |
| Jeff McLaren | | jmclaren@susmangodfrey.com | 7/6/2023 3:27:14 PM | SENT |
| Michael Edward Collins | 24029006 | mcollins@manierherod.com | 7/6/2023 3:27:14 PM | SENT |

7/6/2023 3:27:14 PM
Marilyn Burgess - District Clerk
Harris County
Envelope No: 77268745
By: GONZALEZ, PATRICIA
Filed: 7/6/2023 3:27:14 PM

**CAUSE NO. 2023-38238**

| | | |
|---|---|---|
| ZURICH AMERICAN INSURANCE COMPANY, HCC INTERNATIONAL INSURANCE COMPANY PLC, PHILADELPHIA INDEMNITY INSURANCE COMPANY, EVEREST REINSURANCE COMPANY, | § § § § § § | IN THE DISTRICT COURT OF |
| | § | HARRIS COUNTY, TEXAS |
| | § | |
| PLAINTIFFS, | § | |
| V. | § | |
| APACHE CORPORATION, | § | |
| | § | 281ST JUDICIAL DISTRICT |
| DEFENDANT. | § | |

## <u>DECLARATION OF JON GRAHAM</u>

I, Jon Graham, declare as follows:

1.  My name is Jon Graham. My address is 79 Angelique Way, The Woodlands, Texas 77382. My birthdate is December 5, 1954. I have reviewed the contents of this declaration and have authorized my attorneys to affix my electronic signature to the same. I declare under penalty of perjury under the laws of Texas and the United States that the foregoing is true and correct and is within my personal knowledge. Executed in Llano County, State of Texas, on the 6th day of July, 2023.

2.  I have a B.S. in Mechanical Engineering from University of Missouri at Rolla, and an M.B.A. from the University of Oklahoma.

3.  I have worked in the oil and gas industry for decades. I worked at Apache Corporation from 1994 to 2020 and retired on April 15, 2020. Prior to retirement, I held several positions including Regional Vice President and Reservoir Engineering Manager

for the Gulf Coast region and Vice President of Health, Safety, Security & Environment ("HSSE"). At various times, I worked in Egypt, Canada, Argentina, and most recently in Scotland as the Region Vice President Managing Director for Apache North Sea.

4.   I came out of retirement in January 2021 to work for Fieldwood Energy as a consultant during its second Chapter 11 bankruptcy. Fieldwood I was the entity that owned Gulf of Mexico offshore assets that Fieldwood purchased from Apache in 2013. I was not involved in that transaction.

5.   As part of Fieldwood's bankruptcy court-approved restructuring plan, Fieldwood I's Gulf of Mexico assets would be transferred to an entity called GOM Shelf, LLC, ("GOM Shelf") and I would serve as GOM Shelf's independent sole manager to focus on decommissioning non-producing properties and optimizing cash flow from the producing properties.

6.   On June 2, 2021, during the Fieldwood bankruptcy, lawyers for surety bond holders took my deposition and asked about Fieldwood I's / GOM Shelf's plans for the GOM assets and decommissioning. Mr. Phillip Eisenberg conducted most of the deposition. At page 33, he asked "what the magnitude of the obligations for P&A that would be current for Fieldwood I" and I said I was aware that "there are some estimates of asset retirement obligations for Fieldwood I, and they vary depending on who has done the estimate, but they are anywhere from 800 million to 1.2 billion dollars."

7.  At page 65, Mr. Eisenberg asked if I "had the opportunity to evaluate what the capital needs are for Fieldwood I" and I said the needs "are dominated by decommissioning obligations, and so we – Fieldwood I's cash flow will be primarily used for decommissioning activities" and I said at page 68 that I was aware "that there's over 200 million dollars in current decommissioning obligations that will exist at Fieldwood I on the day it goes effective."

8.  I understand that the insurance companies are alleging that Apache controls GOM Shelf and that I am not an independent manager of the company. That is not correct. All parties to the Fieldwood bankruptcy (including the insurance companies) understood that GOM Shelf would be responsible for its own business operations and would have to seek consent from Apache for certain types of significant activities and transactions like taking out new loans or selling off assets. As a senior creditor of GOM Shelf, Apache has consent rights with respect to issuance of new debt that for example could make it more difficult for GOM Shelf to repay its obligations.

