# EXHIBIT 23

7/6/2023 3:56 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 77271314
By: Patricia Gonzalez
Filed: 7/6/2023 3:56 PM

## SUSMAN GODFREY L.L.P.

A REGISTERED LIMITED LIABILITY PARTNERSHIP

SUITE 5100
1000 LOUISIANA STREET
HOUSTON, TEXAS 77002-5096
(713) 651-9366
FAX (713) 654-6666
WWW.SUSMANGODFREY.COM

---

SUITE 1400
1900 AVENUE OF THE STARS
LOS ANGELES, CALIFORNIA 90067-6029
(310) 789-3100

SUITE 3800
1201 THIRD AVENUE
SEATTLE, WASHINGTON 98101-3000
(206) 516-3880

32ND FLOOR
1301 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6023
(212) 336-8330

---

GEOFFREY L. HARRISON
DIRECT DIAL (713) 653-7807

E-MAIL GHARRISON@SUSMANGODFREY.COM

July 6, 2023

Clerk of Court
Harris County District Court
201 Caroline
Houston, Texas 77002

   Re: Cause No. 2023-38238; *Zurich American Insurance Company, et al.*
     *v. Apache Corporation*; In the 281st Judicial District, Harris County
     Texas.

Dear Clerk:

This is Part 2 to Envelope 77268745 and contains the Declaration of Stuart B. Cupit
and Exhibits 1-10 to Apache's Response to Plaintiff's Request for Injunctive Relief.

Sincerely,

/s/ Geoffrey L. Harrison

Geoffrey L. Harrison

11609613v1/017601

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Naela Olguin on behalf of Geoffrey Harrison
Bar No. 00785947
nolguin@susmangodfrey.com
Envelope ID: 77271314
Filing Code Description: Answer/ Response / Waiver
Filing Description: Exhibits 1-10 to Apache's Response to Plaintiffs' Request for Injunctive Relief
Status as of 7/6/2023 4:17 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Geoffrey L.Harrison | | gharrison@susmangodfrey.com | 7/6/2023 3:56:32 PM | SENT |
| Becky Delancy | | bdelancy@clarkhill.com | 7/6/2023 3:56:32 PM | SENT |
| Christopher Verducci | 24051470 | cverducci@lockelord.com | 7/6/2023 3:56:32 PM | SENT |
| Michael Edward Collins | 24029006 | mcollins@manierherod.com | 7/6/2023 3:56:32 PM | SENT |
| Philip Guy Eisenberg | 24033923 | peisenberg@lockelord.com | 7/6/2023 3:56:32 PM | SENT |
| Jeff McLaren | | jmclaren@susmangodfrey.com | 7/6/2023 3:56:32 PM | SENT |
| Nicholas Spear | | nspear@susmangodfrey.com | 7/6/2023 3:56:32 PM | SENT |
| Charlotte Oxley | | coxley@susmangodfrey.com | 7/6/2023 3:56:32 PM | SENT |
| Adam Diamond | | ADiamond@clarkhill.com | 7/6/2023 3:56:32 PM | SENT |
| James MKimbell | | jkimbell@clarkhill.com | 7/6/2023 3:56:32 PM | SENT |
| Christopher RichardWard | | cward@clarkhill.com | 7/6/2023 3:56:32 PM | SENT |
| Jase ABrown | | jbrown@csglaw.com | 7/6/2023 3:56:32 PM | SENT |

7/6/2023 3:56:32 PM
Marilyn Burgess - District Clerk
Harris County
Envelope No: 77271314
By: GONZALEZ, PATRICIA
Filed: 7/6/2023 3:56:32 PM

Cause No. 2023-38238

| | | |
|---|---|---|
| Zurich American Insurance Company, HCC | § | In the District Court of |
| International Insurance Company PLC, | § | |
| Philadelphia Indemnity Insurance Company, | § | |
| Everest Reinsurance Company, | § | Harris County, Texas |
| Plaintiffs, | § | |
| v. | § | |
| Apache Corporation, | § | 281st Judicial District |
| Defendant. | § | |

### Declaration of Stuart Brett Cupit in Support of Apache's
### Response to Plaintiffs' Request for Injunctive Relief

Stuart Brett Cupit makes the following declaration:

1.      My name is Stuart Brett Cupit.  My address is 2706 Wild Canary Ct., Richmond, TX 77056. My birthdate is July 17, 1971. I declare under penalty of perjury under the laws of Texas and the United States that the foregoing is true and correct and are within my personal knowledge.

2.      I graduated from Texas A&M University in 1995 with a B.S. in petroleum engineering and received a J.D. from Loyola University New Orleans College of Law in 2000.

3.      I am Assistant General Counsel for Apache Corporation.

4.      Exhibit 1 is a true and correct copy of the "Decommissioning Order for Lease OGS-G 01618" from Bureau of Safety and Environmental Enforcement (BSEE) to Apache Corporation.

5.      Exhibit 2 is a true and correct copy of the August 30, 2018 Payment Bond between Fieldwood Energy LLC, Everest Reinsurance Company, and Apache Corporation.

6.      Exhibit 3 is a true and correct copy of the September 27, 2018 Payment Bond between Fieldwood Energy LLC, Philadelphia Indemnity Insurance Company, and Apache Corporation.

7.      Exhibit 4 is a true and correct copy of the September 30, 2013 Deutsche Bank AG

Standby Letter of Credit No. DBS-20280.

8.     Exhibit 5 is a true and correct copy of the August 7, 2021 Subrogation, Subordination, and Payment Agreement.

9.     Exhibit 6 is a true and correct copy of the BSEE Decommissioning webpage (https://www.bsee.gov/decommissioning) captured on July 6, 2033.

10.    Exhibit 7 is a true and correct copy of the BSEE Idle Iron webpage (https://www.bsee.gov/what-we-do/environmental-focuses/decommissioning/idle-iron)  captured on July 6, 2023.

11.    Exhibit 8 is a true and correct copy of the December 11, 2018 BSEE Notice to Lessees and Operators re Idle Iron Decommissioning Guidance for Wells and Platforms.

12.    Exhibit 9 is a true and correct copy of excerpts from the July 18, 2013 Purchase and Sale Agreement.

13.    Exhibit 10 is a true and correct copy of excerpts from the June 2, 2021 deposition of Jon Graham in *In re: Fieldwood Energy LLC*, Case No. 20-33948.

14.    Exhibit 11 is a true and correct copy of excerpts from the April 11, 2018 Fifth Amendment to Decommissioning Agreement.

15.    Exhibit 12 is a true and correct copy of the November 9, 2015 Payment Bonds between Fieldwood Energy LLC, Zurich American Insurance Company, and Deutsche Bank AG New York Branch.

16.    Exhibit 13 is a true and correct copy of excerpts from the Findings of Fact, Conclusions of Law, and Order (I) Confirming Eighth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors and (II) Granting Related Relief, Dkt. #1751, *In re: Fieldwood Energy LLC*, Case No. 20-33948 (Bankr. S.D. Tex. June 25, 2021).

17.     Exhibit 14 is a true and correct copy of the July 6, 2022 letter from Duane Brescia to Jon Graham re Apache Sureties' Evaluation of the GOM Shelf/Apache Production of Documents.

18.     Exhibit 15 is a true and correct copy of the August 2021 Letter Agreement Related to GOM Shelf LLC Merger with Fieldwood Energy I signed by Everest Reinsurance Company.

19.     Exhibit 16 is a true and correct copy of the August 2021 Letter Agreement Related to GOM Shelf LLC Merger with Fieldwood Energy I signed by Zurich American Insurance Company.

20.     Exhibit 17 is a true and correct copy of the August 2021 Letter Agreement Related to GOM Shelf LLC Merger with Fieldwood Energy I signed by Philadelphia Indemnity Insurance Company.

21.     Exhibit 18 is a true and correct copy of the August 2021 Letter Agreement Related to GOM Shelf LLC Merger with Fieldwood Energy I signed by HCC International Insurance Company LLC.

22.     Exhibit 19 is a true and correct copy of the September 8, 2021 GOM Shelf letter to officials at the Department of the Interior, the Bureau of Safety and Environmental Enforcement (BSEE), and the Bureau of Ocean Energy Management (BOEM).

23.     Exhibit 20 is a true and correct copy of the February 22, 2022 GOM Shelf letter to officials at the Department of the Interior, the Bureau of Safety and Environmental Enforcement (BSEE), and the Bureau of Ocean Energy Management (BOEM).

24.     Exhibit 21 is a true and correct copy of the April 5, 2022 GOM Shelf letter to officials at the Department of the Interior, the Bureau of Safety and Environmental Enforcement (BSEE), and the Bureau of Ocean Energy Management (BOEM) which replaced the letters dated

September 8, 2021 and April 5, 2022.

25.     Exhibit 22 is a true and correct copy of the September 8, 2021 email from Peter Czerniakowski to Gregory Aumann re renewal of the Philadelphia Indemnity Insurance Company bond.

26.     Exhibit 23 is a true and correct copy of the August 2, 2022 email from Gregory Aumann to Rose Olmos re renewal of the Philadelphia Indemnity Insurance Company bond.

27.     Exhibit 24 is a true and correct copy of the July 19, 2022 email from Tony Romano to Rose Olmos re renewal of the Everest Reinsurance Company bond.

28.     Exhibit 25 is a true and correct copy of excerpts from the August 14, 2022 Bi-weekly Status Report for South Pass Block #89-B Platform (R&M Repair Work).

29.     Exhibit 26 is a true and correct copy of excerpts from the September 11, 2022 Bi-weekly Status Report for South Pass Block #89-B Platform (R&M Repair Work).

30.     Exhibit 27 is a true and correct copy of the June 6, 2022 Seller Notice of required Decommissioning under Decommissioning Agreement countersigned by GOM Shelf LLC.

31.     Exhibit 28 is a true and correct copy of the March 22, 2022 email from Michelle Hsiao to Rose Olmos re renewal of Deutsche Bank SBLC # 839BGC1600430.

32.     Exhibit 29 is a true and correct copy of the March 28, 2023 email from Konni Geppert to James Snelling re renewal of Deutsche Bank SBLC # 839BGC1600430.

33.     Exhibit 30 is a true and correct copy of the April 17, 2023 email from Abigail Noebels to Duane Brescia and others re courtesy production of documents.

34.     Exhibit 31 is a true and correct copy of the April 19, 2023 email from Abigail Noebels to Duane Brescia and others re supplemental production of documents.

Executed in Harris County, State of Texas, on the 6th day of July, 2023.

4

By: /s/ *Brett Cupit*
     Stuart Brett Cupit

# Exhibit 1

"Decommissioning Order for Lease OGS-G 01618" from Bureau of Safety and Environmental Enforcement (BSEE) to Apache Corporation



# United States Department of the Interior

BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT

Gulf of Mexico OCS Region
1201 Elmwood Park Boulevard
New Orleans, LA 70123-2394

In Reply To:  GE 1078A                                      June 2, 2022

Ms. Brenda Montalvo
Fieldwood Energy LLC
2000 West Sam Houston Parkway South,
Suite 1200
Houston, Texas 77042
Brenda.Montalvo@fwellc.com
Brenda.Montalvo@qnenergy.com

Mr. Jack Isbell/Mr. Eric Johnson/Ms. Laura Hogge
Apache Corporation/Apache Shelf Exploration LLC
2000 Post Oak Boulevard, Suite 100
Houston, Texas 77056
Jack.Isbell@apachecorp.com
Eric.Johnson@apachecorp.com
laura.hogge@apachecorp.com

Ms. Ashlyn Hanna
The Louisiana Land and Exploration Company
600 North Dairy Ashford (3WL-15096)
Houston, Texas 77079
Ashlyn.C.Hanna@conocophillips.com

Ms. Melissa Sassella
Talos ERT LLC
333 Clay Street, Suite 3300
Houston, Texas 77002
Melissa.Sassella@talosenergy.com

Toni E. Kelley and Steve Thompson
Marathon Oil Company
90 Town & Country Boulevard
Houston, Texas 77024
tekelley@marathonoil.com
sjthompson@marathonoil.com

Ms. Brittany Gill and Mr. Jason Anderson
Hess Corporation
1501 McKinney Street
Houston, Texas 77010
bgill@hess.com
jasanderson@hess.com

Erin Harold
Remington Oil and Gas Corporation
(ERT/Talos Energy LLC)
333 Clay Street, Suite 3300
Houston, Texas 77002
erin.harold@talosenergy.com

Mr. Ronald Washington
Anadarko Petroleum Corporation
1201 Lake Robbins Drive
The Woodlands, Texas 77380
Ronald_Washington2@oxy.com

Certified No.7019 0700 0000 4121 2196
OKC Limited Partnership
645 Lakeland East Drive, Suite 101
Flowood, Mississippi  39232

**Subject:**        **Decommissioning Order** for Lease OCS-G 01618

Dear Mses. and Messrs.:

This letter is to notify all recipients that the lessee(s) and operating rights holders on Lease OCS-G
01618, South Pass Block 89 (SP 89) at the time of lease termination have failed to comply with their

2

obligation to timely decommission all infrastructure on this lease. Pursuant to 30 CFR part 250, Subpart Q and the lease agreement, infrastructure on terminated leases must be decommissioned within one year after the lease termination date.

Lease OCS-G 01618 was terminated on March 30, 2021; therefore, decommissioning was required to be completed by March 31, 2022.  Due to the failure of the designated operator, lessee(s), and operating rights holders to perform decommissioning by March 31, 2022, BSEE issued Incident(s) of Noncompliance (INC) on June 2, 2022 to document the designated operator(s)', lessee(s)' and operating rights holder(s)' failure to decommission the lease as required. To date, the infrastructure has not been decommissioned.

As a lessee and/or holder of operating rights of the subject lease at the time of termination, or a predecessor lessee or holder of operating rights, you are responsible for decommissioning all wells, pipelines, platforms, other facilities, and obstructions for which you have accrued decommissioning obligations under 30 CFR 250.1702 (see Enclosure identifying all responsibilities; deadlines set by order or regulation).

Therefore, pursuant to 30 CFR 250.146, 250.1701, 250.1702, 250.1703, 250.1710, 250.1725(a), 550.147, 556.710, and the lease agreement, the recipients of this letter are hereby ordered to decommission the wells within one year of the date of this Order and to decommission the platform by October 31, 2023, and as part of this responsibility to immediately begin maintenance and monitoring of the wells and facilities pending completion of decommissioning. You should coordinate efforts to meet this decommissioning order deadline and to determine who will perform maintenance and monitoring. Within ten days of receipt of this letter, you must contact the appropriate District office and inform them of the company that will perform maintenance and monitoring of the wells and facilities pending decommissioning to prevent threats of harm to safety or the environment. If maintenance and monitoring is currently ongoing and expected to continue until decommissioning is complete, please verify the company name by contacting the appropriate District office.

**Additionally, you must submit monthly progress reports to BSEE, Decommissioning Support Section, until the work is completed or the deadline is reached.** If you plan to submit these reports electronically, you may submit them through the BSEE Technical Information Management System (https://timsweb.bsee.gov).

To facilitate compliance with this Order, BSEE further expects you to coordinate directly with the following departments as necessary:

- Office of Safety Management:  Contact Mr. Jason Mathews, Chief, at (504) 731-1496 or jason.mathews@bsee.gov to discuss Safety and Environmental Management Systems (SEMS) coverage and to identify the SEMS plan that will cover your activities on the remaining wells and facilities;
- Oil Spill Preparedness Division:  Contact Ms. Sara Moore, Supervisor, at (504) 731-1444 or sara.moore@bsee.gov to discuss Oil Spill Response Plan (OSRP) coverage and to identify the OSRP that will cover your activities on the remaining wells and facilities;
- Office of Regional Director:  Contact Ms. Casey Kavanaugh, Technical Advisor, at (504) 736-2701 or casey.kavanaugh@bsee.gov to discuss requirements for permitting the plugging and abandonment of wells and to identify who may submit permit applications;

- Pipeline Section:  Contact Ms. Angie Gobert, Chief, at (504) 736-2876 or angie.gobert@bsee.gov to discuss requirements for permitting the decommission of pipelines and to identify who may submit permit applications; and
- Office of Structural and Technical Support:  Contact Ms. Marilyn Sauls, Chief, at (504) 736-7509 or marilyn.sauls@bsee.gov to discuss requirements for permitting the removal of the remaining platforms and other facilities and to identify who may submit permit applications.

You should expeditiously submit the following, as applicable:

- An appropriate Application for Permit to Modify (APM) under 30 CFR 250.1712, to permanently abandon each well for which you are responsible, to the New Orleans District, 800 W. Commerce Road, Suite 300, New Orleans, Louisiana 70123.  If you want to submit the APM electronically, you may submit it through the BSEE eWell Permitting and Reporting System (https://ewell.bsee.gov);
- An application for approval under 30 CFR 250.1727 to remove any platform or other facility for which you are responsible, to BSEE, Office of Structural and Technical Support, 1201 Elmwood Park Boulevard, GE 1023A, New Orleans, Louisiana 70123.  If you want to submit this application electronically, you may submit it through the BSEE Technical Information Management System (https://timsweb.bsee.gov); and
- An application for approval, under 30 CFR 250.1751 or 250.1752, to decommission any pipelines for which you are responsible to BSEE, Pipeline Section, 1201 Elmwood Park Boulevard, GE 1034A, New Orleans, Louisiana 70123.  If you want to submit this application electronically, you may submit it through the BSEE Technical Information Management System (https://timsweb.bsee.gov).

Failure to comply with this Order may result in further enforcement actions. This Order may be appealed pursuant to 30 CFR part 290. If you elect to appeal under 30 CFR 290.4, a Notice of Appeal must be filed with this office and served on the Associate Solicitor, Division of Mineral Resources, within 60 days of receipt of this letter (see NTL No. 2009-N12). If a Notice of Appeal is filed, please send a courtesy copy via e-mail to the contact e-mail address provided below. Pursuant to 30 CFR 290.6, you may seek informal resolution with the issuing officer's next level supervisor during the 60-day period established in 30 CFR 290.3. You may submit your request through the BSEE Technical Information Management System (https://timsweb.bsee.gov).  If you are adversely affected by the outcome of informal resolution, you will have 60-days from that decision to appeal pursuant to 30 CFR 290.4.

If you have any questions or concerns, you may contact Ms. Catherine Anadu at (504) 736-1713 or Catherine.Anadu@bsee.gov.

Sincerely,

STEPHEN DESSAUER

Digitally signed by STEPHEN DESSAUER
Date: 2022.06.02 06:06:18 -05'00'

Stephen P. Dessauer
Regional Supervisor
Regional Field Operations

2 Enclosures
       Accrued Decommissioning Obligations
       District Office Contacts


cc:    Mr. Keith Krenek
       Sanare Energy Partners, LLC
       11 Greenway Plaza, Suite 2800
       Houston, Texas  77046
       kkrenek@sanarepartners.com

| Company | Interest Type | Scope of Interest | Accrued Decommissioning Obligations |
|---|---|---|---|
| Fieldwood Energy LLC (current) | Lessee | All of Lease OCS-G 01618 | Well(s):<br><br>013 (API No.177224015100)<br>014 (API No.177224017500)<br>B001 (API No.177224005300)<br>B002 (API No.177224005700)<br>B003 (API No.177224006400)<br>B004 (API No.177224006800)<br>B005 (API No.177224008400)<br>B006 (API No.177224009500)<br>B007 (API No.177224008501)<br>B008 (API No.177224009901)<br>B009 (API No.177224008601)<br>B010 (API No.177224010900)<br>B011 (API No.177224010403)<br>B012 (API No.177224011200)<br>B013 (API No.177224011704)<br>B014 (API No.177224011601)<br>B015 (API No.177224012703)<br>B016 (API No.177224014702)<br>B017 (API No.177224015901)<br>B018 (API No.177224017602)<br>B019 (API No.177224017901)<br>B020 (API No.177224016203)<br>B022 (API No.177224017800)<br>C001 (API No.177224020500)<br>C004 (API No.177224021101)<br>C006 (API No.177224021400)<br>C010 (API No.177224022400)<br><br>Platform(s):<br><br>B (CID No. 22662) |
| The Louisiana Land and Exploration Company LLC (current) | Lessee | All of Lease OCS-G 01618 | Well(s):<br><br>013 (API No.177224015100)<br>014 (API No.177224017500)<br>B001 (API No.177224005300)<br>B002 (API No.177224005700)<br>B003 (API No.177224006400)<br>B004 (API No.177224006800)<br>B005 (API No.177224008400)<br>B006 (API No.177224009500)<br>B007 (API No.177224008501)<br>B008 (API No.177224009901)<br>B009 (API No.177224008601) |

| Company | Interest Type | Scope of Interest | Accrued Decommissioning Obligations |
|---|---|---|---|
| | | | B010 (API No.177224010900) |
| | | | B011 (API No.177224010403) |
| | | | B012 (API No.177224011200) |
| | | | B013 (API No.177224011704) |
| | | | B014 (API No.177224011601) |
| | | | B015 (API No.177224012703) |
| | | | B016 (API No.177224014702) |
| | | | B017 (API No.177224015901) |
| | | | B018 (API No.177224017602) |
| | | | B019 (API No.177224017901) |
| | | | B020 (API No.177224016203) |
| | | | B022 (API No.177224017800) |
| | | | C001 (API No.177224020500) |
| | | | C004 (API No.177224021101) |
| | | | C006 (API No.177224021400) |
| | | | C010 (API No.177224022400) |
| | | | |
| | | | Platform(s): |
| | | | |
| | | | B (CID No. 22662) |
| Talos ERT LLC (current) | Lessee | All of Lease OCS-G 01618 | Well(s): |
| | | | |
| | | | 013 (API No.177224015100) |
| | | | 014 (API No.177224017500) |
| | | | B001 (API No.177224005300) |
| | | | B002 (API No.177224005700) |
| | | | B003 (API No.177224006400) |
| | | | B004 (API No.177224006800) |
| | | | B005 (API No.177224008400) |
| | | | B006 (API No.177224009500) |
| | | | B007 (API No.177224008501) |
| | | | B008 (API No.177224009901) |
| | | | B009 (API No.177224008601) |
| | | | B010 (API No.177224010900) |
| | | | B011 (API No.177224010403) |
| | | | B012 (API No.177224011200) |
| | | | B013 (API No.177224011704) |
| | | | B014 (API No.177224011601) |
| | | | B015 (API No.177224012703) |
| | | | B016 (API No.177224014702) |
| | | | B017 (API No.177224015901) |
| | | | B018 (API No.177224017602) |
| | | | B019 (API No.177224017901) |
| | | | B020 (API No.177224016203) |
| | | | B022 (API No.177224017800) |
| | | | C001 (API No.177224020500) |

| Company | Interest Type | Scope of Interest | Accrued Decommissioning Obligations |
|---|---|---|---|
| | | | C004 (API No.177224021101)<br>C006 (API No.177224021400)<br>C010 (API No.177224022400)<br><br>Platform(s):<br><br>B (CID No. 22662) |
| Apache Corporation (prior) | Lessee | All of Lease OCS-G 01618 | Well(s):<br><br>013 (API No.177224015100)<br>014 (API No.177224017500)<br>B001 (API No.177224005300)<br>B002 (API No.177224005700)<br>B003 (API No.177224006400)<br>B004 (API No.177224006800)<br>B005 (API No.177224008400)<br>B006 (API No.177224009500)<br>B007 (API No.177224008501)<br>B008 (API No.177224009901)<br>B009 (API No.177224008601)<br>B010 (API No.177224010900)<br>B011 (API No.177224010403)<br>B012 (API No.177224011200)<br>B013 (API No.177224011704)<br>B014 (API No.177224011601)<br>B015 (API No.177224012703)<br>B016 (API No.177224014702)<br>B017 (API No.177224015901)<br>B018 (API No.177224017602)<br>B019 (API No.177224017901)<br>B020 (API No.177224016203)<br>B022 (API No.177224017800)<br>C001 (API No.177224020500)<br>C004 (API No.177224021101)<br>C006 (API No.177224021400)<br>C010 (API No.177224022400)<br><br>Platform(s):<br><br>B (CID No. 22662) |
| Marathon Oil Company (prior) | Lessee | All of Lease OCS-G 01618 | Well(s):<br><br>013 (API No.177224015100)<br>014 (API No.177224017500)<br>B001 (API No.177224005300)<br>B002 (API No.177224005700) |

| Company | Interest Type | Scope of Interest | Accrued Decommissioning Obligations |
|---|---|---|---|
| | | | B003 (API No.177224006400) |
| | | | B004 (API No.177224006800) |
| | | | B005 (API No.177224008400) |
| | | | B006 (API No.177224009500) |
| | | | B007 (API No.177224008501) |
| | | | B008 (API No.177224009901) |
| | | | B009 (API No.177224008601) |
| | | | B010 (API No.177224010900) |
| | | | B011 (API No.177224010403) |
| | | | B012 (API No.177224011200) |
| | | | B013 (API No.177224011704) |
| | | | B014 (API No.177224011601) |
| | | | B015 (API No.177224012703) |
| | | | B016 (API No.177224014702) |
| | | | B017 (API No.177224015901) |
| | | | B018 (API No.177224017602) |
| | | | B019 (API No.177224017901) |
| | | | B020 (API No.177224016203) |
| | | | B022 (API No.177224017800) |
| | | | C001 (API No.177224020500) |
| | | | C004 (API No.177224021101) |
| | | | C006 (API No.177224021400) |
| | | | C010 (API No.177224022400) |
| | | | |
| | | | Platform(s): |
| | | | |
| | | | B (CID No. 22662) |
| Remington Oil and Gas Corporation (prior) | Lessee | All of Lease OCS-G 01618 | Well(s): |
| | | | |
| | | | 013 (API No.177224015100) |
| | | | 014 (API No.177224017500) |
| | | | B001 (API No.177224005300) |
| | | | B002 (API No.177224005700) |
| | | | B003 (API No.177224006400) |
| | | | B004 (API No.177224006800) |
| | | | B005 (API No.177224008400) |
| | | | B006 (API No.177224009500) |
| | | | B007 (API No.177224008501) |
| | | | B008 (API No.177224009901) |
| | | | B009 (API No.177224008601) |
| | | | B010 (API No.177224010900) |
| | | | B011 (API No.177224010403) |
| | | | B012 (API No.177224011200) |
| | | | B013 (API No.177224011704) |
| | | | B014 (API No.177224011601) |
| | | | B015 (API No.177224012703) |

| Company | Interest Type | Scope of Interest | Accrued Decommissioning Obligations |
|---|---|---|---|
| | | | B016 (API No.177224014702) B017 (API No.177224015901) B018 (API No.177224017602) B019 (API No.177224017901) B020 (API No.177224016203) B022 (API No.177224017800) C001 (API No.177224020500) C004 (API No.177224021101) C006 (API No.177224021400) C010 (API No.177224022400) Platform(s): B (CID No. 22662) |
| Anadarko Petroleum Corporation (prior) | Lessee | All of Lease OCS-G 01618 | Well(s): 013 (API No.177224015100) 014 (API No.177224017500) B001 (API No.177224005300) B002 (API No.177224005700) B003 (API No.177224006400) B004 (API No.177224006800) B005 (API No.177224008400) B006 (API No.177224009500) B007 (API No.177224008501) B008 (API No.177224009901) B009 (API No.177224008601) B010 (API No.177224010900) B011 (API No.177224010403) B012 (API No.177224011200) B013 (API No.177224011704) B014 (API No.177224011601) B015 (API No.177224012703) B016 (API No.177224014702) B017 (API No.177224015901) B018 (API No.177224017602) B019 (API No.177224017901) B020 (API No.177224016203) B022 (API No.177224017800) C001 (API No.177224020500) C004 (API No.177224021101) C006 (API No.177224021400) C010 (API No.177224022400) Platform(s): |

| Company | Interest Type | Scope of Interest | Accrued Decommissioning Obligations |
|---|---|---|---|
| | | | B (CID No. 22662) |
| Hess Corporation (prior) | Lessee | All of Lease OCS-G 01618 | Well(s):<br><br>013 (API No.177224015100)<br>014 (API No.177224017500)<br>B001 (API No.177224005300)<br>B002 (API No.177224005700)<br>B003 (API No.177224006400)<br>B004 (API No.177224006800)<br>B005 (API No.177224008400)<br>B006 (API No.177224009500)<br>B007 (API No.177224008501)<br>B008 (API No.177224009901)<br>B009 (API No.177224008601)<br>B010 (API No.177224010900)<br>B011 (API No.177224010403)<br>B012 (API No.177224011200)<br>B013 (API No.177224011704)<br>B014 (API No.177224011601)<br>B015 (API No.177224012703)<br>B016 (API No.177224014702)<br>B017 (API No.177224015901)<br>B018 (API No.177224017602)<br>B019 (API No.177224017901)<br>B020 (API No.177224016203)<br>B022 (API No.177224017800)<br>C001 (API No.177224020500)<br>C004 (API No.177224021101)<br>C006 (API No.177224021400)<br>C010 (API No.177224022400)<br><br>Platform(s):<br><br>B (CID No. 22662) |
| OKC Limited Partnership (prior) | Lessee | All of Lease OCS-G 01618 | Well(s):<br><br>013 (API No.177224015100)<br>014 (API No.177224017500)<br>B001 (API No.177224005300)<br>B002 (API No.177224005700)<br>B003 (API No.177224006400)<br>B004 (API No.177224006800)<br>B005 (API No.177224008400)<br>B006 (API No.177224009500)<br>B008 (API No.177224009901)<br>B010 (API No.177224010900) |

| Company | Interest Type | Scope of Interest | Accrued Decommissioning Obligations |
|---|---|---|---|
| | | | B012 (API No.177224011200) B016 (API No.177224014702) B017 (API No.177224015901) B018 (API No.177224017602) B019 (API No.177224017901) B022 (API No.177224017800) C001 (API No.177224020500)  Platform(s):  B (CID No. 22662) |
| Talos ERT LLC (current) | Operating Rights Holder | All of Block 89, South and East Addition, from 16,802' TVDSS to 99,999' TVDSS | Well(s):  C001 (API No.177224020500) C004 (API No.177224021101) |
| Fieldwood Energy LLC (current) | Operating Rights Holder | All of Block 89, South and East Addition, from 16,802' TVDSS to 99,999' TVDSS | Well(s):  C001 (API No.177224020500) C004 (API No.177224021101) |
| The Louisiana Land and Exploration Company LLC (current) | Operating Rights Holder | All of Block 89, South and East Addition, from 16,802' TVDSS to 99,999' TVDSS | Well(s):  C001 (API No.177224020500) C004 (API No.177224021101) |
| Apache Shelf Exploration LLC (current) | Operating Rights Holder | All of Block 89, South and East Addition, from 16,802' TVDSS to 99,999' TVDSS | Well(s):  C001 (API No.177224020500) C004 (API No.177224021101) |

