# EXHIBIT 24

7/7/2023 10:09 AM
Marilyn Burgess - District Clerk Harris County
Envelope No. 77289000
By: Bonnie Lugo
Filed: 7/6/2023 4:56 PM

SUSMAN GODFREY L.L.P.

A REGISTERED LIMITED LIABILITY PARTNERSHIP

SUITE 5100

1000 LOUISIANA STREET

HOUSTON, TEXAS 77002-5096

(713) 651-9366

FAX (713) 654-6666

WWW.SUSMANGODFREY.COM

---

SUITE 1400
1900 AVENUE OF THE STARS
LOS ANGELES, CALIFORNIA 90067-6029
(310) 789-3100

SUITE 3800
1201 THIRD AVENUE
SEATTLE, WASHINGTON 98101-3000
(206) 516-3880

32ND FLOOR
1301 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6023
(212) 336-8330

GEOFFREY L. HARRISON
DIRECT DIAL (713) 653-7807

E-MAIL GHARRISON@SUSMANGODFREY.COM

July 6, 2023

Clerk of Court
Harris County District Court
201 Caroline
Houston, Texas 77002

> Re:    Cause No. 2023-38238; *Zurich American Insurance Company, et al.
> v. Apache Corporation*; In the 281st Judicial District, Harris County
> Texas.

Dear Clerk:

This is Part 3 to Envelope 77271314 and contains Exhibits 11-15 to Apache's
Response to Plaintiff's Request for Injunctive Relief.

Sincerely,

/s/ Geoffrey L. Harrison

Geoffrey L. Harrison

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Naela Olguin on behalf of Geoffrey Harrison
Bar No. 00785947
nolguin@susmangodfrey.com
Envelope ID: 77289000
Filing Code Description: No Fee Documents
Filing Description: Answer/ Response / Waiver
Status as of 7/7/2023 11:01 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Geoffrey L.Harrison | | gharrison@susmangodfrey.com | 7/7/2023 10:09:35 AM | SENT |
| Becky Delancy | | bdelancy@clarkhill.com | 7/7/2023 10:09:35 AM | SENT |
| Christopher Verducci | 24051470 | cverducci@lockelord.com | 7/7/2023 10:09:35 AM | SENT |
| Michael Edward Collins | 24029006 | mcollins@manierherod.com | 7/7/2023 10:09:35 AM | SENT |
| Philip Guy Eisenberg | 24033923 | peisenberg@lockelord.com | 7/7/2023 10:09:35 AM | SENT |
| Charlotte Oxley | | coxley@susmangodfrey.com | 7/7/2023 10:09:35 AM | SENT |
| Jeff McLaren | | jmclaren@susmangodfrey.com | 7/7/2023 10:09:35 AM | SENT |
| Nicholas Spear | | nspear@susmangodfrey.com | 7/7/2023 10:09:35 AM | SENT |
| Duane Brescia | | dbrescia@clarkhill.com | 7/7/2023 10:09:35 AM | SENT |
| Adam Diamond | | ADiamond@clarkhill.com | 7/7/2023 10:09:35 AM | SENT |
| Christopher RichardWard | | cward@clarkhill.com | 7/7/2023 10:09:35 AM | SENT |
| Jase ABrown | | jbrown@csglaw.com | 7/7/2023 10:09:35 AM | SENT |
| Winston Luo | | wluo@susmangodfrey.com | 7/7/2023 10:09:35 AM | SENT |
| Abigail Noebels | | anoebels@susmangodfrey.com | 7/7/2023 10:09:35 AM | SENT |

# Exhibit 11

Excerpts from the April 11, 2018 Fifth
Amendment to Decommissioning
Agreement

*Execution Version*

## **FIFTH AMENDMENT TO DECOMMISSIONING AGREEMENT**

This Fifth Amendment to Decommissioning Agreement (this "Amendment") dated as of April 11, 2018 but effective for all purposes as of the Amendment Effective Time (as such term is defined in the body of this Amendment below), is by and among Apache Corporation, a Delaware corporation ("APA" or "Apache"), Apache Shelf, Inc., a Delaware corporation ("APSH"), Apache Deepwater LLC, a Delaware limited liability company ("APDW"), Apache Shelf Exploration LLC, a Delaware limited liability company ("ASE" and each of APA, APSH, APDW and ASE, individually, as a "Seller" and collectively as the "Sellers"), Fieldwood Energy LLC, a Delaware limited liability company, ("Buyer 1") and GOM Shelf LLC, a Delaware limited liability company ("GOM", and together with Buyer 1, "Buyer"). Each Seller and Buyer may be referred to herein as a "Party" or collectively as the "Parties".

### Recitals:

A.    The Parties entered into that certain Decommissioning Agreement dated as of September 30, 2013 (as amended by (i) that certain First Amendment to Decommissioning Agreement dated as of September 30, 2013 (the "First Amendment"), (ii) that certain Second Amendment to Decommissioning Agreement dated as of September 30, 2013 the "Second Amendment"), (iii) that certain Third Amendment to Decommissioning Agreement dated effective as of April 25, 2017 (the "Third Amendment", and (iv) that certain Fourth Amendment to Decommissioning Agreement dated effective as of September 1, 2017 (as such Fourth Amendment was amended by that certain Letter Agreement by and among the Parties dated January 3, 2018 (the "Fourth Amendment" and collectively with the First Amendment, the Second Amendment, and the Third Amendment, the "Prior Amendments")), and as may be further amended, the "Agreement").

B.    The Parties desire to amend the Agreement further as set forth in this Amendment.

C.    The Parties entered into the Agreement pursuant to that certain Purchase and Sale Agreement by and among APA, APSH, APDW and Buyer dated July 18, 2013, as the same may be amended or otherwise modified from time to time (the "PSA").

D.    Any capitalized term used but not defined in this Amendment shall have the meaning assigned to such term in the Agreement.

### Agreements:

NOW THEREFORE, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the Parties hereby agree as follows:

1.    The Agreement is hereby amended by deleting Exhibit I and Exhibit J, each, in their entirety.

2.    The Exhibits portion of the Table of Contents is hereby deleted and replaced in its entirety with the following:

**"Exhibits**

Exhibit A        -        Definitions
Exhibit B        -        Form of Letter of Credit
Exhibit B-1 -        Form of Permitted Surety Bond
Exhibit C        -        Form of Affiliate Guaranty
Exhibit D        -        Form of Turnkey Removal Contract
Exhibit E        -        Initial Decommissioning Plan
Exhibit E-1 -        Initial Post 2017 Decommissioning Plan
Exhibit F        -        Form of Texas Recharacterization Deed of Trust
Exhibit G        -        Form of Trust A NPI Conveyance
Exhibit H        -        Form of Trust A Trust Agreement"

3.        Section 2.1(a) of the Agreement is hereby deleted and replaced in its entirety with the following:

"(a)        With respect to Plan Years 2018, 2019, 2020, 2021, and 2022, (i) without limitation of Buyer's obligations contained in subpart (ii) of this sentence or Section 4.5(a), a Decommissioning Plan is attached hereto as Exhibit E-1 (the "**Initial Post 2017 Decommissioning Plan**"), and (ii) Buyer hereby agrees that it will spend a minimum amount of One Hundred Million U.S. Dollars ($100,000,000.00) in the Plan Year 2018 and a minimum of Eighty Million U.S. Dollars ($80,000,000.00) in each of the Plan Years 2019, 2020, 2021, and 2022 on Decommissioning of the Applicable Properties (such spending obligation for each applicable Plan Year, the "**Required Spend**"). On or before December 31 of each of years 2018, 2019, 2020, and 2021, the Parties shall meet to discuss any modifications that either Party may propose with respect to the Initial Post 2017 Decommissioning Plan; provided that Sellers will not request, propose, or otherwise require a modification to the Initial Post 2017 Decommissioning Plan for any of Plan Years 2018, 2019, 2020, 2021, or 2022 that provides for Buyer to spend more than the Required Spend for the applicable Plan Year. With respect to any Decommissioning performed to which this Agreement applies, in measuring any charges for equipment owned as of the date hereof by Buyer (or any affiliated or subsidiary entity that Controls, or is Controlled by, Buyer) which are charged as part of the actual costs expended by Buyer to perform Decommissioning on the Applicable Properties the amounts charged for such equipment shall be consistent with the charges made for such equipment during the period from January 1, 2017 through June 30, 2017. Sections 2.1(b) through 2.1(g) shall be suspended during Plan Years 2018, 2019, 2020, 2021, and 2022. With respect to the Decommissioning Plans to be put in place following the completion of the Initial Post 2017 Decommissioning Plan, such Decommissioning Plans shall cover three (3) year periods (each a "**Subsequent Decommissioning Plan**"), with the first such Subsequent Decommissioning Plan covering Plan Years 2023, 2024, and 2025. The terms of Sections 2.1(b) through 2.1(g) and Section 2.2 shall apply to the Subsequent Decommissioning Plans, provided that Buyer's proposed first Subsequent Decommissioning Plan (covering Plan Years 2023, 2024, and 2025) shall be submitted to Sellers no earlier than March 1, 2022 and no later than July 1, 2022."

2

4.    The first sentence of Section 2.1(b) shall be amended by deleting the references to "2015" and replacing them with "2022".

5.    The last sentence of Section 2.7(b) of the Agreement is hereby deleted and replaced in its entirety with the following:

"If Buyer fails to reimburse and pay any Seller or its Affiliate for any Reimbursable Amounts within ten (10) Business Days of written demand from Sellers therefor, then Sellers and their Affiliates shall, subject to Section 2.7(c), be entitled to any and all rights and remedies at Law or under any agreement or contract, including specific performance, reimbursement from the Trust A Cash, or drawings under any Letter of Credit, for the Reimbursable Amounts as set forth in Articles III and IV."

6.    The last sentence of Section 3.1 of the Agreement is hereby deleted and replaced in its entirety with the following:

"Additionally, Buyer shall be permitted to replace a portion of the Letters of Credit covering up to an aggregate face amount of One Hundred Forty-Eight Million Seven Hundred Thousand U.S. Dollars ($148,700,000.00) with a surety bond substantially in the form of Exhibit B-1 hereto or in such other form acceptable to Apache in its sole discretion (the "*Permitted Surety Bonds*") which, in each case, are issued by a surety acceptable to Apache in its sole discretion. Any such additional letter of credit or Permitted Surety Bonds called for under the two preceding sentences shall be deemed a "Letter of Credit" for purposes of this Agreement and, in the case of any Permitted Surety Bonds put in place by Buyer under this Agreement, when this Agreement provides for any termination of any "Letter of Credit", the Sellers shall take all reasonable actions (at the sole cost and expense of Buyer) to cause such Permitted Surety Bonds to be terminated or released by the applicable surety issuing such Permitted Surety Bonds."

7.    The references to "Trust B" and the "Trust B Trust Agreement" contained in clause (i) of Section 3.2(a) of the Agreement are hereby deleted and replaced with references to "Trust A" and the "Trust A Trust Agreement", respectively.

8.    The phrase "if the amount received from Trust B within five Business Days after demand is made in accordance with the Trust B Trust Agreement is insufficient to reimburse Sellers for the amounts Sellers are entitled to reimbursement for under Section 2.7, then from Trust A in accordance with the procedures set forth in the Trust A Trust Agreement; and (iii) Third," is hereby deleted from clause (ii) of Section 3.2(a) of the Agreement.

9.    The words "and/or" are added immediately before the words "Trust A" and the words "and/or Trust B Cash" in the second line of Section 3.2(b) of the Agreement and the phrase "and then to the Trust B Account; provided if Sellers receive funds from the Trust B Cash only in connection with such Reimbursable Event, then the overpayment shall be refunded to the Trust B Account" at the end of Section 3.2(b) of the Agreement are hereby deleted.

10.    The parenthetical clause contained within Section 3.4(a) of the Agreement is hereby deleted and replaced in its entirety with the following:

"(or be renewed by the Issuing Bank or replaced by another Issuing Bank with a letter of credit or Permitted Surety Bond substantially in the form of Exhibit B or Exhibit B-1 hereto, as applicable)".

11.    Section 4.2 of the Agreement is hereby amended so that a new subsection (b) is inserted immediately following subsection (a) as follows:

"(b)    On Amendment Effective Time, Trust A has been assigned the Trust A-1 NPI as more specifically provided in the Trust A-1 NPI Conveyance."

12.    Section 4.2(b) of the Agreement is hereby renumbered as Section 4.2(c) and the phrase ", the Trust A-1 NPI" is inserted immediately following the words "the Trust A NPI" in the first sentence of such Section 4.2(c).

13.    Section 4.3(a) of the Agreement is hereby deleted and replaced in its entirety with the following:

"4.3    *Required Trust A Amount*.

"(a)    Except as permitted in Section 4.3(b) or Section 4.5, all payments made to Trust A pursuant to the Trust A NPI Conveyance, the Trust A-1 NPI Conveyance, or otherwise shall be held in the Trust A Account and shall not be withdrawn by Buyer until the balance of the Trust A Account plus the aggregate undrawn face amount of the Letters of Credit is equal to the lesser of (A) the sum of (w) Seven Hundred Ninety-Six Million One Hundred Sixty-Two Thousand Seventy-Five U.S. Dollars ($796,162,075.00) plus (x) the aggregate amounts that shall be deposited into the Trust A Account as contemplated in Section 7.3(a)(i) and (ii) plus (y) the cumulative amount of all Unspent Required Spend Amounts plus (z) upon transfer from those certain separate accounts for the benefit of BOEM Account # 304825050 / 29920291 for OCS-G 04809 (SMI 161) and Account # 304825085 / 29920292 for OCS-G 09591 (EI 281) or such accounts that may replace the forgoing accounts (collectively the "*Hall Houston Accounts*") to Trust A upon termination of the Hall Houston Accounts or the release of funds therefrom, the net amount attributable to Buyer's interest transferred to Trust A from the such Hall Houston Accounts as well as any other amounts in such Hall Houston Accounts attributable to the interest(s) of any other Person to the extent Buyer would receive (except for the obligation that such amount be paid into Trust A hereunder) such amounts upon distribution or disbursement therefrom and (B) 125% of the then Remaining Decommissioning (the lesser of the amounts described in clauses (A) and (B) being the "*Required Trust A Amount*"). For the avoidance of doubt, as of January 31, 2018, the aggregate of the net amounts attributable to Buyer's interest contained in the Hall Houston Accounts and the amounts in such Hall Houston Accounts attributable to the interest(s) of any other Person which Buyer anticipates receiving or having a right to receive upon distribution or disbursement therefrom are Three Million Eight Hundred One Thousand Seven Hundred Sixty Three and 74/100ths U.S. Dollars ($3,801,763.74) in Account # 304825050 / 29920291 for OCS-G 04809

(SMI 161) and One Million Eight Hundred Eighty Three Thousand Four Hundred Seventy and 79/100ths U.S. Dollars ($1,883,470.79) in Account #304825085 / 29920292 for OCS-G 09591 (EI 281). Upon the termination of each of the Hall Houston Accounts, Sellers shall have no rights whatsoever to any funds distributed or disbursed from the Hall Houston Accounts except as provided herein with respect to amounts deposited into the Trust A Account and Sellers and Buyers hereby agree to promptly cause any amounts held in a Hall Houston Account attributable to Buyer's interest, as well as any other amounts in such Hall Houston Accounts attributable to the interest(s) of any other Person to the extent Buyer would receive (except for the obligation that such amount be paid into Trust A hereunder) such amounts upon distribution or disbursement therefrom, to be deposited into the Trust A Account promptly after termination of such Hall Houston Account or release of such amounts therefrom."

14.   The phrase "Buyer is not then required to deposit Available Cash into the Trust B Account pursuant to Section 5.3(b)," is hereby deleted from Section 4.3(b) of the Agreement.

15.   Section 4.4 of the Agreement is hereby amended so that the phrase "Subject to the terms and provisions of Section 4.5 hereof:" immediately follows the title of Section 4.4.

16.   The phrase "plus the Trust B Locked Cash," is hereby deleted from Section 4.4(a)(ii) of the Agreement, and the phrase "; and" at the end of Section 4.4(a)(ii) of the Agreement is hereby deleted and replaced with a comma (",").

17.   Section 4.4(a)(iii) of the Agreement is hereby deleted in its entirety.

18.   The concluding clause of Section 4.4(a) of the Agreement (following Section 4.4(a)(ii)) is hereby amended by (I) deleting the phrase "clauses (i), (ii) and (iii)" in the first line and replacing it with "clauses (i) and (ii)", and (II) inserting the words "or the Trust A-1 NPI Conveyance" immediately following the words "Trust A NPI Conveyance".

19.   Section 4.4(b) of the Agreement is hereby amended by (I) deleting the reference to Section 4.5 and replacing it with a reference to Section 4.6, and (II) inserting the phrase ", and less the amount of any Permitted Surety Bonds accepted by Seller pursuant to Article III, provided that such Permitted Surety Bond remains in effect throughout the Suspension Period" immediately following the phrase "in lieu of providing a Letter of Credit" at the end of clause (i).

20.   Article IV of the Agreement is hereby amended so that a new Section 4.5 is inserted immediately following Section 4.4 as follows:

"4.5   *Certain Rights and Obligations with respect to the Trust A-1 NPI and the Termination of Trust A.*

(a)   By January 15th of each calendar year beginning in 2019 and ending in 2023, Buyer will deliver to Sellers a statement in reasonable detail depicting the total amount of the actual costs spent by Buyers with respect to Decommissioning of the Applicable Properties covered by the Decommissioning Plan for the immediately

5

preceding Plan Year and which shows the calculations required to show whether there is any Unspent Required Spend Amount with respect to such immediately preceding Plan Year. To the extent there is any Unspent Required Spend Amount with respect to a Plan Year, Buyer hereby agrees that it shall, on or before January 31st of the calendar year following the end of such Plan Year, deposit an amount of U.S. Dollars equal to the amount of any Unspent Required Spend Amount into the Trust A Account. Any deposit required pursuant to this Section 4.5(a) shall be in addition to any amounts to be paid to, or deposited into, Trust A with respect to the Trust A NPI and/or the Hall Houston Accounts.

(b)     On the terms and conditions of this Section 4.5(b), Buyer shall have continued access to seek reimbursement from Trust A up to amounts received by Trust A from the Trust A-1 NPI unless and until Buyer defaults on its obligation to fund any Unspent Required Spend Amount ("*Funding Default*"). In order to be funded, each request for reimbursement must be accompanied by a certification signed by the CEO and CFO of Fieldwood certifying that the Required Spend on Decommissioning of the Applicable Properties for the remainder of the applicable Plan Year will be performed and spent or, if not, then stating the amount of Unspent Required Spend Amounts that will need to be deposited for such Plan Year. If Unspent Required Spend Amounts will need to be deposited for such Plan Year, then Buyer may only withdraw amounts from Trust A in excess of such projected Unspent Required Spend Amounts until Buyer has funded to Trust A, through the amounts from the Trust A-1 NPI or otherwise, the projected Unspent Required Spend Amounts. Upon a Funding Default, Fieldwood may not seek any further Trust A reimbursements until the earlier of such time as (i) the Trust A-1 NPI has funded the Unspent Required Spend Amounts in total or (ii) the Required Trust A Amount is achieved, at which time the Funding Default shall terminate.

(c)     On January 31, 2023, if Buyer is not then in a Funding Default, the Trust A-1 NPI shall be released and relinquished by Trust A (or if required to make such release and relinquishment effective, assigned and conveyed) to Buyer, and the Parties shall act in good faith to cause such release, relinquishment, (and if required, assignment and conveyance) to occur promptly. In the event that on January 31, 2023 Buyer is in a Funding Default then the Trust A-1 NPI shall continue to be held by Trust A as provided under the other provisions of this Agreement until the earlier of the date (i) that the amounts added to the Trust A Account after January 31, 2023 which are attributable to proceeds of the Trust A-1 NPI (plus any other amounts deposited by Buyer into the Trust A Account as required pursuant to Section 4.5(a) (other than amounts deposited into Trust A from the Trust A NPI or the Hall Houston Accounts) or Section 4.5(b)) equal the amount of the aggregate remaining Unspent Required Spend Amounts or (ii) the Required Trust A Amount is achieved. Upon the achievement of either of the conditions set forth in clause (i) and (ii) of the immediately preceding sentence, the Trust A-1 NPI shall be released by Trust A and assigned to Buyer."

