# **<u>EXHIBIT 45</u>**

7/12/2023 9:06 AM
Marilyn Burgess - District Clerk Harris County
Envelope No. 77429577
By: Bonnie Lugo
Filed: 7/12/2023 9:06 AM

CAUSE NO. 2023-38238

| | | |
|---|---|---|
| ZURICH AMERICAN INSURANCE COMPANY, HCC INTERNATIONAL INSURANCE COMPANY PLC, PHILADELPHIA INDEMNITY INSURANCE COMPANY and EVEREST REINSURANCE COMPANY, | § § § § § § § § | IN THE DISTRICT COURT OF<br><br>HARRIS COUNTY, TEXAS |
| *Plaintiffs*, | § § | |
| vs. | § § | |
| APACHE CORPORATION, | § § | |
| *Defendant.* | § | 281ST JUDICIAL DISTRICT |

## PLAINTIFFS' BENCH BRIEF ON DECOMMISSIONING

TO THE HONORABLE JUDGE CHRISTINE WEEMS:

The Sureties agree with Apache on two things: (1) Apache had an obligation to perform maintenance and monitoring, and (2) the government, specifically BSEE, ordered Apache to perform maintenance and monitoring pending the completion of decommissioning. That, however, is as far as the common ground goes. The contractual language is clear—decommissioning ***does not*** include maintenance and monitoring. Nonetheless, Apache has made draw requests of approximately $40–60 million from Trust A for maintenance and monitoring expenses.[1]

Alone, the contractual language is sufficient for this Court to determine that Apache has been causing the Sureties irreparable harm by using Trust A proceeds for non-decommissioning expenses. When combined with the rest of the evidence,

---

[1] *See* Plaintiffs' Verified Original Petition and Application for Temporary Restraining Order and Temporary and Permanent Injunctions ("Petition"), ¶ 76.

1

there can be no doubt as to the need for a temporary injunction to enjoin Apache from continuing to deplete Trust A funds with accelerated costs that are not allowed under the applicable agreements.

I. THE CONTRACTUAL LANGUAGE.

Maintenance and monitoring is not included in the contractual definition of "decommissioning" in the agreements that govern the parties. Specifically, the Decommissioning Agreement defines decommissioning as follows:[2]

> "*Decommissioning*" means operations, work and activities conducted to pay, perform, fulfill, satisfy or otherwise discharge (i) P&A Obligations and (ii) Permanently Abandoned Properties P&A Obligations in accordance with the terms of Section 2.5.

The term "P&A" is commonly used in the industry to mean plugging and abandonment. This is reflected in the PSA, which defines "P&A Obligations" as:[3]

> (a)   the Liability and obligation to perform the following plugging, replugging, abandonment, removal, site clearance, site survey, remediation, disposal, and restoration operations, in each case to be conducted in compliance with applicable Laws and contracts, and in a good and workmanlike manner (collectively, "P&A Obligations"):

Furthermore, the term "Permanently Abandoned Properties P&A Obligations" is defined in the Decommissioning Agreement as:[4]

> "*Permanently Abandoned Properties P&A Obligations*" means the performance and completion of the following plugging, replugging, abandonment, removal, site clearance, site survey, remediation, disposal, and restoration operations, in each case to be conducted in compliance with applicable Laws and contracts, and in a good and workmanlike manner:

---

[2] Decommissioning Agreement, p. 40.
[3] PSA, p. 5.
[4] Decommissioning Agreement, Docent, p. 43.

2

Thus, the contract is clear that decommissioning relates ***only*** to "operations, work and activities" conducted to fulfill plugging and abandonment obligations. Maintenance and monitoring, on the other hand, is not referenced anywhere in the definition, nor is it present anywhere else in the Decommissioning Agreement. This is because maintenance and monitoring is a separate, unrelated obligation to decommissioning—while decommissioning refers to the process of plugging and abandoning a well or platform, maintenance and monitoring refers to a process of ensuring safety standards for an operating well or platform. The definitions are inherently exclusive: one deals with dismantling wells and structures, while the other deals with maintaining them.

In fact, maintenance and monitoring was an obligation that existed ***before*** the issuance of an BSEE Order mandating Apache, or GOM Shelf, to conduct decommissioning work. This is because maintenance and monitoring are ***operational*** obligations. For the Court's edification, the chart below demonstrates a general timeline of these processes:



Thus, should the Court look only to the four pages of the contracts, the principle of *expressio unius est exclusio alterius* indicates that by providing a definition for decommissioning that includes terms like plugging, abandonment, removal and disposal, but fails to include maintenance and monitoring, the contracts expressly excluded maintenance and monitoring from the term decommissioning. Accordingly, Apache's charges to the Trust for recovery of maintenance and monitoring, or other non-decommissioning work, are in clear violation of the contract and causing the Sureties immediate, irreparable harm by accelerating the impairment of their collateral.

