**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIELDWOOD ENERGY III LLC,** *et al.* | § | **Case No. 20-33948 (MI)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Post-Effective date Debtors.**[1] | § | |

**PLAN ADMINISTRATOR'S OBJECTION TO CHEVRON U.S.A. INC.,**
**NOBLE ENERGY, INC., TEXACO, INC., UNION OIL COMPANY**
**OF CALIFORNIA, AND UNOCAL PIPELINE COMPANY'S**
**ADMINISTRATIVE EXPENSE PROOFS OF CLAIM**

[Related to POC Nos. 1056, 1060, 1064, 1068 and 1072 filed by Chevron U.S.A. Inc.,
POC Nos. 1058, 1061, 1069, 1074 and 1075 filed by Noble Energy, Inc.,
POC Nos. 1062, 1063, 1070, 1076 and 1077 filed by Texaco, Inc.,
POC Nos. 1059, 1065, 1071, 1080 and 1081 filed by Union Oil Company of California, and
POC Nos. 1057, 1067, 1073, 1078 and 1079 filed by Unocal Pipeline Company]

---

**This is an objection to your claims. The objection asks the Court to disallow the claims that you filed in this bankruptcy case. If you do not file a response within 30 days after the objection was served on you, your claims may be disallowed without a hearing.**

**A hearing will be conducted on this matter on October 2, 2023, at 10:30 am (Central Time) in Courtroom 404, United States Bankruptcy Court for the Southern District of Texas, 515 Rusk Street, Houston, Texas 77002. You may participate in the hearing either in person or by audio/video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at 1-832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Isgur's conference room number**

---

[1] The Post-Effective Date Debtors, along with the last four digits of each Post-Effective Date Debtor's federal tax identification number, as applicable, are: Fieldwood Energy III LLC (6778); Fieldwood Energy Offshore LLC (4494); Fieldwood Energy, Inc. (4991, GOM Shelf LLC (8107), and FW GOM Pipeline, Inc. (8440). Fieldwood Energy III LLC, Fieldwood Energy Offshore, LLC, and Fieldwood Energy Inc. are managed and operated by the Plan Administrator, whose primary mailing address is 16255 Ventura Blvd., Suite 440, Encino, CA, 91436, C/O Province LLC. GOM Shelf LLC and FW GOM Pipeline, Inc. (collectively, the "**Post-Effective Date FWE I Subsidiaries**") are managed and operated by Jon Graham, as sole manager of each Post-Effective Date FWE I Subsidiary. The Debtors in the other nine pending chapter 11 cases (which continue to be jointly administered with the cases of the Post-Effective Date Debtors), each of which have either been dissolved or merged into other entities as of the Effective Date, consist of the following: Dynamic Offshore Resources NS, LLC (0158); Fieldwood Offshore LLC (3489); Fieldwood SD Offshore LLC (8786); Fieldwood Offshore LLC (2930); Bandon Oil and Gas GP, LLC (9172); Bandon Oil and Gas, LP (9266); Fieldwood Energy SP LLC (1971); Galveston Bay Pipeline LLC (5703); and Galveston Bay Processing LLC (0422).

**is 954554.  Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Isgur's home page.  The meeting code is "JudgeIsgur".  Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Isgur's home page.  Select the case name, complete the required fields and click "Submit" to complete your appearance.**

**If you object to the relief requested you must respond in writing.  Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within thirty (30) days from the date this objection was filed.  Otherwise, the Court may treat the Objection as unopposed and sustain the relief requested.**

**Represented parties should act through their attorney.**

TO THE HONORABLE MARVIN ISGUR, U.S. BANKRUPTCY JUDGE:

David Dunn ("Administrator"), as Plan Administrator of Fieldwood Energy III LLC, Fieldwood Energy Offshore LLC, Fieldwood Energy Inc., GOM Shelf LLC and FW GOM Pipeline, Inc., Debtors (the "Post-Effective Date Debtors") files this *Plan Administrator's Objection to Chevron U.S.A., Inc., Noble Energy, Inc., Texaco, Inc., Union Oil Company Of California, And Unocal Pipeline Company's Administrative Expense Proofs of Claim* (the "Objection") and in support thereof respectfully represents as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this Objection under 28 U.S.C. § 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. § 1408.

# BACKGROUND

## A.     The Chapter 11 Case

2.      On August 3, 2020 and August 4, 2020 (as applicable, the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the United States Code (the "Bankruptcy Case") in the United States Bankruptcy Court for the Southern District of Texas (the "Court").

3.      On June 25, 2021, the Court entered the *Findings of Facts, Conclusions of Law, and Order (I) Confirming Eighth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors and (II) Granting Related Relief* [Docket No. 1751] (the "Confirmation Order") confirming, as modified therein, the *Eighth Amended Joint Chapter 11  Plan of Fieldwood Energy LLC and Its Affiliated Debtors* [Docket No. 1742] (including any exhibits and schedules thereto and as may be further amended, supplemented, or modified, including at Docket No. 2008, the "Confirmed Plan").

4.      On August 27, 2021, the Debtors filed that certain *Notice of (I) Entry of Order Confirming Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors and (II) Occurrence of Effective Date* [Docket No. 2016], setting forth that, *inter alia*, the Effective Date occurred on August 27, 2021 (the "Effective Date").

## B.     Plan Administrator

5.      On the Effective Date, David Dunn of Province, Inc. was appointed to serve as the Plan Administrator pursuant to the Confirmed Plan.  *See* Confirmed Plan § 5.9(b).

