**Exhibit N1**

**Chevron Definitive Documents**
**(Revised Plan of Merger and related Asset Schedules)**

**AGREEMENT AND PLAN OF MERGER**
**OF**
**FIELDWOOD ENERGY III LLC,**
**FIELDWOOD SD OFFSHORE LLC,**
**BANDON OIL AND GAS, LP,**
**FIELDWOOD ENERGY OFFSHORE LLC**
**AND**
**DYNAMIC OFFSHORE RESOURCES NS, LLC**

**INTO**

**FIELDWOOD ENERGY IV LLC,**
**FIELDWOOD ENERGY III LLC,**
**FIELDWOOD SD OFFSHORE LLC,**
**BANDON OIL AND GAS, LP,**
**FIELDWOOD ENERGY OFFSHORE LLC**
**AND**
**DYNAMIC OFFSHORE RESOURCES NS, LLC**

This AGREEMENT AND PLAN OF MERGER, dated as of August 27, 2021 (this "Plan of Merger"), is executed and adopted by each of Fieldwood Energy III LLC, a Texas limited liability company ("FWE III"), Fieldwood SD Offshore LLC, a Texas limited liability company ("SD Offshore"), Bandon Oil and Gas, LP, a Texas limited partnership ("Bandon LP"), Fieldwood Energy Offshore LLC, a Texas limited liability company ("FEO"), and Dynamic Offshore Resources NS, LLC, a Texas limited liability company ("Dynamic Offshore" and together with FWE III, SD Offshore, Bandon LP and FEO, the "Surviving Entities").

WHEREAS, commencing August 3, 2020, Fieldwood Energy LLC, a Delaware limited liability company ("FWE"), and certain other affiliates of FWE (each, a "Debtor" and collectively, the "Debtors") filed voluntary petitions with the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") initiating their respective cases pending under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") styled *In re Fieldwood Energy LLC, et al.*, jointly administered under Case No. 20-33948 (MI) (each case of a Debtor, a "Case" and collectively, the "Chapter 11 Cases");

WHEREAS, in connection with the Chapter 11 Cases, the Debtors filed the *Eighth Amended Joint Chapter 11 Plan of Fieldwood Energy LLC and Its Affiliated Debtors* at Docket No. 1742 (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Plan of Reorganization"), which was confirmed by order of the Bankruptcy Court entered on June 25, 2021 at Docket No. 1751 (as may be amended, modified, and supplemented, the "Confirmation Order");

WHEREAS, in accordance with the Plan of Reorganization and Confirmation Order, pursuant to the Credit Bid Purchase Agreement (as defined below) certain assets and properties of the Debtors were sold and conveyed to, and certain liabilities and obligations of Debtors were assumed by, QuarterNorth Energy LLC, a Delaware limited liability company ("Credit Bid

Purchaser"), prior to the effective time of the First Merger (as defined below) (the "Credit Bid Transaction");

WHEREAS, pursuant to the Plan of Reorganization, and as authorized by the Confirmation Order, (i) FWE converted from a Delaware limited liability company to a Texas limited liability company on August 2, 2021, (ii) SD Offshore converted from a Delaware limited liability company to a Texas limited liability company on August 2, 2021, (iii) Bandon LP converted from a Delaware limited partnership to a Texas limited partnership on August 2, 2021 and (iv) FEO converted from a Delaware limited liability company to a Texas limited liability company on August 2, 2021;

WHEREAS, pursuant to the Plan of Reorganization, and as authorized by the Confirmation Order, following the Credit Bid Transaction and prior to the Effective Time on August 27, 2021, FWE effected a divisional merger (the "First Merger") pursuant to that certain Agreement and Plan of Merger of Fieldwood Energy LLC ("FWE I Plan of Merger"), pursuant to which (i) FWE maintained its separate existence and continued as a surviving entity under the name "Fieldwood Energy III LLC;" (ii) a new Texas limited liability company was formed under the name "Fieldwood Energy I LLC" ("FWE I"); and (iii) all of the assets and liabilities of FWE were allocated to FWE I and FWE III, in each case as set forth in the FWE I Plan of Merger;

WHEREAS, pursuant to the Plan of Reorganization, and as authorized by the Confirmation Order, each Surviving Entity is to effect a divisional merger as set forth in this Plan of Merger (the "Merger") promptly following the First Merger, pursuant to which, among other things:

a) each of the Surviving Entities shall maintain its separate existence and continue as a surviving entity under its name as of immediately prior to the Merger;

b) a new Texas limited liability company shall be formed under the name "Fieldwood Energy IV LLC" ("FWE IV");

c) all of the FWE IV Assets (as defined below) shall be allocated to and vested in FWE IV;

d) all of the FWE IV Obligations (as defined below) shall be allocated to and shall constitute liabilities and obligations of, FWE IV;

e) all of the FWE III Assets (as defined below) shall be allocated to and vested in FWE III;

f) all of the FWE III Obligations (as defined below) shall be allocated to, and shall constitute liabilities and obligations of, FWE III;

g) all of the SD Offshore Assets (as defined below) shall be allocated to and vested in FWE III;

h) all of the SD Offshore Obligations (as defined below) shall be allocated to, and shall constitute liabilities and obligations of, FWE III;

i) all of the Bandon LP Assets (as defined below) shall be allocated to and vested in FWE III;

2

j)  all of the Bandon LP Obligations (as defined below) shall be allocated to, and shall constitute liabilities and obligations of, FWE III;

k)  all of the FEO Assets (as defined below) shall be allocated to and vested in FWE III;

l)  all of the FEO Obligations (as defined below) shall be allocated to, and shall constitute liabilities and obligations of, FWE III;

m)  all of the Dynamic Offshore Assets (as defined below) shall be allocated to and vested in FWE III; and

n)  all of the Dynamic Offshore Obligations (as defined below) shall be allocated to, and shall constitute liabilities and obligations of, FWE III; and

WHEREAS, this Plan of Merger has been authorized by the Confirmation Order, which provides such approval of the transactions contemplated hereby as required for purposes of Sections 10.001 et seq. of the Texas Business Organizations Code (the "TBOC"), and Section 1.002(55)(A) of the TBOC and, in accordance with Section 10.008 of TBOC, the Merger shall be consummated without any reversion or impairment, any further act or deed, or any transfer or assignment having occurred.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained, and for good and valuable consideration, the sufficiency of which is acknowledged, and for the purpose of prescribing the terms and conditions of the Merger, the mode of carrying it into effect, the manner and basis of allocating assets and liabilities of each of the resulting entities and such other details and provisions of the Merger as are deemed necessary or desirable, each Surviving Entity has agreed and covenanted, and does hereby agree and covenant, as follows:

1.      Subject to the provisions of this Plan of Merger, the Surviving Entities shall cause the Merger to be consummated by filing a certificate of merger with the Secretary of State of the State of Texas in such form as is required by, and executed in accordance with, the relevant provisions of the TBOC, in substantially the form attached as Exhibit A (the "Certificate of Merger"), together with a certificate of formation of FWE IV in substantially the form attached as Exhibit B-A (the "Certificate of Formation").  The Certificate of Merger shall provide that the Merger shall be effective on the date and time the Certificate of Merger is accepted and filed with the Secretary of State of the State of Texas (the "Effective Time"). The Certificate of Formation of FWE IV shall provide that the Certificate of Formation shall be effective as of the Effective Time.

2.      At the Effective Time:

(a)      Each Surviving Entity shall be divisionally merged in accordance with Section 10.008 of the TBOC with (i) FWE IV being formed as a Texas limited liability company and new domestic entity, separate from the Surviving Entities as a result of the Merger and having been allocated the FWE IV Assets and the FWE IV Obligations in accordance with the TBOC under the name "Fieldwood Energy IV LLC," (ii) each Surviving Entity continuing as a Texas limited liability company or Texas limited partnership, as applicable, and surviving domestic entity

3

of the Merger in accordance with the TBOC under the same name it had immediately prior to the Merger and (iii) FWE III having been allocated all assets and liabilities of the Surviving Entities (other than the FWE IV Assets, the FWE IV Obligations and the Abandoned Properties) in accordance with the TBOC. The Merger will have the effect set forth below and in Section 10.008 of the TBOC.

(b)     There shall be no change (through conversion, exchange, or otherwise) to the membership interests or partnership interests, as applicable, of any of the Surviving Entities, which (i) membership interests in FWE III will continue to be owned by Fieldwood Energy Inc. as of the Effective Time; (ii) membership interests in SD Offshore will continue to be owned by FWE III as of the Effective Time; (iii) limited partner interests in Bandon LP will continue to be owned by FEO as of the Effective Time and general partner interests in Bandon LP will continue to be owned by Bandon Oil and Gas GP, LLC as of the Effective Time; (iv) membership interests in FEO will continue to be owned by FWE III as of the Effective Time; and (v) membership interests in Dynamic Offshore will continue to be owned by FEO as of the Effective Time.

(c)     All of the membership interests of FWE IV shall be acquired by and owned by Fieldwood Energy Inc. as of the Effective Time.

(d)     The certificate of formation and limited liability company agreement or limited partnership agreement, as applicable, of each Surviving Entity as in effect immediately prior to the Effective Time shall be the certificate of formation and limited liability company agreement or limited partnership agreement, as applicable, of such Surviving Entity immediately following the Effective Time.

(e)     The Certificate of Formation shall be the certificate of formation of FWE IV, and the limited liability company agreement of FWE IV immediately following the Effective Time shall be substantially in the form of the company agreement attached hereto as Exhibit B-B (the "FWE IV LLC Agreement").

(f)     The officers and managers of each Surviving Entity, if any, immediately prior to the Effective Time shall continue to be the officers of such Surviving Entity in accordance with and subject to the terms and conditions of the limited liability company agreement or limited partnership agreement, as applicable, of such Surviving Entity.

(g)     The officers and managers of FWE IV, if any, shall be as set forth in, and subject to the terms and conditions of, the FWE IV LLC Agreement.

(h)     All of the rights, title and interests to all real estate and other properties of the Surviving Entities described in Part A of Schedule I attached hereto (the "FWE IV Assets"), subject to any existing liens or other encumbrances on such property, shall be allocated to and vested in FWE IV without reversion or impairment, without further act or deed, and without transfer or assignment having occurred, and no others (and expressly excluding any Surviving Entity Assets).

(i)     All of the liabilities and obligations of the Surviving Entities described in Part B of Schedule I attached hereto (the "FWE IV Obligations") shall be allocated to, and shall

4

constitute liabilities and obligations of, FWE IV, and no others (and expressly excluding any Surviving Entity Obligations).

(j)     All of the rights, title and interests to all real estate and other properties of FWE III other than those that comprise the FWE IV Assets (collectively, the "FWE III Assets"), subject to any existing liens or other encumbrances on such property, shall be allocated to and vested in FWE III without reversion or impairment, without further act or deed, and without transfer or assignment having occurred.

(k)     All of the liabilities and obligations of FWE III other than those that comprise the FWE IV Obligations (collectively, the "FWE III Obligations") shall be allocated to, and shall constitute liabilities and obligations of, FWE III.

(l)     All of the rights, title and interests to all real estate and other properties of SD Offshore other than those that comprise the FWE IV Assets or that constitute Abandoned Properties (collectively, the "SD Offshore Assets"), subject to any existing liens or other encumbrances on such property, shall be allocated to and vested in FWE III without reversion or impairment, without further act or deed, and without transfer or assignment having occurred.

(m)     All of the liabilities and obligations of SD Offshore other than those that comprise the FWE IV Obligations or that relate to Abandoned Properties (collectively, the "SD Offshore Obligations") shall be allocated to, and shall constitute liabilities and obligations of, FWE III.

(n)     All of the rights, title and interests to all real estate and other properties of Bandon LP other than those that comprise the FWE IV Assets or that constitute Abandoned Properties (collectively, the "Bandon LP Assets"), subject to any existing liens or other encumbrances on such property, shall be allocated to and vested in FWE III without reversion or impairment, without further act or deed, and without transfer or assignment having occurred.

(o)     All of the liabilities and obligations of Bandon LP other than those that comprise the FWE IV Obligations or that relate to Abandoned Properties (collectively, the "Bandon LP Obligations") shall be allocated to, and shall constitute liabilities and obligations of, FWE III.

(p)     All of the rights, title and interests to all real estate and other properties of FEO other than those that comprise the FWE IV Assets or that constitute Abandoned Properties (collectively, the "FEO Assets"), subject to any existing liens or other encumbrances on such property, shall be allocated to and vested in FWE III without reversion or impairment, without further act or deed, and without transfer or assignment having occurred.

(q)     All of the liabilities and obligations of FEO other than those that comprise the FWE IV Obligations or that relate to Abandoned Properties (collectively, the "FEO Obligations") shall be allocated to, and shall constitute liabilities and obligations of, FWE III.

(r)     All of the rights, title and interests to all real estate and other properties of Dynamic Offshore other than those that comprise the FWE IV Assets or that constitute Abandoned Properties (collectively, the "Dynamic Offshore Assets"), subject to any existing liens or other

5

encumbrances on such property, shall be allocated to and vested in FWE III without reversion or impairment, without further act or deed, and without transfer or assignment having occurred.

(s)     All of the liabilities and obligations of Dynamic Offshore other than those that comprise the FWE IV Obligations or that relate to Abandoned Properties (collectively, the "Dynamic Offshore Obligations") shall be allocated to, and shall constitute liabilities and obligations of, FWE III.

(t)     FWE IV shall be substituted in any proceeding pending by or against any Surviving Entity (the pre-Merger entity) to the extent that such proceeding is an Obligation or Asset allocated to FWE IV pursuant to Section 2(h) or Section 2(i).

(u)     The applicable Surviving Entity (the surviving entity) shall be substituted in any proceeding pending by or against such Surviving Entity (the pre-Merger entity) to the extent that such proceeding is an Obligation or Asset allocated to such Surviving Entity pursuant to Section 2(j) through Section 2(s), as applicable.

(v)     All acts, plans, policies, Contracts, approvals, and authorizations of each Surviving Entity (the pre-Merger entity) and its respective officers and agents, that were valid and effective immediately prior to the Effective Time shall be taken for all purposes as the acts, plans, policies, Contracts, approvals, and authorizations of such Surviving Entity (the surviving entity) and FWE IV, as applicable and consistent with the foregoing and shall be effective and binding thereon as the same were with respect to such Surviving Entity (the pre-Merger entity).

(w)     The Assets, Obligations, reserves, and accounts of the Surviving Entities (the pre-Merger entities) shall be recorded on the books of a Surviving Entity (the surviving entity) or FWE IV, as applicable and consistent with the foregoing, depending on which entity is allocated such Assets, Obligations, reserves, or accounts, at the amounts at which they, respectively, were carried on the books of the Surviving Entities (the pre-Merger entities) immediately prior to the Effective Time, subject to such adjustments as may be appropriate in giving effect to the Merger.

(x)     Assets that constitute Abandoned Properties and Obligations relating thereto are, to the extent required to be allocated hereunder, allocated to the Surviving Entity that held such Asset or Obligation immediately prior to the Effective Time; provided, however, that for the avoidance of doubt, that nothing herein shall, or is intended to, modify the terms, timing or scope of the abandonment of the Abandoned Properties as provided for pursuant to the Plan of Reorganization; provided, further that, notwithstanding anything to the contrary in this Plan of Merger, no Abandoned Properties (whether assets or liabilities) shall be allocated to FWE IV nor shall FWE IV have any liability or obligation with respect to any Abandoned Properties for any reason at any time.

(y)     Notwithstanding anything set forth in Section 2 of this Plan of Merger or the Exhibits hereto, but subject to Section 13 below, the FWE IV Marketing Contracts and all assets and liabilities related to the FWE IV Marketing Contracts are allocated to FWE IV as of the Effective Date and, subject to the occurrence of the Condition Precedent End Date, vested in FWE IV such that the effectiveness of the vesting of the FWE IV Marketing Contracts in FWE IV shall occur on the Condition Precedent End Date (for clarity, each FWE IV Marketing Contract shall

6

remain vested in the Surviving Entity which originally held such FWE IV Marketing Contract as of immediately prior to the Effective Time and shall only vest in FWE IV upon the occurrence of the Condition Precedent End Date, unless an earlier vesting date is agreed to by FWE IV or required by Law). Notwithstanding anything to the contrary herein, this provision shall not allocate to FWE IV any FWE IV Marketing Contract that is expressly prohibited by Law from being so allocated at the time of the Merger. In such event, subject to any limitations set forth in the Hydrocarbon Sales Contract(s) and compliance with applicable Law, the Surviving Entity shall immediately assign, transfer and convey any such FWE IV Marketing Contract to FWE IV upon notice that such prohibition is no longer applicable delivered by FWE IV to the Surviving Entity, which such assignment, transfer and conveyance shall be for no consideration and at the Surviving Entity's sole cost and expense.

3.      Post-Merger Covenants.

(a)     Each of the Surviving Entities and FWE IV shall, at any time and from time to time from and after the Effective Time as and when requested by another Surviving Entity or FWE IV, as applicable, or by their respective successors or assigns, execute and deliver, or cause to be executed and delivered in its name by its authorized officers, all such conveyances, transfers, deeds, or other instruments as any Surviving Entity or FWE IV, as applicable, or such successors or assigns, may reasonably deem necessary in order to carry out the purposes of this Plan of Merger, pursuant to the terms and conditions herein, including to evidence (i) the allocation to and vesting in FWE III of the FWE III Assets, and the allocation to FWE III of, and the liability and obligation of FWE III for, the FWE III Obligations as a result of the Merger; (ii) the allocation to and vesting in FWE III of the SD Offshore Assets, and the allocation to FWE III of, and the liability and obligation of FWE III for, the SD Offshore Obligations as a result of the Merger; (iii) the allocation to and vesting in FWE III of the Bandon LP Assets, and the allocation to FWE III of, and the liability and obligation of FWE III for, the Bandon LP Obligations as a result of the Merger; (iv) the allocation to and vesting in FWE III of the FEO Assets, and the allocation to FWE III of, and the liability and obligation of FWE III for, the FEO Obligations as a result of the Merger; (v) the allocation to and vesting in FWE III of the Dynamic Offshore Assets, and the allocation to FWE III of, and the liability and obligation of FWE III for, the Dynamic Offshore Obligations as a result of the Merger; and (vi) the allocation to and vesting in FWE IV of the FWE IV Assets, and the allocation to FWE IV of, and the liability and obligation of FWE IV for, the FWE IV Obligations as a result of the Merger. Any cost incurred associated with curing a misallocation of any asset or liability (or failing to properly allocate any asset or liability), or otherwise arising from such misallocation (or failure to allocate), will be properly rectified and borne by FWE III. Without limiting the foregoing, FWE III shall take such actions as necessary to effect a transfer from an account of FWE III to an account designated in writing by FWE IV of (i) the FWE IV Cash Amount, (ii) the FWE IV Suspense Funds, and (iii) the Prepaid JIB Cash Amount.

(b)     From and after the Effective Time (i) FWE IV shall perform the obligations of FWE under Section 10.12 of the Credit Bid Purchase Agreement with respect to Closing Accounts Receivable to the extent attributable to FWE IV Assets as of the Effective Time (provided FWE IV shall have no obligation to incur any cost or expense in performing such obligations), and (ii) FWE III shall, and shall cause its subsidiaries to, perform the obligations of FWE under Section 10.12 of the Credit Bid Purchase Agreement with respect to Closing Accounts

7

Receivable to the extent attributable to Surviving Entity Assets or any assets held by other subsidiaries of FWE III as of the Effective Time.

4.        As a result of the consummation of the Merger in accordance with this Plan of Merger:

(a)        FWE IV shall only be allocated and shall only be vested in and receive the FWE IV Assets, and shall only be allocated, and shall only be subject to the FWE IV Obligations, and FWE IV shall have no rights or obligations relating to any of the Surviving Entity Assets or the Surviving Entity Obligations, except as may be expressly set forth in a separate agreement, which is entered into at or after the Effective Time, between a Surviving Entity and FWE IV with respect to such other Assets or Obligations; and FWE IV shall not be deemed to be a predecessor in interest to any of the Surviving Entity Assets or the Surviving Entity Obligations.