9.  After the bankruptcy court's confirmation order became effective, on September 8, 2021, I sent a default notice for GOM Shelf to the relevant governmental authorities: the Bureau of Safety and Environmental Enforcement ("BSEE"), the Bureau of Ocean Energy Management ("BOEM"), and the U.S. Department of the Interior. The letter identified for the regulators a number of GOM Shelf's offshore properties that had been abandoned and were subject to government-mandated decommissioning and gave

notice that GOM Shelf lacked sufficient assets to fund decommissioning activities including interim maintenance and site visits. I later sent additional notices to the government of GOM Shelf's default for other properties.

10.  Apache did not coerce or compel me or GOM Shelf to default or to provide notice to the federal government. I made the decision in large part because as a matter of fact GOM Shelf did not have sufficient assets and capital to avoid defaulting on its decommissioning obligations. It is in GOM Shelf's best interest and is consistent with federal law and guidance from BSEE and BOEM for GOM Shelf to reduce its substantial decommissioning liabilities as soon as practicable. GOM Shelf does not have sufficient funds to conduct BSEE-required decommissioning activities such as "maintenance and monitoring" of the facilities and plugging and abandonment wells.

11. Apache has submitted reimbursement requests to GOM Shelf's "Trust A" in connection with decommissioning work. I have reviewed the reimbursement requests, invoices, and related materials, and believe that Apache's reimbursement requests relate directly to decommissioning and government-mandated decommissioning work and are properly reimbursable under agreements like the Decommissioning Agreement. After Trust A is exhausted, my understanding and belief is that Apache is entitled to draw on and get reimbursed from the approximately $498 million in letters of credit and surety bonds that were put in place for this very purpose.

12. I have had multiple oral and written communications with the insurance companies on issues related to GOM Shelf's operations, cash flow, reimbursements to Apache for decommissioning obligations, and other matters. Before they filed this lawsuit a few weeks ago, the insurance/surety companies never told me they thought "maintenance and monitoring" or "repair and maintenance" costs were not reimbursable or not covered by the Decommissioning Agreement or not related to decommissioning. Such costs are part of decommissioning and directly relate to decommissioning and are specifically required by BSEE's decommissioning orders to Apache. The insurance companies' question about such M&M or R&M costs had to do with their expectations of the amount of such costs. They did not question that the costs were reimbursable or were part of decommissioning. The July 6, 2022 letter to me from the insurance companies' lawyer Mr. Duane Brescia is an example of this.

13.  In his July 6, 2022 letter, Mr. Brescia suggested among other things that GOM Shelf should stop focusing on older asset retirement obligations "regardless of any government order to Apache" and should slow down the decommissioning schedule. He also suggested that GOM Shelf consider selling "all active fields and wells." Mr. Brescia and the insurance companies have not identified any realistic and specific opportunities to sell assets and have not presented specific offers or transactions. I would consider them if they had, but they have not. The insurance companies do not have rights to dictate

GOM Shelf's business operations and, in my view, they seem to have insufficient regard

for the federal government's orders and decommissioning laws and requirements.

Jon Graham

7/6/2023 3:27:14 PM
Marilyn Burgess - District Clerk
Harris County
Envelope No: 77268745
By: GONZALEZ, PATRICIA
Filed: 7/6/2023 3:27:14 PM

Cause No. 2023-38238

| | | |
|---|---|---|
| Zurich American Insurance Company, HCC | § | In the District Court of |
| International Insurance Company PLC, | § | |
| Philadelphia Indemnity Insurance Company, | § | |
| Everest Reinsurance Company, | § | Harris County, Texas |
| Plaintiffs, | § | |
| v. | § | |
| Apache Corporation, | § | 281st Judicial District |
| Defendant. | § | |

[Proposed]

<u>Order Denying Plaintiffs' Application for Temporary Restraining Order</u>

This Court has considered Plaintiffs' Application for Temporary Restraining Order, has considered Apache's response and cited authorities and evidence (including witness declarations, live witness testimony, and dozens of documents), and has considered heard the parties oral arguments in open Court. The Court ORDERS that Plaintiffs' Application is denied.

The Court FINDS that Plaintiffs are not entitled to a TRO or other injunctive relief because they have not satisfied the requirements for such relief. Plaintiffs have not shown that they have a probable right to relief, and they have not shown that injunctive relief is necessary to prevent an imminent irreparable injury. To the extent that Plaintiffs have a valid claim (and the Court is not now deciding that issue) their alleged injury can be addressed after a trial on the merits with a judgment of money damages if they are so entitled.