*The information contained in this table is based on BSEE/BOEM internal databases. Recipients should ensure all obligations are accurately captured in this table and alert BSEE if they believe it contains incorrect or missing information.*

| Office | BSEE Representative | Office Number | Office Email Address |
|---|---|---|---|
| New Orleans District | Anthony Pizza<br>or<br>David Trocquet | 504-734-6749<br>Or<br>504-734-6750 | Anthony.Pizza@bsee.gov<br><br>David.Trocquet@bsee.gov |
| Houma District | Micah Charpentier<br>or<br>Amy Pellegrin | 985-853-5917<br>Or<br>985-853-5921 | Micah.Charpentier@bsee.gov<br><br>Amy.Pellegrin@bsee.gov |
| Lafayette District | Mark Malbrue | 337-289-5116 | Mark.Malbrue@bsee.gov |
| Lake Charles District | Kim Jackson | 337-437-4635 | Kim.Jackson@bsee.gov |
| Lake Jackson District | Steve Martinez | 713-286-2308 | Stephen.Martinez@bsee.gov |

# Exhibit 2

August 30, 2018 Payment Bond between Fieldwood Energy LLC, Everest Reinsurance Company, and Apache Corporation

# Exhibit 2

August 30, 2018 Payment Bond between Fieldwood Energy LLC, Everest Reinsurance Company, and Apache Corporation

*Execution Version*

# Payment Bond

**Bond No.** ES00001441_____          **Penal Sum:** $75,000,000.00_____

### Know All Men By These Presents,

That *Fieldwood Energy LLC*, a Delaware limited liability company with its principal office at 2000 W. Sam Houston Parkway S, Suite 1200, Houston, Texas 77042 (hereinafter called "**Principal**"), and *Everest Reinsurance Company,* a Delaware corporation with an office at 451 5th Avenue, New York, New York 10017 (hereinafter called "**Surety**"), authorized to do and doing a surety business in the State of Texas, and meeting, and shall continue to meet, the requirements, if any, established for a surety by any governmental authority having jurisdiction, are held and firmly bound unto *Apache Corporation*, a Delaware corporation (hereinafter called "**Obligee**" or "**APA**") with an office at 2000 Post Oak Blvd., Suite 100, Houston, Texas 77056, in the original penal amount of Seventy-Five Million and No/100 Dollars ($75,000,000.00), referred to herein as the "**Stated Amount**", exclusive of reasonable attorney's fees, court costs and expenses, for the payment whereof Principal and Surety bind themselves, their heirs, executors, administrators, and successors and assigns, jointly, severally and solidarily, firmly by these presents.

WHEREAS, Obligee, along with Apache Shelf, Inc., a Delaware corporation ("**APSH**"), Apache Deepwater LLC, a Delaware limited liability company ("**APDW**"), and Apache Shelf Exploration LLC, a Delaware limited liability company ("**ASE**"), and Principal, along with GOM Shelf LLC, a Delaware limited liability company ("**GOM**" collectively, with Principal shall be referred to herein as "**Fieldwood**"), entered into that certain Decommissioning Agreement dated as of September 30, 2013 (as amended, the "**Agreement**"); and

WHEREAS, Obligee, Principal, and Surety may sometimes be referred to in this Payment Bond (the "**Bond**") individually as a "**Party**" and collectively as the "**Parties**"; and

WHEREAS, capitalized terms used, but not defined herein, shall have the meanings given such terms in the Agreement; and

WHEREAS, Principal has obtained this Bond in accordance with its obligations under the Agreement.

NOW, **THEREFORE,** for good and valuable consideration, the Parties agree as follows:

1. **Term and Termination.** This Bond is for an initial term beginning August 30, 2018 and ending on August 30, 2019 (the "**Initial Term**"). This Bond will automatically renew for additional twelve (12) month periods (each a "**Subsequent Term**") unless the Surety provides to the Obligee, by certified mail (return receipt requested), overnight courier or by any other receipted means, advance written notice, no earlier than ninety (90) days and no later than sixty (60) days from the end of the

Initial Term or any Subsequent Term, as applicable, of its intent not to renew the Bond. It is understood and agreed that Surety shall, upon demand in the form of a Drawing Request (as defined in Section 2(a) below) made by Obligee, without any notice other than such Drawing Request, and without any further action by the Obligee, deliver to Obligee cash not later than the Demand Compliance Deadline (as defined in this Section 1 below) in the full amount of the Bond (less any previous amounts paid to the Obligee under the Bond).  This Bond shall remain in full force and effect as to obligations incurred by Principal during the term of this Bond; provided, however:

    (a) This Bond shall automatically terminate (without any requirement for further notice, amendment or other formality or action of any person) upon Surety's receipt of a Termination Notice, accompanied by the original of this Bond and executed by both Principal and Obligee in substantially the form of Exhibit D.

    (b) The Stated Amount of this Bond shall from time to time automatically reduce (without any requirement for further notice, amendment or other formality or action of any person) upon Surety's receipt of a Reduction Notice executed by both Principal and Obligee in substantially the form of Exhibit C.

    (c) This Bond shall terminate upon Surety's payment(s) to Obligee in an aggregate amount equal to the Stated Amount and as applicable, the amounts described in Sections 2(e) and 6.

A "**Demand Compliance Deadline**", for any Drawing Request, means the seventh business day after delivery of such Drawing Request in accordance with Section 3 below.

2.   **Payments.**

    (a) Without limitation of Obligee's right to demand cash in accordance with Section 1 above, funds under this Bond are available to Obligee upon Surety's receipt of either (i) a Decommissioning Drawing Request in substantially the form of Exhibit A or (ii) a Non-Extension Drawing Request in substantially the form of Exhibit B (each of (i) and (ii) being a "**Drawing Request**") signed by an authorized officer of Obligee.  For clarity purposes and not intended to expand or limit the provisions of the Agreement, the Parties acknowledge that Surety is not required, and does not have the obligation or option, to perform any Decommissioning on behalf of either Principal or Obligee.

    (b) Multiple and partial payments under this Bond are allowed.  The Stated Amount of this Bond shall be reduced by the amount of any such payments.

    (c) Surety hereby agrees that each Drawing Request presented under and in compliance with the terms and conditions of this Bond will be duly honored upon presentation to Surety, and Surety agrees to make payment in full on the Demand Compliance Deadline.

#5647104.3

(d) In the event that a Drawing Request fails to comply with the terms and conditions of this Bond but is presented on or before the expiration of the Initial Term or any Subsequent Term, as applicable, Surety shall provide Principal and Obligee with prompt notice of same stating the reasons therefor and shall hold any non-conforming Drawing Request at Obligee's disposal or return any non-conforming Drawing Request to Obligee at the address set forth above by overnight courier. Upon being notified that the Drawing Request was not effected in compliance with this Bond, Obligee may attempt to correct such non-complying Drawing Request in accordance with the terms and conditions hereof.

(e) Payments hereunder shall be made by Surety to Obligee (a) by wire transfer in United States Dollars of immediately available funds in the amount of such payment in accordance with Obligee's instructions set forth in, or accompanying, the Drawing Request and (b) without any deduction, recoupment, diminution, set- off, counterclaim, defenses or withholding (other than deduction or withholding of tax required by law, which shall be permitted), and Surety expressly waives any such right, claim or defense. **If Surety does not make a payment to Obligee on the date it is due to be paid according to the terms of this Bond, such overdue amount shall accrue interest until paid at (a) a simple interest rate equal to 12% per annum (based on 30-day months and a 360-day year) or (b) if less, the maximum rate permitted by applicable law.**

(f) The aggregate liability of Surety under this Bond shall not exceed the Stated Amount plus, as applicable, the amounts described in Sections 2(e) and 6.

3. **Address for Notices.** All Drawing Requests and communications with respect to this Bond shall be in writing, referencing this Bond Number ES00001441,   and sent by overnight courier, delivery in person, facsimile transmission or by electronic mail (with the original by overnight courier in the case of facsimile transmission or electronic mail but delivery shall be deemed to occur upon receipt of the facsimile transmission or electronic mail, as applicable) to the addresses for Surety set forth below:

| **If to Obligee:** | **If to Principal:** |
|---|---|
| Apache Corporation | Fieldwood Energy LLC |
| 2000 Post Oak Blvd, Suite 100 | 2000 West Sam Houston Pkwy South |
| Houston, Texas 77056 | Suite 1200 |
| | Houston, Texas 77042 |
| Attn: Treasury Dept | Attn: Michael T. Dane |
| Facsimile: 713-296-6675 | Facsimile: 713-969-1099 |
| Email: | Email: mdane@fwellc.com |
| FieldwoodDecommissioning@apachecorp.com | |

#5647104.3

**If to Surety:**

Everest Reinsurance Company
451 5th Avenue,
New York, New York 10017
Attn: Tony Romano
Facsimile: 646.746.1991
Email: tony.romano@everestre.com

4. **Conditions.** The obligations of the Surety under this Bond shall be unconditional and irrevocable and the Obligee's Drawing Request shall be accepted by the Surety as conclusive proof that the amount demanded is due and payable by the Surety to the Obligee under this Bond. The Surety, whether in its capacity as surety or subrogee of the Principal, waives, to the fullest extent permitted by applicable law, each and every right which it may have to contest Obligee's computation or payment of the obligations or the Obligee's application of the bond proceeds to the obligations. The Surety waives any and all defenses or counterclaims related to Surety's obligations under this Bond and expressly agrees that no genuine issue of fact exists that would prevent or preclude Surety's obligations to comply with any Draw Request.

Surety's obligations under this Bond are not subject to any condition or qualification except as expressly set forth herein and are not contingent on (i) the ability of the Surety to perfect any lien or security interest on any asset or property of the Principal or any other person; or (ii) the Surety's ability to obtain indemnification from the Principal or any other person; or (iii) any other circumstances which might otherwise constitute a legal or equitable discharge or defense for Surety.

5. **Costs.** Principal shall pay all commissions and charges for this Bond. Principal's failure to pay any such charges shall not (i) be grounds for termination of this Bond, or (ii) hinder, delay, or otherwise excuse Surety's obligations hereunder.

6. **Expenses.** Surety shall pay upon demand all costs incurred by Obligee in the enforcement of this Bond, including expenses and reasonable attorney fees. Surety's obligation to pay such costs shall be in addition to other amounts owed pursuant to this Bond and shall not be limited by the maximum Stated Amount of this Bond.

7. **Representations and Warranties.** Surety represents and warrants to Obligee that as of the date of this Bond and as of the date of commencement of each Subsequent Term:

   (a) Surety has the legal power to execute and deliver this Bond and to perform in accordance with its terms. All necessary actions have been taken to authorize the execution and delivery of this Bond and performance in accordance with its terms. This Bond is a legal, valid and binding obligation of Surety.

#5647104.3

(b) There is no action or proceeding pending or, to Surety's knowledge, threatened before any court, arbitrator, or governmental agency that may materially and adversely affect Surety's ability to perform its obligations under this Bond.

(c) There is no fact that Surety has not disclosed in writing to Obligee of which Surety is aware or which Surety can reasonably foresee that would materially adversely affect Surety or the ability of Surety to perform its obligations hereunder.

8. **Assignment**. No Party shall assign this Bond or any part hereof without the prior consent of the other Parties; provided, however, that without such consent, APA can assign this Bond in whole or in part to (i) APSH, APDW, or ASE and (ii) any permitted assignee of APA, APSH, APDW, or ASE under the Agreement, such assignment on a pro rata basis to such assignee's interest in the Agreement. Subject to the forgoing, this Bond shall be binding upon the and inure to the benefit of the Parties and their respective permitted successors and assigns; provided however, that no assignment shall in any way diminish Surety's obligations hereunder.

5

**IN WITNESS WHEREOF**, the above Parties have executed this instrument under their several seals, as required, on the dates noted below but to be effective as of the 30th day of August, 2018, the name and corporate seal of each corporate party being hereto affixed and those presents duly signed by its undersigned representative pursuant to authority of its governing body.

**APACHE CORPORATION**

By: _____

Name:

Title:

**FIELDWOOD ENERGY LLC**

By: _____

Name: Michael T. Dane

Title: Senior Vice President and Chief Financial Officer

**EVEREST REINSURANCE COMPANY**

By: _____

Name: Teresa D. Kelly

Title: Attorney-in-Fact

*EVEREST*                                                                                              ES050R10003

### POWER OF ATTORNEY
### EVEREST REINSURANCE COMPANY
### *DELAWARE*

KNOW ALL PERSONS BY THESE PRESENTS: That Everest Reinsurance Company, a corporation of the State of Delaware ("Company") having its principal office located at 477 Martinsville Road, Liberty Corner, New Jersey 07938, do hereby nominate, constitute, and appoint:

### *Dan W. Burton, Teresa D. Kelly, Craig, C. Payne, Laura L. Kneitz, Melissa Haddick, Rheagyn L. White*

its true and lawful Attorney(s)-in-fact to make, execute, attest, seal and deliver for and on its behalf, as surety, and as its act and deed, where required, any and all bonds and undertakings in the nature thereof, for the penal sum of no one of which is in any event to exceed UNLIMITED, reserving for itself the full power of substitution and revocation.

Such bonds and undertakings, when duly executed by the aforesaid Attorney(s)-in-fact shall be binding upon the Company as fully and to the same extent as if such bonds and undertakings were signed by the President and Secretary of the Company and sealed with its corporate seal.

This Power of Attorney is granted and is signed by facsimile under and by the authority of the following Resolutions adopted by the Board of Directors of Company ("Board") on the 28th day of July 2016:

   *RESOLVED, that the President, any Executive Vice President, and any Senior Vice President and Anthony Romano are hereby appointed by the Board as authorized to make, execute, seal and deliver for and on behalf of the Company, any and all bonds, undertakings, contracts or obligations in surety or co-surety with others and that the Secretary or any Assistant Secretary of the Company be and that each of them hereby is authorized to attest to the execution of any such bonds, undertakings, contracts or obligations in surety or co-surety and attach thereto the corporate seal of the Company.*

   *RESOLVED, FURTHER, that the President, any Executive Vice President, and any Senior Vice President and Anthony Romano are hereby authorized to execute powers of attorney qualifying the attorney named in the given power of attorney to execute, on behalf of the Company, bonds and undertakings in surety or co-surety with others, and that the Secretary or any Assistant Secretary of the Company be, and that each of them is hereby authorized to attest the execution of any such power of attorney, and to attach thereto the corporate seal of the Company.*

   *RESOLVED, FURTHER, that the signature of such officers named in the preceding resolutions and the corporate seal of the Company may be affixed to such powers of attorney or to any certificate relating thereto by facsimile, and any such power of attorney or certificate bearing such facsimile signatures or facsimile seal shall be thereafter valid and binding upon the Company with respect to any bond, undertaking, contract or obligation in surety or co-surety with others to which it is attached.*

IN WITNESS WHEREOF, Everest Reinsurance Company has caused their corporate seals to be affixed hereto, and these presents to be signed by their duly authorized officers this 28th day of July 2016.

Everest Reinsurance Company

Attest: Nicole Chase, Assistant Secretary

By: Anthony Romano, Vice President

On this 28th day of July 2016, before me personally came Anthony Romano, known to me, who, being duly sworn, did execute the above instrument; that he knows the seal of said Company; that the seal affixed to the aforesaid instrument is such corporate seal and was affixed thereto; and that he executed said instrument by like order.

> **LINDA BOISSELLE**
> **Notary Public, State of New York**
> **No 01B06239736**
> **Qualified in Queens County**
> **Term Expires April 25, 2019**

Linda Boisselle, Notary Public

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of said Company, at the Liberty Corner, this ⟨30th⟩ day of ⟨August⟩ 20 ⟨18⟩.



## EXHIBIT A

## FORM OF DECOMMISSIONING DRAWING REQUEST

Date: _____

To:

[Surety]

Attention:

Re:   Your Payment Bond No._____ (the "**Payment Bond**")

Ladies and Gentlemen:

The undersigned individual, an authorized officer of [insert name of the Obligee] (the "**Obligee**"), hereby certifies to [insert name of the Surety] (the "**Surety**"), with reference to the Payment Bond No. [insert number of the Payment Bond] (the "**Payment Bond**") dated [insert date of the Payment Bond], issued in favour of the Obligee by the Surety for the account of [insert name of the Principal] (the "**Principal**"), as follows as of the date hereof (any capitalized term used in this Decommissioning Drawing Request and not defined in this Decommissioning Drawing Request shall have its respective meaning as set forth in the Payment Bond):

1.      The undersigned is authorized to make the drawing request pursuant to this Decommissioning Drawing Request on behalf of the Obligee.

2.      The Obligee is entitled to make a drawing in the amount of [$_____ ] (the "**Drawing Amount**") pursuant to the terms and conditions of the Payment Bond and of the Decommissioning Agreement dated as of September 30, 2013 among Apache Corporation, Apache Shelf, Inc., Apache Deepwater LLC, Apache Shelf Exploration LLC, Fieldwood Energy LLC and GOM Shelf LLC (as amended, restated or otherwise modified from time to time, the "**Decommissioning Agreement**"). Such Drawing Amount does not exceed the amount available for drawing under the Payment Bond, and the Payment Bond has not expired.

3.      Buyer has failed to reimburse and pay a Seller or its Affiliate for Reimbursable Amounts (as such terms are defined in the Decommissioning Agreement) in the amount of the Drawing Amount within the time period specified in Section 2.7(b) of the Decommissioning Agreement.

4.      Obligee has complied with Section 3.2(a)(i) and Section 3.2(a)(ii) of the Decommissioning Agreement.

5.      The Drawing Amount does not exceed the amount Obligee is entitled to draw under the Payment Bond pursuant to the Decommissioning Agreement.

#5647104.3

6.      The Obligee has provided or will provide the Principal with a copy of this Decommissioning Drawing Request on the date hereof by facsimile transmission to:

[insert name of the Principal]
Attention: [_____]
Facsimile: [_____].

7.      Please remit payment in the amount of [$_____] in immediately available funds, by wire transfer, to the order of Obligee in accordance with the following payment instructions:

[insert payment instructions]

IN WITNESS WHEREOF, the undersigned has executed and delivered this Decommissioning Drawing Request on [insert date of the Decommissioning Drawing Request].

**[INSERT NAME OF THE OBLIGEE]**

By:_____
Name:
Title:

2

**Exhibit B**

**FORM OF NON-EXTENSION DRAWING REQUEST**

<u>**Non-Extension Drawing Request**</u>
[insert name and address of the Obligee]

[                                        ]
[                                        ]
[                                        ]

[insert date of the Non-Extension Drawing Request]

[insert name and address of the Surety]

[                                        ]
[                                        ]
[                                        ]

Drawn under [insert name of the Surety]
Payment Bond Number [insert number of the Payment Bond]
Dated [insert date of the Payment Bond]

Ladies and Gentlemen:

The undersigned individual, an authorized officer of [insert name of the Obligee] (the "**Obligee**"), hereby certifies to [insert name of the Surety] (the "**Surety**"), with reference to the Payment Bond No. [insert number of the Payment Bond] (the "**Payment Bond**") dated [insert date of the Payment Bond], issued in favour of the Obligee by the Surety for the account of [insert name of the Principal] (the "**Principal**"), as follows as of the date hereof (any capitalized term used in this Non-Extension Drawing Request and not defined in this Non-Extension Drawing Request shall have its respective meaning as set forth in the Payment Bond):

1.       The undersigned is authorized to make this Non-Extension Drawing Request on behalf of the Obligee.

2.       The Obligee is entitled to make a drawing in the amount of [$              ] pursuant to the terms of the Payment Bond and the Decommissioning Agreement dated as of September 30, 2013 among Apache Corporation, Apache Shelf, Inc., Apache Deepwater LLC, Apache Shelf Exploration LLC, Fieldwood Energy LLC and GOM Shelf LLC (as amended, restated or otherwise modified from time to time).  Such Drawing Amount does not exceed the amount available for drawing under the Payment Bond, and the Payment Bond has not expired.

3.       The Obligee has provided or will provide the Principal with a copy of this Non-Extension Drawing Request on the date hereof by facsimile transmission to:

[insert name of the Principal]
Attention: [              ]

#5647104.3

Facsimile: [_____].

4.      Please remit payment in the amount of [$_____] in immediately available funds, by wire transfer, to the order of Obligee in accordance with the following payment instructions:

<u>[insert payment instructions for the Trust A Account]</u>

IN WITNESS WHEREOF, the undersigned has executed and delivered this Non-Extension Drawing Request on [insert date of the Non-Extension Drawing Request].

**[INSERT NAME OF THE OBLIGEE]**

By:_____
Name:
Title:

2

#5647104.3

## EXHIBIT C

## FORM OF REDUCTION NOTICE

### Reduction Notice

[insert name and address of the Principal]

[_____]
[_____]
[_____]

[insert date of the Reduction Notice]

[insert name and address of the Surety]

[_____]
[_____]
[_____]

Re:    Payment Bond No. [___] issued by
[insert name of Surety];

Ladies and Gentlemen:

Each of the undersigned individuals, authorized officers of [insert name of the Principal] (the "**Principal**") and [insert name of Obligee] (the "**Obligee**"), respectively, hereby certifies to [insert name of the Surety] (the "**Surety**"), with reference to the Payment Bond No. [insert number of the Payment Bond] (the "**Payment Bond**") dated [insert date of the Payment Bond], issued in favour of the Obligee by the Surety for the account of the Principal, as follows as of the date hereof (any capitalized term used in this Reduction Notice and not defined in this Reduction Notice shall have its respective meaning as set forth in the Payment Bond):

1.    Each of the undersigned is authorized to execute and deliver this Reduction Notice on behalf of the Principal and the Obligee, respectively.

2.    The Drawing Amount under the Payment Bond shall be reduced to the following: [$_____].

Accordingly, in accordance with the requirements of the Payment Bond, upon the Surety's receipt of this Reduction Notice, the Drawing Amount under the Payment Bond shall automatically be reduced to [$_____] without any requirement for further, amendment or other formality or action of any person.

#5647104.3

IN WITNESS WHEREOF, each of the undersigned has executed and delivered this Reduction Notice on [insert date of the Reduction Notice].

**[INSERT NAME OF THE PRINCIPAL]**

By:_____
Name:
Title:

**[INSERT NAME OF THE OBLIGEE]**

By:_____
Name:
Title:

2

## EXHIBIT D

## FORM OF TERMINATION NOTICE

**<u>Termination Notice</u>**
[insert name and address of the Principal]

[_____]
[_____]
[_____]

[insert date of the Termination Notice]

[insert name and address of the Surety]

[_____]
[_____]
[_____]

Re:    Payment Bond No. [___] issued by
[insert name of Surety];

Ladies and Gentlemen:

Each of the undersigned individuals, authorized officers of [insert name of the Principal] (the **"Principal"**) and [insert name of Obligee] (the **"Obligee"**), respectively, hereby certifies to [insert name of the Surety] (the **"Surety"**), with reference to the Payment Bond No. [insert number of the Payment Bond] (the **"Payment Bond"**) dated [insert date of the Payment Bond], issued in favour of the Obligee by the Surety for the account of the Principal, as follows as of the date hereof (any capitalized term used in this Termination Notice and not defined in this Termination Notice shall have its respective meaning as set forth in the Payment Bond):

Each of the undersigned is authorized to execute and deliver this Termination Notice on behalf of the Principal and the Obligee, respectively.

Accordingly, in accordance with the provisions of the Payment Bond, the Payment Bond shall automatically be terminated (without any requirement for further notice, amendment or other formality or action of any person) upon the Surety's receipt of this Termination Notice.

1

#5647104.3

IN WITNESS WHEREOF, each of the undersigned has executed and delivered this Termination Notice on [insert date of the Termination Notice].

**[INSERT NAME OF THE PRINCIPAL]**

By:_____

Name:

Title:


**[INSERT NAME OF THE OBLIGEE]**

By:_____

Name:

Title:

2

# Exhibit 3

September 27, 2018 Payment Bond between Fieldwood Energy LLC, Philadelphia Indemnity Insurance Company, and Apache Corporation

# Exhibit 3

September 27, 2018 Payment Bond between Fieldwood Energy LLC, Philadelphia Indemnity Insurance Company, and Apache Corporation

*Execution Version*

# Payment Bond

Bond No. PB03251500040 _____          Penal Sum: $72,601,297.00 _____

### Know All Men By These Presents,

That *Fieldwood Energy LLC*, a Delaware limited liability company with its principal office at 2000 W. Sam Houston Parkway S, Suite 1200, Houston, Texas 77042 (hereinafter called "**Principal**"), and *Philadelphia Indemnity Insurance Company*, a Pennsylvania corporation with an office at One Bala Plaza East, Suite 100, Bala Cynwyd, PA 19004-1403 (hereinafter called "**Surety**"), authorized to do and doing a surety business in the State of Texas, and meeting, and shall continue to meet, the requirements, if any, established for a surety by any governmental authority having jurisdiction, are held and firmly bound unto *Apache Corporation*, a Delaware corporation (hereinafter called "**Obligee**" or "**APA**") with an office at 2000 Post Oak Blvd., Suite 100, Houston, Texas 77056, in the original penal amount of Seventy-Two Million Six Hundred One Thousand Two Hundred Ninety-Seven and No/100 Dollars ($72,601,297.00), referred to herein as the "**Stated Amount**", exclusive of reasonable attorney's fees, court costs and expenses, for the payment whereof Principal and Surety bind themselves, their heirs, executors, administrators, and successors and assigns, jointly, severally and solidarily, firmly by these presents.