21. Section 4.5 of the Agreement is hereby amended by deleting the title "*Termination of Trust A.*" at the beginning of such Section and shall be renumbered as Section 4.5(d).

22.   Article V of the Agreement is hereby deleted and replaced in its entirety with the following:

**"ARTICLE V**
**[RESERVED]"**

23.   Section 6.1 of the Agreement is hereby deleted and replaced in its entirety with the following:

"6.1    *Reserved*."

24.   Section 6.2 of the Agreement is hereby deleted and replaced in its entirety with the following:

"6.2    *Reserved*."

25.   Section 6.3 of the Agreement is hereby deleted and replaced in its entirety with the following:

"6.3    *Reserved*."

26.   Section 6.5 of the Agreement is hereby amended by deleting the words "*or Trust B*" from the title of such Section and by deleting the words "or Trust B" from the end of such Section.

27.   Section 6.7 of the Agreement is hereby amended (I) to add the phrase "and/or Trust A-1 NPI" after the phrase "Trust A NPI" each time it appears, (II) to add the phrase "or, in the case of the Trust A-1 NPI, the Amendment Effective Time" after the phrase "the Effective Time (as defined in the Trust A NPI Conveyance)", and (III) to add the phrase "and as of the Amendment Effective Time, as applicable" after the phrase "Contemporaneously with execution of this Agreement".

28.   The words "or Trust B" are hereby deleted from Section 6.9 of the Agreement.

29.   The phrase "(i) that certifies compliance with the Trigger Ratio or specifies the amount by which Buyer is out of compliance with the Trigger Ratio; and (ii)" is hereby deleted from Section 6.10 of the Agreement.

30.   Section 6.11 of the Agreement is hereby deleted and replaced in its entirety with the following:

"6.11   *Reserved*."

31.   The words "Trust B NPI" in Section 7.1(a) of the Agreement are hereby deleted and replaced with the words "Trust A-1 NPI".

32.   The words "the Security Instruments and" are hereby deleted from Section 7.1(a)(i) of the Agreement.

33.   Section 7.1(a)(ii) of the Agreement is hereby amended by deleting the phrase "with respect to the Transferred Leases and Trust B shall assign to such transferee the Trust B NPI" and replacing it with the words "and the Trust A-1 NPI".

34.   Section 7.1(a)(iii) of the Agreement is hereby amended to change the reference to "clause (y)" to be a reference to "clause (x)" and to delete the following words: "(A)" and "and (B) the Trust B Locked Cash shall not be increased as a result of such sale and as a result of such sale a percentage of the Trust B Cash shall be paid to Buyer equal to the proportion that the remaining Decommissioning attributable to the Transferred Leases bears to the total Remaining Decommissioning prior to such sale".

35.   Section 7.1(b)(vi) is hereby renumbered as Section 7.1(b)(v) and Sections 7.1(b)(i) through Section 7.1(b)(iv) of the Agreement are hereby deleted and replaced in their entirety with the following:

> "(i)      Apache shall cause the Recharacterization Mortgages to be terminated;
>
> (ii)      Trust A shall release and assign to such transferee the Trust A NPI and Trust A-1 NPI;
>
> (iii)     the Trust A Cash shall be paid to Buyer;
>
> (iv)     the Letters of Credit shall be terminated; and"

36.   Section 7.1(c)(vi) is hereby renumbered as Section 7.1(c)(v) and Sections 7.1(c)(i) through Section 7.1(c)(iv) of the Agreement are hereby deleted and replaced in their entirety with the following:

> "(i)      Apache shall cause the Recharacterization Mortgages to be terminated;
>
> (ii)      Trust A shall release and assign to such transferee the Trust A NPI and Trust A-1 NPI;
>
> (iii)     the Trust A Cash shall be paid to Buyer;
>
> (iv)     the Parties shall terminate the Letters of Credit; and"

37.   Section 7.2 of the Agreement is hereby amended by (I) deleting the words "Trust B NPI" and replacing such words with "Trust A-1 NPI" in Section 7.2(a), (II) deleting the words "or Trust B" from the end of Section 7.2(a), and (III) deleting the phrase "the Security Instruments" from Section 7.2(b).

38.   Section 7.3(a) of the Agreement is hereby amended by (I) deleting each reference to the "Trust B NPI" and replacing each such reference with a reference to the "Trust A-1 NPI", (II) deleting each reference to "Trust B" and replacing each such reference with a reference to "Trust A", (III) deleting the reference to "Trust B Trust Agreement" and replacing such reference with a reference to "Trust A Trust Agreement", and (IV) deleting the phrase "(ii) 20%" and replacing it with "(ii) 10%".

39.   Section 7.3(b) of the Agreement is hereby amended by (I) deleting the phrase "and Trust B" each time it occurs, (II) deleting the phrase "neither Trust A nor Trust B shall" and replacing it with "Trust A shall not", and (III) deleting the words "each of" in the second sentence.

40.   Section 7.3(c) of the Agreement is hereby amended by deleting the phrase "Security Instruments and the" in both instances in which it occurs.

41.   Sections 7.4 and 7.5 of the Agreement shall be amended such that (I) any reference in such Sections to the "Trust B NPI" shall be replaced with the phrase "Trust A-1 NPI", (II) any reference in such Sections to "and Trust B" shall be deleted and (III) any reference to "the Security Instruments" or "the Security Instruments and" are deleted and (IV) the reference to "Section 7.5(a)" shall be replaced with the phrase "Section 7.5".

42.   Section 9.1(a) of the Agreement is hereby amended by (I) deleting the words "Each of", (II) deleting the words "and Trust B", (III) deleting the word "either", and (IV) deleting the words "or Trust B".

43.   Exhibit A of the Agreement is hereby amended so that the definition of "Amendment Effective Time" is inserted immediately following the definition of "APDW" as follows:

> ""*Amendment Effective Time*" means Plan Effective Date."

44.   The definition of "Available Cash" as set forth in Exhibit A of the Agreement is hereby amended to delete the phrases "(other than Funded Debt incurred in violation of Section 6.3 or Section 6.11, as applicable)" and "or Permitted Senior Debt" wherever such phrases appear in such definition.

45.   Exhibit A of the Agreement is hereby amended so that the definition of "Control" is hereby amended by adding the following language to the end of such definition "and the terms "*Controls*" and "*Controlled*" shall correlative meanings".

46.   The definition of "Decommissioning Plan" as set forth in Exhibit A of the Agreement is hereby deleted and replaced in its entirety with the following:

> ""*Decommissioning Plan*" means any decommissioning plans that may have been agreed to by the Parties pursuant to this Agreement, the Initial Post 2017 Decommissioning Plan, and any Subsequent Decommissioning Plan."

47.   Exhibit A of the Agreement is hereby amended so that the definition of "Funding Default" is inserted immediately following the definition of "Funded Debt" as follows:

> ""*Funding Default*" has the meaning ascribed to such term in Section 4.5(b)."

48.   Exhibit A of the Agreement is hereby amended so that the definition of "Hall Houston Accounts" is inserted immediately following the definition of "Government Decommissioning" as follows:

""**_Hall Houston Accounts_**" has the meaning ascribed to such term in <u>Section 4.3(a)</u>."

49. Exhibit A of the Agreement is hereby amended so that the definition of "Initial Post 2017 Decommissioning Plan" is inserted immediately following the definition of "Initial Decommissioning Plan" as follows:

""**_Initial Post 2017 Decommissioning Plan_**" has the meaning ascribed to such term in <u>Section 2.1(b)</u>."

50. The definition of "Issuing Bank" as set forth in Exhibit A of the Agreement is hereby deleted and replaced in its entirety with the following:

""**_Issuing Bank_**" means (1) in the case of Letters of Credit other than Permitted Surety Bonds, (a) Citibank, N.A., (b) Deutsche Bank Trust Company Americas, (c) Bank of America, N.A., (d) Goldman Sachs Bank USA, (e) any other issuing bank mutually agreed by the Parties, (f) Toronto-Dominion Bank, or (g) any other issuing bank eligible to provide letters of credit under the Senior Debt Facility, in each case so long as such bank is a major U.S. commercial bank or a foreign bank with a U.S. branch office, with the rating assigned to its unsecured and senior, long-term debt or deposit obligations (not supported by third party credit enhancement) by Standard & Poor's or Moody's of at least "A-" and "A3", respectively or (2) in the case of Permitted Surety Bonds, a surety approved by Apache in its sole discretion."

51. The definition of "Net Reserve Value" as set forth in Exhibit A of the Agreement is hereby amended such that any reference to the "Trust B NPI" shall be replaced with phrase "Trust A-1 NPI".

52. Exhibit A of the Agreement is hereby amended so that the definitions of "Permitted Surety Bonds", "Plan", and "Plan Effective Date" are inserted immediately following the definition of "Permanently Abandoned Properties P&A Obligations" as follows:

""**_Permitted Surety Bonds_**" has the meaning ascribed to such term in <u>Section 3.1</u>.

"**_Plan_**" means the "Joint Prepackaged Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors" dated February 14, 2018 with respect to the Fieldwood Energy LLC, et al. Chapter 11 cases filed in the United States Bankruptcy Court for the Southern District of Texas; Jointly Administered under Case No. 18-30648, and filed at Docket No. 36, as amended from time to time.

"**_Plan Effective Date_**" means the "Effective Date" of the Plan as the term "Effective Date" is defined in the Plan."

53. The definition of "Recharacterization Mortgages" as set forth in Exhibit A of the Agreement is hereby amended to add the phrase ", in each case, as amended from time to time by the Parties." at the end of such definition.

54. The definition of "Related Decommissioning Agreements" as set forth in Exhibit A of the Agreement is hereby deleted and replaced in its entirety with the following:

"**Related Decommissioning Agreements**" means the Trust A Trust Agreement, the Trust A NPI Conveyance, the Trust A-1 NPI Conveyance, any Letter of Credit, and the Recharacterization Mortgages."

55.   The phrase "to the extent it was incurred by Buyer in compliance with Section 6.3" is hereby deleted from the definition of "Senior Debt Facility" as set forth in Exhibit A of the Agreement

56.   Exhibit A of the Agreement is hereby amended so that the definition of "Subsequent Decommissioning Plan" is inserted immediately following the definition of "Subject Interests" as follows:

"**Subsequent Decommissioning Plan**" has the meaning ascribed to such term in Section 2.1(a)."

57.   The reference to "the Trust B NPI" in definition of "Total Net Reserve Value" as set forth in Exhibit A of the Agreement is hereby deleted and replaced with a reference to "the Trust A-1 NPI".

58.   The reference to "Section 4.2(b)" in the definition of "Trust A Account" as set forth in Exhibit A of the Agreement is hereby deleted and replaced with a reference to "Section 4.2(c)".

59.   The reference to "Section 4.2(b)" in the definition of "Trust A Cash" as set forth in Exhibit A of the Agreement is hereby deleted and replaced with a reference to "Section 4.2(c)".

60.   Exhibit A of the Agreement is hereby amended so that the definitions of "Trust A-1 NPI" and "Trust A-1 NPI Conveyance" are inserted immediately following the definition of "Trust A Trust Agreement" as follows:

"**Trust A-1 NPI**" means that certain Net Profits Overriding Royalty Interest created by the Trust A-1 NPI Conveyance, as more particularly set forth in the Trust A-1 NPI Conveyance.

"**Trust A-1 NPI Conveyance**" means that certain Conveyance of Net Profits Overriding Royalty Interest entered into between Buyer and Trust B on the Closing Date as supplemented and amended by that certain Supplement and First Amendment to Conveyance and Net Profits Overriding Royalty Interest dated November 15, 2013 and as further supplemented and amended by that certain Supplement and Second Amendment to Conveyance and Net Profits Overriding Royalty Interest dated March 12, 2014, as the same has been assigned to and modified by that certain Assignment and Amendment of Net Profits Overriding Royalty Interest entered into between Trust B, as Assignor, and each of Trust A and Buyer, as an Assignee, effective as of 7:00 a.m. (local time, at the location of each Subject Interest (as such term is defined in such Conveyance of Net Profits Overriding Royalty Interest) on the first day of the calendar month preceding the month in which the Plan Effective Date occurs."

61.   The definition of "Trust B" as set forth in Exhibit A of the Agreement is hereby deleted and replaced in its entirety with the following:

""**Trust B**" means the Fieldwood Decommissioning Trust B, a Delaware Statutory Trust."

62.   Exhibit A of the Agreement is hereby amended so that the definition of "Unspent Required Spend Amount" is inserted immediately following the definition of "Turnkey Removal Contract" as follows:

""**Unspent Required Spend Amount**" means the positive difference, if any, obtained by subtracting (a) the actual costs expended by Buyer to perform Decommissioning on the Applicable Properties during any applicable Plan Year from (b) the Required Spend for such Plan Year."

63.   The definitions for the following terms as set forth in Exhibit A of the Agreement are hereby deleted from Exhibit A to the Agreement:

"Available Cash"

"Collateralized Amount"

"Consolidated EBITDAX"

"*Excess Cash Sweep*"

"Excess First Priority Obligations"

"Funded Debt"

"Indebtedness"

"*Initial Decommissioning Plan*"

"Leverage Ratio"

"Net Costs"

"Net Reserve Value"

"*Permitted Senior Debt*"

"Pro Forma Basis"

"*Security Instruments*"

"Senior Secured Leverage Ratio"

"*Trigger Ratio*"

12

"*Trust B Account*"

"*Trust B Cash*"

"*Trust B Locked Cash*"

"*Trust B NPI*"

"*Trust B NPI Conveyance*"

"*Trust B Security Interest*"

"*Trust B Trust Agreement*"

64. **Preservation of Certain Rights and Obligations under the Fourth Amendment**. Notwithstanding anything in this Amendment to the contrary, nothing contained herein shall diminish, amend or otherwise modify the rights and obligations of the Parties contained in Section 1 of the Fourth Amendment, which rights and obligations shall continue as drafted in the Fourth Amendment without giving effect to this Amendment.

65. Miscellaneous.

(a) <u>Consideration</u>. Each of the Parties acknowledges and agrees that it has received good, valuable and adequate consideration, and shall receive substantial benefit from, the execution and delivery of this Amendment.

(b) <u>Reaffirmation</u>. This Amendment is entered into among the Parties pursuant to Section 13.6 of the Agreement. The Parties hereby covenant and agree that the Agreement, as amended by this Amendment (together with all prior amendments and any exhibits and schedules thereto), the Exhibits and Schedules to the Agreement and the other documents contemplated under the Agreement and/or the PSA set forth the entire agreement and understanding of the Parties in respect of the transactions contemplated hereby and thereby and supersede all prior agreements, prior arrangements and prior understandings relating to the subject matter hereof and thereof.

(c) <u>No Release or Waiver</u>. Except as expressly provided herein or in the Agreement, this Amendment shall not release, waive or excuse, and each Party shall remain responsible and liable for, such Party's respective rights and obligations (or breach thereof) under the Agreement, as amended by this Amendment, arising prior to, on or after the date hereof.

(d) <u>Counterparts</u>. This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any .pdf or other electronic transmission hereof or signature hereon shall, for all purposes, be deemed originals.

**[Remainder of Page Intentionally Left Blank. Signature Page(s) Follow.]**

IN WITNESS WHEREOF, the Parties have caused this Amendment to be executed by their authorized representatives, to be effective as of the Amendment Effective Time.

**APACHE CORPORATION**

By: _____

Name: Grady L. Ables

Title: Senior Region Vice President – North Sea, Egypt, Houston Operations, HSSE

**APACHE SHELF, INC.**

By: _____

Name: Grady L. Ables

Title: Director

**APACHE DEEPWATER LLC**

By: _____

Name: Grady L. Ables

Title: Director

**APACHE SHELF EXPLORATION LLC**

By: _____

Name: Grady L. Ables

Title: Director

**FIELDWOOD ENERGY LLC**

By: _____
Name:  John H. Smith
Title:   Senior Vice President – Land &
Business Development


**GOM SHELF LLC**


By: _____
Name:  John H. Smith
Title:   Vice President

Signature Page to Fifth Amendment to Decommissioning Agreement

# Exhibit 12

November 9, 2015 Payment Bonds
between Fieldwood Energy LLC, Zurich
American Insurance Company, and
Deutsche Bank AG New York Branch



**ZURICH**

# PERFORMANCE BOND

Bond No . LPM9181831

KNOW ALL MEN BY THESE PRESENTS, that FIELDWOOD ENERGY LLC ("Fieldwood")
as Principal and ZURICH AMERICAN INSURANCE COMPANY, a corporation duly organized
under the laws of New York and duly authorized and licensed to transact the business of suretyship
in the United States of America (the "Surety") as Surety, and our administrators, successors and
assigns, are held and firmly bound unto DEUTSCHE BANK AG NEW YORK BRANCH (the
"Obligee") in the  penal sum of Ninety Seven Million, Three Hundred Twenty-seven Thousand,
Nine Hundred Thirty-one and no/100 ($97,327,931) lawful money of the United States of
America (the "Bond Amount"), for the payment of which well and truly to be made, we bind
ourselves, our administrators, successors and assigns, jointly and severally by these presents.

WHEREAS, Fieldwood and its subsidiaries entered into an arrangement with Apache Corporation
(the "Beneficiary"), among others pursuant to which Fieldwood will perform decommissioning of
various oil and gas wells in the Gulf of Mexico and other activities as described in that certain
Decommissioning Agreement dated as of September 30, 2013, as amended (the "Agreement"); and

WHEREAS, Fieldwood has entered into certain written applications and agreements between the
Obligee and Fieldwood dated November 9, 2015 (each as amended, restated, supplemented or
otherwise modified, collectively, the "Reimbursement Agreement"), under which the Obligee has
agreed to provide Obligee's standby letter of credit No.839BGC1500971  (the "Security") to ensure
Fieldwood's satisfactory performance of the Agreement to the Beneficiary and Fieldwood has
agreed to reimburse the Obligee for any drawings under the Security to the extent that the Obligee is
not reimbursed under this Bond.

NOW, THEREFORE, in consideration of the mutual agreements set forth herein and other good and
valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Surety
hereby agrees in favor of the Obligee as follows:

THE CONDITION OF THIS OBLIGATION IS SUCH that, if Fieldwood shall fully, faithfully and
timely perform its obligations under the Agreement, then this obligation to be void (unless an Event
of Default (as defined below) shall have occurred or thereafter occurs); otherwise, to remain in full
force and effect.

The Surety shall be obligated to make payment under this Bond if the Obligee delivers a written
notice to the Surety within the time required hereby (which delivery may occur after the
performance of such obligations) that an Event of Default has occurred, provided, however, that this
Bond is subject to the following conditions:

1. Event of Default:  An "Event of Default" for purposes of this Bond is the delivery to the
   Surety by the Obligee of one of the following:

a.  A written statement from the Obligee, in the form attached hereto as Annex A, stating that the Beneficiary has made demand upon Obligee under the Security by delivering to the Obligee a written statement in the form of Exhibit "A" to the Security, which shall be taken by Surety as conclusive proof that Fieldwood has failed to perform and reimburse the Beneficiary for Government Decommissioning obligations (as defined in the Agreement); or

b.  A written statement from the Obligee, in the form attached hereto as Annex B, stating that the Beneficiary has made demand upon Obligee under the Security by delivering to the Obligee a written statement in the form of Exhibit "B" to the Security arising from the Obligee having notified the Beneficiary of the Obligee's election to not extend the Security, which shall be taken by Surety as conclusive proof that Fieldwood has failed to provide the Beneficiary with replacement security within the time required by the Agreement.