## II. OTHER EVIDENCE.

Even if the contractual language was not clear on this issue, the other evidence supports the distinction between (1) decommissioning, and (2) maintenance and monitoring.

A. **The statutory language supports the contract's definition of decommissioning.**

Decommissioning is defined in the section of the Code of Federal Regulations mineral resources, Title 30, as follows:[5]

> § 250.1700 What do the terms "decommissioning," "obstructions," "facility," and "predecessor" mean in this subpart?
>
> (a) *Decommissioning* means:
>
> (1) Ending oil, gas, or sulphur operations; and
>
> (2) Returning the lease, pipeline right-of-way, or the area of a right-of-use and easement to a condition that meets the requirements of BSEE and other agencies that have jurisdiction over decommissioning activities.

Consistent with the contractual language and industry standards, the statute is silent as to the inclusion of maintenance and monitoring in the definition of decommissioning. Similarly, in the subpart of the statute that details the general requirements for decommissioning, maintenance and monitoring is again, missing in action:[6]

---

[5] 30 CFR § 250.1700.
[6] 30 CFR § 250.1703.

> **§ 250.1703 What are the general requirements for decommissioning?**
>
> When your facilities are no longer useful for operations, you must:
>
> (a) Get approval from the appropriate District Manager before decommissioning wells and from the Regional Supervisor before decommissioning platforms and pipelines or other facilities;
>
> (b) Permanently plug all wells. Packers and bridge plugs used as qualified mechanical barriers must comply with ANSI/API Spec. 11D1 (as incorporated by reference in § 250.198). You must have two independent barriers, one being an ANSI/API Spec. 11D1 qualified mechanical barrier, in the exposed center wellbore prior to removing the tree and/or well control equipment;
>
> (c) Remove all platforms and other facilities, except as provided in §§ 250.1725(a) and 250.1730.
>
> (d) Decommission all pipelines;
>
> (e) Clear the seafloor of all obstructions created by your lease, pipeline right-of-way, or right-of-use and easement operations;
>
> (f) Follow all applicable requirements of subpart G of this part; and
>
> (g) Conduct all decommissioning activities in a manner that is safe, does not unreasonably interfere with other uses of the OCS, and does not cause undue or serious harm or damage to the human, marine, or coastal environment.

In fact, in a June 2, 2022 decommissioning order to Apache, BSEE cited a variety of subparts within Title 30 as support for its order to decommission the wells—none of those subparts mention maintenance and monitoring.[7] Instead, as evidenced by the title of those subparts, the Order is: (1) requiring decommissioning and providing background on what that entails; and (2) separately reminding the operator of record that it must continue to maintain and monitor the wells and platforms in the meantime:

- Who is responsible for fulfilling the lease hold obligations?
- Who must meet the decommissioning obligation in this subpart?
- What are the general requirements for decommissioning?
- When must I permanently plug wells on a lease?
- When do I have to remove the platform or facilities?
- Who is responsible for the lease hold obligations?
- What is the effect of an assignment of a lease on an assignor's liability under the lease?[8]

---

[7] *See* BSEE Decommissioning Order for Lease OCS-G 01618, dated June 2, 2022 (Def. Ex. 1).
[8] *Id.* (citing 30 CFR §§ 250.146, 250.1701, 250.1702, 250.1703, 250.1710, 250.1725(a), 550.147, and 556.710).

Thus, the statutory framework and language support the separation of these two activities.

### B. GOM Shelf's letter to the government supports the contract's definition of decommissioning.

Under the Decommissioning Agreement, GOM Shelf "agreed to perform Decommissioning with respect to P&A Obligations."[9] Eleven days after the Effective Date, GOM Shelf first defaulted on these obligations, setting in motion a process that would allow Apache the right to conduct decommissioning and access certain decommissioning security. In GOM Shelf's various letters to the government, informing BSEE, BOEM, and the United States Department of the Interior of its default and inability to conduct the decommissioning, GOM Shelf's sole manager, Jon Graham, states as follows:

> Based on the limited resources available to GOM Shelf following the Effective Date and the Mergers, ***GOM Shelf is currently unable to fund its outstanding obligations that pertain to the Subject Offshore Assets, including plugging, abandonment, removal, site clearance, and any other decommissioning obligations*** established by (inter alia) the Outer Continental Shelf Lands Act, 43 U.S.C. 1331 et seq., DOI regulations (including, without limitation, those found at 30 CFR Parts 250, 550, 553, 556), and the terms and conditions of the relevant agreements. ***Further, GOM Shelf is currently unable to fund any maintenance, inspections, or site visi***ts that may be required by applicable laws and regulations with respect to its interest in these Subject Offshore Assets.[10]

As evidenced by the above, the original obligor of the decommissioning obligations—GOM Shelf—separated its obligations into two buckets, informing the government that it did not have the ability to fund: (1) its obligation to perform

---

[9] Decommissioning Agreement, p. 10.
[10] *See* Letter from Jon Graham, dated February 22, 2022 (Def. Ex. 20).