6.      The Plan Administrator is responsible, to the extent not otherwise provided for in the Confirmed Plan, for carrying out and implementing all provisions of the Confirmed Plan on behalf of the Debtors and Post-Effective Date Debtors, including reviewing and reconciling all

Claims asserted against the Debtors (including, but not limited to, Administrative Expense Claims, Other Secured Claims, Class 6A Unsecured Trade Claims, and Class 6B General Unsecured Claims) and making distributions on account of Allowed Claims.  As more fully set forth therein, section 5.9(c) of the Confirmed Plan vests the Plan Administrator with "all the rights, powers, authority, and duties on behalf of each of the Debtors and [the] Post-Effective Date Debtors [other than the Post-Effective Date FWE I Subsidiaries pursuant to section 5.9(a) of the Confirmed Plan]…to carry out and implement all provisions of the [Confirmed] Plan."  In short, the Plan Administrator has been tasked with: (i) controlling and effectuating the Claims reconciliation process; (ii) settling or compromising any Disputed Claims (as defined in the Confirmed Plan); and (iii) administering and adjusting the Debtors' claims register to reflect any such settlements and compromises.

**C.**     **Bar Dates**

7.     On October 13, 2020, the Debtors filed their Statements of Financial Affairs and Schedules of Assets and Liabilities [Docket Nos. 430 – 454].

8.     On October 14, 2020, the Court entered the *Order (I) Establishing Deadline to File Proofs of Claim and (II) Approving Form and Manner of Notice Thereof* [Docket No. 466] (the "Bar Date Order"), establishing certain dates and deadlines (each a "Bar Date") for filing proofs of claims in these chapter 11 cases.  The Bar Date Order established: (a) November 25, 2020, as the Bar Date for all non-governmental entities to file Proofs of Claim, and (b) February 1, 2021, as the Bar Date for all governmental entities to file Proofs of Claim.

9.     On February 17, 2022, the Court entered the *Order Establishing Deadline for Filing Requests for Payment of Administrative Expense Claims and Procedures Relating Thereto and Approving Form and Notice Thereof* [Docket No. 2387], which, *inter alia*, established March 25,

4

2022 at 5:00 p.m. (Central Time) as the deadline (the "Administrative Claim Bar Date") for persons to assert Administrative Expense Claims against the Debtors.

10.     Section 7.5 of the Confirmed Plan provides, "[a]ny objections to a Claim shall be filed on or before the date that is the later of (a) 180 days after the Effective Date and (b) such later date as may be fixed by the Bankruptcy Court after notice and a hearing, upon a motion by the Post-Effective Date Debtors, as such deadline may be extended from time to time." *See* Confirmed Plan § 7.5.  Accordingly, the deadline to object to Claims (the "Claims Objection Deadline") was originally February 23, 2022, which was extended to August 22, 2022 by the Court's order [Docket No. 2410] entered on March 16, 2022.  The Claims Objection Deadline was further extended to February 18, 2023 by the Court's order [Docket No. 2649] entered September 1, 2022.  Finally, the Claims Objection Deadline was further extended to August 17, 2023 by the Court's order [Docket No. 2770] entered March 16, 2023.

### D.     The Confirmed Plan and Confirmation Order

11.     Fieldwood Energy LLC and its debtor affiliates (each a "Debtor" and, collectively, the "Debtors" or "Company") were one of the largest oil and gas exploration and production companies in the Gulf of Mexico.  Its portfolio of properties includes both deepwater assets and shallow water assets in the Gulf of Mexico. The Company's liquidity profile became volatile in the years preceding the Petition Date, primarily due to (i) the precipitous decline in crude oil prices starting in 2014 and then again in 2020 and (ii) the effects of the COVID-19 pandemic.  The worsening market conditions coupled with significant decommissioning costs resulted in reduced liquidity for the Company and, ultimately, led to the filing of these bankruptcy cases.

12.     The Confirmed Plan set forth a restructuring of the Debtors.  The restructuring included a sale of certain of the Debtors' assets, including specified deepwater assets and shallow

water assets, (collectively, the "Purchased Oil & Gas Lease Interests") to a new entity ("Credit Bid Purchaser") formed at the direction of the Consenting FLTL Lenders.  The schedule of the oil and gas leases, rights-of-way and rights of use and easement included as part of the Purchased Oil & Gas Lease Interests was included as **Exhibit B** to the Disclosure Statement for Fourth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors [Docket No. 1285] (the "Disclosure Statement") and as part of the Plan Supplement.

13.     Through the Confirmed Plan, the Debtors also sought and obtained an order abandoning, pursuant to sections 105(a) and 554(a) of the Bankruptcy Code, certain of Debtors' assets (the "Abandoned Properties").  A schedule of the oil and gas leases, rights-of-way, and rights-of-use and easements related to the Abandoned Properties was included as **Exhibit F** to the Disclosure Statement and as part of the Plan Supplement.

14.     The Confirmation Order provides with respect to the Abandoned Properties:

> Pursuant to this Order, the Plan, Plan Supplement, or any other implementing or supplementing Plan Documents, the Abandoned Properties and any related facilities, platforms, or other assets (the "**Abandoned Assets**"), each as determined by the Debtors, shall be abandoned pursuant to the Plan Documents without further notice to or order of the Bankruptcy Court immediately upon the occurrence of the Effective Date pursuant to sections 105(a) and 554 of the Bankruptcy Code and/or deemed rejected pursuant to Section 365 of the Bankruptcy Code, as applicable.  The Abandoned Assets, including the Abandoned Properties, shall not be allocated to nor vest in the Post-Effective Date Debtors, FWE I, FWE IV, any FWE Additional Entity or any NewCo Entity (including, without limitation, the Credit Bid Purchasers).  Except as otherwise provided in the Plan Documents, none of the Debtors, their Estates, the Post-Effective Date Debtors, FWE I, FWE IV, any FWE Additional Entity nor the NewCo Entities (including, without limitation, the Credit Bid Purchasers) shall be liable for any obligations whatsoever arising from or relating to the post-Effective Date period with regards to the Abandoned Assets, except that FWE III may be deemed to be the operator of the Abandoned Properties that Fieldwood Energy LLC was the designated operator of immediately prior to the Effective Date.

6

*See* Confirmation Order ¶ 12.