(b)        FWE III shall only be allocated and shall only be vested in and receive the Surviving Entity Assets and shall only be allocated and shall only be subject to the Surviving Entity Obligations, and FWE III shall have no rights or obligations relating to any of the FWE IV Assets or the FWE IV Obligations, except as may be expressly set forth in a separate agreement, which is entered into at or after the Effective Time, between FWE III and FWE IV with respect to such other Assets or Obligations.

(c)        SD Offshore shall have no rights or obligations relating to any of the SD Offshore Assets, the FWE IV Assets, the SD Offshore Obligations or the FWE IV Obligations, except as may be expressly set forth in a separate agreement, which is entered into at or after the Effective Time, between SD Offshore and FWE IV and/or FWE III, as applicable, with respect to such other Assets or Obligations.

(d)        Bandon LP shall have no rights or obligations relating to any of the Bandon LP Assets, the FWE IV Assets, the Bandon LP Obligations or the FWE IV Obligations, except as may be expressly set forth in a separate agreement, which is entered into at or after the Effective Time, between Bandon LP and FWE IV and/or FWE III, as applicable, with respect to such other Assets or Obligations.

(e)        FEO shall have no rights or obligations relating to any of the FEO Assets, the FWE IV Assets, the FEO Obligations or the FWE IV Obligations, except as may be expressly set forth in a separate agreement, which is entered into at or after the Effective Time, between FEO and FWE IV and/or FWE III, as applicable, with respect to such other Assets or Obligations.

(f)        Dynamic Offshore shall have no rights or obligations relating to any of the Dynamic Offshore Assets, the FWE IV Assets, the Dynamic Offshore Obligations or the FWE IV Obligations, except as may be expressly set forth in a separate agreement, which is entered into at or after the Effective Time, between Dynamic Offshore and FWE IV and/or FWE III, as applicable, with respect to such other Assets or Obligations.

5.        FWE III shall provide to FWE IV all rights afforded to FWE III pursuant to Section 6 of the FWE I Plan of Merger to the extent related to any FWE IV Assets; provided, however, that any obligation or liability incurred by FWE III to the extent arising from, related to, or connected with providing such rights to FWE IV, (1) shall not constitute an FWE III Obligation,

8

(2) shall be FWE IV Obligations and the obligations and liabilities of FWE IV, and (3) FWE IV shall indemnify and hold harmless FWE III from and against all such obligations and liabilities allocated to FWE IV pursuant to this Section 5.

6.     Certain Definitions.  As used herein and in the Schedules and Exhibits attached hereto, (i) the terms set forth below have the meanings ascribed to such terms below and (ii) the terms defined in the Schedules and Exhibits attached hereto have the meanings ascribed to such terms in such Schedules and Exhibits.

(a)     "Abandoned Properties" means the Surviving Entities' rights to and interests in the executory contracts and unexpired federal leases, rights-of-way, and right-of-use-and-easements listed on Schedule II attached hereto.

(b)     "Asset" means any individual asset, property, right, title or interest in any of the Surviving Entity Assets or the FWE IV Assets; "Assets" means, collectively, the Surviving Entity Assets and the FWE IV Assets.

(c)     "Bandon LP" has the meaning ascribed to such term in the recitals hereto.

(d)     "Bandon LP Assets" has the meaning ascribed to such term in Section 2(n) hereto.

(e)     "Bandon LP Obligations" has the meaning ascribed to such term in Section 2(o) hereto.

(f)     "Bankruptcy Code" has the meaning ascribed to such term in the recitals hereto.

(g)     "Bankruptcy Court" has the meaning ascribed to such term in the recitals hereto.

(h)     "BOEM" has the meaning ascribed to such term in the definition of Environmental Liabilities.

(i)     "BSEE" has the meaning ascribed to such term in the definition of Environmental Liabilities.

(j)     "Case" has the meaning ascribed to such term in the recitals hereto.

(k)     "CERCLA" has the meaning ascribed to such term in the definition of Environmental Laws.

(l)     "Certificate of Formation" has the meaning ascribed to such term in Section 1 hereto.

(m)     "Certificate of Merger" has the meaning ascribed to such term in Section 1 hereto.

9

(n)     "Chapter 11 Cases" has the meaning ascribed to such term in the recitals hereto.

(o)     "Chevron PSAs" means, collectively, (i) that certain Asset Sale and Purchase Agreement, dated as of June 15, 2016, by and between CUSA and FEO, (ii) that certain Purchase and Sale Agreement, dated as of September 1, 2003, by and between Northstar Gulfsands, LLC and Noble Energy, Inc., (iii) that certain Purchase and Sale Agreement, dated as of March 1, 2006, by and between Coldren Resources LP and Noble Energy, Inc., (iv) that certain Purchase and Sale Agreement, dated as of January 1, 2018, by and between Fieldwood Energy LLC and Noble Energy, Inc., (v) that certain Asset Sale and Purchase Agreement, dated as of January 1, 2015, by and among FEO, CUSA and Union Oil Company of California, (vi) that certain Asset Sale and Purchase Agreement, dated as of January 1, 2015, by and among SD Offshore, CUSA, Union Oil Company of California and Unocal Pipeline Company, (vii) that certain Asset Sale and Purchase Agreement, dated as of August 1, 2015, by and between FEO and CUSA, (viii) that certain Purchase and Sale Agreement, dated as of October 1, 2003, by and among SPN Resources, LLC, Union Oil Company of California and Pure Resources, L.P., and (ix) any other agreements pursuant to which FWE or its affiliates acquired any interest in any FWE IV Oil and Gas Properties from CUSA or its affiliates.

(p)     "Closing Accounts Receivable" has the meaning ascribed to such term in the Credit Bid Purchase Agreement.

(q)     "Condition Precedent End Date" means the date that is the first day of the calendar month following the calendar month during which the Effective Time occurs.

(r)     "Confirmation Order" has the meaning ascribed to such term in the recitals hereto.

(s)     "Contract" means any contract, subcontract, lease, sublease, mortgage, franchise, license, purchase order, sales order, indenture, settlement, note, bond, guarantee, loan, instrument, obligation, promise, grant, or other agreement, arrangement, understanding or commitment, whether or not in written form, that is binding upon a Person or its property.

(t)     "Conveyed" means conveyed, transferred, assigned, or sold pursuant to the Chevron PSAs, regardless of whether such conveyance, transfer, assignment, or bill of sale was recorded in the appropriate records of, or approved or recognized by, the applicable Governmental Authority.

(u)     "Credit Bid Purchase Agreement" means the Purchase and Sale Agreement, dated August 27, 2021, by and among FWE, certain affiliates of FWE and Credit Bid Purchaser.

(v)     "Credit Bid Purchaser" has the meaning ascribed to such term in the recitals hereto.

(w)     "Credit Bid Transaction" has the meaning ascribed to such term in the recitals hereto.

(x)     "CUSA" means Chevron U.S.A. Inc., a Pennsylvania corporation.

10

(y) "Debtor" and "Debtors" has the meaning ascribed to such term in the recitals hereto.

(z) "Dynamic Offshore" has the meaning ascribed to such term in the recitals hereto.

(aa) "Dynamic Offshore Assets" has the meaning ascribed to such term in Section 2(r) hereto.

(bb) "Dynamic Offshore Obligations" has the meaning ascribed to such term in Section 2(s) hereto.

(cc) "Effective Time" has the meaning ascribed to such term in Section 1 hereto.

(dd) "Environmental Laws" means, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq. ("CERCLA"); the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 et seq.; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 through 2629; the Oil Pollution Act, 33 U.S.C. § 2701 et seq.; the Emergency Planning and Community Right to Know Act, 42 U.S.C. § 11001 et seq.; the Endangered Species Act, 16 U.S.C. § 1531 et seq.; the Safe Drinking Water Act, 42 U.S.C. §§ 300f through 300j; the Marine Mammal Protection Act, 16 U.S.C. § 1361 et seq.; the Marine Protection, Research and Sanctuaries Act, 16 U.S.C. § 1431 et seq. and 33 U.S.C. § 1401 et seq.; the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 et seq., and the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., in each case as amended in effect as of the Effective Time, and all similar Laws in effect as of the Effective Time of any Governmental Authority having jurisdiction over the property in question addressing pollution, protection of the environment, biological resources, Hazardous Substances, occupational safety, or P&A Obligations.

(ee) "Environmental Liabilities" means any and all damages, remediation, obligations, liabilities, environmental response costs, costs to cure, cost to investigate or monitor, restoration costs, costs of remediation or removal, settlements, penalties, fines, and attorneys' and consultants fees and expenses arising out of or related to any violations or non-compliance with any Environmental Laws, including any contribution obligation under CERCLA or any other Environmental Law or matters incurred or imposed pursuant to any claim or cause of action by a Governmental Authority or other Person, attributable to any environmental liabilities, any Release of Hazardous Substances, or any other environmental condition with respect to the ownership or operation of the Assets, including conditions of FWE IV Facilities not in compliance with Laws promulgated by the Bureau of Ocean Energy Management ("BOEM"), the Bureau of Safety and Environmental Enforcement ("BSEE"), or the United States Coast Guard.

(ff) "FEO" has the meaning ascribed to such term in the recitals hereto.

(gg) "FEO Assets" has the meaning ascribed to such term in Section 2(p) hereto.

(hh) "FEO Obligations" has the meaning ascribed to such term in Section 2(q) hereto.

11

(ii)    "<u>First Merger</u>" has the meaning ascribed to such term in the recitals hereto.

(jj)    "<u>FWE</u>" has the meaning ascribed to such term in the recitals hereto.

(kk)    "<u>FWE I</u>" has the meaning ascribed to such term in the recitals hereto.

(ll)    "<u>FWE I Plan of Merger</u>" has the meaning ascribed to such term in the recitals hereto.

(mm)    "<u>FWE III</u>" has the meaning ascribed to such term in the recitals hereto.

(nn)    "<u>FWE III Assets</u>" has the meaning ascribed to such term in <u>Section 2(j)</u> hereto.

(oo)    "<u>FWE IV Marketing Contracts</u>" means the list of hydrocarbon marketing agreements set forth on Exhibit C that are (x) held by the Surviving Entities immediately prior to the Effective Time and (y) to be allocated in the Merger to FWE IV on Exhibit I-G hereto.

(pp)    "<u>FWE III Obligations</u>" has the meaning ascribed to such term in <u>Section 2(k)</u> hereto.

(qq)    "<u>FWE IV</u>" has the meaning ascribed to such term in the recitals hereto.

(rr)    "<u>FWE IV Assets</u>" has the meaning ascribed to such term in <u>Section 2(h)</u> hereto.

(ss)    "<u>FWE IV Bonds</u>" has the meaning ascribed to such term in <u>clause (xvi)</u> in <u>Part A</u> of <u>Schedule I</u> attached hereto.

(tt)    "<u>FWE IV Cash Amount</u>" has the meaning ascribed to such term in <u>clause (xvii)</u> of <u>Part A</u> of <u>Schedule I</u> hereto.

(uu)    "<u>FWE IV Contracts</u>" has the meaning ascribed to such term in <u>clause (viii)</u> in <u>Part A</u> of <u>Schedule I</u> attached hereto.

(vv)    "<u>FWE IV Facilities</u>" has the meaning ascribed to such term in <u>clause (ii)</u> in <u>Part A</u> of <u>Schedule I</u> attached hereto.

(ww)    "<u>FWE IV Lands</u>" has the meaning ascribed to such term in <u>clause (i)</u> in <u>Part A</u> of <u>Schedule I</u> attached hereto.

(xx)    "<u>FWE IV Leases</u>" has the meaning ascribed to such term in <u>clause (i)</u> in <u>Part A</u> of <u>Schedule I</u> attached hereto.

(yy)    "<u>FWE IV Obligations</u>" has the meaning ascribed to such term in <u>Section 2(i)</u> hereto.

(zz)    "<u>FWE IV Oil and Gas Properties</u>" has the meaning ascribed to such term in <u>clause (ii)</u> in <u>Part A</u> of <u>Schedule I</u> attached hereto.

12

(aaa) "FWE IV Permits" has the meaning ascribed to such term in clause (v) in Part A of Schedule I attached hereto.

(bbb) "FWE IV Rights of Way" has the meaning ascribed to such term in clause (iv) in Part A of Schedule I attached hereto.

(ccc) "FWE IV Suspense Funds" has the meaning ascribed to such term in clause (xiv) in Part A of Schedule I attached hereto.

(ddd) "FWE IV Units" has the meaning ascribed to such term in clause (i) in Part A of Schedule I attached hereto.

(eee) "FWE IV Wells" has the meaning ascribed to such term in clause (ii) in Part A of Schedule I attached hereto.

(fff) "Governmental Authority" means any court, tribunal, arbitrator, body, agency, division, board, bureau, commission or any other similar entity exercising executive, legislative, judicial, regulatory, or administrative functions of government, or any subdivision of any of the foregoing, whether federal, state, county, municipal, tribal, local or foreign, in each case with competent jurisdiction.

(ggg) "Hazardous Substances" means any pollutant, contaminant, dangerous or toxic substance, hazardous or extremely hazardous substance or chemical, or otherwise hazardous material or waste defined as "hazardous waste", "hazardous substance" or "hazardous material" under applicable Environmental Laws, including chemicals, pollutants, contaminants, wastes, or toxic substances that are classified as hazardous, toxic, radioactive, or otherwise are regulated by, or form the basis for Environmental Liability under, any applicable Environmental Law, including hazardous substances under CERCLA.

(hhh) "Hydrocarbon Sales Contracts" has the meaning ascribed to such term in Section 13 hereto.

(iii) "Hydrocarbons" means oil and gas and other hydrocarbons produced or processed in association therewith (regardless of whether such item is in liquid or gaseous form), or any combination thereof, and any minerals (whether in liquid or gaseous form) produced in association therewith, including all crude oil, gas, casinghead gas, condensate, natural gas liquids, and other gaseous or liquid hydrocarbons (including ethane, propane, iso-butane, nor-butane, gasoline, and scrubber liquids) of any type and chemical composition.

(jjj) "Imbalance" means any over-production, under-production, over-delivery, under-delivery, or similar imbalance of Hydrocarbons produced from or allocated to the Surviving Entity Assets or the FWE IV Assets, as applicable, regardless of whether such over-production, under-production, over-delivery, under-delivery, or similar imbalance arises at the wellhead, pipeline, gathering system, transportation system, processing plant, or other location, including any imbalances under gas balancing or similar agreements, imbalances under processing agreements, and imbalances under gathering or transportation agreements.

WEIL:\98044785\13\45327.0007

(kkk) "<u>JIB Advance AR</u>" has the meaning ascribed to such term in <u>clause (xiii)</u> in <u>Part A</u> of <u>Schedule I</u> attached hereto.

(lll) "<u>Laws</u>" means all laws (including common law), statutes, rules, regulations, ordinances, orders, decrees, requirements, judgments, and codes of Governmental Authorities.

(mmm)"<u>Merger</u>" has the meaning ascribed to such term in the recitals hereto.

(nnn) "<u>Obligation</u>" means any individual debt, liability or obligation, damages, losses, and claims (whether direct or indirect, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due) and including all costs and expenses relating thereto in any of the Surviving Entity Obligations or the FWE IV Obligations, as applicable; "<u>Obligations</u>" means, collectively, the Surviving Entity Obligations and the FWE IV Obligations.

(ooo) "<u>P&A Obligations</u>" means any and all obligations, liabilities, damages, losses, and claims arising out of or attributable to the payment or performance of all Plugging and Abandonment.

(ppp) "<u>Person</u>" means any individual, corporation, partnership, limited liability company, association, joint stock company, trust, estate, joint venture, firm, association, unincorporated organization, Governmental Authority, or any other entity.

(qqq) "<u>Plan Effective Date</u>" means the date on which the Plan of Reorganization becomes effective.

(rrr) "<u>Plan of Merger</u>" has the meaning ascribed to such term in the recitals hereto.

(sss) "<u>Plan of Reorganization</u>" has the meaning ascribed to such term in the recitals hereto.

(ttt) "<u>Plugging and Abandonment</u>" and "<u>Plugged and Abandoned</u>" and its derivatives mean all plugging, replugging, abandonment, re-plugging and re-abandonment, equipment removal, disposal, or restoration associated with the properties and assets included in or burdened by the Surviving Entity Assets or the FWE IV Assets, as applicable, including all plugging and abandonment, removal, dismantling, decommissioning, surface and subsurface restoration, site clearance, and disposal of the FWE IV Wells or the FWE IV Facilities, well cellars, fixtures, platforms, caissons, flowlines, pipelines, structures, and personal property of whatever kind located on or under, related to, or associated with operations and activities conducted by whomever with respect to each of the Surviving Entity Assets and the FWE IV Assets, as applicable, the flushing, pickling, burial, removal, and capping of all associated flowlines, field transmission and gathering lines, pit closures, the restoration of the surface, site clearance, any disposal of related waste materials and Hazardous Substances and obligations to obtain plugging exceptions for any of the FWE IV Wells with a current plugging exception, all in accordance with 30 CFR 250 Subpart Q and all other applicable Laws, the terms and conditions of each of the FWE IV Leases or similar leasehold interests, beneficial interests, easements and the FWE IV Leases.

14

(uuu) "Prepaid JIB Cash Amount" has the meaning ascribed to such term in clause (xiii) in Part A of Schedule I attached hereto.

(vvv) "Records" means all books, records, files, data, information, drawings, maps, corporate, financial, tax, and legal data and records to the extent (and only to the extent) related to the Surviving Entity Assets, the Surviving Entity Obligations, the FWE IV Assets, and/or the FWE IV Obligations, as applicable, including electronic copies of all computer records where available, Contract files (including lease files), well logs, division order files, title opinions and other title information (including abstracts, evidences of rental payments, maps, surveys, and data sheets), hazard data and surveys, production records, SEMS Documentation and Procedures, engineering files, and environmental records.

(www) "Release" means any discharge, emission, spilling, leaking, emptying, escaping, pumping, pouring, injecting, dumping, burying, leaching, migrating, abandoning, or disposing into or through the environment of any Hazardous Substance, including the abandonment or discarding of barrels, containers, and other closed receptacles containing any Hazardous Substance.

(xxx) "Royalties" means all rentals, minimum royalties, shut in payments, royalties, overriding royalties, reversionary interests, net profits interests, production payments, carried interests, non-participating royalty interests, reversionary interests, and other royalty burdens and other interests payable out of production of Hydrocarbons from or allocated to the FWE IV Assets, or the proceeds thereof to third parties.

(yyy) "SD Offshore" has the meaning ascribed to such term in the recitals hereto.

(zzz) "SD Offshore Assets" has the meaning ascribed to such term in Section 2(l) hereto.

(aaaa) "SD Offshore Obligations" has the meaning ascribed to such term in Section 2(m) hereto.

(bbbb) "SEMS Documentation and Procedures" means all documents and procedures in place as of the Effective Date by FWE III to comply with BSEE's Safety and Environmental Management System (SEMS) 30 CFR 250 Subpart S with respect to the FWE III Assets and/or the FWE IV Assets.

(cccc) "Surviving Entities" has the meaning ascribed to such term in the recitals hereto.

(dddd) "Surviving Entity Assets" means collectively, the FWE III Assets, the SD Offshore Assets, the Bandon LP Assets, the FEO Assets and the Dynamic Offshore Assets.

(eeee) "Surviving Entity Obligations" means collectively, the FWE III Obligations, the SD Offshore Obligations, the Bandon LP Obligations, the FEO Obligations and the Dynamic Offshore Obligations.

15

(ffff) "Suspense Funds" means any and all funds held in suspense by a Surviving Entity at the Effective Time, and any interest accrued in escrow accounts for such suspended funds.

(gggg) "TBOC" has the meaning ascribed to such term in the recitals hereto.

7. Choice of Law. This Plan of Merger shall be governed by, construed and interpreted in accordance with the Laws of the State of Texas, without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Texas and without regard to any borrowing statute that would result in the application of the statutes of limitations or repose of any other jurisdiction. In furtherance of the foregoing, the Laws of the State of Texas will control even if under such jurisdiction's choice of law or conflict of law analysis, the substantive or procedural law of some other jurisdiction would ordinarily or necessarily apply.