Dated: July _____, 2023

_____
The Honorable Christine Weems

11592082v1/017601

Cause No. 2023-38238

| | | |
|---|---|---|
| Zurich American Insurance Company, HCC | § | In the District Court of |
| International Insurance Company PLC, | § | |
| Philadelphia Indemnity Insurance Company, | § | |
| Everest Reinsurance Company, | § | Harris County, Texas |
| Plaintiffs, | § | |
| v. | § | |
| | § | 281st Judicial District |
| Apache Corporation, | § | |
| Defendant. | § | |

7/6/2023 3:27:14 PM
Marilyn Burgess - District Clerk
Harris County
Envelope No: 77268745
By: GONZALEZ, PATRICIA
Filed: 7/6/2023 3:27:14 PM

## Declaration of Julie Traylor

I, Julie Traylor, declare as follows:

1.      My name is Julie Traylor. My address is 4207 Whitman Street, Houston, Texas 77027. My birthdate is October 3, 1985. I declare under penalty of perjury under the laws of Texas and the United States that the foregoing is true and correct and are within my personal knowledge.

2.      I graduated from Trinity University with a B.S. in Accounting and Management in 2007, received my M.P.A. degree in Accounting from The University of Texas at Austin in 2008, and then earned a M.B.A. from Rice University, Jones Graduate School of Business in 2014.

3.      I am a Certified Public Accountant and started my career as an auditor with Ernst & Young, and then as an investor relations analyst at French oil and gas company Total.

4.      I joined Apache Corporation in 2011, where I started worked in both accounting and financial analysis. In more recent years, I changed my focus into financial operations, planning, and strategy and I held several roles of increasing responsibility, including Apache's Corporate Planning Manager and the Director of Strategic Planning.

5.      Fieldwood Energy LLC ("Fieldwood," which had purchased Apache's GOM assets in 2013) emerged from a second bankruptcy in August 2021, with Apache's former assets being owned by GOM Shelf LLC ("GOM Shelf"), a successor by merger to Fieldwood.  GOM Shelf had

11607314v1/017601

a large number of offshore leases that had been inactive for more than a year, meaning that federal regulations required that those properties be permanently decommissioned. GOM Shelf also had extremely limited financial resources.

6.      On September 8, 2021, GOM Shelf issued its first notice to BSEE that it intended to default on its obligations to decommission more than 40 "abandoned properties" and would not be able to meet its outstanding obligations—"plugging, abandonment, removal, site clearance, and any other decommissioning obligations" and "maintenance, inspections, or site visits"—pertaining to those assets.

7.      Under federal regulations, all prior owners of an offshore lease remain potentially liable for the ultimate costs to decommission the wells and facilities at the end of the lease's productive life.  To the extent that GOM Shelf was going to default in the performance of decommissioning obligations, that liability would return to Apache as the immediate predecessor to GOM Shelf.

8.      Apache began to stand up a GOM Decommissioning team to be able to manage this future liability. In December of 2021, I became the Gulf of Mexico ("GOM") Asset Manager where I oversee Apache's decommissioning-related operations in the GOM. My title changed to GOM General Manager in May 2022.

9.      After GOM Shelf's default letter, BSEE began issuing Decommissioning Orders to Apache (as predecessor owner) to decommission wells and facilities, some of which were identified on GOM Shelf's default notices and some of which were not.  Those letters confirm that "as a predecessor lessee or holder of operating rights," Apache is "responsible for decommissioning all wells, pipelines, platforms, other facilities, and obstructions." In addition, the BSEE letter set out specific obligations:

- To decommission the wells within 1 year of the date of the Order;

2

- To "immediately begin maintenance and monitoring of the wells and facilities pending completion of decommissioning;"

- To "flush and fill" all pipelines with seawater within 6 months of the Order; and

- To "submit monthly progress reports to BSEE... until the work is completed or the deadline reached."

10.     Apache is very experienced in decommissioning offshore facilities, from its many years operating offshore oil and gas assets across the globe. Decommissioning activities are complex, highly-engineered undertakings that require significant advanced planning for safe and efficient work. It is also extremely expensive.  The costs to decommission individual wells in GOM Shelf can range between $500 thousand to as much as $10 million depending on the unique characteristics of the site. Subsea wells are particularly expensive to plug and abandon, averaging near $6 million per well.

11.     At the time that I became the GOM General Manager, our estimate for future liability of the full cost to decommission all of the GOM Shelf assets was approximately $1.5 billion. That included over 300 leases, containing approximately 400 structures, 2,000 wells, 450 pipelines, and other equipment. By the end of 2022, Apache's estimates for the total decommissioning costs had grown to $1.7 billion.