**WHEREAS**, Obligee, along with Apache Shelf, Inc., a Delaware corporation ("**APSH**"), Apache Deepwater LLC, a Delaware limited liability company ("**APDW**"), and Apache Shelf Exploration LLC, a Delaware limited liability company ("**ASE**"), and Principal, along with GOM Shelf LLC, a Delaware limited liability company ("**GOM**" collectively, with Principal shall be referred to herein as "**Fieldwood**"), entered into that certain Decommissioning Agreement dated as of September 30, 2013 (as amended, the "**Agreement**"); and

**WHEREAS**, Obligee, Principal, and Surety may sometimes be referred to in this Payment Bond (the "**Bond**") individually as a "**Party**" and collectively as the "**Parties**"; and

**WHEREAS**, capitalized terms used, but not defined herein, shall have the meanings given such terms in the Agreement; and

**WHEREAS**, Principal has obtained this Bond in accordance with its obligations under the Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the Parties agree as follows:

1. **Term and Termination.** This Bond is for an initial term beginning September 27, 2018 and ending on September 27, 2019 (the "**Initial Term**"). This Bond will automatically renew for additional twelve (12) month periods (each a "**Subsequent Term**") unless the Surety provides to the Obligee, by certified mail (return receipt requested), overnight courier or by any other receipted means, advance written notice, no earlier than ninety (90) days and no later than sixty (60) days from the end of the

Initial Term or any Subsequent Term, as applicable, of its intent not to renew the Bond. It is understood and agreed that Surety shall, upon demand in the form of a Drawing Request (as defined in Section 2(a) below) made by Obligee, without any notice other than such Drawing Request, and without any further action by the Obligee, deliver to Obligee cash not later than the Demand Compliance Deadline (as defined in this Section 1 below) in the full amount of the Bond (less any previous amounts paid to the Obligee under the Bond). This Bond shall remain in full force and effect as to obligations incurred by Principal during the term of this Bond; provided, however:

    (a) This Bond shall automatically terminate (without any requirement for further notice, amendment or other formality or action of any person) upon Surety's receipt of a Termination Notice, accompanied by the original of this Bond and executed by both Principal and Obligee in substantially the form of Exhibit D.

    (b) The Stated Amount of this Bond shall from time to time automatically reduce (without any requirement for further notice, amendment or other formality or action of any person) upon Surety's receipt of a Reduction Notice executed by both Principal and Obligee in substantially the form of Exhibit C.

    (c) This Bond shall terminate upon Surety's payment(s) to Obligee in an aggregate amount equal to the Stated Amount and as applicable, the amounts described in Sections 2(e) and 6.

A "**Demand Compliance Deadline**", for any Drawing Request, means the seventh business day after delivery of such Drawing Request in accordance with Section 3 below.

2.   **Payments.**

    (a) Without limitation of Obligee's right to demand cash in accordance with Section 1 above, funds under this Bond are available to Obligee upon Surety's receipt of either (i) a Decommissioning Drawing Request in substantially the form of Exhibit A or (ii) a Non-Extension Drawing Request in substantially the form of Exhibit B (each of (i) and (ii) being a "**Drawing Request**") signed by an authorized officer of Obligee. For clarity purposes and not intended to expand or limit the provisions of the Agreement, the Parties acknowledge that Surety is not required, and does not have the obligation or option, to perform any Decommissioning on behalf of either Principal or Obligee.

    (b) Multiple and partial payments under this Bond are allowed. The Stated Amount of this Bond shall be reduced by the amount of any such payments.

    (c) Surety hereby agrees that each Drawing Request presented under and in compliance with the terms and conditions of this Bond will be duly honored upon presentation to Surety, and Surety agrees to make payment in full on the Demand Compliance Deadline.

#5647104.3

(d) In the event that a Drawing Request fails to comply with the terms and conditions of this Bond but is presented on or before the expiration of the Initial Term or any Subsequent Term, as applicable, Surety shall provide Principal and Obligee with prompt notice of same stating the reasons therefor and shall hold any non-conforming Drawing Request at Obligee's disposal or return any non-conforming Drawing Request to Obligee at the address set forth above by overnight courier. Upon being notified that the Drawing Request was not effected in compliance with this Bond, Obligee may attempt to correct such non-complying Drawing Request in accordance with the terms and conditions hereof.

(e) Payments hereunder shall be made by Surety to Obligee (a) by wire transfer in United States Dollars of immediately available funds in the amount of such payment in accordance with Obligee's instructions set forth in, or accompanying, the Drawing Request and (b) without any deduction, recoupment, diminution, set-off, counterclaim, defenses or withholding (other than deduction or withholding of tax required by law, which shall be permitted), and Surety expressly waives any such right, claim or defense. **If Surety does not make a payment to Obligee on the date it is due to be paid according to the terms of this Bond, such overdue amount shall accrue interest until paid at (a) a simple interest rate equal to 12% per annum (based on 30-day months and a 360-day year) or (b) if less, the maximum rate permitted by applicable law.**

(f) The aggregate liability of Surety under this Bond shall not exceed the Stated Amount plus, as applicable, the amounts described in Sections 2(e) and 6.

3. **Address for Notices.** All Drawing Requests and communications with respect to this Bond shall be in writing, referencing this Bond Number PB03251500040, and sent by overnight courier, delivery in person, facsimile transmission or by electronic mail (with the original by overnight courier in the case of facsimile transmission or electronic mail but delivery shall be deemed to occur upon receipt of the facsimile transmission or electronic mail, as applicable) to the addresses for Surety set forth below:

**If to Obligee:**

Apache Corporation
2000 Post Oak Blvd, Suite 100
Houston, Texas 77056

Attn: Treasury Dept
Facsimile: 713-296-6675
Email:
FieldwoodDecommissioning@apachecorp.com

**If to Principal:**

Fieldwood Energy LLC
2000 West Sam Houston Pkwy South
Suite 1200
Houston, Texas 77042
Attn: Michael T. Dane
Facsimile: 713-969-1099
Email: mdane@fwellc.com

3

#5647104.3

**If to Surety:**

Philadelphia Indemnity Insurance Company
One Bala Plaza, Suite 100
Bala Cynwyd, PA 19004-1403
Attn: Bill Simpson
Facsimile: 610-227-0186
Email: Bill.Simpson@phly.com

4. **Conditions.** The obligations of the Surety under this Bond shall be unconditional and irrevocable and the Obligee's Drawing Request shall be accepted by the Surety as conclusive proof that the amount demanded is due and payable by the Surety to the Obligee under this Bond. The Surety, whether in its capacity as surety or subrogee of the Principal, waives, to the fullest extent permitted by applicable law, each and every right which it may have to contest Obligee's computation or payment of the obligations or the Obligee's application of the bond proceeds to the obligations. The Surety waives any and all defenses or counterclaims related to Surety's obligations under this Bond and expressly agrees that no genuine issue of fact exists that would prevent or preclude Surety's obligations to comply with any Draw Request.

Surety's obligations under this Bond are not subject to any condition or qualification except as expressly set forth herein and are not contingent on (i) the ability of the Surety to perfect any lien or security interest on any asset or property of the Principal or any other person; or (ii) the Surety's ability to obtain indemnification from the Principal or any other person; or (iii) any other circumstances which might otherwise constitute a legal or equitable discharge or defense for Surety.

5. **Costs.** Principal shall pay all commissions and charges for this Bond. Principal's failure to pay any such charges shall not (i) be grounds for termination of this Bond, or (ii) hinder, delay, or otherwise excuse Surety's obligations hereunder.

6. **Expenses.** Surety shall pay upon demand all costs incurred by Obligee in the enforcement of this Bond, including expenses and reasonable attorney fees. Surety's obligation to pay such costs shall be in addition to other amounts owed pursuant to this Bond and shall not be limited by the maximum Stated Amount of this Bond.

7. **Representations and Warranties.** Surety represents and warrants to Obligee that as of the date of this Bond and as of the date of commencement of each Subsequent Term:

   (a) Surety has the legal power to execute and deliver this Bond and to perform in accordance with its terms. All necessary actions have been taken to authorize the execution and delivery of this Bond and performance in accordance with its terms. This Bond is a legal, valid and binding obligation of Surety.

#5647104.3

(b) There is no action or proceeding pending or, to Surety's knowledge, threatened before any court, arbitrator, or governmental agency that may materially and adversely affect Surety's ability to perform its obligations under this Bond.

(c) There is no fact that Surety has not disclosed in writing to Obligee of which Surety is aware or which Surety can reasonably foresee that would materially adversely affect Surety or the ability of Surety to perform its obligations hereunder.

8. **Assignment.** No Party shall assign this Bond or any part hereof without the prior consent of the other Parties; provided, however, that without such consent, APA can assign this Bond in whole or in part to (i) APSH, APDW, or ASE and (ii) any permitted assignee of APA, APSH, APDW, or ASE under the Agreement, such assignment on a pro rata basis to such assignee's interest in the Agreement. Subject to the forgoing, this Bond shall be binding upon the and inure to the benefit of the Parties and their respective permitted successors and assigns; provided however, that no assignment shall in any way diminish Surety's obligations hereunder.

**IN WITNESS WHEREOF,** the above Parties have executed this instrument under their several seals, as required, on the dates noted below but to be effective as of the 27th day of September, 2018, the name and corporate seal of each corporate party being hereto affixed and those presents duly signed by its undersigned representative pursuant to authority of its governing body.

**APACHE CORPORATION**

By: _____

Name: BEN C. RODGERS

Title: VICE PRESIDENT AND TREASURER

**FIELDWOOD ENERGY LLC**

By: _____

Name: Michael T. Dane

Title: Senior Vice President and Chief Financial Officer

**PHILADELPHIA INDEMNITY INSURANCE COMPANY**

By: _____

Name: Teresa D. Kelly

Title: Attorney-in-Fact

#5647104.3

6

### PHILADELPHIA INDEMNITY INSURANCE COMPANY
One Bala Plaza, Suite 100
Bala Cynwyd, PA 19004-0950

**Power of Attorney**

KNOW ALL PERSONS BY THESE PRESENTS: That **PHILADELPHIA INDEMNITY INSURANCE COMPANY** (the Company), a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, does hereby constitute and appoint **Craig Payne, Dan W. Burton, Teresa D. Kelly, Melissa Haddick, Rheagyn White, and/or Laura L. Kneitz of Alliant Insurance Services, Inc.,** its true and lawful Attorney-in-fact with full authority to execute on its behalf bonds, undertakings, recognizances and other contracts of indemnity and writings obligatory in the nature thereof, issued in the course of its business and to bind the Company thereby, in an amount not to exceed **$75,000,000**.

This Power of Attorney is granted and is signed and sealed by facsimile under and by the authority of the following Resolution adopted by the Board of Directors of PHILADELPHIA INDEMNITY INSURANCE COMPANY on the 14th of November, 2016.

|  |  |
|---|---|
| **RESOLVED:** | That the Board of Directors hereby authorizes the President or any Vice President of the Company: (1) Appoint Attorney(s) in Fact and authorize the Attorney(s) in Fact to execute on behalf of the Company bonds and undertakings, contracts of indemnity and other writings obligatory in the nature thereof and to attach the seal of the Company thereto; and (2) to remove, at any time, any such Attorney-in-Fact and revoke the authority given. And, be it |
| **FURTHER RESOLVED:** | That the signatures of such officers and the seal of the Company may be affixed to any such Power of Attorney or certificate relating thereto by facsimile, and any such Power of Attorney so executed and certified by facsimile signatures and facsimile seal shall be valid and binding upon the Company in the future with respect to any bond or undertaking to which it is attached. |

IN TESTIMONY WHEREOF, PHILADELPHIA INDEMNITY INSURANCE COMPANY HAS CAUSED THIS INSTRUMENT TO BE SIGNED AND ITS CORPORATE SEAL TO BE AFFIXED BY ITS AUTHORIZED OFFICE THIS 27TH DAY OF OCTOBER, 2017.



(Seal)

Robert D. O'Leary Jr., President & CEO
Philadelphia Indemnity Insurance Company

On this 27th day of October, 2017, before me came the individual who executed the preceding instrument, to me personally known, and being by me duly sworn said that he is the therein described and authorized officer of the **PHILADELPHIA INDEMNITY INSURANCE COMPANY**, that the seal affixed to said instrument is the Corporate seal of said Company, that the said Corporate Seal and his signature were duly affixed.

| COMMONWEALTH OF PENNSYLVANIA NOTARIAL SEAL Morgan Knepp, Notary Public Lower Merion Twp, Montgomery County My Commission Expires Sept 25, 2021 MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES | | |
|---|---|---|
| | Notary Public: | *Morgan Knepp* |
| (Notary Seal) | residing at: | Bala Cynwyd, PA |
| | My commission expires: | September 25, 2021 |

I, Edward Sayago, Corporate Secretary of PHILADELPHIA INDEMNITY INSURANCE COMPANY, do hereby certify that the foregoing resolution of the Board of Directors and the Power of Attorney issued pursuant thereto on the 27th day of October, 2017 are true and correct and are still in full force and effect. I do further certify that Robert D. O'Leary Jr., who executed the Power of Attorney as President, was on the date of execution of the attached Power of Attorney the duly elected President of PHILADELPHIA INDEMNITY INSURANCE COMPANY.

In Testimony Whereof I have subscribed my name and affixed the facsimile seal of each Company this 27th day of September, 20 18

Edward Sayago, Corporate Secretary
**PHILADELPHIA INDEMNITY INSURANCE COMPANY**

## EXHIBIT A

## FORM OF DECOMMISSIONING DRAWING REQUEST

Date: _____

To:

[Surety]

Attention:

Re:     Your Payment Bond No._____ (the "**Payment Bond**")

Ladies and Gentlemen:

The undersigned individual, an authorized officer of [insert name of the Obligee] (the "**Obligee**"), hereby certifies to [insert name of the Surety] (the "**Surety**"), with reference to the Payment Bond No. [insert number of the Payment Bond] (the "**Payment Bond**") dated [insert date of the Payment Bond], issued in favour of the Obligee by the Surety for the account of [insert name of the Principal] (the "**Principal**"), as follows as of the date hereof (any capitalized term used in this Decommissioning Drawing Request and not defined in this Decommissioning Drawing Request shall have its respective meaning as set forth in the Payment Bond):

1.      The undersigned is authorized to make the drawing request pursuant to this Decommissioning Drawing Request on behalf of the Obligee.

2.      The Obligee is entitled to make a drawing in the amount of [$_____] (the "**Drawing Amount**") pursuant to the terms and conditions of the Payment Bond and of the Decommissioning Agreement dated as of September 30, 2013 among Apache Corporation, Apache Shelf, Inc., Apache Deepwater LLC, Apache Shelf Exploration LLC, Fieldwood Energy LLC and GOM Shelf LLC (as amended, restated or otherwise modified from time to time, the "**Decommissioning Agreement**"). Such Drawing Amount does not exceed the amount available for drawing under the Payment Bond, and the Payment Bond has not expired.

3.      Buyer has failed to reimburse and pay a Seller or its Affiliate for Reimbursable Amounts (as such terms are defined in the Decommissioning Agreement) in the amount of the Drawing Amount within the time period specified in Section 2.7(b) of the Decommissioning Agreement.

4.      Obligee has complied with Section 3.2(a)(i) and Section 3.2(a)(ii) of the Decommissioning Agreement.

5.      The Drawing Amount does not exceed the amount Obligee is entitled to draw under the Payment Bond pursuant to the Decommissioning Agreement.

#5647104.3

6.     The Obligee has provided or will provide the Principal with a copy of this Decommissioning Drawing Request on the date hereof by facsimile transmission to:

[insert name of the Principal]
Attention: [_____]
Facsimile: [_____].

7.     Please remit payment in the amount of [$_____] in immediately available funds, by wire transfer, to the order of Obligee in accordance with the following payment instructions:

[insert payment instructions]

IN WITNESS WHEREOF, the undersigned has executed and delivered this Decommissioning Drawing Request on [insert date of the Decommissioning Drawing Request].

**[INSERT NAME OF THE OBLIGEE]**

By:_____
Name:
Title:

2

#5647104.3

## Exhibit B

## FORM OF NON-EXTENSION DRAWING REQUEST

**Non-Extension Drawing Request**
[insert name and address of the Obligee]

[_____]
[_____]
[_____]

[insert date of the Non-Extension Drawing Request]

[insert name and address of the Surety]

[_____]
[_____]
[_____]

Drawn under [insert name of the Surety]
Payment Bond Number [insert number of the Payment Bond]
Dated [insert date of the Payment Bond]

Ladies and Gentlemen:

The undersigned individual, an authorized officer of [insert name of the Obligee] (the **"Obligee"**), hereby certifies to [insert name of the Surety] (the **"Surety"**), with reference to the Payment Bond No. [insert number of the Payment Bond] (the **"Payment Bond"**) dated [insert date of the Payment Bond], issued in favour of the Obligee by the Surety for the account of [insert name of the Principal] (the **"Principal"**), as follows as of the date hereof (any capitalized term used in this Non-Extension Drawing Request and not defined in this Non-Extension Drawing Request shall have its respective meaning as set forth in the Payment Bond):

1.    The undersigned is authorized to make this Non-Extension Drawing Request on behalf of the Obligee.

2.    The Obligee is entitled to make a drawing in the amount of [$_____] pursuant to the terms of the Payment Bond and the Decommissioning Agreement dated as of September 30, 2013 among Apache Corporation, Apache Shelf, Inc., Apache Deepwater LLC, Apache Shelf Exploration LLC, Fieldwood Energy LLC and GOM Shelf LLC (as amended, restated or otherwise modified from time to time). Such Drawing Amount does not exceed the amount available for drawing under the Payment Bond, and the Payment Bond has not expired.

3.    The Obligee has provided or will provide the Principal with a copy of this Non-Extension Drawing Request on the date hereof by facsimile transmission to:

[insert name of the Principal]
Attention: [_____]

Facsimile: [_____].

4.      Please remit payment in the amount of [$_____] in immediately available funds, by wire transfer, to the order of Obligee in accordance with the following payment instructions:

[insert payment instructions for the Trust A Account]

IN WITNESS WHEREOF, the undersigned has executed and delivered this Non-Extension Drawing Request on [insert date of the Non-Extension Drawing Request].

**[INSERT NAME OF THE OBLIGEE]**

By:_____

Name:

Title:

2

#5647104.3

## EXHIBIT C

## FORM OF REDUCTION NOTICE

### <u>Reduction Notice</u>

<u>[insert name and address of the Principal]</u>

[                                    ]
[                                    ]
[                                    ]

<u>[insert date of the Reduction Notice]</u>

[insert name and address of the Surety]

[                                  ]
[                                  ]
[                                  ]

> Re:   Payment Bond No. [___] issued by
> [insert name of Surety];

Ladies and Gentlemen:

Each of the undersigned individuals, authorized officers of [insert name of the Principal] (the "**Principal**") and [insert name of Obligee] (the "**Obligee**"), respectively, hereby certifies to [insert name of the Surety] (the "**Surety**"), with reference to the Payment Bond No. [insert number of the Payment Bond] (the "**Payment Bond**") dated [insert date of the Payment Bond], issued in favour of the Obligee by the Surety for the account of the Principal, as follows as of the date hereof (any capitalized term used in this Reduction Notice and not defined in this Reduction Notice shall have its respective meaning as set forth in the Payment Bond):

1.   Each of the undersigned is authorized to execute and deliver this Reduction Notice on behalf of the Principal and the Obligee, respectively.

2.   The Drawing Amount under the Payment Bond shall be reduced to the following: [$_____].

Accordingly, in accordance with the requirements of the Payment Bond, upon the Surety's receipt of this Reduction Notice, the Drawing Amount under the Payment Bond shall automatically be reduced to [$_____] without any requirement for further, amendment or other formality or action of any person.

IN WITNESS WHEREOF, each of the undersigned has executed and delivered this Reduction Notice on [insert date of the Reduction Notice].

**[INSERT NAME OF THE PRINCIPAL]**

By:_____
Name:
Title:


**[INSERT NAME OF THE OBLIGEE]**

By:_____
Name:
Title:

**EXHIBIT D**

**FORM OF TERMINATION NOTICE**

<u>**Termination Notice**</u>

<u>[insert name and address of the Principal]</u>

[                                        ]
[                                        ]
[                                        ]

<u>[insert date of the Termination Notice]</u>

[insert name and address of the Surety]

[                                    ]
[                                    ]
[                                    ]

Re:   Payment Bond No. [___] issued by
      <u>[insert name of Surety]</u>;

Ladies and Gentlemen:

Each of the undersigned individuals, authorized officers of <u>[insert name of the Principal]</u> (the **"Principal"**) and [insert name of Obligee] (the **"Obligee"**), respectively, hereby certifies to <u>[insert name of the Surety]</u> (the **"Surety"**), with reference to the Payment Bond No. <u>[insert number of the Payment Bond]</u> (the **"Payment Bond"**) dated <u>[insert date of the Payment Bond]</u>, issued in favour of the Obligee by the Surety for the account of the Principal, as follows as of the date hereof (any capitalized term used in this Termination Notice and not defined in this Termination Notice shall have its respective meaning as set forth in the Payment Bond):

Each of the undersigned is authorized to execute and deliver this Termination Notice on behalf of the Principal and the Obligee, respectively.

Accordingly, in accordance with the provisions of the Payment Bond, the Payment Bond shall automatically be terminated (without any requirement for further notice, amendment or other formality or action of any person) upon the Surety's receipt of this Termination Notice.

1

IN WITNESS WHEREOF, each of the undersigned has executed and delivered this Termination Notice on [insert date of the Termination Notice].

**[INSERT NAME OF THE PRINCIPAL]**

By:_____
Name:
Title:


**[INSERT NAME OF THE OBLIGEE]**

By:_____
Name:
Title:

2

# Exhibit 4

September 30, 2013 Deutsche Bank AG
Standby Letter of Credit No. DBS-20280

**Deutsche Bank**
GlobalTechnology & Operations



September 30, 2013

Deutsche Bank AG New York Branch
STANDBY LETTER OF CREDIT UNIT
60 WALL STREET
NEW YORK, NY 10005

Fax 212 797-0403

Standby Letter of Credit No. DBS-20280

Beneficiary:

Apache Corporation (the "***Beneficiary***")
2000 Post Oak Boulevard
Suite 1000
Houston, Texas 77056
Attention: Matt Dundrea
Phone: (713) 296-6000

Ladies and Gentlemen:

We, Deutsche Bank AG New York Branch (the "***Issuing Bank***") hereby establish in your favor our Irrevocable Standby Letter of Credit No. DBS-20280 for the account of Fieldwood Energy LLC, a Delaware limited liability company (the "***Applicant***"), for a sum or sums not to exceed in the aggregate U.S. Dollars $97,327,931.00 (Ninety Seven Million Three Hundred Twenty Seven Thousand Nine Hundred Thirty One and No/100 U.S. Dollars) (the "***Stated Amount***").

Funds under this Standby Letter of Credit are available to you upon receipt of your written statement in accordance with the terms and conditions of this Standby Letter of Credit in the form of Exhibit A (a "***Decommissioning Drawing Request***") or Exhibit B (a "***Non-Extension Drawing Request***") attached hereto purportedly signed by your authorized officer.

Multiple and partial drawings under this Standby Letter of Credit are allowed. The Stated Amount of this Standby Letter of Credit shall be reduced by the amount of any such drawings.

The Stated Amount of this Standby Letter of Credit shall from time to time automatically reduce (without any requirement for further notice, amendment or other formality or action of any person) upon the Issuing Bank's receipt of a Reduction Notice executed by both the Applicant and the Beneficiary in the form of Exhibit C.

Chairman of the Supervisory Board: Paul Achleitner
Management Board: Jürgen Fitschen (Co-Chairman), Anshuman Jain (Co-Chairman), Stephan Leithner, Stuart Lewis, Stefan Krause, Rainer Neske, Henry Ritchotte
Deutsche Bank Aktiengesellschaft domiciled in Frankfurt am Main; HRB No 30 000, Frankfurt am Main, Local Court, VAT ID No DE114103379; www.db.com



Deutsche Bank
GlobalTechnology & Operations

Deutsche Bank AG New York Branch
STANDBY LETTER OF CREDIT UNIT
60 WALL STREET
NEW YORK, NY 10005
Fax 212 797-0403

This Standby Letter of Credit expires at our office of Deutsche Bank AG New York Branch, 60 Wall Street, New York, New York 10005 on September 30, 2014 (as such date may be extended pursuant to the next paragraph, the "***Expiration Date***").

It is a condition of this Standby Letter of Credit that its expiry date shall be automatically extended, without amendment, for additional periods of one year from the expiry date hereof, or any future expiration date, unless at least 60 (sixty) days prior to any expiry date we notify you by certified mail (return receipt requested) or by any other receipted means that we elect not to consider expiry date of this Standby Letter of Credit extended for any such additional period.

This Standby Letter of Credit shall automatically terminate (without any requirement for further notice, amendment or other formality or action of any person) upon the Issuing Bank's receipt of a Termination Notice, accompanied by the Original Letter of Credit and executed by both the Applicant and the Beneficiary in the form of Exhibit D.

We hereby agree with you that each Decommissioning Drawing Request or Non-Extension Drawing Request, as applicable, presented under and in compliance with the terms and conditions of this Standby Letter of Credit will be duly honored upon presentation to us, and we will make payment on or before the second Banking Day following such presentment in accordance with the terms and conditions hereof.

As used herein, "Banking Day" means any day other than a Saturday, a Sunday, or a day on which banking institutions in the city of New York, New York are authorized or required to be closed.

In the event that a Decommissioning Drawing Request or Non-Extension Drawing Request, as applicable, fails to comply with the terms and conditions of this Standby Letter of Credit but is presented on or before the Expiration Date of this Standby Letter of Credit, we shall provide you prompt notice of same stating the reasons therefore and shall upon your instructions hold any non-conforming Decommissioning Drawing Request or Non-Extension Drawing Request, as applicable, at your disposal or return any non-conforming Decommissioning Drawing Request or Non-Extension Drawing Request, as applicable, to you at the address set forth above by overnight courier. Upon being notified that the Decommissioning Drawing Request or Non-Extension Drawing

Chairman of the Supervisory Board: Paul Achleitner
Management Board: Jürgen Fitschen (Co-Chairman), Anshuman Jain (Co-Chairman), Stephan Leithner, Stuart Lewis, Stefan Krause, Rainer Neske, Henry Ritchotte
Deutsche Bank Aktiengesellschaft domiciled in Frankfurt am Main, HRB No 30 000, Frankfurt am Main, Local Court, VAT ID No DE114103379, www.db.com

Deutsche Bank
Global Technology & Operations



Deutsche Bank AG New York Branch
STANDBY LETTER OF CREDIT UNIT
60 WALL STREET
NEW YORK, NY 10005
Fax 212 797-0403

Request, as applicable, was not effected in compliance with this Standby Letter of Credit, the Beneficiary may attempt to correct such non-complying Decommissioning Drawing Request or Non-Extension Drawing Request, as applicable, in accordance with the terms and conditions of this Standby Letter of Credit.

Payments hereunder shall be made by us to you (a) by wire transfer in United States Dollars of immediately available funds in the amount of such drawing in accordance with your instructions set forth in the Decommissioning Drawing Request or Non-Extension Drawing Request, as applicable, and (b) without any deduction, recoupment, diminution, set-off, counterclaim or withholding (other than deduction or withholding of tax required by law, which shall be permitted) and we expressly waive any such right.

All Decommissioning Drawing Requests, Non-Extension Drawing Requests and communications with respect to this Standby Letter of Credit shall be in writing, addressed to us at 60 Wall Street, New York, New York 10005, Attention Standby Letter of Credit Unit, referencing this Standby Letter of Credit Number DBS-20280 and presented to us by overnight courier, delivery in person or facsimile transmission to (212) 797-0403 at such address, provided that the original of any such Decommissioning Drawing Request or Non-Extension Drawing Request, as the case may be, sent via facsimile transmission shall also be sent to us at such address by overnight courier. However, our receipt of original Decommissioning Drawing Requests or Non-Extension Drawing Requests will not be conditions for payment hereunder.

All of the Issuing Bank's charges are for the Applicant's account.

Except as otherwise expressly stated herein, this Standby Letter of Credit is subject to the International Standby Practices, International Chamber of Commerce, Publication No. 590 ("ISP98") and as to matters not addressed by the ISP98, shall be governed by and construed in accordance with the laws of State of New York.