2.  Preliminary Notice to Surety:  Obligee shall endeavor to notify the Surety, with reasonable promptness, of any facts or circumstances of which Obligee has received actual notice which constitute an Event of Default.  Such preliminary notice is not, however, a condition precedent of the Surety's obligation under this Bond and failure of the Obligee to so notify the Surety shall not relieve or reduce the Surety's liabilities and obligations to the Obligee under this Bond.

3.  Upon the occurrence of an Event of Default, the Surety shall pay to the Obligee the amount demanded in the Obligee's written statement within ten (10) Business Days (as defined below) after receipt of such statement from the Obligee. Each such written statement from the Obligee shall constitute conclusive evidence of the facts stated therein.  The Surety irrevocably agrees to pay interest on all Overdue Amounts (as defined below) at the annual rate equal to the Prime Rate (as defined below) of the Obligee such interest to accrue on a daily basis for each day that any Overdue Amount remains unpaid, calculated monthly in arrears and shall be compounded monthly until payment in full by the Surety.  The Surety hereby agrees to indemnify and hold harmless the Obligee from and against any and all damages, losses, liabilities and expenses (including, without limitation, reasonable attorneys' fees and disbursements), that may be incurred or sustained by, or asserted or awarded against, the Obligee, in each case arising out of or in connection with or relating to the Surety's failure to pay to the Obligee any amount demanded when due hereunder.  For the purposes of this Bond, (a) the term "**Business Day**" means a day on which chartered banks are open for over-the-counter business in the ordinary course in New York, New York and excludes Saturday, Sunday and any other day which is a recognized holiday in the state of New York; (b) the term "**Prime Rate**" means on any day the fluctuating annual rate of interest established from time to time by the Obligee and in effect that day as the reference rate it will use for purposes of determining rates of interest it will charge on loans to customers in the United States and designated as its prime rate; and (c) the term "**Overdue Amounts**" means amounts due and owing to the Obligee by the Surety under this Agreement.

4.  This Bond sets forth in full the terms of the Surety's liabilities and obligations to the Obligee under this Bond.  Such liabilities and obligations shall not be in any way modified, amended or supplemented by reference to any document or instrument referred to herein, and any such reference shall not be deemed to incorporate herein any document or instrument.  The

Surety's liabilities and obligations under this Bond to the Obligee are not subject to any condition or qualification except as expressly set forth herein and are not contingent on any of the following (and shall not be reduced, diminished or eliminated by virtue of any of the following): (a) the ability or inability of the Surety to acquire or perfect any lien or security interest on any asset or property of Fieldwood, (b) the Surety's success or failure in obtaining indemnification from Fieldwood or (c) any other fact or circumstance involving or affecting any one or more of Fieldwood, the Obligee or the Surety (but the Surety reserving all of its rights against Fieldwood).   This Bond constitutes the Surety's primary, absolute and independent obligation to make payment to the Obligee in accordance with the terms hereof, under any and all circumstances, including, without limitation, due to the lack of validity, legality or enforceability of the Agreement, the Reimbursement Agreement or the Security and irrespective of all objections, exceptions, set-offs, counterclaims or defenses of any kind from the Surety, Fieldwood or other third parties.

5. Address for Written Statements and Notice:  Any written statement or notice provided under this Bond shall be in writing and shall be delivered by personal delivery, certified mail, express mail, or overnight courier service to the address of the party set out below and to the attention of the person there indicated, provided that any written statement or notice shall be delivered only by personal delivery or overnight courier in the event that there is a threatened or actual discontinuance or interruption of regular postal service:

    a.  if to the Surety:

        Zurich American Insurance Company
        Zurich Surety
        500 Enterprise Drive, Rocky Hill, Connecticut 06067
        Attention: Commercial Surety Underwriting

        with a copy to:

        Zurich Surety Bond Claims
        1400 American Lane
        Schaumburg, Illinois 60196
        reportsfclaims@zurichna.com

    b.  if to the Obligee:

        Deutsche Bank AG New York Branch
        Cherine Kenawy, Trade Finance Operations
        60 Wall Street, 38th Floor
        Mailstop: NYC60-3817
        New York, NY 10005-2836
        Attention: Standby Letter of Credit Department
        DBNY.standby-LC@db.com

        With a copy to:

        Deutsche Bank AG New York Branch

60 Wall Street
New York, NY 10005
Attention: Mr. Prashant Mehra

c.  if to Fieldwood:

Fieldwood Energy LLC
2000 W Sam Houston Parkway S
Suite 1200
Houston, Texas 77042
Attention: Richard D. Black, Sr. Vice President and General Counsel

and such statement or notice shall be deemed to have been received on the fifth (5th) Business Day if sent by certified mail or express mail and deemed to have been received on the following Business Day if sent by overnight courier or personal delivery. Any party may change its notice address by delivering a notice of such change to the other parties in the manner provided herein.

6.  Limitations on Liability:  The liability of the Surety shall not exceed the Bond Amount stated above, plus all costs and expenses required to be paid by the Surety hereunder, regardless of the number of years that this Bond shall continue or be continued in force and the number or amounts of premiums paid by Fieldwood (it being acknowledged and agreed that all premiums and fees payable to the Surety for the issuance and maintenance of this Bond are the sole obligation of Fieldwood and the Obligee shall have no liability therefor).  Partial and multiple demands are permitted.  The Bond Amount shall be reduced by the amount of any payment made by the Surety under this Bond.  It is expressly agreed that in the event any payments are made under this Bond, the Bond Amount (as it may be reduced from time to time as a result of payments that are made as against the Bond) shall be carried over on an annual basis for each subsequent calendar year in which the Bond is renewed.

7.  This Bond is an annual obligation for the term of November 9, 2015 to November 9, 2017. This Bond will be automatically renewed for one year annual terms unless the Obligee and Fieldwood are notified of the Surety's intention to not renew or extend this Bond, written notice of which shall be given by the Surety at least ninety (90) days prior to the then current expiration date of this Bond, such cancellation notice to be provided in accordance with Section 5 above.

8.  If the Surety so notifies the Obligee pursuant to Section 7 that this Bond will not be renewed, the Surety acknowledges that the Obligee may be required to notify the Beneficiary at least sixty (60) days prior to the then current expiration date of the Security of the Obligee's election not to extend the Security and that the Beneficiary shall then be entitled to demand payment under the Security in accordance with the Agreement.  To ensure that the Obligee will have sufficient time to make written demand for payment under this Bond in the event the Beneficiary has demanded payment under the Security prior to the latest date the Beneficiary is entitled to make a drawing under the Security, the Surety agrees that if the Beneficiary is entitled to make a drawing under the Security after the then applicable expiration date of the Security for any reason, including, without limitation, the application of applicable laws, rules and regulations relating to letters of credit, the Obligee shall be

given an additional amount of time (equal to the amount of such additional time given to the Beneficiary) to make its written demand on the Surety for payment under this Bond.

9. In the event Fieldwood fails to provide replacement security or other form of collateral acceptable in the Obligee's sole discretion, the Obligee may make written demand for payment under this Bond.  Upon payment by the Surety to the Obligee pursuant to this Section 9, the Obligee shall hold such payment in a cash collateral account on the basis that if the Beneficiary makes a demand under the Security issued by the Obligee, the Obligee shall be entitled to appropriate and apply the relevant amount(s) from such cash collateral to make payment to the Beneficiary with the net balance remaining in such cash collateral account being returned by the Obligee to the Surety (or to the representatives of the Surety) when the Obligee has no further obligations or liabilities to the Beneficiary under such Security.

10. This Bond shall be governed by and construed in accordance with the law of the State of New York (without reference to conflict of law doctrine), and the parties submit to the nonexclusive jurisdiction of the courts of the State of New York located in the County of New York.

11. No right of action shall accrue on this Bond to or for the use of any person or corporation other than the Obligee named herein and the administrators, successors and assigns of the Obligee.

12. The Surety hereby represents that it has the power and requisite authority to execute, deliver and perform its obligations under this Bond.  The Surety is duly authorized to, and has taken all action necessary to authorize it to, perform its obligations under this Bond and is and will continue to be duly authorized to enter into this Bond and to perform its obligations under this Bond. This Bond is the legal and binding obligation of the Surety enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance or similar laws affecting creditors' rights generally and general principles of equity (regardless of whether the application of such principles is considered in a proceeding in equity or at law).

SIGNED, SEALED AND DATED this 9th day of November, 2015.

**FIELDWOOD ENERGY LLC**  
(Fieldwood)

By: _____

Name: G. M. McCarroll

Title:  President and Chief Executive Officer

**ZURICH AMERICAN INSURANCE COMPANY**  
(Surety)

By: _____

Name: Janice H. Fennell

Title:  Attorney-in-Fact

ANNEX A

## FORM OF DEMAND UNDER PERFORMANCE BOND

Date:

**Zurich American Insurance Company**
500 Enterprise Drive
Rocky Hill, Connecticut 06067
Attention: Commercial Surety Underwriting
Facsimile: _____

Re:    Performance Bond No. LPM9181831 (the "**Bond**")

      Each of the undersigned individuals, authorized officers of Deutsche Bank AG New York Branch (the "**Obligee**"), hereby certifies to Zurich American Insurance Company (the "**Surety**"), with reference to the Performance Bond No. LPM9181831 (the "**Bond**") dated November 9, 2015 issued in favor of the Obligee by the Surety for the account of Fieldwood Energy LLC ("**Fieldwood**"), as follows (any capitalized term used in this Demand Under Performance Bond and not defined herein shall have its respective meaning as set forth in the Bond):

    1.    The undersigned is authorized to make this Demand Under Performance Bond on behalf of the Obligee.

    2.    The Obligee is entitled to make a drawing in the amount of [$_____] (the "**Drawing Amount**") pursuant to the terms and conditions of the Bond. Such Drawing Amount does not exceed the amount available for drawing under the Bond, and the time for the Obligee to demand payment under the Bond has not expired.

    3.    The undersigned has been notified that, pursuant to the Decommissioning Agreement dated as of September 30, 2013, among Apache Corporation, Apache Shelf, Inc., Apache Deepwater LLC (collectively "Seller"), Fieldwood and GOM Shelf LLC, as amended, restated or otherwise modified from time to time (the "Decommissioning Agreement"), Obligee was required to make payment to Seller under a standby letter of credit issued in favor of Seller as a result of Fieldwood's failure to reimburse and pay Seller or its Affiliate for Reimbursable Amounts (as such terms are defined in the Decommissioning Agreement) in the amount of the Drawing Amount within the time period specified in Section 2.7(b) of the Decommissioning Agreement.

    4.    Please remit payment in the amount of [$_____] within ten (10) business days, by wire transfer, to the order of Obligee in accordance with the following payment instructions:

[insert payment instructions]

IN WITNESS WHEREOF, the undersigned has executed and delivered this Demand Under Performance Bond on [insert date of the Demand Under Performance Bond].

**Obligee:**

**DEUTSCHE BANK AG NEW YORK BRANCH**

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

**ANNEX B**

**FORM OF NON-EXTENSION DRAWING REQUEST**

Date:

**Zurich American Insurance Company**
500 Enterprise Drive
Rocky Hill, Connecticut 06067
Attention: Commercial Surety Underwriting
Facsimile: _____

Drawn under Zurich American Insurance Company
Performance Bond No. LPM9181831
Dated November 9, 2015

Each of the undersigned individuals, authorized officers of Deutsche Bank AG New York Branch (the **"Obligee"**), hereby certifies to Zurich American Insurance Company (the **"Surety"**), with reference to the Performance Bond No. LPM9181831 (the **"Bond"**) dated November 9, 2015 issued in favor of the Obligee for the account of Fieldwood Energy LLC (**"Fieldwood"**), as follows (any capitalized term used in this Non-Extension Drawing Request and not defined in this Non-Extension Drawing Request shall have its respective meaning as set forth in the Bond):

      1.     The undersigned is authorized to make this Non-Extension Drawing Request on behalf of the Obligee.

      2.     The Obligee is entitled to make a drawing in the amount of [$_____] pursuant to the terms and conditions of the Bond. Such Drawing Amount does not exceed the amount available for drawing under the Bond, and the time for the Obligee to demand payment under the Bond has not expired.

      3.     The undersigned has been notified that, pursuant to the Decommissioning Agreement dated as of September 30, 2013, among Apache Corporation, Apache Shelf, Inc., Apache Deepwater LLC (collectively "Seller"), Fieldwood and GOM Shelf LLC, as amended, restated or otherwise modified from time to time, (the "Decommissioning Agreement"), Obligee was required to make payment to Seller in the amount of the Drawing Amount under the security issued in favor of Seller as a result of Obligee's election to not extend the security.

      4.     Please remit payment in the amount of [$_____] within ten (10) business days, by wire transfer, to the order of Obligee in accordance with the following payment instructions:

[insert payment instructions]

      IN WITNESS WHEREOF, the undersigned has executed and delivered this Non- Extension Drawing Request on [insert date of Non-Extension Drawing Request].

Obligee:

**DEUTSCHE BANK AG NEW YORK BRANCH**

By: _____
Name: _____
Title: _____


By: _____
Name: _____
Title: _____

**ZURICH AMERICAN INSURANCE COMPANY**
**COLONIAL AMERICAN CASUALTY AND SURETY COMPANY**
**FIDELITY AND DEPOSIT COMPANY OF MARYLAND**
**POWER OF ATTORNEY**

KNOW ALL MEN BY THESE PRESENTS: That the ZURICH AMERICAN INSURANCE COMPANY, a corporation of the State of New York, the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY, a corporation of the State of Maryland, and the FIDELITY AND DEPOSIT COMPANY OF MARYLAND a corporation of the State of Maryland (herein collectively called the "Companies"), by JAMES M. CARROLL, Vice President, in pursuance of authority granted by Article V, Section 8, of the By-Laws of said Companies, which are set forth on the reverse side hereof and are hereby certified to be in full force and effect on the date hereof, do hereby nominate, constitute, and appoint **Richard C. ROSE, Jeremy C. ROSE and Janice H. FENNELL, all** of Knoxville, Tennessee, **EACH** its true and lawful agent and Attorney-in-Fact, to make, execute, seal and deliver, for, and on its behalf as surety, and as its act and deed: **any and all bonds and undertakings**, and the execution of such bonds or undertakings in pursuance of these presents, shall be as binding upon said Companies, as fully and amply, to all intents and purposes, as if they had been duly executed and acknowledged by the regularly elected officers of the ZURICH AMERICAN INSURANCE COMPANY at its office in New York, New York., the regularly elected officers of the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY at its office in Owings Mills, Maryland., and the regularly elected officers of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND at its office in Owings Mills,  Maryland., in their own proper persons.

The said Vice President does hereby certify that the extract set forth on the reverse side hereof is a true copy of Article V, Section 8, of the By-Laws of said Companies, and is now in force.

IN WITNESS WHEREOF, the said Vice-President has hereunto subscribed his/her names and affixed the Corporate Seals of the said ZURICH AMERICAN INSURANCE COMPANY, COLONIAL AMERICAN CASUALTY AND SURETY COMPANY, and FIDELITY AND DEPOSIT COMPANY OF MARYLAND, this 20th day of November, A.D. 2012.

ATTEST:

ZURICH AMERICAN INSURANCE COMPANY
COLONIAL AMERICAN CASUALTY AND SURETY COMPANY
FIDELITY AND DEPOSIT COMPANY OF MARYLAND

  

By:

*Assistant Secretary*
*Gerald F. Haley*

*Vice President*
*James M. Carroll*

State of Maryland
County of Baltimore

On this 20th day of November, A.D. 2012, before the subscriber, a Notary Public of the State of Maryland, duly commissioned and qualified, JAMES M. CARROLL, Vice President, and GERALD F. HALEY, Assistant Secretary, of the Companies, to me personally known to be the individuals and officers described in and who executed the preceding instrument, and acknowledged the execution of same, and being by me duly sworn, deposeth and saith, that he/she is the said officer of the Company aforesaid, and that the seals affixed to the preceding instrument are the Corporate Seals of said Companies, and that the said Corporate Seals and the signature as such officer were duly affixed and subscribed to the said instrument by the authority and direction of the said Corporations.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my Official Seal the day and year first above written.

Constance A. Dunn, Notary Public
My Commission Expires: July 14, 2019

POA-F  164-8135C



**PERFORMANCE BOND**

Bond No . **LPM9181832**

KNOW ALL MEN BY THESE PRESENTS, that **FIELDWOOD ENERGY LLC** ("**Fieldwood**") as Principal and **ZURICH AMERICAN INSURANCE COMPANY**, a corporation duly organized under the laws of New York and duly authorized and licensed to transact the business of suretyship in the United States of America (the "Surety") as Surety, and our administrators, successors and assigns, are held and firmly bound unto **DEUTSCHE BANK AG NEW YORK BRANCH** (the "**Obligee**") in the penal sum of **Sixty-seven Million, Five Hundred Fifty-seven Thousand, Three Hundred Fifty-six and no/100** ($67,557,356) lawful money of the United States of America (the "**Bond Amount**"), for the payment of which well and truly to be made, we bind ourselves, our administrators, successors and assigns, jointly and severally by these presents.

WHEREAS, Fieldwood and its subsidiaries entered into an arrangement with Apache Corporation (the "**Beneficiary**"), among others pursuant to which Fieldwood will perform decommissioning of various oil and gas wells in the Gulf of Mexico and other activities as described in that certain Decommissioning Agreement dated as of September 30, 2013, as amended (the "**Agreement**"); and

WHEREAS, Fieldwood has entered into certain written applications and agreements between the Obligee and Fieldwood dated November 9, 2015 (each as amended, restated, supplemented or otherwise modified, collectively, the "**Reimbursement Agreement**"), under which the Obligee has agreed to provide Obligee's standby letter of credit No. 839BGC1500968 (the "**Security**") to ensure Fieldwood's satisfactory performance of the Agreement to the Beneficiary and Fieldwood has agreed to reimburse the Obligee for any drawings under the Security to the extent that the Obligee is not reimbursed under this Bond.

NOW, THEREFORE, in consideration of the mutual agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Surety hereby agrees in favor of the Obligee as follows:

THE CONDITION OF THIS OBLIGATION IS SUCH that, if Fieldwood shall fully, faithfully and timely perform its obligations under the Agreement, then this obligation to be void (unless an Event of Default (as defined below) shall have occurred or thereafter occurs); otherwise, to remain in full force and effect.

The Surety shall be obligated to make payment under this Bond if the Obligee delivers a written notice to the Surety within the time required hereby (which delivery may occur after the performance of such obligations) that an Event of Default has occurred, provided, however, that this Bond is subject to the following conditions:

1. Event of Default:  An "Event of Default" for purposes of this Bond is the delivery to the Surety by the Obligee of one of the following:

a. A written statement from the Obligee, in the form attached hereto as Annex A, stating that the Beneficiary has made demand upon Obligee under the Security by delivering to the Obligee a written statement in the form of Exhibit "A" to the Security, which shall be taken by Surety as conclusive proof that Fieldwood has failed to perform and reimburse the Beneficiary for Government Decommissioning obligations (as defined in the Agreement); or

b. A written statement from the Obligee, in the form attached hereto as Annex B, stating that the Beneficiary has made demand upon Obligee under the Security by delivering to the Obligee a written statement in the form of Exhibit "B" to the Security arising from the Obligee having notified the Beneficiary of the Obligee's election to not extend the Security, which shall be taken by Surety as conclusive proof that Fieldwood has failed to provide the Beneficiary with replacement security within the time required by the Agreement.

2. Preliminary Notice to Surety: Obligee shall endeavor to notify the Surety, with reasonable promptness, of any facts or circumstances of which Obligee has received actual notice which constitute an Event of Default. Such preliminary notice is not, however, a condition precedent of the Surety's obligation under this Bond and failure of the Obligee to so notify the Surety shall not relieve or reduce the Surety's liabilities and obligations to the Obligee under this Bond.