7

decommissioning obligations; and (2) its obligation to perform maintenance and monitoring.

### C. Case law across the nation supports the contract's definition of decommissioning.

Courts have defined decommissioning as "the process of *ending* oil and gas operations at a platform and *removing* associated equipment."[11] These definitions, clearly on point with the contractual definition at issue in this case, are also put into practice by courts who distinguish between (1) decommissioning, and (2) maintenance and monitoring.

For example, in *LLOG*, the Eastern District of Louisiana considered similar BSEE orders for decommissioning platforms and pipelines.[12] In describing the orders, the Court stated:

> In March of 2022, the United States Department of the Interior's Bureau of Safety and Environmental Enforcement ("BSEE") issued orders to Samson Contour and LLOG to decommission the wells associated with the four leases within one year and the platforms and pipelines by October 31, 2023. ***BSEE also commanded*** the organizations to identify which one would begin immediate maintenance and monitoring of the wells and facilities in the meantime. [13]

The Court's use of the phrase "also commanded" is not superfluous, and should be read as the Court separating and distinguishing between the decommissioning portion of the orders and the maintenance and monitoring portion. This logically

---

[11] *Chevron U.S.A. Inc. v. Env't Prot. Agency*, 45 F.4th 380, 382 (D.C. Cir. 2022) (emphasis added); *see also Arc Controls, Inc. v. M/V Nor Goliath*, 2021 WL 1971485, at *1 (S.D. Miss. May 17, 2021), *aff'd sub nom. Cent. Boat Rentals, Inc. v. M/V Nor Goliath*, 31 F. 4th 320 (5th Cir. 2022) (defining decommissioning as "the ***deconstruction*** . . . of offshore platforms for oil and gas wells that are ***no longer productive***.") (emphasis added).
[12] *LLOG Expl. Offshore, LLC v. Samson Contour Energy E&P, LLC*, No. CV 22-667, 2022 WL 2789103, at *1 (E.D. La. July 15, 2022) (emphasis added).
[13] *Id.*

8

makes sense when considering the fact that maintenance and monitoring is generally a continuing obligation associated with operation. Thus, while BSEE has to order parties to decommission wells or platforms, it also has to remind parties who take over decommissioning to continue to maintain and monitor any wells or platforms until decommissioning is complete. This is because decommissioning requires a great deal of funding, equipment, and resources, and is therefore, not a process that occurs *immediately* upon issuance of BSEE's order commanding decommissioning.

In *Venoco*, an offshore oil and gas platform known as Platform Holly was operated by Venoco until 2015 when the pipeline through which the oil and natural gas were brought to market ruptured, forcing Venoco to file bankruptcy.[14] There, the Delaware Bankruptcy Court discussed both the decommissioning, plugging, and abandoning process as well as the necessity of monitoring and maintenance, and in doing so, divided the two as **separate** processes.[15] Specifically, the court placed a clear, unambiguous definition on the plug and abandon process, stating: "The [w]ells will continue to discharge [hydrogen sulfide] until the wellbore is permanently sealed with concrete and reinforced (a process referred to as "plug and abandon" or "P&A")."[16] In comparison, the Court categorizes maintenance and monitoring as an "operating and ownership cost".[17] Thus, the case law supports the contract—decommissioning does not encompass maintenance and monitoring.

---

[14] *Davis v. California* (In re Venoco, LLC), 2022 Bankr. LEXIS 2330, *13.
[15] *Id.*
[16] *Id.*
[17] *Id.* at *33.

9

**D.    The Bankruptcy Court's Confirmation Order supports the contract's definition of decommissioning.**

On June 25, 2021, the United States Bankruptcy Court for the Southern District of Texas, Houston Division, issued its *Findings of Fact, Conclusions of Law, and Order (I) Confirming Eighth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors And (II) Granting Related Relief* ("Confirmation Order").[18]  In this Order, the Court makes abundantly clear that: "Neither the Plan nor the Apache Implementation Agreement (including the Apache Definitive Documents attached thereto) amends or alters the Decommissioning Agreement."[19]  Thus, the Decommissioning Agreement, and its definition of decommissioning, takes precedence over any later-in-time agreements, as ordered by the Bankruptcy Court.

**III.  PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that the Court grant Plaintiffs' application for a temporary injunction restraining and enjoining Apache.

Respectfully submitted,

**LOCKE LORD LLP**

*/s/ Philip Eisenberg*
Philip Eisenberg (TX Bar No. 24033923)
peisenberg@lockelord.com
Christopher A. Verducci (TX Bar No. 24051470)
cverducci@lockelord.com
Aditi Deal (TX Bar No. 24119780)

---

[18] Doc. No. 1751.
[19] *Id.* at ¶ 92.