15.     The Confirmation Order constituted:

(i) approval, pursuant to sections 105(a) and 554 of the Bankruptcy Code, of the abandonment of the Abandoned Assets, including the Abandoned Properties; and (ii) authorization to relinquish the Abandoned Assets, including the Abandoned Properties.  Such abandonment and/or relinquishment does not alter the obligation of the Debtors, the Post-Effective Date Debtors, or the Plan Administrator, as applicable, to comply with laws reasonably designed to protect the public health and safety from identifiable hazards, including, but not limited to, plugging and abandonment obligations (the "**Decommissioning Obligations**") or in any manner extinguish, modify, or otherwise limit: (a) the obligations of non-Debtor third parties for Decommissioning Obligations, or (b) the rights of the United States to enforce such Decommissioning Obligations.

*See* Confirmation Order ¶ 14.

**E.     Chevron U.S.A., Inc. *et al.*'s Administrative Expense Proofs of Claim**

16.     On March 22, 2022, Chevron U.S.A., Inc. ("CUSA"), Noble Energy, Inc. ("Noble"), Texaco Inc. ("Texaco"), Union Oil Company of California ("Union Oil"), and Unocal Pipeline ("Unocal") on behalf of themselves, affiliates, and related entities (collectively "Chevron") filed Administrative Expense Proofs of Claim Nos. 1056, 1057, 1058, 1059, 1060, 1061, 1062, 1063, 1064, 1065, 1067, 1068, 1069, 1070,1071, 1072, 1073, 1074, 1075, 1076, 1077, 1078, 1079, 1080 and 1081 (collectively, the "Chevron Administrative Claims").  Each of the Chevron Administrative Claims are identical except for the Debtor against whom the Chevron Administrative Claim was filed.

17.     The Chevron Administrative Claims state that they "evidence[] post-petition claims against one or more Debtors for the recovery of monies that have been spent and/or will be spent to satisfy Debtors' post-petition obligations…."  *See* Addendum to Chevron Administrative Claims

¶ 1.  Chevron states that it is "a predecessor in interest to various interests in numerous mineral leases, rights-of-way ("ROWs"), and rights-of-use and easements ("RUEs") that constituted assets of the Debtors' bankruptcy estate."  *See* Addendum to Chevron Administrative Claims ¶ 2. Chevron contends that it "has incurred, and will continue to occur *[sic]*, expenses to satisfy certain of Debtors' post-petition obligations…."  *See Id*.

18.     Chevron asserts four different types of claims in its Chevron Administrative Claims, each discussed in further detail below: (1) CUSA Rental Payments; (2) Safe Out Work; (3) Decommissioning Work; and (4) FWE Obligations.

19.     <u>CUSA Rental Payments</u>.  Chevron contends that CUSA made post-petition payments totaling $1,863.68 through the Effective Date to satisfy FWE's obligations to pay rentals on leases OCS-G 36537, OCS-G 36538, OCS-G 36540 and OCS-G 35963 to the US Government (collectively, the "<u>CUSA Rental Payments</u>").  Each of the OCS-G 36537, OCS-G 36538, OCS-G 36540 and OCS-G 35963 are Purchased Oil & Gas Lease Interests. *See* Exhibit B to the Disclosure Statement at Pgs. 4 & 5.

20.     <u>Safe Out Work</u>. Chevron contends that Noble incurred the following costs and expenses after the Effective Date (collectively, the "<u>Safe Out Work</u>"):

a.      Noble has incurred $123,278.89 of post-petition costs and expenses through the Effective Date to perform work associated with the monitoring, maintenance, and/or safe-out of the Neptune Spar (Complex ID #24235) and RUE OCS-G 30353 prior to the Plan's Effective Date.  Both the Neptune Spar (Complex ID #24235) and RUE OCS-G 30353 are Abandoned Properties. *See* Exhibit F to Disclosure Statement at Pg. 13.

b.      Noble incurred $2,048,558.15 of costs and expenses after the Effective Date to perform work associated with the monitoring, maintenance and/or safe-out of the Neptune Spar (Complex ID #24235) and RUE OCS-G 30353.

c.      Noble incurred $343,328.21 after the Effective Date to perform work associated with the monitoring, maintenance and/or safe-out of certain wells on lease OCS-G

15445. OCS-G 15445 is an Abandoned Property. *See* Exhibit F to Disclosure Statement at Pg. 5.

21.     <u>Decommissioning Work</u>. Chevron alleges that it will incur post-Effective Date decommissioning costs and expenses with respect to (collectively, the "<u>Decommissioning Work</u>"):

a.     Noble asserts an administrative expense claim for costs that it will incur on lease OCS-G 15445, which BSEE ordered Noble decommission on February 14, 2022. OCS-G 15445 is an Abandoned Property. *See* Exhibit F to Disclosure Statement at Pg. 5.

b.     Noble asserts an administrative expense claim for costs that it will incur on RUE OCS-G 30353.  RUE OCS-G 30353 is an Abandoned Property. *See* Exhibit F to Disclosure Statement at Pg. 13.

c.     CUSA asserts an administrative expense claim for costs that it will incur on lease OCS-G 03540, which BSEE ordered Noble decommission on February 14, 2022. OCS-G 03540 is an Abandoned Property. *See* Exhibit F to Disclosure Statement at Pg. 1.

22.     <u>FWE Obligations</u>. Chevron reserves its right to assert an administrative expense claim for costs Chevron incurs that were allocated to FWE I and/or FWE IV pursuant to the Confirmation Order (the "<u>FWE Obligations</u>").

## **OBJECTION**

**A.     Objection No. 1: The Chevron Administrative Expense Claims Are Duplicate Claims**

23.     Each of the Chevron Administrative Expense Claims are identical and duplicates of each other.  Failure to disallow and expunge all but one of the Chevron Administrative Expense Claims would result in Chevron holding duplicate claims against the Debtors for the same costs and expenses and an unwarranted recovery against the Debtors to the detriment of other creditors. Accordingly, the Plan Administrator respectfully requests that each Chevron Administrative Expense Claim, except for Administrative Expense Proof of Claim No. 1056, be disallowed as being duplicative of Administrative Expense Proof of Claim No. 1056.