8. FWE III Obligation to Pay Recording Expenses. FWE III shall, and shall cause its debtor affiliates in the Chapter 11 Cases to, on the Plan Effective Date, provide for the payment of any and all documentary, filing, recording, stamp, and registration fees, costs, taxes, and expenses (including all reasonable and documented attorneys' fees and regulatory consultant fees) incurred or imposed after the Effective Time in connection with the filing of record by or on behalf of FWE IV of any instrument or instruments with the appropriate records office of any county, parish, state, federal, or other governmental unit (including BOEM) that may be required in connection with the implementation of the Merger or that either FWE IV determines in its respective sole discretion to be necessary or appropriate to reflect in the appropriate records of any governmental unit that as a result of the Merger (a) ownership of the FWE IV Assets have been allocated to and are vested in FWE IV, and (b) the liabilities and obligations to be allocated to and vested in, respectively, the Surviving Entities or FWE IV pursuant to the Merger have been allocated to and vested in, and constitute liabilities and obligations of, the Surviving Entities and FWE IV, respectively.

9. Interpretation. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. As used herein, the words "include," "includes," and "including" shall be deemed to be followed by the words "without limitation" and will not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it. Words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Plan of Merger as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. All Exhibits and Schedules annexed hereto or referred to in this Plan of Merger are hereby incorporated in and made a part of this Plan of Merger as if set forth in full in this Plan of Merger, and definitions therein shall apply herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein will be defined as set forth in this Plan of Merger, and vice-versa. A reference to any legislation or to any provision of any legislation shall include any modification or re-enactment thereof, any legislative provision substituted therefor, and all regulations and statutory instruments issued thereunder or pursuant thereto.

10. Rejected Contracts. Any Contract rejected pursuant to Section 365 of the Bankruptcy Code in the Chapter 11 Cases shall be deemed to be excluded and removed from any Exhibit or Schedule attached hereto, and any such Contract shall not be allocated to any of the

16

Surviving Entities or FWE IV, and any liabilities or obligations of such Contract shall be treated in accordance with the Plan of Reorganization and Confirmation Order or otherwise satisfied, compromised, settled, released, or discharged pursuant to the Plan of Reorganization and Confirmation Order.

11.  Certain Amendments.  This Agreement may not be amended in a manner that is materially adverse to FWE IV except with the prior written of CUSA.  CUSA is an express third party beneficiary of this Plan of Merger.

12.  Electronic Signatures.  A manual signature on this Plan of Merger or other documents to be delivered pursuant to this Plan of Merger, an image of which shall have been transmitted electronically, will constitute an original signature for all purposes. The delivery of copies of this Plan of Merger or other documents to be delivered pursuant to this Plan of Merger, including executed signature pages where required, by electronic transmission will constitute effective delivery of this Plan of Merger or such other document for all purposes and shall have the same effect as if each Surviving Entity had executed and delivered an original of this Plan of Merger or such other document.  Minor variations in the form of the signature page, including footers from earlier versions of this Plan of Merger or any such other document, shall be disregarded in determining any Surviving Entity's intent or the effectiveness of such signature.

13.  At or immediately following the Effective Date, FWE IV and FEO, on the one hand, and FWE III, on the other hand, shall enter into one or more hydrocarbon purchase agreements whereby FWE IV will sell hydrocarbons produced from its assets to FWE III and FEO on mutually agreeable terms during the period from the Effective Date until the Condition Precedent End Date (the "Hydrocarbon Sales Contract(s)").  Further, notwithstanding anything herein to the contrary, until such time as each FWE IV Marketing Contract is vested in FWE IV at the Condition Precedent End Date, (a) each of FWE III and FEO hereby covenants and agrees to perform such FWE IV Marketing Contract in all material respects for the benefit of FWE IV and in accordance with its terms (taking into account any services received pursuant to the Contract Operating Agreement to be entered into between QuarterNorth Energy LLC and FWE III) and (b)  FWE III and FEO, on the one hand, and FWE IV, on the other hand, shall each be allocated and shall pay, pay over or reimburse to the other all costs, expenses, liabilities and benefits arising in connection with such FWE IV Marketing Contract (taking into account any payments made or services received pursuant to (i) the hydrocarbon purchase agreements described above, (ii) the Contract Operating Agreement to be entered into between QuarterNorth Energy LLC and FWE III and (iii) the Contract Operating Agreement to be entered into between FWE IV and QuarterNorth Energy LLC) such that FWE IV, on the one hand, and FWE III and FEO, on the other, each bear such costs, expenses and liabilities and receive such benefits as such parties would have borne and received had such FWE IV Marketing Contract been vested with FWE IV at the Effective Time (without limiting the foregoing, if FWE III is required to post any form of credit assurance with respect to FWE IV volumes attributable to the FWE IV Marketing Contracts, FWE IV will provide such credit assurance as required by such FWE IV Marketing Contracts and/or applicable law). For the avoidance of doubt, (y) FWE III shall have no obligation to pay or reimburse any costs, expenses, or liabilities related to any FWE IV Marketing Contract from any funds other than the funds FWE III and FEO receive pursuant to such FWE IV Marketing Contract; and (z) FWE IV shall reimburse FWE III upon demand for any and all costs, expenses, or liabilities incurred by

FWE III related to the defense of any claims asserted against FWE III related to the FWE IV Marketing Contracts.

*  *  *  *  *  *

18

IN WITNESS WHEREOF, the undersigned has duly executed this Plan of Merger as of the date first written above.

**FIELDWOOD ENERGY III LLC**,
a Texas limited liability company


By: _____
Name:
Title:


**FIELDWOOD SD OFFSHORE LLC**,
a Texas limited liability company


By: _____
Name:
Title:


**BANDON OIL AND GAS, LP**,
a Texas limited partnership

By: Bandon Oil and Gas GP, LLC, its general partner


By: _____
Name:
Title:


**FIELDWOOD ENERGY OFFSHORE LLC**,
a Texas limited liability company


By: _____
Name:
Title:

**DYNAMIC OFFSHORE RESOURCES NS, LLC**, a Texas limited liability company

By: _____

Name:

Title:

Signature Page to Agreement and Plan of Merger

WEIL:\98044785\13\45327.0007

## Schedule I

## FWE IV Assets and FWE IV Obligations

Part A:

"FWE IV Assets" means all of each Surviving Entity's right, title, and interest in, to, or under the following, as of following the closing of the Credit Bid Transaction and immediately prior to the Effective Time:

     (i)    all ownership or other interests of the Surviving Entities of any kind or nature in the oil, gas, other Hydrocarbon and mineral leases, subleases, operating rights, record title interests, carried interests, royalties, overriding royalty interests, net profits interests, production payments, reversionary interests and other rights or interests of any kind or character in or to Hydrocarbons in place described on Exhibit I-A(i) and Exhibit I-A(ii) attached hereto (including following their termination or expiration), but, in the case of Exhibit I-A(i), only to the extent such ownership interests were Conveyed to FWE or its affiliates pursuant to the Chevron PSAs, and mineral interests or servitudes of every nature, in, on, under, and that may be produced from or attributable to any of the lands covered by such leases, subleases, interests and rights, whether legal or equitable, vested or contingent, and regardless of whether the same are expired or terminated (provided that, with respect to any US OCS oil and gas leases or other assets that are expired or terminated as of the Effective Time, it is acknowledged that (i) such oil and gas leases may not be assignable to the extent they no longer exist, but are being allocated hereby) and (ii) the intent of this definition is to include all interests, rights and obligations held by the Surviving Entities (including for purposes of the definition of FWE IV Obligations) with respect to such oil and gas leases as of the Effective Time, if any, but, in the case relating to the interests listed on Exhibit I-A(i), only to the extent such ownership or other interests were Conveyed to FWE or its affiliates pursuant to the Chevron PSAs) (collectively, the "FWE IV Leases"), together with all pooled, communitized, or unitized acreage that includes all or part of any of the FWE IV Leases (the "FWE IV Units"), and all tenements, hereditaments, and appurtenances belonging to the FWE IV Leases and the FWE IV Units (collectively with the FWE IV Leases and FWE IV Units, the "FWE IV Lands"); for the avoidance of doubt, with respect to the FWE IV Leases described on Exhibit I-A(i), the FWE IV Lands comprising a part of the FWE IV Assets shall only include the ownership interests therein Conveyed to FWE or its affiliates pursuant to the Chevron PSAs, and the descriptions in Exhibit I-A(i) shall only reference such ownership interests;

     (ii)    all ownership interests of the Surviving Entities in the Hydrocarbon, water, CO2, injection, disposal wells or other wells described on Exhibit I-B(i) and Exhibit I-B(ii) attached hereto, but, in the case of Exhibit I-B(i), only to the extent such ownership interests were Conveyed to FWE or its affiliates pursuant to the Chevron PSAs (the "FWE IV Wells" and, together with the FWE IV Leases and the FWE IV Units, the "FWE IV Oil and Gas Properties"); for the avoidance of doubt, (x) in the case of Exhibit I-B(i), the FWE IV Wells comprising a part of the FWE IV Assets shall only include the ownership interests therein Conveyed to FWE or its affiliates pursuant to the Chevron PSAs, and the descriptions in Exhibit I-B(i) shall only reference such ownership interests and (y) rights conveyed to FWE IV pursuant to clause (i) and this clause (ii) include all rights of the Surviving Entities to operate or as to operatorship of the FWE IV Oil and Gas Properties to the extent such rights were Conveyed to FWE or its affiliates pursuant to

the Chevron PSAs or otherwise derived from rights and interests Conveyed to FWE or its affiliates pursuant thereto;

(iii)     all platforms identified on Exhibit I-C(i) attached hereto and all facilities identified on Exhibit I-C(ii) attached hereto, including all associated processing systems, buildings, compressors, meters, tanks, machinery, tools, personal property, equipment (including spars, trees, PLETs, jumpers, flowlines, risers, umbilicals, control assemblies, and production handling equipment), pipelines, gathering lines, water lines, tank batteries, pipeline capacity, other water gathering, transportation, or disposal infrastructure and equipment, frac tanks, ponds, metering facilities, interconnections, and other inventory, boats, vehicles, fixtures, improvements, and other property (whether real, immovable, personal, movable, mixed or otherwise), which were acquired by FWE or its affiliates pursuant to the Chevron PSAs, but in such event only as to the interests (A) so acquired by FWE or its affiliates under and pursuant to such Chevron PSAs or (B) relating to the interests described on Exhibit I-A(ii) and Exhibit I-B(ii) (the "FWE IV Facilities");

(iv)     all surface fee interests, easements, right-of-use easements, licenses, servitudes, rights-of-way, surface leases, authorizations, permits,  and other rights to use the surface or seabed described on Exhibit I-D(i) attached hereto and Exhibit I-D(ii) attached hereto, but only to the extent such were acquired by FWE or its affiliates pursuant to the Chevron PSAs, and only as to the interests (A) so acquired by FWE or its affiliates under and pursuant to such Chevron PSAs or (B) relating to the interests described on Exhibit I-A(ii) and Exhibit I-B(ii) (the "FWE IV Rights of Way");

(v)     all environmental and other governmental (whether federal, state, or local) permits (including all plans filed with or approved by applicable Governmental Authorities), licenses, orders, authorizations, franchises, and related instruments or rights described on Exhibit I-E attached hereto (the "FWE IV Permits");

(vi)     all Hydrocarbons in, on, under, or that may be produced from or attributable to the FWE IV Leases, the FWE IV Units, or the FWE IV Wells, including all oil, condensate, and scrubber liquids inventories and ethane, propane, iso-butane, nor-butane, and gasoline inventories of the Surviving Entities from the FWE IV Oil and Gas Properties in storage or constituting linefill and Imbalances;

(vii)    the FCC licenses associated with the call signs listed on Exhibit I-F attached hereto;

(viii)   all (A) joint operating agreements or unit operating agreements and (B) all other Contracts listed on Exhibit I-G, in each case, to the extent relating to the ownership or operation of any or all of the FWE IV Oil and Gas Properties (the "FWE IV Contracts");

(ix)     originals of the Records that relate exclusively to any one or more of the FWE IV Assets or the FWE IV Obligations, or both, and copies of the Records that constitute FWE I Assets (as defined in the FWE I Plan of Merger) or Surviving Entity Assets and also relate to either or both of the FWE IV Assets or the FWE IV Obligations;

(x)      inventory, equipment, machinery, tools, and other personal property, to the extent located on the FWE IV Facilities or, if located elsewhere, used or held for use exclusively in

2

connection with the FWE IV Oil and Gas Properties, or the FWE IV Facilities, or charged to the joint account pursuant to the applicable FWE IV Contracts;

(xi) Surviving Entity-owned SCADA equipment and all automation systems, including meters and related telemetry, licensed radio frequencies, and associated communications infrastructure including towers, antennas, data links, and network circuits used or held for use exclusively in connection with the FWE IV Oil and Gas Properties or the FWE IV Facilities, or for the production of Hydrocarbons therefrom;

(xii) all deposits with third parties, escrow accounts, guarantees, letters of credit, treasury securities, insurance policies, Oil Spill Financial Responsibility coverage (whether consisting of one or more insurance policies) and other forms of credit assurances or credit support provided by a third party for financial assurance for the obligations and liabilities arising out of or related to the FWE IV Assets, including the P&A Obligations arising out of or related to the FWE IV Assets, in each case only to the extent described on Exhibit I-H;

(xiii) all (i) accounts receivable attributable to the FWE IV Oil and Gas Properties as of the Effective Time, if any, other than the Closing Accounts Receivable (ii) rights to insurance proceeds or other claims of recovery, indemnity, contribution, or reimbursement for any casualty occurring on or at any FWE IV Asset, whether occurring prior to, on or after the Effective Time, (iii) instruments and general intangibles (as such terms are defined in the Uniform Commercial Code of the applicable jurisdictions in which the FWE IV Oil and Gas Properties to which such assets relate are located) and other economic benefits in each case attributable to the FWE IV Oil and Gas Properties (excluding only the Closing Accounts Receivable); *provided*, that, for the avoidance of doubt, nothing in the preceding clauses (i) or (ii) shall be interpreted to limit the scope of "Closing Accounts Receivable" as that term is defined in the Credit Bid Purchase Agreement, (iv) claims of indemnity, contribution, or reimbursement relating to the FWE IV Obligations, (v) Imbalances receivables of the Surviving Entities attributable to the FWE IV Oil and Gas Properties, (vi) cash in the amount of advance payments on account of third party working interest owners in the FWE IV Oil and Gas Properties ("Prepaid JIB Cash Amount"), to the extent such Prepaid JIB Cash Amount is associated with FWE IV Obligations, and (vii) rights to receive and collect cash and advance payments pursuant to cash calls associated with the FWE IV Oil and Gas Properties ("JIB Advance AR"), to the extent such JIB Advance AR is associated with FWE IV Obligations;

(xiv) all Suspense Funds to the extent attributable to any of the FWE IV Oil and Gas Properties (collectively, "FWE IV Suspense Funds");

(xv) unless rejected by the Debtors in the Chapter 11 Cases, the Chevron PSAs and the other transaction documents entered into in connection with the consummation of the transactions contemplated thereby, in each case to the extent related to the FWE IV Assets;

(xvi) all rights to all area-wide operator bonds described on Exhibit I-I attached hereto (the "FWE IV Bonds");

(xvii) cash in an amount (the "FWE IV Cash Amount") equal to $19,534,669.00; and

3

(xviii) all rights of FWE III under Section 6 of the FWE I Plan of Merger to the extent related to the FWE IV Assets.

Notwithstanding anything set forth in this Plan of Merger (or the Schedules or Exhibits attached hereto), no marketing-related contract designated in the column titled "Contract Category" on the Schedule of Assumed Contracts (as defined in the Plan of Reorganization) (e.g., Marketing – Crude Sales, Marketing – Gas Sales, Marketing – Processing) will be allocated to FWE IV upon the occurrence of the Effective Time and such contracts shall instead be retained by Surviving Entity which held such rights or obligations as of immediately prior to the Effective Time; provided, that upon the occurrence of the date that is the first day of the month following the day that is thirty (30) days after receipt to any third-party approvals (including any required FERC-required approvals or waivers) and completion of appropriate documentation for assignment of such contracts as determined necessary by FWE IV, the Surviving Entity retaining such contracts at the Effective Time shall promptly assign such contracts to FWE IV.

Part B:

"FWE IV Obligations" means (A) all of the obligations and liabilities (contractual or otherwise) of the Surviving Entities as of immediately prior to the Effective Time (which shall include such obligations and liabilities of FWE as of immediately prior to the effective time of the First Merger which were vested in and became Obligations of FWE III as of the effective time of the First Merger), without duplication, of any kind, character, or description (whether known or unknown, accrued, absolute, contingent, or otherwise, including claims thereunder) relating to, arising out of, or with respect to any of the FWE IV Assets, including obligations and liabilities of FWE immediately before the First Merger, and of the Surviving Entities as of the Effective Time: (i) relating to the furnishing of makeup gas according to the terms of applicable gas sales, gathering, or transportation FWE IV Contracts and all liabilities and obligations with respect to Imbalances arising out of, related to, or attributable to FWE IV's ownership interests in any of the FWE IV Oil and Gas Properties; (ii) with respect to Royalties arising out of, related to, or attributable to any of the FWE IV Oil and Gas Properties, FWE IV Suspense Funds, and Prepaid JIB Cash Amounts, including any reporting and/or mis-reporting, and payment and/or mis-payment of such Royalties, FWE IV Suspense Funds, or Prepaid JIB Cash Amounts; (iii) constituting or related to Environmental Liabilities arising out of, related to, or attributable to any of the FWE IV Assets; (iv) applicable to or imposed on the lessee, owner, operator, holder, responsible party, payor or designated applicant under or with respect to any of the FWE IV Assets; (v) constituting or relating to any and all P&A Obligations related to FWE IV's ownership interests in, or operation of, any of the FWE IV Assets; (vi) relating to the FWE IV Suspense Funds; (vii) relating to the Chevron PSAs (unless rejected by the Debtors in the Chapter 11 Cases) or any of the other agreements entered into in connection with the consummation of the transactions contemplated thereby, in each case to the extent related to the FWE IV Assets; and (viii) expenses incurred by FWE or any Surviving Entity for Plugging and Abandonment costs and expenses on the FWE IV Assets between the filing on August 3, 2020, of the Chapter 11 Cases and the Effective Time to the extent not paid as of the Effective Time; (B) the obligations of FWE IV as a "Responsible Party" under that certain U.S. Department of the Interior Settlement Agreement, dated on or about the date hereof, by and among Fieldwood and its debtor affiliates and the United States Department of the Interior by and through the Bureau of Safety and Environmental Enforcement and (C) the Obligations of FWE IV under Section 3(b)(i) of this Plan of Merger and

4

the Obligations of FWE III under Section 7 of the FWE I Plan of Merger to the extent related to the FWE IV Assets; provided, however, that, subject to the foregoing clause (B), the FWE IV Obligations do not include any claims, liabilities, or obligations satisfied, compromised, settled, released, or discharged pursuant to the Plan of Reorganization and Confirmation Order, and, for the avoidance of doubt, no other claims, obligations or liabilities of any kind.