12.     Apache's ultimate goal with the GOM Shelf defaulted leases is to safely, quickly, and efficiently complete the federally-required decommissioning operations. The longer that these "idle iron" platforms and wells sit abandoned offshore, the greater risk there is of a hurricane or other serious event causing significant damage to the facilities and the environment and creating even more complex conditions for decommissioning. In my estimation, the cost to plug and abandon toppled wells or facilities would be three to five times greater than the baseline cost to perform the decommissioning of an intact platform and wells.

3

13.     Apache has been coordinating with BSEE to comply with its decommissioning obligations in a safe and timely manner. An important early step for Apache after returning to responsibility for these GOM Shelf assets was to begin maintaining and monitoring the facilities, as ordered by BSEE. This includes testing valves and sensors, checking for hydrocarbons and pressure in the well, and ensuring that platforms are safe.

14.     These types of activities are necessary steps before any actual decommissioning work can be done.  A number of the GOM Shelf properties had been abandoned for a long period of time and were in serious state of disrepair.

15.     South Pass 89 is a good example.  You can see in these "before and after" photographs taken that the platform was severely rusted and corroded, the deck lacked necessary railings and handrails, and flooring had so degraded in areas that it was completely missing.



 

**BEFORE**                        **AFTER**

16.     BSEE will not send its inspectors, and Apache cannot send out its employees or contractors to the platform to test equipment in preparation for decommissioning if the platforms don't meet basic safety standards.

17.     After beginning maintenance, monitoring, and repairs, my team at Apache prepared the plan for decommissioning, sought permit approvals from BSEE, and then has scheduled and coordinated the various equipment and decommissioning teams to do the actual work. On South Pass 89, we are currently removing well conductors, and will reef the facility sometime between the fall of 2023 and summer of 2024.

18.     As GOM General Manager, I also have responsibility for managing the relationship between Apache and GOM Shelf LLC (the Fieldwood entity that now has ownership of the GOM leases). I have weekly interactions with GOM Shelf's manager, Jon Graham, and receive monthly financial updates and operational reports.

19.     I understand that the Insurers in their Petition have contended that Apache "controls" GOM Shelf and that Apache can "force" GOM Shelf to take any actions it wants. That is not true. Mr. Graham is an independent manager of GOM Shelf. Apache and GOM Shelf have a cooperative

relationship because Apache is a senior creditor and jointly liable for decommissioning of GOM Shelf's assets. I do not and have not given GOM Shelf any instructions or demands on how to run its business.

20.     Part of my limited outreach to Mr. Graham is in the context of Apache seeking reimbursement from GOM Shelf of the decommissioning costs. In the course of its bankruptcies, Fieldwood had set aside approximately $238 million in cash for decommissioning located in "Trust A," plus continued contributions which have increased the number somewhat since the bankruptcy exit. There is also approximately $498 million available to Apache in "Letters of Credit" and "Surety Bonds" issued by Deutsche Bank (backstopped by Zurich American Insurance Company and HCC International Insurance Company PLC), Everest Reinsurance Company, and Philadelphia Indemnity Insurance Company for the express purpose of reimbursing Apache for its costs in decommissioning the GOM Shelf defaulted assets.

21.     As Apache began the decommissioning work, it has sent monthly requests for reimbursement to GOM Shelf. GOM Shelf has expressly indicated that it cannot reimburse Apache directly for these costs, and in each instance, has failed to reimburse Apache within the time period required under the Decommissioning Agreement. As a result, Apache has obtained those reimbursements from Trust A, and the cash will soon be exhausted.

22.     Apache expects its Asset Retirement Obligation ("ARO") spend this year related to the GOM Shelf assets to exceed $500 million. After the Trust A is exhausted, Apache intends to seek reimbursement from the Letters of Credit and Surety Bonds.

23.     Recently, the Insurers reached out to GOM Shelf and Apache to set up meetings with an investment bank called Piper Sandler. I believe that the Insurers hired Piper Sandler to identify how to sell the GOM Shelf assets, in the hopes that a cash infusion to GOM Shelf would stop

Apache from needing to draw on the bonds and letters of credit. I attended the meeting, but Piper Sandler had no details or any concrete proposals for a sale that would benefit GOM Shelf and protect Apache's interests.  In my opinion, the Insurers are trying to pressure GOM Shelf to sell assets to further delay Apache from drawing on the bonds, and in the meantime the Insurers would continue to collect more than $6 million in annual premium payments owed under the SSPA.

Executed in Harris County, State of Texas, on the 7th day of July, 2023.

7