Very truly yours,

Deutsche Bank AG New York Branch

By: _____
Name: Everardus J Rozing
Title: Vice President

By: _____
Name: Christine LaMonaca
Assistant Vice President

Chairman of the Supervisory Board: Paul Achleitner
Management Board: Jürgen Fitschen (Co-Chairman), Anshuman Jain (Co-Chairman), Stephan Leithner, Stuart Lewis, Stefan Krause, Rainer Neske, Henry Ritchotte
Deutsche Bank Aktiengesellschaft domiciled in Frankfurt am Main; HRB No 30 000, Frankfurt am Main, Local Court, VAT ID No DE 114103379; www.db.com

**EXHIBIT A**

**FORM OF DECOMMISSIONING DRAWING REQUEST**

Date: _____

To:

Deutsche Bank AG New York Branch
60 Wall Street
New York, NY 10005
Attention: Standby Letter of Credit Unit
Fax no (212) 797-0403

Re:    Your Standby Letter of Credit No. DBS-20280 (the "Standby Letter of Credit")

Ladies and Gentlemen:

      The undersigned individual, an authorized officer of Apache Corporation (the "**Beneficiary**"), hereby certifies to Deutsche Bank AG New York Branch (the "**Issuing Bank**"), with reference to the Standby Letter of Credit No. DBS-20280 (the "**Letter of Credit**") dated September 30, 2013, issued in favour of the Beneficiary by the Issuing Bank for the account of Fieldwood Energy LLC (the "**Applicant**"), as follows as of the date hereof (any capitalized term used in this Drawing Certificate and not defined in this Drawing Certificate shall have its respective meaning as set forth in the Letter of Credit):

      1.    The undersigned is authorized to make the drawing request pursuant to this Decommissioning Drawing Request on behalf of the Beneficiary.

      2.    The Beneficiary is entitled to make a drawing in the amount of [$_____] (the "**Drawing Amount**") pursuant to the terms and conditions of the Letter of Credit and of the Decommissioning Agreement dated as of September 30, 2013 among Apache Corporation, Apache Shelf, Inc., Apache Deepwater LLC, Applicant and GOM Shelf LLC (as amended, restated or otherwise modified from time to time, the "**Decommissioning Agreement**").  Such Drawing Amount does not exceed the amount available for drawing under the Letter of Credit, and the Letter of Credit has not expired.

      3.    Buyer has failed to reimburse and pay a Seller or its Affiliate for Reimbursable Amounts (as such terms are defined in the Decommissioning Agreement) in the amount of the Drawing Amount within the time period specified in Section 2.7(b) of the Decommissioning Agreement.

4.      Beneficiary has complied with Section 3.2(a)(i) and Section 3.2(a)(ii) of the Decommissioning Agreement.

5.      The Drawing Amount does not exceed the amount Beneficiary is entitled to draw under the Letter of Credit pursuant to the Decommissioning Agreement.

6.      The Beneficiary has provided or will provide the Applicant with a copy of this Decommissioning Drawing Request on the date hereof by facsimile transmission to:

Fieldwood Energy LLC
Attention: [_____]
Facsimile: [_____].

7.      Please remit payment in the amount of [$_____] in immediately available funds, by wire transfer, to the order of Beneficiary in accordance with the following payment instructions:

[insert payment instructions]

IN WITNESS WHEREOF, the undersigned has executed and delivered this Decommissioning Drawing Request on [insert date of the Decommissioning Drawing Request].

**APACHE CORPORATION**


By:_____
Name:
Title:

**Exhibit B**

**FORM OF NON-EXTENSION DRAWING REQUEST**

**Non-Extension Drawing Request**

Apache Corporation (the "*Beneficiary*")
2000 Post Oak Boulevard
Suite 1000
Houston, Texas 77056

[insert date of the Non-Extension Drawing Request]

Deutsche Bank AG New York Branch
60 Wall Street
New York, NY 10005
Attention: Standby Letter of Credit Unit
Fax no (212) 797-0403

Drawn under Deutsche Bank AG New York Branch
Letter of Credit Number DBS-20280
Dated September 30, 2013

Ladies and Gentlemen:

The undersigned individual, an authorized officer of Apache Corporation (the "**Beneficiary**"), hereby certifies to Deutsche Bank AG New York Branch (the "**Issuing Bank**"), with reference to the Standby Letter of Credit No. DBS-20280 (the "**Letter of Credit**") dated September 30, 2013, issued in favour of the Beneficiary by the Issuing Bank for the account of Fieldwood Energy LLC (the "**Applicant**"), as follows as of the date hereof (any capitalized term used in this Non-Extension Drawing Request and not defined in this Non-Extension Drawing Request shall have its respective meaning as set forth in the Letter of Credit):

1.      The undersigned is authorized to make this Non-Extension Drawing Request on behalf of the Beneficiary.

2.      The Beneficiary is entitled to make a drawing in the amount of [$_____] pursuant to the terms of the Letter of Credit and the Decommissioning Agreement dated as of September 30, 2013 among Apache Corporation, Apache Shelf, Inc., Apache Deepwater LLC, Applicant and GOM Shelf LLC (as amended, restated or otherwise modified from time to time). Such Drawing Amount does not exceed the amount available for drawing under the Letter of Credit, and the Letter of Credit has not expired.

3.      The Beneficiary has provided or will provide the Applicant with a copy of this Non-Extension Drawing Request on the date hereof by facsimile transmission to:

Fieldwood Energy LLC
Attention: [_____]
Facsimile: [_____].

4.      Please remit payment in the amount of [$_____] in immediately available funds, by wire transfer, to the order of Beneficiary in accordance with the following payment instructions:

[insert payment instructions for the Trust A Account]

IN WITNESS WHEREOF, the undersigned has executed and delivered this Non-Extension Drawing Request on [insert date of the Non-Extension Drawing Request].

**APACHE CORPORATION**

By:_____
Name:
Title:

**EXHIBIT C**

**FORM OF REDUCTION NOTICE**

**Reduction Notice**

Fieldwood Energy LLC
333 Clay Street
Housron, TX 77002

[insert date of the Reduction Notice]

Deutsche Bank AG New York Branch
60 Wall Street
New York, NY 10005
Attention: Standby Letter of Credit Unit
Fax no (212) 797-0403

> Re:    Standby Letter of Credit No. DBS-20280 issued by
>         Deutsche Bank AG New York Branch;

Ladies and Gentlemen:

Each of the undersigned individuals, authorized officers of Fieldwood Energy LLC (the "**Applicant**") and Apache Corporation (the "**Beneficiary**"), respectively, hereby certifies to Deutsche Bank AG New York Branch (the "**Issuing Bank**"), with reference to the Standby Letter of Credit No. DBS-20280 (the "**Letter of Credit**") dated September 30, 2013, issued in favour of the Beneficiary by the Issuing Bank for the account of the Applicant, as follows as of the date hereof (any capitalized term used in this Reduction Notice and not defined in this Reduction Notice shall have its respective meaning as set forth in the Letter of Credit):

1.    Each of the undersigned is authorized to execute and deliver this Reduction Notice on behalf of the Applicant and the Beneficiary, respectively.

2.    The Drawing Amount under the Letter of Credit shall be reduced to the following: [$_____].

Accordingly, in accordance with the requirements of the Letter of Credit, upon the Issuing Bank's receipt of this Reduction Notice, the Drawing Amount under the Letter of Credit shall automatically be reduced to [$_____] without any requirement for further, amendment or other formality or action of any person.

IN WITNESS WHEREOF, each of the undersigned has executed and delivered this Reduction Notice on [insert date of the Reduction Notice].

**FIELDWOOD ENERGY LLC**

By:_____
Name:
Title:


APACHE CORPORATION

By:_____
Name:
Title:

## EXHIBIT D

## FORM OF TERMINATION NOTICE

### <u>Termination Notice</u>

Fieldwood Energy LLC
333 Clay Street
Housron, TX 77002

<u>[insert date of the Termination Notice]</u>

Deutsche Bank AG New York Branch
60 Wall Street
New York, NY 10005
Attention: Standby Letter of Credit Unit
Fax no (212) 797-0403

Re:    Irrevocable Standby Letter of Credit No. DBS-20280 issued by
Deutsche Bank AG New York Branch;

Ladies and Gentlemen:

Each of the undersigned individuals, authorized officers of Fieldwood Energy LLC (the "**Applicant**") and Apache Corporation (the "**Beneficiary**"), respectively, hereby certifies to Deutsche Bank AG New York Branch (the "**Issuing Bank**"), with reference to the Standby Letter of Credit No. DBS-20280 (the "**Letter of Credit**") dated September 30, 2013, issued in favour of the Beneficiary by the Issuing Bank for the account of the Applicant, as follows as of the date hereof (any capitalized term used in this Termination Notice and not defined in this Termination Notice shall have its respective meaning as set forth in the Letter of Credit):

Each of the undersigned is authorized to execute and deliver this Termination Notice on behalf of the Applicant and the Beneficiary, respectively.

Accordingly, in accordance with the provisions of the Letter of Credit, the Letter of Credit shall automatically be terminated (without any requirement for further notice, amendment or other formality or action of any person) upon the Issuing Bank's receipt of this Termination Notice accompanied by the Original Letter of Credit.

IN WITNESS WHEREOF, each of the undersigned has executed and delivered this Termination Notice on [insert date of the Termination Notice].

**FIELDWOOD ENERGY LLC**

By:_____
Name:
Title:


**APACHE CORPORATION**


By:_____
Name:
Title:

# Exhibit 5

## August 7, 2021 Subrogation, Subordination, and Payment Agreement

*EXECUTION VERSION*

## SUBROGATION, SUBORDINATION AND PAYMENT AGREEMENT

THIS SUBROGATION, SUBORDINATION, AND PAYMENT AGREEMENT (as hereafter amended, restated or otherwise modified from time to time, the "Agreement") is entered into effective as of August 27, 2021 (the "Effective Date"), by and among FIELDWOOD ENERGY I, LLC ("FWE I"), a Texas limited liability company, GOM SHELF LLC, a Delaware limited liability company ("GOM Shelf" and together with FWE I, each an "Obligor" and collectively, the "Obligors"), EVEREST REINSURANCE COMPANY ("Everest"), a Delaware corporation, PHILADELPHIA INDEMNITY INSURANCE COMPANY ("Philadelphia"), a Pennsylvania corporation, HCC INTERNATIONAL INSURANCE COMPANY PLC ("HCCI"), a company incorporated under the laws of England, and ZURICH AMERICAN INSURANCE COMPANY ("Zurich"), a New York corporation (each, a "Junior Creditor" or "Apache Surety" and collectively, the "Junior Creditors" or the "Apache Sureties"), and APACHE CORPORATION, a Delaware corporation, ("Apache"), APACHE SHELF, INC., a Delaware corporation ("ASI"), APACHE DEEPWATER LLC, as Texas limited liability company ("APDW"), and APACHE SHELF EXPLORATION LLC, a Texas limited liability company ("APSE", and together with Apache, ASI, and APDW, each, a "Senior Creditor" and collectively, the "Senior Creditors").   Terms defined in Section 1, where used in the Recitals below and elsewhere in this Agreement, shall have the same meanings, where so used, as are prescribed therein.[1]

## RECITALS

### The Decommissioning Agreement and Decommissioning Security

**WHEREAS,** Fieldwood Energy, LLC ("FWE") and GOM Shelf and the Apache PSA Parties entered into that certain *Decommissioning Agreement*, dated as of September 30, 2013, and subsequently amended up to and including the Fifth Amendment to Decommissioning Agreement, dated effective as of April 11, 2018 (with all amendments, the "Decommissioning Agreement"). Pursuant to the Decommissioning Agreement and the Purchase and Sale Agreement between the FWE Parties and the Apache PSA Parties, dated as of July 18, 2013 (with any amendments, the "PSA"), FWE is obligated to perform certain plugging and abandonment and other related decommissioning work (the "Decommissioning Obligations") with respect to properties FWE acquired from the Apache Defendants pursuant to the PSA (the "Legacy Apache Properties").

**WHEREAS,** FWE is obligated to reimburse the Senior Creditors for costs and expenses they incur performing the Decommissioning Obligations in accordance with the Decommissioning Agreement. FWE's reimbursement obligations to the Senior Creditors under the Decommissioning Agreement are supported by the Decommissioning Security.   The term "Decommissioning Security" covers any security obtained, provided, or pledged in connection with the Decommissioning Agreement, including the funds available from Trust A (as defined in the Decommissioning Agreement), letters of credit, bonds, and any future value that may be derived from the NPI Conveyances (as defined in the Decommissioning Agreement).

---

[1] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Apache Definitive Documents or the confirmed 2021 Plan [Docket No. 1751], as applicable, unless otherwise specified.

**WHEREAS,** letters of credit and surety bonds issued on behalf of FWE for the benefit of Apache that are currently outstanding pursuant to the Decommissioning Agreement are:

| Issuer | LC/Bond # | Amount | Original Issue Date |
|---|---|---|---|
| Deutsche Bank ATG, New York Branch | 839BGC1600430 | $   50,000,000.00 | 5/23/2016 |
| Deutsche Bank ATG, New York Branch | 839BGC1500968 | $   67,557,356.00 | 11/12/2015 |
| Deutsche Bank ATG, New York Branch | 839BGC1500969 | $   67,557,356.00 | 11/12/2015 |
| Deutsche Bank ATG, New York Branch | 839BGC1500970 | $   67,557,357.00 | 11/12/2015 |
| Deutsche Bank ATG, New York Branch | DBS-20280 / 839BGC1500971 | $   97,327,931.00 | 9/30/2013 |
|  |  | $ 350,000,000.00 |  |
| Philadelphia Indemnity Insurance Company | PB032515 00040 | $   72,601,297.00 | 9/27/2018 |
| Everest Reinsurance Company | ES00001441 | $   75,000,000.00 | 8/30/2018 |

**WHEREAS,** Everest issued Bond No. ES00001441 in the amount of $75,000,000 on behalf of FWE, as principal, and in favor of Apache as obligee (the "Everest Bond"). Everest and HCCI have allocated liability between themselves for the Everest Bond pursuant to a claims sharing agreement. Philadelphia issued Bond No. PB03251500040 in the amount of $72,601,297 on behalf of FWE, as principal, and in favor of Apache as obligee (the "Philadelphia Bond" and, together with the Everest Bond, the "Apache Surety Bonds"). The Deutsche Bank letters of credit (together with any renewal or replacement letters of credit permitted by Section 2(f) below, the "Letters of Credit") are backed by bonds issued by Zurich and HCCI in favor of Deutsche Bank companies, but Apache is not in privity of contract with those sureties.

**FWE's Bankruptcy and Proposed Plan**

**WHEREAS,** on August 3, 2020 and continuing thereafter (the "Petition Date"), FWE and its debtor affiliates (collectively, the "Debtors") each filed with the Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") a voluntary case under chapter 11 of the Bankruptcy Code, in the case styled *In re Fieldwood Energy LLC, et al.*, Case No. 20-33948 (MI) (the "Chapter 11 Cases").

**WHEREAS,** in connection with the Chapter 11 Cases, the Debtors, the Senior Creditors, and other non-debtor entities (collectively, the "RSA Parties") are parties to that certain Restructuring Support Agreement, dated as of August 4, 2020 (as may be modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "RSA"). Pursuant to the RSA, the Senior Creditors agreed to support a plan of reorganization of the Debtors in which certain of the Legacy Apache Properties and related liabilities and obligations, including the Debtors' obligations under the Decommissioning Agreement, vest in FWE I pursuant to the

2

Divisive Merger, and FWE I shall be responsible for decommissioning the Legacy Apache Properties.

**WHEREAS,** on January 1, 2021, the Debtors filed the *Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (as amended, supplemented, or otherwise modified, the "Underline 2021 Plan").

**WHEREAS,** in accordance with the RSA, the RSA Parties negotiated final forms of the definitive documents providing for the transactions contemplated by, or relating to, the Apache Term Sheet attached to the RSA (the "Apache Definitive Documents" and the transactions contemplated therein, the "Apache Transactions"), where the documents comprising the Apache Definitive Documents are identified in that certain *Apache Term Sheet Implementation Agreement*, dated January 1, 2021 (as may be amended, supplemented, or modified from time to time, the "Implementation Agreement"), by and between FWE and GOM Shelf, on the one hand, and the Senior Creditors, on the other.

**WHEREAS,** on April 16, 2021, counsel for Everest (with counsel for HCCI and Philadelphia and Zurich carbon copied) sent a letter to Apache (the "Surety Letter") detailing legal arguments that allegedly "discharge" Everest's and Philadelphia's obligations to honor over $150 million worth of surety bonds with Apache as the obligee under each surety bond.

**WHEREAS,** on May 2, 2021, as a result of the Apache Sureties sending the Surety Letter to Apache, FWE and GOM Shelf commenced an adversary proceeding in the Bankruptcy Court against Everest, Philadelphia, HCCI, and the Senior Creditors, Case No. 21-03418 (MI), seeking the Bankruptcy Court to declare as a matter of law that confirmation of the Plan, and the effectiveness of the transactions contemplated therein, including under the Apache Definitive Documents, will not discharge the Apache Sureties' obligations under the Apache Surety Bonds or impair Apache's ability to draw on the Apache Surety Bonds in the future (the "Adversary Proceeding").

**WHEREAS,** from June 2, 2021 to June 11, 2021 the Apache Sureties filed the following objections to the confirmation of the 2021 Plan which, in relevant part, assert various objections against the Apache Transactions (collectively, the "Confirmation Objections"):

- *HCC International Insurance Company PLC's Objection to Confirmation of Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors and Joinder [Docket No. 1537];*
- *Objection of Aspen American Insurance Company, Berkley Insurance Company, Everest Reinsurance Company, and Sirius America Insurance Company to the Fourth Amended Chapter 11 Plan [Docket No. 1461];*
- *Supplemental Objection of Aspen American Insurance Company, Berkley Insurance Company, Everest Reinsurance Company, and Sirius America Insurance Company to the Fifth Amended Chapter 11 Plan and Request for Insertion of Language into the Proposed Confirmation Order [Docket No. 1664];*
- *Philadelphia Indemnity Insurance Company's Omnibus Objection to the Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors and Notice to Contract Parties to Executory Contracts and Unexpired*

*Leases of the Schedule of Assumed Contracts and Cure Amounts [Docket No. 1449];*

- *Zurich American Insurance Company's (I) Objection to Fourth Amended Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors and (II) Limited Objection to Assumption of Decommissioning Agreement [Docket No. 1446]*

**WHEREAS,** the Apache Sureties, the Debtors, and the Senior Creditors agreed to settle the Apache Sureties' assertions set forth in the Surety Letter, the parties' pending litigation in the Adversary Proceeding, and the Confirmation Objections pursuant to the terms of a Term Sheet (the "FWE I Term Sheet") which was attached to and made a part of the Confirmation Order entered by the Bankruptcy Court in the Chapter 11 Cases on June 25, 2021 and such FWE I Term Sheet contemplated that the terms therein would be further memorialized in this Agreement.

## AGREEMENT

**NOW, THEREFORE,** for value received, the receipt and sufficiency of which hereby are acknowledged by each of the undersigned, each of the parties hereto hereby agrees as follows:

1. <u>Definitions</u>. Terms listed in this <u>Section 1</u> shall have the following meanings wherever used in this Agreement. Any pronoun shall include the corresponding masculine, feminine or neuter form as the context may require. Accounting terms used herein without definition shall have their meanings as defined in accordance with GAAP.

"<u>2021 Plan</u>" has the meaning prescribed for such term in the Recitals section of this Agreement.

"<u>Adversary Proceeding</u>" has the meaning prescribed for such term in the Recitals section of this Agreement.

"<u>Apache</u>" has the meaning prescribed for such term in the introductory paragraph of this Agreement.

"<u>Apache Definitive Documents</u>" has the meaning prescribed for such term in the Recitals section of this Agreement.

"<u>Apache Surety</u>" or "<u>Apache Sureties</u>" each have the meaning prescribed for such term in the introductory paragraph of this Agreement.

"<u>Apache Surety Bonds</u>" has the meaning prescribed for such term in the Recitals section of this Agreement.

"<u>Apache Transactions</u>" has the meaning prescribed for such term in the Recitals section of this Agreement.

"<u>APDW</u>" has the meaning prescribed for such term in the introductory paragraph of this Agreement.

4

"<u>APSE</u>" has the meaning prescribed for such term in the introductory paragraph of this Agreement.

"<u>ASI</u>" has the meaning prescribed for such term in the introductory paragraph of this Agreement.

"<u>Bankruptcy Code</u>" means the Bankruptcy Reform Act of 1978, as amended and from time to time in effect (11 U.S.C. §§ 101, *et seq*).

"<u>Bankruptcy Court</u>" has the meaning prescribed for such term in the Recitals section of this Agreement.

"<u>Business Day</u>" means any day that is not Saturday, Sunday, or a day on which banks in Harris County, Texas are required or permitted under applicable law to be closed.

"<u>Chapter 11 Cases</u>" has the meaning prescribed for such term in the Recitals section of this Agreement.

"<u>Co-Obligor</u>" means any of the Obligors.

"<u>Commitments</u>" means, collectively, the commitment of Senior Creditors to extend credit under, and subject to the terms of, the Senior Credit Agreement.

"<u>Confirmation Objections</u>" has the meaning prescribed for such term in the Recitals section of this Agreement.

"<u>Debtors</u>" has the meaning prescribed for such term in the Recitals section of this Agreement.

"<u>Decommissioning Agreement</u>" means the Decommissioning Agreement dated as of September 30, 2013, as amended by the First Amendment to Decommissioning Agreement dated as of the Effective Time (as defined therein), the Second Amendment to Decommissioning Agreement dated as of the Effective Time (as defined therein), the Third Amendment to Decommissioning Agreement dated effective as of April 25, 2017, the Fourth Amendment to Decommissioning Agreement dated effective as of September 1, 2017, as amended by that certain Letter Agreement dated January 3, 2018, and the Fifth Amendment to Decommissioning Agreement dated effective as of April 11, 2018, among Fieldwood Energy LLC, GOM Shelf, and the Senior Creditors, and as assumed by FWE I and GOM Shelf pursuant to the 2021 Plan.

"<u>Decommissioning Obligations</u>" has the meaning prescribed for such term in the Recitals section of this Agreement.

"<u>Decommissioning Security</u>" has the meaning prescribed for such term in the Recitals section of this Agreement.

"<u>Defined Premium Payment</u>" has the meaning set out in Section 2(b).

"Effective Date" has the meaning prescribed for such term in the introductory paragraph of this Agreement.

"Everest" has the meaning prescribed for such term in the introductory paragraph of this Agreement.

"Everest Bond" has the meaning prescribed for such term in the Recitals section of this Agreement.

"Farmout Agreement" means that certain agreement, dated as of the Effective Date, 2021, between FWE I, GOM Shelf, the Junior Creditors, and the Surety Representative governing the farm into development of, operation of, and production of hydrocarbons from the Development Area (as defined therein).

"Free Cash Flow" means, with respect to the Obligors on a consolidated basis for any one (1) year period ending on June 30 of each calendar year, the sum, without duplication, of (a) Consolidated EBITDA (as defined in the Senior Credit Agreement as in effect on the Effective Date) for such period, minus (b) expenditures for such period for capital costs incurred in accordance with Sections 7.06 and 7.09 of the FWE I LLC Agreement (as defined in the Senior Credit Agreement as in effect on the Effective Date) or for the performance of Obligors' obligations under the Decommissioning Agreement for such period, minus (c) voluntary payments on Indebtedness (as defined in the Senior Credit Agreement as in effect on the Effective Date) made by any Co-Obligor during such period minus (d) interest expense paid in cash by any Co-Obligor during such period, and minus (e) the amount of taxes paid in cash by any Co-Obligor for such period.

"FWE I" has the meaning prescribed for such term in the introductory paragraph of this Agreement.

"FWE I LLC Agreement" means the Limited Liability Company Operating Agreement of FWE I as in effect on the Effective Date.

"FWE I Term Sheet" has the meaning prescribed for such term in the Recitals section of this Agreement.

"FWE I Premium Claims" means any amounts for fees or premiums accrued Post-Effective Date (up to a maximum of $12 million per annum) to the Letters of Credit issuer(s) or Apache Sureties under (a) the applicable fees for the Letters of Credit, (b) Apache Surety Bonds issued under or in relation to the Decommissioning Agreement and/or (c) general indemnity agreements related to the Apache Surety Bonds, including, without limitation, the Defined Premium Payment and the Incremental Premium Payment.

"GAAP" means generally accepted accounting principles in the U.S. in effect from time to time; provided, that, GAAP will be deemed for all purposes hereof to treat leases that would have not been considered to be indebtedness in accordance with GAAP as in effect on December 31, 2017 (whether such leases were in effect on such date or are entered into thereafter), in a manner consistent with the treatment of such leases under GAAP as in effect on December 31, 2017, notwithstanding any modification or interpretative

changes thereto or implementations of any such modifications or interpretative changes that may have occurred thereafter.

"GOM Shelf" has the meaning prescribed for such term in the introductory paragraph of this Agreement.

"HCCI" has the meaning prescribed for such term in the introductory paragraph of this Agreement.

"Implementation Agreement" has the meaning prescribed for such term in the Recitals section of this Agreement.

"Incremental Premium Payment" has the meaning set out in Section 2(b).

"Independent Accountant" means Deloitte Touche Tohmatsu or such other independent accountant or accounting firm as the Parties mutually agree.

"Junior Creditor" and "Junior Creditors" each have the meaning prescribed for such term in the introductory paragraph of this Agreement.

"Junior Obligations" means all obligations, indebtedness and other amounts at any time now or hereafter owing or otherwise payable by Obligors, or either of them, to any Junior Creditor hereunder and in consideration of or otherwise in connection with the Subrogation and Indemnity Claim, including without limitation, principal, accrued interest and other amounts, costs, fees and expenses (including any such amounts accruing after the commencement of any Proceeding and any interest that would have accrued thereon but for the commencement of such Proceeding) and any and all other obligations of any kind, in each case whether now existing or hereafter incurred, provided, however, that "Junior Obligations" do not include obligations and indebtedness in respect of the FWE I Premium Claims with such FWE I Premium Claims to be suspended at such time, and only for such time, as is expressly provided in Section 2(g).

"Legacy Apache Properties" has the meaning prescribed for such term in the Recitals section of this Agreement.

"Letters of Credit" has the meaning prescribed for such term in the Recitals section of this Agreement.

"Lien" means, with respect to property of a Person, any interest in property securing an obligation owed by such Person or another Person, whether such interest is based on contract, statute or common law, including a security interest, lien, collateral assignment, charge, encumbrance, pledge, hypothecation, deposit arrangement, conditional sale, trust receipt, consignment or bailment for security purposes or similar agreement, and any interest created by any agreement to provide any of the foregoing.

"Obligor" and "Obligors" each have the meaning prescribed for such term in the introductory paragraph of this Agreement, and includes any Obligor as debtor-in-possession in any Proceeding.

7

"<u>Paid in Full</u>" means, with respect to the Senior Debt, that (a) all Senior Debt has been paid in full in cash, including all principal, interest, fees, and other charges under any Senior Documents and including those arising or accruing during a Proceeding (whether or not allowed in the Proceeding), (b) all Senior Debt consisting of the Decommissioning Obligations have been performed or cash collateralized as provided for in the Decommissioning Agreement or otherwise provided in form and substance acceptable to each Senior Creditor in its sole discretion, and (c) all commitments of any Senior Creditor to extend credit under the Senior Documents have been terminated; and "Payment in Full" means the satisfaction of the Senior Debt having been Paid in Full.

"<u>Person</u>" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, governmental authority, or any other entity.

"<u>Petition Date</u>" has the meaning prescribed for such term in the Recitals section of this Agreement.

"<u>Plan</u>" means any plan of partial or complete liquidation, reorganization, readjustment, arrangement, composition or extension, whether in a Proceeding or otherwise.

"<u>Philadelphia</u>" has the meaning prescribed for such term in the introductory paragraph of this Agreement.

"<u>Philadelphia Bond</u>" has the meaning prescribed for such term in the Recitals section of this Agreement.