3. Upon the occurrence of an Event of Default, the Surety shall pay to the Obligee the amount demanded in the Obligee's written statement within ten (10) Business Days (as defined below) after receipt of such statement from the Obligee. Each such written statement from the Obligee shall constitute conclusive evidence of the facts stated therein. The Surety irrevocably agrees to pay interest on all Overdue Amounts (as defined below) at the annual rate equal to the Prime Rate (as defined below) of the Obligee such interest to accrue on a daily basis for each day that any Overdue Amount remains unpaid, calculated monthly in arrears and shall be compounded monthly until payment in full by the Surety. The Surety hereby agrees to indemnify and hold harmless the Obligee from and against any and all damages, losses, liabilities and expenses (including, without limitation, reasonable attorneys' fees and disbursements), that may be incurred or sustained by, or asserted or awarded against, the Obligee, in each case arising out of or in connection with or relating to the Surety's failure to pay to the Obligee any amount demanded when due hereunder. For the purposes of this Bond, (a) the term "**Business Day**" means a day on which chartered banks are open for over-the-counter business in the ordinary course in New York, New York and excludes Saturday, Sunday and any other day which is a recognized holiday in the state of New York; (b) the term "**Prime Rate**" means on any day the fluctuating annual rate of interest established from time to time by the Obligee and in effect that day as the reference rate it will use for purposes of determining rates of interest it will charge on loans to customers in the United States and designated as its prime rate; and (c) the term "**Overdue Amounts**" means amounts due and owing to the Obligee by the Surety under this Agreement.

4. This Bond sets forth in full the terms of the Surety's liabilities and obligations to the Obligee under this Bond. Such liabilities and obligations shall not be in any way modified, amended or supplemented by reference to any document or instrument referred to herein, and any such reference shall not be deemed to incorporate herein any document or instrument. The

Surety's liabilities and obligations under this Bond to the Obligee are not subject to any condition or qualification except as expressly set forth herein and are not contingent on any of the following (and shall not be reduced, diminished or eliminated by virtue of any of the following): (a) the ability or inability of the Surety to acquire or perfect any lien or security interest on any asset or property of Fieldwood, (b) the Surety's success or failure in obtaining indemnification from Fieldwood or (c) any other fact or circumstance involving or affecting any one or more of Fieldwood, the Obligee or the Surety (but the Surety reserving all of its rights against Fieldwood).   This Bond constitutes the Surety's primary, absolute and independent obligation to make payment to the Obligee in accordance with the terms hereof, under any and all circumstances, including, without limitation, due to the lack of validity, legality or enforceability of the Agreement, the Reimbursement Agreement or the Security and irrespective of all objections, exceptions, set-offs, counterclaims or defenses of any kind from the Surety, Fieldwood or other third parties.

5. Address for Written Statements and Notice:  Any written statement or notice provided under this Bond shall be in writing and shall be delivered by personal delivery, certified mail, express mail, or overnight courier service to the address of the party set out below and to the attention of the person there indicated, provided that any written statement or notice shall be delivered only by personal delivery or overnight courier in the event that there is a threatened or actual discontinuance or interruption of regular postal service:

    a.  if to the Surety:

        Zurich American Insurance Company
        Zurich Surety
        500 Enterprise Drive, Rocky Hill, Connecticut 06067
        Attention: Commercial Surety Underwriting

        with a copy to:

        Zurich Surety Bond Claims
        1400 American Lane
        Schaumburg, Illinois 60196
        reportsfclaims@zurichna.com

    b.  if to the Obligee:

        Deutsche Bank AG New York Branch
        Cherine Kenawy, Trade Finance Operations
        60 Wall Street, 38th Floor
        Mailstop: NYC60-3817
        New York, NY 10005-2836
        Attention: Standby Letter of Credit Department
        DBNY.standby-LC@db.com

        With a copy to:

        Deutsche Bank AG New York Branch

60 Wall Street
New York, NY 10005
Attention: Mr. Prashant Mehra

c.   if to Fieldwood:

Fieldwood Energy LLC
2000 W Sam Houston Parkway S
Suite 1200
Houston, Texas 77042
Attention: Richard D. Black, Sr. Vice President and General Counsel

and such statement or notice shall be deemed to have been received on the fifth (5th) Business Day if sent by certified mail or express mail and deemed to have been received on the following Business Day if sent by overnight courier or personal delivery. Any party may change its notice address by delivering a notice of such change to the other parties in the manner provided herein.

6.  Limitations on Liability: The liability of the Surety shall not exceed the Bond Amount stated above, plus all costs and expenses required to be paid by the Surety hereunder, regardless of the number of years that this Bond shall continue or be continued in force and the number or amounts of premiums paid by Fieldwood (it being acknowledged and agreed that all premiums and fees payable to the Surety for the issuance and maintenance of this Bond are the sole obligation of Fieldwood and the Obligee shall have no liability therefor). Partial and multiple demands are permitted. The Bond Amount shall be reduced by the amount of any payment made by the Surety under this Bond. It is expressly agreed that in the event any payments are made under this Bond, the Bond Amount (as it may be reduced from time to time as a result of payments that are made as against the Bond) shall be carried over on an annual basis for each subsequent calendar year in which the Bond is renewed.

7.  This Bond is an annual obligation for the term of November 9, 2015 to November 9, 2017. This Bond will be automatically renewed for one year annual terms unless the Obligee and Fieldwood are notified of the Surety's intention to not renew or extend this Bond, written notice of which shall be given by the Surety at least ninety (90) days prior to the then current expiration date of this Bond, such cancellation notice to be provided in accordance with Section 5 above.

8.  If the Surety so notifies the Obligee pursuant to Section 7 that this Bond will not be renewed, the Surety acknowledges that the Obligee may be required to notify the Beneficiary at least sixty (60) days prior to the then current expiration date of the Security of the Obligee's election not to extend the Security and that the Beneficiary shall then be entitled to demand payment under the Security in accordance with the Agreement. To ensure that the Obligee will have sufficient time to make written demand for payment under this Bond in the event the Beneficiary has demanded payment under the Security prior to the latest date the Beneficiary is entitled to make a drawing under the Security, the Surety agrees that if the Beneficiary is entitled to make a drawing under the Security after the then applicable expiration date of the Security for any reason, including, without limitation, the application of applicable laws, rules and regulations relating to letters of credit, the Obligee shall be

given an additional amount of time (equal to the amount of such additional time given to the Beneficiary) to make its written demand on the Surety for payment under this Bond.

9. In the event Fieldwood fails to provide replacement security or other form of collateral acceptable in the Obligee's sole discretion, the Obligee may make written demand for payment under this Bond. Upon payment by the Surety to the Obligee pursuant to this Section 9, the Obligee shall hold such payment in a cash collateral account on the basis that if the Beneficiary makes a demand under the Security issued by the Obligee, the Obligee shall be entitled to appropriate and apply the relevant amount(s) from such cash collateral to make payment to the Beneficiary with the net balance remaining in such cash collateral account being returned by the Obligee to the Surety (or to the representatives of the Surety) when the Obligee has no further obligations or liabilities to the Beneficiary under such Security.

10. This Bond shall be governed by and construed in accordance with the law of the State of New York (without reference to conflict of law doctrine), and the parties submit to the nonexclusive jurisdiction of the courts of the State of New York located in the County of New York.

11. No right of action shall accrue on this Bond to or for the use of any person or corporation other than the Obligee named herein and the administrators, successors and assigns of the Obligee.

12. The Surety hereby represents that it has the power and requisite authority to execute, deliver and perform its obligations under this Bond. The Surety is duly authorized to, and has taken all action necessary to authorize it to, perform its obligations under this Bond and is and will continue to be duly authorized to enter into this Bond and to perform its obligations under this Bond. This Bond is the legal and binding obligation of the Surety enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance or similar laws affecting creditors' rights generally and general principles of equity (regardless of whether the application of such principles is considered in a proceeding in equity or at law).

SIGNED, SEALED AND DATED this 9th day of November, 2015.

**FIELDWOOD ENERGY LLC**
(Fieldwood)

By: _____

Name: G. M. McCarroll

Title: President and Chief Executive Officer

**ZURICH AMERICAN INSURANCE COMPANY**
(Surety)

By: _____

Name: Janice H. Fennell

Title: Attorney-in-Fact

## ANNEX A

## FORM OF DEMAND UNDER PERFORMANCE BOND

Date:

**Zurich American Insurance Company**
500 Enterprise Drive
Rocky Hill, Connecticut 06067
Attention: Commercial Surety Underwriting
Facsimile: _____

Re:   Performance Bond No. LPM9181832 (the "**Bond**")

Each of the undersigned individuals, authorized officers of Deutsche Bank AG New York Branch (the "**Obligee**"), hereby certifies to Zurich American Insurance Company (the "**Surety**"), with reference to the Performance Bond No. LPM9181832 (the "**Bond**") dated November 9, 2015 issued in favor of the Obligee by the Surety for the account of Fieldwood Energy LLC ("**Fieldwood**"), as follows (any capitalized term used in this Demand Under Performance Bond and not defined herein shall have its respective meaning as set forth in the Bond):

1.      The undersigned is authorized to make this Demand Under Performance Bond on behalf of the Obligee.

2.      The Obligee is entitled to make a drawing in the amount of [$_____] (the "**Drawing Amount**") pursuant to the terms and conditions of the Bond.  Such Drawing Amount does not exceed the amount available for drawing under the Bond, and the time for the Obligee to demand payment under the Bond has not expired.

3.      The undersigned has been notified that, pursuant to the Decommissioning Agreement dated as of September 30, 2013, among Apache Corporation, Apache Shelf, Inc., Apache Deepwater LLC (collectively "Seller"), Fieldwood and GOM Shelf LLC, as amended, restated or otherwise modified from time to time (the "Decommissioning Agreement"), Obligee was required to make payment to Seller under a standby letter of credit issued in favor of Seller as a result of Fieldwood's failure to reimburse and pay Seller or its Affiliate for Reimbursable Amounts (as such terms are defined in the Decommissioning Agreement) in the amount of the Drawing Amount within the time period specified in Section 2.7(b) of the Decommissioning Agreement.

4.      Please remit payment in the amount of [$_____] within ten (10) business days, by wire transfer, to the order of Obligee in accordance with the following payment instructions:

[insert payment instructions]

IN WITNESS WHEREOF, the undersigned has executed and delivered this Demand Under Performance Bond on [insert date of the Demand Under Performance Bond].

**Obligee:**

**DEUTSCHE BANK AG NEW YORK BRANCH**

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

**ANNEX B**

**FORM OF NON-EXTENSION DRAWING REQUEST**

Date:

**Zurich American Insurance Company**
500 Enterprise Drive
Rocky Hill, Connecticut 06067
Attention: Commercial Surety Underwriting
Facsimile: _____

Drawn under Zurich American Insurance Company
Performance Bond No. LPM9181832
Dated November 9, 2015

Each of the undersigned individuals, authorized officers of Deutsche Bank AG New York Branch (the **"Obligee"**), hereby certifies to Zurich American Insurance Company (the **"Surety"**), with reference to the Performance Bond No. LPM9181832 (the **"Bond"**) dated November 9, 2015 issued in favor of the Obligee for the account of Fieldwood Energy LLC (**"Fieldwood"**), as follows (any capitalized term used in this Non-Extension Drawing Request and not defined in this Non-Extension Drawing Request shall have its respective meaning as set forth in the Bond):

    1.    The undersigned is authorized to make this Non-Extension Drawing Request on behalf of the Obligee.

    2.    The Obligee is entitled to make a drawing in the amount of [$_____] pursuant to the terms and conditions of the Bond. Such Drawing Amount does not exceed the amount available for drawing under the Bond, and the time for the Obligee to demand payment under the Bond has not expired.

    3.    The undersigned has been notified that, pursuant to the Decommissioning Agreement dated as of September 30, 2013, among Apache Corporation, Apache Shelf, Inc., Apache Deepwater LLC (collectively "Seller"), Fieldwood and GOM Shelf LLC, as amended, restated or otherwise modified from time to time, (the "Decommissioning Agreement"), Obligee was required to make payment to Seller in the amount of the Drawing Amount under the security issued in favor of Seller as a result of Obligee's election to not extend the security.

    4.    Please remit payment in the amount of [$_____] within ten (10) business days, by wire transfer, to the order of Obligee in accordance with the following payment instructions:

[insert payment instructions]

    IN WITNESS WHEREOF, the undersigned has executed and delivered this Non- Extension Drawing Request on [insert date of Non-Extension Drawing Request].

Obligee:

**DEUTSCHE BANK AG NEW YORK BRANCH**

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

ZURICH AMERICAN INSURANCE COMPANY
COLONIAL AMERICAN CASUALTY AND SURETY COMPANY
FIDELITY AND DEPOSIT COMPANY OF MARYLAND
POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS: That the ZURICH AMERICAN INSURANCE COMPANY, a corporation of the State of New York, the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY, a corporation of the State of Maryland, and the FIDELITY AND DEPOSIT COMPANY OF MARYLAND a corporation of the State of Maryland (herein collectively called the "Companies"), by **JAMES M. CARROLL, Vice President**, in pursuance of authority granted by Article V, Section 8, of the By-Laws of said Companies, which are set forth on the reverse side hereof and are hereby certified to be in full force and effect on the date hereof, do hereby nominate, constitute, and appoint **Richard C. ROSE, Jeremy C. ROSE and Janice H. FENNELL, all of Knoxville, Tennessee, EACH** its true and lawful agent and Attorney-in-Fact, to make, execute, seal and deliver, for, and on its behalf as surety, and as its act and deed: **any and all bonds and undertakings**, and the execution of such bonds or undertakings in pursuance of these presents, shall be as binding upon said Companies, as fully and amply, to all intents and purposes, as if they had been duly executed and acknowledged by the regularly elected officers of the ZURICH AMERICAN INSURANCE COMPANY at its office in New York, New York., the regularly elected officers of the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY at its office in Owings Mills, Maryland., and the regularly elected officers of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND at its office in Owings Mills,  Maryland., in their own proper persons.

The said Vice President does hereby certify that the extract set forth on the reverse side hereof is a true copy of Article V, Section 8, of the By-Laws of said Companies, and is now in force.

IN WITNESS WHEREOF, the said Vice-President has hereunto subscribed his/her names and affixed the Corporate Seals of the said **ZURICH AMERICAN INSURANCE COMPANY, COLONIAL AMERICAN CASUALTY AND SURETY COMPANY,** and **FIDELITY AND DEPOSIT COMPANY OF MARYLAND**, this 20th day of November, A.D. 2012.

ATTEST:

ZURICH AMERICAN INSURANCE COMPANY
COLONIAL AMERICAN CASUALTY AND SURETY COMPANY
FIDELITY AND DEPOSIT COMPANY OF MARYLAND

  

By:

*Assistant Secretary*
*Gerald F. Haley*

*Vice President*
*James M. Carroll*

State of Maryland
County of Baltimore

On this 20th day of November, A.D. 2012, before the subscriber, a Notary Public of the State of Maryland, duly commissioned and qualified, JAMES M. CARROLL, Vice President, and GERALD F. HALEY, Assistant Secretary, of the Companies, to me personally known to be the individuals and officers described in and who executed the preceding instrument, and acknowledged the execution of same, and being by me duly sworn, deposeth and saith, that he/she is the said officer of the Company aforesaid, and that the seals affixed to the preceding instrument are the Corporate Seals of said Companies, and that the said Corporate Seals and the signature as such officer were duly affixed and subscribed to the said instrument by the authority and direction of the said Corporations.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my Official Seal the day and year first above written.

Constance A. Dunn, Notary Public
My Commission Expires: July 14, 2019.

POA-F 164-6135C



# PERFORMANCE BOND

Bond No . LPM9181833

KNOW ALL MEN BY THESE PRESENTS, that FIELDWOOD ENERGY LLC ("Fieldwood") as Principal and ZURICH AMERICAN INSURANCE COMPANY, a corporation duly organized under the laws of New York and duly authorized and licensed to transact the business of suretyship in the United States of America (the "**Surety**") as Surety, and our administrators, successors and assigns, are held and firmly bound unto DEUTSCHE BANK AG NEW YORK BRANCH (the "**Obligee**") in the penal sum of Sixty-seven Million, Five Hundred Fifty-seven Thousand, Three Hundred Fifty-six and no/100 ($67,557,356) lawful money of the United States of America (the "Bond Amount"), for the payment of which well and truly to be made, we bind ourselves, our administrators, successors and assigns, jointly and severally by these presents.

WHEREAS, Fieldwood and its subsidiaries entered into an arrangement with Apache Corporation (the "**Beneficiary**"), among others pursuant to which Fieldwood will perform decommissioning of various oil and gas wells in the Gulf of Mexico and other activities as described in that certain Decommissioning Agreement dated as of September 30, 2013, as amended (the "**Agreement**"); and

WHEREAS, Fieldwood has entered into certain written applications and agreements between the Obligee and Fieldwood dated November 9, 2015 (each as amended, restated, supplemented or otherwise modified, collectively, the "**Reimbursement Agreement**"), under which the Obligee has agreed to provide Obligee's standby letter of credit No. 839BGC1500969 (the "**Security**") to ensure Fieldwood's satisfactory performance of the Agreement to the Beneficiary and Fieldwood has agreed to reimburse the Obligee for any drawings under the Security to the extent that the Obligee is not reimbursed under this Bond.

NOW, THEREFORE, in consideration of the mutual agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Surety hereby agrees in favor of the Obligee as follows:

THE CONDITION OF THIS OBLIGATION IS SUCH that, if Fieldwood shall fully, faithfully and timely perform its obligations under the Agreement, then this obligation to be void (unless an Event of Default (as defined below) shall have occurred or thereafter occurs); otherwise, to remain in full force and effect.

The Surety shall be obligated to make payment under this Bond if the Obligee delivers a written notice to the Surety within the time required hereby (which delivery may occur after the performance of such obligations) that an Event of Default has occurred, provided, however, that this Bond is subject to the following conditions:

1. Event of Default: An "Event of Default" for purposes of this Bond is the delivery to the Surety by the Obligee of one of the following:

a.  A written statement from the Obligee, in the form attached hereto as Annex A, stating that the Beneficiary has made demand upon Obligee under the Security by delivering to the Obligee a written statement in the form of Exhibit "A" to the Security, which shall be taken by Surety as conclusive proof that Fieldwood has failed to perform and reimburse the Beneficiary for Government Decommissioning obligations (as defined in the Agreement); or

b.  A written statement from the Obligee, in the form attached hereto as Annex B, stating that the Beneficiary has made demand upon Obligee under the Security by delivering to the Obligee a written statement in the form of Exhibit "B" to the Security arising from the Obligee having notified the Beneficiary of the Obligee's election to not extend the Security, which shall be taken by Surety as conclusive proof that Fieldwood has failed to provide the Beneficiary with replacement security within the time required by the Agreement.

2.  Preliminary Notice to Surety:  Obligee shall endeavor to notify the Surety, with reasonable promptness, of any facts or circumstances of which Obligee has received actual notice which constitute an Event of Default.  Such preliminary notice is not, however, a condition precedent of the Surety's obligation under this Bond and failure of the Obligee to so notify the Surety shall not relieve or reduce the Surety's liabilities and obligations to the Obligee under this Bond.

3.  Upon the occurrence of an Event of Default, the Surety shall pay to the Obligee the amount demanded in the Obligee's written statement within ten (10) Business Days (as defined below) after receipt of such statement from the Obligee. Each such written statement from the Obligee shall constitute conclusive evidence of the facts stated therein.  The Surety irrevocably agrees to pay interest on all Overdue Amounts (as defined below) at the annual rate equal to the Prime Rate (as defined below) of the Obligee such interest to accrue on a daily basis for each day that any Overdue Amount remains unpaid, calculated monthly in arrears and shall be compounded monthly until payment in full by the Surety.  The Surety hereby agrees to indemnify and hold harmless the Obligee from and against any and all damages, losses, liabilities and expenses (including, without limitation, reasonable attorneys' fees and disbursements), that may be incurred or sustained by, or asserted or awarded against, the Obligee, in each case arising out of or in connection with or relating to the Surety's failure to pay to the Obligee any amount demanded when due hereunder.  For the purposes of this Bond, (a) the term "**Business Day**" means a day on which chartered banks are open for over-the-counter business in the ordinary course in New York, New York and excludes Saturday, Sunday and any other day which is a recognized holiday in the state of New York; (b) the term "**Prime Rate**" means on any day the fluctuating annual rate of interest established from time to time by the Obligee and in effect that day as the reference rate it will use for purposes of determining rates of interest it will charge on loans to customers in the United States and designated as its prime rate; and (c) the term "**Overdue Amounts**" means amounts due and owing to the Obligee by the Surety under this Agreement.