10

aditi.deal@lockelord.com
600 Travis Street
Houston, Texas 77002
(713) 226-1200 (Tel.)
(713) 223-3717 (Fax)

**ATTORNEYS FOR PLAINTIFF HCC INTERNATIONAL INSURANCE COMPANY PLC**

**CLARK HILL, PLC**

*/s/*
James Kimball (TX Bar No. 11420000)
jkimbell@clarkhill.com
Christopher Ward (TX Bar No. 24008233)
cward@clarkhill.com
Duane J. Brescia (TX Bar No. 24025265)
dbrescia@clarkhill.com
Adam Diamond (TX Bar No. 24092344)
adiamond@clarkhilll.com
909 Fannin Street, Suite 2300
Houston, Texas 77010
(713) 951-5600 (Tel.) / (713) 951-5660 (Fax)

**ATTORNEYS FOR PLAINTIFF ZURICH AMERICAN INSURANCE COMPANY**
**MANIER & HEROD**

*/s/*
Michael E. Collins (TX Bar No. 24029006)
mcollins@manierherod.com
Jeff Price (TN Bar No. 019550)
jprice@manierherod.com
Scott Williams (TN Bar No. 021757)
swilliams@manierherod.com
1201 Demonbreun St, Suite 900
Nashville, Tennessee 37203
(615) 244-0300 (Tel.) / (615) 242-4203 (Fax)
*Pro Hac Vice Motions Pending*

**ATTORNEYS FOR PLAINTIFF PHILADELPHIA INDEMNITY INSURANCE COMPANY**

11

        **CHIESA, SHAHINIAN & GIANTOMASI, PC**
        */s/*_____
        Darren Gryzb (NJ Bar No. 016142005)
        dgryzb@csglaw.com
        Jase A. Brown (NJ Bar No. 225202018)
        jbrown@csglaw.com
        105 Eisenhower Parkway
        Roseland, New Jersey 07068
        (973) 325-1500 (Tel.) / (973) 530-2277 (Fax)
        *Pro Hac Vice Motions Pending*

        **ATTORNEYS FOR PLAINTIFF EVEREST REINSURANCE COMPANY**

## CERTIFICATE OF SERVICE

    I certify that on July 12, 2023, a true and correct copy of the foregoing was served via eFile on all counsel of record in accordance with Texas Rules of Civil Procedure.

        */s/ Aditi Deal*
        Aditi Deal

12

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Becky Delancy on behalf of Christopher Richard Ward
Bar No. 24008233
bdelancy@clarkhill.com
Envelope ID: 77429577
Filing Code Description: No Fee Documents
Filing Description: Plaintiffs' Bench Brief on Decommissioning
Status as of 7/12/2023 9:46 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Georgia Seeley | | gseeley@clarkhill.com | 7/12/2023 9:06:45 AM | SENT |
| Geoffrey L.Harrison | | gharrison@susmangodfrey.com | 7/12/2023 9:06:45 AM | SENT |
| Jeff McLaren | | jmclaren@susmangodfrey.com | 7/12/2023 9:06:45 AM | SENT |
| Nicholas Spear | | nspear@susmangodfrey.com | 7/12/2023 9:06:45 AM | SENT |
| Charlotte Oxley | | coxley@susmangodfrey.com | 7/12/2023 9:06:45 AM | SENT |
| Winston Luo | | wluo@susmangodfrey.com | 7/12/2023 9:06:45 AM | SENT |
| Abigail Noebels | | anoebels@susmangodfrey.com | 7/12/2023 9:06:45 AM | SENT |
| Becky Delancy | | bdelancy@clarkhill.com | 7/12/2023 9:06:45 AM | SENT |
| Christopher Verducci | 24051470 | cverducci@lockelord.com | 7/12/2023 9:06:45 AM | SENT |
| Philip Guy Eisenberg | 24033923 | peisenberg@lockelord.com | 7/12/2023 9:06:45 AM | SENT |
| Adam Diamond | | ADiamond@clarkhill.com | 7/12/2023 9:06:45 AM | SENT |
| Christopher RichardWard | | cward@clarkhill.com | 7/12/2023 9:06:45 AM | SENT |
| Jase ABrown | | jbrown@csglaw.com | 7/12/2023 9:06:45 AM | SENT |
| James MKimbell | | jkimbell@clarkhill.com | 7/12/2023 9:06:45 AM | SENT |
| Duane Brescia | | dbrescia@clarkhill.com | 7/12/2023 9:06:45 AM | SENT |
| Aditi Deal | | aditi.deal@lockelord.com | 7/12/2023 9:06:45 AM | SENT |
| Michael Edward Collins | 24029006 | mcollins@manierherod.com | 7/12/2023 9:06:45 AM | SENT |