**B.    Objection No. 2: The Safe Out Work And Decommissioning Work Are Not Necessary Costs And Expenses And Did Not Benefit The Estate And Its Creditors**

**i.    Claims Asserting Section 503(b)(1) Administrative Expense Priority Status Must Be Narrowly Construed**

24.    Section 503(a) of the Bankruptcy Code permits entities to timely file a request for payment of administrative expenses. 11 U.S.C. § 503(a). "The Bankruptcy Code provides that 'actual necessary costs and expenses of preserving the estate' are characterized as administrative expenses [under] 11 U.S.C. § 503(b)(1)(A) [], entitled to priority over the claims of other unsecured creditors." *Texas v. Lowe (In re H.L.S. Energy Company Inc.)*, 151 F.3d 434, 437 (5th Cir. 1998) (citing 11 U.S.C. § 507(a)(1)).

25.    "Generally, section 503(b) priorities should be narrowly construed to maximize the value of the estate for all creditors" *In re Northstar Offshore Group, LLC*, 628 B.R. 286, 299 (Bankr. S.D. Tex. 2020) (quoting 4 COLLIER ON BANKRUPTCY ¶ 503.06[2] (Richard Levin & Henry J. Sommers eds., 16th ed.).

**ii.    Safe Out Work And Decommissioning Work Did Not Arise From A Post-Petition Transaction**

26.    A party claiming that its claim should be entitled to payment as an administrative claim bears the burden of proof. *In re Matter of Whistler Energy II, LLC*, 931 F.3d 432, 441 (5th Cir. 2019).

27.    "In general, '[f]or a claim to be allowed as an administrative expense, goods or services must be delivered or provided pursuant to a *postpetition transaction*; it is not enough that payment becomes due after the petition date if the transaction was entered into with the debtor prepetition." *Northstar*, 628 B.R. at 299 (emphasis in original) (citing 4 COLLIER ON BANKRUPTCY ¶ 503.06[3][a] (Richard Levin & Henry J. Sommers eds., 16th ed.).

28.     In analyzing the statutory requirements imposed by section 503 of the Bankruptcy Code, the Fifth Circuit has held, "to qualify as an 'actual and necessary cost' under section 503(b)(1)(A), a claim against the estate must have arisen post-petition and as a result of actions taken by the trustee [or debtor-in-possession] that benefitted the estate." *Whistler Energy II*, 931 F.3d at 441 (5th Cir. 2019) (quoting *In re Jack/Wade Drilling, Inc.*, 258 F.3d 385, 387 (5th Cir. 2001)).  On this element, "a creditor must show some inducement by the debtor-in-possession." *Id*. at 442.

29.     Here, the Safe Out Work and Decommissioning Work, to the extent performed, was not performed as a result of any post-petition transaction entered into between Chevron and the Debtors.  Chevron fails to provide any information or documentation that the Safe Out Work and Decommissioning Work[2] was performed as a result of a post-petition transaction or that Chevron was induced by the debtor-in-possession to perform the Safe Out Work or Decommissioning Work. Since the Safe Out Work and Decommissioning Work did not arise post-petition and as a result of actions taken by the debtor-in-possession, the claims for Safe Out Work and Decommissioning Work are not entitled to administrative expense status.

### iii.     The Safe Out Work And Decommissioning Work Did Not Benefit The Estate Or Its Creditors

30.     The inquiry of whether a post-petition cost benefitted the estate "is merely a way of testing whether a particular expense was truly 'necessary' to the estate: If it was of no 'benefit,' it cannot have been necessary within the meaning of § 503(b)(1)(A)."  *Whistler Energy II,* 931 F.3d at 443 (quoting *IN re H.L.S. Energy Co., Inc.*, 151 F.3d 434, 437 (5th Cir. 1998)).  "Moreover, an 'actual and necessary cost' must have been of benefit to the estate and its creditors." *Northstar*,

---

[2] In fact, Chevron provides no information or documentation that suggests the Decommissioning Work has been performed.

628 B.R. at 298 (citing *In re H.L.S. Energy Co. Inc.*, 151 F.3d at 437). "This requirement is in keeping with the conceptual justification for administrative expense priority: that creditors must pay for those expenses necessary to produce distribution to which they are entitled." *Id*. at 299. "That is, the costs of salvage are to be paid." *Id*.

31.     The Safe Out Work and Decommissioning Work, to the extent performed, was performed on leases and properties that were abandoned by the Debtors as part of the Confirmed Plan.  As such, the Safe Out Work and Decommissioning Work did not benefit the estates or their creditors because the costs and expenses related to the Safe Out Work and Decommissioning Work did not result in distributions being made to the Estate's creditors nor did they enhance the ability of the debtor-in-possession's business to function.   Instead, the Safe Out Work and Decommissioning Work, to the extent performed, was performed on Abandoned Properties that had no or inconsequential value to the Estates.

### iv.     Safe Out Work And Decommissioning Work Performed Post-Effective Date Is Not Entitled to Administrative Expense Status And Should Be Disallowed.

32.     "[A]lthough § 503 'is silent as to when expenses of a debtor in a reorganization case cease to be accorded administrative priority, courts generally recognize that plan confirmation cuts off the accrual of further administrative expenses.' *Id*. (quoting 4 COLLIER ON BANKRUPTCY ¶ 503.06[3][a] (Richard Levin & Henry J. Sommers eds., 16th ed.)).  "This is true because the 'estate usually no longer exists after plan confirmation or, at the latest, after the effective date of the plan o[f] reorganization." *Id*.  Thus, Chevron's claim for the Safe Out Work post-Effective Date is not entitled to administrative expense status.