5

**Schedule of Exhibits**

| | |
|---|---|
| Exhibit A: | Certificate of Merger |
| Exhibit B-A: | Certificate of Formation – FWE IV |
| Exhibit B-B | FWE IV LLC Agreement |
| Exhibit C | FWE IV Marketing Contracts |
| Exhibit I-A(i): | FWE IV Leases |
| Exhibit I-A(ii): | Certain Other FWE IV Leases |
| Exhibit I-B(i): | FWE IV Wells |
| Exhibit I-B(ii): | Certain Other FWE IV Wells |
| Exhibit I-C(i): | FWE IV Platforms |
| Exhibit I-C(ii): | FWE IV Facilities |
| Exhibit I-D(i): | FWE IV Rights of Way |
| Exhibit I-D(ii): | FWE IV RUEs |
| Exhibit I-E: | FWE IV Permits |
| Exhibit I-F: | FWE IV FCC Licenses |
| Exhibit I-G | FWE IV Contracts |
| Exhibit I-H | FWE IV Financial Assurances |
| Exhibit I-I: | FWE IV Bonds |

[End of Schedule of Exhibits]

## Exhibit A

## Certificate of Merger

[see attached]

**CERTIFICATE OF MERGER**
**(DOMESTIC ENTITY DIVISIONAL MERGER)**
**OF**
**FIELDWOOD ENERGY III LLC,**
**FIELDWOOD SD OFFSHORE LLC,**
**BANDON OIL AND GAS, LP,**
**FIELDWOOD ENERGY OFFSHORE LLC**
**AND**
**DYNAMIC OFFSHORE RESOURCES NS, LLC**

**August 27, 2021**

Pursuant to Title 1, Chapter 10 and Title 3 of the Texas Business Organizations Code (the "TBOC"), the undersigned, Fieldwood Energy III LLC, a Texas limited liability company ("FWE III"), Fieldwood SD Offshore LLC, a Texas limited liability company ("SD Offshore"), Bandon Oil and Gas, LP, a Texas limited partnership ("Bandon LP"), Fieldwood Energy Offshore LLC, a Texas limited liability company ("FEO"), and Dynamic Offshore Resources NS, LLC, a Texas limited liability company ("Dynamic Offshore" and together with FWE III, SD Offshore, Bandon LP and FEO, the "Surviving Entities"), submit this certificate of merger for the purpose of dividing themselves into five surviving domestic entities and one new domestic entity, and hereby certify the following:

FIRST:  The name of each domestic filing entity that is dividing itself is:

(i)      Fieldwood Energy III LLC;

(ii)     Fieldwood SD Offshore LLC;

(iii)    Bandon Oil and Gas, LP;

(iv)     Fieldwood Energy Offshore LLC; and

(v)      Dynamic Offshore Resources NS, LLC.

SECOND:  The principal place of business of each Surviving Entity is 2000 W Sam Houston Pkwy S #1200, Houston, TX 77042.

THIRD:  The filing numbers issued by the Secretary of State of the State of Texas to the Surviving Entities are as follows:

(i)      FWE III is 804176986;

(ii)     SD Offshore is 804176967;

(iii)    Bandon LP is 804174463;

WEIL:\98068663\6\45327.0007

(iv)     FEO is 804176976; and

(v)      Dynamic Offshore is 800138936.

FOURTH:  Each of FWE III, SD Offshore, FEO and Dynamic Offshore is organized as a limited liability company.  Bandon LP is organized as a limited partnership.

FIFTH: Each of FWE III, SD Offshore, Bandon LP, FEO and Dynamic Offshore shall survive the merger and shall maintain its separate existence and continue as a filing entity under its name as of immediately prior to the merger.

SIXTH:  In lieu of providing the plan of merger, the filing entity certifies that:

(i)      An executed copy of the Agreement and Plan of Merger, dated as of August 27, 2021 (the "Plan of Merger"), of FWE III, SD Offshore, Bandon LP, FEO and Dynamic Offshore is on file at the principal place of business of each surviving and new domestic entity provided in this form.

(ii)     On written request, a copy of the Plan of Merger will be furnished without cost by each surviving or new domestic entity to any member or partner of any domestic entity that is a party to or created by the Plan of Merger, and any creditor or obligee of the parties to the merger at the time of the merger if a liability or obligation is then outstanding.

SEVENTH:  No amendments to the certificates of formation of FWE III, SD Offshore, Bandon LP, FEO or Dynamic Offshore are being effected by the merger.

EIGHTH:  The name, jurisdiction of organization, principal place of business address, and entity description of the entity to be created pursuant to the plan of merger are set forth below. The certificate of formation of the new domestic filing entity to be created is being filed with this certificate of merger.

Name:  Fieldwood Energy IV LLC

Entity Description:  limited liability company

Jurisdiction of Organization:  Texas

Principal place of business: 2000 W. Sam Houston Pkwy S. Suite 1200, Houston, TX 77042.

NINTH:   The Plan of Merger has been approved, adopted, certified, executed and acknowledged as required by the TBOC and the governing documents of each of the filing entities.

TENTH:  This document becomes effective when the document is accepted and filed by the Secretary of State of the State of Texas.

2

WEIL:\98068663\6\45327.0007

ELEVENTH: In lieu of providing the tax certificate, each Surviving Entity shall continue to be liable for the payment of all required franchise taxes of such Surviving Entity.

\* \* \* \* \* \*

3

IN WITNESS WHEREOF, the undersigned has caused this certificate of merger to be duly executed as of the date first set forth above.

**FIELDWOOD ENERGY III LLC**,
a Texas limited liability company

By:_____
Name:_____
Title:_____

**FIELDWOOD SD OFFSHORE LLC**,
a Texas limited liability company

By:_____
Name:_____
Title:_____

**BANDON OIL AND GAS, LP**,
a Texas limited partnership

By: Bandon Oil and Gas GP, LLC, its general partner

By:_____
Name:_____
Title:_____

**FIELDWOOD ENERGY OFFSHORE LLC**,
a Texas limited liability company

By:_____
Name:_____
Title:_____

[SIGNATURE PAGE TO CERTIFICATE OF MERGER]

**DYNAMIC OFFSHORE RESOURCES NS, LLC**, a Texas limited liability company

By:_____

Name:_____

Title:_____

[SIGNATURE PAGE TO CERTIFICATE OF MERGER]

**Exhibit B-A**

**Certificate of Formation – FWE IV**

[see attached]

WEIL:\98044785\13\45327.0007

| | | |
|---|---|---|
| **Form 205**<br>**(Revised 05/11)**<br><br>Submit in duplicate to:<br>Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>512 463-5555<br>FAX: 512 463-5709<br>**Filing Fee: $300** |  | This space reserved for office use. |
| | **Certificate of Formation**<br>**Limited Liability Company** | |

## Article 1 – Entity Name and Type

The filing entity being formed is a limited liability company.  The name of the entity is:

FIELDWOOD ENERGY I LLC

The name must contain the words "limited liability company," "limited company," or an abbreviation of one of these phrases.

## Article 2 – Registered Agent and Registered Office
### (See instructions. Select and complete either A or B and complete C.)

☒  A.  The initial registered agent is an organization (cannot be entity named above) by the name of:

CAPITOL CORPORATE SERVICES, INC.
**OR**

☐  B.  The initial registered agent is an individual resident of the state whose name is set forth below:

| | | | |
|---|---|---|---|
| *First Name* | *M.I.* | *Last Name* | *Suffix* |

C.  The business address of the registered agent and the registered office address is:

| | | | |
|---|---|---|---|
| 206 E. 9TH STREET, SUITE 1300 | AUSTIN | TX | 78701 |
| *Street Address* | *City* | *State* | *Zip Code* |

## Article 3—Governing Authority
### (Select and complete either A or B and provide the name and address of each governing person.)

☒  A.  The limited liability company will have managers. The name and address of each initial manager are set forth below.

☐  B.  The limited liability company will not have managers.  The company will be governed by its members, and the name and address of each initial member are set forth below.

| **GOVERNING PERSON 1** | | | | |
|---|---|---|---|---|
| **NAME** (Enter the name of either an individual or an organization, but not both.) | | | | |
| **IF INDIVIDUAL** | | | | |
| Jon | | Graham | | |
| *First Name* | *M.I.* | *Last Name* | | *Suffix* |
| **OR** | | | | |
| **IF ORGANIZATION** | | | | |
| | | | | |
| *Organization Name* | | | | |
| **ADDRESS** | | | | |
| 2000 W Sam Houston Pkwy S, Suite 1200 | Houston | TX | USA | 77042 |
| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* |

Form 205

4

**GOVERNING PERSON 2**

**NAME** (Enter the name of either an individual or an organization, but not both.)

   IF INDIVIDUAL

| | | | |
|---|---|---|---|
| *First Name* | *M.I.* | *Last Name* | *Suffix* |

   OR

   IF ORGANIZATION

   *Organization Name*

**ADDRESS**

| | | | | |
|---|---|---|---|---|
| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* |

---

**GOVERNING PERSON 3**

**NAME** (Enter the name of either an individual or an organization, but not both.)

   IF INDIVIDUAL

| | | | |
|---|---|---|---|
| *First Name* | *M.I.* | *Last Name* | *Suffix* |

   OR

   IF ORGANIZATION

   *Organization Name*

**ADDRESS**

| | | | | |
|---|---|---|---|---|
| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* |

## Article 4 – Purpose

The purpose for which the company is formed is for the transaction of any and all lawful purposes for which a limited liability company may be organized under the Texas Business Organizations Code.

## Supplemental Provisions/Information

Text Area: [The attached addendum, if any, is incorporated herein by reference.]
The entity is formed pursuant to a plan of merger.

Form 205

5

## Organizer

The name and address of the organizer:

Michael Dane
*Name*

| 2000 W. Sam Houston Pkwy. S., Suite 1200 | Houston | TX | 77042 |
|---|---|---|---|
| *Street or Mailing Address* | *City* | *State* | *Zip Code* |

## Effectiveness of Filing (Select either A, B, or C.)

A. ☒ This document becomes effective when the document is filed by the secretary of state.

B. ☐ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing. The delayed effective date is: _____

C. ☐ This document takes effect upon the occurrence of the future event or fact, other than the passage of time. The 90th day after the date of signing is: _____

The following event or fact will cause the document to take effect in the manner described below:

## Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized to execute the filing instrument.

Date: August 27, 2021

_____
Signature of organizer

Michael T. Dane
_____
Printed or typed name of organizer

Form 205                                                        6

TX060BOC - 11/27/2013 Wolters Kluwer Online

**Exhibit B-B**

**FWE IV LLC Agreement**

[see attached]

WEIL:\98044785\13\45327.0007

*Execution Version*

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## FIELDWOOD ENERGY IV LLC

### *(a Texas Limited Liability Company)*

### August 27, 2021

**THE MEMBERSHIP INTERESTS REFERENCED IN THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY APPLICABLE STATE SECURITIES LAWS. SUCH MEMBERSHIP INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AS WELL AS COMPLIANCE WITH THE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY THAT ARE SET FORTH HEREIN.**

**TABLE OF CONTENTS**

**ARTICLE I DEFINITIONS** ....................................................................................................1

    **Section 1.01**    **Definitions**.....................................................................................1

    **Section 1.02.**    **Interpretation**...............................................................................12

**ARTICLE II ORGANIZATION** ...........................................................................................13

    **Section 2.01**    **Formation**.....................................................................................13

    **Section 2.02**    **Name** ............................................................................................13

    **Section 2.03**    **Principal Office** ...........................................................................13

    **Section 2.04**    **Registered Office; Registered Agent.**........................................13

    **Section 2.05**    **Purposes; Powers.**.......................................................................14

    **Section 2.06**    **Term** ............................................................................................14

**ARTICLE III CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS**.............................14

    **Section 3.01**    **Tax Partnership Provisions** .......................................................14

    **Section 3.02**    **Initial Capital Contributions** ....................................................14

    **Section 3.03**    **Additional Capital Contributions** ............................................14

    **Section 3.04**    **Maintenance of Capital Accounts** ............................................14

    **Section 3.05**    **Succession Upon Transfer**.........................................................15

    **Section 3.06**    **Negative Capital Accounts**.........................................................15

    **Section 3.07**    **No Withdrawals from Capital Accounts** ...................................15

    **Section 3.08**    **Treatment of Loans from Members**...........................................15

    **Section 3.09**    **Modifications**...............................................................................16

**ARTICLE IV MEMBERS** ....................................................................................................16

    **Section 4.01**    **No Personal Liability**.................................................................16

    **Section 4.02**    **No Withdrawal**............................................................................16

    **Section 4.03**    **No Interest in Company Property**..............................................16

    **Section 4.04**    **Certification of Membership Interests**......................................16

    **Section 4.05**    **Meetings of Members.** ................................................................17

    **Section 4.06**    **Action Without Meeting**.............................................................18

    **Section 4.07**    **Power of Members**......................................................................18

    **Section 4.08**    **Similar or Competitive Activities; Business Opportunities**.................18

**ARTICLE V ALLOCATIONS**..............................................................................................19

    **Section 5.01**    **Tax Partnership Provisions** ......................................................19

    **Section 5.02**    **Allocation of Net Income and Net Loss** ...................................19

    **Section 5.03**    **Regulatory and Special Allocations** .........................................19

i

Section 5.04    **Tax Allocations.** ...............................................................................20

Section 5.05    **Allocations in Respect of Transferred Membership Interests**.............22

**ARTICLE VI DISTRIBUTIONS** ...................................................................................**22**

Section 6.01    **General.** ................................................................................................22

Section 6.02    **Tax Advances.** .....................................................................................23

Section 6.03    **Tax Withholding; Withholding Advances.**.........................................23

Section 6.04    **Distributions in Kind.**.........................................................................24

**ARTICLE VII MANAGEMENT** ....................................................................................**25**

Section 7.01    **Management of the Company** ..............................................................25

Section 7.02    **Sole Manager**......................................................................................25

Section 7.03    **Material Project Contracts; Net Profit Interest** ..................................25

Section 7.04    **Actions Requiring CUSA Consent** .....................................................26

Section 7.05    **No Compensation of the Sole Manager** ..............................................27

Section 7.06    **No Personal Liability**..........................................................................27

**ARTICLE VIII TRANSFER** .........................................................................................**28**

Section 8.01    **General Restrictions on Transfer.**......................................................28

**ARTICLE IX EXCULPATION AND INDEMNIFICATION** .....................................**29**

Section 9.01    **Exculpation of Covered Persons.** .......................................................29

Section 9.02    **Liabilities and Duties of Covered Persons.**.........................................30

Section 9.03    **Indemnification.**..................................................................................30

Section 9.04    **Survival**...............................................................................................32

**ARTICLE X ACCOUNTING; TAX MATTERS** ..........................................................**33**

Section 10.01    **Financial Statements and Other Information**......................................33

Section 10.02    **Inspection Rights** ...............................................................................33

Section 10.03    **Income Tax Status** ..............................................................................34

Section 10.04    **Tax Matters Representative**................................................................34

Section 10.05    **Tax Returns** ........................................................................................35

Section 10.06    **Company Funds** ..................................................................................36

**ARTICLE XI WINDING UP AND TERMINATION** ..................................................**36**

Section 11.01    **Events Requiring Winding Up** ............................................................36

Section 11.02    **Effectiveness of Termination** .............................................................36

Section 11.03    **Liquidation** .........................................................................................37

ii

Section 11.04    **Certificate of Termination** ........................................................................38
Section 11.05    **Survival of Rights, Duties, and Obligations** ...........................................38
Section 11.06    **Recourse for Claims** ..............................................................................38

**ARTICLE XII MISCELLANEOUS** .................................................................................................**38**

Section 12.01    **Expenses** ...................................................................................................38
Section 12.02    **Further Assurances** .................................................................................38
Section 12.03    **Confidentiality** ........................................................................................39
Section 12.04    **Notices** ......................................................................................................40
Section 12.05    **Headings** ...................................................................................................41
Section 12.06    **Severability** ..............................................................................................41
Section 12.07    **Entire Agreement** ....................................................................................41
Section 12.08    **Successors and Assigns** ...........................................................................41
Section 12.09    **No Third-Party Beneficiaries** .................................................................41
Section 12.10    **Amendment** ..............................................................................................42
Section 12.11    **Waiver** ......................................................................................................42
Section 12.12    **Governing Law** ........................................................................................42
Section 12.13    **Submission to Jurisdiction** .....................................................................42
Section 12.14    **Waiver of Jury Trial** ...............................................................................42
Section 12.15    **Equitable Remedies** ................................................................................43
Section 12.16    **Attorney's Fees** .......................................................................................43
Section 12.17    **Remedies Cumulative** .............................................................................43
Section 12.18    **Counterparts** ...........................................................................................43

**SCHEDULE A MEMBERS SCHEDULE**                                                                    A-1

iii

## LIMITED LIABILITY COMPANY AGREEMENT OF
## FIELDWOOD ENERGY IV LLC

This Limited Liability Company Agreement of Fieldwood Energy IV LLC, a Texas limited liability company (the "**Company**"), dated as of August 27, 2021 (this "**Agreement**"), is entered into by and among the Company, the Initial Member executing this Agreement as of the date hereof, and each other Person who after the date hereof becomes a Member of the Company and becomes a party to this Agreement by executing a joinder agreement in form and substance acceptable to the Company.

### RECITALS

**WHEREAS,** the Company was formed under the laws of the State of Texas by the filing of a Certificate of Formation with the Secretary of State of the State of Texas on August 27, 2021 (the "**Certificate of Formation**") for the purposes set forth in Section 2.05 of this Agreement;

**WHEREAS,** pursuant to and in accordance with the Confirmation Order and the Term Sheet, respectively, and as a result of a divisive merger pursuant to § 10.008 of the BOC, the Company owns the FWE IV Assets, subject to the operational liabilities in connection therewith allocated to the Company in the merger, including the FWE IV Obligations; and

**WHEREAS,** the Initial Member wishes to enter into this Agreement to set forth the terms and conditions governing the ownership, operation and management of the Company.

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I
### DEFINITIONS

**Section 1.01   Definitions.** Capitalized terms used herein and not otherwise defined shall have the meanings set forth in this Section 1.01:

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

    (a)    crediting to such Capital Account any amount that such Member is obligated to restore or is deemed to be obligated to restore pursuant to Treasury Regulations Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704-2(i); and

    (b)    debiting to such Capital Account the items described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

"**Adjusted Taxable Income**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for a Fiscal Year (or

WEIL:\97901822\22\45327.0007

portion thereof) with respect to the Membership Interest held by such Member means the federal taxable income allocated by the Company to the Member with respect to its Membership Interest (as adjusted by any final determination in connection with any tax audit or other proceeding) for such Fiscal Year (or portion thereof); provided, that such taxable income shall be computed (i) minus any excess taxable loss of the Company for any prior period allocable to such Member with respect to its Membership Interest that were not previously taken into account for purposes of determining such Member's Adjusted Taxable Income in a prior Fiscal Year to the extent such loss would be available under the Code to offset income of the Member (or, as appropriate, the direct or indirect owners of the Member) determined as if the income and loss from the Company were the only income and loss of the Member (or, as appropriate, the direct or indirect owners of the Member) in such Fiscal Year and all prior Fiscal Years, and (ii) taking into account any special basis adjustment with respect to such Member resulting from an election by the Company under Code Section 754.

"**Affiliate**" means, with respect to any Person, any other Person who, directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control," when used with respect to any specified Person, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "controlling" and "controlled" shall have correlative meanings.  For the avoidance of doubt, neither CUSA nor any of its Subsidiaries nor Credit Bid Purchaser nor any of its Subsidiaries control the Company and none of them shall constitute an Affiliate of the Company.

"**Agreement**" has the meaning set forth in the Preamble.

"**Applicable Law**" means all applicable provisions of (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations, or orders of any Governmental Authority; (b) any consents or approvals of any Governmental Authority; and (c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"**Bankruptcy**" means (i) the filing by the Company of a petition under the Bankruptcy Code seeking to adjudicate the Company a bankrupt or an insolvent or otherwise commencing, authorizing, or acquiescing in the commencement of a proceeding or cause of action seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, composition, or other relief with respect to itself or its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian, or other similar official over it or any substantial part of its property, or consenting to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or taking any corporate or similar official action to authorize any of the foregoing; (ii) the making of an assignment or any general arrangement for the benefit of creditors; or (iii) the Company's filing an answer or other pleading admitting or failing to contest the allegations of a petition filed against it in any proceeding of the foregoing nature, or taking any other action to authorize any of the actions set forth above.

2

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as amended.

"**BOC**" means the Texas Business Organizations Code, as amended and in effect from time to time.

"**Book Depreciation**" means, with respect to any Company asset for each Fiscal Year, the Company's depreciation, amortization, or other cost recovery deductions determined for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Book Depreciation shall be (a) if such difference is being eliminated by use of the remedial method under Treasury Regulations Section 1.704-3(d), the amount of book basis recovered for such period under the rules prescribed by Treasury Regulations Section 1.704-3(d)(2), or (b) if the remedial method is not used, an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero and the Book Value of the asset is positive, Book Depreciation shall be determined with reference to such beginning Book Value using any permitted method selected by the Sole Manager in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g)(3).