"<u>Proceeding</u>" means, with respect to any Obligor, any (a) insolvency, bankruptcy, receivership, liquidation, reorganization, readjustment, composition or other similar proceeding relating to such Obligor, its property or its creditors, (b) proceeding for any liquidation, dissolution or other winding-up of such Obligor, voluntary or involuntary, whether or not involving insolvency or bankruptcy proceedings, (c) assignment for the benefit of creditors of such Obligor or (d) other marshalling of the assets of such Obligor.

"<u>PSA</u>" has the meaning prescribed for such term in the Recitals section of this Agreement.

"<u>RSA</u>" has the meaning prescribed for such term in the Recitals section of this Agreement.

"<u>RSA Parties</u>" has the meaning prescribed for such term in the Recitals section of this Agreement.

"<u>Senior Collateral</u>" means all property of any Obligor, now owned or hereafter acquired, in which any Senior Liens are granted pursuant to the Senior Documents, and all proceeds thereof, and includes, without limitation, all of the following types of property, now owned and hereafter acquired by any such Obligor: inventory, equipment, furniture and fixtures, accounts, chattel paper, contract rights, documents, instruments, money,

general intangibles, investment property, and all other goods, merchandise or personal property, and all books, records, files (whether in tangible or electronic data entry form), and all proceeds of any of the foregoing.  The Obligors and the Senior Creditors agree that the Senior Collateral shall also secure, on a subordinated basis and subject to the terms of this Agreement, all of the Junior Obligations.

"Senior Credit Agreement" means the certain Standby Loan Agreement dated as of the Effective Date, among the Senior Creditors and Obligors and any successor or replacement loan agreement between Senior Creditors and Obligors, as any of the foregoing may be modified, amended, renewed, extended, restated, supplemented or otherwise modified from time to time.

"Senior Creditor" and "Senior Creditors" each have the meaning prescribed for such term in the introductory paragraph of this Agreement.

"Senior Debt" means any and all of the following, now or hereafter existing or arising:  (a) all principal of, and premium, if any, and interest on, the Senior Loans (including, without limitation, any interest accruing thereon at the legal rate after the commencement of any Proceeding and any additional interest that would have accrued thereon but for the commencement of such Proceeding), (b) all other indebtedness, obligations and liabilities of any Obligor to Senior Creditor under the Senior Credit Agreement, whether now existing or hereafter incurred or created, under or with respect to any Senior Debt Document (including, without limitation, guaranty obligations and claims for indemnity or damages arising under or with respect to the Senior Documents), (c) all indebtedness and obligations arising in connection with any refinancings, replacements or increases of any of the foregoing with Senior Creditor, and whether in the same, lesser or greater amount, (d) any and all renewals, extensions, increases or rearrangements of any of the foregoing, (e) all obligations of Obligors under the Decommissioning Agreement, and (f) any and all other obligations secured by the liens granted under the Senior Debt Documents.  Without limiting the extent and generality of the foregoing, "Senior Debt" includes all indebtedness and obligations from time to time included within the "Obligations" as defined by the Senior Credit Agreement (which definition is incorporated herein by reference), as may be renewed, refinanced, or increased from time to time.

"Senior Documents" means, collectively, the Senior Credit Agreement, and any and all agreements, instruments or documents now existing or hereafter executed in connection with the Senior Debt, pursuant to which the Person executing same agrees to pay, guarantees or assures payment and/or performance of any Senior Debt or grants or purports to grant to Senior Creditors any Liens in any property to secure the Senior Debt, or any part thereof, and all other documents and instruments evidencing, guaranteeing, securing or otherwise pertaining to all or any portion of the Senior Debt, in each case as the same may be modified, amended, renewed, extended, restated, supplemented, refinanced with Senior Creditors or otherwise modified from time to time.  Without limiting the extent and generality of the foregoing, "Senior Documents" includes all "Loan Documents" as defined by the Senior Credit Agreement (which definition is incorporated herein by reference) and any such agreements, instruments or documents executed or

9

entered between Obligors, or either of them, and Senior Creditors, or either of them, after the commencement of a Proceeding.

"Senior Default" means any "Default" or "Event of Default", as such terms are defined by the Senior Credit Agreement (which definitions are incorporated herein by reference).

"Senior Liens" means any and all Liens at any time held by Senior Creditors in any property of any Obligor that secures the Senior Debt.

"Senior Loans" means all "Loans" as defined by the Senior Credit Agreement (which definition is incorporated herein by reference), outstanding from time to time, and any loans constituting Senior Debt made in any replacement or refinancing facility with Senior Creditors, and whether in the same, lesser or greater amount as such Loans.

"Subrogation and Indemnity Claim" has the meaning prescribed for such term in Section 3(b) of this Agreement.

"Subordinated Draws" has the meaning prescribed for such term in Section 3(b) of this Agreement.

"Surety Representative" means the person or entity selected by the Apache Sureties through the Inter-Surety Agreement and designated in writing to the Senior Creditors and the Obligors in a document containing the signature of each Junior Creditor.  The initial Surety Representative shall be Mr. Thomas Finley, of Zurich American Insurance Company.

"Zurich" has the meaning prescribed for such term in the introductory paragraph of this Agreement.

2.     Junior Obligations Subordination. (a) Until all Senior Debt has first been Paid in Full, each Junior Creditor hereby agrees that the Junior Obligations are subordinated and junior in right of payment and claim to the prior payment of all Senior Debt.  Notwithstanding any agreement by any Junior Creditor and any Obligor otherwise, no payments on any Junior Obligations  may be made by any Obligor or demanded, received, or retained by any Junior Creditor.  Payment of the FWE I Premium Claims are expressly permitted on the terms outlined in this Section 2 and to the extent permitted in the Farmout Agreement.  Such payment shall be made to the Surety Representative for allocation and distribution among the Junior Creditors. Except as expressly permitted by this Section 2 and the Farmout Agreement, no payments may be made by any Obligor or demanded, received or retained by any Junior Creditor, on or in respect of any Junior Obligations. Allocation of such FWE I Premium Claims shall be in accordance with a separate agreement by and among the Junior Creditors and upon delivery of said payments of the FWE I Premium Claims to the Surety Representative, Obligors shall be deemed to have satisfied their obligation under this Section 2.

(b)     FWE I shall pay $6.25 million per annum on account of the FWE I Premium Claims, payable in semi-annual installments with the first such payment due and owing 60 days after the Effective Date (the "Defined Premium Payment") and a subsequent semi-annual payment

to be due six (6) months thereafter and then on the same dates of each subsequent year. On each anniversary of the Effective Date, to the extent that (1) all yearly obligations due under the Decommissioning Agreement have been satisfied and (2) FWE I has Free Cash Flow of $20,000,000 or more as of such anniversary of the Effective Date (collectively, the "Incremental Premium Payment Conditions"), FWE I shall owe the Apache Sureties an additional payment of $2.75 million per annum on account of the FWE I Premium Claims and Letters of Credit fees (the "Incremental Premium Payment"). If the Incremental Premium Payment Conditions are not met on each anniversary of the Effective Date, the Incremental Premium Payment, if not otherwise payable from available Free Cash Flow, shall accrue and become due and payable as soon as, and to the extent that, Free Cash Flow at any subsequent anniversary of the Effective Date exceeds $20,000,000, and, if the Farm-In option is elected, also through amounts received by the Junior Creditors pursuant to the Farmout Agreement.

(c)     To the extent a dispute arises regarding the amount of Free Cash Flow between the Surety Representative and FWE I, the Surety Representative and FWE I agree to work together in good faith to mutually resolve such dispute. In furtherance of the foregoing, (i) the Surety Representative shall receive from FWE I all quarterly reports to be delivered to Apache under the Standby Loan Facility and the FWE I LLC Agreement and (ii) in the event of a dispute, the Surety Representative shall have the right to request that FWE I provide to Surety Representative the calculation of Free Cash Flow as of the June 30 immediately preceding the applicable anniversary of the Effective Date that is the subject of such dispute. If such dispute cannot be consensually resolved within fifteen (15) days following FWE I's receipt of a notice of dispute from the Surety Representative, the Surety Representative may submit such dispute to the Independent Accountant for determination. If the Surety Representative does not submit a dispute to the Independent Accountant within sixty (60) days of its delivery of a notice of dispute to FWE I, then the dispute that was the subject of such notice shall be deemed to be fully and finally waived by the Surety Representative and the Junior Creditors and FWE I's determination of Free Cash Flow for the applicable period shall be deemed final. If the dispute is timely submitted to the Independent Accountant for resolution, FWE I and the Surety Representative will each (i) furnish or cause to be furnished to the Independent Accountant such work papers and other documents and information relating to the disputed issues as the Independent Accountant may request and are available to that party or its agents, (ii) be afforded the opportunity to present to the Independent Accountant any material relating to the disputed issues and to discuss the issues with the Independent Accountant, and (iii) cooperate to cause the Independent Accountant to deliver to FWE I and the Surety Representative, within thirty (30) days after such issues are submitted for resolution, a notice of the Independent Accountant's determination of such issues. Such determination by the Independent Accountant will be final, binding, and conclusive on the parties and will be used in computing the Free Cash Flow for each applicable dispute. The fees and expenses of the Independent Accountant incurred in resolving the disputed matters will be borne by the non-prevailing party in any applicable dispute. However, initially, any retainer required by the Independent Accountant will be paid by Junior Creditors with such amount to be reimbursed by FWE I if the Surety Representative is the prevailing party.

Within ten (10) Business Days after the calculation of Free Cash Flow becomes binding and conclusive on the parties if the amount of Free Cash Flow results in an Incremental Premium Payment being owed, FWE I will pay the Incremental Premium Payment by wire transfer to the Surety Representative.

(d)      The total of all FWE I Premium Claims and Letters of Credit fees, in the aggregate, owing for any year shall not exceed $12,000,000 per annum.

(e)      All payments of FWE I Premium Claims shall be suspended upon the first draw by Apache under the Apache Surety Bonds.  After such suspension, all FWE I Premium Claims shall accrue and become payable as a subordinated FWE I Subrogation and Indemnification Claim (as defined below), it being the intent and understanding of the parties that FWE I shall not be required to draw, and Apache shall not be obligated to fund a draw, under the Standby Facility to pay any FWE I Premium Claims. Notwithstanding the foregoing, if, following a draw upon the Apache Surety Bonds, FWE I is able to resume funding of its Decommissioning Obligations under the Decommissioning Agreement, and after all monetary defaults have been cured, including without limitation any obligation to deposit monies into Trust A, the Apache Surety Bond's rights to FWE I Premium Claims shall be reinstated under the conditions provided for herein.

(f)      Any applicable Apache Surety may pay to renew any Letters of Credit or replace any Letters of Credit pursuant to the standards as set forth in the Decommissioning Agreement.

(g)      The FWE I Premium Claims shall not be subordinated and notwithstanding the paragraph above, the Apache Sureties may fully pursue recovery of any FWE I Premium Claims currently due, subject to the following: (i) the Apache Sureties cannot challenge any liens granted by FWE I to Apache on assets that may have otherwise been available to satisfy the FWE I Premium Claims and (ii) the Apache Sureties will have no defense as to payment on the Apache Surety Bonds as a result of FWE I's failure to pay the FWE I Premium Claims. Accrued but unpaid Incremental Premium Payments shall be paid through available Free Cash Flow in subsequent years and to the extent permitted in the Farmout Agreement.

3.      <u>Senior Lien Priority, Subrogation</u>.  (a) Each Obligor and each Junior Creditor represents to Senior Creditors that as of the date hereof the Junior Obligations are unsecured and there are no Liens in any property of any Obligor securing any Junior Obligation; and, the Junior Creditors in respect of the Junior Obligations shall be subrogated to the Senior Creditors' lien rights in the Senior Collateral on a subordinated basis subject to the terms of this Agreement through the contractual subrogation rights granted to the Junior Creditors herein to secure the payment of the Junior Obligations.  Each Obligor agrees that it shall not otherwise grant to or for the benefit of Junior Creditors, and Junior Creditors will not take, any Lien in any property of any Obligor other than through the contractual subrogation provided for by this Agreement on the Senior Collateral solely on a subordinated basis.  As of the Effective Date, the Junior Creditors are subrogated to the lien rights of the Senior Creditors under the terms of this Agreement on a subordinated basis to the extent of the Subordinated Draws referenced below.  Without limiting the foregoing, each Junior Creditor and each Obligor agree that the Senior Liens and all rights of each Senior Creditor in and to the Senior Collateral are and shall be first, senior and prior to any Liens hereafter arising in favour of the Junior Creditors or securing the Junior Obligations, irrespective of the manner or order of creation, attachment or perfection, the time or order of filing of any financing statement or the time of giving or failure to give any notice, or of any other priority that might otherwise exist under applicable law exclusive or independent of this Agreement, and each Junior Creditor hereby expressly subordinates to the Senior Liens any and all such Liens securing the Junior Creditors, <u>provided</u>, that nothing herein impairs the prohibition of the second sentence of this Section 3.

(b)      Obligors and Senior Creditors agree that if the Apache Surety Bonds and Letters of Credit have been drawn on by the Senior Creditors in accordance with their terms (the total amount of draws on the Apache Surety Bonds and Letters of Credit being hereinafter referred to as the "Subordinated Draws") and upon Payment in Full of the Senior Debt, the Junior Creditors shall be subrogated to the rights, if any, of the Senior Creditors against any Obligor and shall receive the benefit of all liens securing the obligations of the Obligor to Senior Creditor satisfied by the funding of such Subordinated Draws. Each Obligor agrees that the amount of such Subordinated Draws shall constitute a valid indemnification obligation of the Obligor to the Junior Creditors and, subject to the terms of subordination of payment contained herein, will pay such amounts to the Junior Creditors. Each Obligor further agrees that the rights of Senior Creditors to which Junior Creditors' rights are subrogated will survive Payment in Full of the Senior Debt notwithstanding any provision of any of the Senior Credit Documents to the contrary, and upon Payment in Full of the Senior Debt, each Senior Creditor shall assign of record the Senior Collateral to the Junior Creditors without representation, warranty or recourse. Such claim, together with the amount of all unpaid FWE I Premium Claims on the Apache Surety Bonds and Letters of Credit (up to a maximum of $12 million per annum), hereinafter referred to as the "Subrogation and Indemnity Claim" shall be a valid, liquidated debt of the Obligor. To the extent funds remain in Trust A after all the Senior Debt has been Paid in Full, Junior Creditors shall be entitled to the funds in Trust A to satisfy the Subrogation and Indemnity Claim. Nothing herein shall prevent or impair Senior Creditors from releasing the Senior Collateral or any part thereof as may be from time to time necessary to carry out the intent and purpose of the Decommissioning Agreement or any Apache Definitive Document.

4.      Limitation on Actions, Remedies by Junior Creditors.  Each Junior Creditor agrees that:

(a)      Until all Senior Debt is Paid in Full and the Commitments are terminated it will not, without the prior written consent of the Senior Creditors (i) at any time commence, prosecute, or participate in any administrative, legal, or equitable action against any Obligor to collect or enforce any Junior Obligations, (ii) at any time commence, prosecute, or participate in commencing or prosecuting, any Proceeding unless Senior Creditors have commenced or prosecuted, or is participating in, such Proceeding, (iii) at any time take any action to enforce the Junior Obligations or exercise any remedies against or in respect of any property of any Obligor to collect the Junior Obligations, or (iv) take any action that would, or could reasonably be expected to, hinder, in any manner, any exercise of remedies under the Senior Documents, it being understood that the Junior Creditors' rights to collect the FWE I Premium Claims are not limited by this provision but are subject to the limitations of Section 2(g) hereof.

(b)      Senior Creditors shall have the exclusive right to enforce rights, exercise remedies and make determinations regarding the release, disposition, or restrictions with respect to the Senior Collateral without any notice to, consultation with or consent of any Junior Creditor. Notwithstanding the foregoing, Junior Creditors will have all rights to notice that a senior creditor would be required to give to a junior perfected secured creditor under applicable law, including the Uniform Commercial Code, with respect to the Senior Collateral. The Surety Representative shall be deemed the proper notice party for all Junior Creditors. The Junior Creditors agree that for the purposes of this subsection, where reasonable notice is required, ten (10) days' notice shall be deemed reasonable. Senior Creditors may enforce the provisions of the Senior Documents and

13

exercise remedies thereunder in such order and in such manner as they may determine in their sole discretion and such exercise and enforcement shall include the rights to sell or otherwise dispose of Senior Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured lender under the Uniform Commercial Code of any applicable jurisdiction and of a secured creditor under the Bankruptcy Code. Each Junior Creditor agrees that such Junior Creditor will not object to the manner in which Senior Creditors may seek to enforce or collect the Senior Debt or the Senior Liens, regardless of whether any action or failure to act by or on behalf of Senior Creditors is, or could be, adverse to the interests of such Junior Creditor, and will not assert, and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or claim the benefit of any marshalling, appraisal, valuation or other similar right that may be available under applicable law with respect to the Senior Collateral.

(c)     Each Junior Creditor agrees that Junior Creditor will not (i) object to, contest, or support or participate with any other Person in contesting, in any judicial action (including any Proceeding), the validity or enforceability of any Senior Debt or any Senior Documents or the validity, extent, perfection, valuation, priority or enforceability of any Senior Liens, (ii) contest, protest or object to any foreclosure proceeding or action brought by any Senior Creditor, or the exercise of any right under any lockbox agreement, control agreement, landlord waiver or bailee's letter or similar agreement or arrangement, or any other exercise by Senior Creditor of any rights and remedies relating to the Senior Collateral or otherwise, or (iii) object to the forbearance by any Senior Creditor from commencing or pursuing any foreclosure action or proceeding or any other enforcement or exercise of any rights or remedies with respect to any of the Senior Collateral.

(d)     If, in violation of the provisions of this Agreement, a Junior Creditor shall commence, prosecute or participate in any suit, action, case or Proceeding against or with respect to any Obligor or its property, Obligors, or either of them, may interpose as a defense or plea the provisions set forth in this Agreement, and any Senior Creditor may intervene and interpose such defense or plea in its own name or in the name of such Obligor and shall, in any event, be entitled to restrain the enforcement of the payment provisions of the Junior Obligations, or of any remedies in respect of property of any Obligor, in its own name or in the name of such Obligor, in the same suit, action, case or Proceeding or in any independent suit, action, case or Proceeding, to the extent any such enforcement would be in violation of this Agreement.

(e)     Notwithstanding the foregoing, each Junior Creditor may (i) file a proof of claim against Obligors in respect of the Junior Obligations in any Proceeding, (ii) file suit on any Junior Obligations at any time during the period of thirty days prior to the applicable date as necessary to toll any applicable statute of limitations, provided, that no Junior Creditor shall prosecute such suit unless otherwise allowed by this Agreement or required by applicable law to preserve its rights, and (iii) send or deliver to Obligors a notice of default regarding the Junior Obligations.

5.     Prepayments.  Until the Senior Debt is Paid in Full, each Obligor agrees that it will not make, and each Junior Creditor agrees that it will not request, demand, accept or retain, any prepayment of any Junior Obligations, or any portion thereof other than the FWE I Premium Claims in accordance with the terms of Section 2 herein, without the prior written consent of each Senior Creditor.

14

6.     <u>Turnover of Improper Payments</u>.  If any payment or distribution of any character, whether in cash, securities or other property shall be received by any Junior Creditor in respect of any Junior Obligations in contravention of any of the terms of this Agreement, such payment or distribution or security shall be received in trust for the benefit of, and shall be paid over or delivered and transferred to, Senior Creditors for application to the payment of the Senior Debt until the Senior Debt is Paid in Full.

7.     <u>Proceedings</u>.

(a)     In the event of any Proceeding (i) all Senior Debt shall first be Paid in Full before any payment or distribution, whether in cash, securities or other property, shall be made to any Junior Creditor on account of any Junior Obligations and (ii) any payment or distribution of any kind or character, whether in cash, securities or other property, which would otherwise (but for these subordination provisions) be payable or deliverable in respect of any Junior Obligations shall be paid or delivered directly to Senior Creditors for application in payment of the Senior Debt until all Senior Debt shall have been Paid in Full and the Commitments terminated.

(b)     In any Proceeding, until the Senior Debt is Paid in Full:

(i)     If Senior Creditors consent to the use of cash collateral or the sale or use of Senior Collateral, or agree to provide post-petition financing to any Obligor, each Junior Creditor agrees that such Junior Creditor shall be deemed to have consented to, and will not contest or raise any objection to nor support any other Person in contesting or objecting to, any such use, or post-petition financing and, in such event, each Junior Creditor shall subordinate, and shall be deemed to have subordinated, any Liens of such Junior Creditor to any adequate protection provided to Senior Creditors and any "carve-out" for reasonable professional and United States Trustee fees; any order granting such use or post-petition financing will preserve Junior Creditors' rights under this Agreement.

(ii)     Each Junior Creditor agrees that such Junior Creditor will not seek relief from, or modification of, the automatic stay or any other stay in respect of any Obligor or any Senior Collateral, without the prior written consent of each Senior Creditor.

(iii)     Each Junior Creditor agrees that such Junior Creditor will not object to or contest, or support any other Person in objecting to or contesting, any request by Senior Creditors for adequate protection or any objection by Senior Creditors to any motion, relief, action or proceeding by any Obligor based on a claim of lack of adequate protection, or the payment of interest, reasonable fees and expenses to Senior Creditors under Section 506(b) or Section 506(c) of the Bankruptcy Code.

For the avoidance of doubt, in any Proceeding, until the Senior Debt is Paid in Full, Junior Creditors will not take any action that is prohibited under or inconsistent with the terms of this Agreement

(c)     Notwithstanding the foregoing clauses (a) and (b) or the provisions of Section 4, each of Junior Creditors may:

(i) file a proof of claim or statement of interest with respect to the Junior Obligations; provided that the Proceeding has previously been commenced by or against any Obligor;

(ii) take any action (not adverse to the priority status of the Senior Debt as set forth in this Agreement) in order to create, perfect, preserve or protect (but not enforce) its subrogation rights with respect to the Senior Collateral under the terms of this Agreement;

(iii) file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any Person objecting to or otherwise seeking the modification or disallowance of the claims of the Junior Creditors, including any claims secured by the Collateral, if any, in each case in accordance with the terms of this Agreement;

(iv) file any pleadings, objections, motions which assert rights or interests that are available to unsecured creditors of the Obligors, in each case, in accordance with applicable law and in a manner not inconsistent with the terms of this Agreement;

(v) vote on any plan of reorganization or file any proof of claim, make other filings and make any arguments and motions that are, in each case, not inconsistent with the terms of this Agreement;

(vi) inspect or appraise the Senior Collateral (and to engage or retain investment bankers or appraisers for the sole purposes of appraising or valuing the Senior Collateral), and receive information or reports concerning the Senior Collateral;

(vii) take any action to the extent necessary to prevent the running of any applicable statute of limitation or similar restriction on claims, or to assert a compulsory cross-claim or counterclaim against any Obligor;

(viii) take any action to seek and obtain specific performance or injunctive relief to compel any Obligor to comply with (or not violate or breach) an obligation to the Junior Creditors, so long as it is not accompanied by a claim for monetary damages or collection action and is not in violation of the provisions of this Agreement; and

(ix) join (but not exercise any control with respect to) any judicial foreclosure proceeding or other judicial lien enforcement proceeding initiated by the Senior Creditors with respect to the Senior Collateral to the extent that any such action could not reasonably be expected, in any material respect, to restrain, hinder, limit, delay for any material period or otherwise interfere with such proceeding by the Senior Creditors with respect to the Senior Collateral.

(d) If Senior Creditors are required to disgorge, turn over or otherwise pay money or property to the estate of any Obligor as a result of a claim of avoidance based upon an alleged

preferential or fraudulent transfer (any such disgorgement, turnover or payment, a "Recovery"), then the Senior Debt and the Senior Liens shall be reinstated to the extent of such Recovery and deemed to be outstanding as if such Recovery had not occurred.  If this Agreement shall have been terminated prior to such Recovery, then this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the priorities and obligations established by this Agreement.  Each Junior Creditor agrees that, prior to the time that the Senior Debt shall be Paid in Full, such Junior Creditor shall not be entitled to benefit from any Recovery relating to any distribution or allocation other than in accordance with this Agreement, it being understood and agreed that the benefit of such Recovery shall be allocated and turned over to Senior Creditors for application in accordance with the priorities set forth in this Agreement; and provided, however, any such Recovery shall only be applied to the payment of the FWE I Premium Claims to the extent the Junior Creditors are expressly entitled to such payment in accordance with the terms of the Agreement.

(e)     This Agreement is a "subordination agreement" under Section 510(a) of the Bankruptcy Code, and shall be effective before, during and after the commencement of a Proceeding.

8.     <u>No Impairment</u>.  Except as expressly stated otherwise in this Agreement, the rights of each Senior Creditor and the rights and obligations of each Junior Creditor, in each case as provided by the terms of this Agreement, shall remain in full force and effect without regard to, and shall not be impaired by any circumstance, including without limitation, (i) any act or failure to act on the part of any Obligor including, without limitation, to comply with its obligations hereunder, including, without limitation, under Sections 2 and 12 herein, (ii) any extension or indulgence in respect of any payment or prepayment of any Senior Debt, (iii) any amendment, modification, increase, refinancing or waiver of, or addition or supplement to, or deletion from, or compromise, release, consent or other action in respect of, any of the terms of any Senior Debt, any Senior Debt Document or any other agreement which may be made relating to any Senior Debt; provided, that solely with respect to an increase, such increase shall be consistent with the purpose of FWE I, as set forth in the FWE I LLC Agreement, (iv) any exercise or non-exercise by Senior Creditors of any right, power, privilege or remedy under the Senior Documents, or any waiver of thereof, (v) any release by Senior Creditors of any Senior Liens, (vi) any extension or indulgence in respect of any payment or prepayment of any Junior Obligations, FWE I Premium Claims, or Incremental Premium Payments, (vii) any amendment, modification, increase, refinancing or waiver of, or addition or supplement to, or deletion from, or compromise, release, consent or other action in respect of, any of the terms of any Junior Obligations, FWE I Premium Claims, or Incremental Premium Payments, any Apache Surety Bonds, general indemnity agreements, or any other agreement which may be made relating to any Junior Obligations, FWE I Premium Claims, or Incremental Premium Payments, provided, that, any such amendment, modification, increase, or refinancing is not otherwise prohibited by this Agreement, (viii) any exercise or non-exercise by any Junior Creditor of any right, power, privilege or remedy under the Apache Surety Bonds, general indemnity agreements, or any waiver of thereof, that is not otherwise prohibited by this Agreement, (ix) any merger or consolidation of any Obligor into or with any other Person, or any sale, lease or transfer of any or all of the assets of any Obligor to any other Person, (x) consent to any use of cash collateral by, or to the extension of credit to any Obligor in, any Proceeding, or (xi) absence of any notice to, or knowledge by, a Junior Creditor, of the existence or occurrence of any of the matters or events set forth in the foregoing clauses (i)

through (v), (ix), and (xvii) preceding; (xii) absence of any notice to, or knowledge by Senior Creditor of the existence or occurrence of any of the matters or events set forth in the foregoing clauses (v) through (viii), (ix), and (x) proceeding.  Each Junior Creditor and Senior Creditor unconditionally waives notice of any of the matters referred to in this Section 8.

9.      <u>Modifications to Senior Debt or Junior Obligations</u>.  The Senior Documents may be modified, amended, supplemented, restated or replaced, and any Senior Debt may be renewed, extended, increased, rearranged or refinanced with Senior Creditors or any other Person without the prior consent of any Junior Creditor.  The Junior Obligations may not be modified or amended to (a) increase any amount payable in respect of the Junior Obligations as in effect on the Effective Date, (b) modify required payment dates of any Junior Obligations as in effect on the Effective Date, or (c) add any additional payment obligations of any kind in connection with any Junior Obligations as in effect on the Effective Date, without the prior consent of Senior Creditors.

10.      <u>Continued Effectiveness of this Agreement</u>.  The provisions of this Agreement are intended to and shall be enforceable at all times, notwithstanding the commencement or continuation of any Proceeding.

11.      <u>Representations and Warranties</u>.

(a)      Each Junior Creditor represents and warrants to Senior Creditors as follows: (i) such Junior Creditor has the requisite capacity to enter into, execute, deliver and carry out the terms of this Agreement, (ii) this Agreement, when executed and delivered, will constitute the valid and legally binding obligation of such Junior Creditor, enforceable in accordance with its terms, except as enforceability may be limited by the effect of any applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally, and principles of equity, and (iii) such Junior Creditor is the sole owner, beneficially and of record, of the Junior Obligations.