4.  This Bond sets forth in full the terms of the Surety's liabilities and obligations to the Obligee under this Bond. Such liabilities and obligations shall not be in any way modified, amended or supplemented by reference to any document or instrument referred to herein, and any such reference shall not be deemed to incorporate herein any document or instrument.  The

Surety's liabilities and obligations under this Bond to the Obligee are not subject to any condition or qualification except as expressly set forth herein and are not contingent on any of the following (and shall not be reduced, diminished or eliminated by virtue of any of the following): (a) the ability or inability of the Surety to acquire or perfect any lien or security interest on any asset or property of Fieldwood, (b) the Surety's success or failure in obtaining indemnification from Fieldwood or (c) any other fact or circumstance involving or affecting any one or more of Fieldwood, the Obligee or the Surety (but the Surety reserving all of its rights against Fieldwood). This Bond constitutes the Surety's primary, absolute and independent obligation to make payment to the Obligee in accordance with the terms hereof, under any and all circumstances, including, without limitation, due to the lack of validity, legality or enforceability of the Agreement, the Reimbursement Agreement or the Security and irrespective of all objections, exceptions, set-offs, counterclaims or defenses of any kind from the Surety, Fieldwood or other third parties.

5.  Address for Written Statements and Notice: Any written statement or notice provided under this Bond shall be in writing and shall be delivered by personal delivery, certified mail, express mail, or overnight courier service to the address of the party set out below and to the attention of the person there indicated, provided that any written statement or notice shall be delivered only by personal delivery or overnight courier in the event that there is a threatened or actual discontinuance or interruption of regular postal service:

    a.  if to the Surety:

        Zurich American Insurance Company
        Zurich Surety
        500 Enterprise Drive, Rocky Hill, Connecticut 06067
        Attention: Commercial Surety Underwriting

        with a copy to:

        Zurich Surety Bond Claims
        1400 American Lane
        Schaumburg, Illinois 60196
        reportsfclaims@zurichna.com

    b.  if to the Obligee:

        Deutsche Bank AG New York Branch
        Cherine Kenawy, Trade Finance Operations
        60 Wall Street, 38th Floor
        Mailstop: NYC60-3817
        New York, NY 10005-2836
        Attention: Standby Letter of Credit Department
        DBNY.standby-LC@db.com

        With a copy to:

        Deutsche Bank AG New York Branch

60 Wall Street
New York, NY 10005
Attention: Mr. Prashant Mehra

c.   if to Fieldwood:

Fieldwood Energy LLC
2000 W Sam Houston Parkway S
Suite 1200
Houston, Texas 77042
Attention: Richard D. Black, Sr. Vice President and General Counsel

and such statement or notice shall be deemed to have been received on the fifth (5th) Business Day if sent by certified mail or express mail and deemed to have been received on the following Business Day if sent by overnight courier or personal delivery.  Any party may change its notice address by delivering a notice of such change to the other parties in the manner provided herein.

6.   Limitations on Liability: The liability of the Surety shall not exceed the Bond Amount stated above, plus all costs and expenses required to be paid by the Surety hereunder, regardless of the number of years that this Bond shall continue or be continued in force and the number or amounts of premiums paid by Fieldwood (it being acknowledged and agreed that all premiums and fees payable to the Surety for the issuance and maintenance of this Bond are the sole obligation of Fieldwood and the Obligee shall have no liability therefor).  Partial and multiple demands are permitted.  The Bond Amount shall be reduced by the amount of any payment made by the Surety under this Bond.  It is expressly agreed that in the event any payments are made under this Bond, the Bond Amount (as it may be reduced from time to time as a result of payments that are made as against the Bond) shall be carried over on an annual basis for each subsequent calendar year in which the Bond is renewed.

7.   This Bond is an annual obligation for the term of November 9, 2015 to November 9, 2017. This Bond will be automatically renewed for one year annual terms unless the Obligee and Fieldwood are notified of the Surety's intention to not renew or extend this Bond, written notice of which shall be given by the Surety at least ninety (90) days prior to the then current expiration date of this Bond, such cancellation notice to be provided in accordance with Section 5 above.

8.   If the Surety so notifies the Obligee pursuant to Section 7 that this Bond will not be renewed, the Surety acknowledges that the Obligee may be required to notify the Beneficiary at least sixty (60) days prior to the then current expiration date of the Security of the Obligee's election not to extend the Security and that the Beneficiary shall then be entitled to demand payment under the Security in accordance with the Agreement.  To ensure that the Obligee will have sufficient time to make written demand for payment under this Bond in the event the Beneficiary has demanded payment under the Security prior to the latest date the Beneficiary is entitled to make a drawing under the Security, the Surety agrees that if the Beneficiary is entitled to make a drawing under the Security after the then applicable expiration date of the Security for any reason, including, without limitation, the application of applicable laws, rules and regulations relating to letters of credit, the Obligee shall be

given an additional amount of time (equal to the amount of such additional time given to the Beneficiary) to make its written demand on the Surety for payment under this Bond.

9. In the event Fieldwood fails to provide replacement security or other form of collateral acceptable in the Obligee's sole discretion, the Obligee may make written demand for payment under this Bond. Upon payment by the Surety to the Obligee pursuant to this Section 9, the Obligee shall hold such payment in a cash collateral account on the basis that if the Beneficiary makes a demand under the Security issued by the Obligee, the Obligee shall be entitled to appropriate and apply the relevant amount(s) from such cash collateral to make payment to the Beneficiary with the net balance remaining in such cash collateral account being returned by the Obligee to the Surety (or to the representatives of the Surety) when the Obligee has no further obligations or liabilities to the Beneficiary under such Security.

10. This Bond shall be governed by and construed in accordance with the law of the State of New York (without reference to conflict of law doctrine), and the parties submit to the nonexclusive jurisdiction of the courts of the State of New York located in the County of New York.

11. No right of action shall accrue on this Bond to or for the use of any person or corporation other than the Obligee named herein and the administrators, successors and assigns of the Obligee.

12. The Surety hereby represents that it has the power and requisite authority to execute, deliver and perform its obligations under this Bond. The Surety is duly authorized to, and has taken all action necessary to authorize it to, perform its obligations under this Bond and is and will continue to be duly authorized to enter into this Bond and to perform its obligations under this Bond. This Bond is the legal and binding obligation of the Surety enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance or similar laws affecting creditors' rights generally and general principles of equity (regardless of whether the application of such principles is considered in a proceeding in equity or at law).

SIGNED, SEALED AND DATED this 9th day of November, 2015.

**FIELDWOOD ENERGY LLC**
(Fieldwood)

By: _____
Name: G. M. McCarroll
Title: President and Chief Executive Officer

**ZURICH AMERICAN INSURANCE COMPANY**
(Surety)

By: _____
Name: Janice H. Fennell
Title: Attorney-in-Fact

## ANNEX A

## FORM OF DEMAND UNDER PERFORMANCE BOND

Date:

**Zurich American Insurance Company**
500 Enterprise Drive
Rocky Hill, Connecticut 06067
Attention: Commercial Surety Underwriting
Facsimile: _____

Re:     Performance Bond No. LPM9181833 (the "**Bond**")

Each of the undersigned individuals, authorized officers of Deutsche Bank AG New York Branch (the "**Obligee**"), hereby certifies to Zurich American Insurance Company (the "**Surety**"), with reference to the Performance Bond No. LPM9181833 (the "**Bond**") dated November 9, 2015 issued in favor of the Obligee by the Surety for the account of Fieldwood Energy LLC ("**Fieldwood**"), as follows (any capitalized term used in this Demand Under Performance Bond and not defined herein shall have its respective meaning as set forth in the Bond):

1.      The undersigned is authorized to make this Demand Under Performance Bond on behalf of the Obligee.

2.      The Obligee is entitled to make a drawing in the amount of [$_____] (the "**Drawing Amount**") pursuant to the terms and conditions of the Bond. Such Drawing Amount does not exceed the amount available for drawing under the Bond, and the time for the Obligee to demand payment under the Bond has not expired.

3.      The undersigned has been notified that, pursuant to the Decommissioning Agreement dated as of September 30, 2013, among Apache Corporation, Apache Shelf, Inc., Apache Deepwater LLC (collectively "Seller"), Fieldwood and GOM Shelf LLC, as amended, restated or otherwise modified from time to time (the "Decommissioning Agreement"), Obligee was required to make payment to Seller under a standby letter of credit issued in favor of Seller as a result of Fieldwood's failure to reimburse and pay Seller or its Affiliate for Reimbursable Amounts (as such terms are defined in the Decommissioning Agreement) in the amount of the Drawing Amount within the time period specified in Section 2.7(b) of the Decommissioning Agreement.

4.      Please remit payment in the amount of [$_____] within ten (10) business days, by wire transfer, to the order of Obligee in accordance with the following payment instructions:

[insert payment instructions]

IN WITNESS WHEREOF, the undersigned has executed and delivered this Demand Under Performance Bond on [insert date of the Demand Under Performance Bond].

**Obligee:**

**DEUTSCHE BANK AG NEW YORK BRANCH**

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

## ANNEX B

## FORM OF NON-EXTENSION DRAWING REQUEST

Date:

**Zurich American Insurance Company**
500 Enterprise Drive
Rocky Hill, Connecticut 06067
Attention: Commercial Surety Underwriting
Facsimile:_____

Drawn under Zurich American Insurance Company
Performance Bond No. LPM9181833
Dated November 9, 2015

Each of the undersigned individuals, authorized officers of Deutsche Bank AG New York Branch (the **"Obligee"**), hereby certifies to Zurich American Insurance Company (the **"Surety"**), with reference to the Performance Bond No. LPM9181833 (the **"Bond"**) dated November 9, 2015 issued in favor of the Obligee for the account of Fieldwood Energy LLC (**"Fieldwood"**), as follows (any capitalized term used in this Non-Extension Drawing Request and not defined in this Non-Extension Drawing Request shall have its respective meaning as set forth in the Bond):

      1.    The undersigned is authorized to make this Non-Extension Drawing Request on behalf of the Obligee.

      2.    The Obligee is entitled to make a drawing in the amount of [$_____] pursuant to the terms and conditions of the Bond.  Such Drawing Amount does not exceed the amount available for drawing under the Bond, and the time for the Obligee to demand payment under the Bond has not expired.

      3.    The undersigned has been notified that, pursuant to the Decommissioning Agreement dated as of September 30, 2013, among Apache Corporation, Apache Shelf, Inc., Apache Deepwater LLC (collectively "Seller"), Fieldwood and GOM Shelf LLC, as amended, restated or otherwise modified from time to time, (the "Decommissioning Agreement"), Obligee was required to make payment to Seller in the amount of the Drawing Amount under the security issued in favor of Seller as a result of Obligee's election to not extend the security.

      4.    Please remit payment in the amount of [$_____] within ten (10) business days, by wire transfer, to the order of Obligee in accordance with the following payment instructions:

[insert payment instructions]

      IN WITNESS WHEREOF, the undersigned has executed and delivered this Non- Extension Drawing Request on [insert date of Non-Extension Drawing Request].

Obligee:

**DEUTSCHE BANK AG NEW YORK BRANCH**

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

ZURICH AMERICAN INSURANCE COMPANY
COLONIAL AMERICAN CASUALTY AND SURETY COMPANY
FIDELITY AND DEPOSIT COMPANY OF MARYLAND
**POWER OF ATTORNEY**

KNOW ALL MEN BY THESE PRESENTS: That the ZURICH AMERICAN INSURANCE COMPANY, a corporation of the State of New York, the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY, a corporation of the State of Maryland, and the FIDELITY AND DEPOSIT COMPANY OF MARYLAND a corporation of the State of Maryland (herein collectively called the "Companies"), by **JAMES M. CARROLL**, Vice President, in pursuance of authority granted by Article V, Section 8, of the By-Laws of said Companies, which are set forth on the reverse side hereof and are hereby certified to be in full force and effect on the date hereof, do hereby nominate, constitute, and appoint **Richard C. ROSE, Jeremy C. ROSE and Janice H. FENNELL**, all of Knoxville, Tennessee, EACH its true and lawful agent and Attorney-in-Fact, to make, execute, seal and deliver, for, and on its behalf as surety, and as its act and deed: any **and all bonds and undertakings**, and the execution of such bonds or undertakings in pursuance of these presents, shall be as binding upon said Companies, as fully and amply, to all intents and purposes, as if they had been duly executed and acknowledged by the regularly elected officers of the ZURICH AMERICAN INSURANCE COMPANY at its office in New York, New York., the regularly elected officers of the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY at its office in Owings Mills, Maryland., and the regularly elected officers of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND at its office in Owings Mills,  Maryland., in their own proper persons.

The said Vice President does hereby certify that the extract set forth on the reverse side hereof is a true copy of Article V, Section 8, of the By-Laws of said Companies. and is now in force.

IN WITNESS WHEREOF, the said Vice-President has hereunto subscribed his/her names and affixed the Corporate Seals of the said **ZURICH AMERICAN INSURANCE COMPANY, COLONIAL AMERICAN CASUALTY AND SURETY COMPANY, and FIDELITY AND DEPOSIT COMPANY OF MARYLAND**, this 20th day of November, A.D. 2012.

ATTEST:

ZURICH AMERICAN INSURANCE COMPANY
COLONIAL AMERICAN CASUALTY AND SURETY COMPANY
FIDELITY AND DEPOSIT COMPANY OF MARYLAND



By: _____

*Assistant Secretary*
*Gerald F. Haley*

_____

*Vice President*
*James M. Carroll*

State of Maryland
County of Baltimore
On this 20th day of November, A.D. 2012, before the subscriber, a Notary Public of the State of Maryland, duly commissioned and qualified, **JAMES M. CARROLL**, Vice President, and GERALD F. HALEY, Assistant Secretary, of the Companies, to me personally known to be the individuals and officers described in and who executed the preceding instrument, and acknowledged the execution of same, and being by me duly sworn, deposeth and saith, that he/she is the said officer of the Company aforesaid, and that the seals affixed to the preceding instrument are the Corporate Seals of said Companies, and that the said Corporate Seals and the signature as such officer were duly affixed and subscribed to the said instrument by the authority and direction of the said Corporations.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my Official Seal the day and year first above written.

_____
Constance A. Dunn, Notary Public
My Commission Expires: July 14, 2019

POA-F  164-6135C



**ZURICH**

# PERFORMANCE BOND

Bond No . **LPM9181834**

KNOW ALL MEN BY THESE PRESENTS, that **FIELDWOOD ENERGY LLC** ("**Fieldwood**") as Principal and **ZURICH AMERICAN INSURANCE COMPANY**, a corporation duly organized under the laws of New York and duly authorized and licensed to transact the business of suretyship in the United States of America (the "**Surety**") as Surety, and our administrators, successors and assigns, are held and firmly bound unto **DEUTSCHE BANK AG NEW YORK BRANCH** (the "**Obligee**") in the penal sum of **Sixty-seven Million, Five Hundred Fifty-seven Thousand, Three Hundred Fifty-seven and no/100** (**$67,557,357**) lawful money of the United States of America (the "**Bond Amount**"), for the payment of which well and truly to be made, we bind ourselves, our administrators, successors and assigns, jointly and severally by these presents.

WHEREAS, Fieldwood and its subsidiaries entered into an arrangement with Apache Corporation (the "**Beneficiary**"), among others pursuant to which Fieldwood will perform decommissioning of various oil and gas wells in the Gulf of Mexico and other activities as described in that certain Decommissioning Agreement dated as of September 30, 2013, as amended (the "**Agreement**"); and

WHEREAS, Fieldwood has entered into certain written applications and agreements between the Obligee and Fieldwood dated November 9, 2015 (each as amended, restated, supplemented or otherwise modified, collectively, the "**Reimbursement Agreement**"), under which the Obligee has agreed to provide Obligee's standby letter of credit No. 839BGC1500970 (the "**Security**") to ensure Fieldwood's satisfactory performance of the Agreement to the Beneficiary and Fieldwood has agreed to reimburse the Obligee for any drawings under the Security to the extent that the Obligee is not reimbursed under this Bond.

NOW, THEREFORE, in consideration of the mutual agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Surety hereby agrees in favor of the Obligee as follows:

THE CONDITION OF THIS OBLIGATION IS SUCH that, if Fieldwood shall fully, faithfully and timely perform its obligations under the Agreement, then this obligation to be void (unless an Event of Default (as defined below) shall have occurred or thereafter occurs); otherwise, to remain in full force and effect.

The Surety shall be obligated to make payment under this Bond if the Obligee delivers a written notice to the Surety within the time required hereby (which delivery may occur after the performance of such obligations) that an Event of Default has occurred, provided, however, that this Bond is subject to the following conditions:

1. Event of Default: An "Event of Default" for purposes of this Bond is the delivery to the Surety by the Obligee of one of the following:

   a. A written statement from the Obligee, in the form attached hereto as Annex A, stating that the Beneficiary has made demand upon Obligee under the Security by delivering to the Obligee a written statement in the form of Exhibit "A" to the Security, which shall be taken by Surety as conclusive proof that Fieldwood has failed to perform and reimburse the Beneficiary for Government Decommissioning obligations (as defined in the Agreement); or

   b. A written statement from the Obligee, in the form attached hereto as Annex B, stating that the Beneficiary has made demand upon Obligee under the Security by delivering to the Obligee a written statement in the form of Exhibit "B" to the Security arising from the Obligee having notified the Beneficiary of the Obligee's election to not extend the Security, which shall be taken by Surety as conclusive proof that Fieldwood has failed to provide the Beneficiary with replacement security within the time required by the Agreement.

2. Preliminary Notice to Surety: Obligee shall endeavor to notify the Surety, with reasonable promptness, of any facts or circumstances of which Obligee has received actual notice which constitute an Event of Default. Such preliminary notice is not, however, a condition precedent of the Surety's obligation under this Bond and failure of the Obligee to so notify the Surety shall not relieve or reduce the Surety's liabilities and obligations to the Obligee under this Bond.

3. Upon the occurrence of an Event of Default, the Surety shall pay to the Obligee the amount demanded in the Obligee's written statement within ten (10) Business Days (as defined below) after receipt of such statement from the Obligee. Each such written statement from the Obligee shall constitute conclusive evidence of the facts stated therein. The Surety irrevocably agrees to pay interest on all Overdue Amounts (as defined below) at the annual rate equal to the Prime Rate (as defined below) of the Obligee such interest to accrue on a daily basis for each day that any Overdue Amount remains unpaid, calculated monthly in arrears and shall be compounded monthly until payment in full by the Surety. The Surety hereby agrees to indemnify and hold harmless the Obligee from and against any and all damages, losses, liabilities and expenses (including, without limitation, reasonable attorneys' fees and disbursements), that may be incurred or sustained by, or asserted or awarded against, the Obligee, in each case arising out of or in connection with or relating to the Surety's failure to pay to the Obligee any amount demanded when due hereunder. For the purposes of this Bond, (a) the term "**Business Day**" means a day on which chartered banks are open for over-the-counter business in the ordinary course in New York, New York and excludes Saturday, Sunday and any other day which is a recognized holiday in the state of New York; (b) the term "**Prime Rate**" means on any day the fluctuating annual rate of interest established from time to time by the Obligee and in effect that day as the reference rate it will use for purposes of determining rates of interest it will charge on loans to customers in the United States and designated as its prime rate; and (c) the term "**Overdue Amounts**" means amounts due and owing to the Obligee by the Surety under this Agreement.