33.     Chevron is not entitled to a claim for the Safe Out Work and Decommissioning Work that was performed after the Effective Date because the Effective Date cut off the accrual of further administrative expenses.  This is further supported by paragraph 12 of the Confirmation

Order which provides that "none of the Debtors [and] their Estates, the Post-Effective Date Debtors, FWE I, FWE IV, any FWE Additional Entity and the NewCo Entities…shall be liable for any obligations whatsoever arising from or relating to the post-Effective Date period with regards to the Abandoned Assets…"  As admitted in the Chevron Administrative Claim, $2,391,886.36 of the Safe Out Work and any Decommissioning Work actually performed was incurred after the Effective Date.  This post-Effective Date Safe Out Work and Decommissioning Work was on Abandoned Properties.  Pursuant to Paragraph 12 of the Confirmation Order, the Debtors and their Estates are not liable for expenses related to the Safe Out Work incurred after the Effective Date.

**C.**    **Objection No. 3: Chevron Is Not Entitled To An Administrative Expense Claim For Safe Out Work and Decommissioning Work On Property That Is Not Property Of The Estate**

34.    Chevron asserts that the Safe Out Work and Decommissioning Work constitute administrative expenses under Section 503(b)(1)(A) of the Bankruptcy Code, even though such costs and expenses are on Abandoned Properties.  While the Chevron Administrative Claim does not make clear what authority Chevron relies upon, it is likely Chevron will rely on the Supreme Court's decision in *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494 (1986), the Fifth Circuit's holding in *State of Tex. v. Lowe (in re H.L.S. Energy Co., Inc.)*, 151 F.3d 434, 436 (5th Cir. 1998) and this Court's holding in *In re Am. Coastal Energy Inc.*, 399 B.R. 805 (Bankr. S.D. Tex. 2009).  Reliance on each of these cases is misplaced.

35.    In *Midlantic*, the issue was whether a bankruptcy trustee could abandon property contaminated with hazardous waste in contravention of state and local laws designed to protect public health or safety.  The Supreme Court held that "a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards." *Midlantic*, 474 U.S. at 506.  The Supreme Court reasoned that

28 U.S.C. § 959(b) requires a trustee to "manage and operate the property in his possession…according to the requirements of the valid laws of the state." *Id*. at 505 (quoting 28 U.S.C. § 959(b)).  Section 959(b) was evidence that Congress did not intend for the Bankruptcy Code to pre-empt all state laws that otherwise constrain the exercise of the trustee's powers.  *Id*. "The Supreme Court, however, expressly left open the question of the priority accorded to governmental costs if the trustee fails to respond to a cleanup order." *Northstar*, 628 B.R. at 301.

36.     In *H.L.S. Energy,* the debtor's obligation to decommission inactive wells arose post-petition and the bankruptcy estate did not have sufficient funds to pay the decommissioning costs. The trustee and the State of Texas agreed that the State would plug the wells and charge the costs to the bankruptcy estate. When the State asserted an administrative expense claim, the trustee objected, arguing that the claim was not entitled to administrative expense status. The Fifth Circuit held that the State's claim was entitled to administrative expense priority because the obligation to plug the wells arose post-petition and the trustee was required to operate the bankruptcy estate in accordance with state law, which required the wells to be plugged. *In re H.L.S. Energy,* 151 F.3d at 438. The court further reasoned that expenses incurred to comply with state law were actual and necessary costs of managing and preserving the estate. *Id.*

37.     In *Am. Coastal,* the debtor owned and operated eight wells that became inactive prior to its bankruptcy filing. The Texas Railroad Commission plugged the wells, and sought reimbursement from the debtor as an administrative expense claim. Citing federal and state law, the debtor argued that, because the liability arose prepetition, the plugging expense did not qualify as an administrative expense, but rather, was a general unsecured claim. The Court rejected the debtor's argument and held that the Texas Railroad Commission's claims were administrative expense claims because the expenses benefitted the estate by remedying violations of

14

environmental and safety laws, regardless of whether the liability for the violation first occurred prepetition or post-petition. *In re Am. Coastal,* 399 B.R at 811.

38.     First, neither *Midlantic, H.L.S. Energy* nor *Am. Coastal* concerned a private party like Chevron.  Instead, the administrative expense claim was asserted by a state agency burdened with the costs of cleaning up the debtor's environmental obligations.  This Court made clear in *Am. Coastal* that "its analysis is limited to environmental remediation claims made by a governmental unit for postpetition remediation." *In re Am. Coastal,* 399 B.R. at 809, n.3. This Court also made clear in *Northstar* that such distinction is important in the analysis of whether decommissioning obligations are entitled to administrative priority. *In re Northstar*, 628 B.R. at 302 – 303 ("However, unlike in *American Coastal*, the party asserting administrative priority is not a state agency, nor, as Northstar argues, was the trustee operating a business in light of Northstar's sale of substantially all of its assets to NOV, nor did 28 U.S.C. § 959 apply because [] Northstar was not in possession of the property.").

39.     More importantly, in both *H.L.S. Energy* and *Am. Coastal*, the debtor continued to have an ownership and/or operating interest in the wells.  The *H.L.S. Energy* and *Am. Coastal* courts relied on the statutory language in 28 U.S.C. § 959(b) requiring a debtor-in-possession to manage and operate the property in his possession" in accordance with state laws. *See In re H.L.S. Energy,* 151 F.3d at 438; *In re Am. Coastal,* 399 B.R at 810-12. These cases only found that a debtor incurs administrative expenses for decommissioning costs related to property in the debtor's possession. In other words, only those decommissioning costs incurred in connection with property in which the Debtor has an interest can qualify as an administrative expense. As the *Am. Coastal* court noted:

> Opinions that have denied administrative expense characterization
> of postpetition expenditures to remediate pre-petition environmental

> liabilities involved expenditures on property that was no longer property of the bankruptcy estate. *In re Dant* & *Russell, Inc.,* 853 F.2d 700, 709 (9th Cir. 1988) *("Kovacs* and *Johnson Bronze* are significant in that they involved assertions of administrative expense priority by a lessor for cleanup costs resulting from property not owned by the bankruptcy estate"). *See also Ohio v. Kovacs,* 469 U.S. 274, 105 S. Ct 705, 83 L. Ed. 2d 649 (1985); *Southern Ry. Co. v. Johnson Bronze Co.,* 758 F.2d 137, 141 (3d Cir. 1985). Since the property was no longer estate property, the expenditure was not necessary to preserve the estate.