"**Book Value**" means, with respect to any Company asset, the adjusted basis of such asset for federal income tax purposes, except as follows:

(a)     the initial Book Value of any Company asset contributed by a Member to the Company shall be the gross Fair Market Value of such Company asset as of the date of such contribution;

(b)     immediately before the distribution by the Company of any Company asset to a Member, the Book Value of such asset shall be adjusted to its gross Fair Market Value as of the date of such distribution;

(c)     the Book Value of all Company assets may, in the sole discretion of the Sole Manager, be adjusted to equal their respective gross Fair Market Values, as reasonably determined by the Sole Manager, as of the following times:

(i)     the acquisition of an additional Membership Interest in the Company by a new or existing Member in consideration for more than a *de minimis* Capital Contribution;

(ii)     the distribution by the Company to a Member of more than a *de minimis* amount of property (other than cash) as consideration for all or a part of such Member's Membership Interest in the Company; and

(iii)     the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g);

3

WEIL:\97901822\22\45327.0007

(d)      the Book Value of each Company asset shall be increased or decreased, as the case may be, to reflect any adjustments to the adjusted tax basis of such Company asset pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Account balances pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); provided, that Book Values shall not be adjusted pursuant to this paragraph (d) to the extent that an adjustment pursuant to paragraph (c) above is made in conjunction with a transaction that would otherwise result in an adjustment pursuant to this paragraph (d); and

(e)      if the Book Value of a Company asset has been determined pursuant to paragraph (a) or adjusted pursuant to paragraphs (c) or (d) above, such Book Value shall thereafter be adjusted to reflect the Book Depreciation taken into account with respect to such Company asset for purposes of computing Net Income and Net Losses.

"**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in the State of Texas are authorized or required to close.

"**Capital Account**" has the meaning set forth in Section 3.04.

"**Capital Contribution**" means, for any Member, the total amount of cash and cash equivalents and the Book Value of any property contributed to the Company by such Member.

"**Certificate of Formation**" has the meaning set forth in the Recitals.

"**Certificate of Merger**" means that certain Certificate of Merger filed by Fieldwood III with the Secretary of State of the State of Texas on August 27, 2021.

"**Certificate of Termination**" means a certificate to be filed upon completion of the winding up and liquidation of the Company as set forth in Section 11.04, which certificate shall be in the form required by § 11.101 of the BOC.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Company**" has the meaning set forth in the Preamble.

"**Company Minimum Gain**" means "partnership minimum gain" as defined in Treasury Regulations Section 1.704-2(b)(2), substituting the term "Company" for the term "partnership" as the context requires.

"**Confidential Information**" has the meaning set forth in Section 12.03(a).

"**Confirmation Order**" means the confirmation order entered in Chapter 11 Case 20-33948, In re: Fieldwood Energy LLC, *et al*, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

"**Continuance**" has the meaning set forth in Section 11.01.

WEIL:\97901822\22\45327.0007

"**Contract Operating Agreement**" means that certain Contract Operating Agreement of even date herewith by and among Credit Bid Purchaser and the Company, of which CUSA is an express third party beneficiary.

"**Covered Person**" has the meaning set forth in Section 9.01(a).

"**Credit Bid Purchaser**" means Mako Buyer LLC, a Delaware limited liability company.

"**CUSA**" means Chevron U.S.A. Inc., a Pennsylvania corporation, and its successors or assigns.

"**Deepwater Assets Decommissioning Funding Agreement**" means that certain Decommissioning Funding Agreement, of event date herewith, by and between CUSA and Credit Bid Purchaser.

"**Depletable Property**" means each separate oil and gas property as defined in Section 614 of the Code.

"**Divisive Merger Documents**" means the Certificate of Merger, Plan of Merger, Certificate of Formation and other documents filed by or on behalf of Fieldwood III with respect to the Company with the Texas Secretary of State related to the divisive merger of Fieldwood III into Fieldwood III (the surviving entity) and the newly-created Company.

"**Electronic Transmission**" means any form of communication, including communication by use of or participation in one or more electronic networks or databases, not directly involving the physical transmission of paper that creates a record that may be retained, retrieved, and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"**Escrow Account**" means that certain escrow account established pursuant to the Escrow Agreement.

"**Escrow Agreement**" means that certain Escrow Agreement of even date herewith between U.S. Bank National Association, as escrow agent, Fieldwood III, the Company and Credit Bid Purchaser.

"**Estimated Tax Amount**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for a Fiscal Year means the Member's Tax Amount for such Fiscal Year as estimated in good faith from time to time by the Sole Manager. In making such estimate, the Sole Manager shall take into account amounts shown on Internal Revenue Service Form 1065 filed by the Company and similar state or local forms filed by the Company for the preceding taxable year and such other adjustments as the Sole Manager reasonably determines are necessary or appropriate to reflect the estimated operations of the Company for the Fiscal Year.

"**Excess Amount**" has the meaning set forth in Section 6.02(c).

5

"**Fair Market Value**" of any asset as of any date means the purchase price that a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's length transaction, as determined in good faith by the Sole Manager on such factors as the Sole Manager, in the exercise of his or her reasonable business judgment, considers relevant.

"**Fieldwood**" means Fieldwood Energy LLC, a Texas limited liability company, and its successors and assigns (excluding, for the avoidance of doubt, the Company).

"**Fieldwood III**" means Fieldwood Energy III LLC, a Texas limited liability company, and its successors and assigns (excluding, for the avoidance of doubt, the Company).

"**Final Completion**" has the meaning ascribed to such term in the Turnkey Removal Agreement.

"**Fiscal Year**" means the calendar year, unless the Company is required to have a taxable year other than the calendar year, in which case Fiscal Year shall be the period that conforms to its taxable year.

"**FWE IV Assets**" has the meaning set forth in the Plan of Merger.

"**FWE IV Obligations**" has the meaning set forth in the Plan of Merger.

"**GAAP**" means generally accepted accounting principles in the United States of America in effect from time to time; provided, that, notwithstanding any term or provision contained in this Agreement, GAAP will be deemed for all purposes hereof to treat leases that would have not been considered to be indebtedness in accordance with GAAP as in effect on December 31, 2017 (whether such leases were in effect on such date or are entered into thereafter) in a manner consistent with the treatment of such leases under GAAP as in effect on December 31, 2017, notwithstanding any modification or interpretative changes thereto or implementations of any such modifications or interpretative changes that may have occurred thereafter.

"**Governmental Authority**" means any court, tribunal, arbitrator, body, agency, division, board, bureau, commission or any other similar entity exercising executive, legislative, judicial, regulatory, or administrative functions of government, or any subdivision of any of the foregoing, whether federal, state, county, municipal, tribal, local or foreign, in each case with competent jurisdiction.

"**Guarantee Obligation**" means, as to any Person (the "guaranteeing Person"), any obligation of (i) the guaranteeing Person or (ii) another Person (including any bank under any letter of credit), if to induce the creation of such obligation of such other Person the guaranteeing Person has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing Person, whether or not contingent, (A) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (B) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise

6

to maintain the net worth or solvency of the primary obligor, (C) to purchase property, securities or services, in each case, primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (D) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.

"**Indebtedness**" means, with respect to any Person at any date, without duplication, all (i) indebtedness of such Person for borrowed money; (ii) obligations of such Person for the deferred purchase price of property or services (other than trade payables incurred in the ordinary course of such Person's business); (iii) obligations of such Person evidenced by notes, bonds, debentures or other similar instruments; (iv) indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (v) capital lease obligations of such Person; (vi) obligations of such Person, contingent or otherwise, as an account party or applicant under acceptance, letter of credit or similar facilities; (vii) obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any capital stock of such Person; (viii) Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (i) through (vii) above; and (ix) obligations of the kind referred to in clauses (i) through (viii) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation.

"**Initial Member**" has the meaning set forth in the term "Member".

"**Joint Development Agreement**" means that certain Joint Development Agreement of even date herewith by and between the Company and Credit Bid Purchaser.

"**Lien**" means any mortgage, pledge, security interest, option, right of first offer, encumbrance, or other restriction or limitation of any nature whatsoever.

"**Liquidator**" has the meaning set forth in Section 11.03(a).

"**Losses**" has the meaning set forth in Section 9.03(a).

"**Material Project Contracts**" means, collectively, the Omnibus Agreement, the NPI Conveyance, the Contract Operating Agreement, the Turnkey Removal Agreement, the Transition Services Agreement, the Joint Development Agreement, the Deepwater Assets Decommissioning Funding Agreement and the SEMS Bridging Agreement, and each a "**Material Project Contract**".

"**Member**" means (a) the Person identified on the Members Schedule as of the date hereof as a Member and who has executed this Agreement or a counterpart thereof (each, an "**Initial Member**"); and (b) each Person who is hereafter admitted as a Member in accordance with the terms of this Agreement and the BOC, in each case so long as such Person is shown on the

Company's books and records as an owner of Membership Interests. The Members shall constitute "members" (as that term is defined in the BOC) of the Company.

"**Member Nonrecourse Debt**" means "partner nonrecourse debt" as defined in Treasury Regulations Section 1.704-2(b)(4), substituting the term "Company" for the term "partnership" and the term "Member" for the term "partner" as the context requires.

"**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if the Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"**Member Nonrecourse Deduction**" means "partner nonrecourse deduction" as defined in Treasury Regulations Section 1.704-2(i), substituting the term "Member" for the term "partner" as the context requires.

"**Members Schedule**" has the meaning set forth in Section 3.02.

"**Membership Interest**" means an interest in the Company owned by a Member, including such Member's right (a) to its distributive share of Net Income, Net Losses, and other items of income, gain, loss, and deduction of the Company; (b) to its distributive share of the assets of the Company; (c) to vote on, consent to, or otherwise participate in any decision of the Members as provided in this Agreement; and (d) to any and all other benefits to which such Member may be entitled as provided in this Agreement or the BOC. The Membership Interest of each Member shall be expressed as a percentage interest and shall be as set forth on the Members Schedule.

"**Net Income**" and "**Net Loss**" mean, for each Fiscal Year or other period specified in this Agreement, an amount equal to the Company's taxable income or taxable loss, or particular items thereof, determined in accordance with Code Section 703(a) (where, for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or taxable loss), but with the following adjustments:

> (a) any income realized by the Company that is exempt from federal income taxation, as described in Code Section 705(a)(1)(B), shall be added to such taxable income or taxable loss, notwithstanding that such income is not includable in gross income;

> (b) any expenditures of the Company described in Code Section 705(a)(2)(B), including any items treated under Treasury Regulations Section 1.704-1(b)(2)(iv)(I) as items described in Code Section 705(a)(2)(B), shall be subtracted from such taxable income or taxable loss, notwithstanding that such expenditures are not deductible for federal income tax purposes;

> (c) any gain or loss (including Simulated Gain or Loss) resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property so disposed, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

8

(d) any items of depreciation, amortization, and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted tax basis shall be computed by reference to the property's Book Value (as adjusted for Book Depreciation) in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g);

(e) if the Book Value of any Company property is adjusted as provided in the definition of Book Value, then the amount of such adjustment shall be treated as an item of gain or loss and included in the computation of such taxable income or taxable loss;

(f) to the extent an adjustment to the adjusted tax basis of any Company property pursuant to Code Sections 732(d), 734(b) or 743(b) is required, pursuant to Treasury Regulations Section 1.704 1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis); and

(g) any items which are specially allocated pursuant to Section 5.03 hereof shall not be taken into account in computing Net Income or Net Loss. The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to Section 5.03 hereof shall be determined by applying rules analogous to those set forth in subparagraphs (a) through (f) above.

"**Nonrecourse Deductions**" has the meaning set forth in Treasury Regulations Section 1.704-2(b).

"**Nonrecourse Liability**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"**NPI Conveyance**" means that certain Conveyance of Net Profits Overriding Royalty Interest from Company to the Escrow Account.

"**NPI Payment**" has the meaning attributed to the term "NPI Payment" under the NPI Conveyance.

"**Omnibus Agreement**" means that certain Omnibus Agreement of even date herewith by and between the Company, CUSA and Credit Bid Purchaser.

"**Person**" means any individual, corporation, partnership, limited liability company, association, joint stock company, trust, estate, joint venture, firm, association, unincorporated organization, Governmental Authority, or any other entity.

"**Plan of Merger**" means the Agreement and Plan of Merger of Fieldwood Energy III LLC into Fieldwood Energy IV LLC and Fieldwood Energy III LLC, dated as of August 27, 2021, and adopted by Fieldwood Energy III LLC.

"**Plan of Reorganization**" means the plan of reorganization of Fieldwood that was included in, and was confirmed by, the Confirmation Order.

9

"**Production Period**" has the meaning attributed to the term "Production Period" under the NPI Conveyance.

"**Quarterly Estimated Tax Amount**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for any calendar quarter of a Fiscal Year means the excess, if any of: (a) the product of (i) a quarter (1/4) in the case of the first calendar quarter of the Fiscal Year, half (1/2) in the case of the second calendar quarter of the Fiscal Year, three-quarters (3/4) in the case of the third calendar quarter of the Fiscal Year, and one (1) in the case of the fourth calendar quarter of the Fiscal Year and (ii) the Member's Estimated Tax Amount for such Fiscal Year; over (b) all distributions previously made during such Fiscal Year to such Member.

"**Regulatory Allocations**" has the meaning set forth in Section 5.03(f).

"**Reimbursable Costs**" has the meaning attributed to such term in the Contract Operating Agreement.

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors or lenders, counsel, accountants, and other agents of such Person.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations thereunder, which shall be in effect at the time.

"**SEMS Bridging Agreement**" means that certain SEMS Bridging Agreement & Interface Document, dated of even date herewith by and between Credit Bid Purchaser and the Company.

"**Shortfall Amount**" has the meaning set forth in Section 6.02(b).

"**Simulated Basis**" means, with respect to each Depletable Property, the Book Value of such property.

"**Simulated Depletion**" means, with respect to each Depletable Property, a depletion allowance computed in accordance with U.S. federal income tax principles (as if the Simulated Basis of the property were its adjusted tax basis and using simulated cost depletion) and in the manner specified in Treasury Regulations Section 1.704-1(b)(2)(iv)(k)(2); provided that the Simulated Depletion with respect to a Depletable Property shall in no event exceed the Simulated Basis of such Depletable Property.

"**Simulated Gain or Loss**" means the simulated gain or loss computed with respect to a sale or other disposition of any Depletable Property pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(k)(2).

"**Sole Manager**" has the meaning set forth in Section 7.01.

10

"**Subsidiary**" means, with respect to any Person, any other Person of which a majority of the outstanding shares or other equity interests having the power to vote for directors or managers or comparable positions are owned, directly or indirectly, by the first Person.

"**Tax Advance**" has the meaning set forth in Section 6.02(a).

"**Tax Amount**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for a Fiscal Year means, subject to (i) any restrictions in the Company's then-applicable debt financing arrangements, if any, and (ii) the Sole Manager's good faith determination to retain any other amounts necessary to satisfy obligations of the Company that are reasonably expect to be due and payable during the 90 days following the date of determination (i) the product of (a) the Tax Rate for such Fiscal Year (but not to exceed the Tax Rate applicable to C-corporations for such Fiscal Year) and (b) the Adjusted Taxable Income of the Member for such Fiscal Year with respect to its Membership Interest or (ii) the actual amount of U.S. federal, state and local income tax (including any state or local tax imposed in lieu of an income tax) paid by such Member with respect to such Fiscal Year in respect of the taxable income allocated to the Member by the Company, after taking into account all deductions available to such Member from all sources in excess of such Member's income from other sources; *provided*, *however*, that if at any time Fieldwood Energy Inc. has cash tax liability (including an estimated tax liability) on account of items of income or gain of the Company without sufficient cash on hand from a corresponding cash distribution in respect of such income or gain (all as reasonably determined by Fieldwood Energy Inc.), then the Tax Amount shall be increased such that the Company timely distributes cash sufficient to pay such tax liability.

"**Tax Matters Representative**" has the meaning set forth in Section 10.04(a).

"**Tax Rate**" of a Member, or if the Member is disregarded for U.S. federal income tax purposes, the members or beneficiaries of such Member, for any period, means the highest effective marginal combined federal, state, and local tax rate applicable to an individual residing in Houston, Texas (or, if higher, a corporation doing business in Houston, Texas), taking into account (a) the character (for example, long-term or short-term capital gain, ordinary, or exempt) of the applicable income and (b) if applicable, the deduction under IRC Section 199A.

"**Taxing Authority**" has the meaning set forth in Section 6.03(b).

"**Term Sheet**" means that certain term sheet, dated March 22, 2021, by and between Fieldwood, on the one hand, and CUSA, on the other hand.

"**Third Party Payment**" has the meaning attributed to such term in the Contract Operating Agreement.

"**Transfer**" means to, directly or indirectly, sell, transfer, assign, convey, gift, pledge, encumber, hypothecate, or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise (including by merger or division), or to enter into any contract, option, or other arrangement or understanding with respect to the sale, transfer, assignment, conveyance, gift, pledge, encumbrance, hypothecation, or similar disposition of, any Membership Interests owned by a Person or any interest (including a beneficial interest) in any Membership Interests owned by

11

a Person.  "**Transfer**" when used as a noun shall have a correlative meaning.  "**Transferor**" and "**Transferee**" mean a Person who makes or receives a Transfer, respectively.

"**Transition Services Agreement**" means the Neptune Spar Transition Services Agreement of even date herewith by and between Credit Bid Purchaser and Noble Energy, Inc.

"**Treasury Regulations**" means the final or temporary regulations issued by the United States Department of Treasury pursuant to its authority under the Code, and any successor regulations.

"**Turnkey Removal Agreement**" means that certain Turnkey Removal Agreement of even date herewith by and among Credit Bid Purchaser, CUSA and the Company.

"**Withholding Advances**" has the meaning set forth in Section 6.03(b).

**Section 1.02.**     **Interpretation**.  For purposes of this Agreement: (a) the words "include," "includes," and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole.

The definitions given for any defined terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms.

Unless the context otherwise requires, references herein: (x) to Articles, Sections, Exhibits, and Schedules mean the Articles and Sections of, and Exhibits and Schedules attached to, this Agreement; (y) to an agreement, instrument, or other document means such agreement, instrument, or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder.

This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

The Exhibits and Schedules referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

12

## ARTICLE II
## ORGANIZATION

**Section 2.01    Formation**.

(a)    The Company was formed on August 27, 2021, pursuant to the provisions of the BOC, upon the filing and acceptance of the Certificate of Formation with the Secretary of State of the State of Texas.

(b)    This Agreement shall constitute the "company agreement" (as that term is used in the BOC) of the Company.  The rights, powers, duties, obligations, and liabilities of the Members and the Sole Manager shall be determined pursuant to the BOC and this Agreement.  To the extent that the rights, powers, duties, obligations, and liabilities of any Members or the Sole Manager are different by reason of any provision of this Agreement than they would be under the BOC in the absence of such provision, this Agreement shall, to the extent permitted by the BOC, control.

**Section 2.02    Name.** The name of the Company is "Fieldwood Energy IV LLC" or such other name or names as may be designated by the Sole Manager; provided, that the name shall always contain the words "Limited Liability Company" or "Limited Company" or an abbreviation of one of those phrases.  Amendments to the Certificate of Formation or this Agreement to reflect any such name change may be made by the Sole Manager without the consent of the Members. The Sole Manager shall give prompt notice to the Members and CUSA of any change to the name of the Company and any related amendment to the Certificate of Formation or this Agreement. The Company may conduct business under any assumed or fictitious name required by Applicable Law or otherwise deemed desirable by the Sole Manager.

**Section 2.03    Principal Office.** The principal office of the Company is located at 2000 W. Sam Houston Parkway S., Suite 1200, Houston, Texas 77042, or such other place as may from time to time be determined by the Sole Manager.  The Sole Manager shall give prompt notice of any such change to each of the Members and CUSA.

**Section 2.04    Registered Office; Registered Agent.**

(a)    The registered office of the Company shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Sole Manager may designate from time to time in the manner provided by the BOC and Applicable Law.

(b)    The registered agent for service of process on the Company in the State of Texas shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Sole Manager may designate from time to time in the manner provided by the BOC and Applicable Law.

13

**Section 2.05   Purposes; Powers**.

(a)   The purposes of the Company are to (i) engage in the Plugging and Abandonment and decommissioning of the FWE IV Assets, as such terms are defined in the Plan of Merger, (ii) the operation of the FWE IV Assets prior to their Plugging and Abandonment and decommissioning, (iii) such other activities as are approved pursuant to the terms of this Agreement, including subject to Section 7.04, and (iv) to engage in any and all activities necessary or incidental to the foregoing purposes.