(b)      Each Senior Creditor represents and warrants to Junior Creditors as follows:  (i) such Senior Creditor has the requisite capacity to enter into, execute, deliver and carry out the terms of this Agreement, (ii) this Agreement, when executed and delivered, will constitute the valid and legally binding obligations of such Senior Creditor, enforceable in accordance with its terms, except as enforceability may be limited by the effect of any applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally, and principles of equity, and (iii) the Senior Creditors are the sole owners, beneficially and of record, of the Senior Debt.

(c)      Each Obligor represents and warrants to each Senior Creditor and each Junior Creditor as follows: the Confirmation Order entered in connection with the Plan (i) gives such Obligor the requisite power and authority to enter into, execute, deliver and carry out the terms of this Agreement and (ii) provides that this Agreement, when executed and delivered, will constitute the valid and legally binding obligation of such Obligor, enforceable in accordance with its terms, except as enforceability may be limited by the effect of any applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally, and principles of equity.

12.     <u>Participation in Farmout</u>.  Obligors and the Apache Sureties agree to enter into the Farmout Agreement.

13.     <u>Subrogation Rights</u>.  Obligors acknowledge solely for the purposes of this Agreement the rights of subrogation of the Apache Sureties arising from payment of any of the Apache Bonds, and Obligors consent to the contractual subrogation rights granted by Senior Creditors to Junior Creditors herein upon Payment in Full of the Senior Debt, and to the transfer of liens to the Junior Creditors upon Payment in Full of the Senior Debt, all subject to the terms and conditions of this Agreement.

14.     <u>Sharing of Information</u>.  Obligors hereby confirm and acknowledge that the Surety Representative will have the same access rights to information as does Apache as set out in the FWE I LLC Agreement as in effect on the Effective Date.  In addition, Surety will have the same inspection rights as Apache to inspect documents and seek other information as set out in the FWE I LLC Agreement as in effect on the Effective Date.  Surety Representative is expressly permitted to share all information obtained by Surety from Obligors and Apache, or any other person, with Apache Sureties, subject to any third party contractual limitations, if any.

15.     <u>Cumulative Rights, No Waivers</u>.  Each right of Senior Creditors under this Agreement shall be cumulative and in addition to any other right of Senior Creditors against Obligors or either of them, or any Junior Creditor, under applicable law.  Any failure or delay on the part of Senior Creditors in exercising any such right shall not operate as a waiver thereof or impair the rights of Senior Creditors thereafter to exercise same.

16.     <u>Modification</u>.  No waiver or consent with respect to any provision of this Agreement shall be effective unless in writing and signed by Senior Creditors and Junior Creditors, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose given.  Neither this Agreement, nor any provision hereof, may be amended or modified except pursuant to an agreement in writing entered into by Senior Creditors, Junior Creditors and Obligors.  Any notice to or demand on a Junior Creditor which is required by this Agreement shall not entitle Junior Creditor to any other or further notice or demand in the same, similar or other circumstances unless specifically required by this Agreement.  Any notice to or demand on a Senior Creditor which is required by this Agreement shall not entitle such Senior Creditor to any other or further notice or demand in the same, similar or other circumstances unless specifically required by this Agreement.

17.     <u>Notices</u>.  Except as otherwise provided herein, all notices and correspondence hereunder shall be in writing and sent by certified or registered mail, return receipt requested, or by overnight delivery service, with all charges prepaid, or by email or by telecopy transmission, promptly confirmed in writing sent by first-class mail to the following addresses:

(a)     If to Junior Creditor Everest:

Everest Reinsurance Company
Everest National Insurance Company
451 5th Avenue
New York, NY 10017

Attn:  James J. Real, V.P. Financial Lines
(james.real@everestnational.com)

with a copy to:

Chiesa Shahinian & Giantomasi PC
One Boland Drive
West Orange, New Jersey 07052
Attn:  Darren Grzyb, Esq. (dgrzyb@csglaw.com)

(b)      If to Junior Creditor HCCI:

HCC International Insurance Company LLC
The Grange
Rearsby, Leicester LE7 4FY
Attn: Martyn Ward, Managing Director – Credit & Surety
(MWard@tmhcc.com)

with a copy to:

Locke Lord LLP
600 Travis Street, Suite 2800
Houston, Texas 77002
Attn: Philip G. Eisenberg, Esq. (peisenberg@lockelord.com)

(c)      If to Junior Creditor Philadelphia:

Philadelphia Indemnity Insurance Company
P.O. Box 3635
Bala Cynwyd, Pennsylvania 19004
Attn: Kimberly Czap, Vice President (Kimberly.czap@phly.com)

with a copy to:

Manier & Herod, P.C.
1201 Demonbreun St., Suite 900
Nashville, TN 37203
Attn: Robert Miller, Esq. (rmiller@manierherod.com)

(d)      If to Junior Creditor Zurich:

Zurich American Insurance
P.O. Box 68549
Shaumburg, Illinois 60196
Attn: Thomas Finley (Thomas.Finley@zurichna.com)]

with a copy to:

20

Clark Hill
720 Brazos, Suite 700
Austin, Texas 78701
Attn: Duane J. Brescia, Esq. (dbrescia@clarkhill.com)

(e)     If to Obligors, or to any Obligor:

Fieldwood Energy I, LLC
GOM Shelf LLC
2000 W. Sam Houston Parkway S., Suite 1200
Houston, TX 77042
Attention: Jon Graham (jgraham@fwellc.com)]

with a copy to:

Weil, Gotshal & Manges LLP
700 Louisiana, Suite 1700
Houston, TX 77002
Attn:  Alfredo Perez, Esq. (alfredo.perez@weil.com)

(f)     If to a Senior Creditor:

Apache Corporation
2000 Post Oak Boulevard, Suite 100
Houston, Texas 77056-4400
Attention:  S. Brett Cupit (brett.cupit@apachecorp.com)

with a copy to:

Hunton Andrews Kurth LLP
600 Travis Street, Suite 4200
Houston, Texas 77002
Attention:  Robin Russell, Esq. (RRussell@andrewskurth.com)

or in any case, to such other address as the party addressed shall have previously designated by written notice to the serving party, given in accordance with this section.  All such notices and correspondence shall be deemed given (a) if sent by certified or registered mail, three (3) Business Days after being postmarked, (b) if sent by overnight delivery service, when received at the above stated addresses, (c) if sent by facsimile transmission, when receipt of such transmission is acknowledged, and (d) if sent by email, when successfully delivered to the email address designated for the recipient pursuant to this Agreement for such purpose.

18.     Severability.  In case any provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

19.     <u>Assignment of Obligations</u>.  The Junior Obligations may not be transferred or assigned to any Person unless such transferee or assignee agrees in writing to be bound by this Agreement as if it were Junior Creditor hereunder.  No assignment shall release the assigner without each Senior Creditor's written release.  No assignment by the Senior Creditors shall affect the subrogation rights of the Junior Creditors provided for herein.

20.     <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of the successors and assigns of each Senior Creditor and each Junior Creditor and shall be binding upon the successors and assigns of each Senior Creditor, each Junior Creditor and each Obligor.

21.     <u>Counterparts; Electronic Copies</u>.  This Agreement may be executed in any number of counterparts, and an electronic copy of any such executed counterpart shall be deemed valid as an original.

22.     <u>Defines Rights of Creditors</u>.  The provisions of this Agreement are solely for the purpose of defining the relative rights of each Senior Creditor, on the one hand, and each Junior Creditor, on the other hand, and shall not be deemed to create any rights or priorities in favor of any other Person, including, without limitation, any Obligor or any debtor-in-possession or trustee in bankruptcy in any Proceeding.

23.     <u>Termination</u>.  This Agreement shall terminate when the Senior Debt is Paid in Full, and the earlier to occur of (i) the last to occur of payment in full of the Junior Obligations and the termination or expiration of all of the Apache Bonds and (ii) the liquidation and dissolution of Obligors, in either such case, subject to <u>Section 7(c)</u>.

24.     **<u>CHOICE OF LAW.</u>**

(a)     THIS AGREEMENT HAS BEEN EXECUTED OR COMPLETED AND/OR IS TO BE PERFORMED IN TEXAS, AND IT AND ALL TRANSACTIONS HEREUNDER OR PURSUANT HERETO SHALL BE GOVERNED AS TO INTERPRETATION, VALIDITY, EFFECT, RIGHTS, DUTIES AND REMEDIES OF THE PARTIES THEREUNDER AND IN ALL OTHER RESPECTS BY THE LAWS OF TEXAS, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF.

(b)     ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER RELATED DOCUMENT SHALL BE BROUGHT IN THE STATE OR FEDERAL COURTS OF HARRIS COUNTY, TEXAS, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH JUNIOR CREDITOR AND EACH OBLIGOR CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS.  EACH JUNIOR CREDITOR AND EACH OBLIGOR IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO VENUE ON THE GROUNDS OF FORUM <u>NON CONVENIENS</u>, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH JURISDICTION. NOTWITHSTANDING THE FOREGOING, SENIOR CREDITORS SHALL HAVE THE RIGHT TO BRING ANY ACTION OR PROCEEDING AGAINST ANY OBLIGOR OR ITS PROPERTY IN THE COURTS OF ANY OTHER JURISDICTION AS LENDER DEEMS NECESSARY OR

APPROPRIATE IN ORDER TO EXERCISE REMEDIES WITH RESPECT TO THE SENIOR COLLATERAL.

25. **WAIVER OF JURY TRIAL. EACH CREDITOR AND EACH OBLIGOR IRREVOCABLY WAIVES ITS RESPECTIVE RIGHT TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY KIND BROUGHT BY ANY SUCH PERSON AGAINST ANOTHER, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE. EACH CREDITOR AND EACH OBLIGOR AGREES THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES TO THIS AGREEMENT FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS OR ANY PROVISION HEREOF OR THEREOF. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT AND THE LOAN DOCUMENTS, WHETHER OR NOT SPECIFICALLY SET FORTH THEREIN.**

26. <u>Execution; Entire Agreement</u>. A telecopy or other electronic transmission of any executed counterpart of this Agreement shall be deemed valid as an original.

THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT AMONG THE PARTIES REGARDING THE SUBJECT MATTER HEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO ORAL AGREEMENTS AMONG THE PARTIES.

27. <u>Dismissal of Adversary Proceeding</u>. Except as specifically provided for herein and in the Confirmation Order, on the Effective Date, all claims of the Junior Creditors against the Debtors and the Senior Creditors, including those asserted by the Apache Sureties and described in the Debtors' Complaint filed at Docket No. 1 in Adversary Proceeding Case No. 21-3418 in the Bankruptcy Court ("Adversary Proceeding") shall be released. The Adversary Proceeding shall be dismissed with prejudice and the parties consent to the filing of an agreed order to effectuate same. The parties hereto agree that the Court's findings of fact and conclusions of law contained in the Confirmation Order pertaining to the Senior Creditors and the Apache Sureties (¶¶ 79–96) are final, binding, and non-appealable.

- SIGNATURES FOLLOW –

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

<u>SENIOR CREDITORS</u>

APACHE CORPORATION

By: _____

Name: Ben C. Rodgers
Title:  Senior Vice President, Treasurer and
        Marketing and Midstream

APACHE SHELF, INC.

By: _____

Name: Ben C. Rodgers
Title:  Senior Vice President and Treasurer

APACHE DEEPWATER LLC

By: _____

Name: Ben C. Rodgers
Title:  Senior Vice President and Treasurer

APACHE SHELF EXPLORATION LLC

By: _____

Name: Ben C. Rodgers
Title:  Senior Vice President and Treasurer

Signature Page to Subrogation, Subordination and Payment Agreement

JUNIOR CREDITORS

EVEREST REINSURANCE COMPANY

By: _____
Name: James J. Real
Title: Vice President, Claims

HCC INTERNATIONAL INSURANCE
COMPANY PLC

By:_____
Name:
Title:

PHILADELPHIA INDEMNITY INSURANCE
COMPANY

By:_____
Name:
Title:

ZURICH AMERICAN INSURANCE COMPANY

By:_____
Name:
Title:

<u>JUNIOR CREDITORS</u>

EVEREST REINSURANCE COMPANY


By:_____
Name:
Title:

HCC INTERNATIONAL INSURANCE
COMPANY PLC


By:_____
Name: Ryan Grant O'Neill
Title:   Senior Underwriter - Surety

PHILADELPHIA INDEMNITY INSURANCE
COMPANY


By:_____
Name:
Title:

ZURICH AMERICAN INSURANCE COMPANY


By:_____
Name:
Title:

<u>JUNIOR CREDITORS</u>

EVEREST REINSURANCE COMPANY

By:_____
Name:
Title:

HCC INTERNATIONAL INSURANCE
COMPANY PLC

By:_____
Name:
Title:

PHILADELPHIA INDEMNITY INSURANCE
COMPANY

By:_____
Name:  Kimberly B Kzdp
Title:  VP

ZURICH AMERICAN INSURANCE COMPANY

By:_____
Name:
Title:

Signature Page to Subrogation, Subordination and Payment Agreement

JUNIOR CREDITORS

EVEREST REINSURANCE COMPANY

By:_____
Name:
Title:

HCC INTERNATIONAL INSURANCE
COMPANY PLC

By:_____
Name:
Title:

PHILADELPHIA INDEMNITY INSURANCE
COMPANY

By:_____
Name:
Title:

ZURICH AMERICAN INSURANCE COMPANY

By:_____
Name:  *Tom Finley*
Title:  *Claims Professional*

Signature Page to Subrogation, Subordination and Payment Agreement

OBLIGORS

FIELDWOOD ENERGY I LLC

By:
Name:   Jon Graham
Title:    Sole Manager

GOM Shelf LLC

By:
Name:   Thomas R. Lamme
Title:    Authorized Signatory

<u>OBLIGORS</u>

FIELDWOOD ENERGY I LLC


By:_____
Name:   Jon Graham
Title:    Sole Manager

GOM Shelf LLC


By:_____
Name: Thomas R. Lamme
Title: Vice President

# Exhibit 6

BSEE Decommissioning webpage

**U.S. DEPARTMENT OF THE INTERIOR**



MENU

# Bureau of Safety and Environmental Enforcement

Promoting Safety, Protecting the Environment and Conserving Offshore Resources

## Decommissioning

When a company signs a lease for offshore oil or gas exploration or production, Right-of-Way or Right-of-Use-and-Easement, that initial agreement includes the process of "decommissioning" the well, that is, safely plugging the hole in the earth's crust, and disposing of the equipment used to support the production. This process is critical for environmental protection after a well is drilled, utilized for production, then plugged and sealed when the well is exhausted, in the Outer Continental Shelf (OCS).

Decommissioning regulation authority for BSEE began with 43 U.S. Code 1334 and 30 CFR 250, Subpart Q, Decommissioning Activities. These provide deeper detail regarding regulations for sealing the well, to protect the environment and people using the waters around it.

Approximately 1,885 active production platforms exist on the OCS with more than 60% of these facilities more than 25 years old.  (Platforms are facilities which facilitate the extraction and processing of oil and natural gas, different from drilling rigs which "drill" a well to discover hydrocarbons and bring them to the surface for processing). Over the past decade, the offshore energy industry has averaged 200 platform removals per year.

Platforms generally consist of two parts for decommissioning purposes: the topside (the structure visible above the waterline) and the substructure (the parts between the surface and the seabed, or mudline). In most cases the topsides that contain the operational components are taken to shore for recycling or re-use. The substructure is generally severed 15 feet below the mudline, then removed and brought to shore to sell as scrap for recycling or refurbished for installation at another location.

The Regional Supervisor may grant a departure from the requirement to remove a structure by approving partial structure removal or toppling in place for conversion to an artificial reef if the operator meets the requirements of the National Artificial Reef Plan as permitted by several U.S. Federal agencies. State government agencies are responsible for managing marine fisheries

resources programs.

As a result of successful initiatives to provide new habitat for marine life, ships and platforms which have reached the end of their useful life are sunk in pre-approved places to create artificial reefs. Today the National Oceanic and Atmospheric Administration (NOAA) has overall responsibility for the program, working with many other state and federal agencies, including BSEE.

## Idle Iron

From the first signature on a lease, offshore operators know that they will have to clean up the area after they drill and produce hydrocarbons (oil and natural gas) and decommission the facilities and structures placed on the leased area, also called Plug and Abandonment (P & A).

The most common way to reclaim a site includes removing the superstructure and often selling it as scrap metal. Other situations may require that the structure be dismantled and removed, such as damage incurred from a storm, use of different equipment on the original structure or another company using the well. Any operation that is decommissioned and is no longer "economically viable," infrastructure that is severely damaged or idle infrastructure on active leases, are considered "idle iron" according to NTL 2018-G03.

BSEE's Idle Iron policy keeps inactive facilities and structures from littering the Gulf of Mexico by requiring companies to dismantle and responsibly dispose of infrastructure after they plug non-producing wells. BSEE enforces these lease agreements primarily for two reasons beyond the CFR requirement:

1. Environmental effects –toppled structures pose a potential environmental hazard due to the topsides and the associated equipment, electronics, wiring, piping, tanks, etc., that are left on the bottom of the Gulf of Mexico. These items pose a financial, safety and environmental burden, and must be removed from the bottom

2. Safety – Severe weather such as hurricanes, have toppled, severely damaged or destroyed the structures associated with oil and gas production. While any structure could be destroyed during a hurricane, idle facilities pose an unnecessary risk of leaks from wells into the environment and potential damage to the ecosystem, passing ships and commercial fishermen.

## Reef in Place

Retired petroleum platforms are required by the Bureau of Ocean Energy Management's lease agreement to be removed from the marine environment and taken to shore for disposal within one year from termination of the oil and gas lease. An alternative to onshore disposal is the conversion of retired platforms to permitted and permanently submerged platform artificial reefs, commonly referred to as Rigs to Reefs. Three methods of platform removal and reefing are used in the RTR process.

Recognizing the preservation of environmental values associated with the method of partial removal of the platform, in 1997 a policy was established to allow the industry the option to partially remove the well conductors at the same depth below the water line (BWL).

Creating artificial reefs minimizes the impacts on the platforms' fish and reef communities.



The tow-and-place platform reefing method



The topple-in-place platform reefing method



The partial removal platform reefing method

*(click to expand images)*



**FAQs**



**Research**



**Rigs-to-Reefs**



**Statistics for Decommissioned OCS Platforms**



**Pacific Region Decommissioning**



**Offshore Infrastructure Dashboard**

[Return to top](#)

# Exhibit 7
## BSEE Idle Iron webpage

**U.S. DEPARTMENT OF THE INTERIOR**



MENU

# Bureau of Safety and Environmental Enforcement

Promoting Safety, Protecting the Environment and Conserving Offshore Resources

## Idle Iron

From the first signature on a lease, offshore operators know that they will have to clean up the area after they drill and produce hydrocarbons (oil and natural gas) and decommission the facilities and structures placed on the leased area, also called Plug and Abandonment (P & A).

The most common way to reclaim a site includes removing the superstructure and often selling it as scrap metal. Other situations may require that the structure be dismantled and removed, such as damage incurred from a storm, use of different equipment on the original structure or another company using the well. Any operation that is decommissioned and is no longer "economically viable," infrastructure that is severely damaged or idle infrastructure on active leases, are considered "idle iron" according to NTL 2018-G03.

*BSEE's Idle Iron* policy keeps inactive facilities and structures from littering the Gulf of Mexico by requiring companies to dismantle and responsibly dispose of infrastructure after they plug non-producing wells. BSEE enforces these lease agreements primarily for two reasons beyond the CFR requirement:

1. Environmental effects –toppled structures pose a potential environmental hazard due to the topsides and the associated equipment, electronics, wiring, piping, tanks, etc., that are left on the bottom of the Gulf of Mexico. These items pose a financial, safety and environmental burden, and must be removed from the bottom
2. Safety – Severe weather such as hurricanes, have toppled, severely damaged or destroyed the structures associated with oil and gas production. While any structure could be destroyed during a hurricane, idle facilities pose an unnecessary risk of leaks from wells into the environment and potential damage to the ecosystem, passing ships and commercial fishermen.

**Return to top**

# Exhibit 8

December 11, 2018 BSEE Notice to Lessees and Operators re Idle Iron Decommissioning Guidance for Wells and Platforms

**UNITED STATES DEPARTMENT OF THE INTERIOR**
**BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT**
**GULF OF MEXICO OCS REGION**

NTL No. 2018-G03                                        Effective Date: December 11, 2018

NOTICE TO LESSEES AND OPERATORS OF FEDERAL OIL AND GAS LEASES
AND PIPELINE RIGHT-OF-WAY HOLDERS IN THE
OUTER CONTINENTAL SHELF, GULF OF MEXICO OCS REGION

**Idle Iron Decommissioning Guidance for Wells and Platforms**

This Notice to Lessees and Operators and Pipeline Right-of-way Holders (NTL) supersedes NTL
No. 2010-G05, Decommissioning Guidance for Wells and Platforms, and is being issued to
update and streamline guidance on this topic.  This NTL provides clarification and guidance to
help ensure that idle infrastructure on active leases is decommissioned in a timely manner in
accordance with regulation.  This NTL reaffirms the decommissioning guidance contained in
NTL No. 2010-G05 (issued on September 15, 2010), carries forward the substance of the
definitions provided therein, and adds language that describes BSEE's authority to work with
operators to accomplish such work (i.e., the Bureau of Safety and Environmental Enforcement
(BSEE) possesses discretion in implementing schedules for decommissioning idle iron).

**Background**

Idle infrastructure poses a potential threat to the Outer Continental Shelf (OCS) environment and
potential financial liabilities if destroyed or damaged in a future event, such as a hurricane.  The
cost and time to permanently plug wells and remove storm-damaged infrastructure is
significantly higher than decommissioning assets that have not been damaged as of the time of
decommissioning.  These increased costs have potential ramifications on financial security
requirements and may even impact the future viability of your company.

**Regulatory Authority for Decommissioning Idle Wells and Platforms**

Pursuant to 30 CFR 250.1703, you must permanently plug all wells and remove all platforms and
other facilities when no longer useful for operations.  Further, 30 CFR 250.1711 states that BSEE
will order you to permanently plug a well if it poses a hazard to safety or the environment, or is
not useful for lease operations and is not capable of oil, gas, or sulphur production in paying
quantities.

To clarify the phrases "no longer useful for operations" and "not capable of oil, gas, or sulphur
production in paying quantities," "toppled platform," and "downhole zonal isolation," BSEE
provides the following guidance:

In determining whether a well is "*capable of production in paying quantities,"* BSEE will

include wells that can produce enough oil, gas, or sulphur to yield a positive stream of income after subtracting normal expenses.  These expenses may include actual royalty payments based on the well's production and the direct lease operating costs allocated to the well.

BSEE will consider the following timeframes, when determining whether a well or platform is "*no longer useful for operations*":
   (1) For a ***well***,
       (a) the well has not been used in the past 5 years (i) for operations associated with the exploration for or the development and production of oil, gas, sulphur, or other mineral resource or (ii) as infrastructure to support such operations; and
       (b) you have no plans to use the well (i) for operations associated with the exploration for or the development and production of oil, gas, sulphur, or other mineral resource, or (ii) as infrastructure to support such operations.
   (2) For a ***platform***, the platform has
       (a) been toppled or otherwise destroyed; or
       (b) not been used in the past 5 years (i) for operations associated with the exploration for or the development and production of oil, gas, sulphur, or other mineral resource, (ii) as infrastructure to support such operations, or (iii) for other energy- or marine - related purposes as authorized by BSEE or the Bureau of Ocean Energy Management.

BSEE will consider "*toppled platforms*" to include platforms or other structures that have collapsed or fallen or been displaced by a storm or other external forces and, as a result of such an event, are partially or completely destroyed.

BSEE views "*downhole zonal isolation*" to mean isolating all hydrocarbon and sulphur zones by adhering to the plugging and testing requirements of 30 CFR 250.1712 (approval); 30 CFR 250.1713 (notification); 30 CFR 250.1714 (plugs); 30 CFR 250.1715(a)(1), (a)(2), or (a)(3) (plugging); and 30 CFR 250.1715(b)(1) or (b)(2) (plug test). Downhole zonal isolation includes meeting the casing pressure management requirements of API RP 90 (as incorporated by reference in 30 CFR 20.198) and 30 CFR 250.519 – 250.530.

**Guidance**

Because the regulations do not expressly prescribe the time frame for decommissioning idle wells and platforms when no longer useful for operations, the following guidance is provided:

   **1.**   Decommissioning Idle Wells on Active Leases

       A.  Pursuant to 30 CFR 250.1703 and 250.1711(b), if any well is no longer useful for operations (as defined above) ***and*** is no longer capable of producing oil, gas, or sulphur in paying quantities, you must perform one of the following and should do so as soon as possible, but no later than 3 years after the well is no longer useful for operations:
           i.  Permanently plug and abandon the well in accordance with 30 CFR 250.1712 through 250.1716; or
           ii  Plug the well in accordance with 30 CFR 250.1712 through 250.1715 (i.e., only wellhead and casing removal requirement remains); or
           iii. Provide the well with downhole zonal isolation (see definition above).  Within 2 years after you provide a well with downhole zonal isolation, BSEE expects

3

you to comply with either (i) or (ii) above.

B.  In performing the work set forth in paragraph A above, we recommend that you prioritize the well work based on risk conditions, such as:

    i.  Wells on structures with the highest risk of toppling (e.g., those structures that have not passed required assessments or are structurally damaged (including leaners)).

    ii.  Wells that were producing oil.

    iii.  Wells that are capable of natural flow.  In order for a well to be deemed incapable of natural flow, the appropriate BSEE Gulf of Mexico (GOM) Region District Manager must approve your application for such a determination as required by 30 CFR 250.810 or 250.825 for dry and subsea trees, respectively.

    iv.  Wells that have casing pressure.

    v.  Wells that are located close to the shoreline, environmentally sensitive areas, or other infrastructure.

C.    Future Use Determination:  For any well that meets element (1)(a) of the definition of "no longer useful for operations," but which you believe to be useful for operations or capable of production in paying quantities, you should provide supporting documentation to the BSEE GOM Regional Supervisor, Regional Field Operations, for review and concurrence.  Note that if BSEE determines such well is useful for lease operations or is capable of producing oil, gas, or sulphur in paying quantities, you may still be required to perform a downhole zonal isolation in order to ensure compliance with 30 CFR 250.106(c), depending on the length of time needed before you can return to the well to resume useful operations.  If BSEE requires downhole zonal isolation, BSEE will require you to specify a timeframe for completion of such work at the time of the aforementioned BSEE determination.  Note that No. 1.A.iii above will not be applicable whether the zonal isolation is completed as required by BSEE or voluntarily by the operator and that BSEE may continue to monitor the well until operations are resumed.

The supporting documentation should include, but may not be limited to, the following:

1.  Detailed discussion of your plans for the well.
2.  Log section identifying the zone(s) to be produced.
3.  Recoverable reserve estimate.
4.  Reservoir parameters (e.g., porosity, acre-feet, water saturation, formation volume factor, etc.) including recovery factor.
5.  List of all wells penetrating the reservoir.
6.  Structure map showing penetration points and depths for each well penetrating the reservoir, fluid contacts, and reservoir boundaries.
7.  Isopach map showing the net feet of pay for each well, identified at the penetration point.
8.  Any well test information acquired.
9.  Detailed economic analysis.
10. A schedule of the well work.

4

11. An estimated date of resuming production.

**2.**   Decommissioning Idle Platforms or Other Facilities on Active Leases

    A.   Pursuant to 30 CFR 250.1703(c), you must remove a platform (including a toppled platform) or other facility when it is no longer useful for operations. Because the regulations do not expressly prescribe the time frame for completing these operations, BSEE clarifies that you are required to do so as soon as possible, but no later than 5 years after the platform is no longer useful for operations.

    B.   Future Use Determination: For any platform or other facility that has not been used in the past 5 years and which you believe to be useful for future operations, you should submit to the BSEE GOM Regional Supervisor, Regional Field Operations, supporting documentation demonstrating the usefulness for review and concurrence.  The supporting documentation should include but may not be limited to the following:
        i.   Detailed discussion of the facility's future utility.
        ii.   Detailed schedule for operations to resume on the facility.