4. This Bond sets forth in full the terms of the Surety's liabilities and obligations to the Obligee under this Bond. Such liabilities and obligations shall not be in any way modified, amended or supplemented by reference to any document or instrument referred to herein, and any such reference shall not be deemed to incorporate herein any document or instrument. The

Surety's liabilities and obligations under this Bond to the Obligee are not subject to any condition or qualification except as expressly set forth herein and are not contingent on any of the following (and shall not be reduced, diminished or eliminated by virtue of any of the following): (a) the ability or inability of the Surety to acquire or perfect any lien or security interest on any asset or property of Fieldwood, (b) the Surety's success or failure in obtaining indemnification from Fieldwood or (c) any other fact or circumstance involving or affecting any one or more of Fieldwood, the Obligee or the Surety (but the Surety reserving all of its rights against Fieldwood).   This Bond constitutes the Surety's primary, absolute and independent obligation to make payment to the Obligee in accordance with the terms hereof, under any and all circumstances, including, without limitation, due to the lack of validity, legality or enforceability of the Agreement, the Reimbursement Agreement or the Security and irrespective of all objections, exceptions, set-offs, counterclaims or defenses of any kind from the Surety, Fieldwood or other third parties.

5.  Address for Written Statements and Notice:  Any written statement or notice provided under this Bond shall be in writing and shall be delivered by personal delivery, certified mail, express mail, or overnight courier service to the address of the party set out below and to the attention of the person there indicated, provided that any written statement or notice shall be delivered only by personal delivery or overnight courier in the event that there is a threatened or actual discontinuance or interruption of regular postal service:

    a.  if to the Surety:

        Zurich American Insurance Company
        Zurich Surety
        500 Enterprise Drive, Rocky Hill, Connecticut 06067
        Attention: Commercial Surety Underwriting

        with a copy to:

        Zurich Surety Bond Claims
        1400 American Lane
        Schaumburg, Illinois 60196
        reportsfclaims@zurichna.com

    b.  if to the Obligee:

        Deutsche Bank AG New York Branch
        Cherine Kenawy, Trade Finance Operations
        60 Wall Street, 38th Floor
        Mailstop: NYC60-3817
        New York, NY 10005-2836
        Attention: Standby Letter of Credit Department
        DBNY.standby-LC@db.com

        With a copy to:

        Deutsche Bank AG New York Branch

60 Wall Street
New York, NY 10005
Attention: Mr. Prashant Mehra

c.  if to Fieldwood:

Fieldwood Energy LLC
2000 W Sam Houston Parkway S
Suite 1200
Houston, Texas 77042
Attention: Richard D. Black, Sr. Vice President and General Counsel

and such statement or notice shall be deemed to have been received on the fifth (5th) Business Day if sent by certified mail or express mail and deemed to have been received on the following Business Day if sent by overnight courier or personal delivery.  Any party may change its notice address by delivering a notice of such change to the other parties in the manner provided herein.

6.  Limitations on Liability:  The liability of the Surety shall not exceed the Bond Amount stated above, plus all costs and expenses required to be paid by the Surety hereunder, regardless of the number of years that this Bond shall continue or be continued in force and the number or amounts of premiums paid by Fieldwood (it being acknowledged and agreed that all premiums and fees payable to the Surety for the issuance and maintenance of this Bond are the sole obligation of Fieldwood and the Obligee shall have no liability therefor).  Partial and multiple demands are permitted.  The Bond Amount shall be reduced by the amount of any payment made by the Surety under this Bond.  It is expressly agreed that in the event any payments are made under this Bond, the Bond Amount (as it may be reduced from time to time as a result of payments that are made as against the Bond) shall be carried over on an annual basis for each subsequent calendar year in which the Bond is renewed.

7.  This Bond is an annual obligation for the term of November 9, 2015 to November 9, 2017. This Bond will be automatically renewed for one year annual terms unless the Obligee and Fieldwood are notified of the Surety's intention to not renew or extend this Bond, written notice of which shall be given by the Surety at least ninety (90) days prior to the then current expiration date of this Bond, such cancellation notice to be provided in accordance with Section 5 above.

8.  If the Surety so notifies the Obligee pursuant to Section 7 that this Bond will not be renewed, the Surety acknowledges that the Obligee may be required to notify the Beneficiary at least sixty (60) days prior to the then current expiration date of the Security of the Obligee's election not to extend the Security and that the Beneficiary shall then be entitled to demand payment under the Security in accordance with the Agreement.  To ensure that the Obligee will have sufficient time to make written demand for payment under this Bond in the event the Beneficiary has demanded payment under the Security prior to the latest date the Beneficiary is entitled to make a drawing under the Security, the Surety agrees that if the Beneficiary is entitled to make a drawing under the Security after the then applicable expiration date of the Security for any reason, including, without limitation, the application of applicable laws, rules and regulations relating to letters of credit, the Obligee shall be

given an additional amount of time (equal to the amount of such additional time given to the Beneficiary) to make its written demand on the Surety for payment under this Bond.

9.  In the event Fieldwood fails to provide replacement security or other form of collateral acceptable in the Obligee's sole discretion, the Obligee may make written demand for payment under this Bond.  Upon payment by the Surety to the Obligee pursuant to this Section 9, the Obligee shall hold such payment in a cash collateral account on the basis that if the Beneficiary makes a demand under the Security issued by the Obligee, the Obligee shall be entitled to appropriate and apply the relevant amount(s) from such cash collateral to make payment to the Beneficiary with the net balance remaining in such cash collateral account being returned by the Obligee to the Surety (or to the representatives of the Surety) when the Obligee has no further obligations or liabilities to the Beneficiary under such Security.

10. This Bond shall be governed by and construed in accordance with the law of the State of New York (without reference to conflict of law doctrine), and the parties submit to the nonexclusive jurisdiction of the courts of the State of New York located in the County of New York.

11. No right of action shall accrue on this Bond to or for the use of any person or corporation other than the Obligee named herein and the administrators, successors and assigns of the Obligee.

12. The Surety hereby represents that it has the power and requisite authority to execute, deliver and perform its obligations under this Bond.  The Surety is duly authorized to, and has taken all action necessary to authorize it to, perform its obligations under this Bond and is and will continue to be duly authorized to enter into this Bond and to perform its obligations under this Bond. This Bond is the legal and binding obligation of the Surety enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance or similar laws affecting creditors' rights generally and general principles of equity (regardless of whether the application of such principles is considered in a proceeding in equity or at law).

SIGNED, SEALED AND DATED this 9th day of November, 2015.


**FIELDWOOD ENERGY LLC**
(Fieldwood)

By: _____
Name:  G. M. McCarroll
Title:   President and Chief Executive Officer


**ZURICH AMERICAN INSURANCE COMPANY**
(Surety)

By: _____
Name:  Janice H. Fennell
Title:   Attorney-in-Fact

ANNEX A

## FORM OF DEMAND UNDER PERFORMANCE BOND

Date:

**Zurich American Insurance Company**
500 Enterprise Drive
Rocky Hill, Connecticut 06067
Attention: Commercial Surety Underwriting
Facsimile: _____

Re:     Performance Bond No. LPM9181834 (the "**Bond**")

Each of the undersigned individuals, authorized officers of Deutsche Bank AG New York Branch (the "**Obligee**"), hereby certifies to Zurich American Insurance Company (the "**Surety**"), with reference to the Performance Bond No. LPM9181834 (the "**Bond**") dated November 9, 2015 issued in favor of the Obligee by the Surety for the account of Fieldwood Energy LLC ("**Fieldwood**"), as follows (any capitalized term used in this Demand Under Performance Bond and not defined herein shall have its respective meaning as set forth in the Bond):

1.     The undersigned is authorized to make this Demand Under Performance Bond on behalf of the Obligee.

2.     The Obligee is entitled to make a drawing in the amount of [$_____] (the "**Drawing Amount**") pursuant to the terms and conditions of the Bond.  Such Drawing Amount does not exceed the amount available for drawing under the Bond, and the time for the Obligee to demand payment under the Bond has not expired.

3.     The undersigned has been notified that, pursuant to the Decommissioning Agreement dated as of September 30, 2013, among Apache Corporation, Apache Shelf, Inc., Apache Deepwater LLC (collectively "Seller"), Fieldwood and GOM Shelf LLC, as amended, restated or otherwise modified from time to time (the "Decommissioning Agreement"), Obligee was required to make payment to Seller under a standby letter of credit issued in favor of Seller as a result of Fieldwood's failure to reimburse and pay Seller or its Affiliate for Reimbursable Amounts (as such terms are defined in the Decommissioning Agreement) in the amount of the Drawing Amount within the time period specified in Section 2.7(b) of the Decommissioning Agreement.

4.     Please remit payment in the amount of [$_____] within ten (10) business days, by wire transfer, to the order of Obligee in accordance with the following payment instructions:

[insert payment instructions]

IN WITNESS WHEREOF, the undersigned has executed and delivered this Demand Under Performance Bond on [insert date of the Demand Under Performance Bond].

**Obligee:**

**DEUTSCHE BANK AG NEW YORK BRANCH**

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

## ANNEX B

## FORM OF NON-EXTENSION DRAWING REQUEST

Date:

**Zurich American Insurance Company**
500 Enterprise Drive
Rocky Hill, Connecticut 06067
Attention: Commercial Surety Underwriting
Facsimile:_____

Drawn under Zurich American Insurance Company
Performance Bond No. LPM9181834
Dated November 9, 2015

Each of the undersigned individuals, authorized officers of Deutsche Bank AG New York Branch (the **"Obligee"**), hereby certifies to Zurich American Insurance Company (the **"Surety"**), with reference to the Performance Bond No. LPM9181834 (the **"Bond"**) dated November 9, 2015 issued in favor of the Obligee for the account of Fieldwood Energy LLC (**"Fieldwood"**), as follows (any capitalized term used in this Non-Extension Drawing Request and not defined in this Non-Extension Drawing Request shall have its respective meaning as set forth in the Bond):

      1.    The undersigned is authorized to make this Non-Extension Drawing Request on behalf of the Obligee.

      2.    The Obligee is entitled to make a drawing in the amount of [$_____] pursuant to the terms and conditions of the Bond.  Such Drawing Amount does not exceed the amount available for drawing under the Bond, and the time for the Obligee to demand payment under the Bond has not expired.

      3.    The undersigned has been notified that, pursuant to the Decommissioning Agreement dated as of September 30, 2013, among Apache Corporation, Apache Shelf, Inc., Apache Deepwater LLC (collectively "Seller"), Fieldwood and GOM Shelf LLC, as amended, restated or otherwise modified from time to time, (the "Decommissioning Agreement"), Obligee was required to make payment to Seller in the amount of the Drawing Amount under the security issued in favor of Seller as a result of Obligee's election to not extend the security.

      4.    Please remit payment in the amount of [$_____] within ten (10) business days, by wire transfer, to the order of Obligee in accordance with the following payment instructions:

[insert payment instructions]

IN WITNESS WHEREOF, the undersigned has executed and delivered this Non- Extension Drawing Request on [insert date of Non-Extension Drawing Request].

Obligee:

**DEUTSCHE BANK AG NEW YORK BRANCH**

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

**ZURICH AMERICAN INSURANCE COMPANY**
**COLONIAL AMERICAN CASUALTY AND SURETY COMPANY**
**FIDELITY AND DEPOSIT COMPANY OF MARYLAND**
**POWER OF ATTORNEY**

KNOW ALL MEN BY THESE PRESENTS: That the ZURICH AMERICAN INSURANCE COMPANY, a corporation of the State of New York, the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY, a corporation of the State of Maryland, and the FIDELITY AND DEPOSIT COMPANY OF MARYLAND a corporation of the State of Maryland (herein collectively called the "Companies"), by **JAMES M. CARROLL, Vice President**, in pursuance of authority granted by Article V, Section 8, of the By-Laws of said Companies, which are set forth on the reverse side hereof and are hereby certified to be in full force and effect on the date hereof, do hereby nominate, constitute, and appoint **Richard C. ROSE, Jeremy C. ROSE and Janice H. FENNELL, all of Knoxville, Tennessee, EACH** its true and lawful agent and Attorney-in-Fact, to make, execute, seal and deliver, for, and on its behalf as surety, and as its act and deed: **any and all bonds and undertakings**, and the execution of such bonds or undertakings in pursuance of these presents, shall be as binding upon said Companies, as fully and amply, to all intents and purposes, as if they had been duly executed and acknowledged by the regularly elected officers of the ZURICH AMERICAN INSURANCE COMPANY at its office in New York, New York., the regularly elected officers of the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY at its office in Owings Mills, Maryland., and the regularly elected officers of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND at its office in Owings Mills,  Maryland., in their own proper persons.

The said Vice President does hereby certify that the extract set forth on the reverse side hereof is a true copy of Article V, Section 8, of the By-Laws of said Companies, and is now in force.

IN WITNESS WHEREOF, the said Vice-President has hereunto subscribed his/her names and affixed the Corporate Seals of the said **ZURICH AMERICAN INSURANCE COMPANY, COLONIAL AMERICAN CASUALTY AND SURETY COMPANY**, and **FIDELITY AND DEPOSIT COMPANY OF MARYLAND**, this 20th day of November, A.D. 2012.

ATTEST:

**ZURICH AMERICAN INSURANCE COMPANY**
**COLONIAL AMERICAN CASUALTY AND SURETY COMPANY**
**FIDELITY AND DEPOSIT COMPANY OF MARYLAND**

  

By: _____

*Assistant Secretary*
*Gerald F. Haley*

_____

*Vice President*
*James M. Carroll*

State of Maryland
County of Baltimore
On this 20th day of November, A.D. 2012, before the subscriber, a Notary Public of the State of Maryland, duly commissioned and qualified, **JAMES M. CARROLL, Vice President, and GERALD F. HALEY, Assistant Secretary**, of the Companies, to me personally known to be the individuals and officers described in and who executed the preceding instrument, and acknowledged the execution of same, and being by me duly sworn, deposeth and saith, that he/she is the said officer of the Company aforesaid, and that the seals affixed to the preceding instrument are the Corporate Seals of said Companies, and that the said Corporate Seals and the signature as such officer were duly affixed and subscribed to the said instrument by the authority and direction of the said Corporations.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my Official Seal the day and year first above written.

_____

Constance A. Dunn, Notary Public
My Commission Expires: July 14, 2019

POA-F  164-6135C

# Exhibit 13

Excerpts from the June 25, 2021
Findings of Fact, Conclusions of Law,
and Order, *In re: Fieldwood Energy
LLC*, Case No. 20-33948

ENTERED
06/25/2021

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIELDWOOD ENERGY LLC, *et al.*,** | § | **Case No. 20-33948 (MI)** |
| | § | |
| Debtors.[1] | § | **(Jointly Administered)** |
| | § | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
ORDER (I) CONFIRMING EIGHTH AMENDED JOINT CHAPTER 11
PLAN OF FIELDWOOD ENERGY LLC AND ITS AFFILIATED
DEBTORS AND (II) GRANTING RELATED RELIEF[2]**

**WHEREAS**, Fieldwood Energy LLC ("**FWE**") and each of its affiliated debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), as

"proponents of the plan" within the meaning of section 1129 of title 11 of the United States Code

(the "**Bankruptcy Code**"), filed the *Eighth Amended Joint Chapter 11 Plan of Fieldwood Energy*

*LLC and its Affiliated Debtors*, dated June 25, 2021 (ECF No. 1742) (including any exhibits and

schedules thereto as may be further amended, supplemented, or modified, the "**Plan**") and the

*Disclosure Statement for Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and*

*its Affiliated Debtors*, April 15, 2021 (ECF No. 1285) (the "**Disclosure Statement**");[3]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Dynamic Offshore Resources NS, LLC (0158); Fieldwood Energy LLC (6778); Fieldwood Energy Inc. (4991); Fieldwood Energy Offshore LLC (4494); Fieldwood Onshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); FW GOM Pipeline, Inc. (8440); GOM Shelf LLC (8107); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422).  The Debtors' primary mailing address is 2000 W. Sam Houston Parkway S., Suite 1200, Houston, TX  77042.

[2] This Order remains subject to the review of the Debtors, the RSA parties, and other stakeholders, including, the review and comment of the Required DIP Lenders and Requisite FLTL Lenders.  All rights are reserved.

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan, a copy of which is annexed hereto as **Exhibit A**.  Any term used in the Plan or this order (the "**Order**") that is not defined in the Plan or this Order, but that is used in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure

**WHEREAS**, on April 15, 2021, after due and proper notice and a hearing, the Bankruptcy Court entered the *Amended Order (I) Approving Disclosure Statement and Form and Manner of Notice of Disclosure Statement Hearing; (II) Establishing Solicitation and Voting Procedures; (III) Scheduling Confirmation Hearing; (IV) Establishing Notice and Objection Procedures for Confirmation of the Proposed Plan; (V) Approving Notice and Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases; (VI) Approving Procedures for Objections to the Assignment and Transfer of Property of the Estate; and (VII) Granting Related Relief* (ECF No. 1286) (together with any schedules and exhibits thereto, the "**Disclosure Statement Order**"), which, pursuant to sections 105, 365, 1125, 1126, 1128, and 1145 of the Bankruptcy Code, Bankruptcy Rules 2002, 3001, 3003, 3016, 3017, 3018, 3020, 6004, and 9006, and Rules 2002-1 and 3016-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Local Rules**"), among other things, (i) approved the Disclosure Statement, (ii) established solicitation and voting procedures, (iii) established notice and objection procedures in respect of confirmation of the Plan, including the form and method of notice of the hearing to consider confirmation of the Plan (the "**Confirmation Hearing**"), and (iv) established procedures for the assumption and rejection of executory contracts and unexpired leases under the Plan;

**WHEREAS,** the Debtors filed and served the *Notice of Entry of Amended Order (I) Approving Disclosure Statement and Form and Manner of Notice of Disclosure Statement Hearing; (II) Establishing Solicitation and Voting Procedures; (III) Scheduling Confirmation Hearing; (IV) Establishing Notice and Objection Procedures for Confirmation of the Proposed*

---

(the "**Bankruptcy Rules**") shall have the meaning ascribed to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

Plan; (V) Approving Notice and Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases; (VI) Approving Procedures for Objections to the Assignment and Transfer of Property of the Estate; and (VII) Granting Related Relief (ECF No. 1290) (the "**Confirmation Hearing Notice**") on April 15, 2021;

**WHEREAS**, pursuant to the Disclosure Statement Order, the Bankruptcy Court set the voting deadline for the Plan at June 2, 2021 at 4:00 p.m. (prevailing Central Time) (the "**Voting Deadline**") and the deadline to file an objection to confirmation of the Plan at June 2, 2021 at 11:59 p.m. (prevailing Central Time) (the "**Plan Objection Deadline**");

**WHEREAS**, on April 19, 2021, the Debtors caused to be transmitted (i) as to holders of Claims in Class 1 (Other Secured Claims), Class 3 (FLFO Claims), Class 4 (FLTL Claims), Class 5 (SLTL Claims), Class 6A (Unsecured Trade Claims), and Class 6B (General Unsecured Claims) entitled to vote on the Proposed Plan: (a) the Confirmation Hearing Notice; (b) a USB flash drive containing the Disclosure Statement, the Plan, and the Disclosure Statement Order; (c) an appropriate ballot, substantially in the form annexed to the Disclosure Statement Order as **Exhibits 2, 3, 4, 5, 6 and 7** (a "**Ballot**"), as applicable; and (d) a postage-prepaid return envelope (all of the foregoing, collectively, the "**Solicitation Packages**"); and (ii) as to holders of Class 2 (Priority Non-Tax Claims), Class 8 (Subordinated Securities Claims) and Class 10 (Existing Equity Interests), (a) the Confirmation Hearing Notice; and (b) a notice of non-voting status (a "**Notice of Non-Voting Status**") in the form annexed to the Disclosure Statement Order as **Exhibit 8,** as set forth in the *Affidavit of Service* (ECF No. 1309) executed by Alex Orchowski of the Debtors' Court-appointed claims and noticing agent, Prime Clerk, LLC (the "**Solicitation Agent**") on April 23, 2021 (the "**Solicitation Materials Declaration**"), evidencing the timely service of the Solicitation Packages;