*In re Am. Coastal,* 399 B.R. 805, n.4. Other courts have reached similar conclusions. *See, e.g., In re McCrory Corp,* 188 B.R. 763, 769-70 (Bankr. S.D.N.Y. 1995) (holding that a debtor had appropriately abandoned a leasehold interest by rejection of the relevant lease, that such leasehold interest was no longer property of the estate, and that any postpetition cleanup costs would not benefit the estate); *In re Insilco Techs., Inc.,* 309 B.R. 111, 115 (Bankr. D. Del. 2004) ("In general, only those costs incurred to cleanup property for which an estate has an interest in or owns may qualify as administrative expenses."); *In re Mahoney-Troast Constr. Co.,* 189 B.R. 57, 62 (Bankr. D. N.J. 1995) ("Finally, as the trustee points out, the debtor did not own the property and cleanup was effected almost two years after the lease was rejected and the trustee returned the property."). Indeed, the rationale behind these holdings is that the estate does not benefit from remediation costs incurred post-petition once the property in question is no longer property of the estate.

40.     This Court found similarly in *Northstar*, 628 B.R. 286 (Bankr. S.D. Tex. 2020). In *Northstar*, the debtor was a co-owner of two oil and gas leases with Medco Energi. *Northstar*, 628 B.R. at 291. Post-petition, the leases were rejected pursuant to 11 U.S.C. § 365. *Id*. at 290. After the rejection, Medco Energi performed decommissioning work on the leases and filed an application for allowance and payment of an administrative claim seeking the debtor's share of the decommissioning cost.  *Id*. at 294 – 295.   While this court recognized that Northstar's decommissioning obligations under the leases were the type of "continuing post-petition duty" that

could give rise to an administrative claim, the Court held that such claim was not an administrative expense because the trustee was not operating a business in light of Northstar's sale of substantially all of its assets and 28 U.S.C. § 959 did not apply because Northstar was not in possession of the property.  *Id*. at 302 – 303.

41.     Here, as of the Effective Date, the Debtors abandoned the properties and leases upon which the Safe Out Work and Decommissioning Work will be incurred.  As a result, the Abandoned Properties were no longer a part of the estate. *See* 5 COLLIER ON BANKRUPTCY ¶ 554.02[3] (16th 2023) ("Upon abandonment under section 554, the trustee is divested of control of the property because it is no longer part of the estate."). At least with respect to the Abandoned Properties, there is no business being operated by a trustee or debtor-in-possession.

42.     The Decommissioning Work are for costs and expenses that Chevron may incur on Abandoned Properties after the Effective Date.  The Safe Out Work performed after the Effective Date was also on Abandoned Properties. Like the creditor in *Northstar*, Chevron seeks an administrative expense claim against property that is no longer property of the estate.  As such, the estate is no longer in possession of the Abandoned Properties, is not operating a business in which the Abandoned Properties are utilized and Chevron is not entitled to an administrative expense priority claim on account of the Decommissioning Work.  *See, e.g., Northstar*, 628 B.R. at 301 - 303, *In re McCrory Corp.*, 188 B.R. at 765; *Johnson Bronze Co.*, 758 F.2d at 141.

   v.     **Chevron Cannot Subrogate to an Administrative Priority Claim.**

43.     In *Northstar*, Medco Energi argued it was entitled to subrogation of its claim to the rights of the United States pursuant to 11 U.S.C. § 509(a) in light of Northstar and Medco Energi's joint and several liability under 30 C.F.R. § 250.1701.  *Northstar*, 628 at 304.  The Court disagreed, holding that the exception in Section 509(b) of the Bankruptcy Code precluded Medco Energi's

subrogation claim because Medco Energi was jointly and severally liable with Northstar and Medco Energi received consideration in the form of the release of its obligations by the United States. *Id*. at 304 – 309.

44.     Section 509(a) and (b) provide:

(a) Except as provided in subsection (b) or (c) of this section, an entity that is liable with the debtor on, or that has secured, a claim of a creditor against the debtor, and that pays such claim is subrogated to the rights of such creditor to the extent of such payment.

(b) Such entity is not subrogated to the rights of such creditor to the extent that—

(1) a claim of such entity for reimbursement or contribution on account of such payment of such creditor's claim is—
(A) allowed under section 502 of this title;
(B) disallowed other than under section 502(e) of this title; or
(C) subordinated under section 510 of this title; or

(2) as between the debtor and such entity, such entity received the consideration for the claim held by such creditor.

45.     In *Northstar*, this Court discussed the purpose of Section 509(a) and why it should be narrowly construed:

Accordingly, under § 509, which governs 'claims of codebtors, to be subrogated to a claim, creditors must show that (1) they are an entity that is liable with the debtor on, or that has secured, a claim of a creditor against a debtor, (2) they have paid the claim secured, and (3) they have not received consideration for the claim held by such creditor.' Section 509 allows a co-obligor who pays, after the petition date, a claim for which the debtor is primarily liable, to be subrogated to the rights of the creditor that the co-obligor has paid. Section 509 operates as a narrow, equitable backstop to ensure that a co-obligor is entitled to whatever distribution would otherwise have gone to the creditor whose claim the obligor paid postpetition. Under section 509(a), an entity is liable with the debtor when the entity is obligated to pay, by law or equity, on a claim of a creditor *against the debtor*.  In other words, in 'order for subrogation to be

18

> available to the co-obligor under section 509, [] the *debtor* must be
> the party that in the eyes of the law is *primarily liable* for the
> indebtedness paid by the obligor. This is so because "[o]ne cannot
> seek subrogation for paying one's own debts."