(b)   The Company shall have all the powers necessary or convenient to carry out the purposes for which it is formed, including the powers granted by the BOC.

**Section 2.06   Term.**  The term of the Company commenced on the date the Certificate of Formation was filed with the Secretary of State of the State of Texas and shall continue in existence perpetually until the Company is terminated in accordance with the provisions of this Agreement.

## ARTICLE III
## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

**Section 3.01   Tax Partnership Provisions.**  This ARTICLE III is intended to apply only if the Company becomes a partnership for U.S. federal income tax purposes.

**Section 3.02   Initial Capital Contributions.**  Contemporaneously with the execution of this Agreement, and pursuant to the Plan of Reorganization and as a result of a divisive merger pursuant to § 10.008 of the BOC, the Company holds the properties and assets identified as the FWE IV Assets, which shall, together with the amount of any expenses paid pursuant to Section 12.01, constitute the aggregate Capital Contributions made by the Initial Member.  The Initial Member shall own Membership Interests in the amount set forth opposite such Member's name on Schedule A attached hereto (the "**Members Schedule**").  From and after the date of this Agreement, the Sole Manager shall maintain and update the Members Schedule upon the issuance or Transfer of any Membership Interests to any new or existing Member in accordance with this Agreement.

**Section 3.03   Additional Capital Contributions.**  No Member shall be required to make any additional Capital Contributions to the Company.  Any future Capital Contributions made by any Member shall only be made with the consent of the Sole Manager.  To the extent that a Member makes an additional Capital Contribution to the Company, the Sole Manager shall revise the Members Schedule to reflect an increase in the Membership Interest of the contributing Member that fairly and equitably reflects the value of its additional Capital Contribution in relation to the aggregate amount of all Capital Contributions made by the Members.

**Section 3.04   Maintenance of Capital Accounts.**  The Company shall establish and maintain for each Member a separate capital account (a "**Capital Account**") on its books and records in accordance with this Section 3.04.  Each Capital Account shall be established and maintained in accordance with the following provisions:

(a)   Each Member's Capital Account shall be increased by the amount of:

14

WEIL:\97901822\22\45327.0007

(i)      such Member's Capital Contributions, including such Member's initial Capital Contribution and any additional Capital Contributions;

(ii)      any Net Income or other item of income or gain allocated to such Member pursuant to ARTICLE V; and

(iii)      any liabilities of the Company that are assumed by such Member or secured by any property distributed to such Member.

(b)      Each Member's Capital Account shall be decreased by:

(i)      the cash amount or Book Value of any property distributed to such Member pursuant to ARTICLE VI and Section 11.03(d);

(ii)      the amount of any Net Loss or other item of loss or deduction allocated to such Member pursuant to ARTICLE V; and

(iii)      the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company.

**Section 3.05   Succession Upon Transfer.**  In the event that any Membership Interests are Transferred in accordance with the terms of this Agreement, the Transferee shall succeed to the Capital Account of the Transferor to the extent it relates to the Transferred Membership Interests and, subject to Section 5.05, shall receive allocations and distributions pursuant to ARTICLE V, ARTICLE VI, and ARTICLE XI in respect of such Membership Interests.

**Section 3.06   Negative Capital Accounts.**  In the event that any Member shall have a deficit balance in its Capital Account, such Member shall have no obligation, during the term of the Company or upon termination or liquidation thereof, to restore such negative balance or make any Capital Contributions to the Company by reason thereof, except as may be required by Applicable Law or in respect of any negative balance resulting from a withdrawal of capital or termination in contravention of this Agreement.

**Section 3.07   No Withdrawals from Capital Accounts.**  No Member shall be entitled to withdraw any part of its Capital Account or to receive any distribution from the Company, except as otherwise provided in this Agreement.  No Member shall receive any interest, salary, or drawing with respect to its Capital Contributions or its Capital Account, except as otherwise provided in this Agreement.  The Capital Accounts are maintained for the sole purpose of allocating items of income, gain, loss, and deduction among the Members and shall have no effect on the amount of any distributions to any Members, in liquidation or otherwise.

**Section 3.08   Treatment of Loans from Members.**  Loans by any Member to the Company shall not be considered Capital Contributions and shall not affect the maintenance of such Member's Capital Account, other than to the extent provided in Section 3.04(a)(iii), if applicable.

15

**Section 3.09 Modifications.** The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Treasury Regulations. If the Sole Manager determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Sole Manager may authorize such modifications without the consent of any Member.

**ARTICLE IV**
**MEMBERS**

**Section 4.01 No Personal Liability.** Except as otherwise expressly provided in the BOC, by Applicable Law, or expressly in this Agreement, no Member will be obligated personally for any debt, obligation, or liability of the Company or other Members, whether arising in contract, tort, or otherwise, including a debt, obligation, or liability under a judgment, decree, or order of a court, solely by reason of being a Member.

**Section 4.02 No Withdrawal.** So long as a Member continues to hold a Membership Interest, such Member shall not have the ability to withdraw or resign as a Member prior to the winding up and termination of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the winding up and termination of the Company shall be null and void. As soon as any Person who is a Member ceases to hold a Membership Interest, such Person shall no longer be a Member.

**Section 4.03 No Interest in Company Property.** No real or personal property of the Company shall be deemed to be owned by any Member individually, but shall be owned by, and title shall be vested solely in, the Company. Without limiting the foregoing, each Member hereby irrevocably waives during the term of the Company any right that such Member may have to maintain any action for partition with respect to the property of the Company.

**Section 4.04 Certification of Membership Interests**.

(a) The Sole Manager may, but shall not be required to, issue certificates to the Members representing the Membership Interests held by such Member.

(b) In the event that the Sole Manager shall issue certificates representing Membership Interests in accordance with Section 4.04(a), then in addition to any other legend required by Applicable Law, all certificates representing issued and outstanding Membership Interests shall bear a legend substantially in the following form:

> THE MEMBERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY. NO TRANSFER, SALE, CONVEYANCE, ASSIGNMENT, GIFT, PLEDGE, HYPOTHECATION, ENCUMBRANCE, OR OTHER DISPOSITION OF THE MEMBERSHIP

16

INTEREST REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH COMPANY AGREEMENT.

THE MEMBERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, GIFTED, PLEDGED, HYPOTHECATED, OR OTHERWISE DISPOSED EXCEPT PURSUANT TO (A) A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS OR (B) AN EXEMPTION FROM REGISTRATION THEREUNDER.

**Section 4.05  Meetings of Members**.

(a)  Meetings of the Members may be called by (i) the Sole Manager or (ii) Members holding a majority of the Membership Interests.

(b)  Written notice stating the place, date, and time of the meeting and, in the case of a meeting of the Members not regularly scheduled, describing the purposes for which the meeting is called, shall be delivered not fewer than ten days and not more than 60 days before the date of the meeting to each Member, by or at the direction of the Sole Manager or the Member(s) calling the meeting, as the case may be.  The Members may hold meetings at the Company's principal office or at such other place, within or outside the State of Texas, as the Sole Manager or the Member(s) calling the meeting may designate in the notice for such meeting.

(c)  Any Member may participate in a meeting of the Members by means of conference telephone or other communications equipment by means of which all Persons participating in the meeting can talk to and hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting.

(d)  On any matter that is to be voted on by Members, a Member may vote in person or by proxy, and such proxy may be granted in writing, by means of Electronic Transmission or as otherwise permitted by Applicable Law.  Every proxy shall be revocable in the discretion of the Member executing it unless otherwise provided in such proxy; provided, that such right to revocation shall not invalidate or otherwise affect actions taken under such proxy prior to such revocation.  In lieu of a proxy, a Member may grant an irrevocable power of attorney to conduct the affairs of such Member with respect to matters of the Company, including matters relating to the organization, internal affairs, or termination of the Company.

(e)  The business to be conducted at such meeting need not be limited to the purpose described in the notice and can include business to be conducted by Members; provided, that the appropriate Members shall have been notified of the meeting in accordance with Section 4.05(b).  Attendance of a Member at any meeting shall constitute

17

WEIL:\97901822\22\45327.0007

a waiver of notice of such meeting, except where a Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(f)      A quorum of any meeting of the Members shall require the presence, whether in person or by proxy, of the Members holding a majority of the Membership Interests.  Subject to Section 4.06, no action may be taken by the Members unless the appropriate quorum is present at a meeting.

(g)      Subject to Section 4.06, Section 7.04, Section 12.10 or any provision of this Agreement or the BOC requiring the vote, consent, or approval of a different percentage of the Membership Interests, no action may be taken by the Members at any meeting at which a quorum is present without the affirmative vote of the Members holding a majority of the outstanding Membership Interests.

**Section 4.06    Action Without Meeting**.

(a)      Notwithstanding the provisions of Section 4.05, any matter that is to be voted on, consented to, or approved by the Members may be taken without a meeting, without prior notice, and without a vote if consented to, in writing or by Electronic Transmission, by a Member or Members holding not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which each Member entitled to vote on the action is present and votes.  A record shall be maintained by the Sole Manager of each such action taken by written consent of a Member or Members.

(b)      A Member's consent may not be established by a Member's failure to object to an action in a timely manner or by any other means not explicitly provided for in this Agreement.

(c)      If any action or decision permitted by this Agreement to be taken or made by less than all of the Members is taken or made by a written consent signed by less than all of the Members, the Sole Manager shall, within ten calendar days after such action is taken or such decision is made, give written notice of the action taken or the decision made to the Members who did not sign the written consent.

**Section 4.07    Power of Members.**  The Members shall have the power to exercise any and all rights or powers granted to Members pursuant to the express terms of this Agreement and the BOC.  Except as otherwise specifically provided by this Agreement or required by the BOC, no Member, in its capacity as a Member, shall have the power to act for or on behalf of, or to bind, the Company, other than to the extent that the Company has granted a power of attorney to such Member to bind the Company on such actions.

**Section 4.08    Similar or Competitive Activities; Business Opportunities.**  Nothing contained in this Agreement shall prevent any Member or any of its Affiliates from engaging in any other activities or businesses, regardless of whether those activities or businesses are similar to or competitive with the Company.  None of the Members nor any of their Affiliates shall be

18

obligated to account to the Company or to the other Members for any profits or income earned or derived from such other activities or businesses. None of the Members nor any of their Affiliates shall be obligated to inform the Company or the other Members of a business opportunity of any type or description.

**ARTICLE V**
**ALLOCATIONS**

**Section 5.01    Tax Partnership Provisions.** This ARTICLE V is intended to apply only if the Company becomes a partnership for U.S. federal income tax purposes.

**Section 5.02    Allocation of Net Income and Net Loss.** For each Fiscal Year (or portion thereof), after giving effect to the special allocations set forth in Section 5.03, Net Income and Net Loss of the Company shall be allocated among the Members pro rata in accordance with their Membership Interests.

**Section 5.03    Regulatory and Special Allocations.** Notwithstanding the provisions of Section 5.02:

(a)    If there is a net decrease in Company Minimum Gain (determined according to Treasury Regulations Section 1.704-2(d)(1)) during any Fiscal Year, each Member shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This Section 5.03(a) is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)    Member Nonrecourse Deductions shall be allocated in the manner required by Treasury Regulations Section 1.704-2(i). Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), if there is a net decrease in Member Nonrecourse Debt Minimum Gain during any Fiscal Year, each Member that has a share of such Member Nonrecourse Debt Minimum Gain shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain. Items to be allocated pursuant to this paragraph shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This Section 5.03(b) is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)    Nonrecourse Deductions shall be allocated to the Members in accordance with their Membership Interests.

(d)    In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), Net Income shall be specially allocated to such Member in an

19

amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustments, allocations, or distributions as quickly as possible. This Section 5.03(d) is intended to comply with the "qualified income offset" requirement in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(e)     Simulated Depletion and Simulated Gain or Loss with respect to any Depletable Property shall be allocated among the Members in proportion to their shares of the Simulated Basis in such property. Each Member's share of the Simulated Basis in each of the Company's Depletable Properties shall be allocated to each Member in accordance with such Member's Membership Interest as of the time such Depletable Property is acquired by the Company, and shall be reallocated among the Members in accordance with the Members' Membership Interest as determined immediately following the occurrence of an event giving rise to any adjustment to the Book Values of the Company's oil and gas properties pursuant to the terms of this Agreement (or at the time of any material additions to the federal income tax basis of such Depletable Property).

(f)     The allocations set forth in subsections Section 5.03(a), Section 5.03(b), Section 5.03(c), Section 5.03(d) and Section 5.03(e) above (the "**Regulatory Allocations**") are intended to comply with certain requirements of the Treasury Regulations under Code Section 704. Notwithstanding any other provisions of this ARTICLE V (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating Net Income and Net Losses among Members so that, to the extent possible, the net amount of such allocations of Net Income and Net Losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to such Member if the Regulatory Allocations had not occurred.

**Section 5.04    Tax Allocations**.

(a)     Subject to Section 5.04(b), Section 5.04(c), and Section 5.04(d), all income, gains, losses and deductions of the Company shall be allocated, for federal, state, and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses, and deductions pursuant to Section 5.02 and Section 5.03, except that if any such allocation for tax purposes is not permitted by the Code or other Applicable Law, the Company's subsequent income, gains, losses, and deductions shall be allocated among the Members for tax purposes, to the extent permitted by the Code and other Applicable Law, so as to reflect as nearly as possible the allocation set forth in Section 5.02 and Section 5.03.

(b)     Items of Company taxable income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) using such reasonable method under Treasury Regulations Section 1.704-3 as shall be determined by the Sole Manager, so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value.

20

(c)  If the Book Value of any Company asset is adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f) as provided in clause (c) of the definition of Book Value, subsequent allocations of items of taxable income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value using such reasonable method under Treasury Regulations Section 1.704-3 as shall be determined by the Sole Manager.

(d)  Allocations of tax credit, tax credit recapture, and any items related thereto shall be allocated to the Members according to their interests in such items as determined by the Sole Manager taking into account the principles of Treasury Regulations Section 1.704-1(b)(4)(ii).

(e)  The deduction for depletion with respect to each separate oil and gas property (as defined in Section 614 of the Code) shall, in accordance with Section 613A(c)(7)(D) of the Code, be computed for federal income tax purposes separately by the Members rather than the Company.  The proportionate share of the adjusted tax basis of each oil and gas property shall be allocated to each Member in accordance with such Member's Membership Interest as of the time such oil and gas property is acquired by the Company (and any additions to such U.S. federal income tax basis resulting from expenditures required to be capitalized in such basis shall be allocated among the Members in a manner designed to cause the Members' proportionate shares of such adjusted U.S. federal income tax basis to be in accordance with their Membership Interests as determined at the time of any such additions), and shall be reallocated among the Members in accordance with the Members' Membership Interests as determined immediately following the occurrence of an event giving rise to an adjustment to the Book Values of the Company's oil and gas properties.  For purposes of the separate computation of gain or loss by each Member on the taxable disposition of each oil and gas property, the amount realized from such disposition shall be allocated (i) first, to the Members in an amount equal to the Simulated Basis in such oil and gas property in proportion to their allocable shares thereof and (ii) second, any remaining amount realized shall be allocated consistent with the allocation of Simulated Gain or Loss.  The allocations described in this Section 5.04(e) are intended to be applied in accordance with the Members' "interests in partnership capital" under Section 613A(c)(7)(D) or the Code; provided, however, that the Members understand and agree that the Sole Manager may authorize special allocations of federal income tax basis, income, gain, deduction or loss, as computed for U.S. federal income tax purposes, in order to eliminate differences between Simulated Basis and adjusted U.S. federal income tax basis with respect to each oil and gas property, in such manner as determined consistent with the principles outlined in Sections 5.04b) and 5.04c).  The provisions of this Section 5.04(e) and the other provisions of this Agreement relating to allocations under Section 613A(c)(7)(D) of the Code are intended to comply with Treasury Regulations Section 1.704-1(b)(4)(v) and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  Each Member, with the assistance of the Company, shall separately keep records of its share of the adjusted tax basis in each oil and gas property, adjust such share of the adjusted tax basis for any cost or percentage depletion allowable with respect to such property and use such adjusted tax basis in the computation of its cost depletion or in the computation of its gain or loss on the disposition

21

of such property by the Company. Upon the reasonable request of the Company, each Member shall advise the Company of its adjusted tax basis in each oil and gas property and any depletion computed with respect thereto, both as computed in accordance with the provisions of this subsection for purposes of allowing the Company to make adjustments to the tax basis of its assets as a result of certain transfers of interests in the Company or distributions by the Company. The Company may rely on such information and, if it is not provided by the Member, may make such reasonable assumptions as it shall determine with respect thereto. When reasonably requested by the Members, the Company shall provide all available information needed by such Members to comply with the record keeping requirements of this Section 5.04(e) and other applicable tax reporting obligations.

(f)     Allocations pursuant to this Section 5.04 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Losses, distributions, or other items pursuant to any provisions of this Agreement.

**Section 5.05   Allocations in Respect of Transferred Membership Interests.**   In the event of a Transfer of Membership Interests during any Fiscal Year made in compliance with the provisions of ARTICLE VIII, Net Income, Net Losses, and other items of income, gain, loss, and deduction of the Company attributable to such Membership Interests for such Fiscal Year shall be determined using the interim closing of the books method.

## ARTICLE VI
## DISTRIBUTIONS

**Section 6.01   General**.

(a)     Subject to Section 6.02 and Section 7.03(b), distributions of available cash shall be made to the Members when and in such amounts as determined by the Sole Manager and only following (i) payment of all operating expenses of the Company, including required payments under the Material Project Contracts, and the termination of the Material Project Contracts, (ii) the payment in full of any and all amounts owing to Credit Bid Purchaser or CUSA under any Material Project Contract, and (iii) the cessation of all production from, and Final Completion of all plugging and abandonment and decommissioning of the FWE IV Assets. After making all distributions required for a given Fiscal Year under Section 6.02, and paying all operating expenses, and making appropriate reserves for future operating expenses, and paying all amounts then due and outstanding under the Material Project Contracts as described in the preceding sentence, the termination of the Material Project Contracts, and the satisfaction of the condition under item (iii), in each case as described in the preceding sentence, distributions determined to be made by the Sole Manager pursuant to this Section 6.01(a) shall be paid to the Members in accordance with their respective Membership Interests.

(b)     Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any distribution to the Members (i) prior to the cessation of all production from, and Final Completion of all plugging and abandonment and

22

decommissioning activities on, the FWE IV Assets, except as provided in Section 6.02, or (ii) if such distribution would violate § 101.206 of the BOC or other Applicable Law.

**Section 6.02    Tax Advances**.

(a)    Subject to (i) any restrictions in the Company's then-applicable debt financing arrangements, if any, and (ii) the Sole Manager's good faith determination to retain any other amounts necessary to satisfy obligations of the Company that are reasonably expected to be due and payable in the 90 days following the date of determination, at least three days before each date prescribed by the Code for a calendar-year corporation to pay quarterly installments of estimated tax, the Company shall use commercially reasonable efforts to distribute cash to each Member in proportion to and to the extent of such Member's Quarterly Estimated Tax Amount for the applicable calendar quarter (each such distribution, a "**Tax Advance**").

(b)    If, at any time after the final Quarterly Estimated Tax Amount has been distributed pursuant to Section 6.02(a) with respect to any Fiscal Year, the aggregate Tax Advances to any Member with respect to such Fiscal Year are less than such Member's Tax Amount for such Fiscal Year (a "**Shortfall Amount**"), the Company shall use commercially reasonable efforts to distribute cash in proportion to and to the extent of each Member's Shortfall Amount.  The Company shall use commercially reasonable efforts to distribute Shortfall Amounts with respect to a Fiscal Year before the 90th day of the next succeeding Fiscal Year; provided, that if the Company has made distributions other than pursuant to this Section 6.02, the Sole Manager may apply such distributions to reduce any Shortfall Amount.

(c)    If the aggregate Tax Advances made to any Member pursuant to this Section 6.02 for any Fiscal Year exceed such Member's Tax Amount (an "**Excess Amount**"), such Excess Amount shall reduce subsequent Tax Advances that would be made to such Member pursuant to this Section 6.02, except to the extent taken into account as an advance pursuant to Section 6.02(d).