**3**.   Idle Iron Reporting

Although you are expected to monitor your idle wells and platforms and to undertake decommissioning on your own initiative, in accordance with the regulations, as clarified by this NTL, BSEE plans to continue to provide you with a list of idle wells and platforms annually to help expedite the process.  Companies may conduct idle iron abandonment operations consistent with the regulations and timelines provided in this NTL while taking into consideration their individual workload or risk matrix.  However, BSEE retains the discretion to be flexible on the timelines listed above when justified on a case-by-case basis to the satisfaction of the Regional Supervisor.  In making such a decision to extend such timelines, BSEE will consider all wells, platforms, and other facilities that are no longer useful for operations and not capable of production in paying quantities, as well as your decommissioning schedule (anticipated permit submittal, work start, and work complete date) for each well and platform.  Failure to comply with the timelines outlined in this NTL without a BSEE extension of time may result in the issuance of decommissioning orders from BSEE.

**Other Decommissioning-Related Issues:**

BSEE reminds you of your regulatory obligation to decommission infrastructure on terminated/expired/relinquished leases and rights-of-way within 1 year after the lease or right-of-way expiration/termination/relinquished date in accordance with 30 CFR 250.1710, 30 CFR 250.1725(a), 30 CFR 250.1010(h), and the lease or right-of-way instrument.  Failure to do so within this 1-year period, absent BSEE's approval, will typically result in the issuance of an Incident of Noncompliance.  Further, BSEE expects that operators will ordinarily prioritize decommissioning of expired or terminated lease structures, wells, and pipelines over Idle Iron infrastructure, absent countervailing safety or environmental considerations.  In addition:

5

- Pursuant to 30 CFR 250.1711(a), the BSEE GOM Region will order you to permanently plug any well that poses a hazard to safety or the environment.

- You must submit decommissioning applications, receive approval of those applications, and submit subsequent reports according to the requirements and deadlines in 30 CFR 250.1704 (and regulations referenced therein) to the appropriate BSEE District and/or Regional Offices.

- Pursuant to 30 CFR 250.1704(i), you must submit a certified summary of expenditures for permanently plugging any well, removal of any platform or other facility, clearance of any site after wells have been plugged or platforms or facilities removed, and decommissioning of pipelines.

**Guidance Document Statement**

BSEE issues NTLs as guidance documents in accordance with 30 CFR 250.103 to clarify or provide more detail about certain BSEE regulatory requirements and to outline the information you provide in your various submittals.  Under that authority, this NTL sets forth guidance and clarification regarding certain regulatory requirements and provides a clear and consistent approach to complying with those requirements.

**Paperwork Reduction Act of 1995 Statement**

The information referred to in this NTL is intended to provide clarification or guidance regarding compliance with requirements contained in 30 CFR Part 250, Subparts A, H, J, and Q, and with Applications for Permit to Modify (APMs).  The Office of Management and Budget (OMB) has approved the information collection requirements in these regulations under OMB Control Numbers 1014-0022, 1014-0003, 1014-0016, 1014-0010, and 1014-0026, respectively.  This NTL does not impose any additional information collection requirements subject to the Paperwork Reduction Act of 1995.

**Contacts**

Please address any questions on the content of this NTL to BSEE GOM Regional Field Operations, Decommissioning Support Section by e-mail at BSEEIdleIron@bsee.gov.


/S/ Lars Herbst
Lars Herbst
Regional Director

# Exhibit 9
## Excerpts from the July 18, 2013
## Purchase and Sale Agreement

*Execution Version*

PURCHASE AND SALE AGREEMENT

by and among

APACHE CORPORATION,

APACHE SHELF, INC., and

APACHE DEEPWATER LLC

collectively as the Sellers,

FIELDWOOD ENERGY LLC

as Buyer

and

GOM SHELF LLC

Dated as of July 18, 2013

# TABLE OF CONTENTS

Page

Article 1.   Definitions and Rules of Construction..................................................................1

    1.1   Definitions.................................................................................................1
    1.2   Rules of Construction ...............................................................................33

Article 2.   Purchase and Sale of Assets, GOM Interests, PipelineCo Interests and Paloma Interests .....................................................................................................34

    2.1   Purchase and Sale of the GOM Interests, the PipelineCo Interests, the Paloma Interests, and Assets.....................................................................34
    2.2   Excluded Assets ........................................................................................36
    2.3   GOM Equity Purchase ..............................................................................39

Article 3.   Purchase Price ...................................................................................................42

    3.1   Consideration; Allocated Values ...............................................................42
    3.2   Increases in Purchase Price .......................................................................43
    3.3   Decreases in Purchase Price.......................................................................44
    3.4   Deposit ......................................................................................................46
    3.5   Payment.....................................................................................................46
    3.6   Closing Statement .....................................................................................46
    3.7   Closing ......................................................................................................47
    3.8   Post-Closing Adjustment...........................................................................47
    3.9   Allocation of Revenue and Expenses ........................................................49
    3.10   Purchase Price Allocation .........................................................................49

Article 4.   Representations and Warranties of Sellers ...........................................................50

    4.1   Organization of Sellers .............................................................................50
    4.2   Authorization; Enforceability ...................................................................50
    4.3   Brokers' Fees ............................................................................................51
    4.4   No Conflicts; Consents ..............................................................................51
    4.5   Bankruptcy ................................................................................................51
    4.6   Litigation ...................................................................................................51
    4.7   Approvals...................................................................................................51
    4.8   Taxes.........................................................................................................52
    4.9   Material Contracts.....................................................................................53
    4.10   Imbalances ................................................................................................55
    4.11   Suspense Funds .........................................................................................55
    4.12   Non-Consent Operations...........................................................................55
    4.13   Current Commitments................................................................................55
    4.14   Delivery of Hydrocarbons.........................................................................55
    4.15   Capitalization; Title to Interests................................................................55
    4.16   Compliance with Laws ..............................................................................56
    4.17   Environmental Matters...............................................................................56
    4.18   Consents and Preferential Rights ...............................................................57

4.19     Decommissioning Obligations................................................................57
4.20     Payout Status..........................................................................................57
4.21     BOEM Approval......................................................................................57
4.22     Seismic Data...........................................................................................57
4.23     Purchased Inventory...............................................................................57
4.24     Certain GOM Representations.................................................................57

Article 5.     Representations and Warranties Relating to Buyer ................................58

5.1     Organization of Buyer............................................................................58
5.2     Authorization; Enforceability ................................................................58
5.3     No Conflict; Consents.............................................................................58
5.4     Litigation................................................................................................58
5.5     Brokers' Fees .........................................................................................58
5.6     Financing................................................................................................58
5.7     Securities Law Compliance ....................................................................60
5.8     Buyer's Independent Investigation .........................................................60
5.9     Approvals................................................................................................60
5.10     BOEM.....................................................................................................60
5.11     March Information Receipt .....................................................................61

Article 6.     Covenants...............................................................................................61

6.1     Conduct of Business ..............................................................................61
6.2     Access to Information and the Assets .....................................................63
6.3     Third Party Approvals............................................................................64
6.4     Regulatory Filings..................................................................................64
6.5     Books and Records .................................................................................65
6.6     Excluded Assets......................................................................................65
6.7     Apache Marks.........................................................................................66
6.8     Further Assurances.................................................................................66
6.9     Fees and Expenses .................................................................................67
6.10     Non-Negotiation.....................................................................................67
6.11     GOM Indebtedness.................................................................................67
6.12     Assumed Obligations; Retained Obligations .........................................67
6.13     Suspense Funds......................................................................................68
6.14     Casualty Event and Increased P&A Obligations ....................................68
6.15     Preferential Rights to Purchase ..............................................................71
6.16     Imbalances..............................................................................................74
6.17     Consents.................................................................................................74
6.18     Release of Apache Entity Credit Support ...............................................75
6.19     BOEM Qualifications and Assignments .................................................76
6.20     Conveyances..........................................................................................78
6.21     Operatorship Matters .............................................................................79
6.22     Certain Overriding Royalty Interests .....................................................81
6.23     FERC Regulated Transport ....................................................................81
6.24     Seismic Transfer ....................................................................................81
6.25     Financing................................................................................................82

| 6.26 | Financial Statements; Relevant Cooperation ............................................................ | 85 |
| 6.27 | FCC Matters .............................................................................................................. | 86 |
| 6.28 | Matters Associated With Depths Applicable to HBP Leases and GOM HBP Leases ........................................................................................................................ | 87 |
| 6.29 | Cooperation ............................................................................................................... | 88 |
| 6.30 | Hedges ....................................................................................................................... | 88 |
| 6.31 | Consent Matter .......................................................................................................... | 88 |
| 6.32 | GOM Distributions .................................................................................................... | 89 |
| 6.33 | Turnkey Contract ...................................................................................................... | 89 |

| Article 7. | Tax Matters ............................................................................................................... | 89 |

| 7.1 | Responsibility for Filing Tax Returns and Paying Taxes ......................................... | 89 |
| 7.2 | Responsibility for Tax Audits and Contests ............................................................. | 91 |
| 7.3 | Cooperation on Tax Returns and Tax Proceedings .................................................. | 92 |
| 7.4 | Tax Refunds .............................................................................................................. | 92 |
| 7.5 | Transfer Taxes .......................................................................................................... | 92 |
| 7.6 | Post-Closing Actions ............................................................................................... | 92 |
| 7.7 | Absence of Limitations ............................................................................................ | 93 |

| Article 8. | Employment Matters .................................................................................................. | 93 |

| 8.1 | Employment Matters .................................................................................................. | 93 |

| Article 9. | Title Matters .............................................................................................................. | 93 |

| 9.1 | Review of Title Records ........................................................................................... | 93 |
| 9.2 | Alleged Title Defects ................................................................................................ | 93 |
| 9.3 | Special Warranties of Title ....................................................................................... | 99 |
| 9.4 | Waiver ....................................................................................................................... | 99 |

| Article 10. | Environmental Matters ............................................................................................ | 100 |

| 10.1 | Buyer's Acknowledgement Concerning Possible Contamination of the Assets and Properties ............................................................................................... | 100 |
| 10.2 | Adverse Environmental Conditions .......................................................................... | 100 |
| 10.3 | Waiver ....................................................................................................................... | 103 |

| Article 11. | Conditions to Closing; Closing Deliverables .......................................................... | 104 |

| 11.1 | Conditions of Buyer to Closing ............................................................................... | 104 |
| 11.2 | Closing Deliverables by the Sellers ......................................................................... | 104 |
| 11.3 | Conditions of the Sellers to Closing ......................................................................... | 106 |
| 11.4 | Closing Deliverables by Buyer ................................................................................. | 106 |
| 11.5 | Joint Deliverables ..................................................................................................... | 108 |

| Article 12. | Indemnification and Waivers ................................................................................... | 108 |

| 12.1 | Indemnification ......................................................................................................... | 108 |
| 12.2 | Limitations on Liability ............................................................................................ | 109 |
| 12.3 | Procedures ................................................................................................................. | 113 |
| 12.4 | Waiver of Consequential Damages ........................................................................... | 114 |
| 12.5 | Waivers and Disclaimers ........................................................................................... | 115 |

12.6    Exclusive Remedy and Release ...................................................................116
12.7    Express Negligence Rule ..........................................................................117

Article 13.   Termination ...........................................................................................117

13.1    Termination ...............................................................................................117
13.2    Effect of Termination ................................................................................119
13.3    Required Information .................................................................................120

Article 14.   Governing Law; Venue ...........................................................................120

14.1    Governing Law ..........................................................................................120
14.2    Venue ........................................................................................................120
14.3    Waiver of Trial by Jury .............................................................................121

Article 15.   Other Provisions ....................................................................................121

15.1    Notices ......................................................................................................121
15.2    Assignment ................................................................................................122
15.3    Like-Kind Exchange ..................................................................................122
15.4    Rights of Third Parties ..............................................................................123
15.5    Counterparts ..............................................................................................123
15.6    Entire Agreement .......................................................................................123
15.7    Disclosure Schedules .................................................................................123
15.8    Amendments ..............................................................................................124
15.9    Publicity ....................................................................................................124
15.10   Joint and Several Liability .........................................................................124
15.11   Severability ...............................................................................................124
15.12   Waivers ......................................................................................................124
15.13   Specific Performance .................................................................................125

List of Exhibits and Schedules

<u>Exhibits:</u>

| | |
|---|---|
| Exhibit A-1 | Leases |
| Exhibit A-2 | Wells |
| Exhibit A-3 | Units |
| Exhibit A-4 | Platforms, Pipelines and Processing Plants |
| Exhibit A-5 | Fee-Owned Properties |
| Exhibit B-1 | Form of Omnibus Assignment |
| Exhibit B-2 | Form of Texas Assignment |
| Exhibit B-3 | Form of Louisiana Assignment |
| Exhibit B-4 | Form of Alabama Assignment |
| Exhibit B-5 | Form of Mississippi Assignment |
| Exhibit B-6 | Form of BOEM Non-Required Filing Assignment |
| Exhibit C | Form of Decommissioning Agreement |
| Exhibit D | Form of PPR Escrow Agreement |
| Exhibit E-1 | Form of Exploration Agreement |
| Exhibit E-2 | Form of Exploration Agreement Side Letter |
| Exhibit F | Employment Matters |
| Exhibit G-1 | Form of Texas Deed of Trust |
| Exhibit G-2 | Form of Louisiana Mortgage |
| Exhibit G-3 | Form of Mississisippi Deed of Trust |
| Exhibit G-4 | Form of Alabama Mortgage |
| Exhibit H | Form of Real Property Fee Deed |
| Exhibit I | Form of Assignment of Contract |
| Exhibit J-1 | Form of Briar Lake Sublease |
| Exhibit J-2 | Form of Pinhook Sublease |
| Exhibit K | [Reserved] |
| Exhibit L-1 | Form of Stock Power – PipelineCo |
| Exhibit L-2 | Form of Stock Power – Paloma |
| Exhibit L-3 | Form of Membership Interest Transfer Instrument |
| Exhibit M | Form of PPR Notice Letter |
| Exhibit N | Pending Abandoned Properties |
| Exhibit O | Form of Master Facilities Agreement |
| Exhibit P | Purchased Inventory |
| Exhibit Q | Petition for Temporary Waivers of Capacity Release Regulations and Related Pipeline Tariff Provisions |
| Exhibit R | White Map |
| Exhibit S | Form of Transition Services Agreement |
| Exhibit T | Form of GOM Assignment and Assumption Agreement |
| Exhibit U | Form of Intercreditor Agreement |
| Exhibit V | Form of Turnkey Contract |

v

Schedules:

| | |
|---|---|
| Schedule 1(a) | Seller Knowledge Individuals |
| Schedule 1(b) | Buyer Knowledge Individuals |
| Schedule 2.1(s) | Included Software and Computer Hardware |
| Schedule 2.2(c) | Certain Excluded Contracts |
| Schedule 4.6 | Litigation |
| Schedule 4.8 | Taxes |
| Schedule 4.8(b) | Tax Partnerships |
| Schedule 4.9 | Material Contracts |
| Schedule 4.10 | Imbalances |
| Schedule 4.11 | Suspense Funds |
| Schedule 4.12 | Non-Consent Operations |
| Schedule 4.13 | Current Commitments |
| Schedule 4.14 | Delivery of Hydrocarbons |
| Schedule 4.15(a) | Capitalization |
| Schedule 4.16 | Compliance with Laws |
| Schedule 4.17 | Environmental Matters |
| Schedule 4.18 | Consents and Preferential Rights |
| Schedule 4.19 | Decommissioning Obligations |
| Schedule 4.20 | Payout Status |
| Schedule 4.21 | Specified Leases |
| Schedule 6.1(a) | Operations Before Closing |
| Schedule 6.1(b)(v) | Required Transfers |
| Schedule 6.15 | Preferential Rights to Purchase |
| Schedule 6.18 | Credit Support |
| Schedule 6.24 | Existing Seismic Agreements |
| Schedule AVS | Allocated Value of Interests |
| Schedule FCC | FCC Licenses |
| Schedule FLS | Foremost Leases |
| Schedule SIS | Special Indemnity Schedule |

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "Agreement"), dated as of July 18, 2013, is by and among Apache Corporation, a Delaware corporation ("APA"), Apache Shelf, Inc., a Delaware corporation ("APSH"), and Apache Deepwater LLC, a Delaware limited liability company ("APDW" and each of APA, APSH and APDW individually, as a "Seller" and collectively as the "Sellers"), Fieldwood Energy LLC, a Delaware limited liability company ("Buyer"), and GOM Shelf LLC, a Delaware limited liability company ("GOM"). Each Seller, Buyer and GOM are sometimes referred to herein individually as a "Party" and collectively as the "Parties."

Recitals:

WHEREAS, (i) the Sellers own certain Assets (as defined hereafter), (ii) APA owns 100% of the issued and outstanding equity interests in GOM (the "GOM Interests"), (iii) APA owns 100% of the issued and outstanding equity interests in Apache GOM Pipeline, Inc., a Delaware corporation (the "PipelineCo", and such equity interests, the "PipelineCo Interests"), (iv) PipelineCo owns 33% of the issued and outstanding equity interests in SP 49 Pipeline LLC, a Delaware limited liability company (the "Pipeline Subsidiary" and such 33% of the equity interests, the "Pipeline Subsidiary Interests") and (v) APA owns 9.65% of the issued and outstanding equity interests in Paloma Pipe Line Company, a Delaware corporation ("Paloma", and such equity interests, the "Paloma Interests").

WHEREAS, Buyer desires to purchase the GOM Interests, the PipelineCo Interests, the Paloma Interests and certain Assets from the Sellers, and the Sellers desire to sell such GOM Interests, such PipelineCo Interests, such Paloma Interests and such Assets to Buyer, subject to the terms and conditions of this Agreement.

WHEREAS, contemporaneously with the execution of this Agreement, Buyer has delivered to Sellers the Buyer Parent Guarantee, duly executed by the party thereto.

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements hereinafter set forth, for the monetary consideration hereinafter set forth, and subject to the terms and provisions herein contained, the Parties agree as follows:

## Article 1.
### Definitions and Rules of Construction

1.1    Definitions.

Capitalized terms used throughout this Agreement and not defined in this Section 1.1 have the meaning ascribed to them elsewhere in this Agreement or in the Schedules or Exhibits hereto. As used herein, the following terms shall have the following meanings:

"8/8ths Assets" is defined in Section 2.3(a).

"Abandoned Properties" means, collectively, the Permanently Abandoned Properties and the Pending Abandoned Properties.

"Accounting Referee" is defined in Section 3.8(b).

"Acquisition Notice" is defined in Section 6.2(c).

"Acquisition Transaction" is defined in Section 6.10.

"Adjusted Purchase Price" is defined in Section 3.3.

"Advisor" is defined in Section 2.2(e)(iv).

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with, such specified Person through one or more intermediaries or otherwise.  For the purposes of this definition, "control" means, where used with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings. For purposes of this Agreement, (a) PipelineCo shall be deemed to be an Affiliate of APA through the Closing, and shall be deemed to be an Affiliate of Buyer following the Closing, (b) Pipeline Subsidiary shall not constitute an Affiliate of any Seller or Buyer, (c) Paloma shall not constitute an Affiliate of any Seller or Buyer and (d) GOM shall be treated in accordance with Sections 2.3(c) and 2.3(d).

"Agreed Title Benefit" is defined in Section 9.2(b).

"Agreed Title Defect" is defined in Section 9.2(a).

"Agreement" is defined in the preamble to this Agreement.

"Alleged Title Benefit" is defined in Section 9.2(b).

"Alleged Title Benefit Notice" is defined in Section 9.2(b).

"Alleged Title Defect" is defined in Section 9.2(a).

"Alleged Title Defects Notice" is defined in Section 9.2(a).

"Allocated Value" is defined in Section 3.1(b).

"Allocated Value Schedule" means, collectively, Exhibits A-1 through A-5 and Schedule AVS.

"Allocation" is defined in Section 3.10.

"APA" is defined in the preamble to this Agreement.

"APA Consolidated Group" is defined in Section 4.8(f).

2

"<u>Apache Entity</u>" means APA or any Affiliate of APA (which shall in any event, include each Seller and its Affiliates).

"<u>Apache Marks</u>" means the names "<u>Apache</u>" and "<u>Mariner</u>" including any variants thereof, and other trademarks, service marks and trade names owned by any Seller or any of its Affiliates other than GOM.

"<u>APDW</u>" is defined in the preamble to this Agreement.

"<u>APSH</u>" is defined in the preamble to this Agreement.

"<u>Assets</u>" is defined in <u>Section 2.1</u>.

"<u>Assigned Percentage</u>" means:

(a)    With respect to any Lease that constitutes a Primary Term Exploration Lease, an undivided 50% of the Sellers' collective right, title and interest in and to such Lease and corresponding Lease Related Interests;

(b)    With respect to any Contract that primarily covers, is attributable to or is related to or otherwise binding upon any Primary Term Exploration Lease, any Easement that is related to any Primary Term Exploration Lease, any Permit applicable to any Primary Term Exploration Lease, and any Production that is attributable to any Primary Term Exploration Lease an undivided 50% of the Sellers' collective right, title and interest in and to such Contract, Easement, Permit and Production insofar and only insofar as (i) any such Contract that primarily covers, is attributable to or is related to or otherwise binding upon any Primary Term Exploration Lease, (ii) any such Easement is related to any Primary Term Exploration Lease, (iii) any such Permit is applicable to any Primary Term Exploration Lease or (iv) any such Production is attributable to any Primary Term Exploration Lease as of the Effective Time;

(c)    With respect to any Purchased Inventory, all of Sellers' collective right, title, and interest in and to such Purchased Inventory;

(d)    With respect to any Unit that covers and includes the Lands covered by any Primary Term Exploration Lease, an undivided 50% of the Sellers' collective right, title and interest in and to such Unit;

(e)    With respect to any Lease that constitutes a HBP Lease, (i) all of the Sellers' collective right, title and interest in and to such Lease insofar and only insofar as such Lease covers Lands lying above 100 feet below the base of the deepest Producing Horizon identified as applicable to such HBP Lease on the applicable Property Exhibit and its stratigraphic equivalent (with respect to any Lease, the "<u>Shallow Rights</u>") and corresponding Lease Related Interests and (ii) an undivided 50% of the Sellers' collective right, title and interest in and to such Lease insofar and only insofar as such Lease covers Lands lying at or below 100 feet below the base of the deepest Producing Horizon identified as applicable to such HBP Lease on the applicable Property Exhibit and its stratigraphic equivalent (with respect to any Lease, the "<u>Deep Rights</u>") and corresponding Lease Related Interests;

3

(f)        With respect to any Well (i) located on the Lands covered by any HBP Lease as of the Closing Date, all of the Sellers' collective right, title and interest in and to such Well and (ii) located on the Lands covered by any Primary Term Exploration Lease, 50% of the Sellers' collective right, title and interest in and to such Well;

(g)        With respect to any Facilities, all of the Sellers' collective right, title and interest in and to such Facilities, subject, however, to each Seller's retained right of access and use of such Facilities pursuant to the Master Facilities Agreement;

(h)        With respect to any Shore-Based Facilities, except as otherwise provided in the Exploration Agreement, all of the Sellers' collective right, title and interest in and to such Shore-Based Facilities;

(i)        With respect to any Processing Plant other than the Shared Processing Plants, all of the Sellers' collective right, title and interest in and to such Processing Plants;

(j)        With respect to the Shared Processing Plants, the portion of such Shared Processing Plants as described on Exhibit A-4;

(k)        With respect to any Unit that covers and includes any HBP Lease, (i) all of the Sellers' collective right, title and interest in and to such Unit insofar and only insofar as any such Unit covers and includes the Shallow Rights attributable to such HBP Lease and (ii) an undivided 50% of the Sellers' collective right, title and interest in and to such Unit insofar and only insofar as such Unit covers and includes the Deep Rights attributable to such HBP Lease;

(l)        With respect to any Contract that primarily covers, is attributable to or is related to or used or useful in connection with or otherwise binding upon any HBP Lease, (i) all of the Sellers' collective right, title and interest in and to such Contract insofar and only insofar as such Contract that primarily covers, is attributable to or is related to or used or useful in connection with or otherwise binding upon the Shallow Rights and (ii) an undivided 50% of the Sellers' collective right, title and interest in and to such Contract insofar and only insofar as such right, title and interest is not described in clause (i) above;

(m)        With respect to any Easement that is related to any HBP Lease (i) all of the Sellers' collective right, title and interest in and to such Easement insofar and only insofar as such Easement is related to the Shallow Rights and (ii) an undivided 50% of the Sellers' collective right, title and interest in and to such Easement insofar and only insofar as such right, title and interest is not described in clause (i) above;

(n)        With respect to the FERC Regulated Transport, all of Sellers' collective right, title and interest in and to the FERC Regulated Transport;

(o)        With respect to any Production attributable to any HBP Lease or any Unit that covers and includes any HBP Lease on or after the Effective Time, (i) all of the Sellers' collective right, title and interest in and to such Production insofar and only insofar as such Production is attributable to the Shallow Rights applicable to such HBP Lease or such Unit and (ii) an undivided 50% of the Sellers' collective right, title and interest in and to such Production

4

insofar and only insofar as such Production is attributable to the Deep Rights applicable to such HBP Lease or such Unit;

(p)    With respect to any Permit that pertains to or is used or held for use or otherwise applicable to any HBP Lease, (i) all of the Sellers' collective right, title and interest in and to such Permit insofar and only insofar as such Permit pertains to or is used or useful in connection with the Shallow Rights and (ii) an undivided 50% of the Sellers' collective right, title and interest in and to such Permit insofar and only insofar as such right, title and interest is not described in clause (i) above;

(q)    With respect to any Records, any Fee-Owned Properties, any Suspense Funds and any Imbalances, subject to the other provisions of this Agreement and the other Transaction Documents, all of the Sellers' collective right, title and interest in and to such Records, Fee-Owned Properties, Suspense Funds and Imbalances;

(r)    With respect to the FCC Licenses, all of Sellers' collective right, title and interest in and to such FCC Licenses;

(s)    With respect to the Proprietary Seismic Data, an undivided fifty percent (50%) of all of Sellers' collective right, title and interest in and to such Proprietary Seismic Data subject to Section 6.24;

(t)    With respect to Cash Receipts, all of Sellers' collective right, title and interest in and to such Cash Receipts; and

(u)    With respect to the Personal Properties, all of Sellers' collective right, title and interest in and to the Personal Properties.

"Assignment Agreements" means the assignments in the forms attached hereto as Exhibit B-1 through B-6.