**WHEREAS**, on May 26, 2021, the Debtors filed the *Notice of Filing of Plan Supplement in Connection with Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (ECF No. 1394) (the "**Plan Supplement**"), which includes the following documents: (i) the Amended Organizational Documents for FWE I; (ii) the Schedule of Retained Causes of Action; (iii) the Schedule of Assumed Contracts; (iv) the Credit Bid Purchase Agreement; (v) the Apache Definitive Documents; (vi) the First Lien Exit Facility Agreement; (vii) the Chevron Term Sheet; (viii) the Eni Term Sheet; (ix) the Hunt Term Sheet; and (x) the Oil and Gas Lease Schedules;

**WHEREAS**, on May 27, 2021, the Debtors filed the *Notice to Contract Parties to Executory Contracts and Unexpired Leases of the Schedule of Assumed Contracts and Cure Amounts* (ECF No. 1395) (the "**Assumption Notice**"), which includes the schedule of executory contracts and unexpired leases to be assumed by the Debtors pursuant to the Plan (as may be further amended, supplemented, or modified, the "**Schedule of Assumed Contracts**");

**WHEREAS**, on June 11, 2021, the Debtors filed the *Notice of Filing of Second Amended Schedule of Assumed Contracts and Cure Amounts* (ECF No. 1549) (the "**Amended Assumption Notice**");

**WHEREAS**, on June 15, 2021, the Debtors filed the *Notice of Filing of Amended Plan Supplement in Connection with Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (ECF No. 1562) (the "**Amended Plan Supplement**"), which includes the following documents: (i) the Amended Organizational Documents for FWE I; (ii) the Schedule of Retained Causes of Action; (iii) the Schedule of Assumed Contracts; (iv) the Plan Administrator Agreement; (v) the Credit Bid Purchase Agreement; (vi) the NewCo Organizational Documents; (vii) the Apache Definitive Documents; (viii) the First Lien Exit Facility Credit Agreement;

4

(ix) the Second Lien Exit Facility Credit Agreement; (x) the New Money Warrant Agreement; (xi) the GUC/SLTL Form Warrant Agreement; (xii) the Chevron Definitive Documents; (xiii) the Eni Definitive Documents; (xiv) the Hunt Term Sheet; and (xv) the Oil and Gas Lease Schedules;

**WHEREAS**, on June 16, 2021, the Debtors filed the *Notice of Filing of Second Amended Plan Supplement in Connection with Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (ECF No. 1587) (the "**Second Amended Plan Supplement**"); the *Notice of Filing of Third Amended Plan Supplement in Connection with Fifth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (ECF No. 1642) (the "**Third Amended Plan Supplement**"); and the *Notice of Filing of Fourth Amended Plan Supplement in Connection with Fifth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (ECF No. 1645) (the "**Fourth Amended Plan Supplement**" and, together with the Plan Supplement, First Amended Plan Supplement, Second Amended Plan Supplement, and the Third Amended Plan Supplement, and any future supplements thereto the "**Plan Supplements**"), which included the following documents: (i) the Required Disclosures Under Section 1129(a)(5); (ii) the NewCo Organizational Documents; (iii) the New Intercreditor Agreement; (iv) the GUC/SLTL Form Warrant Agreement; and (v) the Oil and Gas Lease Schedules;

**WHEREAS**, the Confirmation Hearing was held on June 21–25, 2021; and

**WHEREAS**, the following declarations (collectively, the "**Declarations**") were filed in support of confirmation of the Plan and were admitted into evidence at the Confirmation Hearing:

    i.    *Declaration of Alex Orchowski of Prime Clerk LLC Regarding Solicitation of Votes and Tabulation of Ballots Cast on the Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (ECF No. 1521) (the "**Voting Declaration**");

    ii.    *Declaration of John-Paul Hanson in Support of Confirmation of the Debtors' Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (ECF No. 1556) (the "**Hanson Declaration**"); and

   iii. *Declaration of Marc J. Brown in Support of Debtors' Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and its Affiliated Debtors* (ECF No. 1555) (the "**Brown Declaration**").

  **NOW, THEREFORE**, based on the Hanson Declaration, the Brown Declaration, the Voting Declaration, the record of the Confirmation Hearing, including all the evidence proffered or adduced, and the arguments of counsel made, at the Confirmation Hearing, and the entire record of the Chapter 11 Cases (as defined herein); and after due deliberation thereon and sufficient cause appearing therefor,

<mark>IT IS HEREBY FOUND AND DETERMINED THAT:</mark>

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

  A. <u>Findings of Fact and Conclusions of Law</u>.  The findings of fact and conclusions of law set forth herein, together with the findings of fact and conclusions of law set forth in the record of the Confirmation Hearing, constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

  B. <u>Exclusive Jurisdiction; Venue; Core Proceeding (28 U.S.C. §§ 157(b)(2), 1334(a))</u>.  The Bankruptcy Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. § 1334.  Venue is proper under 28 U.S.C. §§ 1408 and 1409.  Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L), and other findings and orders contained herein are also core proceedings pursuant to 28 U.S.C. 157(b)(2) and the Bankruptcy Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.  The Debtors consent to the entry of a final order by the Bankruptcy Court in accordance with the terms set forth herein to the extent that it is later determined that the

vii. with respect to any pre-petition tax return filed after the bar date for Governmental Units, for which the LDR has filed an estimated Claim prior to such bar date, the LDR shall be permitted to amend the applicable proof of Claim after the Effective Date without the permission of this Bankruptcy Court, the Debtors, or any other party in interest; and

viii. the Debtors and the Post-Effective Date Debtors, as applicable, shall not be excused from any obligation under applicable Louisiana state law to timely submit returns (including any delinquent returns), which returns shall be filed by the later of (i) 90 days after the Effective Date or (ii) the applicable due date under Louisiana law, and shall remit payment of taxes in the ordinary course of business.

79. **Apache.** FWE shall pay up to $5.5 million (the "**Apache Fee Cap**") of reasonable and documented fees and expenses of Apache related to the formation of FWE I and FWE's restructuring, including the negotiation and preparation of the Apache Definitive Documents (collectively, the "**Apache Fees and Expenses**"); provided that amounts paid to Apache on account of the Apache Fees and Expenses shall not be subject to disgorgement unless the transactions contemplated in the Apache Definitive Documents fail to close as a result of Apache's breach of the Restructuring Support Agreement. Any Apache Fees and Expenses in excess of the Apache Fee Cap shall be the sole responsibility of FWE I.

80. The Prepetition FLFO Lenders, Prepetition FLTL Lenders, and Prepetition SLTL Lenders shall, simultaneously with the execution and delivery of the Apache Definitive Documents (to occur no later than the Effective Date) and the creation of FWE I LLC pursuant to the Apache Definitive Documents, be deemed to release (and/or cause the applicable administrative agent or collateral agent to release) all liens and encumbrances on, interests in, and claims against the Legacy Apache Properties (as defined in the Apache Term Sheet) and the other FWE I Assets (as defined in Part A of Schedule I to the Plan of Merger) and the Consenting Creditors (as defined in the Apache Implementation Agreement (as may be amended from time to time)) shall release the Apache PSA Parties from any and all causes of action and claims of any kind related to the Legacy

Apache Properties arising prior to the Effective Date. From the time of the entry of this Order to the Effective Date, the Debtors shall not cause, permit or otherwise allow the creation of new liens (contractual or statutory) against the Legacy Apache Properties or the other FWE I Assets except for tax liens which arise by operation of law for taxes not yet due and payable, nor shall the Prepetition FLFO Lenders, Prepetition FLTL Lenders, and Prepetition SLTL Lenders consent to same.

81.     FWE's assets to be allocated to, possessed by, assumed by, and vested in FWE I and FWE III, respectively, pursuant to the transactions contemplated by and in accordance with the Plan of Merger (the "**Divisive Merger**"), including contracts, leases, oil and gas leases and assets constituting real property interests (including all fee surface interests in land, surface leases, easements, rights of way, servitudes, licenses, franchises, road, railroad, and other surface use permits or agreements), except as otherwise provided in this Order, shall be (a) free and clear of (i) any right of consent, notice, and other similar rights, if any, that are applicable to the vesting of the assets in connection with the Divisive Merger (such rights, the "**Consent Rights**") and (ii) all preferential purchase rights, rights of first refusal, drag-along rights, tag-along rights, and other similar rights, if any, that are applicable to the vesting of the assets in connection with the Divisive Merger (such rights, the "**Preferential Purchase Rights**"), but (b) subject to and burdened by (x) the liabilities and obligations allocated to and vested in, respectively, FWE I or FWE III, as specified in the Plan of Merger, pursuant to the Divisive Merger (collectively, "**Allocated Obligations**") and (y) Permitted Post-Closing Liens (as defined in the Schedule of Defined Terms for Required Confirmation Order Provisions, attached to the Apache Implementation Agreement as **<u>Exhibit B</u>**).

82.     All Entities (as defined under section 101(15) of the Bankruptcy Code) or Parties that fail to timely file an objection are (a) forever barred from objecting to the allocation and vesting of the assets in connection with the Divisive Merger free and clear of all Consent Rights and Preferential Purchase Rights, and all other persons are forever barred from asserting any alleged Consent Rights or Preferential Purchase Rights with respect to the Divisive Merger, and (b) deemed to consent to and approve the allocation and vesting of the assets free and clear of all Consent Rights and Preferential Purchase Rights, regardless of whether such consent must be in writing pursuant to the terms of any agreement.  Except as otherwise provided in the Plan or this Order with respect to the Released Parties (other than with respect to any NewCo Entity or any Credit Bid Acquired Interests, in each case with respect to any right, claim, or interest arising (i) under an agreement assumed and assigned or allocated to any NewCo Entity under which FWE I or GOM Shelf LLC is a party or (ii) in connection with an obligation assumed pursuant to the Credit Bid Transaction (which all such rights, claims, or interests are hereby expressly reserved)), nothing herein shall affect or be deemed to restrict or limit Apache's, FWE I's, or GOM Shelf LLC's claims for or rights to seek payments or contribution from, and any defenses against, current or prior working interest owners, predecessors, co-owners and/or operators, or from any other parties that are contractually, legally, regulatorily or equitably liable for decommissioning or related obligations with respect to the Legacy Apache Properties and FWE I Assets.

83.     Subject to a cap of $300,000, (the "**Apache Implementation Costs Cap**") which amount shall be funded by FWE III as an Administrative Expense Claim no later than twenty-one (21) days after the Effective Date, FWE III shall, and shall cause its debtor affiliates in the above-captioned Chapter 11 Cases to, on the Effective Date, provide for the payment of any and all documentary, filing, recording, stamp, and registration fees, costs, taxes, and expenses (including

all reasonable and documented attorneys' fees and regulatory consultant fees) incurred or imposed after the Effective Time (as defined in the Plan of Merger) in connection with the filing of record by or on behalf of FWE I or GOM Shelf LLC of any instrument or instruments with the appropriate records office of any county, parish, state, federal, or other governmental unit (including the U.S. Bureau of Ocean Energy Management ("**BOEM**")) that may be required in connection with the implementation of the Divisive Merger or that either FWE I or GOM Shelf LLC determines in its respective sole discretion to be necessary or appropriate to reflect in the appropriate records of any governmental unit that as a result of the Divisive Merger (a) ownership of the FWE I Assets have been allocated to and are vested in FWE I (and to the extent appropriate to reflect ownership of the GOM Shelf Properties (as defined in the Plan of Merger) in GOM Shelf LLC), and (b) the Allocated Obligations have been allocated to and vested in, and constitute liabilities and obligations of, FWE I and FWE III, respectively (collectively, the "**Apache Implementation Costs**"). For the avoidance of doubt, the documentary, filing, recording, stamp, and registration fees of FWE I or GOM Shelf LLC, shall include such costs and expenses required to file or to cause to be filed of record in the records office, as determined by Apache to be appropriate, of any county, parish, state, federal, or other governmental unit (including BOEM) of the mortgages, security interests and similar security documentation as is contemplated by the Standby Loan Agreement and the Standby Credit Facility Documents to secure the obligations of FWE I and GOM Shelf LLC thereunder. Any Apache Implementation Costs that exceed the Apache Implementation Costs Cap shall be the sole responsibility of and paid for by FWE I.

84. Upon the Effective Date of the Plan, to the extent the Decommissioning Agreement is an executory contract, it will be assumed, with the consent of the Apache PSA Parties, by the Fieldwood PSA Parties and, upon consummation of the transactions provided for in the Plan of

Merger, become the obligation of FWE I. Upon execution of the Apache Definitive Documents, including, without limitation the granting of liens to Apache on the FWE I and GOM Shelf LLC assets contemplated thereunder, the Debtors will be deemed to have cured all defaults existing under the Decommissioning Agreement as of the Effective Date (the "**Apache Cure**") and no third party, including, without limitation, the Apache Sureties, may raise any defense to payment under the Apache Surety Bonds or letters of credit, in each case constituting Decommissioning Security, based on the agreement reached between the Debtors and Apache as to the Apache Cure.

85.     Except for the rights and remedies to enforce (a) the Decommissioning Agreement against GOM Shelf LLC and FWE I following the Divisive Merger (which agreement shall be allocated to FWE I and GOM Shelf LLC under the Divisive Merger), (b) the Plan, (c) this Order, and (d) the obligations contemplated by the Apache Definitive Documents, the Apache PSA Parties shall be deemed Releasing Parties (as defined in the Plan) under the Plan and waive and release any and all pre-Effective Date claims of any kind (including, without limitation, the Apache Audit Claims, the Apache Trust A Claims and any claims that could qualify as administrative expense claims) against the Debtors, their estates and any other Released Party in all circumstances only to the extent such claims accrued on or prior to the Effective Date and only to the extent such releases do not impair the Decommissioning Security, or Apache's ability to draw on the Decommissioning Security in any respect. For the avoidance of doubt, any and all claims the Apache PSA Parties may have against FWE I or GOM Shelf LLC related to the Decommissioning Agreement arising post-Effective Date and any security obtained, provided, or pledged in connection with the Decommissioning Agreement (the "**Decommissioning Security**") will be preserved.

86.     Except for the rights and remedies to enforce (a) the Decommissioning Agreement against the Apache PSA Parties following the Divisive Merger, (b) the Plan, (c) this Order, and (d) the obligations contemplated by the Apache Definitive Documents, the Debtors shall waive and release any and all pre-Effective Date claims of any kind against the Apache PSA Parties, in all circumstances only to the extent such claims accrued on or prior to the Effective Date.  For the avoidance of doubt, any and all claims FWE I may have against the Apache PSA Parties related to the Decommissioning Agreement arising post-Effective Date and the Decommissioning Security will be preserved.

87.     All rights of the Apache PSA Parties with respect to bonds and letters of credit constituting security for decommissioning of the assets held by the GOM Shelf LLC or allocated to and vested in FWE I, including, without limitation, the Decommissioning Security shall be preserved as against such bonding companies and letter of credit issuers in all respects.  The Debtors shall not terminate any bonds issued on behalf of the Debtors relating to the Legacy Apache Properties under which any federal, state or local governmental entity is an obligee.  Except as otherwise provided in the Plan Documents, Everest reserves all rights regarding all bonds for which it issued to obligees other than Apache.  For avoidance of doubt, Everest Bond No. ES00001441 in favor of Apache, as obligee, is expressly an Apache Surety Bond and subject to the Apache-Surety Term Sheet.

88.     With respect to the agreements and memberships relating, in whole or in part, to well containment/control, clean-up of spills, or other pollution, or the gathering of data relating to certifications required to be made to a governmental unit with respect to the FWE I Assets (as defined in the Plan of Merger) or GOM Shelf Oil and Gas Properties (as defined in the Plan of Merger), to the extent any such agreements or memberships are also needed in respect to any

Credit Bid Acquired Interests or FWE III Assets (as defined in the Plan of Merger) that are set forth on **Exhibit 23** attached to the Apache Implementation Agreement, then on or before the Effective Date, FWE shall obtain new agreements and membership for such use with respect to the Credit Bid Acquired Interests or FWE III Assets. With respect to any Excluded Contracts (as defined in the Plan of Merger), FWE shall, on or before the Effective Date, prepare and negotiate replacement agreements with the counterparties to such Excluded Contracts upon substantially the same terms as such Excluded Contracts which may be executed by FWE I immediately following the Effective Date.

89. The Fieldwood PSA Parties and the Apache PSA Parties may, by mutual agreement, amend and modify, without the consent of the Consenting Creditors, the forms of the agreements governing the terms of employment of the Independent Director (as defined in the Apache Term Sheet) of FWE I and of the "sole manager" (as that term is used in the Apache Term Sheet) of FWE I (the "**Sole Manager**"), and the form of the agreement with the "service provider" (as that term is used in the Apache Term Sheet) of FWE I (the "**Contract Services Provider**") to be included in the bid package for the Contract Services Provider.

90. The Bankruptcy Court (i) approves the Apache Definitive Documents, as such documents are defined in the Apache Implementation Agreement (as amended), and all transactions contemplated thereby and thereof, including the Plan of Merger and Standby Credit Facility Documents, and all actions to be taken, undertakings to be made, and obligations to be incurred by FWE I and GOM Shelf LLC, as applicable, contemplated thereby; and (ii) authorizes FWE I and GOM Shelf LLC, following the consummation of the Plan of Merger, without further notice to or action, order, or approval of this Bankruptcy Court and without the need for any further corporate or shareholder action, to enter into, deliver, and fully perform its obligations under the

Apache Definitive Documents, including without limitation, the Standby Credit Facility Documents. Upon entry of this Order, FWE I or the Sole Manager, as applicable, shall be authorized and empowered, without further approval of the Bankruptcy Court or any other party, to take such actions and perform such acts as may be necessary, convenient, desirable, or appropriate to execute and deliver the Apache Definitive Documents in accordance with the Plan and to execute and deliver all documents relating thereto and to perform all of their obligations thereunder. On the Effective Date, the Apache Definitive Documents shall constitute legal, valid, binding, and authorized obligations of FWE I and GOM Shelf LLC, as applicable, enforceable in accordance with their terms, and such obligations of FWE I or GOM Shelf LLC shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination by FWE I or GOM Shelf LLC or the Post-Effective Date Debtors under applicable law, the Plan, or this Order. On the Effective Date, all liens granted pursuant to, or in connection with, the Apache Definitive Documents shall be deemed granted by FWE I or GOM Shelf LLC pursuant to the Apache Definitive Documents. On the Effective Date, all liens granted pursuant to, or in connection with Apache Definitive Documents, as applicable, (i) shall be valid, binding, perfected, enforceable liens in the property subject to a security interest granted by FWE I pursuant to the Apache Definitive Documents, as applicable, with the priorities established in respect thereof under applicable non-bankruptcy law and the Apache Definitive Documents, including, but not limited to, the Mortgages, Security Agreement or Standby Loan Agreement and (ii) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination by FWE I or GOM Shelf LLC under applicable law, the Plan, or this Order. For the avoidance of doubt, the liens granted to Apache pursuant to the Recharacterization Mortgages (as such term is defined in the Decommissioning Agreement, as amended from time to time, and as

supplemented by the Recharacterization Mortgages) upon any recharacterization of the Trust A or Trust A-1 NPIs (as such terms are defined in the Decommissioning Agreement, as amended from time to time, and as supplemented by the Recharacterization Mortgages) shall be senior in all respects to any other liens.

91.     The allocation of the Decommissioning Agreement to FWE I, which will occur upon the effectiveness of the Divisive Merger provided for in the Plan, is not a transfer or assignment and is not subject to any transfer or assignment consent requirement.

92.     Neither the Plan nor the Apache Implementation Agreement (including the Apache Definitive Documents attached thereto) amends or alters the Decommissioning Agreement.