*Northstar*, 628 B.R. at 305 – 306 (emphasis added)(internal citations omitted).

46.     The principles of Section 509(a) are further reflected under the exception set forth

in Section 509(b)(2):

> Taking into consideration '[t]he legislative history, and generally
> recognizable principles of law of equitable subrogation,' as set forth
> in the exception under § 509(b), 'courts refuse to extend section 509
> to a party who itself is primarily liable on the creditors claim *or* has
> otherwise received the consideration for the claim of the creditor.'

*Northstar* at 306.

47.     Section 509(b)(2) makes clear that where "the co-obligor itself received

consideration for which its payment was made, it will not be subrogated to the rights of the creditor

that it paid." *Id*. (quoting 4 COLLIER ON BANKRUPTCY ¶ 509.01[4] (Richard Levin & Henry J.

Sommers eds., 16th ed.)).   "This implements the public policy behind section 509, which is to

permit subrogation of those *secondary liable* with the debtor but to deny subrogation where the

paying co-obligor is merely paying its own debt." *Id*. at 306 – 307. "Notably, courts have

'recognized that a party who pays a judgment on which it is *jointly and severally liable* with the

debtor does not have the right to subrogation, because the paying creditor receives consideration

in the form of a release." *Id*. at 307.

48.     The Code of Federal Regulations provides that "lessees and owners of operating

rights are jointly and severally responsible for meeting decommissioning obligations for facilities

on leases…as the obligations accrue and until each obligation is met." 30 C.F.R. § 250.1701(a).

Likewise, "[a]ll holders of right-of-way are jointly and severally liable for meeting

decommissioning obligations for facilities on their right-of-way, including right-of-way pipelines,

as the obligations accrue and until each obligation is met."   30 C.F.R. § 250.1701(b).
Decommissioning obligations accrue when a party is or "become[s] a lessee or the owner of
operating rights of a lease on which there is a well that has not been permanently plugged according
to this subpart, a platform, a lease term pipeline, or other facility, or an obstruction." 30 C.F.R. §
250.1702(d).  "Every current and prior record title owner is *joint and severally liable*, along with
all other record title owners and all prior and current operating rights owners, for compliance
with…decommissioning obligations, which accrue while it holds record title interest."  30 C.F.R.
§ 556.604(d) (emphasis added).

49.     First, it should be noted that Chevron provides no information or documentation
that it has actually incurred any costs or expenses for Decommissioning Work nor performed the
decommissioning work.  Without actually incurring such costs and expenses or performing the
decommissioning work, Chevron is not entitled to be subrogated to the rights of the United States.

50.     Even if Chevron has incurred costs and expenses for the Decommissioning Work
or performed the decommissioning work, Chevron is still not entitled to be subrogated to the rights
of the United States. Likewise, in the event any of the Safe Out Work constitutes decommissioning
under 30 C.F.R. § 250.1700, Chevron is not entitled to be subrogated to the rights of the United
States. Chevron is a predecessor-in-interest with respect to all the Abandoned Properties upon
which Chevron alleges it incurred Safe Out Work and may incur Decommissioning Work. As such,
Chevron is jointly and severally liable with the Debtors for the Decommissioning Work.  30 C.F.R.
§ 250.1700.  Therefore, neither Chevron nor the Debtors are primarily or secondarily liable as to
the Decommissioning Work and any Safe Out Work that constitutes decommissioning under 30
C.F.R. § 250.1700. Chevron cannot avail itself of subrogation under Section 509(a) of the
Bankruptcy Code.  Moreover, because Chevron's liability is of equal status as the Debtors, in

paying for or performing the Safe Out Work and Decommissioning Work, Chevron received and would receive consideration in the form of a release by the United States.

  **vi.**    **The Costs Associated with the Safe Out Work and Decommissioning Work Are Prepetition Expenses**

  51.   In the alternative to the proceeding objections, Chevron's Safe Out Work and Decommissioning Work all constitute prepetition obligations of the Debtors and Chevron. Although decommissioning work may have occurred post-petition, the decommissioning obligations of Chevron and the Debtors with respect to the Safe Out Work and Decommissioning Work accrued pre-petition.

  52.   As discussed above, all prior and current interest holders in the Abandoned Properties on which the Safe Out Work and Decommissioning Work were performed are jointly and severally liable to BOEM and BSEE for the decommissioning obligations.  30 C.F.R. §§ 250.146, 250.1701. In particular, 30 C.F.R. § 250.1701 provides that:

  (a)   Lessees and owners of operating rights are jointly and severally responsible for meeting decommissioning obligations for facilities on leases, including the obligations related to lease-term pipelines, as the obligations accrue and until each obligation is met.

  (b)   All holders of a right-of-way are jointly and severally liable for meeting decommissioning obligations for facilities on their right-of-way, including right-of-way pipelines, as the obligations accrue and until each obligation is met.

  (c)   In this subpart, the terms "you" or "I" refer to lessees and owners of operating rights, as to facilities installed under the authority of a lease, and to right-of-way holders as to facilities installed under the authority of a right-of-way.

  53.   Pursuant to 30 C.F.R. § 250.1702, both Chevron and the Debtors became obligated to perform decommissioning obligations on the Abandoned Properties upon which the Safe Out Work and Decommissioning Work were performed when they first became parties to the lease, which occurred during the prepetition period.   Accordingly, the Safe Out Work and

Decommissioning Work were prepetition obligations and any claims arising from Chevron's satisfaction of such prepetition decommissioning obligations constitute prepetition claims, not claims entitled to priority status pursuant to 11 U.S.C. § 503(b)(1)(A).