(d)    Any distributions made pursuant to this Section 6.02 shall be treated for purposes of this Agreement as advances on distributions pursuant to Section 6.01 and shall reduce, dollar-for-dollar, the amount otherwise distributable to such Member pursuant to Section 6.01.

**Section 6.03    Tax Withholding; Withholding Advances**.

(a)    **Tax Withholding.**  Each Member agrees to furnish the Company with any representations and forms as shall be reasonably requested by the Company to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have.

(b)    **Withholding Advances.**  The Company is hereby authorized at all times to make payments ("**Withholding Advances**") with respect to each Member in amounts required to discharge any obligation of the Company, including any obligation under Section 6225 of the Code (as determined by the Tax Matters Representative based on the

WEIL:\97901822\22\45327.0007

advice of legal or tax counsel to the Company) to withhold or make payments to any federal, state, local or foreign taxing authority (a "**Taxing Authority**") with respect to any distribution or allocation by the Company of income or gain to such Member and to withhold the same from distributions to such Member. Any funds withheld from a distribution by reason of this Section 6.03(b) shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement. If the Company makes any Withholding Advance in respect of a Member hereunder that is not immediately withheld from actual distributions to the Member, then the Member shall promptly reimburse the Company for the amount of such payment, plus interest at a rate equal to the prime rate published in the Wall Street Journal on the date of payment plus two percent per annum, compounded annually, on such amount from the date of such payment until such amount is repaid (or deducted from a distribution) by the Member (any such payment shall not constitute a Capital Contribution). Each Member's reimbursement obligation under this Section 6.03(b) shall continue after such Member transfers its Membership Interests.

(c) **Indemnification.** Each Member hereby agrees to defend, indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest, or penalties that may be asserted by reason of the Company's failure to deduct and withhold tax on amounts distributable or allocable to such Member. The provisions of this Section 6.03(c) and the obligations of a Member pursuant to Section 6.03(b) shall survive the termination, dissolution, liquidation, and winding up of the Company and the withdrawal of such Member from the Company or Transfer of its Membership Interests. The Company may pursue and enforce all rights and remedies it may have against each Member under this Section 6.03, including bringing a lawsuit to collect repayment with interest of any Withholding Advances.

(d) **Overwithholding.** None of the Company or the Sole Manager shall be liable for any excess taxes withheld in respect of any distribution or allocation of income or gain to a Member. In the event of an overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate Taxing Authority.

**Section 6.04 Distributions in Kind**.

(a) Subject to Sections 6.01 and 6.02, the Sole Manager is hereby authorized, as it may reasonably determine, to make distributions to the Members in the form of securities or other property (but not including any oil and gas properties) held by the Company; provided, that Tax Advances shall only be made in cash. In any non-cash distribution, the securities or property so distributed will be distributed among the Members in the same proportion and priority as cash equal to the Fair Market Value of such securities or property would be distributed among the Members pursuant to Section 6.01.

(b) Any distribution of securities shall be subject to such conditions and restrictions as the Sole Manager determines are required or advisable to ensure compliance with Applicable Law. In furtherance of the foregoing, the Sole Manager may require that the Members execute and deliver such documents as the Sole Manager may deem necessary or appropriate to ensure compliance with all federal and state securities laws that

24

apply to such distribution and any further Transfer of the distributed securities, and may appropriately legend the certificates that represent such securities to reflect any restriction on Transfer with respect to such laws.

## ARTICLE VII
## MANAGEMENT

**Section 7.01     Management of the Company.**  The business and affairs of the Company shall be managed, operated, and controlled by or under the direction of one manager designated pursuant to Section 7.02 (the "**Sole Manager**").  Subject to the provisions of Section 7.04, the Sole Manager shall have, and is hereby granted, full and complete power, authority, and discretion for, on behalf of, and in the name of the Company, to take such actions as it may deem necessary or advisable to carry out any and all of the objectives and purposes of the Company, to the exclusion of the Members unless expressly provided for otherwise in this Agreement or expressly required under the BOC.  Subject to the provisions of Section 7.06, the Sole Manager shall have, and is hereby granted, full and complete power, authority, and discretion for, on behalf of, and in the name of the Company, to take such actions as it may deem necessary or advisable to carry out any and all of the objectives and purposes of the Company.

**Section 7.02     Sole Manager.**  The Company shall not have any officers or employees other than the Sole Manager.  Sunset Energy Gulf Coast Asset Management LLC has been selected and designated by the Member with the consent of CUSA to serve as the initial Sole Manager. The Sole Manager may not be removed without CUSA's prior written consent, which may be given, delayed or withheld in its sole discretion.  In the event that the Sole Manager is removed with CUSA's written consent or the Sole Manager resigns or otherwise ceases to serve in such capacity, then the Sole Manager shall be selected pursuant to the following procedure:  CUSA and the Company (acting through the Member for all purposes under this Section 7.02, who shall solicit input from Credit Bid Purchaser for all purposes under this Section 7.02) shall agree on a replacement, and, if they cannot agree, the Company shall designate a replacement, which shall be subject to CUSA's approval (which approval shall not to be unreasonably withheld, conditioned or delayed).

**Section 7.03     Material Project Contracts; Net Profit Interest**.

(a)      The Company's execution and performance of its obligations under each of the Omnibus Agreement, the NPI Conveyance, the Contract Operating Agreement, the Turnkey Removal Agreement, the Joint Development Agreement, the Deepwater Assets Decommissioning Funding Agreement, the SEMS Bridging Agreement, the Transition Services Agreement and the Escrow Agreement has been approved by the Member and shall not require any other approval on the part of the Company (by the Sole Manager or otherwise).  The Sole Manager shall not amend or modify such agreements, except in accordance with this Agreement.

(b)      At the end of each Production Period, the Company shall pay into the Escrow Account the NPI Payment, if any is due, as calculated pursuant to the terms of the NPI Conveyance.

WEIL:\97901822\22\45327.0007

**Section 7.04    Actions Requiring CUSA Consent.**  Without the prior written consent of CUSA (which written consent may be given, delayed or withheld in CUSA's sole discretion, unless expressly indicated otherwise), the Company shall not do, or enter into any commitment to do, any of the following:

(a)    engage in any business or activity other than (i) plugging and abandoning and decommissioning the FWE IV Assets and (ii) operating the FWE IV Assets prior to their plugging and abandonment and decommissioning;

(b)    use revenue or free cash flow for any purpose other than (i) for funding Reimbursable Costs or Third Party Payments under the Contract Operating Agreement (or similar charges under a replacement thereto) and, if applicable, payment into the Escrow Account and (ii) Tax Advances pursuant to Section 6.02(a);

(c)    issue additional Membership Interests or any other equity securities or admit additional Members to the Company;

(d)    approve any decommissioning plan with respect to the FWE IV Assets; or engage or retain any decommissioning subcontractor other than Credit Bid Purchaser pursuant to the Turnkey Removal Agreement;

(e)    incur any Indebtedness;

(f)    make any loan, advance, or capital contribution or make any investment in any Person;

(g)    replace, remove or change the powers of the Sole Manager;

(h)    replace or remove Credit Bid Purchaser under the Contract Operating Agreement; engage or retain any contract operator other than Credit Bid Purchaser pursuant to the Contract Operating Agreement; amend, or waive the application of, any provision of the Contract Operating Agreement;

(i)    divest any of the FWE IV Assets (other than sales of hydrocarbons in the ordinary course of business) or acquire any other assets (other than for a purpose permitted under Section 7.04(a) and in accordance with the terms of the Contract Operating Agreement, and further subject to any approval rights contained therein);

(j)    approving any prospective joint development project or other capital project for which an election to participate has been delivered to the Company pursuant to the Joint Development Agreement or approve any well takeover under the Joint Development Agreement;

(k)    agree to any (i) settlement or order with any Governmental Authority relating to the FWE IV Assets or the operations conducted thereon, (ii) settlement relating to contribution or payment amounts relating to decommissioning obligations with any Person, including any predecessor-in-interest to all or any portion of the leases and lands

26

covered by the FWE IV Assets or any surety bond provider or other provider or holder of security relating to decommissioning operations, or (iii) any other settlement involving FWE IV Assets or the operation of FWE IV;

(l) amend any provision of a Material Project Contract, or waive any material right of the Company under a Material Project Contract;

(m) [Reserved];

(n) take any act of Bankruptcy, liquidate or otherwise terminate the existence of the Company or any of its Subsidiaries;

(o) enter into a fundamental business transaction within the meaning of such term in the BOC;

(p) establish a Subsidiary or enter into any joint venture or similar business arrangement or enter into a transaction covered by Section 7.03;

(q) enter into, amend, waive, or terminate any contract with an Affiliate of the Company; or

(r) amend, modify, supplement, restate, or waive any provision of the Certificate of Formation, this Agreement or any other organizational documents of the Company or its Subsidiaries (and any such amendment, modification, supplement, or waiver that is attempted without CUSA's prior written consent shall be void *ab initio* and without effect).

If CUSA in good faith believes that (x) Credit Bid Purchaser is in breach the Contract Operating Agreement in a manner that is materially adverse to the Company or is liable to the Company for indemnification pursuant to the terms of the Contract Operating Agreement, and (y) the Company has failed to enforce its rights (including, if applicable, termination right) with respect to such breach or indemnification and such failure is materially adverse to the Company, then CUSA may (i) deliver a written notice to the Company requesting that the Company enforce such rights (any rights to which such request relates must be specifically identified) and (ii) if the Company fails to enforce such rights within thirty days of its receipt of such notice, CUSA may itself enforce the rights of the Company against Credit Bid Purchaser on the Company's behalf.

**Section 7.05   No Compensation of the Sole Manager**.  The Sole Manager shall receive an offer letter and be compensated for the services provided by such individual as the Sole Manager of the Company in the amount set forth in such offer letter.  The Company shall reimburse the Sole Manager for all reasonable, ordinary, necessary, and direct third-party expenses incurred by the Sole Manager on behalf of the Company in carrying out the Company's business activities.

**Section 7.06   No Personal Liability**.  Except as otherwise provided in the BOC or by Applicable Law, or expressly provided in this Agreement or any written agreement between the Company and the Sole Manager, (i) the Sole Manager will not be obligated personally for any debt, obligation, or liability of the Company, whether arising in contract, tort, or otherwise,

27

including a debt, obligation, or liability under a judgment, decree, or order of a court, solely by reason of being or acting as the Sole Manager and (ii) subject to Section 7.04, the Sole Manager shall carry out his or her duties under this Agreement in good faith and a manner in which the Sole Manager believes to be consistent with and in furtherance of the purpose of the Company specified in Section 2.05(a).

# ARTICLE VIII
# TRANSFER

**Section 8.01    General Restrictions on Transfer**.

(a)    No Member shall Transfer all or any portion of its Membership Interest in the Company without the prior written approval of the Sole Manager.

(b)    Subject to Section 8.01(a), each Member agrees that it will not Transfer all or any portion of its Membership Interest in the Company, and the Company agrees that it shall not issue any Membership Interests:

(i)    except as permitted under the Securities Act and other Applicable Laws, and then, with respect to a Transfer of Membership Interests, only upon delivery to the Company of an opinion of counsel in form and substance satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act;

(ii)    if the Company becomes a partnership for U.S. federal income tax purposes, if such Transfer or issuance would cause the Company to be considered a "publicly traded partnership" under Section 7704(b) of the Code within the meaning of Treasury Regulations Section 1.7704-1(h)(1)(ii), including the look-through rule in Treasury Regulations Section 1.7704-1(h)(3);

(iii)    if such Transfer or issuance would affect the Company's existence or qualification as a limited liability company under the BOC;

(iv)    if the Company becomes a partnership for U.S. federal income tax purposes, if such Transfer or issuance would cause the Company to lose its status as a partnership for federal income tax purposes;

(v)    if such Transfer or issuance would cause the Company to be required to register as an investment company under the Investment Company Act of 1940, as amended;

(vi)    if such Transfer or issuance would cause the assets of the Company to be deemed "Plan Assets" as defined under the Employee Retirement Income Security Act of 1974 or its accompanying regulations or result in any "prohibited transaction" thereunder involving the Company; and

28

WEIL:\97901822\22\45327.0007

(vii)    such Transfer would limit, hinder or prohibit the Company from carrying out its purpose under Section 2.05(a).

(c)    Any Transfer or attempted Transfer of any Membership Interest in violation of this Agreement shall be null and void *ab initio*, no such Transfer shall be recorded on the Company's books, and the purported Transferee in any such Transfer shall not be treated (and the purported Transferor shall continue to be treated) as the owner of such Membership Interest for all purposes of this Agreement.

(d)    No Transfer of any Membership Interest to a Person not already a Member of the Company shall be deemed completed until the prospective Transferee has executed a joinder agreement in form and substance acceptable to the Company.

(e)    For the avoidance of doubt, any completed Transfer of a Membership Interest permitted by this Agreement shall be deemed a sale, transfer, conveyance, assignment, or other disposal of such Membership Interest in its entirety as intended by the parties to such Transfer, and shall not be deemed a sale, transfer, conveyance, assignment, or other disposal of any less than all of the rights and benefits described in the definition of the term "Membership Interest."

## ARTICLE IX
## EXCULPATION AND INDEMNIFICATION

**Section 9.01    Exculpation of Covered Persons**.

(a)    **Covered Persons.**  As used herein, the term "**Covered Person**" shall mean (i) each current or former Member; (ii) each current or former manager, officer, director, shareholder, partner, member, Affiliate, employee, agent, or Representative of each Member, and each of their Affiliates; and (iii) each manager (including the Sole Manager), officer (if any), employee (if any), agent, or Representative of the Company.

(b)    **Standard of Care.**  No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage, or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in good faith reliance on the provisions of this Agreement, so long as such action or omission does not constitute fraud or willful misconduct by such Covered Person.

(c)    **Good Faith Reliance.**  A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports, or statements (including financial statements and information, opinions, reports, or statements as to the value or amount of the assets, liabilities, Net Income, or Net Losses of the Company or any facts pertinent to the existence and amount of assets from which distributions might properly be paid) of the following Persons or groups: (i) another Member; (ii) one or more managers, officers or employees of the Company; (iii) any attorney, independent accountant, appraiser, or other expert or professional employed or engaged by or on behalf of the Company; or (iv) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person

29

WEIL:\97901822\22\45327.0007

reasonably believes to be within such other Person's professional or expert competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in § 3.102 or § 3.105 of the BOC.

**Section 9.02   Liabilities and Duties of Covered Persons.**

(a)    **Limitation of Liability.**  This Agreement, unless otherwise specifically stated herein, is not intended to, and does not, create or impose any fiduciary duty on any Covered Person.  Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by Applicable Law, and in doing so, acknowledges and agrees that the duties and obligations of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement.  The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

(b)    **Duties.**  Subject to Section 7.06, whenever in this Agreement a Covered Person is permitted or required to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), the Covered Person shall be entitled to consider only such interests and factors as such Covered Person desires and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person.  Whenever in this Agreement a Covered Person is permitted or required to make a decision in such Covered Person's "good faith," the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or any other Applicable Law.

**Section 9.03   Indemnification.**

(a)    **Indemnification.**  To the fullest extent permitted by the BOC, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution, or replacement, only to the extent that such amendment, substitution, or replacement permits the Company to provide broader indemnification rights than the BOC permitted the Company to provide prior to such amendment, substitution, or replacement), the Company shall indemnify, hold harmless, defend, pay, and reimburse any Covered Person against any and all losses, claims, damages, judgments, fines, or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines, or liabilities, and any amounts expended in settlement of any claims (collectively, "**Losses**") to which such Covered Person may become subject by reason of:

(i)     any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company, any Member, or any direct or indirect Subsidiary of the foregoing in connection with the business of the Company; or

(ii)    such Covered Person being or acting in connection with the business of the Company as a member, shareholder, Affiliate, manager, director, officer, employee, or agent of the Company, any Member, or any of their respective

30

Affiliates, or that such Covered Person is or was serving at the request of the Company as a member, manager, director, officer, employee, or agent of any Person including the Company;

provided, that (x) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his conduct was unlawful, and (y) such Covered Person's conduct did not constitute fraud or willful and intentional misconduct, in either case as determined by a final, nonappealable order of a court of competent jurisdiction. In connection with the foregoing, the termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Covered Person did not act in good faith or, with respect to any criminal proceeding, had reasonable cause to believe that such Covered Person's conduct was unlawful, or that the Covered Person's conduct constituted fraud or willful misconduct.

(b) **Control of Defense.** Upon a Covered Person's discovery of any claim, lawsuit, or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 9.03, the Covered Person shall give prompt written notice to the Company of such claim, lawsuit, or proceeding; provided, that the failure of the Covered Person to provide such notice shall not relieve the Company of any indemnification obligation under this Section 9.03, unless the Company shall have been materially prejudiced thereby. The Company shall be entitled to participate in or assume the defense of any such claim, lawsuit, or proceeding at its own expense. After notice from the Company to the Covered Person of its election to assume the defense of any such claim, lawsuit, or proceeding, the Company shall not be liable to the Covered Person under this Agreement or otherwise for any legal or other expenses subsequently incurred by the Covered Person in connection with investigating, preparing to defend, or defending any such claim, lawsuit, or other proceeding. If the Company does not elect (or fails to elect) to assume the defense of any such claim, lawsuit, or proceeding, the Covered Person shall have the right to assume the defense of such claim, lawsuit, or proceeding as it deems appropriate, but it shall not settle any such claim, lawsuit, or proceeding without the consent of the Company (which consent shall not be unreasonably withheld, conditioned, or delayed).

(c) **Reimbursement.** The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend, or defending any claim, lawsuit, or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 9.03; provided, that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this Section 9.03, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(d) **Entitlement to Indemnity.** The indemnification provided by this Section 9.03 shall not be deemed exclusive of any other rights to indemnification to which those

31

seeking indemnification may be entitled under the BOC, any agreement or otherwise. The provisions of this Section 9.03 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 9.03 and shall inure to the benefit of the executors, administrators, legatees, and distributees of such Covered Person.

(e) **Insurance.** To the extent available on commercially reasonable terms, the Company may purchase, at its expense, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Sole Manager may reasonably determine; provided, that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder. If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses.

(f) **Funding of Indemnification Obligation.** Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this Section 9.03 shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

(g) **Savings Clause.** If this Section 9.03 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Section 9.03 to the fullest extent permitted by any applicable portion of this Section 9.03 that shall not have been invalidated and to the fullest extent permitted by Applicable Law.

(h) **Amendment.** The provisions of this Section 9.03 shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this Section 9.03 is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound. No amendment, modification, or repeal of this Section 9.03 that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

**Section 9.04 Survival.** The provisions of this ARTICLE IX shall survive the dissolution, liquidation, winding up, termination of the Company and the withdrawal of any Member or the Transfer of any Member's interest in the Company.

32

## ARTICLE X
## ACCOUNTING; TAX MATTERS

**Section 10.01 Financial Statements and Other Information.** The Company shall prepare and furnish to each Member and CUSA the following reports:

(a) **Annual Financial Statements.** As soon as available, and in any event within 105 days after the end of each Fiscal Year, its unaudited consolidated balance sheet and related consolidated statements of operations, Members' equity and cash flows as of the end of and for such year prepared in accordance with GAAP consistently applied.

(b) **Quarterly Financial Statements.** As soon as available, and in any event within 60 days after the end of each quarterly accounting period in each Fiscal Year (including the last fiscal quarter of the Fiscal Year), its unaudited consolidated balance sheet and related unaudited consolidated statements of operations, Members' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the current Fiscal Year, setting forth in each case in comparative form the figures for the corresponding period or periods of the previous Fiscal Year or as at the end of such period or periods, all in reasonable detail and certified by the Company as presenting fairly in all material respects the consolidated financial condition and results of operations of the Company in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes.

(c) **Monthly Operating Data.** As soon as available, but in no event later than 45 days after the end of each calendar month, a statement in a form reasonably satisfactory to each Member and CUSA showing all operating data for the Company, including operating expenses and revenue for each of the Company, for such calendar month.

(d) **Budget Updates.** Promptly once available and no less than bi-annually, an operating budget for the Fiscal Year, forecasting revenue, operating costs, and capital expenses for each fiscal quarter.