"Assumed Obligations" means, subject to the proviso contained in this defined term, all of the following Liabilities and obligations, known or unknown, with respect to the Pending Abandoned Properties (insofar and only insofar as described in clause (a) of this definition of Assumed Liabilities) or the ownership or operation of the Assets or the Pipeline Company Assets, regardless of whether such obligations or Liabilities arose or arise on, before or after the Closing Date except as otherwise provided in clauses (b), (c) and (j) of this definition of Assumed Obligations (*provided, however,* for the avoidance of doubt (and without limiting the limitations on Buyer's obligations under this Agreement), the Assumed Obligations do not apply to or include any Liabilities and obligations with respect to the Excluded Assets):

(a)    the Liability and obligation to perform the following plugging, replugging, abandonment, removal, site clearance, site survey, remediation, disposal, and restoration operations, in each case to be conducted in compliance with applicable Laws and contracts, and in a good and workmanlike manner (collectively, "P&A Obligations"):

(i)    to properly plug and abandon and remove, dismantle, decommission and dispose of all wells, structures, platforms, facilities, flow lines, pipelines, any

5

other Equipment located on the Assets or Pipeline Company Assets and all applicable Pending Abandoned Properties;

(ii)     to replug any well, wellbore, or previously plugged well to the extent (A) drilled in connection with the Leases or (B) in connection with any applicable Pending Abandoned Property;

(iii)     to flush, cap, pickle, bury or remove all flow lines and other pipelines now or hereafter used in connection with the Assets, the Pipeline Company Assets or the Pending Abandoned Properties; and

(iv)     to clean up any Hazardous Substances related to the Assets, the Pipeline Company Assets or the Pending Abandoned Properties to the extent required by Law;

(b)     Liabilities and obligations attributable to claims for royalties or overriding royalties attributable to the sale on or after the Effective Time of Hydrocarbons and fees relating thereto (including Liabilities and obligations attributable to claims alleging undervaluation or underpayment thereof or wrongdoing, fault or strict liability relating thereto) relating to the Assets or the Pipeline Company Assets;

(c)     the Liability and obligation applicable to or imposed on the lessee, owner or operator of the Assets, Pipeline Company Assets, or as required by Law or Governmental Authority with respect to the Assets or Pipeline Company Assets, other than Liabilities and obligations attributable to claims for royalties or overriding royalties attributable to the sale prior to the Effective Time of Hydrocarbons and fees relating thereto (including Liabilities and obligations attributable to claims alleging undervaluation or underpayment thereof or wrongdoing, fault or strict liability relating thereto) relating to the Assets or Pipeline Company Assets;

(d)     all Taxes for which Buyer has agreed to be responsible under this Agreement;

(e)     any item or matter disclosed on the Disclosure Schedules with respect to the Assets or Pipeline Company Assets as of the Execution Date other than Retained Obligations;

(f)     Imbalances;

(g)     any Suspense Funds (i) that accrue prior to Closing to the extent, but only to the extent, that the Suspense Funds delivered to Buyer include such amount or (ii) that may accrue after Closing;

(h)     all Buyer PPR Obligations;

(i)     the Subleases; and

(j)     all other obligations and Liabilities that arise under the Leases, material Contracts or that otherwise relate to the Assets or the Pipeline Company Assets, other than

Liabilities and obligations attributable to claims for royalties or overriding royalties attributable to the sale prior to the Effective Time of Hydrocarbons and fees relating thereto (including Liabilities and obligations attributable to claims alleging undervaluation or underpayment thereof or wrongdoing, fault or strict liability relating thereto) relating to the Assets or Pipeline Company Assets;

provided that, Buyer does not assume any obligations or Liabilities to the extent that the Buyer Indemnified Parties are entitled to indemnity for such obligations or Liabilities pursuant to Article 12.

"Assuming Indemnifying Party" is defined in Section 12.3(b).

"Audit Firm" is defined in Section 6.26(b).

"Bcf" means one billion (1,000,000,000) cubic feet of gas.

"BOEM" means the Bureau of Ocean Energy Management.

"BOEM Qualifications" is defined in Section 6.19(a)(i).

"Briar Lake Master Lease" means that certain Office Lease between Crescent One Briarlake Plaza, L.P., as landlord, and Mariner Energy, Inc., as tenant, dated effective as of August 17, 2007, for the lease of premises located in the building known as One BriarLake Plaza at 2000 West Sam Houston Parkway South, Houston, Texas, as amended, supplemented or otherwise modified prior to the date hereof.

"Briar Lake Sublease" means the Sublease in the form attached hereto as Exhibit J-1.

"BSEE" means the Bureau of Safety and Environmental Enforcement.

"Business Day" means any day that is not a Saturday, Sunday or legal holiday in the State of Texas and that is not otherwise a federal holiday in the United States.

"Business Plan" shall mean the business plan regarding the Assets previously adopted and currently being carried out by the Sellers as described to Buyer in Sellers' management presentation dated April 8, 2013.

"Buyer" is defined in the preamble to this Agreement.

"Buyer Indemnified Parties" is defined in Section 12.1(a).

"Buyer Parent Guarantee" means the Guarantee dated of even date herewith executed by Riverstone Global Energy and Power Fund V, L.P., a Delaware limited partnership, in favor of Sellers.

"Buyer PPR Obligations" is defined in Section 6.15(f).

"Cash Receipts" is defined in Section 2.1(t).

(ii)     GOM shall have no liability to any Seller or its Affiliates as a result of any representation, warranty or covenant made in this Agreement or any Closing certificate by or in respect of GOM or any of its assets and each Seller on behalf of itself and its Affiliates (A) hereby, as of Closing, forever releases GOM from any breach by GOM of this Agreement (in its capacity as GOM and not to the extent it is jointly liable for the performance of any post-closing covenants applicable to Buyer under this Agreement or any of the other Transaction Documents) or (except for the Turnkey Contract) any other contract entered into by GOM and any Seller or its Affiliates prior to (but not at) Closing to the extent that any such breach gives rise to Liabilities or obligations that would constitute Retained Obligations and (B) acknowledges and agrees that any such breach shall not limit or otherwise reduce in any respect the rights of Buyer and its Affiliates (including GOM after Closing) under Article 12.

(iii)     It is the intention of the Parties to implement the Purchase Price adjustment provisions in Article 3 as if GOM were to sell to Buyer the GOM Retained Assets at Closing and, without limiting the indemnification obligations of Sellers under this Agreement, there shall be no other adjustments of the Purchase Price with respect to GOM.

(iv)     If the provisions of Section 6.19(c) apply, then, for purposes of clarity, GOM shall be responsible for performing all obligations and duties of Buyer under this Agreement and the other Transaction Documents at, from, and after Closing.

**Article 3.**
**Purchase Price**

3.1     Consideration; Allocated Values.

(a)     In consideration for the purchase of the Assets, the GOM Interests, the PipelineCo Interests, and the Paloma Interests, Buyer agrees to (i) pay to the Sellers, three billion seven hundred fifty million Dollars ($3,750,000,000.00) (the "Purchase Price"), subject to adjustment as set forth in Sections 3.2 and 3.3, and (ii) assume the Assumed Obligations.

(b)     With respect to (i) certain of the Assets, the Allocated Value Schedule identifies the agreed allocation of a portion of the Purchase Price (which for purposes of clarity, is without adjustment pursuant to Sections 3.2 and 3.3) for each such Asset, as determined in accordance with Section 3.1(c) and (ii) the GOM Interests, the PipelineCo Interests, and the Paloma Interests, the Allocated Value Schedule identifies the agreed allocation of a portion of the Purchase Price (which for purposes of clarity, is without adjustment pursuant to Sections 3.2 and 3.3) to the GOM Interests, the PipelineCo Interests and the Paloma Interests (each, an "Allocated Value").

(c)     The Parties agree that Exhibits A-1 through A-5 constitute the entirety of the Property Exhibits (i.e., all of Exhibit A) for purposes of this Agreement.  With respect to Allocated Value determinations made with respect to certain of the Assets, the Working Interest and Net Revenue Interest of Sellers identified as applicable to certain Units, Wells and platforms on the Property Exhibit may be different than the Working Interest and Net Revenue Interest of

42

IN WITNESS WHEREOF this Agreement has been duly executed and delivered by each of the Parties as of the date first above written.

*BUYER*:

FIELDWOOD ENERGY LLC

By: _____

Name: G. M. McCarrol

Title: Chief Executive Officer

*SELLERS*:

APACHE CORPORATION

By: _____
Name: Roger B. Plank
Title: President and Chief Corporate Officer


APACHE SHELF, INC.

By: _____
Name: Roger B. Plank
Title: President and Chief Corporate Officer


APACHE DEEPWATER LLC

By: _____
Name: Roger B. Plank
Title: President and Chief Corporate Officer


*Sellers Signature Page to*
*Purchase and Sale Agreement*

*GOM:*

GOM SHELF LLC

By: _____
Name: Roger B. Plank
Title: President and Chief Corporate Officer

# Exhibit 10

Excerpts from the June 2, 2021
deposition of Jon Graham in
*In re: Fieldwood Energy LLC*,
Case No. 20-33948

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

IN RE:                        )
                              ) No. 4:20-CV-228-P
FIELDWOOD ENERGY, LLC,        )
et al,                        )
                              )
        Debtor.               )

----------------------------------------

ORAL DEPOSITION OF
JON GRAHAM
JUNE 2, 2021
Volume 1

----------------------------------------

        ORAL DEPOSITION OF JON GRAHAM, produced as

a witness at the instance of Plaintiff as, and duly

sworn, was taken in the above-styled and numbered cause

on the 2nd day of June, 2021 from 9:00 a.m. to 11:08

a.m., before Nancy Newhouse, a Certified Shorthand

Reporter in and for the State of Texas, reported by oral

shorthand, at the law offices of Herrmann Law, PLLC, 801

Cherry Street, Suite 2365, Fort Worth, Texas 76102,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached hereto.



Page 7

1                    INDEX

2                                              PAGE

3   Appearances. . . . . . . . . . . . . . . . .   2

4   JON GRAHAM

5        Examination by Mr. Eisenberg. . . . . . . .   9

6        Examination by Mr. Zuber. . . . . . . . . .  78

7        Further Examination by Mr. Eisenberg. . . . .  81

8        Examination by Mr. Miller . . . . . . . . .  83

9        Examination by Mr. Weir . . . . . . . . . .  84

10

11  Signature & Changes. . . . . . . . . . . . . .  94

12  Reporter's Certificate . . . . . . . . . . . .  96

13

14                   EXHIBITS

15  NO.  DESCRIPTION                             PAGE

16       N/A

17

18

19

20

21

22

23

24

25



Page 8

```
 1                    P R O C E E D I N G S
 2                    (On the record at 12:46 p.m.)
 3                    COURT REPORTER:  Today's date is June the
 4  2nd, 2021, the time is 9:00 a.m., we are on the record.
 5  This is the oral deposition of Jon Graham.  I don't know
 6  how we are going to do this -- in the -- in the United
 7  States Bankruptcy Court for the Southern District of
 8  Texas, Houston Division, regarding Fieldwood Energy, LLC
 9  et al.
10                    I'm not going to ask -- I guess -- I don't
11  know who everybody is that's here, so if you will just
12  put your name in the chat and who you're representing, I
13  can get -- get it out of there.  Otherwise, we can get
14  started, and I will go ahead and swear the witness in.
15                    Mr. Graham, will you please raise your
16  right hand?
17                    (The witness complies.)
18                    COURT REPORTER:  Do you solemnly swear or
19  affirm that the testimony you give today will be the
20  truth, the whole truth and nothing but the truth so help
21  you God?
22                    THE WITNESS:  Yes.
23                    COURT REPORTER:  Thank you.  And we're
24  ready.
25                    MR. EISENBERG:  You're ready, Nancy?
```



Page 9

```
 1              COURT REPORTER:  We're ready.
 2              MR. EISENBERG:  Okay.
 3                    JON GRAHAM,
 4    having been first duly sworn, testified as follows:
 5                    EXAMINATION
 6    BY MR. EISENBERG:
 7         Q.   Mr. Graham, my name is Philip Eisenberg, I am
 8    with the law firm of Locke Lord LLP, and we represent
 9    HCCI International in this matter which is a surety
10    company.
11              And you understand you are here to give
12    your deposition testimony in connection with the
13    Fieldwood bankruptcy?
14         A.   Yes, that's my understanding.
15         Q.   All right.  Would you state your full name for
16    the record, please?
17         A.   Jon Anthony Graham.
18         Q.   And how are you feeling this morning, Mr.
19    Graham?
20         A.   Everything is good.
21         Q.   Good.  And what -- what -- where are you
22    physically located?
23         A.   I am on the west loop in Houston, Texas in
24    Fieldwood's office.
25         Q.   Okay.  And --
```



Page 10

1              MR. ZUBER:  I'm in a deposition, what's

2    happened?

3              MR. EISENBERG:  What's that, Scott?

4    Scott, you -- you are live, you need to mute your phone.

5    Thank you.

6         Q.   (BY MR. EISENBERG)  All right.  Mr. Graham, you

7    still with me?

8         A.   I am.

9         Q.   Okay.  There you go, okay.

10             So -- so you are at Fieldwood's offices,

11   is there anyone else in the room with you?

12        A.   No, there are not.

13        Q.   Is there anything in front of you in the

14   office?

15        A.   Just my computer screen.

16        Q.   Okay.  And the computer screen, it's only with

17   the folks you are taking a deposition, you get to look at

18   me for a little while?

19        A.   That's correct.

20        Q.   All right.  Can you also share your home

21   address for the record?

22        A.   79 Angelique Way, The Woodlands, Texas.

23        Q.   And is there a ZIP code that goes with that?

24        A.   77382.

25        Q.   Okay.  And are you currently employed, Mr.



Page 11

1    Graham?

2          A.    I am.

3          Q.    And whom -- whom are you currently employed by?

4          A.    Fieldwood Energy.

5          Q.    And -- and what is the nature of that

6    employment, are you a direct employee or a consultant?

7          A.    I'm a consultant.

8          Q.    And is there a written consulting agreement?

9          A.    There is a letter agreement.

10         Q.    And do you know -- well, can you describe to us

11   the compensation provisions in the consulting agreement?

12         A.    I will need to consult with my attorney,

13   because I think I am bound by a confidentiality

14   agreement, before I answer that question.

15         Q.    And I -- I've signed a confidentiality

16   agreement in this case, and I am bound by confidentiality

17   as well, so ...

18               MR. EISENBERG:  Alfredo, are you his

19   lawyer here today?

20               MR. PEREZ:  I am his lawyer here today,

21   and to the extent that everyone on the phone is -- is

22   subject to the protective order, I don't have a problem

23   with that being disclosed.

24               MR. EISENBERG:  Thank you, Alfredo --

25   Mr. Perez.



Page 12

1          MR. PEREZ:  Is anybody -- is anyone on

2   this call not subject to the protective order?

3       Q.  (BY MR. EISENBERG)  Hear -- hearing no --

4   hearing nothing, Mr. Graham, I believe we can proceed.

5          Do you need the question again?

6       A.  Yes,  please.

7       Q.  Okay.  Can you describe the compensation

8   provisions in your letter agreement with Fieldwood?

9       A.  My compensation is $27,000.00 a month payable

10  on a monthly basis for my -- for my work here at

11  Fieldwood Energy as a consultant.

12      Q.  And is there a minimum amount of hours that you

13  are supposed to put in during a given month?

14      A.  It's not specified.

15      Q.  What -- what is the scope of your consultancy?

16      A.  My -- my -- my -- my focus is to become

17  familiar with the Fieldwood I Legacy Apache Properties.

18  Also to become familiar with the Fieldwood organization

19  that will be the contract operator during the transition

20  service period.

21      Q.  And when did you start your consultancy, sir?

22      A.  In January of this year, 2021.

23      Q.  And you have been steadily working under this

24  consultancy agreement since January of 2021?

25      A.  That's correct.



Page 13

1    Q.   And do you anticipate transitioning from

2    consultant with Fieldwood Energy at some point?

3       A.   Yeah.  Once Fieldwood I emerges from the

4    bankruptcy and is established.  I will be the sole

5    manager for Fieldwood I.

6       Q.   And when you say Fieldwood I, what do you mean,

7    sir?

8       A.   It's the -- the limited liability corporation

9    that will be responsible for the Apache Legacy

10   Properties.

11      Q.   And prior to January of 2021, by whom were you

12   employed?

13      A.   I -- I was retired.  My -- my last employment,

14   I -- I retired from Apache Corporation on April 15th,

15   2020.

16      Q.   All right.  Well, let's try to do this in an

17   organized fashion to make it easier for the record and

18   everybody else.

19           Where did you go to college?

20      A.   I have a Bachelor's of Science in Mechanical

21   Engineering from University of Missouri at Rolla, and I

22   also have a Master's of Business Administration from the

23   University of Oklahoma.

24      Q.   Okay.  Appreciate that.

25           And then did you go straight to the



Page 32

1    place?

2        A.   Will be as -- as long as necessary and to

3    provide an orderly transition for Fieldwood I.  There is

4    no set time, to my understanding.

5        Q.   Can -- can you terminate the transition

6    services agreement -- is it your understanding that the

7    transition services agreement can be terminated once you

8    step in as the sole manager of Fieldwood I?

9        A.   My understanding is the sole manager has the --

10   the right to -- to terminate the agreement, yes.

11       Q.   Do you have an understanding of what the

12   current decommissioning obligations are for Fieldwood I?

13       A.   Yes.  I am familiar with some of the

14   decommissioning estimates that have been made by -- by

15   the decommissioning organization here at Fieldwood

16   Energy.

17       Q.   And based upon your understanding, can you tell

18   us how much from a dollar standpoint is currently due and

19   owing from the standpoint of decommissioning for

20   Fieldwood I --

21           MR. PEREZ:  Object to the form of the

22   question.  It -- it -- it calls for a legal conclusion as

23   to how much is due and owing.

24           MR. EISENBERG:  As a businessman, I don't

25   want a legal conclusion.



Page 33

```
 1              MR. PEREZ:  I still don't understand what
 2   due and owing means in the context of -- of
 3   decommissioning.
 4       Q.  (BY MR. EISENBERG)  Well, if you can answer,
 5   I'll -- otherwise, I will rephrase.
 6              MR. PEREZ:  I mean, I think it -- I mean,
 7   I don't understand what due and owing is under -- in the
 8   context of a decommissioning or -- that -- that seems to
 9   me to be a legal conclusion.
10       Q.  (BY MR. EISENBERG)  Sitting here today, Mr.
11   Graham, on the day that the plan goes effective, assuming
12   Fieldwood I gets formed, do you know what the magnitude
13   of the obligations for P&A are that would be current for
14   Fieldwood I?
15              MR. PEREZ:  Same objection.  I don't know
16   what current means, but if you can answer that, answer
17   it.
18       A.   There -- there are some estimates of asset
19   retirement obligations for Fieldwood I, and they vary
20   depending on who has done the estimate, but they are
21   anywhere from 800 million to 1.2 billion dollars.
22       Q.  (BY MR. EISENBERG)  And that's the total for
23   the decommissioning, correct?
24              One hundred percent, right?
25       A.   That's my understanding, yes.
```



Page 34

1        Q.    And you understand you don't do all of that all

2   at one time, right?

3        A.    That's correct.

4        Q.    Right.   The --

5        A.    You --

6        Q.    -- that there are regulations --

7        A.    -- you are -- you are bound by regulations of

8   when -- when fields need to be decommissioned based on

9   their last production or if the lease is expired as

10   prescribed by -- by best the info.

11       Q.    Okay.   And so how much of that 800 to 1.2

12   billion dollars would have to be performed under the

13   regulations on day one?

14       A.    I have not done that analysis.

15       Q.    Do you know what the estimated current

16   production for Fieldwood I would be, assuming it went

17   effective June 15th?

18       A.    I know what the current production is is today

19   -- or was yesterday.

20       Q.    And what is that, sir?

21       A.    It was approximately 18,300 barrels of oil

22   equivalent a day.

23       Q.    And have you done any analysis to determine

24   whether the -- the Fieldwood I, based on its current

25   production and its current decommissioning obligations,



Page 35

1    is capable of meeting its ongoing obligations?

2              MR. PEREZ:  Object to the form of the

3    question, calls for a legal conclusion.  I -- I'm not --

4    and it's vague as well.

5        Q.   (BY MR. EISENBERG)  You can answer, sir.

6              MR. PEREZ:  Still --

7        A.   I don't understand the question you are asking.

8        Q.   (BY MR. EISENBERG)  Okay.  So on day one you

9    are going to step in as the sole manager of Fieldwood I,

10   right?

11       A.   That's the plan.

12       Q.   And Fieldwood I on day one, it's going to have

13   current obligations and current cash flow, right?

14       A.   When -- when Fieldwood emerges there will be no

15   accounts payable, because that will be wiped to zero and

16   that will become NewCo's responsibility, and there will

17   be ongoing production, yes, that generates revenue.

18       Q.   And have you done any analysis on whether the

19   going-forward revenues from Fieldwood I is sufficient to

20   cash flow the company, i.e., meet its ongoing

21   obligations, including its decommissioning obligations?

22       A.   I am aware of some forecasts that have been

23   made that -- that shows that it's capable, yes.

24       Q.   Have you done any independent analysis of those

25   forecasts?



Page 36

1      A.    No, I have not.

2      Q.    So sitting here today, other than relying on

3  forecasts that you've seen, do you have any independent

4  knowledge of whether or not Fieldwood I is capable of

5  meeting its obligations as they come due, based on its

6  current cash flows?

7      A.    I -- I -- I guess I don't understand

8  specifically what you are asking.  Could you -- could you

9  clarify that a little bit?

10      Q.    Sure.  You make money from production and you

11  pay your bills as they are required to be paid, right,

12  and you perform your obligations.

13            Have you done any independent analysis of

14  Fieldwood I as a functioning company as to whether it

15  would cash flow on a going forward basis once it's

16  formed?

17      A.    I have been made privy to estimates made by --

18  by Fieldwood Energy that -- that they shows it being

19  positive, and -- and I have no -- no problem with their

20  methodology.

21      Q.    And which -- which -- which estimates do you

22  recall that they showed you?

23      A.    I believe it is referred to as Exhibit O in the

24  -- in the filing documents.

25      Q.    So other than Exhibit O, do you have any other



Page 37

1    bases for whether or not Fieldwood I on day one can cash

2    flow?

3        A.   Data has been avail -- made available to me

4    under lease operating statements that -- that are -- that

5    Fieldwood Energy has prepared that shows yes, there is --

6    there is positive cash flow.  I believe the last lease

7    operating statement I saw was -- was dated in February or

8    March.

9        Q.   Are they doing decommissioning obligations as

10   part of that lease operating statement analysis that

11   you're talking about?

12       A.   Not as a part of the lease operating statement

13   but yes, there is an ongoing decommissioning program to

14   satisfy regulations.

15       Q.   And do you know how much, approximately, that

16   is?

17       A.   My understanding is that there have been

18   expenditures of approximately 35 million dollars from

19   August 2020 until I believe sometime in the first of May.

20       Q.   And if Fieldwood I was required to do all of

21   its currently due plugging and abandonment obligations on

22   July 1st, would there be sufficient funds to actually do

23   that?

24       A.   The -- what Fieldwood I would utilize as -- as

25   much of its current cash flow to satisfy those



1   obligations, then it would rely upon the -- the resources

2   available in the decommissioning security agreement

3   signed between Apache and Fieldwood in 2013.

4       Q.   Well, that security doesn't belong to Fieldwood

5   I, does it?

6       A.   That's correct, it belongs to Apache.  Or put

7   it this way, Apache is the only one that can draw from

8   the Trust A, I believe, and the other decommissioning

9   securities.

10      Q.   So without Apache's consent, Fieldwood I would

11  not be able to meet its obligations, correct?

12           MR. PEREZ:  Object to the form of the

13  question.  I think it calls for a legal conclusion as to

14  -- you know, it assumes facts not in evidence.

15      Q.   (BY MR. EISENBERG)  Yeah, you -- you can

16  answer, sir.  I'm not asking a legal question.

17      A.   Fieldwood I --

18           MR. PEREZ:  I think you are, but --

19      Q.   (BY MR. EISENBERG)  Go ahead.

20           MR. PEREZ:  No, go ahead.

21      Q.   (BY MR. EISENBERG)  You go, sir.

22      A.   No.  Fieldwood I will have to utilize the

23  decommissioning strategy agreement to fulfill its

24  obligations over its life.

25      Q.   And what source of capital would Fieldwood I



Page 39

1   have once it becomes effective and you are the sole

2   manager?

3        A.   The -- the -- the capital available is to be

4   spent on decommissioning.  With the consent of Apache, it

5   could be spent on production enhancement projects.

6        Q.   But if Apache didn't consent, then you couldn't

7   develop any of the -- any -- any projects to increase or

8   find new reserves, correct?

9        A.   According to the Apach – or the Fieldwood LLC

10  agreement, any expenditures made outside of day-to-day

11  operations and decommissioning has to have the consent of

12  Apache.

13       Q.   And do they have to have a reason to say no, or

14  can they just say no?

15            MR. PEREZ:  Object to the form of the

16  question, I think the document speaks for itself.

17            MR. EISENBERG:  I am just asking for his

18  understanding, Alfredo.

19       A.   They have the right to consent.

20       Q.   (BY MR. EISENBERG)  And so if they don't

21  consent, then there is not sufficient capital to develop

22  behind pipe reserves, for instance?

23       A.   For -- for Fieldwood I to undertake

24  recompletions to production enhancement, it has to have

25  the consent of Apache, according to the agreement, my



Page 65

1          MR. EISENBERG:  -- is not quite that bad.

2          No.

3     Q.   (BY MR. EISENBERG)  Have you had an -- have you

4  had the opportunity to evaluate what the capital needs

5  are for Fieldwood I?

6     A.   Well, capital -- capital needs are -- are --

7  are dominated by decommissioning obligations, and so we

8  -- Fieldwood I's cash flow will primarily be used for

9  decommissioning activities, and then if there are any

10 other opportunities that are pursued, they'll be

11 evaluated and -- and presented for approval by Apache to

12 -- to undertake those, because according to the

13 agreement, I -- I can only expend money on operating and

14 decommissioning.

15    Q.   Okay.  So independent or divorced from the

16 capital expenditures for decommissioning, have you had an

17 opportunity to evaluate the capital needs of Fieldwood I

18 to -- to move forward and recognize the value from the

19 existing properties?

20    A.   I have re -- I have reviewed the reserve report

21 which outlines crude developed behind pipe, crude

22 developed non-producing and crude undeveloped

23 opportunities.

24    Q.   And does Fieldwood I currently have the capital

25 to address those opportunities?



Page 66

1      A.    The priority for the capital is for

2    decommissioning and then to -- to optimize the cash flow

3    from existing producing properties, so yeah, I guess

4    comprehensively have not assessed each one of those

5    opportunities.

6      Q.    And my question was a little bit different,

7    Mr. Graham, so I will try it again, and if Mr. Perez

8    wants to object that's fine, too.

9            Have -- have you -- other than the

10   decommissioning, have you had the opportunity to

11   determine whether or not Fieldwood I has ample capital

12   available to recognize those reserves that you have

13   evaluated that you just talked about?

14     A.    According to the joint development agreement,

15   Fieldwood NewCo has the opportunity for a period of two

16   years to present projects that would develop some of the

17   Fieldwood I resources, and that would be no capital

18   expenditure to Fieldwood I.  So beyond that no, I have

19   not done the detailed analysis of what, because I don't

20   know which projects they are going to -- they are going

21   to recommend --

22     Q.    Well --

23     A.    -- or they will likely propose.

24     Q.    Okay.  Well, let's assume they don't propose

25   any, can -- can Fieldwood I, sitting here today on its



Page 67

1    own, does it have the capital to do the projects that are

2    represented in that reserve report?

3         A.   Fieldwood I does not have the capital to -- to

4    decommissioning all their obligations, let alone

5    recompletion projects.

6         Q.   All right.  So the answer is no, it does not

7    have the capital, correct?

8         A.   There -- there are not ample supplies of it,

9    no.

10        Q.   Have you had any conversations or meetings with

11   any of the government agencies that regulate Fieldwood I,

12   including BOEM or BSEE?

13        A.   No, I have not.

14        Q.   Are you aware whether or not Fieldwood I has

15   prepared or will be required to prepare an idle iron

16   plan?

17        A.   I -- I -- I'm not privy to that, no, I'm not.

18        Q.   And you -- you know what an idle iron plan is,

19   right?

20        A.   I do.

21        Q.   And -- and an idle iron plan is a requirement

22   under the regulations, correct?

23        A.   That's correct.

24        Q.   All right.  And have you seen an idle iron plan

25   for Fieldwood -- the properties that make up Fieldwood I?



Page 68

1        A.    I've seen a decommissioning plan which would --
2    which would include an idle iron.
3        Q.    And are you aware, sir, that there's over 200
4    million dollars in current decommissioning obligations
5    that will exist at Fieldwood I on the day that it goes
6    effective?
7        A.    Yes.  I believe that is forecasted in -- in one
8    of the spreadsheets that I -- I've seen.
9        Q.    It -- it's in excess of 200 million, isn't it,
10   sir?
11       A.    My understanding if I remember right, it's 220
12   million dollars.
13       Q.    Thank you, sir.
14              Have you done any budgeting for Fieldwood
15   I on a going forward basis in the four months you've been
16   there?
17       A.    Not any detailed budgeting, no.
18       Q.    How about not detailed budgeting?
19       A.    Well, I've -- I've looked at their forecast of
20   -- of production and cash flow.
21       Q.    And -- and have you -- have you done any
22   independent analysis of those forecasts?
23       A.    Those -- those forecasts are -- are generated
24   by Fieldwood employees, and I've reviewed their work,
25   yes.