93.     Neither the Plan nor the Apache Implementation Agreement (including the Apache Definitive Documents attached thereto) discharges or otherwise changes the Sureties' obligations to Apache under the Surety Bonds or impairs Apache's ability to draw on the Surety Bonds post-Effective Date.

94.     The reorganization of FWE in accordance with the Plan, including the creation of FWE I pursuant to a divisive merger and its formation under the Fieldwood Energy I LLC Agreement, does not give Apache or any of its affiliates control over FWE I in any manner that would be recognized under the Securities Act of 1934, the Bankruptcy Code, or any other applicable law, and none of the terms of the Apache Definitive Documents, including the consent rights granted to Apache thereunder, cause Apache to have any such control over FWE I.

95.     <u>Apache-Surety Term Sheet</u>.  The Bankruptcy Court (i) approves the term sheet between the Debtors and Apache, Zurich American Insurance Company ("**Zurich**"), Everest Reinsurance Company ("**Everest**"), HCC International Insurance Company ("**HCCI**"), and Philadelphia Indemnity Insurance Company ("**Philadelphia**" and together with Zurich, Everest

and HCCI, the "**Apache Sureties**" and each an "**Apache Surety**"), a copy of which is attached hereto as **Exhibit B** (the "**Apache-Surety Term Sheet**") and all actions to be taken, undertakings to be made, and obligations to be incurred contemplated thereby; (ii) authorizes the Debtors to negotiate the definitive documents in accordance with the Apache-Surety Term Sheet (the "**Apache-Surety Definitive Documents**"); and (iii) authorizes FWE I or GOM Shelf LLC, without further notice to or action, order, or approval of this Bankruptcy Court and without the need for any further corporate or shareholder action, to enter into, deliver, and fully perform its obligations under the Apache Sureties Definitive Documents, including, without limitation, the *Subrogation, Subordination and Payment Agreement* ("**SSPA**") contemplated in the Apache-Surety Term Sheet.

96.     Apache Surety Claims.  All claims against the Debtors, if any, of the Apache Sureties arising under or relating to any surety bonds, letters of credit, indemnification agreements, or other related agreements existing as of the Petition Date (including, without limitation, any claims for premiums, fees, expenses, or similar charges, whether due before, on, or after the Petition Date), including but not limited to any claims and causes of action, whether arising in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws), are classified as General Unsecured Claims in Class 6B and shall be treated accordingly under the Plan.  For the avoidance of doubt, all rights and claims of the Apache Sureties set forth in the Apache-Surety Term Sheet shall be treated pursuant to the Apache-Surety Term Sheet.

97.     Non-Apache Sureties Claims.  Nothing in the Plan or this Order shall or shall be deemed to adjudicate or modify the rights of any obligees ("**Obligees**") or surety providers (other than, solely in their capacity as such, the surety providers that issued bonds in favor of Apache and

are parties to the Apache-Surety Term Sheet, such surety providers the "**Apache Sureties**" and all other surety providers, the "**Non-Apache Sureties**") as between the Obligee and the Non-Apache Surety under any surety bonds issued on behalf of the Debtors, their non-Debtor affiliates, or otherwise (the "**Non-Apache Term Sheet Surety Bonds**") or under applicable law. Other than Sections 5.13, 10.6, 10.7, 10.8, and 10.9 of the Plan, nothing in the Plan or this Order bars, impairs, enjoins, releases, alters, diminishes or enlarges any of the rights or defenses of the Non-Apache Sureties (other than a Releasing Party) against any non-Debtor Entity (other than the Post-Effective Date Debtors, FWE I, FWE IV, any NewCo Entity, or any Credit Bid Acquired Interests), including, but not limited to, any predecessors in interest or co-working interest parties with respect to any of the Debtors' assets. For the avoidance of doubt, the Non-Apache Sureties shall not be entitled, under any circumstances, to claim a right of subrogation against the Debtors, the Post-Effective Date Debtors, FWE I, any FWE Additional Entity or NewCo and its subsidiaries (including Credit Bid Purchasers), unless such subrogation rights, if any, relate to obligations that both (x) accrue post-Effective Date and (y) arise from post-Effective Date activity and, with respect NewCo and its subsidiaries (including Credit Bid Purchasers), relates to the Credit Bid Acquired Interests. Similarly, for the avoidance of doubt, nothing in this Order or the Plan, including any language referencing subrogation, shall bar, impair, enjoin, release, alter, diminish or enlarge any of the Non-Apache Sureties' rights to seek contribution from any co-working interest party, predecessor owner, or any non-Debtor Entity (other than the Post-Effective Date Debtors, FWE I, GOM Shelf LLC, FWE IV, or any NewCo Entity) for any payment by any of the Non-Apache Sureties under the Non-Apache Term Sheet Surety Bonds. To the extent of any conflict between this paragraph and paragraphs 111–18 (including any matters incorporated into paragraphs 111–18), the rights and obligations of the parties bound by the Eni Definitive

Documents and Eni Implementation Agreement (including without limitation Eni and NAS) identified in paragraphs 111–18 are governed by paragraphs 111–18.

98.    Nothing in this Order or the Plan shall require the Non-Apache Sureties to issue any new surety bonds or extensions or renewals of the Non-Apache Term Sheet Surety Bonds.

99.    For the avoidance of doubt, no Non-Apache Term Sheet Surety Bond under which a Debtor is the principal is being assumed, assumed and assigned, or assumed and allocated to any entity under the Plan or the Plan Documents, including Credit Bid Purchaser, FWE I, FWE III and/or FWE IV.

100.    Nothing in this Order and/or the Plan shall, or be deemed to: bar, impair, enjoin, release, alter, diminish, or in any way affect or impact the regulatory authority of the Government, including with respect to the security and bonding requirements for owners and operators of oil and gas assets in the Gulf of Mexico.  The Government maintains its full regulatory authority to require that FWE I, Credit Bid Purchaser and/or any other entities being created under the Plan post security and bonding under the applicable regulations, and this Order and/or Plan in no way purports to infringe upon those rights.  To the extent the Government requires any such security and/or bonding consistent with law and regulations, the respective entity will obtain the required bonding, including any required supplemental bonding.

101.    <u>CUSA</u>.  Chevron U.S.A. Inc., its parent and affiliates, including Noble Energy, Inc., Union Oil Company of California, Unocal Pipeline Company and Texaco Inc. (such parent and affiliates, together with CUSA, individually each a "**CUSA Entity**" and collectively the "**CUSA Entities**") shall not be deemed to be a "Released Party" or a "Releasing Party" as such terms are defined in the Plan.  For the avoidance of doubt, other than set forth expressly in the Plan, no CUSA Entity has waived or released, or shall be deemed to have waived or released, any claim,

170.    <u>Final Order</u>.  This Order is a final order and the period in which an appeal must be filed shall commence upon the entry hereof.

171.    <u>Payment of DIP Claims</u>.  Except to the extent that a holder of a DIP Claim agrees in writing to a different treatment, each holder of a DIP Claim shall be paid in full in Cash in an amount equal to the full amount of such Claims in accordance with the DIP Facility Credit Agreement and DIP Documents as provided under Section 2.3 and 2.4 of the Plan and the DIP Order.

172.    <u>Expiration of Challenge Period</u>.  The Challenge Period (as defined in the DIP Order) has expired as to all parties in interest, including the Creditors' Committee.

173.    <u>Stay of Confirmation Order</u>.  Notwithstanding anything to the contrary in the Plan, this Order shall be stayed until the expiration of 14 days after entry of this Order in accordance with Bankruptcy Rule 3020(e).

Signed: June 25, 2021

Marvin Isgur<br>
United States Bankruptcy Judge

# Exhibit 14

July 6, 2022 letter from Duane Brescia to
Jon Graham re Apache Sureties'
Evaluation of the GOM Shelf/Apache
Production of Documents



Duane J. Brescia
T (512) 499-3647
F +15125365702
Email:DBrescia@ClarkHill.com

Clark Hill
720 Brazos Street, Suite 700
Austin, TX 78701
T 512-499-3600
F 512-499-3660

July 6, 2022

***By Email and Regular Mail***
Jon Graham (jgraham@fwellc.com)
GOM Shelf LLC
2000 W. Sam Houston Parkway S., Suite 1200
Houston, TX 77042

Re:    **Apache Sureties' Evaluation of GOM Shelf/Apache Production of Documents**

Dear Mr. Graham:

This letter is sent on behalf of Tom Finley, the Surety Representative for the Apache Sureties under the *Subrogation, Subordination and Payment Agreement* (the "**SSPA**") dated August 27, 2021. As you know, the Apache Sureties remain interested in monitoring and evaluating the operations of GOM Shelf, LLC ("**GOM Shelf**") in order to understand the circumstances that may impact their obligations under the bonds for which Apache Corporation ("**Apache**") is the beneficiary or ultimate beneficiary.

We appreciate the effort by you and the QuarterNorth Energy, LLC ("**QNE**") team to respond to our requests and the requests of our retained professionals. These requests were initiated in November 2021, after receipt of the first Monthly Operating Report ("**MOR**") and have continued from that time culminating in your most recent production of documents in June of 2022 and your ongoing discussions with our financial advisors, Grant Thornton, and petroleum engineering advisors, Netherland Sewell & Associates.

While we continue to evaluate the information provided and notes of the discussions, which we expect will be ongoing, the Surety Representative has been able to make some observations and comments with the help of its advisors. We believe it is best to continue the open communication and to raise concerns so all sides can respond to requests (including that from Apache, regarding its pending request seeking consent to a modification of the Decommissioning Agreement for reimbursement purposes). Below are select observations, most of which will not be surprising or new:

July 6, 2022
Page 2

- **Production**. As has been discussed frequently in our communications as well as in the MORs, production got off to a dismal start in September 2021. We understand that the disparity in 2021 was due in part to significant damage caused by Hurricane Ida, a pipeline leak, and delayed INCs. Production from the months of April and May 2022 were the first months where production has approached expectations of the GOM Plan. However, the GOM Plan and actual performance is well below the production projections from Fieldwood Energy, LLC's ("**FWE**") as of Plan confirmation by at least by 38%. Is there a justification or explanation for such disparity in projections >25/mboed (*Exhibit O* to Disclosure Statement) and ~18/mboed (GOM Plan)? We now have the updated YE 2021 Ryder Scott reserve report and it does not appear that GOM Shelf will reach the Plan projections. The Apache Sureties request further detail on where additional production can be achieved, whether by recompletions, behind-pipe, rework, sidetrack, or other projects. The Apache Sureties also request information on whether any of these capital projects have been foregone or delayed for any reason.

  One of the areas that was discussed between you and Grant Thornton/Netherland Sewell recently was additional information on opportunities arising from additional capital expenditures. As you know, when the FWE Plan was confirmed and the Apache Sureties completed the settlement term sheet, there was significant discussion about the possibility of funding new projects that would benefit all parties involved. The Apache Sureties remain interested (along with its industry partners) in exploring these opportunities where they make sense and increase production and profits.

- **Expenses**. General and administrative expenses ("**G&A**"), repair and maintenance costs ("**R&M**") and lease operating expenses ("**LOE**") have all been significantly above expectations, while production was 50% or less of expectation. Projected G&A spend, even beyond the initial term of the TSA, is at least 2x that of other pureplay E&P companies, such as W&T and Talos. Please provide your analysis and expectation as to how this can be remedied. We hope that this issue is being addressed in extended negotiations with QNE and other third-party providers. We would like to better understand this negotiation process and your timetable for choosing alternative options.

  R&M is where the biggest disparity between expectation and performance lies. While we are concerned with the amount of time and cost needed for a multitude of repairs and resolution of continual INC notices, the issue appears to be stabilizing and GOM Shelf has indicated that it should continue to be reduced to a point that meets Plan expectations. Please provide further detail on same and any circumstances where the current expectation may not be achieved.

  As for LOE, the incurred amounts are out of line with the size of the assets/number of properties and production. As it currently stands, GOM Shelf's projected annual LOE will be multiples of that incurred by W&T and Talos. What is your solution to this current trend?

clarkhill.com

July 6, 2022
Page 3

- **Revenue**. In line with production, revenue has been below prior projections, but is significantly up in March and April 2022, and May appears to be above expectation as well. This is positive news. It is therefore critical to be able to deploy these additional revenues to backstop GOM Shelf's exposures. We would like to discuss with you whether those funds should be added to Trust A or utilized for capital projects to further enhance production.

- **Default Notices**. As the Surety Representative previously advised you last year, the Apache Sureties are concerned about the impact of the default notices sent to BOEM/BSEE in September 2021. To put it bluntly, the Apache Sureties were shocked to learn that these notices, the latest of which was served in February 2022, impacted more than $450 million in ARO obligations. The stated purpose of GOM Shelf was to operate its assets effectively and efficiently with the goal to reduce ARO. Yet, the first notice was sent less than two weeks after the Effective Date and three weeks after GOM Shelf had reached a settlement agreement with BOEM/BSEE with an understanding regarding the timeline to complete ARO obligations on non-producing properties. (See Amended Plan Supplement at ECF 2014 in the Fieldwood bankruptcy case). This action was prejudicial to the Apache Sureties and materially altered bond risk. The Apache Sureties reserve all rights in connection with that election.

  When compared with GOM Shelf's knowledge that (i) production had been reduced to a fraction of original projections and (ii) significant R&M expense would be required to turn things around, we fail to understand the business need and urgency to declare the defaults *before* GOM Shelf had the chance to stabilize operations and address its stated corporate obligation. In our view, this had an accelerant on ARO before GOM Shelf would incur any legal obligation or consequence to BOEM/BSEE. When coupled with Apache's request to consent to still further premature ARO, it appears that a concerted effort is underway to exhaust Trust A before GOM Shelf operations have had a fair chance to stabilize and more of the ARO can be resolved by GOM Shelf, not Apache.

  The Apache Sureties do not yet have sufficient information concerning the timing and cost of Apache's efforts to perform ARO per the government's orders or an ability to fully understand the financial consequence of these defaults. However, this action improperly risked bond loss through an inability to exonerate loss and mitigate damages. The Apache Sureties would like additional information pertinent to the consequences of the default notices and whether GOM Shelf's current profitability can be utilized to deflect unnecessary loss. At this time, the Apache Sureties are unable to consent to further early ARO retirement until the impact of these defaults is understood.

- **P&A Schedule**. With the recent trend in profitability and excess cash flow, is there any business reason to alter the GOM Shelf P&A schedule to more aggressively remedy older ARO, regardless of any government order to Apache? Our understanding was that, despite some of the default notices, the BOEM/BSEE timetable to issue orders is slow. We would like to see whether GOM Shelf can rectify some of the accelerated

July 6, 2022
Page 4

        ARO before additional orders are issued.  Please let us know when or if a revised plan is contemplated.

- **Alternatives/Sale Options**.  With GOM Shelf's recent trend of profitability and prices continuing to remain historically high, we believe that conditions are ripe to fully explore the potential to sell some or all operating assets, with the proceeds being placed in Trust A and/or managed under mutually beneficial conditions.  The market is ripe for short term production and low risk opportunities and it would be prudent to earnestly test the market.  Given the performance to date, the Apache Sureties believe it is imperative that you aggressively consider a sale of all active fields and wells.  What is GOM Shelf doing now?  We estimate that the currently producing properties have a PV10 value of $768 million and that there would be significant interest in the assets, which would exceed the expected profit from production.  When paired with the ability to assign the P&A obligations associated with such properties, all mitigation options must be effectively pursued.

        If you would like to discuss GOM Shelf's options or your sale efforts to date, the Apache Sureties and our advisors would welcome the opportunity to assist you in that effort.  Should you have any questions related to this letter, please feel free to contact me.

        Regards,

Duane J. Brescia

cc:    Tom Finley, Surety Representative (Thomas.finley@zurichna.com)
       Jason Brookner (jbrookner@grayreed.com)
       David Peterman (dpeterman@grayreed.com)
       Anthony Lannie (Anthony.lannie@apachecorp.com)
       Brett Cupit (Brett.Cupit@apachecorp.com)
       Scott Williams (swilliams@manierherod.com)
       Philip G. Eisenberg (peisenberg@lockelord.com)
       Darren Grzyb (dgrzyb@csglaw.com)
       Chris Ward (cward@clarkhill.com)

# Exhibit 15

August 2021 Letter Agreement Related to GOM Shelf LLC Merger with Fieldwood Energy I signed by Everest Reinsurance Company



August ___, 2021

Everest Reinsurance Company
Everest National Insurance Company
451 5th Avenue
New York, NY 10017
Attn: James J. Real, V.P. Financial Lines
(james.real@everestnational.com)

Philadelphia Indemnity Insurance Company
P.O. Box 3635
Bala Cynwyd, Pennsylvania 19004
(Kimberly.czap@phly.com)

HCC International Insurance Company LLC
The Grange
Rearsby, Leicester LE7 4FY
Attn: Martyn Ward, Managing Director – Credit & Surety
(MWard@tmhcc.com)

Zurich American Insurance Company
P.O. Box 68549
Shaumburg, Illinois 60196
Attn: Thomas Finley
(Thomas.Finley@zurichna.com)

      Re: *Letter agreement related to GOM Shelf LLC merger with Fieldwood Energy I (the "Letter Agreement")*

      In connection with the *Eighth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors (ECF No. 1742),* dated June 25, 2021 (as amended, supplemented, or otherwise modified, the "Plan"), Fieldwood Energy I LLC ("FWE I") will be created pursuant to a divisive merger of Fieldwood Energy LLC ("Fieldwood"). GOM Shelf LLC ("GOM Shelf") will be a wholly owned subsidiary of FWE I. In order to ease administrative burden and to maintain regulatory approvals that will be required of FWE I that GOM Shelf, as an existing Gulf of Mexico Operator, has already obtained, promptly following the divisive merger that creates FWE I, Fieldwood intends to merge FWE I into GOM Shelf, with GOM Shelf being the surviving entity (the "GOM Shelf Merger").

      Each of GOM Shelf and Fieldwood were indemnitors for certain bonds issued in favor of Apache Corporation and its various subsidiaries. Because the GOM Shelf Merger is not specifically contemplated under the Plan nor addressed in the confirmation order, Apache is requiring that Fieldwood obtain from each Apache surety, including Everest Reinsurance Company, Philadelphia Indemnity Insurance Company, HCC International Insurance Company, and Zurich American

Insurance Company (each an "Apache Surety" and collectively the "Apache Sureties"), the consent provided for in this Letter Agreement to the GOM Shelf Merger. By execution of this Letter Agreement, each Apache Surety hereby consents to the GOM Shelf Merger and agrees and acknowledges that the GOM Shelf Merger will not alter its individual obligations as an Apache Surety nor create a defense to performance of those obligations, nor shall it alter the rights of Apache or any other beneficiaries of the underlying bonds each individual Apache Surety has issued in favor of Apache Corporation or Deutsche Bank ATG, New York Branch for the benefit of Apache Corporation, as applicable. Each person whose signature appears below represents and warrants that such person has all necessary power and authority to execute this Letter Agreement on behalf of the entity on whose behalf such person has signed and further represents and warrants on behalf of such entity that the execution of this Letter Agreement by such entity has been authorized by all necessary corporate action. Please execute in the space provided below and return a copy to me.

Sincerely,

Fieldwood Energy LLC

By: Thomas R. Lamme, Senior Vice President and General Counsel

AGREED TO BY:

EVEREST REINSURANCE COMPANY
By: _____
Name: James J. Real, V.P. Financial Lines and authorized representative

Date: 8/6/21

PHILADELPHIA INDEMNITY INSURANCE COMPANY
BY: _____
Name: Kimberly Czap, Vice President and authorized representative

Date: _____

HCC INTERNATIONAL INSURANCE COMPANY, PLC
By: _____
Name: Ryan Grant O'Neil, Senior Underwriter – Surety

Date: _____

ZURICH AMERICAN INSURANCE COMPANY
By: _____
Name: Thomas Finley, Surety Claims Professional and authorized representative

Date: _____