**D.     Objection No. 4: The FWE Obligations And Decommissioning Work Are Disallowed Under 11 U.S.C. § 502(e)(1)(B)**

54.     Section 502(e)(1)(B) of the Bankruptcy Code provides, in pertinent part, that:

> [T]he court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured the claim of a creditor, to the extent that…such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution[.]

11 U.S.C. § 502(e)(1)(B).

55.     Contingent claims should thus be disallowed if they meet the following factors: (i) the claim is for reimbursement or contribution, (ii) the claim is asserted by an entity that is liable with the debtor on an underlying claim, and (iii) the claim is contingent at the time of its allowance or disallowance.  *See In re Sorenson v. Drexel Burnham Lambert Group, Inc., (In re Drexel Burnham Lambert Group, Inc.)*, 146 B.R. 92, 95-96 (S.D.N.Y. 1992)(articulating three-part test); *In re Tri-Union Dev. Corp.*, 314 B.R. 611, 616-17 (Bankr. S.D. Tex. 2004)(analyzing whether reimbursement claim was contingent, then assessing whether "the responding parties are 'liable with the debtor'").

56.     If Chevron were able to establish that the Debtors had reimbursement obligations pursuant to certain agreements, then any claim they may have in the future against the Debtors would be for reimbursement or contribution.  "Courts have consistently held that 'the concept of reimbursement includes indemnity.'"  *In re Falcon V, L.L.C.*, 620 B.R. 256, 269-70 (Bankr. M.D. La. 2020)(finding that surety that issued bonds was not entitled to claim pursuant to Section

502(e)(1)(B) since it was a contingent claim); *In re RNI Wind Down Corp.*, 369 B.R. 174, 181-82 (Bankr. D. Del. 2007)(quoting *In re Vectrix Bus. Solutions, Inc.*, 2005 WL 3244199, at \*3 (Bankr. N.D. Tex. 2005)).

57.     Second, the claim must be asserted by an entity that is liable with the debtor on an underlying claim.  In order for Section 502(e) to apply, "[t]here must exist…a shared liability to the same party on the same claim."  *In re Tri-Union Dev. Corp.*, 314 B.R. 611, 616-17 (Bankr. S.D. Tex. 2004).  "[T]he co-liability requirement is to be interpreted to require a finding that the causes of action in the underlying lawsuit assert claims upon which, if proven, the debtor could be liable but for the automatic stay."  *In re Drexel Burnham Lambert Group, Inc.*, 146 B.R. 92, 95 (S.D.N.Y. 1992).  The existence of a direct claim by the third party against the debtor does not preclude the application of Section 502(e)(1)(B).  *In re Tri-Union Dev. Corp.*, 314 B.R. at 616-17.  As discussed above, the Debtors and Chevron are jointly and severally liable to BOEM and BSEE on the decommissioning obligations for those Abandoned Properties on which the FWE Obligations and Decommissioning Work would be performed.

58.     Third, the FWE Obligations and Decommissioning Work remain contingent.  In the *Tri-Union Dev. Corp.* case, the Court noted that "contingent" under Section 502(e) in this context means "unfunded" and that claims remain "contingent" for purposes of Bankruptcy Code § 502(e)(1)(B) until the co-debtor has paid the creditor.  *In re Tri-Union Dev. Corp.*, 314 B.R. at 616-17.  The FWE Obligations and Decommissioning Work remain contingent until Chevron performs or pays for such decommissioning costs and expenses.

**E.     FWE Obligations Are the Responsibility of FWE I and FWE IV**

59.     Chevron reserves its right to assert administrative claims for costs Chevron incurs with respect to obligations allocated to FWE I and/or FWE IV pursuant to the Confirmation Order.

As set forth in the Chevron Administrative Claim, these obligations are the responsibility of FWE I and/or FWE IV, not the Post-Effective Date Debtors.

**F.      No Further Objection to the CUSA Rental Payments**

60.      The Administrator does not further object to the CUSA Rental Payments being provided Administrative Expense Priority Under 11 U.S.C. § 503(b)(1), provided that Chevron is only allowed one allowed administrative expense claim on account of the CUSA Rental Payments.

<u>**CONCLUSIONS AND PRAYER**</u>

Chevron has failed to carry its burden of demonstrating that its decommissioning costs qualify as administrative expenses under section 503(b)(1)(A) of the Bankruptcy Code.  For the reasons set forth above, the Administrator requests that the Court enter an order, substantially in the form annexed hereto as <u>**Exhibit A**</u>, denying Chevron's request for an administrative expense claim, and granting such other and further relief as is just and appropriate under the circumstances.

DATED:  August 15, 2023

Respectfully submitted,

*/s/ Kenneth Green*
Ken Green (Texas State Bar No. 24036677)
Aaron Guerrero (Texas State Bar No. 24050698)
Bryan Prentice (Texas State Bar No. 24099787)
Bonds Ellis Eppich Schafer Jones LLP
950 Echo Lane, Suite 120
Houston, Texas 77024
(713) 335-4990 telephone
(713) 335-4991 facsimile
ken.green@bondsellis.com
aaron.guerrero@bondsellis.com
bryan.prentice@bondsellis.com

**ATTORNEYS FOR DAVID DUNN, THE PLAN ADMINISTRATOR FOR THE POST-EFFECTIVE DATE DEBTORS**

## **CERTIFICATE OF SERVICE**

I certify that on this 15th day of August, 2023, a true and correct copy of the above and foregoing was served through the Court's electronic case filing system (ECF) upon all parties registered with the ECF and by U.S. First Class Mail and email to the following:

Chevron U.S.A., Inc.
c/o Andrews Myers, P.C.
1885 Saint James Place, 15th Floor
Houston, TX  77056
Attn:  Edward Ripley
Email:  eripley@andrewsmyers.com

Chevron U.S.A., Inc.
c/o Gray Reed
1300 Post Oak Blvd., Suite 2000
Houston, TX  77056
Attn:  Patrick Kelly
Email:  pkelly@grayreed.com


*/s/Kenneth Green*
Kenneth Green