(e) **Material Government Communication.** Promptly following receipt thereof by FWE IV, copies of all material written notices or other material communications issued or provided by or to any Governmental Authority.

(f) **Additional Information.** Promptly following any reasonable request therefor, such other information regarding the operations, business affairs and financial condition of the Company, as any Member or CUSA may reasonably request, including, without limitation, decommissioning cost estimates and calculations.

**Section 10.02 Inspection Rights.** Upon reasonable notice from a Member or CUSA, the Company shall afford each Member or CUSA and their respective Representatives access during normal business hours to (a) the Company's properties, offices, plants, and other facilities; (b) the corporate, financial, and similar records, reports, and documents of the Company, including, without limitation, all books and records, minutes of proceedings, internal management documents, reports of operations, reports of adverse developments, copies of any management

33

WEIL:\97901822\22\45327.0007

letters and communications with Members or the Sole Manager, and to permit each Member or CUSA and their respective Representatives to examine such documents and make copies thereof; and (c) the Sole Manager, any officers, senior employees, and public accountants of the Company, and to afford each Member or CUSA and their respective Representatives the opportunity to discuss the affairs, finances, and accounts of the Company with such Sole Manager, officers, senior employees, and public accountants (and the Company hereby authorizes said accountants to discuss with such Member or CUSA and their respective Representatives such affairs, finances, and accounts).

**Section 10.03 Income Tax Status.** The Company and the Initial Member intend that the Company shall be treated as a disregarded entity for U.S., federal, state, and local income tax purposes. Neither the Company nor any Member shall make an election for the Company to be classified as other than a partnership or a disregarded entity pursuant to Treasury Regulations Section 301.7701-3.

**Section 10.04 Tax Matters Representative**. The following Sections 10.04(a)-(f) are intended to apply if the Company becomes a partnership for U.S. federal income tax purposes:

(a) **Appointment.** The Members hereby appoint the Sole Manager as "partnership representative" as provided in Code Section 6223(a) (the "**Tax Matters Representative**"). If any state or local tax law provides for a tax matters partner/partnership representative or Person having similar rights, powers, authority or obligations, the Person designated as the Tax Matters Representative shall also serve in such capacity. To the extent required by Applicable Law, if the Tax Matters Representative is an entity, it shall appoint a "designated individual" to act on its behalf. The Tax Matters Representative can be removed at any time by a vote of Members holding a majority of the Membership Interests, and shall resign if it is no longer a Member. In the event of the resignation or removal of the Tax Matters Representative, Members holding a majority of the Membership Interests shall select a replacement Tax Matters Representative.

(b) **Tax Examinations and Audits.** The Tax Matters Representative is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by Taxing Authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. The Tax Matters Representative shall promptly notify the Members in writing of the commencement of any tax audit of the Company, upon receipt of a tax assessment and upon receipt of a notice of final partnership adjustment, and shall keep the Members reasonably informed of the status of any tax audit and resulting administrative and judicial proceedings. Without the consent of Members holding a majority of the Membership Interests, the Tax Matters Representative shall not extend the statute of limitations, file a request for administrative adjustment, file suit relating to any Company tax refund or deficiency or enter into any settlement agreement relating to items of income, gain, loss or deduction of the Company with any Taxing Authority.

WEIL:\97901822\22\45327.0007

(c)      **US Federal Tax Proceedings.**   The Members acknowledge that the Company may elect the application of Section 6226 of the Code.  This acknowledgement applies to each Member whether or not the Member owns an interest in the Company in both the reviewed year and the year of the tax adjustment.  In the event that the Company elects the application of Section 6226 of the Code, the Members agree and covenant to take into account and report to the Internal Revenue Service (or any other applicable taxing authority) any adjustment to their tax items for the reviewed year of which they are notified by the Company in a written statement, in the manner provided in Section 6226(b) of the Code, whether or not the Member owns any interest in the Company at such time.  Any Member that fails to report its share of such adjustments on its tax return, agrees to indemnify and hold harmless the Company and the Tax Matters Representative from and against any and all losses, costs, liabilities and expenses related to taxes (including penalties and interest) imposed on the Company as a result of the Member's inaction.  If the Company is required to pay the assessment of the imputed underpayment under Section 6225(a)(1) of the Code or similar provisions of state law, any taxes, penalties, and interest payable by the Company shall be treated as attributable to the Members, and, to the extent possible, the Tax Matters Representative shall allocate the burden of any such amounts to those Members to whom such amounts are reasonably attributable taking into account the Member's or former Member's allocable share of taxable income or loss with respect to the Fiscal Year to which such assessment pertains and adjustments that may have been made in computing the imputed underpayment.  To the extent that any such amount is payable by the Company, at the option of the Tax Matters Representative, such amount shall be recoverable from such Member as provided in Section 6.03(c).  The provisions contained in this Section 10.04 shall survive the dissolution, termination or liquidation of the Company, the withdrawal of any Member or the Transfer of any Member's interest in the Company and apply to unadmitted assignees of a Member's interest who may be considered current or former partners of the Company for federal tax purposes.

(d)      **Tax Returns.**  Each Member agrees that such Member shall not treat any Company item inconsistently on such Member's federal, state, foreign or other income tax return with the treatment of the item on the Company's return.

(e)      **Section 754 Election.**  The Tax Matters Representative will make an election under Code Section 754, if the Company becomes a partnership for U.S. federal income tax purposes.

(f)      **Indemnification**.   The Company shall defend, indemnify, and hold harmless the Tax Matters Representative against any and all liabilities sustained as a result of any act or decision concerning Company tax matters and within the scope of responsibilities as Tax Matters Representative, so long as such act or decision was done or made in good faith and does not constitute gross negligence or willful misconduct.

**Section 10.05 Tax Returns.**  At the expense of the Company, the Sole Manager (or any officer of the Company that it may designate pursuant to this Agreement) shall endeavor to cause the preparation and timely filing (including extensions) of all tax returns, if any, required to be filed by the Company pursuant to the Code as well as all other required tax returns in each

35

WEIL:\97901822\22\45327.0007

jurisdiction in which the Company owns property or does business. If the Company becomes a partnership for U.S. federal income tax purposes, as soon as reasonably possible after the end of each Fiscal Year, the Sole Manager or any designated officer of the Company, as applicable, will cause to be delivered to each Person who was a Member at any time during such Fiscal Year, IRS Schedule K-1 to Form 1065, if applicable, and such other information with respect to the Company as may be necessary for the preparation of such Person's federal, state, and local income tax returns for such Fiscal Year.

**Section 10.06 Company Funds.** All funds of the Company shall be deposited in its name, or in such name as may be designated by the Sole Manager, in such checking, savings, or other accounts, or held in its name in the form of such other investments as shall be designated by the Sole Manager. The funds of the Company shall not be commingled with the funds of any other Person. All withdrawals of such deposits or liquidations of such investments by the Company shall be made exclusively upon the signature or signatures of the Sole Manager, or any officer or officers of the Company that may be designated by the Sole Manager, as applicable, pursuant to this Agreement.

**ARTICLE XI**
**WINDING UP AND TERMINATION**

**Section 11.01 Events Requiring Winding Up.** The Company shall begin to wind up its business and affairs only upon the occurrence of any of the following events (in each case, subject to the applicable provisions of Section 7.04):

(a) upon the permanent cessation of all production from, and Final Completion of all plugging and abandonment and decommissioning of, the FWE IV Assets;

(b) the occurrence of a nonwaivable event under the terms of the BOC which requires the winding up of the Company after its termination unless a Continuance occurs in respect of such event; or

(c) the entry of a judicial decree ordering winding up and termination under § 11.314 of the BOC in proceedings of which CUSA has been given notice and an opportunity to participate.

(d) Notwithstanding the occurrence of an event referenced in Section 11.01(b), if the Company is permitted prior to the termination of its existence in accordance with the BOC to revoke a winding up upon the occurrence of such event and the Sole Manager provides its prior written consent to such revocation, then, to the extent so permitted under the BOC and in the manner provided therein, the Company's existence shall be continued (the revocation of such a winding up and continuance of the Company, a "**Continuance**").

**Section 11.02 Effectiveness of Termination.** The Company shall begin to wind up its business and affairs as soon as reasonably practicable upon the occurrence of an event described in Section 11.01 (if such event has not been revoked or cancelled), but the Company shall not terminate until the winding up of the Company has been completed, the assets of the Company

36

have been distributed as provided in Section 11.03, and the Certificate of Termination shall have been filed as provided in Section 11.04.

**Section 11.03 Liquidation.** If the Company is to be terminated pursuant to Section 11.01, the Company shall be liquidated and its business and affairs wound up in accordance with the BOC and the following provisions:

(a) **Liquidator.** The Sole Manager shall act as liquidator to wind up the Company (the "**Liquidator**"); provided, however, that if there is then a vacancy in the position of the Sole Manager or the Sole Manager is not willing to act as the Liquidator, the Members shall appoint a Person to act as the Liquidator with the consent of CUSA. The Liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

(b) **Accounting.** As promptly as possible after the event requiring winding up and again after final liquidation, the Liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last day of the calendar month in which such event occurs or the final liquidation is completed, as applicable.

(c) **Notice.** The Liquidator shall deliver to each known claimant of the Company the notice required by § 11.052 of the BOC.

(d) **Distribution of Proceeds.** The Liquidator shall liquidate the assets of the Company and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of Applicable Law:

(i) First, to the payment of all of the Company's debts and liabilities to its creditors (including Members, if applicable), including amounts owed, if any, pursuant to the Material Project Contracts to CUSA and/or Credit Bid Purchaser, and the expenses of liquidation (including sales commissions incident to any sales of assets of the Company);

(ii) Second, to the establishment of and additions to other reserves that are determined by the Liquidator to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company; and

(iii) Third, to the Members in accordance with the positive balances in their respective Capital Accounts, as determined after taking into account all Capital Account adjustments for the taxable year of the Company during which the liquidation of the Company occurs.

(e) **Discretion of Liquidator.** Notwithstanding the provisions of Section 11.03(d) that require the liquidation of the assets of the Company, but subject to the order of priorities set forth in Section 11.03(d), if upon winding up of the Company the Liquidator reasonably determines that an immediate sale of part or all of the Company's

37

WEIL:\97901822\22\45327.0007

assets would be impractical or could cause undue loss to the Members, the Liquidator may defer the liquidation of any assets except those necessary to satisfy Company liabilities and reserves, and may, upon approval of holders of a majority of the outstanding Membership Interests, distribute to the Members, in lieu of cash, as tenants in common and in accordance with the provisions of Section 11.03(d), undivided interests in such Company assets as the Liquidator deems not suitable for liquidation. Any such distribution in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operating of such properties at such time. For purposes of any such distribution, any property to be distributed will be valued at its Fair Market Value.

**Section 11.04 Certificate of Termination.** Upon completion of the distribution of the assets of the Company as provided in Section 11.03(d) hereof, the Liquidator or other such officer or Sole Manager shall execute and cause to be filed a Certificate of Termination in the State of Texas and shall cause the cancellation of all qualifications and registrations of the Company as a foreign limited liability company in jurisdictions other than the State of Texas and shall take such other actions as may be necessary to terminate the Company. Upon acceptance of the Certificate of Termination by the Texas Secretary of State, the Company shall be terminated.

**Section 11.05 Survival of Rights, Duties, and Obligations.** Dissolution, liquidation, winding up, or termination of the Company for any reason shall not release any party from any Loss that at the time of such dissolution, liquidation, winding up, or termination already had accrued to any other party or thereafter may accrue in respect of any act or omission prior to such dissolution, liquidation, winding up, or termination. For the avoidance of doubt, none of the foregoing shall replace, diminish, or otherwise adversely affect any Member's right to indemnification pursuant to Section 9.03.

**Section 11.06 Recourse for Claims.** Each Member shall look solely to the assets of the Company for all distributions with respect to the Company, such Member's Capital Account, and such Member's share of Net Income, Net Loss, and other items of income, gain, loss, and deduction, and shall have no recourse therefor (upon termination or otherwise) against the Liquidator or any other Member.

**ARTICLE XII**
**MISCELLANEOUS**

**Section 12.01 Expenses.** The Initial Member will pay, or cause to be paid, or contribute to the Company amounts necessary for the Company to pay, all amounts necessary to fully cover (a) costs associated with the formation of the Company in connection with the Divisive Merger Documents and (b) any premiums to satisfy organizational or area wide bonding requirements.

**Section 12.02 Further Assurances.** In connection with this Agreement and the transactions contemplated hereby, the Company and the Member hereby agree, at the request of the Company or any other Member, to execute and deliver such additional documents, instruments, conveyances, and assurances and to take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

38

**Section 12.03 Confidentiality**.

(a)    Each Member acknowledges that it will have access to and become acquainted with trade secrets, proprietary information, and confidential information belonging to the Company and its Affiliates that are not generally known to the public, including, but not limited to, information concerning business plans, financial statements, and other information, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists, or other business documents that the Company treats as confidential, in any format whatsoever (including oral, written, electronic, or any other form or medium) (collectively, "**Confidential Information**").  In addition, each Member acknowledges that:  (i) the Company has invested, and continues to invest, substantial time, expense, and specialized knowledge in developing its Confidential Information; (ii) the Confidential Information provides the Company with a competitive advantage over others in the marketplace; and (iii) the Company would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public.  Without limiting the applicability of any other agreement to which any Member is subject, no Member shall, directly or indirectly, disclose or use (other than solely for the purposes of such Member monitoring and analyzing its investment in the Company) at any time, including, without limitation, use for personal, commercial, or proprietary advantage or profit, either during its association with the Company or thereafter, any Confidential Information of which such Member is or becomes aware.  Each Member in possession of Confidential Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss, and theft.

(b)    Nothing contained in Section 12.03(a) shall prevent any Member from disclosing Confidential Information: (i) upon the order of any court or administrative agency; (ii) upon the request or demand of any regulatory agency or authority having jurisdiction over such Member; (iii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories, or other discovery requests; (iv) to the extent necessary in connection with the exercise of any remedy hereunder; (v) to the other Members; or (vi) to such Member's Representatives who, in the reasonable judgment of such Member, need to know such Confidential Information and agree to be bound by the provisions of this Section 12.03 as if a Member; or (vii) to any potential Transferee in connection with a proposed Transfer of Membership Interests from such Member, as long as such potential Transferee agrees in writing to be bound by the provisions of this Section 12.03 as if a Member before receiving such Confidential Information; provided, that in the case of clause (i), (ii), or (iii), such Member shall notify the Company and other Members of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the Company and other Members) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available.

(c)    The restrictions of Section 12.03(a) shall not apply to Confidential Information that: (i) is or becomes generally available to the public other than as a result of a disclosure by a Member in violation of this Agreement; (ii) is or has been independently developed or conceived by such Member without use of Confidential

39

WEIL:\97901822\22\45327.0007

Information; or (iii) becomes available to such Member or any of its Representatives on a non-confidential basis from a source other than the Company, the other Members, or any of their respective Representatives, provided, that such source is not known by the receiving Member to be bound by a confidentiality agreement regarding the Company.

(d)     The obligations of each Member under this Section 12.03 shall survive for so long as such Member remains a Member, and for three years following the earlier of (i) termination, dissolution, liquidation, and winding up of the Company; (ii) the withdrawal of such Member from the Company; or (iii) such Member's Transfer of its Membership Interests; provided that with respect to Confidential Information that constitutes a trade secret under Applicable Law, the obligations of each Member under this Section 12.03 shall survive until, if ever, such Confidential Information loses its trade secret protection other than due, directly or indirectly, to an act or omission of the Member.

**Section 12.04 Notices.**   All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given:

(a)     when delivered by hand (with written confirmation of receipt);

(b)     when received by the addressee if sent by a nationally recognized overnight courier (receipt requested);

(c)     on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid; or

(d)     on the day delivered if sent by electronic mail to the address below during normal business hours of the recipient and on the next Business Day if sent by electronic mail after normal business hours of the recipient.

Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 12.04):

| If to the Company: | Fieldwood Energy IV LLC |
| --- | --- |
| | 2000 W. Sam Houston Parkway S., Suite 1200 |
| | Houston, Texas 77042 |
| | Attention: Sole Manager |
| | Phone: (713) 969-1183 |
| | Email: Dave.abell@fwellc.com |

WEIL:\97901822\22\45327.0007

| | |
|---|---|
| with a copy to:<br><br>(which shall not constitute notice) | Chevron U.S.A. Inc.<br>100 Northpark Blvd<br>Covington, LA 70443<br>Attention: Land Manager<br>Phone: (985) 773-6538<br>Email: tdwebre@chevron.com |
| **If to Member**: | To the Member's respective mailing address as set forth on the Members Schedule. |

**Section 12.05 Headings.** The headings in this Agreement are inserted for convenience or reference only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision of this Agreement.

**Section 12.06 Severability.** If any term or provision of this Agreement is held to be invalid, illegal, or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Except as provided in Section 9.03(g), upon such determination that any term or other provision is invalid, illegal, or unenforceable, this Agreement shall be modified automatically so as to effect the original intent of the parties as closely as possible in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible, legal, and enforceable.

**Section 12.07 Entire Agreement.** This Agreement, together with the Certificate of Merger, Plan of Merger, Certificate of Formation, the Material Project Contracts and all related Exhibits and Schedules, constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

**Section 12.08 Successors and Assigns.** Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, and assigns.

**Section 12.09 No Third-Party Beneficiaries.** Except (a) with respect to certain rights reserved to CUSA as set forth in this Agreement, which shall be for the benefit of and enforceable by CUSA, and (b) as provided in ARTICLE IX, which shall be for the benefit of and enforceable by Covered Persons as described therein, this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors, and assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person, including any creditor of the Company, any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement; provided, however that CUSA and each Covered Persons shall be an express third party beneficiary of this Agreement.

41

**Section 12.10 Amendment.** Subject to Sections 2.02, no provision of this Agreement may be amended or modified except by an instrument in writing executed by the Company and the Members holding a majority of the Membership Interests; provided, however that any amendment or modification which impacts the rights of CUSA hereunder, including changes to Section 2.05 (Purpose) shall be subject to the prior written consent of CUSA, which may be given, delayed or withheld in its sole discretion. Any such written amendment or modification will be binding upon the Company, CUSA and each Member. Notwithstanding the foregoing, amendments to the Members Schedule following any new issuance, redemption, repurchase, or Transfer of Membership Interests in accordance with this Agreement may be made by the Sole Manager without the consent of or execution by the Members.

**Section 12.11 Waiver.** No waiver by any party or CUSA of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving or CUSA, respectively. No waiver by any party or CUSA shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege. For the avoidance of doubt, nothing contained in this Section 12.11 shall diminish any of the explicit and implicit waivers described in this Agreement.

**Section 12.12 Governing Law.** All issues and questions concerning the application, construction, validity, interpretation, and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Texas, without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Texas.

**Section 12.13 Submission to Jurisdiction.** The parties hereby agree that any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort, or otherwise, shall be brought in the federal courts of the United States of America or the courts of the State of Texas, in each case located in Harris County and in Houston, Texas. Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in any such court or that any such suit, action, or proceeding that is brought in any such court has been brought in an inconvenient forum. Service of process, summons, notice, or other document by registered mail to the address set forth in Section 12.04 shall be effective service of process for any suit, action, or other proceeding brought in any such court.

**Section 12.14 Waiver of Jury Trial**. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY DISPUTE OR CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES

WEIL:\97901822\22\45327.0007

AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 12.15 Equitable Remedies.** Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties or CUSA, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, each of the other parties hereto and CUSA shall, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

**Section 12.16 Attorney's Fees.** In the event that any party or third-party beneficiary hereto institutes any legal suit, action, or proceeding, including arbitration, against another party in respect of a matter arising out of or relating to this Agreement, the prevailing party or third-party beneficiary in the suit, action, or proceeding shall be entitled to receive, in addition to all other damages to which it may be entitled, the costs incurred by it in conducting the suit, action, or proceeding, including reasonable attorneys' fees and expenses and court costs.

**Section 12.17 Remedies Cumulative.** The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise, except to the extent expressly provided in Section 9.02 to the contrary.

**Section 12.18 Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by email or other means of Electronic Transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

(SIGNATURE PAGE FOLLOWS)

43